Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                          MIAMI DIVISION
3
                     CASE NO. 1:22-cv-21004-DPG
4
5
     JESSICA GUASTO,
6
7                      Plaintiff,
8    vs.
9
     THE CITY OF MIAMI BEACH, FL,
10   a Florida municipality,
11
                       Defendant.
12   _____/
13
14
                           2 South Biscayne Boulevard
15                         Miami, Florida
                           Tuesday, February 6, 2024
16                         9:00 a.m. to 3:00 p.m.
17
18
       VIDEOTAPED DEPOSITION OF JESSICA SALABARRIA (GUASTO)
19
20         Taken before Marlene Gutierrez, Notary
21   Public, State of Florida at Large, pursuant to Notice
22   of Taking Deposition filed in the above cause.
23
24                       - - - - - -
25

Page 2

```
1  APPEARANCES:
2     PAUL A. DARAGJATI, ESQ.
       ROSE DARAGJATI, ESQ.
3     Paul A. Daragjati, PLC
       4745 Sutton Park Court
4     Suite 503
       Jacksonville, Florida 32224
5     paul@daragjatilaw.com
       On behalf of the Plaintiff.
6
7
       MICHAEL L. ELKINS, ESQ.
8     MLE Law
       1212 Northeast 16th Terrace
9     Fort Lauderdale, Florida 33304
       melkins@mlelawfirm.com
10    On behalf of the Defendant.
11
       HENRY J. HUNNEFELD, ESQ. (Via Zoom)
12    BENJAMIN J. BRAUN, ESQ.
       City of Miami Beach
13    1700 Convention Center Drive
       Fourth Floor
14    Miami Beach, Florida 33139
       henryhunnefeld@miamibeachfl.com
15    On behalf of the Defendant.
16
17
18    ALSO PRESENT:
19    JAVIER ORDONEZ, Videographer
20
21         - - - - - -
22
23
24
25
```

Page 3

```
1              I N D E X
2
   Witness
3
   JESSICA SALABARRIA (GUASTO)
4
   Direct Examination By Mr. Elkins        5
5
6
7
         DEFENDANT'S EXHIBITS
8
9  Number     Description           page
10 Exhibit 1   charge of discrimination     39
11 Exhibit 2   settlement agreement         41
12 Exhibit 3   photo from Instagram         61
13 Exhibit 4   charge of discrimination     74
14 Exhibit 5   charge of discrimination     107
15 Exhibit 6   plaintiff's responses to     111
                interrogatories
16
   Exhibit 7   settlement agreement        128
17
18
19
20
21
22
23
24
25
```

Page 4

```
1       THE VIDEOGRAPHER:  Good morning.  We are going
2  on the record at 8:58 a.m. on February 6th, 2024.
3  This is media unit 1 of the video-recorded
4  deposition of Jessica Guasto taken by counsel in the
5  matter of Jessica Guasto v. City of Miami Beach.
6  The location of this deposition is 2 South Biscayne
7  Boulevard in Miami, Florida.
8  My name is Javier Ordonez.  I am the videographer.
9  The court reporter is Marlene Gutierrez.  And we are
10 both here with the firm Veritext.
11 Will counsel please introduce themselves for the
12 record, after which the court reporter will swear in
13 the witness.
14     MR. DARAGJATI:  Paul Daragjati and Rose
15 Daragjati on behalf of Jessica Guasto, the
16 plaintiff.
17     MR. ELKINS:  Michael Elkins on behalf of the
18 City of Miami Beach, and appearing via Zoom, Henry
19 Hunnefeld and Benjamin Braun from the city
20 attorney's office.
21     THE COURT REPORTER:  Ma'am, would you raise
22 your right hand, please.
23
24
25
```

Page 5

```
1  Thereupon --
2        JESSICA SALABARRIA (GUASTO)
3  was called as a witness by the Defendant and, having
4  been first duly sworn, and responding, "Yes," was
5  examined and testified as follows:
6         DIRECT EXAMINATION
7  BY MR. ELKINS:
8    Q  Good morning.
9    A  Good morning.
10   Q  How do you want me to address you?  Is it
11 Mrs. Guasto or Ms. Guasto?
12   A  Jessica Guasto or Salabarria is fine, because I
13 recently just got my name changed back to Salabarria.
14   Q  Okay.  So we'll talk about that in a little bit.
15     Have you ever given a deposition before?
16   A  Yes.
17   Q  Okay.  When?
18   A  In criminal court, for cases where I've arrested
19 defendants.
20   Q  How many times have you been deposed?
21   A  Off the top of my head, I don't have a number.
22   Q  Best guess.
23   A  I don't have a number.
24   Q  Have you ever been deposed in a civil case?
25   A  No.
```

2 (Pages 2 - 5)

Page 6

1    Q   Okay.  So civil depositions might be a little
2  bit different, so I'm going to go over a few ground
3  rules for today.  Hopefully, it'll make this go a
4  little bit faster.
5        The first rule is that even though you're on
6  video today, we have a court reporter here who's taking
7  down everything we say, so you have to give audible
8  answers.  You can't nod your head or, like, say "mmm"
9  and "ah."  Do you understand that?
10   A   Okay.
11   Q   The second rule, probably the most important
12  one, and definitely the one we both have to follow, is
13  that the court reporter can't take down two people
14  talking at the same time.  So we both have to do our
15  best to not talk over each other.  I know at points
16  you're probably going to be able to anticipate the
17  answers to some of my questions and you might have the
18  urge to just answer, but I'm going to ask that you try
19  to refrain from doing that.  By the same token, I am
20  going to try to refrain from interrupting you or
21  cutting you short or doing anything like that, which
22  will make life a lot easier for all of us.
23       Do you understand that?
24   A   I understand.
25   Q   Okay.  At no point today in any of my questions,

Page 7

1  no matter what I ask you, am I asking you to tell me
2  what you spoke to your lawyer about in any context.  So
3  for every question I ask, do not reveal to me anything
4  that you spoke to your lawyer about, even if the
5  question -- if answering it would require you to tell
6  me what you talked to your lawyer about, I'm not asking
7  that.  And I'm sure your lawyer will jump in and make
8  sure that you don't do that, but I just want to be
9  clear.
10       Do you understand that?
11   A   I understand.
12   Q   Okay.  Did you do anything to prepare for this
13  deposition?
14   A   Yes.  With my attorney.
15   Q   Okay.  And did you meet with your attorney?
16   A   Yes.
17   Q   When did you meet with him?
18   A   I met with him on several dates.
19   Q   Okay.  What were the dates?
20   A   Off the top of my head, one was yesterday, and
21  then subsequent to that, a few days before this
22  deposition.
23   Q   How long did you meet with him yesterday?
24   A   Off the top of my head, I don't have the
25  approximate time, but it was lengthy.

Page 8

1    Q   Okay.  Was it more or less than two hours?
2    A   I don't remember.
3    Q   More or less than four hours?
4    A   I don't remember.
5    Q   Okay.  Did you review any documents in
6  preparation for this deposition?
7    A   Yes, we did.
8    Q   Did you independently review any documents?
9    A   Yes, I did.
10   Q   Okay.  Tell me what documents you independently
11  reviewed.
12   A   So I reviewed my EEOC complaints.  I reviewed
13  the court complaints.  I reviewed the -- the documents
14  that were submitted from the city, with allegations, as
15  well as the letter that the chief wrote to -- to --
16  to -- I forgot the word -- basically the letter that he
17  wrote when he subsequently removed -- separated me from
18  the city.
19       I'm sorry about that.
20   Q   It's okay.
21       What else, if anything?
22   A   Just other documents.  I don't know on the top
23  of my head.
24   Q   Okay.  And I asked you earlier, you know, how
25  you prefer to be addressed, and you mentioned that you

Page 9

1  just recently had your name changed back to Salabarria;
2  is that correct?
3    A   That is correct.
4    Q   So you recently divorced?
5    A   Yes.
6    Q   When did you get divorced?
7    A   I believe it was in June of last year.
8    Q   June of 2023?
9    A   Yes.
10   Q   Okay.  Okay.  And have you talked with Mr. Nick
11  Guasto about this case since the divorce?
12   A   No.
13   Q   Okay.  Are you currently working?
14   A   No.
15   Q   Where were you last employed?
16   A   I was last employed with Opa-locka Police
17  Department.
18   Q   Okay.  When -- what were the dates of those --
19  that employment?
20   A   October of 2023 till November of 2023.
21   Q   What was your role there?
22   A   Police officer.
23   Q   What was your rate of pay?
24   A   Approximately 40,000 a year.
25   Q   And who was your direct supervisor?

3 (Pages 6 - 9)

Page 10

1    A  My direct supervisor was Lawrence Holborow.
2    Q  How do you spell his last name?
3    A  H-O-L-B-O-R-O-W.
4    Q  And why do you no longer work there?
5    A  Because I was separated from Opa-locka.
6    Q  Why?
7    A  An incident occurred in Opa-locka, and since I
8  was on probation, they didn't give me a reason and they
9  separated me.
10    Q  What was the incident?
11    A  The incident was a complaint.
12    Q  What was the complaint?
13    A  The complaint was me complaining about an
14  officer who stepped on my shoe, unwarranted and
15  unwanted.  And I brought it up to my chain of command,
16  and subsequent to that, I was separated.  And he also
17  spoke to me in derogatory manners.  So I let my chain
18  of command know, and subsequent to that, I was
19  separated.
20    Q  I'm not ignoring you.  I'm just taking notes.
21    A  That's fine.
22    Q  So I apologize for the delay.
23       Okay.  Let me go back to that.  You said that an
24  officer stepped on your shoe?
25    A  Yes.  Intentionally and purposefully.

Page 11

1    Q  Like in an attempt to hurt you?
2    A  I don't know what his intention was, but I know
3  that it was unwarranted and unwanted.  And I -- and it
4  was inappropriate.
5    Q  Did he like slam his foot down on your shoe?
6  Was it -- I'm just trying to get a little bit more
7  detail on exactly what you mean by stepped on your
8  shoe.
9    A  Yes.  He walked up to me and stepped on my shoe.
10  His intention, I don't know, but I told him to cease.
11  I --
12    Q  Like -- I'm sorry.  Continue.  I apologize.
13    A  I told him to cease, and I said it was
14  inappropriate.  And I brought it up to my chain of
15  command.
16    Q  Did he do it, like, violently?
17    A  Yes.
18    Q  Okay.  And what's his name?
19    A  I don't remember his first name.
20    Q  What's his last name?
21    A  His last name is -- give me a second, because I
22  don't --
23    Q  Take your time.
24    A  I worked -- I barely worked with him, so I don't
25  remember his name right now.

Page 12

1    Q  You don't remember his first or last name?
2    A  I believe -- I don't remember for sure his first
3  name, but his last name is -- starts with an L, like
4  Lafore or Lafavore, one of those two.
5    Q  Was he an officer or a sergeant or a lieutenant?
6    A  He was an officer.
7    Q  Okay.  And so you made a complaint about this
8  officer -- we'll call him Lafave for purposes of the
9  deposition -- to your chain of command about him, as
10  you described, violently stepping on your foot?
11    A  Yes.
12    Q  And then you also said he spoke to you in a
13  derogatory manner; is that right?
14    A  Yes.  When I --
15    Q  What did he do?
16    A  -- told him to cease.
17    Q  What did he say?
18    A  He said a lot of profanity.
19    Q  Okay.  And who did you complain to?
20    A  I complained to my lieutenant, which was
21  Lieutenant Holborow.
22    Q  Did you file like a formal complaint?
23    A  I did, yes.
24    Q  Okay.  Make sure to let me finish the question.
25    A  I'm sorry.

Page 13

1    Q  That's okay.  It's just because she can't take
2  us down talking at the same time.  So we just have to
3  be super careful, because she's the most important
4  person in this room, the court reporter.  I know you're
5  not doing it on purpose.
6       So let me ask again.  Did you file a formal
7  complaint?
8    A  Yes, I did.
9    Q  What's that called at Opa-locka?  Is there a
10  name?
11    A  There was no name.  I just filed a complaint and
12  sent it up my chain of command through my lieutenant.
13    Q  And was this in November of 2023?
14    A  Yes.
15    Q  And how long is the probationary period for a
16  police officer at Opa-locka?
17    A  I believe a year.
18    Q  And you said earlier, though, that they let you
19  go because you were within your probationary period?
20    A  Yes.
21    Q  But if you were let go in -- okay.  I see.  So
22  it was not a long period of time that you worked there?
23  It was --
24    A  That is correct.
25    Q  -- one month.

Page 14

1    I was thinking it was over a year, but
2 October 2023 to November 2023 is a month.
3      So you make this complaint, and they don't --
4 instead of doing anything about it, they just
5 terminated you?
6    A  Yes.
7    Q  And they didn't give you a reason why?
8    A  No.
9    Q  How long after you made the complaint did they
10 let you go?
11   A  Between a week to two weeks.
12   Q  Okay.  Have you filed any kind of complaint
13 against Opa-locka --
14   A  No.
15   Q  -- an EEOC charge or anything?
16   A  No.
17   Q  Are you planning to?
18   A  I filed for a hearing.
19   Q  With?
20   A  With the city.  Because there was no
21 investigation.  There was no -- my complaint went
22 unheard.  There was no due process.  There was no steps
23 that they took to remedy my complaint or to investigate
24 my complaint.  And so I filed with the city for a
25 hearing, and I'm waiting on that.

Page 15

1    Q  When you say filed with the city for a hearing,
2 is that like under their personnel rules?
3    A  Yes.
4    Q  Is it like -- make sure you don't interrupt.
5 I'm sorry.  Again, it's going to make her job a lot
6 easier.
7      You're saying you filed for a hearing under,
8 like, the personnel rules or the civil service rules?
9    A  Yes.
10   Q  Was it -- do you know if it's civil service
11 rules or personnel rules?
12   A  I believe it's the personnel rules.
13   Q  Okay.  When's that hearing taking place?
14   A  I don't have a date.
15   Q  Okay.  And I presume at that point, you were not
16 part of the union or part of the -- didn't have any
17 rights under the union or the collective bargaining
18 agreement, correct?
19   A  That is correct.
20   Q  And what's the union over there?  Is it FOP or
21 PBA?
22   A  PBA.
23   Q  Okay.  So they obviously didn't take any action
24 on this?
25   A  No.

Page 16

1    Q  Okay.  Have you looked for employment since
2 November of 2023?
3    A  Yes.
4    Q  Okay.  Where have you sought employment?
5    A  I looked through employment through Indeed, and
6 I've applied to various jobs.
7    Q  What jobs?
8    A  It varies from jobs with education, with
9 director of security, with private sector jobs --
10   Q  Can you --
11   A  -- just anything that has to do with public
12 administration.
13   Q  Name for me the companies that you've applied
14 for employment with since your separation in November
15 of 2023.
16   A  So from the top of my head, I recollect one,
17 which is Florida Commission of Offenders.
18   Q  What is that?
19   A  That is a review of documentations of offenders
20 where they're requesting for clemency or to be put on
21 probation.  And you're an investigator that reviews
22 their -- their request, and you send up a report
23 through your chain, through the Florida Commission.
24   Q  What's the job that you applied for there?
25   A  As an investigator.

Page 17

1    Q  When did you do that?
2    A  About a month ago.
3    Q  And how did you do it?  Like online?  Did you --
4    A  Through Indeed.
5    Q  Through Indeed.
6      What other companies did you apply for
7 employment at?
8    A  A lot of companies.  I can't name them off the
9 top of my head.
10   Q  Can you name any of them besides this one?
11   A  No.
12   Q  So just so I got it straight, from November 2023
13 till present day, you can only remember one company
14 that you've applied for employment with?
15   A  Yes.
16   Q  Okay.  Are there records through Indeed of the
17 companies that you've applied for employment with since
18 November 2023?
19   A  Yes.
20   Q  And where are those records?
21   A  If I log on, they're there, probably.  I don't
22 know how long they keep the records.
23   Q  Did you independently keep any records?
24   A  No.
25   Q  So if they're not stored in Indeed, then they

5 (Pages 14 - 17)

Page 18

1  don't exist?
2    A   I don't know how Indeed works.
3    Q   You understand, though, that because of your
4  lawsuit, you're under a duty to preserve documents,
5  correct?
6    A   Yes.
7    Q   And you know that you have a duty to mitigate
8  your damages, right?
9    A   Yes.
10   Q   And you understand that applications for
11 employment are evidence, potentially, of your
12 satisfaction or nonsatisfaction of that duty, right?
13   A   Yes.
14   Q   And you're not saving the -- your job
15 applications?
16   A   Like I said, I do it through Indeed.  It doesn't
17 give you an option to download them.  It goes directly
18 to the employer.
19   Q   Have you kept any lists?
20   A   No.
21   Q   So other than Indeed, for November 2023 going
22 forward, there's no other record of where you've
23 applied for employment?
24   A   As far as the date -- which dates are you asking
25 me?  Because you --

Page 19

1    Q   November 2023 --
2    A   Okay.
3    Q   -- forward.
4    A   November 2023, that is the only place that I
5  have applied, which is the Florida Commission.
6    Q   That's the only job you've applied for?
7    A   I'm sorry.  That's the only job that I remember
8  that I -- that I have the name of.  But there has been
9  various through Indeed.  You just go through the list
10 and you apply to the ones that you seem interested in.
11 And the list is there.  It's 50, 60 jobs.
12   Q   And of those 50 or 60 jobs, you can't remember a
13 single other one?
14   A   They're usually through directors of security,
15 public safety.  I don't have the name.
16   Q   Okay.  Did you do any other type of job
17 applications or job searches from November 2023
18 forward, or just through Indeed?
19   A   It has been just through Indeed.
20   Q   No recruiter of any kind?
21   A   No.
22   Q   Okay.  Where did you work before Opa-locka
23 Police Department?  What was the job right before that?
24   A   I worked at Brickell City Centre as a director
25 of security.

Page 20

1    Q   Is that the name of the company, Brickell City
2  Centre?
3    A   Yes.
4    Q   What were the dates of employment there?
5    A   So it was March of 2023 till, I believe, August
6  of 2023.
7    Q   What was your rate of pay there?
8    A   It was salary, and it was about 80,000 a year.
9    Q   How much did you earn when you were working
10 there, total, if you remember?
11   A   I don't recall.
12   Q   Okay.  Who was your supervisor?
13   A   My supervisor is Michael Serrano -- was Michael
14 Serrano.
15   Q   S-E-R-R-A-N-O?
16   A   Yes.
17   Q   Okay.  And why did you not work there anymore?
18 What happened?
19   A   So there was an incident that occurred where a
20 violent male subject assaulted myself and another
21 security guard while carrying out our duties as
22 security officers.  And subsequent to that, he was
23 arrested for a felony and convicted.  And he pled and
24 he has -- he's providing a letter of apology as well as
25 completing alcohol and drug abuse courses as part of

Page 21

1  his plea.
2        And so during that incident that occurred,
3  subsequent to that, the director of the mall asked for
4  me to be removed from -- from the director of security
5  position because of the incident that occurred, even
6  though the subject was arrested.  I followed all
7  procedures, and I carried out my duties.  And you're an
8  at-will employee at that point.  And I have all the
9  evidence and reports and videos that show the assault.
10 And he was arrested, and he wrote me a letter of
11 apology.
12   Q   Okay.  You said a lot there, which I appreciate,
13 so I'm going to back up and try to break that down a
14 little bit and make sure that I understand it.
15       First of all, you said the director of the mall
16 asked that you be removed?  Did I hear that right?
17   A   Yes.
18   Q   What's the name of the director of the mall?
19   A   His name is Dave Johnson.
20   Q   Dave Johnson.
21       And I'm sorry, one thing I forgot to cover
22 earlier -- and I should have said this at the
23 beginning.  A couple of basic things.  One, if you need
24 a break at any time, just let me know.  This is not
25 intended to keep you sitting there as long as possible.

6 (Pages 18 - 21)

Page 22

1 So you can take a break whenever you need. I just ask
2 that you not take a break when there's a question
3 pending, and obviously, don't speak to your counsel
4 about your testimony on any break.
5     Do you understand that?
6 A  Yes.
7 Q  And, of course, if I ask a question and you
8 don't understand the question or you need me to clarify
9 it, absolutely ask me to do so.
10     Do you understand that?
11 A  Yes.
12 Q  Okay. I'm sorry I didn't tell you that earlier.
13     So when did this incident happen?
14 A  It happened around September or August, either
15 early August or late September. I don't recall the
16 exact date.
17 Q  Well, you said you only worked there until
18 August.
19 A  Yes.
20 Q  So the incident wouldn't have happened in
21 September, right?
22 A  I'm sorry. Yes. So it had to be either in the
23 beginning of August -- so somewhere between July, like
24 late July, and early August.
25 Q  Okay.

Page 23

1 A  I don't have the date on top of my head.
2 Q  And the incident involved like a customer at the
3 mall; is that right?
4 A  Yes.
5 Q  Who was apparently on drugs and alcohol and was
6 violent?
7 A  Yes.
8 Q  And then you and other officers interacted with
9 this individual?
10 A  Yes.
11 Q  Who were the other officers with you?
12 A  It was another security officer. His name is
13 Dwight Cruz.
14 Q  And what did the -- what's the name of the
15 individual who was, you know, on drugs and alcohol and
16 all that? What's his name?
17 A  I don't know his name off the top of my head,
18 but I have it with me.
19 Q  You have it with you?
20 A  I'm sorry. I have it in my records.
21 Q  Okay. And what records do you have of this?
22 A  Just a copy of the plea and the apology letter
23 that I'm waiting for.
24 Q  So this individual is violent at the mall, and
25 you interact with him with another security guard. And

Page 24

1 what do you -- what do you guys do?
2 A  We basically intervened, because that was our
3 duty to do so, and we attempted to escort the
4 individual out of the mall. And he decided to get
5 physical with the officer and I, and he struck me
6 several times. And subsequent to that, the police came
7 and arrested him. And that was the extent of the
8 incident. It was captured on CCTV, and the officers
9 had probable cause to arrest him. And he was taken and
10 transported to jail. The state attorney upped it to a
11 felony, and he pled.
12 Q  He pled to the felony?
13 A  Yes.
14 Q  So why is it or what was the reason that
15 Mr. Johnson asked for your removal?
16 A  I don't know.
17 Q  Well, tell --
18 A  I know that I was at will. I don't know if that
19 incident was something that -- I don't know. I don't
20 know the question to that. I just know that I did my
21 job and I did what I had to do, and I became a victim
22 of this belligerent male that was causing a scene and
23 assaulting myself and another officer.
24 Q  When you say you became a victim of this male,
25 the guy who was drunk -- we'll call him the consumer at

Page 25

1 the mall -- you mean because he struck you, or
2 because --
3 A  Yes.
4 Q  -- you lost your job, or both?
5 A  Both. But he did strike me. And subsequent to
6 that, because of that incident, I was let go.
7 Q  Were you written up?
8 A  No.
9 Q  Were you talked to about it?
10 A  No.
11 Q  So I'm just trying to make sure I understand
12 exactly how the separation from employment occurred.
13 The incident happens, and then you go into work the
14 next day, several days later, and they just tell you,
15 We're going to terminate your employment?
16 A  Yes. So what occurred was, after the incident,
17 I tried to speak to the director of security about the
18 incident, and he never got back with me. And then a
19 few days later, I was told that they're moving in a
20 different direction with another director.
21 Q  The director of security is Dan or Michael?
22 A  Dave.
23 Q  Dave. Sorry. Yes. Dave Johnson.
24 A  Yes.
25 Q  Was there a problem with the incident that

7 (Pages 22 - 25)

Page 26

1 caused you to want to talk to the director of security
2 about it?
3   A  Well, it's my job to have a meeting with him
4 about the incident, because I report to him and I had
5 the duty to go over the incident with him and give him
6 details of what had occurred.  And my security and I
7 went to go speak to him and he said he was busy at the
8 moment, and he never got back to me.
9   Q  Okay.  And did you ever follow up as to why you
10 were let go?
11   A  I did not.
12   Q  Did you bring any claim or are there any pending
13 claims against Brickell City Centre for that
14 termination?
15   A  No.
16   Q  Okay.
17   A  Again, when you're at will, you really are at
18 will of the employer for any reason, that they can just
19 let you go, when it comes to the private sector.  So in
20 that case, I did my job, I completed what I had to do,
21 this individual was arrested, and I did nothing wrong.
22   Q  Why do you believe you were let go?
23   A  I don't know.
24   Q  Okay.  And where did you work before Brickell
25 City Centre?

Page 27

1   A  I worked at Miami Dade College as a public -- a
2 public safety director.
3   Q  One second.  I have a quick question, going back
4 to Brickell City Centre.  Maybe I didn't hear you
5 correctly, but I thought your job title was director of
6 security.
7   A  So, yes, but there's a director of the mall that
8 oversees me as a director of security.
9   Q  Okay.  Can you just break down for me like
10 the -- kind of the org chart of how that works.
11   A  So the director of the mall is in charge of the
12 structure of the mall, any projects, as well as the
13 director of security, whoever that may be.  So he's
14 basically an added layer.
15   Q  And so where do you fit, if we have the director
16 of -- Dave Johnson is the director of mall security?
17   A  He's the director of the entire mall, like the
18 property manager.
19   Q  Okay.  I see.  And then where does Michael
20 Serrano fit in this hypothetical chart?
21   A  He is -- he would be my supervisor.
22   Q  And what's his title -- or what was his title?
23   A  An account manager.
24   Q  His title was account manager?
25   A  Yes.

Page 28

1   Q  What does that mean?
2   A  So, basically, he provides security officers to
3 the mall for us to -- to hire and interview.  He
4 provides our security officers.
5   Q  Like through third parties?
6   A  Yes.
7   Q  So you worked directly for Brickell City
8 Centre --
9   A  Yes.
10   Q  -- which is a company, I take it?
11   A  Yes.
12   Q  Okay.  And then the -- are you saying that the
13 security guards that worked underneath you are
14 contracted through a third-party company?
15   A  Yes.
16   Q  Okay.  And so was there anybody else above you
17 besides Mr. Serrano?
18   A  Dave Johnson.
19   Q  Right.  I mean between -- between you and
20 Mr. Serrano.
21   A  No.
22   Q  Okay.  So it would go Dave Johnson, who's
23 basically in charge of the whole mall, like the
24 property manager?
25   A  Yes.

Page 29

1   Q  Then Michael Serrano, and then you, in the
2 context of security?
3   A  Yes.
4   Q  And your title was director of security?
5   A  Yes.
6   Q  How many directors -- other directors of
7 security were there?
8   A  It was myself and two assistants.
9   Q  Was anyone else let go as part of that incident
10 that you described?
11   A  No.
12   Q  Just you?
13   A  Yes.
14   Q  Okay.  Okay.  And you said you worked at Miami
15 Dade College?
16   A  Yes.
17   Q  Okay.  When did you work there?
18   A  In May of 2022 till January of 2023.
19   Q  And what did you earn there?  What was your
20 salary?
21   A  About 60,000 a year.
22   Q  Who was your supervisor?
23   A  My supervisor was Nelson -- I don't know how to
24 pronounce his last name, but it starts with an
25 M-A-G-N-A, like Magana.

8 (Pages 26 - 29)

Page 30

1   Q   That's fine. I'm sure the court reporter
2   prefers you spell it out --
3   A   Okay.
4   Q   -- so it's easier.
5       And what was your job title?
6   A   Public safety director.
7   Q   And why did you leave Miami Dade College?
8   A   For the opportunity to work at Brickell City
9   Centre, because the monetary salary was not enough for
10  me to pay my bills.
11  Q   So you resigned?
12  A   Yes.
13  Q   Were you ever disciplined at Miami Dade College?
14  A   No.
15  Q   No write-ups? No verbal counselings? Nothing
16  like that?
17  A   No.
18  Q   Is there a reason you had a two-month break
19  between Miami Dade College and Brickell City Centre?
20  A   Waiting for Brickell City Centre to approve
21  my -- my hiring.
22  Q   So you resigned from Miami Dade College before
23  you were approved to work at Brickell City Centre?
24  A   Yes, but I knew that I was going to get the job.
25  Q   How did you know?

Page 31

1   A   Because they had told me. It was just a matter
2   of getting everything through HR and submitting the
3   paperwork. It was a process, and they kept delaying my
4   start date.
5   Q   Any idea why?
6   A   I don't know.
7   Q   Okay. And where did you work before Miami Dade
8   College?
9   A   The Miami Beach Police Department.
10  Q   Okay. And your employment at City of Miami
11  Beach ended January 2021, correct?
12  A   That is correct.
13  Q   Okay. So you didn't work anywhere or did you
14  work anywhere between January 2021 and May 2022?
15  A   So I had, here and there sporadically, a private
16  investigator's job, but that wasn't a -- a fixed income
17  or a -- those jobs just came here and there whenever
18  they needed an investigator.
19  Q   Who is "they"?
20  A   When the company needed an investigator.
21  Q   What company?
22  A   GPS Security.
23  Q   Okay. So you worked as a contractor for GPS
24  Security, or were you a W-2 employee?
25  A   I believe a W-2 employee. I was a private

Page 32

1   investigator, and whenever they had cases, they would
2   assign it to me, if I wanted to take them, or if they
3   had -- or if they needed several investigators. But
4   they had a lot of investigators that were senior to me,
5   so the jobs that I got were few, far, and between.
6   Q   So from January 2021 until May of 2022, you
7   worked as a private investigator for GPS Security. Do
8   I have that right?
9   A   Yes.
10  Q   But you were not working full-time; is that
11  correct?
12  A   I only worked whenever they had a case.
13  Q   Okay. How many cases did you work on for them?
14  A   A few. I don't know by the top of my head.
15  Q   More than ten or less than ten?
16  A   More than ten.
17  Q   More than 50?
18  A   I don't recall.
19  Q   How were you paid?
20  A   Through direct deposit.
21  Q   I understand that. But were you paid as a --
22  per job, per hour, per salary? Was it a salary? Like,
23  what was the way you were paid?
24  A   Per hour.
25  Q   And what was the rate of pay per hour?

Page 33

1   A   Depending on what the client wanted to pay the
2   company. So between $20 an hour to $30 an hour. It
3   depends on how much the client wanted to pay.
4   Q   Do you remember how much you earned from GPS
5   Security?
6   A   I don't know.
7   Q   Okay. Did you have benefits with them?
8   A   No.
9   Q   How about with Miami Dade College? Did you have
10  benefits?
11  A   Yes.
12  Q   What were the benefits?
13  A   Health and dental.
14  Q   Anything else?
15  A   I don't remember now.
16  Q   You don't remember if there was a 401(k) or
17  anything like that?
18  A   401(k), there was.
19  Q   Did you contribute?
20  A   I don't know.
21  Q   Okay.
22  A   I believe it was automatic, but I didn't look
23  into it.
24  Q   And then how about with Brickell City Centre?
25  A   Health and dental, and I believe 401(k).

9 (Pages 30 - 33)

1   Q   Did you contribute to that?
2   A   Again, I think it's automatic.  They
3 automatically take it from your check.
4   Q   You think they automatically take a 401(k)
5 contribution?
6   A   I think so.
7   Q   Okay.
8   A   I'm not a hundred percent sure.
9   Q   Would that be reflected in your paychecks, if
10 they did or didn't?
11   A   It should.  I don't know.
12   Q   How about with Opa-locka Police Department?
13 What were the benefits there?
14   A   I didn't have any, because I was on probation.
15   Q   So no health, no dental, obviously no pension?
16   A   Correct.
17   Q   Okay.  And so sitting here today, just going
18 back so we can wrap this part up, you're currently
19 unemployed, correct?
20   A   That is correct.
21   Q   When's the last time you went on a job
22 interview?
23   A   About a week, two weeks ago.
24   Q   Where did you interview?
25   A   At the Florida Commission --

1   Q   Okay.
2   A   -- which I'm in the hiring process.  So I will
3 be getting that -- that job, from what I was told.
4   Q   Who told you that?
5   A   The hiring director.
6   Q   Any idea when it starts?
7   A   I believe late in February.
8   Q   And what's the job title, again?
9   A   Investigator.
10   Q   And what's the rate of pay?
11   A   I believe it is 44,000 a year.
12   Q   Is that here in South Florida?
13   A   Yes.
14   Q   Any benefits?
15   A   Not until you pass probation.
16   Q   How long is that?
17   A   A year and a half.
18   Q   That's a long probationary period.
19   A   It's a private company.
20   Q   And should you pass the probationary period,
21 what are the benefits then?
22   A   Health, life insurance, and I believe dental.
23       MR. ELKINS:  Okay.  I have to use the restroom
24 again, so let's take five.
25       THE VIDEOGRAPHER:  The time is 9:35 a.m.  We're

1 going off the record.
2       (A break was taken from 9:35 a.m. to
3       9:42 a.m.)
4       THE VIDEOGRAPHER:  The time is 9:42 a.m.  We're
5 back on the record.
6 BY MR. ELKINS:
7   Q   Just a brief follow-up on Miami Dade College.  I
8 just want to confirm, you were never written up there?
9   A   No.  Not from what I recall, no.
10   Q   And you never received any kind of counseling or
11 anything?
12   A   No.
13   Q   And you didn't resign in lieu of termination?
14   A   No.
15   Q   Never had any disciplinary issues there?
16   A   No.
17   Q   Okay.  Great.
18       Okay.  What was your first role at the City of
19 Miami Beach?
20   A   I was a police officer.
21   Q   Okay.  And when were you hired?
22   A   January of 2020 -- I'm sorry.  January 2012.
23   Q   Okay.  Do you remember who did your interview?
24   A   We did not have an interview.
25   Q   Okay.  How did you get hired?

1   A   Through the background investigator.
2   Q   Okay.  And what was your -- what was your
3 first -- who was in your chain of command when you
4 first started working there?
5   A   My first chain of command?  I don't know.  This
6 was over ten years ago.  I don't know.
7   Q   Okay.  Were you eventually promoted?
8   A   Yes.
9   Q   When were you promoted?
10   A   In 2017.
11   Q   Okay.  And what were you promoted to?
12   A   To sergeant.
13   Q   Who promoted you?
14   A   The City of Miami Beach.
15   Q   Obviously.  Which person was in charge that --
16 that promoted you?
17   A   So it's a test that you take.  It's not up to
18 any person.
19   Q   Who was the chief then?
20   A   The chief was Daniel Oates.
21   Q   Did anything happen with your promotion to
22 sergeant?
23   A   Can you be specific.
24   Q   Were you able to successfully complete your
25 probationary period as sergeant?

Page 38

1   A   I did complete my probationary period.
2   Q   Was there ever a grievance filed over that?
3   A   Yes, there was.
4   Q   What was that grievance about?
5   A   So it was a grievance regarding wrongful
6   termination by the city.
7   Q   Okay.  Can you be more specific.
8   A   Is there a specific question that you can ask
9   me?
10  Q   Can you be more specific about the subject
11  matter of your grievance regarding your probationary
12  period as a sergeant.
13  A   So the grievance was because the chief at the
14  time said it -- he had demoted me over performance
15  issues.  However, there was no documentation of any
16  type of performance issues.  In fact, all of my
17  lieutenants said that I was passing my performance
18  satisfactorily.
19      So when the union brought this to Daniel Oates's
20  attention, he switched his statement, or story, on why
21  he was demoting me and said it was because I was a
22  subject of an internal affairs investigation.  And so
23  the union said that there was another male officer who
24  had just gotten promoted to sergeant that was also
25  under an internal affairs investigation and he was not

Page 39

1   demoted.  So the chief's decision to demote me was
2   unjust, and he didn't have a reason to demote me.
3   Q   What was the result of that grievance?
4   A   I settled with the city to get my promotion
5   back, with seniority and no back pay.
6   Q   Did you also file an EEOC charge?
7   A   I did.
8   Q   Okay.  So I'm going to show you what I'm going
9   to mark --
10      MR. ELKINS:  Can everybody see the document?
11      MR. DARAGJATI:  Yeah.
12      MR. ELKINS:  That's a success.
13  BY MR. ELKINS:
14  Q   I'm going to show you what I'm going to mark as
15  Exhibit 1.
16      MR. ELKINS:  I'll -- Madam Court Reporter, I'll
17  just either put the documents in the -- well, I'll
18  email them to you, since you don't have the chat.
19      (Defendant's Exhibit 1 was marked for
20      identification.)
21  BY MR. ELKINS:
22  Q   Have you ever seen this document before?
23  A   Yes, I have.
24  Q   What is this document?
25  A   It's my EEOC complaint.

Page 40

1   Q   Okay.  One second.  My pen's not working.
2       Okay.  What was the basis of your EEOC charge?
3   A   The basis of the EEOC charge is the fact that --
4   again, the chief at the time said that he was demoting
5   me because I did not meet probation due to performance
6   issues.  Mind you, he demoted me shy of a few days of
7   me passing my probation.  And my lieutenants that I was
8   working for at the time stated that there was no
9   performance issues and that I was, indeed, meeting
10  performance standards and that I was going to
11  successfully pass my probation.
12      So then he switched the reasoning for why he was
13  demoting me, to the fact that there was an open
14  internal affairs case at the time over a call for
15  service that occurred in my shift involving other
16  officers, and I was the sergeant during that incident.
17  And so he said it was because there was an open
18  internal affairs investigation.  However, there was a
19  male sergeant who was in the same position as me, where
20  he was under an internal affairs investigation, the
21  case was being reviewed by the state attorney's office,
22  and he was not demoted.  So I believe, and the union
23  believed, which they filed a grievance, that I was
24  retaliated based on my sex and based on the fact that I
25  was a female.

Page 41

1   Q   So you believe that Chief Oates discriminated
2   against you on the basis of your gender?
3   A   That is correct.
4   Q   Okay.  And do you still believe that today?
5   A   I still believe that today.
6   Q   Okay.  And so I'm going to show you what I'm
7   going to mark as Exhibit 2.
8       MR. ELKINS:  Can everybody see that?
9       (Defendant's Exhibit 2 was marked for
10      identification.)
11  BY MR. ELKINS:
12  Q   Have you seen this document before?
13      Sorry.  I didn't mean to keep scrolling.
14  A   Yes.
15  Q   Okay.  What is this document?
16  A   The settlement agreement for 2019, I believe.
17  I -- I don't know which document this is.
18  Q   Well, it's for your -- it says union grievance
19  number 2018-11.
20  A   Okay.
21  Q   That was the grievance, I believe, that you
22  filed relating to your promotional status as a
23  sergeant --
24  A   Okay.
25  Q   -- correct?

11 (Pages 38 - 41)

1    And then it also talks about your EEOC charge,
2 EEOC charge number 510-2018-06495.  Do you see that?
3    A  Yes.
4    Q  Okay.  And if we look at that charge, do the
5 charge numbers match?
6    A  Yes.
7    Q  Okay.  So this is the settlement agreement for
8 both your union grievance and the EEOC charge, correct?
9    A  Yes.
10    Q  Okay.  And in this, I believe -- correct me if
11 I'm wrong -- you agreed to accept a 20-hour soft
12 suspension as discipline for the IA case, correct?
13    A  That is correct.
14    Q  And you were allowed to return to work as a
15 sergeant, with an effective start date of August 12,
16 2019?
17    A  That is correct.
18    Q  And you got retroactive pay, correct?
19    A  I didn't -- I did not get retro pay.  I got --
20    Q  It says here --
21    A  I'm sorry.  I thought it was back pay.  I got --
22 my rate went back to sergeant, and the only retroactive
23 pay that I got was -- after I signed the -- this
24 agreement, there were a few days where I still hadn't
25 been put back to sergeant, so they retroacted me for

1 those days --
2    Q  Right.
3    A  -- not for the time that I was out as a
4 sergeant.
5    Q  And then you agreed to additional probationary
6 time of six months?
7    A  Yes.
8    Q  And you had to attend FTO for one month?
9    A  Yes.
10    Q  And you were assigned a field training officer,
11 correct?
12    A  Yes.
13    Q  Okay.  And in exchange for that, you also
14 released your claims against the city, right?
15    A  Yes.
16    Q  Okay.  And so, of course, you didn't file a
17 lawsuit on either this EEOC charge or the grievance,
18 obviously?
19    A  That is correct.
20    Q  Okay.
21    A  Because at the end of the day, what was most
22 important to me was to be back as a sergeant, that I
23 worked so hard to do, and that I put all my dedication,
24 and it was wrongfully taken from me during that time.
25    And I agreed to settle this agreement because

1 all I wanted to do was just go back to being a
2 sergeant.  I didn't agree with the terms of it, but the
3 union said it was the best way to resolve this.  And by
4 that, me going back to being reinstated as a sergeant,
5 I didn't want to fight it anymore.
6    Q  When you say you didn't agree with the terms,
7 what terms did you not agree with?
8    A  Well, I didn't think it was fair for --
9    Q  Do you want me to put the document back up?
10    A  Yes, please.
11    Q  I'm sorry.  I don't want to ask you questions
12 about a document that you don't have in front of you.
13 Give me one second.
14    Can you see it?
15    A  No.
16    Q  You can't?
17    A  No.
18    MR. DARAGJATI:  I don't see it either.
19    MR. ELKINS:  Really?
20    MR. DARAGJATI:  No.
21    MR. ELKINS:  Okay.  Hold on.
22 BY MR. ELKINS:
23    Q  Oh, okay.  It says it's loading.
24    How about now?
25    A  No.

1    MR. DARAGJATI:  We see it now.
2    THE WITNESS:  I don't see it.
3    Now I see it.
4 BY MR. ELKINS:
5    Q  It says that the internet connection is
6 unstable, but we should be okay now.  Can you see it --
7    A  Yes.
8    Q  -- Ms. -- and I'll call you Ms. Salabarria.
9    A  That's fine.
10    Q  Okay.  All right.  What terms did you not agree
11 with?
12    A  So I did not agree with receiving a soft
13 suspension for that discipline IA case, because the
14 officers involved in that case didn't receive any
15 discipline with that case.  I believe that it was,
16 again, retaliatory against me and they used the fact
17 that I was -- I filed the EEOC and I was getting my
18 stripes back, getting my promotion back.  That was
19 their way of justifying why they had demoted me.
20    Q  Who is "they"?
21    A  The city.
22    Q  What other terms --
23    A  Because -- I'm sorry.
24    Q  Go ahead.  No, no, no.  My apologies.
25    A  They sent this case to the state attorney's

1 office, and the state attorney's office cleared any
2 type of wrongdoing.  And the only person that received
3 discipline with this case was me, again the only
4 female.
5    Q   What other terms do you not agree with -- or did
6 you not agree with?
7    A   Well, since I had passed my probationary period
8 and I was going to pass it -- there was no lieutenants
9 that said I was not going to pass my probationary
10 period.  I was, again, put on probation for six months,
11 and I had to go through the FTO program for a month,
12 again something that they have not done to anybody else
13 but me.
14    Q   Okay.  So you didn't agree with the FTO training
15 part?
16    A   No.
17    Q   Okay.  What other terms did you not agree with?
18       If you need me to scroll, just let me know.
19    A   No.  That's it.  I basically settled with the
20 city because what was most important to me was getting
21 my -- my rank back, that I worked very hard for.  And I
22 didn't want to continue to endure to fight the terms of
23 this agreement, and so I settled.  But what happened
24 did happen and it's -- it's something that I
25 experienced and it's my story, and I know exactly what

1 happened with this case and how I was mistreated during
2 this case.
3    Q   Do you routinely sign agreements with terms that
4 you don't agree to?  Is that common for you?
5    A   It's -- I didn't agree with it, like I said.
6 And like I said, I wanted for this to go away, in the
7 sense of I just wanted to get my promotion back, my
8 rank back, which was the most important thing to me.
9 And I felt like I had to make this sacrifice, even
10 though I didn't believe that I did anything wrong.  I
11 did it because it was the only way for me to get my
12 promotion back, even though I didn't agree with it.
13    Q   You understand, though, you obviously could have
14 fought the grievance through the grievance process
15 that's in the collective bargaining agreement, right?
16    A   Yes.
17    Q   You could've gone to arbitration, right?
18    A   Yes.  I believe those are hypothetical
19 questions.  And at the time, I did what I felt was
20 right, and I did what I felt I needed to do, because I
21 had -- I felt like I had no other avenue.  And the
22 union had spoken to the city, and they came up with
23 this offer.  And so that's why I did what I did at that
24 time.
25    Q   Respectfully, it's not a hypothetical.  I'm

1 asking you if you were able to, if you could have taken
2 advantage of the full grievance process in the
3 collective bargaining agreement.  Let me ask it another
4 way.  Were you somehow prevented from taking advantage
5 of the grievance process?
6    A   No, but when I spoke to the -- to the union
7 about this incident, about me not agreeing to these
8 terms, they said it was the only way and that that's
9 the last offer that the city was going to give.
10       And, again, I believe I answered this question
11 already.  That's what I did at that time, because what
12 was most important to me was getting back to work and
13 getting back to my rank.
14    Q   Did the union tell you they wouldn't support a
15 grievance going forward?
16    A   I don't know exactly what they told me at that
17 time, since it was a while ago, but they had mentioned
18 that it was the best thing for me to do at the moment,
19 if all I wanted back was just my promotion.
20    Q   And you weren't forced to sign this, were you?
21    A   No.
22    Q   And that's -- I'm showing you page 3.  That's
23 your signature, right?
24    A   Yes.
25    Q   Okay.  So even though you didn't agree with the

1 terms, you signed it, understanding you could've fought
2 the grievance going forward?
3    A   I understand.
4    Q   Okay.  And you certainly could've let the EEOC
5 charge play out and file a lawsuit against the city,
6 based on those allegations, couldn't you?
7    A   Again, I believe that's a hypothetical question.
8    Q   That's okay.  You have to answer those.
9    A   Okay.  I --
10    Q   Let me -- let me clarify for you, which I
11 probably should have clarified at the beginning.  You
12 basically have to answer my questions, unless your
13 lawyer instructs you not to answer based upon some sort
14 of privilege, like the attorney-client privilege.
15 Other than that, I have wide latitude to ask you
16 questions, which includes hypotheticals.  Okay?
17    A   Okay.  So what was your question, again?
18    Q   You could have fought the grievance through
19 arbitration, and you could have let the EEOC charge
20 play out and then filed a lawsuit on that basis,
21 correct?
22    A   That is correct.
23    Q   Okay.  But you voluntarily chose to sign this,
24 correct?
25    A   Yes.

13 (Pages 46 - 49)

Page 50

1   Q  Okay.

2   A  Because like I said, at the time, I felt like it

3 was the best thing for my person and for my career

4 to settle with the city, even though I didn't agree

5 with the terms.

6   Q  Okay.

7   A  And like I said, what I -- what was most

8 important to me was just getting back to work. Money

9 wasn't important to me. What was important to me

10 was -- was being reinstated to what I worked hard for

11 and what I earned myself through my dedication.

12   Q  When did you first meet Steven Cosner?

13   A  In 2014.

14   Q  How did you meet him?

15   A  I'm sorry. I believe in 2012, when I started.

16   Q  Okay. What was the nature of your relationship

17 with Mr. Cosner?

18   A  Which day are you talking about? 2012 or 2014?

19   Q  Walk me from the beginning, 2012 through '14.

20   A  So, in 2012, I had just started, and he was part

21 of the FTO postacademy scenarios. So I obviously knew

22 who he was because he participated in the scenarios,

23 but that was the extent of me knowing him back in 2012,

24 up until -- in 2014, where I had to -- I'm sorry --

25 where I bid for my shift and I ended up working on

Page 51

1 midnights with a senior squad that included Steven

2 Cosner.

3   Q  Okay. And what was the general nature of your

4 relationship? Was it friendly? Was it romantic? Was

5 it professional?

6   A  It was professional and it was friendship.

7   Q  Okay.

8   A  Again, we worked together in the same squad. I

9 tried to build a rapport with all of my squad members,

10 and I tried to maintain a good working relationship

11 with everybody that was on my squad. And when you work

12 with somebody -- I'm sorry. When you work with a squad

13 of people weekly, for hours, you start to build that

14 rapport and that acquaintance, and you become friends

15 with each other.

16   Q  Was it anything ever more than friendship?

17   A  No.

18   Q  Did you ever have sex with Mr. Cosner?

19   A  No.

20   Q  So if he testifies that you guys did have sex on

21 multiple occasions, he's lying?

22   A  Yes.

23   Q  Okay. And you never had any romantic

24 relationship with him whatsoever?

25   A  No.

Page 52

1   Q  Did he ever harass you in any way?

2   A  Yes.

3   Q  Okay. How and when?

4   A  So, in 2014, at the time, I was working

5 midnights and I was going through an unfortunate

6 incident where there was a male sergeant, a senior male

7 sergeant, that was stalking me within the city and

8 outside of the city. This male sergeant was

9 substantiated in his actions of what he was doing to me

10 while he was harassing me, and he was subsequently told

11 to resign or he would be terminated. I was going

12 through that at the moment while I was on the shift and

13 squad with Steven Cosner.

14     At the time, he, Steven Cosner, had shown

15 interest in me romantically, and I had told him that I

16 didn't want any type of romantic relationship with him.

17 He provided this grotesque greeting card to me that was

18 unwelcomed and unwanted, and I confided in other

19 individuals in my squad, as well as veteran officers,

20 about his actions. And they had told me that since I

21 was a young officer in the police department -- I was

22 22 years old when this happened. Cosner was in his

23 40s. He had a lot of tenure in the police department,

24 and a lot of influence, because he had been there for a

25 long time. So they told me to -- not to cut off my

Page 53

1 friendship with him abruptly, because he's the type of

2 person that's vindictive in his ways and he's known for

3 that. And since I had already been going through this

4 issue with the sergeant, where he had stalked me, I

5 didn't want to again bring up another incident that was

6 occurring with another male officer. So I kept him at

7 arm's length and I tried to maintain a friendship with

8 him. I told him that his advances were unwarranted and

9 I didn't want anything to do with him and -- but I told

10 him that we could maintain a friendship. Because,

11 again, I was scared. I was 22 years old. I had just

12 passed my probation. I had just started, and the last

13 thing that I wanted to do was continue to bring up

14 complaints of sexual harassment. And all I wanted was

15 for that to stop.

16     So, yes, I did maintain a friendship with him,

17 until he crossed the line and couldn't take no for an

18 answer. And when I finally told him, Listen, I am

19 dating somebody else, I'm not welcoming your advances,

20 he didn't take it well and our friendship ended

21 subsequent to that. And we never spoke again, for

22 years later. We would see each other in the hallway,

23 and he would not speak to me, he would not acknowledge

24 me, he would not look at me. And I believe he carried

25 that vendetta, that animosity, that -- for me rejecting

Page 54

1  him back in 2014, that culminated to the incident that
2  occurred in 2021 -- I'm sorry -- yes, in 2020.
3      Q   December of 2020?
4      A   December of 2020.
5      Q   Late December of 2020?
6      A   Yes.
7      Q   Okay.  So there was a lot there, so I'm going to
8  go back and go through it a little bit.
9          First of all, I just want to make sure I
10  understand.  You believe that Cosner was angry at you
11  six, almost seven years later, and --
12     A   Yes.
13     Q   Hold on.
14     A   I'm sorry.
15     Q   That's okay.
16         -- and that that's -- you're referring to the
17  allegation of officer misconduct that he wrote about
18  you in December 2020.  You believe that that is due to
19  you rejecting him in 2014?
20     A   Absolutely.
21     Q   Do you have any evidence of that?
22     A   I don't have any evidence of that, but I can go
23  over what I believe happened and his actions towards
24  me, and the fact that, like you said, all these years,
25  he would purposefully ignore me.  When he became a

Page 55

1  lieutenant, I passed him in the hallway.  I was a
2  sergeant; he was a lieutenant.  I said "good evening."
3  He ignored me.  And I can tell that that animosity was
4  still there.  He sat right behind me in the sergeant's
5  office, never said a word to me, would ignore me, would
6  not speak to me.  And that is not normal for peers to
7  be acting that way.
8          Again, after I told him I did not want to have a
9  relationship with him, he did not speak to me ever
10  again.  He was upset.  And like I said, I was there, I
11  lived it, I know what happened, and I experienced it.
12     Q   And I want to make sure I go back and unpack a
13  lot of what you talked about earlier.  But between 2014
14  and December of 2020, besides ignoring you, did he ever
15  do anything else to you?
16     A   Yes.
17     Q   What did he do?
18     A   There was an incident where he was working -- we
19  were both sergeants at the time, and there was an
20  incident where he had a -- he was working midnights and
21  I was working day shift.  I was an incoming sergeant,
22  and he was an outgoing sergeant.  So he raised me on
23  the radio to go over to channel 13, which is a
24  supervisor channel.  And in that channel, he asked me
25  to approve an A form that he had not approved yet, that

Page 56

1  involved a DUI and that involved a use of force.
2      Q   And this is 2017ish?
3      A   '17ish?  Yes.  Either '17ish or '18.  I don't
4  recall.
5      Q   But you said it -- you said it was -- you were a
6  new sergeant.  So I believe you were promoted to
7  sergeant in '17.
8      A   Yes.  Yes.
9      Q   One at a time.
10     A   So he asked me to approve that A form, and I
11  told him I was not going to approve that A form,
12  because it involved a DUI that happened on his shift
13  with a use of force.  And per our policies, we do not
14  approve other sergeant's A forms that include uses of
15  force, unless directed to by a lieutenant for exigent
16  circumstances or any directives that they would give
17  you.
18         But I told him that I was not going to sign that
19  A form, I was not working when that A form was written,
20  when that incident occurred, and when that use of force
21  occurred.  And he was upset with me and abruptly
22  changed to the other -- to the main channel.  I believe
23  there were some words exchanged, in the sense of him
24  saying, Well, you're a sergeant, you can approve it.  I
25  said, With all due respect, I'm not going to approve

Page 57

1  that A form, which involved a serious crime of a DUI
2  with injuries and with a use of force.  And he was
3  upset by that.
4      Q   Did he write you up?
5      A   We were both sergeants, so, no, he did not write
6  me up.  And I was not insubordinate to him, and he was
7  not insubordinate to me.  We're peers at this point.
8  But he asked me if I can approve this A form.  And the
9  liability that that A form entails, with that use of
10  force, I was not going to approve that for him.
11     Q   Did you file a complaint against him?
12     A   No.
13     Q   So I asked you, like, what other things did he
14  do to you from 2014, before the incident in
15  December 2020, that demonstrated to you that he was
16  holding a grudge or angry at you for rejecting him,
17  besides ignoring you, and you're telling me that he
18  asked you to fill out an A form that you -- or approve
19  an A form that you believe you should not have been
20  approving, correct?
21     A   That is correct.
22     Q   Okay.
23     A   But his tone and the way that he spoke to me
24  over the radio was inappropriate and was in haste, and
25  I can tell that he was angry.  Again, I was there and I

1 lived through that, and I know exactly what happened.
2 At that point, we were both sergeants. He had no
3 authority over me. And the one and only day that he
4 ever has authority over me is when he became a
5 lieutenant, and the one and only day that I worked for
6 him, these so-called allegations are made by him.
7    Q   And you believe that in 2017, his request for
8 you to approve this form was because of his anger from
9 your rejection in 2014, or your supposed rejection?
10   A   No. His anger was, again, by me not wanting to
11 approve this A form, but he was overly angry and I can
12 tell. And since we had not spoken to each other since
13 2014 -- and, again, every time we see each other in the
14 hallway, every time he sits next to me, he ignores me
15 and he does not speak to me. That is not normal for
16 your peers to be doing to you. So, yes, I believe the
17 way that he took that rejection, he continued to hold
18 that grudge and that animosity towards me.
19   Q   Okay. Going backwards from your earlier
20 testimony, when we were talking about how you got to
21 know Lieutenant Cosner, then Sergeant Cosner, I guess,
22 in 2014 you said there was a male sergeant stalking
23 you?
24   A   Yes.
25   Q   Who was that?

1    A   Albert Estrevez.
2    Q   And you made a complaint about that?
3    A   Yes, I did.
4    Q   And he was asked to resign?
5    A   Yes. His actions were substantiated. They
6 found evidence of him doing so, of him stalking me off
7 and on duty.
8    Q   And he was asked to resign for that?
9    A   And they gave him the option to resign or he
10 would be terminated.
11   Q   And did he resign?
12   A   And he resigned.
13   Q   Okay.
14   A   And the only reason why I even found out that he
15 was stalking me was because a neighbor in my
16 neighborhood told me that there was a Miami Beach
17 supervisor vehicle that was continuously passing
18 through my neighborhood, in front of my house, parking
19 a block from my house, parking close to my house, at
20 odd hours of the night, on multiple occasions, on
21 multiple instances. And I brought that up to my chain
22 of command, and they investigated it and they found an
23 egregious number of times where he was stalking me at
24 my house, and while on duty as well. He would
25 follow -- whatever calls that I had, he would be like a

1 block away or be in the near vicinity.
2    Q   Okay. And you had spoken to Cosner about this?
3 This was sort of how the two of you became friendly,
4 through communicating about this?
5    A   No.
6    Q   I thought you testified earlier that while you
7 were going through this is when you first started
8 becoming friendly with Lieutenant Cosner. Did I not
9 hear that correctly?
10   A   That is not correct.
11   Q   Okay. Can you clarify that, then.
12   A   I said that I was working in his squad while
13 this incident had occurred, while I was going through
14 this incident. I was working with him and other male
15 officers, senior officers, that had a lot of tenure
16 over me, on this midnight shift. And I was going
17 through that incident while I was working on that
18 squad.
19   Q   Got it.
20       Were you and Cosner good friends?
21   A   We were good friends.
22   Q   Did you socialize outside of work?
23   A   No.
24   Q   Did he ever meet your family?
25   A   No.

1    Q   Okay. And you never went out with him for a
2 drink or to dinner or anything like that?
3    A   No.
4    Q   You never went to his house?
5    A   No.
6    Q   He never went to your house?
7    A   No.
8    Q   He never met anyone in your family?
9    A   No.
10   Q   Okay. So I'm going to show what I'm going to
11 mark as Exhibit 3. Let me know when you can see it.
12   A   I can see it.
13       (Defendant's Exhibit 3 was marked for
14       identification.)
15 BY MR. ELKINS:
16   Q   Okay. These are screenshots of Lieutenant
17 Cosner's Instagram --
18   A   Okay.
19   Q   -- from 2014 and '15, I believe. Am I right
20 that your -- in this first one, your Instagram, I
21 guess, at the time, was forever_camelot; is that right?
22   A   That is correct.
23   Q   Okay. And so you commented on his Instagram
24 here, correct?
25   A   That is correct.

16 (Pages 58 - 61)

1   Q   Okay.  And then the same thing for page 2, Bates
2   number 001354.  That's you again, right,
3   forever_camelot?
4   A   Yes.
5   Q   Okay.  And I think this is from December 25th,
6   2013, I think at the bottom, right?
7   A   Okay.
8   Q   All right.  And then, here, there's somebody
9   named luluu_74.  Do you know who that is?
10  A   Yes.
11  Q   Who is that?
12  A   That is my mother.
13  Q   And so, here, your mother is liking his
14  Instagram?
15  A   Yes.
16  Q   Any idea why?
17  A   So my mother works at the Hialeah Police
18  Department.  She's a clerk.  And she is very much into
19  the brotherhood of police work and befriending as many
20  police officers, kind of like a community, a
21  brotherhood.
22      So, usually, on Facebook, it says things like
23  people that you may know and it says -- usually, it
24  says their occupation or they have mutual friends in
25  common.  And it's not uncommon at all for you to add

1   persons that you think you may know or think that -- in
2   her case, that are police officers.  And she has
3   multiple people from Miami Beach on her friends list,
4   and apparently, Cosner is one of them.  But it's not
5   uncommon at all.  It's a common practice.  It's
6   something that you do in social media, to network, to
7   connect.  And my mother did befriend not only him, but
8   multiple people from Miami Beach.
9   Q   Okay.  So we'll go to the next one.  Same thing
10  here.  It looks like your mother is liking that post,
11  too, page 4?
12  A   (No verbal response.)
13  Q   Same thing, page 5?
14  A   I can't see.
15  Q   Can you not see it?
16  A   I can see, but it's not changing pages.
17  Q   I think it might be multiple pages of the same
18  thing.
19  A   Okay.
20  Q   Hold on.  Yeah, you're right, it's not changing
21  pages.  Sorry.  I think the internet connection here is
22  a little unstable.
23      Okay.  Here we go.  So page 8, this is you
24  commenting on Cosner's Instagram post from June 20th,
25  2014; is that correct?

1   A   Yes.
2   Q   Okay.  Let me go back.
3       Okay.  And I think page 7 is your mom again.  Do
4   you see that?
5   A   That's the same one that you --
6   Q   Right.
7   A   -- pointed out multiple times.
8   Q   Okay.
9   A   It's not more than -- the one that you've shown
10  me has been the one that you've said multiple times.
11  Q   Correct.
12      And then page 9, it looks like it's your mom
13  liking again different posts?
14  A   Yes.
15  Q   This looks like a picture of Lieutenant Cosner,
16  I'm going to guess with his daughter, maybe.
17  A   Okay.
18  Q   And then the same thing, page 10, your mom
19  liking this again?
20  A   Okay.
21  Q   Another like.
22      Page 11, your mom again, correct?
23  A   Okay.
24  Q   And then page 12 is you liking his Facebook post
25  from June of 2015?

1   A   Okay.
2   Q   So is this after he -- before or after he, like,
3   propositioned you?
4   A   It was before and after.
5   Q   Before and after?
6   A   Yes.
7   Q   So even after he attempted to take the
8   relationship past friends and you rejected him, you
9   were still liking his social media?
10  A   Yes.  So like I stated, I had spoken to several
11  of my colleagues, veteran officers, veteran female
12  officers, and at the time, you know, a retired sergeant
13  who worked in this -- in the squad and in this shift.
14  And the advice that I was given -- I was a 22-year-old
15  female at the time, and the advice that I was given was
16  go along to get along, in the sense of don't abruptly
17  end any type of friendships, you've already been
18  through a lot with the case that -- of the officer
19  stalking you, you don't want to, you know -- it's not
20  going to be healthy for your -- for your career if you
21  make another complaint, just continue to be friends
22  with your squad mates, get along politically, try to
23  maintain these friendships so that you don't have
24  issues moving forward, especially with Cosner, who has
25  been known to be vindictive and hostile towards certain

17 (Pages 62 - 65)

1 people that he doesn't like.
2     And since he had a lot of influence and a lot of
3 tenure in the police department, I was scared and
4 worried that if I had cut off my friendship with him,
5 that he was going to make my career, while I'm working,
6 difficult, because he had a lot of influence in my
7 squad.  And I was trying to maintain a working
8 relationship with everyone.  But I had told him
9 multiple times that I wasn't interested in him.  And it
10 culminated to the point where I had to tell him, That
11 is it, our friendship is done, you have crossed the
12 line multiple times, I gave you multiple chances, and
13 now this friendship is done and it's over.  And we had
14 not spoken ever since.
15    Q   And he ignored you, for the most part, for the
16 bulk of almost seven years, correct?
17    A   Yes.
18    Q   So he didn't -- he didn't do anything to you in
19 the seven-year period, correct?
20    A   Well, he couldn't do anything to me, because we
21 were both the same rank.
22    Q   Well, if he couldn't do anything to you, then
23 why were you worried about him being vindictive?
24    A   Because we were working in the same squad and he
25 had a lot of influence with our sergeant and he had a

1 lot of influence within that squad and within the
2 department.
3     And I had just gone through a very traumatizing
4 incident with this sergeant who was stalking me, and
5 the last thing that I wanted was another issue, another
6 complaint, when all I wanted was just to go and do my
7 job and be left alone.  And sometimes you have to do
8 things to survive, like maintain friendships that you
9 don't want, because you're trying to survive, you're
10 trying to maintain your livelihood.  And working and
11 being employed was my livelihood.
12     And I was petrified and worried and scared that
13 if I continued to make complaints over these advances,
14 that it was going to culminate to me getting more
15 retaliation or me being in a position where I wasn't
16 going to be liked in the police department, I wasn't
17 going to be successful in the police department,
18 because a lot of these people had influence with
19 command staff, with sergeants.  And my peers told me
20 just try to lay low, don't cut off friendships
21 abruptly, and just maintain what you're doing now.
22    Q   When you say more retaliation, what retaliation
23 were you experiencing back then?  Because as I
24 understand it -- correct me if I'm wrong -- you made a
25 complaint about Mr. Estrevez, which was sustained and

1 he was ultimately told either quit or you're going to
2 be fired.  So what do you mean by more retaliation?
3    A   That is correct.  So Estrevez worked on the
4 midnight squad, and now -- and he had been working
5 there for a long time, 20-plus years.  And like I said,
6 he had a lot of influence within the police department.
7 He had been there a long time.  And because of his
8 termination, a lot of his friends and followers were
9 very upset by that.  And I started to experience
10 incidents that were occurring to me, where my personal
11 vehicle's tires were slashed, my gas tank was filled
12 with salt water and sand.
13     And I made a complaint to internal affairs, and
14 they said they couldn't substantiate because they
15 didn't have the evidence, but they moved me to -- off
16 the road, to protect me from any further retaliation.
17 And so they put me to work in the red-light camera,
18 under -- under accident investigations unit.
19    Q   And when was this, what year?
20    A   That was in 2014, 2015, around that time.
21    Q   Did you make a complaint about the tires being
22 slashed also?
23    A   Yes, I did.
24    Q   So was it one complaint, about both the tires
25 and the gas tank?

1    A   Yes.  I couldn't take it anymore.  I tried to
2 go -- I basically -- like I said, I didn't want to
3 continue to bring up things that was occurring to me,
4 but it just emulted to a multiple of things and now
5 it's affecting my personal vehicle, it's affecting my
6 health, it's affecting my mental health.  And I got to
7 a point where I had to go and tell them, Hey, this is
8 what's going on.
9     And so my vehicle was towed from the police
10 station after that incident happened, and a sergeant at
11 the time had to give me a ride home.  So I got to the
12 point where I brought this up to internal affairs.
13 They reviewed it.  They said they couldn't find any
14 evidence, because there was no cameras in the garage at
15 the time.  And their fix to my complaints were to put
16 me in the red-light camera and assign me there as an
17 AIU investigator.  And I was there for about three,
18 almost four years.
19    Q   So you made a complaint, and even though the
20 city was not able to determine who either, you know,
21 slashed your tires or filled your gas tank, they took
22 action to protect you?
23    A   Yes.
24    Q   Okay.  Who were the veteran officers that you
25 referenced that you spoke to about Cosner?

Page 70

1   A   So I don't remember.  At the time, I do know
2   that there were veterans officers, who had retired
3   shortly after that.  There's been multiple officers
4   that had retired after that.  But during that time, it
5   was senior officers from that -- from the midnight
6   squad and from my squad.  And I can't tell you now who
7   was in my squad during that time.
8   Q   Do you remember their ranks?
9   A   Officers and a sergeant.
10   Q   Do you remember the sergeant's name?
11   A   Yes.
12   Q   What was the name of the sergeant?
13   A   His last name is Rojo.
14   Q   Rojo?
15   A   Yes.
16   Q   So you remember, it sounds like, a lot of
17   details relating to Cosner, relating to the gas tank,
18   relating to the tires being slashed, relating to the
19   card that he gave you, the 2017 radio call, but you
20   don't remember the names of these officers that you've
21   referenced multiple times, that you confided in, that
22   told you not to make complaints?  You don't remember
23   one name?
24   A   I gave you a name.  I gave you Sergeant Rojo.
25   Q   You don't remember his full name?

Page 71

1   A   I don't remember now.
2   Q   And you don't remember anyone else's name?
3   A   No, not at the time.  I had just started.  I was
4   brand-new to that squad, and there's multiple officers
5   in the shift.  I don't remember the names right now of
6   who I specifically spoke to that day.  If I told you
7   who I specifically spoke to, I would be lying.  So I
8   don't know who I specifically spoke to, but I do know
9   that I was scared enough to confide in my peers.
10   Q   You just don't remember -- other than someone
11   with the -- sergeant with the name Rojo, you don't
12   remember the names of any of these other peers that you
13   confided in?
14   A   No, not off the top of my head of who I
15   specifically spoke to.
16   Q   Do you have notes about what you talked to?
17   A   No.
18   Q   Is it a coincidence that your mom is liking
19   Lieutenant Cosner's Instagram posts around the same
20   time that all of this is happening?  That's a
21   coincidence?  It just so happens to be that, hey, she
22   friend-requests a lot of people from Miami Beach, and
23   by happenstance, during this exact time period, she's
24   also liking his posts?
25   A   So, first of all, I can't tell you what my mom

Page 72

1   is doing with her Instagram or her Facebook.  I don't
2   monitor her Instagram and her Facebook.
3       So, like I said, I didn't live with my mom at
4   the time.  I don't know what she's doing with her
5   Facebook or her Instagram.  But I do know that my mom
6   has befriended a lot of police officers from different
7   agencies, not only Hialeah, Miami Beach, and other
8   multiple agencies.  She is into the brotherhood of
9   police work.  She likes to network with other officers.
10   And she has multiple people from Miami Beach, and she
11   probably likes all of their stuff too.
12   Q   Well, if you don't know what she does with her
13   Instagram, how do you know she's probably liking
14   everybody else's stuff too?
15   A   Because that's what she does.  She likes a bunch
16   of posts, from a bunch of people, all the time.
17   Q   So you do have some knowledge of what she does?
18   A   Some knowledge.  Like I said, she adds a bunch
19   of officers from different agencies, she likes to
20   network with law enforcement, and she's very heavily
21   into that.  She's very friendly, in the sense that she
22   will like anybody's post and network with as many
23   people as she can.
24   Q   Did you confide in your mom about the situation
25   with Cosner?

Page 73

1   A   No.
2   Q   Why not?
3   A   Because I didn't want to.
4   Q   Why didn't you want to?
5   A   I didn't feel like I wanted to bring it up to my
6   mom and worry her of what was going on.
7   Q   And where did she work at the time?
8   A   Hialeah Police Department.
9   Q   Is she a police officer?
10   A   No.
11   Q   What did she do there?
12   A   She's a clerk.
13   Q   Does she still work there?
14   A   Yes.
15   Q   Okay.  Just so I've got it -- and I know I asked
16   it, but I just want to make sure -- other than Cosner's
17   2017 request for you to approve an A form, between your
18   rejecting him in '14 or early '15, and December -- late
19   December of 2020, you had no other interaction with him
20   whatsoever?
21   A   From what time frame to what time frame?
22   Q   From the time frame that you ended the
23   friendship, you know, '14 or '15ish, somewhere in that
24   neighborhood, through late December 2020, other than
25   this 2017 request to fill out -- or approve the A form,

Page 74

1 you had no other interaction with him?
2   A   No.
3   Q   And whenever you two saw each other, he would
4 ignore you?
5   A   Yes.  That is correct.
6   Q   And did you ever attempt to talk to him?
7   A   No.
8   Q   You ignored him as well?
9   A   Yes.
10   Q   Okay.
11   A   And, again, I did so because of the way he took
12 my rejection and the animosity that he had towards me
13 telling him that I was not interested.  And I had tried
14 on multiple times to be cordial, and he continued to
15 ignore me.  So, yes, I had nothing else to speak to him
16 about.  I had tried.  I'd done my best that I could,
17 like I said, to maintain cordial working relationships
18 with my peers.  And he was very upset about my
19 rejection, and he continued to ignore me.
20       (Defendant's Exhibit 4 was marked for
21       identification.)
22 BY MR. ELKINS:
23   Q   All right.  Let me know if you can see this
24 document.
25   A   I can see it.

Page 75

1   Q   Okay.  Do you recognize this document?
2   A   Yes.
3   Q   What is it?
4   A   It's an EEOC complaint.
5   Q   Okay.  Is this an EEOC complaint that you filed?
6   A   Yes.
7   Q   Okay.  So this is your second EEOC complaint
8 against the city, correct?
9   A   That is correct.
10   Q   Okay.  And the date, I believe, that you filed
11 this was July 13th, 2020?
12   A   That is when it was filed.
13   Q   Okay.  And did you file this after you were
14 placed under investigation by internal affairs?
15   A   Do you have the document that shows the date
16 that I was placed under internal affairs?
17   Q   I don't have that specific document, but I can
18 get you that date.  I mean, I can represent to you that
19 this was filed after you were placed under
20 investigation.  I'm just asking if you remember that.
21   A   Again, I don't remember that, but I would like
22 to see the document.
23   Q   Okay.  Well, you don't remember if you filed
24 this before or after you were placed under
25 investigation?

Page 76

1   A   I don't remember the date that I was filed under
2 investigation.
3   Q   Okay.  Did you fill out this charge, or did
4 someone fill it out for you?
5   A   Somebody filled it out for me.
6   Q   Who?
7   A   Michael Pancier, at the time.
8   Q   Okay.  And I don't want to know what you talked
9 with Michael about.  We'll get to that later.
10       What's the basis of this charge?
11   A   So the basis of this charge is because at the
12 time, after I had just gotten my rank back, I was
13 experiencing -- I was working with numerous male
14 lieutenants, and I was experiencing a lot of
15 inappropriate and -- behavior and inappropriate
16 comments while working with these lieutenants.  And I
17 gave the examples in that EEOC complaint.
18       So one of them would be, they would watch porn
19 inside the sergeant's office.  They would banter back
20 and forth about penis enlargements, about people that
21 sleep around to get ahead in the department.  And I was
22 growing very uncomfortable with the way that these
23 lieutenants were conducting themselves in my presence.
24 And, you know, I would have conversations with my
25 lieutenants, and they would turn it into a joke.

Page 77

1       For example, at one point, I told Lieutenant
2 Flanagan that there was going to be an officer that was
3 going to be late for work.  He had requested a couple
4 of hours in the beginning of the shift.  And I said
5 because he was getting some dental work, he was getting
6 a dental filling.  And his response to me was, Oh, so
7 he was getting a -- he was getting a rectal filling,
8 which I found absolutely appalling and disgusting.
9 And -- and the fact that I was constantly hearing these
10 type of comments and having to be subjected to this
11 type of behavior in my working office, in my space, I
12 went and I spoke to the FOP about what was going on
13 throughout my -- my shifts, throughout my time there.
14       And at the time, I was in a relationship with
15 Nicholas Guasto, who was my significant other, and he
16 got a firsthand account of some of the behavior that
17 was going on.  So he went to Wayne Jones at the time
18 and had like about a two- to three-hour meeting in
19 regards to this behavior and these inappropriate
20 incidents that I was being subjected to.  And so it
21 fell on deaf ears.  Wayne Jones at the time said that
22 he was going to meet with me, that he was going to
23 bring these individuals in and speak with them, along
24 with Chief Clements.  The FOP said that they were going
25 to meet with Chief Clements and speak to him about what

20 (Pages 74 - 77)

1 was going on, which they did.
2      But, again, nothing occurred after that, no --
3 there was no follow-up. They didn't bring me in to ask
4 me who was -- who was behaving in this way on -- you
5 know, my concerns weren't heard. They fell on deaf
6 ears, and nobody did anything to -- to stop it. So it
7 culminated to me filing another EEOC complaint.
8    Q   When did Nick meet with Wayne?
9    A   Sometime in February of -- it was around the
10 Super Bowl. I remember that.
11   Q   Of 2020?
12   A   Whenever the -- '20? Yes. So it was in 2020,
13 February of 2020, that he met with Wayne Jones.
14   Q   And you were dating Nick at the time?
15   A   Yes.
16   Q   Did you ever date anybody else who worked for
17 the city?
18   A   No.
19   Q   Only Nick Guasto?
20   A   I'm sorry. There was one individual. His name
21 was Henry Doce. And I was in a relationship with him
22 prior to Nick.
23   Q   How long were you in a relationship with Henry
24 Doce?
25   A   Approximately five, six years. Approximately.

1    Q   Was that like generally public knowledge at the
2 city?
3    A   Yes. It was a serious relationship. We lived
4 together. We were, you know, in a relationship for a
5 good amount of time.
6    Q   How about Steven Feldman? Were you ever in a
7 relationship with him?
8    A   No.
9    Q   How about a casual relationship?
10   A   No.
11   Q   Any other casual relationships?
12   A   No.
13   Q   Okay. Okay. It says here that you started to
14 receive sexually explicit text messages from a command
15 staff member. Who was the command staff member?
16   A   The command staff member was Steven Feldman.
17   Q   Okay. When did you receive those messages?
18   A   It was during the time that I had just recently
19 got reinstated to sergeant.
20   Q   So 2018, '19ish --
21   A   Yes.
22   Q   -- somewhere around there?
23      And you never reported them?
24   A   No.
25   Q   Why not?

1    A   Because I was scared. He's a command staff
2 member, with a lot of influence, a lot of influence and
3 a lot of power in that police department. And I was
4 petrified again; why am I in a position again where I
5 am harassed by these male officers, these male command
6 staff members, these people of authority, these older
7 people than me, these people with a lot of tenure in
8 this police department?
9    Q   Well, you said "again" -- well, what was the
10 basis of your fear? Because from what I've heard from
11 you so far, any complaints you've made were addressed
12 by the city.
13   A   That is not what I said.
14   Q   Well, you made the complaint about the officer
15 stalking you.
16   A   Yes.
17   Q   And that had been addressed, correct?
18   A   Yes.
19   Q   And then you had resolved your grievance and
20 earlier EEOC charge, correct? Is that correct?
21   A   Yes.
22   Q   And with Cosner, you rejected his advances, and
23 then again, Sands, was one incident in 2017. At the
24 time of this EEOC charge in 2020, you and Cosner had no
25 contact whatsoever. So what exactly were you fearing

1 from a retaliation standpoint?
2    A   Well, I had just gotten my stripes back, my
3 sergeant's position back, and I was scared that this
4 very known, powerful command staff member would have
5 influence in me coming forward and telling the city
6 what was -- what was going on with him. And I was
7 scared to be demoted again and to be retaliated
8 against.
9       My complaints happened, and they continued to
10 happen. Yes, they have been resolved differently, some
11 of them, but the point of the matter is that they
12 continue to happen. This behavior continues to happen.
13 It is a toxic environment, where they condone this type
14 of behavior. So, yes, the complaints have been -- have
15 been addressed, but the complaints continue to happen.
16 And that's what I was scared of, of more continued
17 behavior.
18   Q   Do you still have the text messages that he sent
19 you?
20   A   I do not.
21   Q   What happened to them?
22   A   I was scared, so I deleted them.
23   Q   When did you delete them?
24   A   I don't have the date.
25   Q   Okay. It says here you had an issue in October

Page 82

1 or November of '19, where Lieutenant Garcia was
2 screenshotting your personal pictures of your social
3 media and forwarding it to the whole police station?
4    A   That is correct.
5    Q   What type of pictures was he screenshotting?
6    A   So he -- I don't know how he managed to get
7 pictures of Nick and I, personal pictures that Nick had
8 put on his Instagram, but he was basically taking
9 screenshots of our pictures and sending them around the
10 police station, saying things like, How could Jessica
11 date Nick, who is fat and ugly?  He was telling --
12 making fun of the fact that him and I were together, to
13 multiple people who came forward and told Nick what he
14 was doing, as well as Nick telling me what he was
15 doing.
16        And so Nick actually asked him in my presence
17 why he was doing that, and he told him because he
18 could.  And he did it.  And this incident happened,
19 where he confronted him, in the main police station, on
20 the second floor, with multiple people present.
21    Q   And other than the EEOC charge, did you complain
22 about that conduct?
23    A   I had been complaining about that conduct,
24 again --
25    Q   To who?

Page 83

1    A   -- through Wayne Jones and through the FOP.
2    Q   And why didn't the FOP do anything about it?
3    A   They did.  They spoke to the chief of police,
4 and they told him what was going on.  And, again, like
5 I said, it fell on deaf ears.  Nothing was done about
6 it.
7    Q   Did you tell the FOP that nothing was done about
8 it?
9    A   Yes.  And they told me as well.
10    Q   And why didn't they take any action after that?
11    A   They continued to try to take action, but,
12 again, the city -- the -- I'm sorry -- the chief did
13 not want to hear or resolve any of my complaints.
14    Q   And by "chief," are you referring to Chief
15 Clements?
16    A   That is correct.
17    Q   Who from the FOP talked to Chief Clements about
18 this issue with Lieutenant Garcia?
19    A   Kevin Millan.
20    Q   Anyone else?
21    A   I believe Robert Azicri.
22    Q   Anyone else?
23    A   I don't remember off the top of my head.
24    Q   Anything in writing about this complaint?
25    A   Yes.

Page 84

1    Q   What was in writing about it?
2    A   I have messages between myself and Kevin Millan,
3 talking to him about these complaints and these issues.
4 And on that same date, I met with him for about three
5 hours in the FOP office.  And then from there, he went
6 and spoke to Chief Clements.  He called me on that same
7 day, saying that the chief was going to bring me in to
8 speak to me about my complaints, and it never happened.
9 It never transpired.
10    Q   What day?
11    A   I don't have the date on the top of my head, but
12 I do have that information.
13    Q   Where is that information?
14    A   My counsel has it.
15    Q   Is there any reason it wasn't produced?
16    A   I believe it was, through text messages.
17    Q   Oh, okay.  And we're talking about Lieutenant
18 Garcia here?
19    A   My messages about Lieutenant Garcia and some of
20 the issues that I was going through with Kevin Millan.
21 Yes, that exchange.
22    Q   Okay.  And Lieutenant Garcia's issues also
23 include his requests for you to go to breakfast and
24 work out with him in the gym?
25    A   Yes.  He would ask me to go to breakfast, and I

Page 85

1 would say no on multiple occasions, to the point where
2 he brought me into the office and said, This is the way
3 that we build rapport, and I expect you to come to
4 breakfast with the rest of the sergeants and the
5 lieutenants.  On that one occasion, I did go with him,
6 with the rest of my squad mates, and it turned -- with
7 the rest of the sergeants and some of the lieutenants,
8 and it turned into me sitting in a cafe with all these
9 male officers talking about the waitresses inside the
10 restaurant, talking about sexual connotations, to the
11 point where I said, I'm leaving, I have to go do
12 administrative work.  And I left from -- from those
13 breakfasts.  It was severely uncomfortable and so
14 inappropriate, and that's the main reason why I
15 refrained from going.
16    Q   And was that part of your complaints?
17    A   Yes.
18    Q   Okay.  And then you say here that you were
19 subjected to a hostile work environment when your
20 supervisors and others openly engaged in sexually
21 inappropriate and offensive comments and viewing
22 pornographic videos in the workplace on their cell
23 phones.  Who -- what supervisors did that?
24    A   The ones on my EEOC, as well as other sergeants
25 and lieutenants.

22 (Pages 82 - 85)

1   Q   What are their names?
2   A   There's multiple sergeants inside the sergeant
3   room at any given time.  It was a huge banter going on
4   back and forth, where you can hear and see the contents
5   of porn that they were displaying, with multiple
6   sergeants there, with lieutenants coming in and out,
7   laughing, joking.
8   Q   Well, you said here "my supervisors."  So who
9   are the supervisors you're referring to?
10   A   So some of them included Lieutenant Garcia, some
11   of them included Lieutenant Flanagan, who were my
12   superiors, and then my peers were multiple sergeants
13   that were in the room.
14   Q   Okay.  Well, what are their names?  Well, let me
15   ask it a different way.  What sergeants did you observe
16   engaging in sexually inappropriate and offensive
17   comments and/or viewing pornographic videos on their
18   cell phones?
19   A   So I don't have the specific names of who was
20   doing that at the time.  I do know that I was inside
21   this room of -- filled with multiple sergeants,
22   multiple lieutenants, and I can hear and see them
23   putting on their cell phone porn, and then joking and
24   bantering back and forth very loudly.
25   Q   So you filed an EEOC charge accusing, quote,

1   others openly engaging in sexually inappropriate and
2   offensive comments and viewing pornographic videos in
3   the workplace on their cell phones, and you can't name
4   a single person besides the supervisors?
5   A   So I did name the supervisors.
6   Q   I know.  I said --
7   A   And then --
8   Q   Hold on.
9       I said besides the supervisors.  I'm asking
10   about the -- who are the others?
11   A   Okay.  So, like I said, at the time, I'm in a
12   room full of multiple sergeants, with all this banter
13   going back and forth, 10, 15 sergeants in there at any
14   given time, walking in and out, and showing this
15   content, laughing about this content.  My desk was in a
16   position where I can't name you the specific people,
17   but I did see and hear what they were speaking about.
18   And it was loud.  They were putting porn on their phone
19   in a loud volume.  I don't have the specifics of who
20   was doing it, but I do know that it was going on.
21   Q   So out of these 14 or 15 people, you can't name
22   one person, correct?
23   A   No.
24   Q   Okay.  And then it says the lieutenants and
25   sergeants would openly laugh and make comments like,

1   This is how so-and-so got the new position, or this is
2   what you have to do around here to get in a specialized
3   unit.  Who are the lieutenants and sergeants that made
4   these comments?
5   A   Again, like I said, Lieutenant Garcia.
6   Lieutenant Flanagan was one of them.  Lieutenant
7   Garcia.  Lieutenant Dohler was one of them.  Multiple.
8   This was a common behavior where multiple of
9   lieutenants and sergeants were conducting themselves
10   in.
11   Q   What about sergeants?  Can you name any specific
12   ones?
13   A   I can't name any specific ones.
14   Q   Okay.
15   A   Again, they're all bunched up together.  They're
16   all inside this office, bantering back and forth.  And
17   I was trying my best to stay away from that -- that
18   behavior and that crowd, as my desk was off to the
19   left.
20   Q   And it says, I've been subjected to listening to
21   my colleagues talk about penis enlargements and detail
22   how the procedure is done.  Who are the colleagues that
23   talked about this?
24   A   So we have cubicles in the sergeant's office,
25   and you can hear sergeants speaking about this and

1   joking about it --
2   Q   But you don't know --
3   A   -- very loudly.
4       No, I do not know who -- who it was that said
5   it, but I know that it happened.
6   Q   Did you ever tell anyone to stop?
7   A   I did not tell anybody to stop.  I would just
8   walk away or leave the office.  And when I would do
9   that, I would get accused of being an introvert, and I
10   would get accrued of not being a team player and not
11   being with my peers.
12   Q   Why is it that you can't remember a single name
13   of any sergeants that did any of this conduct?  You
14   have multiple allegations that are pretty specific, you
15   use the broad term "sergeants," but you can't name one
16   sergeant, one of the 14 or 15?  You didn't recognize
17   anyone's voices?  Nothing like that?
18   A   I didn't recognize anyone's voices.  I know that
19   I sat at my desk, and I know that I heard what I heard
20   and saw on the phones this type of content.
21   Q   Well, let me ask you this:  If you didn't
22   recognize their voices and you didn't know their names,
23   how do you know they were sergeants?
24   A   Because it's the sergeants' office, where all
25   the sergeants are in there doing their administrative

Page 90

1 work. Where they're in, you can hear the radio. You
2 can hear them coming on the radio and saying specific,
3 you know, calls on the radio or acknowledging radio --
4 the radio. You can tell and you know that it was a
5 sergeant.
6    Q  But there were also lieutenants in there
7 as well, and you know who they are, right?
8    A  Yes.
9    Q  And it's possible there could have been other
10 people in there that weren't sergeants. I mean, you
11 really don't know, right?
12    A  You do know, because in the sergeants' office,
13 you can see the sergeants' desks, and you can see that
14 there's sergeants in there. And there is not -- it's
15 not common at all for an officer to be in there.
16    Q  So you could visibly see the sergeants in the
17 office when these types of comments were being made and
18 when the porn was being viewed, but you can't, sitting
19 here today, name one that engaged in any of the conduct
20 that you reference on the first page of this 2020 EEOC
21 charge? Do I have that right?
22    A  No. I sat in my desk. It was off to the left.
23 I can see and hear them playing porn, them talking all
24 this banter. I can see them coming in and out. But I
25 don't know who directly was doing it. I was trying to

Page 91

1 concentrate on what was in front of me, which was my
2 desk and my administrative work that I was conducting,
3 and I tried to not look at this type of behavior. And
4 when it got so egregious, I would just walk out and try
5 to put blinders on and not see and not try to engage in
6 any of this type of behavior.
7    Q  Who are the colleagues that you had to listen to
8 disparage black supervisors and use derogatory comments
9 like, quote, these negros are entitled and racist, end
10 quote?
11    A  That was multiple of my lieutenants.
12    Q  What are their names?
13    A  One of them said it directly to me, which was at
14 the time -- I believe he's a captain now -- Lieutenant
15 Baldwin. It was during the riots. And I had reported
16 to him directly, and he was giving me some information
17 for the shift when he said that quote to me.
18    Q  Anyone else?
19    A  Lieutenant Flanagan would say things like --
20 there was an incident that occurred on the beach, where
21 Andrew Gillum, who I believe was a political person,
22 got in trouble on the beach. And he made some
23 derogatory comments about him, saying that he was
24 probably having black anal sex and engaging in -- in
25 sexual behaviors and drugs and that's why he got in

Page 92

1 trouble. And then he proceeded to dry hump a partition
2 in the sergeants' office, in front of me.
3    Q  I have one question here. Who specifically made
4 the comment, These negros are entitled and racist? Who
5 said that?
6    A  That is Lieutenant Baldwin, at the time.
7    Q  When did he say that?
8    A  Like I said, during the riots.
9    Q  Do you remember what year that was?
10    A  I don't recall.
11    Q  What was the time frame of this general conduct,
12 the porn in the office, the penis enlargement
13 discussion, these racist comments? Like, what year was
14 all this going on?
15    A  It was a constant, every year, all year.
16    Q  All day, every day?
17    A  All day.
18    Q  Did you ever make any written complaints about
19 any of this prior to your EEOC charge?
20    A  Like I said, I had enough of this type of
21 behavior that I was deeply offended by it. And by
22 proxy, I had -- Nick Guasto spoke to -- because he had
23 that good rapport with Wayne Jones, and he spoke to him
24 about everything that was going on. And he was in
25 there for about three hours with Wayne Jones. And,

Page 93

1 again, I spoke to the FOP about it prior to this EEOC.
2       MR. ELKINS: Okay. Let's take five.
3       THE VIDEOGRAPHER: The time is 10:58 a.m.
4    We're going off the record.
5          (A break was taken from 10:58 a.m. to
6          11:17 a.m.)
7       THE VIDEOGRAPHER: The time is 11:17 a.m.
8    We're back on the record.
9 BY MR. ELKINS:
10    Q  Okay. You mentioned this meeting between Nick,
11 I guess your then-boyfriend, then soon-to-be future
12 husband, I guess -- between Nick and Wayne Jones. It
13 was like a three-hour meeting you talked about?
14    A  Yes.
15    Q  When did that meeting take place?
16    A  In February of 2020.
17    Q  Were you present for the meeting?
18    A  I was not.
19    Q  Was anyone else present for the meeting, that
20 you know of?
21    A  Yes.
22    Q  Who?
23    A  Lieutenant -- at the time, he was Lieutenant --
24 either Lieutenant Garcia or Captain Garcia at the time.
25 I don't remember. But Eric Garcia.

24 (Pages 90 - 93)

Page 94

1   Q  Not the same Garcia from the EEOC charge?
2   A  No.
3   Q  Different, right?
4   A  Yes.
5   Q  Okay.  Anyone else?
6   A  Steven Feldman was present as well.
7   Q  Okay.  And how did you learn of the contents of
8   the meeting?  Did Nick tell you?
9   A  So I had asked to -- I'm sorry.  Nick had told
10  me that he was going to speak to Wayne Jones about my
11  concerns and my complaints that I was experiencing
12  throughout.  And so I asked if I could be present in
13  the meeting, and Wayne Jones had told him that he would
14  rather speak to him and then Nick can relay to me the
15  information, but that he was very much open to hearing
16  Nick's concerns -- or --
17  Q  And this happened -- go ahead.  I'm sorry.
18  A  -- that he was very much open to having a
19  discussion with Nick regarding my concerns.
20  Q  And this happened February 2020.  So that would
21  include -- the concerns, I'm assuming, that were
22  addressed in this meeting were on this first page of
23  this EEOC charge?  And I ask that because the second
24  page deals with, it looks like, allegations from after
25  February 2020.  So do I have that right?

Page 95

1   A  Can you rephrase your question, because --
2   Q  Yeah.
3   A  -- I don't understand what you're asking me.
4   Q  Nick's February 2020 meeting with Wayne --
5   A  Yes.
6   Q  -- where he addressed your concerns, the
7   concerns that he was addressing were concerns obviously
8   that occurred from February 2020 backwards, correct?
9   A  No.  It was a culmination of -- basically, Nick
10  went in there and had discussed with him from A through
11  Z, in the sense of what I have experienced in my
12  career, in my tenure, from the moment I got there, all
13  the way to the present date in February.
14  Q  So February 2020 backwards?
15  A  Yes.
16  Q  Okay.  And it looks like, from this EEOC charge,
17  the allegations on page 1 are from February 2020
18  backwards, correct?
19      Take a minute and look at it.  I'm not trying to
20  trap you.  I just want to make sure I've got the time
21  lines correct.
22  A  So it's correct that -- can you lower it,
23  please.  No.  Like go to the next page.
24      So it's correct that it has -- it was from
25  February backwards, but also forward as well, because

Page 96

1   there's incidents that are from May of 2020 and from
2   April of 2022.
3   Q  Yeah, but I'm asking you about what Nick talked
4   to Wayne about.  How could, in May -- in February of
5   2020, Nick talk to Wayne about things that happened in
6   April and May of 2020?  They hadn't happened yet.
7   A  Okay.  I understand your question now.
8       So, yes, it was from everything before February,
9   before -- from -- all the way to my beginning of my
10  tenure with the police department.
11  Q  Right.  So including February 2020 backwards?
12  A  Yes.
13  Q  But Nick did not talk to Wayne about anything
14  occurring March 2020, April 2020, May 2020, June 2020,
15  all of this stuff on the second page?
16  A  That is correct.
17  Q  Oh, okay.  Okay.  Got it.
18  A  That is correct.  And obviously because it
19  hadn't happened yet.  We were still --
20  Q  Correct.
21  A  -- in February.
22  Q  Correct.
23  A  However, the FOP did speak to the chief about
24  everything post-February 2020 and everything after
25  February of 2020 --

Page 97

1   Q  Did they --
2   A  -- to --
3   Q  Go ahead.
4   A  They met with Chief Clements and spoke to him
5   about all of these complaints that are on this EEOC.
6   Q  Before the EEOC charge was filed?
7   A  I believe before and after.
8   Q  Well, we'll get to after.
9   A  Okay.
10  Q  Who from the FOP spoke to Chief Clements, and
11  when?
12  A  So I don't have the date with me right now, but
13  I do know that it was Kevin Millan and Robert Azicri,
14  were two of them.  I know that -- it was somebody.
15  Reggie Lester also spoke to the chief, as well, of what
16  was transpiring.  So they're all part of the FOP.
17  Q  And did you make written complaints to them
18  about each of these post-February 2020 allegations on
19  page 2 of the 2020 EEOC charge?
20  A  Well, I had a meeting with them, an in-person
21  meeting, for about two and a half, three hours.
22  Q  You and the FOP?
23  A  Yes, I did.
24  Q  And who was present at that meeting?
25  A  In that meeting, Kevin Millan was present and

25 (Pages 94 - 97)

Page 98

1 Robert Azicri was present.
2   Q   And when was that meeting?
3   A   I don't have the date with me at this moment
4 right now, but I -- it did occur.
5   Q   You don't even remember what month
6 approximately?
7   A   I don't. I would have to look at my records.
8   Q   What records would you have to look at?
9   A   The text messages between Kevin Millan and I,
10 when he asked me to come over to the FOP office to
11 speak.
12   Q   And was that before or after you filed the EEOC
13 charge?
14   A   I believe that was after. I mean, I'm sorry,
15 before.
16   Q   Okay. Why didn't the FOP take any formal action
17 on your behalf?
18   A   The FOP did take formal action --
19   Q   What did they do?
20   A   -- on my behalf.
21       They spoke to Richard Clements and advised him
22 of the incidents that were going on and my complaints.
23 And the chief had told them that he was going to handle
24 it.
25   Q   But you don't believe the chief did handle it?

Page 99

1   A   He did not handle it.
2   Q   Okay. So why didn't the FOP take any action
3 then?
4   A   They continued to ask Clements to handle it, and
5 it continued to not be heard.
6   Q   But they never filed a grievance, correct, on
7 your behalf?
8   A   There was no grievance to file. It's a
9 complaint that you can -- you can notify anybody of a
10 complaint. I notified my FOP. My FOP told me that
11 they were going to notify the chief of police, who did
12 not take any action.
13   Q   Did you go to internal affairs about any of the
14 complaints?
15   A   No. I went to the FOP, and the FOP went to
16 Richard Clements, who said he was going to handle it.
17   Q   And when the chief didn't handle it, did you go
18 to internal affairs?
19   A   No. I went back to the FOP, and I advised him
20 that I still had not been spoken to. And they said
21 they were going to follow up with Richard Clements.
22   Q   At any point did you go to internal affairs
23 about any of these complaints?
24   A   No, I did not.
25   Q   Okay.

Page 100

1   A   Again, in our policies, it states that you can
2 go to whoever to report harassment and any type of
3 retaliation or any type of inappropriate behavior. And
4 that's who I felt the most comfortable with, was to
5 tell the FOP what was going on, because internal
6 affairs is part of the chief's office. They work
7 directly for the chief. So in that sense, yes, I went
8 to the FOP, who went directly to the chief.
9   Q   On page 2 of the EEOC charge, where you say, In
10 or about February of 2020, I had another lieutenant
11 asking several sergeants whom he saw speaking to me if
12 they were sleeping with me.
13       Who's that lieutenant?
14   A   That lieutenant is Lieutenant Dohler.
15   Q   And who were the sergeants?
16   A   There were several sergeants that came up to me.
17 I don't remember who they were. Again, we were in the
18 sergeants' office. There was always a multiple of
19 sergeants there at a time. And I was told, Hey,
20 Lieutenant Dohler is asking, you know, every time they
21 see you with another sergeant, if -- if there's -- if
22 they're sleeping with you.
23   Q   And who's the major that inappropriately grabbed
24 your wrist?
25   A   That was Major De La Espriella.

Page 101

1   Q   Did you make a complaint about him doing that?
2   A   No, because, again, I told the FOP about all of
3 these complaints. Everything that is here on this
4 document, I had told the FOP. I told them about
5 Lieutenant Garcia. I told them about Lieutenant
6 Dohler. I told them about Lieutenant Baldwin. I told
7 them about Major De La Espriella. I let -- I had a
8 meeting with them for two-plus hours, and I told them
9 all of what was going on.
10   Q   Is there a reason that through the bulk of this
11 EEOC charge, you don't actually name people? I mean,
12 if you had told the FOP and you made all of these
13 internal complaints, I'm assuming you gave them names.
14 But why in the EEOC charge do you say another
15 lieutenant, a major, a male sergeant? How come you
16 don't name anybody?
17   A   I don't know. I know that that's the way my
18 attorney at the time wrote this document. But I did
19 name names to the FOP. And I did relay that
20 information to them to relay to the chief. And in this
21 document, it does name some people.
22   Q   It names some, but there's plenty of others that
23 aren't named.
24       So who is the male sergeant that was verbally
25 counseled for violating the state emergency order?

1    A   At that time, that was -- I don't know for sure.
2   I believe it was either Lieutenant -- I'm sorry --
3   Sergeant Del Castillo or it was -- it could've been --
4   it had to be a sergeant that worked in the
5   entertainment district.  That's what I remember at the
6   time.  So I don't know if it was him or the other
7   sergeant that worked on the opposite side of the week
8   with him.  But I'm not -- I'm not certain which one it
9   was.
10   Q   And who was the lieutenant in March or April of
11  2020 that made the comment about the rectum filling?
12   A   That was Lieutenant Flanagan.
13   Q   And that's the same -- that's also Lieutenant
14  Flanagan that you're referring to a few weeks later,
15  the lieutenant that started to imitate sexual acts in
16  the workplace?
17   A   Yes.  The one that I had described earlier about
18  him dry humping a partition.
19   Q   Okay.  Who's the lieutenant that demanded you to
20  respond to their office and see your personal cell
21  phone, to check its battery, in April of 2020?
22   A   That was Lieutenant Flanagan.
23   Q   And that's the same lieutenant throughout this
24  whole paragraph, correct?
25   A   That is correct.

1    Q   Okay.  And then looking down in June 2020, who's
2   the lieutenant that made comments in front of you that
3   it's the Hispanics causing riots in Miami and making
4   the protests violent?
5    A   That was Lieutenant Baldwin, the same who had
6   made that previous comment about -- I believe it's on
7   the first page.
8    Q   Which comment are you referring to?
9    A   The one that says, I had to listen to some of my
10  colleagues disparage black supervisors and use
11  derogatory comments.
12   Q   The same lieutenant?
13   A   Yes.
14   Q   Lieutenant Baldwin?
15   A   Yes.
16   Q   Okay.  Got it.
17       All right.  So if I'm understanding right -- I
18  just want to make sure I get it -- for all of the
19  complaints up through February 2020, Nick Guasto talked
20  to Wayne Jones about those.  And you were also talking
21  to the FOP about those, or did just Nick talk to Wayne?
22   A   No.  Nick spoke to Wayne, and I spoke to the
23  FOP.
24   Q   Okay.
25   A   And I had wanted to be included in the meeting

1   with Wayne Jones, but he had said it would be better if
2   it was just Nick.
3    Q   And then thereafter, you had multiple meetings
4   with the FOP about all of these complaints that flowed
5   from February 2020 through June 2020, correct?
6    A   That is correct.
7    Q   Do you remember how many meetings you had with
8   the FOP?
9    A   I know there were multiple.  There was in person
10  and there was over the phone.
11   Q   Do you remember how many?
12   A   More than a handful.
13   Q   And was it always -- was Kevin Millan in every
14  single one of them?
15   A   He was the FOP president at the time.  Yes.
16   Q   Okay.  And did you ever express any
17  dissatisfaction with how the FOP handled these
18  complaints?
19   A   At the time, I did not, because I believed in
20  good faith that they were going to handle my
21  complaints.  At the time, Kevin Millan had continued to
22  speak to the chief.  So he had reached out to me every
23  single time he did, so I believed that he was doing
24  what he had to do by letting the administration know of
25  my complaints.  So, no.  He had let the chief know

1   multiple times.
2        I'm dissatisfied with how management, to include
3   Richard Clements, did not handle my complaints and did
4   not give me the opportunity to speak with him about
5   these complaints.
6    Q   During this time period you're talking about?
7    A   Yes.
8    Q   And is Lieutenant Cosner mentioned in your 2020
9   EEOC charge that we just reviewed?
10   A   The one that we just reviewed?  No.
11   Q   Correct.
12   A   No.
13   Q   Is he part of any of those allegations at all?
14   A   No.
15   Q   Okay.  And it's the 2020 EEOC charge that is the
16  protected activity that you believe you were retaliated
17  against, when you were ultimately separated from
18  employment.  Do I have that right?
19   A   It is the EEOC charge that my counsel present
20  filed, as well as the 2020.
21   Q   Well, you're talking about your 2021 EEOC
22  charge?
23   A   Yes.
24   Q   Well, your 2021 EEOC charge -- correct me if I'm
25  wrong -- came after you were terminated, correct?

Page 106

1  A  Yes.
2  Q  Right?
3  A  Yes.
4  Q  Okay.  So there's no way the city could've
5  retaliated against you, because you were already
6  separated.  Does that make sense?
7  A  That makes sense.  Sorry.  I did not understand
8  your question.
9  Q  I figured you didn't.  I'm not trying to trap
10  you.  That's why I want to clarify it.
11     So the protected activity that you believe
12  caused the city to retaliate against you is this 2020
13  EEOC charge we just went over, correct?
14  A  Yes.
15  Q  Okay.  Your position, as I understand it, in the
16  remaining claims from this lawsuit is that you were
17  fired because you filed that 2020 EEOC charge?
18  A  Not only that, but because of these frivolous
19  allegations that Lieutenant Cosner wrote.  And I
20  believe that the city retaliated against me and
21  separated my employment over allegations that were
22  never substantiated, that were never proven, and
23  basically were just allegations.  So in -- with the
24  EEOC and with that incident that happened with
25  Lieutenant Cosner, I do believe that the city

Page 107

1  retaliated against me and separated me unjustly.
2  Q  So you think part of the reason the city
3  separated you is because it relied on unproven,
4  unsubstantiated, uninvestigated allegations?
5  A  That is correct.
6     MR. ELKINS:  Okay.  I think now is a good time
7  to eat, because I'm kind of hungry.  An hour?
8     MR. DARAGJATI:  That's fine.
9     THE VIDEOGRAPHER:  Off the record.  The time is
10  11:36 a.m.  We're going off the record.
11     (A break was taken from 11:36 a.m. to
12     12:32 p.m.)
13     THE VIDEOGRAPHER:  The time is 12:32 p.m.
14  We're back on the record.
15  BY MR. ELKINS:
16  Q  Okay.  I think I had asked you earlier, so I
17  just want to double-check it, that for the 2020 EEOC
18  charge, which covered events up to February 2020, and
19  then events right after February 2020 through
20  June 2020, if Cosner was involved in anything in that
21  charge, and I think you said he was not.
22  A  That is correct.
23     (Defendant's Exhibit 5 was marked for
24     identification.)
25  BY MR. ELKINS:

Page 108

1  Q  Okay.  So I'm going to show you -- do you see
2  this document?
3  A  Yes.
4  Q  Okay.  This is your 2021 EEOC charge, which I
5  believe is the third EEOC charge you filed against the
6  city.  Correct?
7  A  That is correct.
8  Q  Okay.  Now, in this charge -- I'm going to
9  scroll down.  Right at the top here you say, On the
10  first day back to work after CP signed the agreement --
11  that's you, I believe, charging party -- Respondent
12  Cosner, who was previously involved in the conduct
13  leading to the 2020 charge -- so I'm confused.  Was he
14  involved in the 2020 charge or not?
15  A  He was not involved in the 2020 charge.
16  Q  Why did you put it in your 2021 charge that he
17  was?
18  A  So in the conduct leading to the 2020 charge,
19  which means everything that happened from the beginning
20  of -- of my tenure there, he was part of that conduct
21  leading up to the 2020 charge.  So I didn't file
22  anything against Cosner in 2014, moving on to 2020, but
23  he did have conduct leading up to the 2020 charge.  I
24  just had not reported it, like I said, because I was
25  scared to report his behavior towards me.

Page 109

1  Q  But he's not part of the 2020 charge, correct?
2  A  Not specifically, not there in that 2020 charge.
3  Q  Okay.
4  A  But he's involved in the conduct leading up to
5  the 2020 charge.
6  Q  Got it.
7     Do you know if Cosner was even aware that you
8  had filed a 2020 EEOC charge?
9  A  Yes.
10  Q  How do you know he was -- if he was or was not
11  aware?
12  A  Because he sat right in back of me in the
13  sergeants' office, and it was common knowledge of my
14  EEOC charge, as well as my LCA that was implemented.
15  And so he sat behind me.  It was a common occurrence
16  where sergeants in the sergeants' office were talking
17  about my EEOC charge, as well as my LCA, where they
18  would openly make comments about my EEOC charge and my
19  LCA.  And he sat right in back of me, and he was privy
20  to a lot of this information.  And he would see when
21  the FOP would come in -- into the office to ask me to
22  step out to come speak to them.  And it was common
23  knowledge throughout the whole entire station,
24  specifically the sergeants' office where this
25  information was known and it was open and it was out

28 (Pages 106 - 109)

Page 110

1 there.
2  Q  Do you have any evidence directly that he knew?
3 Like, did he tell you he knew?  Did someone tell you
4 that he knew?
5  A  No.
6  Q  You're just -- what I'm hearing is, you're
7 assuming he knew because, based on what you're telling
8 me, he overheard conversations about your LCA, which I
9 believe you're referring to your last chance agreement,
10 correct?
11  A  That is correct.
12  Q  And your 2020 EEOC charge?
13  A  That is correct.
14     And it was -- like I said, it was common
15 knowledge.  It was discussions that would happen
16 openly.  And at times, I was present for those
17 conversations, where I had to tell them, Hey, do not
18 discuss my EEOC in the office, in the sergeants'
19 office.
20  Q  Did you have to tell Cosner that?
21  A  No, I did not tell Cosner that.
22  Q  Did you hear him discussing it?
23  A  No.
24  Q  Okay.  You're talking about other sergeants that
25 you heard talking about it?

Page 111

1  A  Yes.
2  Q  Who?
3  A  A lot of my peers.  For instance, Mike Muley
4 would speak about it.  Jerome Berrian would speak about
5 it.  Other sergeants, like Frank Del Castillo, would
6 talk about it.  Just different sergeants would speak
7 about it or ask me about it.  And I would tell them,
8 Hey, I'm not going to discuss that with you, or I can't
9 discuss that with you.
10     And there were many times where Cosner was in
11 the office and was sitting in back of me when these
12 conversations were taking place.  Again, I didn't have
13 any interaction with him, but if he's in the office, I
14 assume that he heard it.
15  Q  Okay.  But you don't know for sure?
16  A  I mean, he's sitting in back of me, so, again, I
17 assume that he heard it.  It was loud enough that I
18 know that he would be able to hear.
19  Q  All right.  I'm going to show you what I'm going
20 to mark as Exhibit 6.
21     (Defendant's Exhibit 6 was marked for
22      identification.)
23 BY MR. ELKINS:
24  Q  Let me scroll up.  Do you recognize this
25 document?  Are you able to see it, first of all?

Page 112

1  A  Yes.
2  Q  Okay.  Do you recognize it?
3  A  Yes.
4  Q  This is your responses to interrogatories that
5 we sent in this case, correct?
6  A  Yes.
7  Q  All right.  I'm going to scroll down.
8     And I presume that's your signature?
9  A  Yes.
10  Q  Right?  Jessica Salabarria Guasto?
11  A  Yes.
12  Q  Okay.  And you had it notarized, correct?
13  A  That is correct.
14  Q  All right.  So you signed these answers under
15 oath, correct?
16  A  Yes.
17  Q  Okay.  I'm going to go to interrogatory
18 number 9.  I had asked you earlier if you filed your
19 2020 EEOC charge after you were placed under
20 investigation by internal affairs.  And I think you
21 wrote in your interrogatory answers:  Plaintiff filed
22 an EEOC charge in July 2020.  Prior to filing her
23 complaint in May 2020, the Miami Beach Police
24 Department gave plaintiff and her then-husband,
25 Nicholas Guasto, notice that they were being

Page 113

1 investigated for being outside the city limits while on
2 duty.
3  A  Okay.
4  Q  So you filed your EEOC charge after you were
5 placed under investigation, correct?
6  A  That is correct.
7  Q  Okay.
8  A  But that has nothing to do with -- with what I
9 was being investigated for or the EEOC charge.  I had
10 -- I had taken multiple steps and opportunities to try
11 to get these complaints that I had resolved.  And when
12 it wasn't getting resolved, when I kept not hearing
13 anything from the chief or from the city, I had no
14 other choice but to file the EEOC.  But it had nothing
15 to do with the investigation.
16  Q  I didn't ask you if it did.  All I asked you
17 was, did you file the EEOC charge after being placed
18 under investigation?  And I think the answer to that --
19 correct me if I'm wrong -- is you did.
20  A  That correct.  I just wanted to elaborate.
21  Q  You're free to do so.
22     Okay.  So at some point, I believe on
23 November 2nd, 2020, there was a meeting that you were
24 present for regarding both your EEOC charge and the
25 pending internal affairs investigation.  Do you

Page 114

1 remember that meeting?
2   A   Yes.
3   Q   Did you attend that meeting?
4   A   Yes.
5   Q   Okay.  And did you have two lawyers at that
6 meeting?
7   A   Yes.
8   Q   And that was Michael Pancier and Gene Gibbons,
9 correct?
10   A   That is correct.
11   Q   Do you remember who from the city was at that
12 meeting?
13   A   I remember that Michael Smith was at that
14 meeting, from my recollection.  I believe Richard
15 Clements.  And you were present.  And I don't recall
16 who else was present off the top of my head right now.
17   Q   A.J., I think, the internal affairs --
18   A   Yes, that's correct.
19       Do you have the document that you're referring
20 to?
21   Q   I'm not referring to any documents.
22   A   Okay.
23   Q   Okay.  And you understood that that meeting was
24 a confidential settlement meeting to discuss your EEOC
25 charge and the pending IA investigation, correct?

Page 115

1   A   That is correct.
2   Q   Okay.  You had previously made allegations that
3 that meeting turned into an improper 112 interrogation.
4 Are you familiar with that?
5   A   Yes.
6   Q   Okay.  At any point in that meeting, did either
7 of your two lawyers stop the meeting and allege that it
8 was an improper 112 investigation?
9   A   No, they did not.
10   Q   Okay.  And correct me if I'm wrong, but wasn't
11 the president of the FOP at the time, Kevin Millan,
12 present at that meeting?
13   A   Yes, he was -- he was present.
14   Q   Did he ever stop the meeting and say, This is an
15 improper 112 investigation?
16   A   Not from what I recall.
17   Q   And one of your lawyers was your union attorney,
18 Eugene Gibbons, correct?
19   A   That is correct.
20   Q   And as I understand it -- correct me if I'm
21 wrong -- Mr. Gibbons has extensive experience in
22 internal affairs matters and 112 interviews; is that
23 correct?
24   A   I don't know that to be true or not.
25   Q   Okay.  Were you comfortable with him as your FOP

Page 116

1 attorney at the time?
2   A   I was not comfortable with him as my FOP
3 attorney at the time.
4   Q   Why not?
5   A   Because when I had previously had the issue
6 where I got wrongfully demoted, again I expressed that
7 I didn't want to settle with these terms.  And Gene
8 Gibbons was pushing for me to settle with these terms,
9 saying that the FOP would not be able to continue to
10 fight it or would not -- it was -- it would be in my
11 best interest.  And I kept telling him that I did not
12 agree with the terms of the settlement.  However, like
13 I stated before, I settled because all I wanted was
14 just to be reinstated back to sergeant, and that meant
15 more to me than continuing to fight for monies, when
16 money wasn't important to me.  What was important to me
17 was my rank.
18       So in that meeting, I didn't feel properly
19 represented.  I felt like the FOP was working for
20 management, and I felt that they didn't do their due
21 diligence and their job to stop this meeting, this
22 so-called meeting, that turned into an interrogation,
23 where they violated my 112 officer bill of rights.
24   Q   You're referring to the November 2nd, 2020
25 meeting?

Page 117

1   A   Yes.
2   Q   And so sitting here today, are you continuing to
3 allege that your 112 police officer bill of rights were
4 violated during that meeting?
5   A   Yes.
6   Q   At any point in time in that meeting, did you
7 stand up and say, This is an improper meeting?
8   A   Well, when I tried to let my counsel know what
9 was --
10   Q   Hold on.  I don't want to know what you talked
11 to your lawyer about.
12   A   Oh, I'm sorry.  I apologize.
13   Q   Yeah.  Don't tell me -- I'm saying this
14 respectfully.  Do not tell me what your lawyers told
15 you.  So when I'm asking -- and I should have made this
16 clear, so let me clarify for you.  I'm talking about
17 what happened in that room, the room that you were in
18 with your lawyers, plus all the personnel from the
19 city.  Does that make sense?
20   A   That makes sense.
21   Q   Anything you talked to them about privately, do
22 not tell me that.
23   A   Okay.
24   Q   I'm not asking about it.
25       Okay.  So let me reask the question.

30 (Pages 114 - 117)

Page 118

1    MR. ELKINS:  We'll strike from the record the
2    statement "when I told my counsel."  Strike that, so
3    that there's no waiver issue.
4    BY MR. ELKINS:
5    Q   During the meeting, did you ever speak up in the
6    room, in front of everybody, that it was an improper
7    112 investigation?
8    A   No.  In the meeting, I was intimidated.  I was
9    scared.  I didn't know what this meeting was about,
10   because the meeting was presented to me that it was
11   going to be an EEOC meeting where there was going to be
12   a settlement in regards to the EEOC and that all my
13   concerns were going to be heard by the chief and the
14   city.
15       However, when I sat there, they presented on a
16   PowerPoint one still shot from this investigation, and
17   they asked me questions to answer, what was on the
18   PowerPoint, in violation of my due processes and my 112
19   rights.  And I didn't want to discuss it.  I didn't --
20   I stayed quiet.  And I looked over to my attorney and
21   to the FOP.  And I believe that's when we had a break
22   in the meeting, and then from there, we went over to
23   another room and I had discussions with my counsel.
24   Q   Don't talk to me about --
25   A   I'm not.  I'm not.  I'm just saying what

Page 119

1    happened.
2    Q   There were multiple breaks during that meeting,
3    correct?
4    A   Yes.
5    Q   Okay.  And at any point in time during the
6    display of the PowerPoint, did either of your lawyers
7    object to any questioning about what was going on with
8    the PowerPoint?
9    A   They did not.  And that's what was so concerning
10   to me, was the fact that they did not.  And there is a
11   clear violation of my 112 by this PowerPoint, and
12   nobody is saying anything to defend me or to uphold my
13   officer bill of rights.
14   Q   And at any point in time, did the president of
15   the FOP interject and say, This is an improper
16   investigation, during the PowerPoint?
17   A   No, he did not.
18       Again, I felt like I was being misrepresented.
19   I felt that they -- but when I say "they," the city and
20   the chief made it seem like this meeting was to discuss
21   the EEOC and to discuss my concerns.  And the meeting
22   invite said it was going to be a meeting invite for a
23   settlement and to discuss the EEOC.
24       And when I get there, I'm blindsided by this
25   PowerPoint that was presented, with internal affairs

Page 120

1    sitting in the room, on a laptop, writing I don't know
2    what type of notes, that were never presented to me,
3    again in violation of my due process.  And they're
4    asking me to answer questions of something that -- a
5    document that I haven't even reviewed.  And so, yeah, I
6    was misrepresented.
7        And, again, I strongly believe that at the time,
8    the FOP and Gene Gibbons was more on management's side,
9    more than on my side.  They didn't protect me.
10   Q   Did you take any action against the FOP, Gene,
11   or your private lawyer, Michael Pancier?
12   A   No, I did not.
13   Q   You didn't file a ULP against the FOP?
14   A   No, I did not, because I had no knowledge of
15   what to do or how to do it.  Again, I was scared.  I
16   felt intimidated.  I felt -- I'm in a room full of all
17   these men and with all this authority, and I'm
18   basically left in this meeting out to dry.  Nobody's
19   speaking up, when there's clear violations.
20   Q   Well, to be fair, you're saying you were left in
21   this room, but you did have two lawyers and the
22   president of the FOP there on your behalf, correct?
23   A   That is correct.
24   Q   And one of those lawyers you hired on your own.
25   That's Michael Pancier, correct?

Page 121

1    A   So the attorney that I hired was recommended by
2    Gene Gibbons, who told me he cannot file the EEOC, so
3    he asked me to --
4    Q   Hold on.
5    A   Oh, I'm sorry.  I'm so sorry.
6    Q   Let's strike any commentary about what Gene
7    Gibbons told her -- told you.
8        MR. ELKINS:  I'm sorry.  Can you read back my
9    question.
10       (The requested portion of the record was
11       read back by the reporter as above
12       recorded.)
13   BY MR. ELKINS:
14   Q   So let me clarify that question, to maybe help
15   you be able to answer it without revealing anything
16   that might be privileged.
17   A   Thank you.
18   Q   Gene Gibbons is a lawyer provided to you by
19   virtue of your prior membership in the FOP, correct?
20   A   That is correct.
21   Q   He's the FOP's counsel, correct?
22   A   That is correct.
23   Q   And you don't have to pay for him --
24   A   That is correct.
25   Q   -- right?

31 (Pages 118 - 121)

Page 122

1    Since your FOP dues and that type of thing?
2    A   That is correct.
3    Q   But Michael Pancier was not through the FOP.
4    That was a lawyer that you, Jessica Salabarria, engaged
5    separate on your own.  Correct?
6    A   That is not correct.
7    Q   Okay.
8    A   I mean, it is --
9    Q   Explain that.
10   A   -- it is correct in a way, because I was the one
11   who hired him.  However, I was advised to do so and --
12   Q   Don't tell me what you were advised to do.
13   A   Okay.
14   Q   The fact is, you hired him on your own?
15   A   Yes.
16   Q   That's what matters.
17   A   Yes.
18   Q   Okay.  And is it fair to say that Gene was your
19   labor lawyer and Michael Pancier was your employment
20   lawyer, your private employment discrimination lawyer?
21   A   Yes.  Pancier was for the EEOC.
22   Q   And Gene was for the internal affairs
23   investigation and things of that nature?
24   A   That is correct.
25   Q   So if you weren't expecting there to be any

Page 123

1    discussions about the internal affairs investigation,
2    why would Gene need to be there?
3    A   So that's exactly my point.  I was told that
4    this meeting was going to be EEOC-related and it was
5    going to be to discuss my concerns with the behavior
6    that was going on in the police department with all of
7    my lieutenants, the lieutenants that I named in the
8    EEOC, and the behavior that I discussed in the EEOC.
9       And when I get there, that was not the case.  It
10   was -- it turned into an interrogation, and they never
11   discussed the EEOC.  They never discussed any of my
12   accusers -- any of the accusers that I put on the EEOC.
13   They never spoke about the behavior that was going on.
14   They stopped me from speaking about the behavior that
15   was going on.  Specifically, the chief said, We're not
16   doing that here.  And so -- and so at some point after
17   the PowerPoint was presented and I refused to speak
18   about the PowerPoint, because I knew something was
19   wrong, that's when we took a break and the meeting
20   was -- was -- was paused at the moment.
21   Q   Did you record the meeting?
22   A   No, I did not.
23   Q   You didn't leave a phone in the room recording
24   anything?
25   A   No, I did not.

Page 124

1    Q   Why -- when your former attorney, Jason Kuno,
2    was presented with allegations that you recorded the
3    meeting, why didn't you just have your lawyer refute
4    them?
5    A   I don't know what my lawyer did in his responses
6    to the city, but I do know that I read several
7    documentations where he said there is no recording.
8    And I believe that was also discussed through my
9    counsel at the moment.
10   Q   Mr. Kuno?
11   A   No.  My current one as well.
12   Q   I don't want to know what you talk about with
13   your current counsel.
14      Okay.  And so, eventually, after the meeting,
15   you're familiar that the parties -- the parties, the
16   city and your lawyers, engaged in some settlement
17   discussions?  Do you remember that?
18   A   Yes.
19   Q   Okay.  And those settlement discussions resulted
20   in two documents, a settlement agreement and a last
21   chance agreement, correct?
22   A   So on the day of the meeting where they
23   discussed settlements, which -- which was with the
24   chief present and the HR director -- you were in there
25   as well -- again, like you noted, the people that were

Page 125

1    in the meeting, they said a settlement agreement was
2    presented to my side through the FOP.  But they never
3    specifically said what the settlement agreement would
4    be and that they would later on a later date let me
5    know what the settlement entailed.  It was vague.
6    There was no type of indication that the settlement
7    agreement would include any type of LCA.  In fact,
8    while I was sitting there, I didn't want to agree to a
9    settlement agreement.  However, I was told that if I
10   didn't agree to the settlement agreement, that I would
11   be terminated, based on the PowerPoint that was
12   presented on the big screen.
13   Q   Who told you that?
14   A   You did.
15   Q   I told you that?
16   A   Yes.
17   Q   What did I say?
18   A   You said, The city does not want you here,
19   you're not a good fit for the city, and the city's not
20   a good fit for you, and so it would be best right now
21   for you to settle; and if you don't agree, what's on
22   the PowerPoint up there right now is going to lead to
23   you being terminated, and if you don't agree to that
24   settlement, you're going to be terminated.
25      And that was said in front of everybody else

32 (Pages 122 - 125)

Page 126

1 that was present in that meeting. And when I tried to
2 speak about the behavior that was occurring, there was
3 a comment that was mentioned that, So what if officers
4 and sergeants view porn in the office, they're a bunch
5 of cops, not choir boys.
6       And that was said in front of me, in my
7 presence, which was absolutely -- it was -- it was so
8 offensive and so hurtful to hear that being said in
9 front of everybody, to be said, So what if officers
10 watch porn, they're a bunch of police officers, not
11 choir boys. It was the most offensive and derogatory
12 term that I heard in that meeting. And I knew then and
13 there that there was no interest of listening to any of
14 my concerns and listening to any of my EEOC complaints.
15 And this was all about trying to get me to settle with
16 the city and to settle into -- agreeing into a
17 settlement agreement, that was not presented to me on
18 what the settlement terms would be, just that if I
19 didn't agree, I would be terminated based on the
20 PowerPoint.
21    Q  And I told you that?
22    A  That -- yes.
23    Q  Did your lawyers object when I supposedly said
24 this?
25    A  They did not.

Page 127

1    Q  Did the president of the FOP object when I
2 supposedly said this?
3    A  They did not. Again, that's why I believe that
4 the FOP was not working for me but more so for
5 management.
6    Q  So I think what my question was -- and I
7 appreciate that answer -- was that after the meeting,
8 there were settlement discussions between the city and
9 your lawyers. Is that accurate or not?
10    A  All that was told was, Let's do a settlement,
11 the terms of the settlement are not -- we don't know
12 what the terms are going to be, but we will let you
13 know.
14       And, again, it was based on the fact that if I
15 didn't agree to the settlement, that I would be
16 terminated based on the PowerPoint.
17    Q  You were not presented the terms of any
18 settlement agreement at the November 2nd meeting, were
19 you?
20    A  No.
21    Q  The terms of -- and any negotiations of a
22 settlement were between the city and your lawyers,
23 correct?
24    A  That is correct.
25    Q  The city made proposals, and then your lawyers

Page 128

1 made counterproposals, correct?
2    A  That is correct.
3    Q  So the settlement agreement and last chance
4 agreement that you ultimately signed was the product of
5 negotiation between your representatives and the city,
6 correct?
7    A  That is correct.
8    Q  Okay. So I'm showing you what I'm marking as
9 Exhibit 7, which you should have up on your screen.
10       (Defendant's Exhibit 7 was marked for
11       identification.)
12 BY MR. ELKINS:
13    Q  Can you see it?
14    A  I see a settlement agreement.
15    Q  Okay.
16    A  The first page?
17    Q  Yes.
18       And this relates to EEOC charge
19 number 510-2020-04794, which is the 2020 EEOC charge.
20       And then if I scroll down here, this has some
21 terms about you paying back some money to the city,
22 taking a suspension.
23       This is the settlement agreement that resulted
24 from that November 2nd meeting and then further
25 negotiations, correct?

Page 129

1    A  That is correct.
2    Q  Okay. And you did sign this, didn't you?
3    A  That is correct.
4    Q  And you can -- I can see it's initialed on each
5 page. Are these your initials on each page?
6    A  That is correct.
7    Q  Okay. And is that your signature --
8    A  That is correct.
9    Q  -- on the settlement agreement?
10       And then there's a last chance agreement, right?
11    A  That is correct.
12    Q  And is that your signature -- I'm going to
13 scroll down the pages, but is that your signature on
14 each page?
15    A  Yes.
16    Q  Okay. And then the last chance agreement,
17 that's your signature, correct?
18    A  That is correct.
19    Q  Okay. And going through the terms here,
20 starting on page 1 and going to page 2, you ultimately
21 agreed to take a 160-hour suspension, correct?
22    A  That is correct.
23    Q  You agreed to pay back 86 total hours of time,
24 split up. I think 44 was regular time and 24 was
25 overtime. Correct?

33 (Pages 126 - 129)

1    A   That is correct.
2    Q   And so I think the total amount you were paying
3  the city was $3,531.20, correct?
4    A   That is correct.
5    Q   And you paid that to the city?
6    A   Yes.
7    Q   Okay.  So unlike many settlement agreements, the
8  city didn't pay you anything; you paid the city?
9    A   That is correct.
10   Q   Okay.  You agreed to execute the last chance
11  agreement, correct?
12   A   That is correct.
13   Q   You agreed to delete your podcast Cafecitos -- I
14  can't pronounce the full name, but it's --
15   A   Cafecitos y Chisme with Nick & Jess.
16   Q   You agreed to delete that, correct?
17   A   Yes.
18       So when it came to the last chance agreement and
19  the settlement agreement, I did not want to agree to
20  any settlement agreement or any last chance agreement.
21  Again, I can't discuss what I spoke with my counsel,
22  but I do have information that -- that proves what --
23  what I wanted in lieu of the settlement agreement,
24  which did not include a last chance agreement or a
25  settlement agreement.  The city went back and forth

1  with my representatives, and I was told that if I
2  didn't agree to the settlement agreement --
3        MR. DARAGJATI:  Hold on a second.  Do not talk
4  about --
5        THE WITNESS:  Okay.
6        MR. DARAGJATI:  -- conversations you had with
7  Gene or with Pancier.
8        THE WITNESS:  Okay.
9        MR. DARAGJATI:  Do you understand?
10       THE WITNESS:  Yes.
11  BY MR. ELKINS:
12   Q   Do you have anything else that you could testify
13  to that would not -- on this topic, that would not
14  involve your conversations with your counsel?
15   A   Not -- correct.  No.  Just that I didn't want to
16  sign this agreement and -- I wanted to take this --
17  this case to internal affairs, and I didn't want to
18  agree to a settlement agreement.  And I felt like I had
19  no other choice.
20   Q   And you didn't want to agree to the first
21  settlement agreement you signed, correct?
22   A   That is correct.
23   Q   And you were also being advised by the FOP
24  president as to this settlement agreement and last
25  chance agreement, correct?

1    A   That is correct.
2    Q   Did he advise you to sign this?
3    A   Yes, he did.  And I kept telling him that I
4  didn't want to sign it, that I was scared that as soon
5  as I signed, I was going to be terminated.  And that's
6  exactly what happened.  On my first day back after
7  signing this agreement, Lieutenant Cosner made these
8  allegations against me, on my very first day, on the
9  only day that I've ever worked for him as -- in a
10  subordinate position.  And he writes these allegations,
11  and this LCA was implemented.
12   Q   Did anyone force you to sign this?
13   A   I felt forced.
14   Q   Why?
15   A   Because in the settlement meeting that was an
16  interrogation, I felt like I had no other choice but to
17  get -- but to agree to a settlement, because I was
18  being threatened with termination.
19   Q   The interrogation that the FOP president, your
20  labor lawyer, and your private attorney -- the
21  interrogation that none of them objected to?
22   A   That is correct.  But that's how I felt and
23  that's -- and, again, nobody at that point stood up for
24  me or guided me in the right way, and my concerns were
25  left unheard.  And I didn't want to go through a

1  settlement.  I wanted to go through my due processes
2  and through my officer bill of rights and -- that's
3  what I wanted, to -- to go through the process, just
4  like everybody else, and not have to go through a
5  settlement agreement, because I knew what was going to
6  happen.  And ultimately, it did.
7    Q   Then why did you sign it?
8    A   Again, I was scared.  I was scared, because I
9  was being told in this meeting, in front of everybody,
10  that if I didn't agree to it, I was going to get
11  terminated.
12   Q   Well, you weren't presented this settlement
13  agreement at the November -- hold on.  You were not
14  presented this settlement agreement at the November 2nd
15  meeting, were you?
16   A   No.
17   Q   You were not presented any of these terms at the
18  November 2nd meeting?
19   A   No.
20       MR. ELKINS:  Let's take a break for two
21  minutes.  Let's go off the record.
22       THE VIDEOGRAPHER:  The time is 1:04 p.m.  We're
23  going off the record.
24       (A break was taken from 1:04 p.m. to
25       2:58 p.m.)

34 (Pages 130 - 133)

Page 134

1    THE VIDEOGRAPHER:  The time is 2:58 p.m.  We're
2  back on the record.
3    MR. ELKINS:  So we've agreed, between the
4  lawyers, that we're going to suspend the deposition.
5  It's been rescheduled via Zoom for February 13th at
6  10:00 a.m.
7  I'll remind the witness that she's still in the
8  deposition, so she can't discuss her testimony with
9  counsel during the suspension.
10  And we will reconvene February 13th via Zoom.
11  Anything else, Paul?
12    MR. DARAGJATI:  No.  That encapsulates the
13  agreement.
14  Do you have a time when you want to do it?
15    MR. ELKINS:  10:00 a.m.
16    MR. DARAGJATI:  10:00 a.m.?  Okay.  That's
17  fine.  Okay.  Very good.
18    MR. ELKINS:  Okay.  Thank you.
19    THE VIDEOGRAPHER:  Before we get off the video
20  record, are there any video orders today?
21    MR. DARAGJATI:  Not from the plaintiff.
22    MR. ELKINS:  Not from the city, no.
23    THE VIDEOGRAPHER:  All right.
24    THE COURT REPORTER:  Any record, transcript?
25    MR. ELKINS:  No, I'm not going to order yet.

Page 135

1    MR. DARAGJATI:  No, ma'am.
2    THE VIDEOGRAPHER:  That concludes today's
3  testimony given by Ms. Jessica Guasto.  The time is
4  now 3:00 p.m., and we are going off the record.
5    (Thereupon, the deposition was adjourned
6    at 3:00 p.m.)
7
8    EXCEPT FOR ANY CORRECTIONS
9    MADE ON THE ERRATA SHEET BY ME,
10    I CERTIFY THIS IS A TRUE AND
11    ACCURATE TRANSCRIPT.  FURTHER
12    DEPONENT SAYETH NOT.
13
14  _____
15  WITNESS' NAME
16
17  STATE OF FLORIDA    )
18    ) SS:
19  COUNTY OF MIAMI-DADE)
20
21    Sworn and subscribed to before me this _____ day
22  of _____ 2024.
23  PERSONALLY KNOW_____ OR I.D.
24  _____
25  _____

Page 136

1    Notary Public in and for the State of Florida at
2  Large.
3  My commission expires: July 20, 2025
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 137

1    ERRATA SHEET
   RE : Jessica Guasto v. City of Miami Beach
2  DEPO OF: Jessica Guasto
   TAKEN : February 6, 2024
3  ASSG# : 633790
   DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
4  Page # | Line # | Change   | Reason
   _____|_____|_____|_____
5  _____|_____|_____|_____
6  _____|_____|_____|_____
7  _____|_____|_____|_____
8  _____|_____|_____|_____
9  _____|_____|_____|_____
10  _____|_____|_____|_____
11  _____|_____|_____|_____
12  _____|_____|_____|_____
13  _____|_____|_____|_____
14  _____|_____|_____|_____
15  _____|_____|_____|_____
16  State of Florida ) _____
   County of     )  Notary Public
17
   Under penalties of perjury, I declare that I have read
18  my deposition transcript, and it is true and correct
   subject to any changes in form or substance entered
19  here.
20  _____
   Date        Signature
21
22
23
24
25

35 (Pages 134 - 137)

Page 138

1
         CERTIFICATE OF OATH

2

3 STATE OF FLORIDA:
       : SS

4 COUNTY OF DADE:

5

6    I, Marlene Gutierrez, Shorthand Reporter and

7 Notary Public, State of Florida, certify that JESSICA

8 GUASTO appeared before me on the 6th day of February,

9 2024, and was duly sworn.

10

11    WITNESS my hand and official seal this 14th day

12 of February, 2024.

13

14

15 _____

16    Marlene Gutierrez

17    Notary Public-State of Florida

18    My Commission #GG126375

19    Expires: July 20, 2025

20

21

22 Personally known_____

23 Or Produced Identification_____

24 Type of Identification Produced_____

25

---

Page 139

1    REPORTER'S DEPOSITION CERTIFICATE

2

3

4 STATE OF FLORIDA:

5       : SS

6 COUNTY OF DADE:

7

8    I, Marlene Gutierrez, Notary Public, certify

9 that I was authorized to and did stenographically

10 report the deposition of JESSICA GUASTO; that a review

11 of the transcript was requested; and that the

12 transcript is a true and complete record of my

13 stenographic notes.

14

15    I further certify that I am not a relative,

16 employee, attorney, or counsel of any of the parties,

17 nor am I financially interested in the action.

18

19    Dated this 14th day of February, 2024.

20

21 _____

22    MARLENE GUTIERREZ

23

24

25

---

Page 140

1    VERITEXT FLORIDA REPORTING COMPANY
    2 South Biscayne Boulevard

2     Suite 2250
    Miami, Florida 33131

3     (305) 371-1884
      (305) 377-1100 (fax)

4

   February 13, 2024

5

   Jessica Guasto

6 EMAIL: paul@daragjatilaw.com

7 RE  : Jessica Guasto Vs. City of Miami Beach
   DEPO OF: Jessica Guasto

8 TAKEN : February 6, 2023
   Number of pgs: 136

9

10 The above-referenced transcript is available for
   review.

11

   JESSICA GUASTO should read the testimony to

12 verify its accuracy. If there are any changes, JESSICA
   GUASTO should note those with the reason on the

13 attached Errata Sheet.

14    JESSICA GUASTO should, please, date and sign the
   Errata Sheet and email to the deposing attorney as well

15 as to Veritext at Transcripts-fl@veritext.com and
   copies will be email to all ordering parties.

16

   It is suggested that the completed errata be

17 returned 30 days from receipt of testimony, as
   considered reasonable under Federal rules*, however,

18 there is no Florida statute to this regard.

19 If the witness fails to do so, the transcript may be
   used as if signed.

20

21 Yours,

22 Veritext Legal Solutions

23

24

25

---

Page 141

1    VERITEXT FLORIDA REPORTING CO.
    2 South Biscayne Boulevard, #2250

2     Miami, Florida 33131
    (305) 376-8800

3

   February 13, 2024

4

   MICHAEL L. ELKINS, ESQ.

5 MLE Law
   1212 Northeast 16th Terrace

6 Fort Lauderdale, Florida 33304
   melkins@mlelawfirm.com

7

   RE:  Jessica Guasto vs. City of Miami Beach

8 DEPO OF: Jessica Guasto
   TAKEN:  February 6, 2024

9

   Dear Counsel:

10 The original transcript of the deposition listed above
   is enclosed for your file. The witness did not waive

11 reading and signing and has been sent a letter
   notifying them to read and sign their deposition

12 transcript.
   The witness will be provided a copy of their deposition

13 transcript for reading, and we will forward to you any
   corrections made by the witness at that time, along

14 with an original signature page which should be
   attached to the original transcript which is in your

15 possession.

16 Sincerely,

17

18 Marlene Gutierrez

19

20

21

22

23

24

25

36 (Pages 138 - 141)

**[& - 2nd]**

**&**

**&**   130:15

**0**

**001354**   62:2

**1**

**1**   3:10 4:3 39:15
39:19 95:17
129:20
**10**   64:18 87:13
**107**   3:14
**10:00**   134:6,15
134:16
**10:58**   93:3,5
**11**   64:22
**111**   3:15
**112**   115:3,8,15
115:22 116:23
117:3 118:7,18
119:11
**11:17**   93:6,7
**11:36**   107:10,11
**12**   42:15 64:24
**1212**   2:8 141:5
**128**   3:16
**12:32**   107:12,13
**13**   55:23 140:4
141:3
**136**   140:8
**13th**   75:11
134:5,10
**14**   50:19 73:18
73:23 87:21
89:16

**14th**   138:11
139:19
**15**   61:19 73:18
87:13,21 89:16
**15ish**   73:23
**160**   129:21
**16th**   2:8 141:5
**17**   56:7
**1700**   2:13
**17ish**   56:3,3
**18**   56:3
**19**   82:1
**19ish**   79:20
**1:04**   133:22,24
**1:22**   1:3

**2**

**2**   1:14 3:11 4:6
31:24,25 41:7,9
62:1 97:19
100:9 129:20
140:1 141:1
**20**   33:2 42:11
68:5 78:12
136:3 138:19
**2012**   36:22
50:15,18,19,20
50:23
**2013**   62:6
**2014**   50:13,18
50:24 52:4 54:1
54:19 55:13
57:14 58:9,13
58:22 61:19
63:25 68:20
108:22

**2015**   64:25
68:20
**2017**   37:10 58:7
70:19 73:17,25
80:23
**2017ish**   56:2
**2018**   79:20
**2018-11**   41:19
**2019**   41:16
42:16
**2020**   36:22 54:2
54:3,4,5,18
55:14 57:15
73:19,24 75:11
78:11,12,13
80:24 90:20
93:16 94:20,25
95:4,8,14,17
96:1,5,6,11,14
96:14,14,14,24
96:25 97:18,19
100:10 102:11
102:21 103:1,19
104:5,5 105:8
105:15,20
106:12,17
107:17,18,19,20
108:13,14,15,18
108:21,22,23
109:1,2,5,8
110:12 112:19
112:22,23
113:23 116:24
128:19

**2021**   31:11,14
32:6 54:2
105:21,24 108:4
108:16
**2022**   29:18
31:14 32:6 96:2
**2023**   9:8,20,20
13:13 14:2,2
16:2,15 17:12
17:18 18:21
19:1,4,17 20:5,6
29:18 140:8
**2024**   1:15 4:2
135:22 137:2
138:9,12 139:19
140:4 141:3,8
**2025**   136:3
138:19
**20th**   63:24
**21004**   1:3
**22**   52:22 53:11
65:14
**2250**   140:2
141:1
**24**   129:24
**25th**   62:5
**2:58**   133:25
134:1
**2nd**   113:23
116:24 127:18
128:24 133:14
133:18

| 3 |
|---|
| **3** 3:12 48:22 61:11,13 |
| **3,531.20** 130:3 |
| **30** 33:2 140:17 |
| **305** 140:3,3 141:2 |
| **3120** 138:14 139:20 |
| **32224** 2:4 |
| **33131** 140:2 141:2 |
| **33139** 2:14 |
| **33304** 2:9 141:6 |
| **371-1884** 140:3 |
| **376-8800** 141:2 |
| **377-1100** 140:3 |
| **39** 3:10 |
| **3:00** 1:16 135:4 135:6 |

| 4 |
|---|
| **4** 3:13 63:11 74:20 |
| **40,000** 9:24 |
| **401** 33:16,18,25 34:4 |
| **40s** 52:23 |
| **41** 3:11 |
| **44** 129:24 |
| **44,000** 35:11 |
| **4745** 2:3 |

| 5 |
|---|
| **5** 3:4,14 63:13 107:23 |

| 50 |
|---|
| **50** 19:11,12 32:17 |
| **503** 2:4 |
| **510-2018-064...** 42:2 |
| **510-2020-047...** 128:19 |

| 6 |
|---|
| **6** 1:15 3:15 111:20,21 137:2 140:8 141:8 |
| **60** 19:11,12 |
| **60,000** 29:21 |
| **61** 3:12 |
| **633790** 137:3 |
| **6th** 4:2 138:8 |

| 7 |
|---|
| **7** 3:16 64:3 128:9,10 |
| **74** 3:13 62:9 |

| 8 |
|---|
| **8** 63:23 |
| **80,000** 20:8 |
| **86** 129:23 |
| **8:58** 4:2 |

| 9 |
|---|
| **9** 64:12 112:18 |
| **9:00** 1:16 |
| **9:35** 35:25 36:2 |
| **9:42** 36:3,4 |

| a |
|---|
| **a.j.** 114:17 |

**a.m.** 1:16 4:2 35:25 36:2,3,4 93:3,5,6,7 107:10,11 134:6 134:15,16
**able** 6:16 37:24 48:1 69:20 111:18,25 116:9 121:15
**above** 1:22 28:16 121:11 140:10 141:10
**abruptly** 53:1 56:21 65:16 67:21
**absolutely** 22:9 54:20 77:8 126:7
**abuse** 20:25
**accept** 42:11
**accident** 68:18
**account** 27:23 27:24 77:16
**accrued** 89:10
**accuracy** 140:12
**accurate** 127:9 135:11
**accused** 89:9
**accusers** 123:12 123:12
**accusing** 86:25
**acknowledge** 53:23
**acknowledging** 90:3

**acquaintance** 51:14
**acting** 55:7
**action** 15:23 69:22 83:10,11 98:16,18 99:2 99:12 120:10 139:17
**actions** 52:9,20 54:23 59:5
**activity** 105:16 106:11
**acts** 102:15
**actually** 82:16 101:11
**add** 62:25
**added** 27:14
**additional** 43:5
**address** 5:10
**addressed** 8:25 80:11,17 81:15 94:22 95:6
**addressing** 95:7
**adds** 72:18
**adjourned** 135:5
**administration** 16:12 104:24
**administrative** 85:12 89:25 91:2
**advances** 53:8 53:19 67:13 80:22

**[advantage - approximately]**

**advantage** 48:2
48:4
**advice** 65:14,15
**advise** 132:2
**advised** 98:21
99:19 122:11,12
131:23
**affairs** 38:22,25
40:14,18,20
68:13 69:12
75:14,16 99:13
99:18,22 100:6
112:20 113:25
114:17 115:22
119:25 122:22
123:1 131:17
**affecting** 69:5,5
69:6
**agencies** 72:7,8
72:19
**ago** 17:2 34:23
37:6 48:17
**agree** 44:2,6,7
45:10,12 46:5,6
46:14,17 47:4,5
47:12 48:25
50:4 116:12
125:8,10,21,23
126:19 127:15
130:19 131:2,18
131:20 132:17
133:10
**agreed** 42:11
43:5,25 129:21
129:23 130:10

130:13,16 134:3
**agreeing** 48:7
126:16
**agreement** 3:11
3:16 15:18
41:16 42:7,24
43:25 46:23
47:15 48:3
108:10 110:9
124:20,21 125:1
125:3,7,9,10
126:17 127:18
128:3,4,14,23
129:9,10,16
130:11,18,19,20
130:20,23,24,25
131:2,16,18,21
131:24,25 132:7
133:5,13,14
134:13
**agreements**
47:3 130:7
**ah** 6:9
**ahead** 45:24
76:21 94:17
97:3
**aiu** 69:17
**albert** 59:1
**alcohol** 20:25
23:5,15
**allegation** 54:17
**allegations** 8:14
49:6 58:6 89:14
94:24 95:17
97:18 105:13

106:19,21,23
107:4 115:2
124:2 132:8,10
**allege** 115:7
117:3
**allowed** 42:14
**amount** 79:5
130:2
**anal** 91:24
**andrew** 91:21
**anger** 58:8,10
**angry** 54:10
57:16,25 58:11
**animosity** 53:25
55:3 58:18
74:12
**answer** 6:18
49:8,12,13
53:18 113:18
118:17 120:4
121:15 127:7
**answered** 48:10
**answering** 7:5
**answers** 6:8,17
112:14,21
**anticipate** 6:16
**anybody** 28:16
46:12 78:16
89:7 99:9
101:16
**anybody's**
72:22
**anymore** 20:17
44:5 69:1

**anyone's** 89:17
89:18
**apologies** 45:24
**apologize** 10:22
11:12 117:12
**apology** 20:24
21:11 23:22
**appalling** 77:8
**apparently** 23:5
63:4
**appearances** 2:1
**appeared** 138:8
**appearing** 4:18
**applications**
18:10,15 19:17
**applied** 16:6,13
16:24 17:14,17
18:23 19:5,6
**apply** 17:6
19:10
**appreciate**
21:12 127:7
**approve** 30:20
55:25 56:10,11
56:14,24,25
57:8,10,18 58:8
58:11 73:17,25
**approved** 30:23
55:25
**approving**
57:20
**approximate**
7:25
**approximately**
9:24 78:25,25

98:6
**april** 96:2,6,14
102:10,21
**arbitration**
47:17 49:19
**arm's** 53:7
**arrest** 24:9
**arrested** 5:18
20:23 21:6,10
24:7 26:21
**asked** 8:24 21:3
21:16 24:15
55:24 56:10
57:8,13,18 59:4
59:8 73:15
82:16 94:9,12
98:10 107:16
112:18 113:16
118:17 121:3
**asking** 7:1,6
18:24 48:1
75:20 87:9 95:3
96:3 100:11,20
117:15,24 120:4
**assault** 21:9
**assaulted** 20:20
**assaulting** 24:23
**assg** 137:3
**assign** 32:2
69:16
**assigned** 43:10
**assistants** 29:8
**assume** 111:14
111:17

**assuming** 94:21
101:13 110:7
**attached** 140:13
141:14
**attempt** 11:1
74:6
**attempted** 24:3
65:7
**attend** 43:8
114:3
**attention** 38:20
**attorney** 7:14
7:15 24:10
49:14 101:18
115:17 116:1,3
118:20 121:1
124:1 132:20
139:16 140:14
**attorney's** 4:20
40:21 45:25
46:1
**audible** 6:7
**august** 20:5
22:14,15,18,23
22:24 42:15
**authority** 58:3,4
80:6 120:17
**authorized**
139:9
**automatic** 33:22
34:2
**automatically**
34:3,4
**available**
140:10

**avenue** 47:21
**aware** 109:7,11
**azicri** 83:21
97:13 98:1

**b**

**b** 10:3
**back** 5:13 9:1
10:23 21:13
25:18 26:8 27:3
34:18 36:5 39:5
39:5 42:21,22
42:25 43:22
44:1,4,9 45:18
45:18 46:21
47:7,8,12 48:12
48:13,19 50:8
50:23 54:1,8
55:12 64:2
67:23 76:12,19
81:2,3 86:4,24
87:13 88:16
93:8 99:19
107:14 108:10
109:12,19
111:11,16
116:14 121:8,11
128:21 129:23
130:25 132:6
134:2
**background**
37:1
**backwards**
58:19 95:8,14
95:18,25 96:11

**baldwin** 91:15
92:6 101:6
103:5,14
**banter** 76:19
86:3 87:12
90:24
**bantering** 86:24
88:16
**barely** 11:24
**bargaining**
15:17 47:15
48:3
**based** 40:24,24
49:6,13 110:7
125:11 126:19
127:14,16
**basic** 21:23
**basically** 8:16
24:2 27:14 28:2
28:23 46:19
49:12 69:2 82:8
95:9 106:23
120:18
**basis** 40:2,3
41:2 49:20
76:10,11 80:10
**bates** 62:1
**battery** 102:21
**beach** 1:9 2:12
2:14 4:5,18 31:9
31:11 36:19
37:14 59:16
63:3,8 71:22
72:7,10 91:20
91:22 112:23

137:1 140:7
141:7
**becoming** 60:8
**befriend** 63:7
**befriended** 72:6
**befriending**
62:19
**beginning** 21:23
22:23 49:11
50:19 77:4 96:9
108:19
**behalf** 2:5,10,15
4:15,17 98:17
98:20 99:7
120:22
**behaving** 78:4
**behavior** 76:15
77:11,16,19
81:12,14,17
88:8,18 91:3,6
92:21 100:3
108:25 123:5,8
123:13,14 126:2
**behaviors** 91:25
**believe** 9:7 12:2
13:17 15:12
20:5 26:22
31:25 33:22,25
35:7,11,22
40:22 41:1,4,5
41:16,21 42:10
45:15 47:10,18
48:10 49:7
50:15 53:24
54:10,18,23

56:6,22 57:19
58:7,16 61:19
75:10 83:21
84:16 91:14,21
97:7 98:14,25
102:2 103:6
105:16 106:11
106:20,25 108:5
108:11 110:9
113:22 114:14
118:21 120:7
124:8 127:3
**believed** 40:23
104:19,23
**belligerent**
24:22
**benefits** 33:7,10
33:12 34:13
35:14,21
**benjamin** 2:12
4:19
**berrian** 111:4
**best** 5:22 6:15
44:3 48:18 50:3
74:16 88:17
116:11 125:20
**better** 104:1
**bid** 50:25
**big** 125:12
**bill** 116:23
117:3 119:13
133:2
**bills** 30:10
**biscayne** 1:14
4:6 140:1 141:1

**bit** 5:14 6:2,4
11:6 21:14 54:8
**black** 91:8,24
103:10
**blinders** 91:5
**blindsided**
119:24
**block** 59:19
60:1
**bottom** 62:6
**boulevard** 1:14
4:7 140:1 141:1
**bowl** 78:10
**boyfriend** 93:11
**boys** 126:5,11
**brand** 71:4
**braun** 2:12 4:19
**break** 21:13,24
22:1,2,4 27:9
30:18 36:2 93:5
107:11 118:21
123:19 133:20
133:24
**breakfast** 84:23
84:25 85:4
**breakfasts**
85:13
**breaks** 119:2
**brickell** 19:24
20:1 26:13,24
27:4 28:7 30:8
30:19,20,23
33:24
**brief** 36:7

**bring** 26:12
53:5,13 69:3
73:5 77:23 78:3
84:7
**broad** 89:15
**brotherhood**
62:19,21 72:8
**brought** 10:15
11:14 38:19
59:21 69:12
85:2
**build** 51:9,13
85:3
**bulk** 66:16
101:10
**bunch** 72:15,16
72:18 126:4,10
**bunched** 88:15
**busy** 26:7

**c**

**cafe** 85:8
**cafecitos** 130:13
130:15
**call** 12:8 24:25
40:14 45:8
70:19
**called** 5:3 13:9
58:6 84:6
116:22
**calls** 59:25 90:3
**camelot** 61:21
62:3
**camera** 68:17
69:16

**cameras** 69:14
**captain** 91:14
  93:24
**captured** 24:8
**card** 52:17
  70:19
**career** 50:3
  65:20 66:5
  95:12
**careful** 13:3
**carried** 21:7
  53:24
**carrying** 20:21
**case** 1:3 5:24
  9:11 26:20
  32:12 40:14,21
  42:12 45:13,14
  45:15,25 46:3
  47:1,2 63:2
  65:18 112:5
  123:9 131:17
**cases** 5:18 32:1
  32:13
**castillo** 102:3
  111:5
**casual** 79:9,11
**cause** 1:22 24:9
**caused** 26:1
  106:12
**causing** 24:22
  103:3
**cctv** 24:8
**cease** 11:10,13
  12:16

**cell** 85:22 86:18
  86:23 87:3
  102:20
**center** 2:13
**centre** 19:24
  20:2 26:13,25
  27:4 28:8 30:9
  30:19,20,23
  33:24
**certain** 65:25
  102:8
**certainly** 49:4
**certificate** 138:1
  139:1
**certify** 135:10
  138:7 139:8,15
**chain** 10:15,17
  11:14 12:9
  13:12 16:23
  37:3,5 59:21
**chance** 110:9
  124:21 128:3
  129:10,16
  130:10,18,20,24
  131:25
**chances** 66:12
**change** 137:4
**changed** 5:13
  9:1 56:22
**changes** 137:3
  137:18 140:12
**changing** 63:16
  63:20
**channel** 55:23
  55:24,24 56:22

**charge** 3:10,13
  3:14 14:15
  27:11 28:23
  37:15 39:6 40:2
  40:3 42:1,2,4,5
  42:8 43:17 49:5
  49:19 76:3,10
  76:11 80:20,24
  82:21 86:25
  90:21 92:19
  94:1,23 95:16
  97:6,19 98:13
  100:9 101:11,14
  105:9,15,19,22
  105:24 106:13
  106:17 107:18
  107:21 108:4,5
  108:8,13,14,15
  108:16,18,21,23
  109:1,2,5,8,14
  109:17,18
  110:12 112:19
  112:22 113:4,9
  113:17,24
  114:25 128:18
  128:19
**charging** 108:11
**chart** 27:10,20
**chat** 39:18
**check** 34:3
  102:21 107:17
**chief** 8:15 37:19
  37:20 38:13
  40:4 41:1 77:24
  77:25 83:3,12

83:14,14,17
  84:6,7 96:23
  97:4,10,15
  98:23,25 99:11
  99:17 100:7,8
  101:20 104:22
  104:25 113:13
  118:13 119:20
  123:15 124:24
**chief's** 39:1
  100:6
**chisme** 130:15
**choice** 113:14
  131:19 132:16
**choir** 126:5,11
**chose** 49:23
**circumstances**
  56:16
**city** 1:9 2:12 4:5
  4:18,19 8:14,18
  14:20,24 15:1
  19:24 20:1
  26:13,25 27:4
  28:7 30:8,19,20
  30:23 31:10
  33:24 36:18
  37:14 38:6 39:4
  43:14 45:21
  46:20 47:22
  48:9 49:5 50:4
  52:7,8 69:20
  75:8 78:17 79:2
  80:12 81:5
  83:12 106:4,12
  106:20,25 107:2

[city - concerns]

108:6 113:1,13
114:11 117:19
118:14 119:19
124:6,16 125:18
125:19 126:16
127:8,22,25
128:5,21 130:3
130:5,8,8,25
134:22 137:1
140:7 141:7
**city's**  125:19
**civil**  5:24 6:1
15:8,10
**claim**  26:12
**claims**  26:13
43:14 106:16
**clarified**  49:11
**clarify**  22:8
49:10 60:11
106:10 117:16
121:14
**clear**  7:9 117:16
119:11 120:19
**cleared**  46:1
**clemency**  16:20
**clements**  77:24
77:25 83:15,17
84:6 97:4,10
98:21 99:4,16
99:21 105:3
114:15
**clerk**  62:18
73:12
**client**  33:1,3
49:14

**close**  59:19
**coincidence**
71:18,21
**colleagues**
65:11 88:21,22
91:7 103:10
**collective**  15:17
47:15 48:3
**college**  27:1
29:15 30:7,13
30:19,22 31:8
33:9 36:7
**come**  85:3 98:10
101:15 109:21
109:22
**comes**  26:19
**comfortable**
100:4 115:25
116:2
**coming**  81:5
86:6 90:2,24
**command**  10:15
10:18 11:15
12:9 13:12 37:3
37:5 59:22
67:19 79:14,15
79:16 80:1,5
81:4
**comment**  92:4
102:11 103:6,8
126:3
**commentary**
121:6
**commented**
61:23

**commenting**
63:24
**comments**  76:16
77:10 85:21
86:17 87:2,25
88:4 90:17 91:8
91:23 92:13
103:2,11 109:18
**commission**
16:17,23 19:5
34:25 136:3
138:18
**common**  47:4
62:25 63:5 88:8
90:15 109:13,15
109:22 110:14
**communicating**
60:4
**community**
62:20
**companies**
16:13 17:6,8,17
**company**  17:13
20:1 28:10,14
31:20,21 33:2
35:19 140:1
**complain**  12:19
82:21
**complained**
12:20
**complaining**
10:13 82:23
**complaint**  10:11
10:12,13 12:7
12:22 13:7,11

14:3,9,12,21,23
14:24 39:25
57:11 59:2
65:21 67:6,25
68:13,21,24
69:19 75:4,5,7
76:17 78:7
80:14 83:24
99:9,10 101:1
112:23
**complaints**  8:12
8:13 53:14
67:13 69:15
70:22 80:11
81:9,14,15
83:13 84:3,8
85:16 92:18
94:11 97:5,17
98:22 99:14,23
101:3,13 103:19
104:4,18,21,25
105:3,5 113:11
126:14
**complete**  37:24
38:1 139:12
**completed**
26:20 140:16
**completing**
20:25
**concentrate**
91:1
**concerning**
119:9
**concerns**  78:5
94:11,16,19,21

95:6,7,7 118:13
119:21 123:5
126:14 132:24
**concludes** 135:2
**condone** 81:13
**conduct** 82:22
82:23 89:13
90:19 92:11
108:12,18,20,23
109:4
**conducting**
76:23 88:9 91:2
**confide** 71:9
72:24
**confided** 52:18
70:21 71:13
**confidential**
114:24
**confirm** 36:8
**confronted**
82:19
**confused** 108:13
**connect** 63:7
**connection** 45:5
63:21
**connotations**
85:10
**considered**
140:17
**constant** 92:15
**constantly** 77:9
**consumer** 24:25
**contact** 80:25
**content** 87:15
87:15 89:20

**contents** 86:4
94:7
**context** 7:2 29:2
**continue** 11:12
46:22 53:13
65:21 69:3
81:12,15 116:9
**continued** 58:17
67:13 74:14,19
81:9,16 83:11
99:4,5 104:21
**continues** 81:12
**continuing**
116:15 117:2
**continuously**
59:17
**contracted**
28:14
**contractor**
31:23
**contribute**
33:19 34:1
**contribution**
34:5
**convention** 2:13
**conversations**
76:24 110:8,17
111:12 131:6,14
**convicted** 20:23
**copies** 140:15
**cops** 126:5
**copy** 23:22
141:12
**cordial** 74:14,17

**correct** 9:2,3
13:24 15:18,19
18:5 31:11,12
32:11 34:16,19
34:20 41:3,25
42:8,10,12,13
42:17,18 43:11
43:19 49:21,22
49:24 57:20,21
60:10 61:22,24
61:25 63:25
64:11,22 66:16
66:19 67:24
68:3 74:5 75:8,9
80:17,20,20
82:4 83:16
87:22 95:8,18
95:21,22,24
96:16,18,20,22
99:6 102:24,25
104:5,6 105:11
105:24,25
106:13 107:5,22
108:6,7 109:1
110:10,11,13
112:5,12,13,15
113:5,6,19,20
114:9,10,18,25
115:1,10,18,19
115:20,23 119:3
120:22,23,25
121:19,20,21,22
121:24 122:2,5
122:6,10,24
124:21 127:23

127:24 128:1,2
128:6,7,25
129:1,3,6,8,11
129:17,18,21,22
129:25 130:1,3
130:4,9,11,12
130:16 131:15
131:21,22,25
132:1,22 137:18
**corrections**
135:8 141:13
**correctly** 27:5
60:9
**cosner** 50:12,17
51:2,18 52:13
52:14,22 54:10
58:21,21 60:2,8
60:20 63:4
64:15 65:24
69:25 70:17
72:25 80:22,24
105:8 106:19,25
107:20 108:12
108:22 109:7
110:20,21
111:10 132:7
**cosner's** 61:17
63:24 71:19
73:16
**could've** 47:17
49:1,4 102:3
106:4
**counsel** 4:4,11
22:3 84:14
105:19 117:8

118:2,23 121:21
124:9,13 130:21
131:14 134:9
139:16 141:9
**counseled**
101:25
**counseling**
36:10
**counselings**
30:15
**counterpropos...**
128:1
**county** 135:19
137:16 138:4
139:6
**couple** 21:23
77:3
**course** 22:7
43:16
**courses** 20:25
**court** 1:1 2:3
4:9,12,21 5:18
6:6,13 8:13 13:4
30:1 39:16
134:24
**cover** 21:21
**covered** 107:18
**cp** 108:10
**crime** 57:1
**criminal** 5:18
**crossed** 53:17
66:11
**crowd** 88:18
**cruz** 23:13

**cubicles** 88:24
**culminate** 67:14
**culminated** 54:1
66:10 78:7
**culmination**
95:9
**current** 124:11
124:13
**currently** 9:13
34:18
**customer** 23:2
**cut** 52:25 66:4
67:20
**cutting** 6:21
**cv** 1:3

**d**

**d** 3:1
**dade** 27:1 29:15
30:7,13,19,22
31:7 33:9 36:7
135:19 138:4
139:6
**damages** 18:8
**dan** 25:21
**daniel** 37:20
38:19
**daragjati** 2:2,2
2:3 4:14,14,15
39:11 44:18,20
45:1 107:8
131:3,6,9
134:12,16,21
135:1
**daragjatilaw.c...**
2:5 140:6

**date** 15:14
18:24 22:16
23:1 31:4 42:15
75:10,15,18
76:1 78:16
81:24 82:11
84:4,11 95:13
97:12 98:3
125:4 137:20
140:14
**dated** 139:19
**dates** 7:18,19
9:18 18:24 20:4
**dating** 53:19
78:14
**daughter** 64:16
**dave** 21:19,20
25:22,23,23
27:16 28:18,22
**day** 17:13 25:14
43:21 50:18
55:21 58:3,5
71:6 84:7,10
92:16,16,17
108:10 124:22
132:6,8,9
135:21 138:8,11
139:19
**days** 7:21 25:14
25:19 40:6
42:24 43:1
140:17
**de** 100:25 101:7
**deaf** 77:21 78:5
83:5

**deals** 94:24
**dear** 141:9
**december** 54:3
54:4,5,18 55:14
57:15 62:5
73:18,19,24
**decided** 24:4
**decision** 39:1
**declare** 137:17
**dedication**
43:23 50:11
**deeply** 92:21
**defend** 119:12
**defendant** 1:11
2:10,15 5:3
**defendant's** 3:7
39:19 41:9
61:13 74:20
107:23 111:21
128:10
**defendants** 5:19
**definitely** 6:12
**del** 102:3 111:5
**delay** 10:22
**delaying** 31:3
**delete** 81:23
130:13,16
**deleted** 81:22
**demanded**
102:19
**demonstrated**
57:15
**demote** 39:1,2
**demoted** 38:14
39:1 40:6,22

**[demoted - doing]**                                                    Page 151

45:19 81:7
116:6
**demoting** 38:21
40:4,13
**dental** 33:13,25
34:15 35:22
77:5,6
**department**
9:17 19:23 31:9
34:12 52:21,23
62:18 66:3 67:2
67:16,17 68:6
73:8 76:21 80:3
80:8 96:10
112:24 123:6
**depending** 33:1
**depends** 33:3
**depo** 137:2
140:7 141:8
**deponent**
135:12
**deposed** 5:20,24
**deposing** 140:14
**deposit** 32:20
**deposition** 1:18
1:22 4:4,6 5:15
7:13,22 8:6 12:9
134:4,8 135:5
137:18 139:1,10
141:10,11,12
**depositions** 6:1
**derogatory**
10:17 12:13
91:8,23 103:11
126:11

**described** 12:10
29:10 102:17
**description** 3:9
**desk** 87:15
88:18 89:19
90:22 91:2
**desks** 90:13
**detail** 11:7
88:21
**details** 26:6
70:17
**determine** 69:20
**different** 6:2
25:20 64:13
72:6,19 86:15
94:3 111:6
**differently**
81:10
**difficult** 66:6
**diligence** 116:21
**dinner** 61:2
**direct** 3:4 5:6
9:25 10:1 32:20
**directed** 56:15
**direction** 25:20
**directives** 56:16
**directly** 18:17
28:7 90:25
91:13,16 100:7
100:8 110:2
**director** 16:9
19:24 21:3,4,15
21:18 25:17,20
25:21 26:1 27:2
27:5,7,8,11,13

27:15,16,17
29:4 30:6 35:5
124:24
**directors** 19:14
29:6,6
**disciplinary**
36:15
**discipline** 42:12
45:13,15 46:3
**disciplined**
30:13
**discriminated**
41:1
**discrimination**
3:10,13,14
122:20
**discuss** 110:18
111:8,9 114:24
118:19 119:20
119:21,23 123:5
130:21 134:8
**discussed** 95:10
123:8,11,11
124:8,23
**discussing**
110:22
**discussion**
92:13 94:19
**discussions**
110:15 118:23
123:1 124:17,19
127:8
**disgusting** 77:8
**disparage** 91:8
103:10

**display** 119:6
**displaying** 86:5
**dissatisfaction**
104:17
**dissatisfied**
105:2
**district** 1:1,1
102:5
**division** 1:2
**divorce** 9:11
**divorced** 9:4,6
**doce** 78:21,24
**document** 39:10
39:22,24 41:12
41:15,17 44:9
44:12 74:24
75:1,15,17,22
101:4,18,21
108:2 111:25
114:19 120:5
**documentation**
38:15
**documentations**
16:19 124:7
**documents** 8:5
8:8,10,13,22
18:4 39:17
114:21 124:20
**dohler** 88:7
100:14,20 101:6
**doing** 6:19,21
13:5 14:4 52:9
58:16 59:6
67:21 72:1,4
82:14,15,17

**[doing - entailed]**

86:20 87:20
89:25 90:25
101:1 104:23
123:16
**double** 107:17
**download** 18:17
**dpg** 1:3
**drink** 61:2
**drive** 2:13
**drug** 20:25
**drugs** 23:5,15
91:25
**drunk** 24:25
**dry** 92:1 102:18
120:18
**due** 14:22 40:5
54:18 56:25
116:20 118:18
120:3 133:1
**dues** 122:1
**dui** 56:1,12 57:1
**duly** 5:4 138:9
**duties** 20:21
21:7
**duty** 18:4,7,12
24:3 26:5 59:7
59:24 113:2
**dwight** 23:13

**e**

**e** 3:1 20:15
**earlier** 8:24
13:18 21:22
22:12 55:13
58:19 60:6
80:20 102:17

107:16 112:18
**early** 22:15,24
73:18
**earn** 20:9 29:19
**earned** 33:4
50:11
**ears** 77:21 78:6
83:5
**easier** 6:22 15:6
30:4
**eat** 107:7
**education** 16:8
**eeoc** 8:12 14:15
39:6,25 40:2,3
42:1,2,8 43:17
45:17 49:4,19
75:4,5,7 76:17
78:7 80:20,24
82:21 85:24
86:25 90:20
92:19 93:1 94:1
94:23 95:16
97:5,6,19 98:12
100:9 101:11,14
105:9,15,19,21
105:24 106:13
106:17,24
107:17 108:4,5
109:8,14,17,18
110:12,18
112:19,22 113:4
113:9,14,17,24
114:24 118:11
118:12 119:21
119:23 121:2

122:21 123:4,8
123:8,11,12
126:14 128:18
128:19
**effective** 42:15
**egregious** 59:23
91:4
**either** 22:14,22
39:17 43:17
44:18 56:3 68:1
69:20 93:24
102:2 115:6
119:6
**elaborate**
113:20
**elkins** 2:7 3:4
4:17,17 5:7
35:23 36:6
39:10,12,13,16
39:21 41:8,11
44:19,21,22
45:4 61:15
74:22 93:2,9
107:6,15,25
111:23 118:1,4
121:8,13 128:12
131:11 133:20
134:3,15,18,22
134:25 141:4
**else's** 71:2 72:14
**email** 39:18
140:6,14,15
**emergency**
101:25

**employed** 9:15
9:16 67:11
**employee** 21:8
31:24,25 139:16
**employer** 18:18
26:18
**employment**
9:19 16:1,4,5,14
17:7,14,17
18:11,23 20:4
25:12,15 31:10
105:18 106:21
122:19,20
**emulted** 69:4
**encapsulates**
134:12
**enclosed** 141:10
**ended** 31:11
50:25 53:20
73:22
**endure** 46:22
**enforcement**
72:20
**engage** 91:5
**engaged** 85:20
90:19 122:4
124:16
**engaging** 86:16
87:1 91:24
**enlargement**
92:12
**enlargements**
76:20 88:21
**entailed** 125:5

**[entails - felt]** Page 153

entails 57:9
enter 137:3
entered 137:18
entertainment
102:5
entire 27:17
109:23
entitled 91:9
92:4
environment
81:13 85:19
eric 93:25
errata 135:9
137:1 140:13,14
140:16
escort 24:3
especially 65:24
espriella 100:25
101:7
esq 2:2,2,7,11
2:12 141:4
estrevez 59:1
67:25 68:3
eugene 115:18
evening 55:2
events 107:18
107:19
eventually 37:7
124:14
everybody
39:10 41:8
51:11 72:14
118:6 125:25
126:9 133:4,9

evidence 18:11
21:9 54:21,22
59:6 68:15
69:14 110:2
exact 22:16
71:23
exactly 11:7
25:12 46:25
48:16 58:1
80:25 123:3
132:6
examination 3:4
5:6
examined 5:5
example 77:1
examples 76:17
except 135:8
exchange 43:13
84:21
exchanged
56:23
execute 130:10
exhibit 3:10,11
3:12,13,14,15
3:16 39:15,19
41:7,9 61:11,13
74:20 107:23
111:20,21 128:9
128:10
exhibits 3:7
exigent 56:15
exist 18:1
expect 85:3
expecting
122:25

experience 68:9
115:21
experienced
46:25 55:11
95:11
experiencing
67:23 76:13,14
94:11
expires 136:3
138:19
explain 122:9
explicit 79:14
express 104:16
expressed 116:6
extensive
115:21
extent 24:7
50:23

**f**

facebook 62:22
64:24 72:1,2,5
fact 38:16 40:3
40:13,24 45:16
54:24 77:9
82:12 119:10
122:14 125:7
127:14
fails 140:19
fair 44:8 120:20
122:18
faith 104:20
familiar 115:4
124:15
family 60:24
61:8

far 18:24 32:5
80:11
faster 6:4
fat 82:11
fax 140:3
fear 80:10
fearing 80:25
february 1:15
4:2 35:7 78:9,13
93:16 94:20,25
95:4,8,13,14,17
95:25 96:4,8,11
96:21,24,25
97:18 100:10
103:19 104:5
107:18,19 134:5
134:10 137:2
138:8,12 139:19
140:4,8 141:3,8
federal 140:17
feel 73:5 116:18
feldman 79:6,16
94:6
fell 77:21 78:5
83:5
felony 20:23
24:11,12
felt 47:9,19,20
47:21 50:2
100:4 116:19,20
119:18,19
120:16,16
131:18 132:13
132:16,22

**[female - fought]**

**female** 40:25
  46:4 65:11,15
**field** 43:10
**fight** 44:5 46:22
  116:10,15
**figured** 106:9
**file** 12:22 13:6
  39:6 43:16 49:5
  57:11 75:13
  99:8 108:21
  113:14,17
  120:13 121:2
  141:10
**filed** 1:22 13:11
  14:12,18,24
  15:1,7 38:2
  40:23 41:22
  45:17 49:20
  75:5,10,12,19
  75:23 76:1
  86:25 97:6
  98:12 99:6
  105:20 106:17
  108:5 109:8
  112:18,21 113:4
**filing** 78:7
  112:22
**fill** 57:18 73:25
  76:3,4
**filled** 68:11
  69:21 76:5
  86:21
**filling** 77:6,7
  102:11

**finally** 53:18
**financially**
  139:17
**find** 69:13
**fine** 5:12 10:21
  30:1 45:9 107:8
  134:17
**finish** 12:24
**fired** 68:2
  106:17
**firm** 4:10
**first** 5:4 6:5
  11:19 12:1,2
  21:15 36:18
  37:3,4,5 50:12
  54:9 60:7 61:20
  71:25 90:20
  94:22 103:7
  108:10 111:25
  128:16 131:20
  132:6,8
**firsthand** 77:16
**fit** 27:15,20
  125:19,20
**five** 35:24 78:25
  93:2
**fix** 69:15
**fixed** 31:16
**fl** 1:9 140:15
**flanagan** 77:2
  86:11 88:6
  91:19 102:12,14
  102:22
**floor** 2:13 82:20

**florida** 1:1,10
  1:15,21 2:4,9,14
  4:7 16:17,23
  19:5 34:25
  35:12 135:17
  136:1 137:16
  138:3,7,17
  139:4 140:1,2
  140:18 141:1,2
  141:6
**flowed** 104:4
**follow** 6:12 26:9
  36:7 59:25 78:3
  99:21
**followed** 21:6
**followers** 68:8
**follows** 5:5
**foot** 11:5 12:10
**fop** 15:20 77:12
  77:24 83:1,2,7
  83:17 84:5 93:1
  96:23 97:10,16
  97:22 98:10,16
  98:18 99:2,10
  99:10,15,15,19
  100:5,8 101:2,4
  101:12,19
  103:21,23 104:4
  104:8,15,17
  109:21 115:11
  115:25 116:2,9
  116:19 118:21
  119:15 120:8,10
  120:13,22
  121:19 122:1,3

  125:2 127:1,4
  131:23 132:19
**fop's** 121:21
**force** 56:1,13,15
  56:20 57:2,10
  132:12
**forced** 48:20
  132:13
**forever** 61:21
  62:3
**forgot** 8:16
  21:21
**form** 55:25
  56:10,11,19,19
  57:1,8,9,18,19
  58:8,11 73:17
  73:25 137:18
**formal** 12:22
  13:6 98:16,18
**former** 124:1
**forms** 56:14
**fort** 2:9 141:6
**forth** 76:20 86:4
  86:24 87:13
  88:16 130:25
**forward** 18:22
  19:3,18 48:15
  49:2 65:24 81:5
  82:13 95:25
  141:13
**forwarding**
  82:3
**fought** 47:14
  49:1,18

**found** 59:6,14
59:22 77:8
**four** 8:3 69:18
**fourth** 2:13
**frame** 73:21,21
73:22 92:11
**frank** 111:5
**free** 113:21
**friend** 71:22
**friendly** 51:4
60:3,8 72:21
**friends** 51:14
60:20,21 62:24
63:3 65:8,21
68:8
**friendship** 51:6
51:16 53:1,7,10
53:16,20 66:4
66:11,13 73:23
**friendships**
65:17,23 67:8
67:20
**frivolous** 106:18
**front** 44:12
59:18 91:1 92:2
103:2 118:6
125:25 126:6,9
133:9
**fto** 43:8 46:11
46:14 50:21
**full** 32:10 48:2
70:25 87:12
120:16 130:14
**fun** 82:12

**further** 68:16
128:24 135:11
139:15
**future** 93:11

**g**

**g** 29:25
**garage** 69:14
**garcia** 82:1
83:18 84:18,19
86:10 88:5,7
93:24,24,25
94:1 101:5
**garcia's** 84:22
**gas** 68:11,25
69:21 70:17
**gender** 41:2
**gene** 114:8
116:7 120:8,10
121:2,6,18
122:18,22 123:2
131:7
**general** 51:3
92:11
**generally** 79:1
**getting** 31:2
35:3 45:17,18
46:20 48:12,13
50:8 67:14 77:5
77:5,7,7 113:12
**gg126375**
138:18
**gibbons** 114:8
115:18,21 116:8
120:8 121:2,7
121:18

**gillum** 91:21
**give** 6:7 10:8
11:21 14:7
18:17 26:5
44:13 48:9
56:16 69:11
105:4
**given** 5:15 65:14
65:15 86:3
87:14 135:3
**giving** 91:16
**go** 6:2,3 10:23
13:19,21 14:10
19:9 25:6,13
26:5,7,10,19,22
28:22 29:9 44:1
45:24 46:11
47:6 54:8,8,22
55:12,23 63:9
63:23 64:2
65:16 67:6 69:2
69:7 84:23,25
85:5,11 94:17
95:23 97:3
99:13,17,22
100:2 112:17
132:25 133:1,3
133:4,21
**goes** 18:17
**going** 4:1 6:2,16
6:18,20 15:5
18:21 21:13
25:15 27:3
30:24 34:17
36:1 39:8,8,14

39:14 40:10
41:6,7 44:4 46:8
46:9 48:9,15
49:2 52:5,11
53:3 54:7 56:11
56:18,25 57:10
58:19 60:7,13
60:16 61:10,10
64:16 65:20
66:5 67:14,16
67:17 68:1 69:8
73:6 77:2,3,12
77:17,22,22,24
78:1 81:6 83:4
84:7,20 85:15
86:3 87:13,20
92:14,24 93:4
94:10 98:22,23
99:11,16,21
100:5 101:9
104:20 107:10
108:1,8 111:8
111:19,19 112:7
112:17 118:11
118:11,13 119:7
119:22 123:4,5
123:6,13,15
125:22,24
127:12 129:12
129:19,20 132:5
133:5,10,23
134:4,25 135:4
**good** 4:1 5:8,9
51:10 55:2
60:20,21 79:5

92:23 104:20
107:6 125:19,20
134:17
**gotten**  38:24
76:12 81:2
**gps**  31:22,23
32:7 33:4
**grabbed**  100:23
**great**  36:17
**greeting**  52:17
**grievance**  38:2
38:4,5,11,13
39:3 40:23
41:18,21 42:8
43:17 47:14,14
48:2,5,15 49:2
49:18 80:19
99:6,8
**grotesque**  52:17
**ground**  6:2
**growing**  76:22
**grudge**  57:16
58:18
**guard**  20:21
23:25
**guards**  28:13
**guasto**  1:5,18
3:3 4:4,5,15 5:2
5:11,11,12 9:11
77:15 78:19
92:22 103:19
112:10,25 135:3
137:1,2 138:8
139:10 140:5,7
140:7,11,12,14

141:7,8
**guess**  5:22 58:21
61:21 64:16
93:11,12
**guided**  132:24
**gutierrez**  1:20
4:9 138:6,16
139:8,22 141:18
**guy**  24:25
**guys**  24:1 51:20
**gym**  84:24

**h**

**h**  10:3
**half**  35:17 97:21
**hallway**  53:22
55:1 58:14
**hand**  4:22
138:11
**handful**  104:12
**handle**  98:23,25
99:1,4,16,17
104:20 105:3
**handled**  104:17
**happen**  22:13
37:21 46:24
81:10,12,12,15
110:15 133:6
**happened**  20:18
22:14,20 46:23
47:1 52:22
54:23 55:11
56:12 58:1
69:10 81:9,21
82:18 84:8 89:5
94:17,20 96:5,6

96:19 106:24
108:19 117:17
119:1 132:6
**happening**
71:20
**happens**  25:13
71:21
**happenstance**
71:23
**harass**  52:1
**harassed**  80:5
**harassing**  52:10
**harassment**
53:14 100:2
**hard**  43:23
46:21 50:10
**haste**  57:24
**head**  5:21 6:8
7:20,24 8:23
16:16 17:9 23:1
23:17 32:14
71:14 83:23
84:11 114:16
**health**  33:13,25
34:15 35:22
69:6,6
**healthy**  65:20
**hear**  21:16 27:4
60:9 83:13 86:4
86:22 87:17
88:25 90:1,2,23
110:22 111:18
126:8
**heard**  78:5
80:10 89:19,19

99:5 110:25
111:14,17
118:13 126:12
**hearing**  14:18
14:25 15:1,7,13
77:9 94:15
110:6 113:12
**heavily**  72:20
**help**  121:14
**henry**  2:11 4:18
78:21,23
**henryhunnefeld**
2:14
**hey**  69:7 71:21
100:19 110:17
111:8
**hialeah**  62:17
72:7 73:8
**hire**  28:3
**hired**  36:21,25
120:24 121:1
122:11,14
**hiring**  30:21
35:2,5
**hispanics**  103:3
**holborow**  10:1
12:21
**hold**  44:21
54:13 58:17
63:20 87:8
117:10 121:4
131:3 133:13
**holding**  57:16
**home**  69:11

[hopefully - interact]                                    Page 157

hopefully  6:3
hostile  65:25
  85:19
hour  32:22,24
  32:25 33:2,2
  42:11 77:18
  93:13 107:7
  129:21
hours  8:1,3
  51:13 59:20
  77:4 84:5 92:25
  97:21 101:8
  129:23
house  59:18,19
  59:19,24 61:4,6
hr  31:2 124:24
huge  86:3
hump  92:1
humping
  102:18
hundred  34:8
hungry  107:7
hunnefeld  2:11
  4:19
hurt  11:1
hurtful  126:8
husband  93:12
  112:24
hypothetical
  27:20 47:18,25
  49:7
hypotheticals
  49:16

**i**

i.d.  135:23
ia  42:12 45:13
  114:25
idea  31:5 35:6
  62:16
identification
  39:20 41:10
  61:14 74:21
  107:24 111:22
  128:11 138:23
  138:24
ignore  54:25
  55:5 74:4,15,19
ignored  55:3
  66:15 74:8
ignores  58:14
ignoring  10:20
  55:14 57:17
imitate  102:15
implemented
  109:14 132:11
important  6:11
  13:3 43:22
  46:20 47:8
  48:12 50:8,9,9
  116:16,16
improper  115:3
  115:8,15 117:7
  118:6 119:15
inappropriate
  11:4,14 57:24
  76:15,15 77:19
  85:14,21 86:16
  87:1 100:3

inappropriately
  100:23
incident  10:7,10
  10:11 20:19
  21:2,5 22:13,20
  23:2 24:8,19
  25:6,13,16,18
  25:25 26:4,5
  29:9 40:16 48:7
  52:6 53:5 54:1
  55:18,20 56:20
  57:14 60:13,14
  60:17 67:4
  69:10 80:23
  82:18 91:20
  106:24
incidents  68:10
  77:20 96:1
  98:22
include  56:14
  84:23 94:21
  105:2 125:7
  130:24
included  51:1
  86:10,11 103:25
includes  49:16
including  96:11
income  31:16
incoming  55:21
independently
  8:8,10 17:23
indication  125:6
individual  23:9
  23:15,24 24:4
  26:21 78:20

individuals
  52:19 77:23
influence  52:24
  66:2,6,25 67:1
  67:18 68:6 80:2
  80:2 81:5
information
  84:12,13 91:16
  94:15 101:20
  109:20,25
  130:22
initialed  129:4
initials  129:5
injuries  57:2
inside  76:19
  85:9 86:2,20
  88:16
instagram  3:12
  61:17,20,23
  62:14 63:24
  71:19 72:1,2,5
  72:13 82:8
instance  111:3
instances  59:21
instructs  49:13
insubordinate
  57:6,7
insurance  35:22
intended  21:25
intention  11:2
  11:10
intentionally
  10:25
interact  23:25

interacted   23:8
interaction
   73:19 74:1
   111:13
interest   52:15
   116:11 126:13
interested   19:10
   66:9 74:13
   139:17
interject   119:15
internal   38:22
   38:25 40:14,18
   40:20 68:13
   69:12 75:14,16
   99:13,18,22
   100:5 101:13
   112:20 113:25
   114:17 115:22
   119:25 122:22
   123:1 131:17
internet   45:5
   63:21
interrogation
   115:3 116:22
   123:10 132:16
   132:19,21
interrogatories
   3:15 112:4
interrogatory
   112:17,21
interrupt   15:4
interrupting
   6:20
intervened   24:2

interview   28:3
   34:22,24 36:23
   36:24
interviews
   115:22
intimidated
   118:8 120:16
introduce   4:11
introvert   89:9
investigate
   14:23
investigated
   59:22 113:1,9
investigation
   14:21 38:22,25
   40:18,20 75:14
   75:20,25 76:2
   112:20 113:5,15
   113:18,25
   114:25 115:8,15
   118:7,16 119:16
   122:23 123:1
investigations
   68:18
investigator
   16:21,25 31:18
   31:20 32:1,7
   35:9 37:1 69:17
investigator's
   31:16
investigators
   32:3,4
invite   119:22,22
involve   131:14

involved   23:2
   45:14 56:1,1,12
   57:1 107:20
   108:12,14,15
   109:4
involving   40:15
issue   53:4 67:5
   81:25 83:18
   116:5 118:3
issues   36:15
   38:15,16 40:6,9
   65:24 84:3,20
   84:22
it'll   6:3

**j**

j   2:11,12
jacksonville   2:4
jail   24:10
january   29:18
   31:11,14 32:6
   36:22,22
jason   124:1
javier   2:19 4:8
jerome   111:4
jess   130:15
jessica   1:5,18
   3:3 4:4,5,15 5:2
   5:12 82:10
   112:10 122:4
   135:3 137:1,2
   138:7 139:10
   140:5,7,7,11,12
   140:14 141:7,8
job   15:5 16:24
   18:14 19:6,7,16

19:17,23 24:21
   25:4 26:3,20
   27:5 30:5,24
   31:16 32:22
   34:21 35:3,8
   67:7 116:21
jobs   16:6,7,8,9
   19:11,12 31:17
   32:5
johnson   21:19
   21:20 24:15
   25:23 27:16
   28:18,22
joke   76:25
joking   86:7,23
   89:1
jones   77:17,21
   78:13 83:1
   92:23,25 93:12
   94:10,13 103:20
   104:1
july   22:23,24
   75:11 112:22
   136:3 138:19
jump   7:7
june   9:7,8 63:24
   64:25 96:14
   103:1 104:5
   107:20
justifying   45:19

**k**

k   33:16,18,25
   34:4
keep   17:22,23
   21:25 41:13

**kept** 18:19 31:3 53:6 113:12 116:11 132:3

**kevin** 83:19 84:2,20 97:13 97:25 98:9 104:13,21 115:11

**kind** 14:12 19:20 27:10 36:10 62:20 107:7

**knew** 30:24 50:21 110:2,3,4 110:7 123:18 126:12 133:5

**know** 6:15 8:22 8:24 10:18 11:2 11:2,10 13:4 15:10 17:22 18:2,7 21:24 23:15,17 24:16 24:18,18,19,20 24:20 26:23 29:23 30:25 31:6 32:14 33:6 33:20 34:11 37:5,6 41:17 46:18,25 48:16 55:11 58:1,21 61:11 62:9,23 63:1 65:12,19 69:20 70:1 71:8 71:8 72:4,5,12 72:13 73:15,23 74:23 76:8,24 78:5 79:4 82:6 86:20 87:6,20 89:2,4,5,18,19 89:22,23 90:3,4 90:7,11,12,25 93:20 97:13,14 100:20 101:17 101:17 102:1,6 104:9,24,25 109:7,10 111:15 111:18 115:24 117:8,10 118:9 120:1 124:5,6 124:12 125:5 127:11,13 135:23

**knowing** 50:23

**knowledge** 72:17,18 79:1 109:13,23 110:15 120:14

**known** 53:2 65:25 81:4 109:25 138:22

**kuno** 124:1,10

**l**

**l** 2:7 10:3 12:3 141:4

**la** 100:25 101:7

**labor** 122:19 132:20

**lafave** 12:8

**lafavore** 12:4

**lafore** 12:4

**laptop** 120:1

**large** 1:21 136:2

**late** 22:15,24 35:7 54:5 73:18 73:24 77:3

**latitude** 49:15

**lauderdale** 2:9 141:6

**laugh** 87:25

**laughing** 86:7 87:15

**law** 2:8 72:20 141:5

**lawrence** 10:1

**lawsuit** 18:4 43:17 49:5,20 106:16

**lawyer** 7:2,4,6,7 49:13 117:11 120:11 121:18 122:4,19,20,20 124:3,5 132:20

**lawyers** 114:5 115:7,17 117:14 117:18 119:6 120:21,24 124:16 126:23 127:9,22,25 134:4

**lay** 67:20

**layer** 27:14

**lca** 109:14,17,19 110:8 125:7 132:11

**lead** 125:22

**leading** 108:13 108:18,21,23 109:4

**learn** 94:7

**leave** 30:7 89:8 123:23

**leaving** 85:11

**left** 67:7 85:12 88:19 90:22 120:18,20 132:25

**legal** 140:22

**length** 53:7

**lengthy** 7:25

**lester** 97:15

**letter** 8:15,16 20:24 21:10 23:22 141:11

**letting** 104:24

**liability** 57:9

**lieu** 36:13 130:23

**lieutenant** 12:5 12:20,21 13:12 55:1,2 56:15 58:5,21 60:8 61:16 64:15 71:19 77:1 82:1 83:18 84:17,19 84:22 86:10,11 88:5,6,6,7 91:14 91:19 92:6 93:23,23,24 100:10,13,14,14

100:20 101:5,5
101:6,15 102:2
102:10,12,13,15
102:19,22,23
103:2,5,12,14
105:8 106:19,25
132:7
**lieutenants**
38:17 40:7 46:8
76:14,16,23,25
85:5,7,25 86:6
86:22 87:24
88:3,9 90:6
91:11 123:7,7
**life** 6:22 35:22
**light** 68:17
69:16
**liked** 67:16
**likes** 72:9,11,15
72:19
**liking** 62:13
63:10 64:13,19
64:24 65:9
71:18,24 72:13
**limits** 113:1
**line** 53:17 66:12
137:4
**lines** 95:21
**list** 19:9,11 63:3
**listed** 141:10
**listen** 53:18 91:7
103:9
**listening** 88:20
126:13,14

**lists** 18:19
**little** 5:14 6:1,4
11:6 21:14 54:8
63:22
**live** 72:3
**lived** 55:11 58:1
79:3
**livelihood** 67:10
67:11
**loading** 44:23
**location** 4:6
**locka** 9:16 10:5
10:7 13:9,16
14:13 19:22
34:12
**log** 17:21
**long** 7:23 13:15
13:22 14:9
17:22 21:25
35:16,18 52:25
68:5,7 78:23
**longer** 10:4
**look** 33:22 42:4
53:24 91:3
95:19 98:7,8
**looked** 16:1,5
118:20
**looking** 103:1
**looks** 63:10
64:12,15 94:24
95:16
**lost** 25:4
**lot** 6:22 12:18
15:5 17:8 21:12
32:4 52:23,24

54:7 55:13
60:15 65:18
66:2,2,6,25 67:1
67:18 68:6,8
70:16 71:22
72:6 76:14 80:2
80:2,3,7 109:20
111:3
**loud** 87:18,19
111:17
**loudly** 86:24
89:3
**low** 67:20
**lower** 95:22
**luluu** 62:9
**lying** 51:21 71:7

**m**

**m** 29:25
**ma'am** 4:21
135:1
**madam** 39:16
**made** 12:7 14:9
58:6 59:2 67:24
68:13 69:19
80:11,14 88:3
90:17 91:22
92:3 101:12
102:11 103:2,6
115:2 117:15
119:20 127:25
128:1 132:7
135:9 141:13
**magana** 29:25
**main** 56:22
82:19 85:14

**maintain** 51:10
53:7,10,16
65:23 66:7 67:8
67:10,21 74:17
**major** 100:23
100:25 101:7,15
**make** 6:3,22 7:7
12:24 14:3 15:4
15:5 21:14
25:11 47:9 54:9
55:12 65:21
66:5 67:13
68:21 70:22
73:16 87:25
92:18 95:20
97:17 101:1
103:18 106:6
109:18 117:19
**makes** 106:7
117:20
**making** 82:12
103:3
**male** 20:20
24:22,24 38:23
40:19 52:6,6,8
53:6 58:22
60:14 76:13
80:5,5 85:9
101:15,24
**mall** 21:3,15,18
23:3,24 24:4
25:1 27:7,11,12
27:16,17 28:3
28:23

managed  82:6
management
  105:2 116:20
  127:5
management's
  120:8
manager  27:18
  27:23,24 28:24
manner  12:13
manners  10:17
march  20:5
  96:14 102:10
mark  39:9,14
  41:7 61:11
  111:20
marked  39:19
  41:9 61:13
  74:20 107:23
  111:21 128:10
marking  128:8
marlene  1:20
  4:9 138:6,16
  139:8,22 141:18
match  42:5
mates  65:22
  85:6
matter  4:5 7:1
  31:1 38:11
  81:11
matters  115:22
  122:16
mean  11:7 25:1
  28:1,19 41:13
  68:2 75:18
  90:10 98:14

101:11 111:16
  122:8
means  108:19
meant  116:14
media  4:3 63:6
  65:9 82:3
meet  7:15,17,23
  40:5 50:12,14
  60:24 77:22,25
  78:8
meeting  26:3
  40:9 77:18
  93:10,13,15,17
  93:19 94:8,13
  94:22 95:4
  97:20,21,24,25
  98:2 101:8
  103:25 113:23
  114:1,3,6,12,14
  114:23,24 115:3
  115:6,7,12,14
  116:18,21,22,25
  117:4,6,7 118:5
  118:8,9,10,11
  118:22 119:2,20
  119:21,22
  120:18 123:4,19
  123:21 124:3,14
  124:22 125:1
  126:1,12 127:7
  127:18 128:24
  132:15 133:9,15
  133:18
meetings  104:3
  104:7

melkins  2:9
  141:6
member  79:15
  79:15,16 80:2
  81:4
members  51:9
  80:6
membership
  121:19
men  120:17
mental  69:6
mentioned  8:25
  48:17 93:10
  105:8 126:3
messages  79:14
  79:17 81:18
  84:2,16,19 98:9
met  7:18 61:8
  78:13 84:4 97:4
miami  1:2,9,15
  2:12,14 4:5,7,18
  27:1 29:14 30:7
  30:13,19,22
  31:7,9,10 33:9
  36:7,19 37:14
  59:16 63:3,8
  71:22 72:7,10
  103:3 112:23
  135:19 137:1
  140:2,7 141:2,7
miamibeachfl....
  2:14
michael  2:7
  4:17 20:13,13
  25:21 27:19

29:1 76:7,9
  114:8,13 120:11
  120:25 122:3,19
  141:4
midnight  60:16
  68:4 70:5
midnights  51:1
  52:5 55:20
mike  111:3
millan  83:19
  84:2,20 97:13
  97:25 98:9
  104:13,21
  115:11
mind  40:6
minute  95:19
minutes  133:21
misconduct
  54:17
misrepresented
  119:18 120:6
mistreated  47:1
mitigate  18:7
mle  2:8 141:5
mlelawfirm.c...
  2:9 141:6
mmm  6:8
mom  64:3,12,18
  64:22 71:18,25
  72:3,5,24 73:6
moment  26:8
  48:18 52:12
  95:12 98:3
  123:20 124:9

[monetary - november]                                    Page 162

**monetary** 30:9
**money** 50:8
  116:16 128:21
**monies** 116:15
**monitor** 72:2
**month** 13:25
  14:2 17:2 30:18
  43:8 46:11 98:5
**months** 43:6
  46:10
**morning** 4:1 5:8
  5:9
**mother** 62:12
  62:13,17 63:7
  63:10
**moved** 68:15
**moving** 25:19
  65:24 108:22
**muley** 111:3
**multiple** 51:21
  59:20,21 63:3,8
  63:17 64:7,10
  66:9,12,12 69:4
  70:3,21 71:4
  72:8,10 74:14
  82:13,20 85:1
  86:2,5,12,21,22
  87:12 88:7,8
  89:14 91:11
  100:18 104:3,9
  105:1 113:10
  119:2
**municipality**
  1:10

**mutual** 62:24

**n**

**n** 3:1 20:15
  29:25
**name** 4:8 5:13
  9:1 10:2 11:18
  11:19,20,21,25
  12:1,3,3 13:10
  13:11 16:13
  17:8,10 19:8,15
  20:1 21:18,19
  23:12,14,16,17
  29:24 70:10,12
  70:13,23,24,25
  71:2,11 78:20
  87:3,5,16,21
  88:11,13 89:12
  89:15 90:19
  101:11,16,19,21
  130:14 135:15
**named** 62:9
  101:23 123:7
**names** 70:20
  71:5,12 86:1,14
  86:19 89:22
  91:12 101:13,19
  101:22
**nature** 50:16
  51:3 122:23
**near** 60:1
**need** 21:23 22:1
  22:8 46:18
  123:2
**needed** 31:18,20
  32:3 47:20

**negotiation**
  128:5
**negotiations**
  127:21 128:25
**negros** 91:9
  92:4
**neighbor** 59:15
**neighborhood**
  59:16,18 73:24
**nelson** 29:23
**network** 63:6
  72:9,20,22
**never** 25:18
  26:8 36:8,10,15
  51:23 53:21
  55:5 61:1,4,6,8
  79:23 84:8,9
  99:6 106:22,22
  120:2 123:10,11
  123:13 125:2
**new** 56:6 71:4
  88:1
**nicholas** 77:15
  112:25
**nick** 9:10 78:8
  78:14,19,22
  82:7,7,11,13,14
  82:16 92:22
  93:10,12 94:8,9
  94:14,19 95:9
  96:3,5,13
  103:19,21,22
  104:2 130:15
**nick's** 94:16
  95:4

**night** 59:20
**nobody's**
  120:18
**nod** 6:8
**nonsatisfaction**
  18:12
**normal** 55:6
  58:15
**northeast** 2:8
  141:5
**notarized**
  112:12
**notary** 1:20
  136:1 137:16
  138:7,17 139:8
**note** 140:12
**noted** 124:25
**notes** 10:20
  71:16 120:2
  139:13
**notice** 1:21
  112:25
**notified** 99:10
**notify** 99:9,11
**notifying**
  141:11
**november** 9:20
  13:13 14:2 16:2
  16:14 17:12,18
  18:21 19:1,4,17
  82:1 113:23
  116:24 127:18
  128:24 133:13
  133:14,18

**number**  3:9
  5:21,23 41:19
  42:2 59:23 62:2
  112:18 128:19
  140:8
**numbers**  42:5
**numerous**  76:13

**o**

**o**  10:3,3,3 20:15
**oates**  37:20 41:1
**oates's**  38:19
**oath**  112:15
  138:1
**object**  119:7
  126:23 127:1
**objected**  132:21
**observe**  86:15
**obviously**  15:23
  22:3 34:15
  37:15 43:18
  47:13 50:21
  95:7 96:18
**occasion**  85:5
**occasions**  51:21
  59:20 85:1
**occupation**
  62:24
**occur**  98:4
**occurred**  10:7
  20:19 21:2,5
  25:12,16 26:6
  40:15 54:2
  56:20,21 60:13
  78:2 91:20 95:8

**occurrence**
  109:15
**occurring**  53:6
  68:10 69:3
  96:14 126:2
**october**  9:20
  14:2 81:25
**odd**  59:20
**offended**  92:21
**offenders**  16:17
  16:19
**offensive**  85:21
  86:16 87:2
  126:8,11
**offer**  47:23 48:9
**office**  4:20
  40:21 46:1,1
  55:5 76:19
  77:11 84:5 85:2
  88:16,24 89:8
  89:24 90:12,17
  92:2,12 98:10
  100:6,18 102:20
  109:13,16,21,24
  110:18,19
  111:11,13 126:4
**officer**  9:22
  10:14,24 12:5,6
  12:8 13:16
  23:12 24:5,23
  36:20 38:23
  43:10 52:21
  53:6 54:17
  65:18 73:9 77:2
  80:14 90:15

  116:23 117:3
  119:13 133:2
**officers**  20:22
  23:8,11 24:8
  28:2,4 40:16
  45:14 52:19
  60:15,15 62:20
  63:2 65:11,12
  69:24 70:2,3,5,9
  70:20 71:4 72:6
  72:9,19 80:5
  85:9 126:3,9,10
**official**  138:11
**oh**  44:23 77:6
  84:17 96:17
  117:12 121:5
**okay**  5:14,17
  6:1,10,25 7:12
  7:15,19 8:1,5,10
  8:20,24 9:10,10
  9:13,18 10:23
  11:18 12:7,19
  12:24 13:1,21
  14:12 15:13,15
  15:23 16:1,4
  17:16 19:2,16
  19:22 20:12,17
  21:12 22:12,25
  23:21 26:9,16
  26:24 27:9,19
  28:12,16,22
  29:14,14,17
  30:3 31:7,10,13
  31:23 32:13
  33:7,21 34:7,17

  35:1,23 36:17
  36:18,21,23,25
  37:2,7,11 38:7
  39:8 40:1,2 41:4
  41:6,15,20,24
  42:4,7,10 43:13
  43:16,20 44:21
  44:23 45:6,10
  46:14,17 48:25
  49:4,8,9,16,17
  49:23 50:1,6,16
  51:3,7,23 52:3
  54:7,15 57:22
  58:19 59:13
  60:2,11 61:1,10
  61:16,18,23
  62:1,5,7 63:9,19
  63:23 64:2,3,8
  64:17,20,23
  65:1 69:24
  73:15 74:10
  75:1,5,7,10,13
  75:23 76:3,8
  79:13,13,17
  81:25 84:17,22
  85:18 86:14
  87:11,24 88:14
  93:2,10 94:5,7
  95:16 96:7,17
  96:17 97:9
  98:16 99:2,25
  102:19 103:1,16
  103:24 104:16
  105:15 106:4,15
  107:6,16 108:1

108:4,8 109:3
110:24 111:15
112:2,12,17
113:3,7,22
114:5,22,23
115:2,6,10,25
117:23,25 119:5
122:7,13,18
124:14,19 128:8
128:15 129:2,7
129:16,19 130:7
130:10 131:5,8
134:16,17,18
**old**  52:22 53:11
65:14
**older**  80:6
**ones**  19:10
85:24 88:12,13
**online**  17:3
**opa**  9:16 10:5,7
13:9,16 14:13
19:22 34:12
**open**  40:13,17
94:15,18 109:25
**openly**  85:20
87:1,25 109:18
110:16
**opportunities**
113:10
**opportunity**
30:8 105:4
**opposite**  102:7
**option**  18:17
59:9

**order**  101:25
134:25
**ordering**  140:15
**orders**  134:20
**ordonez**  2:19
4:8
**org**  27:10
**original**  141:10
141:14,14
**outgoing**  55:22
**outside**  52:8
60:22 113:1
**overheard**
110:8
**overly**  58:11
**oversees**  27:8
**overtime**  129:25
**own**  120:24
122:5,14

**p**

**p.m.**  1:16
107:12,13
133:22,24,25
134:1 135:4,6
**page**  3:9 48:22
62:1 63:11,13
63:23 64:3,12
64:18,22,24
90:20 94:22,24
95:17,23 96:15
97:19 100:9
103:7 128:16
129:5,5,14,20
129:20 137:4
141:14

**pages**  63:16,17
63:21 129:13
**paid**  32:19,21
32:23 130:5,8
**pancier**  76:7
114:8 120:11,25
122:3,19,21
131:7
**paperwork**  31:3
**paragraph**
102:24
**park**  2:3
**parking**  59:18
59:19
**part**  15:16,16
20:25 29:9
34:18 46:15
50:20 66:15
85:16 97:16
100:6 105:13
107:2 108:20
109:1
**participated**
50:22
**parties**  28:5
124:15,15
139:16 140:15
**partition**  92:1
102:18
**party**  28:14
108:11
**pass**  35:15,20
40:11 46:8,9
**passed**  46:7
53:12 55:1

**passing**  38:17
40:7 59:17
**past**  65:8
**paul**  2:2,3,5
4:14 134:11
140:6
**paused**  123:20
**pay**  9:23 20:7
30:10 32:25
33:1,3 35:10
39:5 42:18,19
42:21,23 121:23
129:23 130:8
**paychecks**  34:9
**paying**  128:21
130:2
**pba**  15:21,22
**peers**  55:6 57:7
58:16 67:19
71:9,12 74:18
86:12 89:11
111:3
**pen's**  40:1
**penalties**  137:17
**pending**  22:3
26:12 113:25
114:25
**penis**  76:20
88:21 92:12
**pension**  34:15
**people**  6:13
51:13 62:23
63:3,8 66:1
67:18 71:22
72:10,16,23

76:20 80:6,7,7
82:13,20 87:16
87:21 90:10
101:11,21
124:25
**percent**  34:8
**performance**
38:14,16,17
40:5,9,10
**period**  13:15,19
13:22 35:18,20
37:25 38:1,12
46:7,10 66:19
71:23 105:6
**perjury**  137:17
**person**  13:4
37:15,18 46:2
50:3 53:2 87:4
87:22 91:21
97:20 104:9
**personal**  68:10
69:5 82:2,7
102:20
**personally**
135:23 138:22
**personnel**  15:2
15:8,11,12
117:18
**persons**  63:1
**petrified**  67:12
80:4
**pgs**  140:8
**phone**  86:23
87:18 102:21
104:10 123:23

**phones**  85:23
86:18 87:3
89:20
**photo**  3:12
**physical**  24:5
**picture**  64:15
**pictures**  82:2,5
82:7,7,9
**place**  15:13 19:4
93:15 111:12
**placed**  75:14,16
75:19,24 112:19
113:5,17
**plaintiff**  1:7 2:5
4:16 112:21,24
134:21
**plaintiff's**  3:15
**planning**  14:17
**play**  49:5,20
**player**  89:10
**playing**  90:23
**plc**  2:3
**plea**  21:1 23:22
**please**  4:11,22
44:10 95:23
140:14
**pled**  20:23
24:11,12
**plenty**  101:22
**plus**  68:5 101:8
117:18
**podcast**  130:13
**point**  6:25 15:15
21:8 57:7 58:2
66:10 69:7,12

77:1 81:11 85:1
85:11 99:22
113:22 115:6
117:6 119:5,14
123:3,16 132:23
**pointed**  64:7
**points**  6:15
**police**  9:16,22
13:16 19:23
24:6 31:9 34:12
36:20 52:21,23
62:17,19,20
63:2 66:3 67:16
67:17 68:6 69:9
72:6,9 73:8,9
80:3,8 82:3,10
82:19 83:3
96:10 99:11
112:23 117:3
123:6 126:10
**policies**  56:13
100:1
**political**  91:21
**politically**  65:22
**porn**  76:18 86:5
86:23 87:18
90:18,23 92:12
126:4,10
**pornographic**
85:22 86:17
87:2
**portion**  121:10
**position**  21:5
40:19 67:15
80:4 81:3 87:16

88:1 106:15
132:10
**possession**
141:15
**possible**  21:25
90:9
**post**  63:10,24
64:24 72:22
96:24 97:18
**postacademy**
50:21
**posts**  64:13
71:19,24 72:16
**potentially**
18:11
**power**  80:3
**powerful**  81:4
**powerpoint**
118:16,18 119:6
119:8,11,16,25
123:17,18
125:11,22
126:20 127:16
**practice**  63:5
**prefer**  8:25
**prefers**  30:2
**preparation**  8:6
**prepare**  7:12
**presence**  76:23
82:16 126:7
**present**  2:18
17:13 82:20
93:17,19 94:6
94:12 95:13
97:24,25 98:1

105:19 110:16
113:24 114:15
114:16 115:12
115:13 124:24
126:1
**presented**
118:10,15
119:25 120:2
123:17 124:2
125:2,12 126:17
127:17 133:12
133:14,17
**preserve** 18:4
**president**
104:15 115:11
119:14 120:22
127:1 131:24
132:19
**presume** 15:15
112:8
**pretty** 89:14
**prevented** 48:4
**previous** 103:6
**previously**
108:12 115:2
116:5
**prior** 78:22
92:19 93:1
112:22 121:19
**private** 16:9
26:19 31:15,25
32:7 35:19
120:11 122:20
132:20

**privately**
117:21
**privilege** 49:14
49:14
**privileged**
121:16
**privy** 109:19
**probable** 24:9
**probably** 6:11
6:16 17:21
49:11 72:11,13
91:24
**probation** 10:8
16:21 34:14
35:15 40:5,7,11
46:10 53:12
**probationary**
13:15,19 35:18
35:20 37:25
38:1,11 43:5
46:7,9
**problem** 25:25
**procedure**
88:22
**procedures** 21:7
**proceeded** 92:1
**process** 14:22
31:3 35:2 47:14
48:2,5 120:3
133:3
**processes**
118:18 133:1
**produced** 84:15
138:23,24

**product** 128:4
**profanity** 12:18
**professional**
51:5,6
**program** 46:11
**projects** 27:12
**promoted** 37:7
37:9,11,13,16
38:24 56:6
**promotion**
37:21 39:4
45:18 47:7,12
48:19
**promotional**
41:22
**pronounce**
29:24 130:14
**properly** 116:18
**property** 27:18
28:24
**proposals**
127:25
**propositioned**
65:3
**protect** 68:16
69:22 120:9
**protected**
105:16 106:11
**protests** 103:4
**proven** 106:22
**proves** 130:22
**provided** 52:17
121:18 141:12
**provides** 28:2,4

**providing** 20:24
**proxy** 92:22
**public** 1:21
16:11 19:15
27:1,2 30:6 79:1
136:1 137:16
138:7,17 139:8
**purpose** 13:5
**purposefully**
10:25 54:25
**purposes** 12:8
**pursuant** 1:21
**pushing** 116:8
**put** 16:20 39:17
42:25 43:23
44:9 46:10
68:17 69:15
82:8 91:5
108:16 123:12
**putting** 86:23
87:18

**q**

**question** 7:3,5
12:24 22:2,7,8
24:20 27:3 38:8
48:10 49:7,17
92:3 95:1 96:7
106:8 117:25
121:9,14 127:6
**questioning**
119:7
**questions** 6:17
6:25 44:11
47:19 49:12,16
118:17 120:4

**quick** 27:3
**quiet** 118:20
**quit** 68:1
**quote** 86:25
　91:9,10,17

**r**

**r** 10:3 20:15,15
**racist** 91:9 92:4
　92:13
**radio** 55:23
　57:24 70:19
　90:1,2,3,3,4
**raise** 4:21
**raised** 55:22
**rank** 46:21 47:8
　48:13 66:21
　76:12 116:17
**ranks** 70:8
**rapport** 51:9,14
　85:3 92:23
**rate** 9:23 20:7
　32:25 35:10
　42:22
**rather** 94:14
**reached** 104:22
**read** 121:8,11
　124:6 137:17
　140:11 141:11
**reading** 141:11
　141:13
**really** 26:17
　44:19 90:11
**reask** 117:25
**reason** 10:8
　14:7 24:14

26:18 30:18
39:2 59:14
84:15 85:14
101:10 107:2
137:4 140:12
**reasonable**
　140:17
**reasoning** 40:12
**recall** 20:11
　22:15 32:18
　36:9 56:4 92:10
　114:15 115:16
**receipt** 140:17
**receive** 45:14
　79:14,17
**received** 36:10
　46:2
**receiving** 45:12
**recently** 5:13
　9:1,4 79:18
**recognize** 75:1
　89:16,18,22
　111:24 112:2
**recollect** 16:16
**recollection**
　114:14
**recommended**
　121:1
**reconvene**
　134:10
**record** 4:2,12
　18:22 36:1,5
　93:4,8 107:9,10
　107:14 118:1
　121:10 123:21

133:21,23 134:2
134:20,24 135:4
139:12
**recorded** 4:3
　121:12 124:2
**recording**
　123:23 124:7
**records** 17:16
　17:20,22,23
　23:20,21 98:7,8
**recruiter** 19:20
**rectal** 77:7
**rectum** 102:11
**red** 68:17 69:16
**reference** 90:20
**referenced**
　69:25 70:21
　140:10
**referring** 54:16
　83:14 86:9
　102:14 103:8
　110:9 114:19,21
　116:24
**reflected** 34:9
**refrain** 6:19,20
**refrained** 85:15
**refused** 123:17
**refute** 124:3
**regard** 140:18
**regarding** 38:5
　38:11 94:19
　113:24
**regards** 77:19
　118:12

**reggie** 97:15
**regular** 129:24
**reinstated** 44:4
　50:10 79:19
　116:14
**rejected** 65:8
　80:22
**rejecting** 53:25
　54:19 57:16
　73:18
**rejection** 58:9,9
　58:17 74:12,19
**related** 123:4
**relates** 128:18
**relating** 41:22
　70:17,17,18,18
**relationship**
　50:16 51:4,10
　51:24 52:16
　55:9 65:8 66:8
　77:14 78:21,23
　79:3,4,7,9
**relationships**
　74:17 79:11
**relative** 139:15
**relay** 94:14
　101:19,20
**released** 43:14
**relied** 107:3
**remaining**
　106:16
**remedy** 14:23
**remember** 8:2,4
　11:19,25 12:1,2
　17:13 19:7,12

20:10 33:4,15
33:16 36:23
70:1,8,10,16,20
70:22,25 71:1,2
71:5,10,12
75:20,21,23
76:1 78:10
83:23 89:12
92:9 93:25 98:5
100:17 102:5
104:7,11 114:1
114:11,13
124:17
**remind**  134:7
**removal**  24:15
**removed**  8:17
  21:4,16
**rephrase**  95:1
**report**  16:22
  26:4 100:2
  108:25 139:10
**reported**  79:23
  91:15 108:24
**reporter**  4:9,12
  4:21 6:6,13 13:4
  30:1 39:16
  121:11 134:24
  138:6
**reporter's**  139:1
**reporting**  140:1
  141:1
**reports**  21:9
**represent**  75:18
**representatives**
  128:5 131:1

**represented**
  116:19
**request**  16:22
  58:7 73:17,25
**requested**  77:3
  121:10 139:11
**requesting**
  16:20
**requests**  71:22
  84:23
**require**  7:5
**rescheduled**
  134:5
**resign**  36:13
  52:11 59:4,8,9
  59:11
**resigned**  30:11
  30:22 59:12
**resolve**  44:3
  83:13
**resolved**  80:19
  81:10 113:11,12
**respect**  56:25
**respectfully**
  47:25 117:14
**respond**  102:20
**respondent**
  108:11
**responding**  5:4
**response**  63:12
  77:6
**responses**  3:15
  112:4 124:5
**rest**  85:4,6,7

**restaurant**
  85:10
**restroom**  35:23
**result**  39:3
**resulted**  124:19
  128:23
**retaliate**  106:12
**retaliated**  40:24
  81:7 105:16
  106:5,20 107:1
**retaliation**
  67:15,22,22
  68:2,16 81:1
  100:3
**retaliatory**
  45:16
**retired**  65:12
  70:2,4
**retro**  42:19
**retroacted**
  42:25
**retroactive**
  42:18,22
**return**  42:14
**returned**  140:17
**reveal**  7:3
**revealing**
  121:15
**review**  8:5,8
  16:19 139:10
  140:10
**reviewed**  8:11
  8:12,12,13
  40:21 69:13
  105:9,10 120:5

**reviews**  16:21
**richard**  98:21
  99:16,21 105:3
  114:14
**ride**  69:11
**right**  4:22 11:25
  12:13 18:8,12
  19:23 21:16
  22:21 23:3
  28:19 32:8 43:2
  43:14 45:10
  47:15,17,20
  48:23 55:4
  61:19,21 62:2,6
  62:8 63:20 64:6
  71:5 74:23 90:7
  90:11,21 94:3
  94:25 96:11
  97:12 98:4
  103:17,17
  105:18 106:2
  107:19 108:9
  109:12,19
  111:19 112:7,10
  112:14 114:16
  121:25 125:20
  125:22 129:10
  132:24 134:23
**rights**  15:17
  116:23 117:3
  118:19 119:13
  133:2
**riots**  91:15 92:8
  103:3

**road** 68:16
**robert** 83:21
  97:13 98:1
**rojo** 70:13,14,24
  71:11
**role** 9:21 36:18
**romantic** 51:4
  51:23 52:16
**romantically**
  52:15
**room** 13:4 86:3
  86:13,21 87:12
  117:17,17 118:6
  118:23 120:1,16
  120:21 123:23
**rose** 2:2 4:14
**routinely** 47:3
**rule** 6:5,11
**rules** 6:3 15:2,8
  15:8,11,11,12
  140:17

**s**

**s** 20:15
**sacrifice** 47:9
**safety** 19:15
  27:2 30:6
**salabarria** 1:18
  3:3 5:2,12,13
  9:1 45:8 112:10
  122:4
**salary** 20:8
  29:20 30:9
  32:22,22
**salt** 68:12

**sand** 68:12
**sands** 80:23
**sat** 55:4 89:19
  90:22 109:12,15
  109:19 118:15
**satisfaction**
  18:12
**satisfactorily**
  38:18
**saving** 18:14
**saw** 74:3 89:20
  100:11
**sayeth** 135:12
**saying** 15:7
  28:12 56:24
  82:10 84:7 90:2
  91:23 116:9
  117:13 118:25
  119:12 120:20
**says** 41:18 42:20
  44:23 45:5
  62:22,23,24
  79:13 81:25
  87:24 88:20
  103:9
**scared** 53:11
  66:3 67:12 71:9
  80:1 81:3,7,16
  81:22 108:25
  118:9 120:15
  132:4 133:8,8
**scenarios** 50:21
  50:22
**scene** 24:22

**screen** 125:12
  128:9
**screenshots**
  61:16 82:9
**screenshotting**
  82:2,5
**scroll** 46:18
  108:9 111:24
  112:7 128:20
  129:13
**scrolling** 41:13
**seal** 138:11
**searches** 19:17
**second** 6:11
  11:21 27:3 40:1
  44:13 75:7
  82:20 94:23
  96:15 131:3
**sector** 16:9
  26:19
**security** 16:9
  19:14,25 20:21
  20:22 21:4
  23:12,25 25:17
  25:21 26:1,6
  27:6,8,13,16
  28:2,4,13 29:2,4
  29:7 31:22,24
  32:7 33:5
**see** 13:21 27:19
  39:10 41:8 42:2
  44:14,18 45:1,2
  45:3,6 53:22
  58:13 61:11,12
  63:14,15,16

64:4 74:23,25
  75:22 86:4,22
  87:17 90:13,13
  90:16,23,24
  91:5 100:21
  102:20 108:1
  109:20 111:25
  128:13,14 129:4
**seem** 19:10
  119:20
**seen** 39:22
  41:12
**send** 16:22
**sending** 82:9
**senior** 32:4 51:1
  52:6 60:15 70:5
**seniority** 39:5
**sense** 47:7 56:23
  65:16 72:21
  95:11 100:7
  106:6,7 117:19
  117:20
**sent** 13:12 45:25
  81:18 112:5
  141:11
**separate** 122:5
**separated** 8:17
  10:5,9,16,19
  105:17 106:6,21
  107:1,3
**separation**
  16:14 25:12
**september**
  22:14,15,21

**sergeant** 12:5
37:12,22,25
38:12,24 40:16
40:19 41:23
42:15,22,25
43:4,22 44:2,4
52:6,7,8 53:4
55:2,21,22 56:6
56:7,24 58:21
58:22 65:12
66:25 67:4
69:10 70:9,12
70:24 71:11
79:19 86:2
89:16 90:5
100:21 101:15
101:24 102:3,4
102:7 116:14
**sergeant's** 55:4
56:14 70:10
76:19 81:3
88:24
**sergeants** 55:19
57:5 58:2 67:19
85:4,7,24 86:2,6
86:12,15,21
87:12,13,25
88:3,9,11,25
89:13,15,23,24
89:25 90:10,12
90:13,14,16
92:2 100:11,15
100:16,18,19
109:13,16,16,24
110:18,24 111:5

111:6 126:4
**serious** 57:1
79:3
**serrano** 20:13
20:14 27:20
28:17,20 29:1
**service** 15:8,10
40:15
**settle** 43:25 50:4
116:7,8 125:21
126:15,16
**settled** 39:4
46:19,23 116:13
**settlement** 3:11
3:16 41:16 42:7
114:24 116:12
118:12 119:23
124:16,19,20
125:1,3,5,6,9,10
125:24 126:17
126:18 127:8,10
127:11,15,18,22
128:3,14,23
129:9 130:7,19
130:20,23,25
131:2,18,21,24
132:15,17 133:1
133:5,12,14
**settlements**
124:23
**seven** 54:11
66:16,19
**several** 7:18
24:6 25:14 32:3
65:10 100:11,16

124:6
**severely** 85:13
**sex** 40:24 51:18
51:20 91:24
**sexual** 53:14
85:10 91:25
102:15
**sexually** 79:14
85:20 86:16
87:1
**sheet** 135:9
137:1 140:13,14
**shift** 40:15
50:25 52:12
55:21 56:12
60:16 65:13
71:5 77:4 91:17
**shifts** 77:13
**shoe** 10:14,24
11:5,8,9
**short** 6:21
**shorthand**
138:6
**shortly** 70:3
**shot** 118:16
**show** 21:9 39:8
39:14 41:6
61:10 108:1
111:19
**showing** 48:22
87:14 128:8
**shown** 52:14
64:9
**shows** 75:15

**shy** 40:6
**side** 102:7 120:8
120:9 125:2
**sign** 47:3 48:20
49:23 56:18
129:2 131:16
132:2,4,12
133:7 140:14
141:11
**signature** 48:23
112:8 129:7,12
129:13,17
137:20 138:14
139:20 141:14
**signed** 42:23
49:1 108:10
112:14 128:4
131:21 132:5
140:19
**significant**
77:15
**signing** 132:7
141:11
**sincerely** 141:16
**single** 19:13
87:4 89:12
104:14,23
**sits** 58:14
**sitting** 21:25
34:17 85:8
90:18 111:11,16
117:2 120:1
125:8
**situation** 72:24

**six**   43:6 46:10
   54:11 78:25
**slam**   11:5
**slashed**   68:11
   68:22 69:21
   70:18
**sleep**   76:21
**sleeping**   100:12
   100:22
**smith**   114:13
**social**   63:6 65:9
   82:2
**socialize**   60:22
**soft**   42:11 45:12
**solutions**   140:22
**somebody**   51:12
   53:19 62:8 76:5
   97:14
**soon**   93:11
   132:4
**sorry**   8:19 11:12
   12:25 15:5 19:7
   21:21 22:12,22
   23:20 25:23
   36:22 41:13
   42:21 44:11
   45:23 50:15,24
   51:12 54:2,14
   63:21 78:20
   83:12 94:9,17
   98:14 102:2
   106:7 117:12
   121:5,5,8
**sort**   49:13 60:3

**sought**   16:4
**sounds**   70:16
**south**   1:14 4:6
   35:12 140:1
   141:1
**southern**   1:1
**space**   77:11
**speak**   22:3
   25:17 26:7
   53:23 55:6,9
   58:15 74:15
   77:23,25 84:8
   94:10,14 96:23
   98:11 104:22
   105:4 109:22
   111:4,4,6 118:5
   123:17 126:2
**speaking**   87:17
   88:25 100:11
   120:19 123:14
**specialized**   88:2
**specific**   37:23
   38:7,8,10 75:17
   86:19 87:16
   88:11,13 89:14
   90:2
**specifically**   71:6
   71:7,8,15 92:3
   109:2,24 123:15
   125:3
**specifics**   87:19
**spell**   10:2 30:2
**split**   129:24
**spoke**   7:2,4
   10:17 12:12

   48:6 53:21
   57:23 69:25
   71:6,7,8,15
   77:12 83:3 84:6
   92:22,23 93:1
   97:4,10,15
   98:21 103:22,22
   123:13 130:21
**spoken**   47:22
   58:12 60:2
   65:10 66:14
   99:20
**sporadically**
   31:15
**squad**   51:1,8,9
   51:11,12 52:13
   52:19 60:12,18
   65:13,22 66:7
   66:24 67:1 68:4
   70:6,6,7 71:4
   85:6
**ss**   135:18 138:3
   139:5
**staff**   67:19
   79:15,15,16
   80:1,6 81:4
**stalked**   53:4
**stalking**   52:7
   58:22 59:6,15
   59:23 65:19
   67:4 80:15
**stand**   117:7
**standards**   40:10
**standpoint**   81:1

**start**   31:4 42:15
   51:13
**started**   37:4
   50:15,20 53:12
   60:7 68:9 71:3
   79:13 102:15
**starting**   129:20
**starts**   12:3
   29:24 35:6
**state**   1:21 24:10
   40:21 45:25
   46:1 101:25
   135:17 136:1
   137:16 138:3,7
   138:17 139:4
**stated**   40:8
   65:10 116:13
**statement**   38:20
   118:2
**states**   1:1 100:1
**station**   69:10
   82:3,10,19
   109:23
**status**   41:22
**statute**   140:18
**stay**   88:17
**stayed**   118:20
**stenographic**
   139:13
**stenographica...**
   139:9
**step**   109:22
**stepped**   10:14
   10:24 11:7,9

**stepping** 12:10
**steps** 14:22
  113:10
**steven** 50:12
  51:1 52:13,14
  79:6,16 94:6
**stood** 132:23
**stop** 53:15 78:6
  89:6,7 115:7,14
  116:21
**stopped** 123:14
**stored** 17:25
**story** 38:20
  46:25
**straight** 17:12
**strike** 25:5
  118:1,2 121:6
**stripes** 45:18
  81:2
**strongly** 120:7
**struck** 24:5 25:1
**structure** 27:12
**stuff** 72:11,14
  96:15
**subject** 20:20
  21:6 38:10,22
  137:18
**subjected** 77:10
  77:20 85:19
  88:20
**submitted** 8:14
**submitting** 31:2
**subordinate**
  132:10

**subscribed**
  135:21
**subsequent** 7:21
  10:16,18 20:22
  21:3 24:6 25:5
  53:21
**subsequently**
  8:17 52:10
**substance**
  137:18
**substantiate**
  68:14
**substantiated**
  52:9 59:5
  106:22
**success** 39:12
**successful** 67:17
**successfully**
  37:24 40:11
**suggested**
  140:16
**suite** 2:4 140:2
**super** 13:3
  78:10
**superiors** 86:12
**supervisor** 9:25
  10:1 20:12,13
  27:21 29:22,23
  55:24 59:17
**supervisors**
  85:20,23 86:8,9
  87:4,5,9 91:8
  103:10
**support** 48:14

**supposed** 58:9
**supposedly**
  126:23 127:2
**sure** 7:7,8 12:2
  12:24 15:4
  21:14 25:11
  30:1 34:8 54:9
  55:12 73:16
  95:20 102:1
  103:18 111:15
**survive** 67:8,9
**suspend** 134:4
**suspension**
  42:12 45:13
  128:22 129:21
  134:9
**sustained** 67:25
**sutton** 2:3
**swear** 4:12
**switched** 38:20
  40:12
**sworn** 5:4
  135:21 138:9

**t**

**take** 6:13 11:23
  13:1 15:23 22:1
  22:2 28:10 32:2
  34:3,4 35:24
  37:17 53:17,20
  65:7 69:1 83:10
  83:11 93:2,15
  95:19 98:16,18
  99:2,12 120:10
  129:21 131:16
  133:20

**taken** 1:20 4:4
  24:9 36:2 43:24
  48:1 93:5
  107:11 113:10
  133:24 137:2
  140:8 141:8
**talk** 5:14 6:15
  26:1 74:6 88:21
  96:5,13 103:21
  111:6 118:24
  124:12 131:3
**talked** 7:6 9:10
  25:9 55:13
  71:16 76:8
  83:17 88:23
  93:13 96:3
  103:19 117:10
  117:21
**talking** 6:14
  13:2 50:18
  58:20 84:3,17
  85:9,10 90:23
  103:20 105:6,21
  109:16 110:24
  110:25 117:16
**talks** 42:1
**tank** 68:11,25
  69:21 70:17
**team** 89:10
**tell** 7:1,5 8:10
  22:12 24:17
  25:14 48:14
  55:3 57:25
  58:12 66:10
  69:7 70:6 71:25

83:7 89:6,7 90:4
94:8 100:5
110:3,3,17,20
110:21 111:7
117:13,14,22
122:12
**telling** 57:17
74:13 81:5
82:11,14 110:7
116:11 132:3
**ten** 32:15,15,16
37:6
**tenure** 52:23
60:15 66:3 80:7
95:12 96:10
108:20
**term** 89:15
126:12
**terminate** 25:15
**terminated** 14:5
52:11 59:10
105:25 125:11
125:23,24
126:19 127:16
132:5 133:11
**termination**
26:14 36:13
38:6 68:8
132:18
**terms** 44:2,6,7
45:10,22 46:5
46:17,22 47:3
48:8 49:1 50:5
116:7,8,12
126:18 127:11

127:12,17,21
128:21 129:19
133:17
**terrace** 2:8
141:5
**test** 37:17
**testified** 5:5
60:6
**testifies** 51:20
**testify** 131:12
**testimony** 22:4
58:20 134:8
135:3 140:11,17
**text** 79:14 81:18
84:16 98:9
**thank** 121:17
134:18
**thing** 21:21 47:8
48:18 50:3
53:13 62:1 63:9
63:13,18 64:18
67:5 122:1
**things** 21:23
57:13 62:22
67:8 69:3,4
82:10 91:19
96:5 122:23
**think** 34:2,4,6
44:8 62:5,6 63:1
63:1,17,21 64:3
107:2,6,16,21
112:20 113:18
114:17 127:6
129:24 130:2

**thinking** 14:1
**third** 28:5,14
108:5
**thought** 27:5
42:21 60:6
**threatened**
132:18
**three** 69:17
77:18 84:4
92:25 93:13
97:21
**till** 9:20 17:13
20:5 29:18
**time** 6:14 7:25
11:23 13:2,22
21:24 32:10
34:21 35:25
36:4 38:14 40:4
40:8,14 43:3,6
43:24 47:19,24
48:11,17 50:2
52:4,14,25
55:19 56:9
58:13,14 61:21
65:12,15 68:5,7
68:20 69:11,15
70:1,4,7 71:3,20
71:23 72:4,16
73:7,21,21,22
76:7,12 77:13
77:14,17,21
78:14 79:5,18
80:24 86:3,20
87:11,14 91:14
92:6,11 93:3,7

93:23,24 95:20
100:19,20
101:18 102:1,6
104:15,19,21,23
105:6 107:6,9
107:13 115:11
116:1,3 117:6
119:5,14 120:7
129:23,24
133:22 134:1,14
135:3 141:13
**times** 5:20 24:6
59:23 64:7,10
66:9,12 70:21
74:14 105:1
110:16 111:10
**tires** 68:11,21
68:24 69:21
70:18
**title** 27:5,22,22
27:24 29:4 30:5
35:8
**today** 6:3,6,25
34:17 41:4,5
90:19 117:2
134:20
**today's** 135:2
**together** 51:8
79:4 82:12
88:15
**token** 6:19
**told** 11:10,13
12:16 25:19
31:1 35:3,4
48:16 52:10,15

52:20,25 53:8,9
53:18 55:8
56:11,18 59:16
66:8 67:19 68:1
70:22 71:6 77:1
82:13,17 83:4,9
94:9,13 98:23
99:10 100:19
101:2,4,4,5,6,6
101:8,12 117:14
118:2 121:2,7,7
123:3 125:9,13
125:15 126:21
127:10 131:1
133:9
**tone** 57:23
**took** 14:23
58:17 69:21
74:11 123:19
**top** 5:21 7:20,24
8:22 16:16 17:9
23:1,17 32:14
71:14 83:23
84:11 108:9
114:16
**topic** 131:13
**total** 20:10
129:23 130:2
**towards** 54:23
58:18 65:25
74:12 108:25
**towed** 69:9
**toxic** 81:13
**training** 43:10
46:14

**transcript**
134:24 135:11
137:3,18 139:11
139:12 140:10
140:19 141:10
141:12,13,14
**transcripts**
140:15
**transpired** 84:9
**transpiring**
97:16
**transported**
24:10
**trap** 95:20
106:9
**traumatizing**
67:3
**tried** 25:17 51:9
51:10 53:7 69:1
74:13,16 91:3
117:8 126:1
**trouble** 91:22
92:1
**true** 115:24
135:10 137:18
139:12
**try** 6:18,20
21:13 65:22
67:20 83:11
91:4,5 113:10
**trying** 11:6
25:11 66:7 67:9
67:10 88:17
90:25 95:19
106:9 126:15

**tuesday** 1:15
**turn** 76:25
**turned** 85:6,8
115:3 116:22
123:10
**two** 6:13 8:1
12:4 14:11 29:8
30:18 34:23
60:3 74:3 77:18
97:14,21 101:8
114:5 115:7
120:21 124:20
133:20
**type** 19:16
38:16 46:2
52:16 53:1
65:17 77:10,11
81:13 82:5
89:20 91:3,6
92:20 100:2,3
120:2 122:1
125:6,7 138:24
**types** 90:17

**u**

**ugly** 82:11
**ulp** 120:13
**ultimately** 68:1
105:17 128:4
129:20 133:6
**uncomfortable**
76:22 85:13
**uncommon**
62:25 63:5
**under** 15:2,7,17
18:4 38:25

40:20 68:18,18
75:14,16,19,24
76:1 112:14,19
113:5,18 137:17
140:17
**underneath**
28:13
**understand** 6:9
6:23,24 7:10,11
18:3,10 21:14
22:5,8,10 25:11
32:21 47:13
49:3 54:10
67:24 95:3 96:7
106:7,15 115:20
131:9
**understanding**
49:1 103:17
**understood**
114:23
**unemployed**
34:19
**unfortunate**
52:5
**unheard** 14:22
132:25
**uninvestigated**
107:4
**union** 15:16,17
15:20 38:19,23
40:22 41:18
42:8 44:3 47:22
48:6,14 115:17
**unit** 4:3 68:18
88:3

| | | | |
|---|---|---|---|
| **united**  1:1 | **varies**  16:8 | **viewed**  90:18 | **walked**  11:9 |
| **unjust**  39:2 | **various**  16:6 | **viewing**  85:21 | **walking**  87:14 |
| **unjustly**  107:1 | 19:9 | 86:17 87:2 | **want**  5:10 7:8 |
| **unpack**  55:12 | **vehicle**  59:17 | **vindictive**  53:2 | 26:1 36:8 44:5,9 |
| **unproven**  107:3 | 69:5,9 | 65:25 66:23 | 44:11 46:22 |
| **unstable**  45:6 | **vehicle's**  68:11 | **violated**  116:23 | 52:16 53:5,9 |
| 63:22 | **vendetta**  53:25 | 117:4 | 54:9 55:8,12 |
| **unsubstantiated** | **verbal**  30:15 | **violating**  101:25 | 65:19 67:9 69:2 |
| 107:4 | 63:12 | **violation**  118:18 | 73:3,4,16 76:8 |
| **unwanted**  10:15 | **verbally**  101:24 | 119:11 120:3 | 83:13 95:20 |
| 11:3 52:18 | **verify**  140:12 | **violations** | 103:18 106:10 |
| **unwarranted** | **veritext**  4:10 | 120:19 | 107:17 116:7 |
| 10:14 11:3 53:8 | 140:1,15,22 | **violent**  20:20 | 117:10 118:19 |
| **unwelcomed** | 141:1 | 23:6,24 103:4 | 124:12 125:8,18 |
| 52:18 | **veritext.com** | **violently**  11:16 | 130:19 131:15 |
| **uphold**  119:12 | 140:15 | 12:10 | 131:17,20 132:4 |
| **upped**  24:10 | **veteran**  52:19 | **virtue**  121:19 | 132:25 134:14 |
| **ups**  30:15 | 65:11,11 69:24 | **visibly**  90:16 | **wanted**  32:2 |
| **upset**  55:10 | **veterans**  70:2 | **voices**  89:17,18 | 33:1,3 44:1 47:6 |
| 56:21 57:3 68:9 | **vicinity**  60:1 | 89:22 | 47:7 48:19 |
| 74:18 | **victim**  24:21,24 | **volume**  87:19 | 53:13,14 67:5,6 |
| **urge**  6:18 | **video**  4:3 6:6 | **voluntarily** | 73:5 103:25 |
| **use**  35:23 56:1 | 134:19,20 | 49:23 | 113:20 116:13 |
| 56:13,20 57:2,9 | **videographer** | **vs**  1:8 140:7 | 130:23 131:16 |
| 89:15 91:8 | 2:19 4:1,8 35:25 | 141:7 | 133:1,3 |
| 103:10 | 36:4 93:3,7 | | **wanting**  58:10 |
| **used**  45:16 | 107:9,13 133:22 | **w** | **watch**  76:18 |
| 140:19 | 134:1,19,23 | | 126:10 |
| **uses**  56:14 | 135:2 | **w**  10:3 31:24,25 | **water**  68:12 |
| **usually**  19:14 | **videos**  21:9 | **waiting**  14:25 | **way**  32:23 44:3 |
| 62:22,23 | 85:22 86:17 | 23:23 30:20 | 45:19 47:11 |
| | 87:2 | **waitresses**  85:9 | 48:4,8 52:1 55:7 |
| **v** | **videotaped**  1:18 | **waive**  141:10 | 57:23 58:17 |
| | **view**  126:4 | **waiver**  118:3 | 74:11 76:22 |
| **v**  4:5 137:1 | | **walk**  50:19 89:8 | 78:4 85:2 86:15 |
| **vague**  125:5 | | 91:4 | |

95:13 96:9
101:17 106:4
122:10 132:24
**wayne**  77:17,21
78:8,13 83:1
92:23,25 93:12
94:10,13 95:4
96:4,5,13
103:20,21,22
104:1
**ways**  53:2
**we've**  134:3
**week**  14:11
34:23 102:7
**weekly**  51:13
**weeks**  14:11
34:23 102:14
**welcoming**
53:19
**went**  14:21 26:7
34:21 42:22
61:1,4,6 77:12
77:17 84:5
95:10 99:15,15
99:19 100:7,8
106:13 118:22
130:25
**whatsoever**
51:24 73:20
80:25
**when's**  15:13
34:21
**wide**  49:15
**witness**  3:2 4:13
5:3 45:2 131:5,8

131:10 134:7
135:15 138:11
140:19 141:10
141:12,13
**word**  8:16 55:5
**words**  56:23
**work**  10:4 19:22
20:17 25:13
26:24 29:17
30:8,23 31:7,13
31:14 32:13
42:14 48:12
50:8 51:11,12
60:22 62:19
68:17 72:9 73:7
73:13 77:3,5
84:24 85:12,19
90:1 91:2 100:6
108:10
**worked**  11:24
11:24 13:22
19:24 22:17
27:1 28:7,13
29:14 31:23
32:7,12 43:23
46:21 50:10
51:8 58:5 65:13
68:3 78:16
102:4,7 132:9
**working**  9:13
20:9 32:10 37:4
40:1,8 50:25
51:10 52:4
55:18,20,21
56:19 60:12,14

60:17 66:5,7,24
67:10 68:4
74:17 76:13,16
77:11 116:19
127:4
**workplace**
85:22 87:3
102:16
**works**  18:2
27:10 62:17
**worried**  66:4,23
67:12
**worry**  73:6
**wrap**  34:18
**wrist**  100:24
**write**  30:15 57:4
57:5 137:3
**writes**  132:10
**writing**  83:24
84:1 120:1
**written**  25:7
36:8 56:19
92:18 97:17
**wrong**  26:21
42:11 47:10
67:24 105:25
113:19 115:10
115:21 123:19
**wrongdoing**
46:2
**wrongful**  38:5
**wrongfully**
43:24 116:6
**wrote**  8:15,17
21:10 54:17

101:18 106:19
112:21

**x**

**x**  3:1

**y**

**y**  130:15
**yeah**  39:11
63:20 95:2 96:3
117:13 120:5
**year**  9:7,24
13:17 14:1 20:8
29:21 35:11,17
65:14 66:19
68:19 92:9,13
92:15,15
**years**  37:6 52:22
53:11,22 54:11
54:24 66:16
68:5 69:18
78:25
**yesterday**  7:20
7:23
**young**  52:21

**z**

**z**  95:11
**zoom**  2:11 4:18
134:5,10

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 142

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4              CASE NO.:1:22-cv-21004-DPG

 5  JESSICA GUASTO,

 6           PLAINTIFF,

    VS.
 7
    THE CITY OF MIAMI BEACH, FL,
 8  A FLORIDA MUNICIPALITY,

 9           DEFENDANT.

10  _____/

11              VOLUME 2 (PAGES 142-177)

12  CONTINUED VIDEO
    DEPOSITION OF:        JESSICA (GUASTO) SALABARRIA
13
    DATE:                 FEBRUARY 13, 2024
14
    TIME:                 10:14 A.M. - 11:11 A.M.
15
    PLACE:                VIA ZOOM REMOTE CONFERENCING
16
    REPORTED BY:          TAMARA MASCI TANNEN, RPR, FPR-C
17                        STENOGRAPHIC COURT REPORTER
                          NOTARY PUBLIC, STATE OF FLORIDA
18

19

20

21

22

23

24

25
```

**COASTAL REPORTING, INC. (954) 523-5326**

Page 143

```
 1  APPEARANCES:

 2  PAUL A. DARAGJATI, ESQ.
    ROSE DARAGJATI, ESQ.
 3  PAUL A. DARAGJATI, PLC
    4745 SUTTON PARK COURT
 4  SUITE 503
    JACKSONVILLE, FLORIDA  32224
 5  PAUL@DARAGJATILAW.COM
          COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.

 6

 7

 8  MICHAEL L. ELKINS, ESQ.
    MLE LAW
 9  1212 NORTHEAST 16TH TERRACE
    FORT LAUDERDALE, FLORIDA  33304
10  (954) 401-2608
    MELKINS@MLELAWFIRM.COM
11        COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.

12

13  ALSO PRESENT:

14  ERICK CLAVIJO, VIDEOGRAPHER, COASTAL VIDEO

15

16              * * * * * * * * *

17              S T I P U L A T I O N S

18

19        It is hereby stipulated and agreed by and

20  between counsel for the respective parties, and the

21  deponent, that the reading and signing of the deposition

22  are hereby waived.

23

24

25
```

**COASTAL REPORTING, INC. (954) 523-5326**

Page 144

```
 1              I N D E X

 2  WITNESS                                          PAGE

 3  JESSICA GUASTO

 4  Direct Examination by Mr. Elkins                  146

 5

 6              E X H I B I T S

 7  DEPOSITION         DESCRIPTION                    PAGE

 8  Exhibit Number 7   Complaint                      163

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**COASTAL REPORTING, INC. (954) 523-5326**

Page 145

```
 1              P R O C E E D I N G S

 2              * * * *

 3        THE VIDEOGRAPHER:  We're now on the video record.

 4  Today is Tuesday, the 13th day of February, 2024.  The

 5  time is approximately 10:14 A.M.

 6        And we are conducting a deposition conference via

 7  Zoom for the purpose of taking the video deposition of

 8  Jessica Guasto taken by the Plaintiff in the matter of

 9  -- in case number 122-CV-21004-DPG.  And the case is

10  Jessica Guasto versus the City of Miami Beach, Florida,

11  which is filed in the U.S. District Court of the

12  Southern District of Florida, Miami Division.

13        The court reporter is Tamara Masci Tannen from

14  Coastal Reporting.  My name is Erick Clavijo.  I am the

15  videographer on behalf of Coastal Video.  I am not

16  related to any party on this action, nor am I

17  financially interested in the outcome.

18        Would all counsel please state their appearances

19  for the record, after which the court reporter will

20  swear in the witness.

21        MR. DARAGJATI:  My name is Paul Daragjati.  With

22  me is my associate Rose Daragjati.  We represent the

23  Plaintiff, Jessica Guasto, who is also present.

24        MR. ELKINS:  Michael Elkins on behalf of the

25  Defendant, City of Miami Beach.
```

**COASTAL REPORTING, INC. (954) 523-5326**

Page 146

1   THE REPORTER: Jessica, raise your right hand,
2   please.  Do you swear that the testimony you are about
3   to give will be the truth, the whole truth, and nothing
4   but the truth so help you God?
5   THE WITNESS: Yes.
6   THE REPORTER: Thank you.  You may proceed.
7   **JESSICA GAUSTO** SALABARRIA,
8   Having been first duly sworn, testified as follows:
9   MR. ELKINS: Okay.  Tammy, I'm going to refer to
10  Jessica as Ms. Salabarria, which is her -- she had her
11  last name changed recently.  So to avoid any confusion
12  just so you know when we refer to Ms. Salabarria, it's
13  Ms. -- also Jessica.  Does that make sense?
14  THE REPORTER: Yes.
15  **DIRECT EXAMINATION**
16  BY MR. ELKINS:
17  Q.  Okay.  Ms. Salabarria, this is continuation of
18  your deposition from February 6th.  Do you remember all the
19  rules that we went over at that deposition?
20  **A.  Yes.**
21  Q.  Okay.  And you understand that you're still under
22  oath, correct?
23  **A.  Yes.**
24  Q.  Did you talk to anybody about that deposition?
25  **A.  No.**

Page 147

1   Q.  Did you talk to your lawyer about it?
2   **A.  No.**
3   Q.  Okay.  And nobody else?
4   **A.  No.**
5   Q.  Okay.  I think where we had left off in that
6   deposition was we were talking about your 2020 -- I think
7   July 2020 EEOC charge.  Do you remember that?
8   **A.  Yes.**
9   Q.  Okay.  I'm going to go through a few other things
10  here before we get back to that.  So I'm going to show
11  you --
12  **A.  Excuse me.**
13  Q.  -- hold on.  Okay.  I'm showing you what we had
14  marked as Exhibit 6.  Do you see this document?
15  **A.  Yes.  I can see it.**
16  Q.  Okay.  And this was your responses to the City's
17  interrogatories?
18  **A.  Yes.**
19  Q.  And I don't remember if we did this before, so I'm
20  going to do it now.  Did you -- is that your signature on
21  these?
22  **A.  Yes.**
23  Q.  Okay.  So I want to go through these this morning.
24  So we had asked you to list a number of witnesses:  Names,
25  addresses, emails address, of people who would have

Page 148

1   knowledge about any of the facts in this lawsuit.  Do you
2   see that?
3   **A.  Yes.**
4   Q.  Okay.  Let me ask you this:  What is your
5   understanding of the current claims that you have against
6   the City?
7   **A.  So my current claims that is my understanding is**
8   **that it's for retaliation for -- for filing an EEOC and for**
9   **being retaliated against by filing that EEOC, and then**
10  **subsequently after settling with the City, I was fired,**
11  **terminated, separated from the City on my first day back;**
12  **and therefore, that's where the retaliation charge is.**
13  Q.  And so, your claim is, so I understand it, that
14  you -- you understand that for retaliation, you have to have
15  engaged in some sort of protected activity and then the City
16  fired you for engaging in that protected activity.  You
17  understand that, right?
18  **A.  Yes.**
19  Q.  And in this case, the protected activity that you
20  claim forms the basis of your retaliation is the 2020 EEOC
21  charge; do I have that right?
22  **A.  Yes.**
23  Q.  Okay.  And your position in this lawsuit is that
24  the City fired you because you filed that EEOC charge,
25  correct?

Page 149

1   **A.  Yes.**
2   Q.  Okay.  And that EEOC charge was in I think July of
3   2020, correct?
4   **A.  That is correct.**
5   Q.  And then you were fired in January of 2021, right?
6   **A.  Yes.**
7   Q.  So about seven -- give or take a few weeks, but
8   approximately seven months later?
9   **A.  Yes.  However, there wasn't -- the settlement for**
10  **that EEOC wasn't settled until sometime in December.  So it**
11  **was -- it wasn't that it was settled in June or July.  It**
12  **was -- it was settled within December.  And then, subsequent**
13  **to that, the very next month after settling, my very first**
14  **day back, Lieutenant Cosner, he filed these baseless**
15  **unsubstantiated allegations.  And from there, I was**
16  **separated from the City my very first day back.**
17  Q.  What's the significance of settlement relative to
18  your claims of retaliation?  Why is that -- why does that
19  matter to you?
20  **A.  Well, because at the time Chief Clements was very**
21  **adamant through -- through proxy through Nicholas Guasto and**
22  **the FOP to -- to have me get rid of the -- the EEOC.  And he**
23  **was having backdoor conversations with Nicholas and asking**
24  **him to have me get rid of the EEOC and that that would be**
25  **the only way to settle, to have me settle with the City.**

Page 150

1 And he was very adamant about that EEOC being withdrawn.
2         And then, during my settlement meeting, when I was
3 supposed to go in there and speak on -- on the issues that I
4 was having that was -- that it was written on the EEOC, we
5 never got into any of those claims.  We never -- the --
6 Chief Clements never spoke to me, didn't ask me questions
7 about my concerns.  So to me, his main motivation was to get
8 that EEOC withdrawn and to have me settle.
9         And then, subsequent to there, the first chance
10 that they took -- the City took to get me terminated to get
11 me separated was my very first day back.
12         And that's why it's significant to me, the -- the
13 timing of it, the baseless allegations that Lieutenant
14 Cosner wrote that were never investigated, were never
15 substantiated.  And I got separated on allegations.  It's --
16 that's why I -- I believe it's significant.
17     Q.   So you believe that the City never investigated
18 Lieutenant Cosner's allegations; did I hear that right?
19     A.   That is correct.
20     Q.   Were they required to?
21     A.   Yes, they were.
22     Q.   Weren't you an employee at-will after your Last
23 Chance Agreement?
24         MR. DARAGJATI:  Object to form.
25 BY MR. ELKINS:

Page 151

1     Q.   You can answer.
2     A.   Does that mean I -- I answer?
3     Q.   Yes.
4         MR. DARAGJATI:  Yes, you can answer.
5         THE WITNESS:  Okay.  So my Last Chance Agreement,
6 if you read it, on my Last Chance Agreement, it doesn't
7 say anything about waiving my Officer Bill of Rights,
8 nor do -- does it say anything about me waiving any of
9 my due processes or any of the City's policies and SOPs
10 concerning my due processes.
11         So from my understanding of the LCA, I never
12 waived my statutory Officer Bill of Rights, nor did I
13 waive any of my due process rights.  And also, the --
14 the LCA is very ambiguous; it's not specific.  It
15 doesn't state specifics.  It only says you can't
16 arbitrate and you can't grieve.  But it does not say
17 anywhere on that LCA that I waive any of my Officer
18 Bill of Rights.
19 BY MR. ELKINS:
20     Q.   You understand that there's a difference between
21 what the police officer -- the protections of the Police
22 Officer Bill of Rights and whether or not the City has to
23 show just cause to terminate you; you -- you understand
24 those are two completely different things?
25     A.   So what I understand is that no matter if I'm

Page 152

1 at-will or not, there has to be an investigation.  There has
2 to be a --
3     Q.   Are you sure about that?
4     A.   Yes, through my Officer Bill of Rights.  And --
5     Q.   And did --
6     A.   -- that wasn't done.
7     Q.   And at any point in time -- so it sounds like
8 you're very well-versed in the Police Officer Bill of
9 Rights.
10         At any point in time, did you take advantage of
11 the administrative mechanisms in there to complain that your
12 Police Officer Bill of Rights were violated?
13     A.   I did.  So I was brought to this meeting that was
14 on January 19th.  It was labeled as an invite from the
15 Chief's secretary.  I had no idea what this invite, this
16 meeting entailed.  It just said an invite.  When I get
17 there, it's the Chiefs -- Chief Clements, the command staff,
18 the Internal Affairs commander, AJ Prieto, and then I see
19 Cosner there, as well as the FOP that was already there
20 summoned by the -- Chief of Police.
21         So I asked what this meeting was about.  And
22 Reggie Lester told me it was about an allegation.  Again, I
23 had no idea what this meeting was about.  He wasn't very
24 shared what it was about, just that it was an investigation
25 -- an allegation, I'm sorry.

Page 153

1         And so, I told him I do not want to go into that
2 meeting.  This is discipline in nature.  It looks like
3 discipline in nature.  Why is the Internal Affairs commander
4 in this meeting?  And he went to Richard Clements and told
5 Richard Clements that I was not going to go -- I did not
6 want to participate in this meeting without an attorney.
7 And so, Richard Clements relayed to Reggie Lester that if I
8 didn't attend this meeting, that I would be terminated right
9 there on the spot.
10         And at that point, I was terrified that I was
11 going to be terminated.  And so, I sat in the meeting.
12 However, I didn't want to answer any of the questions.  And
13 again, I had asked for my representative of my choice to be
14 in this meeting, which was denied several times.
15     Q.   You had actually four -- three or four members of
16 the FOP in that meeting, isn't that true?
17     A.   Like I stated, the FOP was summoned by the Chief,
18 not by me.  I did not ask for any of those members of the
19 FOP to be there.
20     Q.   That's not my question.  My question is:  They
21 were there.  Yes or no?
22     A.   Yes, they were there summoned by the Chief of
23 Police.
24     Q.   I'm not asking you --
25     A.   And my --

Page 154

1    Q.  -- who summoned who.  My question is -- and it's a
2  yes or no question -- were there three or four members of
3  the FOP present at this meeting?
4    A.  Yes.
5    Q.  And one of them was the president of the FOP,
6  correct?
7    A.  That is correct.
8    Q.  And the other members were the executive board
9  members of the FOP, correct?
10    A.  That is correct.
11    Q.  Okay.  At any point in that meeting, did any of
12  your FOP representatives -- and you're referring to the
13  meeting prior, just before your separation from employment,
14  correct?
15    A.  Yes.
16    Q.  Okay.  At any point in time, did you or any member
17  of the FOP allege or take advantage of the procedures in
18  Florida Statute Section 112.534, which I'm assuming you're
19  familiar with since you seem to know your Police Officer's
20  Bill of Rights and how they apply.  Did that happen?
21    A.  So again, I was in this meeting and I refused to
22  answer.  And I didn't want to participate in this meeting.
23  And I asked for my representative of choice, which was for
24  an attorney to be present.  And I was told that I could not
25  leave the meeting, that I had to continue in this meeting,

Page 155

1  **and that if I did not, I was going to be terminated.**
2          **So I sat there and I answered very little and I --**
3  **and I didn't participate in giving any type of responses**
4  **that I knew were of investigatory purposes.  This was an**
5  **investigation that they were trying to conduct without my**
6  **rights.**
7    Q.  That's a nice answer, but it's not answering my
8  question.
9          So I want you to listen to my question and answer
10  the question I'm asking you.  I know you have a series of
11  responses you're going to give.  That's not -- but you're
12  not answering the question.
13          The question is:  At any point in time, during
14  this meeting or after, did you or any member of the FOP
15  initiate any of the procedures of Florida Statute 112.534
16  alleging that the meeting was an improper investigation and
17  that the investigator was violating Chapter 112?  Did that
18  happen; yes or no?
19    A.  **Yes, it did.**
20    Q.  Who did it and when and how?
21    A.  **Reggie Lester advised the Chief of Police that it**
22  **was against my rights.**
23    Q.  What did he do?
24    A.  **That's what he said.  And he told the Chief that**
25  **-- about this meeting being in violation of my rights and he**

Page 156

1  **gave a direct order and said that if we did not participate**
2  **in this meeting, I was going to be terminated.  That is my**
3  **answer.**
4    Q.  And did -- at any point in time after that then,
5  did the agent -- did you or the FOP request that the Chief
6  or that their designee cease the interview?
7    A.  **Yes, they did.  And again, Richard Clements said**
8  **this meeting was going to continue.**
9    Q.  And how come nobody after the meeting or --
10          Or let me ask you this:  After the meeting did
11  anybody file a grievance or anything against the City for
12  violating your 112 rights?
13    A.  **There was a grievance that was written, not**
14  **directly after the meeting, but it was -- there was a**
15  **grievance that was conducted by John Kuno who was my**
16  **previous counsel.**
17    Q.  Yeah, that's after your termination, though.  I'm
18  talking about before you were separated from employment.
19    A.  **Before I was separated from employment, no.**
20    Q.  And at any point in time, after Reggie told the
21  Chief this was a 112 violation, did they initiate within
22  three working days a written notice of violation and a
23  request for a compliance review hearing; did that happen?
24    A.  **No, that did not happen.**
25    Q.  Why not?  Why didn't you do it?

Page 157

1    A.  **I don't know.  I -- I -- I know that I told the**
2  **FOP to -- to do it, to -- to protect me and --**
3    Q.  Who -- hold on.  You told the FOP to go ahead and
4  within the three working days file the written notice of
5  violation under Section 112.534?
6    A.  **Yes, I had many conversations with the FOP that I**
7  **wanted to grieve this.**
8    Q.  Well, I'm not asking if you wanted to grieve it.
9  Listen to what I'm asking you.
10          Florida Statute 112.534 is the procedure that a
11  police officer or correctional officer can use, must use,
12  when there is a 112 investigatory violation.
13          Part of that procedure is that if the interview
14  continues within three working days, there has to be a
15  written notice of violation and a request for a compliance
16  review hearing that must be filed with the agency, in this
17  case the City, the agency head or their designee.
18          Did that happen?
19    A.  **That did not happen.**
20    Q.  Why not?  Why didn't you do it?
21    A.  **Because I -- my FOP was supposed to do it and I**
22  **don't know how to do that.  I'm not an FOP.  That's why**
23  **they're my representatives.  And I -- and I asked them to**
24  **file a grievance.  I asked them to protect me.  I asked them**
25  **that this -- this meeting was in violation of my 112 rights**

1  and my due processes.  And -- and I -- and again, the -- the
2  -- the meeting when it -- when it concluded, I didn't hear
3  anything back.  There was nothing else that was said.  And
4  from one -- from the 19th to the 25th, I was kept in the
5  dark, not only from the administration, but from the FOP as
6  well.
7       Q.  You --
8       A.  And then, the -- the day before they -- they
9  separated me, I was told not to come into work, again not
10  being told why.  And then, on Monday is when they then
11  separated me from the City.
12       Q.  You would agree with me that the -- the Police
13  Officer's Bill of Rights is pretty important in the context
14  of police work, correct?
15       A.  That is correct.  And that's something that I
16  cannot waive, not even through a LCA contract.  It's
17  statutory.
18       Q.  I -- I understand that.  I know you believe that
19  the Police Officer Bill of Rights governs your employment
20  status.  We'll talk about that in a little bit.
21            But I -- what I'm trying to figure out is:  If
22  you're -- you had four FOP members at this meeting, all --
23  according to you, they alleged a violation of the 112, but
24  nobody ever filed anything in writing with the City after
25  the fact within -- under Florida Statute 112.534 Subsection

1  (1)(c), that there was a 112 violation.  And you're saying
2  that you told them to do that.  But you didn't do it in
3  writing, correct?
4       A.  That is correct.
5       Q.  So you're -- so the FOP just blew off this alleged
6  112 violation?
7       A.  So the FOP who was summoned by the Chief, yes,
8  they did not protect my rights.  The only person that --
9  that was there standing up for me was Reggie Lester who had
10  told the Chief to stop this meeting.
11       Q.  Why didn't you bring any claim against the FOP for
12  not protecting you?
13       A.  Because I did not know that I could do that.  I
14  was not educated in that -- in that matter during at the
15  time.
16       Q.  When did you become educated in that matter?
17       A.  Recently, as in a few months ago.
18       Q.  How did you get educated on that?
19       A.  I started reading.
20       Q.  So you think -- in your world here, I just want to
21  make sure I understand this, because there was also a
22  November meeting that you allege was an improper 112
23  interrogation as well.
24            So your testimony is that the November meeting
25  where you had two lawyers and the FOP president there was an

1  improper interrogation.  And the January meeting where you
2  had four members of the FOP, including the president and the
3  entire executive board, that that was an improper 112
4  interrogation, correct?  Both those meetings in your view
5  were improper 112 interrogations, correct?
6       A.  That is correct.
7       Q.  Okay.  And nobody, your two lawyers, Michael
8  Pancier and Eugene Gibbons, they didn't protect you.  And
9  the FOP president didn't protect you.  And no one on the FOP
10  executive board protected you.  And the FOP and Eugene, none
11  of them ever took advantage of Florida Statute 112.534 on
12  your behalf, correct?
13       A.  That is correct.
14       Q.  So everybody from the multiple lawyers and
15  multiple top level FOP personnel, all of them dropped the
16  ball on you, correct?
17       A.  That is correct.
18       Q.  And you have yet to bring a single claim against
19  any of them for them supposedly not protecting your rights;
20  isn't that true?
21       A.  That is correct.  And like I stated, I did not
22  know that I could do that, that I can file a claim with my
23  FOP, and --
24       Q.  You --
25       A.  -- and again -- excuse me.  Sorry.  So like I

1  stated before, the FOP was summoned by the Chief.  And at
2  the end of the day, the FOP, they're not an entity separate
3  from the police department.  They work for the Chief.  They
4  work in the organization.  They were summoned by the -- by
5  the Chief.  And at the end of the day they have to work
6  under the Chief.
7            So it was very concerning to me that I get to this
8  meeting and my FOP was already there and I had no idea what
9  was going on.  They knew before the meeting and they knew
10  after the meeting and they never told me what was going on.
11  And --
12       Q.  You never brought any claim against them?
13       A.  In the November meeting, they -- they did that to
14  me, but for Nicholas Guasto, they didn't do that to him.
15  They protected him.  They followed all his rights.  And so,
16  the disparity there is that I am a female.  Nick was a male.
17  And they don't -- they did not protect me, the female.
18       Q.  The FOP?
19       A.  The FOP and management.  That is correct.
20       Q.  So this was also because you're a female?
21       A.  Yes.  Yes, I was --
22       Q.  And --
23       A.  Mm-hmm.  Sorry.  Go ahead.
24       Q.  I just want to -- my real -- my question was very
25  simple:  To this day, you have never brought a claim against

Page 162

1 the FOP, correct; yes or no?
2 A. That is correct. That is correct.
3 Q. And you never brought a claim against either of
4 your prior lawyers, Gene Gibbons or Michael Pancier,
5 correct?
6 A. That is correct.
7 Q. But you hired --
8 A. However -- I'm sorry.
9 Q. Hold on. You hired a lawyer almost immediately
10 after your separation from employment, didn't you?
11 A. Yes.
12 Q. In fact, you filed a grievance in February, on
13 February 19th, 2021, through your lawyer, correct?
14 A. Yes.
15 Q. And your lawyer, Mr. Kuno, holds himself out as
16 labor attorney, correct?
17 A. Yes.
18 Q. Why didn't you bring a claim against the FOP
19 through your labor lawyer then that they violated -- that
20 they didn't protect your rights?
21 A. Again, it was something that I did not know that I
22 could do at the time. And now I know, and now I have known,
23 you know, as of recently, that's what I've done. I've
24 educated myself to know my protections and my rights because
25 of what I went through. And Kuno did file a grievance. And

COASTAL REPORTING, INC. (954) 523-5326

Page 163

1 that grievance went unsupported by the union, the same
2 people that did not protect me.
3 Q. But you knew enough to sue the City, Chief
4 Clements and Cosner individually, didn't you?
5 A. Yes, I did.
6 Q. And you understand that the claims against Chief
7 Clements and Lieutenant Cosner were dismissed with prejudice
8 by the judge, correct?
9 A. That is correct.
10 Q. And you understand that all your claims relating
11 to the Last Chance Agreement, the Settlement Agreement, and
12 everything that occurred that caused you to enter into those
13 agreements, you understand all those claims were dismissed
14 with prejudice by the judge, correct?
15 A. Yes.
16 Q. So I'm going to show you what I'm going to mark as
17 Exhibit 7. And then we'll get back to your interrogatory
18 answers. Can you see the document?
19 A. Yes, I can see it.
20 (Deposition Exhibit Number 7 marked for
21 identification.)
22 BY MR. ELKINS:
23 Q. This is your Complaint. Do you recognize this?
24 A. Yes.
25 Q. Okay. Did you review this before it was filed?

COASTAL REPORTING, INC. (954) 523-5326

Page 164

1 A. Yes.
2 Q. Okay. I'm going to go to Paragraph 27. Okay. Do
3 you see Paragraph 27?
4 A. Yes.
5 Q. Can you read that for us, please?
6 A. The LCA required to give up her rights under the
7 Collective Bargaining Agreement between the City and FOP
8 making her an at-will employee without protections of the
9 just cause standard for discipline under the Collective
10 Bargaining Agreement.
11 Q. And Paragraph 28?
12 A. Under the LCA, Chief Clements could terminate
13 Guasto for any violation of the City of Miami MBPD policy or
14 procedure with the Chief being the judge of compliance with
15 those policies and procedures.
16 Q. Okay. So you pled in your lawsuit -- correct me
17 if I'm wrong -- that that the Last Chance Agreement turned
18 you into an at-will employee, right?
19 A. Yes.
20 Q. So you could be fired for any reason or no reason,
21 correct?
22 A. It doesn't say no reason.
23 Q. You understand what "at-will employee" means?
24 A. Yes.
25 Q. What does it mean to you?

COASTAL REPORTING, INC. (954) 523-5326

Page 165

1 A. It means that the City -- that I was working
2 at-will with the City. However, I didn't understand in the
3 LCA, like I said, it doesn't waive any of my Officer Bill of
4 Rights or my due processes, something that I did not waive
5 that I understood I did not waive. That's what I
6 understood.
7 Q. But my question to you is: You understand that
8 employment at-will is a legal term of art, right?
9 A. Yes.
10 Q. Okay. And you understand that it has a defined
11 legal meaning, correct?
12 A. Yes.
13 Q. Okay. And you understand, or do you understand
14 that employment at-will means that an employer can fire
15 someone for any reason or no reason; do you understand that?
16 A. Yes.
17 Q. You understand that it has nothing to do with your
18 Police Officer Bill of Rights?
19 A. No, I do not understand that.
20 Q. Okay. Fair enough. Let's --
21 A. What I -- what I don't understand is being a
22 police officer, anybody can make any allegation against you.
23 That's the nature of the job. So anybody could have alleged
24 anything. That doesn't mean that I committed those things
25 or did those things.

COASTAL REPORTING, INC. (954) 523-5326

COASTAL REPORTING, INC. (954) 523-5326

1    And so, that's why my Officer Bill of Rights are
2  there to protect me.  And that's why the due process rights
3  are there to protect me as well, so that I -- so that
4  somebody making a false allegation doesn't cause me my -- my
5  employment.
6    Q.   I think that -- do you -- you understand the
7  difference between what the Police Officer Bill of Rights
8  protects and what you're protected with through the just
9  cause standard in your Collective Bargaining Agreement?  Do
10  you understand the difference between those two things?
11    A.   I understand it.  However, I know that on my LCA,
12  I didn't waive it.
13    Q.   Hmm.  You mean -- so you think you were also
14  protected from the Collective Bargaining Agreement as well?
15    A.   No.  I understand that I was protected under my
16  Officer Bill of Rights, something that I did not waive.
17    Q.   So you believe that the Police Officer Bill of
18  Rights says that the City, when you become an at-will
19  employee, can't fire you for any reason or no reason?
20    A.   I know that there's protections under that.
21    Q.   Okay.  All right.  Let's talk about your
22  interrogatory answers again.  Okay.
23    I asked you -- well, the City asked you to list
24  witnesses that -- or individuals that would have knowledge
25  of the facts and circumstances alleged in the pleadings in

1  this lawsuit.  Do you see this?
2    A.   Yes.
3    Q.   Why didn't you list former Chief Clements?  You've
4  talked about him extensively in this deposition.  He's
5  referenced in your Complaint.  You sued him individually.
6  I'm curious why he wasn't listed as a witness?
7    A.   So I thought these were for witnesses that -- that
8  can support some of the things that I -- that I'm claiming
9  happened.  That's why I didn't list him.  Obviously, I -- I
10  know that he's involved in all my claims --
11    Q.   Well --
12    A.   -- and my, you know, my allegations against the
13  City.
14    Q.   Well, let's look at the question and see if it
15  even says that.  It says, please provide the name, physical
16  address, email address, telephone number, place of
17  employment and job title of any person, any person, who has,
18  claims to have or who you believe may have knowledge or
19  information pertaining to any fact alleged in the pleadings
20  filed in this lawsuit, action or any fact underlying the
21  subject matter of lawsuit.  Do you see that?
22    A.   Yes.
23    Q.   Does it say facts that support your claims or does
24  it talk about any facts?
25    A.   It says any facts.

1    Q.   But --
2    A.   But I believe that --
3    Q.   Hold on.
4    A.   Mm-hmm.
5    Q.   Does Chief Clements have information as to the
6  facts alleged in your lawsuit?
7    A.   Yes.
8    Q.   Okay.  But you didn't list him, did you?
9    A.   No.
10    Q.   What other individuals have knowledge about the
11  facts in your lawsuit that you didn't -- that you didn't
12  list?
13    A.   That I didn't list?
14    Q.   Yeah.
15    A.   Agent Prieto, who was the Commander of Internal
16  Affairs at the time.
17    Q.   Who else?
18    A.   Steven Cosner, who was the lieutenant working the
19  nights in question.
20    Q.   Who else?
21    A.   Off the top of my head I -- I don't have names.
22    Q.   Why didn't you list Eugene Gibbons or Michael
23  Pancier?
24    A.   Because this is in regards to the 2020 EEOC and
25  then the allegations that Cosner -- that -- that Cosner had

1  written against me, so I believed that this was tied into
2  that -- into the -- after I had gotten rid of the -- the --
3  after I had dismissed the EEOC charge through the
4  settlement, the allegations of -- that Cosner had against
5  me.
6    That's why I didn't tie them into that.  I thought
7  it was just when it came to the retaliation of me being
8  terminated.
9    Q.   Why didn't you list the former city HR director,
10  Michael Smith?
11    A.   The same reason.
12    Q.   The same reason?
13    A.   Yes.
14    Q.   Was he not the HR director when you were separated
15  from your employment?
16    A.   Yes, he was.
17    Q.   So wouldn't he have information about that?
18    A.   Yes, he does.
19    Q.   But you didn't list him?
20    A.   No, I did not.
21    Q.   And my question is:  Why?
22    A.   Again, I believe that this was talking about the
23  -- the night in question with the allegations of Cosner
24  before that the -- the meeting.  That's why I didn't list
25  them.

Page 170

1    Q.   All right.  So we then asked you to provide
2  information on what each witness would testify to.  I'm
3  going to go back to Nick.  I'm going to start with Reginald
4  Lester.  You said: "Member of the FOP has knowledge of my
5  complaints of harassment, retaliation of the FOP, was in the
6  January 19th meeting and observed Chief Clements threaten to
7  terminate me after I requested representation of my -- my
8  choice and for my attorney."  Do you see that?
9    A.   Yes.
10   Q.   What other information would Reginald Lester
11 testify to?
12   A.   So he would testify to the fact that, like it says
13 there, that the Chief threatened to terminate me during that
14 meeting.  He would testify to the fact that while I was
15 sitting in that meeting, I didn't want to answer any of the
16 questions that Chief Richard Clements was asking me.  He
17 would testify to the fact that, again, I said that this was
18 in violation of my 112 rights and my due processes.  That's
19 what he would testify to.
20   Q.   What about Robert Jenkins; what -- what meetings
21 was he witness to?
22   A.   He was a witness to the meetings with December,
23 the day that I signed the LCA, the Settlement Agreement.
24 And prior to that, while he was president, I've had
25 conversations with him about certain harassment that I was

Page 171

1  going through in the police department that I've discussed
2  in my EEOCs.
3    So he's very -- you know, he has a lot of
4  information about me speaking to him about these type of
5  behaviors and retaliation that I was going through as well
6  as him being involved with the time that I was demoted as
7  well.
8    Q.   Was he involved in your separation from employment
9  in January of 2021?
10   A.   No.
11   Q.   And was he involved at all?  Did you speak to him
12 after the January 19th meeting?
13   A.   I did have conversations with him.
14   Q.   And what were those conversations about?
15   A.   Just again of me telling him how I'm not being
16 properly represented by the FOP, that I was summoned to this
17 meeting and the FOP was already there, and my rights were
18 violated, and I was searching for answers, searching for
19 help so that I can remedy what I was going through and have
20 intervention to all of these rights being violated.
21   Q.   So --
22   A.   And he was a tenured -- he was a tenured FOP
23 president.  He was president of the state as well.  And I
24 was searching for somebody to help me when it came to this.
25   Q.   So after your January 19th, 2021 meeting, you

Page 172

1  talked to Bobby Jenkins about the 112 violations; is that
2  your testimony?
3    A.   Yes.  Yes.
4    Q.   And did Bobby Jenkins -- was he the state -- well,
5  was he the state FOP president at the time?
6    A.   I don't recall if it was after.  I don't remember
7  at the moment right now.
8    Q.   Did he ever file anything under 112.534 or
9  anything else to protect your 112 rights or assert a
10 violation of your 112 rights; did he do anything about it?
11   A.   No, because he wasn't the president at the time.
12 He was a former president, so he --
13   Q.   What did --
14   A.   -- there was nothing that he could have done about
15 it.
16   Q.   What did he tell you?
17   A.   I don't recall at the time, the extent of the
18 conversation, but he was trying to search for answers for
19 me.
20   Q.   Well, what was he doing to search for answers?
21   A.   He was trying to talk to the other FOP president.
22 You know, several times he said he would get back to me, but
23 throughout everything that was going on, we -- there was no
24 set plan or, you know, advice that he gave me.  But I tried.
25 I tried to reach out to as many FOP as I can.  And it all --

Page 173

1  it all -- nobody helped me.
2    Q.   Why haven't you sued the FOP recently?
3    A.   So at the time, I haven't.  But that's after I've
4  learned that I can, that's, you know, something that I'm
5  looking into.
6    Q.   Okay.  And you're saying --
7    MR. DARAGJATI:  Mike, Mike, I'm sorry.  I need a
8  break at this point.
9    MR. ELKINS:  Okay.
10   MR. DARAGJATI:  If we can take a break before you
11 go on to your next question, because she just made some
12 statements that placed me in a difficult situation.
13   MR. ELKINS:  Oh, okay.  Why don't we do this:
14 Take your break.  Paul, you have my cell, right?
15   MR. DARAGJATI:  I do.  Yeah, I'll -- I'll call
16 you.  I've got to call --
17   MR. ELKINS:  You call me.  We'll go on a break,
18 everybody.
19   THE VIDEOGRAPHER:  Going off the -- going off the
20 video record at 10:53 A.M.
21   (Recess was taken.)
22   THE VIDEOGRAPHER:  And we are back on the video
23 record at 11:10 A.M.
24   MR. DARAGJATI:  Okay.  During the break I had a
25 conversation with my client and with Mr. Elkins.  I

Page 174

1  advised both of them that based upon some testimony
2  that my client gave, she has placed me in a conflict
3  situation, as I'm the statewide counsel to the State of
4  Florida FOP.
5       I can no longer represent Ms. Guasto in this
6  matter.  I can't even continue this deposition today.
7  So I'll -- this evening I'll be moving to withdraw as
8  counsel for Ms. Guasto.
9       My understanding from the City is that it would be
10  unopposed.  And we've also had conversations about the
11  discovery scheduling order.  Based upon my withdrawal,
12  I have no objection to any request by the City for an
13  extension of the discovery timetable to complete
14  discovery.
15       MR. ELKINS:  Yeah.  Michael Elkins, on behalf of
16  the City.  I just want to clarify that the
17  conversations that Paul had with his client and with
18  the City were separate.
19       MR. DARAGJATI:  Right, that is correct, yes.
20       MR. ELKINS:  We didn't have them together, number
21  one.  Number two, yes, the motion to withdraw will be
22  unopposed.
23       And I you just want to remind Ms. Salabarria that
24  the deposition is suspended pending her either getting
25  new counsel or representing herself, however she

Page 175

1  chooses to proceed, but that she remains under oath and
2  should not talk about this deposition while it is
3  suspended.  And that's it for today, I guess.
4       MR. DARAGJATI:  All right.  Thank you, everyone.
5       THE VIDEOGRAPHER:  This concludes the video
6  deposition of Jessica Guasto.  Going off the video
7  record at 11:11 A.M.
8       THE VIDEOGRAPHER:  Mr. Elkins, will you need a
9  copy of the video?
10       MR. ELKINS:  I do not need a copy of the video.
11  Tammy, I'm going to order, not rush, just a mini.
12  Don't give me all the other bells and whistles.
13       THE VIDEOGRAPHER:  Mr. Daragjati, would you need a
14  copy of the video?
15       MR. DARAGJATI:  No, sir, I do not.
16       THE VIDEOGRAPHER:  Okay.  Thank you, very much.
17       (Deposition adjourned at 11:11 A.M.)
18
19
20
21
22
23
24
25

Page 176

1               CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4       I, TAMARA MASCI TANNEN, RPR, Notary Public, State of
5  Florida, certify that JESSICA GAUSTO personally appeared
6  before me on the 13th day of February 2024 and was duly
7  sworn.
8       Signed this 13th day of February 2024.
9
10       _____
         TAMARA MASCI TANNEN, RPR, FPR-C
11       Notary Public
         State of Florida
12       My Commission #HH 93523
         Expires March 7, 2025
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 177

1            REPORTER'S DEPOSITION CERTIFICATE
2
3  STATE OF FLORIDA    )
   COUNTY OF PALM BEACH)
4
5       I, TAMARA MASCI TANNEN, Registered Professional
   Reporter, certify that I was authorized to and did
6  stenographically report the Continued Videotaped Deposition
   of JESSICA GAUSTO; that a review of the transcript was not
7  requested; and that the foregoing transcript, pages 142-is a
   true and complete record of my stenographic notes.
8
       I FURTHER CERTIFY that I am not a relative,
9  employee, attorney or counsel of any of the parties,
   nor am I a relative or employee of any of the parties'
10  attorney or counsel connected with the action, nor am I
   financially interested in the action.
11
12       DATED this 3rd day of March 2024.
13
14
15       _____
16       TAMARA MASCI TANNEN, RPR, FPR-C
17
18
19
20
21
22
23
24
25

BY MR. ELKINS: [3]
146/16 150/25 151/19
MR. DARAGJATI: [10]
145/21 150/24 151/4
173/7 173/10 173/15
173/24 174/19 175/4
175/15
MR. ELKINS: [8]
145/24 146/9 173/9
173/13 173/17 174/15
174/20 175/10
THE REPORTER: [3]
146/1 146/6 146/14
THE
VIDEOGRAPHER: [7]
145/3 173/19 173/22
175/5 175/8 175/13
175/16
THE WITNESS: [1]
151/5

**1**

10:14 [2]   142/14 145/5
10:53 [1]   173/20
112 [15]   155/17 156/12
156/21 157/12 157/25
158/23 159/1 159/6
159/22 160/3 160/5
170/18 172/1 172/9
172/10
112.534 [7]   154/18
155/15 157/5 157/10
158/25 160/11 172/8
11:10 [1]   173/23
11:11 [3]   142/14 175/7
175/17
1212 [1]   143/9
122-CV-21004-DPG [1]
145/9
13 [1]   142/13
13th [3]   145/4 176/6
176/8
142-177 [1]   142/11
142-is [1]   177/7
16TH [1]   143/9
177 [1]   142/11
19th [6]   152/14 158/4
162/13 170/6 171/12
171/25

**2**

2020 [5]   147/6 147/7
148/20 149/3 168/24
2021 [4]   149/5 162/13
171/9 171/25
2024 [5]   142/13 145/4
176/6 176/8 177/12
2025 [1]   176/12
25th [1]   158/4
2608 [1]   143/9
27 [2]   164/2 164/3
28 [1]   164/11

**3**

32224 [1]   143/4
33304 [1]   143/9
3rd [1]   177/12

**4**

401-2608 [1]   143/10
4745 [1]   143/3

**5**

503 [1]   143/4

**6**

6th [1]   146/18

**9**

93523 [1]   176/12
954 [1]   143/10

**A**

A.M [7]   142/14 142/14
145/5 173/20 173/23
175/7 175/17
about [34]   146/2
146/24 147/1 147/6
148/1 149/7 150/1
150/7 151/7 151/8
152/3 152/21 152/22
152/23 152/24 155/25
156/18 158/20 166/21
167/4 167/24 168/10
169/17 169/22 170/20
170/25 171/4 171/4
171/14 172/1 172/10
172/14 174/10 175/2
according [1]   158/23
action [4]   145/16
167/20 177/10 177/10
activity [3]   148/15
148/16 148/19
actually [1]   153/15
adamant [2]   149/21
150/1
address [3]   147/25
167/16 167/16
addresses [1]   147/25
adjourned [1]   175/17
administration [1]
158/5
administrative [1]
152/11
advantage [3]   152/10
154/17 160/11
advice [1]   172/24
advised [2]   155/21
174/1
Affairs [3]   152/18
153/3 168/16
after [21]   145/19
148/10 149/13 150/22
155/14 156/4 156/9
156/10 156/14 156/17
156/20 158/24 161/10
162/10 169/2 169/3
170/7 171/12 171/25
172/6 173/3
again [12]   152/22
153/13 154/21 156/7
158/1 158/9 160/25
162/21 166/22 169/22
170/17 171/15
against [15]   148/5
148/9 155/22 156/11
159/11 160/18 161/12

161/25 162/3 162/18
163/6 168/17 169/8
169/1 169/4
agency [1]   157/16
157/17
agent [2]   156/5 168/15
ago [1]   159/17
agree [1]   158/12
agreed [1]   143/19
Agreement [11]   150/23
151/5 151/6 163/11
163/11 164/7 164/10
164/17 166/9 166/14
170/23
agreements [1]   163/13
ahead [2]   157/3 161/23
AJ [1]   152/18
all [16]   145/18 146/18
158/22 160/15 161/15
163/10 163/13 166/21
167/10 170/1 171/11
171/20 172/25 173/1
175/4 175/12
allegation [4]   152/22
152/25 165/22 166/4
allegations [8]   149/15
150/13 150/15 150/18
167/12 168/25 169/4
169/23
allege [2]   154/17
159/22
alleged [6]   158/23
159/5 165/23 166/25
167/19 168/6
alleging [1]   155/16
almost [1]   162/9
already [3]   152/19
161/8 171/17
also [8]   143/13 145/23
146/13 151/13 159/21
161/20 166/13 174/10
am [7]   145/14 145/15
145/16 161/16 177/8
177/9 177/10
ambiguous [1]   151/14
answer [9]   151/1 151/2
151/4 153/12 154/22
155/7 155/9 156/3
170/15
answered [1]   155/2
answering [1]   155/7
155/12
answers [5]   163/18
166/22 171/18 172/18
172/20
any [41]
anybody [4]   146/24
156/11 165/22 165/23
anything [9]   151/7
151/8 156/11 158/3
158/24 165/24 172/8
172/9 172/10
anywhere [1]   151/17
appearances [2]
142/18 145/18
appeared [1]   176/5
APPEARING [2]   143/5
143/11
apply [1]   154/20

approximately [2]
145/5 145/8
arbitrate [1]   151/16
are [8]   143/22 145/6
146/2 151/24 152/3
166/1 166/3 173/22
art [1]   165/8
as [24]   146/8 146/10
147/14 152/14 152/19
152/19 158/5 159/17
159/23 162/15 162/23
163/16 166/3 166/14
167/6 168/5 171/5
171/6 171/6 171/23
172/25 172/25 174/3
174/7
ask [4]   148/4 150/6
153/18 156/10
asked [10]   147/24
152/21 153/13 154/22
157/23 157/24 157/24
166/23 166/23 170/1
asking [6]   149/23
153/24 155/10 157/8
157/9 170/16
assert [1]   172/9
associate [1]   145/22
assuming [1]   154/18
attend [1]   153/8
attorney [6]   153/6
154/24 162/16 170/8
177/9 177/10
authorized [1]   177/5
avoid [1]   146/11

**B**

back [10]   147/10
148/11 149/14 149/16
150/11 158/3 163/17
170/3 172/22 173/22
backdoor [1]   149/23
ball [1]   160/16
Bargaining [4]   164/7
164/10 166/9 166/14
based [2]   174/1 174/11
baseless [2]   149/14
150/13
basis [1]   148/20
be [17]   146/3 149/24
152/1 152/2 153/8
153/11 153/13 153/19
154/24 155/1 156/2
157/14 157/16 164/20
174/7 174/9 174/21
BEACH [4]   142/7
145/10 145/25 177/3
because [10]   148/24
149/20 157/21 159/13
159/21 161/20 162/24
168/24 172/11 173/11
become [2]   159/16
166/18
been [1]   146/8
before [12]   147/10
147/19 154/13 156/18
156/19 158/8 161/1
161/9 163/25 169/24
173/10 176/6
behalf [6]   143/5 143/11

145/15 145/24 160/12
176/8
behaviors [1]   171/5
being [10]   148/9 150/1
155/25 158/10 164/14
165/21 169/7 171/6
171/15 171/20
believe [7]   150/16
150/17 158/18 166/17
167/18 168/2 169/22
believed [1]   169/1
bells [1]   175/12
between [5]   143/20
151/20 164/7 166/7
166/10
Bill [16]   151/7 151/12
151/18 151/22 152/4
152/8 152/12 154/20
158/13 158/19 165/3
165/18 166/1 166/7
166/16 166/17
bit [1]   158/20
blew [1]   159/5
board [3]   154/8 160/3
160/10
Bobby [2]   172/1 172/4
both [2]   160/4 174/1
break [5]   173/8 173/10
173/14 173/17 173/23
bring [1]   159/11
160/18 162/18
brought [4]   152/13
161/12 161/25 162/3
BROWARD [1]   176/3

**C**

call [3]   173/15 173/16
173/17
came [2]   169/7 171/24
can [16]   147/15 151/1
153/14 157/11 160/22
163/18 163/19 164/5
165/14 165/22 167/8
171/19 172/25 173/4
can't [4]   151/15 151/16
166/19 174/6
cannot [1]   158/16
case [5]   142/4 145/9
145/9 148/19 157/17
cause [4]   151/23 164/9
166/4 166/9
caused [1]   163/12
cease [1]   156/6
cell [1]   173/14
certain [1]   170/25
CERTIFICATE [2]
175/18 177/1
certify [2]   176/5 177/5
177/8
chance [6]   150/9
150/23 151/5 151/6
163/11 164/17
changed [1]   146/11
Chapter [1]   155/17
charge [6]   147/7
148/12 148/21 148/24
149/2 169/3
Chief [25]   149/20

**C**

Chief... [24] 150/6
152/17 152/20 153/17
153/22 155/21 155/24
156/5 156/21 159/7
159/10 161/1 161/3
161/5 161/6 163/3
163/6 164/12 164/14
167/3 168/5 170/6
170/13 170/16
Chief's [1] 152/15
Chiefs [1] 152/17
choice [3] 153/13
154/23 170/8
chooses [1] 175/1
circumstances [1]
166/25
city [30] 142/7 145/10
145/25 148/6 148/10
148/11 148/15 148/24
149/16 149/25 150/10
150/17 151/22 156/11
157/17 158/11 158/24
163/3 164/7 164/13
165/1 165/2 166/18
166/23 167/13 169/9
174/9 174/12 174/16
174/18
City's [2] 147/16 151/9
claim [9] 148/13
148/20 159/11 160/18
160/22 161/12 161/25
162/3 162/18
claiming [1] 167/8
claims [10] 148/5
148/7 149/18 150/5
163/6 163/10 163/13
167/10 167/18 167/23
clarify [1] 174/16
CLAVIJO [2] 143/14
145/14
Clements [14] 149/20
150/6 152/17 153/4
153/5 153/7 156/7
163/4 163/7 164/12
167/3 168/5 170/6
170/16
client [3] 173/25 174/2
174/17
COASTAL [3] 143/14
145/14 145/15
Collective [4] 164/7
164/9 166/9 166/14
come [2] 156/9 158/9
command [1] 152/17
commander [2] 152/18
153/3 168/15
Commission [1]
176/12
committed [1] 165/24
complain [1] 152/11
Complaint [3] 144/8
163/23 167/5
complaints [1] 170/5
complete [2] 174/13
177/7
completely [1] 151/24
compliance [3] 156/23

157/15 164/14
176/8 177/12
concerning [2] 157/10
161/7
concerns [1] 150/7
concluded [1] 158/2
concludes [1] 175/5
conduct [1] 155/5
conducted [1] 156/15
conducting [1] 145/6
conference [1] 145/6
CONFERENCING [1]
142/15
conflict [1] 174/2
confusion [1] 146/11
connected [1] 177/10
context [1] 158/13
continuation [1]
146/17
continue [3] 154/25
156/8 174/6
CONTINUED [2]
142/12 177/6
continues [1] 157/14
contract [1] 158/16
conversation [2]
172/18 173/25
conversations [7]
149/23 157/6 170/25
171/13 171/14 174/10
174/17
copy [3] 175/9 175/10
175/14
correct [37]
correctional [1] 157/11
Cosner [10] 149/14
150/14 152/19 163/4
163/7 168/18 168/25
168/25 169/4 169/23
Cosner's [1] 150/18
could [8] 154/24
159/13 160/22 162/22
164/12 164/20 165/23
172/14
counsel [10] 143/5
143/11 143/20 145/18
156/16 174/3 174/8
174/25 177/9 177/10
COUNTY [2] 176/3
177/3
court [6] 142/1 142/17
142/23 145/11 145/13
145/19
curious [1] 167/6
current [2] 148/5 148/7
cv [2] 142/4 145/9

**D**

DARAGJATI [6] 143/2
143/2 143/3 145/21
145/22 175/13
DARAGJATILAW.COM
[1] 143/5
dark [1] 158/5
DATE [1] 142/13
DATED [1] 177/12
day [13] 145/4 148/11
149/14 149/16 150/11
158/8 161/2 161/5
161/25 170/23 176/6

176/8 177/12
days [3] 156/22 157/4
157/14
December [3] 149/10
149/12 170/22
DEFENDANT [3] 142/9
143/11 145/25
defined [1] 165/10
demoted [1] 171/6
denied [1] 153/14
department [2] 161/3
171/1
deponent [1] 143/21
deposition [18] 142/12
143/21 144/7 145/6
145/7 146/18 146/19
146/24 147/6 163/20
167/4 174/6 174/24
175/2 175/6 175/17
177/1 177/6
DESCRIPTION [1]
144/7
designee [2] 156/6
157/17
did [57]
didn't [32] 150/6 153/8
153/12 154/22 155/3
156/25 157/20 158/2
159/2 159/11 160/8
160/9 161/14 162/10
162/18 162/20 163/4
165/2 166/12 167/3
167/9 168/8 168/11
168/11 168/13 168/22
169/6 169/9 169/19
169/24 170/15 174/20
difference [3] 151/20
166/7 166/10
different [1] 151/24
difficult [1] 173/12
direct [2] 146/15 156/1
directly [1] 156/14
director [2] 169/9
169/14
discipline [3] 153/2
153/3 164/9
discovery [3] 174/11
174/13 174/14
discussed [1] 171/1
dismissed [3] 163/7
163/13 169/3
disparity [1] 161/16
DISTRICT [4] 142/1
142/2 145/11 145/12
DIVISION [2] 142/3
145/12
do [37]
document [2] 147/14
163/18
does [10] 146/13
149/18 151/2 151/8
151/10 164/25 167/23
167/23 168/5 169/18
doesn't [6] 151/6
151/15 164/22 165/3
165/24 166/4
doing [1] 172/20
don't [11] 147/19 157/1
157/22 161/17 165/21

**done [1]** 152/6 162/23
172/14
DPG [2] 142/4 145/9
dropped [1] 160/15
due [7] 151/9 151/10
151/13 158/1 165/4
166/2 170/18
duly [2] 146/8 176/6
during [5] 150/2
155/13 159/14 170/13
173/24

**E**

each [1] 170/2
educated [4] 159/14
159/16 159/18 162/24
EEOC [14] 147/7 148/8
148/9 148/20 148/24
149/2 149/10 149/22
149/24 150/1 150/4
150/8 168/24 169/3
EEOCs [1] 171/2
either [2] 162/3 174/24
ELKINS [6] 143/8
145/24 163/22 173/25
174/15 175/8
else [5] 147/3 158/3
168/17 168/20 172/9
email [1] 167/16
emails [1] 147/25
employee [7] 150/22
164/8 164/18 164/23
166/19 177/9 177/9
employer [1] 165/14
employment [11]
154/13 156/18 156/19
158/19 162/10 165/8
165/14 166/5 167/17
169/15 171/8
end [2] 161/2 161/5
engaged [1] 148/15
engaging [1] 148/16
enough [2] 163/3
165/20
entailed [1] 152/16
enter [1] 163/12
entire [1] 160/3
entity [1] 161/2
ERICK [2] 143/14
145/14
ESQ [3] 143/2 143/2
143/8
Eugene [2] 160/8
160/10 168/22
even [3] 158/16 167/15
174/6
evening [1] 174/7
ever [3] 158/24 160/11
172/8
everybody [2] 160/14
173/18
everyone [1] 175/4
everything [2] 163/12
172/23
EXAMINATION [1]
146/15
excuse [1] 147/12

**160/25**
executive [3] 154/8
160/3 160/10
Exhibit [3] 147/14
163/17 163/20
Exhibit 6 [1] 147/14
Expires [1] 176/12
extension [1] 174/13
extensively [1] 167/4
extent [1] 172/17

**F**

fact [7] 158/25 162/12
167/19 167/20 170/12
170/14 170/17
facts [7] 148/1 166/25
167/23 167/24 167/25
168/6 168/11
Fair [1] 165/20
false [1] 166/4
familiar [1] 154/19
FEBRUARY [7] 142/13
145/4 146/18 162/12
162/13 176/6 176/8
February 19th [1]
162/13
February 6th [1]
146/18
female [3] 161/16
161/17 161/20
few [3] 147/9 149/7
159/17
figure [1] 158/21
file [6] 156/11 157/4
157/24 160/22 162/25
172/8
filed [8] 145/11 148/24
149/14 157/16 158/24
162/12 163/25 167/20
filing [2] 148/8 148/9
financially [1] 145/17
177/10
fire [2] 165/14 166/19
fired [5] 148/10 148/16
148/24 149/5 164/20
first [6] 146/8 148/11
149/13 149/16 150/9
150/11
FL [1] 142/7
FLORIDA [17] 142/2
142/8 142/17 143/4
143/9 145/10 145/12
154/18 155/15 157/10
158/25 160/11 174/4
176/2 176/5 176/11
177/2
followed [1] 161/15
follows [1] 146/8
FOP [47]
foregoing [1] 177/7
form [1] 150/24
former [3] 167/3 169/9
172/12
forms [1] 148/20
FORT [1] 143/9
four [5] 153/15 153/15
154/2 158/22 160/2
FPR [3] 142/16 176/10
177/16

**F**

**FPR-C [3]** 142/16 176/10 177/16
**FURTHER [1]** 177/8

**G**

**GAUSTO [4]** 142/12 146/7 176/5 177/6
**gave [3]** 156/1 172/24 174/2
**Gene [1]** 162/4
**get [11]** 147/10 149/22 149/24 150/7 150/10 150/10 152/16 159/18 161/7 163/17 172/22
**getting [1]** 174/24
**Gibbons [3]** 160/8 162/4 168/22
**give [5]** 146/3 149/7 155/11 164/6 175/12
**giving [1]** 155/3
**go [11]** 147/9 147/23 150/3 153/1 153/5 157/3 161/23 164/2 170/3 173/11 173/17
**God [1]** 146/14
**going [25]** 146/9 147/9 147/10 147/20 153/5 153/11 155/1 155/11 156/2 156/8 161/9 161/10 163/16 163/16 164/2 170/3 170/3 171/1 171/5 171/19 172/23 173/19 173/19 175/6 175/11
**got [3]** 150/5 150/15 173/16
**gotten [1]** 169/2
**governs [1]** 158/19
**grievance [7]** 156/11 156/13 156/15 157/24 162/12 162/25 163/1
**grieve [3]** 151/16 157/7 157/8
**GUASTO [10]** 142/5 145/8 145/10 145/23 149/21 161/14 164/13 174/5 174/8 175/6
**guess [1]** 175/3

**H**

**had [23]** 146/10 147/5 147/13 147/24 152/15 152/23 153/13 153/15 154/25 157/6 158/22 159/9 159/25 160/2 161/8 168/25 169/2 169/3 169/4 170/24 173/24 174/10 174/17
**hand [1]** 146/1
**happen [6]** 154/20 155/18 156/23 156/24 157/18 157/19
**happened [1]** 167/9
**harassment [2]** 170/5 170/25
**has [10]** 151/22 152/1 152/1 157/14 165/10 165/17 167/17 170/4

171/3 174/2
**have [28]** 147/23 148/5 148/14 148/14 148/21 149/22 149/24 149/25 150/8 155/10 160/18 161/5 161/25 162/22 165/23 166/24 167/18 167/18 168/5 168/10 168/21 169/17 171/13 171/19 172/14 173/14 174/12 174/20
**haven't [2]** 173/2 173/3
**having [3]** 146/8 149/23 150/4
**he [42]**
**he's [3]** 167/4 167/10 171/3
**head [2]** 157/17 168/21
**hear [2]** 150/18 158/2
**hearing [2]** 156/23 157/16
**help [3]** 146/4 171/19 171/24
**helped [1]** 173/1
**her [5]** 146/10 146/10 164/6 164/8 174/24
**here [2]** 147/10 159/20
**hereby [2]** 143/19 143/22
**herself [1]** 174/25
**HH [1]** 176/12
**him [15]** 149/24 153/1 161/14 161/15 167/4 167/5 167/9 168/8 169/19 170/25 171/4 171/6 171/11 171/13 171/15
**himself [1]** 162/15
**hired [2]** 162/7 162/9
**his [3]** 150/7 161/15 174/17
**hmm [3]** 161/23 166/13 168/4
**hold [4]** 147/13 157/3 162/9 168/3
**holds [1]** 162/15
**how [6]** 154/20 155/20 156/9 157/22 159/18 171/15
**however [6]** 149/9 153/12 162/8 165/2 166/11 174/25
**HR [2]** 169/9 169/14

**I**

**I'll [4]** 173/15 173/15 174/7 174/7
**I'm [29]** 146/9 147/9 147/10 147/13 147/19 151/25 152/25 153/24 154/18 155/10 156/17 157/8 157/9 157/22 158/21 162/8 163/16 163/16 164/2 164/17 167/6 167/8 170/2 170/3 171/15 173/4 173/7 174/3 175/11
**I've [6]** 162/23 162/23 170/24 171/1 173/3

173/16
**idea [3]** 152/15 152/23 161/8
**identification [1]** 163/21
**immediately [1]** 162/9
**important [1]** 158/13
**improper [5]** 155/16 159/22 160/1 160/3 160/5
**including [1]** 160/2
**individually [1]** 163/4 167/5
**individuals [2]** 166/24 168/10
**information [6]** 167/19 168/5 169/17 170/2 170/10 171/4
**initiate [2]** 155/15 156/21
**interested [2]** 145/17 177/10
**Internal [3]** 152/18 153/3 168/15
**interrogation [3]** 159/23 160/1 160/4
**interrogations [1]** 160/5
**interrogatories [1]** 147/17
**interrogatory [2]** 163/17 166/22
**intervention [1]** 171/20
**interview [2]** 156/6 157/13
**investigated [2]** 150/14 150/17
**investigation [4]** 152/1 152/24 155/5 155/16
**investigator [1]** 155/17
**investigatory [2]** 155/4 157/12
**invite [1]** 152/14
**involved [4]** 167/10 171/6 171/8 171/11
**is [64]**
**isn't [2]** 153/16 160/20
**issues [1]** 150/3
**it [66]**
**it's [10]** 146/12 148/8 150/12 150/15 150/16 151/14 152/17 154/1 155/7 158/16

**J**

**JACKSONVILLE [1]** 143/4
**January [7]** 149/5 152/14 160/1 170/6 171/9 171/12 171/25
**January 19th [4]** 152/14 170/6 171/12 171/25
**Jenkins [3]** 170/20 172/1 172/4
**JESSICA [12]** 142/5 142/12 145/8 145/10 145/23 146/1 146/7

146/10 146/13 175/6
**job [2]** 165/23 167/17
**John [1]** 156/15
**judge [3]** 163/8 163/14 164/14
**July [3]** 147/7 149/2 149/11
**July 2020 [1]** 147/7
**June [1]** 149/11
**just [16]** 146/12 151/23 152/16 152/24 154/13 159/5 159/20 161/24 164/9 166/8 169/7 171/15 173/11 174/16 174/23 175/11

**K**

**kept [1]** 158/4
**knew [4]** 155/4 161/9 161/9 163/3
**know [21]** 146/12 154/19 155/10 157/1 157/1 157/22 158/18 159/13 160/22 162/21 162/22 162/23 162/24 166/11 166/20 167/10 167/12 171/3 172/22 172/24 173/4
**knowledge [5]** 148/1 166/24 167/18 168/10 170/4
**known [1]** 162/22
**Kuno [3]** 156/15 162/15 162/25

**L**

**labeled [1]** 152/14
**labor [2]** 162/16 162/19
**last [6]** 146/11 150/22 151/5 151/6 163/11 164/17
**later [1]** 149/8
**LAUDERDALE [1]** 143/9
**LAW [1]** 143/8
**lawsuit [8]** 148/1 148/23 164/16 167/1 167/20 167/21 168/6 168/11
**lawyer [5]** 147/1 162/9 162/13 162/15 162/19
**lawyers [4]** 159/25 160/7 160/14 162/4
**LCA [9]** 151/11 151/14 151/17 158/16 164/6 164/12 165/3 166/11 170/23
**learned [1]** 173/4
**leave [1]** 154/25
**left [1]** 147/5
**legal [2]** 165/8 165/11
**Lester [6]** 152/22 153/7 155/21 159/9 170/4 170/10
**let [2]** 148/4 156/10
**let's [3]** 165/20 166/21 167/14
**level [1]** 160/15

146/10 146/13 175/6
**lieutenant [5]** 149/14 150/13 150/18 163/7 168/18
**like [7]** 152/7 153/2 153/17 160/21 160/25 165/3 170/12
**list [11]** 147/24 166/23 167/3 167/9 168/8 168/12 168/13 168/22 169/9 169/19 169/24
**listed [1]** 167/6
**listen [2]** 155/9 157/9
**little [2]** 155/2 158/20
**longer [1]** 174/5
**look [1]** 167/14
**looking [1]** 173/5
**looks [1]** 153/2
**lot [1]** 171/3

**M**

**made [1]** 173/11
**main [1]** 150/7
**make [3]** 146/13 159/21 165/22
**making [2]** 164/8 166/4
**male [1]** 161/16
**management [1]** 161/19
**many [2]** 157/6 172/25
**March [2]** 176/12 177/12
**mark [1]** 163/16
**marked [2]** 147/14 163/20
**MASCI [6]** 142/16 145/13 176/4 176/10 177/5 177/16
**matter [7]** 145/8 149/19 151/25 159/14 159/16 167/21 174/6
**may [2]** 146/6 167/18
**MBPD [1]** 164/13
**me [51]**
**mean [2]** 151/2 164/25 165/24 166/13
**meaning [1]** 165/11
**means [3]** 164/23 165/1 165/14
**mechanisms [1]** 152/11
**meeting [45]**
**meetings [3]** 160/4 170/20 170/22
**MELKINS [1]** 143/10
**member [3]** 154/16 155/14 170/4
**members [7]** 153/15 153/18 154/2 154/8 154/9 158/22 160/2
**MIAMI [6]** 142/3 142/7 145/10 145/12 145/25 164/13
**MICHAEL [7]** 143/8 145/24 160/7 162/4 168/22 169/10 174/15
**Mike [2]** 173/7 173/7
**mini [1]** 175/11
**MLE [1]** 143/8
**MLELAWFIRM.COM [1]** 143/10

## M

**Mm [2]** 161/23 168/4
**Mm-hmm [2]** 161/23 168/4
**moment [1]** 172/7
**Monday [1]** 158/10
**month [1]** 149/13
**months [2]** 149/8 159/17
**morning [1]** 147/23
**motion [1]** 174/21
**motivation [1]** 150/7
**moving [1]** 174/7
**MR [2]** 163/22 175/13 175/8
**Mr. [3]** 162/15 173/25 175/8
**Mr. Elkins [2]** 173/25 175/8
**Mr. Kuno [1]** 162/15
**Ms [3]** 146/10 146/12 146/13
**Ms. [4]** 146/17 174/5 174/8 174/23
**Ms. Guasto [2]** 174/5 174/8
**Ms. Salabarria [2]** 146/17 174/23
**much [1]** 175/16
**multiple [2]** 160/14 160/15
**MUNICIPALITY [1]** 142/8
**must [2]** 157/11 157/16
**my [74]**
**myself [1]** 162/24

## N

**name [4]** 145/14 145/21 146/11 167/15
**names [2]** 147/24 168/21
**nature [3]** 153/2 153/3 165/23
**need [4]** 173/7 175/8 175/10 175/13
**never [11]** 150/5 150/5 150/6 150/14 150/14 150/17 151/11 161/10 161/12 161/25 162/3
**new [1]** 174/25
**next [2]** 149/13 173/11
**nice [1]** 155/7
**Nicholas [3]** 149/21 149/23 161/14
**Nick [2]** 161/16 170/3
**night [1]** 169/23
**nights [1]** 168/19
**no [28]** 146/25 147/2 147/4 151/25 152/15 152/23 153/21 154/2 155/18 156/19 156/24 160/9 161/8 162/1 164/20 164/22 165/15 165/19 166/15 166/19 168/9 169/20 171/10 172/11 172/23 174/5 174/12 175/15
**NO.:1:22 [1]** 142/4

## NO.:1:22-cv-21004-DP

**G [1]** 142/4
**nobody [1]** 147/3 156/9 158/24 160/7 173/1
**none [1]** 160/10
**NORTHEAST [1]** 143/9
**not [52]**
**NOTARY [3]** 142/17 176/4 176/11
**notes [1]** 177/7
**nothing [4]** 146/3 158/3 165/17 172/14
**notice [3]** 156/22 157/4 157/15
**November [3]** 159/22 159/24 161/13
**now [5]** 145/3 147/20 162/22 162/22 172/7
**number [6]** 145/9 147/24 163/20 167/16 174/20 174/21

## O

**oath [3]** 146/22 175/1 176/1
**Object [1]** 150/24
**objection [1]** 174/12
**observed [1]** 170/6
**Obviously [1]** 167/9
**occurred [1]** 163/12
**off [6]** 147/5 159/5 168/21 173/19 173/19 175/6
**officer [18]** 151/7 151/12 151/17 151/21 151/22 152/4 152/8 152/12 157/11 157/11 158/19 165/3 165/18 165/22 166/1 166/7 166/16 166/17
**Officer's [2]** 154/19 158/13
**Oh [1]** 173/13
**okay [31]** 146/9 146/17 146/21 147/3 147/5 147/9 147/13 147/16 147/23 148/4 148/23 149/2 151/5 154/11 154/16 160/7 163/25 164/2 164/2 164/16 165/10 165/13 165/20 166/21 166/22 168/8 173/6 173/9 173/13 173/24 175/16
**one [4]** 154/5 158/4 160/9 174/21
**only [4]** 149/25 151/15 158/5 159/8
**order [3]** 156/1 174/11 175/11
**organization [1]** 161/4
**other [6]** 147/9 154/8 168/10 170/10 172/21 175/12
**out [3]** 158/21 162/15 172/25
**outcome [1]** 145/17
**over [1]** 146/19

## P

**PAGE [2]** 144/2 144/7
**pages [2]** 142/11 177/7
**PALM [1]** 177/3
**Pancier [2]** 160/8 162/4 168/23
**Paragraph [3]** 164/2 164/3 164/11
**PARK [1]** 143/3
**Part [1]** 157/13
**participate [4]** 153/6 154/22 155/3 156/1
**parties [2]** 143/20 177/9
**parties' [1]** 177/9
**party [1]** 145/16
**PAUL [6]** 143/2 143/3 143/5 145/21 173/14 174/17
**pending [1]** 174/24
**people [2]** 147/25 163/2
**person [3]** 159/8 167/17 167/17
**personally [1]** 176/5
**personnel [1]** 160/15
**pertaining [1]** 167/19
**physical [1]** 167/15
**place [2]** 142/15 167/16
**placed [2]** 173/12 174/2
**PLAINTIFF [4]** 142/6 143/5 145/8 145/23
**plan [1]** 172/24
**PLC [1]** 143/3
**pleadings [2]** 166/25 167/19
**please [4]** 145/18 146/2 164/5 167/15
**pled [1]** 164/14
**point [9]** 152/7 152/10 153/10 154/11 154/16 155/13 156/4 156/20 173/8
**police [18]** 151/21 151/21 152/8 152/12 152/20 153/23 154/19 155/21 157/11 158/12 158/14 158/19 161/3 165/18 165/22 166/7 166/17 171/1
**policies [2]** 151/9 164/15
**policy [1]** 164/13
**position [1]** 148/23
**prejudice [2]** 163/7 163/14
**present [4]** 143/13 145/23 154/3 154/24
**president [11]** 154/5 159/25 160/2 160/9 170/24 171/23 171/23 172/5 172/11 172/12 172/21
**pretty [1]** 158/13
**previous [1]** 156/16
**Prieto [2]** 152/18

## P

**prior [3]** 154/13 162/4 170/24
**procedure [3]** 157/10 157/13 164/14
**procedures [3]** 154/17 155/15 164/15
**proceed [2]** 146/6 175/1
**process [2]** 151/13 166/2
**processes [5]** 151/9 151/10 158/1 165/4 170/18
**Professional [1]** 177/5
**properly [1]** 171/16
**protect [11]** 157/2 157/24 159/8 160/8 160/9 161/17 162/20 163/2 166/2 166/3 172/9
**protected [8]** 148/15 148/16 148/19 160/10 161/15 166/8 166/14 166/15
**protecting [2]** 159/12 160/19
**protections [4]** 151/21 162/24 164/8 166/20
**protects [1]** 166/8
**provide [2]** 167/15 170/1
**proxy [1]** 149/21
**PUBLIC [3]** 142/17 176/4 176/11
**purpose [1]** 145/7
**purposes [1]** 155/4

## Q

**question [16]** 153/20 153/20 154/1 154/2 155/8 155/9 155/10 155/12 155/13 161/24 165/7 167/14 168/19 169/21 169/23 173/11
**questions [3]** 150/6 153/12 170/16

## R

**raise [1]** 146/1
**reach [1]** 172/25
**read [2]** 151/6 164/5
**reading [2]** 143/21 159/19
**real [1]** 161/24
**reason [9]** 164/20 164/20 164/22 165/15 165/15 166/19 166/19 169/11 169/12
**recall [2]** 172/6 172/17
**recently [4]** 146/11 159/17 162/23 173/2
**Recess [1]** 173/21
**recognize [1]** 163/23
**record [6]** 145/3 145/19 173/20 173/23 175/7 177/7
**refer [2]** 146/9 146/12
**referenced [1]** 167/5

## R

**referring [1]** 154/12
**refused [1]** 154/21
**regards [1]** 168/24
**Reggie [5]** 152/22 153/7 155/21 156/20 159/9
**Reginald [2]** 170/3 170/10
**Registered [1]** 177/5
**related [1]** 145/16
**relating [1]** 163/10
**relative [3]** 149/17 177/8 177/9
**relayed [1]** 153/7
**remains [1]** 175/1
**remedy [1]** 171/19
**remember [4]** 146/18 147/7 147/19 172/6
**remind [1]** 174/23
**REMOTE [1]** 142/15
**report [1]** 177/6
**REPORTED [1]** 142/16
**reporter [4]** 142/17 145/13 145/19 177/5
**REPORTER'S [1]** 176/13
**Reporting [1]** 145/14
**represent [2]** 145/22 174/5
**representation [1]** 170/7
**representative [2]** 153/13 154/23
**representatives [2]** 154/12 157/23
**represented [1]** 171/16
**representing [1]** 174/25
**request [4]** 156/5 156/23 157/15 174/12
**requested [2]** 170/7 177/7
**required [2]** 150/20 164/6
**respective [1]** 143/20
**responses [3]** 147/16 155/3 155/11
**retaliated [1]** 148/9
**retaliation [8]** 148/8 148/12 148/14 148/20 149/18 169/7 170/5 171/5
**review [4]** 156/23 157/16 163/25 177/6
**Richard [5]** 153/4 153/5 153/7 156/7 170/16
**rid [3]** 149/22 149/24 169/2
**right [14]** 146/1 146/17 148/21 149/5 150/18 153/8 164/18 165/8 166/21 170/1 172/7 173/14 174/19 175/4
**rights [34]** 151/7 151/12 151/13 151/18 151/22 152/4 152/9 152/12 154/20 155/6 155/22 155/25 156/12

**R**

rights... **[21]** 157/25
158/13 158/19 159/8
160/19 161/15 162/20
162/24 164/6 165/4
165/18 166/1 166/2
166/7 166/16 166/18
170/18 171/17 171/20
172/9 172/10
Robert **[1]** 170/20
ROSE **[2]** 143/2 145/22
RPR **[4]** 142/16 176/4
176/10 177/16
rules **[1]** 146/19
rush **[1]** 175/11

**S**

said **[9]** 152/16 155/24
156/1 156/7 158/3
165/3 170/4 170/17
172/22
SALABARRIA **[6]**
142/12 146/7 146/10
146/12 146/17 174/23
same **[3]** 163/1 169/11
169/12
sat **[2]** 153/11 155/2
say **[5]** 151/7 151/8
151/16 164/22 167/23
saying **[2]** 159/1 173/6
says **[6]** 151/15 166/18
167/15 167/15 167/25
170/12
scheduling **[1]** 174/11
search **[2]** 172/18
172/20
searching **[3]** 171/18
171/18 171/24
secretary **[1]** 152/15
Section **[2]** 154/18
157/5
see **[11]** 147/14 147/15
148/2 152/18 163/18
163/19 164/3 167/1
167/14 167/21 170/8
seem **[1]** 154/19
sense **[1]** 146/13
separate **[2]** 161/2
174/18
separated **[9]** 148/11
149/16 150/11 150/15
156/18 156/19 158/9
158/11 169/14
separation **[3]** 154/13
162/10 171/8
series **[1]** 155/10
set **[1]** 172/24
settle **[3]** 149/25
149/25 150/8
settled **[1]** 149/10
149/11 149/12
settlement **[6]** 149/9
149/17 150/2 163/11
169/4 170/23
settling **[2]** 148/10
149/13
seven **[2]** 149/7 149/8
several **[2]** 153/14

172/22
shared **[1]** 152/24
she **[5]** 146/10 173/11
174/2 174/25 175/1
should **[1]** 175/2
show **[3]** 147/10
151/23 163/16
showing **[1]** 147/13
signature **[1]** 147/20
signed **[2]** 170/23
176/8
significance **[1]** 149/17
significant **[2]** 150/12
150/16
signing **[1]** 143/21
simple **[1]** 161/25
since **[1]** 154/19
single **[1]** 160/18
sir **[1]** 175/15
sitting **[1]** 170/15
situation **[2]** 173/12
174/3
Smith **[1]** 169/10
so **[57]**
some **[4]** 148/15 167/8
173/11 174/1
somebody **[2]** 166/4
171/24
someone **[1]** 165/15
something **[5]** 158/15
162/21 165/4 166/16
173/4
sometime **[1]** 149/10
SOPs **[1]** 151/9
sorry **[5]** 152/25
160/25 161/23 162/8
173/7
sort **[1]** 148/15
sounds **[1]** 152/7
SOUTHERN **[2]** 142/2
145/12
speak **[2]** 150/3 171/11
speaking **[1]** 171/4
specific **[1]** 151/14
specifics **[1]** 151/15
spoke **[1]** 150/6
spot **[1]** 153/9
staff **[1]** 152/17
standard **[2]** 164/9
166/9
standing **[1]** 159/9
start **[1]** 170/3
started **[1]** 159/19
state **[11]** 142/17
145/18 151/15 171/23
172/4 172/5 174/3
176/2 176/4 176/11
177/2
stated **[3]** 153/17
160/21 161/1
statements **[1]** 173/12
STATES **[1]** 142/1
statewide **[1]** 174/3
status **[1]** 158/20
Statute **[5]** 154/18
155/15 157/10 158/25
160/11
statutory **[2]** 151/12
158/17

stenographic **[2]**
142/17 177/7
stenographically **[1]**
177/6
Steven **[1]** 168/18
still **[1]** 146/21
stipulated **[1]** 143/19
stop **[1]** 159/10
subject **[1]** 167/21
Subsection **[1]** 158/25
subsequent **[2]** 149/12
150/9
subsequently **[1]**
148/10
substantiated **[1]**
150/15
sue **[1]** 163/3
sued **[2]** 167/5 173/2
SUITE **[1]** 143/4
summoned **[8]** 152/20
153/17 153/22 154/1
159/7 161/1 161/4
171/16
support **[2]** 167/8
167/23
supposed **[2]** 150/3
157/21
supposedly **[1]** 160/19
sure **[2]** 152/3 159/21
suspended **[2]** 174/24
175/3
SUTTON **[1]** 143/3
swear **[2]** 145/20 146/2
sworn **[2]** 146/8 176/7

**T**

take **[5]** 149/7 152/10
154/17 153/10 173/14
taken **[2]** 145/8 173/21
taking **[1]** 154/7
talk **[7]** 146/24 147/1
158/20 166/21 167/24
172/21 175/2
talked **[1]** 167/4 172/1
talking **[3]** 147/6
156/18 169/22
TAMARA **[6]** 142/16
145/13 176/4 176/10
177/5 177/16
Tammy **[2]** 146/9
175/11
TANNEN **[6]** 142/16
145/13 176/4 176/10
177/5 177/16
telephone **[1]** 167/16
tell **[1]** 172/16
telling **[1]** 171/15
tenured **[2]** 171/22
171/22
term **[1]** 165/8
terminate **[1]** 151/23
164/12 170/7 170/13
terminated **[7]** 148/11
150/10 153/8 153/11
155/1 156/2 169/8
termination **[1]** 156/17
TERRACE **[1]** 143/9
terrified **[1]** 153/10
testified **[1]** 146/8

testify **[6]** 170/2 170/11
170/12 170/14 176/7
170/19
testimony **[4]** 146/2
159/24 172/2 174/1
Thank **[3]** 146/6 175/4
175/16
that **[233]**
that's **[22]** 148/12
150/12 150/16 153/20
155/7 155/11 155/24
156/17 157/22 158/15
162/23 165/5 165/23
166/1 166/2 167/9
169/6 169/24 170/18
173/3 173/4 175/3
their **[3]** 145/18 156/6
157/17
them **[14]** 154/5 157/23
157/24 157/24 159/2
160/11 160/15 160/19
160/19 161/12 169/6
169/25 174/1 174/20
then **[15]** 148/9 148/15
149/5 149/12 150/2
150/9 152/18 156/4
158/8 158/10 158/10
162/19 163/17 168/25
170/1
there **[33]** 149/9 149/15
150/3 150/9 152/1
152/1 152/11 152/17
152/19 152/19 153/9
153/19 153/21 153/22
154/2 155/2 156/13
156/14 157/12 157/14
158/3 159/1 159/9
159/21 159/25 161/8
161/16 166/2 166/3
170/13 171/17 172/14
172/23
there's **[2]** 151/20
166/20
therefore **[1]** 148/12
these **[6]** 147/21
147/23 149/14 167/7
171/4 171/20
they **[31]** 150/10
150/20 150/21 153/20
153/22 154/20 155/5
155/7 156/21 158/8
158/8 158/10 158/23
159/8 160/8 161/3
161/3 161/4 161/5
161/9 161/9 161/10
161/13 161/13 161/14
161/15 161/15 161/17
161/17 162/19 162/20
they're **[2]** 157/23
161/2
things **[6]** 147/9 151/24
165/24 165/25 166/10
167/8
think **[6]** 147/5 147/6
149/2 159/20 166/6
166/13
this **[64]**
those **[11]** 150/5
151/24 153/18 160/4

163/12 163/13 164/15
165/25 166/10
171/14
though **[1]** 156/17
thought **[2]** 167/7
169/6
threaten **[1]** 170/6
threatened **[1]** 170/13
three **[5]** 153/15 154/2
156/22 157/4 157/14
through **[15]** 147/9
147/23 149/21 149/21
149/21 152/4 158/16
162/13 162/19 162/25
166/8 169/3 171/1
171/5 171/19
throughout **[1]** 172/23
tie **[1]** 169/6
tied **[1]** 169/1
time **[17]** 142/14 145/5
149/20 152/7 152/10
154/16 155/13 156/4
154/16 155/19 162/22
168/16 171/6 172/5
172/11 172/17 173/3
times **[2]** 153/14
172/22
timetable **[1]** 174/13
timing **[1]** 150/13
title **[1]** 167/17
today **[3]** 145/4 174/6
175/3
together **[1]** 174/20
told **[13]** 152/22 153/1
153/4 154/24 155/24
156/20 157/1 157/3
158/9 158/10 159/2
159/10 161/10
took **[3]** 150/10 150/10
160/11
top **[2]** 160/15 168/21
transcript **[2]** 177/6
177/7
tried **[2]** 172/24 172/25
true **[3]** 153/16 160/20
177/7
truth **[3]** 146/3 146/3
146/4
trying **[4]** 155/5 158/21
172/18 172/21
Tuesday **[1]** 145/4
turned **[1]** 164/17
two **[5]** 151/24 159/25
160/7 166/10 174/21
type **[2]** 155/3 171/4

**U**

U.S **[1]** 145/11
under **[11]** 146/21
157/5 158/25 161/6
164/6 164/9 164/12
166/15 166/20 172/8
175/1
underlying **[1]** 167/20
understand **[26]**
146/21 148/13 148/14
148/17 151/20 151/23
151/25 158/18 159/21
163/6 163/10 163/13

## U

understand... [14] 164/23 165/2 165/7 165/10 165/13 165/13 165/15 165/17 165/19 165/21 166/6 166/10 166/11 166/15

understanding [4] 148/5 148/7 151/11 174/9

understood [2] 165/5 165/6

union [1] 163/1

UNITED [1] 142/1

unopposed [2] 174/10 174/22

unsubstantiated [1] 149/15

unsupported [1] 163/1

until [1] 149/10

up [2] 159/9 164/6

upon [2] 174/1 174/11

us [1] 164/5

use [2] 157/11 157/11

## V

versed [1] 152/8

versus [1] 145/10

very [14] 149/13 149/13 149/16 149/20 150/1 150/11 151/14 152/8 152/23 155/2 161/7 161/24 171/3 175/16

via [2] 142/15 145/6

video [12] 142/12 143/14 145/3 145/7 145/15 173/20 173/22 175/5 175/6 175/9 175/10 175/14

videographer [2] 143/14 145/15

Videotaped [1] 177/6

view [1] 160/4

violated [4] 152/12 162/19 171/18 171/20

violating [2] 155/17 156/12

violation [13] 155/25 156/21 156/22 157/5 157/12 157/15 157/25 158/23 159/1 159/6 164/13 170/18 172/10

violations [1] 172/1

VOLUME [1] 142/11

VS [1] 142/6

## W

waive [8] 151/13 151/17 158/16 165/3 165/4 165/5 166/12 166/16

waived [2] 143/22 151/12

waiving [2] 151/7 151/8

want [11] 147/23 153/1 153/6 153/12 154/22 155/9 159/20 161/24

170/15 174/16 174/23

wanted [2] 157/7 157/8

was [120]

wasn't [7] 149/9 149/10 149/11 152/6 152/23 167/6 172/11

way [1] 149/25

we [19] 145/6 145/22 146/12 146/19 147/5 147/6 147/10 147/13 147/19 147/24 150/4 150/5 156/1 170/1 172/23 173/10 173/13 173/22 174/20

we'll [3] 158/20 163/17 173/17

We're [1] 145/3

we've [1] 174/10

weeks [1] 149/7

well [16] 149/20 152/8 152/19 157/8 158/6 159/23 166/3 166/14 166/23 167/11 167/14 171/5 171/7 171/23 172/4 172/20

well-versed [1] 152/8

went [4] 146/19 153/4 162/25 163/1

were [24] 147/6 149/5 150/14 150/14 150/20 150/21 152/12 153/21 153/22 154/2 154/8 155/4 155/5 156/18 160/5 161/4 163/7 163/13 166/13 167/7 169/14 171/14 171/17 174/18

Weren't [1] 150/22

what [36] 147/13 148/4 151/21 151/25 152/15 152/21 152/23 152/24 155/23 155/24 157/9 158/21 161/8 161/10 162/23 162/25 163/16 164/23 164/25 165/5 165/21 165/21 166/7 166/8 168/10 170/2 170/10 170/19 170/20 170/20 170/20 171/14 171/19 172/13 172/16 172/20

What's [1] 149/17

when [13] 146/12 150/2 152/16 155/20 157/12 158/2 158/2 158/10 159/16 166/18 169/7 169/14 171/24

where [4] 147/5 148/12 159/25 160/1

whether [1] 151/22

which [6] 145/11 145/19 146/10 153/14 154/18 154/23

while [3] 170/14 170/24 175/2

whistles [1] 175/12

who [15] 145/23 147/25 154/1 154/1 155/20 156/15 157/3

159/7 159/9 167/17 167/18 168/15 168/17 168/18 168/20

whole [1] 146/3

why [25] 149/18 149/18 150/12 150/16 153/3 156/25 156/25 157/20 157/20 157/22 158/10 159/11 162/18 166/1 166/2 167/3 167/6 167/9 168/22 169/6 169/9 169/21 169/24 173/2 173/13

will [13] 145/19 146/3 150/22 152/1 164/8 164/18 164/23 165/2 165/8 165/14 166/18 174/21 175/8

withdraw [2] 174/7 174/21

withdrawal [1] 174/11

withdrawn [2] 150/1 150/8

within [5] 149/12 156/21 157/14 157/14 158/25

without [3] 153/6 155/5 164/8

witness [7] 144/2 145/20 146/5 167/6 170/2 170/21 170/22

witnesses [3] 147/24 166/24 167/7

work [5] 158/9 158/14 161/3 161/4 161/5

working [5] 156/22 157/4 157/14 165/1 168/18

world [1] 159/20

would [15] 145/18 147/25 149/24 153/8 158/12 166/24 170/2 170/10 170/12 170/14 170/17 170/19 172/22 174/9 175/13

wouldn't [1] 169/17

writing [2] 158/24 159/3

written [6] 150/4 156/13 156/22 157/4 157/15 169/1

wrong [1] 164/17

wrote [1] 150/14

## Y

Yeah [4] 156/17 168/14 173/15 174/15

yes [56]

yet [1] 160/18

you [158]

you're [12] 146/21 152/8 154/12 154/18 155/11 155/11 158/22 159/1 159/5 161/20 166/8 173/6

You've [1] 167/3

your [50]

## Z

ZOOM [2] 142/15 145/7

Page 178

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3                    MIAMI DIVISION
 4              CASE NO.:1:22-cv-21004-DPG
 5   JESSICA GUASTO,
 6          PLAINTIFF,
 7   VS.
 8   THE CITY OF MIAMI BEACH, FL,
     A FLORIDA MUNICIPALITY,
 9          DEFENDANT.
10   _____/
11              VOLUME 3 (PAGES 178-244)
12   CONTINUED VIDEO
     DEPOSITION OF:        JESSICA (GUASTO) SALABARRIA
13
     DATE:                 MARCH 15, 2024
14
     TIME:                 10:01 A.M. - 11:45 A.M.
15
     PLACE:                VIA ZOOM REMOTE CONFERENCING
16
     REPORTED BY:          TAMARA MASCI TANNEN, RPR, FPR-C
17                         STENOGRAPHIC COURT REPORTER
                           NOTARY PUBLIC, STATE OF FLORIDA
18
19
20
21
22
23
24
25
```

Page 179

```
 1   APPEARANCES:
 2   DANIEL B. BARROUKH, ESQ.
     DEREK SMITH LAW GROUP, PLLC
 3   520 BRICKELL KEY DRIVE
     SUITE O-301
 4   MIAMI, FLORIDA  33131-2433
     (786) 688-2335
 5   DANIELB@DEREKSMITHLAW.COM
          COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
 6
 7
 8   MICHAEL L. ELKINS, ESQ.
     MLE LAW
 9   1212 NORTHEAST 16TH TERRACE
     FORT LAUDERDALE, FLORIDA  33304
10   (954) 401-2608
     MELKINS@MLELAWFIRM.COM
11        COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.
12
13   ALSO PRESENT:
14   MATTHEW LEIVA, VIDEOGRAPHER, COASTAL VIDEO
15
16              * * * * * * * * *
17              S T I P U L A T I O N S
18
19         It is hereby stipulated and agreed by and
20   between counsel for the respective parties, and the
21   deponent, that the reading and signing of the deposition
22   are hereby reserved.
23
24
25
```

Page 180

```
 1                    I N D E X
 2   WITNESS                                      PAGE
 3   JESSICA SALABARRIA
 4   Direct Examination by Mr. Elkins             182
 5
 6                  E X H I B I T S
 7   DEPOSITION        DESCRIPTION                 PAGE
```

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit Number 9 | Allegation of Employee Misconduct Form | 189 |
| Exhibit Number 10 | Memorandum dated 1/25/21 | 214 |
| Exhibit Number 11 | Declaration of Nicholas Guasto | 225 |
| Exhibit Number 12 | Letter dated 12/4/20 from Michael Pancier to EEOC | 230 |
| Exhibit Number 13 | Letter from U.S. Equal Employment Opportunity Commission to Elkins | 232 |
| Exhibit Number 14 | Receipt of Employee Handbook | 233 |
| Exhibit Number 15 | Letter of Resignation dated 12/18/20 | 234 |

Page 181

```
 1                  P R O C E E D I N G S
 2                      * * * *
```

3           THE VIDEOGRAPHER:  Good morning.  We are now on

4   the record.  This is Matthew Leiva, the videographer.

5   Are we ready to begin?

6           MR. ELKINS:  We are.

7           MR. BARROUKH:  Yes.

8           THE VIDEOGRAPHER:  Stand by.  One moment.  Okay.

9   Good morning.  We're now on the video record.  The time

10   is 10:01 A.M Eastern time.  Today's date is March 15th,

11   2024.  And the video deposition of Jessica Guasto in

12   the matter of Jessica Guasto versus the City of Miami

13   Beach, Florida, a Florida municipality.

14           MR. ELKINS:  Municipality.

15           THE VIDEOGRAPHER:  There we go.  I apologize.

16   Case Number 122-CV-21004-DPG.  My name is Matthew

17   Leiva.  I'm your videographer for today.  Tamara Masci

18   Tannen is your court reporter for today.  We're both

19   representing Coastal Services.

20           And counsel, please introduce yourselves and

21   thereupon the witness will be sworn in.

22           MR. BARROUKH:  Daniel Barroukh, Counsel for

23   Plaintiff, Jessica Guasto.

24           MR. ELKINS:  Michael Elkins on behalf of

25   Defendant, City of Miami Beach.

Page 182

1    THE REPORTER:  Jessica, raise your right hand,
2  please.  Do you swear that the testimony you are about
3  to give will be the truth, the whole truth, and nothing
4  but the truth, so help you God?
5    THE WITNESS:  I do.
6    THE REPORTER:  Thank you.  You may proceed.
7    **JESSICA SALABARRIA,**
8  Having been first duly sworn, testified as follows:
9    **DIRECT EXAMINATION**
10 BY MR. ELKINS:
11   Q.   All right.  Ms. Salabarria, did you do anything to
12 prepare for this day three of your deposition, understanding
13 that this is a continue -- continuation of your original
14 depo from back in February?
15   **A.   Yes.**
16   Q.   Okay.  What did you do?
17   **A.   Spoke to my attorney.**
18   Q.   When did you speak to your attorney?
19   **A.   I don't have the date right now.  Can't recollect**
20 **which date exactly.**
21   Q.   For how long did you speak to your attorney about
22 this deposition?
23   **A.   I don't know.**
24   Q.   Okay.  And did you go over questions and answers
25 from your earlier in this testimony?

Page 183

1    **A.   Yes.**
2    Q.   You understand that you're not allowed to discuss
3  your deposition testimony with your lawyer while the
4  deposition's pending?
5    **A.   Can you rephrase that question because I didn't**
6  **understand what you were saying.  Like, if I prepared for my**
7  **case; is that what you asked?**
8    Q.   No, this is a continuation of your deposition.
9  Your deposition was suspended on two prior occasions.  You
10 remember that, right?
11   **A.   Yes.**
12   Q.   And so, in your first deposition, and in the
13 second one, we discussed the fact that while your deposition
14 is pending, you cannot discuss questions, you cannot discuss
15 the deposition with your lawyer.  Did you understand that?
16   **A.   Yes.**
17   Q.   But you have in fact discussed the deposition with
18 your counsel; is that correct?
19   **A.   That is not correct.**
20   MR. BARROUKH:  Objection.  Yeah.  Objection.  You
21 -- you can't ask her questions about what we spoke
22 about.
23   MR. ELKINS:  Well, she already answered that she
24 did discuss it with you.  And if she's discussing the
25 depo with you while it's pending, it's actually not

Page 184

1  privileged because if --
2    MR. BARROUKH:  She -- she already -- she already
3  said she did not understand the question.  Can we move
4  on, please?
5    MR. ELKINS:  I'm going to move on.  But I'll
6  definitely raise the issue with the judge, for sure.
7  Because she shouldn't --
8    THE WITNESS:  Yes, I didn't understand what you
9  were asking me.  I thought you said if I discussed my
10 case with my counsel.
11 BY MR. ELKINS:
12   Q.   Well, that's a nice way to clean it up.  But I
13 clearly asked if you discussed this deposition, and you said
14 yes.  So that's fine.  We'll take it to Judge Gayles and see
15 what he says about it.
16   Okay.  I'm going to show you what I've marked as
17 -- previously as Exhibit 5.  Can you see the document?
18   **A.   Yes.**
19   Q.   Okay.  This is the EEOC charge you filed on
20 June -- yeah -- June 22nd, 2021.  And we've gone over this
21 before, right?
22   **A.   Yes.**
23   Q.   Okay.  I just want to make sure I understand what
24 this case is about.  Can you see the second page here that
25 I'm looking at?

Page 185

1    **A.   Yes.**
2    Q.   Okay.  It says, "CP -- "
3    That's you, correct?  Charging Party?
4    **A.   Yes.**
5    Q.   -- was terminated for engaging in a -- in a
6  protected activity, filing the 2020 charge.  That's
7  referring to your 2020 EEOC charge I think from July or June
8  of 2020, correct?  Is that correct?
9    **A.   That is correct.**
10   Q.   Okay.  So that's the protected activity at issue
11 as per your EEOC charge; is that right?
12   **A.   That is correct.**
13   Q.   Okay.  And then, there's the second part to the
14 sentence that says, "and retaliation against RP."
15   RP is Responding Parties, right?
16   **A.   Yes.**
17   Q.   Okay.  And I think if we look up here, it talks
18 about additional respondents responsible for discriminatory
19 conduct.  And it says you were employed by the Responding
20 Party.  That's the City of Miami Beach, correct?
21   **A.   That is correct.**
22   Q.   Okay.  What do you mean -- I understand that the
23 protected activity triggering the supposed retaliation is
24 the 2020 EEOC charge of discrimination.  But then it says,
25 "and retaliation against Responding Party," which is City of

Page 186

1   Miami Beach.  What does that mean, and retaliation against
2   City of Miami Beach?
3       A.   At this moment, I don't know what that means.
4       Q.   Okay.  Who wrote this charge?
5       A.   Can you go up to the author of the charge, please?
6   Can you scroll down?
7       Q.   Sure.
8       A.   That was my previous counsel.
9       Q.   Paul?
10      A.   I believe so, yes.
11      Q.   Okay.  But you signed it, right?  That's your
12  signature?
13      A.   Yes.
14      Q.   And you read it before you signed it, right?
15      A.   Yes.
16      Q.   Okay.  Going forward to the December -- I think
17  it's 27 or 28 incident involving Lieutenant Cosner.  In this
18  charge you say that Cosner accused you of further violation
19  of workplace rules.  Do you see that?
20      A.   Can you point to where it says it?
21      Q.   Yeah.  Right here.  "Respondent Cosner, who was
22  previously involved in the conduct leading to the 2020
23  charge, accused Charging Party of further violation of
24  workplace rules."
25      A.   Okay.

Page 187

1       Q.   Do you see that?
2       A.   Yes.
3       Q.   And the conduct that you're referring to from
4   Lieutenant Cosner that was part of that 2020 charge or that
5   led to the 2020 charge, that was the issues that you had had
6   with him six or seven years prior, right?
7       A.   At this time, I don't recall.  I do know that I
8   had issues with Cosner from previous years leading up to
9   this EEOC charge.
10      Q.   Well, I think you told me that Cosner had, you
11  know, asked you out or tried to take your relationship
12  further than just friendship back in 2014 or '15; and then,
13  you rejected him; and then, from that point forward, in '14
14  or '15 -- we can call it '15 -- he just wouldn't speak to
15  you.  Do you remember that testimony?
16      A.   I remember.  And I remember having issues with
17  Cosner, like -- like I explained from 20 -- around the time
18  of 2020, 2013, 2014.  All the way till 2021.
19      Q.   Well, that's not what you told me before.  What
20  you told me before was you had issues with him in '13, '14
21  or '15 whenever that was, correct?
22      A.   Yes.
23      Q.   And you rejected him, correct?
24      A.   Yes.
25      Q.   And then, from that moment forward, you didn't

Page 188

1   work with him, you didn't speak to him, he wouldn't speak to
2   you.  I think you told me that you'd pass him in the hallway
3   and he would ignore you.
4            So what other -- are you referring to the fact
5   that he just ignored you for six years, or five years, as
6   issues?
7       A.   I'm respond -- I'm responding to the fact that he
8   held this animosity and this -- this animosity and this
9   hatred towards me from the moment that I rejected him till
10  2021, which is evident by him making false allegations
11  against me.  So he held that with him all these years --
12      Q.   Right.
13      A.   -- and retaliated against me for filing my EEOC
14  complaint.
15      Q.   Right.  So that -- that's what I was getting at.
16  Your point about the issues that you're talking about after
17  you rejected him, whenever that -- that date was.  I know
18  you don't remember it off the top of your head.  I don't
19  either.  But it's in the record.
20           The issues that you're referring to after that, go
21  to his what you call animosity and anger towards your
22  rejection.  So he ignored you for six or seven years.  And
23  your position in this lawsuit is he essentially finally took
24  it out on you when he made these allegations against you in
25  December of 2020, correct?

Page 189

1       A.   Yes.
2       Q.   Okay.  Got it.
3            So let's go to -- bear with me as I get another
4   document.  Okay.
5            I'm showing you what I'm going to mark as
6   Exhibit 9.  Do you see the document?
7       A.   Yes.
8            (Deposition Exhibit Number 9 marked for
9   identification.)
10  BY MR. ELKINS:
11      Q.   Okay.  This is the Allegation of Employee
12  Misconduct form that Cosner submitted to the City against
13  you.  This has been produced I think by both parties in this
14  case.
15      A.   Is that the original signed copy that I can refer
16  to?
17      Q.   This is the copy that the City produced.
18      A.   Okay.  Would you happen to have the signed copy --
19  a signed copy?
20      Q.   I might.  But there's only a difference I believe
21  in the heading.  I don't think there's any substantive
22  difference.  So we can go through this document.
23      A.   I just don't know who wrote this document.  It's
24  not signed by anybody, so I would like to refer to a
25  document that's signed.

Page 190

1    Q.  Well, you're going to refer to the documents that
2  I put in front of you.  I understand what you're saying.
3  But this is the document the City produced.
4         MR. BARROUKH:  You can answer, Jessica.  It's all
5         right.
6         THE WITNESS:  Okay.  I just want to state for the
7         record that it's an unsigned copy.
8  BY MR. ELKINS:
9    Q.  That's fine.  The document speaks for itself.
10         So I'm going to give you a moment to read this.
11  I'll scroll when you need me to scroll because I'm going to
12  ask you some questions about it.  But I want you to have an
13  opportunity to read it first.
14    A.  It moved.
15    Q.  Sorry.
16    A.  Can you scroll down?
17    Q.  Tell me when you want me to stop.
18    A.  You can stop.  Okay.
19    Q.  All right.  You alleged in this lawsuit that the
20  allegations are false -- that Cosner made false allegations
21  against you, right?
22    A.  Yes.
23    Q.  Okay.  So tell me the allegations in this document
24  that are false.
25    A.  All of it.

Page 191

1    Q.  The entire thing's false?
2    A.  His allegations, what did he charge me with?  Can
3  you --
4    Q.  Well, he says that -- he says that on Sunday night
5  at 2200 hours, he told you that they needed a sergeant for
6  overtime for the midnight shift.  Is that true or false?
7    A.  That is false.  I never spoke to Cosner.  He never
8  gave me any directives and I never gave him my overtime
9  slip.  He never spoke to me at the beginning of the shift.
10    Q.  And so, Cosner did not tell you that you were the
11  next supervisor to be forced to work since they didn't have
12  any volunteers for the overtime.  That next sentence is
13  false too?
14    A.  That is correct, it is false.
15    Q.  Okay.  And then, were you assigned to Area 3?
16    A.  I was assigned to Area 3.
17    Q.  Okay.  Who told you you'd be assigned to Area 3?
18    A.  Lieutenant Brown at the time.
19    Q.  And who told you you'd be working overtime?
20    A.  Lieutenant Brown at the time.
21    Q.  Okay.  And were you told you'd be working midnight
22  till 6:00 A.M.?
23    A.  Yes.
24    Q.  Cosner says that you acknowledged the order within
25  several minutes provided him with an overtime slip completed

Page 192

1  by you, which you documented in your own handwriting that
2  you were working Area 3.  Is that true or false?
3    A.  That is also false.  I did not give him my
4  overtime slip.  I turned in my overtime slip to Lieutenant
5  Brown.
6    Q.  Okay.  And then, it says, at approximately 3:55,
7  which is A.M., he forwarded an email to you with the details
8  of the watch orders that needed to be assigned to Area 3
9  offices for completion prior to the end of the shift.  Is
10  that true or false?
11    A.  He sent me an email saying I forgot to send you
12  this at 3:55 A.M.
13    Q.  And you have a copy of that email?
14    A.  Yes.
15    Q.  So he did send you an email at 3:55?
16    A.  Yes.  He sent me an email saying I forgot to send
17  you these details at 3:55.
18    Q.  Okay.  I understand it says he forgot.  But does
19  the email say -- did the email have the details and watch
20  orders that needed to be assigned to the Area 3 officers?
21    A.  Yes.
22    Q.  Okay.  Area 3?
23    A.  That is correct.
24    Q.  What is Area 3?
25    A.  Area 3 is the north end -- the north end area of

Page 193

1  the -- Miami Beach.
2    Q.  Okay.  And the beach is split up into three areas,
3  right:  Entertainment District, Mid Beach and North Beach,
4  correct?
5    A.  It's split into several areas.  I don't know what
6  those areas are now.
7    Q.  Well, what was it when you were working there?
8    A.  I know that Area 3 was in the north end.
9    Q.  Okay.  Well, what were the other areas when you
10  were employed there?
11    A.  I don't recall at this moment.
12    Q.  Okay.  And then it says he sent you a text message
13  to your cellphone advising you to check your email.  That
14  was at 3:59.  Is that true or false?
15    A.  At this time, since it happened so long ago, I
16  don't recall the exact time that he sent me anything or the
17  text message.
18    Q.  Okay.  And then it says, he says he called you
19  repeatedly, but your phone went to voicemail.  Is that true
20  or false?
21    A.  Again, I don't remember at this time.  I don't
22  recall.  It happened so many years ago.
23    Q.  And then it says he tried to raise you via the
24  police radio immediately afterwards.  Is that true or false?
25    A.  Since it happened three years ago, I -- I don't

Page 194

1  remember at this time.

2      Q.  And then it says the dispatcher raised you

3  multiple times, and you didn't respond.  Is that true or

4  false?

5      A.  Again, I don't -- I don't remember exactly how

6  everything happened.

7      Q.  Okay.  And then it says, Sergeant Wilson Romero

8  told -- advised via radio that he would try to call you.  Is

9  that true or false?

10     A.  I don't remember.

11     Q.  And then it says, "he," referring to Wilson

12  Romero, called me, Cosner, at 4:11 hours to advise that he

13  couldn't reach you and that your phone rang through your

14  voicemail.  Do you know if that's true or false?

15     A.  I can't attest to what he says he did with Wilson

16  Romero.

17     Q.  So have you spoken to Wilson Romero about that?

18     A.  No.

19     Q.  And then, Cosner says he again tried to have the

20  dispatcher raise you.  And after several attempts by name

21  and unit, you finally responded.  Is that true or false?

22     A.  Again, it happened three years ago.  I don't

23  remember the exact -- what happened that night.

24     Q.  Okay.  But you remembered it enough to allege in a

25  federal lawsuit that he made false allegations; now today

COASTAL REPORTING, INC. (954) 523-5326

Page 195

1  you don't remember?

2      A.  That is correct.  I remember -- yeah, I remember

3  what happened in the sense of his allegations are not

4  correct, are not true.

5      Q.  All right.  We'll just keep going through this

6  then.  Then it says the tone of your voice sounded as if you

7  were just waking up.  Do you remember that?

8      A.  Again, I -- I can't attest to what he perceives my

9  voice sounded like.  I think that's adjusted.  So I don't --

10  I don't know how somebody's tone sounds like they're just

11  waking up.

12     Q.  Okay.  Then it says he spoke with you via the

13  supervisor channel, which is the specific radio channel,

14  correct?

15     A.  Can you point to that again where it says that?

16     Q.  Yeah.  Right at the top here it says, I spoke with

17  her via the supervisor channel.

18         So what I'm asking you is:  The supervisor channel

19  is a specific channel for sergeants, lieutenants and

20  captains that regular officers don't hear, correct?

21     A.  Yes.  So I remember --

22     Q.  Well, hold on.  That was my question.  And it says

23  he asked you where you were and you told him that you were

24  05.  So first, what does "05" mean?

25     A.  05 means at the station.

COASTAL REPORTING, INC. (954) 523-5326

Page 196

1      Q.  Okay.  Do you remember that happening?

2      A.  I don't remember the exact words that I told him.

3  So I -- I don't remember what I spoke to him.  If I had a

4  recorded copy, I would be able to recall what I said to him

5  exactly.

6      Q.  If you had what?

7      A.  If I had a copy of that recording of what I said

8  to him, I could attest to it, but I don't remember exactly

9  verbatim what I said to him.

10     Q.  Okay.  And 05 is the main station?

11     A.  Yes.

12     Q.  And that's the one on Washington, correct?

13     A.  Yes.

14     Q.  And it says Cosner responded by asking you if you

15  meant 05 at the NESS.

16         What is NESS -- what does NESS, N-e-s-s mean?

17     A.  I don't know the abbreviation for that.

18     Q.  You've never heard of that abbreviation?

19     A.  I know the abbreviation.  I just don't know what

20  it stands for.

21     Q.  Okay.  And then it says you said no, and that you

22  were at the main station.  Do you remember telling Cosner

23  that?

24     A.  I, again, I don't remember my exact words, so I

25  can't attest to what he said he -- what he said I said.

COASTAL REPORTING, INC. (954) 523-5326

Page 197

1      Q.  Well --

2      A.  So --

3      Q.  What do you remember --

4      A.  I know that the main station is 05.

5      Q.  I'm not asking you what he says you said.  I'm

6  asking you if you remember what you said.  Do you remember

7  what you said?

8      A.  No, I don't remember.

9      Q.  Well, how do you know it's false if you don't

10  remember?

11     A.  Because I know that his allegations are false.

12     Q.  Okay.  Which allegations are false?

13     A.  Can you go up to his charges?  Keep going.  The

14  specific allegations, what he's specifically saying are the

15  allegations, those are all false.

16     Q.  Okay.  But the details of those allegations are

17  contained in the narrative; isn't that true?

18     A.  That's what it looks like.

19     Q.  Okay.  So what in this narrative -- I mean, I can

20  go through every sentence with you.  I'm happy to do that.

21  But if you're saying, for example, failure to supervise is a

22  false allegation, then tell me in this narrative what facts

23  here are false that would establish that failure to

24  supervise is a false allegation.

25     A.  I just know that his allegations of -- that are in

COASTAL REPORTING, INC. (954) 523-5326

COASTAL REPORTING, INC. (954) 523-5326

Page 198

1  the top are all false and this was never investigated.
2      Q.  Okay.  Well, I've given you the opportunity to
3  read this.  You can read it again.
4      But what I'm asking you, and I'll ask you again:
5  What specific facts in this document, if any, do you know to
6  be false or are you --
7      A.  You have --
8      Q.  -- are you testifying that you can't -- you don't
9  remember what's true or false in this narrative?
10     A.  I -- I just know that his allegations are false.
11 If you have a specific question, I can answer it.  But his
12 allegations are false.
13     Q.  We'll just keep going sentence by sentence then.
14     A.  Okay.  Before you answer the question, I need to
15 use the restroom.
16     Q.  Okay.
17     A.  Ask your question.  I need to use the restroom.
18     Q.  Okay.  Okay.  We can go off the record.
19     THE VIDEOGRAPHER:  Stand --
20     MR. ELKINS:  You're --
21     THE VIDEOGRAPHER:  Standby -- I'm sorry.
22     MR. ELKINS:  You're advised not to talk about your
23 deposition while you step away.
24     THE WITNESS:  Okay.
25     THE VIDEOGRAPHER:  Okay.  Stand by.  Going off the

Page 199

1  video record.  The time is 10:27 A.M.
2      (Recess was taken.)
3      THE VIDEOGRAPHER:  Okay.  Stand by.  Going back on
4  video record.  The time is 10:33 A.M.
5  BY MR. ELKINS:
6      Q.  Okay.  Going back to this document, Cosner says
7  that after you told him you were 05 at the NESS, you told
8  him that you were at the main station, he asked you if you
9  were aware that you were assigned to Area 3, and you
10 answered affirmatively.  Do you remember that?
11     A.  I don't remember.
12     Q.  He then says he ordered you to respond to
13 Area 3 and check your email; do you remember that?
14     A.  I also don't remember.
15     Q.  Okay.  And then Cosner says he became involved in
16 a vehicle stop along 71st Street that resulted in an arrest
17 at 4:16.  And he says, Officer Ocejo -- I think I'm
18 pronouncing that right.
19     MR. ELKINS:  O-c-e-j-o, Tammy.
20 BY MR. ELKINS:
21     Q.  -- was one of the officers who responded as
22 backup.
23     Cosner says after the subject was transported, I
24 waited on scene with Officer Ocejo and he waited for a tow
25 truck.  I asked Officer Ocejo to check his email and see

Page 200

1  if -- Ms. Salabarria.  He told me he did not have any emails
2  from her.  This was at approximately 520 hours.
3      Now, I know you weren't there for all of that, so
4  you certainly can't tell me what did or did not happen
5  there.  But have you spoken to Officer Ocejo about this
6  everything and what he may have told Cosner?
7      A.  No.
8      Q.  Okay.  So sitting here today, you do not know if
9  this interaction between Cosner and Officer Ocejo is true or
10 false?
11     A.  I don't know.  I do know that they did not provide
12 me with any witness statements, any witness testimony, any
13 recordings or any documentation to prove these allegations
14 specific what you're speaking on.  Anything that pertains to
15 that I was not presented with any information or statements.
16     Q.  I know -- I know you're talking about Chapter 112.
17 And we'll get to that.
18     But what I'm asking you is:  Sitting here today
19 you don't know if this instance with Officer Ocejo and
20 Cosner, if it's true or false?  You didn't speak to Officer
21 Ocejo, correct?
22     A.  I did not speak to Officer Ocejo.  What I'm
23 telling you is that I did not receive anything pertaining to
24 any witness statements --
25     Q.  I know.

Page 201

1      A.  -- that he's stating here.  That's what I'm
2  talking about.
3      Q.  I understand that.  But that's not my question.
4  And you've made that abundantly clear.
5      A.  Okay.
6      Q.  I'll ask the question one more time:  Sitting here
7  today, you did not speak with Officer Ocejo before filing
8  your lawsuit or during the pendency of this lawsuit to ask
9  him if this interaction referred to in this document
10 occurred with him and Cosner.  True or false?
11     A.  My answer to that is that as any other
12 investigation, I was not afforded the opportunity to speak
13 with Officer Ocejo, how it's supposed be procedurally.
14 Therefore, the City did not give me the opportunity to speak
15 to Officer Ocejo or to read any of his -- or any witness
16 statements.
17     Q.  Well, my question didn't ask you that.  My
18 question specifically asked:  After filing your lawsuit or
19 during the pendency of this lawsuit, have you spoken to
20 Officer Ocejo?
21     A.  I believe I answered that question with my
22 previous answer.
23     Q.  You didn't, actually.  You said that during the
24 investigation, you weren't provided witness statements.
25 That was before your lawsuit.  So I'm going to ask it again.

Page 202

```
 1          During the pendency of this lawsuit, and right
 2   when you filed it, have you spoken to Officer Ocejo?
 3      A.   I have not spoken to Officer Ocejo.
 4      Q.   Okay.  Okay.  That's all I wanted to know.  Then
 5   it says, at 543 hours, I, Cosner, received an unsolicited
 6   text message from Sergeant Salabarria advising me that she
 7   had emailed the squad stats and detail assignment.  Is that
 8   true or false?
 9      A.   I don't remember at this time.
10      Q.   Then it says she claimed that she had told
11   officers via landline and email of their detailed
12   assignments.  Is that true or false?
13      A.   Can you point to that, what you're referring to?
14      Q.   Yep, right here.  She claimed that she had told
15   officers via landline and email of their detail assignments.
16   Is that true or false?
17      A.   So what I do remember doing is at the beginning of
18   my shift, I spoke to Steven Serrano and I let him know to
19   make sure that all officers, including myself complete the
20   details for the north if there's any.  Because at the
21   beginning of my shift, I was never given any directives by
22   any lieutenants.
23      Q.   Okay.  And it says the email that she sent me was
24   sent at 536 hours.  Is that true or false?
25      A.   I don't have a copy of that email, so I don't
```

COASTAL REPORTING, INC. (954) 523-5326

Page 203

```
 1   recall.
 2      Q.   Okay.  And you said you spoke with Serrano.
 3   You've listed him as a witness in this case, correct?
 4      A.   Yes.
 5      Q.   And when's the last time you spoke with Serrano
 6   about this case?
 7      A.   That same night when I gave him the details.
 8      Q.   So the last time you've spoken to Serrano was
 9   the -- this evening.  You haven't talked to him about your
10   lawsuit?
11      A.   That is correct.
12      Q.   You haven't spoken to him about listing him as a
13   witness?
14      A.   No.
15      Q.   And has your lawyer or anybody obtained any
16   written statements from him?
17           MR. BARROUKH:  Objection.
18           MR. ELKINS:  What's the objection?
19           MR. BARROUKH:  Asking --
20           MR. ELKINS:  If you've obtained written statements
21      from a witness, I've asked for them.  And he's not your
22      client.  There's no privilege.
23           MR. BARROUKH:  Everything -- everything that he's
24      given us we've provided.
25           MR. ELKINS:  Okay.  Then she can answer the
```

COASTAL REPORTING, INC. (954) 523-5326

Page 204

```
 1   question.
 2           MR. BARROUKH:  Okay.
 3   BY MR. ELKINS:
 4      Q.   Is there a written statement from Serrano; yes or
 5   no?
 6           MR. ELKINS:  I'm asking your client.  He's not
 7      your client.  If you've talked to him, I'm allowed to
 8      know about that.
 9   BY MR. ELKINS:
10      Q.   It's a simple question.  Has anybody obtained a
11   written statement from Serrano?
12      A.   Are you asking him that question or asking me?
13           MR. BARROUKH:  He's asking you.  You can answer.
14           THE WITNESS:  Okay.  Can you -- can you ask me the
15      question again?
16   BY MR. ELKINS:
17      Q.   Have you or any of your agents, your lawyers,
18   anybody obtained a written statement from Mr. Serrano?
19      A.   You would have to ask my lawyer about that.
20      Q.   You can't refer to your lawyer.  You would know if
21   there's a written statement.  It's a yes or no question.  Is
22   there a written statement from Serrano or not?
23      A.   I don't know.
24           MR. BARROUKH:  Objection.  Form.  She's telling
25      you she doesn't know.
```

COASTAL REPORTING, INC. (954) 523-5326

Page 205

```
 1   BY MR. ELKINS:
 2      Q.   Well, did you review the documents produced in
 3   this case, Ms. Salabarria?
 4      A.   I have reviewed documents.
 5      Q.   Did you produce a written statement from
 6   Mr. Serrano?
 7           MR. BARROUKH:  Objection.  Form.
 8   BY MR. ELKINS:
 9      Q.   You can answer.
10      A.   Can you rephrase your question?
11      Q.   Yeah.  In the documents that you've produced in
12   this case, are you aware of whether or not a written
13   statement from Serrano was produced?
14      A.   I don't know --
15           MR. BARROUKH:  Objection.  Form.
16           THE WITNESS:  I'm not --
17   BY MR. ELKINS:
18      Q.   You don't know is that your answer?
19      A.   I don't know.  I'm not aware.  I don't know.
20      Q.   Okay.  And you don't know sitting here today if
21   anyone's obtained a written statement from him?
22           MR. BARROUKH:  Objection.  Form.
23   BY MR. ELKINS:
24      Q.   You can answer.
25      A.   I don't know.
```

COASTAL REPORTING, INC. (954) 523-5326

Page 206

```
1          MR. ELKINS:  And Danny, you're telling me if you
2     have a written statement from him, you would have
3     produced it?
4          MR. BARROUKH:  Yes, that's what I'm telling you.
5          MR. ELKINS:  So you're saying there's no written
6     statement then?  Because none has been produced.
7          MR. BARROUKH:  I've told you if I had a written
8     statement from him, I would have produced it.
9          MR. ELKINS:  Okay.  And I'm telling you, none has
10    been produced.  So can you affirmatively tell me if one
11    exists or not?  I mean, are we hiding the ball here on
12    the written statement you obtained from a witness?
13         MR. BARROUKH:  To my knowledge, at this time,
14    there is no statement from Serrano.
15         MR. ELKINS:  Okay.
16 BY MR. ELKINS:
17    Q.   And Ms. Salabarria, I think you told me this
18    already, but you told me you haven't spoken to him since
19    this evening -- the evening of these allegations when you
20    told him to, you know, provide the duty assignments?
21    A.   I remember speaking to him on that day.  And I
22    don't remember if I spoke to him after.  But I do know that
23    I spoke to him that day.
24    Q.   Do you know if he knows that you've listed him as
25 a witness in this case?
```

COASTAL REPORTING, INC. (954) 523-5326

Page 207

```
1          MR. BARROUKH:  Objection.  Form.
2          THE WITNESS:  I don't know.
3          MR. ELKINS:  I'm asking her if she knows what he
4     knows.  She can answer that.
5          THE WITNESS:  What was your question?
6  BY MR. ELKINS:
7     Q.   Do you know if Serrano knows that you've listed
8  him as a witness in this case?
9     A.   I don't know.
10         MR. BARROUKH:  Form.
11 BY MR. ELKINS:
12    Q.   Okay.  It says -- going back to the document here,
13    it says -- we're talking about the email you sent -- or
14    Cosner is talking about the email you sent at 536 hours.  It
15    says it included the squad stats and detail assignments.  Do
16    you remember if the email included that or not?
17    A.   Can you point to it one more time, please?  I want
18    to make sure what you're referring to.
19    Q.   This is what we were talking about earlier.  The
20    email that she sent me was sent at 536 hours.  And then, it
21    says, "it," referring to the email, included the squad stats
22    and detail assignments.
23    A.   What was your question?
24    Q.   Do you know if the email included the squad stats
25    and detail assignments?  Is that a true or false allegation
```

COASTAL REPORTING, INC. (954) 523-5326

Page 208

```
1  in this document?
2     A.   What's the allegation?
3     Q.   Cosner wrote in referring to the email, it says,
4     it included the squad stats and detail assignments.  I'm
5     just asking you if that's true or false?
6     A.   I don't remember at this point.  I -- I do know
7     that at some point, I sent an email with all the squad stats
8     as you're supposed to do.  But I don't remember specifically
9     what you're referring to or what he's referring to.
10    Q.   Okay.  Then it says, I, Cosner, called Officer
11    Hansel Romero and asked him if he had received any emails,
12    texts or phone calls from Sergeant Salabarria advising him
13    of detail assignments.  He said he did not and that she had
14    only asked for stats in an email that was sent at 521 hours.
15    That email was forwarded to me by Officer Ocejo.
16         Have you spoken with Officer Hansel Romero since
17    you filed this lawsuit?
18    A.   Not that I recall.
19    Q.   And then it says I began calling all the officers
20    assigned to Area 3 and inquired the same of each of them.
21         Do you know if Cosner did or did not do that?
22    A.   I don't know.
23    Q.   Every one of the officers advised that they had
24    not received a call or text.
25         Do you know if that's a true or false statement?
```

COASTAL REPORTING, INC. (954) 523-5326

Page 209

```
1     A.   I don't know.  Again, I was never provided with an
2     investigation or --
3     Q.   I understand.
4     A.   -- or anything -- anything to support his
5     allegations.
6     Q.   Understood.
7          Officer Romero then forwarded an email that he
8     received from Sergeant Salabarria at 542 hours.
9          Do you know if that's true or false?
10    A.   I can't see where you're pointing.  Can you --
11    Q.   Right here.  Officer Romero then forwarded an
12    email that he received from Sergeant Salabarria at 542
13    hours.
14         Do you know if that's true or false?
15    A.   I don't know.  I don't have any -- anything to
16    refer to --
17    Q.   Okay.
18    A.   -- at this time.
19    Q.   The email had been sent to each of the Area 3
20    officers.  Do you know if that's true or false?
21    A.   What was the question?
22    Q.   Do you know if when Cosner writes the email had
23    been sent to each of the Area 3 officers, do you know if
24    that's true or false?
25    A.   I don't know.  Again, I don't -- I wasn't provided
```

COASTAL REPORTING, INC. (954) 523-5326

Page 210

1  with any -- any documentation to support his allegations.
2      Q.  Understood.
3          It was the detail assignments and began with a
4  highlighted line saying squad -- quote, "squad per our
5  conversation, please note the below details for our shift,"
6  end quote.
7          Do you know if an email exists that says that?  Is
8  that true or false?
9      A.  If you have something that I can refer to.  But
10  I -- at this moment, I don't-- I don't know.
11      Q.  Well, you're the one that's alleged everything in
12  here is false, so that's why we're going through it sentence
13  by sentence.  So you obviously know what is or is not false.
14  Or at least you've made that claim in your lawsuit.  So
15  that's why we're walking through this sentence by sentence.
16          So Cosner writes, I found this very concerning
17  because it was now the second time she had claimed to have
18  had a conversation with the officers about their
19  assignments, when all six of them claim that had never
20  happened and they did not report to any assigned details
21  during the shift.
22          Do you know if the officers had told Cosner that
23  that never happened and they did not report to any assigned
24  details during the shift; do you know if that's true or
25  false?

Page 211

1      A.  I don't know.  Like I said, I wasn't provided with
2  any testimony or any -- anything to support what he's
3  alleging that they said.
4      Q.  Right.  And since the filing of your lawsuit, did
5  you do any investigation on your own to determine if what
6  Cosner said these officers told him was true or false?
7      MR. BARROUKH:  Objection.  Form.
8  BY MR. ELKINS:
9      Q.  You can answer.
10      A.  I know that my counsel has.  So you can ask them.
11      Q.  Your counsel's done an investigation into these
12  officers.  I don't understand what that means.
13      A.  I don't understand your question.  Can you
14  rephrase it, please?
15      Q.  It's a very simple question.
16          Since you filed this lawsuit alleging that all
17  these allegations are false, have you done any investigation
18  with these officers, spoken to them, asked them if what they
19  told Cosner was true or false; did you do that?
20      A.  I don't know.  I know that if I would have been
21  given the opportunity to do so, like they normally do and
22  procedurally, I would have been -- I would have had an
23  opportunity to do so.
24      Q.  I'm not asking you about what happened when you --
25  when you were terminated.  My question is about since you

Page 212

1  filed your lawsuit.  I know you want to just keep going back
2  to that moment.  But that's -- that's not how this works.
3          You filed a federal lawsuit alleging everything in
4  here is false.  I want to know either right before or after
5  you filed that lawsuit, did you talk to any of these six
6  officers that Cosner is referring to.  I believe their names
7  are Baumer, Ocejo, Serrano, Garrido, Romero, Albaladejo.
8      MR. ELKINS:  I'll spell that, Tammy.
9  A-l-b-a-l-a-d-e-j-o.
10  BY MR. ELKINS:
11      Q.  Did you speak to any of them to flesh out, find
12  out, if what Cosner said in here is true?  You personally,
13  after or right before you filed your lawsuit.  That's all I
14  want to know.  If the answer is no, that's fine.
15      A.  That I personally speak to them?  No.
16      Q.  You.  Did anybody on your behalf speak to them?
17      A.  I don't know.
18      Q.  Okay.  Did -- did your lawyer speak to them?
19      A.  I don't know.
20      Q.  Okay.  Did any other agent of yours speak to them?
21      A.  I don't know.
22      Q.  Okay.  Did you or anyone on your behalf obtain any
23  written statements from any of these six officers?
24      A.  I don't know.
25      Q.  Okay.  Cosner puts in here that the AVL Detail

Page 213

1  Report shows that your vehicle had been parked at the
2  station from 2200 hours -- that's 10:00 -- on 12/27 until
3  4:23 in the morning on 12/28.
4          You have produced that AVL report in your
5  discovery.  You've seen the AVL report.  Is the AVL
6  report -- is that true what the AVL report says, that your
7  vehicle was parked from 2200 till 10:00 P.M. on 12/27 until
8  4:23 in the morning on -- on 12/28?
9      A.  I don't know.
10      Q.  Do you have any reason to believe that the AVL
11  report was doctored in any way?
12      A.  I don't know.
13      Q.  Okay.
14      A.  Again, if this would have been provided to me in
15  realtime, I would have been able to answer that question,
16  but I don't know.
17      Q.  But sitting here today after you filed your
18  lawsuit in federal court claiming it's all false, you don't
19  know?
20      A.  I don't know.
21      MR. BARROUKH:  Objection to form.
22      MR. ELKINS:  Okay.  I just need to mark this.
23  Give me one second.
24  BY MR. ELKINS:
25      Q.  I'm going to show you what I'm going to mark as

Page 214

1   Exhibit 10.  One second.  Okay.
2            *(Deposition Exhibit Number 10 marked for*
3   *identification.)*
4   BY MR. ELKINS:
5        Q.   This is Exhibit 10.  This is the letter from
6   former, at the time Chief Clements -- now former Chief
7   Clements to you implementing your letter of resignation.
8   You've seen this document before, correct?
9        **A.   Yes.**
10       Q.   Okay.  And on January 19th, you were brought into
11  the Chief's office for a meeting to discuss Cosner's
12  allegations; is that correct?
13       **A.   What was your question again?**
14       Q.   On January 19th, 2021 there was a meeting that you
15  were present at and that meeting was to discuss the
16  allegations from Lieutenant Cosner, correct?
17       **A.   That is not correct.  I was sent an email**
18  **invitation to attend an unknown meeting that I had no idea**
19  **what the meeting was about.**
20       Q.   Okay.  And this document says that present at that
21  meeting was Wayne Jones, Paul Ozaeta, who at the time was
22  the FOP President; Arley Flaherty, who at the time was the
23  FOB First Vice President; Reggie Lester, who at the time was
24  the FOP Second Vice President, Delvin Brown, the FOB
25  Grievance Chair, Cosner and A.J. Prieto.

COASTAL REPORTING, INC. (954) 523-5326

Page 215

1            MR. ELKINS:  Tammy, do you need any of those
2   spellings?
3            THE REPORTER:  (Nodding.)
4   BY MR. ELKINS:
5        Q.   Were those people -- these people that are listed
6   here, were they present at this meeting?
7        **A.   From my recollection, I believe so.**
8        Q.   Okay.  Now I understand that you are taking the
9   position that this meeting was an improper interrogation
10  under the Police Officer Bill of Rights; is that true?
11       **A.   Yes.**
12       Q.   So do you know under Chapter 112 what the remedy
13  is if a municipality or an investigator violates 112?  Do
14  you know what the consequences of that are?
15       **A.   I don't know off the top of my head.**
16       Q.   And did anybody, any one of Paul Ozaeta,
17  the FOP president; Arley Flaherty, the FOP First Vice
18  President; Reggie Lester, the FOP Second Vice President, or
19  Delvin Brown, the FOP Grievance Chairman, did any of them
20  file anything on your behalf taking advantage of the
21  administrative remedies in Chapter 112 in the Police Officer
22  Bill of Rights?  Did they file anything alleging a
23  violation?
24       **A.   I don't know.  I do know that the FOP was already**
25  **there and was summoned by the Chief of Police without my**

COASTAL REPORTING, INC. (954) 523-5326

Page 216

1   **knowledge.**
2        Q.   Okay.
3        **A.   So they were already there when I was told to come**
4   **into this unknown meeting, unknown nature, and the FOP was**
5   **already there conjuring with the Chief behind closed doors.**
6   **And not once did they speak to me to tell me what this**
7   **meeting was about or what was the nature of this meeting.**
8        Q.   Well, what is the significance of the FOP being at
9   the meeting before you arrived in your mind?
10       **A.   They were summoned by the Chief of Police.  And**
11  **the FOP is supposed to represent me.  And they were already**
12  **there summoned by the Chief of Police, not the Member.**
13       Q.   Okay.  And -- and why is that a problem for you?
14       **A.   They were summoned by the Chief of Police.  That's**
15  **the problem.**
16       Q.   Why is that -- I'm asking you why that's a
17  problem?
18       **A.   Because the FOP represents the Members, not the**
19  **Police Chief.**
20       Q.   How is -- how is it -- how is the fact that the
21  Chief wanted the FOP to be at a meeting where he's going to
22  have -- he's going to have with one of his Members a
23  problem?
24       **A.   At this time, I don't know.**
25       Q.   You would agree with me, though, it would be more

COASTAL REPORTING, INC. (954) 523-5326

Page 217

1   of a problem if the Chief met with you without the FOP
2   there; isn't that true?
3        **A.   Rephrase that question.**
4        Q.   It would be more of a problem if the Chief met
5   with you or tried to meet with you without a representative
6   from your union; that would be a problem, wouldn't it?
7        **A.   Those were not my representatives of choice.  And**
8   **I was denied my representation of choice.  And that's the**
9   **problem.**
10       Q.   Who denied you representation of choice?
11       **A.   The Chief of Police, Richard Clements.**
12       Q.   Okay.  And did any one of Paul Ozaeta, the FOP
13  President; Arley Flaherty, the FOP First Vice President;
14  Reggie Lester, the FOP Second Vice President, or Delvin
15  Brown, FOP Grievance Chair, did any one of them at any point
16  in this meeting stop the meeting and say, no, you can't
17  continue, Chief, we're going to get her someone else to
18  represent her?  Did that happen?
19       **A.   Reggie Lester told the Chief of Police that I was**
20  **requesting representation of my choice.  And the Chief of**
21  **Police stated that that was going to be denied and that I**
22  **would be terminated if I didn't continue with this meeting.**
23       Q.   And you -- have you spoken to Reggie Lester about
24  that since this meeting?
25       **A.   Before I was terminated, yes, I did speak to him.**

COASTAL REPORTING, INC. (954) 523-5326

Page 218

1  But after I was terminated, no.

2      Q.   And you understand, though, that your Last Chance

3  Agreement converted you to an employee at-will.  I think we

4  talked about that earlier, right?

5      **A.   So if I was at-will, why was the FOP there?**

6      Q.   This is my opportunity to ask you questions, so

7  you have to answer my question.  You understand that your

8  Last Chance Agreement converted you to an employee at-will,

9  correct?

10     **A.   I understand that the FOP -- I'm sorry.  So I was**

11 **not at-will.  I was under the Officer Bill of Rights, which**

12 **is statutory and it is afforded to all sworn police**

13 **officers.  So no, I did not understand or knew that I was**

14 **at-will.**

15     Q.   So you think that the Police Officer Bill of

16 Rights guarantees you employment; is that what you're

17 telling me?

18     **A.   I understand that the Officer Bill of Rights**

19 **guarantees that I'm not at-will.**

20     Q.   Okay.  That's interesting.  Okay.  Tell me -- tell

21 me what happened in this meeting, the January 19th, 2021

22 meeting; what happened?

23     **A.   Is there a specific question that you have?**

24     Q.   Yeah.  What happened in this meeting?  What do you

25 remember happening?  That's the specific question.

Page 219

1      **A.   That's too much of a broad question.  So I -- I**

2  **don't know.  I can't give you an answer to that.**

3      Q.   You don't get to not answer.  It's not a broad

4  question.  It's very simple.  There was a meeting on

5  January 19th, 2021.  I am asking you very specifically what

6  do you remember that happened in the meeting?  If you say

7  you don't remember, that's fine, but you don't get to tell

8  me that that's too broad.  What happened?  It's a very

9  specific question, actually.  What happened in this meeting?

10         MR. BARROUKH:  You can answer him, Jessica.

11         THE WITNESS:  Okay.  So I remember that I was

12     invited to this unknown meeting, unknown in nature.

13     When I got there, my accuser, Steven Cosner, was there,

14     along with the Internal Affairs Commander, so

15     immediately that raised a red flag to me because it --

16     it seemed to be discipline in nature.

17         And the fact that the FOP was already there

18     summoned by the Chief of Police was also concerning to

19     me.  And it was also concerning to me that I was not

20     afforded my representation of my choice.  I also asked

21     for Arley Flaherty to be removed from this meeting, as

22     I did not want her to be a part of this meeting.  That

23     was also denied.

24         And I do remember that this meeting was not taped,

25     was not recorded.  And I wasn't given any documentation

Page 220

1      as far as witness statements, nor was I given a copy of

2      any supplementation to support these allegations.  And

3      that's as much as I remember at this moment.

4  BY MR. ELKINS:

5      Q.   Okay.  Do you remember during the meeting being

6  given a copy of the Allegation of Employee Misconduct?

7      **A.   I don't remember.**

8      Q.   Do you recall that happening --

9      **A.   I don't --**

10     Q.   Okay.  If you don't remember, you don't remember.

11         Do you remember informing the Chief that despite

12 being assigned to the North District, you didn't report to

13 the North District?

14     **A.   I don't remember.  And I don't -- I don't remember**

15 **even the questions that he asked, that the Chief of Police**

16 **asked me, as they weren't recorded.  And I don't -- I don't**

17 **remember what questions he asked me.**

18     Q.   Okay.  So I presume then if I was to walk through

19 each of the allegations in here, you're going to tell me

20 that you don't remember because the meeting wasn't recorded?

21     **A.   That is correct.  I don't remember.**

22     Q.   Do you remember telling the City that you were

23 working on Officer Stella's evaluation while you were in

24 your police vehicle at the station on December 27th through

25 to the morning of December 28th; do you remember that?

Page 221

1      **A.   I don't remember that.  If I can be provided a**

2  **copy of what I said, maybe it could recollect my memory.**

3      Q.   Understood.  Understood.

4          And -- and the City implemented your Letter of

5  Resignation on January 25th, which was six days after the

6  meeting, correct?

7      **A.   If that's what it says there, then that's correct.**

8      Q.   Well, do you recall that happening?

9      **A.   I just know that I was brought into January 25th,**

10 **another meeting, and I was presented this document.**

11     Q.   And in this document, the City implements your

12 Letter of Resignation, correct?

13     **A.   That is correct.**

14     Q.   So connect for me the 2020 EEOC charge that was

15 June or July of 2020, which you say in your 2021 charge is

16 the protected activity, connect that to me with your

17 January 2021 termination.

18         MR. BARROUKH:  Objection.  Form.

19 BY MR. ELKINS:

20     Q.   Okay.  You can answer.  I'll ask the question a

21 different way.

22         How are you connecting your 20 -- your filing of

23 your 2020 EEOC charge, which you say in your 2021 charge was

24 your protected activity, and we've talked about at length,

25 how are you connecting that to your termination?

Page 222

1    A.   So again --
2         MR. BARROUKH:  Objection.  Form.
3    BY MR. ELKINS:
4         Q.   You can answer.
5    A.   Okay.  So I know that I filed a EEOC charge.  And
6    then, I was retaliated against for filing that EEOC charge.
7    And then, I was retaliated against for filing that EEOC --
8    EEOC charge.  And then, I suffered an adverse employment
9    action by being terminated for filing that EEOC charge.
10        Q.   Well, what was the retaliation for filing the EEOC
11   charge?  The termination is the retaliation, correct?
12   A.   Yes.  I was -- I was retaliated against by the
13   City --
14        Q.   Right.
15   A.   -- by being falsely accused of these allegations
16   that led to this adverse employment action.  And I was
17   terminated.
18        Q.   I understand that that is your legal claim.
19        What I'm asking you is:  How or what evidence do
20   you have that connects what happened in December of 2020
21   with Cosner and these allegations to the filing of the 2020
22   EEOC charge in June or July of 2020?  Like, what facts do
23   you have that connect for you the City did this because I
24   filed that charge?
25        MR. BARROUKH:  Objection.  Form.

Page 223

1    BY MR. ELKINS:
2         Q.   You can answer.
3    A.   I -- I don't understand your question.  I -- all I
4    know is that the way I answered it, that's my answer.  And
5    that's as good of an answer that I have right now.  I'm
6    sorry.
7         Q.   No problem.  That's fine.
8         And at no point -- I think we talked about this
9    before.  I just want to clarify.  At no point did your prior
10   attorneys, Michael Pancier, Gene Gibbons, or Mr. Cunill --
11        MR. ELKINS:  C-u-n-i-l-l, Tammy.
12   BY MR. ELKINS:
13        Q.   -- did any of those lawyers file anything under
14   the administrative procedure in Chapter 112 on your behalf,
15   correct?
16   A.   I -- I don't know.
17        Q.   Okay.  And in the -- just going back -- and I
18   don't mean to jump around, it's not a tactic.  I just have
19   some other things I want to get to.
20        You remember the November 2nd, 2020 meeting where
21   you were represented by both Mr. Pancier, who was your
22   privately-hired EEOC attorney, and Mr. Gibbons, who was FOP
23   counsel.  And I believe Kevin Milano was present as well.
24   You remember that meeting, correct?
25   A.   Yes.

Page 224

1         Q.   And I believe you've alleged that that meeting
2    also was a violation of Chapter 112, correct?
3    A.   Yes.
4         Q.   Okay.  Were you interrogated in that meeting?
5    A.   Yes.
6         Q.   Okay.  Who interrogated you and what did they say,
7    if you remember?
8    A.   I don't remember.
9         Q.   Okay.  So if your lawyers, either Mr. Pancier or
10   Mr. Gibbons, if they testify that you were not interrogated
11   in that meeting, are they lying?
12        MR. BARROUKH:  Objection.  Form.
13   BY MR. ELKINS:
14        Q.   You can answer.
15   A.   I don't -- I don't know.
16        Q.   Okay.  And you under -- and you are aware that
17   that meeting was -- was set up by your counsel with the City
18   as a confidential settlement meeting, correct?
19        MR. BARROUKH:  Objection.  Form.
20   BY MR. ELKINS:
21        Q.   You can answer.
22   A.   I remember that this meeting was to discuss my
23   EEOC.
24        MR. ELKINS:  Give me one second.  So I'm going to
25   show you what I'm going to mark as Exhibit 10 -- no,

Page 225

1    I'm sorry -- Exhibit 11.  I'm sorry for the delay.  I
2    just label the documents as I go.
3         (Deposition Exhibit Number 11 marked for
4    identification.)
5    BY MR. ELKINS:
6         Q.   Okay.  All right.  I'm showing you a copy of what
7    I've marked as Exhibit 11.  Do you recognize this document?
8    A.   Yes.
9         Q.   What is this document?
10   A.   Declaration of Nicholas Guasto.
11        Q.   Have you seen it before?
12   A.   Yes.
13        Q.   When was the last time you saw it?
14   A.   I don't remember.
15        Q.   Were you involved in the preparation of this
16   Declaration?
17   A.   No.
18        Q.   Who prepared it?
19   A.   I don't remember at this time.
20        MR. BARROUKH:  Objection to form.
21   BY MR. ELKINS:
22        Q.   You can answer.
23   A.   Yeah, I -- I don't remember.  I wasn't involved in
24   it.
25        Q.   Was this Declaration -- I believe it was signed

Page 226

1  on -- hold on -- November 5th, 2021. Were you still married
2  to Mr. Guasto then?
3      A.  I don't remember the exact date we separated.
4      Q.  I didn't ask you when you separated. I asked if
5  you were still married?
6      A.  Still married. I think so. I don't -- I don't
7  remember.
8      Q.  Well, when was your divorce finalized?
9      A.  I -- I don't remember that. I would have to look
10 at -- I would have to look at the documents to refer to
11 which date it was finalized.
12     Q.  Had you filed for divorce by November of 2021?
13 You're telling me you don't remember when you filed for
14 divorce, even approximately?
15     A.  I didn't file for divorce, so I don't know.
16     Q.  You don't remember when Nick filed for divorce?
17     A.  I don't remember.
18     Q.  Okay. And you don't remember who prepared this
19 Declaration?
20         MR. BARROUKH:  Objection.
21         THE WITNESS:  No, I wasn't --
22         MR. BARROUKH:  Form.
23 BY MR. ELKINS:
24     Q.  You can -- you don't remember, Ms. Salabarria?
25     A.  I wasn't involved in the preparation of this, so I

Page 227

1  don't know.
2      Q.  Who was?
3          MR. BARROUKH:  Objection. She already -- she
4  already answered that she didn't know.
5          MR. ELKINS:  Okay. I can ask her multiple times.
6  You can object to form. Your objection's -- your asked
7  and answered objection is preserved. Don't coach the
8  witness.
9  BY MR. ELKINS:
10     Q.  Answer, please.
11     A.  You would have to ask Nicholas Guasto. I don't
12 know.
13     Q.  Okay. This was submitted to the EEOC I believe as
14 part of your response to the City's position statement to
15 your 2021 EEOC charge; is that correct?
16     A.  Say that again.
17     Q.  This Declaration was submitted to the EEOC,
18 correct?
19     A.  Okay. Yes.
20     Q.  Is that true?
21     A.  Yeah, I believe so.
22     Q.  Okay. And that was done in response to the City's
23 position statement to your 2021 EEOC charge, correct?
24     A.  Yes.
25     Q.  Okay. Did you submit anything else to the EEOC

Page 228

1  besides this Declaration in response to the City's position
2  statement?
3      A.  I don't know.
4      Q.  You don't remember if you submitted a rebuttal
5  statement or if your lawyer submitted a rebuttal statement?
6      A.  I don't know. You would have to ask my lawyer.
7      Q.  And you understand that we asked for everything
8  that you submitted to the EEOC; are you aware of that?
9      A.  I -- I don't know.
10     Q.  You didn't review the request for production that
11 we had sent you previous?
12     A.  I reviewed documentations, but I don't know what
13 you're referring to. I -- I don't know.
14     Q.  You don't know what I'm referring to when I ask
15 you if you've provided us everything that you submitted to
16 the EEOC? What about that do you not understand?
17     A.  I don't understand because I'm not a lawyer, so I
18 don't know what my counsel did.
19     Q.  Okay. So sitting here today, you can't tell me if
20 you submitted anything else to the EEOC besides this
21 Declaration from Mr. Guasto?
22     A.  I don't know.
23         MR. ELKINS:  All right. Let's -- Dan, do you
24 prefer Daniel or Dan, by the way?
25         MR. BARROUKH:  We can do Danny, actually.

Page 229

1          MR. ELKINS:  Danny. Okay. Danny, let's take 15
2  so I can go through some things. I might be done. If
3  not, I'm probably very, very, very close to being done.
4  I just want to take a little bit of time to
5  double-check so we don't have to keep breaking, if
6  that's okay.
7          MR. BARROUKH:  Absolutely. Take your time.
8  Fifteen minutes or do you want 20?
9          MR. ELKINS:  No, let's just come back at 11:00.
10 Let's come back at 11:40. No, I'm sorry. 11 -- 11:30.
11 11:30.
12         MR. BARROUKH:  All right. That works for me.
13         MR. ELKINS:  All right. Thank you.
14         MR. BARROUKH:  Thank you. Yeah, no problem.
15         THE REPORTER:  Is this off the record?
16         THE VIDEOGRAPHER:  I apologize. Going off the
17 video record. The time is 11:13. A.M.
18         MR. ELKINS:  Thank you.
19         (Recess was taken.)
20         THE VIDEOGRAPHER:  Okay. Stand by. Going back on
21 video record. The time is 11:30 A.M.
22 BY MR. ELKINS:
23     Q.  All right. I'm going to show you what I've marked
24 as Exhibit 12.
25         (Deposition Exhibit Number 12 marked for

Page 230

1 identification.)
2 BY MR. ELKINS:
3     Q.   Have you ever seen this document before?
4     A.   At this moment, I don't -- I don't know.  I've
5 seen a lot of documents, so I don't know which one
6 specifically this one is.
7     Q.   Okay.  Well, I'll give you a minute to take a look
8 at it.  Just tell me when you want me to scroll if you need
9 me to.
10     A.   Okay.  Thank you.  Can you go down?  Okay.
11     Q.   Okay.  This is a letter from your prior counsel to
12 the EEOC, correct?
13     A.   That's what it looks like.
14     Q.   Well, is Michael Pancier your prior counsel?
15     A.   Yes.
16     Q.   Is he writing this letter to the EEOC?
17     A.   Again, that's what it looks like to me.
18     Q.   Okay.  So the answer is, yes, this is a letter
19 from your prior counsel to the EEOC?
20     A.   That is a prior letter, yes.
21     Q.   Okay.  And this was your counsel informing the
22 EEOC that the June or July 2020 EEOC charge, the charge that
23 you say is your protected activity, that charge was
24 resolved and the parties just need some additional time to
25 work out the settlement paperwork.  Is that essentially what

Page 231

1 this letter says?
2     A.   Yes.
3     Q.   Okay.  And your counsel provided a copy of this
4 letter to you, didn't he?
5     A.   I believe so.
6     Q.   Okay.  Because it says at the bottom, CP, Charging
7 Party.
8          Charging Party is you, correct?
9     A.   Yes.
10     Q.   And this was a resolution that resulted in the
11 Settlement Agreement and the Last Chance Agreement that you
12 signed later in December, correct?
13          MR. BARROUKH:  Objection.  Form.
14 BY MR. ELKINS:
15     Q.   You can answer.
16     A.   I believe so.
17     Q.   I think he references in here that the settlement
18 between the parties which will be final when the parties
19 complete the settlement paperwork does not involve a
20 monetary payment to Charging Party.  Do you see that?
21     A.   Yes.
22     Q.   And the Settlement Agreement you ultimately
23 signed, like, a week or two or a couple weeks after
24 December 2020, which had the Settlement Agreement involved
25 you paying the City, not the City paying you, correct?

Page 232

1     A.   Where does it say that?
2     Q.   Right here.
3     A.   Okay.
4     Q.   Right?
5     A.   What was your question?
6     Q.   The Settlement Agreement that you ultimately
7 signed later in December involved you paying the City, not
8 the City paying you, correct?
9     A.   Yes.
10     Q.   And that's what he's referring to here, correct?
11     A.   That's what it looks like.
12     Q.   I'm showing you what I'm marking as Exhibit 13.
13          (Deposition Exhibit Number 13 marked for
14 identification.)
15 BY MR. ELKINS:
16     Q.   Have you seen this document before?
17     A.   Can you lower it?  Okay.  I don't remember if I've
18 seen it.  There was a lot of paperwork that I've seen, so I
19 can't tell you specifically I've seen this one before.
20     Q.   Okay.  Well, this says --
21     A.   It's possible.
22     Q.   Sure.  That's fair.
23          Your name doesn't show on here that you received
24 it.  This is from the U.S. Equal Employment Opportunity
25 Commission, correct?

Page 233

1     A.   Yes.
2     Q.   Okay.  And this says, that this is to inform
3 you -- it's written to me -- that the charge cited above,
4 which is this 502-2020-04794, which is your 2020 EEOC
5 charge, has been withdrawn at the request of the Charging
6 Party.  Do you see that?
7     A.   Okay.
8     Q.   You're the Charging Party, correct?
9     A.   Yes.
10     Q.   And this document is dated February 9th, 2021,
11 correct?
12     A.   Yes.
13     Q.   I'm going to show you what I'm going to mark as
14 Exhibit 14.
15          (Deposition Exhibit Number 14 marked for
16 identification.)
17 BY MR. ELKINS:
18     Q.   Okay.  This is a document from 2012.  I'm going to
19 ask you if you've seen it.  You may not remember, which is
20 fine.  It's your, it's your receipt of the Employee
21 Handbook.
22     A.   Okay.
23     Q.   Do you remember signing a bunch of documents when
24 you first became employed at the City?
25     A.   Yes.

Page 234

1    Q.   And is that your signature?

2    A.   Yes.

3    Q.   And it says here, "Employee Handbook Receipt."  Do

4  you see that?

5    A.   Yes.

6    Q.   It says you're acknowledging you received a copy

7  of the City of Miami Beach Employee Guide?

8    A.   Yes.

9    Q.   And that you're responsible for reading it and

10 following the guidelines contained therein?

11   A.   Yes.

12   Q.   You understand that a violation of the guidelines

13 may result in disciplinary action up to and including

14 termination; do you see that?

15   A.   Yes.

16   Q.   Almost there.

17        MR. ELKINS:  I'm going to show you what I'm

18   marking as Exhibit 15.

19        (Deposition Exhibit Number 15 marked for

20   identification.)

21 BY MR. ELKINS:

22   Q.   Okay.  This is the Letter of Resignation prepared

23 on December 18th that was attached to your Settlement

24 Agreement and Last Chance Agreement.  Is that your

25 signature?

Page 235

1    A.   Yes.

2    Q.   All right.  Just a few more questions and then I'm

3  done.

4        You're familiar with your former union's or any

5  union's duty of fair representation?

6    A.   No.  I have not -- I don't know exactly what

7  you're referring to.  Like, I -- I just don't understand

8  that.  So if you can rephrase it or --

9    Q.   No problem.  I'll withdraw it.

10        Sitting here today, have you filed a lawsuit

11 against the FOP?

12   A.   No.

13   Q.   Have you filed an Unfair Labor Practice charge

14 against them?

15   A.   No.

16   Q.   Have you filed anything against the FOP relating

17 to their conduct with you as it relates to your separation

18 from employment with the City of Miami Beach?

19   A.   No.

20        MR. BARROUKH:  Objection.  Form.

21 BY MR. ELKINS:

22   Q.   You can answer.

23   A.   No.

24   Q.   Okay.  And one final point:  When we talked about

25 your prior employers the first day that you were deposed,

Page 236

1  you referenced working security at Brickell City Centre.  To

2  date, I haven't received any documents from Brickell City

3  Centre.

4        So my question is:  What -- what's the name of the

5  company that you actually worked for?  Like, who is --

6  what's the name of that actual company?  I know you

7  worked --

8    A.   So.

9    Q.   -- at Brickell City Centre, but it was -- and I'll

10 tell you why I'm asking.  It's not a trick.  It was unclear

11 to me if you were part of, like, a company that was hired as

12 a third-party vendor to provide security at Brickell City

13 Centre or did you work directly for Brickell City Centre?  I

14 just don't think we ever got that clarified.  That's what

15 I'm trying to figure out.

16   A.   Okay.  So I was contracted by Brickell City

17 Centre.  I had to interview with them and make sure that the

18 property manager and whatnot agreed to have me as their

19 account manager, security manager.  And the security

20 officers are contracted by Allied Universal.

21   Q.   Okay.  But you didn't work for Allied or you did

22 work for Allied?

23   A.   I believe it was both.  So Brickell City Centre

24 and Allied Universal.

25   Q.   Do you know if Brickell City Centre had a contract

Page 237

1  with Allied Universal for Allied to provide security?

2    A.   I believe so.  I don't know the exact contracts or

3  what they have in place.

4    Q.   When you got paid, what was on your paystub?

5    A.   I believe it was Universal.  I -- I don't have the

6  exact name.  Universal Corp. or something to that effect.

7    Q.   So it wasn't Brickell City Centre on your paystub?

8    A.   No.

9    Q.   And who was your -- go ahead.

10        MR. BARROUKH:  I was just going to say we provided

11   you with these documents recently actually, within the

12   past two weeks with her W-2s, paystubs, things of that

13   nature, which can speak to the employment record a lot

14   more accurately.

15        MR. ELKINS:  Well, is there records from Allied

16   Universal and Brickell City Centre?

17        MR. BARROUKH:  All of the W-2s that I received

18   I've given to you.  If it doesn't clarify, then I don't

19   believe there are any documents in existence which

20   could clarify further.

21        MR. ELKINS:  Hold on one second.  So I got the

22   Indeed reports, which I think David sent me.

23        MR. BARROUKH:  Yes.

24        MR. ELKINS:  And I did get the payroll stuff.  I'm

25   trying to go to your email where I think you sent that

Page 238

```
 1    over.
 2         MR. BARROUKH:  Yes.  Would you like this to stay
 3    on the record or do you want to go off the record?
 4         MR. ELKINS:  We -- we can go off the record.  I
 5    don't want to waste the time if you sent it.  I just
 6    don't remember it being there.  It was 10 pages that
 7    you sent me.
 8         THE VIDEOGRAPHER:  Counsel, do you want to go off
 9    record?
10         MR. ELKINS:  Yeah, we can go off record.
11         THE VIDEOGRAPHER:  Stand by.  Going off record.
12    The time is 11:42 A.M.
13         (Discussion was held off the record.)
14         THE VIDEOGRAPHER:  Okay.  Going back on video
15    record.  The time is 11:43 A.M.
16    BY MR. ELKINS:
17         Q.   Okay.  So just to clarify from earlier your --
18    when you worked at Brickell City Centre, you were -- the
19    company you worked for was Universal Protection Service,
20    LLC, correct?
21         A.   I believe so.  If that's what it says on there,
22    then that's who was providing the -- the funds for my
23    employment.
24         Q.   Okay.  And then, with respect to damages, it's my
25    understanding that you are only requesting backpay; is that
```

Page 239

```
 1    correct?  You're not -- you've waived your compensatory
 2    damages, correct?
 3         A.   I'm not sure.  You would have to ask my attorney.
 4         Q.   I can't ask your attorney.  You're the plaintiff.
 5    You have to answer that question.
 6         A.   I - I don't know.  I don't -- I'm not familiar
 7    with legal jargon, so I don't know.
 8         Q.   You're not familiar with the damages you're
 9    requesting in your own lawsuit; is that your answer?
10         MR. BARROUKH:  Objection.  Form.
11         THE WITNESS:  No.
12    BY MR. ELKINS:
13         Q.   You can answer.
14         A.   I -- I don't know.
15         Q.   Okay.  Fair enough.
16         MR. ELKINS:  I don't have anything further.
17         Read or waive?
18         MR. BARROUKH:  Let's go off the record.  We're
19    going to read.
20         MR. ELKINS:  Tammy, I'm going to order.
21         THE VIDEOGRAPHER:  Before going off video record,
22    counsel, will you be ordering the video?
23         MR. ELKINS:  Not ordering the video.  I'm ordering
24    the transcript.  Tammy, I only need a mini.  Don't --
25    don't send me the whole thing.  And then the exhibits,
```

Page 240

```
 1    I can drop them into the chat right now, if that will
 2    work.
 3         THE VIDEOGRAPHER:  Counsel, Daniel?
 4         MR. BARROUKH:  Yeah, we don't need a video.  We're
 5    -- Ms. Court Reporter, we're going to read as well.
 6         THE VIDEOGRAPHER:  Okay.  Understood.  Stand by.
 7    Going off video record.  The time is 11:45 A.M.
 8         THE REPORTER:  Daniel, are you ordering a copy?
 9         MR. BARROUKH:  Yeah, is the mini the four pages on
10    one page?
11         THE REPORTER:  Yes.
12         MR. BARROUKH:  All right.  We'll -- we'll do that
13    as well.
14         THE REPORTER:  Do you want her entire deposition?
15    Because I'm not sure if you guys have --
16         MR. BARROUKH:  We'll just do this deposition.
17         THE REPORTER:  Okay.
18         MR. BARROUKH:  I appreciate it.
19         (Deposition concluded at 11:45 A.M.)
20
21
22
23
24
25
```

Page 241

```
 1                   CERTIFICATE OF OATH
 2    STATE OF FLORIDA
 3    COUNTY OF BROWARD
 4         I, TAMARA MASCI TANNEN, RPR, Notary Public, State of
 5    Florida, certify that JESSICA SALABARRIA personally appeared
 6    before me via Zoom on the 15th day of March 2024 and was
 7    duly sworn.
 8         Signed this 15th day of March 2024.
 9
10         _____
11         TAMARA MASCI TANNEN, RPR, FPR-C
           Notary Public
12         State of Florida
           My Commission #HH 93523
13         Expires March 7, 2025
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 242

REPORTER'S DEPOSITION CERTIFICATE

1
2  STATE OF FLORIDA   )
3  COUNTY OF PALM BEACH)
4
5       I, TAMARA MASCI TANNEN, Registered Professional
   Reporter, certify that I was authorized to and did
6  stenographically report the Continued Video Deposition of
   JESSICA SALABARRIA; that a review of the transcript was
7  requested; and that the foregoing transcript, pages 178-240,
   is a true and complete record of my stenographic notes.
8
       I FURTHER CERTIFY that I am not a relative,
9  employee, attorney or counsel of any of the parties,
   nor am I a relative or employee of any of the parties'
10 attorney or counsel connected with the action, nor am I
   financially interested in the action.
11
12      DATED this 27th day of March 2024.
13
14
15           _Tamara Masci Tannen_
16      TAMARA MASCI TANNEN, RPR, FPR-C
17
18
19
20
21
22
23
24
25

COASTAL REPORTING, INC. (954) 523-5326

---

Page 243

E R R A T A   S H E E T

1
2  DO NOT WRITE ON THE TRANSCRIPT — ENTER CHANGES
3  IN RE:          GUASTO V CITY OF MIAMI BEACH
   CASE NO:        1:22-cv-21004-DPG
4  DATE:           MARCH 15, 2024
   DEPONENT NAME:  JESSICA SALABARRIA
5
6  PAGE/LINE        CORRECTION                    REASON
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17           (Use other side if necessary)
18      Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated are true.
19
20 _____          _____
21 JESSICA SALABARRIA                     DATE
22
23
24
25

COASTAL REPORTING, INC. (954) 523-5326

---

Page 244

1  DATE:  MARCH 27, 2024
2  JESSICA SALABARRIA
   C/O DANIEL B. BARROUKH, ESQ.
3  DEREK SMITH LAW GROUP, PLLC
   520 BRICKELL KEY DRIVE
4  SUITE O-301
   MIAMI, FLORIDA  33131-2433
5  DANIELB@DEREKSMITHLAW.COM
6
7  IN RE:  GUASTO V CITY OF MIAMI BEACH
           Continued Video Deposition of Jessica Salabarria
8
       This letter is to advise you that the transcript
9  taken in the above-referenced deposition has been
   transcribed.  Please contact our office at (954)523-5326 to
10 make arrangements to read and sign or sign below to waive
   review of the transcript.
11
       It is suggested that the review of this transcript
12 be completed within 30 days of your receipt of this letter
   as considered reasonable under Federal Rules*; however,
13 there is no Florida Statute to this regard.
14
       The original of this transcript has been forwarded
15 to the ordering party and your errata, once received, will
   be forwarded to all ordering parties for inclusion in the
   transcript.
16
17 Very truly yours,
18
19  _Tamara Masci Tannen_
   Tamara Masci Tannen, RPR
20
   Waiver:
21
   I, _____, hereby waive the reading and signing
22 of my deposition transcript.
23 _____          _____
   DEPONENT                               DATE
24
25 *Federal Civil Procedure Rule 30(e)Florida Civil Procedure
   Rule 1.310(e).

COASTAL REPORTING, INC. (954) 523-5326

**BY MR. ELKINS: [34]**
182/10 190/8 199/5
199/20 204/3 204/16
205/1 205/8 205/17
205/23 206/16 207/6
207/11 211/8 212/10
215/4 220/4 221/19
222/3 223/1 223/12
224/13 224/20 225/21
226/23 227/9 229/22
230/2 231/14 232/15
234/21 235/21 238/16
239/12
**MR. BARROUKH: [48]**
181/7 181/22 183/20
184/2 190/4 203/17
203/19 203/23 204/2
204/13 204/24 205/7
205/15 205/22 206/4
206/7 206/13 207/1
207/10 211/7 213/21
219/10 221/18 222/2
222/25 224/12 224/19
225/20 226/20 226/22
227/3 228/25 229/7
229/12 229/14 231/13
235/20 237/10 237/17
237/23 238/2 239/10
239/18 240/4 240/9
240/12 240/16 240/18
**MR. ELKINS: [37]**
181/6 181/14 181/24
183/23 184/5 198/20
198/22 199/19 203/18
203/20 203/25 204/6
206/1 206/5 206/9
206/15 207/3 212/8
213/22 215/1 223/11
224/24 227/5 228/23
229/1 229/9 229/13
229/18 234/17 237/15
237/21 237/24 238/4
238/10 239/16 239/20
239/23
**THE REPORTER: [8]**
182/1 182/6 215/3
229/15 240/8 240/11
240/14 240/17
**THE
VIDEOGRAPHER: [15]**
181/3 181/8 181/15
198/19 198/21 198/25
199/3 229/16 229/20
238/8 238/11 238/14
239/21 240/3 240/6
**THE WITNESS: [10]**
184/8 190/6 198/24
204/14 205/16 207/2
207/5 219/11 226/21
239/11

**'**
**'13 [1]** 187/20
**'14 [2]** 187/13 187/20
**'15 [4]** 187/12 187/14
187/14 187/21

**0**
**04794 [1]** 233/4
**05 [7]** 195/24 195/24
195/25 196/10 196/15
197/4 199/7

**1**
**1.310 [1]** 244/25
**1/25/21 [1]** 180/9
**10 [5]** 214/1 214/2
214/5 224/25 238/6
**10:00 [2]** 213/2 213/7
**10:01 [2]** 178/14
181/10
**10:27 [1]** 199/1
**10:33 [1]** 199/4
**11 [4]** 225/1 225/3
225/7 229/10
**112 [6]** 200/16 215/12
215/13 215/21 223/14
224/2
**11:00 [1]** 229/9
**11:13 [1]** 229/17
**11:30 [3]** 229/10
229/11 229/21
**11:40 [1]** 229/10
**11:42 [1]** 238/12
**11:43 [1]** 238/15
**11:45 [3]** 178/14 240/7
240/19
**12 [2]** 229/24 229/25
**12/18/20 [1]** 180/16
**12/27 [2]** 213/2 213/7
**12/28 [2]** 213/3 213/8
**12/4/20 [1]** 180/11
**1212 [1]** 179/9
**122-CV-21004-DPG [1]**
181/16
**13 [2]** 232/12 232/13
**14 [2]** 233/14 233/15
**15 [5]** 178/13 229/1
234/18 234/19 243/4
**15th [3]** 181/10 241/6
241/8
**16TH [1]** 179/9
**178-240 [1]** 242/7
**178-244 [1]** 178/11
**18th [1]** 234/23
**19th [4]** 214/10 214/14
218/21 219/5
**1:22-cv-21004-DPG [1]**
243/3

**2**
**20 [5]** 180/11 180/16
187/17 221/22 229/8
**2012 [1]** 233/18
**2013 [1]** 187/18
**2014 [2]** 187/12 187/18
**2020 [19]** 185/6 185/7
185/8 185/24 186/22
187/4 187/5 187/18
188/25 221/14 221/15
221/23 222/20 222/21
222/22 223/20 230/22
231/24 233/4
**2021 [14]** 184/20
187/18 188/10 214/14
218/21 219/5 221/15

221/17 221/23 226/1
229/16 227/23
229/10
**2024 [7]** 178/13 181/11
241/6 241/8 242/12
243/4 244/1
**2025 [1]** 241/12
**21 [1]** 180/9
**2200 [3]** 191/5 213/2
213/7
**22nd [1]** 184/20
**2335 [1]** 179/4
**240 [1]** 242/7
**2433 [2]** 179/4 244/4
**244 [1]** 178/11
**25th [2]** 221/5 221/9
**2608 [1]** 179/10
**27 [4]** 186/17 213/2
213/7 244/1
**27th [2]** 220/24 242/12
**28 [3]** 186/17 213/3
213/8
**28th [1]** 220/25
**2nd [1]** 223/20
**2s [2]** 237/12 237/17

**3**
**30 [2]** 244/12 244/24
**301 [2]** 179/3 244/4
**33131-2433 [2]** 179/4
244/4
**33304 [1]** 179/9
**3:55 [4]** 192/6 192/12
192/15 192/17
**3:59 [1]** 193/14

**4**
**401-2608 [1]** 179/10
**4:11 [1]** 194/12
**4:16 [1]** 199/17
**4:23 [2]** 213/3 213/8

**5**
**510-2020-04794 [1]**
233/4
**520 [3]** 179/3 200/2
244/3
**521 [1]** 208/14
**523-5326 [1]** 244/9
**5326 [1]** 244/9
**536 [3]** 202/24 207/14
207/20
**542 [2]** 209/8 209/12
**543 [1]** 202/5
**5th [1]** 226/1

**6**
**688-2335 [1]** 179/4
**6:00 [1]** 191/22

**7**
**71st [1]** 199/16
**786 [1]** 179/4

**9**
**93523 [1]** 241/12
**954 [2]** 179/10 244/9
**9th [1]** 233/10

221/17 221/23 226/1
**229/16** 227/23
233/10

**A**
**A.J [1]** 214/25
**A.M [14]** 178/14 178/14
181/10 191/22 192/7
192/12 199/1 199/4
229/17 229/21 238/12
238/15 240/7 240/19
**abbreviation [3]**
196/17 196/18 196/19
**able [2]** 196/4 213/15
**about [34]** 182/2
182/21 183/21 183/22
184/15 184/24 185/18
188/16 188/16 190/12
194/17 198/22 200/5
200/16 201/2 203/6
203/9 203/12 204/8
204/19 207/13 207/14
207/19 210/18 211/24
211/25 214/19 216/7
217/23 218/4 221/24
223/8 228/16 235/24
**above [2]** 233/3 244/9
**above-referenced [1]**
244/9
**Absolutely [1]** 229/7
**abundantly [1]** 201/4
**account [1]** 236/19
**accurately [1]** 237/14
**accused [3]** 186/18
186/23 222/15
**accuser [1]** 219/13
**acknowledged [1]**
191/24
**acknowledging [1]**
234/6
**action [5]** 222/9 222/16
234/13 242/10 242/10
**activity [6]** 185/6
185/10 185/23 221/16
221/24 230/23
**actual [1]** 236/6
**actually [6]** 183/25
201/23 219/9 228/25
236/5 237/11
**additional [2]** 185/18
230/24
**adjusted [1]** 195/9
**administrative [2]**
215/21 223/14
**advantage [2]** 215/20
222/16
**adverse [2]** 222/8
222/16
**advise [2]** 194/12
244/8
**advised [3]** 194/8
198/22 208/23
**advising [3]** 193/13
202/6 208/12
**Affairs [1]** 219/14
**affirmatively [2]**
199/10 206/10
**afforded [3]** 201/12
218/12 219/20
**after [13]** 188/16
188/20 194/20 199/7
199/23 201/18 206/22
212/4 212/13 213/17

218/1 221/23 231/23
**afterwards [1]** 193/24
**again [18]** 193/21
194/5 194/19 194/22
195/8 195/15 196/24
198/3 198/4 201/25
204/15 209/1 209/25
213/14 214/13 222/1
227/16 230/17
**against [14]** 185/14
185/25 186/1 188/11
188/13 188/24 189/12
190/21 222/6 222/7
222/12 235/11 235/14
235/16
**agent [1]** 212/20
**agents [1]** 204/17
**ago [4]** 193/15 193/22
193/25 194/22
**agree [1]** 216/25
**agreed [2]** 179/13
236/18
**Agreement [9]** 218/3
218/8 231/11 231/11
231/22 231/24 232/6
234/24 234/24
**ahead [1]** 237/9
**Albaladejo [1]** 212/7
**all [29]** 182/11 187/18
188/11 190/4 190/19
190/25 195/5 197/15
198/1 200/3 202/4
202/19 208/7 208/19
210/19 211/16 212/13
213/18 218/12 223/3
225/6 228/23 229/12
229/13 229/23 235/2
235/17 240/12 244/15
**allegation [7]** 180/8
189/11 197/22 197/24
207/25 208/2 220/6
**allegations [27]** 188/10
188/24 190/20 190/20
190/23 191/2 194/25
195/3 197/11 197/12
197/14 197/15 197/16
197/25 198/10 198/12
200/13 206/19 209/5
210/1 211/17 214/12
214/16 220/2 220/19
222/15 222/21
**allege [1]** 194/24
**alleged [3]** 190/19
210/11 224/1
**alleging [4]** 211/3
211/16 212/3 215/22
**Allied [7]** 236/20
236/21 236/22 236/24
237/1 237/15 237/15
**allowed [2]** 183/2
204/7
**Almost [1]** 234/16
**along [2]** 199/16
219/14
**already [11]** 183/23
184/2 184/2 206/18
215/24 216/3 216/5
216/11 219/17 227/3
227/4

**A**

also [8] 179/13 192/3
199/14 219/18 219/19
219/20 219/23 224/2
am [4] 219/5 242/8
242/9 242/10
anger [1] 188/21
animosity [3] 188/8
188/8 188/21
another [2] 189/3
221/10
answer [33] 190/4
198/11 198/14 201/11
201/22 203/25 204/13
205/9 205/18 205/24
207/4 211/9 212/14
213/15 218/7 219/2
219/3 219/10 221/20
222/4 223/2 223/4
223/5 224/14 224/21
225/22 227/10 230/18
231/15 235/22 239/5
239/9 239/13
answered [6] 183/23
199/10 201/21 223/4
227/4 227/7
answers [1] 182/24
any [50] 189/21 191/8
191/12 198/5 200/1
200/12 200/12 200/12
200/13 200/15 200/24
201/11 201/15 201/15
202/20 202/21 202/22
203/15 204/17 208/11
209/15 210/1 210/1
210/20 210/23 211/2
211/2 211/5 211/17
212/5 212/11 212/20
212/22 212/23 213/10
213/11 215/1 215/16
215/19 217/12 217/15
217/15 219/25 220/2
223/13 235/4 236/2
237/19 242/9 242/9
anybody [6] 189/24
203/15 204/10 204/18
212/16 215/16
anyone [1] 212/22
anyone's [1] 219/25
anything [15] 182/11
193/16 200/14 200/23
209/4 209/4 209/15
211/2 215/20 215/22
223/13 227/25 228/20
235/16 239/16
apologize [2] 181/15
229/16
APPEARANCES [1]
178/18
appeared [1] 241/5
APPEARING [2] 179/5
179/11
appreciate [1] 240/18
approximately [3]
192/6 200/2 226/14
are [41] 179/22 181/3
181/5 181/6 182/2
188/4 190/20 190/24

193/6 195/3 195/4
197/10 197/17 197/19
197/15 197/16 197/23
197/25 198/1 198/6
198/8 198/10 198/12
204/12 205/12 206/11
211/17 212/7 215/5
215/8 215/14 221/22
221/25 224/11 224/16
228/8 236/20 237/19
238/25 240/8 243/18
area [16] 191/15
191/16 191/17 192/2
192/8 192/20 192/22
192/24 192/25 192/25
193/8 199/9 199/13
208/20 209/19 209/23
areas [4] 193/2 193/5
193/6 193/9
Arley [4] 214/22 215/17
217/13 219/21
around [2] 187/17
223/18
arrangements [1]
244/10
arrest [1] 199/16
arrived [1] 216/9
as [39] 182/8 184/16
184/17 185/11 188/5
189/3 189/5 195/6
199/21 201/11 203/3
203/12 206/24 207/8
208/8 213/25 219/21
220/1 220/1 220/3
220/3 220/16 223/5
223/23 224/18 224/25
225/2 225/7 227/13
229/24 232/12 233/13
234/18 235/17 236/11
236/18 240/5 240/13
244/12
ask [21] 183/21 190/12
198/4 198/17 201/6
201/8 201/17 201/25
204/14 204/19 211/10
218/6 221/20 226/4
227/5 227/11 228/6
228/14 233/19 239/3
239/4
asked [18] 183/7
184/13 187/11 195/23
199/8 199/25 201/18
203/21 208/11 208/14
211/18 219/20 220/15
220/16 220/17 226/4
227/6 228/7
asking [19] 184/9
195/18 196/14 197/5
197/6 198/4 200/18
203/19 204/6 204/12
204/12 204/13 207/3
208/5 211/24 216/16
219/5 222/19 236/10
assigned [10] 191/15
191/16 191/17 192/8
192/20 199/9 208/20
210/20 210/23 220/12
assignment [1] 202/7
assignments [10]

202/12 202/15 206/20
206/24 207/22 207/23
207/15 207/22 207/25
208/4 208/13 210/3
210/19
attached [1] 234/23
attempts [1] 194/20
attend [1] 214/18
attest [4] 194/15 195/8
196/8 196/25
attorney [8] 182/17
182/18 182/21 223/22
239/3 239/4 242/9
242/10
attorneys [1] 223/10
author [1] 186/5
authorized [1] 242/5
AVL [6] 212/25 213/4
213/5 213/5 213/6
213/10
aware [5] 199/9 205/12
205/19 224/16 228/8
away [1] 198/23

**B**

back [11] 182/14
187/12 199/3 199/6
207/12 212/1 223/17
229/9 229/10 229/20
238/14
backpay [1] 238/25
backup [1] 199/22
ball [1] 206/11
BARROUKH [3] 179/2
181/22 244/2
Baumer [1] 212/7
be [26] 181/21 182/3
191/11 191/17 191/19
191/21 192/8 192/20
196/4 198/6 201/13
216/21 216/25 217/4
217/6 217/21 217/22
219/16 219/21 219/22
221/1 229/2 231/18
239/22 244/12 244/15
beach [15] 178/7
181/13 181/25 185/20
186/1 186/2 193/1
193/2 193/3 193/3
234/7 235/18 242/3
243/3 244/7
bear [1] 189/3
became [2] 199/15
233/24
because [15] 183/5
184/1 184/7 190/11
197/11 202/20 206/6
210/17 216/18 219/15
220/20 222/23 228/17
231/6 240/15
been [14] 182/8 189/13
206/6 206/10 209/19
209/23 211/20 211/22
213/1 213/14 213/15
233/5 244/9 244/14
before [19] 184/21
186/14 187/19 187/20
198/14 201/7 201/25
212/4 212/13 214/8
216/9 217/25 223/9

202/12 202/19 207/21
215/18 221/22 221/24
208/4 208/13 210/3
225/1 230/5 232/25
begat [2] 208/19 210/3
begin [1] 181/5
beginning [3] 191/9
202/17 202/21
behalf [7] 179/5 179/11
181/24 212/16 212/22
215/20 223/14
behind [1] 216/5
being [7] 216/8 220/5
220/12 222/9 222/15
229/3 238/6
believe [18] 186/10
189/20 201/21 212/6
213/10 215/7 223/23
224/1 225/25 227/13
227/21 231/5 231/16
236/23 237/2 237/5
237/19 238/21
below [2] 210/5 244/10
besides [2] 228/1
228/20
between [3] 179/20
200/9 231/18
Bill [2] 215/10 215/22
218/11 218/15 218/18
bit [1] 229/4
both [4] 181/18 189/13
223/21 236/23
bottom [1] 231/6
breaking [1] 229/5
BRICKELL [13] 179/3
236/1 236/2 236/9
236/12 236/13 236/16
236/23 236/25 237/7
237/16 238/18 244/3
broad [3] 219/1 219/3
219/8
brought [2] 214/10
221/9
BROWARD [1] 241/3
Brown [6] 191/18
191/20 192/5 214/24
215/19 217/15
bunch [1] 233/23

**C**

C-u-n-i-l-l [1] 223/11
C/O [1] 244/2
call [4] 187/14 188/21
194/8 208/24
called [3] 193/18
194/12 208/10
calling [1] 208/19
calls [1] 208/12
can [59] 183/5 184/3
184/17 184/24 186/5
186/6 186/20 187/14
189/15 189/22 190/4
190/16 190/18 191/2
195/15 197/13 197/19
198/3 198/11 198/18
202/13 203/25 204/13
204/14 204/14 205/9
205/10 205/24 206/10
207/4 207/17 209/10
210/9 211/9 211/10
211/13 219/10 221/1

225/1 230/3 232/16
224/14 224/17 225/4
began [2] 208/19 210/3
begin [1] 181/5
beginning [3] 191/9
begin [1] 181/5
began [2] 208/19 210/3
can't [14] 182/19
183/21 194/15 195/8
196/25 198/8 200/4
204/20 209/10 217/16
219/2 228/19 232/19
239/4
cannot [2] 183/14
183/14
captains [1] 195/20
case [13] 178/4 181/16
183/7 184/10 184/24
189/14 203/3 203/6
205/3 205/12 206/25
207/8 243/3
cellphone [1] 193/13
Centre [11] 236/1
236/3 236/9 236/13
236/13 236/17 236/24
236/25 237/7 237/16
238/18
certainly [1] 200/4
CERTIFICATE [2]
240/20 242/1
certify [1] 241/5 242/5
242/8
Chair [2] 214/25
217/15
Chairman [1] 215/19
Chance [4] 218/2
218/8 231/11 234/24
CHANGES [1] 243/2
channel [5] 195/13
195/13 195/17 195/18
195/19
Chapter [5] 200/16
215/12 215/21 223/14
224/2
charge [2] 184/19
185/6 185/7 185/11
185/24 186/4 186/5
186/18 186/23 187/4
187/5 187/9 191/2
221/14 221/15 221/23
221/23 221/5 222/6
222/8 222/9 222/11
222/22 222/24 227/15
227/23 230/22 230/22
230/23 233/3 233/5
235/13
charges [1] 197/13
Charging [7] 185/3
186/23 231/6 231/8
231/20 233/5 233/8
chat [1] 240/1
check [1] 193/13
199/13 199/25 229/5
Chief [18] 214/6 214/6
215/25 216/5 216/10
216/12 216/14 216/19
216/21 217/1 217/4
217/11 217/17 217/19
217/20 219/18 220/11

**C**

Chief... [1] 220/15
Chief's [1] 214/11
choice [5] 217/7 217/8
 217/10 217/20 219/20
cited [1] 233/3
CITY [36] 178/7 181/12
 181/25 185/20 185/25
 186/2 189/12 189/17
 190/3 201/14 220/22
 221/4 221/11 222/13
 222/23 224/17 231/25
 231/25 232/7 232/8
 233/24 234/7 235/18
 236/1 236/2 236/9
 236/12 236/13 236/16
 236/23 236/25 237/7
 237/16 238/18 243/3
 244/7
City's [3] 227/14
 227/22 228/1
Civil [2] 244/24 244/24
claim [3] 210/14
 210/19 222/18
claimed [3] 202/10
 202/14 210/17
claiming [1] 213/18
clarified [1] 236/14
clarify [4] 223/9 237/18
 237/20 238/17
clean [1] 184/12
clear [1] 201/4
clearly [1] 184/13
Clements [3] 214/6
 214/7 217/11
client [3] 203/22 204/6
 204/7
close [1] 229/3
closed [1] 216/5
coach [1] 227/7
COASTAL [2] 179/14
 181/19
come [3] 216/3 229/9
 229/10
Commander [1]
 219/14
Commission [3]
 180/13 232/25 241/12
company [4] 236/5
 236/6 236/11 238/19
compensatory [1]
 239/1
complaint [1] 188/14
complete [3] 202/19
 231/19 242/7
completed [2] 191/25
 244/12
completion [1] 192/9
concerning [3] 210/16
 219/18 219/19
concluded [1] 240/19
conduct [4] 185/19
 186/22 187/3 235/17
CONFERENCING [1]
 178/15
confidential [1] 224/18
conjuring [1] 216/5
connect [3] 221/14

 221/16 222/23
connected [1] 242/10
connecting [2] 221/22
 221/25
connects [1] 222/20
consequences [1]
 215/14
considered [1] 244/12
contact [1] 244/9
contained [2] 197/17
 234/10
continuation [2]
 182/13 183/8
continue [3] 182/13
 217/17 217/22
CONTINUED [3]
 178/12 242/6 244/7
contract [1] 236/25
contracted [2] 236/16
 236/20
contracts [1] 237/2
conversation [2] 210/5
 210/18
converted [2] 218/3
 218/8
copy [16] 189/15
 189/17 189/18 189/19
 190/7 192/13 196/4
 196/7 202/25 220/1
 220/6 221/2 225/6
 231/3 234/6 240/8
Corp [1] 237/6
correct [53] 183/18
 183/19 185/3 185/8
 185/8 185/9 185/12
 185/20 185/21 187/21
 187/23 188/25 191/14
 192/23 193/4 195/2
 195/4 195/14 195/20
 196/12 200/21 203/3
 203/11 214/8 214/12
 214/16 214/17 218/9
 220/21 221/6 221/7
 221/12 221/13 222/11
 223/15 223/24 224/2
 224/18 227/15 227/18
 227/23 230/12 231/8
 231/12 231/25 232/8
 232/10 232/25 233/8
 233/11 238/20 239/1
 239/2
CORRECTION [1]
 243/6
Cosner [40] 186/17
 186/18 186/21 187/4
 187/8 187/10 187/17
 189/12 190/20 191/7
 191/10 191/24 194/12
 194/19 196/14 196/22
 199/6 199/15 199/23
 200/6 200/9 200/20
 201/10 202/5 207/14
 208/3 208/10 208/21
 209/22 210/16 210/22
 211/6 211/19 212/6
 212/12 212/25 214/16
 214/25 219/13 222/21
Cosner's [1] 214/11
could [3] 196/8 221/2

 237/20
couldn't [1] 194/13
counsel [22] 179/5
 179/11 179/20 181/20
 181/22 183/18 184/10
 186/8 211/10 223/23
 224/17 228/18 230/11
 230/14 230/19 230/21
 231/3 238/8 239/22
 240/3 242/9 242/10
counsel's [1] 211/11
COUNTY [2] 241/3
 242/3
couple [1] 231/23
court [5] 178/1 178/17
 181/18 213/18 240/5
CP [2] 185/2 231/6
Cunill [1] 223/10
cv [3] 178/4 181/16
 243/3

**D**

damages [3] 238/24
 239/2 239/8
Dan [2] 228/23 228/24
DANIEL [6] 179/2
 181/22 228/24 240/3
 240/8 244/2
DANIELB [2] 179/5
 244/5
Danny [4] 206/1
 228/25 229/1 229/1
date [12] 178/13
 181/10 182/19 182/20
 188/17 226/3 226/11
 236/2 243/4 243/20
 243/21 244/23
dated [5] 180/9 180/11
 180/15 233/10 242/12
David [1] 237/22
day [7] 182/12 206/21
 206/23 235/25 241/6
 241/8 242/12
days [2] 221/5 244/12
December [9] 186/16
 188/25 220/24 220/25
 222/20 231/12 231/24
 232/7 234/23
December 18th [1]
 234/23
December 2020 [1]
 231/24
December 27th [1]
 220/24
December 28th [1]
 220/25
Declaration [8] 180/10
 225/10 225/16 225/25
 226/19 227/17 228/1
 228/21
declare [1] 243/18
DEFENDANT [3] 178/9
 179/11 181/25
definitely [1] 184/6
delay [1] 225/1
Delvin [3] 214/24
 215/19 217/14
denied [4] 217/8
 217/10 217/21 219/23

 depo [2] 182/11 183/25
deponent [3] 179/21
 243/4 244/23
deposed [1] 235/25
deposition [30] 178/12
 179/21 180/7 181/11
 182/12 182/22 183/3
 183/8 183/9 183/12
 183/13 183/15 183/17
 184/13 189/8 198/23
 214/2 225/3 229/25
 232/13 233/15 234/19
 240/14 240/16 240/19
 242/1 242/6 244/7
 244/9 244/22
deposition's [1] 183/4
DEREK [2] 179/2 244/3
DEREKSMITHLAW.CO
 M [2] 179/5 244/5
DESCRIPTION [1]
 180/7
despite [1] 220/11
detail [9] 202/7 202/15
 207/15 207/22 207/25
 208/4 208/13 210/3
 212/25
detailed [1] 202/11
details [9] 192/7
 192/17 192/19 197/16
 202/20 203/7 210/5
 210/20 210/24
determine [1] 211/5
did [58] 182/11 182/16
 182/18 182/21 182/24
 183/15 183/24 184/3
 191/2 191/10 192/3
 192/15 192/19 194/15
 200/1 200/4 200/4
 200/11 200/22 200/23
 201/7 201/14 205/2
 205/5 208/13 208/21
 208/21 210/20 210/23
 211/4 211/19 212/5
 212/11 212/16 212/18
 212/18 212/20 212/22
 215/16 215/19 215/22
 216/6 217/12 217/15
 217/18 217/25 218/13
 219/22 222/23 223/9
 223/13 224/6 227/25
 228/18 236/13 236/21
 237/24 242/5
didn't [17] 183/5 184/8
 187/25 188/1 191/11
 194/3 200/20 201/17
 201/23 217/22 220/12
 226/4 226/15 227/4
 228/10 231/4 236/21
difference [2] 189/20
 189/22
different [1] 221/21
DIRECT [1] 182/9
directives [2] 191/8
 202/21
directly [1] 236/13
disciplinary [1] 234/13
discipline [1] 219/16
discovery [1] 213/5
discrimination [1]

 185/24
discriminatory [1]
 185/18
discuss [7] 183/2
 183/14 183/14 183/24
 214/11 214/15 224/22
discussed [4] 183/13
 183/17 184/9 184/13
discussing [1] 183/24
Discussion [1] 238/13
dispatcher [2] 194/2
 194/20
DISTRICT [5] 178/1
 178/2 193/3 220/12
 220/13
DIVISION [1] 178/3
divorce [5] 226/8
 226/12 226/14 226/15
 226/16
do [80]
doctored [1] 213/11
document [25] 184/17
 189/4 189/6 189/22
 189/23 189/25 190/3
 190/9 190/23 198/5
 199/6 201/9 207/12
 208/1 214/8 214/20
 221/10 221/11 225/7
 225/9 230/3 232/16
 233/10 233/18 243/18
documentation [3]
 200/13 210/1 219/25
documentations [1]
 228/12
documented [1] 192/1
documents [11] 190/1
 205/2 205/4 205/11
 225/2 226/10 230/5
 233/23 236/2 237/11
 237/19
does [6] 186/1 192/18
 195/24 196/16 231/19
 232/1
doesn't [3] 204/25
 232/23 237/18
doing [1] 202/17
don't [143]
done [6] 211/11 211/17
 227/22 229/2 229/3
 235/3
doors [1] 216/5
double [1] 229/5
double-check [1]
 229/5
down [3] 186/6 190/16
 230/10
DPG [3] 178/4 181/16
 243/3
DRIVE [2] 179/3 244/3
drop [1] 240/1
duly [2] 182/8 241/7
during [1] 201/8
 201/19 201/23 202/1
 210/21 210/24 220/5
duty [2] 206/20 235/5

**E**

each [4] 208/20 209/19
 209/23 220/19

**E**

earlier [4] 182/25
207/19 218/4 238/17
Eastern [1] 181/10
EEOC [32] 180/12
184/19 185/7 185/11
185/24 187/9 188/13
221/14 221/23 222/5
222/6 222/7 222/8
222/9 222/10 222/22
223/22 224/23 227/13
227/15 227/17 227/23
227/25 228/8 228/16
228/20 230/12 230/16
230/19 230/22 230/22
233/4
effect [1] 237/6
either [3] 188/19 212/4
224/9
ELKINS [10] 179/8
180/13 181/24 184/11
189/10 204/9 213/24
214/4 225/5 233/17
else [3] 217/17 227/25
228/20
email [31] 192/7
192/11 192/13 192/15
192/16 192/19 192/19
193/13 199/13 199/25
202/11 202/15 202/23
202/25 207/13 207/14
207/16 207/20 207/21
207/24 208/3 208/7
208/14 208/15 209/7
209/12 209/19 209/22
210/7 214/17 237/25
emailed [1] 202/7
emails [2] 200/1
208/11
employed [3] 185/19
193/10 233/24
employee [11] 180/8
180/14 189/11 218/3
218/8 220/6 233/20
234/3 234/7 242/9
242/9
employers [1] 235/25
employment [8]
180/13 218/16 222/8
222/16 232/24 235/18
237/13 238/23
end [5] 192/9 192/25
192/25 193/8 210/6
engaging [1] 185/5
enough [2] 194/24
239/15
ENTER [1] 243/2
Entertainment [1]
193/3
entire [2] 191/1 240/14
Equal [2] 180/13
232/24
errata [1] 244/14
ESQ [3] 179/2 179/8
244/2
essentially [2] 188/23
230/25
establish [1] 197/23

evaluation [1] 220/23
even [2] 220/11 226/14
evening [3] 203/9
206/19 206/19
ever [2] 230/3 236/14
every [2] 197/20
208/23
everything [8] 194/6
200/6 203/23 203/23
210/11 212/3 228/7
228/15
evidence [1] 222/19
evident [1] 188/10
exact [7] 193/16
194/23 196/2 196/24
226/3 237/2 237/6
exactly [5] 182/20
194/5 196/5 196/8
235/6
EXAMINATION [1]
182/9
example [1] 197/21
Exhibit [18] 184/17
189/6 189/8 214/1
214/2 214/5 224/25
225/1 225/3 225/7
229/24 229/25 232/12
232/13 233/14 233/15
234/18 234/19
Exhibit 12 [1] 229/24
Exhibit 13 [1] 232/12
Exhibit 14 [1] 233/14
Exhibit 15 [1] 234/18
Exhibit 5 [1] 184/17
Exhibit 9 [1] 189/6
exhibits [1] 239/25
existence [1] 237/19
exists [2] 206/11 210/7
Expires [1] 241/12
explained [1] 187/17

**F**

fact [6] 183/13 183/17
188/4 188/7 216/20
219/17
facts [4] 197/22 198/5
222/22 243/18
failure [2] 197/21
197/23
fair [3] 232/22 235/5
239/15
false [55] 188/10
190/20 190/20 190/24
191/1 191/6 191/7
191/13 191/14 192/2
192/3 192/10 193/14
193/20 193/24 194/4
194/9 194/14 194/21
194/25 197/9 197/11
197/12 197/15 197/22
197/23 197/24 198/1
198/6 198/9 198/10
198/12 200/10 200/20
201/10 202/8 202/12
202/16 202/24 207/25
208/5 208/25 209/9
209/14 209/20 209/24
210/8 210/12 210/13
210/25 211/6 211/17

211/19 212/4 213/18
falsely [4] 235/4 239/6
239/8
familiar [3] 235/4 239/6
239/8
far [1] 220/11
February [2] 182/14
233/10
February 9th [1]
233/10
federal [5] 194/25
212/3 213/18 244/12
244/24
few [1] 235/2
Fifteen [1] 229/8
figure [1] 236/15
file [4] 215/20 215/22
223/13 226/15
filed [17] 184/19 202/2
208/17 211/16 212/1
212/3 212/5 212/13
213/17 222/5 222/24
226/12 226/13 226/16
235/10 235/13 235/16
filing [11] 185/6 188/13
201/7 201/18 211/4
221/22 222/6 222/7
222/9 222/10 222/21
final [2] 231/18 235/24
finalized [2] 226/8
226/11
finally [2] 188/23
194/21
financially [1] 242/10
find [1] 212/11
fine [6] 184/14 190/9
212/14 219/7 223/7
233/20
first [9] 182/8 183/12
190/13 195/24 214/23
215/17 217/13 233/24
235/25
five [1] 188/5
FL [1] 178/7
flag [1] 219/15
Flaherty [4] 214/22
215/17 217/13 219/21
flesh [1] 212/11
FLORIDA [14] 178/2
178/8 178/17 179/4
179/9 181/13 181/13
241/2 241/5 241/11
242/2 244/4 244/13
244/24
FOB [2] 214/23 214/24
following [1] 234/10
follows [1] 182/8
FOP [23] 214/22
214/24 215/17 215/17
215/18 215/19 215/24
216/4 216/8 216/11
216/18 216/21 217/1
217/12 217/13 217/14
217/15 218/5 218/10
219/17 223/22 235/11
235/16
forced [1] 191/11
foregoing [2] 242/7
243/18
forgot [3] 192/11

192/16 192/18
form [21] 180/8 189/12
204/24 205/7 205/15
205/22 207/1 207/10
211/7 213/21 221/18
222/2 222/25 224/12
224/19 225/20 226/22
227/6 231/13 235/20
239/10
former [3] 214/6 214/6
235/4
FORT [1] 179/9
forward [3] 186/16
187/13 187/25
forwarded [6] 192/7
208/15 209/7 209/11
244/14 244/15
found [1] 210/16
four [1] 240/9
FPR [3] 178/16 241/10
242/16
FPR-C [3] 178/16
241/10 242/16
friendship [1] 187/12
front [1] 190/2
funds [1] 238/22
further [6] 186/18
186/23 187/12 237/20
239/16 242/8

**G**

Garrido [1] 212/7
gave [3] 191/8 191/8
203/7
Gayles [1] 184/14
Gene [1] 223/10
get [7] 189/3 200/17
217/17 219/3 219/7
223/19 237/24
getting [1] 188/15
Gibbons [3] 223/10
223/22 224/10
give [8] 182/3 190/10
192/3 201/14 213/23
219/2 224/24 230/7
given [8] 198/2 202/21
203/24 211/21 219/25
220/1 220/6 237/18
go [19] 181/15 182/24
186/5 188/20 189/3
189/22 197/13 197/20
198/18 225/2 229/2
230/10 237/9 237/25
238/3 238/4 238/8
238/10 239/18
God [1] 182/4
going [42] 184/5
184/16 186/16 189/5
190/1 190/10 190/11
195/5 197/13 198/13
198/25 199/3 199/6
201/25 207/12 210/12
212/1 213/25 213/25
216/21 216/22 217/17
217/21 220/19 223/17
224/24 224/25 229/16
229/20 229/23 233/13
233/13 233/18 234/17
237/10 238/11 238/14

239/19 239/20 239/21
240/5 240/7
gone [1] 184/20
good [3] 181/3 181/9
223/5
got [5] 189/2 219/13
236/14 237/4 237/21
Grievance [3] 214/25
215/19 217/15
GROUP [2] 179/2
244/3
guarantees [2] 218/16
218/19
GUASTO [12] 178/5
178/12 180/10 181/11
181/12 181/23 225/10
226/2 227/11 228/21
243/3 244/7
Guide [1] 234/7
guidelines [2] 234/10
234/12
guys [1] 240/15

**H**

had [30] 187/5 187/5
187/8 187/10 187/10
187/20 196/3 196/6
196/7 202/7 202/10
202/14 206/7 208/11
208/13 208/23 209/19
209/22 210/17 210/18
210/19 210/22 211/22
213/1 214/18 226/12
228/11 231/24 236/17
236/25
hallway [1] 188/2
hand [1] 182/1
Handbook [3] 180/14
233/21 234/3
handwriting [1] 192/1
Hansel [2] 208/11
208/16
happen [3] 189/18
200/4 217/18
happened [17] 193/15
193/22 193/25 194/6
194/22 194/23 195/3
210/20 210/23 211/24
218/21 218/22 218/24
219/6 219/8 219/9
222/20
happening [3] 196/1
196/25 221/8
happy [1] 197/20
has [5] 189/13 203/15
204/10 206/6 206/9
211/10 233/5 244/9
244/14
hatred [1] 188/9
have [65] 182/19
183/17 189/18 190/12
191/11 192/13 192/19
194/7 194/19 198/7
198/11 200/1 200/5
200/6 201/19 202/2
202/3 202/25 204/17
204/19 205/4 206/2
206/2 206/8 208/16
209/15 210/9 210/17

**H**

**have... [37]** 211/17
211/20 211/22 211/22
213/4 213/10 213/14
213/15 216/22 216/22
217/23 218/7 218/23
222/20 222/23 223/5
223/18 225/11 226/9
226/10 227/11 228/6
229/5 230/3 232/16
235/6 235/10 235/13
235/16 236/18 237/3
237/5 239/3 239/5
239/16 240/15 243/18
**haven't [4]** 203/9
203/12 206/18 236/12
**having [2]** 182/8
187/16
**he [61]** 184/15 187/14
188/1 188/3 188/5
188/7 188/11 188/22
188/23 188/24 191/2
191/4 191/4 191/5
191/7 191/9 192/7
192/11 192/15 192/16
192/18 193/12 193/16
193/18 193/18 193/23
194/8 194/11 194/12
194/15 194/15 194/19
194/25 195/8 195/12
195/23 196/25 196/25
196/25 197/5 199/8
199/12 199/12 199/15
199/17 199/24 200/1
200/1 200/6 206/24
207/3 208/11 208/13
208/13 209/7 209/12
220/15 220/17 230/16
231/4 231/17
**he's [11]** 197/14 201/1
203/21 203/23 204/6
204/13 208/9 211/2
216/21 216/22 232/10
**head [2]** 188/18 215/15
**heading [1]** 189/21
**hear [1]** 195/20
**heard [1]** 196/18
**held [3]** 188/8 188/11
238/13
**help [1]** 182/4
**her [10]** 183/21 195/17
200/2 207/3 217/17
217/18 219/22 227/5
237/12 240/14
**here [28]** 184/24
185/17 186/21 195/16
197/23 200/8 200/18
201/1 201/6 202/14
205/20 206/11 207/12
209/11 210/12 212/4
212/12 212/25 213/17
215/6 220/19 228/19
231/17 232/2 232/10
232/23 234/3 235/10
**hereby [3]** 179/19
179/22 244/21
**HH [1]** 241/12
**hiding [1]** 206/11

**highlighted [1]** 210/4
**him [48]** 187/6 187/13
187/20 187/23 188/1
188/1 188/2 188/9
188/10 188/11 188/17
191/8 191/25 192/3
195/23 196/2 196/3
196/4 196/8 196/9
199/7 199/8 201/9
201/10 202/18 203/3
203/7 203/9 203/12
203/12 203/16 204/7
204/12 205/21 206/2
206/8 206/18 206/20
206/21 206/22 206/23
206/24 207/8 208/11
208/12 211/6 217/25
219/10
**hired [2]** 223/22 236/11
**his [13]** 188/21 191/2
195/3 197/11 197/13
197/25 198/10 198/11
199/25 201/15 209/4
210/1 216/22
**hold [3]** 195/22 226/1
237/21
**hours [11]** 191/5
194/12 200/2 202/5
202/24 207/14 207/20
208/14 209/8 209/13
213/2
**how [12]** 182/21 194/5
195/10 197/9 201/13
212/2 216/20 216/20
216/20 221/22 221/25
222/19
**however [1]** 244/12

**I**

**I'll [9]** 184/5 190/11
198/4 201/6 212/8
221/20 230/7 235/9
236/9
**I'm [63]** 181/17 184/5
184/16 184/25 188/7
188/7 189/5 189/5
190/10 190/11 195/18
197/5 197/5 197/20
198/4 198/21 199/17
200/18 200/22 201/1
201/25 204/6 204/7
205/16 205/19 206/4
206/9 207/3 208/4
211/24 213/25 213/25
216/16 218/10 218/19
222/19 223/5 224/24
224/25 225/1 225/1
225/6 228/14 228/17
229/3 229/10 229/23
232/12 232/12 233/13
233/13 233/18 234/17
234/17 235/2 236/10
236/15 237/24 239/3
239/6 239/20 239/23
240/15
**I've [11]** 184/16 198/2
203/21 206/7 225/7
229/23 230/4 232/17
232/18 232/19 237/18

**idea [1]** 214/18
**identification [7]** 189/9
214/7 225/4 230/1
232/14 233/16 234/20
**ignore [1]** 188/3
**ignored [2]** 188/5
188/22
**immediately [2]** 193/24
219/15
**implemented [1]** 221/4
**implementing [1]**
214/7
**implements [1]** 221/11
**improper [1]** 215/9
**incident [1]** 186/17
**included [5]** 207/15
207/16 207/21 207/24
208/4
**including [2]** 202/19
234/13
**inclusion [1]** 244/15
**Indeed [1]** 237/22
**inform [1]** 233/2
**information [2]** 200/15
**informing [2]** 220/11
230/21
**inquired [1]** 208/20
**instance [1]** 200/19
**interaction [2]** 200/9
201/9
**interested [1]** 242/10
**interesting [1]** 218/20
**Internal [1]** 219/14
**interrogated [3]** 224/4
224/6 224/10
**interrogation [1]** 215/9
**interview [1]** 236/17
**introduce [1]** 181/20
**investigated [1]** 198/1
**investigation [6]**
201/12 201/24 209/2
211/5 211/11 211/17
**investigator [1]** 215/13
**invitation [1]** 214/18
**invited [1]** 219/12
**involve [1]** 231/19
**involved [7]** 186/22
199/15 225/15 225/23
226/25 231/24 232/7
**involving [1]** 186/17
**is [151]**
**isn't [2]** 197/17 217/2
**issue [2]** 184/6 185/10
**issues [7]** 187/5 187/8
187/16 187/20 188/6
188/16 188/20
**it [116]**
**it's [25]** 183/25 183/25
186/17 188/19 189/23
190/4 190/7 193/5
197/9 200/20 201/15
204/10 204/21 211/15
213/18 219/3 219/4
219/8 223/18 232/21
233/3 233/20 233/20
236/10 238/24
**itself [1]** 190/9

**J**

**January [7]** 214/10
214/14 218/21 219/5
221/5 221/9 221/17
**January 19th [4]**
214/10 214/14 218/21
219/5
**January 2021 [1]**
221/17
**January 25th [2]** 221/5
221/9
**jargon [1]** 239/7
**JESSICA [15]** 178/5
178/12 181/11 181/12
181/23 182/1 182/7
190/4 219/10 241/5
242/6 243/4 243/20
244/2 244/7
**Jones [1]** 214/21
**judge [2]** 184/6 184/14
**July [4]** 185/7 221/15
222/22 230/22
**July 2020 [1]** 230/22
**jump [1]** 223/18
**June [6]** 184/20 184/20
185/7 221/15 222/22
230/22
**June 22nd [1]** 184/20
**just [32]** 184/23 187/12
187/14 188/5 189/23
190/6 195/5 195/7
195/10 196/19 197/25
198/10 198/13 208/5
212/1 213/22 221/9
223/9 223/17 223/18
225/2 229/4 229/9
230/8 230/24 235/2
235/7 236/14 237/10
238/5 238/17 240/16

**K**

**keep [5]** 195/5 197/13
198/13 212/1 229/5
**Kevin [1]** 223/23
**KEY [2]** 179/3 244/3
**knew [1]** 218/13
**know [112]**
**knowledge [2]** 206/13
216/1
**knows [4]** 206/24
207/3 207/4 207/7

**L**

**label [1]** 225/2
**Labor [1]** 235/13
**landline [2]** 202/11
202/15
**last [7]** 203/5 203/8
218/2 218/8 225/13
231/11 234/24
**later [2]** 231/12 232/7
**LAUDERDALE [1]**
179/9
**LAW [3]** 179/2 179/8
244/3
**lawsuit [21]** 188/23
190/19 194/25 201/8
201/8 201/18 201/19
201/25 202/1 203/10

208/17 210/14 211/4
211/6 212/1 212/3
212/5 212/13 213/18
235/10 239/9
**lawyer [9]** 183/3
183/15 203/15 204/19
204/20 212/18 228/5
228/6 228/17
**lawyers [3]** 204/17
223/13 224/9
**leading [2]** 186/22
187/8
**least [1]** 210/14
**led [2]** 187/5 222/16
**legal [2]** 222/18 239/7
**LEIVA [3]** 179/14 181/4
181/17
**length [1]** 221/24
**Lester [5]** 214/23
215/18 217/14 217/19
217/23
**let [1]** 202/18
**let's [6]** 189/3 228/23
229/1 229/9 229/10
239/18
**letter [16]** 180/11
180/13 180/15 214/5
214/7 221/4 221/12
230/11 230/16 230/18
230/20 231/1 231/4
234/22 244/8 244/12
**Lieutenant [6]** 186/17
187/4 191/18 191/20
192/4 214/16
**lieutenants [2]** 195/19
202/22
**like [18]** 183/6 187/17
187/17 189/24 195/9
195/10 197/18 211/1
211/21 222/22 230/13
230/17 231/23 232/11
235/7 236/5 236/11
238/2
**line [2]** 210/4 243/6
**listed [4]** 203/3 206/24
207/7 215/5
**listing [1]** 203/12
**little [1]** 229/4
**LLC [1]** 238/20
**long [2]** 182/21 193/15
**look [5]** 185/17 226/9
226/10 230/7
**looking [1]** 184/25
**looks [4]** 197/18
230/13 230/17 232/11
**lot [3]** 230/5 232/18
237/13
**lower [1]** 232/17
**lying [1]** 224/11

**M**

**made [5]** 188/24
190/20 194/25 201/4
210/14
**main [4]** 196/10 196/22
197/4 199/8
**make [5]** 184/23
202/19 207/18 236/17
244/10

**M**
making [1] 188/10
manager [3] 236/18 236/19 236/19
many [1] 193/22
MARCH [8] 178/13 181/10 241/6 241/8 241/12 242/12 243/4 244/1
March 15th [1] 181/10
mark [5] 189/5 213/22 213/25 224/25 233/13
marked [10] 184/16 189/8 214/2 225/3 225/7 229/23 229/25 232/13 233/15 234/19
marking [2] 232/12 234/18
married [3] 226/1 226/5 226/6
MASCI [7] 178/16 181/17 241/4 241/10 242/5 242/16 244/19
matter [1] 181/12
MATTHEW [3] 179/14 181/4 181/16
may [4] 182/6 200/6 233/19 234/13
maybe [1] 221/2
me [68]
mean [7] 185/22 186/1 195/24 196/16 197/19 206/11 223/18
means [3] 186/3 195/25 211/12
meant [1] 196/15
meet [1] 217/5
meeting [39] 214/11 214/14 214/15 214/18 214/19 214/21 215/6 215/9 216/4 216/7 216/7 216/9 216/21 217/16 217/16 217/22 217/24 218/21 218/22 218/24 219/4 219/6 219/9 219/12 219/21 219/22 219/24 220/5 220/20 221/6 221/10 223/20 223/24 224/1 224/4 224/11 224/17 224/18 224/22
MELKINS [1] 179/10
Member [1] 216/12
Members [2] 216/18 216/22
Memorandum [1] 180/9
memory [1] 221/2
message [3] 193/12 193/17 202/6
met [2] 217/1 217/4
MIAMI [14] 178/3 178/7 179/4 181/12 181/25 185/20 186/1 186/2 193/1 234/7 235/18 243/3 244/4 244/7
MICHAEL [5] 179/8 180/11 181/24 223/10

230/14
Mid [1] 193/5
midnight [2] 191/6 191/21
might [2] 189/20 229/2
Milano [1] 223/23
mind [1] 216/9
mini [2] 239/24 240/9
minute [1] 230/7
minutes [2] 191/25 229/8
Misconduct [3] 180/8 189/12 220/6
MLE [1] 179/8
MLELAWFIRM.COM [1] 179/10
moment [10] 181/8 186/3 187/25 188/9 190/10 193/11 210/10 212/2 220/3 230/4
monetary [1] 231/20
more [6] 201/6 207/17 216/25 217/4 235/2 237/14
morning [5] 181/3 181/9 213/3 213/8 220/25
move [2] 184/3 184/5
moved [1] 190/14
MR [8] 184/11 189/10 204/9 213/24 214/4 223/10 225/5 233/17
Mr. [8] 204/18 205/6 223/21 223/22 224/9 224/10 226/2 228/21
Mr. Gibbons [2] 223/22 224/10
Mr. Guasto [2] 226/2 228/21
Mr. Pancier [2] 223/21 224/9
Mr. Serrano [2] 204/18 205/6
Ms [1] 200/1
Ms. [5] 182/11 205/3 206/17 226/24 240/5
Ms. Court [1] 240/5
Ms. Salabarria [4] 182/11 205/3 206/17 226/24
much [2] 219/1 220/3
multiple [2] 194/3 227/5
municipality [4] 178/8 181/13 181/14 215/13
my [47] 181/16 182/17 183/6 184/9 184/10 186/8 188/13 191/8 192/3 192/4 195/8 195/22 196/24 201/3 201/11 201/17 201/17 201/21 202/18 202/21 204/19 206/13 211/10 211/25 215/7 215/15 215/25 217/7 217/8 217/20 218/6 218/7 219/13 219/20 219/20 221/2 223/4 224/22 228/6 228/18 236/4

238/22 238/24 239/3 241/16 241/21 244/22
myself [1] 202/19

**N**
N-e-s-s [1] 196/16
name [7] 181/16 194/20 232/23 236/4 236/6 237/6 243/4
names [1] 212/6
narrative [1] 197/17 197/19 197/22 198/9
nature [5] 216/4 216/7 219/12 219/16 237/13
necessary [1] 243/17
need [9] 190/11 198/14 198/17 213/22 215/1 230/8 230/24 239/24 240/4
needed [3] 191/5 192/8 192/20
NESS [4] 196/15 196/16 196/16 199/7
never [10] 191/7 191/7 191/8 191/9 196/18 198/1 202/21 209/1 210/19 210/23
next [2] 191/11 191/12
nice [1] 184/12
Nicholas [3] 180/10 225/10 227/11
Nick [1] 226/16
night [3] 191/4 194/23 203/7
no [36] 183/8 194/18 196/21 197/8 200/7 203/14 203/22 204/5 204/21 206/5 206/14 212/14 212/15 214/18 217/16 218/1 218/13 223/7 223/8 223/9 224/25 225/17 226/21 229/9 229/10 229/12 235/6 235/9 235/12 235/15 235/19 235/23 237/8 239/11 243/3 244/13
NO.:1:22 [1] 178/4
NO.:1:22-cv-21004-DPG [1] 178/4
Nodding [1] 215/3
none [2] 206/6 206/9
normally [1] 211/21
north [7] 192/25 192/25 193/3 193/8 202/20 220/12 220/13
NORTHEAST [1] 179/9
not [74]
NOTARY [3] 178/17 241/4 241/11
note [1] 210/5
notes [1] 242/7
nothing [1] 182/3
November [3] 223/20 226/1 226/12
November 2nd [1] 223/20
November 5th [1] 226/1

now [11] 181/3 181/9 182/13 183/6 194/24 200/3 210/17 214/6 215/8 223/5 240/1
Number [8] 181/16 189/8 214/2 225/3 229/25 232/13 233/15 234/19

**O**
O-301 [2] 179/3 244/4
O-c-e-j-o [1] 199/19
OATH [1] 241/1
object [1] 227/6
objection [23] 183/20 183/20 203/17 203/18 204/24 205/7 205/15 205/22 207/1 211/7 213/21 221/18 222/2 222/25 224/12 224/19 225/20 226/20 227/3 227/7 231/13 235/20 239/10
objection's [1] 227/6
obtain [1] 212/22
obtained [6] 203/15 203/20 204/10 204/18 205/21 206/12
obviously [1] 210/13
occasions [1] 183/9
occurred [1] 201/10
Ocejo [16] 199/17 199/24 199/25 200/5 200/9 200/19 200/21 200/22 201/7 201/13 201/15 201/20 202/2 202/3 208/15 212/7
off [15] 188/18 198/18 198/25 215/15 229/15 229/16 238/3 238/4 238/8 238/10 238/11 238/13 239/18 239/21 240/7
office [2] 214/11 244/9
Officer [25] 199/17 199/24 199/25 200/5 200/9 200/19 200/20 200/22 201/7 201/13 201/15 201/20 202/2 202/3 208/10 208/15 208/16 209/7 209/11 215/10 215/21 218/11 218/15 218/18 220/23
officers [19] 192/20 195/20 199/21 202/11 202/15 202/19 208/19 208/23 209/20 209/23 210/18 210/22 211/6 211/12 211/18 212/6 212/23 218/13 236/20
offices [1] 192/9
okay [130]
once [2] 216/6 244/14
one [22] 181/8 183/13 196/12 199/21 201/6 206/10 207/17 208/23 210/11 213/23 214/1 215/16 216/22 217/12 217/15 224/24 235/6

230/6 232/19 235/24 239/21 240/10
only [4] 189/20 208/14 238/25 239/24
opportunity [9] 180/13 190/13 198/2 201/12 201/14 211/21 211/23 218/6 232/24
order [2] 191/24 239/20
ordered [1] 199/12
ordering [6] 239/22 239/23 239/23 240/8 244/14 244/15
orders [2] 192/8 192/20
original [3] 182/13 189/15 244/14
other [6] 188/4 193/9 201/11 212/20 223/19 243/17
our [3] 210/4 210/5 244/9
out [6] 187/11 188/24 212/11 212/12 230/25 236/15
over [3] 182/24 184/20 238/1
overtime [7] 191/6 191/8 191/12 191/19 191/25 192/4 192/14
own [3] 192/1 211/5 239/9
Ozaeta [2] 214/21 217/12
Ozeata [1] 215/16

**P**
P.M [1] 213/7
page [6] 180/2 180/7 184/24 240/10 243/6
PAGE/LINE [1] 243/6
pages [4] 178/11 238/6 240/9 242/7
paid [1] 237/4
PALM [1] 242/3
Pancier [5] 180/12 223/10 223/21 224/9 230/14
paperwork [3] 230/25 231/19 232/18
parked [2] 213/1 213/7
part [5] 185/13 187/4 219/22 227/14 236/11
parties [8] 179/20 185/15 189/13 230/24 231/18 231/18 242/9 244/15
parties' [1] 242/9
party [11] 185/3 185/20 185/25 186/23 231/7 231/8 231/20 233/6 233/8 236/12 244/14
pass [1] 188/2
past [1] 237/12
Paul [4] 186/9 214/21 215/16 217/12
paying [4] 231/25 231/25 232/7 232/8

**P**

payment [1] 231/20
payroll [1] 237/24
paystub [2] 237/4
 237/7
paystubs [1] 237/12
penalties [1] 243/18
pendency [2] 201/8
 201/19 202/1
pending [3] 183/4
 183/14 183/25
people [2] 215/5 215/5
per [2] 185/11 210/4
perceives [1] 195/8
perjury [1] 243/18
personally [2] 212/12
 212/15 241/5
pertaining [1] 200/23
pertains [1] 200/14
phone [3] 193/19
 194/13 208/12
place [2] 178/15 237/3
plaintiff [4] 178/6
 179/5 181/23 239/4
please [9] 181/20
 182/2 184/4 186/5
 207/17 210/5 211/14
 227/10 244/9
PLLC [2] 179/2 244/3
point [12] 186/20
 187/13 188/16 195/15
 202/13 207/17 208/6
 208/7 217/15 223/8
 223/9 235/24
pointing [1] 209/10
police [16] 193/24
 215/10 215/21 215/25
 216/10 216/12 216/14
 216/19 217/11 217/19
 217/21 218/12 218/15
 219/18 220/15 220/24
position [5] 188/23
 215/9 227/14 227/23
 228/1
possible [1] 232/21
Practice [1] 235/13
prefer [1] 228/24
preparation [2] 225/15
 226/25
prepare [1] 182/12
prepared [4] 183/6
 225/18 226/18 234/22
present [5] 179/13
 214/15 214/20 215/6
 223/23
presented [2] 200/15
 221/10
preserved [1] 227/7
president [9] 214/22
 214/23 214/24 215/17
 215/18 215/18 217/13
 217/13 217/14
presume [1] 220/18
previous [4] 186/8
 187/8 201/22 228/11
previously [2] 184/17
 186/22
Prieto [1] 214/25

prior [9] 183/9 187/6
 192/9 224/9 230/11
 230/14 230/19 230/20
 235/25
privately [1] 223/22
privately-hired [1]
 223/22
privilege [1] 203/22
privileged [1] 184/1
probably [1] 229/3
problem [11] 216/13
 216/15 216/17 216/23
 217/1 217/4 217/6
 217/9 223/7 229/14
 235/9
procedurally [2]
 201/13 211/22
procedure [3] 223/14
 244/24 244/24
proceed [1] 182/6
produce [1] 205/5
produced [11] 189/13
 189/17 190/3 205/2
 205/11 205/13 206/3
 206/6 206/8 206/10
 213/4
production [1] 228/10
Professional [1] 242/5
pronouncing [1]
 199/18
property [1] 236/18
protected [6] 185/6
 185/10 185/23 221/16
 221/24 230/23
Protection [1] 238/19
prove [1] 200/13
provide [4] 200/11
 206/20 236/12 237/1
provided [11] 191/25
 201/24 203/24 209/1
 209/25 211/1 213/14
 221/1 228/15 231/3
 237/10
providing [1] 238/22
PUBLIC [3] 178/17
 241/4 241/11
put [1] 190/2
puts [1] 212/25

**Q**

question [37] 183/5
 184/3 195/22 198/11
 198/14 198/17 201/3
 201/6 201/17 201/18
 201/21 204/1 204/10
 204/12 204/15 204/21
 205/10 207/5 207/23
 209/21 211/13 211/15
 211/25 213/15 214/13
 217/3 218/7 218/23
 218/25 219/1 219/4
 219/9 221/20 223/3
 232/5 236/4 239/5
questions [8] 182/24
 183/14 183/21 190/12
 218/6 220/15 220/17
 235/2
quote [2] 210/4 210/6

**R**

radio [3] 193/24 194/8
 195/13
raise [4] 182/1 184/6
 193/23 194/20
raised [2] 194/2 219/15
rang [1] 194/13
RE [2] 243/3 244/7
reach [1] 194/13
read [11] 186/14
 190/10 190/13 198/3
 198/3 201/15 239/17
 239/19 240/5 243/18
 244/10
reading [3] 179/21
 234/9 244/21
ready [1] 181/5
realtime [1] 213/15
reason [2] 213/10
 243/6
reasonable [1] 244/12
rebuttal [2] 228/4
 228/5
recall [8] 187/7 193/11
 193/16 193/22 196/4
 203/1 208/18 221/8
receipt [4] 180/14
 233/20 234/3 244/12
receive [1] 200/23
received [10] 202/5
 208/11 208/24 209/8
 209/12 232/23 234/6
 236/2 237/17 244/14
recently [1] 237/11
Recess [2] 199/2
 229/19
recognize [1] 225/7
recollect [2] 182/19
 221/2
recollection [1] 215/7
record [23] 181/4
 181/9 188/19 190/7
 198/18 199/1 199/4
 229/15 229/17 229/21
 237/13 238/3 238/3
 238/4 238/9 238/10
 238/11 238/13 238/15
 239/18 239/21 240/7
 242/7
recorded [4] 196/4
 219/25 220/16 220/20
recording [1] 196/7
recordings [1] 200/13
records [1] 237/15
red [1] 219/15
refer [7] 189/15 189/24
 190/1 204/20 209/16
 210/9 226/10
referenced [2] 236/1
 244/9
references [1] 231/17
referred [1] 201/9
referring [16] 185/7
 187/3 188/4 188/20
 194/11 202/13 207/18
 207/21 208/3 208/9
 208/9 212/6 228/9
 228/14 232/10 235/7

regard [1] 244/13
Reggie [5] 214/20
 215/18 217/14 217/19
 217/23
Registered [1] 242/5
regular [1] 195/20
rejected [4] 187/13
 187/23 188/9 188/17
rejection [1] 188/22
relates [1] 235/17
relating [1] 235/16
relationship [1] 187/11
relative [2] 242/8 242/9
remedies [1] 215/21
remedy [1] 215/12
remember [79]
remembered [1]
 194/24
REMOTE [1] 178/15
removed [1] 219/21
repeatedly [1] 193/19
rephrase [3] 183/5
 205/10 211/14 217/3
 235/8
report [10] 210/20
 210/23 213/1 213/4
 213/5 213/6 213/6
 213/11 220/12 242/6
REPORTED [1] 178/16
reporter [4] 178/17
 181/18 240/5 242/5
REPORTER'S [1]
 241/13
reports [1] 237/22
represent [2] 216/11
 217/18
representation [5]
 217/8 217/10 217/20
 219/20 235/5
representative [1]
 217/5
representatives [1]
 217/7
represented [1] 223/21
representing [1]
 181/19
represents [1] 216/18
request [2] 228/10
 233/5
requested [1] 242/7
requesting [3] 217/20
 238/25 239/9
reserved [1] 179/22
resignation [5] 180/15
 214/7 221/5 221/12
 234/22
resolution [1] 231/10
resolved [1] 230/24
respect [1] 238/24
respective [1] 179/20
respond [3] 188/7
 194/3 199/12
responded [3] 194/21
 196/14 199/21
Respondent [1] 186/21
respondents [1]
 185/18
responding [4] 185/15
 185/19 185/25 188/7

response [3] 227/14
 227/22 228/1
responsible [2] 185/18
 234/9
restroom [2] 198/15
 198/17
result [1] 234/13
resulted [2] 199/16
 231/10
retaliated [4] 188/13
 222/6 222/7 222/12
retaliation [6] 185/14
 185/23 185/25 186/1
 222/10 222/11
review [5] 205/2
 228/10 242/6 244/10
 244/11
reviewed [2] 205/4
 228/12
Richard [1] 217/11
right [39] 182/1 182/11
 182/19 183/10 184/21
 185/11 185/15 186/11
 186/14 186/21 187/6
 188/12 188/15 190/5
 190/19 190/21 193/3
 195/5 195/16 199/18
 202/1 202/14 209/11
 211/4 212/4 212/13
 218/4 222/14 223/5
 225/6 228/23 229/12
 229/13 229/23 232/2
 232/4 235/2 240/1
 240/12
Rights [5] 215/10
 215/22 218/11 218/16
 218/18
Romero [9] 194/7
 194/12 194/16 194/17
 208/11 208/16 209/7
 209/11 212/7
RP [2] 185/14 185/15
RPR [5] 178/16 241/4
 241/10 242/16 244/19
Rule [2] 244/24 244/25
rules [3] 186/19 186/24
 244/12

**S**

said [21] 184/3 184/9
 184/13 196/4 196/7
 196/9 196/21 196/25
 196/25 196/25 197/5
 197/6 197/7 201/23
 203/2 208/13 211/1
 211/3 211/6 212/12
 221/2
SALABARRIA [17]
 178/12 182/7 182/11
 200/1 202/6 205/3
 206/17 208/12 209/8
 209/12 226/24 241/5
 242/6 243/4 243/20
 244/2 244/7
same [3] 203/7 208/20
saw [1] 225/13
say [11] 186/18 192/19
 217/16 219/6 221/15
 221/23 224/6 227/16

**S**

say... [3] 230/23 232/1
237/10
saying [8] 183/6 190/2
192/11 192/16 197/14
197/21 206/5 210/4
says [54] 184/15 185/2
185/14 185/19 185/24
186/20 191/4 191/4
191/24 192/6 192/18
193/12 193/18 193/18
193/23 194/2 194/7
194/11 194/15 194/19
195/6 195/12 195/15
195/16 195/22 196/14
196/21 197/5 199/6
199/12 199/15 199/17
199/23 202/5 202/10
202/23 207/12 207/13
207/15 207/21 208/3
208/10 208/19 210/7
213/6 214/20 221/7
231/1 231/6 232/20
233/2 234/3 234/6
238/21
scene [1] 199/24
scroll [5] 186/6 190/11
190/11 190/16 230/8
second [11] 183/13
184/24 185/13 210/17
213/23 214/1 214/24
215/18 217/14 224/24
237/21
security [5] 236/1
236/12 236/19 236/19
237/1
see [12] 184/14 184/17
184/24 186/19 187/1
189/6 199/25 209/10
231/20 233/6 234/4
234/14
seemed [1] 219/16
seen [10] 213/5 214/8
225/11 230/3 230/5
232/16 232/18 232/18
232/19 233/19
send [4] 192/11 192/15
192/16 239/25
sense [1] 195/3
sent [20] 192/11
192/16 193/12 193/16
202/23 202/24 207/13
207/14 207/20 207/20
208/7 208/14 209/19
209/23 214/17 228/11
237/22 237/25 238/5
238/7
sentence [9] 185/14
191/12 197/20 198/13
198/13 210/12 210/13
210/15 210/15
separated [2] 226/3
226/4
separation [1] 235/17
sergeant [6] 191/5
194/7 202/6 208/12
209/8 209/12
sergeants [1] 195/19

Serrano [13] 202/18
203/2 203/5 203/6
204/4 204/11 204/18
204/22 205/6 205/13
206/14 207/7 212/7
Service [1] 238/19
Services [1] 181/19
set [1] 224/17
settlement [9] 224/18
230/25 231/11 231/17
231/19 231/22 231/24
232/6 234/23
seven [2] 187/6 188/22
several [3] 191/25
193/5 194/20
she [23] 183/23 183/23
184/2 184/2 184/2
184/3 184/7 202/6
202/10 202/10 202/14
202/14 202/23 203/25
204/25 207/3 207/4
207/20 208/13 210/17
227/3 227/3 227/4
she's [2] 183/24
204/24
shift [8] 191/6 191/9
192/9 202/18 202/21
210/5 210/21 210/24
shouldn't [1] 184/7
show [7] 184/16
213/25 224/25 229/23
232/23 233/13 234/17
showing [3] 189/5
225/6 232/12
shows [1] 213/1
side [1] 243/17
sign [2] 244/10 244/10
signature [3] 186/12
234/1 234/25
signed [12] 186/11
186/14 189/15 189/18
189/19 189/24 189/25
225/25 231/12 231/23
232/7 241/8
significance [1] 216/8
signing [3] 179/21
233/23 244/21
simple [3] 204/10
211/15 219/4
since [9] 191/11
193/15 193/25 206/18
208/16 211/4 211/16
211/25 217/24
sitting [7] 200/8 200/18
201/6 205/20 213/17
228/19 235/10
six [7] 187/6 188/5
188/22 210/19 212/5
212/23 221/5
slip [4] 191/9 191/25
192/4 192/4
SMITH [2] 179/2 244/3
so [83]
some [5] 190/12 208/7
223/19 229/2 230/24
somebody's [1] 195/10
someone [1] 217/17
something [2] 210/9
237/6

sorry [7] 190/15
198/21 218/10 223/6
225/1 225/1 229/10
225/17
sounded [2] 195/6
195/9
sounds [1] 195/10
SOUTHERN [1] 178/2
speak [18] 182/18
182/21 187/14 188/1
188/1 200/20 200/22
201/7 201/12 201/14
212/11 212/15 212/16
212/18 212/20 216/6
217/25 237/13
speaking [2] 200/14
206/21
speaks [1] 190/16
specific [9] 195/13
195/19 197/14 198/5
198/11 200/14 218/23
218/25 219/9
specifically [6] 197/14
201/18 208/8 219/5
230/6 232/19
spell [1] 212/8
spellings [1] 215/2
split [2] 193/2 193/5
spoke [12] 182/17
183/21 191/7 191/9
195/12 195/16 196/3
202/18 203/2 203/5
206/22 206/23
spoken [11] 194/17
200/5 201/19 202/2
202/3 203/8 203/12
206/18 208/16 211/18
217/23
squad [8] 202/7 207/15
207/21 207/24 208/4
208/7 210/4 210/4
Stand [7] 181/8 198/19
198/25 199/3 229/20
238/11 240/6
Standby [1] 198/21
stands [1] 196/20
state [6] 178/17 190/6
241/2 241/4 241/11
242/2
stated [2] 217/21
243/18
statement [19] 204/4
204/11 204/18 204/21
204/22 205/5 205/13
205/21 206/2 206/6
206/8 206/12 206/14
208/25 227/14 227/23
228/2 228/5 228/5
statements [9] 200/12
200/15 200/24 201/16
201/24 203/16 203/20
212/23 220/1
STATES [1] 178/1
stating [1] 201/1
station [7] 195/25
196/10 196/22 197/4
197/8 213/2 220/24
stats [7] 202/7 207/15
207/21 207/24 208/4
208/7 208/14

Statute [1] 244/13
statutory [1] 218/12
stay [1] 238/2
Stella's [1] 220/23
stenographic [2]
178/17 242/7
stenographically [1]
242/6
step [1] 198/23
Steven [2] 202/18
219/13
still [3] 226/1 226/5
226/6
stipulated [1] 179/19
stop [4] 190/17 190/18
199/16 217/16
Street [1] 199/16
stuff [1] 237/24
subject [1] 199/23
submit [1] 227/25
submitted [8] 189/12
227/13 227/17 228/4
228/5 228/8 228/15
228/20
substantive [1] 189/21
suffered [1] 222/8
suggested [1] 244/11
SUITE [2] 179/3 244/4
summoned [5] 215/25
216/10 216/12 216/14
219/18
Sunday [1] 191/4
supervise [2] 197/21
197/24
supervisor [4] 191/11
195/13 195/17 195/18
supplementation [1]
220/2
support [4] 209/4
210/1 211/2 220/2
sure [9] 184/6 184/23
186/7 202/19 207/18
232/22 236/17 239/3
240/15
suspended [1] 183/9
swear [1] 182/2
sworn [4] 181/21 182/8
218/12 241/7

**T**

tactic [1] 223/18
take [6] 184/14 187/11
229/1 229/4 229/7
230/7
taken [3] 199/2 229/19
244/9
taking [2] 215/8 215/20
talk [2] 198/22 212/5
talked [6] 203/9 204/7
218/4 221/24 223/8
235/24
talking [6] 188/16
200/16 201/2 207/13
207/14 207/19
talks [1] 185/17
TAMARA [7] 178/16
181/17 241/4 241/10

242/15 242/16 244/19
Tammy [6] 199/19
212/8 215/1 223/11
239/20 239/24
TANNEN [7] 178/16
181/18 241/4 241/10
242/5 242/16 244/19
taped [1] 219/24
tell [15] 190/17 190/23
191/10 197/22 200/4
206/10 216/6 218/20
218/20 219/7 220/19
228/19 230/8 232/19
236/10
telling [1] 196/22
200/23 204/24 206/1
206/4 206/9 218/17
220/22 226/13
terminated [7] 185/5
211/25 217/22 217/25
218/1 222/9 222/17
termination [4] 221/17
221/25 222/11 234/14
TERRACE [1] 179/9
testified [1] 182/8
testify [1] 224/10
testifying [1] 198/8
testimony [6] 182/2
182/25 183/3 187/15
200/12 211/2
text [4] 193/12 193/17
202/6 208/24
texts [1] 208/12
than [1] 187/12
Thank [5] 182/6 229/13
229/14 229/18 230/10
that [342]
that's [57] 184/12
184/14 185/3 185/6
185/10 185/20 186/11
187/19 188/15 189/25
190/9 194/14 195/9
196/12 197/18 201/1
201/3 202/4 206/4
208/5 208/25 209/9
209/14 209/20 209/24
210/11 210/12 210/15
210/24 212/2 212/2
212/13 212/14 213/2
216/14 216/16 217/8
218/20 218/25 219/1
219/7 219/8 220/3
221/7 221/7 223/4
223/5 223/7 229/6
230/13 230/17 232/10
232/11 232/22 236/14
238/21 238/22
their [6] 202/11 202/15
210/18 212/6 235/17
236/18
them [16] 203/21
208/20 210/19 211/10
211/18 211/18 212/11
212/15 212/16 212/18
212/20 215/19 217/15
235/14 236/17 240/1
then [42] 185/13
185/24 187/12 187/13
187/25 191/15 192/6

**T**

**then...** [35] 193/12
193/18 193/23 194/2
194/7 194/11 194/19
195/6 195/6 195/12
196/21 197/22 198/13
199/12 199/15 202/4
202/10 203/25 206/6
207/20 208/10 208/19
209/7 209/11 220/18
221/7 222/6 222/7
222/8 226/2 235/2
237/18 238/22 238/24
239/25
**there** [28] 181/15 193/7
193/10 200/3 200/5
204/4 204/22 206/14
214/14 215/25 216/3
216/5 216/12 217/2
218/5 218/23 219/4
219/13 219/13 219/17
221/7 232/18 234/16
237/15 237/19 238/6
238/21 244/13
**there's** [7] 185/13
189/20 189/21 202/20
203/22 204/21 206/5
**Therefore** [1] 201/14
**therein** [1] 234/10
**thereupon** [1] 181/21
**these** [16] 188/11
188/24 192/17 200/13
206/19 211/6 211/11
211/17 211/18 212/5
212/23 215/5 220/2
222/15 222/21 237/11
**they** [21] 191/5 191/11
200/11 208/23 210/20
210/23 211/3 211/18
211/21 215/6 215/22
216/3 216/6 216/10
216/11 216/14 220/16
224/6 224/10 224/11
237/3
**they're** [1] 195/10
**thing** [1] 239/25
**thing's** [1] 191/1
**things** [3] 223/19 229/2
237/12
**think** [18] 185/7 185/17
186/16 187/10 188/2
189/13 189/21 195/9
199/17 206/17 218/3
218/15 223/8 226/6
231/17 236/14 237/22
237/25
**third** [1] 236/12
**third-party** [1] 236/12
**this** [144]
**those** [7] 193/6 197/15
197/16 215/1 215/5
217/7 223/13
**though** [2] 216/25
218/2
**thought** [1] 184/9
**three** [4] 182/12 193/2
193/25 194/22
**through** [9] 189/22
194/13 195/5 197/20
210/12 210/15 226/15
220/24 229/2
**till** [4] 187/18 188/9
191/22 213/7
**time** [37] 178/14 181/9
181/10 187/7 187/17
191/18 191/20 193/15
193/16 193/21 194/1
199/1 199/4 201/6
202/9 203/5 203/8
206/13 207/17 209/18
210/17 214/6 214/21
214/22 214/23 216/24
225/13 225/19 229/4
229/7 229/17 229/21
230/24 238/5 238/12
238/15 240/7
**times** [2] 194/3 227/5
**today** [10] 181/17
181/18 194/25 200/8
200/18 201/7 205/20
213/17 228/19 235/10
**Today's** [1] 181/10
**told** [26] 187/10 187/19
187/20 188/2 191/5
191/17 191/19 191/21
194/8 195/23 196/2
199/7 199/7 200/1
200/6 202/10 202/14
206/7 206/17 206/18
206/20 210/22 211/6
211/19 216/3 217/19
**tone** [2] 195/6 195/10
**too** [3] 191/13 219/1
219/8
**took** [1] 188/23
**top** [4] 188/18 195/16
198/1 215/15
**tow** [1] 199/24
**towards** [2] 188/9
188/21
**transcribed** [1] 244/9
**transcript** [10] 239/24
242/6 242/7 243/2
244/8 244/10 244/11
244/14 244/15 244/22
**transported** [1] 199/23
**trick** [1] 236/10
**tried** [4] 187/11 193/23
194/19 217/5
**triggering** [1] 185/23
**truck** [1] 199/25
**true** [38] 191/6 192/2
192/10 193/14 193/19
193/24 194/3 194/9
194/14 194/21 195/4
197/17 198/9 200/9
200/20 201/10 202/8
202/12 202/16 202/24
207/25 208/5 208/25
209/9 209/14 209/20
209/24 210/8 210/24
211/6 211/19 212/12
213/6 215/10 217/2
227/20 242/7 243/18
**truly** [1] 244/17
**truth** [3] 182/3 182/3
182/4
**try** [1] 194/8
**trying** [2] 236/15
237/25
**turned** [1] 192/4
**two** [3] 183/9 231/23
237/12

**U**

**U.S** [2] 180/13 232/24
**ultimately** [2] 231/22
232/6
**unclear** [1] 236/10
**under** [7] 215/10
215/12 218/11 223/13
224/16 243/18 244/12
**understand** [26] 183/2
183/6 183/15 184/3
184/8 184/23 185/22
190/2 192/18 201/3
209/3 211/12 211/13
215/8 218/2 218/7
218/10 218/13 218/18
222/18 223/3 228/7
228/16 228/17 234/12
235/7
**understanding** [2]
182/12 238/25
**Understood** [5] 209/6
210/2 221/3 221/3
240/6
**Unfair** [1] 235/13
**union** [1] 217/6
**union's** [2] 235/4 235/5
**unit** [1] 194/21
**UNITED** [1] 178/1
**Universal** [7] 236/20
236/24 237/1 237/5
237/6 237/16 238/19
**unknown** [5] 214/18
216/4 216/4 219/12
219/12
**unsigned** [1] 190/7
**unsolicited** [1] 202/5
**until** [2] 213/2 213/7
**up** [10] 184/12 185/17
186/5 187/8 193/2
195/7 195/11 197/13
224/17 234/13
**us** [2] 203/24 228/15
**use** [3] 198/15 198/17
243/17

**V**

**vehicle** [4] 199/16
213/1 213/7 220/24
**vendor** [1] 236/12
**verbatim** [1] 196/9
**versus** [1] 181/12
**very** [9] 210/16 211/15
219/4 219/5 219/8
229/3 229/3 229/3
244/17
**via** [8] 178/15 193/23
194/8 195/12 195/17
202/11 202/15 241/6
**Vice** [6] 214/23 214/24
215/17 215/18 217/13
217/14
**video** [16] 178/12
**vtr** [1] 194/8
**t** [1] 194/8
179/14 179/19 181/11
**well** [1] 199/24 229/24
239/22 239/23 240/4
240/7 242/6 244/7
**videographer** [3]
179/14 181/4 181/17
**violates** [1] 215/13
**violation** [5] 186/18
186/23 215/23 224/2
234/12
**voice** [2] 195/6 195/9
**voicemail** [2] 193/19
194/14
**VOLUME** [1] 178/11
**volunteers** [1] 191/12
**VS** [1] 178/6

**W**

**W-2s** [2] 237/12 237/17
**waited** [2] 199/24
199/24
**waive** [3] 239/17
244/10 244/21
**waived** [1] 239/1
**Waiver** [1] 244/20
**waking** [2] 195/7
195/11
**walk** [1] 220/18
**walking** [1] 210/15
**want** [18] 184/23 190/6
190/12 190/17 207/17
212/1 212/4 212/14
219/22 223/9 223/19
229/4 229/8 230/8
238/3 238/5 238/8
240/14
**wanted** [2] 202/4
216/21
**was** [128]
**Washington** [1] 196/12
**wasn't** [8] 209/25
211/1 219/25 220/20
225/23 226/21 226/25
237/7
**waste** [1] 238/5
**watch** [2] 192/8 192/19
**way** [6] 184/12 187/18
213/11 221/21 223/4
228/24
**Wayne** [1] 214/21
**we** [27] 181/3 181/5
181/6 181/15 183/13
183/21 184/3 185/17
187/14 189/22 198/18
206/11 207/19 218/3
223/8 226/3 228/7
228/11 228/25 229/5
235/24 236/14 237/10
238/4 238/4 238/10
240/4
**we'll** [7] 184/14 195/5
198/13 200/17 240/12
240/12 240/16
**we're** [9] 181/9 181/18
207/13 210/12 210/15
217/17 239/18 240/4
240/5
**we've** [2] 184/20
**179/14 181/11
**179/14 181/11
179/14 194/1
229/21 238/14 239/21
239/22 239/23 240/4
240/7 242/6 244/7
**week** [1] 237/23
**weeks** [2] 231/23
237/12
**well** [26] 183/23
184/12 187/10 187/19
190/1 191/4 193/7
193/9 195/22 197/1
197/9 198/2 201/17
205/2 210/11 216/8
221/8 222/10 223/23
226/8 230/7 230/14
232/20 237/15 240/5
240/13
**went** [1] 193/19
**were** [40] 183/6 184/9
185/19 191/10 191/15
191/21 192/2 193/7
193/9 193/10 195/7
195/23 195/23 196/22
199/7 199/8 199/9
199/9 207/19 211/25
214/10 214/15 215/5
215/6 216/3 216/10
216/11 216/14 217/7
220/22 220/23 223/21
224/4 224/10 225/15
226/1 226/5 235/25
236/11 238/18
**weren't** [3] 200/3
201/24 220/16
**what** [122]
**what's** [5] 198/9
203/18 208/2 236/4
236/6
**whatnot** [1] 236/18
**when** [27] 182/18
188/24 190/11 190/17
193/7 193/9 202/2
203/7 206/19 209/22
210/19 211/24 211/25
216/3 219/13 225/13
226/4 226/8 226/13
226/16 228/14 230/8
231/18 233/23 235/24
237/4 238/18
**when's** [1] 203/5
**whenever** [2] 187/21
188/17
**where** [8] 186/20
195/15 195/23 209/10
216/21 223/20 232/1
237/25
**whether** [1] 205/12
**which** [21] 182/20
185/25 188/10 192/1
192/7 195/13 197/12
218/11 221/5 221/15
221/23 226/11 230/5
231/18 231/24 233/4
233/4 233/19 237/13
237/19 237/22
**while** [5] 183/3 183/13
183/25 198/23 220/23
**who** [19] 186/4 186/21
189/23 191/17 191/19
191/21 214/21 214/22
214/23 217/10 223/21
223/22 224/6 225/15

**W**

who... [5] 226/18 227/2
236/5 237/9 238/22
**whole [2]** 182/3 239/25
**why [7]** 210/12 210/15
216/13 216/16 216/16
218/5 236/10
**will [12]** 181/21 182/3
218/3 218/5 218/8
218/11 218/14 218/19
231/18 239/22 240/1
244/14
**Wilson [4]** 194/7
194/11 194/15 194/17
**withdraw [1]** 235/9
**withdrawn [1]** 233/5
**within [3]** 191/24
237/11 244/12
**without [3]** 215/25
217/1 217/5
**witness [16]** 180/2
181/21 182/5 200/12
200/12 200/24 201/15
201/24 203/3 203/13
203/21 206/12 206/25
207/8 220/1 227/8
**words [2]** 196/2 196/24
**work [7]** 188/1 191/11
230/25 236/13 236/21
236/22 240/2
**worked [4]** 236/5 236/7
238/18 238/19
**working [6]** 191/19
191/21 192/2 193/7
220/23 236/1
**workplace [2]** 186/19
186/24
**works [2]** 212/2 229/12
**would [26]** 188/3
189/18 189/24 194/8
196/4 197/23 204/19
204/20 206/2 206/8
211/20 211/22 211/22
213/14 213/15 216/25
216/25 217/4 217/6
217/22 226/9 226/10
227/11 228/6 238/2
239/3
**wouldn't [3]** 187/14
188/1 217/6
**WRITE [1]** 243/2
**writes [2]** 209/22
210/16
**writing [1]** 230/16
**written [16]** 203/16
203/20 204/4 204/11
204/18 204/21 204/22
205/5 205/12 205/21
206/2 206/5 206/7
206/12 212/23 233/3
**wrote [3]** 186/4 189/23
208/3

**Y**

**yeah [13]** 183/20
184/20 186/21 195/2
195/16 205/11 218/24
225/23 227/21 229/14

238/10 240/4 240/9
**years [9]** 187/6 187/8
188/5 188/5 188/11
188/22 193/22 193/25
194/22
**Yep [1]** 202/14
**yes [63]** 181/7 182/15
183/1 183/11 183/16
184/8 184/14 184/18
184/22 185/1 185/4
185/16 186/10 186/13
186/15 187/2 187/22
187/24 189/1 189/7
190/22 191/23 192/14
192/16 192/21 195/21
196/11 196/13 203/4
204/4 204/21 206/4
214/9 215/11 217/25
222/12 223/25 224/3
224/5 225/8 225/12
227/19 227/24 230/15
230/18 230/20 231/2
231/9 231/21 232/9
233/1 233/9 233/12
233/25 234/2 234/5
234/8 234/11 234/15
235/1 237/23 238/2
240/11
**you [451]**
**you'd [4]** 188/2 191/17
191/19 191/21
**you're [32]** 183/2 187/3
188/16 188/20 190/1
190/2 197/21 198/20
198/22 200/14 200/16
202/13 206/1 206/5
207/18 208/8 208/9
209/10 210/11 218/16
220/19 226/13 228/13
233/8 234/6 234/9
235/4 235/7 239/1
239/4 239/8 239/8
**you've [16]** 196/18
201/4 203/3 203/8
203/20 204/7 205/11
206/24 207/7 210/14
213/5 214/8 224/1
228/15 233/19 239/1
**your [124]**
**yours [2]** 212/20
244/17
**yourselves [1]** 181/20

**Z**

**ZOOM [2]** 178/15 241/6