UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JESSICA GUASTO,

        Plaintiff,          CASE NO.:  22-cv-21004-DPG

vs.

THE CITY OF MIAMI BEACH, FL,
a Florida municipality, et al,

        Defendants.

_____

DEPOSITION OF:    STEVE COSNER

DATE TAKEN:       May 17, 2024

TIME:             10:43 a.m. - 3:47 p.m.

PLACE:            Everyone appeared remotely
                  via Zoom

REPORTED BY:      MELISSA FERNANDEZ
                  Court Stenographer

_____

```
 1    APPEARANCES:

 2        DANIEL J. BARROUKH ESQUIRE
          Derek Smith Law Group, PLLC
 3        Suite O-301
          520 Brickell Key Drive
 4        Miami, Florida  33131
          (305) 946-1884
 5        danielb@dereksmithlaw.com
          (Appeared via Zoom)
 6
          APPEARED ON BEHALF OF THE PLAINTIFF
 7
          MICHAEL LEWIS ELKINS, ESQUIRE
 8        MLE Law
          1212 Northeast 16th Terrace
 9        Fort Lauderdale, Florida  33304
          (954) 401-2608
10        melkins@mlelawfirm.com
          (Appeared via Zoom)
11
          APPEARED ON BEHALF OF THE DEFENDANTS
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   TESTIMONY OF STEVE COSNER

 2        Direct Examination by Mr. Barroukh              4

 3        Cross-Examination by Mr. Elkins              137

 4   CERTIFICATE OF OATH                      154

 5   CERTIFICATE OF REPORTER                      155

 6   ERRATA SHEET                              156

 7   READ & SIGN COVER PAGE                      157

 8                        - - - -

 9                  S T I P U L A T I O N S

10   It is hereby agreed and so stipulated by and between

11   the parties hereto, through their respective counsel,

12   that the reading and signing of the transcript is

13   expressly reserved by the Deponent.

14                      - - - - -

15                   E X H I B I T S
```

```
16   Plaintiff's Exhibit 1
          Valentine's Day Card                      27
17   Plaintiff's Exhibit 2
          Note card                                30
18   Plaintiff's Exhibit 3
          E-mail and Administrative Action Form     46
19   Plaintiff's Exhibit 4
          Miami Beach Police Department
20        Rules and Regulations                    55
     Plaintiff's Exhibit 5
21        12/28/20 e-mail from Steven Cosner to
          Jessica Salabarria                       66
22   Plaintiff's Exhibit 6
          1/8/21 e-mail from Steven Cosner to Mr. Elkins   71
23   Plaintiff's Exhibit 7
          1/8/21 e-mail from Steven Cosner to A.J. Prieto  108
24   Plaintiff's Exhibit 8
          Internal Affairs resume                  111
25   Plaintiff's Exhibit 9
          Definition of Terms                      112
```

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 4 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 4

1    The deposition of STEVE COSNER, was taken pursuant to
2  notice by counsel for the Plaintiff on the 17th day of May,
3  2024, commencing at 10:43 a.m.  Said deposition was reported by
4  Melissa Fernandez, Court Reporter, Notary Public, State of
5  Florida at Large.
6
7                    * * * * *
8                 STEVE COSNER,
9    having been duly sworn, was examined and testified upon his
10                 oath as follows:
11        THE WITNESS:  I do.
12              DIRECT EXAMINATION
13  BY MR. BARROUKH:
14    Q    All right.  Good morning, Mr. Cosner.  Can you please
15  state your full name for the record?
16    A    Good morning.  My name is Steve Cosner.
17    Q    And how would you like me to address you today,
18  Mr. Cosner?
19    A    Steve or Mr. Cosner is fine.
20    Q    All right.  And have you ever given a deposition
21  before?
22    A    Yes.
23    Q    Have you been deposed in a civil matter?
24    A    I believe many years ago I did.
25    Q    All right.  So now that we're on Zoom, though, a few

Page 5

1  things have changed.  You understand that your testimony you're
2  giving today has the same force and effect as it would as if
3  you were testifying in court, correct?
4    A    Yes.
5    Q    All right.  So the two new rules for Zoom are that
6  because we do have a court reporter here today we can only give
7  audible answers, no ums or ahs, no head nods.  We need to give
8  audible answers.  Do you understand that?
9    A    Yes.
10    Q    And the second rule is, again, because Ms. Melissa
11  Fernandez is here, we cannot speak over each other as she can
12  only take one person's testimony down at once.  Does that make
13  sense?
14    A    Yes.
15    Q    I'm going to do my best to let you complete your
16  answers; I'd ask that you allow me to complete my questions.
17  All right?
18    A    Okay.
19    Q    Okay.  And at no point today when I'm asking you a
20  question no matter what the question is, if that involves you
21  telling me what you spoke to your attorney about, I'm not
22  asking what you spoke to your attorney about.  I don't want to
23  know.  Does that make sense?
24    A    Yes.
25    Q    Okay.  And I'm sure Michael will also tell you, do

Page 6

1  not answer his question, he'll object.  And even when he does
2  make some objections, you will be allowed to answer and you
3  will have to answer unless he tells you do not answer that
4  question.  All right.  So if you need me to repeat anything,
5  I'll be more than happy to do so.  Again, I don't want to have
6  any ambiguous questions and I don't want you to give an answer
7  on a question you're not understanding.  Does that make sense?
8    A    Yes.
9    Q    So if you need me to repeat a question, please do so.
10  And if you need to take a bathroom break or any break for
11  whatever reason at any point here today, that's fine, just
12  allow me to finish the line of questioning I'm going through.
13  Okay?
14    A    Okay.
15    Q    All right.  So with that being said, is there
16  anything that would prevent you from testifying clearly today?
17    A    No.
18    Q    And where are you conducting this deposition from?
19    A    Mr. Elkins' office.
20    Q    Mr. Elkins' office in Fort Lauderdale; is that
21  correct?
22    A    Yes.
23    Q    All right.  And is anybody in the room with you?
24    A    Mr. Elkins is.
25    Q    All right.  Did you do anything to prepare for this

Page 7

1  deposition?
2    A    I spoke with Mr. Elkins.
3    Q    All right.  How long did you speak to Mr. Elkins for?
4    A    Maybe an hour.
5    Q    All right.  And during that hour meeting did you
6  review any documents with Mr. Elkins?
7        MR. ELKINS:  Objection.  Privileged.
8        MR. BARROUKH:  I'm not asking what documents he
9  reviewed; just if he reviewed the documents.
10        MR. ELKINS:  That's fair.
11    A    Yes.
12  BY MR. BARROUKH:
13    Q    All right.  And how long did you spend looking at
14  documents with Mr. Elkins?
15    A    Maybe 30 minutes of that hour.
16    Q    All right.  And did you speak to anybody else about
17  this deposition today outside of Mr. Elkins?
18    A    No.
19    Q    All right.  Did you independently review any
20  documents today prior to this deposition?
21    A    Today, no.
22    Q    Have you independently reviewed any documents for
23  this deposition?
24    A    Yes.
25    Q    Which documents did you review?

Deposition of Steve Cosner                                         Jessica Guasto v. The City of Miami Beach, FL, et al.

1  A   The Administrative Action Form; the Allegation of
2  Employee Misconduct; there was a few e-mails. I saw the Last
3  Chance Agreement. What else was there? The card.
4  Q   And I'm not assuming you're looking up at something,
5  but you're looking to the side and I just want to make sure
6  there's no document in front of you.
7  A   No, there's nothing in front of me.
8  Q   Okay. And how long do you believe you looked at or
9  reviewed the Administrative Action Form?
10  A   Maybe ten minutes.
11  Q   Okay. And the same goes for the Allegation of
12  Employee Misconduct Form?
13  A   Yeah.
14  Q   And the e-mails, you said there were various e-mails.
15  Do you remember which e-mails you reviewed?
16  A   There was e-mails where I had forwarded some
17  information to Mr. Elkins, where I forwarded some information
18  to A.J. Prieto. I think there was an e-mail that Chief
19  Clements had sent to Robin and an e-mail that A.J. had sent to
20  Chief Clements.
21  Q   Okay. And approximately how long do you think you
22  spent reviewing those documents?
23  A   It's anywhere from a few seconds to a few minutes on
24  each.
25  Q   Okay. And how long do you believe you reviewed the

1  Last Chance Agreement Form?
2  A   That I didn't really even read through. I just kind
3  of glimpsed at a couple of pieces of it. It was a little long.
4  Q   And you said the card. How long did you review any
5  cards for?
6  A   It was a greeting card that I had provided to
7  Ms. Salabarria. I just looked at it for a few seconds.
8  Q   Okay. So are you currently employed?
9  A   Yes.
10  Q   And what's your position?
11  A   I'm a lieutenant with the Miami Beach Police
12  Department.
13  Q   And how long have you been a lieutenant with the
14  Miami Beach Police Department?
15  A   As a lieutenant since August or September of 2020.
16  Q   And what was your role with the police department
17  prior to August or September of 2020?
18  A   I was a sergeant.
19  Q   And how long were you a sergeant for?
20  A   From I think it was like the end of October,
21  beginning of November of 2014, until my promotion to
22  lieutenant.
23  Q   And prior to 2014, were you still employed by the
24  police department?
25  A   Yes, I was a police officer.

1  Q   And how long were you a police officer for?
2  A   I was hired by the Department in February of 1996.
3  Q   So just to make sure, you were an officer February
4  '96, promoted to sergeant October, November of 2014, promoted
5  again to lieutenant in August or September of 2022; is that
6  correct?
7  A   Twenty.
8  Q   Twenty. Excuse me. Thank you. So what are your
9  primary responsibilities as a lieutenant for the police
10  department?
11  A   I'm a patrol shift commander for the midnight shift.
12  So, basically, I run -- I'm running the patrol unit, all the
13  aspects of the midnight shift patrol.
14  Q   Does that include supervising individuals?
15  A   I basically through the chain of command I would be
16  supervising the entirety, but the way it works is I supervise
17  the sergeants and the sergeants supervise the officers. But
18  that does not negate my supervisory responsibilities with the
19  officers as well.
20  Q   Okay. So you -- do you assign duties to the
21  sergeants?
22  A   Yes.
23  Q   What types of duties do you assign to the sergeants?
24  A   I'll provide them with any details that we need the
25  officers to take care of during the course of their shift, any

1  watch orders. There could be administrative duties. There's a
2  wide variety of things that the sergeants have to handle.
3  Q   Are there limitations to the details you provide to
4  officers?
5  A   I don't follow the question.
6  Q   Sure. So where do you obtain information for these
7  details that you send to the officers?
8  A   It can be something that I come up with that I want
9  handled. It could be something that's forwarded to me by an
10  e-mail or phone call or direct conversation with the captain or
11  a major, all the way up to the chief. We also get requests
12  from various city officials.
13  Q   Okay. And if any of these sergeants or officers
14  beneath you for whatever reason oppose the duties that you
15  assign them, can they challenge the instructions or duties you
16  assign them?
17  A   Only if it's an unlawful order.
18  Q   All right. And regarding your administrative duties,
19  could you talk to me about those a little bit, please?
20  A   I take care of staffing for the individual shift that
21  I'm working, hiring people on overtime, reviewing annual
22  evaluations, reviewing Response To Resistance Reports, Pursuit
23  Reports. There's -- those are some examples, but there's a
24  laundry list of stuff that I have to do.
25  Q   All right. Regarding the staffing for independent

Deposition of Steve Cosner                                        Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 12

1  shifts, what does that entail?
2      A   Each shift has a minimum staffing requirement.
3  There's officers that are assigned to different zones within
4  the city.  The city is divided into four geographic zones for
5  patrol purposes.  So we have to move people from one zone to
6  another or we have to hire people on overtime to fill any
7  vacancies in the staffing and assign people to specific details
8  that may be outside of the normal course of patrol.  For
9  example, if there's an issue with dealing with homeless or
10 narcotics, or speeding, or so forth, I may have -- if I have
11 the extra bodies I can assign those officers to handle those
12 details.
13     Q   Okay.  So that is the response -- or excuse me.  So
14 that is the capability of a lieutenant to staff individuals for
15 shifts; is that correct?
16     A   That's part of it, yes.
17     Q   And you said that one of the roles as a lieutenant as
18 well is hiring people on overtime, right?
19     A   Yes.
20     Q   And those two went hand-in-hand because if you need
21 to staff people who have already worked a full shift they may
22 also be working overtime, correct?
23     A   Reword that again.
24     Q   Sometimes when you staff people on a shift it's an
25 overtime performance period, correct?

Page 13

1      A   Correct.
2      Q   So prior to becoming an officer did you receive any
3  specialized training or education related to law enforcement?
4      A   I attended the Broward County Police Academy in 1994.
5      Q   And how long did you attend the academy for?
6      A   I want to say maybe four or five months long.
7      Q   And outside of that training at the academy was there
8  any other law enforcement related training you received?
9      A   Prior to attending the police academy I worked as a
10 complaint officer with the Miami Shores Police Department from
11 1991 until 1994.  And that involved -- it was not in an
12 enforcement capacity as of a police officer, but, essentially,
13 I was a dispatcher.  I took phone reports, walk-in reports.  So
14 I was able to write various police reports.  So that aspect of
15 police work I already had experienced in before I went to the
16 academy.
17     Q   Okay.  Now, regarding education and training related
18 to law enforcement leadership, was there anything you attended?
19     A   Line supervision.
20     Q   You said line supervision?
21     A   Line, L-I-N-E, like a straight line.  Line
22 supervision.
23     Q   And what is line supervision?
24     A   It's a -- I believe it was a two week course at the
25 Miami-Dade Police Academy for first line supervisors.

Page 14

1      Q   And what did you learn in that course in those two
2  weeks?
3      A   It was the basics of leading a squad, supervising
4  responsibilities as a supervisor, as a sergeant, how to handle
5  disputes among employees, how to handle violations of policy.
6  It was very generic because it involved -- the students in that
7  class were supervisors from various agencies which all have
8  their own policies of how they handle things.
9      Q   Did you review any Miami Beach Police Department
10 specific rules or regulations at that course?
11     A   I couldn't tell you.
12     Q   Do you remember if line supervision specifically
13 instructed you on Miami Beach Police Department rules and
14 policies?
15     A   It did not.
16     Q   Do you remember if line supervision instructed you on
17 harassment policies specifically?
18     A   Harassment was discussed, not necessarily any
19 policies.
20     Q   Were there any other leadership training courses you
21 took outside of line supervision?
22     A   I honestly don't remember.  I've taken a lot of
23 courses over my career.
24     Q   Okay.  Well, it's important I understand what courses
25 you took.  So are there any courses you do remember regarding

Page 15

1  your supervisory position?
2      A   I honestly don't remember.  I'd have to pull up my
3  training history.
4      Q   Okay.  Did you receive any training or guidance on
5  handling complaints of harassment?
6      A   I think it was probably discussed in the class.  This
7  is many years ago so I don't really recall.
8      Q   Okay.  Do you remember any previous instances at the
9  Miami Beach Police Department where harassment was alleged
10 against another individual?
11         MR. ELKINS:  Objection to form.  You can answer.
12     A   I mean, throughout the years you hear of different
13 things.  I mean, I'm not directly involved in it so basically
14 it's just rumor and scuttlebutt around the station of one
15 person or another making a complaint.
16 BY MR. BARROUKH:
17     Q   Have you ever been a subject of a harassment
18 complaint at the police department?
19     A   I don't believe so, no.
20     Q   Do you remember being taught specifically at the
21 Beach, at the Miami Beach Police Department, if there were
22 harassment courses or training?
23     A   If there was courses or training on harassment?
24     Q   Yes, on how to handle harassment being reported or
25 how to prevent harassment from occurring in the workplace.

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 16

1    A   I wouldn't know.  There's hundreds of courses that
2  come through, you know.  The way it works, we have a training
3  unit and as classes are available you have different academies
4  and different departments that host trainings around the county
5  and around up in Broward County even, and if somebody finds a
6  course that they find may be interesting to them or beneficial
7  to them they apply to attend it.  But I couldn't tell you.
8  There's hundred of courses out there.
9    Q   Was there required training on prevention of
10 harassment at the Beach?
11   A   I know that we have a policy on it.  We have a policy
12 on harassment, but it's not a formal class.  It's a policy.
13   Q   Okay.  And regarding -- are you familiar with the
14 word retaliation?
15   A   Yes.
16   Q   What does retaliation mean to you?
17       MR. ELKINS:  Objection to form.  You can answer.
18   A   Retaliation is if somebody does something to you that
19 you don't like and you do something to basically get even at
20 them.
21 BY MR. BARROUKH:
22   Q   And based on your definition of retaliation, was
23 there any training regarding retaliation or preventing
24 retaliation based on --
25       MR. ELKINS:  Objection to form.  You can answer.

Page 17

1    A   Not that I can recall.
2  BY MR. BARROUKH:
3    Q   And did you have any decision-making authorities in
4  disciplinary issues at the Beach?
5    A   No.
6    Q   Did you give performance evaluations at the Beach?
7    A   Yes.
8    Q   To your knowledge, were those evaluations used to
9  assess discipline?
10       MR. ELKINS:  Objection to the form.  You can answer.
11   A   No.  Evaluations are not for discipline.
12 BY MR. BARROUKH:
13   Q   Are you able to write other things that could impact
14 an employee's performance perception?
15       MR. ELKINS:  Objection to form.  You can answer.
16   A   I need clarification on that question.
17 BY MR. BARROUKH:
18   Q   Could you impact a subordinates's performance
19 evaluation by submitting forms or other documents?
20       MR. ELKINS:  Objection to form.  You can answer.
21   A   Well, if somebody commits a violation of policy or,
22 whether it a Department policy, a City work rule, Department
23 rule or regulation, as a supervisor it's my obligation to
24 document that, whether it be something where document my own
25 observations or an allegation and that gets submitted to

Page 18

1  internal affairs for their evaluation.  Whatever happens with
2  that, if there is discipline that's handed down, then that,
3  yes, would effectively have an impact on that person's annual
4  evaluation for that year.
5  BY MR. BARROUKH:
6    Q   And you're aware then that your actions could result
7  in discipline to a subordinate; is that correct?
8    A   Yes.
9    Q   All right.  So I will shift the attention to my
10 client, Jessica Salabarria.  So how did you come to know
11 Jessica Salabarria, formerly Jessica Guasto, before that
12 formerly Jessica Salabarria?
13   A   It was working I believe on midnight shift for a
14 little while or afternoon shift.  The first time that I
15 actually ever spoke to her, we were on a call.  I want to say
16 it was in like the 1000 block of Collins Court.  I don't
17 remember what the call was, but there was several other
18 officers there.  It was during the winter.  It was very, very
19 cold that night.  She was commenting about how her hands were
20 kind of getting numb from the cold.  I had some like hand
21 warmers that were like little pouches that you open up and
22 expose to air and it warms up.  I had one left.  I had been
23 using them.  So I offered it to her and she thanked me for it.
24 That was the first time I think I ever spoke to her.
25   Q   And what year was that?

Page 19

1    A   Maybe 2013.
2    Q   And what position -- so 2013, that was before you
3  were a sergeant then?
4    A   Yes.
5    Q   All right.  And what was Ms. Salabarria's title at
6  the time?
7    A   She was a police officer.
8    Q   So you were both police officers then at the time,
9  correct?
10   A   Yes.
11   Q   And when you say you were on a call, that means you
12 were at a physical location together, correct?
13   A   Yeah.  We were handling a call that we were
14 dispatched to or it may have been something that somebody
15 self-initiated.
16   Q   Got it.  And how long did you work as an officer
17 alongside Jessica?
18   A   Until I got promoted in 2014.  I don't remember if
19 she stayed on midnights.  I mean, we didn't work together a
20 lot, but we were both in the patrol division.
21   Q   And how big is the patrol division?
22   A   I think we're at like -- we're very understaffed
23 right now.  I think even back then we were maybe 170 officers.
24   Q   Did you work a lot with Jessica back then?
25   A   Maybe a couple days a week because we had different

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 20

1  days off because I had been with the agency a lot longer than
2  her.
3      Q    And how many hours a day would you say you worked
4  with her?
5      A    Well, we worked ten-hour shifts, but that doesn't
6  mean that we worked together ten hours a day.
7      Q    Exactly.  So how many hours a day approximately were
8  you spending with her when you were both officers?
9      A    Anywhere from none to, I don't know, maybe two or
10  three.  It all depended on what kind of calls, if we were
11  dispatched to the same calls, if we were working in the same
12  zone.  There's too many factors for me to even try to calculate
13  a number for you.
14      Q    And when you first began as co-officers did you guys
15  have a relationship outside of the police department when you
16  first began?
17      A    No.
18      Q    And did you ever, again, still first around this time
19  when you began working together, spend any time outside of
20  work?
21      A    Did we ever spend any time outside of work?
22      Q    Yes.
23      A    Yes, we did.
24      Q    Do you remember what you did on that time outside of
25  work with her?

Page 21

1      MR. ELKINS:  Objection to form.  You can answer.
2      A    Yeah.  We went to the chili cook-off at C.B. Smith
3  Park in January of 2014.  We met for breakfast a few times
4  after I got off of work.  We went to Miami Metro Zoo.  It
5  wasn't something we did all the time, but we occasionally would
6  go and do things.  We met for lunch in Hialeah.  We went to the
7  Olive Garden, I remember, once for lunch.  There was one time
8  where she had taken a trip to, I forgot where it was, it was
9  somewhere in north Florida with some friends of hers.  We had
10  been communicating on the phone by text and she was telling me
11  how she was regretting going up there and that she really
12  wanted to come back because she wasn't having a good time.  I
13  offered to go pick her up.  She agreed to that.  I drove about
14  four and a half hours to go pick her up.  She was waiting
15  outside with her suitcase of the house that she had been
16  staying at.  She jumped in my car.  We turned around and drove
17  back home.
18  BY MR. BARROUKH:
19      Q    And what happen after you got back home?
20      A    Well, I drove her to her house, or where she was
21  staying at in an efficiency at her grandparents' house in
22  Hialeah.  I drove her there.  She had fallen asleep in the car.
23  When we got to the house I woke her up and told her she was
24  home.  And she realized she was at the efficiency and she said,
25  no, I don't want to go here, let's go back to your place.  So

Page 22

1  we went back to my apartment in Pembroke Pines.
2      Q    And what happened when you got back to your
3  apartment?
4      A    We got back to the apartment.  She stayed the rest of
5  the night and we were intimate with each other that night.
6      Q    And you said that you drove four and a half hours to
7  pick her up from northern Florida, correct?
8      A    Yeah, about four and a half to five hours, yeah.
9      Q    Had you been intimate with Jessica prior to this
10  event?
11      A    No.
12      Q    Were there any romantic feelings towards Jessica
13  prior to this event?
14      MR. ELKINS:  Objection to form.  You can answer.
15      A    There was.  Our relationship had been very
16  flirtatious through the phone calls and text messages.
17  BY MR. BARROUKH:
18      Q    Did you think that by picking her up it would advance
19  a personal relationship with her?
20      MR. ELKINS:  Objection to form.  You can answer.
21      A    I had no idea what was going to happen.  I picked her
22  up and took her home.  That's it.  Nothing else.
23  BY MR. BARROUKH:
24      Q    And when you say you two were intimate, did you two
25  have sex?

Page 23

1      A    Yes.
2      Q    Did she sleep over?
3      A    She did.
4      Q    And what did you do the next morning?
5      A    Later that day, I don't know what time it was, but
6  later that day I took her back home.
7      Q    And did you sleep over at her place after that?
8      A    No, I never slept at her house.
9      Q    All right.  How long was -- scratch that.  Did you
10  have a continuing intimate relationship with Jessica?
11      A    We had had sex one other time after that.
12      Q    All right.  Around what day or month or year was it
13  the first time you had sex with Jessica?
14      A    It probably was somewhere around early to mid 2014.
15      Q    And when was the second time you had sex with
16  Jessica?
17      A    Shortly thereafter.  I don't recall.
18      Q    Also in earlier mid 2014, correct?
19      A    I believe so.
20      Q    Did you ever take Jessica on a date following the
21  first time you were intimate?
22      MR. ELKINS:  Objection to form.  You can answer.
23      A    A date, no.  We never really went on what I guess
24  what you would call a formal date type of thing, but we would
25  go and do things together.  We went to lunch.  I went to her

Deposition of Steve Cosner                                     Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 24

house. I met her parents. I met her grandparents.

BY MR. BARROUKH:

Q    And what did she introduce you as to her parents and grandparents?

A    I believe it was just as a friend.

Q    Did you believe you were more than friends with Jessica at that time?

A    No. I knew we weren't in like a formal relationship. There was, I think, feelings both expressed by both sides, but it never got to a point where there was any kind of exclusivity between us.

Q    And what feelings were expressed on both sides?

A    How do you mean that?

Q    Like when you said -- you said that there was -- I could have the court reporter maybe read it back, but I believe you said although there was no exclusivity, there were feelings for each other expressed at the time.

A    Yeah, I mean, in our discussions in our text messages there would be comments about how we felt about each other. You know, there was a point in time where she would text me that she loved me, that she missed me. I mean, that was all kind of a new thing to me, the whole text messaging thing. I was not a big text messager. But it was like almost nonstop with the text messages. When our relationship first started, just even as a friendship, I was on a trip with a buddy of mine

Page 25

in Georgia and we were playing pool in the cabin that we were staying at and she would text back and forth with me for hours. And some of the text messages were just humorous, joking, some of it was very adult nature, you know, very suggestive. Some of it was very blunt. And, you know, that kind of continued on for the duration of our relationship.

Q    And what is that duration?

A    That was until, I would say, probably into 2015. Maybe the first quarter maybe of 2015.

Q    Okay. And would you say just at the time in 2014 to 2015 were you attracted to Jessica?

MR. ELKINS: Objection to form.

BY MR. BARROUKH:

Q    You can answer.

MR. ELKINS: You can answer.

A    Yes, I was.

BY MR. BARROUKH:

Q    Were you friends with Jessica outside of the intimate aspect of your relationship?

MR. ELKINS: Objection to form. Asked and answered. You can answer. You can answer always.

THE WITNESS: You said asked and answered. I thought --

MR. ELKINS: Just to make it go quicker, unless I specifically say don't answer, I'm objecting for reasons

Page 26

that do not prevent you from answering.

A    Okay. Ask the question again for me.

BY MR. BARROUKH:

Q    Sure. And you would say you were friendly with Jessica, right?

MR. ELKINS: Objection to form. You can answer.

A    Yes, we were friendly.

BY MR. BARROUKH:

Q    All right. And, ultimately, when you were promoted to lieutenant did you have supervisory authority over Jessica?

A    By way of rank, yes, but she never worked within my direct supervision.

Q    Okay. And we'll get to that. Did you ever love my client romantically?

MR. ELKINS: Objection to form. I'm going to let him answer but that borders on harassing --

MR. BARROUKH: I said --

MR. ELKINS: Hold on. Hold on. If you're going to ask him questions that get to the point of harassing or embarrassing, I can put that on the record. I'm going to let him answer it, but if it goes farther than that I'm going to tell him not to.

A    Honestly, I thought maybe I did. I thought I did. Truth of the matter, when all of our communications started I was going through a divorce. I was splitting up with my

Page 27

ex-wife so I think I was probably just reaching out for something and may have thought more about what I felt for her than I actually did.

BY MR. BARROUKH:

Q    I understand. Did you ever text my client that you loved her?

A    Yes.

Q    Did you ever write to my client that you loved her physically?

A    Yes.

Q    All right. I'd like to share with you what I've marked as Exhibit 1.

(Whereupon, Plaintiff's Exhibit 1 was marked for identification.)

BY MR. BARROUKH:

Q    Can you see the screen?

A    Yes.

Q    All right. Can you see the bar or no?

A    See the what?

Q    All right. I think we're good. Could you please read this part?

A    "Try the one in the center. It's cream filled."

Q    And on the bottom left here in the chocolate heart box?

A    "I love you."

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 28

1   Q   And this is the second page of that card. What does
2   it say?
3   A   "And the chocolate covered nuts too. Happy
4   Valentine's Day."
5   Q   And you can see that it's dated in pen February 14th,
6   2014, correct?
7   A   Correct.
8   Q   And then underneath it says: Love you Sweetie, a few
9   exclamation marks, Xs and Os, correct?
10  A   Correct.
11  Q   Is that your signature?
12  A   It's my initial of my first name.
13  Q   All right. Have you seen this card before?
14  A   Yes.
15  Q   How have you seen this card before?
16  A   Other than when I reviewed it the other night, that's
17  the card that I gave her back in February of 2014.
18  Q   And why did you give Jessica this card?
19  A   Because we had kind of started having the same
20  relationship I was explaining to you where both of us were
21  communicating and expressing feelings towards one another.
22  Q   And did she give you this card prior to being
23  intimate with her?
24      MR. ELKINS: Objection to form. I think you asked if
25  she gave him the card. I believe he gave it to her.

Page 29

1   BY MR. BARROUKH:
2   Q   Sorry about that. Did you give her the card prior to
3   being intimate with Jessica?
4   A   I would say probably, yeah. I don't recall the
5   exact date of when that happened, when we were intimate, but I
6   believe it was probably prior to that.
7   Q   And "Sweetie," was that just a nickname you gave to
8   Jessica?
9       MR. ELKINS: Objection to form. You can answer.
10  A   Not to her specifically. It was just a term.
11  BY MR. BARROUKH:
12  Q   And where did you give Jessica this card?
13  A   Where were we physically when I gave it to her?
14  Q   Yes.
15  A   I have no recollection of that.
16  Q   Do you know if you gave her this card at the station?
17      MR. ELKINS: Objection to form. You can answer.
18  A   I have no recollection. I know I gave her the card.
19  I couldn't tell you where it was, where I was physically. I
20  don't know.
21  BY MR. BARROUKH:
22  Q   Did you disclose your relationship to anybody at the
23  police department?
24  A   There was one or two people that knew that we were
25  talking.

Page 30

1   Q   Is there a formal process you have to go through to
2   announce you're in a relationship with another officer,
3   sergeant, lieutenant?
4   A   No.
5   Q   Did you notify your captain?
6   A   No.
7   Q   When you wrote, "Love you, Sweetie," is that
8   something you take lightly or what does that mean to you?
9       MR. ELKINS: Objection to form. You can answer.
10  A   It's just a term of endearment.
11  BY MR. BARROUKH:
12  Q   And can you explain to me your intention when you
13  gave this card to Jessica?
14      MR. ELKINS: Objection to form. You can answer.
15  A   It was a Valentine's Day card. I gave it to her for
16  Valentine's Day.
17  BY MR. BARROUKH:
18  Q   Okay. All right. I'm going to pull up another
19  exhibit. Bear with me. I'd like to mark this as Exhibit 2.
20      (Whereupon, Plaintiff's Exhibit 2 was marked for
21      identification.)
22  BY MR. BARROUKH:
23  Q   Can you see the screen?
24  A   Yes.
25  Q   And are you familiar with this card?

Page 31

1   A   Actually, I saw that the other night. I don't recall
2   what that was from. It looks like it's probably something that
3   was ordered online, maybe flowers or, I don't know.
4   Q   Could you read the card for me, please?
5   A   "Jessica, I hope this is the best birthday yet. I
6   love you with all my heart and I'm so happy you have come into
7   my life. You are my princess. I love you, babydoll. Love
8   Steve."
9   Q   Do you know when Jessica's birthday is?
10  A   I believe it was in April.
11  Q   In April. You said that also around earlier mid 2014
12  is when you were intimate with her, correct?
13  A   Yeah, I believe that was it.
14  Q   So April would be included in that time frame,
15  correct?
16  A   It's possible, yes.
17  Q   Do you deny writing this card?
18  A   No.
19  Q   So you wrote this card, correct?
20      MR. ELKINS: Objection to form. You can answer.
21  A   I didn't write it. You can see that it's printed.
22  Like I said, it looks like based on the perforations that
23  appear to be on the top of that card, it looks like something
24  may have been ordered online that I had delivered to her and,
25  you know, I may have typed something in there when I made the

Deposition of Steve Cosner                                          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 32

order and whoever I ordered it from printed it out to be on that card.

BY MR. BARROUKH:

Q    So you ordered this card for Jessica, correct?

A    I don't recall doing it, but I don't deny that I would have.

Q    Okay.  Is it fair to say that Jessica meant a lot to you?

MR. ELKINS:  Objection to form.  You can answer.

A    At the time I felt like she did, yes.

BY MR. BARROUKH:

Q    All right.  And you mentioned that your relationship with Jessica ended in early 2015, right?

A    Around that time, yeah.  I had finally gotten to where I was at my wit's end with some stuff.

Q    Could you talk to me about your relationship with Jessica and how it came to that end?

A    I just kept catching her in a lot of lies.  She would say that she was, you know, with her girlfriends and then I'd find out she was with somebody else from the agency or from another police agency, that they were out.  I noticed things that she was posting on social media where she was kind of embracing a gentleman who was a captain at the time.  When I questioned her about it she told me, oh, no, he's just a friend of the family, but then I would see even more pictures.  It was

Page 33

obvious to me that it was not a friend of the family, that there was some sort of a relationship.  I would see them in the gym at the station together.  And I got fed up with it.  I saw the writing on the wall.  I decided that it was no longer something I wanted to pursue.

Q    And how did that make you feel when you saw her -- when you caught her in those lies or you saw her with that captain?  How did that make you feel?

MR. ELKINS:  Objection to form.

A    At that point because we weren't really in a, like I said, we weren't really in a formal relationship, it wasn't like she was cheating on me or anything like that, and it was something that I had noticed started building slowly over time so honestly I had started dating other people and kind of sowing my oats as well.  So at the point where it was done it was just done and I moved on with my life.

BY MR. BARROUKH:

Q    I understand.  And would you say you were hurt by her actions?

MR. ELKINS:  Objection to form.  You can answer.

A    Hurt?  I don't know that I would say hurt.  I was frustrated, definitely frustrated, but, like I said, I was already in motion with another relationship at that point that I was very happy in so it really didn't impact me much at all.

BY MR. BARROUKH:

Page 34

Q    And then although you and Jessica weren't exclusive or formally dating, did you still feel betrayed by Jessica?

A    No.

MR. ELKINS:  Objection to form.  You can answer.

A    No, I never felt betrayed by her.

BY MR. BARROUKH:

Q    And I really don't want to dig into this too much, but when was the divorce with your ex-wife?

A    We separated at the end of 2013 and the divorce was finalized in August of 2015.

Q    All right.  And was Jessica a reason for the separation whatsoever?

A    A reason for it, no, but a catalyst that helped me to take the step, yes.  I had already started feeling that I was losing the relationship with my ex.  I was just having trouble finding the right way to make it happen.  And when she started reaching out when I was on that trip with my friend in Georgia and she started the text messaging I thought maybe there could be something there and I felt that was the time.  So that's -- it kind of helped me to get over that hump.

Q    And how long were you with your ex?

A    About 13 years.

Q    Did you have any children?

A    I have two.

Q    Both with the ex-wife, correct?

Page 35

A    Yes.

Q    We can move on.  Did you -- to your knowledge did Jessica ever complain about either of the cards I showed you?

A    She never did.

Q    All right.  Did Jessica complain to you personally about these cards?

A    She never did.

Q    What did Jessica say when you gave her the cards?

A    Well, you're saying cards referring to both.  I couldn't tell you what she said about the second one because that was -- that wasn't something I hand delivered to her.  The one that you're showing right there, she laughed at it.

Q    Jessica thought this card was funny?

A    Yes.

Q    It is a funny card.  So did Jessica text you when -- did Jessica text you or say anything about this note that you had delivered or sent to her?

A    I can't say whether she did or not.  Like I said, I don't even recall sending this.

Q    But you're positive she didn't complain about you sending this, correct?

A    I never once heard her complain about anything that I said, did or joked about anything.  She never complained about anything with me.

Q    Okay.  So did you and Jessica ever have a

Deposition of Steve Cosner                                          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 36

1  conversation in early 2015 when the relationship ended, to use
2  your words?
3      A   No.  It just dissolved.  She did her thing and I did
4  mine.
5      Q   Have you guys spoken about the ending of that or the
6  dissolving of the relationship?
7      A   No.
8      Q   But you still worked in the same police department
9  for years after that, correct?
10     A   For the same Department, yes, but not in the same
11 capacity.
12     Q   Okay.  And when -- were you promoted while you were
13 seeing Jessica?
14     A   Excuse me.  Sorry.  Yeah, because I was promoted to
15 sergeant at the end of '14, so probably that was like to where
16 things started.  I started noticing things that I was not happy
17 with and it started just fading away over the next few months.
18     Q   Did you ever supervise Jessica around that time in
19 early 2015?
20     A   It's possible.  I don't think she was ever on any of
21 my squads like as an assigned subordinate, but it's possible we
22 may have worked the same zone or something like that at some
23 times.
24     Q   And previously you said that at times lieutenants
25 were in charge of staffing for individual shifts and the hiring

Page 37

1  people on overtime, right?
2      A   Right.
3      Q   Did you have that authority over Jessica?
4      A   As a sergeant?
5      Q   Yes.
6      A   No.
7      Q   Could you assign who was on your squad?  I'm not
8  familiar with how squads are assigned.  You say she may have
9  been on the same squad as me.  Was she ever selected -- or did
10 you have the power to select her squad?
11     A   No.  The officers -- we do shift bids twice a year
12 and the way that works is they work their way down from the
13 lieutenants based on seniority.  The lieutenant will start off
14 by picking what shift they want to work and what zone that they
15 want to cover, what days off they want to have.  Once they're
16 done with the lieutenants, then they go to the sergeants.  They
17 pick their shifts and so forth.  Then they go to the officers.
18 And it's all based on seniority.  So if you're the junior
19 officer in patrol, you get the scraps of what's left over.  If
20 you're the senior officer, you get your pick of the litter.
21 The officers choose which supervisor or what zone or what shift
22 they want to work.  It has nothing to do with me.
23     Q   So based on what you're saying, Jessica could have
24 selected shifts to work with you; is that correct?
25     A   Not shifts.  I'm talking about for a full assignment.

Page 38

1  Like I said, we do a shift bid every two years -- I'm sorry,
2  twice a year, but just because I may bid as an officer to work
3  the north district and that's my normal assignment, if there's
4  an opening available in the south district and the lieutenant
5  says, hey, I need to fill this spot so I'm going to take
6  somebody where we have extra bodies in this zone over here and
7  move them to fill that spot so that we have the adequate
8  staffing on all of the zones equally.  That's on a day-by-day
9  basis depending on what the needs are of the shift.
10     Q   Do you remember ever assigning Jessica to a new area
11 prior to 2020?
12     A   No, because the sergeants don't do that.  The
13 lieutenants do.
14     Q   You were a lieutenant, correct?
15     A   I was a lieutenant in 2020.  You said prior to 2020.
16     Q   Thank you.  I appreciate that.  Prior to December of
17 2020, did you ever assign Jessica to a shift or overtime hours
18 in a zone?
19     A   Well, that would have only been on a few month period
20 because I was promoted in September or August.  I don't recall
21 that I ever had that happen.  I think she was working afternoon
22 shift.
23     Q   Also, I just want to let you know, if I'm looking
24 down, I'm taking notes.  I don't mean to be disrespectful to
25 you, sir.

Page 39

1      A   No worries.
2      Q   So December 27th was the first time you assigned
3  Jessica a shift, correct?
4          MR. ELKINS:  Objection to form.
5  BY MR. BARROUKH:
6      Q   You can answer.
7      A   Yes.
8      Q   Okay.  Prior to December 27th, 2020, do you recall
9  supervising Jessica?
10     A   Prior to that date?  How far back are you asking?
11     Q   While you were lieutenant and she was a sergeant.
12     A   Okay.  So just from the time I got promoted to
13 lieutenant until December 27th, no, I don't recall ever having
14 supervised her.
15     Q   So you did not have the power to or authority to
16 assign her schedules or change her shifts until September of
17 2020, correct?
18     A   Correct.
19     Q   And then two or three months later when you were
20 lieutenant you had the authority, you were able to move her in
21 a shift in December 27th, 2020, correct?
22     A   I think that needs -- I think that needs some
23 explanation, though.
24     Q   Okay.  Are you aware that my client filed an EEOC
25 charge of discrimination against the Miami Beach Police

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 40

1  Department?
2      A    Am I aware now?
3      Q    Yes.
4      A    I am aware now, yes.
5      Q    What is the earliest date you were aware that my
6  client filed EEOC charges against the police department?
7          MR. ELKINS:  Objection to form.  I don't know if you
8      clarified which charge.  You can answer if you know.
9      A    I don't recall a date.  I want to say it was probably
10  sometime in 2021 after all of this had transpired.
11  BY MR. BARROUKH:
12     Q    Are you aware she filed a charge of discrimination
13  against the police department in 2018?
14     A    No.
15     Q    Are you aware that she filed a charge of
16  discrimination against the police department in 2020?
17     A    I'm aware now, yes.
18     Q    And are you aware that she filed a third charge of
19  discrimination against the police department in 2021?
20     A    Yes, I've seen that.
21     Q    All right.  Now, prior to December 27th, 2020, for
22  the next few questions, were you aware that she filed a charge
23  of discrimination in 2018?
24     A    No.
25     Q    Were you -- still the same conditions, were you aware

Page 41

1  she filed a charge of discrimination in 2020?
2      A    No.
3      Q    What about 2021?
4          MR. ELKINS:  Objection to form.  How can he be aware
5      of 2021 prior to December of 2020?
6          MR. BARROUKH:  Great point.  Thank you.
7  BY MR. BARROUKH:
8      Q    Are you aware that my client signed -- now as we're
9  sitting here today are you aware that my client signed a Last
10  Chance Agreement as part of her June 2020 EEOC charge?
11     A    I know she signed now a Last Chance Agreement, but I
12  don't know what it was in reference to.
13     Q    Did you read the complaint when this lawsuit was
14  filed?
15     A    The original complaint, yeah, but that was back when
16  it happened.  I don't recall what all was in it.
17     Q    Did you review the complaint prior to the deposition
18  here today?
19     A    No.
20     Q    When was the last time you read the complaint to your
21  knowledge?
22     A    Shortly after it was filed.
23     Q    All right.  And so were you aware in 2020 that my
24  client had signed a Last Chance Agreement?
25     A    No.

Page 42

1      Q    So you were not aware of any settlements or
2  negotiations or agreements that my client had entered into as a
3  result of the EEOC charge; is that correct?
4          MR. ELKINS:  Objection to form.  Asked and answered.
5      A    No.
6  BY MR. BARROUKH:
7      Q    And following the settlement agreement, so in
8  December of 2020, were there any allegations of misconduct
9  against my client?
10         MR. ELKINS:  Objection to form.
11     A    In December of 2020?
12  BY MR. BARROUKH:
13     Q    Yes.
14     A    Are you referring to the allegation that I wrote or
15  are you asking if there's any other than that?
16     Q    To your knowledge what you believe or what you know.
17         MR. ELKINS:  Objection to form.
18  BY MR. BARROUKH:
19     Q    I'm just asking in December of 2020 are you aware of
20  my client being written up for any misconduct?
21     A    The write-up that I provided, yes.
22     Q    All right.  And what was the result of your write-up?
23     A    That was --
24         MR. ELKINS:  Objection to form.  You can answer.
25     A    The result of that was that the chief, I guess, chose

Page 43

1  to utilize the Last Chance Agreement and have her separate from
2  the city.
3  BY MR. BARROUKH:
4      Q    Is that a complicated way of saying she was fired?
5          MR. ELKINS:  Objection to form.
6      A    Well, I believe on the Last Chance Agreement it's not
7  firing.  It's that you agree that if you make a violation that
8  you're going to resign.
9  BY MR. BARROUKH:
10     Q    So the way you understand it, he implicated her
11  resignation via the Last Chance Agreement, correct?
12     A    That's correct.
13     Q    And was there a meeting regarding implicating the
14  Last Chance Agreement and the resignation of my client?
15     A    There was a meeting.  We didn't discuss that, though.
16     Q    When was the meeting?
17     A    When?
18     Q    Yes.
19     A    I believe it was January of '21.
20     Q    And were you present at this meeting?
21     A    Yes.
22     Q    Where was the meeting held?
23     A    It was in the conference room in the chief's office.
24     Q    And do you remember who else was present at the
25  meeting?

Page 44

1    A   Chief Clements, Deputy Chief Jones.  The union
2  president, Paul Ozaeta, was there by Zoom or Teams, one of
3  those platforms.  Ms. Salabarria was there.  A.J. Prieto,
4  Delvin Brown, Reggie Lester, and Carley Flaherty.  I think that
5  was it.
6    Q   And why do you believe -- or were you asked to appear
7  at the meeting?
8    A   I was asked by the chief to be there, yes.
9    Q   And what did the chief ask you or what did the chief
10  say to you when he asked for you to appear at the meeting?
11    A   Because I was the one who authored the write-up he
12  wanted me to be present in case there was any questions about
13  any of the details in it.  And it was just basically to present
14  her with that write-up and what the allegation was and to ask
15  for her to provide a statement about it.
16    Q   And did you speak to her at the meeting outside of
17  that?
18    A   I did not.
19    Q   Did you ask Jessica any questions during that
20  meeting?
21    A   I don't recall asking any questions.
22    Q   Do you remember Jessica asking any questions?
23    A   There was discussion.  She was talking definitely.  I
24  couldn't tell you what she asked.
25    Q   Do you remember if Jessica asked for an attorney at

Page 45

1  the meeting?
2    A   I never heard her ask for an attorney.
3    Q   Did you hear anybody deny Jessica an attorney based
4  on what you heard?
5    A   No.
6    Q   So would Paul Ozaeta be lying if he says Chief
7  Clements denied Jessica an attorney?
8       MR. ELKINS:  Objection to form.
9    A   I can't tell you whether he said that or not.  I can
10  tell you only what I remember hearing.
11  BY MR. BARROUKH:
12    Q   Okay.  Did my client have an attorney present at that
13  meeting?
14    A   No.
15    Q   To your knowledge, or based on how you felt at the
16  meeting, did you believe there was a proper meeting and it
17  could have been halted if it was not proper?
18       MR. ELKINS:  Objection to form.  You can answer.
19    A   I felt that the meeting was fine.  She had plenty of
20  representation from the union.
21  BY MR. BARROUKH:
22    Q   And do you remember what the chief said surrounding
23  his implication of her resignation in the Last Chance
24  Agreement?
25    A   I don't recall that being discussed in the meeting.

Page 46

1    Q   All right.  That was not discussed?
2    A   Her resignation?
3    Q   The factors that led to him implicating her
4  resignation.
5    A   The factors meaning the write-up that I provided was
6  discussed.
7    Q   All right.  Was anything else discussed as a factor?
8    A   Not that I can recall, no.
9    Q   All right.  So I'm going to show you what I've marked
10  as Exhibit 4.
11       MR. ELKINS:  Can we take ten?  I need to make a call.
12       MR. BARROUKH:  That's fine.
13       (A recess was taken.)
14  BY MR. BARROUKH:
15    Q   All right.  So we were previously discussing the
16  meeting and your allegation of misconduct against my client,
17  correct?
18    A   Correct.
19    Q   All right.  I'm going to show you what I'd like to
20  mark as Exhibit 4.  It says 4, but I'll change it to 3.
21       (Whereupon, Plaintiff's Exhibit 3 was marked for
22  identification.)
23  BY MR. BARROUKH:
24    Q   Are you familiar with this document?
25    A   I just see an e-mail.

Page 47

1    Q   All right.  Do you see where it says from?  I'm
2  highlighting it right now.  Do you see that?
3    A   Yes.
4    Q   What does that say?
5    A   That's my name.
6    Q   And is this your e-mail address,
7  stevencosner@miamibeachfl.gov?
8    A   Yes.
9    Q   And what is the subject of this e-mail?
10    A   Salabarria Administrative Action Form.
11    Q   Who did you send this e-mail to?
12    A   Mr. Elkins.
13    Q   What time did you send it to Mr. Elkins?
14    A   January 8th of 2021 at 12:34 a.m.
15    Q   All right.  And this is, to confirm, the e-mail you
16  sent Mr. Elkins?
17    A   Yes.
18    Q   All right.  Are you familiar with this form?  I'll
19  scroll down.  I can give you some more time to review it if
20  you'd like.
21    A   No, I'm familiar with it.
22    Q   Okay.  So did you fill out this form?
23    A   I did.
24    Q   And if we get to the bottom here, you see that
25  there's no signatures, witnesses or dates on this document,

Page 48

1  correct?
2      A   Correct.
3      Q   And why is this document not signed or dated?
4      MR. ELKINS:  Objection to the form.
5      A   Because it's a draft.
6  BY MR. BARROUKH:
7      Q   It's a draft.  Did you send a finalized copy to
8  anybody?
9      A   No.  Once I sent the draft the ball started rolling
10 with this one.
11     Q   And when you say the ball started rolling, what does
12 that mean?
13     A   Because this had also been sent to internal affairs.
14     Q   Who sent it to internal affairs?
15     A   I sent it to internal affairs.
16     Q   Was that draft signed?
17     A   No.
18     Q   Would you normally sign these documents?
19     MR. ELKINS:  Objection to form.
20     A   We would if I had a hard copy, but I don't have the
21 ability to sign a digital copy.
22     Q   Okay.  So could you read this section for me starting
23 at, "I have read"?
24     A   "I have read the Administrative Action Form and

Page 49

1  understand it.  Additionally, I have been provided with an
2  employee --
3      MR. ELKINS:  I can't see the screen share.
4  BY MR. BARROUKH:
5      Q   Mr. Cosner, can you see the screen share?
6      A   I can.
7      MR. ELKINS:  I can't.  It came back.  Sorry.  Can you
8  reshare it?
9      MR. BARROUKH:  Yeah.
10     MR. ELKINS:  Thank you.  Sorry about that.
11     A   Okay.  Starting back at the beginning it says:  "I
12 have read the Administrative Action Form and understand it.
13 Additionally, I have been provided with an employee's
14 Administrative Action Response Form and it has been explained
15 to me."
16 BY MR. BARROUKH:
17     Q   All right.  And do you -- you never brought this to
18 Jessica; is that correct?
19     A   Correct.
20     Q   The sentence says, the second sentence:  "I have been
21 provided with an Employee's Administrative Action Response
22 Form."  Right?  Did you ever provide an Administrative Action
23 Response Form to Jessica?
24     MR. ELKINS:  Objection to form.  Misstates what this
25 is saying.

Page 50

1  BY MR. BARROUKH:
2      Q   You can answer.
3      A   I did not, because this isn't -- you don't submit it
4  at that time.
5      Q   When would you submit one of those forms?
6      MR. ELKINS:  Objection to form.  Misstates what it
7  says.
8      A   If the form -- when the form goes to internal
9  affairs, any discipline that may or may not be conveyed from
10 the substance of this form has to come from the chief of
11 police.  So once they would say, okay, we're going to issue
12 discipline, this gets returned to the supervisor who authored
13 it to provide it to the employee who was the subject of the
14 allegation.  And at that point all the signatures are placed on
15 this and the response form are provided to them at that point.
16 BY MR. BARROUKH:
17     Q   Is there a limit to how many Administrative Action
18 Forms you can send?
19     MR. ELKINS:  Objection to form.
20     A   No.
21 BY MR. BARROUKH:
22     Q   Theoretically, could you send a hundred
23 Administrative Action Forms?
24     MR. ELKINS:  Objection to form.
25     A   I'm not really following what your question is here.

Page 51

1  BY MR. BARROUKH:
2      Q   I'm confused because you're making it seem as if you
3  can file as many of these Administrative Action Forms as you
4  want without having to verify prior with the individuals
5  involved.  You could send out a hundred of these to Mr. Elkins
6  or to A.J. Prieto and you don't need anybody to confirm or deny
7  these statements?
8      A   No.  Would you like me to explain to you the process?
9      Q   Yes.  Yes, please.
10     A   Okay.  As a supervisor, actually, any officer can do
11 it, but as a supervisor, if I witness another officer
12 committing what I believe is a violation of policy or
13 department rules or regulations, I document it on this form
14 with the narrative of what my observations were.  Okay?  At
15 that point it gets sent to internal affairs.  This itself is
16 not discipline.  This is just my documentation of what I
17 observed.  I send this to internal affairs.  They look at it
18 and decide if it needs further investigation or if they're
19 going to return it back to me after they've consulted with the
20 chief of police and so forth.  If they determine that my
21 observations are sufficient enough, then they will allow for
22 whatever -- you can see at the top there it says level of
23 action, documentation of verbal conference, written warning or
24 letter of reprimand.
25     Those are the three types of discipline that are possibly

Deposition of Steve Cosner                                Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 52

1  going to be issued based on this form.  This form would then be
2  returned to me saying we're going to say we want a letter of
3  reprimand, this is going to be counted as a letter of
4  reprimand.  You see there at the top there, the number at the
5  top right, right there?
6     A   Yes.
7     Q   That's for a discipline number that gets issued by
8  internal affairs.  Once that discipline number is issued and
9  any level of action is given, they send it back to me and then
10 I submit this to that particular individual along with a
11 response form to allow them to respond to whatever is written
12 up.  If they disagree with it, if they want to challenge it,
13 that's where they can write that on that response form.  They
14 can also grieve it through the union process.
15     If there's a situation where somebody comes to me and
16 alleges that another officer did something, whether it's an
17 officer in the agency, whether it's a civilian, or anybody,
18 comes to me as a supervisor and says Officer X did X, Y, Z, and
19 I did not observe it, then I would write it on an Allegation of
20 Employee Misconduct.  And then the same process.  It goes to
21 internal affairs.  They follow it through.  They investigate
22 it.  They determine whether or not it's going to be basically a
23 shift-level investigation where it comes back to me or whether
24 there's going to be discipline.  If there's going to be
25 discipline, everything would be transferred to an

Page 53

1  Administrative Action Form like this one and then the same
2  process.
3     Q   Okay.
4     A   So this particular form is what I wrote based on my
5  observations of that particular incident that I submitted to
6  internal affairs.  So there would be no response form provided
7  to her at this point.
8     Q   All right.  So to your knowledge there was no
9  completed form sent back to you then; is that fair?
10    A   I never got a completed form because, as I
11 explained -- my understanding is at that point when the chief
12 got it there was all of this other stuff that was going on
13 unbeknownst to me about the last chance and so forth.  He
14 contacted me later, several days later, to discuss this.
15 That's when I found out that there was a last chance.  Okay?
16 So at that point they didn't need to -- to my understanding,
17 they didn't need to submit this back to me for any discipline
18 because the discipline that would have been sufficient for this
19 action form was not applicable to what was going on with
20 Ms. Salabarria's incident.
21    Q   And what do you believe is discipline proper to this
22 Administrative Action Form?
23        MR. ELKINS:  Objection to form.  You can answer.
24    A   I don't suggest discipline.  I write up what I
25 observe and they tell me what level of discipline to issue.

Page 54

1  BY MR. BARROUKH:
2     Q   All right.  I'm asking you to speculate, though.  Do
3  you believe that termination is appropriate for this as a
4  response to this Administrative Action Form?
5        MR. ELKINS:  Objection to form.  You can answer.
6     A   I'm not going to speculate to that.
7  BY MR. BARROUKH:
8     Q   Are you aware of any other officer, sergeant or
9  lieutenant who's been terminated for violating the same
10 Department SOP numbers?
11        MR. ELKINS:  Objection to form.  You can answer.
12    A   I don't know.
13 BY MR. BARROUKH:
14    Q   It's a yes-or-no question.  Are you aware of any?
15    A   I'm not aware of any.
16    Q   Okay.  And you mentioned twice in your explanation
17 that you are supposed to send these forms to internal affairs
18 but here it clearly says Michael Elkins.  Why did you send this
19 form to Mr. Elkins?
20        MR. ELKINS:  Objection.  Attorney-client privilege.
21 Don't answer that.
22        MR. BARROUKH:  I'm asking him why he sent it to
23 you.
24        MR. ELKINS:  Yeah.  He's not answering it.  You can
25 move on.

Page 55

1  BY MR. BARROUKH:
2     Q   So on the left of this document we see some DRR
3  numbers, correct?
4     A   Yes.
5     Q   All right.  Let me go over here.  And I'd like to
6  mark this document as Exhibit 4.
7        (Whereupon, Plaintiff's Exhibit 4 was marked for
8  identification.)
9  BY MR. BARROUKH:
10    Q   Are you familiar with this document?
11    A   Yes.
12    Q   All right.  It's 49 pages.  I can go through the
13 document if you'd like.
14    A   It depends on what you're going to ask me.
15    Q   All right.  This says page 1 of 49 and when we go all
16 the way to the bottom it says page 49 of 49.  I can go through
17 each one for you, but to your knowledge is this a complete set
18 of Miami Beach Police Department Rules and Regulations?
19    A   It appears to be, yes.
20    Q   All right.  And this says revised date January 4th,
21 '22, correct?
22    A   Correct.
23    Q   In fact, this was actually produced to us by the
24 police department.  You can see the city's Bates number on the
25 bottom, right?  We're not skipping any number.  It goes from

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 56

1  001471 all the way down to 001591.  Do you see that?
2      A   Yes.  1519.
3      Q   Sorry.  Thank you.  1519.  So this document, the DRR,
4  does that correlate to the DRRs here in your Administrative
5  Action Form?
6      A   Yes.
7      Q   So the way it would work is DRR 3.8.2, we would
8  scroll down and we would find DRR 3.8.2, correct?
9      A   Correct.
10     Q   All right.  So I'd like to review the DRRs with you.
11 We can go one at a time or several at a time.  Which do you
12 prefer?
13     A   It's your choice.
14     Q   All right.  So let's start off with 3.8.2.  You cited
15 Ms. Salabarria as violating the Department's standard operating
16 procedure, DRR 3.8.2, which as we can see here is
17 insubordination, correct?
18     A   Yes.
19     Q   And 3.8.2 says that it's a failure or deliberate
20 refusal of any employee to obey a lawful order given by a
21 supervising officer will be considered insubordination,
22 correct?
23     A   Correct.
24     Q   3.8.2 provides ridiculing supervisory officers or
25 their orders, whether in their presence or during their

Page 57

1  absence, is also subordination, correct?
2      A   Correct.
3      Q   All right.  And, actually, prior to taking in the
4  specific 3.8.2, did you ever review these documents, the DRRs?
5      A   Prior to what now?
6      Q   Prior to writing this Administrative Action Form
7  where you cited these Department violations, did you ever
8  review the DRRs, the Department Rules and Regulations?
9      A   Yes.
10     Q   All right.  And did you review these documents with
11 anybody?
12     A   No.
13     Q   You reviewed these Department Rules and Regulations
14 by yourself?
15     A   Yes.
16     Q   How long did you review these documents for?
17         MR. ELKINS:  Objection to form.
18     A   I've reviewed them multiple times.  Every time I have
19 to write an allegation of employee misconduct or Administrative
20 Action Form I have refer back to either an SOP or a DRR.
21 BY MR. BARROUKH:
22     Q   And when was the first time you reviewed these DRRs?
23     A   Probably the first time that I wrote somebody up.
24     Q   And, again, you did not review these with anybody
25 else, you reviewed them by yourself?

Page 58

1          MR. ELKINS:  Objection to form.  Asked and answered.
2      A   Yes.
3  BY MR. BARROUKH:
4      Q   Was this Administrative Action Form the first time
5  you had written somebody up?
6      A   No.
7      Q   When was the first time you wrote somebody up?
8          MR. ELKINS:  Objection to form.
9      A   I don't recall, but probably in 2015.
10 BY MR. BARROUKH:
11     Q   So for approximately how many years have you been
12 referring to these DRRs?
13     A   In the capacity of a supervisor for this reason from
14 2015 until now, nine years, but I have looked at it throughout
15 the course of my career because these are things that we need
16 to know.
17     Q   And how did you learn how to interpret these
18 Department Rules and Regulations?
19         MR. ELKINS:  Objection to form.  You can answer.
20     A   I read it.
21 BY MR. BARROUKH:
22     Q   Did you receive any specific training on how to
23 interpret these rules and regulations?
24     A   There's no training necessary.
25     Q   So you reviewed these documents entirely by yourself

Page 59

1  without any training or supervision or getting interpretations
2  as to how to understand and apply these Department rules and
3  regulations, correct?
4          MR. ELKINS:  Objection to form.  Asked and answered.
5      And compound.
6      A   Yeah.  It's simple English.  I understand English.
7  BY MR. BARROUKH:
8      Q   All right.  So 3.8.2, as again you cited in your, I'm
9  going to call this your AAF.  Is that all right?
10     A   That's fine.
11     Q   In your AAF you cite 3.8.2.  It says:  "Failure to
12 abide a lawful order, failure or deliberate refusal of any
13 employee to obey a lawful order given by a supervising officer
14 will be considered insubordination.  Ridiculing supervisory
15 officers or their orders, whether in their presence or during
16 their absence is also insubordination."
17     Which aspect of 3.8.2 did my client violate in your
18 report?  Again, I can give you time to read this.
19     A   She was ordered to issue the directives to her
20 officers that she was supervising that night and she failed to
21 do so.
22     Q   All right.  Give me one moment.  When you say she
23 failed to do so, could you point that out for me?
24         MR. ELKINS:  Objection to form.  You can answer if
25     you understand.

Page 60

1    A   You want me to point out in the narrative where I
2  documented that?
3  BY MR. BARROUKH:
4    Q   Yes.
5    A   All right.
6        MR. ELKINS:  Objection to form.  You can answer.
7    A   Okay.  At 3:55 in the morning, 3:55 a.m., right
8  there, I forwarded an e-mail to Sergeant Salabarria with the
9  details on watch orders that needed to be assigned to the Area
10  3 officers for completion prior to the end of their shift.  I
11  then sent a text message to her cellular phone advising her to
12  check her e-mail at 3:59.  After a few minutes I did not
13  receive an acknowledgement to the text.  I tried to call her
14  phone at 4:04.  I got her voicemail.  I tried to raise her on
15  the radio.  She didn't answer.  Sergeant Romero tried to call
16  her.  He called me and said that he couldn't get her either.
17    So when I finally got ahold of her she said she was at the
18  station.  I asked her if she knew she was in Area 3.  She
19  answered affirmatively.  Then I told her -- I ordered her to
20  respond to Area 3 and check her e-mail.
21  BY MR. BARROUKH:
22    Q   So when was the -- you can continue if you'd like,
23  but where is the 3.8.2 violation?
24    A   Well, it's documented further in here.  If you can go
25  up a little bit further I'm sure it's in there.  That's too

Page 61

1  far.  Hold on.  I'm going to have to read through and --
2    Q   Absolutely.  Take as much time as you need.
3    A   Go down a little bit.  Up a little bit.
4    Q   Is it better in small form or you can't read it?
5    A   No, I need it a little bit bigger.  That's good.
6  Scroll up just a bit there so I can see.  Okay.  Hold on.  Hold
7  on.  Okay.  At 5:43 I received an unsolicited text message from
8  Sergeant Salabarria advising that she had e-mailed me the squat
9  stats and the detail assignments.  She claimed that she had
10  told the officers by landline and e-mail of the detail
11  assignments.  The e-mail that she sent me was at 5:36 a.m.  It
12  included the squad stats and the detail assignments.  I called
13  officer Romero, asked him if he had received any e-mails, texts
14  or phone calls from Salabarria advising him of the detail
15  assignments.  He did not.  Just that she had asked for the
16  stats at 5:21.  Stats meaning, you know, how many calls he
17  handled, how many arrests, how many citations and so forth.
18    The e-mail was forwarded to be by Officer Ocejo.  I
19  started calling all of the officers in Area 3.  Every one of
20  the officers advised me that they had not received a call or a
21  text advising of any of the details.  Officer Romero then
22  forwarded an e-mail that he received from Sergeant Salabarria
23  at 5:42.  The e-mail had been sent to each of the area
24  officers.  It was the detail assignments and began with a
25  highlighted line stating:  "Squad, per our conversation, please

Page 62

1  note the below details for our shift."  I found that very
2  concerning because it was now the second time that she claimed
3  to have had a conversation with the officers about their
4  assignments when all six of them claim that never happened and
5  they did not report to any details during the shift.
6    Q   So where in what you read to me is a 3.8.2 violation?
7    A   All of it.
8    Q   All of it?  How?
9        MR. ELKINS:  Objection to form.  You can answer.
10    A   Because it clearly documents that she was told to
11  give this assignment to the officers so that they could do
12  their jobs and she failed to do so.
13  BY MR. BARROUKH:
14    Q   Doesn't it say that she sent the officers e-mails and
15  she gave them instructions?
16    A   Her e-mail says that she did.  They never heard
17  anything from her.  And the e-mail says "per the conversation"
18  indicating that there was a prior conversation that she had
19  with them that never happened.
20    Q   Did you ask Jessica if she had this conversation?
21    A   I did not.
22    Q   Why didn't you ask Jessica?
23    A   I didn't feel that it was necessary at that point
24  considering I had six officers that all told me the same thing.
25    Q   However she was the sergeant in this, is it

Page 63

1  appropriate to say squad?
2    A   She was supervising that squad for the night, yes.
3    Q   And you didn't think it was proper to ask her?
4        MR. ELKINS:  Objection to form.  You can answer.
5    A   At that point, no, it was not necessary to ask her.
6  BY MR. BARROUKH:
7    Q   And it would have taken a few minutes at most to ask
8  her and get an answer from her; is that correct?
9        MR. ELKINS:  Objection to form.  You can answer.
10    A   The time it would have taken is irrelevant.
11  By MR. BARROUKH:
12    Q   I'm not asking if it's relevant.  I'm asking you if
13  it would have been about ten minutes, give or take?
14        MR. ELKINS:  Objection to form.  You can answer.
15    A   Had I chose to do that it probably would have taken a
16  couple of minutes, yes.
17  BY MR. BARROUKH:
18    Q   All right.  So 3.8.2 says that there's a failure or
19  deliberate refusal of any employee to obey a lawful order.  I'm
20  not going to read it again.  Did Jessica ridicule a supervising
21  officer or their orders?
22    A   I don't know.
23    Q   So it's fair to say that this section of 3.8.2 that
24  I'm highlighting is not applicable as insubordination?
25    A   Correct.

Page 64

1    Q   Did Jessica deliberately refuse, refuse, to obey a
2 lawful order?
3    A   Based on the totality of the circumstances that I had
4 provided to me, yes, she deliberately refused.
5    Q   So you're interpreting 3.8.2 to mean a deliberate
6 refusal where you didn't even ask Jessica if she accepted the
7 order or not and didn't ask her if she had actually proceeded
8 with following your orders; is that correct?
9    A   Correct.
10   Q   All right.  We can move on to the next DRR, DRR
11 6.5.4.  Do you see that?
12   A   Yeah.
13   Q   And it's under the section of Integrity?
14   A   Correct.
15   Q   All right.  Could you please read 6.5.4 for me?
16   A   "No employee will intentionally make false reports,
17 either written or verbal, or enter or cause to be entered in
18 any Department book, record or report, any inaccurate, false or
19 improper information."
20   Q   And you see this word here "intentionally," correct?
21   A   Yes.
22   Q   Did you ask Jessica if she intentionally made a false
23 report?
24   A   No.
25   Q   Did you ask her if she intentionally wrote or made a

Page 65

1 written or verbal false report that was to be entered into the
2 Department book, record or report?
3    A   No.
4    Q   So you stated that Jessica violated that Department
5 rule and regulation without actually asking if she intended to
6 do so; is that correct?
7    A   Correct.
8    Q   Yet you still put that as an Integrity violation,
9 correct?
10       MR. ELKINS:  Objection to form.  You can answer.
11   A   Yes.
12 BY MR. BARROUKH:
13   Q   All right.  We can continue to 6.15.1.  I believe
14 it's .1, not .10.  Yeah.  Could you please read -- this under
15 the Performance of Duties Section, correct?
16   A   Yes.
17   Q   Could you please read 6.15.1 for me?
18   A   "Employees will remain at or within their assigned
19 work areas during working hours unless otherwise authorized by
20 a supervisor."
21   Q   Did you ask Jessica where she was that night?
22   A   Yes.
23   Q   And what did she tell you?
24   A   She used the code that she was 05, which means that
25 she's at the station.

Page 66

1    Q   And where was Jessica that night?
2    A   At the headquarters building.
3    Q   And when was Jessica there?  I can pull up the report
4 if you'd like to refresh your memory.
5    A   When was she there?
6    Q   Yeah.  When was she at the headquarters as you're
7 saying?
8    A   I believe she was there the entirety of the night
9 until a few minutes after I contacted her by radio.
10   Q   All right.  Give me one moment.  I'm sharing what I'd
11 like to mark as Exhibit 5 with you.
12       (Whereupon, Plaintiff's Exhibit 5 was marked for
13 identification.)
14 BY MR. BARROUKH:
15   Q   Please let me know when you can see the document.
16   A   I see it.
17   Q   All right.  And do you know what the document is?
18   A   It's an e-mail.
19   Q   When was the e-mail sent?
20   A   December 28th, 2020 at 3:55 a.m.
21   Q   And who sent this e-mail?
22   A   I did.
23   Q   And what is the content of this e-mail?
24   A   If you scroll down further.  Right there.  Those are
25 all of the details that she was supposed to assign to the

Page 67

1 officers.
2    Q   And what did you tell her in this e-mail?
3    A   That I had forgot to send it to her.  Please assign
4 it and that I needed a DAL, which is a Daily Activity Log, and
5 stats by 6:15 in the morning.
6    Q   How could Jessica send you -- how could Jessica
7 assign her officers' information if you did not send her the
8 duties?
9        MR. ELKINS:  Objection to form.  You can answer.
10   A   This e-mail was sent 3:55.  The officers work until 7
11 a.m.  There was multiple hours of time for them to go into
12 these details.
13 BY MR. BARROUKH:
14   Q   Prior to the 3:55 Jessica could not have sent the
15 assignments to her officers, correct?
16   A   Correct.
17   Q   And just to confirm, this e-mail from Martin Dionne?
18   A   Dionne.
19   Q   Dionne.  You were cc'd on this document, correct?
20   A   Correct.
21   Q   And these were the assignments for the night; is that
22 correct?
23   A   Those are the assignments for that particular zone.
24   Q   Okay.  And you did not send them to Jessica while she
25 was assigned to your squad; is that correct?

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 20 of 223

Deposition of Steve Cosner                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 68

MR. ELKINS:  Objection to form.  You can answer.

A   I did send it to her.

BY MR. BARROUKH:

Q   You did not send it on time, though; is that correct?

A   There's no specific time that I'm supposed to send it.

Q   If you forgot to send it to her does that mean you probably should sent it to her?

A   I could have sent it earlier.

Q   All right.  Back to 6.15.1.  "Employees will remain at or within their assigned work areas during working hours unless authorized be a supervisor."  Correct?

A   Correct.

Q   When did Jessica -- or where in your report did Jessica violate 6.15.1?

A   Scroll.  Stop.  I spoke to her by the supervisor channel and asked her where she was.  She told me that she was 05.  Again, that means that she was at the station.  Now, we have a headquarters building and we have a north end substation.  So I asked her if she meant 05 at the NESS, meaning the north end substation.  She said, no, and that she was at the main station.  I asked her if she was aware that she was assigned to Area 3 and she answered affirmatively.  I then ordered her to respond to Area 3 and check her e-mail.

Q   And after you ordered her to respond to Area 3 and

Page 69

check her e-mail what did she do?

A   I believe we discovered that several minutes later she got in her car and she drove up to Area 3, parked her car for about 45 minutes or so, and then drove back to the station.

Q   So when you ordered her to respond to Area 3 a few minutes later she drove there; is that correct?

A   Correct.

Q   All right.  So she went to her assigned work area during her work after you ordered her to; is that correct?

A   Correct.

Q   So when you say she violated 6.15.1, that's not entirely accurate; is that correct?

MR. ELKINS:  Objection to form.

BY MR. BARROUKH:

Q   You can answer.

A   That is accurate.

Q   Can you explain to me how it's accurate?

A   She was assigned to Area 3.  She was not in Area 3.

Q   But you can agree that she wasn't in Area 3 for a few hours because you forgot to send her the assignment; is that fair?

MR. ELKINS:  Objection to form.

A   No, that's not even close.

BY MR. BARROUKH:

Q   We can move on to the next DRR, 6.15.6.  Do you see

Page 70

that?

A   Yes.

Q   And that's also a Performance of Duty issue?

A   Yes.

Q   And it says:  "Employees will adhere to SOPs, regulations, directives, policies and procedures and will faithfully execute all duties and responsibilities of their assigned position."

A   Can you go back?  Was it 6.15.6 or .15.16?  All right.  Go back.  Okay.  "Employees will adhere to SOPs, regulations, directives, policies and procedures and will faithfully execute all duties and responsibilities of their assigned position."  Yes.

Q   What does that mean to you?

A   That means that each officer or supervisor has specific duties that they're supposed to dole out throughout the course of their tour of duty while they're working.  They're supposed to follow all the policies and regulations of the Department and the city and execute the duties that they're supposed to be responsible for.

Q   And did you ask Jessica if she completed the duties she was responsible for in the night in question?

A   No.

Q   Why not?

A   Because I don't have to ask somebody if they did it

Page 71

if I can show that they didn't.

Q   So did you give her a chance to explain herself?

A   No, I didn't have any further conversation with her about this incident.

Q   All right.  And you will admit that she did drive to Area 3 that night and sent the assignments, whether it was, we can disagree on if it was late or not, it ended up happening; is that correct?

A   She did not send -- I'd have to look at what the e-mail says again, what she sent to them, but the e-mail she sent was indicating she had already sent them the details and discussed with them.  So she didn't send them the details.

Q   All right.  I'm going to share what I've marked as Exhibit 6.

(Whereupon, Plaintiff's Exhibit 6 was marked for identification.)

BY MR. BARROUKH:

Q   Let me know when you see the document.

A   Yes.

Q   All right.  Again, can you tell me who the e-mail is from?

A   It's from me.

Q   Are you familiar with this document?

A   Yeah.

Q   All right.  And I just want to represent that this is

Page 72

1  all --
2      MR. BARROUKH:  Michael, you have all of these
3  documents.
4  BY MR. BARROUKH:
5      Q    This says -- this is from you to Mr. Elkins; is that
6  correct?
7      A    Yes.
8      Q    Again, this time 12:11 a.m. is slightly before you
9  sent the AAF to Mr. Elkins as well, correct?
10     A    Yes.
11     Q    So there's at least 20 minutes of communication at
12 that point.  And so just so you know, there are additional
13 documents here.  The Beach is in possession of them.  I believe
14 they actually produced them but for the purposes of efficiency
15 I removed them from this document at this time.  I'm more than
16 happy to pull up the original if you'd like.  But the AVL
17 reports, the text messages and phone calls are not here.  Is
18 that an issue?
19     MR. ELKINS:   Well, hold on.  It's going to be an
20 issue if you're going to ask him about.
21     MR. BARROUKH:  I'm not going to ask him about the
22 phone calls, text messages, or AVL report, just the
23 e-mails.
24     MR. ELKINS:  Then it's not an issue.
25     MR. BARROUKH:  All right.

Page 73

1  BY MR. BARROUKH:
2      Q    We're referring to Jessica's e-mails, correct, when
3  we were talking about the AAF and you said she had sent the
4  e-mails.  That was the topic of issue, right, Mr. Cosner?
5      A    Right.
6      Q    So we're going to start with this e-mail, and
7  although it's confusing, the structure in the document, bear
8  with me, this e-mail, can you tell me who sent this and what
9  time they sent it?
10     A    This e-mail was sent by her.  And you wanted what,
11 the time?
12     Q    Who is her?
13     A    By Jessica Salabarria.
14     Q    Yes.  And what date and time did she send the e-mail?
15     A    December 28th at 5:21 a.m.
16     Q    And who did she send the e-mail to?
17     A    The officers in her squad.
18     Q    And were these the officers that she was supposed to
19 send assignments and directives to?
20     A    Yes.
21     Q    You can take another minute to look and see if anyone
22 was left out, but do you believe everyone was included from
23 that squad?
24     A    I believe that's everybody, yeah.
25     Q    Okay.  And I just want to point out one more time,

Page 74

1  when you said you forgot to send it it was almost 4 a.m., at
2  3:55 a.m., and she sent this at 5:21 a.m.  Do you see that?
3      A    Yes.
4      Q    And then you can see again another e-mail.  Who sent
5  this e-mail?
6      A    Jessica Salabarria.
7      Q    And what is the subject line of the e-mail?
8      A    Area 3 details, midnight shift stats from December
9  27th to December 28th.
10     Q    Thank you.  And who did she send the e-mail to?
11     A    To me.
12     Q    At what time did she send the e-mail?
13     A    December 28th, 2020 at 5:36.
14     Q    And she sent this at your request; is that correct?
15     A    Yes.  Each supervisor sends that to the lieutenant.
16     Q    Now, where were we?  I believe we were on 6.15.6.
17 Did Jessica fail to adhere to her responsibilities after
18 sending those e-mails to the squad individuals?
19     MR. ELKINS:  Objection to form.  Misstates what the
20 e-mail shows.
21     MR. BARROUKH:  Mike, I'm going to ask you to keep it
22 to a form objection, please.
23 BY MR. BARROUKH:
24     Q    You can answer.
25     A    Say again.  Did she fail to do her responsibilities

Page 75

1  what?
2      Q    Sure.  I'll make it more simple.  After sending those
3  e-mails, you asked her to send those to her officers.  She sent
4  the e-mail to her officers.  Did she violate 6.15.6?
5      A    By the e-mail sending, no.
6      Q    So where did she violate 6.15.6?
7      A    The fact that she was at the station and not in the
8  zone that she was assigned at to supervise the officers as they
9  were handling the calls and details in that zone, she's failing
10 to supervise.
11     Q    Are you aware of any other sergeant or lieutenant or
12 supervisor who has been at the station instead of an area they
13 were assigned to?
14     MR. ELKINS:  Objection to form.  You can answer.
15     A    Yes.  Sergeants have desks in the station to do some
16 administrative tasks, but they're still required to go to their
17 zone.
18 BY MR. BARROUKH:
19     Q    All right.  Could I have the names of all the
20 sergeants that have been assigned to go to areas that failed to
21 appear to those area?
22     MR. ELKINS:  Objection to form.  You can answer.
23     A    I can't provide you all the names of those sergeants.
24 BY MR. BARROUKH:
25     Q    Why not?

Page 76

1    A   Well, because, there's I believe 62 sergeants
2  currently in the Department and since then there's been a lot
3  of sergeants that have resigned -- or not resigned, retired,
4  and then there's been new people promoted to sergeant. So for
5  you to expect me to name off, I'd estimate somewhere around 75,
6  80 names right now, I can't do that. However, if you want to
7  pull a list of the seniority report from the Department, I'm
8  sure those names will be on there.
9    Q   Okay. But you said I'm asking you list 65 to 70
10 names. I'm asking you to list people that have been assigned
11 to areas and failed to appear there. Is it your testimony that
12 65 to 70 sergeants have been assigned to areas and failed to
13 appear there?
14         MR. ELKINS: Objection to form.
15 BY MR. BARROUKH:
16    Q   You can answer.
17    A   No, that's not what I'm saying. I'm saying that's
18 how many sergeants we have in the agency. I can't tell you
19 what other sergeants may or may not have done. Now, do
20 sergeants go to the station for administrative duties
21 throughout their shift, yes, but they're also expected to be in
22 their zone and supervising their officers. So when it's for
23 the duration of the shift, the majority of the shift, then
24 that's a problem.
25    Q   And when she was there from -- from when you sent her

Page 77

1  that e-mail at 3:55, when you sent her this e-mail to when she
2  started driving was approximately an hour and 20 minutes; is
3  that correct, an hour and 25 minutes; is that correct?
4    A   From the time I sent the e-mail until she started
5  driving north to the zone?
6    Q   Yes.
7    A   I don't recall the time that she started. Right
8  there. Hold on. Right there. So at 4:23, which is
9  approximately just shy of half an hour before she left the
10 station, but as you can see also it shows that her car was
11 parked from 10 p.m., 2200 hours, until 4:23. That's six and
12 half hours that she was sitting at the station.
13    Q   I understand. But from when you sent this e-mail at
14 3:55 a.m. she took less than 30 minutes to go to the area in
15 question; is that correct?
16    A   Correct.
17    Q   And do you know any other sergeants who have been
18 assigned to an area and have taken 30 minutes before leaving
19 the station to appear there? I'm not asking their names, just
20 if you know of sergeants who have done that.
21         MR. ELKINS: Objection to form.
22    A   Yes.
23 BY MR. BARROUKH:
24    Q   Can you name three of those sergeants for me?
25         MR. ELKINS: Objection to form.

Page 78

1         MR. BARROUKH: What's the basis of the objection?
2         MR. ELKINS: This has nothing to do whatsoever, and
3  it's misstates, totally misstates the issue of the 30
4  minutes. So since you've given me the opportunity to give
5  you the basis, I will. The implication from your
6  question --
7         MR. BARROUKH: No, I'm --
8         MR. ELKINS: One person at a time. Daniel, one at a
9  time. One at a time. One at a time.
10         MR. BARROUKH: Michael, please respect --
11         MR. ELKINS: One at a time. You asked me to explain
12 the objection so I'm going to. The question -- one at a
13 time.
14         MR. BARROUKH: You need to object to form.
15         MR. ELKINS: No. I objected to form and you said
16 what's the basis for the objection. We can have the court
17 reporter read it back. And I'm going to give you the
18 basis. So one at a time. She can't take us down at the
19 same time. The implication from your question is that
20 Jessica didn't have to go to Area 3 until she got the
21 e-mail at 3:55 and then she only took 30 minutes to get
22 there.
23         MR. BARROUKH: Michael, I'm going go to ask you to
24 stop. You're testifying on the record. I'm going to ask
25 you to stop.

Page 79

1         MR. ELKINS: You asked me to explain the objection.
2         MR. BARROUKH: I'm now asking you to not explain the
3  objection. Thank you.
4         MR. ELKINS: You can't talk over me. I've explained.
5  Lack of predicate. Improper factual basis --
6         MR. BARROUKH: Michael, I'm asking you respectfully
7  to please let me continue the deposition.
8         MR. ELKINS: Well, then don't ask me to explain the
9  objection if you don't want the answer. I objected to
10 form --
11 BY MR. BARROUKH:
12    Q   Mr. Cosner, could you please you please give me three
13 names of sergeants who have failed to go to areas that they
14 were assigned to within 30 minutes of the assignment?
15         MR. ELKINS: Objection to form.
16    A   Well, I wouldn't use the word fail. When they're
17 busy doing administrative duties directly after roll call that
18 may delay them in getting up to zone, that's an acceptable
19 occurrence.
20 BY MR. BARROUKH:
21    Q   Did you ask Jessica what she was doing at the
22 station?
23    A   I did not.
24    Q   Could Jessica have been doing administrative duties
25 while she was at the station?

Deposition of Steve Cosner | Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 80

1    A   I guess it's possible.

2    Q   But you didn't ask her?

3    A   No.

4    Q   All right.  We're going to continue with the next

5  DRR.  Is there a reason you didn't ask her or you didn't feel

6  it was necessary?

7    A   Because there's laws that protect police officers.

8  It's called the Police Officers' Bill of Rights.  If there's

9  something that I am observing that I believe is a violation and

10  that there's potentially going to be discipline, I cannot go

11  and ask them about these things.

12    Q   You're testifying that you cannot ask your

13  subordinates what assignments they were working on?

14    A   That's correct, because if I ask them any questions

15  about these issues here that I'm writing up on this AAF, then

16  internal affairs, based on the Officers' Bill Of Rights, later

17  on should they need to investigate further, she can say, I'm

18  not giving you a statement, I've already spoken to Lieutenant

19  Cosner.

20    Q   So you've never asked a subordinate, hey, what are

21  you working on right now?

22    A   If it's due to something that's going to potentially

23  be involving discipline, I do not continue any conversation.  I

24  just document.  That's the whole purpose of the investigation.

25    Q   So it's your testimony here today that you believe

Page 81

1  it's not only wrong but illegal and against the Department's

2  policies to ask subordinates what assignments they're working

3  on?

4        MR. ELKINS:  Objection to form.

5    A   If it's in the context of an investigation to a

6  violation of policy or departmental rules, yes.

7  BY MR. BARROUKH:

8    Q   But this was before you wrote this form.  You could

9  have asked her, is that correct?  Before there was ever any

10  disciplinary issues you could have asked her what she was

11  working on while she was at the station; is that correct?

12    A   No.

13    Q   You could not have asked her what she was working on

14  before you filed this form?

15    A   I would have -- if I asked her the question and this

16  report was written, then now she has a claim against the

17  Officers' Bill of Rights.  I cannot have any discussion or get

18  any statements from her.

19    Q   And, Mr. Cosner, again, I'm not talking about when

20  this was written.  I'm talking in the moment as it's happening

21  you never asked her?

22    A   No, I didn't because all of this was transpiring in a

23  short period of time.  I've answered your question.

24    Q   Okay.  I can continue.  We can go to DRR 6.15.9.

25        MR. ELKINS:  What are we going to do about lunch?  I

Page 82

1  asked that earlier.

2        MR. BARROUKH:  I didn't hear you.  We can take lunch

3  whenever you want.  We can do 30 minutes for lunch if that

4  works for you but I'm okay to keep going right now.

5        MR. ELKINS:  How much do you have left?  That would

6  depend on whether we need to take a lunch or not.

7        MR. BARROUKH:  We have a few hours left.

8        MR. ELKINS:  A few like four or a few like one or

9  two?

10        MR. BARROUKH:  At the minimum -- I would say at

11  minimum two, but I'm not going to limit myself.

12        MR. ELKINS:  I'm not asking you to limit yourself.

13  Does our court reporter want to take a break for lunch?

14        THE COURT REPORTER:  I'm okay if it's a couple more

15  hours.  Anything longer than that, probably we should take

16  a break.

17        MR. BARROUKH:  Okay.  So we're good to keep going?

18        MR. ELKINS:  If it's going to be a few more hours,

19  sure.

20  BY MR. BARROUKH:

21    Q   All right.  So DRR 6.15.9, do you see that?

22    A   Yes.

23    Q   6.15.9 is right here again under Performance of

24  Duties.  Could you read 6.15.9 for me, please?

25    A   "Employees will be attentive to job duties and will

Page 83

1  avoid any appearance of loitering or otherwise neglecting

2  work."

3    Q   And how did Ms. Salabarria violate 6.15.9?  And I can

4  scroll again if you need me to.

5    A   Because she was at the station, was unable to get

6  ahold of her on the radio or by the phone, inattentive to the

7  duties that she was supposed to be taking care of.

8    Q   And with regard to that violation, did you ask her if

9  she was working while she was at the station?

10    A   No.

11    Q   So, again, she could have been working at the

12  station, which is why -- as a reason for her unavailability; is

13  that correct?

14    A   Yes.

15    Q   Okay.  6.28.36, DRR 6.28.36, do you see that?

16    A   Yes.

17    Q   So 6.28.36, unfortunately, for 6.28.36, 6.28.3.10 and

18  .20 and .34 in the documents, the DRRs you provided to us, they

19  are not in here and we don't have them in any other production.

20  Would you like to speak to 6.28 in general or would you like to

21  move on?

22    A   We can move on.

23    Q   So that's fine.  So where did you find the DRR

24  6.28.36?

25    A   In the Department Rules and Regulations that I had at

Deposition of Steve Cosner | Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 84

1  the time.
2      Q   And you said that these were the rules and
3  regulations; is that correct?
4      A   This is a revised edition that happened after the
5  fact.
6      Q   So we didn't receive the Department Rules and
7  Regulations at the time that she was employed there; is that
8  your statement?
9      A   That's what it appears.
10         MR. BARROUKH:  All right.  Michael, can you send
11     over the --
12         MR. ELKINS:  Yeah, I don't know why that -- I'll get
13     those for sure.  I don't know what happened.  That was
14     obviously an oversight.
15         MR. BARROUKH:  Well, it's important.  Could we take a
16     break for you to send those over?
17         MR. ELKINS:  I don't know that I'd be able to get
18     them right now.  I can try.
19         MR. BARROUKH:  Yeah.  We'll continue with the other
20     ones, but you might want to get them.
21         MR. ELKINS:  I can't both try to get them and defend
22     the deposition at the same time.
23         MR. BARROUKH:  I understand that.  All right.  So
24     let's take five minutes and let me know.  If you can get
25     them great, if it's going to take a while let me know how long.

Page 85

1         MR. ELKINS:  We'll take a break.
2         MR. BARROUKH:  We'll take five minutes.  We'll be
3     back at 1:02.
4         (A recess was taken.)
5         MR. BARROUKH:  Can we go back on the record, please.
6  BY MR. BARROUKH:
7      Q   So just to reiterate regarding your relationship with
8  Jessica, in 2015 the relationship ended without a formal
9  conversation; is that correct?
10     A   Yeah.  Like I said, it just kind of faded away.  It
11  wasn't like a hard stop.
12     Q   And when was the last time you saw Jessica in an
13  intimate setting before it stopped?
14     A   Describe intimate setting, how you're using that
15  term.
16     Q   What do you believe the word intimate to mean?
17     A   Well, intimate can mean in a sexual relationship or a
18  sexual way or it can be just something where it's one-on-one,
19  you know, maybe a romantic type, like a dinner.
20     Q   Okay.  I'm using the romantic connotation of the
21  word.  So when was the last time you had a romantic one-on-one
22  event with Jessica?
23     A   Probably middle or end of 2014.
24     Q   And what happened?  What did you guys do?
25     A   I'm not even sure.  I kind of remember going to like

Page 86

1  a lunch.
2      Q   And so this was during the day?
3      A   It's -- I'm telling you from a very vague
4  recollection.  I don't keep those types of details that deep in
5  my head like that.
6      Q   I understand.  And the last time you were intimate
7  sexually with Jessica was mid or early February -- or mid or
8  early spring of 2014; is that correct?
9      A   To the best of my recollection, yeah.
10     Q   And you guys only had sex two times but were seeing
11  each other for roughly all of 2014; is that correct?
12     A   I wouldn't use that term that we were seeing each
13  other.  It was kind of -- it was more of like a flirtatious
14  relationship.  It was -- there was no -- we weren't boyfriend
15  and girlfriend.
16     Q   Okay.  So during your flirtatious relationship you
17  were intimate sexually on two occasions, correct?
18         MR. ELKINS:  Objection to form.
19     A   Correct.
20  BY MR. BARROUKH:
21     Q   Who initiated the sexual encounters between you and
22  Jessica?
23         MR. ELKINS:  Objection to form.
24     A   I would say it was mutual.
25  BY MR. BARROUKH:

Page 87

1      Q   Mutual.  Did you ever -- did you ever try initiating
2  another sexual encounter with Jessica after this second time?
3         MR. ELKINS:  Objection to form.
4      A   I don't believe we ever were in a position to do
5  that.
6  BY MR. BARROUKH:
7      Q   All right.  If you were in a position to would you
8  have?
9         MR. ELKINS:  Objection to form.
10     A   If the circumstances indicated that there was
11  potential for that, then, yeah, probably.
12  BY MR. BARROUKH:
13     Q   Okay.  And from your perspective it was a mutual
14  dissolution or a mutual split, if we can call it that; is that
15  fair?
16     A   I don't -- I don't know what was in her thought
17  process at the time.  I can tell you that I was getting
18  frustrated with the way things were going and I just stopped
19  communicating with her.  It just basically kind of fell apart
20  and dissolved.
21     Q   Did she try communicating with you at any point after
22  you had decided that's it, I'm not going to keep doing this?
23     A   Yes.
24     Q   And what did she say?
25     A   I couldn't tell you what she said.  Are you asking

Page 88

1  for specific wording?

2    Q   Not specific wording. You said she communicated to

3  you so I'm just asking what she said.

4    A   She tried to talk to me, whether it was saying hello

5  in the hallway or anything else. I told you, I got fed up with

6  catching her with the lies, seeing the direction that it was

7  going, realizing what all was actually what I believed to be

8  the truth of the matter was, it was just a game. I got fed up

9  with it so I had no desire to continue having any more

10  communication or interaction with that person unless it was in

11  a necessary professional manner.

12    Q   Okay. Outside of the necessary professional manner

13  that you just spoke of, did you go out of your way to avoid

14  communicating with Jessica?

15    A   Go out of my way, no. I just didn't communicate with

16  her.

17    Q   Did you intentionally not communicate with her then?

18    A   Yes.

19    Q   Okay. So I'll continue with sharing my screen.

20    MR. BARROUKH: Also, Michael, I really -- off the

21    record, Melissa.

22    (An off-the-record discussion took place.)

23  BY MR. BARROUKH:

24    Q   All right. Mr. Cosner, did Jessica ever oppose any

25  intimate advances by you?

Page 89

1    A   Did she ever oppose them? No, she did not.

2    Q   Did she ever oppose any text message communication

3  that you sent to her?

4    A   No.

5    Q   I'm sorry, I didn't hear what you said.

6    A   No. Not that I can recall, no.

7    Q   Okay. So going back to, I believe it was Exhibit 3.

8  Let me share my screen. Going back to this Administrative

9  Action Form as well as going back to the DRRs.

10    MR. BARROUKH: Michael, are you fine if we continue

11    with these as the ones stated in this document?

12    MR. ELKINS: Yes. Yeah. And then I think we'll just

13    have to confirm that they didn't change. But if they did

14    then you're going to have at some point requestion him.

15  BY MR. BARROUKH:

16    Q   Okay. So then let's just start off with this one.

17  For the Department Rule and Regulation, 640.1, Tortuous Acts.

18  Can you confirm that this is an incorrect version of the

19  Department document you were citing to?

20    A   Yeah, that's incorrect. As I'm looking at this, it

21  looks like it may have been actually an error on the form

22  because if you look down below, 6.43.1, untruthfulness. Go

23  back to the AAF. Untruthfulness is highlighted. So that was

24  probably an error in the number there.

25    Q   Well, it's more likely that it's an improper version

Page 90

1  rather than an error or you just --

2    MR. ELKINS: Hold on. I'm just going to object to

3    form. We know the DRRs, and I submitted them, it was an

4    accident, it's a revised version from 2022 and this all

5    happened in 2020. So I just think we have to let the

6    corrected version when we get it speak for itself. You

7    know what I'm saying?

8  BY MR. BARROUKH:

9    Q   Okay. I will ask you then about the prior ones that

10  we had spoken to. We spoke to Insubordination, Integrity, and

11  Performance of Duties; is that correct?

12    A   Yeah.

13    Q   All right. Do you believe that based on this

14  incident Ms. Salabarria failed to supervise the officers in her

15  squad?

16    A   Yes.

17    Q   How so?

18    A   Because she was not in the zone. I believe we

19  already discussed this. She was not in the zone. She had no

20  communication with the officers until the very end of the shift

21  when she sent them an e-mail.

22    Q   Didn't you already tell me, though, that a sergeant

23  who is not in the zone may still be doing work and that happens

24  frequently?

25    MR. ELKINS: Objection to form. You can answer.

Page 91

1    A   Yes, but with clarification I'd like to expound on

2  that.

3  BY MR. BARROUKH:

4    Q   No. I'm going to continue.

5    MR. ELKINS: No. No. No. You have to let him

6    finish his answer. He said he wants to expound on it.

7    You have to let him expound on it. This isn't court where

8    the judge can shut him down. You can't do that. He's

9    free to give his full answer.

10    MR. BARROUKH: Is he going to speak to the

11    Department procedures or --

12    MR. ELKINS: You asked him about what he told you

13    and he has said I would like to expound upon it.

14    Listen, I'm going to have him expound upon it on redirect

15    if you're insisting that he can't expound upon it now,

16    which I think is totally improper.

17    MR. BARROUKH: That's fine. I just don't want to

18    discuss any other DRR that we don't have access to at this

19    time. Is that fair?

20    MR. ELKINS: He's not discussing -- well, he can

21    testify however he wants. I didn't hear that he's going

22    to talk about a DRR that we don't have. Why don't you

23    just let him finish his answer and you can question him on

24    it. He's clearly said he wants to expound on it. I think

25    he's entitled to do that.

Page 92

MR. BARROUKH: Okay. That's fair.

A   Okay. I'm not referring to any particular DRR. I'm referring to your question. When a supervisor has, for example, a significant amount of administrative duties that they have to take care of that requires them to be in the office on their computer, as long as they allow the lieutenant that's on duty to know what the status is and why they're in the office as opposed to being up in the zone, that's fine. They also have to be able to listen to the radio, be aware of what's going on and to break away from whatever administrative duties they're doing to go to the zone should they be needed.

They also need to talk to the supervisor for the zone adjacent to them to let that supervisor know that they're going to be in the office and that they can't be there to handle all the tasks and the other supervisor can pick up some of the slack so there's proper supervision in that area.

BY MR. BARROUKH:

Q   And, again, you never asked Jessica what assignment she had that night; is that true?

MR. ELKINS: Objection to form.

A   To what assignments she had?

BY MR. BARROUKH:

Q   To the administrative tasks that she had.

A   No, I didn't ask her anything.

Q   Did you ask the supervisor in an alternate area like

Page 93

you were previously mentioning whether she had informed them that she had administrative orders?

A   I don't recall talking to another supervisor.

Q   Did you write anything in this Administrative Action Form about talking to another supervisor?

A   I don't recall. I'd have to look through it and read it again.

Q   All right. I'll give you a chance to review it. Let me know how much time you need.

A   Actually, yes, when you go down, I spoke with Sergeant Wilson Romero. He said he was going to try to call her. He ended up calling me back and saying that he wasn't able to get ahold of her. I asked if he had spoken to her at all throughout the night and he said no.

Q   And then if you keep reading the sentence from, "I again tried to have."

A   "I again tried to have the dispatcher raise her and after several attempts by name and unit number she finally responded."

Q   Did you ask Sergeant Romero at that point if she had finally responded to him?

A   No, I never had another contact with him after that phone call.

Q   So it's possible that Jessica did contact Sergeant Romero?

Page 94

MR. ELKINS: Objection to form.

A   If she did it was after the time of this particular notation.

BY MR. BARROUKH:

Q   Yes, but it is possible that after the time of you asking Sergeant Romero to contact her she eventually contacted him; is that possible?

A   But the problem with that is it's three plus hours after the beginning of her shift responsibilities for midnight shift.

Q   Yes, but I believe this is only 4:04 and you e-mailed her that you were late with the e-mail at 3:55. So that's only nine minutes after you sent your e-mail, correct?

A   She started her shift on midnights. Her responsibilities are at 1 a.m.

Q   Yes, but this specific assignment from you was not sent until 3:55, correct?

A   That has nothing to do with what I'm discussing. That is correct, but it has nothing to do with this.

Q   Okay. So if I understand, you're saying she still had a duty to Officer Romero --

A   To Sergeant Romero. From 1:00 to 3:55, which is nearly three hours, there had been no communication with the other sergeant.

Q   So you're testifying that she had an obligation to

Page 95

the sergeant then prior to going and doing administrative work to inform him, hey, I'm going to go back to headquarters and do administrative duties?

A   Yes. The idea is if you cannot be there you have to communicate with somebody to let me know the status. There has to be communication in this line of work.

Q   I understand. And did you initiate the communication with Sergeant Romero?

A   No. When I raised her on the radio and I tried to call her she heard on the radio me raising her multiple times. There was no response from her. When he heard that he said on the radio that he was going to try to call her. When he couldn't get ahold of her he then contacted me.

Q   Okay. So to be clear, though, Sergeant Romero did not have any issue prior to your attempt of reaching out?

A   That's a very open question there. What do you mean by issue?

Q   Do you believe that Sergeant Romero had tried contacting Jessica prior to your attempt to contact Jessica through the radio?

MR. ELKINS: Objection to form.

A   I don't know what Sergeant Romero did.

BY MR. BARROUKH:

Q   Did you ask him?

A   No. I didn't ask if he tried to call. I asked if he

Page 96

1  had heard from her, had any communication from her.
2      Q   Did you ask him if he needed her assistance with
3  something?
4      A   No.
5      Q   And then do you know any other sergeants that have
6  failed to answer their radio while they were on shift?
7          MR. ELKINS:  Objection to form.
8      A   It happens on occasion.
9  BY MR. BARROUKH:
10     Q   How frequently does it happen?
11         MR. ELKINS:  Objection to form.
12     A   On occasion.  I couldn't tell you.  I don't work 24
13 hours a day.
14 BY MR. BARROUKH:
15     Q   Okay.  From your experience, are you aware of any
16 sergeants that have failed to respond to their radio when
17 they're on shift?
18         MR. ELKINS:  Objection to form.
19     A   It happens occasionally that officers and sergeants
20 and lieutenants can miss the radio, but when they're raised by
21 name or there's an alert tone that's broadcast over the radio
22 to get their attention, typically they respond back.  If
23 there's an issue where the radio is faulty, their battery is
24 dead or something like that, that's beyond their control.
25 BY MR. BARROUKH:

Page 97

1      Q   Did you ask Ms. Salabarria if her radio was faulty?
2      A   No, because she responded to me eventually.
3      Q   Did you ask her if she changed her batteries on her
4  radio?
5      A   No.
6      Q   Why not?
7      A   Because I didn't.
8      Q   Do you think -- so before asking her if there were
9  issues with her radio you wrote in a report that she violated
10 the Department's standard operating procedures; is that
11 correct?
12     A   Yes.
13     Q   And you didn't think it could jeopardize her
14 employment or it could lead to discipline when you wrote this
15 and submitted this Administrative Action Form?
16     A   What was the question again?
17     Q   Do you believe that -- so you believe that instead
18 of -- it was proper instead of asking about her radio and
19 whether or not it was faulty, if she had issues with it, that
20 it was a better course of action to file this Administrative
21 Action Form stating she violated Department standard operating
22 procedures?
23         MR. ELKINS:  Objection to form.
24     A   Yes.
25 BY MR. BARROUKH:

Page 98

1      Q   And you knew that filing this Administrative Action
2  Form could have disciplinary effects against Ms. Salabarria; is
3  that correct?
4      A   Yes.
5      Q   So instead of taking the time to ask her one question
6  you claim she violated the Department standard operating
7  procedures; is that correct?
8          MR. ELKINS:  Objection to form.
9      A   Yes.
10 BY MR. BARROUKH:
11     Q   All right.  And you stated that Ms. Salabarria failed
12 to report to her assigned zone; is that correct?
13     A   Yes.
14     Q   But ultimately she did report to her assigned zone
15 based on what you wrote in the Affirmative Action Form?
16     A   Yes.
17     Q   So although she initially did not appear at Area 3
18 she did go to Area 3 eventually, correct?
19     A   Yes.
20     Q   And you previously mentioned that sergeants can work
21 at headquarters and then go to their area.  Are sergeants
22 violating standard operating procedures while they're doing
23 administrative tasks at the headquarters instead of being in
24 that area?
25     A   No.

Page 99

1      Q   But here you said Ms. Salabarria was violating the
2  standard operating procedure when she did that?
3          MR. ELKINS:  Objection to form.
4      A   Yes.
5  BY MR. BARROUKH:
6      Q   And you also stated that, towards the bottom, she
7  showed extreme neglect in the performance of her duties; is
8  that correct?
9      A   Yes.
10     Q   Could you explain how she showed extreme neglect in
11 the performance of her duties?
12     A   Again, there was almost three hours, beyond three
13 hours of the shift that she was in the station.  She had not
14 communicated to another supervisor.  She had not communicated
15 to me.  She did not go to the zone to supervise the officers
16 that she was responsible for supervising.  When I provided her
17 with an e-mail with things to take care of she failed to do
18 that.
19     Q   I'm confused because up here you state that you
20 agreed for Jessica, and I'm paraphrasing, to work at -- it says
21 here that she was going to work the midnight to 6 a.m. shift;
22 is that correct?
23     A   Oh, you know what, you're right.  Yeah, our hours
24 currently are -- the afternoon shift currently is until 1:00.
25 At that time it was 12:00.  I forgot they changed the hours.

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 100

1  So the reality is it was almost four hours rather than three
2  hours.
3      Q   So does that mean that you were almost four hours
4  late in sending this e-mail to Jessica?
5      A   There's no time frame that I have to complete that.
6      Q   Right, but this is the assignment for the officers in
7  the areas; is that correct?
8      A   Correct.
9      Q   So if Jessica didn't receive this until four hours
10 after her shift started how would she know where to assign the
11 officers?
12     A   Understood.  However, after that was given it still
13 was never done.
14     Q   I believe these e-mails here show that she actually
15 did send e-mails.  Give me one moment.  She actually did this,
16 but it was later than you asked for it to be completed; is that
17 fair?
18         MR. ELKINS:  Objection to form.
19     A   She claims in the e-mail that she discussed it with
20 the officers.  All six officers said that that never happened.
21 BY MR. BARROUKH:
22     Q   Where is this e-mail does she claim she discussed
23 with the officers?
24     A   Not in this e-mail.  In the one --
25     Q   I'm talking to this e-mail, which is an e-mail to

Page 101

1  you.
2      A   It was sent right at the end of the shift when the
3  officers are ready to start going to the station and turning in
4  their equipment.
5      Q   I understand, but she completed it when you asked her
6  at one point during her shift; is that correct?
7      A   We're going to have to agree to disagree on this.
8      Q   Okay.  I'll ask this then:  Did Jessica send you the
9  midnight shift statistics on December 28th, 2020?
10     A   Yes.
11     Q   Did Jessica send you the details of the officers'
12 location on December 28th of 2020?
13     A   Yes.
14     Q   Did Jessica go to Area 3 on December 28th of 2020?
15     A   Yes.
16     Q   So -- and you never asked Jessica if she was working
17 while she was at the headquarters so it's possible that Jessica
18 while she was at the headquarters all the way until the end of
19 her shift at 6 a.m., which is the subject of the e-mail prior,
20 it's possible she was working that entire period; is that
21 correct?
22     A   Yes.
23     Q   But you didn't ask her if that was the case?
24         MR. ELKINS:  Objection to form.
25     A   No.

Page 102

1          MR. BARROUKH:  Michael, anything on those DRRs?
2          MR. ELKINS:  I don't have them yet.
3  BY MR. BARROUKH:
4      Q   Mr. Cosner, just as a personal belief, do you think
5  that this type of behavior where a sergeant fails to answer
6  their radio or stays at headquarters instead of going to the
7  assigned area, would you say that's an uncommon or common
8  behavior?
9          MR. ELKINS:  Objection to form.
10     A   It's uncommon.
11 BY MR. BARROUKH:
12     Q   Do you know any other sergeants that have done those
13 actions?
14         MR. ELKINS:  Objection to form.
15     A   That have failed to go to their zone?
16 BY MR. BARROUKH:
17     Q   That have, instead of going to their zone, worked at
18 headquarters on administrative assignments?
19     A   Yes, that happens.  All the sergeants do that.
20     Q   Every single sergeant you know does that?
21     A   Well, I believe there's a few sergeants that have
22 offices up in the north end substation that will work out of
23 that office up there.
24     Q   So it is not -- so you're telling me every single
25 sergeant did exactly what Jessica did in this matter?

Page 103

1          MR. ELKINS:  Objection to form.
2      A   No, that's not what I'm telling you.
3  BY MR. BARROUKH:
4      Q   Okay.  We can continue.  You said that Jessica
5  willfully -- that she showed a willful effort to deceive a
6  supervisor; is that correct?
7      A   Yes.
8      Q   How did she show a willful effort to deceive a
9  supervisor?  And I can scroll up if you need me to.
10     A   Again, the information that she conveyed to me that
11 she had spoken to the officers, that she gave them their
12 assignments properly and so forth, was a lie.  That is a
13 willful effort to deceiving.
14     Q   Did you ask her if she spoke to the officers?
15         MR. ELKINS:  Objection to form.
16     A   Again, I asked the officers if they had any contact
17 with their supervisor that night and all six of them told me
18 no.
19 BY MR. BARROUKH:
20     Q   Did you ask Jessica if she made contact with those
21 officers that night?
22         MR. ELKINS:  Objection to form.
23     A   No.
24 BY MR. BARROUKH:
25     Q   Did you ask Jessica if she willfully tried to deceive

Page 104

1 you that night?
2     MR. ELKINS: Objection to form.
3   A   No.
4 BY MR. BARROUKH:
5   Q   And you also stated that sergeant Salabarria's
6 actions show a willful effort -- or excuse me, absence show a
7 failure to obey a direct order from said supervisor; is that
8 correct?
9   A   Yes.
10  Q   But we already stated that on December 28th, 2020, in
11 these e-mails she had complete, although it was late, and I
12 understand it was late, she had ultimately completed the
13 assignments you had requested?
14     MR. ELKINS: Objection to form.
15  A   No.
16 BY MR. BARROUKH:
17  Q   So what am I missing?
18  A   What you're missing is it's been explained multiple
19 times here now, that these details were not presented to the
20 officers. It was sent in an e-mail here saying that she gave
21 these officers the assignments. She never gave them the
22 assignments. She never contacted the officers to give them the
23 assignments.
24  Q   Can you take a look at this e-mail for me. It's
25 Monday, December 28th, 2020 at 5:42 a.m. Can you tell me who

Page 105

1 this e-mail is from?
2   A   Jessica Salabarria.
3   Q   Can you tell me who she sent the e-mail to?
4   A   To her squad.
5   Q   And what does this say in her e-mail?
6   A   You want me to read the entire e-mail?
7   Q   Would you like to summarize or I can ask more
8 specifically. More specifically, do you believe she sent her
9 squad details about where they were supposed to be?
10  A   What she sent to them was the e-mail that you're
11 showing me at 5:42 a.m. This was the first that any of the
12 officers had seen anything about a detail. They were not
13 assigned these details ahead of time to give them time to
14 actually perform the details. It was at the very end of the
15 shift when this e-mail was sent out right as they were getting
16 ready to go to the station and turn in their equipment.
17  Q   So when you said that she failed to send out her
18 squad assignments, she sent them, they were just late?
19  A   When she sent them in this e-mail highlighted it
20 says, "Per our conversation, please note the details of our
21 shift." There was no conversation. I can only say it so many
22 times. I don't understand.
23  Q   I understand, but that's not my question. My
24 question specifically is: Although the e-mail was late, she
25 did send the e-mail?

Page 106

1   A   Yes, she did.
2   Q   So then when you say in the AAF that she failed to
3 obey the direct orders, she failed to report to her assigned
4 zone, she failed to supervise the officers under her watch,
5 it's not that she failed to do it, it's that she did not do it
6 in a timely manner; is that correct? Is that fair to say?
7     MR. ELKINS: Objection to form.
8   A   I disagree with your assessment.
9 BY MR. BARROUKH:
10  Q   You're telling me that she failed to report to her
11 assigned zone but in the same exact page even you say that she
12 had reported to that zone.
13     MR. ELKINS: Objection to form.
14  A   Responding to the zone after she was directed four
15 hours into her shift, okay, there's a -- we're not ignoring the
16 first four hours of the shift.
17 BY MR. BARROUKH:
18  Q   I understand that, but the exact almost to the minute
19 first four hours of her shift you had not sent her
20 instructions?
21  A   Those instructions have nothing to do with her
22 responding to the zone.
23  Q   Let me ask you this, Mr. Cosner: Have you ever
24 failed to be somewhere you were assigned?
25     MR. ELKINS: Objection to form.

Page 107

1   A   Not failed to -- there's been times where I've had to
2 be assigned some place and had to go somewhere else for a
3 reason, but I communicate that with my supervisor.
4 BY MR. BARROUKH:
5   Q   So you have not failed to appear at a location you
6 were assigned to unless you had a valid reason; is that fair?
7     MR. ELKINS: Objection to form.
8   A   In what context are you asking this?
9 BY MR. BARROUKH:
10  Q   In the context of your employment through the Miami
11 Beach Police Department.
12     MR. ELKINS: Objection to form.
13  A   Are you asking in the context of my normal day-to-day
14 duties on duty or are you even referring to court? There's
15 been times honestly I've missed court. I've had to go to a
16 court appearance and because of whatever personal reasons I
17 wasn't able to attend it. And then I ended up -- I received
18 discipline for that.
19 BY MR. BARROUKH:
20  Q   And what type of discipline did you receive for
21 failure to appear in court?
22     MR. ELKINS: Objection to form.
23  A   I don't recall what that was. It's been many, many
24 years ago.
25 BY MR. BARROUKH:

Page 108

1  Q   But you weren't terminated obviously, correct?
2  A   No, I was not terminated.
3  Q   Were you placed on a Last Chance Agreement?
4     MR. ELKINS:  Objection to form.
5  A   No.
6     MR. BARROUKH:  I'd like to into introduce exhibit,
7  what I'm marking as Exhibit 7 over here.
8     (Whereupon, Plaintiff's Exhibit 7 was marked for
9  identification.)
10 BY MR. BARROUKH:
11 Q   Okay.  Can you please read this document for me?
12 What is this?
13 A   It's an e-mail.
14 Q   And who is the e-mail from?
15 A   From me.
16 Q   To who?
17 A   A.J. Prieto.
18 Q   And what is the date this e-mail was sent?
19 A   January 8th, 2021.
20 Q   And what was the time this was sent?
21 A   12:35 a.m.
22 Q   Can you please read the contents of the e-mail?
23 A   "Hello A.J.  I was advised to forward this to you.
24 Please review and advise if there's anything else you need me
25 to take care of.  Thanks, SC."

Page 109

1  Q   Who advised you to forward this e-mail to A.J.?
2  A   I believe Chief Clements.
3  Q   Chief Clements?
4  A   I believe so.  I can't swear to that, but I believe
5  it was Chief Clements.
6  Q   Have you ever filled out -- have you filled out
7  another AAF form before?
8  A   Yes, I've filled out quite a few.
9  Q   And when you fill the AAF forms out do you typically
10 send them to A.J. Prieto?
11 A   Well, A.J. Prieto was running internal affairs at the
12 time.
13 Q   So do you typically send AAF forms that you want to
14 submit to the head of internal affairs then?
15 A   I have.
16 Q   Who else have you sent these AAF forms to?
17 A   Sometimes I'll just send it to an investigator in
18 internal affairs.
19 Q   Have you ever sent an AAF form apart from this one to
20 Michael Elkins?
21     MR. ELKINS:  Objection.  Attorney-client privilege.
22 He's not answering that.
23 BY MR. BARROUKH:
24 Q   What other AAF forms have you sent to A.J. Prieto?
25 A   I don't believe I've sent any others to A.J. Prieto.

Page 110

1  I think this is the only one that I authored during the time
2  that he was running internal affairs.
3  Q   Did you send any other AAF forms while he was at
4  internal affairs?
5     MR. ELKINS:  Objection to form.
6  A   I don't recall if I did or not.
7  BY MR. BARROUKH:
8  Q   So just to be clear, at 12:35, which is one minute
9  after you sent this to Michael Elkins and I believe maybe 24
10 minutes after you sent these to Michael Elkins, Chief Clements
11 directed you to send this to A.J. Prieto?
12     MR. ELKINS:  Objection to form.
13 A   When the e-mail was sent and when I was told to send
14 it is probably two different times.
15 BY MR. BARROUKH:
16 Q   Okay.  But you can agree that this e-mail to A.J.
17 Prieto is sent one minute after you sent your e-mail to Michael
18 Elkins; is that correct?
19 A   It is one minute off, yes.
20 Q   And then you say, I was advised to forward this to
21 you, correct?
22 A   Correct.
23 Q   And you can't say for sure who advised you to forward
24 this but you believe it was Chief Clements?
25 A   I believe it was Chief Clements advising me to send

Page 111

1  it.
2  Q   And, again, just to show you this AAF form.  It's the
3  same exact form.  I can give you time to read it.  No
4  signatures or anything like that.  Did A.J. Prieto respond to
5  this submission?
6  A   I don't recall.
7  Q   Did you speak to A.J. Prieto at all about this
8  Administrative Action Form?
9  A   I don't recall.
10 Q   Did you speak to -- well, prior to sending this you
11 said you were advised by Chief Clements to forward this to A.J.
12 Prieto.  What did Chief Clements tell you?
13 A   I don't recall.  And I told you I can't swear that
14 that was the person who told me to send it.
15 Q   But just to confirm then, this is not -- this is the
16 first time and only time you have sent an AAF to A.J. Prieto?
17 A   No.  I said I can't recall if I've sent any others.
18     MR. BARROUKH:  And I'd like to introduce this
19 document and mark this document as Exhibit 8.
20     (Whereupon, Plaintiff's Exhibit 8 was marked for
21 identification.)
22 BY MR. BARROUKH:
23 Q   Do you know what the document is?
24 A   It appears to be my internal affairs jacket.
25 Q   That's correct.  So just to go through your internal

Deposition of Steve Cosner                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 112

1  affairs record, we can see that --
2      MR. ELKINS:  I got the -- I'm sorry to interrupt you.
3  I got the DRRs.
4      MR. BARROUKH:  Okay.  Give me a few minutes, please.
5      MR. ELKINS:  Hold on.  Can we take a break so that I
6  can get it organized and get it over to you?  I can't do
7  that and defend the depo at the same time.  There's no
8  pending question.
9      MR. BARROUKH:  Okay.  All right.  How long do you
10  need?
11      MR. ELKINS:  Just give me a couple of minutes.
12      MR. BARROUKH:  Okay.  Off the record.
13      (A recess was taken.)
14      MR. BARROUKH:  Back on the record.
15  BY MR. BARROUKH:
16  Q   All right.  Mr. Cosner, I'm just going to go through
17  the DRRs that we discussed, which is Exhibit 4 on the right and
18  then the document on the left is Exhibit 9.  I'm marking this
19  as Exhibit 9.  Does that make sense?
20      (Whereupon, Plaintiff's Exhibit 9 was marked for
21  identification.)
22  A   The left is what?
23  BY MR. BARROUKH:
24  Q   The left is the DRRs that I just received from
25  Mr. Elkins that are the DRRs as you can see.  The title in

Page 113

1  effect 2008 until archived on January 4th, 2022.
2  A   You're not sharing anything.  I don't see it.
3      MR. ELKINS:  You're not sharing your screen.
4  BY MR. BARROUKH:
5  Q   There we go.  Okay.  So on the right is Exhibit 4 and
6  on the left is what I'm marking as Exhibit 9.  It states DRR in
7  effect 2008 until archived on January 4th, 2022.  Do you see
8  that?
9  A   Yeah.
10  Q   Okay.  I'm just going to confirm with you quickly
11  that the DRRs we have already gone through match up so we don't
12  have to go through them again.  Okay?
13  A   Okay.
14  Q   So 3.8.2, failure -- 3.8.2 is the same, correct?
15  A   Yes.
16  Q   Okay.  Now we're going to go to 6.5.4.  All right.
17  Is 6.5.4 the same?
18  A   I can't read the one on the right all the way because
19  you have -- the screens of our cameras are on the right side of
20  my screen.  I don't know if I can move it.
21  Q   Yeah, you can move it.
22  A   There we go.  All right.  6.5.4, right?
23  Q   Yes, sir.  They look the same to me so I'm just going
24  to continue to the next one.
25      MR. ELKINS:  They're not identical.  I mean, the

Page 114

1  documents speak for themselves.  The older one uses the
2  word "shall" after employee, and the newer one use the
3  word "will."  I don't mean to interrupt but we're going to
4  be here all night if we --
5  BY MR. BARROUKH:
6  Q   Okay.  So then we're going to move on to 6.15.1,
7  which we also covered prior, self performance of duties.
8  A   Right.
9  Q   We can continue.  6.15.6.  You include policies in
10  the new one.  We can continue.  6.15.9.
11      MR. ELKINS:  Yeah, I don't think there's a material
12  difference.
13      MR. BARROUKH:  I agree, but, again, we'll do a more
14  thorough analysis if we need to.
15  BY MR. BARROUKH:
16  Q   Okay.  6.15.9 is the same.  So that brings us to, as
17  you can see in Exhibit 3, that brings us to 6.28.3.6.  And,
18  again, Mr. Cosner, were you trained on interpreting Exhibit 9
19  or the DRRs in effect 2008 until archives January 4, 2022?
20      MR. ELKINS:  Objection to form.
21  A   No.
22  BY MR. BARROUKH:
23  Q   And you interpreted the language from this document
24  independently; is that correct?
25  A   Correct.

Page 115

1  Q   And you applied the language independently in
2  assessing violations; is that correct?
3  A   Correct.
4  Q   All right.  So that brings us to 6.28.3.6.  So 6.28
5  is conduct unbecoming as we can see here.  Conduct unbecoming,
6  correct?
7  A   Correct.
8  Q   All right.  And I apologize if I take up some time to
9  review this.  This is the first time I'm looking at these as
10  well.  6.28.3.6, "Has been intoxicated, or under the influence
11  of intoxicants or narcotics or controlled substances without
12  prescription, barbiturates, central nervous system stimulants
13  as defined in FSS 893.2 and FSS 893.356(s)(a), while on duty or
14  while wearing any portion of an issued uniform, whether on or
15  off duty."  Is that correct?
16  A   That's what it says, but that's obviously an error on
17  the DRR that was chosen for the AAF.
18  Q   Okay.  My issue is as we've seen here, there's no DRR
19  with that section in the DRR provided to my office.  So was
20  there another DRR that you're referring to because this one --
21  A   Yeah, that's obviously -- that's not even something
22  that's --
23  Q   Okay.  So just to be clear, Ms. Salabarria, in this
24  AFF you were not charging her -- alleging that she was
25  intoxicated or under the influence of intoxicants while on duty

Page 116

1  or while wearing any portion of an issued uniform whether on or
2  off duty?
3      A    That's correct.  But as I'm looking at it I can see
4  the one right above it is probably the one that I had intended,
5  6.28.3.5, but that's not what was indicated.  But that would
6  make sense, that one there.
7          MR. BARROUKH:  Okay.  Michael is there another
8      document or are we going based off this one?
9          MR. ELKINS:  He just testified that he made a
10     mistake, that he meant to put 6.28.3.5 and he wrote
11     6.28.3.6 so we're going to chock it up to a mistake on the
12     form because that's what he just told you it was.
13         MR. BARROUKH:  Okay.  That's fine.
14 BY MR. BARROUKH:
15     Q    So let's assume you made a mistake and you intended
16 to write 6.28.3.5.  You're claiming that my client has violated
17 any lawful or reasonable regulation or order, failed to obey
18 any lawful or reasonable direction made and given by a
19 supervisor.  Where in your AAF do you cite to Ms. Salabarria
20 violating 6.28.3.5?
21     A    It falls under the same part as the Insubordination.
22 I actually don't know why that would be in here.  I don't know
23 if -- it's essentially -- it's essentially the same as
24 insubordination.  It's just under the Conduct Unbecoming
25 category of the DRRs.  The same actions apply to both.

Page 117

1      Q    And where does she fail to obey reasonable direction
2  made by a supervisor?
3      A    Where we discussed it before as far as issuing the
4  watch orders and details to the officers and she did not do so.
5      Q    Okay.  And I'm going to ask this one more time and
6  then I'll stop bringing it up because I don't want to continue
7  bothering you or wasting time.  Although my client performed
8  these actions late, but she still performed them, are you
9  considering them a failure to perform them?
10     A    Yes, I'm considering them a failure.
11     Q    Even though she did perform them at some point during
12 her shift?
13         MR. ELKINS:  Objection to form.
14     A    Sending the e-mail out at the time the officers are
15 leaving with a notation that they had the discussion about what
16 they were, which was not true, is not conducting -- is not
17 taking on the directive.
18 BY MR. BARROUKH:
19     Q    Okay.  We can continue.  Now we go to 6.28.3.10.
20 6.28.3.10, "Has been guilty of actions which amount to
21 insubordination or disgraceful conduct, whether permitted or on or
22 off duty."  Is that correct?
23     A    Yes.
24     Q    And what disgraceful conduct has my client -- first,
25 let me backtrack.  What do you believe disgraceful conduct

Page 118

1  means?
2          MR. ELKINS:  Objection to form.
3      A    Well, the wording on that is insubordination or
4  disgraceful conduct.  I think we've already covered the fact
5  that insubordination was captured in this narrative.
6  BY MR. BARROUKH:
7      Q    Well, that's why I'm asking you.  I'm focusing on the
8  disgraceful conduct portion.  Just to clarify, you're also
9  alleging disgraceful conduct?
10     A    I'm not.
11     Q    Okay.  And insubordination, again, is the reference
12 to sending the e-mail too late.  Okay.  Let's move on to
13 6.28.3.20, Has been guilty of conduct -- "Has been guilty of
14 conduct unbecoming an employee of the city."  Correct?
15     A    Correct.
16     Q    What does conduct unbecoming mean to you in your
17 understanding?
18     A    Well, everything is described in all of these
19 subsections here.  It gives examples of what would constitute
20 conduct unbecoming.  There's several DRRs in here that she was
21 written up for which are within conduct unbecoming and that
22 would cover that base.
23     Q    Okay.  So your answer in addressing conduct
24 unbecoming is to use other stated examples of conduct
25 unbecoming?

Page 119

1      A    Essentially.
2      Q    But there's a specific carve out for this point,
3  right?
4      A    Right.
5      Q    So you believe the specific carve out is asking
6  about, it's not just asking for the other carve out, that's why
7  those other ones exist?
8      A    The way that this gets written up is anything within
9  the SOPs or the DRRs that fits whatever it is that I'm
10 documenting in an AAF, all of them can go on there.  I'm not
11 disciplining.  That's just saying these are the things that I
12 think she's violated and if the chief decides, okay, well, this
13 one I don't want to continue with, he has the ability to toss
14 that out.
15     Q    Did the chief ask you about you alleging Jessica
16 violated 6.28.3.20?
17     A    We didn't discuss that I can recall specifics for the
18 DRRs.  He asked me specifically what happened that evening and
19 we discussed the narrative of my Administrative Action.
20     Q    And did he ask you if you spoke to Jessica that
21 night?
22     A    I don't recall what he asked me.
23     Q    Okay.  Did he ask you if you questioned Jessica about
24 what she was working on at the headquarters?
25     A    I don't recall.

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 33 of 223

Deposition of Steve Cosner                           Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 120

1    Q   So moving on, 6.28.3.34, "Has failed to properly
2  supervise subordinates."  Do you see that?
3    A   Yes.
4    Q   And where in the AFF do you cite her violating that
5  DRR?
6    A   Again, she never made it to the station -- or to the
7  zone, had no communication with her subordinates for the first
8  four hours of the shift.
9    Q   Okay.  Moving on to DRR 6.34.1, that is
10  untruthfulness.  Do you see that?
11    A   Yeah.
12    Q   Can you please read 6.34.1 for me?
13    A   "Employees will not knowingly make untrue statements
14  except as authorized in the performance of duties."
15    Q   And then what do you believe this means, 6.34.1?
16    A   It means that they should not lie.
17    Q   Did you ask Jessica if she was lying on December
18  28th, 2020?
19    A   No.
20    Q   Did you ask Jessica if she knowingly made untrue
21  statements?
22    A   No.
23    Q   So we can move on to DRR 6.39.1, and that says,
24  supervisor responsibility and that does coordinate with Exhibit
25  3.  Do you see that?

Page 121

1    A   Yes.
2    Q   Okay.  I'll read 6.39.1.  "Supervisors are charged
3  with the responsibility of providing guidance and assistance to
4  their subordinates and instilling positive work ethics.
5  Supervisors will be cognizant that such responsibility includes
6  maintaining a working knowledge of the goals and objectives of
7  the Department, and continuously work towards these goals and
8  objectives.  Supervisors must exemplify leadership qualities
9  consistent with the Department's Mission Statement".  Is that
10  correct?
11    A   Correct.
12    Q   Where in the AAF form did Jessica violate 6.39.1?
13    A   The fact that she was not there to supervise, she was
14  not there to instill any work ethic, she was not there with the
15  officers demonstrating leadership.  And, basically, these
16  officers by seeing her failures are seeing that it's okay to do
17  those sort of things.  So that would fall under that supervisor
18  responsibility.
19    Q   Did you ask the officers working under Jessica that
20  night if she had failed to instill positive work ethics in
21  them?
22       MR. ELKINS:  Objection to form.
23    A   No.
24  BY MR. BARROUKH:
25    Q   Did you ask them if Jessica failed to provide

Page 122

1  guidance and assistance to them?
2    A   No.
3    Q   Are you telling me that a sergeant who is working at
4  headquarters -- or strike that.  A sergeant who is not in their
5  area is automatically in violation of 6.39.1?
6       MR. ELKINS:  Objection to form.
7    A   No.
8  BY MR. BARROUKH:
9    Q   So an officer can be working on an assignment away
10  from their area and still be fulfilling 6.39.1; is that
11  correct?
12       MR. ELKINS:  Objection to form.
13    A   Yes.
14  BY MR. BARROUKH:
15    Q   Okay.  And lastly that brings us to DRR 6.40.1, not
16  Tortuous Conduct but Radio Transmissions, which makes a lot
17  more sense.  So could you please read that 6.40.1 for us?
18    A   "Employees will use their radios in accordance with
19  established procedures and will avoid use of sarcasm,
20  impertinent remarks, or other improper radio transmissions
21  including interfering with radio broadcasting.  Employees will
22  not use the radio for non-police functions or personal
23  business.  Employees are to monitor their radios at all times."
24    Q   And in 6.40.1 what is the established procedures for
25  radio transmissions?

Page 123

1    A   It's going to be in reference to using proper
2  protocol as far as how you're communicating with getting the
3  proper codes, communicating -- not cutting off other officers
4  that are taking on the radio, using your call sign.
5    Q   And I'm sorry to interrupt, but where can I find
6  these established procedures?
7    A   I believe there's an SOP regarding radio procedures.
8    Q   Are you aware of which SOP it is?
9    A   No, I'm not.
10    Q   Can you recite the SOP to me?
11    A   No.
12    Q   But, more or less, there are general protocols which
13  are established for the radio and it's understood generally
14  what is allowed; is that fair to say?
15    A   Yes.
16    Q   Okay.  But sitting here today you can't tell me
17  exactly what procedures exist as they're written?
18    A   As it's written, no.
19    Q   Okay.  And can you explain to me how Jessica violated
20  6.40.1?
21    A   The last sentence in that it says, employees are to
22  monitor their radios at all times.
23    Q   Okay.  So can you explain to me how Jessica
24  violated -- I understand where you're going with this, I just
25  need this for record, please, how Jessica violated 6.40.1.

Page 124

1   A   Yeah. I raised her multiple times on the radio. She
2   failed to answer. Dispatch raised her. This went on for a
3   while, for multiple minutes that we could not get ahold of her.
4   Q   And, again, you did not ask Jessica why she didn't
5   respond to the radio; is that correct?
6   A   That's correct.
7   Q   So you had previously stated that -- actually, we're
8   going back to Exhibit 8, which, again, is the internal affairs
9   resume. Is that better?
10  A   Yeah.
11  Q   Okay. So page 8, I believe. Could you please read
12  what it says in bold on page 8?
13      MR. ELKINS: I don't see where this is Bates stamped.
14  So is this from you guys?
15      MR. BARROUKH: This is public record. You guys have
16  access to it in your own documents. This is your records.
17      MR. ELKINS: Well, hold on. Wait a minute. Are you
18  saying that you guys didn't produce this to us in
19  discovery because I definitely asked for it?
20      MR. BARROUKH: I believe -- I did not produce it. I
21  believe Paul produced it, but, regardless, this is --
22      MR. ELKINS: When I say you guys, I mean as the
23  Plaintiffs.
24      MR. BARROUKH: I understand. Off the top of my head
25  I don't know if Paul produced it, but I can tell you that

Page 125

1   this is the Miami Beach Police Department's internal
2   affairs documentation.
3       MR. ELKINS: I understand that. But if you're going
4   to use documents in this case it doesn't mean you just get
5   to go on a treasure trove and pull public records --
6       MR. BARROUKH: Michael, I'm going to continue the
7   deposition. I'm only going to ask a few questions about
8   this document.
9       MR. ELKINS: Just so we can get the record clear, you
10  don't know if you produced this to us in this case --
11      MR. BARROUKH: At this time I'm not aware if this has
12  been produced by prior counsel. I have not produced it,
13  but I'm going to continue to ask my question.
14      MR. ELKINS: Okay. And you're using it --
15      MR. BARROUKH: Yeah.
16  BY MR. BARROUKH:
17  Q   All right. Mr. Cosner, can you please read in bold
18  what this says on page 8?
19      MR. ELKINS: I'm going to object to form and it's
20  going to be a standing objection that my client and
21  witness is being questioned about a document that I don't
22  know was produced in this case. So he can answer, but
23  every question about this document is subject to that
24  objection. You can answer.
25      MR. BARROUKH: He's got standing objection.

Page 126

1   Mr. Elkins is not going to make the same objections moving
2   forward, but if he has other objections he can object to
3   that. Okay?
4       MR. ELKINS: Yes. I just don't want to keep
5   objecting to every question.
6       MR. BARROUKH: I'm with you. Okay.
7   BY MR. BARROUKH:
8   Q   So can you please read in bold at the top of page 8
9   for us, Mr. Cosner?
10  A   "Discipline, internal affairs number D2011-045, case
11  closed."
12  Q   And underneath it says allegations. What does that
13  say?
14  A   "Court attendance, court overtime and accountability.
15  Administrative action."
16  Q   And beneath that?
17  A   "Miami Beach PD manual, SOP 97, absence or tardiness
18  for court."
19  Q   And what is the disciplinary action that's stated?
20  A   Received a written warning on March 25th of 2011.
21  Q   And what was the days or hours you were suspended?
22  A   Zero.
23  Q   And if we move down to the middle of the page, could
24  you please read where the mouse is right now?
25  A   "Discipline, internal affairs No. D2011-132, case

Page 127

1   closed."
2   Q   And underneath allegation what does it say?
3   A   "Sleeping on duty. Administrative Action, August
4   25th, 2011."
5   Q   Continue.
6   A   Miami Beach PD Manual, Department Rule and Regulation
7   6.20, sleeping on duty. Disciplinary action, written warning,
8   August 25th, 2011, days or hours suspended is zero.
9   Q   Okay. So just to be clear, there was a disciplinary
10  action in the form of a written warning but no days or hours of
11  suspensions as a discipline to you sleeping on duty; is that
12  correct?
13  A   Correct.
14  Q   When you were -- if you remember, I understand it was
15  13, 14 years ago, when you were sleeping on duty, were you a
16  field officer?
17      MR. ELKINS: Objection to form.
18  A   A field officer? I don't know what a field
19  officer --
20  BY MR. BARROUKH:
21  Q   Were you an officer on August 25th, 2011?
22  A   I was a police officer, yes.
23  Q   And when you were -- it says here you were sleeping
24  on duty. When you were on duty does that mean you had tasks or
25  assignments on August 25th, 2011?

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 128

1  A   That particular incident I was ill and I was working
2  the front desk with three other officers. I wasn't in the
3  field.
4  Q   Okay. If you remember this incident can you tell me
5  more about it?
6     MR. ELKINS: Objection to form.
7  A   Yeah, I can. There was three or four other officers
8  at the front desk area which is a secured area. They handle
9  walk-in complaints and reports and phone reports. I was
10 seated, because I was feeling very ill, I had been taking
11 medication, and I was seated. It's an elevated platform that
12 we sit on and around the side of it there's an area that's down
13 low at ground level. It's out of the view of the public. I
14 was sitting there with my feet up on the desk and my eyes
15 closed. The chief at the time, Ray Martinez and I had been at
16 odds about several different things. He walked by and saw me
17 with my eyes closed. I was not sleeping. But he wrote me up
18 or had somebody write me up for sleeping on duty. So I argued
19 it. I fought it with the union. The city decided to uphold it
20 and I accepted the written warning.
21 BY MR. BARROUKH:
22 Q   So you believe that this was an incorrect -- excuse
23 me.
24    MR. BARROUKH: Give me a two minute break. Sorry
25    about that. I need to take care of something. I

Page 129

1  apologize. Two minutes tops. Is that okay, Michael?
2     MR. ELKINS: Let's just take five. I've got to make
3  a call anyway.
4     MR. BARROUKH: Okay. Let's take five.
5     (A recess was taken.)
6     MR. BARROUKH: All right. We're ready to go back on
7  the record.
8  BY MR. BARROUKH:
9  Q   All right. So as we were stating before, on August
10 25th, 2011, you were allegedly sleeping on duty in violation of
11 the Department Rule and Regulation 6.20 and as a result you
12 received disciplinary action in the form of a written warning
13 but no days or hours suspension, correct?
14 A   Correct.
15 Q   Now I'd like to share Exhibits 8 and 9, 8 being your
16 report, and 9 being the DRR notes. So while you were in the
17 back room with your feet kicked up on a desk and eyes closed,
18 do you believe the officer, your supervisor, could have alleged
19 you violated 6.28.3.5?
20    MR. ELKINS: Objection to form.
21 A   "Any lawful or reasonable regulation or fail to obey
22 any lawful or reasonable direction." Well, let me see. Hold
23 on. Back to where it was. I guess they probably could have
24 put that on there if they wanted to.
25 BY MR. BARROUKH:

Page 130

1  Q   Moving to 6.28.3(10). Do you think they could have
2  also put this DRR violation?
3     MR. ELKINS: Objection to form.
4  A   Guilty of actions which amount to insubordination,
5  no. Disgraceful conduct, no. No, that doesn't apply.
6  BY MR. BARROUKH:
7  Q   And what are you basing that whether it applies or
8  not off of?
9     MR. ELKINS: Form objection.
10 A   The allegation of sleeping on duty is not me being
11 insubordinate to anybody. I don't believe that that
12 constitutes disgraceful conduct. Disgraceful conduct would
13 have to be something that's higher on the ladder, I would say.
14 BY MR. BARROUKH:
15 Q   Okay. But that again being higher on the ladder is a
16 personal subjective analysis, correct?
17    MR. ELKINS: Objection to form.
18 A   I guess it would have to -- it would have --
19 disgraceful conduct is a general term so it would have to be up
20 to the interpretation.
21 BY MR. BARROUKH:
22 Q   Okay. So moving on to 6.28.3.20, "Has been guilty of
23 conduct unbecoming an employee of the city." Do you believe
24 that going to the side room while you're supposed to be on your
25 shift, kicking your legs up, closing your eyes, even though

Page 131

1  you're not sleeping do you think your supervisor at the time
2  could have charged you with violating this DRR?
3     MR. ELKINS: Objection to form.
4  A   Yeah, if the sleeping on duty -- well, no, sleeping
5  on duty is not under the context of conduct unbecoming. It's a
6  whole separate DRR.
7  BY MR. BARROUKH:
8  Q   I'm asking you your opinion on this.
9  A   No, that's not conduct unbecoming.
10 Q   Okay. And, again, I'm just asking your opinion. You
11 can tell me no and we can continue as well. Moving on to
12 6.28.3.34. Actually, this is not -- you were not a supervisor
13 at the time, correct?
14 A   Correct.
15 Q   Okay. That's fine. And, again, 6.39.1 wouldn't
16 apply because of the same supervisor nuance. And 6.40.1, were
17 you in possession of a radio or did you have a radio at the
18 time you were allegedly sleeping on duty?
19 A   I did have a radio, yes.
20 Q   And when you were allegedly sleeping on duty were you
21 responding to the radio?
22 A   Nobody was raising me on the radio.
23 Q   Okay. That's fine. Thank you. Have any other
24 employees -- or, excuse me, let me rephrase. Have any
25 employees at the Beach accused you of harassment?

Deposition of Steve Cosner

Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 132

1  A  We recently had an issue between myself, Lieutenant
2  Rabelo and a Lieutenant Carvajal. I don't remember if
3  harassment was one of her allegations.
4  Q  What do you remember her allegations to be?
5  A  You know, it may have been harassment, sexual
6  discrimination. I don't recall. It was a big thing with HR.
7  It was a monthslong investigation in which both myself and
8  Lieutenant Rabelo were exonerated.
9  Q  I understand. So I previously said Lieutenant
10  Rabelo. I may have misunderstood. Did you say she was being
11  accused of harassment alongside you?
12  A  No. Lieutenant Rabelo is a male. Lieutenant
13  Carvajal is a female. She was the one that filed the
14  allegations against Lieutenant Rabelo and myself.
15  Q  Got it. Do you know if Carvajal was placed on a Last
16  Chance Agreement?
17  A  She was not.
18  Q  Okay. Where does -- I apologize for forgetting this.
19  Is it Officer Carvajal or --
20  A  Lieutenant.
21  Q  Is Lieutenant Carvajal still employed by the City of
22  Miami Beach?
23  A  Yes.
24  Q  How often do you interact with Lieutenant Carvajal?
25  A  Very rarely.

Page 133

1  Q  And do you remember what accusations she made against
2  you in any complaint regarding harassment?
3  A  Like I said, I believe there was a harassment
4  component to it. There was a sexual discrimination component
5  to it, but I don't recall what else was involved in it.
6  Q  Do you remember any instances of misconduct with
7  Ms. Carvajal?
8  A  Misconduct from me?
9  Q  From her, from you, both of you working together at
10  any point where something went wrong.
11  A  We had disagreements. We were both at the time
12  assigned to be in charge of the field training program for the
13  Department, which was a bad choice by the administration at the
14  time because you don't have two supervisors leading a unit like
15  that. You have one person leading. It was an attempt to try
16  something new. And I had been involved with the field training
17  program since 1998. She had never been involved with the field
18  training program. I knew how it needed to be run. Lieutenant
19  Rabelo had been in charge of the program. And she had a
20  direction she wanted to go that conflicted with us and we had
21  many arguments over it. So there was arguments she took and
22  decided to make it into a harassment claim.
23  Q  I understand. Again, you said the result of her
24  harassment claim was that you and Lieutenant Rabelo were
25  exonerated, correct?

Page 134

1  A  Yes.
2  Q  Lieutenant Carvajal is Hispanic, correct?
3  A  Yes, I believe she's Dominican.
4  Q  And how old is she?
5  A  I don't know.
6  Q  Around what age?
7  A  I'd say she's probably around 40, 39, 40 years old.
8  Q  And when she complained about sex discrimination,
9  harassment, did she file an EEOC charge or was that an internal
10  complaint?
11  A  It was internal. It went to IA and then I believe it
12  went to HR. I don't recall if she filed an EEOC complaint.
13  Q  Okay. And did you -- when was this?
14  A  This was -- I think it -- the issues had been ongoing
15  throughout. Let's see. When was that? I want to say the
16  issues had gone from maybe August of '21 through the end of the
17  year and then I think it culminated into the complaint
18  somewhere around December of '21 or January of '22, maybe.
19  Q  And when were you exonerated?
20  A  I think it was like five months.
21  Q  So June of '22; is that fair?
22  A  Roughly.
23  Q  We'll call it summer of '22, early summer of '22.
24  Okay. When was the last time you spoke with Jessica?
25  A  I believe it was at the meeting in the chief's

Page 135

1  conference room.
2  Q  The last time you've ever spoken to her inside or
3  outside of a professional environment?
4  A  Yeah. I have no need or desire to speak with her.
5  Q  Okay. Where do you believe your relationship with
6  Jessica stands today?
7      MR. ELKINS: Objection. Form.
8  A  I don't have a relationship with her. To me it's
9  like she's a stranger on the street.
10  BY MR. BARROUKH:
11  Q  Okay. And how does that make you feel?
12      MR. ELKINS: Objection. Form.
13  A  It makes me feel fine. I'm happily married.
14  BY MR. BARROUKH:
15  Q  Okay. And that was going to be my next question. I
16  saw you had a ring on your finger. When did you get remarried?
17  A  We were married September 1st of 2018.
18  Q  So you were -- where did you meet your wife?
19  A  We met online.
20  Q  Okay. Nothing to do with the police department or
21  work, is that correct?
22  A  No.
23  Q  Okay. Did Jessica ever meet your current wife?
24      MR. ELKINS: Objection. Form.
25  A  No, she didn't.

Page 136

1  MR. BARROUKH: Okay. All right. Michael, I think
2  that's all my questions but give me five minutes to take a
3  look and I'll get back to you, but I think that's it for
4  now.
5  MR. ELKINS: Take your time.
6  MR. BARROUKH: Thank you.
7  (A recess was taken.)
8  BY MR. BARROUKH:
9  Q   Just a few more questions. Are you aware of Jessica
10 opposing advances of a sexual nature or intimate nature from
11 any other officers or employees of Miami Beach Police
12 Department?
13 A   Not that I'm aware of, no.
14 Q   Did Jessica tell you that other officers were
15 interested in her at any point?
16 A   I don't recall if she did. I know there was talk
17 around the Department that she had been involved with quite a
18 few different people.
19 Q   Understood. But she never specifically told you she
20 opposed that type of behavior towards her, correct?
21 A   Not that I can recall, no.
22 MR. BARROUKH: Okay. All right. I have no further
23 questions, Michael.
24 MR. ELKINS: Okay. I have a few. Daniel, can you
25 pull up Exhibit 5 for me, please?

Page 137

1  MR. BARROUKH: Yeah.
2  MR. ELKINS: I hate to bother you to    scroll, but
3  apparently you're going to have to do it.
4  MR. BARROUKH: Just let me know where you want me to
5  go.
6  MR. ELKINS: Yeah. Just give me one second. Can you
7  go to the top? Sorry.
8  MR. BARROUKH: You have this document, by the way
9  Michael. I know it's easier because I have it pulled up
10 but if you want to take some time to pull these documents
11 up.
12 MR. ELKINS: No, because you've pulled them out of
13 discovery so I want to use the ones you're using.
14 MR. BARROUKH: Okay. That's fine.
15 MR. ELKINS: I extended you the same courtesy in some
16 of our other depos. If you can just bear with me. It's
17 not going to be long. Go to the top.
18 CROSS-EXAMINATION
19 BY MR. ELKINS:
20 Q   Okay. Let's start here, Lieutenant. You were
21 questioned extensively about this e-mail and timing of it, that
22 it came at 3:55 a.m.; Do you see that on the e-mail, the time?
23 A   Yes.
24 MR. ELKINS: Can you scroll down a little bit,
25 Daniel?

Page 138

1  MR. BARROUKH: Yeah.
2  MR. ELKINS: So right there. Stop right there.
3  BY MR. ELKINS:
4  Q   These assignments that were e-mailed, these are known
5  as details, correct?
6  A   Yes.
7  Q   Is there a distinction between a detail for a shift
8  and then an officer's regular assignments for a shift?
9  MR. BARROUKH: Objection.
10 BY MR. ELKINS:
11 Q   You can answer.
12 A   Yes.
13 Q   Okay. What is a detail? Let's start with that.
14 What are details?
15 MR. BARROUKH: Objection.
16 BY MR. ELKINS:
17 Q   You can answer.
18 A   So a detail is where an officer is asked to handle a
19 specific task at a specific location to address a specific
20 issue. So, for example, where you have the business corridor
21 73rd to 75th Street on Collins Avenue, Apartment 1, so that
22 means that Officer Otero and Dr. Zapata need to go to that area
23 when calls for service allow it. They have to get out of their
24 car. They have to walk. They're going to check the doors to
25 the businesses. They're going to make sure there's no homeless

Page 139

1  sleeping in the alcoves, that there's nothing going on of any
2  kind of nefarious nature.
3  Q   Is it fair to say that a detail is something specific
4  that is done time permitting in addition to a police officer's
5  regular duties on a shift?
6  A   Yes.
7  MR. BARROUKH: Objection.
8  BY MR. ELKINS:
9  Q   Okay. So whether or not --
10 MR. BARROUKH: I just want to make sure it was
11 heard. I objected.
12 BY MR. ELKINS:
13 Q   Okay. And so an example of a detail, correct me if
14 I'm wrong, might be a watch order, right?
15 A   Yes.
16 Q   Am I correct if I say that a watch order is usually
17 like a citizen or a business want the police to occasionally
18 patrol their particular location, right?
19 A   Yeah. It's a little bit more direct for a watch
20 order as opposed to a detail where a watch order would be like
21 if you're going on vacation or your house is being tinted, they
22 would request can we have an officer come by and check my
23 property while I'm away.
24 Q   So that would be part of something additional from
25 the officer's normal duties and responsibilities?

Deposition of Steve Cosner

Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 140

1  A   Yes.

2  Q   All right.  Now, you were questioned about this

3 e-mail, the 3:55 a.m. timing that it was sent to Jessica.  Do

4 you remember that sort of line of questioning?

5  A   Yes.

6  Q   Does the assignment -- does you as the lieutenant

7 forwarding the detail assignments to the sergeant which are for

8 the officers have anything to do in any way, shape, or form

9 with the requirement, necessity of, or need for the sergeant to

10 be in their area?

11      MR. BARROUKH:  Objection.

12 BY MR. ELKINS:

13  Q   You can answer.

14  A   No.

15  Q   Are they completely independent of each other?

16      MR. BARROUKH:  Objection.

17  A   Yes.

18 BY MR. ELKINS:

19  Q   Okay.  Speaking of a sergeant, Ms. Salabarria in

20 particular being in her area, obviously, sergeants do do

21 administrative work at the station, correct?

22  A   Yes.

23  Q   Do they normally spend four to six hours at the

24 station and not be in their area?

25      MR. BARROUKH:  Objection.

Page 141

1 BY MR. ELKINS:

2  Q   You can answer.

3  A   That's not the normal, no.

4  Q   Did Jessica ever alert you on her shift that she

5 would be spending excessive time at the station doing

6 administrative work?

7  A   No.

8  Q   And was she at the station for like four to six hours

9 before you told her to go to Area 3?

10      MR. BARROUKH:  Objection.

11 BY MR. ELKINS:

12  Q   Should she have been in area 3 well before your

13 e-mail of 3:55 a.m.?

14      MR. BARROUKH:  Objection.

15 BY MR. ELKINS:

16  Q   You can answer.

17  A   Yes.

18      MR. ELKINS:  Can you -- I'm sorry, can you scroll

19   down on this?  Okay.  Can you pull up Exhibit 6, please?

20   Okay.  Stop right there.

21 BY MR. ELKINS:

22  Q   I'd like to direct you to Exhibit 6.  This is an

23 e-mail that was forwarded to you at 5:59 a.m. by Officer

24 Romero, correct?

25  A   Yes.

Page 142

1  Q   And if we look right down it's an e-mail from Jessica

2 to the squad, correct?

3  A   Yes.

4  Q   And it was sent at 5:42 a.m., correct?

5  A   Yes.

6  Q   And contained in the e-mail are the detail

7 assignments that you had e-mailed, you can leave it right

8 there, are the detail assignments that you had e-mailed at

9 3:55, correct?

10  A   Yes.

11  Q   So she forwarded those just under an hour later,

12 correct, to her squad?

13  A   Well, from 3:55 she forwarded it --

14  Q   Oh, I'm sorry, just under two hours.

15  A   Just under two hours.

16  Q   So just under two hours later.  But let's focus on

17 the first part of the e-mail where it says:  "Squad, per our

18 conversation, please note the below details for our shift."  Do

19 you see that?

20  A   Yes.

21  Q   Did you speak to the six officers as to whether they

22 had that conversation?

23  A   Yes.

24  Q   And what did each one of them tell you?

25      MR. BARROUKH:  Objection.

Page 143

1  A   They told me that they had no contact with the

2 sergeant.

3 BY MR. ELKINS:

4  Q   Okay.  And was that the basis, or one of the bases,

5 for you saying in the Administrative Action Form that she had

6 lied?

7  A   Yes.

8  Q   Because she had put in the e-mail to everybody that

9 they had this conversation and you spoke to all of them and

10 they said they didn't, right?

11      MR. BARROUKH:  Objection.

12  A   Correct.

13 BY MR. ELKINS:

14  Q   When you talked to each officer had you informed them

15 what anyone else had said?

16  A   No.

17  Q   Did you inform them that you were trying to get

18 Jessica or anything like that?

19  A   No.

20  Q   Okay.  And is it sufficient to provide the detail

21 assignments 18 minutes before the end of the shift --

22      MR. BARROUKH:  Objection.

23 BY MR. ELKINS:

24  Q   -- as this e-mail seems to indicate?

25  A   No, it's not.

Deposition of Steve Cosner                                      Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 144

1      MR. ELKINS:  Hold on.  I'm trying to go through the
2  exhibits first, Daniel, so I don't have to repeatedly ask
3  you to pull them up so just give me a minute.
4      MR. BARROUKH:  I have no problem pulling them up if
5  you need it.
6      MR. ELKINS:  I'm trying to not have to do that to
7  you.
8  BY MR. ELKINS:
9      Q   Okay.  Did you have any -- Lieutenant, was there any
10 issue -- did you have any problem with the fact that she had
11 not communicated the detail assignments prior to 3:55 in the
12 morning after you sent them?
13     MR. BARROUKH:  Objection.
14 BY MR. ELKINS:
15     Q   Because she couldn't have, right?
16     A   She couldn't have, no.
17     Q   Was your primary concern both that -- was your
18 primary concern that she said she had these phone conversations
19 that the officers told you they did not have with her?
20     MR. BARROUKH:  Objection.
21     A   Yes.
22 BY MR. ELKINS:
23     Q   And was also a concern that she put an e-mail that
24 the conversations happened when in reality everybody denies
25 them?

Page 145

1      A   Yes.
2      Q   Was it also a concern that at least the e-mailing of
3  the detail assignments was almost two hours after you had
4  e-mailed her?
5      A   That was a concern.
6      Q   Were you also concerned that her car pursuant to the
7  AVL report hadn't moved from the main station for between I
8  think it's four to six hours?
9      A   Yes.
10     MR. BARROUKH:  Objection.
11 BY MR. ELKINS:
12     Q   Were you also concerned that she never communicated
13 to you that she was at the station the whole time doing
14 anything specific?
15     MR. BARROUKH:  Objection.
16 BY MR. ELKINS:
17     Q   What should she have been doing in Area 3?
18     A   Responding to any calls that the officers are on,
19 making sure that they're handling the calls appropriately,
20 being generally aware of what's going on in the zone and
21 attending to anything that the officers may need.  As a
22 sergeant you're not just a supervisor, but you're also a
23 resource for the officers.
24     Q   So generally speaking, a sergeant is patrolling in
25 the same area as their squad, correct?

Page 146

1      A   Correct.
2      Q   And they may have to go to a particular call, for
3  example, if it involved like excessive force or use of force,
4  right?
5      A   Correct.
6      Q   Or they may have to cover another call if a
7  particular officer is involved in a detention that's going to
8  take a long period of time, the sergeant would be able to fill
9  in, correct?
10     MR. BARROUKH:  Objection.
11     A   Yes.
12 BY MR. ELKINS:
13     Q   And they can only do that if they are in the area,
14 correct?
15     MR. BARROUKH:  Objection.
16     A   Correct.
17 BY MR. ELKINS:
18     Q   Okay.  Now, just to be clear, I think you testified
19 about it earlier, at the time you wrote the Administrative
20 Action Form that you were questioned about extensively today,
21 did you have any knowledge about Jessica's 2020 EEOC charge?
22     A   I did not.
23     Q   Did you have enough any knowledge about her 2018 EEOC
24 charge?
25     A   I did not.

Page 147

1      Q   Were you involved in any way in any internal affairs
2  investigation of which Jessica was the subject?
3      A   No.
4      Q   Were you involved in any way in any of the facts or
5  circumstances or anything that led to Jessica's settlement
6  agreement and correspondingly her Last Chance Agreement?
7      A   No.
8      Q   Did you even know about those two documents at the
9  time that you wrote the Administrative Action Form?
10     A   No.
11     Q   Do you know all of the reasons that Chief Clements
12 implemented her Last Chance Agreement?
13     A   No.
14     Q   Were you involved in any discussions, meetings or
15 anything involving whether to implement the Last Chance
16 Agreement?
17     A   No.
18     Q   Are you a decision maker in any way, shape, or form
19 when it comes to discipline?
20     A   No.
21     Q   So you were not part of the disciplinary process in
22 terms of deciding to implement the Last Chance Agreement?  You
23 had no input into that, did you?
24     A   I did not.
25     Q   You were asked extensively about what all sergeants

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 148

1  do.  Do you have occasion to observe all sergeants and what
2  they do in terms of going to their areas or not?
3     A   No.
4     Q   So you would only know what the sergeants do that
5  you're responsible for, correct?
6     MR. BARROUKH:  Objection.
7     A   Yes.
8  BY MR. ELKINS:
9     Q   You were questioned extensively about your IA profile
10 from things that happened in 2011, right?
11    A   Yes.
12    Q   That's like approximately almost ten years before
13 Jessica's separation; is that right?
14    A   Yes.
15    Q   How many chiefs have there been between your internal
16 affairs items that you were questioned about in 2011 and
17 Jessica's separation of January 2021?
18    A   Ray, Martinez, Dan Oates, Ray Clements, and now we're
19 at Wayne Jones.  So four.
20    Q   But up until -- hold on.  You said Wayne, but
21 Wayne --
22    A   Oh, I'm sorry, Wayne came after.  So, yeah, you're
23 right.  So three.
24    Q   So Chief Martinez who had completely different staff
25 than Clements had, correct?

Page 149

1     A   Correct.
2     Q   And so Chief Martinez was the decision maker in 2011,
3  right?
4     A   Yes.
5     Q   And then after Chief Martinez the decision maker was
6  Dan Coates, Chief Coates, correct?
7     A   Yes.
8     Q   And the decision maker for Jessica was Chief
9  Clements, correct?
10    A   Yes.
11    Q   So Jessica's separation and the decisions relating to
12 that were two chiefs removed from any decision or disciplinary
13 decisions relating to you in 2011, correct?
14    A   Correct.
15    Q   Were you ever questioned about any allegation of
16 sexual harassment as to Jessica?
17    A   No.
18    Q   Were you ever made aware of any allegation of sexual
19 harassment as to Jessica?
20    A   No.
21    Q   When Rosa Carvajal made an allegation you were the
22 subject of an internal investigation, correct?
23    A   Correct.
24    Q   Was that investigation extensive?
25    A   Very.

Page 150

1     Q   And I think you testified that you were exonerated
2  sometime in the summer of 2022; is that right?
3     A   Something like that, yeah.
4     Q   Is March 2022 probably the more accurate date; do you
5  know?
6     A   I would say yes.
7     Q   Were you interviewed as part of that investigation?
8     A   Yes.
9     MR. ELKINS:  Sorry, I shut my camera off.  I should
10 have had my camera on.  I apologize.
11    MR. BARROUKH:  Yeah, I asked you about that earlier.
12    MR. ELKINS:  I should have had my camera on when I
13 was questioning the Lieutenant for the benefit of our
14 court reporter.  I'm sorry, that was totally
15 unintentional.    Now I'm almost done.  I'm just looking at
16 some notes here    real quick.
17    MR. BARROUKH:  Michael, can I stop screen share?
18    MR. ELKINS:  Yes.  Thank you.  I appreciate your
19 assistance.  Just give me -- actually, give me three
20 minutes to double check everything.
21    (A recess was taken.)
22    MR. ELKINS:  All right.  Back at 3:45.
23 BY MR. ELKINS:
24    Q   Okay.  Lieutenant, you testified earlier about
25 internal affairs and its role; do you remember that?

Page 151

1     A   Yes.
2     Q   I think you had testified earlier that internal
3  affairs issues discipline; do you recall that?
4     A   Yes.
5     Q   But is it accurate that internal affairs now as
6  constituted, and as it was constituted in 2020 and 2021, is
7  only as fact finder, they don't actually issue any discipline,
8  do they?
9     MR. BARROUKH:  Objection.
10 BY MR. ELKINS:
11    Q   Is that correct?
12    A   Yes, that's changed.
13    Q   So when you testified that internal affairs issues
14 discipline, that was a mistake, correct?
15    A   That was a mistake on my part.
16    Q   Okay.  And I think you talked a little bit about
17 Chapter 112 of the Police Officers' Bill of Rights.  Do you
18 remember that?
19    A   Yes.
20    Q   Was that your opinion on how the Police Officers'
21 Bill of Rights work?
22    A   Yes.
23    Q   And it's possible, though, that -- you're not a
24 lawyer, correct?
25    A   Correct.

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 152

1    Q   And so you weren't issuing a legal opinion of how it
2   works, were you?
3    A   I was not.
4    Q   And you were not testifying and binding the city as
5   to how the city treats 112, were you?
6    A   No.
7    Q   That was your personal view on how you apply 112 in
8   your role as a lieutenant, correct?
9    A   Yes.
10   Q   But it's possible that your application and view may
11  not exactly correspond with truly legally how 112 operates,
12  correct?
13   A   Yes.
14   Q   And you are not a command staff employee such that
15  you could bind the city to that, correct?
16   A   Correct.
17   Q   That was just Lieutenant Cosner's view of 112,
18  right?
19   A   Correct.
20     MR. ELKINS:  I don't have anything further.
21     MR. BARROUKH:  All right.  I have nothing on cross.
22     MR. ELKINS:  We will read.  And, Ms. Fernandez, I'm
23  going to order expedited so as quickly you can get it to
24  me.  And I only ask for a mini.  You don't have to give
25  The full transcript.

Page 153

1     THE COURT REPORTER: So you're ordering the original?
2     MR. ELKINS:  What?
3     THE COURT REPORTER:  You're ordering the original?
4     MR. ELKINS:  Yeah.  We're going to read it too.
5     (At 3:47 p.m., no further questions were propounded
6   to this witness.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4        I, the undersigned authority, certify that Steve Cosner

 5   remotely appeared before me and was duly sworn.

 6        WITNESS my hand and official seal this 17th day of

 7   May, 2024.

 8

 9

10        _____

11        MELISSA FERNANDEZ
          Notary Public - State of Florida
          Commission No.:  HH 278990
12        My Commission Expires:  6/21/2026

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                REPORTER'S DEPOSITION CERTIFICATE

 2   STATE OF FLORIDA

 3   COUNTY OF HILLSBOROUGH

 4        I, MELISSA FERNANDEZ, Court Reporter, certify

 5   that I was authorized to and did stenographically report

 6   the foregoing deposition, and that the transcript is

 7   a true record of the stenographic notes.

 8        I further certify that I am not a relative,

 9   employee, attorney, or counsel of any of the parties,

10   nor am I a relative or employee of any of the parties'

11   attorney or counsel connected with the action, nor am

12   I financially interested in the action.

13        Dated this 21st day of May, 2024.

14

15

16                    _____
                      MELISSA FERNANDEZ
17                    Court Stenographer

18

19

20

21

22

23

24

25
```

Deposition of Steve Cosner                          Jessica Guasto v. The City of Miami Beach, FL, et al.

```
 1              DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

 2   IN THE CASE OF:   JESSICA GUASTO v. THE CITY OF MIAMI BEACH, FL,
                       ET AL
 3
     DEPOSITION OF:  STEVE COSNER        DATE:  5/17/2024
 4
     PLEASE READ THE TRANSCRIPT OF YOUR DEPOSITION.  If YOU FEEL YOU
 5   NEED TO MAKE CORRECTIONS, PLEASE NOTE ON THIS PAGE.  DO NOT
     MARK ON THE TRANSCRIPT ITSELF.  SIGN AND DATE THE COVER PAGE
 6   AND RETURN BOTH ERRATA SHEET AND COVER PAGE AS DIRECTED.

 7   PAGE    LINE            ERROR OR AMENDMENT

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20                       (Melissa Fernandez)

21   PLEASE DISTRIBUTE TO:   Daniel J. Barroukh, Esquire
                            Danielb@dereksmithlaw.com
22

23

24

25
```

Deposition of Steve Cosner                    Jessica Guasto v. The City of Miami Beach, FL, et al.

```
 1                    READ AND SIGN
                       COVER PAGE
 2
           I have read the foregoing pages, and,
 3      except for the corrections or amendments
        I have indicated on the sheet attached
 4      for such purposes, I hereby subscribe to
        the accuracy of this transcript.
 5

 6      _____

 7      SIGNATURE OF DEPONENT

 8      _____

 9      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    May 21, 2024

2    STEVE COSNER
     MLE Law
3    melkins@mlelawfirm.com
     1212 Northeast 16th Terrace
4    Fort Lauderdale, Florida  33304

5    RE:  JESSICA GUASTO v. THE CITY OF MIAMI BEACH, FL, ET AL

6    Dear Mr. Elkins:

7    The deposition of STEVE COSNER taken on the 17th day of May,
     2024, in the above-styled case has been transcribed.  Please
8    follow the Options below coinciding with your transcript copy
     choice:

9
     OPTION 1:  If you have ordered a transcript copy, please use
10   the original Errata Sheet attached to your transcript copy for
     your client to note any changes/corrections.  When reading is
11   complete, please promptly (within 30 days) send a copy of the
     signed errata sheet to opposing counsel, Mr. Barroukh.

12
     OPTION 2:  If you have NOT ordered a transcript copy, please
13   notify your client that a copy of said transcript, along with
     the original Errata Sheet, will be made available at one of our
14   office locations for him/her to Read & Sign and note any
     corrections/changes.

15
     Please note:  Your client MUST CALL TO MAKE AN APPOINTMENT,
16   (215) 341-3616.  Please instruct your client to call our office
     during normal business hours to make an appointment within
17   thirty (30) business days.

18   Thank you,

19

20   _____
     Melissa Fernandez, Court Reporter
21
     cc:  Daniel J. Barroukh, Esquire
22

23

24

25

## WORD INDEX

**< 0 >**
**001471** 56:*1*
**001591** 56:*1*
**05** 65:*24* 68:*18, 20*

**< 1 >**
**1** 3:*16* 27:*12, 13*
55:*15* 65:*14* 94:*15*
138:*21* 158:*8*
**1/8/21** 3:*22, 23*
**1:00** 94:*22* 99:*24*
**1:02** 85:*3*
**10** 65:*14* 77:*11*
**10:43** 1:*12* 4:*3*
**1000** 18:*16*
**108** 3:*23*
**111** 3:*24*
**112** 3:*25* 151:*17*
152:*5, 7, 11, 17*
**12/28/20** 3:*21*
**12:00** 99:*25*
**12:11** 72:*8*
**12:34** 47:*14*
**12:35** 108:*21* 110:*8*
**1212** 2:*8* 158:*3*
**13** 34:*22* 127:*15*
**137** 3:*3*
**14** 36:*15* 127:*15*
**14th** 28:*5*
**15.16** 70:*9*
**1519** 56:*2, 3*
**154** 3:*4*
**155** 3:*5*
**156** 3:*6*
**157** 3:*7*
**16th** 2:*8* 158:*3*
**17** 1:*11*
**170** 19:*23*
**17th** 4:*2* 154:*6*
158:*7*
**18** 143:*21*
**1991** 13:*11*
**1994** 13:*4, 11*
**1996** 10:*2*
**1998** 133:*17*
**1st** 135:*17*

**< 2 >**

**2** 3:*17* 30:*19, 20*
158:*11*
**20** 72:*11* 77:*2* 83:*18*
**2008** 113:*1, 7* 114:*19*
**2011** 126:*20* 127:*4, 8,
21, 25* 129:*10* 148:*10,
16* 149:*2, 13*
**2013** 19:*1, 2* 34:*9*
**2014** 9:*21, 23* 10:*4*
19:*18* 21:*3* 23:*14, 18*
25:*10* 28:*6, 17* 31:*11*
85:*23* 86:*8, 11*
**2015** 25:*8, 9, 11*
32:*13* 34:*10* 36:*1, 19*
58:*9, 14* 85:*8*
**2018** 40:*13, 23*
135:*17* 146:*23*
**2020** 9:*15, 17* 38:*11,
15, 17* 39:*8, 17, 21*
40:*16, 21* 41:*1, 5, 10,
23* 42:*8, 11, 19* 66:*20*
74:*13* 90:*5* 101:*9, 12,
14* 104:*10, 25* 120:*18*
146:*21* 151:*6*
**2021** 40:*10, 19* 41:*3,
5* 47:*14* 108:*19*
148:*17* 151:*6*
**2022** 10:*5* 90:*4*
113:*1, 7* 114:*19*
150:*2, 4*
**2024** 1:*11* 4:*3* 154:*7*
155:*13* 158:*1, 7*
**21** 43:*19* 134:*16, 18*
158:*1*
**215** 158:*16*
**21st** 155:*13*
**22** 55:*21* 134:*18, 21,
23*
**2200** 77:*11*
**22-cv-21004-DPG** 1:*4*
**24** 96:*12* 110:*9*
**25** 77:*3*
**25th** 126:*20* 127:*4, 8,
21, 25* 129:*10*
**27** 3:*16*
**278990** 154:*11*
**27th** 39:*2, 8, 13, 21*
40:*21* 74:*9*

**28th** 66:*20* 73:*15*
74:*9, 13* 101:*9, 12, 14*
104:*10, 25* 120:*18*

**< 3 >**
**3** 3:*18* 46:*20, 21*
60:*10, 18, 20* 61:*19*
68:*23, 24, 25* 69:*3, 5,
18, 19* 71:*6* 74:*8*
78:*20* 89:*7* 98:*17, 18*
101:*14* 114:*17*
120:*25* 141:*9, 12*
145:*17*
**3.8.2** 56:*7, 8, 14, 16,
19, 24* 57:*4* 59:*8, 11,
17* 60:*23* 62:*6* 63:*18,
23* 64:*5* 113:*14*
**3:45** 150:*22*
**3:47** 1:*12* 153:*5*
**3:55** 60:*7* 66:*20*
67:*10, 14* 74:*2* 77:*1,
14* 78:*21* 94:*12, 17,
22* 137:*22* 140:*3*
141:*13* 142:*9, 13*
144:*11*
**3:59** 60:*12*
**30** 3:*17* 7:*15* 77:*14,
18* 78:*3, 21* 79:*14*
82:*3* 158:*11, 17*
**305** 2:*4*
**33131** 2:*4*
**33304** 2:*9* 158:*4*
**34** 83:*18*
**341-3616** 158:*16*
**39** 134:*7*

**< 4 >**
**4** 3:*2, 19* 46:*10, 20*
55:*6, 7* 74:*1* 112:*17*
113:*5* 114:*19*
**4:04** 60:*14* 94:*11*
**4:23** 77:*8, 11*
**40** 134:*7*
**401-2608** 2:*9*
**45** 69:*4*
**46** 3:*18*
**49** 55:*12, 15, 16*
**4th** 55:*20* 113:*1, 7*

**< 5 >**

**5** 3:*20* 66:*11, 12*
136:*25*
**5/17/2024** 156:*2*
**5:21** 61:*16* 73:*15*
74:*2*
**5:36** 61:*11* 74:*13*
**5:42** 61:*23* 104:*25*
105:*11* 142:*4*
**5:43** 61:*7*
**5:59** 141:*23*
**520** 2:*3*
**55** 3:*20*

**< 6 >**
**6** 3:*22* 71:*14, 15*
99:*21* 101:*19* 141:*19,
22*
**6.15.1** 65:*13, 17*
68:*10, 15* 69:*11*
114:*6*
**6.15.6** 69:*25* 70:*9*
74:*16* 75:*4, 6* 114:*9*
**6.15.9** 81:*24* 82:*21,
23, 24* 83:*3* 114:*10,
16*
**6.20** 127:*7* 129:*11*
**6.28** 83:*20* 115:*4*
**6.28.3(10** 130:*1*
**6.28.3.10** 83:*17*
117:*19, 20*
**6.28.3.20** 118:*13*
119:*16* 130:*22*
**6.28.3.34** 120:*1*
131:*12*
**6.28.3.5** 116:*5, 10, 16,
20* 129:*19*
**6.28.3.6** 114:*17*
115:*4, 10* 116:*11*
**6.28.36** 83:*15, 17, 24*
**6.34.1** 120:*9, 12, 15*
**6.39.1** 120:*23* 121:*2,
12* 122:*5, 10* 131:*15*
**6.40.1** 122:*15, 17, 24*
123:*20, 25* 131:*16*
**6.43.1** 89:*22*
**6.5.4** 64:*11, 15*
113:*16, 17, 22*
**6/21/2026** 154:*12*
**6:15** 67:*5*

**62**  76:1
**640.1**  89:17
**65**  76:9, 12
**66**  3:21

**< 7 >**
**7**  3:23  67:10  108:7, 8
**70**  76:9, 12
**71**  3:22
**73rd**  138:21
**75**  76:5
**75th**  138:21

**< 8 >**
**8**  3:24  111:19, 20  124:8, 11, 12  125:18  126:8  129:15
**80**  76:6
**893.2**  115:13
**893.356(s)(a**  115:13
**8th**  47:14  108:19

**< 9 >**
**9**  3:25  112:18, 19, 20  113:6  114:18  129:15, 16
**946-1884**  2:4
**954**  2:9
**96**  10:4
**97**  126:17

**< A >**
**A.J**  3:23  8:18, 19  44:3  51:6  108:17, 23  109:1, 10, 11, 24, 25  110:11, 16  111:4, 7, 11, 16
**a.m**  1:12  4:3  47:14  60:7  61:11  66:20  67:11  72:8  73:15  74:1, 2  77:14  94:15  99:21  101:19  104:25  105:11  108:21  137:22  140:3  141:13, 23  142:4
**AAF**  59:9, 11  72:9  73:3  80:15  89:23  106:2  109:7, 9, 13, 16, 19, 24  110:3  111:2,

**16**  115:17  116:19  119:10  121:12
**abide**  59:12
**ability**  48:21  119:13
**able**  13:14  17:13  39:20  84:17  92:9  93:13  107:17  146:8
**above-styled**  158:7
**absence**  57:1  59:16  104:6  126:17
**Absolutely**  61:2
**academies**  16:3
**Academy**  13:4, 5, 7, 9, 16, 25
**acceptable**  79:18
**accepted**  64:6  128:20
**access**  91:18  124:16
**accident**  90:4
**accountability**  126:14
**accuracy**  157:4
**accurate**  69:12, 16, 17  150:4  151:5
**accusations**  133:1
**accused**  131:25  132:11
**acknowledgement**  60:13
**Action**  3:18  8:1, 9  47:10  48:25  49:12, 14, 21, 22  50:17, 23  51:3, 23  52:9  53:1, 19, 22  54:4  56:5  57:6, 20  58:4  89:9  93:4  97:15, 20, 21  98:1, 15  111:8  119:19  126:15, 19  127:3, 7, 10  129:12  143:5  146:20  147:9  155:11, 12
**actions**  18:6  33:19  102:13  104:6  116:25  117:8, 20  130:4
**Activity**  67:4
**Acts**  89:17
**addition**  139:4
**additional**  72:12  139:24
**Additionally**  49:1, 13
**address**  4:17  47:6

**138**:19
**addressing**  118:23
**adequate**  38:7
**adhere**  70:5, 10  74:17
**adjacent**  92:13
**administration**  133:13
**Administrative**  3:18  8:1, 9  11:1, 18  47:10  48:25  49:12, 14, 21, 22  50:17, 23  51:3  53:1, 22  54:4  56:4  57:6, 19  58:4  75:16  76:20  79:17, 24  89:8  92:4, 10, 23  93:2, 4  95:1, 3  97:15, 20  98:1, 23  102:18  111:8  119:19  126:15  127:3  140:21  141:6  143:5  146:19  147:9
**admit**  71:5
**adult**  25:4
**advance**  22:18
**advances**  88:25  136:10
**advise**  108:24
**advised**  61:20  108:23  109:1  110:20, 23  111:11
**advising**  60:11  61:8, 14, 21  110:25
**AFF**  115:24  120:4
**Affairs**  3:24  18:1  48:13, 14, 15  50:9  51:15, 17  52:8, 21  53:6  54:17  80:16  109:11, 14, 18  110:2, 4  111:24  112:1  124:8  125:2  126:10, 25  147:1  148:16  150:25  151:3, 5, 13
**Affirmative**  98:15
**affirmatively**  60:19  68:23
**afternoon**  18:14  38:21  99:24
**age**  134:6
**agencies**  14:7
**agency**  20:1  32:20, 21  52:17  76:18

**ago**  4:24  15:7  107:24  127:15
**agree**  43:7  69:19  101:7  110:16  114:13
**agreed**  3:10  21:13  99:20
**Agreement**  8:3  9:1  41:10, 11, 24  42:7  43:1, 6, 11, 14  45:24  108:3  132:16  147:6, 12, 16, 22
**agreements**  42:2
**ahead**  105:13
**ahold**  60:17  83:6  93:13  95:13  124:3
**ahs**  5:7
**air**  18:22
**al**  1:6  156:2  158:5
**alcoves**  139:1
**alert**  96:21  141:4
**Allegation**  8:1, 11  17:25  42:14  44:14  46:16  50:14  52:19  57:19  127:2  130:10  149:15, 18, 21
**allegations**  42:8  126:12  132:3, 4, 14
**alleged**  15:9  129:18
**allegedly**  129:10  131:18, 20
**alleges**  52:16
**alleging**  115:24  118:9  119:15
**allow**  5:16  6:12  51:21  52:11  92:6  138:23
**allowed**  6:2  123:14
**alongside**  19:17  132:11
**alternate**  92:25
**ambiguous**  6:6
**AMENDMENT**  156:7
**amendments**  157:3
**amount**  92:4  117:20  130:4
**analysis**  114:14  130:16
**announce**  30:2
**annual**  11:21  18:3

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 49 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**answer** 6:*1*, *2*, *3*, *6*
15:*11* 16:*17*, *25*
17:*10*, *15*, *20* 21:*1*
22:*14*, *20* 23:22
25:*14*, *15*, *21*, *25* 26:*6*,
*16*, *21* 29:*9*, *17* 30:*9*,
*14* 31:*20* 32:*9* 33:*20*
34:*4* 39:*6* 40:*8*
42:*24* 45:*18* 50:*2*
53:*23* 54:*5*, *11*, *21*
58:*19* 59:*24* 60:*6*, *15*
62:*9* 63:*4*, *8*, *9*, *14*
65:*10* 67:*9* 68:*1*
69:*15* 74:*24* 75:*14*,
*22* 76:*16* 79:*9* 90:*25*
91:*6*, *9*, *23* 96:*6*
102:*5* 118:*23* 124:*2*
125:*22*, *24* 138:*11*, *17*
140:*13* 141:*2*, *16*
**answered** 25:*20*, 22
42:*4* 58:*1* 59:*4*
60:*19* 68:*23* 81:*23*
**answering** 26:*1*
54:*24* 109:22
**answers** 5:*7*, *8*, *16*
**anybody** 6:*23* 7:*16*
29:*22* 45:*3* 48:*8*
51:*6* 52:*17* 57:*11*, *24*
130:*11*
**anyway** 129:*3*
**apart** 87:*19* 109:*19*
**apartment** 22:*1*, *3*, *4*
138:*21*
**apologize** 115:*8*
129:*1* 132:*18* 150:*10*
**apparently** 137:*3*
**appear** 31:*23* 44:*6*,
*10* 75:*21* 76:*11*, *13*
77:*19* 98:*17* 107:*5*,
*21*
**appearance** 83:*1*
107:*16*
**APPEARANCES** 2:*1*
**appeared** 1:*13* 2:*5*,
*10* 154:*5*
**appears** 55:*19* 84:*9*
111:*24*
**applicable** 53:*19*
63:*24*

**application** 152:*10*
**applied** 115:*1*
**applies** 130:7
**apply** 16:7 59:2
116:*25* 130:*5* 131:*16*
152:7
**APPOINTMENT**
158:*14*, *16*
**appreciate** 38:*16*
150:*18*
**appropriate** 54:*3*
63:*1*
**appropriately** 145:*19*
**approximately** 8:*21*
20:*7* 58:*11* 77:*2*, *9*
148:*12*
**April** 31:*10*, *11*, *14*
**archived** 113:*1*, *7*
**archives** 114:*19*
**area** 38:*10* 60:*9*, *18*,
*20* 61:*19*, *23* 68:*23*,
*24*, *25* 69:*3*, *5*, *8*, *18*,
*19* 71:*6* 74:*8* 75:*12*,
*21* 77:*14*, *18* 78:*20*
92:*16*, *25* 98:*17*, *18*,
*21*, *24* 101:*14* 102:*7*
122:*5*, *10* 128:*8*, *12*
138:22 140:*10*, *20*, *24*
141:*9*, *12* 145:*17*, *25*
146:*13*
**areas** 65:*19* 68:*11*
75:*20* 76:*11*, *12*
79:*13* 100:7 148:*2*
**argued** 128:*18*
**arguments** 133:*21*
**arrests** 61:*17*
**Asked** 25:*20*, *22*
28:*24* 42:*4* 44:*6*, *8*,
*10*, *24*, *25* 58:*1* 59:*4*
60:*18* 61:*13*, *15*
68:*17*, *20*, *22* 75:*3*
78:*11* 79:*1* 80:*20*
81:*9*, *10*, *13*, *15*, *21*
82:*1* 91:*12* 92:*18*
93:*13* 95:*25* 100:*16*
101:*5*, *16* 103:*16*
119:*18*, *22* 124:*19*
138:*18* 147:*25*
150:*11*

**asking** 5:*19*, 22 7:*8*
39:*10* 42:*15*, *19*
44:*21*, 22 54:*2*, 22
63:*12* 65:*5* 76:*9*, *10*
77:*19* 79:*2*, *6* 82:*12*
87:*25* 88:*3* 94:*6*
97:*8*, *18* 107:*8*, *13*
118:*7* 119:*5*, *6* 131:*8*,
*10*
**asleep** 21:22
**aspect** 13:*14* 25:*19*
59:*17*
**aspects** 10:*13*
**assess** 17:9
**assessing** 115:2
**assessment** 106:*8*
**assign** 10:*20*, *23*
11:*15*, *16* 12:*7*, *11*
37:*7* 38:*17* 39:*16*
66:*25* 67:*3*, *7* 100:*10*
**assigned** 12:*3* 36:*21*
37:*8* 39:*2* 60:*9*
65:*18* 67:*25* 68:*11*,
*23* 69:*8*, *18* 70:*8*, *13*
75:*8*, *13*, *20* 76:*10*, *12*
77:*18* 79:*14* 98:*12*,
*14* 102:*7* 105:*13*
106:*3*, *11*, *24* 107:*2*, *6*
133:*12*
**assigning** 38:*10*
**assignment** 37:25
38:*3* 62:*11* 69:*20*
79:*14* 92:*18* 94:*16*
100:*6* 122:*9* 140:*6*
**assignments** 61:*9*, *11*,
*12*, *15*, *24* 62:*4* 67:*15*,
*21*, *23* 71:*6* 73:*19*
80:*13* 81:*2* 92:*21*
102:*18* 103:*12*
104:*13*, *21*, *22*, *23*
105:*18* 127:*25* 138:*4*,
*8* 140:*7* 142:*7*, *8*
143:*21* 144:*11* 145:*3*
**assistance** 96:*2*
121:*3* 122:*1* 150:*19*
**assume** 116:*15*
**assuming** 8:*4*
**attached** 157:*3*
158:*10*

**attempt** 95:*15*, *19*
133:*15*
**attempts** 93:*18*
**attend** 13:*5* 16:*7*
107:*17*
**attendance** 126:*14*
**attended** 13:*4*, *18*
**attending** 13:*9*
145:*21*
**attention** 18:*9* 96:*22*
**attentive** 82:*25*
**attorney** 5:*21*, 22
44:*25* 45:*2*, *3*, *7*, *12*
155:*9*, *11*
**Attorney-client** 54:*20*
109:*21*
**attracted** 25:*11*
**audible** 5:*7*, *8*
**August** 9:*15*, *17* 10:*5*
34:*10* 38:*20* 127:*3*, *8*,
*21*, *25* 129:*9* 134:*16*
**authored** 44:*11*
50:*12* 110:*1*
**authorities** 17:*3*
**authority** 26:*10* 37:*3*
39:*15*, *20* 154:*4*
**authorized** 65:*19*
68:*12* 120:*14* 155:*5*
**automatically** 122:*5*
**available** 16:*3* 38:*4*
158:*13*
**Avenue** 138:*21*
**AVL** 72:*16*, 22 145:*7*
**avoid** 83:*1* 88:*13*
122:*19*
**aware** 18:*6* 39:*24*
40:*2*, *4*, *5*, *12*, *15*, *17*,
*18*, *22*, *25* 41:*4*, *8*, *9*,
*23* 42:*1*, *19* 54:*8*, *14*,
*15* 68:*22* 75:*11* 92:*9*
96:*15* 123:*8* 125:*11*
136:*9*, *13* 145:*20*
149:*18*

**< B >**
**babydoll** 31:*7*
**back** 19:*23*, *24* 21:*12*,
*17*, *19*, *25* 22:*1*, *2*, *4*
23:*6* 24:*15* 25:*2*
28:*17* 39:*10* 41:*15*

49:7, *11*   51:*19*   52:9,
*23*   53:9, *17*   57:*20*
68:*10*   69:*4*   70:9, *10*
78:*17*   85:3, *5*   89:7, 8,
9, *23*   93:*12*   95:2
96:22   112:*14*   124:8
129:6, *17*, *23*   136:*3*
150:22
**backtrack**   117:*25*
**bad**   133:*13*
**ball**   48:9, *11*
**bar**   27:*18*
**barbiturates**   115:*12*
**BARROUKH**   2:2
3:2   4:*13*   7:8, *12*
15:*16*   16:*21*   17:2, *12*,
*17*   18:5   21:*18*   22:*17*,
*23*   24:2   25:*13*, *17*
26:3, 8, *17*   27:4, *15*
29:*1*, *11*, *21*   30:*11*, *17*,
*22*   32:3, *11*   33:*17*, *25*
34:6   39:5   40:*11*
41:6, 7   42:6, *12*, *18*
43:3, 9   45:*11*, *21*
46:*12*, *14*, *23*   48:6, *22*
49:4, 9, *16*   50:*1*, *16*,
*21*   51:*1*   54:*1*, 7, *13*,
*22*   55:*1*, 9   57:*21*
58:3, *10*, *21*   59:7
60:3, *21*   62:*13*   63:6,
*11*, *17*   65:*12*   66:*14*
67:*13*   68:3   69:*14*, *24*
71:*17*   72:2, *4*, *21*, *25*
73:*1*   74:*21*, *23*   75:*18*,
*24*   76:*15*   77:*23*   78:*1*,
7, *10*, *14*, *23*   79:2, *6*,
*11*, *20*   81:7   82:2, *7*,
*10*, *17*, *20*   84:*10*, *15*,
*19*, *23*   85:2, *5*, 6
86:*20*, *25*   87:6, *12*
88:*20*, *23*   89:*10*, *15*
90:8   91:3, *10*, *17*
92:*1*, *17*, *22*   94:4
95:*23*   96:9, *14*, *25*
97:*25*   98:*10*   99:5
100:*21*   102:*1*, 3, *11*,
*16*   103:3, *19*, *24*
104:4, *16*   106:9, *17*
107:4, 9, *19*, *25*   108:6,
*10*   109:*23*   110:7, *15*

111:*18*, *22*   112:*4*, 9,
*12*, *14*, *15*, *23*   113:4
114:5, *13*, *15*, *22*
116:7, *13*, *14*   117:*18*
118:6   121:*24*   122:8,
*14*   124:*15*, *20*, *24*
125:6, *11*, *15*, *16*, *25*
126:6, 7   127:*20*
128:*21*, *24*   129:*4*, *6*, 8,
*25*   130:6, *14*, *21*
131:7   135:*10*, *14*
136:*1*, 6, 8, *22*   137:*1*,
4, 8, *14*   138:*1*, 9, *15*
139:7, *10*   140:*11*, *16*,
*25*   141:*10*, *14*   142:*25*
143:*11*, *22*   144:*4*, *13*,
*20*   145:*10*, *15*   146:*10*,
*15*   148:6   150:*11*, *17*
151:9   152:*21*   156:*21*
158:*11*, *20*
**base**   118:22
**based**   16:22, *24*
31:22   37:*13*, *18*, *23*
45:3, *15*   52:*1*   53:4
64:*3*   80:*16*   90:*13*
98:*15*   116:8
**bases**   143:*4*
**basically**   10:*12*, *15*
15:*13*   16:*19*   44:*13*
52:22   87:*19*   121:*15*
**basics**   14:*3*
**basing**   130:7
**basis**   38:9   78:*1*, 5,
*16*, *18*   79:5   143:*4*
**Bates**   55:*24*   124:*13*
**bathroom**   6:*10*
**batteries**   97:*3*
**battery**   96:*23*
**BEACH**   1:6   3:*19*
9:*11*, *14*   14:9, *13*
15:9, *21*   16:*10*   17:*4*,
6   39:25   55:*18*   72:*13*
107:*11*   125:*1*   126:*17*
127:6   131:*25*   132:*22*
136:*11*   156:2   158:*5*
**Bear**   30:*19*   73:7
137:*16*
**becoming**   13:2
**began**   20:*14*, *16*, *19*
61:*24*

**beginning**   9:*21*
49:*11*   94:9
**BEHALF**   2:5, *10*
**behavior**   102:5, *8*
136:*20*
**belief**   102:*4*
**believe**   4:*24*   8:8, *25*
13:*24*   15:*19*   18:*13*
23:*19*   24:5, *6*, *15*
28:*25*   29:6   31:*10*, *13*
42:*16*   43:6, *19*   44:6
45:*16*   51:*12*   53:*21*
54:*3*   65:*13*   66:8
69:2   72:*13*   73:22, *24*
74:*16*   76:*1*   80:9, *25*
85:*16*   87:*4*   89:7
90:*13*, *18*   94:*11*
95:*18*   97:*17*   100:*14*
102:*21*   105:8   109:2,
4, *25*   110:9, *24*, *25*
117:*25*   119:5   120:*15*
123:7   124:*11*, *20*, *21*
128:22   129:*18*
130:*11*, *23*   133:*3*
134:3, *11*, *25*   135:5
**believed**   88:7
**beneath**   11:*14*
126:*16*
**beneficial**   16:*6*
**benefit**   150:*13*
**best**   5:*15*   31:5   86:9
**betrayed**   34:2, *5*
**better**   61:*4*   97:*20*
124:9
**beyond**   96:*24*   99:*12*
**bid**   38:*1*, 2
**bids**   37:*11*
**big**   19:*21*   24:*23*
132:6
**bigger**   61:5
**Bill**   80:8, *16*   81:*17*
151:*17*, *21*
**bind**   152:*15*
**binding**   152:*4*
**birthday**   31:5, 9
**bit**   11:*19*   60:*25*
61:*3*, 5, 6   137:*24*
139:*19*   151:*16*
**block**   18:*16*

**blunt**   25:5
**bodies**   12:*11*   38:6
**bold**   124:*12*   125:*17*
126:8
**book**   64:*18*   65:2
**borders**   26:*16*
**bother**   137:2
**bothering**   117:7
**bottom**   27:23   47:24
55:*16*, *25*   99:6
**box**   27:24
**boyfriend**   86:*14*
**break**   6:*10*   82:*13*, *16*
84:*16*   85:*1*   92:*10*
112:5   128:*24*
**breakfast**   21:*3*
**Brickell**   2:*3*
**bringing**   117:6
**brings**   114:*16*, *17*
115:*4*   122:*15*
**broadcast**   96:*21*
**broadcasting**   122:*21*
**brought**   49:*17*
**Broward**   13:*4*   16:5
**Brown**   44:*4*
**buddy**   24:25
**building**   33:*13*   66:2
68:*19*
**business**   122:*23*
138:*20*   139:*17*
158:*16*, *17*
**businesses**   138:*25*
**busy**   79:*17*

**< C >**
**C.B**   21:2
**cabin**   25:*1*
**calculate**   20:*12*
**call**   11:*10*   18:*15*, *17*
19:*11*, *13*   23:*24*
46:*11*   59:9   60:*13*, *15*
61:*20*   79:*17*   87:*14*
93:*11*, *23*   95:*10*, *12*,
*25*   123:*4*   129:*3*
134:*23*   146:2, *6*
158:*14*, *16*
**called**   60:*16*   61:*12*
80:8
**calling**   61:*19*   93:*12*

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 51 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**calls** 20:*10*, *11* 22:*16* 61:*14*, *16* 72:*17*, *22* 75:*9* 138:*23* 145:*18*, *19*

**camera** 150:*9*, *10*, *12*

**cameras** 113:*19*

**capability** 12:*14*

**capacity** 13:*12* 36:*11* 58:*13*

**captain** 11:*10* 30:*5* 32:*23* 33:*8*

**captured** 118:*5*

**car** 21:*16*, *22* 69:*3* 77:*10* 138:*24* 145:*6*

**Card** 3:*16*, *17* 8:*3* 9:*4*, *6* 28:*1*, *13*, *15*, *17*, *18*, *22*, *25* 29:*2*, *12*, *16*, *18* 30:*13*, *15*, *25* 31:*4*, *17*, *19*, *23* 32:*2*, *4* 35:*13*, *15*

**cards** 9:*5* 35:*3*, *6*, *8*, *9*

**care** 10:*25* 11:*20* 83:*7* 92:*5* 99:*17* 108:*25* 128:*25*

**career** 14:*23* 58:*15*

**Carley** 44:*4*

**Carvajal** 132:*2*, *13*, *15*, *19*, *21*, *24* 133:*7* 134:*2* 149:*21*

**carve** 119:*2*, *5*, *6*

**CASE** 1:*4* 44:*12* 101:*23* 125:*4*, *10*, *22* 126:*10*, *25* 156:*2* 158:*7*

**catalyst** 34:*13*

**catching** 32:*18* 88:*6*

**category** 116:*25*

**caught** 33:*7*

**cause** 64:*17*

**cc** 158:*20*

**cc'd** 67:*19*

**cellular** 60:*11*

**center** 27:*22*

**central** 115:*12*

**CERTIFICATE** 3:*4*, *5* 154:*1* 155:*1*

**certify** 154:*4* 155:*4*, *8*

**chain** 10:*15*

**challenge** 11:*15* 52:*12*

**Chance** 8:*3* 9:*1* 41:*10*, *11*, *24* 43:*1*, *6*, *11*, *14* 45:*23* 53:*13*, *15* 71:*2* 93:*8* 108:*3* 132:*16* 147:*6*, *12*, *15*, *22*

**change** 39:*16* 46:*20* 89:*13*

**changed** 5:*1* 97:*3* 99:*25* 151:*12*

**CHANGES** 156:*1*

**changes/corrections** 158:*10*

**channel** 68:*17*

**Chapter** 151:*17*

**charge** 36:*25* 39:*25* 40:*8*, *12*, *15*, *18*, *22* 41:*1*, *10* 42:*3* 133:*12*, *19* 134:*9* 146:*21*, *24*

**charged** 121:*2* 131:*2*

**charges** 40:*6*

**charging** 115:*24*

**cheating** 33:*12*

**check** 60:*12*, *20* 68:*24* 69:*1* 138:*24* 139:*22* 150:*20*

**Chief** 8:*18*, *20* 11:*11* 42:*25* 44:*1*, *8*, *9* 45:*6*, *22* 50:*10* 51:*20* 53:*11* 109:*2*, *3*, *5* 110:*10*, *24*, *25* 111:*11*, *12* 119:*12*, *15* 128:*15* 147:*11* 148:*24* 149:*2*, *5*, *6*, *8*

**chiefs** 148:*15* 149:*12*

**chief's** 43:*23* 134:*25*

**children** 34:*23*

**chili** 21:*2*

**chock** 116:*11*

**chocolate** 27:*23* 28:*3*

**choice** 56:*13* 133:*13* 158:*8*

**choose** 37:*21*

**chose** 42:*25* 63:*15*

**chosen** 115:*17*

**circumstances** 64:*3* 87:*10* 147:*5*

**citations** 61:*17*

**cite** 59:*11* 116:*19* 120:*4*

**cited** 56:*14* 57:*7* 59:*8*

**citing** 89:*19*

**citizen** 139:*17*

**CITY** 1:*6* 11:*12* 12:*4* 17:*22* 43:*2* 70:*19* 118:*14* 128:*19* 130:*23* 132:*21* 152:*4*, *5*, *15* 156:*2* 158:*5*

**city's** 55:*24*

**civil** 4:*23*

**civilian** 52:*17*

**claim** 62:*4* 81:*16* 98:*6* 100:*22* 133:*22*, *24*

**claimed** 61:*9* 62:*2*

**claiming** 116:*16*

**claims** 100:*19*

**clarification** 17:*16* 91:*1*

**clarified** 40:*8*

**clarify** 118:*8*

**class** 14:*7* 15:*6* 16:*12*

**classes** 16:*3*

**clear** 95:*14* 110:*8* 115:*23* 125:*9* 127:*9* 146:*18*

**clearly** 6:*16* 54:*18* 62:*10* 91:*24*

**Clements** 8:*19*, *20* 44:*1* 45:*7* 109:*2*, *3*, *5* 110:*10*, *24*, *25* 111:*11*, *12* 147:*11* 148:*18*, *25* 149:*9*

**client** 18:*10* 26:*14* 27:*5*, *8* 39:*24* 40:*6* 41:*8*, *9*, *24* 42:*2*, *9*, *20* 43:*14* 45:*12* 46:*16* 59:*17* 116:*16* 117:*7*, *24* 125:*20* 158:*10*, *13*, *14*, *16*

**close** 69:*23*

**closed** 126:*11* 127:*1* 128:*15*, *17* 129:*17*

**closing** 130:*25*

**Coates** 149:*6*

**code** 65:*24*

**codes** 123:*3*

**cognizant** 121:*5*

**coinciding** 158:*8*

**cold** 18:*19*, *20*

**Collins** 18:*16* 138:*21*

**come** 11:*8* 16:*2* 18:*10* 21:*12* 31:*6* 50:*10* 139:*22*

**comes** 52:*15*, *18*, *23* 147:*19*

**command** 10:*15* 152:*14*

**commander** 10:*11*

**commencing** 4:*3*

**commenting** 18:*19*

**comments** 24:*19*

**Commission** 154:*11*, *12*

**commits** 17:*21*

**committing** 51:*12*

**common** 102:*7*

**communicate** 88:*15*, *17* 95:*5* 107:*3*

**communicated** 88:*2* 99:*14* 144:*11* 145:*12*

**communicating** 21:*10* 28:*21* 87:*19*, *21* 88:*14* 123:*2*, *3*

**communication** 72:*11* 88:*10* 89:*2* 90:*20* 94:*23* 95:*6*, *7* 96:*1* 120:*7*

**communications** 26:*24*

**complain** 35:*3*, *5*, *20*, *22*

**complained** 35:*23* 134:*8*

**complaint** 13:*10* 15:*15*, *18* 41:*13*, *15*, *17*, *20* 133:*2* 134:*10*, *12*, *17*

**complaints** 15:*5* 128:*9*

**complete** 5:*15*, *16* 55:*17* 100:*5* 104:*11* 158:*11*

**completed** 53:*9*, *10* 70:*21* 100:*16* 101:*5* 104:*12*

**completely** 140:*15*
148:*24*
**completion** 60:*10*
**complicated** 43:*4*
**component** 133:*4*
**compound** 59:*5*
**computer** 92:6
**concern** 144:*17, 18,
23* 145:2, 5
**concerned** 145:6, *12*
**concerning** 62:2
**conditions** 40:*25*
**conduct** 115:*5*
116:*24* 117:*21, 24, 25*
118:*4, 8, 9, 13, 14, 16,
20, 21, 23, 24* 122:*16*
130:*5, 12, 19, 23*
131:*5, 9*
**conducting** 6:*18*
117:*16*
**conference** 43:*23*
51:*23* 135:*1*
**confirm** 47:*15* 51:6
67:*17* 89:*13, 18*
111:*15* 113:*10*
**conflicted** 133:*20*
**confused** 51:2 99:*19*
**confusing** 73:7
**connected** 155:*11*
**connotation** 85:*20*
**considered** 56:*21*
59:*14*
**considering** 62:*24*
117:*9, 10*
**consistent** 121:*9*
**constitute** 118:*19*
**constituted** 151:6
**constitutes** 130:*12*
**consulted** 51:*19*
**contact** 93:22, *24*
94:*6* 95:*19* 103:*16,
20* 143:*1*
**contacted** 53:*14* 66:*9*
94:*6* 95:*13* 104:*22*
**contacting** 95:*19*
**contained** 142:*6*
**content** 66:*23*
**contents** 108:*22*
**context** 81:*5* 107:*8,
10, 13* 131:*5*

**continue** 60:*22*
65:*13* 79:7 80:*4, 23*
81:*24* 84:*19* 88:*9, 19*
89:*10* 91:*4* 103:*4*
113:*24* 114:*9, 10*
117:*6, 19* 119:*13*
125:*6, 13* 127:*5*
131:*11*
**continued** 25:*5*
**continuing** 23:*10*
**continuously** 121:*7*
**control** 96:*24*
**controlled** 115:*11*
**conversation** 11:*10*
36:*1* 61:*25* 62:*3, 17,
18, 20* 71:*3* 80:*23*
85:*9* 105:*20, 21*
142:*18, 22* 143:*9*
**conversations** 144:*18,
24*
**conveyed** 50:*9*
103:*10*
**co-officers** 20:*14*
**cook-off** 21:2
**coordinate** 120:*24*
**copy** 48:*7, 20, 21*
158:*8, 10, 11, 13*
**correct** 5:*3* 6:*21*
10:*6* 12:*15, 22, 25*
13:*1* 18:7 19:*9, 12*
22:7 23:*18* 28:*6, 7, 9,
10* 31:*12, 15, 19* 32:*4*
34:*25* 35:*21* 36:*9*
37:*24* 38:*14* 39:*3, 17,
18, 21* 42:*3* 43:*11, 12*
46:*17, 18* 48:*1, 2*
49:*18, 19* 55:*3, 21, 22*
56:*8, 9, 17, 22, 23*
57:*1, 2* 59:*3* 63:*8, 25*
64:*8, 9, 14, 20* 65:*6, 7,
9, 15* 67:*15, 16, 19, 20,
22, 25* 68:*4, 12, 13*
69:*6, 7, 9, 10, 12* 71:*8*
72:*6, 9* 73:*2* 74:*14*
77:*3, 15, 16* 80:*14*
81:*9, 11* 83:*13* 84:*3*
85:*9* 86:*8, 11, 17, 19*
90:*11* 94:*13, 17, 19*
97:*11* 98:*3, 7, 12, 18*
99:*8, 22* 100:*7, 8*

101:*6, 21* 103:*6*
104:*8* 106:*6* 108:*1*
110:*18, 21, 22* 111:*25*
113:*14* 114:*24, 25*
115:2, *3, 6, 7, 15*
116:*3* 117:*22* 118:*14,
15* 121:*10, 11* 122:*11*
124:*5, 6* 127:*12, 13*
129:*13, 14* 130:*16*
131:*13, 14* 133:*25*
134:*2* 135:*21* 136:*20*
138:*5* 139:*13, 16*
140:*21* 141:*24* 142:2,
*4, 9, 12* 143:*12*
145:*25* 146:*1, 5, 9, 14,
16* 148:*5, 25* 149:*1, 6,
9, 13, 14, 22, 23*
151:*11, 14, 24, 25*
152:*8, 12, 15, 16, 19*
**corrected** 90:*6*
**CORRECTIONS**
156:*5* 157:*3*
**corrections/changes**
158:*14*
**correlate** 56:*4*
**correspond** 152:*11*
**correspondingly**
147:*6*
**corridor** 138:*20*
**COSNER** 1:*10* 3:*1,
21, 22, 23* 4:*1, 8, 14,
16, 18, 19* 49:*5* 73:*4*
79:*12* 80:*19* 81:*19*
88:*24* 102:*4* 106:*23*
112:*16* 114:*18*
125:*17* 126:*9* 154:*4*
156:*2* 158:*2, 7*
**Cosner's** 152:*17*
**counsel** 3:*11* 4:2
125:*12* 155:*9, 11*
158:*11*
**counted** 52:*3*
**County** 13:*4* 16:*4, 5*
154:*3* 155:*3*
**couple** 9:*3* 19:*25*
63:*16* 82:*14* 112:*11*
**course** 10:*25* 12:*8*
13:*24* 14:*1, 10* 16:*6*
58:*15* 70:*17* 97:*20*

**courses** 14:*20, 23, 24,
25* 15:*22, 23* 16:*1, 8*
**COURT** 1:*1, 15* 4:*4*
5:*3, 6* 18:*16* 24:*15*
78:*16* 82:*13, 14* 91:7
107:*14, 15, 16, 21*
126:*14, 18* 150:*14*
153:*1, 3* 155:*4, 17*
158:*20*
**courtesy** 137:*15*
**COVER** 3:7 37:*15*
118:*22* 146:*6* 156:*5,
6* 157:*1*
**covered** 28:*3* 114:7
118:*4*
**cream** 27:22
**cross** 152:*21*
**Cross-Examination**
3:*3* 137:*18*
**culminated** 134:*17*
**current** 135:*23*
**currently** 9:*8* 76:2
99:*24*
**cutting** 123:*3*

**< D >**
**D2011-045** 126:*10*
**D2011-132** 126:*25*
**Daily** 67:*4*
**DAL** 67:*4*
**Dan** 148:*18* 149:*6*
**DANIEL** 2:2 78:*8*
136:*24* 137:*25* 144:2
156:*21* 158:*20*
**danielb@dereksmithla
w.com** 2:5 156:*21*
**DATE** 1:*11* 23:*20,
23, 24* 29:*5* 39:*10*
40:*5, 9* 55:*20* 73:*14*
108:*18* 150:*4* 156:2,
5* 157:*8*
**dated** 28:*5* 48:*3*
155:*13*
**dates** 47:*25*
**dating** 33:*14* 34:2
**Day** 3:*16* 4:2 20:*3,
6, 7* 23:*5, 6, 12* 28:*4*
30:*15, 16* 86:2 96:*13*
154:*6* 155:*13* 158:7
**day-by-day** 38:*8*

days 19:25 20:1
37:15 53:14 126:21
127:8, 10 129:13
158:11, 17
day-to-day 107:13
dead 96:24
dealing 12:9
Dear 158:6
deceive 103:5, 8, 25
deceiving 103:13
December 38:16
39:2, 8, 13, 21 40:21
41:5 42:8, 11, 19
66:20 73:15 74:8, 9,
13 101:9, 12, 14
104:10, 25 120:17
134:18
decide 51:18
decided 33:4 87:22
128:19 133:22
decides 119:12
deciding 147:22
decision 147:18
149:2, 5, 8, 12
decision-making 17:3
decisions 149:11, 13
deep 86:4
defend 84:21 112:7
Defendants 1:8 2:10
defined 115:13
definitely 33:22
44:23 124:19
Definition 3:25 16:22
delay 79:18
deliberate 56:19
59:12 63:19 64:5
deliberately 64:1, 4
delivered 31:24
35:11, 17
Delvin 44:4
demonstrating 121:15
denied 45:7
denies 144:24
deny 31:17 32:5
45:3 51:6
Department 3:19
9:12, 14, 16, 24 10:2,
10 13:10 14:9, 13
15:9, 18, 21 17:22
20:15 29:23 36:8, 10

40:1, 6, 13, 16, 19
51:13 54:10 55:18,
24 57:7, 8, 13 58:18
59:2 64:18 65:2, 4
70:19 76:2, 7 83:25
84:6 89:17, 19 91:11
97:21 98:6 107:11
121:7 127:6 129:11
133:13 135:20
136:12, 17
departmental 81:6
departments 16:4
Department's 56:15
81:1 97:10 121:9
125:1
depend 82:6
depended 20:10
depending 38:9
depends 55:14
depo 112:7
Deponent 3:13 157:6
depos 137:16
deposed 4:23
DEPOSITION 1:10
4:1, 3, 20 6:18 7:1,
17, 20, 23 41:17 79:7
84:22 125:7 155:1, 6
156:2 158:7
Deputy 44:1
Derek 2:2
Describe 85:14
described 118:18
desire 88:9 135:4
desk 128:2, 8, 14
129:17
desks 75:15
detail 61:9, 10, 12, 14,
24 105:12 138:7, 13,
18 139:3, 13, 20
140:7 142:6, 8
143:20 144:11 145:3
details 10:24 11:3, 7
12:7, 12 44:13 60:9
61:21 62:1, 5 66:25
67:12 71:11, 12 74:8
75:9 86:4 101:11
104:19 105:9, 13, 14,
20 117:4 138:5, 14
142:18
detention 146:7

determine 51:20
52:22
difference 114:12
different 12:3 15:12
16:3, 4 19:25 110:14
128:16 136:18
148:24
dig 34:7
digital 48:21
dinner 85:19
Dionne 67:17, 18, 19
Direct 3:2 4:12
11:10 26:12 104:7
106:3 139:19 141:22
directed 106:14
110:11 156:6
direction 88:6
116:18 117:1 129:22
133:20
directive 117:17
directives 59:19 70:6,
11 73:19
directly 15:13 79:17
disagree 52:12 71:7
101:7 106:8
disagreements 133:11
disciplinary 17:4
81:10 98:2 126:19
127:7, 9 129:12
147:21 149:12
discipline 17:9, 11
18:2, 7 50:9, 12
51:16, 25 52:7, 8, 24,
25 53:17, 18, 21, 24,
25 80:10, 23 97:14
107:18, 20 126:10, 25
127:11 147:19 151:3,
7, 14
disciplining 119:11
disclose 29:22
discovered 69:2
discovery 124:19
137:13
discrimination 39:25
40:12, 16, 19, 23 41:1
132:6 133:4 134:8
discuss 43:15 53:14
91:18 119:17
discussed 14:18 15:6
45:25 46:1, 6, 7

determine 51:20
52:22
difference 114:12
different 12:3 15:12
16:3, 4 19:25 110:14
128:16 136:18
148:24
dig 34:7
digital 48:21
dinner 85:19
Dionne 67:17, 18, 19
Direct 3:2 4:12
11:10 26:12 104:7
106:3 139:19 141:22
directed 106:14
110:11 156:6
direction 88:6
116:18 117:1 129:22
133:20
directive 117:17
directives 59:19 70:6,
11 73:19
directly 15:13 79:17
disagree 52:12 71:7
101:7 106:8
disagreements 133:11
disciplinary 17:4
81:10 98:2 126:19
127:7, 9 129:12
147:21 149:12
discipline 17:9, 11
18:2, 7 50:9, 12
51:16, 25 52:7, 8, 24,
25 53:17, 18, 21, 24,
25 80:10, 23 97:14
107:18, 20 126:10, 25
127:11 147:19 151:3,
7, 14
disciplining 119:11
disclose 29:22
discovered 69:2
discovery 124:19
137:13
discrimination 39:25
40:12, 16, 19, 23 41:1
132:6 133:4 134:8
discuss 43:15 53:14
91:18 119:17
discussed 14:18 15:6
45:25 46:1, 6, 7

71:12 90:19 100:19,
22 112:17 117:3
119:19
discussing 46:15
91:20 94:18
discussion 44:23
81:17 88:22 117:15
discussions 24:18
147:14
disgraceful 117:21,
24, 25 118:4, 8, 9
130:5, 12, 19
Dispatch 124:2
dispatched 19:14
20:11
dispatcher 13:13
93:17
disputes 14:5
disrespectful 38:24
dissolution 87:14
dissolved 36:3 87:20
dissolving 36:6
distinction 138:7
DISTRIBUTE 156:21
DISTRICT 1:1 38:3,
4
divided 12:4
division 19:20, 21
divorce 26:25 34:8, 9
document 8:6 17:24
46:24 47:25 48:3
51:13 55:2, 6, 10, 13
56:3 66:15, 17 67:19
71:18, 23 72:15 73:7
80:24 89:11, 19
108:11 111:19, 23
112:18 114:23 116:8
125:8, 21, 23 137:8
documentation 51:16,
23 125:2
documented 60:2, 24
documenting 119:10
documents 7:6, 8, 9,
14, 20, 22, 25 8:22
17:19 48:18 57:4, 10,
16 58:25 62:10 72:3,
13 83:18 114:1
124:16 125:4 137:10
147:8

**doing** 32:5 79:17, 21, 24 87:22 90:23 92:11 95:1 98:22 141:5 145:13, 17
**dole** 70:16
**Dominican** 134:3
**doors** 138:24
**double** 150:20
**Dr** 138:22
**draft** 48:5, 7, 9, 16
**Drive** 2:3 71:5
**driving** 77:2, 5
**drove** 21:13, 16, 20, 22 22:6 69:3, 4, 6
**DRR** 55:2 56:3, 7, 8, 16 57:20 64:10 69:25 80:5 81:24 82:21 83:15, 23 91:18, 22 92:2 113:6 115:17, 18, 19, 20 120:5, 9, 23 122:15 129:16 130:2 131:2, 6
**DRRs** 56:4, 10 57:4, 8, 22 58:12 83:18 89:9 90:3 102:1 112:3, 17, 24, 25 113:11 114:19 116:25 118:20 119:9, 18
**due** 80:22
**duly** 4:9 154:5
**duration** 25:6, 7 76:23
**duties** 10:20, 23 11:1, 14, 15, 18 65:15 67:8 70:7, 12, 16, 19, 21 76:20 79:17, 24 82:24, 25 83:7 90:11 92:4, 11 95:3 99:7, 11 107:14 114:7 120:14 139:5, 25
**Duty** 70:3, 17 92:7 94:21 107:14 115:13, 15, 25 116:2 117:22 127:3, 7, 11, 15, 24 128:18 129:10 130:10 131:4, 5, 18, 20

**< E >**
**earlier** 23:18 31:11 68:9 82:1 146:19 150:11, 24 151:2
**earliest** 40:5
**early** 23:14 32:13 36:1, 19 86:7, 8 134:23
**easier** 137:9
**edition** 84:4
**education** 13:3, 17
**EEOC** 39:24 40:6 41:10 42:3 134:9, 12 146:21, 23
**effect** 5:2 113:1, 7 114:19
**effectively** 18:3
**effects** 98:2
**efficiency** 21:21, 24 72:14
**effort** 103:5, 8, 13 104:6
**either** 35:3 57:20 60:16 64:17
**elevated** 128:11
**ELKINS** 2:5 3:3, 22 6:19, 20, 24 7:2, 3, 6, 7, 10, 14, 17 8:17 15:11 16:17, 25 17:10, 15, 20 21:1 22:14, 20 23:22 25:12, 15, 20, 24 26:6, 15, 18 28:24 29:9, 17 30:9, 14 31:20 32:9 33:9, 20 34:4 39:4 40:7 41:4 42:4, 10, 17, 24 43:5 45:8, 18 46:11 47:12, 13, 16 48:4, 19 49:5, 7, 10, 24 50:6, 19, 24 51:5 53:23 54:5, 11, 18, 19, 20, 24 57:17 58:1, 8, 19 59:4, 24 60:6 62:9 63:4, 9, 14 65:10 67:9 68:1 69:13, 22 72:5, 9, 19, 24 74:19 75:14, 22 76:14 77:21, 25 78:2, 8, 11, 15 79:1, 4, 8, 15

81:4, 25 82:5, 8, 12, 18 84:12, 17, 21 85:1 86:18, 23 87:3, 9 89:12 90:2, 25 91:5, 12, 20 92:20 94:1 95:21 96:7, 11, 18 97:23 98:8 99:3 100:18 101:24 102:2, 9, 14 103:1, 15, 22 104:2, 14 106:7, 13, 25 107:7, 12, 22 108:4 109:20, 21 110:5, 9, 10, 12, 18 112:2, 5, 11, 25 113:3, 25 114:11, 20 116:9 117:13 118:2 121:22 122:6, 12 124:13, 17, 22 125:3, 9, 14, 19 126:1, 4 127:17 128:6 129:2, 20 130:3, 9, 17 131:3 135:7, 12, 24 136:5, 24 137:2, 6, 12, 15, 19, 24 138:2, 3, 10, 16 139:8, 12 140:12, 18 141:1, 11, 15, 18, 21 143:3, 13, 23 144:1, 6, 8, 14, 22 145:11, 16 146:12, 17 148:8 150:9, 12, 18, 22, 23 151:10 152:20, 22 153:2, 4 158:6
**E-mail** 3:18, 21, 22, 23 8:18, 19 11:10 46:25 47:6, 9, 11, 15 60:8, 12, 20 61:10, 11, 18, 22, 23 62:16, 17 66:18, 19, 21, 23 67:2, 10, 17 68:24 69:1 71:10, 20 73:6, 8, 10, 14, 16 74:4, 5, 7, 10, 12, 20 75:4, 5 77:1, 4, 13 78:21 90:21 94:12, 13 99:17 100:4, 19, 22, 24, 25 101:19 104:20, 24 105:1, 3, 5, 6, 10, 15, 19, 24, 25 108:13, 14, 18, 22 109:1 110:13, 16, 17 117:14 118:12

137:21, 22 140:3 141:13, 23 142:1, 6, 17 143:8, 24 144:23
**e-mailed** 61:8 94:11 138:4 142:7, 8 145:4
**e-mailing** 145:2
**e-mails** 8:2, 14, 15, 16 61:13 62:14 72:23 73:2, 4 74:18 75:3 100:14, 15 104:11
**embarrassing** 26:20
**embracing** 32:23
**employed** 9:8, 23 84:7 132:21
**Employee** 8:2, 12 49:2 50:13 52:20 56:20 57:19 59:13 63:19 64:16 114:2 118:14 130:23 152:14 155:9, 10
**employees** 14:5 65:18 68:10 70:5, 10 82:25 120:13 122:18, 21, 23 123:21 131:24, 25 136:11
**employee's** 17:14 49:13, 21
**employment** 97:14 107:10
**encounter** 87:2
**encounters** 86:21
**endearment** 30:10
**ended** 32:13 36:1 71:7 85:8 93:12 107:17
**enforcement** 13:3, 8, 12, 18
**English** 59:6
**entail** 12:1
**enter** 64:17 156:1
**entered** 42:2 64:17 65:1
**entire** 101:20 105:6
**entirely** 58:25 69:12
**entirety** 10:16 66:8
**entitled** 91:25
**environment** 135:3
**equally** 38:8
**equipment** 101:4 105:16

**ERRATA** 3:*6* 156:*6*
158:*10, 11, 13*
**error** 89:*21, 24* 90:*1*
115:*16* 156:7
**ESQUIRE** 2:2, *5*
156:*21* 158:*20*
**essentially** 13:*12*
116:*23* 119:*1*
**established** 122:*19,
24* 123:*6, 13*
**estimate** 76:*5*
**et** 1:*6* 156:*2* 158:*5*
**ethic** 121:*14*
**ethics** 121:*4, 20*
**evaluation** 17:*19*
18:*1, 4*
**evaluations** 11:*22*
17:*6, 8, 11*
**evening** 119:*18*
**event** 22:*10, 13* 85:*22*
**eventually** 94:*6* 97:*2*
98:*18*
**everybody** 73:*24*
143:*8* 144:*24*
**ex** 34:*15, 21*
**exact** 29:*5* 106:*11,
18* 111:*3*
**Exactly** 20:*7* 102:*25*
123:*17* 152:*11*
**Examination** 3:2
4:*12*
**examined** 4:*9*
**example** 12:9 92:*4*
138:*20* 139:*13* 146:*3*
**examples** 11:*23*
118:*19, 24*
**excessive** 141:*5* 146:*3*
**exclamation** 28:*9*
**exclusive** 34:*1*
**exclusivity** 24:*10, 16*
**Excuse** 10:*8* 12:*13*
36:*14* 104:*6* 128:*22*
131:*24*
**execute** 70:*7, 12, 19*
**exemplify** 121:*8*
**Exhibit** 3:*16, 17, 18,
19, 20, 22, 23, 24, 25*
27:*12, 13* 30:*19, 20*
46:*10, 20, 21* 55:*6, 7*
66:*11, 12* 71:*14, 15*

89:*7* 108:*6, 7, 8*
111:*19, 20* 112:*17, 18,
19, 20* 113:*5, 6*
114:*17, 18* 120:*24*
124:*8* 136:*25* 141:*19,
22*
**Exhibits** 129:*15*
144:*2*
**exist** 119:*7* 123:*17*
**exonerated** 132:*8*
133:*25* 134:*19* 150:*1*
**expect** 76:*5*
**expected** 76:*21*
**expedited** 152:*23*
**experience** 96:*15*
**experienced** 13:*15*
**Expires** 154:*12*
**explain** 30:*12* 51:*8*
69:*17* 71:*2* 78:*11*
79:*1, 2, 8* 99:*10*
123:*19, 23*
**explained** 49:*14*
53:*11* 79:*4* 104:*18*
**explaining** 28:*20*
**explanation** 39:*23*
54:*16*
**expose** 18:*22*
**expound** 91:*1, 6, 7,
13, 14, 15, 24*
**expressed** 24:*9, 12, 17*
**expressing** 28:*21*
**expressly** 3:*13*
**extended** 137:*15*
**extensive** 149:*24*
**extensively** 137:*21*
146:*20* 147:*25* 148:*9*
**extra** 12:*11* 38:*6*
**extreme** 99:*7, 10*
**ex-wife** 27:*1* 34:*8, 25*
**eyes** 128:*14, 17*
129:*17* 130:*25*

< F >
**fact** 55:*23* 75:*7*
84:*5* 118:*4* 121:*13*
144:*10* 151:*7*
**factor** 46:7
**factors** 20:*12* 46:*3, 5*
**facts** 147:*4*

**factual** 79:*5*
**faded** 85:*10*
**fading** 36:*17*
**fail** 74:*17, 25* 79:*16*
117:*1* 129:*21*
**failed** 59:*20, 23*
62:*12* 75:*20* 76:*11,
12* 79:*13* 90:*14* 96:*6,
16* 98:*11* 99:*17*
102:*15* 105:*17* 106:*2,
3, 4, 5, 10, 24* 107:*1, 5*
116:*17* 120:*1* 121:*20,
25* 124:*2*
**failing** 75:*9*
**fails** 102:*5*
**failure** 56:*19* 59:*11,
12* 63:*18* 104:*7*
107:*21* 113:*14* 117:*9,
10*
**failures** 121:*16*
**fair** 7:*10* 32:*7* 53:*9*
63:*23* 69:*21* 87:*15*
91:*19* 92:*1* 100:*17*
106:*6* 107:*6* 123:*14*
134:*21* 139:*3*
**faithfully** 70:*7, 12*
**fall** 121:*17*
**fallen** 21:*22*
**falls** 116:*21*
**false** 64:*16, 18, 22*
65:*1*
**familiar** 16:*13* 30:*25*
37:*8* 46:*24* 47:*18, 21*
55:*10* 71:*23*
**family** 32:*25* 33:*1*
**far** 39:*10* 61:*1*
117:*3* 123:*2*
**farther** 26:*21*
**faulty** 96:*23* 97:*1, 19*
**February** 10:*2, 3*
28:*5, 17* 86:*7*
**fed** 33:*3* 88:*5, 8*
**feel** 33:*6, 8* 34:*2*
62:*23* 80:*5* 135:*11,
13* 156:*2*
**feeling** 34:*14* 128:*10*
**feelings** 22:*12* 24:*9,
12, 16* 28:*21*
**feet** 128:*14* 129:*17*
**fell** 87:*19*

**felt** 24:*19* 27:*2*
32:*10* 34:*5, 19* 45:*15,
19*
**female** 132:*13*
**FERNANDEZ** 1:*13*
4:*4* 5:*11* 152:*22*
154:*10* 155:*4, 16*
156:*20* 158:*20*
**field** 127:*16, 18*
128:*3* 133:*12, 16, 17*
**file** 51:*3* 97:*20*
134:*9*
**filed** 39:*24* 40:*6, 12,
15, 18, 22* 41:*1, 14, 22*
81:*14* 132:*13* 134:*12*
**filing** 98:*1*
**fill** 12:*6* 38:*5, 7*
47:*22* 109:*9* 146:*8*
**filled** 27:*22* 109:*6, 8*
**finalized** 34:*10* 48:*7*
**finally** 32:*14* 60:*17*
93:*18, 21*
**financially** 155:*12*
**find** 16:*6* 32:*20*
56:*8* 83:*23* 123:*5*
**finder** 151:*7*
**finding** 34:*16*
**finds** 16:*5*
**fine** 4:*19* 6:*11*
45:*19* 46:*12* 59:*10*
83:*23* 89:*10* 91:*17*
92:*8* 116:*13* 131:*15,
23* 135:*13* 137:*14*
**finger** 135:*16*
**finish** 6:*12* 91:*6, 23*
**fired** 43:*4*
**firing** 43:*7*
**first** 13:*25* 18:*14, 24*
20:*14, 16, 18* 23:*13,
21* 24:*24* 25:*9* 28:*12*
39:*2* 57:*22, 23* 58:*4,
7* 105:*11* 106:*16, 19*
111:*16* 115:*9* 117:*24*
120:*7* 142:*17* 144:*2*
**fits** 119:*9*
**five** 13:*6* 22:*8* 84:*24*
85:*2* 129:*2, 4* 134:*20*
136:*2*
**FL** 1:*6* 156:*2* 158:*5*
**Flaherty** 44:*4*

flirtatious  22:*16*
86:*13*, *16*

**FLORIDA**  1:*1*, *6*
2:*4*, *9*  4:*5*  21:*9*  22:*7*
154:*2*, *11*  155:*2*
158:*4*

flowers  31:*3*

focus  142:*16*

focusing  118:*7*

follow  11:*5*  52:*21*
70:*18*  158:*8*

following  23:*20*  42:*7*
50:*25*  64:*8*

follows  4:*10*

fonts  61:*4*

force  5:*2*  146:*3*

foregoing  155:*6*
157:*1*

forgetting  132:*18*

forgot  21:*8*  67:*3*
68:*7*  69:*20*  74:*1*
99:*25*

**Form**  3:*18*  8:*1*, *9*, *12*
9:*1*  15:*11*  16:*17*, *25*
17:*10*, *15*, *20*  21:*1*
22:*14*, *20*  23:*22*
25:*12*, *20*  26:*6*, *15*
28:*24*  29:*9*, *17*  30:*9*,
*14*  31:*20*  32:*9*  33:*9*,
*20*  34:*4*  39:*4*  40:*7*
41:*4*  42:*4*, *10*, *17*, *24*
43:*5*  45:*8*, *18*  47:*10*,
*18*, *22*  48:*4*, *19*, *25*
49:*12*, *14*, *22*, *23*, *24*
50:*6*, *8*, *10*, *15*, *19*, *24*
51:*13*  52:*1*, *11*, *13*
53:*1*, *4*, *6*, *9*, *10*, *19*, *22*,
*23*  54:*4*, *5*, *11*, *19*
56:*5*  57:*6*, *17*, *20*
58:*1*, *4*, *8*, *19*  59:*4*, *24*
60:*6*  62:*9*  63:*4*, *9*, *14*
65:*10*  67:*9*  68:*1*
69:*13*, *22*  74:*19*, *22*
75:*14*, *22*  76:*14*
77:*21*, *25*  78:*14*, *15*
79:*10*, *15*  81:*4*, *8*, *14*
86:*18*, *23*  87:*3*, *9*
89:*9*, *21*  90:*3*, *25*
92:*20*  93:*5*  94:*1*
95:*21*  96:*7*, *11*, *18*

97:*15*, *21*, *23*  98:*2*, *8*,
*15*  99:*3*  100:*18*
101:*24*  102:*9*, *14*
103:*1*, *15*, *22*  104:*2*,
*14*  106:*7*, *13*, *25*
107:*7*, *12*, *22*  108:*4*
109:*7*, *19*  110:*5*, *12*
111:*2*, *3*, *8*  114:*20*
116:*12*  117:*13*  118:*2*
121:*12*, *22*  122:*6*, *12*
125:*19*  127:*10*, *17*
128:*6*  129:*12*, *20*
130:*3*, *9*, *17*  131:*3*
135:*7*, *12*, *24*  140:*8*
143:*5*  146:*20*  147:*9*,
*18*

formal  16:*12*  23:*24*
24:*8*  30:*1*  33:*11*
85:*8*

formally  34:*2*

formerly  18:*11*, *12*

forms  17:*19*  50:*5*, *18*,
*23*  51:*3*  54:*17*  109:*9*,
*13*, *16*, *24*  110:*3*

**Fort**  2:*9*  6:*20*  158:*4*

forth  12:*10*  25:*2*
37:*17*  51:*20*  53:*13*
61:*17*  103:*12*

forward  108:*23*
109:*1*  110:*20*, *23*
111:*11*  126:*2*

forwarded  8:*16*, *17*
11:*9*  60:*8*  61:*18*, *22*
141:*23*  142:*11*, *13*

forwarding  140:*7*

fought  128:*19*

found  53:*15*  62:*1*

**four**  12:*4*  13:*6*
21:*14*  22:*6*, *8*  82:*8*
100:*1*, *3*, *9*  106:*14*, *16*,
*19*  120:*8*  128:*7*
140:*23*  141:*8*  145:*8*
148:*19*

frame  31:*14*  100:*5*

free  91:*9*

frequently  90:*24*
96:*10*

friend  24:*5*  32:*24*
33:*1*  34:*17*

friendly  26:*4*, *7*

friends  21:*9*  24:*6*
25:*18*

friendship  24:*25*

front  8:*6*, *7*  128:*2*, *8*

frustrated  33:*22*
87:*18*

**FSS**  115:*13*

fulfilling  122:*10*

full  4:*15*  12:*21*
37:*25*  91:*9*  152:*25*

functions  122:*22*

funny  35:*13*, *15*

further  51:*18*  60:*24*,
*25*  66:*24*  71:*3*  80:*17*
136:*22*  152:*20*  153:*5*
155:*8*

**< G >**

game  88:*8*

**Garden**  21:*7*

general  83:*20*
123:*12*  130:*19*

generally  123:*13*
145:*20*, *24*

generic  14:*6*

gentleman  32:*23*

geographic  12:*4*

**Georgia**  25:*1*  34:*17*

getting  18:*20*  59:*1*
79:*18*  87:*17*  105:*15*
123:*2*

girlfriend  86:*15*

girlfriends  32:*19*

give  5:*6*, *7*  6:*6*  17:*6*
28:*18*, *22*  29:*2*, *12*
47:*19*  59:*18*, *22*
62:*11*  63:*13*  66:*10*
71:*2*  78:*4*, *17*  79:*12*
91:*9*  93:*8*  100:*15*
104:*22*  105:*13*  111:*3*
112:*4*, *11*  128:*24*
136:*2*  137:*6*  144:*3*
150:*19*  152:*24*

given  4:*20*  52:*9*
56:*20*  59:*13*  78:*4*
100:*12*  116:*18*

gives  118:*19*

giving  5:*2*  80:*18*

glimpsed  9:*3*

go  21:*6*, *13*, *14*, *25*
23:*25*  25:*24*  30:*1*
37:*16*, *17*  55:*5*, *12*, *15*,
*16*  56:*11*  60:*24*  61:*3*
67:*11*  70:*9*, *10*  75:*16*,
*20*  76:*20*  77:*14*
78:*20*, *23*  79:*13*
80:*10*  81:*24*  85:*5*
88:*13*, *15*  89:*22*
92:*11*  93:*10*  95:*2*
98:*18*, *21*  99:*15*
101:*14*  102:*15*
105:*16*  107:*2*, *15*
111:*25*  112:*16*  113:*5*,
*12*, *16*, *22*  117:*19*
119:*10*  125:*5*  129:*6*
133:*20*  137:*5*, *7*, *17*
138:*22*  141:*9*  144:*1*
146:*2*

goals  121:*6*, *7*

goes  8:*11*  26:*21*
50:*8*  52:*20*  55:*25*

going  5:*15*  6:*12*
21:*11*  22:*21*  26:*15*,
*18*, *20*, *22*, *25*  30:*18*
38:*5*  43:*8*  46:*9*, *19*
50:*11*  51:*19*  52:*1*, *2*,
*3*, *22*, *24*  53:*12*, *19*
54:*6*  55:*14*  59:*9*
61:*1*  63:*20*  71:*13*
72:*19*, *20*, *21*  73:*6*
74:*21*  78:*12*, *17*, *23*,
*24*  80:*4*, *10*, *22*  81:*25*
82:*4*, *11*, *17*, *18*  84:*25*
85:*25*  87:*18*, *22*  88:*7*
89:*7*, *8*, *9*, *14*  90:*2*
91:*4*, *10*, *14*, *21*  92:*10*,
*13*  93:*11*  95:*1*, *2*, *12*
99:*21*  101:*3*, *7*  102:*6*,
*17*  112:*16*  113:*10*, *16*,
*23*  114:*3*, *6*  116:*8*, *11*
117:*5*  123:*1*, *24*
124:*8*  125:*3*, *6*, *7*, *13*,
*19*, *20*  126:*1*  130:*24*
135:*15*  137:*3*, *17*
138:*24*, *25*  139:*1*, *21*
145:*20*  146:*7*  148:*2*
152:*23*  153:*4*

**Good**  4:*14*, *16*  21:*12*

27:20  61:5  82:17
**gotten**  32:14
**grandparents**  21:21
24:1, 4
**Great**  41:6  84:25
**greeting**  9:6
**grieve**  52:14
**ground**  128:13
**Group**  2:2
**GUASTO**  1:3  18:11
156:2  158:5
**guess**  23:23  42:25
80:1  129:23  130:18
**guidance**  15:4  121:3
122:1
**guilty**  117:20  118:13
130:4, 22
**guys**  20:14  36:5
85:24  86:10  124:14,
15, 18, 22
**gym**  33:3

**< H >**
**half**  21:14  22:6, 8
77:9, 12
**hallway**  88:5
**halted**  45:17
**hand**  18:20  35:11
154:6
**handed**  18:2
**hand-in-hand**  12:20
**handle**  11:2  12:11
14:4, 5, 8  15:24
92:14  128:8  138:18
**handled**  11:9  61:17
**handling**  15:5  19:13
75:9  145:19
**hands**  18:19
**happen**  21:19  22:21
34:16  38:21  96:10
**happened**  22:2  29:5
41:16  62:4, 19  84:4,
13  85:24  90:5
100:20  119:18
144:24  148:10
**happening**  71:7
81:20
**happens**  18:1  90:23
96:8, 19  102:19
**happily**  135:13

**happy**  6:5  28:3
31:6  33:24  36:16
72:16
**harassing**  26:16, 19
**harassment**  14:17, 18
15:5, 9, 17, 22, 23, 24,
25  16:10, 12  131:25
132:3, 5, 11  133:2, 3,
22, 24  134:9  149:16,
19
**hard**  48:20  85:11
**hate**  137:2
**head**  5:7  86:5
109:14  124:24
**headquarters**  66:2, 6
68:19  95:2  98:21, 23
101:17, 18  102:6, 18
119:24  122:4
**hear**  15:12  45:3
82:2  89:5  91:21
**heard**  35:22  45:2, 4
62:16  95:10, 11  96:1
139:11
**hearing**  45:10
**heart**  27:23  31:6
**held**  43:22
**he'll**  6:1
**hello**  88:4  108:23
**helped**  34:13, 20
**hereto**  3:11
**hey**  38:5  80:20  95:2
**HH**  154:11
**Hialeah**  21:6, 22
**higher**  130:13, 15
**highlighted**  61:25
89:23  105:19
**highlighting**  47:2
63:24
**HILLSBOROUGH**
154:3  155:3
**him/her**  158:14
**hire**  12:6
**hired**  10:2
**hiring**  11:21  12:18
36:25
**Hispanic**  134:2
**history**  15:3
**Hold**  26:18  61:1, 6
72:19  77:8  90:2

112:5  124:17  129:22
144:1  148:20
**home**  21:17, 19, 24
22:22  23:6
**homeless**  12:9  138:25
**honestly**  14:22  15:2
26:23  33:14  107:15
**hope**  31:5
**host**  16:4
**hour**  7:4, 5, 15  77:2,
3, 9  142:11
**hours**  20:3, 6, 7
21:14  22:6, 8  25:2
38:17  65:19  67:11
68:11  69:20  77:11,
12  82:7, 15, 18  94:8,
23  96:13  99:12, 13,
23, 25  100:1, 2, 3, 9
106:15, 16, 19  120:8
126:21  127:8, 10
129:13  140:23  141:8
142:14, 15, 16  145:3,
8  158:16
**house**  21:15, 20, 21,
23  23:8  24:1  139:21
**HR**  132:6  134:12
**humorous**  25:3
**hump**  34:20
**hundred**  16:8  50:22
51:5
**hundreds**  16:1
**hurt**  33:18, 21

**< I >**
**IA**  134:11  148:9
**idea**  22:21  95:4
**identical**  113:25
**identification**  27:14
30:21  46:22  55:8
66:13  71:16  108:9
111:21  112:21
**ignoring**  106:15
**ill**  128:1, 10
**illegal**  81:1
**impact**  17:13, 18
18:3  33:24
**impertinent**  122:20
**implement**  147:15, 22
**implemented**  147:12
**implicated**  43:10

**implicating**  43:13
46:3
**implication**  45:23
78:5, 19
**important**  14:24
84:15
**improper**  64:19  79:5
89:25  91:16  122:20
**inaccurate**  64:18
**inattentive**  83:6
**incident**  53:5, 20
71:4  90:14  128:1, 4
**include**  10:14  114:9
**included**  31:14
61:12  73:22
**includes**  121:5
**including**  122:21
**incorrect**  89:18, 20
128:22
**independent**  11:25
140:15
**independently**  7:19,
22  114:24  115:1
**indicate**  143:24
**indicated**  87:10
116:5  157:3
**indicating**  62:18
71:11
**individual**  11:20
15:10  36:25  52:10
**individuals**  10:14
12:14  51:4  74:18
**influence**  115:10, 25
**inform**  95:2  143:17
**information**  8:17
11:6  64:19  67:7
103:10
**informed**  93:1
143:14
**initial**  28:12
**initially**  98:17
**initiate**  95:7
**initiated**  86:21
**initiating**  87:1
**input**  147:23
**inside**  135:2
**insisting**  91:15
**instances**  15:8  133:6
**instill**  121:14, 20

**instilling** 121:*4*
**instruct** 158:*16*
**instructed** 14:*13, 16*
**instructions** 11:*15*
62:*15* 106:*20, 21*
**insubordinate** 130:*11*
**insubordination**
56:*17, 21* 59:*14, 16*
63:*24* 90:*10* 116:*21,
24* 117:*21* 118:*3, 5,
11* 130:*4*
**Integrity** 64:*13* 65:*8*
90:*10*
**intended** 65:*5* 116:*4,
15*
**intention** 30:*12*
**intentionally** 64:*16,
20, 22, 25* 88:*17*
**interact** 132:*24*
**interaction** 88:*10*
**interested** 136:*15*
155:*12*
**interesting** 16:*6*
**interfering** 122:*21*
**Internal** 3:*24* 18:*1*
48:*13, 14, 15* 50:*8*
51:*15, 17* 52:*8, 21*
53:*6* 54:*17* 80:*16*
109:*11, 14, 18* 110:*2,
4* 111:*24, 25* 124:*8*
125:*1* 126:*10, 25*
134:*9, 11* 147:*1*
148:*15* 149:*22*
150:*25* 151:*2, 5, 13*
**interpret** 58:*17, 23*
**interpretation** 130:*20*
**interpretations** 59:*1*
**interpreted** 114:*23*
**interpreting** 64:*5*
114:*18*
**interrupt** 112:*2*
114:*3* 123:*5*
**interviewed** 150:*7*
**intimate** 22:*5, 9, 24*
23:*10, 21* 25:*18*
28:*23* 29:*3, 5* 31:*12*
85:*13, 14, 16, 17* 86:*6,
17* 88:*25* 136:*10*
**intoxicants** 115:*11, 25*
**intoxicated** 115:*10, 25*

**introduce** 24:*3*
108:*6* 111:*18*
**investigate** 52:*21*
80:*17*
**investigation** 51:*18*
52:*23* 80:*24* 81:*5*
132:*7* 147:*2* 149:*22,
24* 150:*7*
**investigator** 109:*17*
**involved** 13:*11* 14:*6*
15:*13* 51:*5* 133:*5, 16,
17* 136:*17* 146:*3, 7*
147:*1, 4, 14*
**involves** 5:*20*
**involving** 80:*23*
147:*15*
**irrelevant** 63:*10*
**issue** 12:*9* 50:*11*
53:*25* 59:*19* 70:*3*
72:*18, 20, 24* 73:*4*
78:*3* 95:*15, 17* 96:*23*
115:*18* 132:*1* 138:*20*
144:*10* 151:*7*
**issued** 52:*1, 7, 8*
115:*14* 116:*1*
**issues** 17:*4* 80:*15*
81:*10* 97:*9, 19*
134:*14, 16* 151:*3, 13*
**issuing** 117:*3* 152:*1*
**items** 148:*16*
**its** 150:*25*

**< J >**
**jacket** 111:*24*
**January** 21:*3* 43:*19*
47:*14* 55:*20* 108:*19*
113:*1, 7* 114:*19*
134:*18* 148:*17*
**jeopardize** 97:*13*
**JESSICA** 1:*3* 3:*21*
18:*10, 11, 12* 19:*17,
24* 22:*9, 12* 23:*10, 13,
16, 20* 24:*7* 25:*11, 18*
26:*5, 10* 28:*18* 29:*3,
8, 12* 30:*13* 31:*5*
32:*4, 7, 13, 17* 34:*1, 2,
11* 35:*3, 5, 8, 13, 15,
16, 25* 36:*13, 18* 37:*3,
23* 38:*10, 17* 39:*3, 9*
44:*19, 22, 25* 45:*3, 7*

49:*18, 23* 62:*20, 22*
63:*20* 64:*1, 6, 22*
65:*4, 21* 66:*1, 3* 67:*6,
14, 24* 68:*14, 15*
70:*21* 73:*13* 74:*6, 17*
78:*20* 79:*21, 24* 85:*8,
12, 22* 86:*7, 22* 87:*2*
88:*14, 24* 92:*18*
93:*24* 95:*19* 99:*20*
100:*4, 9* 101:*8, 11, 14,
16, 17* 102:*25* 103:*4,
20, 25* 105:*2* 119:*15,
20, 23* 120:*17, 20*
121:*12, 19, 25* 123:*19,
23, 25* 124:*4* 134:*24*
135:*6, 23* 136:*9, 14*
140:*3* 141:*4* 142:*1*
143:*18* 147:*2* 149:*8,
16, 19* 156:*2* 158:*5*
**Jessica's** 31:*9* 73:*2*
146:*21* 147:*5* 148:*13,
17* 149:*11*
**job** 82:*25*
**jobs** 62:*12*
**joked** 35:*23*
**joking** 25:*3*
**Jones** 44:*1* 148:*19*
**judge** 91:*8*
**jumped** 21:*16*
**June** 41:*10* 134:*21*
**junior** 37:*18*

**< K >**
**keep** 74:*21* 82:*4, 17*
86:*4* 87:*22* 93:*15*
126:*4*
**kept** 32:*18*
**Key** 2:*3*
**kicked** 129:*17*
**kicking** 130:*25*
**kind** 9:*2* 18:*20*
20:*10* 24:*10, 22* 25:*5*
28:*19* 32:*22* 33:*14*
34:*20* 85:*10, 25*
86:*13* 87:*19* 139:*2*
**knew** 24:*8* 29:*24*
60:*18* 98:*1* 133:*18*
**know** 5:*23* 16:*1, 2,
11* 18:*10* 20:*9* 23:*5*
24:*20* 25:*4, 5* 29:*16,*

18, 20* 31:*3, 9, 25*
32:*19* 33:*21* 38:*23*
40:*7, 8* 41:*11, 12*
42:*16* 54:*12* 58:*16*
61:*16* 63:*22* 66:*15,
17* 71:*18* 72:*12*
77:*17, 20* 84:*12, 13,
17, 24, 25* 85:*19*
87:*16* 90:*3, 7* 92:*7,
13* 93:*9* 95:*5, 22*
96:*5* 99:*23* 100:*10*
102:*12, 20* 111:*23*
113:*20* 116:*22*
124:*25* 125:*10, 22*
127:*18* 132:*5, 15*
134:*5* 136:*16* 137:*4,
9* 147:*8, 11* 148:*4*
150:*5*
**knowingly** 120:*13, 20*
**knowledge** 17:*8* 35:*2*
41:*21* 42:*16* 45:*15*
53:*8* 55:*17* 121:*6*
146:*21, 23*
**known** 138:*4*

**< L >**
**Lack** 79:*5*
**ladder** 130:*13, 15*
**landline** 61:*10*
**language** 114:*23*
115:*1*
**Large** 4:*5*
**lastly** 122:*15*
**late** 71:*7* 94:*12*
100:*4* 104:*11, 12*
105:*18, 24* 117:*8*
118:*12*
**Lauderdale** 2:*9* 6:*20*
158:*4*
**laughed** 35:*12*
**laundry** 11:*24*
**Law** 2:*2, 8* 13:*3, 8,
18* 158:*2*
**lawful** 56:*20* 59:*12,
13* 63:*19* 64:*2*
116:*17, 18* 129:*21, 22*
**laws** 80:*7*
**lawsuit** 41:*13*
**lawyer** 151:*24*
**lead** 97:*14*

**leadership** 13:*18*
14:*20*  121:*8, 15*
**leading** 14:*3* 133:*14,*
*15*
**learn** 14:*1* 58:*17*
**leave** 142:7
**leaving** 77:*18* 117:*15*
**led** 46:*3* 147:5
**left** 18:22 27:*23*
37:*19* 55:2 73:22
77:9 82:5, 7 112:*18,*
*22, 24* 113:6
**legal** 152:*1*
**legally** 152:*11*
**legs** 130:*25*
**Lester** 44:*4*
**letter** 51:*24* 52:2, *3*
**level** 51:22 52:9
53:25 128:*13*
**LEWIS** 2:5
**lie** 103:*12* 120:*16*
**lied** 143:6
**lies** 32:*18* 33:7 88:6
**lieutenant** 9:*11, 13,*
*15, 22* 10:5, *9* 12:*14,*
*17* 26:*10* 30:*3* 37:*13*
38:*4, 14, 15* 39:*11, 13,*
*20* 54:9 74:*15* 75:*11*
80:*18* 92:6 132:*1, 2,*
*8, 9, 12, 14, 20, 21, 24*
133:*18, 24* 134:2
137:*20* 140:6 144:9
150:*13, 24* 152:8, *17*
**lieutenants** 36:*24*
37:*13, 16* 38:*13*
96:*20*
**life** 31:7 33:*16*
**lightly** 30:*8*
**limit** 50:*17* 82:*11, 12*
**limitations** 11:*3*
**line** 6:*12* 13:*19, 20,*
*21, 23, 25* 14:*12, 16,*
*21* 61:25 74:7 95:6
140:*4* 156:7
**L-I-N-E** 13:*21*
**list** 11:*24* 76:7, *9, 10*
**Listen** 91:*14* 92:9
**litter** 37:*20*
**little** 9:*3* 11:*19*
18:*14, 21* 60:25 61:*3,*

*5* 137:*24* 139:*19*
151:*16*
**location** 19:*12*
101:*12* 107:5 138:*19*
139:*18*
**locations** 158:*14*
**Log** 67:*4*
**loitering** 83:*1*
**long** 7:*3, 13* 8:8, *21,*
*25* 9:*3, 4, 13, 19* 10:*1*
13:5, *6* 19:*16* 23:9
34:*21* 57:*16* 84:*25*
92:6 112:9 137:*17*
146:*8*
**longer** 20:*1* 33:*4*
82:*15*
**look** 51:*17* 71:9
73:*21* 89:22 93:6
104:*24* 113:*23* 136:*3*
142:*1*
**looked** 8:8 9:7
58:*14*
**looking** 7:*13* 8:4, *5*
38:*23* 89:*20* 115:9
116:*3* 150:*15*
**looks** 31:2, *22, 23*
89:*21*
**losing** 34:*15*
**lot** 14:22 19:*20, 24*
20:*1* 32:7, *18* 76:2
122:*16*
**love** 26:*13* 27:25
28:*8* 30:7 31:6, *7*
**loved** 24:*21* 27:6, *8*
**low** 128:*13*
**lunch** 21:6, *7* 23:25
81:25 82:2, *3, 6, 13*
86:*1*
**lying** 45:6 120:*17*

**< M >**
**main** 68:22 145:7
**maintaining** 121:6
**major** 11:*11*
**majority** 76:*23*
**maker** 147:*18* 149:2,
*5, 8*
**making** 15:*15* 51:2
145:*19*
**male** 132:*12*

**manner** 88:*11, 12*
106:*6*
**manual** 126:*17* 127:6
**March** 126:*20* 150:*4*
**mark** 30:*19* 46:20
55:6 66:*11* 111:*19*
156:5
**marked** 27:*12, 13*
30:20 46:9, *21* 55:7
66:*12* 71:*13, 15*
108:8 111:*20* 112:*20*
**marking** 108:7
112:*18* 113:6
**marks** 28:9
**married** 135:*13, 17*
**Martin** 67:*17*
**Martinez** 128:*15*
148:*18, 24* 149:2, *5*
**match** 113:*11*
**material** 114:*11*
**matter** 4:*23* 5:20
26:*24* 88:8 102:25
**mean** 15:*12, 13*
16:*16* 19:*19* 20:6
24:*13, 18, 21* 30:8
38:24 48:*12* 64:5
68:7 70:*14* 85:*16, 17*
95:*16* 100:*3* 113:25
114:*3* 118:*16* 124:22
125:*4* 127:24
**meaning** 46:5 61:*16*
68:*21*
**means** 19:*11* 65:24
68:*18* 70:*15* 118:*1*
120:*15, 16* 138:22
**meant** 32:7 68:*20*
116:*10*
**media** 32:22
**medication** 128:*11*
**meet** 135:*18, 23*
**meeting** 7:5 43:*13,*
*15, 16, 20, 22, 25* 44:7,
*10, 16, 20* 45:*1, 13, 16,*
*19, 25* 46:*16* 134:25
**meetings** 147:*14*
**MELISSA** 1:*13* 4:4
5:*10* 88:*21* 154:*10*
155:*4, 16* 156:20
158:20

**melkins@mlelawfirm.c**
**om** 2:*10* 158:*3*
**memory** 66:*4*
**mentioned** 32:*12*
54:*16* 98:*20*
**mentioning** 93:*1*
**message** 60:*11* 61:7
89:2
**messager** 24:*23*
**messages** 22:*16*
24:*18, 24* 25:*3* 72:*17,*
*22*
**messaging** 24:22
34:*18*
**met** 21:*3, 6* 24:*1*
135:*19*
**Metro** 21:*4*
**MIAMI** 1:*6* 2:*4*
3:*19* 9:*11, 14* 13:*10*
14:*9, 13* 15:*9, 21*
21:*4* 39:25 55:*18*
107:*10* 125:*1* 126:*17*
127:*6* 132:22 136:*11*
156:2 158:*5*
**Miami-Dade** 13:*25*
**MICHAEL** 2:*5* 5:*25*
54:*18* 72:*2* 78:*10, 23*
79:6 84:*10* 88:20
89:*10* 102:*1* 109:*20*
110:9, *10, 17* 116:7
125:*6* 129:*1* 136:*1,*
*23* 137:9 150:*17*
**mid** 23:*14, 18* 31:*11*
86:7
**middle** 85:*23* 126:*23*
**midnight** 10:*11, 13*
18:*13* 74:8 94:9
99:*21* 101:9
**midnights** 19:*19*
94:*14*
**Mike** 74:*21*
**mine** 24:*25* 36:*4*
**mini** 152:*24*
**minimum** 12:2
82:*10, 11*
**minute** 73:*21* 106:*18*
110:8, *17, 19* 124:*17*
128:*24* 144:*3*
**minutes** 7:*15* 8:*10,*
*23* 60:*12* 63:7, *13, 16*

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 60 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

66:9  69:2, *4*, *6*  72:*11*
77:2, *3*, *14*, *18*  78:*4*,
*21*  79:*14*  82:3  84:24
85:2  94:*13*  110:*10*
112:*4*, *11*  124:*3*
129:*1*  136:2  143:*21*
150:*20*
**Misconduct**  8:2, *12*
42:*8*, *20*  46:16  52:20
57:*19*  133:6, *8*
**missed**  24:*21*  107:*15*
**missing**  104:*17*, *18*
**Mission**  121:9
**Misstates**  49:*24*  50:6
74:*19*  78:3
**mistake**  116:*10*, *11*,
*15*  151:*14*, *15*
**misunderstood**  132:*10*
**MLE**  2:8  158:2
**moment**  59:22  66:*10*
81:*20*  100:*15*
**Monday**  104:*25*
**monitor**  122:*23*
123:22
**month**  23:*12*  38:*19*
**months**  13:6  36:*17*
39:*19*  134:*20*
**monthslong**  132:7
**morning**  4:*14*, *16*
23:*4*  60:7  67:5
144:*12*
**motion**  33:*23*
**mouse**  126:*24*
**move**  12:5  35:2
38:7  39:*20*  54:25
64:*10*  69:*25*  83:*21*,
*22*  113:*20*, *21*  114:6
118:*12*  120:*23*
126:*23*
**moved**  33:*16*  145:7
**moving**  120:*1*, *9*
126:*1*  130:*1*, *22*
131:*11*
**multiple**  57:*18*  67:*11*
95:*10*  104:*18*  124:*1*,
*3*
**municipality**  1:6
**mutual**  86:*24*  87:*1*,
*13*, *14*

**< N >**

**name**  4:*15*, *16*  28:*12*
47:*5*  76:*5*  77:*24*
93:*18*  96:*21*
**names**  75:*19*, *23*
76:*6*, *8*, *10*  77:*19*
79:*13*
**narcotics**  12:*10*
115:*11*
**narrative**  51:*14*  60:*1*
118:*5*  119:*19*
**nature**  25:*4*  136:*10*
139:2
**nearly**  94:*23*
**necessarily**  14:*18*
**necessary**  58:*24*
62:*23*  63:*5*  80:*6*
88:*11*, *12*
**necessity**  140:9
**need**  5:7  6:*4*, *9*, *10*
10:*24*  12:*20*  17:*16*
38:*5*  46:*11*  51:*6*
53:*16*, *17*  58:*15*  61:*2*,
*5*  78:*14*  80:*17*  82:*6*
83:*4*  92:*12*  93:*9*
103:*9*  108:*24*  112:*10*
114:*14*  123:*25*
128:*25*  135:*4*  138:*22*
140:*9*  144:*5*  145:*21*
156:*5*
**needed**  60:*9*  67:*4*
92:*11*  96:*2*  133:*18*
**needs**  38:*9*  39:*22*
51:*18*
**nefarious**  139:*2*
**negate**  10:*18*
**neglect**  99:*7*, *10*
**neglecting**  83:*1*
**negotiations**  42:*2*
**nervous**  115:*12*
**NESS**  68:*20*
**never**  23:*8*, *23*  24:*10*
26:*11*  34:*5*  35:*4*, *7*,
*22*, *23*  45:*2*  49:*17*
53:*10*  62:*4*, *16*, *19*
80:*20*  81:*21*  92:*18*
93:*22*  100:*13*, *20*
101:*16*  104:*21*, *22*

120:*6*  133:*17*  136:*19*
145:*12*
**new**  5:*5*  24:*22*
38:*10*  76:*4*  114:*10*
133:*16*
**newer**  114:*2*
**nickname**  29:*7*
**night**  18:*19*  22:*5*
28:*16*  31:*1*  59:*20*
63:*2*  65:*21*  66:*1*, *8*
67:*21*  70:*22*  71:*6*
92:*19*  93:*14*  103:*17*,
*21*  104:*1*  114:*4*
119:*21*  121:*20*
**nine**  58:*14*  94:*13*
**nods**  5:*7*
**non-police**  122:*22*
**nonstop**  24:*23*
**normal**  12:8  38:*3*
107:*13*  139:*25*  141:*3*
158:*16*
**normally**  48:*18*
140:*23*
**north**  21:*9*  38:*3*
68:*19*, *21*  77:*5*
102:*22*
**Northeast**  2:8  158:*3*
**northern**  22:*7*
**Notary**  4:*4*  154:*11*
**notation**  94:*3*  117:*15*
**Note**  3:*17*  35:*16*
62:*1*  105:*20*  142:*18*
156:*5*  158:*10*, *14*
**notes**  38:*24*  129:*16*
150:*16*  155:*7*
**notice**  4:*2*
**noticed**  32:*21*  33:*13*
**noticing**  36:*16*
**notify**  30:*5*  158:*13*
**November**  9:*21*  10:*4*
**nuance**  131:*16*
**numb**  18:*20*
**number**  20:*13*  52:*4*,
*7*, *8*  55:*24*, *25*  89:*24*
93:*18*  126:*10*
**numbers**  54:*10*  55:*3*
**nuts**  28:*3*

**< O >**

**O-301**  2:*3*
**Oates**  148:*18*
**OATH**  3:*4*  4:*10*
154:*1*
**oats**  33:*15*
**obey**  56:*20*  59:*13*
63:*19*  64:*1*  104:*7*
106:*3*  116:*17*  117:*1*
129:*21*
**object**  6:*1*  78:*14*
90:*2*  125:*19*  126:*2*
**objected**  78:*15*  79:*9*
139:*11*
**objecting**  25:*25*
126:*5*
**Objection**  7:*7*  15:*11*
16:*17*, *25*  17:*10*, *15*,
*20*  21:*1*  22:*14*, *20*
23:*22*  25:*12*, *20*  26:*6*,
*15*  28:*24*  29:*9*, *17*
30:*9*, *14*  31:*20*  32:*9*
33:*9*, *20*  34:*4*  39:*4*
40:*7*  41:*4*  42:*4*, *10*,
*17*, *24*  43:*5*  45:*8*, *18*
48:*4*, *19*  49:*24*  50:*6*,
*19*, *24*  53:*23*  54:*5*, *11*,
*20*  57:*17*  58:*1*, *8*, *19*
59:*4*, *24*  60:*6*  62:*9*
63:*4*, *9*, *14*  65:*10*
67:*9*  68:*1*  69:*13*, *22*
74:*19*, *22*  76:*14*  77:*21*, *25*  78:*1*,
*12*, *16*  79:*1*, *3*, *9*, *15*
81:*4*  86:*18*, *23*  87:*3*,
*9*  90:*25*  92:*20*  94:*1*
95:*21*  96:*7*, *11*, *18*
97:*23*  98:*8*  99:*3*
100:*18*  101:*24*  102:*9*,
*14*  103:*1*, *15*, *22*
104:*2*, *14*  106:*7*, *13*,
*25*  107:*7*, *12*, *22*
108:*4*  109:*21*  110:*5*,
*12*  114:*20*  117:*13*
118:*2*  121:*22*  122:*6*,
*12*  125:*20*, *24*, *25*
127:*17*  128:*6*  129:*20*
130:*3*, *9*, *17*  131:*3*
135:*7*, *12*, *24*  138:*9*,
*15*  139:*7*  140:*11*, *16*,
*25*  141:*10*, *14*  142:*25*

143:*11*, 22   144:*13*, 20   145:*10*, 15   146:*10*, 15   148:*6*   151:*9*

**objections**   6:2   126:*1*, 2

**objectives**   121:*6*, 8

**obligation**   17:*23*   94:*25*

**observations**   17:*25*   51:*14*, 21   53:*5*

**observe**   52:*19*   53:*25*   148:*1*

**observed**   51:*17*

**observing**   80:*9*

**obtain**   11:*6*

**obvious**   33:*1*

**obviously**   84:*14*   108:*1*   115:*16*, 21   140:*20*

**occasion**   96:*8*, 12   148:*1*

**occasionally**   21:*5*   96:*19*   139:*17*

**occasions**   86:*17*

**occurrence**   79:*19*

**occurring**   15:*25*

**Ocejo**   61:*18*

**October**   9:*20*   10:*4*

**odds**   128:*16*

**offered**   18:*23*   21:*13*

**office**   6:*19*, 20   43:*23*   92:*6*, 8, *14*   102:*23*   115:*19*   158:*14*, 16

**officer**   9:*25*   10:*1*, 3   13:*2*, 10, 12   19:*7*, 16   30:*2*   37:*19*, 20   38:*2*   51:*10*, 11   52:*16*, 17, 18   54:*8*   56:*21*   59:*13*   61:*13*, 18, 21   63:*21*   70:*15*   94:*21*   122:*9*   127:*16*, 18, 19, 21, 22   129:*18*   132:*19*   138:*18*, 22   139:*22*   141:*23*   143:*14*   146:*7*

**officers**   10:*17*, 19, 25   11:*4*, 7, 13   12:*3*, 11   18:*18*   19:*8*, 23   20:*8*   37:*11*, 17, 21   56:*24*   59:*15*, 20   60:*10*   61:*10*, 19, 20, 24   62:*3*,

11, 14, 24   67:*1*, 7, 10, 15   73:*17*, 18   75:*3*, 4, 8   76:*22*   80:*7*, 8, *16*   81:*17*   90:*14*, 20   96:*19*   99:*15*   100:*6*, 11, 20, 23   101:*3*, 11   103:*11*, 14, 16, 21   104:*20*, 21, 22   105:*12*   106:*4*   117:*4*, 14   121:*15*, 16, 19   123:*3*   128:*2*, 7   136:*11*, 14   140:*8*   142:*21*   144:*19*   145:*18*, 21, 23   151:*17*, 20

**officer's**   138:*8*   139:*4*, 25

**offices**   102:*22*

**official**   154:*6*

**officials**   11:*12*

**off-the-record**   88:*22*

**oh**   32:*24*   99:*23*   142:*14*   148:*22*

**Okay**   5:*18*, 19, 25   6:*13*, 14   8:*8*, 11, 21, 25   9:*8*   10:*20*   11:*13*   12:*13*   13:*17*   14:*24*   15:*4*, 8   16:*13*   25:*10*   26:*2*, 13   30:*18*   32:*7*   35:*25*   36:*12*   39:*8*, 12, 24   45:*12*   47:*22*   48:*23*   49:*11*   50:*11*   51:*10*, 14   53:*3*, 15   54:*16*   60:*7*   61:*6*, 7   67:*24*   70:*10*   73:*25*   76:*9*   81:*24*   82:*4*, 14, 17   83:*15*   85:*20*   86:*16*   87:*13*   88:*12*, 19   89:*7*, 16   90:*9*   92:*1*, 2   94:*20*   95:*14*   96:*15*   101:*8*   103:*4*   106:*15*   108:*11*   110:*16*   112:*4*, 9, 12   113:*5*, 10, 12, 13, 16   114:*6*, 16   115:*18*, 23   116:*7*, 13   117:*5*, 19   118:*11*, 12, 23   119:*12*, 23   120:*9*   121:*2*, 16   122:*15*   123:*16*, 19, 23   124:*11*   125:*14*   126:*3*, 6   127:*9*   128:*4*   129:*1*,

4   130:*15*, 22   131:*10*, 15, 23   132:*18*   134:*13*, 24   135:*5*, 11, 15, 20, 23   136:*1*, 22, 24   137:*14*, 20   138:*13*   139:*9*, 13   140:*19*   141:*19*, 20   143:*4*, 20   144:*9*   146:*18*   150:*24*   151:*16*

**old**   134:*4*, 7

**older**   114:*1*

**Olive**   21:*7*

**once**   5:*12*   21:*7*   35:*22*   37:*15*   48:*9*   50:*11*   52:*8*

**one-on-one**   85:*18*, 21

**ones**   84:*20*   89:*11*   90:*9*   119:*7*   137:*13*

**ongoing**   134:*14*

**online**   31:*3*, 24   135:*19*

**open**   18:*21*   95:*16*

**opening**   38:*4*

**operates**   152:*11*

**operating**   56:*15*   97:*10*, 21   98:*6*, 22   99:*2*

**opinion**   131:*8*, 10   151:*20*   152:*1*

**opportunity**   78:*4*

**oppose**   11:*14*   88:*24*   89:*1*, 2

**opposed**   92:*8*   136:*20*   139:*20*

**opposing**   136:*10*   158:*11*

**OPTION**   158:*8*, 11

**Options**   158:*8*

**order**   11:*17*   32:*1*   56:*20*   59:*12*, 13   63:*19*   64:*2*, 7   104:*7*   116:*17*   139:*14*, 16, 20   152:*23*

**ordered**   31:*3*, 24   32:*1*, 4   59:*19*   60:*19*   68:*24*, 25   69:*5*, 9   158:*8*, 11

**ordering**   153:*1*, 3

**orders**   11:*1*   56:*25*   59:*15*   60:*9*   63:*21*

64:*8*   93:*2*   106:*3*   117:*4*

**organized**   112:*6*

**original**   41:*15*   72:*16*   153:*1*, 3   158:*10*, 13

**Os**   28:*9*

**Otero**   138:*22*

**outside**   7:*17*   12:*8*   13:*7*   14:*21*   20:*15*, 19, 21, 24   21:*15*   25:*18*   44:*16*   88:*12*   135:*3*

**oversight**   84:*14*

**overtime**   11:*21*   12:*6*, 18, 22, 25   37:*1*   38:*17*   126:*14*

**Ozaeta**   44:2   45:*6*


**< P >**

**p.m**   1:*12*   77:*11*   153:*5*

**PAGE**   3:*7*   28:*1*   55:*15*, 16   106:*11*   124:*11*, 12   125:*18*   126:*8*, 23   156:*5*, 6, 7   157:*1*

**pages**   55:*12*   157:*1*

**paraphrasing**   99:*20*

**parents**   24:*1*, 3

**Park**   21:*3*

**parked**   69:*3*   77:*11*

**part**   12:*16*   27:*21*   41:*10*   116:*21*   139:*24*   142:*17*   147:*21*   150:*7*   151:*15*

**particular**   52:*10*   53:*4*, 5   67:*23*   92:*2*   94:*2*   128:*1*   139:*18*   140:*20*   146:*2*, 7

**parties**   3:*11*   155:*9*, 10

**patrol**   10:*11*, 12, 13   12:*5*, 8   19:*20*, 21   37:*19*   139:*18*

**patrolling**   145:*24*

**Paul**   44:2   45:*6*   124:*21*, 25

**PD**   126:*17*   127:*6*

**Pembroke**   22:*1*

**pen**   28:*5*

**pending**   112:*8*

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**people** 11:2*1* 12:5, *6,*
*7, 18, 21, 24* 29:24
33:*14* 37:*1* 76:4, *10*
136:*18*
**perception** 17:*14*
**perforations** 31:22
**perform** 105:*14*
117:9, *11*
**performance** 12:*25*
17:6, *14, 18* 65:*15*
70:*3* 82:23 90:*11*
99:7, *11* 114:7
120:*14*
**performed** 117:7, 8
**period** 12:25 38:*19*
81:*23* 101:*20* 146:8
**permitted** 117:2*1*
**permitting** 139:*4*
**person** 15:*15* 78:8
88:*10* 111:*14* 133:*15*
**personal** 22:*19*
102:*4* 107:*16* 122:22
130:*16* 152:7
**personally** 35:5
**person's** 5:*12* 18:*3*
**perspective** 87:*13*
**phone** 11:*10* 13:*13*
21:*10* 22:*16* 60:*11,*
*14* 61:*14* 72:*17, 22*
83:6 93:*23* 128:9
144:*18*
**physical** 19:*12*
**physically** 27:9
29:*13, 19*
**pick** 21:*13, 14* 22:7
37:*17, 20* 92:*15*
**picked** 22:2*1*
**picking** 22:*18* 37:*14*
**pictures** 32:25
**pieces** 9:*3*
**Pines** 22:*1*
**PLACE** 1:*13* 21:25
23:7 88:22 107:2
**placed** 50:*14* 108:*3*
132:*15*
**Plaintiff** 1:*4* 2:*5* 4:2
**Plaintiffs** 124:*23*
**Plaintiff's** 3:*16, 17,*
*18, 19, 20, 22, 23, 24,*
*25* 27:*13* 30:20

46:2*1* 55:7 66:*12*
71:*15* 108:8 111:*20*
112:*20*
**platform** 128:*11*
**platforms** 44:*3*
**playing** 25:*1*
**please** 4:*14* 6:9
11:*19* 27:20 31:*4*
51:*9* 61:25 64:*15*
65:*14, 17* 66:*15* 67:*3*
74:22 78:*10* 79:7, *12*
82:*24* 85:5 105:*20*
108:*11, 22, 24* 112:*4*
120:*12* 122:*17*
123:25 124:*11*
125:*17* 126:8, *24*
136:25 141:*19*
142:*18* 156:2, *5, 21*
158:7, *8, 11, 14, 16*
**plenty** 45:*19*
**PLLC** 2:2
**plus** 94:*8*
**point** 5:*19* 6:*11*
24:*10, 20* 26:*19*
33:*10, 15, 23* 41:6
50:*14, 15* 51:*15* 53:7,
*11, 16* 59:*23* 60:*1*
62:*23* 63:5 72:*12*
73:25 87:2*1* 89:*14*
93:20 101:6 117:*11*
119:*2* 133:*10* 136:*15*
**Police** 3:*19* 9:*11, 14,*
*16, 24, 25* 10:*1, 9*
13:*4, 9, 10, 12, 14, 15,*
*25* 14:9, *13* 15:*9, 18,*
*21* 19:7, 8 20:*15*
29:23 32:2*1* 36:8
39:25 40:6, *13, 16, 19*
50:*11* 51:20 55:*18,*
*24* 80:7, 8 107:*11*
125:*1* 127:22 135:20
136:*11* 139:*4, 17*
151:*17, 20*
**policies** 14:8, *14, 17,*
*19* 70:6, *11, 18* 81:2
114:9
**policy** 14:5 16:*11, 12*
17:2*1, 22* 51:*12* 81:6
**pool** 25:*1*

**portion** 115:*14*
116:*1* 118:8
**position** 9:*10* 15:*1*
19:2 70:8, *13* 87:*4, 7*
**positive** 35:20 121:*4,*
*20*
**possession** 72:*13*
131:*17*
**possible** 31:*16* 36:20,
*21* 80:*1* 93:24 94:5,
*7* 101:*17, 20* 151:23
152:*10*
**possibly** 51:25
**posting** 32:22
**potential** 87:*11*
**potentially** 80:*10, 22*
**pouches** 18:2*1*
**power** 37:*10* 39:*15*
**predicate** 79:5
**prefer** 56:*12*
**prepare** 6:25
**prescription** 115:*12*
**presence** 56:25 59:*15*
**present** 43:20, *24*
44:*12, 13* 45:*12*
**presented** 104:*19*
**president** 44:2
**prevent** 6:*16* 15:25
26:*1*
**preventing** 16:*23*
**prevention** 16:9
**previous** 15:8
**previously** 36:*24*
46:*15* 93:*1* 98:20
124:*7* 132:*9*
**Prieto** 3:*23* 8:*18*
44:*3* 51:6 108:*17*
109:*10, 11, 24, 25*
110:*11, 17* 111:*4, 7,*
*12, 16*
**primary** 10:9 144:*17,*
*18*
**princess** 31:7
**printed** 31:2*1* 32:*1*
**prior** 7:20 9:*17, 23*
13:2, *9* 22:9, *13*
28:22 29:2, *6* 38:*11,*
*15, 16* 39:8, *10* 40:2*1*
41:5, *17* 51:*4* 57:*3, 5,*
*6* 60:*10* 62:18 67:*14*

90:9 95:*1, 15, 19*
101:*19* 111:*10* 114:7
125:*12* 144:*11*
**privilege** 54:2*0*
109:*21*
**Privileged** 7:7
**probably** 15:*6* 23:*14*
25:8 27:*1* 29:*4, 6*
31:2 36:*15* 40:9
57:23 58:9 63:*15*
68:8 82:*15* 85:23
87:*11* 89:24 110:*14*
116:*4* 129:23 134:7
150:*4*
**problem** 76:24 94:8
144:*4, 10*
**procedure** 56:*16*
99:2
**procedures** 70:6, *11*
91:*11* 97:*10, 22* 98:7,
*22* 122:*19, 24* 123:6,
*7, 17*
**proceeded** 64:7
**process** 30:*1* 51:8
52:*14, 20* 53:2 87:*17*
147:2*1*
**produce** 124:*18, 20*
**produced** 55:23
72:*14* 124:2*1, 25*
125:*10, 12, 22*
**production** 83:*19*
**professional** 88:*11,*
*12* 135:*3*
**profile** 148:9
**program** 133:*12, 17,*
*18, 19*
**promoted** 10:*4*
19:*18* 26:9 36:*12, 14*
38:20 39:*12* 76:4
**promotion** 9:2*1*
**promptly** 158:*11*
**proper** 45:*16, 17*
53:2*1* 63:*3* 92:*16*
97:*18* 123:*1, 3*
**properly** 103:*12*
120:*1*
**property** 139:23
**propounded** 153:*5*
**protect** 80:7

protocol 123:2
protocols 123:12
provide 10:24 11:3
44:15 49:22 50:13
75:23 121:25 143:20
provided 9:6 42:21
46:5 49:1, 13, 21
50:15 53:6 64:4
83:18 99:16 115:19
provides 56:24
providing 121:3
Public 4:4 124:15
125:5 128:13 154:11
pull 15:2 30:18
66:3 72:16 76:7
125:5 136:25 137:10
141:19 144:3
pulled 137:9, 12
pulling 144:4
purpose 80:24
purposes 12:5 72:14
157:4
pursuant 4:1 145:6
pursue 33:5
Pursuit 11:22
put 26:20 65:8
116:10 129:24 130:2
143:8 144:23

< Q >
qualities 121:8
quarter 25:9
question 5:20 6:1, 4,
7, 9 11:5 17:16 26:2
50:25 54:14 70:22
77:15 78:6, 12, 19
81:15, 23 91:23 92:3
95:16 97:16 98:5
105:23, 24 112:8
125:13, 23 126:5
135:15
questioned 32:24
119:23 125:21
137:21 140:2 146:20
148:9, 16 149:15
questioning 6:12
140:4 150:13
questions 5:16 6:6
26:19 40:22 44:12,
19, 21, 22 80:14

125:7 136:2, 9, 23
153:5
quick 150:16
quicker 25:24
quickly 113:10
152:23
quite 109:8 136:17

< R >
Rabelo 132:2, 8, 10,
12, 14 133:19, 24
radio 60:15 66:9
83:6 92:9 95:9, 10,
12, 20 96:6, 16, 20, 21,
23 97:1, 4, 9, 18
102:6 122:16, 20, 21,
22, 25 123:4, 7, 13
124:1, 5 131:17, 19,
21, 22
radios 122:18, 23
123:22
raise 60:14 93:17
raised 95:9 96:20
124:1, 2
raising 95:10 131:22
rank 26:11
rarely 132:25
Ray 128:15 148:18
reaching 27:1 34:17
95:15
READ 3:7 9:2
24:15 27:21 31:4
41:13, 20 48:23, 24,
25 49:12 58:20
59:18 61:1, 4 62:6
63:20 64:15 65:14,
17 78:17 82:24 93:6
105:6 108:11, 22
111:3 113:18 120:12
121:2 122:17 124:11
125:17 126:8, 24
152:22 153:4 156:2
157:1 158:14
reading 3:12 93:15
158:10
ready 101:3 105:16
129:6
real 150:16
reality 100:1 144:24

realized 21:24
realizing 88:7
really 9:2 15:7
21:11 23:23 33:10,
11, 24 34:7 50:25
88:20
reason 6:11 11:14
34:11, 13 58:13 80:5
83:12 107:3, 6
reasonable 116:17, 18
117:1 129:21, 22
reasons 25:25
107:16 147:11
recall 15:7 17:1
23:17 29:4 31:1
32:5 35:19 38:20
39:8, 13 40:9 41:16
44:21 45:25 46:8
58:9 77:7 89:6 93:3,
6 107:23 110:6
111:6, 9, 13, 17
119:17, 22, 25 132:6
133:5 134:12 136:16,
21 151:3
receive 13:2 15:4
58:22 60:13 84:6
100:9 107:20
received 13:8 61:7,
13, 20, 22 107:17
112:24 126:20
129:12
recess 46:13 85:4
112:13 129:5 136:7
150:21
recite 123:10
recollection 29:15, 18
86:4, 9
record 4:15 26:20
64:18 65:2 78:24
85:5 88:21 112:1, 12,
14 123:25 124:15
125:9 129:7 155:7
records 124:16 125:5
redirect 91:14
refer 57:20
reference 41:12
118:11 123:1
referring 35:9 42:14
58:12 73:2 92:2, 3

107:14 115:20
refresh 66:4
refusal 56:20 59:12
63:19 64:6
refuse 64:1
refused 64:4
regard 83:8
regarding 11:18, 25
13:17 14:25 16:13,
23 43:13 85:7 123:7
133:2
regardless 124:21
Reggie 44:4
regretting 21:11
regular 138:8 139:5
regulation 17:23
65:5 89:17 116:17
127:6 129:11, 21
Regulations 3:20
14:10 51:13 55:18
57:8, 13 58:18, 23
59:3 70:6, 11, 18
83:25 84:3, 7
reiterate 85:7
related 13:3, 8, 17
relating 149:11, 13
relationship 20:15
22:15, 19 23:10 24:8,
24 25:6, 19 28:20
29:22 30:2 32:12, 16
33:2, 11, 23 34:15
36:1, 6 85:7, 8, 17
86:14, 16 135:5, 8
relative 155:8, 10
relevant 63:12
remain 65:18 68:10
remarks 122:20
remarried 135:16
remember 8:15
14:12, 16, 22, 25 15:2,
8, 20 18:17 19:18
20:24 21:7 38:10
43:24 44:22, 25
45:10, 22 85:25
127:14 128:4 132:2,
4 133:1, 6 140:4
150:25 151:18
remotely 1:13 154:5
removed 72:15

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 64 of 223
Deposition of Steve Cosner
Jessica Guasto v. The City of Miami Beach, FL, et al.

149:*12*

**repeat**  6:*4, 9*
**repeatedly**  144:*2*
**rephrase**  131:*24*
**report**  59:*18*  62:*5*
64:*18, 23*  65:*1, 2*
66:*3*  68:*14*  72:*22*
76:*7*  81:*16*  97:*9*
98:*12, 14*  106:*3, 10*
129:*16*  145:*7*  155:*5*
**REPORTED**  1:*13*
4:*3*  15:*24*  106:*12*
**REPORTER**  3:*5*  4:*4*
5:*6*  24:*15*  78:*17*
82:*13, 14*  150:*14*
153:*1, 3*  155:*4*
158:*20*
**REPORTER'S**  155:*1*
**Reports**  11:*22, 23*
13:*13, 14*  64:*16*
72:*17*  128:*9*
**represent**  71:*25*
**representation**  45:*20*
**reprimand**  51:*24*
52:*3, 4*
**request**  74:*14*  139:*22*
**requested**  104:*13*
**requestion**  89:*14*
**requests**  11:*11*
**required**  16:*9*  75:*16*
**requirement**  12:*2*
140:*9*
**requires**  92:*5*
**reserved**  3:*13*
**reshare**  49:*8*
**resign**  43:*8*
**resignation**  43:*11, 14*
45:*23*  46:*2, 4*
**resigned**  76:*3*
**Resistance**  11:*22*
**resource**  145:*23*
**respect**  78:*10*
**respectfully**  79:*6*
**respective**  3:*11*
**respond**  52:*11*  60:*20*
68:*24, 25*  69:*5*  96:*16,*
*22*  111:*4*  124:*5*
**responded**  93:*19, 21*
97:*2*

**Responding**  106:*14,*
*22*  131:*21*  145:*18*
**Response**  11:*22*
12:*13*  49:*14, 21, 23*
50:*15*  52:*11, 13*  53:*6*
54:*4*  95:*11*
**responsibilities**  10:*9,*
*18*  14:*4*  70:*7, 12*
74:*17, 25*  94:*9, 15*
139:*25*
**responsibility**  120:*24*
121:*3, 5, 18*
**responsible**  70:*20, 22*
99:*16*  148:*5*
**rest**  22:*4*
**result**  18:*6*  42:*3, 22,*
*25*  129:*11*  133:*23*
**resume**  3:*24*  124:*9*
**retaliation**  16:*14, 16,*
*18, 22, 23, 24*
**retired**  76:*3*
**return**  51:*19*  156:*6*
**returned**  50:*12*  52:*2*
**review**  7:*6, 19, 25*
9:*4*  14:*9*  41:*17*
47:*19*  56:*10*  57:*4, 8,*
*10, 16, 24*  93:*8*
108:*24*  115:*9*
**reviewed**  7:*9, 22*  8:*9,*
*15, 25*  28:*16*  57:*13,*
*18, 22, 25*  58:*25*
**reviewing**  8:*22*
11:*21, 22*
**revised**  55:*20*  84:*4*
90:*4*
**Reword**  12:*23*
**ridicule**  63:*20*
**ridiculing**  56:*24*
59:*14*
**right**  4:*14, 20, 25*
5:*5, 17*  6:*4, 15, 23, 25*
7:*3, 5, 13, 16, 19*
11:*18, 25*  12:*18*  18:*9*
19:*5, 23*  23:*9, 12*
26:*5, 9*  27:*11, 18, 20*
28:*13*  30:*18*  32:*12,*
*13*  34:*11, 16*  35:*5, 12*
37:*1, 2*  40:*21*  41:*23*
42:*22*  46:*1, 7, 9, 15,*
*19*  47:*1, 2, 15, 18*

49:*17, 22*  52:*5*  53:*8*
54:*2*  55:*5, 12, 15, 20,*
*25*  56:*10, 14*  57:*3, 10*
59:*8, 9, 22*  60:*5, 7*
63:*18*  64:*10, 15*
65:*13*  66:*10, 17, 24*
68:*10*  69:*8*  70:*10*
71:*5, 13, 20, 25*  72:*25*
73:*4, 5*  75:*19*  76:*6*
77:*7, 8*  80:*4, 21*  82:*4,*
*21, 23*  84:*10, 18, 23*
87:*7*  88:*24*  90:*13*
93:*8*  98:*11*  99:*23*
100:*6*  101:*2*  105:*15*
112:*9, 16, 17*  113:*5,*
*16, 18, 19, 22*  114:*8*
115:*4, 8*  116:*4*  119:*3,*
*4*  125:*17*  126:*24*
129:*6, 9*  136:*1, 22*
138:*2*  139:*14, 18*
140:*2*  141:*20*  142:*1,*
*7*  143:*10*  144:*15*
146:*4*  148:*10, 13, 23*
149:*3*  150:*2, 22*
152:*18, 21*
**Rights**  80:*8, 16*
81:*17*  151:*17, 21*
**ring**  135:*16*
**Robin**  8:*19*
**role**  9:*16*  150:*25*
152:*8*
**roles**  12:*17*
**roll**  79:*17*
**rolling**  48:*9, 11*
**romantic**  22:*12*
85:*19, 20, 21*
**romantically**  26:*14*
**Romero**  60:*15*  61:*13,*
*21*  93:*11, 20, 25*  94:*6,*
*21, 22*  95:*8, 14, 18, 22*
141:*24*
**room**  6:*23*  43:*23*
129:*17*  130:*24*  135:*1*
**Rosa**  149:*21*
**roughly**  86:*11*  134:*22*
**rule**  5:*10*  17:*22, 23*
65:*5*  89:*17*  127:*6*
129:*11*
**Rules**  3:*20*  5:*5*
14:*10, 13*  51:*13*

55:*18*  57:*8, 13*  58:*18,*
*23*  59:*2*  81:*6*  83:*25*
84:*2, 6*
**rumor**  15:*14*
**run**  10:*12*  133:*18*
**running**  10:*12*
109:*11*  110:*2*

**< S >**
**Salabarria**  3:*21*  9:*7*
18:*10, 11, 12*  44:*3*
47:*10*  56:*15*  60:*8*
61:*8, 14, 22*  73:*13*
74:*6*  83:*3*  90:*14*
97:*1*  98:*2, 11*  99:*1*
105:*2*  115:*23*  116:*19*
140:*19*
**Salabarria's**  19:*5*
53:*20*  104:*5*
**sarcasm**  122:*19*
**saw**  8:*2*  31:*1*  33:*3,*
*6, 7*  85:*12*  128:*16*
135:*16*
**saying**  35:*9*  37:*23*
43:*4*  49:*25*  52:*2*
66:*7*  76:*17*  88:*4*
90:*7*  93:*12*  94:*20*
104:*20*  119:*11*
124:*18*  143:*5*
**says**  28:*8*  38:*5*  45:*6*
46:*20*  47:*1*  49:*11, 20*
50:*7*  51:*22*  52:*18*
54:*18*  55:*15, 16, 20*
56:*19*  59:*11*  62:*16,*
*17*  63:*18*  70:*5*  71:*10*
72:*5*  99:*20*  105:*20*
115:*16*  120:*23*
123:*21*  124:*12*
125:*18*  126:*12*
127:*23*  142:*17*
**SC**  108:*25*
**schedules**  39:*16*
**scraps**  37:*19*
**scratch**  23:*9*
**screen**  27:*16*  30:*23*
49:*3, 5*  88:*19*  89:*8*
113:*3, 20*  150:*17*
**screens**  113:*19*
**scroll**  47:*19*  56:*8*
61:*6*  66:*24*  68:*16*

83:4   103:9   137:2, 24
141:18
scuttlebutt   15:14
seal   154:6
seated   128:10, 11
second   5:10   23:15
28:1   35:10   49:20
62:2   87:2   137:6
seconds   8:23   9:7
section   48:23   63:23
64:13   65:15   115:19
secured   128:8
see   27:16, 18, 19
28:5   30:23   31:21
32:5   33:2   46:25
47:1, 2, 24   49:3, 5
51:22   52:4   55:2, 24
56:1, 16   61:6   64:11,
20   66:15, 16   69:25
71:18   73:21   74:2, 4
77:10   82:21   83:15
112:1, 25   113:2, 7
114:17   115:5   116:3
120:2, 10, 25   124:13
129:22   134:15
137:22   142:19
seeing   36:13   86:10,
12   88:6   121:16
seen   28:13, 15   40:20
105:12   115:18
select   37:10
selected   37:9, 24
self   114:7
self-initiated   19:15
send   11:7   47:11, 13
48:7   50:18, 22   51:5,
17   52:9   54:17, 18
67:3, 6, 7, 24   68:2, 4,
5, 7   69:20   71:9, 12
73:14, 16, 19   74:1, 10,
12   75:3   84:10, 16
100:15   101:8, 11
105:17, 25   109:10, 13,
17   110:3, 11, 13, 25
111:14   158:11
sending   35:19, 21
74:18   75:2, 5   100:4
111:10   117:14
118:12

sends   74:15
senior   37:20
seniority   37:13, 18
76:7
sense   5:13, 23   6:7
112:19   116:6   122:17
sent   8:19   35:17
47:16   48:9, 13, 14, 15
51:15   53:9   54:22
60:11   61:11, 23
62:14   66:19, 21
67:10, 14   68:8, 9
71:6, 10, 11   72:9
73:3, 8, 9, 10   74:2, 4,
14   75:3   76:25   77:1,
4, 13   89:3   90:21
94:13, 17   101:2
104:20   105:3, 8, 10,
15, 18, 19   106:19
108:18, 20   109:16, 19,
24, 25   110:9, 10, 13,
17   111:16, 17   140:3
142:4   144:12
sentence   49:20   93:15
123:21
separate   43:1   131:6
separated   34:9
separation   34:12
148:13, 17   149:11
September   9:15, 17
10:5   38:20   39:16
135:17
sergeant   9:18, 19
10:4   14:4   19:3   30:3
36:15   37:4   39:11
54:8   60:8, 15   61:8,
22   62:25   75:11   76:4
90:22   93:11, 20, 24
94:6, 22, 24   95:1, 8,
14, 18, 22   100:5, 20,
25   104:5   122:3, 4
140:7, 9, 19   143:2
145:22, 24   146:8
sergeants   10:17, 21,
23   11:2, 13   37:16
38:12   75:15, 20, 23
76:1, 3, 12, 18, 19, 20
77:17, 20, 24   79:13
96:5, 16, 19   98:20, 21

102:12, 19, 21   140:20
147:25   148:1, 4
service   138:23
set   55:17
setting   85:13, 14
settlement   42:7
147:5
settlements   42:1
sex   22:25   23:11, 13,
15   86:10   134:8
sexual   85:17, 18
86:21   87:2   132:5
133:4   136:10   149:16,
18
sexually   86:7, 17
shape   140:8   147:18
share   27:11   49:3, 5
71:13   89:8   129:15
150:17
sharing   66:10   88:19
113:2, 3
SHEET   3:6   156:6
157:3   158:10, 11, 13
shift   10:11, 13, 25
11:20   12:2, 21, 24
18:9, 13, 14   37:11, 14,
21   38:1, 9, 17, 22
39:3, 21   60:10   62:1,
5   74:8   76:21, 23
90:20   94:9, 10, 14
96:6, 17   99:13, 21, 24
100:10   101:2, 6, 9, 19
105:15, 21   106:15, 16,
19   117:12   120:8
130:25   138:7, 8
139:5   141:4   142:18
143:21
shift-level   52:23
shifts   12:1, 15   20:5
36:25   37:17, 24, 25
39:16
Shores   13:10
short   81:23
Shortly   23:17   41:22
show   46:9, 19   71:1
100:14   103:8   104:6
111:2
showed   35:3   99:7,
10   103:5

showing   35:12
105:11
shows   74:20   77:10
shut   91:8   150:9
shy   77:9
side   8:5   113:19
128:12   130:24
sides   24:9, 12
SIGN   3:7   48:18, 21
123:4   156:5   157:1
158:14
signature   28:11
157:6
signatures   47:25
50:14   111:4
signed   41:8, 9, 11, 24
48:3, 16   158:11
significant   92:4
signing   3:12
simple   59:6   75:2
single   102:20, 24
sir   38:25   113:23
sit   128:12
sitting   41:9   77:12
123:16   128:14
situation   52:15
six   62:4, 24   77:11
100:20   103:17
140:23   141:8   142:21
145:8
skipping   55:25
slack   92:16
sleep   23:2, 7
Sleeping   127:3, 7, 11,
15, 23   128:17, 18
129:10   130:10   131:1,
4, 18, 20   139:1
slept   23:8
slightly   72:8
slowly   33:13
small   61:4
Smith   2:2   21:2
social   32:22
somebody   16:5, 18
17:21   19:14   32:20
38:6   52:15   57:23
58:5, 7   70:25   95:5
128:18
SOP   54:10   57:20

123:7, *8*, *10*  126:17
**SOPs**  70:5, *10*  119:9
**Sorry**  29:2  36:14
38:*1*  49:7, *10*  56:3
89:*5*  112:2  123:5
128:24  137:7  141:*18*
142:14  148:22  150:9,
*14*
**sort**  33:2  121:*17*
140:*4*
**south**  38:*4*
**SOUTHERN**  1:*1*
**sowing**  33:*15*
**speak**  5:*11*  7:3, *16*
44:*16*  83:20  90:6
91:*10*  111:7, *10*
114:*1*  135:4  142:*21*
**Speaking**  140:*19*
145:24
**specialized**  13:*3*
**specific**  12:7  14:*10*
57:4  58:22  68:5
70:*16*  88:*1*, *2*  94:16
119:2, *5*  138:*19*
139:3  145:14
**specifically**  14:*12*, *17*
15:20  25:25  29:*10*
105:8, *24*  119:*18*
136:*19*
**specifics**  119:*17*
**speculate**  54:2, *6*
**speeding**  12:*10*
**spend**  7:*13*  20:*19*, *21*
140:*23*
**spending**  20:8  141:*5*
**spent**  8:22
**split**  87:*14*
**splitting**  26:25
**spoke**  5:*21*, *22*  7:2
18:*15*, *24*  68:*16*
88:*13*  90:*10*  93:*10*
103:*14*  119:*20*
134:24  143:*9*
**spoken**  36:5  80:*18*
90:*10*  93:*13*  103:*11*
135:2
**spot**  38:*5*, *7*
**spring**  86:*8*
**squad**  14:*3*  37:7, *9*,
*10*  61:*12*, *25*  63:*1*, *2*

67:25  73:17, *23*
74:*18*  90:*15*  105:4, *9*,
*18*  142:2, *12*, *17*
145:25
**squads**  36:2*1*  37:8
**squat**  61:8
**staff**  12:*14*, *21*, *24*
148:24  152:14
**staffing**  11:*20*, *25*
12:2, *7*  36:25  38:8
**stamped**  124:*13*
**standard**  56:*15*
97:*10*, *21*  98:6, *22*
99:*2*
**standing**  125:20, *25*
**stands**  135:6
**start**  37:*13*  56:14
73:6  89:*16*  101:*3*
137:*20*  138:*13*
**started**  24:24  26:24
28:*19*  33:13, *14*
34:*14*, *16*, *18*  36:*16*,
*17*  48:9, *11*  61:*19*
77:2, *4*, *7*  94:*14*
100:*10*
**starting**  48:23  49:*11*
**State**  4:*4*, *15*  99:*19*
154:2, *11*  155:2
**stated**  65:4  89:*11*
98:*11*  99:6  104:5, *10*
118:*24*  124:7  126:*19*
**statement**  44:*15*
80:*18*  84:8  121:9
**statements**  51:7
81:*18*  120:*13*, *21*
**STATES**  1:*1*  113:6
**stating**  61:25  97:2*1*
129:9
**station**  15:*14*  29:*16*
33:*3*  60:*18*  65:25
68:*18*, *22*  69:4  75:7,
*12*, *15*  76:20  77:*10*,
*12*, *19*  79:22, *25*
81:*11*  83:5, *9*, *12*
99:*13*  101:*3*  105:*16*
120:6  140:2*1*, *24*
141:*5*, *8*  145:7, *13*
**statistics**  101:9
**stats**  61:9, *12*, *16*

67:5  74:8
**status**  92:7  95:5
**stayed**  19:*19*  22:4
**staying**  21:*16*, *21*
25:2
**stays**  102:6
**Stenographer**  1:*15*
155:17
**stenographic**  155:7
**stenographically**
155:5
**step**  34:*14*
**STEVE**  1:*10*  3:*1*
4:*1*, *8*, *16*, *19*  31:8
154:*4*  156:2  158:2, *7*
**Steven**  3:2*1*, *22*, *23*
**stevencosner@miamib**
**eachfl.gov**  47:7
**stimulants**  115:*12*
**stipulated**  3:*10*
**Stop**  68:*16*  78:24, *25*
85:*11*  117:6  138:2
141:*20*  150:*17*
**stopped**  85:*13*  87:*18*
**straight**  13:2*1*
**stranger**  135:9
**street**  135:9  138:2*1*
**strike**  122:*4*
**structure**  73:7
**students**  14:6
**stuff**  11:24  32:*15*
53:*12*
**subject**  15:*17*  47:9
50:*13*  74:7  101:*19*
125:2*3*  147:2  149:22
**subjective**  130:*16*
**submission**  111:*5*
**submit**  50:*3*, *5*  52:*10*
53:*17*  109:*14*
**submitted**  17:25
53:*5*  90:*3*  97:*15*
**submitting**  17:*19*
**subordinate**  18:7
36:2*1*  80:20
**subordinates**  80:*13*
81:*2*  120:2, *7*  121:*4*
**subordinates's**  17:*18*
**subordination**  57:*1*
**subscribe**  157:*4*

**subsections**  118:*19*
**substance**  50:*10*
**substances**  115:*11*
**substation**  68:20, *21*
102:22
**sufficient**  51:2*1*
53:*18*  143:20
**suggest**  53:24
**suggestive**  25:*4*
**suitcase**  21:*15*
**Suite**  2:*3*
**summarize**  105:7
**summer**  134:*23*
150:2
**supervise**  10:*16*, *17*
36:*18*  75:8, *10*  90:*14*
99:*15*  106:*4*  120:2
121:*13*
**supervised**  39:*14*
**supervising**  10:*14*, *16*
14:*3*  39:9  56:2*1*
59:*13*, 20  63:2, 20
76:22  99:*16*
**supervision**  13:*19*, 20,
22, 23  14:*12*, *16*, *21*
26:*12*  59:*1*  92:*16*
**supervisor**  14:*4*
17:*23*  37:2*1*  50:*12*
51:*10*, *11*  52:*18*
58:*13*  65:20  68:*12*,
*16*  70:*15*  74:*15*
75:*12*  92:*3*, *12*, *13*, *15*,
*25*  93:*3*, *5*  99:*14*
103:6, *9*, *17*  104:7
107:*3*  116:*19*  117:2
120:*24*  121:*17*
129:*18*  131:*1*, *12*, *16*
145:22
**supervisors**  13:*25*
14:7  121:2, *5*, *8*
133:*14*
**supervisory**  10:*18*
15:*1*  26:*10*  56:*24*
59:*14*
**supposed**  54:*17*
66:25  68:*5*  70:*16*, *18*,
20  73:*18*  83:7  105:9
130:*24*
**sure**  5:*25*  8:*5*  10:*3*
11:6  26:4  60:25

75:2  76:8  82:19
84:13  85:25  110:23
138:25  139:10
145:19
**surrounding**  45:22
**suspended**  126:21
127:8
**suspension**  129:13
**suspensions**  127:11
**swear**  109:4  111:13
**Sweetie**  28:8  29:7
30:7
**sworn**  4:9  154:5
**system**  115:12

< T >
**take**  5:12  6:10
10:25  11:20  23:20
30:8  34:14  38:5
46:11  61:2  63:13
73:21  78:18  82:2, 6,
13, 15  84:15, 24, 25
85:1, 2  92:5  99:17
104:24  108:25  112:5
115:8  128:25  129:2,
4  136:2, 5  137:10
146:8
**TAKEN**  1:11  4:1
14:22  21:8  46:13
63:7, 10, 15  77:18
85:4  112:13  129:5
136:7  150:21  158:7
**talk**  11:19  32:16
79:4  88:4  91:22
92:12  136:16
**talked**  143:14  151:16
**talking**  29:25  37:25
44:23  73:3  81:19, 20
93:3, 5  100:25
**tardiness**  126:17
**task**  138:19
**tasks**  75:16  92:15,
23  98:23  127:24
**taught**  15:20
**Teams**  44:2
**tell**  5:25  14:11  16:7
26:22  29:19  35:10
44:24  45:9, 10  53:25
65:23  67:2  71:20
73:8  76:18  87:17, 25

90:22  96:12  104:25
105:3  111:12  123:16
124:25  128:4  131:11
136:14  142:24
**telling**  5:21  21:10
86:3  102:24  103:2
106:10  122:3
**tells**  6:3
**ten**  8:10  20:6  46:11
63:13  148:12
**ten-hour**  20:5
**term**  29:10  30:10
85:15  86:12  130:19
**terminated**  54:9
108:1, 2
**termination**  54:3
**Terms**  3:25  147:22
148:2
**Terrace**  2:8  158:3
**testified**  4:9  116:9
146:18  150:1, 24
151:2, 13
**testify**  91:21
**testifying**  5:3  6:16
78:24  80:12  94:25
152:4
**TESTIMONY**  3:1
5:1, 12  76:11  80:25
**text**  21:10  22:16
24:18, 20, 22, 23, 24
25:2, 3  27:5  34:18
35:15, 16  60:11, 13
61:7, 21  72:17, 22
89:2
**texts**  61:13
**Thank**  10:8  38:16
41:6  49:10  56:3
74:10  79:3  131:23
136:6  150:18  158:18
**thanked**  18:23
**Thanks**  108:25
**Theoretically**  50:22
**thing**  23:24  24:22
36:3  62:24  132:6
**things**  5:1  11:2
14:8  15:13  17:13
21:6  23:25  32:21
36:16  58:15  80:11
87:18  99:17  119:11

121:17  128:16
148:10
**think**  8:18, 21  9:20
15:6  18:24  19:22, 23
22:18  24:9  27:1, 20
28:24  36:20  38:21
39:22  44:4  63:3
89:12  90:5  91:16, 24
97:8, 13  102:4  110:1
114:11  118:4  119:12
130:1  131:1  134:14,
17, 20  136:1, 3  145:8
146:18  150:1  151:2,
16
**third**  40:18
**thirty**  158:17
**thorough**  114:14
**thought**  25:23  26:23
27:2  34:18  35:13
87:16
**three**  20:10  39:19
51:25  77:24  79:12
94:8, 23  99:12  100:1
128:2, 7  148:23
150:19
**TIME**  1:12  18:14,
24  19:6, 8  20:18, 19,
21, 24  21:5, 7, 12
23:5, 11, 13, 15, 21
24:7, 17, 20  25:10
31:14  32:10, 14, 23
33:13  34:19  36:18
39:2, 12  41:20  47:13,
19  50:4  56:11  57:18,
22, 23  58:4, 7  59:18
61:2  62:2  63:10
67:11  68:4, 5  72:8,
15  73:9, 11, 14, 25
74:12  77:4, 7  78:8, 9,
11, 13, 18, 19  81:23
84:1, 7, 22  85:12, 21
86:6  87:2, 17  91:19
93:9  94:2, 5  98:5
99:25  100:5  105:13
108:20  109:12  110:1
111:3, 16  112:7
115:8, 9  117:5, 7, 14
125:11  128:15  131:1,
13, 18  133:11, 14
134:24  135:2  136:5

137:10, 22  139:4
141:5  145:13  146:8,
19  147:9
**timely**  106:6
**times**  21:3  36:23, 24
57:18  86:10  95:10
104:19  105:22  107:1,
15  110:14  122:23
123:22  124:1
**timing**  137:21  140:3
**tinted**  139:21
**title**  19:5  112:25
**today**  4:17  5:2, 6, 19
6:11, 16  7:17, 20, 21
41:9, 18  80:25
123:16  135:6  146:20
**told**  21:23  32:24
60:19  61:10  62:10,
24  68:17  88:5  91:12
103:17  110:13
111:13, 14  116:12
136:19  141:9  143:1
144:19
**tone**  96:21
**top**  31:23  51:22
52:4, 5  124:24  126:8
137:7, 17
**topic**  73:4
**tops**  129:1
**Tortuous**  89:17
122:16
**toss**  119:13
**totality**  64:3
**totally**  78:3  91:16
150:14
**tour**  70:17
**trained**  114:18
**training**  13:3, 7, 8, 17
14:20  15:3, 4, 22, 23
16:2, 9, 23  58:22, 24
59:1  133:12, 16, 18
**trainings**  16:4
**transcribed**  158:7
**transcript**  3:12
152:25  155:6  156:1,
2, 5  157:4  158:8, 10,
11, 13
**transferred**  52:25
**Transmissions**

122:*16*, *20*, *25*
**transpired** 40:*10*
**transpiring** 81:*22*
**treasure** 125:*5*
**treats** 152:*5*
**tried** 60:*13*, *14*, *15*
88:*4* 93:*16*, *17* 95:*9*,
*18*, *25* 103:*25*
**trip** 21:*8* 24:*25*
34:*17*
**trouble** 34:*15*
**trove** 125:*5*
**true** 92:*19* 117:*16*
155:*7*
**truly** 152:*11*
**Truth** 26:*24* 88:*8*
**try** 20:*12* 27:*22*
84:*18*, *21* 87:*1*, *21*
93:*11* 95:*12* 133:*15*
**trying** 143:*17* 144:*1*,
*6*
**turn** 105:*16*
**turned** 21:*16*
**turning** 101:*3*
**Twenty** 10:*7*, *8*
**twice** 37:*11* 38:*2*
54:*16*
**two** 5:*5* 12:*20* 13:*24*
14:*1* 20:*9* 22:*24*
29:*24* 34:*24* 38:*1*
39:*19* 82:*9*, *11* 86:*10*,
*17* 110:*14* 128:*24*
129:*1* 133:*14* 142:*14*,
*15*, *16* 145:*3* 147:*8*
149:*12*
**type** 23:*24* 85:*19*
102:*5* 107:*20* 136:*20*
**typed** 31:*25*
**types** 10:*23* 51:*25*
86:*4*
**typically** 96:*22*
109:*9*, *13*

**< U >**
**ultimately** 26:*9*
98:*14* 104:*12*
**ums** 5:*7*
**unable** 83:*5*
**unavailability** 83:*12*

**unbecoming** 115:*5*
116:*24* 118:*14*, *16*, *20*,
*21*, *24*, *25* 130:*23*
131:*5*, *9*
**unbeknownst** 53:*13*
**uncommon** 102:*7*, *10*
**underneath** 28:*8*
126:*12* 127:*2*
**undersigned** 154:*4*
**understaffed** 19:*22*
**understand** 5:*1*, *8*
14:*24* 27:*5* 33:*18*
43:*10* 49:*1*, *12* 59:*2*,
*6*, *25* 77:*13* 84:*23*
86:*6* 94:*20* 95:*7*
101:*5* 104:*12* 105:*22*,
*23* 106:*18* 123:*24*
124:*24* 125:*3* 127:*14*
132:*9* 133:*23*
**understanding** 6:*7*
53:*11*, *16* 118:*17*
**Understood** 100:*12*
123:*13* 136:*19*
**unfortunately** 83:*17*
**uniform** 115:*14*
116:*1*
**unintentional** 150:*15*
**union** 44:*1* 45:*20*
52:*14* 128:*19*
**unit** 10:*12* 16:*3*
93:*18* 133:*14*
**UNITED** 1:*1*
**unlawful** 11:*17*
**unsolicited** 61:*7*
**untrue** 120:*13*, *20*
**untruthfulness** 89:*22*,
*23* 120:*10*
**uphold** 128:*19*
**use** 36:*1* 79:*16*
86:*12* 114:*2* 118:*24*
122:*18*, *19*, *22* 125:*4*
137:*13* 146:*3* 158:*8*
**uses** 114:*1*
**usually** 139:*16*
**utilize** 43:*1*

**< V >**
**vacancies** 12:*7*
**vacation** 139:*21*
**vague** 86:*3*

**Valentine's** 3:*16*
28:*4* 30:*15*, *16*
**valid** 107:*6*
**variety** 11:*2*
**various** 8:*14* 11:*12*
13:*14* 14:*7*
**verbal** 51:*23* 64:*17*
65:*1*
**verify** 51:*4*
**version** 89:*18*, *25*
90:*4*, *6*
**view** 128:*13* 152:*7*,
*10*, *17*
**violate** 59:*17* 68:*15*
75:*4*, *6* 83:*3* 121:*12*
**violated** 65:*4* 69:*11*
97:*9*, *21* 98:*6* 116:*16*
119:*12*, *16* 123:*19*, *24*,
*25* 129:*19*
**violating** 54:*9* 56:*15*
98:*22* 99:*1* 116:*20*
120:*4* 131:*2*
**violation** 17:*21* 43:*7*
51:*12* 60:*23* 62:*6*
65:*8* 80:*9* 81:*6* 83:*8*
122:*5* 129:*10* 130:*2*
**violations** 14:*5* 57:*7*
115:*2*
**voicemail** 60:*14*
**vs** 1:*5*

**< W >**
**Wait** 124:*17*
**waiting** 21:*14*
**walk** 138:*24*
**walked** 128:*16*
**walk-in** 13:*13* 128:*9*
**wall** 33:*4*
**want** 5:*22* 6:*5*, *6*
8:*5* 11:*8* 13:*6* 18:*15*
21:*25* 34:*7* 37:*14*, *15*,
*22* 38:*23* 40:*9* 51:*4*
52:*2*, *12* 60:*1* 71:*25*
73:*25* 76:*6* 79:*9*
82:*3*, *13* 84:*20* 91:*17*
105:*6* 109:*13* 117:*6*
119:*13* 126:*4* 134:*15*
137:*4*, *10*, *13* 139:*10*,
*17*

**wanted** 21:*12* 33:*5*
44:*12* 73:*10* 129:*24*
133:*20*
**wants** 91:*6*, *21*, *24*
**warmers** 18:*21*
**warms** 18:*22*
**warning** 51:*23*
126:*20* 127:*7*, *10*
128:*20* 129:*12*
**wasting** 117:*7*
**watch** 11:*1* 60:*9*
106:*4* 117:*4* 139:*14*,
*16*, *19*, *20*
**way** 10:*16* 11:*11*
16:*2* 26:*11* 34:*16*
37:*12* 43:*4*, *10* 55:*16*
56:*1*, *7* 85:*18* 87:*18*
88:*13*, *15* 101:*18*
113:*18* 119:*8* 137:*8*
140:*8* 147:*1*, *4*, *18*
**Wayne** 148:*19*, *20*, *21*,
*22*
**wearing** 115:*14*
116:*1*
**week** 13:*24* 19:*25*
**weeks** 14:*2*
**well** 10:*19* 12:*18*
14:*24* 17:*21* 20:*5*
21:*20* 33:*15* 35:*9*
38:*19* 43:*6* 60:*24*
72:*9*, *19* 76:*1* 79:*8*,
*16* 84:*15* 85:*17* 89:*9*,
*25* 91:*20* 102:*21*
109:*11* 111:*10*
115:*10* 118:*3*, *7*, *18*
119:*12* 124:*17*
129:*22* 131:*4*, *11*
141:*12* 142:*13*
**went** 12:*20* 13:*15*
21:*2*, *4*, *6* 22:*1* 23:*23*,
*25* 69:*8* 124:*2*
133:*10* 134:*11*, *12*
**we're** 4:*25* 19:*22*
27:*20* 41:*8* 50:*11*
52:*2* 55:*25* 73:*2*, *6*
80:*4* 82:*17* 101:*7*
106:*15* 113:*16* 114:*3*,
*6* 116:*11* 124:*7*
129:*6* 148:*18* 153:*4*
**we've** 115:*18* 118:*4*

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**whatsoever**  34:*12*
 78:2
**wide**  11:2
**wife**  135:*18*, *23*
**willful**  103:*5*, *8*, *13*
 104:*6*
**willfully**  103:*5*, *25*
**Wilson**  93:*11*
**winter**  18:*18*
**WITNESS**  4:*11*
 25:22  51:*11*  125:*21*
 153:6  154:6
**witnesses**  47:25
**wit's**  32:*15*
**woke**  21:*23*
**word**  16:*14*  64:*20*
 79:16  85:*16*, *21*
 114:2, *3*
**wording**  88:*1*, *2*
 118:*3*
**words**  36:2
**work**  13:*15*  17:22
 19:*16*, *19*, *24*  20:*20*,
 *21*, *25*  21:4  37:*12*, *14*,
 *22*, *24*  38:2  56:7
 65:19  67:10  68:*11*
 69:8, *9*  83:2  90:*23*
 95:*1*, *6*  96:12  98:*20*
 99:20, *21*  102:22
 121:*4*, *7*, *14*, *20*
 135:*21*  140:*21*  141:6
 151:*21*
**worked**  12:*21*  13:9
 20:*3*, *5*, *6*  26:*11*  36:8,
 *22*  102:*17*
**working**  11:*21*  12:22
 18:*13*  20:*11*, *19*
 38:*21*  65:19  68:*11*
 70:*17*  80:*13*, *21*  81:2,
 *11*, *13*  83:*9*, *11*
 101:*16*, *20*  119:*24*
 121:6, *19*  122:*3*, *9*
 128:*1*  133:9
**workplace**  15:*25*
**works**  10:*16*  16:2
 37:*12*  82:4  152:2
**worries**  39:*1*
**write**  13:*14*  17:*13*
 27:8  31:*21*  52:*13*, *19*

53:24  57:*19*  93:4
 116:*16*  128:*18*  156:*1*
**write-up**  42:*21*, *22*
 44:*11*, *14*  46:5
**writing**  31:*17*  33:4
 57:6  80:*15*
**written**  42:20  51:23
 52:*11*  58:5  64:*17*
 65:*1*  81:*16*, *20*
 118:*21*  119:8  123:*17*,
 *18*  126:20  127:7, *10*
 128:20  129:*12*
**wrong**  81:*1*  133:*10*
 139:*14*
**wrote**  30:7  31:*19*
 42:*14*  53:4  57:23
 58:7  64:25  81:8
 97:9, *14*  98:*15*
 116:*10*  128:*17*
 146:*19*  147:9

**< X >**
**Xs**  28:*9*

**< Y >**
**Yeah**  8:*13*  19:*13*
 21:2  22:8  24:*18*
 29:4  31:*13*  32:*14*
 36:*14*  41:*15*  49:9
 54:24  59:6  64:*12*
 65:*14*  66:6  71:*24*
 73:24  84:*12*, *19*
 85:*10*  86:9  87:*11*
 89:*12*, *20*  90:*12*
 99:*23*  113:*9*, *21*
 114:*11*  115:*21*
 120:*11*  124:*1*, *10*
 125:*15*  128:7  131:4
 135:4  137:*1*, *6*  138:*1*
 139:*19*  148:22  150:*3*,
 *11*  153:4
**year**  18:*4*, *25*  23:*12*
 37:*11*  38:2  134:*17*
**years**  4:*24*  15:*7*, *12*
 34:22  36:9  38:*1*
 58:*11*, *14*  107:*24*
 127:*15*  134:7  148:*12*
**yes-or-no**  54:*14*

**< Z >**
**Zapata**  138:22
**Zero**  126:22  127:8
**zone**  12:*5*  20:*12*
 36:22  37:*14*, *21*  38:*6*,
 *18*  67:*23*  75:*8*, *9*, *17*
 76:22  77:5  79:*18*
 90:*18*, *19*, *23*  92:*8*, *11*,
 *12*  98:*12*, *14*  99:*15*
 102:*15*, *17*  106:*4*, *11*,
 *12*, *14*, *22*  120:*7*
 145:*20*
**zones**  12:*3*, *4*  38:*8*
**Zoo**  21:*4*
**Zoom**  1:*13*  2:*5*, *10*
 4:25  5:5  44:2

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

### WORD LIST

**< 0 >**
**001471** *(1)*
**001591** *(1)*
**05** *(3)*

**< 1 >**
**1** *(8)*
**1/8/21** *(2)*
**1:00** *(2)*
**1:02** *(1)*
**10** *(2)*
**10:43** *(2)*
**1000** *(1)*
**108** *(1)*
**111** *(1)*
**112** *(6)*
**12/28/20** *(1)*
**12:00** *(1)*
**12:11** *(1)*
**12:34** *(1)*
**12:35** *(2)*
**1212** *(2)*
**13** *(2)*
**137** *(1)*
**14** *(2)*
**14th** *(1)*
**15.16** *(1)*
**1519** *(2)*
**154** *(1)*
**155** *(1)*
**156** *(1)*
**157** *(1)*
**16th** *(2)*
**17** *(1)*
**170** *(1)*
**17th** *(3)*
**18** *(1)*
**1991** *(1)*
**1994** *(2)*
**1996** *(1)*
**1998** *(1)*
**1st** *(1)*

**< 2 >**
**2** *(4)*
**20** *(3)*
**2008** *(3)*

**2011** *(10)*
**2013** *(3)*
**2014** *(14)*
**2015** *(10)*
**2018** *(4)*
**2020** *(29)*
**2021** *(8)*
**2022** *(7)*
**2024** *(6)*
**21** *(4)*
**215** *(1)*
**21st** *(1)*
**22** *(5)*
**2200** *(1)*
**22-cv-21004-DPG** *(1)*
**24** *(2)*
**25** *(1)*
**25th** *(6)*
**27** *(1)*
**278990** *(1)*
**27th** *(6)*
**28th** *(10)*

**< 3 >**
**3** *(27)*
**3.8.2** *(17)*
**3:45** *(1)*
**3:47** *(2)*
**3:55** *(18)*
**3:59** *(1)*
**30** *(10)*
**305** *(1)*
**33131** *(1)*
**33304** *(2)*
**34** *(1)*
**341-3616** *(1)*
**39** *(1)*

**< 4 >**
**4** *(11)*
**4:04** *(2)*
**4:23** *(2)*
**40** *(2)*
**401-2608** *(1)*
**45** *(1)*
**46** *(1)*
**49** *(4)*
**4th** *(3)*

**< 5 >**
**5** *(4)*
**5/17/2024** *(1)*
**5:21** *(3)*
**5:36** *(2)*
**5:42** *(4)*
**5:43** *(1)*
**5:59** *(1)*
**520** *(1)*
**55** *(1)*

**< 6 >**
**6** *(7)*
**6.15.1** *(6)*
**6.15.6** *(6)*
**6.15.9** *(7)*
**6.20** *(2)*
**6.28** *(2)*
**6.28.3(10** *(1)*
**6.28.3.10** *(3)*
**6.28.3.20** *(3)*
**6.28.3.34** *(2)*
**6.28.3.5** *(5)*
**6.28.3.6** *(4)*
**6.28.36** *(5)*
**6.34.1** *(3)*
**6.39.1** *(6)*
**6.40.1** *(6)*
**6.43.1** *(1)*
**6.5.4** *(5)*
**6/21/2026** *(1)*
**6:15** *(1)*
**62** *(1)*
**640.1** *(1)*
**65** *(2)*
**66** *(1)*

**< 7 >**
**7** *(4)*
**70** *(2)*
**71** *(1)*
**73rd** *(1)*
**75** *(1)*
**75th** *(1)*

**< 8 >**
**8** *(10)*
**80** *(1)*
**893.2** *(1)*

**893.356(s)(a** *(1)*
**8th** *(2)*

**< 9 >**
**9** *(8)*
**946-1884** *(1)*
**954** *(1)*
**96** *(1)*
**97** *(1)*

**< A >**
**A.J** *(18)*
**a.m** *(24)*
**AAF** *(20)*
**abide** *(1)*
**ability** *(2)*
**able** *(8)*
**above-styled** *(1)*
**absence** *(4)*
**Absolutely** *(1)*
**academies** *(1)*
**Academy** *(6)*
**acceptable** *(1)*
**accepted** *(2)*
**access** *(2)*
**accident** *(1)*
**accountability** *(1)*
**accuracy** *(1)*
**accurate** *(5)*
**accusations** *(1)*
**accused** *(2)*
**acknowledgement** *(1)*
**Action** *(42)*
**actions** *(8)*
**Activity** *(1)*
**Acts** *(1)*
**addition** *(1)*
**additional** *(2)*
**Additionally** *(2)*
**address** *(3)*
**addressing** *(1)*
**adequate** *(1)*
**adhere** *(3)*
**adjacent** *(1)*
**administration** *(1)*
**Administrative** *(47)*
**admit** *(1)*
**adult** *(1)*
**advance** *(1)*

Case 1:22-cv-21004-MD   Document 69-6   Entered on FLSD Docket 06/03/2024   Page 71 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

advances *(2)*
advise *(1)*
advised *(6)*
advising *(5)*
AFF *(2)*
Affairs *(30)*
Affirmative *(1)*
affirmatively *(2)*
afternoon *(3)*
age *(1)*
agencies *(1)*
agency *(5)*
ago *(4)*
agree *(5)*
agreed *(3)*
Agreement *(18)*
agreements *(1)*
ahead *(1)*
ahold *(5)*
ahs *(1)*
air *(1)*
al *(3)*
alcoves *(1)*
alert *(2)*
Allegation *(14)*
allegations *(5)*
alleged *(2)*
allegedly *(3)*
alleges *(1)*
alleging *(3)*
allow *(6)*
allowed *(2)*
alongside *(2)*
alternate *(1)*
ambiguous *(1)*
AMENDMENT *(1)*
amendments *(1)*
amount *(3)*
analysis *(2)*
announce *(1)*
annual *(2)*
answer *(73)*
answered *(8)*
answering *(3)*
answers *(3)*
anybody *(10)*
anyway *(1)*
apart *(2)*
apartment *(4)*

apologize *(4)*
apparently *(1)*
appear *(10)*
appearance *(2)*
APPEARANCES *(1)*
appeared *(6)*
appears *(3)*
applicable *(2)*
application *(1)*
applied *(1)*
applies *(1)*
apply *(6)*
APPOINTMENT *(2)*
appreciate *(1)*
appropriate *(2)*
appropriately *(1)*
approximately *(6)*
April *(3)*
archived *(2)*
archives *(1)*
area *(44)*
areas *(8)*
argued *(1)*
arguments *(2)*
arrests *(1)*
Asked *(41)*
asking *(31)*
asleep *(1)*
aspect *(3)*
aspects *(1)*
assess *(2)*
assessing *(1)*
assessment *(1)*
assign *(13)*
assigned *(30)*
assigning *(1)*
assignment *(10)*
assignments *(30)*
assistance *(4)*
assume *(1)*
assuming *(1)*
attached *(2)*
attempt *(3)*
attempts *(1)*
attend *(3)*
attendance *(1)*
attended *(2)*
attending *(2)*
attention *(2)*

attentive *(1)*
attorney *(9)*
Attorney-client *(2)*
attracted *(1)*
audible *(2)*
August *(11)*
authored *(3)*
authorities *(1)*
authority *(5)*
authorized *(4)*
automatically *(1)*
available *(3)*
Avenue *(1)*
AVL *(3)*
avoid *(3)*
aware *(30)*

< B >
babydoll *(1)*
back *(44)*
backtrack *(1)*
bad *(1)*
ball *(2)*
bar *(1)*
barbiturates *(1)*
BARROUKH *(237)*
base *(1)*
based *(15)*
bases *(1)*
basically *(8)*
basics *(1)*
basing *(1)*
basis *(7)*
Bates *(2)*
bathroom *(1)*
batteries *(1)*
battery *(1)*
BEACH *(24)*
Bear *(3)*
becoming *(1)*
began *(4)*
beginning *(3)*
BEHALF *(2)*
behavior *(3)*
belief *(1)*
believe *(67)*
believed *(1)*
beneath *(2)*
beneficial *(1)*

benefit *(1)*
best *(3)*
betrayed *(2)*
better *(3)*
beyond *(2)*
bid *(2)*
bids *(1)*
big *(3)*
bigger *(1)*
Bill *(5)*
bind *(1)*
binding *(1)*
birthday *(2)*
bit *(9)*
block *(2)*
blunt *(1)*
bodies *(2)*
bold *(3)*
book *(2)*
borders *(1)*
bother *(1)*
bothering *(1)*
bottom *(5)*
box *(1)*
boyfriend *(1)*
break *(9)*
breakfast *(1)*
Brickell *(1)*
bringing *(1)*
brings *(4)*
broadcast *(1)*
broadcasting *(1)*
brought *(1)*
Broward *(2)*
Brown *(1)*
buddy *(1)*
building *(3)*
business *(5)*
businesses *(1)*
busy *(1)*

< C >
C.B *(1)*
cabin *(1)*
calculate *(1)*
call *(25)*
called *(3)*
calling *(2)*
calls *(11)*

camera  *(3)*
cameras  *(1)*
capability  *(1)*
capacity  *(3)*
captain  *(4)*
captured  *(1)*
car  *(7)*
Card  *(27)*
cards  *(5)*
care  *(7)*
career  *(2)*
Carley  *(1)*
Carvajal  *(9)*
carve  *(3)*
CASE  *(10)*
catalyst  *(1)*
catching  *(2)*
category  *(1)*
caught  *(1)*
cause  *(1)*
cc  *(1)*
cc'd  *(1)*
cellular  *(1)*
center  *(1)*
central  *(1)*
CERTIFICATE  *(4)*
certify  *(3)*
chain  *(1)*
challenge  *(2)*
Chance  *(20)*
change  *(3)*
changed  *(4)*
CHANGES  *(1)*
changes/corrections
 *(1)*
channel  *(1)*
Chapter  *(1)*
charge  *(15)*
charged  *(2)*
charges  *(1)*
charging  *(1)*
cheating  *(1)*
check  *(7)*
Chief  *(31)*
chiefs  *(2)*
chief's  *(2)*
children  *(1)*
chili  *(1)*
chock  *(1)*

chocolate  *(2)*
choice  *(3)*
choose  *(1)*
chose  *(2)*
chosen  *(1)*
circumstances  *(3)*
citations  *(1)*
cite  *(3)*
cited  *(3)*
citing  *(1)*
citizen  *(1)*
CITY  *(16)*
city's  *(1)*
civil  *(1)*
civilian  *(1)*
claim  *(6)*
claimed  *(2)*
claiming  *(1)*
claims  *(1)*
clarification  *(2)*
clarified  *(1)*
clarify  *(1)*
class  *(3)*
classes  *(1)*
clear  *(6)*
clearly  *(4)*
Clements  *(16)*
client  *(24)*
close  *(1)*
closed  *(5)*
closing  *(1)*
Coates  *(2)*
code  *(1)*
codes  *(1)*
cognizant  *(1)*
coinciding  *(1)*
cold  *(2)*
Collins  *(2)*
come  *(7)*
comes  *(4)*
command  *(2)*
commander  *(1)*
commencing  *(1)*
commenting  *(1)*
comments  *(1)*
Commission  *(2)*
commits  *(1)*
committing  *(1)*
common  *(1)*

communicate  *(4)*
communicated  *(5)*
communicating  *(7)*
communication  *(9)*
communications  *(1)*
complain  *(4)*
complained  *(2)*
complaint  *(11)*
complaints  *(2)*
complete  *(6)*
completed  *(6)*
completely  *(2)*
completion  *(1)*
complicated  *(1)*
component  *(2)*
compound  *(1)*
computer  *(1)*
concern  *(5)*
concerned  *(2)*
concerning  *(1)*
conditions  *(1)*
conduct  *(24)*
conducting  *(2)*
conference  *(3)*
confirm  *(7)*
conflicted  *(1)*
confused  *(2)*
confusing  *(1)*
connected  *(1)*
connotation  *(1)*
considered  *(1)*
considering  *(3)*
consistent  *(1)*
constitute  *(1)*
constituted  *(2)*
constitutes  *(1)*
consulted  *(1)*
contact  *(7)*
contacted  *(5)*
contacting  *(1)*
contained  *(1)*
content  *(1)*
contents  *(1)*
context  *(5)*
continue  *(22)*
continued  *(1)*
continuing  *(1)*
continuously  *(1)*
control  *(1)*

controlled  *(1)*
conversation  *(15)*
conversations  *(2)*
conveyed  *(2)*
co-officers  *(1)*
cook-off  *(1)*
coordinate  *(1)*
copy  *(9)*
correct  *(177)*
corrected  *(1)*
CORRECTIONS  *(2)*
corrections/changes
 *(1)*
correlate  *(1)*
correspond  *(1)*
correspondingly  *(1)*
corridor  *(1)*
COSNER  *(27)*
Cosner's  *(1)*
counsel  *(6)*
counted  *(1)*
County  *(5)*
couple  *(5)*
course  *(9)*
courses  *(8)*
COURT  *(24)*
courtesy  *(1)*
COVER  *(7)*
covered  *(3)*
cream  *(1)*
cross  *(1)*
Cross-Examination
 *(2)*
culminated  *(1)*
current  *(1)*
currently  *(4)*
cutting  *(1)*

< D >
D2011-045  *(1)*
D2011-132  *(1)*
Daily  *(1)*
DAL  *(1)*
Dan  *(1)*
DANIEL  *(7)*
danielb@dereksmithla
w.com  *(2)*
DATE  *(15)*
dated  *(3)*

dates  (1)
dating  (2)
Day  (16)
day-by-day  (1)
days  (10)
day-to-day  (1)
dead  (1)
dealing  (1)
Dear  (1)
deceive  (3)
deceiving  (1)
December  (22)
decide  (1)
decided  (4)
decides  (1)
deciding  (1)
decision  (5)
decision-making  (1)
decisions  (2)
deep  (1)
defend  (2)
Defendants  (2)
defined  (1)
definitely  (3)
Definition  (2)
delay  (1)
deliberate  (4)
deliberately  (2)
delivered  (3)
Delvin  (1)
demonstrating  (1)
denied  (1)
denies  (1)
deny  (4)
Department  (54)
departmental  (1)
departments  (1)
Department's  (5)
depend  (1)
depended  (1)
depending  (1)
depends  (1)
depo  (1)
Deponent  (2)
depos  (1)
deposed  (1)
DEPOSITION  (18)
Deputy  (1)
Derek  (1)

Describe  (1)
described  (1)
desire  (2)
desk  (4)
desks  (1)
detail  (18)
details  (27)
detention  (1)
determine  (2)
difference  (1)
different  (9)
dig  (1)
digital  (1)
dinner  (1)
Dionne  (3)
Direct  (8)
directed  (3)
direction  (5)
directive  (1)
directives  (4)
directly  (2)
disagree  (4)
disagreements  (1)
disciplinary  (9)
discipline  (29)
disciplining  (1)
disclose  (1)
discovered  (1)
discovery  (2)
discrimination  (9)
discuss  (4)
discussed  (13)
discussing  (3)
discussion  (4)
discussions  (2)
disgraceful  (10)
Dispatch  (1)
dispatched  (2)
dispatcher  (2)
disputes  (1)
disrespectful  (1)
dissolution  (1)
dissolved  (2)
dissolving  (1)
distinction  (1)
DISTRIBUTE  (1)
DISTRICT  (4)
divided  (1)
division  (2)

divorce  (3)
document  (33)
documentation  (3)
documented  (2)
documenting  (1)
documents  (23)
doing  (12)
dole  (1)
Dominican  (1)
doors  (1)
double  (1)
Dr  (1)
draft  (4)
Drive  (2)
driving  (2)
drove  (8)
DRR  (30)
DRRs  (20)
due  (1)
duly  (2)
duration  (3)
duties  (30)
Duty  (23)

< E >
earlier  (8)
earliest  (1)
early  (7)
easier  (1)
edition  (1)
education  (2)
EEOC  (8)
effect  (4)
effectively  (1)
effects  (1)
efficiency  (3)
effort  (4)
either  (4)
elevated  (1)
ELKINS  (238)
E-mail  (95)
e-mailed  (6)
e-mailing  (1)
e-mails  (15)
embarrassing  (1)
embracing  (1)
employed  (4)
Employee  (16)
employees  (14)

employee's  (3)
employment  (2)
encounter  (1)
encounters  (1)
endearment  (1)
ended  (6)
enforcement  (4)
English  (2)
entail  (1)
enter  (2)
entered  (3)
entire  (2)
entirely  (2)
entirety  (2)
entitled  (1)
environment  (1)
equally  (1)
equipment  (2)
ERRATA  (5)
error  (5)
ESQUIRE  (4)
essentially  (4)
established  (5)
estimate  (1)
et  (3)
ethic  (1)
ethics  (2)
evaluation  (3)
evaluations  (4)
evening  (1)
event  (3)
eventually  (3)
everybody  (3)
ex  (2)
exact  (4)
Exactly  (4)
Examination  (2)
examined  (1)
example  (5)
examples  (3)
excessive  (2)
exclamation  (1)
exclusive  (1)
exclusivity  (2)
Excuse  (6)
execute  (3)
exemplify  (1)
Exhibit  (42)
Exhibits  (2)

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

exist  *(2)*
exonerated  *(4)*
expect  *(1)*
expected  *(1)*
expedited  *(1)*
experience  *(1)*
experienced  *(1)*
Expires  *(1)*
explain  *(11)*
explained  *(4)*
explaining  *(1)*
explanation  *(2)*
expose  *(1)*
expound  *(7)*
expressed  *(3)*
expressing  *(1)*
expressly  *(1)*
extended  *(1)*
extensive  *(1)*
extensively  *(4)*
extra  *(2)*
extreme  *(2)*
ex-wife  *(3)*
eyes  *(4)*

< F >
fact  *(7)*
factor  *(1)*
factors  *(3)*
facts  *(1)*
factual  *(1)*
faded  *(1)*
fading  *(1)*
fail  *(5)*
failed  *(27)*
failing  *(1)*
fails  *(1)*
failure  *(9)*
failures  *(1)*
fair  *(14)*
faithfully  *(2)*
fall  *(1)*
fallen  *(1)*
falls  *(1)*
false  *(4)*
familiar  *(8)*
family  *(2)*
far  *(4)*
farther  *(1)*

faulty  *(3)*
February  *(5)*
fed  *(3)*
feel  *(8)*
feeling  *(2)*
feelings  *(5)*
feet  *(2)*
fell  *(1)*
felt  *(7)*
female  *(1)*
FERNANDEZ  *(9)*
field  *(7)*
file  *(3)*
filed  *(12)*
filing  *(1)*
fill  *(6)*
filled  *(4)*
finalized  *(2)*
finally  *(4)*
financially  *(1)*
find  *(5)*
finder  *(1)*
finding  *(1)*
finds  *(1)*
fine  *(14)*
finger  *(1)*
finish  *(3)*
fired  *(1)*
firing  *(1)*
first  *(25)*
fits  *(1)*
five  *(8)*
FL  *(3)*
Flaherty  *(1)*
flirtatious  *(3)*
FLORIDA  *(11)*
flowers  *(1)*
focus  *(1)*
focusing  *(1)*
follow  *(4)*
following  *(4)*
follows  *(1)*
fonts  *(1)*
force  *(3)*
foregoing  *(2)*
forgetting  *(1)*
forgot  *(6)*
Form  *(179)*
formal  *(6)*

formally  *(1)*
formerly  *(2)*
forms  *(11)*
Fort  *(3)*
forth  *(7)*
forward  *(6)*
forwarded  *(9)*
forwarding  *(1)*
fought  *(1)*
found  *(2)*
four  *(18)*
frame  *(2)*
free  *(1)*
frequently  *(2)*
friend  *(4)*
friendly  *(2)*
friends  *(3)*
friendship  *(1)*
front  *(4)*
frustrated  *(3)*
FSS  *(2)*
fulfilling  *(1)*
full  *(5)*
functions  *(1)*
funny  *(2)*
further  *(10)*

< G >
game  *(1)*
Garden  *(1)*
general  *(3)*
generally  *(3)*
generic  *(1)*
gentleman  *(1)*
geographic  *(1)*
Georgia  *(2)*
getting  *(6)*
girlfriend  *(1)*
girlfriends  *(1)*
give  *(33)*
given  *(7)*
gives  *(1)*
giving  *(2)*
glimpsed  *(1)*
go  *(62)*
goals  *(2)*
goes  *(5)*
going  *(104)*
Good  *(6)*

gotten  *(1)*
grandparents  *(3)*
Great  *(2)*
greeting  *(1)*
grieve  *(1)*
ground  *(1)*
Group  *(2)*
GUASTO  *(4)*
guess  *(5)*
guidance  *(1)*
guilty  *(5)*
guys  *(8)*
gym  *(1)*

< H >
half  *(5)*
hallway  *(1)*
halted  *(1)*
hand  *(3)*
handed  *(1)*
hand-in-hand  *(1)*
handle  *(9)*
handled  *(2)*
handling  *(4)*
hands  *(1)*
happen  *(5)*
happened  *(13)*
happening  *(2)*
happens  *(5)*
happily  *(1)*
happy  *(6)*
harassing  *(2)*
harassment  *(22)*
hard  *(2)*
hate  *(1)*
head  *(4)*
headquarters  *(12)*
hear  *(5)*
heard  *(8)*
hearing  *(1)*
heart  *(2)*
held  *(1)*
he'll  *(1)*
hello  *(2)*
helped  *(2)*
hereto  *(1)*
hey  *(3)*
HH  *(1)*
Hialeah  *(2)*

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

higher *(2)*
highlighted *(3)*
highlighting *(2)*
**HILLSBOROUGH** *(2)*
him/her *(1)*
hire *(1)*
hired *(1)*
hiring *(3)*
Hispanic *(1)*
history *(1)*
Hold *(13)*
home *(5)*
homeless *(2)*
honestly *(5)*
hope *(1)*
host *(1)*
hour *(7)*
hours *(44)*
house *(7)*
HR *(2)*
humorous *(1)*
hump *(1)*
hundred *(3)*
hundreds *(1)*
hurt *(3)*

< I >
IA *(2)*
idea *(2)*
identical *(1)*
identification *(9)*
ignoring *(1)*
ill *(2)*
illegal *(1)*
impact *(4)*
impertinent *(1)*
implement *(2)*
implemented *(1)*
implicated *(1)*
implicating *(2)*
implication *(3)*
important *(2)*
improper *(5)*
inaccurate *(1)*
inattentive *(1)*
incident *(6)*
include *(2)*
included *(3)*

includes *(1)*
including *(1)*
incorrect *(3)*
independent *(2)*
independently *(4)*
indicate *(1)*
indicated *(3)*
indicating *(2)*
individual *(4)*
individuals *(4)*
influence *(2)*
inform *(2)*
information *(6)*
informed *(2)*
initial *(1)*
initially *(1)*
initiate *(1)*
initiated *(1)*
initiating *(1)*
input *(1)*
inside *(1)*
insisting *(1)*
instances *(2)*
instill *(2)*
instilling *(1)*
instruct *(1)*
instructed *(2)*
instructions *(4)*
insubordinate *(1)*
insubordination *(13)*
Integrity *(3)*
intended *(3)*
intention *(1)*
intentionally *(5)*
interact *(1)*
interaction *(1)*
interested *(2)*
interesting *(1)*
interfering *(1)*
Internal *(33)*
interpret *(2)*
interpretation *(1)*
interpretations *(1)*
interpreted *(1)*
interpreting *(2)*
interrupt *(3)*
interviewed *(1)*
intimate *(18)*
intoxicants *(2)*

intoxicated *(2)*
introduce *(3)*
investigate *(2)*
investigation *(9)*
investigator *(1)*
involved *(13)*
involves *(1)*
involving *(2)*
irrelevant *(1)*
issue *(18)*
issued *(5)*
issues *(9)*
issuing *(2)*
items *(1)*
its *(1)*

< J >
jacket *(1)*
January *(10)*
jeopardize *(1)*
JESSICA *(129)*
Jessica's *(7)*
job *(1)*
jobs *(1)*
joked *(1)*
joking *(1)*
Jones *(2)*
judge *(1)*
jumped *(1)*
June *(2)*
junior *(1)*

< K >
keep *(7)*
kept *(1)*
Key *(1)*
kicked *(1)*
kicking *(1)*
kind *(15)*
knew *(5)*
know *(71)*
knowingly *(2)*
knowledge *(10)*
known *(1)*

< L >
Lack *(1)*
ladder *(2)*
landline *(1)*

language *(2)*
Large *(1)*
lastly *(1)*
late *(9)*
Lauderdale *(3)*
laughed *(1)*
laundry *(1)*
Law *(6)*
lawful *(9)*
laws *(1)*
lawsuit *(1)*
lawyer *(1)*
lead *(1)*
leadership *(4)*
leading *(3)*
learn *(2)*
leave *(1)*
leaving *(2)*
led *(2)*
left *(12)*
legal *(1)*
legally *(1)*
legs *(1)*
Lester *(1)*
letter *(3)*
level *(4)*
LEWIS *(1)*
lie *(2)*
lied *(1)*
lies *(3)*
lieutenant *(42)*
lieutenants *(5)*
life *(2)*
lightly *(1)*
limit *(3)*
limitations *(1)*
line *(16)*
L-I-N-E *(1)*
list *(4)*
Listen *(2)*
litter *(1)*
little *(11)*
location *(5)*
locations *(1)*
Log *(1)*
loitering *(1)*
long *(21)*
longer *(3)*
look *(9)*

Case 1:22-cv-21004-MD    Document 69-6    Entered on FLSD Docket 06/03/2024    Page 76 of 223

Deposition of Steve Cosner                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

looked  (3)
looking  (8)
looks  (4)
losing  (1)
lot  (8)
love  (7)
loved  (3)
low  (1)
lunch  (9)
lying  (2)

< M >
main  (2)
maintaining  (1)
major  (1)
majority  (1)
maker  (4)
making  (3)
male  (1)
manner  (3)
manual  (2)
March  (2)
mark  (6)
marked  (12)
marking  (3)
marks  (1)
married  (2)
Martin  (1)
Martinez  (5)
match  (1)
material  (1)
matter  (5)
mean  (24)
meaning  (3)
means  (8)
meant  (3)
media  (1)
medication  (1)
meet  (2)
meeting  (19)
meetings  (1)
MELISSA  (9)
melkins@mlelawfirm.com  (2)
memory  (1)
mentioned  (3)
mentioning  (1)
message  (3)
messager  (1)

messages  (6)
messaging  (2)
met  (5)
Metro  (1)
MIAMI  (21)
Miami-Dade  (1)
MICHAEL  (22)
mid  (5)
middle  (2)
midnight  (7)
midnights  (2)
Mike  (1)
mine  (2)
mini  (1)
minimum  (3)
minute  (8)
minutes  (31)
Misconduct  (9)
missed  (2)
missing  (2)
Mission  (1)
Misstates  (5)
mistake  (5)
misunderstood  (1)
MLE  (2)
moment  (4)
Monday  (1)
monitor  (2)
month  (2)
months  (4)
monthslong  (1)
morning  (6)
motion  (1)
mouse  (1)
move  (15)
moved  (2)
moving  (6)
multiple  (6)
municipality  (1)
mutual  (4)

< N >
name  (8)
names  (7)
narcotics  (2)
narrative  (4)
nature  (4)
nearly  (1)
necessarily  (1)

necessary  (6)
necessity  (1)
need  (33)
needed  (5)
needs  (4)
nefarious  (1)
negate  (1)
neglect  (2)
neglecting  (1)
negotiations  (1)
nervous  (1)
NESS  (1)
never  (28)
new  (6)
newer  (1)
nickname  (1)
night  (21)
nine  (2)
nods  (1)
non-police  (1)
nonstop  (1)
normal  (6)
normally  (2)
north  (6)
Northeast  (2)
northern  (1)
Notary  (2)
notation  (1)
Note  (9)
notes  (4)
notice  (1)
noticed  (2)
noticing  (1)
notify  (2)
November  (2)
nuance  (1)
numb  (1)
number  (9)
numbers  (2)
nuts  (1)

< O >
O-301  (1)
Oates  (1)
OATH  (3)
oats  (1)
obey  (9)
object  (5)
objected  (3)

objecting  (2)
Objection  (147)
objections  (3)
objectives  (2)
obligation  (2)
observations  (4)
observe  (3)
observed  (1)
observing  (1)
obtain  (1)
obvious  (1)
obviously  (5)
occasion  (3)
occasionally  (3)
occasions  (1)
occurrence  (1)
occurring  (1)
Ocejo  (1)
October  (2)
odds  (1)
offered  (2)
office  (10)
officer  (40)
officers  (79)
officer's  (3)
offices  (1)
official  (1)
officials  (1)
off-the-record  (1)
oh  (4)
Okay  (134)
old  (2)
older  (1)
Olive  (1)
once  (7)
one-on-one  (2)
ones  (5)
ongoing  (1)
online  (3)
open  (2)
opening  (1)
operates  (1)
operating  (6)
opinion  (4)
opportunity  (1)
oppose  (4)
opposed  (3)
opposing  (2)
OPTION  (2)

Options *(1)*
order *(15)*
ordered *(12)*
ordering *(2)*
orders *(9)*
organized *(1)*
original *(6)*
Os *(1)*
Otero *(1)*
outside *(13)*
oversight *(1)*
overtime *(8)*
Ozaeta *(2)*

< P >
p.m *(3)*
PAGE *(15)*
pages *(2)*
paraphrasing *(1)*
parents *(2)*
Park *(1)*
parked *(2)*
part *(9)*
particular *(11)*
parties *(3)*
patrol *(9)*
patrolling *(1)*
Paul *(4)*
PD *(2)*
Pembroke *(1)*
pen *(1)*
pending *(1)*
people *(13)*
perception *(1)*
perforations *(1)*
perform *(3)*
performance *(12)*
performed *(2)*
period *(5)*
permitted *(1)*
permitting *(1)*
person *(5)*
personal *(6)*
personally *(1)*
person's *(2)*
perspective *(1)*
phone *(13)*
physical *(1)*
physically *(3)*

pick *(6)*
picked *(1)*
picking *(2)*
pictures *(1)*
pieces *(1)*
Pines *(1)*
PLACE *(5)*
placed *(3)*
Plaintiff *(3)*
Plaintiffs *(1)*
Plaintiff's *(18)*
platform *(1)*
platforms *(1)*
playing *(1)*
please *(43)*
plenty *(1)*
PLLC *(1)*
plus *(1)*
point *(29)*
Police *(46)*
policies *(9)*
policy *(8)*
pool *(1)*
portion *(3)*
position *(7)*
positive *(3)*
possession *(2)*
possible *(11)*
possibly *(1)*
posting *(1)*
potential *(1)*
potentially *(2)*
pouches *(1)*
power *(2)*
predicate *(1)*
prefer *(1)*
prepare *(1)*
prescription *(1)*
presence *(2)*
present *(5)*
presented *(1)*
president *(1)*
prevent *(3)*
preventing *(1)*
prevention *(1)*
previous *(1)*
previously *(6)*
Prieto *(15)*
primary *(3)*

princess *(1)*
printed *(2)*
prior *(34)*
privilege *(2)*
Privileged *(1)*
probably *(22)*
problem *(4)*
procedure *(2)*
procedures *(12)*
proceeded *(1)*
process *(7)*
produce *(2)*
produced *(8)*
production *(1)*
professional *(3)*
profile *(1)*
program *(4)*
promoted *(2)*
promotion *(1)*
promptly *(1)*
proper *(8)*
properly *(2)*
property *(1)*
propounded *(1)*
protect *(1)*
protocol *(1)*
protocols *(1)*
provide *(8)*
provided *(12)*
provides *(1)*
providing *(1)*
Public *(5)*
pull *(10)*
pulled *(2)*
pulling *(1)*
purpose *(1)*
purposes *(3)*
pursuant *(2)*
pursue *(1)*
Pursuit *(1)*
put *(7)*

< Q >
qualities *(1)*
quarter *(1)*
question *(30)*
questioned *(9)*
questioning *(3)*
questions *(14)*

quick *(1)*
quicker *(1)*
quickly *(2)*
quite *(2)*

< R >
Rabelo *(7)*
radio *(33)*
radios *(3)*
raise *(2)*
raised *(4)*
raising *(2)*
rank *(1)*
rarely *(1)*
Ray *(3)*
reaching *(3)*
READ *(41)*
reading *(3)*
ready *(3)*
real *(1)*
reality *(2)*
realized *(1)*
realizing *(1)*
really *(10)*
reason *(9)*
reasonable *(5)*
reasons *(3)*
recall *(35)*
receive *(7)*
received *(9)*
recess *(6)*
recite *(1)*
recollection *(4)*
record *(15)*
records *(2)*
redirect *(1)*
refer *(1)*
reference *(3)*
referring *(8)*
refresh *(1)*
refusal *(1)*
refuse *(2)*
refused *(1)*
regard *(1)*
regarding *(10)*
regardless *(1)*
Reggie *(1)*
regretting *(1)*
regular *(2)*

regulation  (7)
Regulations  (15)
reiterate  (1)
related  (3)
relating  (2)
relationship  (26)
relative  (2)
relevant  (1)
remain  (2)
remarks  (1)
remarried  (1)
remember  (28)
remotely  (2)
removed  (2)
repeat  (2)
repeatedly  (1)
rephrase  (1)
report  (19)
REPORTED  (4)
REPORTER  (12)
REPORTER'S  (1)
Reports  (9)
represent  (1)
representation  (1)
reprimand  (3)
request  (2)
requested  (1)
requestion  (1)
requests  (1)
required  (2)
requirement  (2)
requires  (1)
reserved  (1)
reshare  (1)
resign  (1)
resignation  (5)
resigned  (2)
Resistance  (1)
resource  (1)
respect  (1)
respectfully  (1)
respective  (1)
respond  (9)
responded  (3)
Responding  (4)
Response  (11)
responsibilities  (10)
responsibility  (4)
responsible  (4)

rest  (1)
result  (6)
resume  (2)
retaliation  (6)
retired  (1)
return  (2)
returned  (2)
review  (16)
reviewed  (12)
reviewing  (3)
revised  (3)
Reword  (1)
ridicule  (1)
ridiculing  (2)
right  (147)
Rights  (5)
ring  (1)
Robin  (1)
role  (3)
roles  (1)
roll  (1)
rolling  (2)
romantic  (4)
romantically  (1)
Romero  (14)
room  (5)
Rosa  (1)
roughly  (2)
rule  (7)
Rules  (15)
rumor  (1)
run  (2)
running  (3)

< S >
Salabarria  (24)
Salabarria's  (3)
sarcasm  (1)
saw  (8)
saying  (16)
says  (32)
SC  (1)
schedules  (1)
scraps  (1)
scratch  (1)
screen  (9)
screens  (1)
scroll  (10)
scuttlebutt  (1)

seal  (1)
seated  (2)
second  (8)
seconds  (2)
section  (5)
secured  (1)
see  (48)
seeing  (6)
seen  (5)
select  (1)
selected  (2)
self  (1)
self-initiated  (1)
send  (45)
sending  (9)
sends  (1)
senior  (1)
seniority  (3)
sense  (6)
sent  (67)
sentence  (4)
separate  (2)
separated  (1)
separation  (4)
September  (6)
sergeant  (42)
sergeants  (33)
service  (1)
set  (1)
setting  (2)
settlement  (2)
settlements  (1)
sex  (6)
sexual  (9)
sexually  (2)
shape  (2)
share  (7)
sharing  (4)
SHEET  (6)
shift  (55)
shift-level  (1)
shifts  (8)
Shores  (1)
short  (1)
Shortly  (2)
show  (8)
showed  (4)
showing  (2)
shows  (2)

shut  (2)
shy  (1)
side  (4)
sides  (2)
SIGN  (7)
signature  (2)
signatures  (3)
signed  (7)
significant  (1)
signing  (1)
simple  (2)
single  (2)
sir  (2)
sit  (1)
sitting  (4)
situation  (1)
six  (9)
skipping  (1)
slack  (1)
sleep  (2)
Sleeping  (15)
slept  (1)
slightly  (1)
slowly  (1)
small  (1)
Smith  (2)
social  (1)
somebody  (13)
SOP  (6)
SOPs  (3)
Sorry  (16)
sort  (3)
south  (1)
SOUTHERN  (1)
sowing  (1)
speak  (12)
Speaking  (2)
specialized  (1)
specific  (16)
specifically  (10)
specifics  (1)
speculate  (2)
speeding  (1)
spend  (4)
spending  (2)
spent  (1)
split  (1)
splitting  (1)
spoke  (13)

spoken (6)
spot (2)
spring (1)
squad (20)
squads (2)
squat (1)
staff (5)
staffing (6)
stamped (1)
standard (6)
standing (2)
stands (1)
start (7)
started (19)
starting (2)
State (6)
stated (9)
statement (4)
statements (4)
STATES (2)
stating (3)
station (31)
statistics (1)
stats (6)
status (2)
stayed (2)
staying (3)
stays (1)
Stenographer (2)
stenographic (1)
stenographically (1)
step (1)
STEVE (11)
Steven (3)
stevencosner@miamib
eachfl.gov (1)
stimulants (1)
stipulated (1)
Stop (8)
stopped (2)
straight (1)
stranger (1)
street (2)
strike (1)
structure (1)
students (1)
stuff (3)
subject (8)
subjective (1)

submission (1)
submit (5)
submitted (4)
submitting (1)
subordinate (3)
subordinates (5)
subordinates's (1)
subordination (1)
subscribe (1)
subsections (1)
substance (1)
substances (1)
substation (3)
sufficient (3)
suggest (1)
suggestive (1)
suitcase (1)
Suite (1)
summarize (1)
summer (3)
supervise (10)
supervised (1)
supervising (11)
supervision (10)
supervisor (36)
supervisors (6)
supervisory (5)
supposed (10)
sure (15)
surrounding (1)
suspended (2)
suspension (1)
suspensions (1)
swear (2)
Sweetie (3)
sworn (1)
system (1)

< T >
take (35)
TAKEN (15)
talk (7)
talked (2)
talking (9)
tardiness (1)
task (1)
tasks (5)
taught (1)
Teams (1)

tell (28)
telling (7)
tells (1)
ten (5)
ten-hour (1)
term (5)
terminated (3)
termination (1)
Terms (3)
Terrace (2)
testified (7)
testify (1)
testifying (6)
TESTIMONY (5)
text (20)
texts (1)
Thank (11)
thanked (1)
Thanks (1)
Theoretically (1)
thing (6)
things (18)
think (41)
third (1)
thirty (1)
thorough (1)
thought (7)
three (14)
TIME (113)
timely (1)
times (14)
timing (2)
tinted (1)
title (2)
today (15)
told (18)
tone (1)
top (8)
topic (1)
tops (1)
Tortuous (2)
toss (1)
totality (1)
totally (3)
tour (1)
trained (1)
training (18)
trainings (1)
transcribed (1)

transcript (12)
transferred (1)
Transmissions (3)
transpired (1)
transpiring (1)
treasure (1)
treats (1)
tried (10)
trip (3)
trouble (1)
trove (1)
true (3)
truly (1)
Truth (2)
try (9)
trying (3)
turn (1)
turned (1)
turning (2)
Twenty (1)
twice (3)
two (25)
type (5)
typed (1)
types (3)
typically (3)

< U >
ultimately (3)
ums (1)
unable (1)
unavailability (1)
unbecoming (12)
unbeknownst (1)
uncommon (2)
underneath (1)
undersigned (1)
understaffed (1)
understand (27)
understanding (4)
Understood (3)
unfortunately (1)
uniform (2)
unintentional (1)
union (4)
unit (4)
UNITED (1)
unlawful (1)
unsolicited (1)

Deposition of Steve Cosner                          Jessica Guasto v. The City of Miami Beach, FL, et al.

untrue  *(2)*
untruthfulness  *(3)*
uphold  *(1)*
use  *(12)*
uses  *(1)*
usually  *(1)*
utilize  *(1)*

< V >
vacancies  *(1)*
vacation  *(1)*
vague  *(1)*
Valentine's  *(4)*
valid  *(1)*
variety  *(1)*
various  *(4)*
verbal  *(3)*
verify  *(1)*
version  *(4)*
view  *(4)*
violate  *(6)*
violated  *(12)*
violating  *(7)*
violation  *(12)*
violations  *(3)*
voicemail  *(1)*
vs  *(1)*

< W >
Wait  *(1)*
waiting  *(1)*
walk  *(1)*
walked  *(1)*
walk-in  *(2)*
wall  *(1)*
want  *(38)*
wanted  *(6)*
wants  *(3)*
warmers  *(1)*
warms  *(1)*
warning  *(6)*
wasting  *(1)*
watch  *(8)*
way  *(24)*
Wayne  *(4)*
wearing  *(2)*
week  *(2)*
weeks  *(1)*
well  *(35)*

went  *(14)*
we're  *(22)*
we've  *(2)*
whatsoever  *(2)*
wide  *(1)*
wife  *(2)*
willful  *(4)*
willfully  *(2)*
Wilson  *(1)*
winter  *(1)*
WITNESS  *(6)*
witnesses  *(1)*
wit's  *(1)*
woke  *(1)*
word  *(7)*
wording  *(3)*
words  *(1)*
work  *(37)*
worked  *(9)*
working  *(25)*
workplace  *(1)*
works  *(5)*
worries  *(1)*
write  *(12)*
write-up  *(5)*
writing  *(4)*
written  *(17)*
wrong  *(3)*
wrote  *(15)*

< X >
Xs  *(1)*

< Y >
Yeah  *(47)*
year  *(6)*
years  *(12)*
yes-or-no  *(1)*

< Z >
Zapata  *(1)*
Zero  *(2)*
zone  *(32)*
zones  *(3)*
Zoo  *(1)*
Zoom  *(6)*

Plaintiffs' Exhibit

1

Cosner 5/17/2024 M.F.



02-14-14

AND THE CHOCOLATE COVERED NUTS, TOO.

HAPPY VALENTINE'S DAY!

Love You Sweetie !!

XXOO

**Plaintiffs' Exhibit**

**2**

Cosner 5/17/2024 M.F.

JESSICA, I HOPE THIS IS THE BEST BIRTHDAY YET.  I LOVE YOU WITH ALL MY HEART AND AM SO HAPPY YOU HAVE COME INTO MY LIFE.  YOU ARE MY PRINCESS.   I LOVE YOU BABYDOLL.  LOVE STEVE.

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Subject:** Salabarria Administrative Action Form
**To:** melkins@mlelawfirm.com <melkins@mlelawfirm.com>
**Sent:** January 8, 2021 12:34 AM (UTC-05:00)
**Attached:** Salabarria AAF.pdf

Please see the attached AAF.



*Steve Cosner, Lieutenant*
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

**Plaintiffs' Exhibit**

**3**

Cosner 5/17/2024 M.F.

## MIAMIBEACH POLICE

# Administrative Action Form

D#

| Employee:<br>Salabarria, Jessica | Job Title:<br>Sergeant of Police | Division:<br>Operations/Patrol | Date:<br>12/30/2020 |
|---|---|---|---|

| Level of Action:<br>Documentation of Verbal Conference: | Written Warning: | Letter of<br>Reprimand: |
|---|---|---|

| Violation of City Work Rule: | Title: |
|---|---|

| Violation of Department SOP #: DRR 3.8.2, DRR 6.5.4, DRR 6.15.1, 6.15.6, 6.15.9, DRR 6.28.3.6, 6.28.3.10, 6.28.3.20, 6.28.3.34, DRR 6.34.1, DRR 6.39.1, DRR 6.40.1 | Title: Insubordination, Integrity, Performance of Duties, Conduct Unbecoming, Untruthfulness, Supervisor Responsibility, Radio Transmissions |
|---|---|

| Violation of General Special Order #: | Title: |
|---|---|

**Documentation of Incident:** On Sunday night, 12/27/2020 at approximately 2200 hours, I advised Sergeant Jessica Salabarria that we needed a Sergeant on overtime for the midnight shift. I told her that she was the next supervisor to be forced to work over since we did not have any volunteers for the position. She was told that she would be assigned to Area 3 and would be working from 0000-0600 hours. She acknowledged the order and within several minutes she provided me with an overtime slip completed by her in which she documented in her own handwriting that she was working in Area 3. She left the sergeant's office shortly thereafter. At approximately 0355 hours, I forwarded an email to Sergeant Salabarria with the details and watch orders that needed to be assigned to the Area 3 officers for completion prior to the end of their shift. I then sent a text message to her cellular phone advising her to check her email at 0359 hours. After a few minutes I did not receive an acknowledgement of the text message, so I tried to call her phone at 0404 hours. Then phone rang repeatedly and went to voicemail. I tried to raise her via the police radio immediately afterwards. The dispatcher raised her multiple times with no response. Sergeant Wilson Romero advised via radio that he would try to call her. He called me at 0411 hours to advise that he could not reach her and that her phone rang through to voicemail. I again tried to have the dispatcher raise her, and after several attempts by name and unit number, she finally responded. The tone of her voice sounded as if she was just waking up. I spoke with her via the supervisor channel and asked her where she was. She told me that she was "05". I responded by asking if she meant, "05 at the NESS". She said no and that she was at the main station. I asked if she was aware that she was assigned to Area 3 and she answered affirmatively. I then ordered her to respond to Area 3 and to check her email.

I became involved in a vehicle stop along 71 street that resulted in an arrest at 0416. Officer Ocejo was one of the officers who responded as back-up. After the subject was transported, I waited on scene with Officer Ocejo as he waited for a tow truck. I asked Officer Ocejo to check his email to see if the details had been forwarded by Sergeant Salabarria. He told me that he did not have any emails from her. This was at approximately 0520 hours. At 0543 hours, I received an unsolicited text message from Sergeant Salabarria advising that she had emailed me the squad stats and the detail assignments. She claimed that she had told the officers via landline and email of their detail assignments. The email that she sent me was sent at 0536 hours. It included the squad stats and detail assignments. I called Officer Hansel Romero and asked him if he had received any emails, texts, or phone calls from Sergeant Salabarria advising him of detail assignments. He said that he did not and that she had only asked for stats in an email that was sent at 0521 hours. That email was forwarded to me by Officer Ocejo. I began

calling all the officers assigned to Area 3 and inquired the same of each of them.  Every one of the officers advised that they had not received a call or text advising of the details.  Officer Romero then forwarded an email that he received from Sergeant Salabarria at 0542 hours.  The email had been sent to each of the Area 3 officers.  It was the detail assignments and began with a highlighted line stating, "squad per our conversation please note the below details for our shift".  I found this very concerning because it was now the second time that she had claimed to have had a conversation with the officers about their assignments when all six of them claimed that never happened and they did not report to any assigned details during the shift.

I sent an email to Lieutenant Jorge Garcia asking for a Detail Report for Sergeant Salabarria's assigned marked vehicle via the AVL system.  My inquiry was for her vehicle movement from 2200 hours on 12/27/2020 through 0600 hours on 12/28/2020.  The Detail Report showed that her vehicle had been parked at the station from 2200 hours on 12/27/2020 until 0423 hours on 12/28/2020 which was a few minutes after we spoke on the supervisor channel. For a total of 6 hours and 23 minutes.  It is unknown how long the vehicle had been parked prior to that.  The report indicated that she left the station and drove directly to 73rd Street and Ocean Terrace where she again parked her vehicle at 0440 hours.  The vehicle remained in that position until 0533 hours for a total of 53 minutes.  She then left that location and drove directly to the MBPD headquarters.

Note that of the six officers assigned to Area 3 on the shift in question 4 of them have 2 years of experience or less.

Sergeant Salabarria's actions show a willful effort to deceive a supervisor and a failure to obey a direct order from said supervisor.  She failed to report to her assigned zone and failed to supervise the officers under her watch.  She failed on multiple occasions to respond to the police radio and showed extreme neglect in the performance of her duties.

**I have read the Administrative Action Form and understand it.  Additionally, I have been provided with an employee's Administrative Action Response Form and it has been explained to me.**
Employee's Initials

| | |
|---|---|
| Employee's Signature: _____<br><br>Print Name:_____ Date: | Lieutenant Signature:_____<br><br>Print Name:_____ Date: |
| Preparer's Signature: _____<br><br>Print Name: _____ Date: | Captain Signature: _____<br><br>Print Name:_____ Date: |
| Witness Signature: _____<br><br>Print Name:_____ Date: | Division Commander Signature:_____<br><br>Print Name:_____ Date: |

Revised 01/22/2014

| | |
|---|---|
| Witness Signature: _____ | Chief of Police Signature:_____ |
| Print Name:_____ Date: | Print Name:_____ Date: |

Revised 01/22/2014

Plaintiffs' Exhibit

**4**

Cosner 5/17/2024 M.F.

# MIAMI BEACH POLICE DEPARTMENT

# RULES AND REGULATIONS (DRR)

Richard M. Clements, Chief of Police

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 1 of 49

MIAMIBEACH
POLICE

City 001471

**MISSION**

ADDRESS CRIME AND COMMUNITY CONCERNS

**VISION**

A SAFE AND WELCOMING ENVIRONMENT FOR EVERYONE

**VALUES**

HONORABLE
PROFESSIONAL
RESILIENT

**GOALS**

USE INNOVATIVE APPROACHES TO ADDRESS CRIME
MAINTAIN AND ENHANCE A PROFESSIONAL AND WELL TRAINED WORKFORCE
ENHANCE THE PUBLIC'S PERCEPTION OF THE MIAMI BEACH POLICE
DEPARTMENT

Effective Date: 7/03/00
Revised Date: 1/4/22

DRR
Page 2 of 49

MIAMIBEACH
POLICE
City 001472

## OATH OF OFFICE

All Police employees, prior to assuming sworn status, will take and subsequently abide by an oath of office to enforce the law and uphold the nation's constitution, the laws of the United States and of the State of Florida, to obey the Rules and Regulations of the City of Miami Beach and the rules, regulations and orders of the Miami Beach Police Department. [1.1.1]

"I do solemnly swear (or affirm) that I am entitled to hold the office to which I am appointed and that I will obey the Constitution and the laws of the United States and of the State of Florida, and that I will obey the Rules and Regulations of the City of Miami Beach, and Rules, Regulations and Orders of the Miami Beach Police Department and that I will faithfully perform all of the duties of police officer of the City of Miami Beach."

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 3 of 49

MIAMIBEACH
POLICE
City 001473

## LAW ENFORCEMENT CODE OF ETHICS

The City of Miami Beach Police Department has adopted the Code of Ethics as published by the International Association of Chiefs of Police. All sworn police officers of this Department, in the execution of their duties and responsibilities, will abide by the Code of Ethics as listed below. [1.1.2]

As a LAW ENFORCEMENT OFFICER, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws and the regulations of my Department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, political beliefs, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held…so long as I am true to the ethics of the police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

I know that I alone am responsible for my own standard of professional performance and will take every reasonable opportunity to enhance and improve my level of knowledge and competence.

I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession…law enforcement.

International Association of Chiefs of Police

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 4 of 49

MIAMIBEACH
POLICE
City 001474

## *CIVILAIN EMPLOYEE CODE OF ETHICS*

As a Miami Beach Police Department civilian employee, it is my duty and responsibility to serve the community and provide professional support for Department operations.  I will keep my private life unsullied as an example to all, develop self-restraint and be constantly mindful of the welfare of others.  Honest in thought and deed in personal and official life, I will be exemplary in obeying the laws of the land and the rules and regulations of the Department.  What I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret, unless revelation is necessary in the performance of my duty.  I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions.  I will constantly strive to achieve these objectives and ideals, dedicating my efforts toward ensuring the efficient and effective operation of the Miami Beach Police Department.

I WILL:

Obey all Miami Beach Police Department policies, procedures, rules and regulations that are applicable to my civilian capacity and all City of Miami Beach policies, procedures, rules and regulations;

Perform my duties with efficiency to the best of my ability;

Endeavor to avoid any actions creating the appearance that I am violating the law or the ethical standards contained herein;

Be truthful at all times.  My conduct and performance of duties will be accomplished in an honest manner, and in compliance with the laws; local, state and country;

Adhere to the confidentiality of the Law Enforcement Profession;

Recognize at all times that I am public safety employee, and that ultimately, I am responsible to the public;

Give the most efficient and impartial service;

Be courteous in all my contacts;

Treat my fellow employees with equality, dignity and respect;

Adhere to all laws and regulations that provide equal opportunity for all persons;

Strive to do only those things that will reflect honor on my fellow employees, my agency and myself.

I WILL NOT:

In the performance of my duties, work for unethical advantage or personal profit;

Knowingly make unauthorized commitments or promises of any kind purporting to bind the Miami Beach Police Department.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 5 of 49

MIAMIBEACH
POLICE
City 001475

# CITY OF MIAMI BEACH
## POLICIES, PROCEDURES, PERSONNEL AND WORK RULES

All employees of the Miami Beach Police Department (Department) are subject to all City of Miami Beach policies, procedures, Personnel Rules and Work Rules.

The City of Miami Beach's policies, procedures and rules are available on the city's website.

City 001476

## DEPARTMENT RULES AND REGULATIONS

## DEFINITION OF TERMS

Except as otherwise provided, whenever in the Rules and Regulations the following words or terms are used, they have the meanings respectively ascribed to them as follows:

ACCOUNTABILITY - The state of being held responsible by a higher authority for specified job-related results.

ACCREDITATION - A voluntary, self-motivated approach by which organizations seek to achieve, objectively verify, and maintain high quality in their operations through periodic evaluations.

ACTING - Serving temporarily in a position to which the employee is assigned by competent authority, usually in a position of higher rank.  All the authority, responsibilities, and duties of the higher rank devolve upon the acting employee.

ACTIVE DUTY - See Tour of Duty.

ADA - The Americans with Disabilities Act of 1990 requires departments of any State or Local Government to ensure that qualified individuals with disabilities can participate in, and receive the benefits of, any program, service or activity.

AFSCME - American Federation of State, County and Municipal Employees.

AMEND - To alter by adding, deleting, or rephrasing.  To improve, make better.  To remove the faults or errors of, to rectify.

APPOINTMENT - The designation of a person by the appointing authority to any position within the Department.

***AREAS*** - A component of the Department in the Patrol Division that is commanded by a Captain and reports to a Major.  The city is also divided geographically into ***four*** Areas.

***ASSIGNMENT - A position within the Department; a task or piece of work assigned to someone as part of a job***.

***ASSISTANT*** CHIEF OF POLICE - Reports directly to the Deputy Chief of Police and who serves as the assistant to the Deputy Chief of Police with the following duties and responsibilities.

AUTHORITY - The power to enforce laws, determine, or judge; a person or group invested with this power.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 7 of 49

MIAMIBEACH
POLICE

City 001477

*CODE* OF ETHICS - The rules or standards governing the conduct of members of a profession.

CAPTAIN - District or Unit *Supervisor*.

CHAIN OF COMMAND - The unbroken line of authority from the Chief of Police down through a single subordinate at each level of command, to the level of execution.

CHIEF OF POLICE - The Executive Head of the Department.

CITY OF MIAMI BEACH EMPLOYEE POLICIES - The rules and regulations as set forth by the city governing *employee behaviors and expectations*.  Serve as specific standards to which all employees must adhere.  It is inclusive of City Personnel Rules and current employee bargaining unit contracts. [12.2.1g]

CITY ORDINANCE - A law enacted by the City Commission of the City of Miami Beach, Florida.

CITY PERSONNEL RULES - The rules and regulations as set forth by the City of Miami Beach governing the conduct of all city employees.

CIVILIAN - An employee of the Department whose position does not require certification under Florida Statute 943 and does not possess the authority to make arrests, carry a firearm or exercise any law enforcement authority.

COMMAND STAFF - Consists of the Chief of Police, Deputy Chief, Assistant Chief, Majors, Captains, Commander, *Public Information Officer, Accreditation Manager* and the Executive Assistant to the Chief of Police.

COMMANDING OFFICER – Chief of Police, Deputy Chief, Assistant Chief, Majors, Captains, Commander, Lieutenants, Managers, Sergeants or Supervisors who are in charge of Divisions, Districts, Units, Sections, Squads, Offices, Shifts, or Staffs.  Any officer *or civilian* assigned to exercise command.  During the absence of the Commanding Officer, the officer designated to relieve such Commanding Officer is in command and during that time is the acting Commanding Officer.

COMMUNICATIONS WORKERS OF AMERICA CONTRACT - An agreement between the City of Miami Beach, Florida and the Communications Workers of America (CWA), Local 3178.

COMPLAINT - A report by a citizen or individual, requesting some degree of police service, responded to by an employee of the Department.

CONDUCT UNBECOMING - Any conduct or act, which has an adverse impact upon the operation of the Department and destroys public respect and confidence in the Department and/or its employees.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 8 of 49

MIAMIBEACH
POLICE
City 001478

COVERT ASSIGNMENT - A position in an operation conducted to avoid detection, which is divulged only to those directly involved in the operation.

CULPABLE NEGLIGENCE - Being found at fault for a negligent act.

DAYS OFF - Every employee of the Department will be excused from duty on designated days each week without the loss of pay. The time and manner of excusing employees of the Department from duty will be determined by the Chief of Police and/or their designee.

DEPARTMENT - The Police Department of the City of Miami Beach, Florida.

DEPARTMENT RULES AND REGULATIONS (DRR) - Written directives issued by the Chief of Police which define police purpose, duty and conduct of all Department employees.  Serve as specific standards to which all employees must adhere.  It is inclusive of City Personnel Rules and current employee bargaining unit contracts. [12.2.1g]

DEPARTMENT STANDARD OPERATING PROCEDURES (SOPS) - Written directives issued by the Chief of Police relating to permanent directives concerned with policies or procedures.  **SOPs are available to all employees through PowerDMS**.

***DEPUTY CHIEF OF POLICE - Second in command of the Department who reports directly to the Chief of Police and who serves as the assistant to the Chief of Police***.

DETAIL - Employees of the Department, sometimes from more than one organizational component, grouped together for the accomplishment of a specific mission. When not engaged in a continuing operation, the detail is called a special detail.

DETECTIVE - Officers assigned to an investigative function.  The designation is an assignment and not a promotion.

DETENTION OFFICER - Any non-sworn employee of the department, whose primary responsibility is the supervision, protection, care, custody and control of persons being detained by the Department prior to transfer to the Miami-Dade County Jail.  Detention Officers must possess a State Certification as required in Chapter 943, Florida Statutes, and may carry a firearm and other weapons as permitted by Department SOP but may carry those authorized weapons only when on-duty.  Detention Officers are not sworn law enforcement officers and are not authorized to make arrests nor exercise any other police power that a sworn law enforcement officer possesses.

DIRECTIVE - Any official or authoritative instruction involving the management or guidance of operations.

DISCRETION - Freedom to act or judge on one's own.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 9 of 49

MIAMIBEACH
POLICE
City 001479

DIVISION - A component of the Department that operates under the direction of a Division Major and reports directly to the **Deputy Chief or Assistant Chief**.

DIVISION ORDER - Written orders from a Division Major that are temporary in nature to announce policies or procedures with respect to that Division and will be incorporated as SOPs at a later date.  **Division Orders must be approved by the Chief of Police prior to publication**.  No Division Order will supersede or alter **an SOP or a** General Order.

DOMESTIC VIOLENCE - Florida Statute; an act of battery, sexual battery, assault, sexual assault, or any criminal offense resulting in physical injury or death of one family or household member by another.

DRUG RECOGNITION EXPERT - An officer(s) certified by the National Highway Traffic Safety Authority (NHTSA) and International Association of Chiefs of Police (IACP) to perform drug recognition evaluations.

DUTY - An act or course of action required by position, law or custom.  A service, function or task assigned to an employee.

E.E.O.C. - Equal Employment Opportunity Commission.

EMPLOYEE - Any person, regardless of position, sworn or non-sworn, who is employed by the Department.

EXCULPATORY EVIDENCE - Evidence that shows clearance from an accusation or charge.

EXECUTIVE ASSISTANT TO THE CHIEF - A staff position, reporting directly to the Chief of Police, who provides administrative support to the Chief.

EXTENUATING CIRCUMSTANCES - Something arising suddenly out of the current of events; any event or occasional action or remedy; a sudden and unexpected happening or an unforeseen occurrence or condition.

F.C.I.C. - Florida Crime Information Center.

FIDELITY BOND - A bond purchased to guard against monetary loss by persons in a relationship of special trust or confidence.

FLAGRANT ACT - An act, civil or criminal, or in violation of Department Rules and Regulations, policies or procedures, that is so obviously bad or wrong that it is more conspicuous.

F.D.L.E. - Florida Department of Law Enforcement.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 10 of 49

MIAMIBEACH
POLICE
City 001480

FLORIDA STATUTE CHAPTER 119 - Is known as the Florida Public Records Act; it directs that **most** documents created and/or maintained by a governmental entity be made available for public inspection.

FRATERNAL ORDER OF POLICE CONTRACT - An agreement between the City of Miami Beach, Florida and the Miami Beach Fraternal Order of Police William Nichols Lodge No. 8 (FOP).

FUNCTION - A general term for the required or expected activity of a person or an organizational component.

GENERAL ORDER - Written orders from the Chief of Police that are temporary in nature to announce policies or procedures and will be incorporated as SOPs at a later date.

GOAL - A relatively broad statement of the end or result that one intends ultimately to achieve.  A goal usually requires a relatively long time span to achieve and, whenever possible, should be stated in a way that permits measurement of its achievement.

GOVERNMENT SUPERVISORS' ASSOCIATION OF FLORIDA CONTRACT - An agreement between the City of Miami Beach, Florida and the Government Supervisors Association of Florida (GSAF) OPEIU, Local 100.

***HARASSMENT - Any form of discrimination, real or perceived, including harassment, on the basis of race, sex, color, national origin, religion, age, disability, ancestry, marital status, pregnancy, sexual orientation or the exercise of their constitutional or statutory rights.  Bullying is considered harassment***.

HEADQUARTERS - The police building that houses the staff offices of the various Divisions and functions that are responsible for policing the City of Miami Beach.

HUMAN RESOURCES DEPARTMENT - The city department responsible for all employee matters dealing with city employees.

IMMEDIATELY - Is to be construed to mean as soon as possible and practicable.

INCIDENT - An event that requires law enforcement action of the dispatching of officers in response to citizen requests for law enforcement services.  This includes any incident, whether criminal or non-criminal for which there has been a response to the scene, an investigation or the preparation of a verbal or written report.

INCOMPETENCE - Incapable of the satisfactory performance of duties.  The lack of any of the following qualities is evidence of incompetence; courage, honesty, emotional stability, sound judgment, alertness, decisiveness, power to observe, initiative, energy, intelligence or the ability to get along with people.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 11 of 49

MIAMIBEACH
POLICE
City 001481

INSUBORDINATION - The willful disobedience of any order lawfully issued by a supervisor *or designee of a supervisor delivering the lawful order*, or any disrespectful, mutinous, insolent or abusive language toward a supervisor.

LAWFUL ORDER - An order in keeping with the performance of any duty, issued either verbally or written over the signature of the Chief or a supervising officer, or prescribed by law or *by the Department's policies, procedures, practices and/or rules and regulations*, or for the preservation of good order, efficiency and proper discipline of the Department.

LENGTH OF SERVICE - The length of continuous time an employee has been employed by the City of Miami Beach.

LIEUTENANT - A Unit Supervisor.

MAJOR - A Division Supervisor who reports directly to the Deputy Chief or Assistant Chief.

MALE PRONOUN "HE" OR "HIS" - Whenever used may refer to either male or female employee, as the case may be.

MANAGER - A non-sworn supervisory employee responsible for commanding a Unit, Section or Shift in the Department.

MARITIME LAW - Laws pertaining to waterways and water vessels.

MATERIALITY - Important substance.

MAY - Is permissible.

MEMORANDUM - A formal or informal, written document that may or may not convey an order; it is generally used to clarify, inform or inquire.

MIAMI BEACH MUNICIPAL EMPLOYEES' UNION - Agreement between the City of Miami Beach, Florida and the Miami Beach Municipal Employees Union, AFSCME Local #1554.

MISSION, VISION AND VALUE STATEMENTS - Statements that guide the Department's principles, philosophy and purpose.

MOTOR VEHICLES - Every vehicle which is self-propelled, including automobiles, vans, motorcycles, trucks *and vessels*.

N.C.I.C. - National Crime Information Center.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 12 of 49

MIAMIBEACH
POLICE
City 001482

NEGLECT OF DUTY - Failure to perform duties as required by statute, ordinance, work rules and regulations, procedures, practices, SOPs, or Department directives, written or verbal.  Examples include, **but are not limited to**, failure to take appropriate action on the commission of a crime, disorder, or other act or condition deserving police attention; absence without leave; failure to report for duty at the time and place designated; unnecessary absence from assigned **Area** during tour of duty; failure to perform duties prescribed in Rules and Regulations; failure to conform to Department operating procedures.

OATH - A solemn, formal declaration or promise to fulfill a pledge.

OBJECTIVE - An end or result that one intends to attain in order to achieve partial fulfillment of a goal.  An objective is a sub-goal or an element of a goal, and therefore, requires a shorter time to accomplish than does a goal.

OFF-DUTY - The state of an employee during the hours not "on-duty" when free of the responsibility of performing usual routine duties.

OFFICE - A component of the Department performing a specific function that reports to a Manager, Lieutenant, Sergeant, or Supervisor.

OFFICIAL BULLETIN - A Bulletin prepared under the direction of the **Chief of Police**, published twice a week to ensure that all employees of the department are kept fully informed and have up to date information.

OFFICIAL CORRESPONDENCE - Letters written on official Miami Beach Police Department letterhead, written in the name of the Chief of Police, with the authorized employee placing their name on the letter and signing it.

OFFICIOUSLY - Unduly forward manner.

ON-DUTY - The state of an employee during the hours of the day (shift) when actively engaged in the performance of duties.

ORDER - An instruction, either written or oral, given by a supervisor and/or acting supervisor, **or a designee thereof**, to a subordinate.

ORGANIZATIONAL CHART - A chart delineating the chain of command within the structure of the Department and is updated as needed.

ORGANIZATIONAL COMPONENT - A subdivision of the Department, such as a Division, District, Unit, Section, Shift, Squad, Office, Staff, or a position that is established and staffed on a full-time basis to provide a specific function.

POLICE COMMANDER - A sworn **supervisor of equal rank to a Department Captain**.

POLICE OFFICER - An employee of the Department who has police powers.  The term is applied without regard to gender, division or duty. See Sworn Officer.

Effective Date:  7/03/00
Revised Date:  1/4/22
DRR
Page 13 of 49
MIAMIBEACH
POLICE
City 001483

POLICY - A written directive that is a broad statement of the Department's principles mission, vision and/or values.

POST - A fixed point or location to which an officer is assigned for duty. It is the desk, office or other place to which an officer is assigned at the Station; it is also the location where an officer is assigned for specific duty, such as an intersection or crosswalk for traffic duty.

***PRACTICE - the customary, habitual, or expected procedure or way of doing of something***.

PROCEDURE - The official method of dealing with any given situation prescribed by the Department.

PROFICIENCY - The additional skills, knowledge and abilities that are needed to remain competent in performing the duties and responsibilities of a job.

PROMOTION - A change in the employment status of an employee to a position of greater responsibility or higher rank.

PROMULGATED - Announce officially.

***PUBLISH - Announce officially***.

RANK - Each class of officer within the Department has a rank.

RANKING OFFICER - The officer having the highest rank.  Officers of the same rank will grade accordingly to the date of their appointment to that rank.  If the dates of appointment are the same, then the total continuous length of service time will prevail. When two or more officers are on duty together, the officer of the highest rank is in command and will be held responsible for the operation.  For a special detail and for a special period, an officer may be designated by the superior officer or officer in charge of an incident to take command without regard to rank.

REPORT - A written communication, unless otherwise specified, relating to police matters.

RESERVE POLICE OFFICER - A state certified, sworn law enforcement officer who possesses the same powers and performs the same duties as a regular, full-time officer. Reserve police officers have qualifications and training equivalent to full time, regular, sworn officers performing like functions and are utilized to supplement the Department's day-to-day delivery of law enforcement services.

RESPONSE TO RESISTANCE - A response by an officer to overcome a person's physical resistance to an officer's performance of a legal duty, to protect an officer or another person from physical resistance or acts of aggression that are likely to cause bodily harm or is used to apprehend a fleeing criminal suspect.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 14 of 49

MIAMIBEACH
POLICE
City 001484

SELECTIVE TRAFFIC ENFORCEMENT PROGRAM - The assignment of personnel to traffic enforcement activities at times and locations where hazardous or congested conditions exist. Such assignments are usually based on such factors as traffic volume, accident experience, frequency of traffic violations, and emergency and service need.

SENIORITY - A position of higher standing determined first by rank, then by time in rank, then by length of service time in the Department.

SERGEANT - The rank above police officer.  Sergeants generally supervise activities at the operational level.

SERIOUS PHYSICAL INJURY - A bodily injury that creates a substantial risk of death; causes serious, permanent disfigurement; or results in long-term loss or impairment of the functioning of any bodily member or organ.

SEXUAL HARASSMENT - Unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature, constitute sexual harassment when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

SHIFT - A component under a District or Unit, commanded by a Lieutenant or Manager. A Shift is the same level as a Section.

SHIFT SUPERVISER - A sworn employee who is the senior officer in charge.

SOP (STANDARD OPERATING PROCEDURE) - The accepted abbreviation for Standard Operating Procedure.

SPAN OF CONTROL - The number of persons reporting to any one supervisor.

SPECIAL EVENT - An activity, such as a parade, festival, athletic contest, or public demonstration, that results in the need for enhanced police presence, for control of traffic, crowds or that may result in police interdiction.

SPECIAL INCIDENT NOTIFICATION - A written report used by a supervisor to advise of any emergency, serious crime or unusual occurrence to the Chief of Police as soon as possible.

SQUAD - A component under a shift commanded by a sergeant or supervisor and reports to a lieutenant.

STAFF - A component under an office performing a specific function that reports to a lieutenant, manager, or a non-sworn supervisor.

STAFF INSPECTION - An inspection conducted by employees who do not have control of the persons, facilities or procedures being inspected.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 15 of 49

MIAMIBEACH
POLICE
City 001485

STANDARD OPERATING PROCEDURE (SOP) - Written Directives issued by the Chief of Police, relating to permanent directives concerning with policies, SOPs, policies, procedures, GOs and DRRs and any other Department directive to establish guidance of employee behavior or operations.

STATE LAW - The statutes of the State of Florida.

SUBORDINATE - Lower in rank.

SUPERVISE - To assign, direct or manage the activities of a subordinate.

SUPERVISOR - An employee appointed to coordinate, direct and oversee other employees, either temporarily or permanently.

SURETY BOND - A bond where one assumes responsibility of another.

SUSPENSION - The act of temporarily denying an employee the privilege of performing their duties.  In consequence of dereliction or other violation of rules, regulations or orders.  Suspension is either a step in the disciplinary process, or the penalty assessed.

SWORN OFFICER - A certified law enforcement officer, subject to an oath of office and possessing those general peace officer powers prescribed by the Florida Constitution, Florida State Statutes and City of Miami Beach Ordinances.

TERMINATION - *Also referred to as dismissal*, the act of terminating (ending) the service of the employee with the Department.

TITLE - The distinguishing name of an assigned position within the Department.

TORTUOUS ACT - An act giving rise to tort liability.

TOUR OF DUTY - The time during which the employees are on duty.

TRAFFIC LAW ENFORCEMENT - Law enforcement as it applies to statutes, ordinances and legally authorized regulations relating to the use of streets and highways and ownership and operation of motor vehicles and other road vehicles.

UNIT - A component of the Department that is commanded by a Captain, Police Commander, Lieutenant or a Manager.

UNIT DIRECTIVE - Any written document used to guide the performance or conduct of a specific Department Unit or function and is applicable to employees assigned to that unit or function with the prior authorization of the Chief of Police.  No Division Unit Directive will supersede or alter a Department SOP or GO.

***WILL* - *Is expressive of authority that is mandatory*.**

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 16 of 49

MIAMIBEACH
POLICE
City 001486

WRITTEN DIRECTIVE - Any written document used to guide or affect the performance or conduct of Department employees.  The term includes Procedures, Rules and Regulations, General Orders, Division Orders, SOPs, Memorandums and instructional material.

WRITTEN DIRECTIVE RECEIPT - ***An electronic signature through PowerDMS*** or a form which employees are responsible to sign, acknowledging the receipt of each Department Directive they receive.  It is each employee's responsibility to review and comply with all Department Directives.

WRITTEN DIRECTIVE SYSTEM - A formal system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 17 of 49

MIAMIBEACH
POLICE
City 001487

**THE ORGANIZATION OF THE MIAMI BEACH POLICE DEPARTMENT**

**Descending Order of Authority**

In the event of the sudden unexpected absence of the Chief of Police, the most senior ranking officer will assume the duties of the Chief of Police until relieved by a higher authority.  Command authority automatically succeeds in the following order, unless otherwise directed:

Deputy Chief of Police;

Assistant Chief of Police;

Senior Major;

Senior Captain;

Police Commander;

Senior Lieutenant;

Senior Sergeant;

Senior Officer.

All other absences will be preceded by a memorandum *or email* which will appoint a temporary replacement for the expected time of the Chief of Police's absence.  The appointed employee will assume all duties and responsibilities afforded the Chief.  The relative rank of line officers of the Department for the purposes of determining responsibilities of command only, will be designated as follows:

Chief of Police;

Deputy Chief of Police;

Assistant Chief of Police;

Major;

Captain;

Police Commander;

Lieutenant;

Sergeant;

Police Officer.



City 001488

**Chief of Police**

The Chief of Police is the Chief **Executive and** Administrative Officer of the Department and the final Department authority on all matters of policy, procedure, operations, discipline **and employee assignment, duties and work hours**.  The Chief of Police is responsible for the planning, directing, coordinating, controlling and staffing of all activities of the Department for its continued and efficient operation; for the enforcement of Rules and Regulations within the Department; for the Department's relationship with the citizens, the city government and other agencies for providing and defining the Mission, **Vision and Values** of the Department; and for the successful accomplishment thereof.

**Deputy Chief of Police**

**Reports directly to the Chief of Police and who serves as the assistant to the Chief of Police who supervises and maintains a liaison between the different Divisions and the Chief of Police; ensures that the orders and policies of the Chief of Police are carried out; and serves as the Acting Chief of Police in the absence of the Chief of Police and performs all the duties regularly the responsibility of the Chief of Police.**

**Assistant Chief of Police**

**Reports directly to the Deputy Chief of Police and who serves as the assistant to the Deputy Chief of Police who supervises and maintains a liaison between the different Divisions and the Deputy Chief of Police; ensures that the orders and policies of the Chief of Police and Deputy Chief of Police are carried out; plans for the response to unusual occurrences; and serves as the Acting Deputy Chief of Police in the absence of the Deputy Chief of Police and serves as the Acting Chief of Police in the absence of the Deputy Chief of Police and the Chief of Police.  It will be the duty of the Assistant Chief of Police to ensure that the orders and policies of the Chief of Police are carried out and, during the absence of the Chief of Police and Deputy Chief of Police to perform all the duties regularly the responsibility of the Chief of Police and Deputy Chief of Police.**

**Commanding Officers**

Commanding officers consist of Majors, Captains, the Police Commander, Lieutenants, Sergeants, Managers and Supervisors who are in charge of Divisions, Districts, Units, Shifts, Staffs and Squads.  Commanding officers have direct supervision and control, subject to the orders of the Chief of Police, over all officers and other employees of the Department assigned to their command.  They are responsible for their efficiency and effectiveness and will coordinate the functions and activities of the various units of their command.  They will promote harmony among the employees of their command.  They are responsible for the cooperation of their command with all other divisions of the Department.  They will act in cases not regularly assigned to their command when the delay necessary to inform the proper unit might result in a failure of the Department to perform a police duty.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 19 of 49

MIAMIBEACH
POLICE
City 001489

Commanding officers are also responsible for:

Ensuring that each employee of their command has a current copy of the Department's policies, procedures and Rules and Regulations available through PowerDMS and will see that each employee of their command is properly instructed in their duties and performs such duties in the manner prescribed.

Preparing, transmitting, filing, using, and preserving official records, reports, returns, forms, affidavits, warrants, subpoenas, and other papers of legal process, as well as correspondence originating in, or forwarded to, their command.

Clearly understanding the Mission of the Department as outlined by the Chief of Police and coordinate activities under their respective commands consistent with this Mission.

Inspection of all buildings and offices within their command, and the furnishings and equipment thereof, with a view toward preserving the good order, repair, safety, and sanitation of same.

The proper care, economical use, efficiency and service ability of the equipment assigned for their use and the use of the employees of their command.

Observance and enforcement of all Department Rules and Regulations, SOPs, City Personnel Rules, City Work Rules and General Orders.

The preservation of the health, welfare and safety of any person in the custody of, in the care of, or detained by, any employee of the respective commands of such commanding officers and will also be responsible for the preservation and safeguarding of all property of such persons.

Not allowing violence to be used in the questioning or management of any person in the custody of, or in the care of, or who is detained by, any employee under their command except when force is reasonable and necessary in the maintaining custody and control of the individual.  Any incident detrimental to the health, welfare and safety of such persons while in the custody, or in the care of, or who is under detention by an employee of their command will immediately be reported by such commanding officer to the Chief of Police via a Special Incident Notification.

Taking all precautions to ensure the safety of persons in an intoxicated condition.  When any prisoner needs medical attention, or there is doubt as to the physical or mental condition of a detainee, the commanding officer will ensure or will immediately procure medical assistance and will be guided by the recommendations of the authorized medical professional.  In emergency cases, such commanding officer will immediately order the detainee sent to a hospital.  Commanding officers will make an immediate, accurate and complete written Special incident Notification to the Chief of Police of death, or injury to, or loss of property of any prisoner in the custody or care of or detained by any employee under their command.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 20 of 49

MIAMIBEACH
POLICE
City 001490

The supervision of roll-calls for employees during their hours of duty and will be responsible for inspection of the employees of their commands, and for determining the fitness for duty of same; the communication of all information and orders; the giving of requested instructions and advice, notation and reporting of illnesses, absentees, and tardiness; notation and reporting of any want of cleanliness or neatness in person or in uniform and the correction of any negligence in attire, and the inspection of all equipment, including arms and ammunition, to determine if the same is in good working order.  The responsibilities herein outlined may be delegated, but such delegation will not relieve such commanding officers of the responsibility for the neglect of duty or inefficiency of the employees to whom such responsibilities are delegated.

Ensuring the accuracy, preservation and safekeeping of all records of their command during their hours of duty, and will not authorize their removal, except on police business, or under due process of law, nor will they allow any alterations of such records, except for the purpose of correcting a clerical misprint or other error, and where such alteration is made, such commanding officers will give the reason(s), therefore.

Without specific instructions, establishing the required details and assignments necessary to carry out the functions of the Department and of their command in particular.  They will be guided in their assignment of employees by the number of employees available to them for assignment and the necessity for assigning their subordinates where they will be most useful and efficient.

Ensuring that, during the temporary absence of a commanding officer, when no other provision is made by the Chief of Police, that command automatically devolves upon the subordinate present next in seniority to such commanding officer.  Seniority will be determined, first by rank, second by continuous service in the rank, then by length of service time in the Department.

In the necessary performance of their duties, giving orders to any subordinate employee not attached to their command, will exercise great care that such orders do not conflict with those of the commanding officer of the said subordinate employee.  However, commanding officers are responsible for taking appropriate action where there is a serious breach of discipline, improper conduct by an employee in a period of emergency or when supervisory action is necessary and lacking.  That commanding officer will advise the employee's direct supervisor of their actions as soon as possible.

And authorized to place an employee temporarily in the position of an employee of higher rank.

Not countermanding an order issued by a superior officer without sufficient reason.

Exercising their authority over their subordinates with kindness, firmness and justice and will require each subordinate to perform their own duty.

Exercising their authority without bias or prejudice and will not, under any circumstances, or in any manner, obligate themselves to any person of a lesser rank.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 21 of 49

MIAMIBEACH
POLICE
City 001491

Ensuring that they are not only responsible for their own conduct and performance of police duties, but that of their subordinates as well. They will set an example to all subordinates in energy, sobriety, courtesy, dignity, courage, truthfulness, skill, discipline and careful painstaking attention to duty. They will at all times appear neatly attired and clean in person and equipment.

Reporting any emergency, serious crime, or unusual occurrence to their immediate superior. They will make copies of all serious or unusual incidents to their immediate superior. They will make copies of all serious or unusual incidents reported during their hours of duty and forward them to the office of the Chief of Police via a Special Incident Notification. Examples of serious incidents *include but are not limited to* homicide, rape *with limited distribution, serious crime(s) against a juvenile, with limited distribution*, traffic homicide, armed robbery, home invasion, any crime involving the use of weapons or resulting in personal injury and any other incident deemed of importance. They will notify the Chief of Police, or designee, as soon as possible in the event of a homicide, rape, shooting, or serious injury involving any employee of *the Department*.

Personally responding to any emergency or occurrence of a serious or unusual nature which arises, unless their presence at the station would be of more value under the circumstances, in which case, they will assign a competent supervisor to take command at the scene of the emergency. They will also, whenever possible, respond to calls where employees of their command are involved in controversy or accident.

The prompt service of all official notices, summons, or subpoenas which may be sent to them by proper authority.

Maintaining a pleasant, courteous, and dignified attitude and will recognize every caller's presence without unnecessary delay. They will accord respect, courtesy, sincerity and patient attention to every citizen calling at the police station. Under no circumstances will they belittle a seemingly trivial request, complaint or piece of information.

Upon going on duty, thoroughly familiarizing themselves with all police business that has been transacted since their last tour of duty and which may affect them or their command in any way. Ignorance of such police business will be no excuse for the improper performance of any of their duties.

Being guided by Chapter 119, Florida Statute in handling requests for inspection or release of public records.

In the event of the death, resignation, suspension or dismissal of any employee of the Department, will ensure that any Department-issued property in possession of the employee whose command the employee was last assigned, has been returned to the Property and Evidence Unit.

The punctual attendance of all employees within their command and will be responsible for each employee's attendance, overtime, court time, vacations, sick leaves, leaves of absence and suspension records as required by the city.



Maintaining strict and constant scrutiny of all employees of their commands with a view to ascertaining their efficiency and fitness for service. They will prepare performance evaluations for each of the officers of their command at such intervals and upon such forms as may be required by the city.

The efficiency, discipline and morale of all employees of their command. They will investigate, or cause to be investigated, all complaints by citizens and reports by employees of the Department of misconduct, incompetency, neglect of duty or any violations of the Department Rules and Regulations, SOPs and General Orders on the part of anyone under their command, and they will submit an Allegation of Employee Misconduct Form pursuant to policy. They will also report any incompetent employee who may be assigned to their command. The report will include recommendations as to the action to be taken. Commanding officers will be strictly charged with the responsibility of maintaining discipline, without laxity or discrimination, among employees of their command. Repeated leniency toward employees in their command will be deemed neglect of duty on the part of such commanding officers.

Providing guidance and assistance to their subordinates and instilling positive work ethics. Supervisors will be cognizant that such responsibility includes maintaining a working knowledge of the goals and objectives of the Department and continuously working toward these goals and objectives. Supervisors must exemplify leadership qualities consistent with the Department's Mission, *Vision and Values* Statement.

Ensuring that any disciplinary action initiated by them against a subordinate of forwarding a complete written record of the case to the Internal Affairs Unit.

Submitting a detailed report to the Chief of Police any time a large-scale event occurs. Examples of large-scale events are civil disturbances or any event which requires a call-out of a *significant number* of Department employees. This report will be submitted in a Special Incident Notification *as well as an After-Action Report* and will include a summary of the preparation needed, manpower used, problems encountered, number of arrests made, and any other information deemed of importance.

Being governed by the Department Rules and Regulations, SOPs and General Orders set forth for commanding officers and the orders of the Department.

Communicating and explaining all orders and provide all necessary information to their subordinates. They will issue clear, concise and definite orders to their subordinates. Vague, ambiguous, ill-defined orders and commands that cannot be executed are confusing to subordinates and prejudicial to the efficiency, good order and morale of the Department. Commanding officers are responsible for the proper execution of their orders.

Not performing the duties regularly assigned to a subordinate when the subordinate is available to perform them but will require each subordinate officer to perform their own duties.

Ensuring that their subordinates make all required reports promptly, accurately and completely, and on the proper forms.

Effective Date: 7/03/00
Revised Date: 1/4/22

DRR
Page 23 of 49

MIAMIBEACH
POLICE
City 001493

Forwarding through the ***chain of command*** all written communications received from their subordinates requesting a transfer or containing a grievance or suggestion.

Investigating any observed, or notified of, a willful neglect of duty or misconduct by an employee not assigned to their command, to determine the facts and make a written report on an Allegation of Employee Misconduct Form.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 24 of 49

MIAMIBEACH
POLICE

City 001494

**EMPLOYEE RULES OF CONDUCT** [26.1.1]

**3.1**      **Span of Control and Authority**

**3.1.1**    Each Department employee is accountable to only one supervisor at any given time.

**3.1.2**    Only one supervisor will be designated as the commander of any one Division, Unit, Shift, Squad or Office and will be accountable for the effective direction, coordination and control of that organizational component.

**3.1.3**    All Command and Supervisory employees are hereby delegated the authority to make those decisions necessary for the effective execution of their assigned responsibilities.  Each Command and Supervisory employee will be held accountable for the use of delegated authority. [11.3.1]

**3.1.4**    Employees will report to, and be responsible to, their supervisor and follow the chain of command thereafter.  Employees may report to a sworn or non-sworn supervisor.  This ensures that each employee is responsible to only one supervisor at any given time.

**3.1.5**    The number of immediate subordinates of each supervisor is limited to 12 under normal day-to-day operations.  There will be instances, dictated by circumstance, when this may be modified.  Division supervisors will be responsible for reviewing the span of control of all supervisors under their command to assure efficiency is maintained.  Division supervisors *will* consider the extent to which supervisors must carry out non-managerial tasks, demands on supervisors' time from Department sources outside the unit and the specialty of tasks performed by the unit.

**3.1.6**    Shift supervisors will authorize additional supervisory personnel, on an overtime basis, if necessary, when the span of control exceeds a 12 to 1 ration.  Example: If there is only one Patrol Sergeant on duty on a particular shift and two Patrol Lieutenants are working, Shift *Captains* will designate the alternate Lieutenant or assign a Patrol Officer *as an* Acting Sergeant to the first-line supervisory function.

**3.1.7**    In order to carry out its functions, the Department is divided into several organizational components delineating the span of control and the ranks of the members of the chain of command within the Department pursuant to the Organizational Chart.

**3.1.8**    The chain of command will be preserved in order to maintain principles of good administration and will not be by-passed except under emergency conditions or unusual situations.  *Such instances will be reported through the chain of command to the Chief of Police*.

---

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 25 of 49

MIAMIBEACH
POLICE
City 001495

**3.2     Knowledge and Conformity to DRR, SOPs or General Orders**

3.2.1     Employees will thoroughly familiarize themselves with, conform to and abide by, the Department Rules and Regulations, SOPs, General Orders, City Work Rules, City Personnel Rules, ***all other authorized Department practices and procedures*** and all union contracts.  Employees must have a working knowledge of all laws and ordinances in force.  In the event of improper action or breach of discipline, it will be presumed that the employee involved was familiar with the law and/or order in question.  Upon return from any extended absence, employees will familiarize themselves with all changes that may have occurred during such absence.

3.2.2     All employees are responsible for the information distributed through the Official Bulletin.

**3.3     Orders**

3.3.1     Employees will strictly obey and properly execute any lawful order, issued either verbally or written, from any senior ranking supervisory officer.  The term lawful order will be construed as an order in keeping with the performance of any duty prescribed by law, Department Rules and Regulations, SOPs, General Orders, City Work Rules, City Personnel Rules, ***all other authorized Department practices and procedures***, or for the preservation of order, efficiency or proper discipline. [12.1.3]

3.3.2     Orders from superiors to subordinates will be clear and understandable in language, civil in tone and issued in the pursuit of Department business.

3.3.3     Orders given by an employee of equal or lesser rank will be obeyed when said employee is relaying the orders of a superior. [12.1.3]

3.3.4     Under normal operating conditions, the highest-ranking employee present at an incident will assume command of the incident.  When employees of the same organizational component of equal rank are at a scene, the senior employee will assume command.  When employees of two or more organizational components are involved in an incident, the ranking employee present from the organizational component responsible for the follow up investigation and/or conclusion of the case will assume responsibility for, and take command of, the investigation.  The Chief of Police has the authority to designate command authority in any situation as needed. [12.1.2c,d]

3.3.5     Subordinates in doubt as to the nature, meaning or details of a lawful order will seek clarification from the person issuing the order.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 26 of 49

MIAMIBEACH
POLICE
City 001496

**3.4**         **Orders of the Chief of Police** [12.1.1]

**3.4.1**       Any written or verbal order posted or communicated bearing the signature or name of the Chief of Police will have the same effect and be construed as a part of the Department Rules and Regulations, SOPS, General Orders ***or any other procedure or practice*** of the Department.

**3.4.2**       The approval of the Chief of Police is necessary before an order is issued affecting the entire Department.  The Chief of Police's signature must be obtained as evidence of that approval.

**3.4.3**       An order issued by a supervisory officer pertaining to employees of their particular command will be considered an order of that command.

**3.5**      **Conflicting Orders**

**3.5.1**       Upon receipt of an order conflicting with any previous order or instructions, the employee affected will advise the person issuing the second order of this fact.  Responsibility for countermanding the original instruction will then rest with the individual issuing the second order.  If so directed, the subordinate will obey the second order.  The individual issuing the second order will, as soon as practical, ***inform the supervisory officer issuing the original order or instruction*** of the action taken.  The subordinate will not be held accountable for disobeying the original order.  Conflicting orders will be issued only when clearly necessary. [12.1.3]

**3.6**      **Unjust Orders and/or Orders Contrary to Regulations**

**3.6.1**       No supervisory officer will knowingly issue an order which is unjust or is in violation of any order or command issued by the Chief of Police or a ***supervisory officer of higher authority***.  Supervisory officers have the discretion to take temporary action contrary to Department Rules and Regulations, SOPs or General Orders ***or any other procedure or practice*** when circumstances justify doing so, but the supervisory officer doing so will be held accountable for such decisions.

**3.6.2**       Employees who are given orders which they feel to be unjust or contrary to Department Rules and Regulations, SOPs or General Orders, must first obey the order to the best of their ability.  They may then proceed to appeal as provided by Department Rules and Regulations, SOPs, or General Orders. In any case where there is sound reason to believe that such orders or instructions are inconsistent or unjust, it is the right of any employee receiving same to respectfully call it to the attention of the person issuing the order.

**3.7**          **Unlawful Orders** [12.1.3]

**3.7.1**          No supervisory officer will knowingly issue any order which is in violation of, or tends to nullify, any law or ordinance.  Since obedience to any unlawful order is never a defense for any unlawful action.  No employee is required to obey any order which is contrary to federal, state, county or local law or ordinance.  Responsibility for refusal to obey rests with the employee who will be strictly held accountable to justify the action.

**3.7.2**          Employees who receive an order that, in their opinion, is unlawful, unjust, or improper, will report it in writing to the Chief of Police through the chain of command.  Appeals for relief from such orders will be made at this time.

**3.8**     **Insubordination**

**3.8.1**          Employees will not speak derogatorily or critically to other Department employees, or to any person outside the Department, regarding the orders or instructions issued by any supervisory officer.

**3.8.2**          Failure or deliberate refusal of any employee to obey a lawful order given by a supervisory officer will be considered insubordination.  Ridiculing supervisory officers or their orders, whether in their presence or during their absence, is also insubordination.

**4.1**     **Duty to Conform to Law**

**4.1.1**          Persons employed in law enforcement are highly visible representatives of the legal system and bear a heavy burden for maintaining, through their own conduct, the honor and integrity of all governmental institutions. Therefore, the conduct of employees of the Department will not violate the law.  Violation of an ordinance or state or federal statute, in addition to the possibility of legal and criminal prosecution, serves as fundamental grounds for disciplinary action.

**4.2**     **Duty to Conform to Procedural Criminal Law**

**4.2.1**          All persons are guaranteed basic civil rights, including, but not limited to, freedom of speech, press, assemblage and petition; freedom from unreasonable arrest, search and seizure; freedom from self-incrimination; right to counsel; right to privacy; and due process and equal protection of the law.  All employees are responsible for ensuring that civil rights are not violated.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 28 of 49

MIAMIBEACH
POLICE
City 001498

**4.3    Duties Toward Those in Police Custody or Care**

**4.3.1**        All employees will take appropriate action to ensure the preservation of the health, welfare, safety and property of any person within the custody or care of the Department.  Employees will further assure that no violence, indignities, or discourtesies are used in the management of any person within the custody or care of the Department and that, when needed, such persons obtain necessary medical attention.  ***Employees have an affirmative duty to intervene within the scope of their authority pursuant to Department policy and procedures***. [1.2.10]

**4.4    Commanding and Supervisory Responsibility**

**4.4.1**        Supervisory officers are specifically charged with strict enforcement of the provisions of section 4.4 through exercising either their line or staff supervisory authority.

**5.1    Response to Resistance**

**5.1.1**        When in the course of official duties, a sworn employee is required by circumstances to utilize physical force against an individual, the degree and kind of force will be calculated only to overcome unlawful resistance. Excessive and unnecessary force is prohibited. [4.1.1]

**5.1.2**        Any use of force will be documented on a Control of Persons Report.

**5.2    Deadly Response to Resistance**

**5.2.1**        Any officer's response to resistance that is likely to cause death or great bodily harm.  An officer may use deadly force only when the officer reasonably believes that the action is in defense of any human life in imminent danger of death or serious bodily injury. [4.1.2]

**5.2.2**        Sworn employees will use deadly force only in accordance with authorized procedures of the Department and will not violate or exceed statutory provisions governing the use of deadly force.

**5.3    Excessive Force**

**5.3.1**        A response to resistance which is not objectively reasonable, or the amount applied is more than is reasonably necessary in achieving a lawful objective. [4.1.1]



City 001499

**5.3.2**   Sworn employees will not strike or use physical force on any person to the extent that injuries, which reasonably require professional medical treatment, are inflicted, unless necessary in self-defense, or in defense of another, or to overcome actual physical resistance to arrest or to prevent escape.  Any use of force will be documented on a Control of Persons Report.

**6.1**      **Employee Requirements**

**6.1.1**   All employees will ensure that their correct telephone number(s) and residential addresses are provided to the Support Services Division. Changes in telephone numbers and/or residential addresses will be reported to the Support Services Division within 24 hours of such change. The Support Services Division will be responsible for notifying the appropriate Divisions and the Public Safety Communications Division (PSCD) of the change.

**6.1.2**   This information is confidential pursuant to Chapter 119, Florida Statutes. Any employee who improperly uses or distributes this information will be disciplined.

**6.1.3**   Employees will not use the Department or any Department facility as a mailing address for private or personal purposes without the written permission of the Chief of Police.

**6.1.4**   The exception being that any sworn police officer may register a personally owned vehicle using the Department's street address or the use of a post office box with or without the street address of the Department.  This exception is authorized by the Florida Department of Highway Safety and Motor Vehicles.

**6.1.5**   A badge and identification card and/or a notarized statement on the Department's letterhead verifying employment of the officer must be presented to the auto tag agency.  This statement must include the officer's badge number.  The officer will be required to show this statement with each transaction on a license plate, as it will not be retained by the tag agencies.

**6.2**   **Personal Appearance**

**6.2.1**   All employees will maintain a neat, clean appearance and will dress in good taste.  Personnel permitted to wear civilian clothing will conform to standards of cleanliness, neatness, and the standards set forth by the Department.

---

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 30 of 49

MIAMIBEACH
POLICE

City 001500

**6.3     Personal Conduct**

**6.3.1**     Employees are members of a team working together with the primary objective of serving the community.  Individuals who fail to follow the necessary rules and regulations, policies and procedures governing conduct, not only penalize themselves, but do a disservice to all other members of the Department and to the community.

**6.3.2**     All *employees* must be fully aware of the ethical responsibilities of their position and must strive constantly to live up to the highest possible standards of professional policing.  An employee acts as an official representative of government who is required and trusted to work within the law.  The employee's powers and duties are conferred by state statute.  The fundamental duties of an officer include serving the community, safeguarding lives and property, protecting the innocent, keeping the peace and ensuring the rights of all to liberty, equality and justice.

**6.3.3**     All employees will perform all duties impartially, without favor, affection, or ill will and without regard to status, sex, race, national origin, religion, political belief, station in life *or any other recognized classification*.  All citizens will be treated equally with courtesy, consideration and dignity.  Employees will never allow personal feelings, animosities or friendship to influence official conduct.  Laws will be enforced appropriately and courteously and, in carrying out their responsibilities, officers will strive to obtain maximum cooperation from the public.  Employees will conduct themselves in appearance and deportment in such a manner as to inspire confidence and respect for the position of public trust they hold.

**6.4     Authority** [11.3.1]

**6.4.1**     Officers will not exceed their authority in the enforcement of the law.

**6.4.2**     Officers *and civilian employees* will not disobey the law or rules of criminal procedure in such areas as interrogation, arrest, detention, searches, seizures, use of informants and the preservation of evidence.

**6.4.3**     Officers will not restrict the freedoms of individuals, whether by arrest or detention, in violation of the Constitution and the Laws of the United States and the State of Florida.

**6.5     Integrity**

**6.5.1**     Officers will not knowingly make false accusations of any criminal ordinance, traffic or other law violations.  This provision will not prohibit the use of deception during criminal investigations or interrogations as permitted under law.



**6.5.2**     Employees will truthfully, completely and impartially report, testify and present evidence, including exculpatory evidence, in all matters of an official nature.

**6.5.3**     Employees learning of conduct or observing conduct which is in violation of any law or policy of this Department by another officer(s) and/or non-sworn employee(s) of the Department or *other agency* will take necessary action and report the incident to the officer's/employee's immediate supervisor, who will be required to prepare an Allegation of Employee Misconduct Form *if such action(s) involve a Department employee.  A supervisor of another agency whose employee is involved in such action(s) will be notified immediately as will the Chief of Police*.  The failure of the Department supervisor to adhere to the aforementioned rule will subject them to disciplinary action. [1.2.10]

**6.5.4**     No employee will intentionally make false reports, either written or verbal, or enter or cause to be entered in any Department book, record or report any inaccurate, false or improper information.

## 6.6     Responsibility

**6.6.1**     Employees will not consume alcoholic beverages of any kind while on duty, except as authorized in the performance of official duties. Employees will not report for duty with the odor of alcoholic beverages on their breath, or while under the influence of alcohol.

**6.6.2**     Employees will not bring intoxicating beverages into any police building or vehicle except that has been seized as evidence, contraband, unsecured property or a prisoner's property.

**6.6.3**     Employees will not consume intoxicating beverages on Department premises or vehicles.

**6.6.4**     Employees will not consume intoxicating beverages while in uniform or while wearing any identifiable part of a Department Uniform while off duty.

**6.6.5**     Employees, while off duty and partaking of alcoholic beverages and/or frequenting premises established primarily for consumption or sale of alcoholic beverages, will do so only as private individuals and will not display Department identification unless necessary to perform official duties.

**6.6.6**     While off duty, employees may be subject to disciplinary action if found to be disorderly and intoxicated in a public place.

**6.6.7**     Employees will not use any controlled substance except when prescribed in the treatment of an illness by a physician or dentist.  An employee will immediately notify their supervisor before reporting for duty when prescribed medication is used that might affect their ability to perform their duties.

**6.6.8**     Employees will not enter or frequent places established primarily for the sale, storage, or consumption of alcoholic beverages; the sale or display of sexually explicit pictures or materials; or nude or semi-nude performances while on duty and/or in uniform, except in discharge of official duties.

**6.6.9**     Employees are prohibited from visiting, attending, entering or patronizing other than strictly in the line of duty, with the knowledge and consent of their immediate supervisor, any premises or establishment where illegal activities are known, believed or reasonably suspected to take place.

**6.6.10**    Employees will avoid regular or continuous association with persons, other than immediate family, who are known to have the lifestyle of continuing criminal activity or are known to be under investigation by the Department or another law enforcement agency *for any criminal* investigation(s).

**6.6.11**    Employees who are under criminal investigation and/or arrested by another law enforcement agency will notify their Division Major immediately of such investigation and/or arrest.  *The Division Major will, in turn, immediately notify the Chief of Police and Internal Affairs*.

**6.6.12**    Employees will not, while on duty, partake in wagering or gambling, including but not limited to, pari-mutuel wagering or purchase or redemption of lottery tickets.  The foregoing prohibition will not apply when the employee is engaging in any departmentally sanctioned activity.

## 6.7     Courtesy and Respect

**6.7.1**     Employees will courteously and promptly adhere to policies and procedures established for the investigation of complaints of alleged misconduct by Department employees.

**6.7.2**     Employees will be polite and courteous in contacts with the public and other Department personnel.

**6.7.3**     Employees will not ridicule, mock, deride, taunt, belittle, willfully embarrass, humiliate or shame any person or do anything reasonable calculated to incite a person to violence.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 33 of 49

MIAMIBEACH
POLICE
City 001503

## 6.8    Unlawful Compensation

**6.8.1**    Employees will not use their official position, identification cards or badges for personal or financial gain for themselves or another person, for obtaining privileges not otherwise available to them except in the performance of duty and/or for avoiding consequences of unlawful or prohibited actions.

**6.8.2**    Employees will not lend to another person their identification cards, badges, uniforms or any other Department equipment or permit these items to be photographed or reproduced without the ***prior*** written approval of the Chief of Police.

**6.8.3**    Employees will not authorize the use of their names, photographs or titles in a manner that identifies the employee ***as a member*** of this Department in connection with advertisement for any product, commodity or commercial enterprise without the ***prior*** written approval of the Chief of Police.

**6.8.4**    Employees will maintain a neutral position with regard to the merits of any labor dispute, political protest or other public demonstration while acting in an official capacity.

**6.8.5**    Employees will not accept any gift, gratuity or reward in money or other consideration for services rendered in the line of duty to the public or to any person, business or agency except that authorized in writing by the Chief of Police.

**6.8.6**    Any unauthorized gift, gratuity, loan, fee reward, service or other thing of value coming into the possession of any employee will be forwarded immediately to the Office of the Chief of Police.  The Chief will make all reasonable attempts to return the item to the donor.  Failing in this, the item will be donated to a charitable organization.

**6.8.7**    Employees will not accept or solicit referral fees, rebates, or so-called kickbacks from individuals or companies receiving business because of Department activities.  Such referral fees, rebates, or kickbacks include money, services, favors, gifts, discounts, considerations or anything of service value.  All such activities are prohibited, but not limited to, those received from polygraph services, security services, tow truck operators, ambulance services, hospitals, clinics, auto repair shops, lawyers, undertakers, restaurants and companies selling or providing equipment or services to the Department.  This does not apply to Department activities that are charitable in nature, such as the Holiday Toy Giveaway, Police Athletic League activities, P.O.A.T. and any other similarly related charitable activities.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 34 of 49

MIAMIBEACH POLICE
City 001504

**6.9     Inappropriate Influence**

**6.9.1**          Employees will, unless required by law or policy, refrain from becoming involved in official matters, or influencing the actions of other employees in official matters impacting the employee's family, relatives, persons with whom the employee has or has had a significant personal relationship or with whom the employee has or has any business or employment relationship(s).

**6.9.2**          Employees will not use the authority of their position as members of the Department, or information available to them due to their status as employees, for any purpose of personal gain including but not limited to initiating or furthering personal and/or intimate interactions of any kind with persons with whom the officer has had contact.

**6.10    Confidentiality**

**6.10.1**        Employees will not knowingly violate any Department restrictions for the release or dissemination of information, except in the course of official duties or as required by law, or publicly disclose information likely to endanger or embarrass victims, witnesses or complainants.

**6.10.2**        Employees will not divulge the identity of persons giving confidential information except as required by law or Department policy.

**6.10.3**        Employees will not make known to any persons the contents of any directive or order, which they may receive, if such disclosure would destroy the intended effect of that order or Department activity.

**6.10.4**        All information, not prohibited by Department policies and procedures, will be given courteously and accurately to persons requesting the information.

**6.10.5**        Employees will not reveal the identity, presence, activities or description of undercover, plainclothes and narcotics officers except in the strict discharge of their duty.

**6.10.6**        Except in the strict discharge of duty, employees will not reveal the existence of or any information regarding Department projects, investigations or operations aimed at the apprehension of criminals or the suppression of vice activities.

**6.10.7**        ***Employees will abide by the provisions of Marcy's Law***.

**6.11   Training**

**6.11.1**    All employees will attend in-service, specialized, promotional and other training pursuant to Department policy and/or procedures and/or at the discretion of the Chief of Police.  Such attendance will be considered a duty assignment.  Certificates of completion and other relevant documents pertaining to all training activities, ***whether Department or received from another source***, will be filed, when submitted, in the employee's personnel file.  It is the employee's responsibility to provide the certificate and/or other relevant documents to the Support Services Division ***Training Unit*** for filing. [33.5.1]

**6.11.2**    If a supervisor determines that infractions or poor work quality are the result of a lack of knowledge of procedures or policy, the supervisor may request training through their Division major to the Training Unit.  The purpose of additional training is to assist the employee in correcting and improving his performance level.  Training may be conducted during reasonable hours on the Department's time.  ***Such remedial training will be documented by the Training Unit***. [33.1.5a]

**6.12   Civil Litigation**

**6.12.1**    Employees will not seek in any way, nor will they accept from any person, money or other compensation for damages sustained or expenses incurred by them in the line of duty without first notifying the Chief of Police in writing via the chain of command of such action and first receiving written approval.

**6.12.2**    Employees who have received sick leave or salary for illness or injury sustained off-duty will notify the Chief of Police in writing via the chain of command of any intent to seek, sue, solicit or accept compensation for damages before any action is taken and will include the facts of the claim and the name of the respondent.

**6.12.3**    Employees served with notices that they are being sued as a result of actions performed in the line of duty will immediately send written notification of this to the Chief of Police via the chain of command.  This notice will include all of the facts of the incident and details relating to the civil suit.

**6.13   Department Equipment**

**6.13.1**    Employees will notify their immediate supervisor of any loss, damage, defects or hazardous conditions of any City of Miami Beach equipment or property as soon as such are discovered.

**6.13.2**    Employees will not intentionally mark, mar, alter or deface any Department facility or equipment.



City 001506

**6.13.3**  Employees will not place unauthorized or objectionable material on Department bulletin boards or intentionally mark, mar, alter, deface or remove printed or written notices properly placed upon the bulletin boards.

**6.13.4**  Employees will not appropriate any Department property for their own use, either on a temporary or permanent basis.

**6.13.5**  Employees will utilize Department equipment for its intended purpose in accordance with established procedures and will not subject such equipment to loss, or damage through careless handling or abuse or intentional abuse.

**6.13.6**  Employees will not use unauthorized or non-approved equipment.

**6.13.7**  ***Employees will not leave any Department issued equipment, including all electronic or telephonic equipment, in the possession of any unauthorized individual outside of their designated primary residence***.

## 6.14   Political Activity

**6.14.1**  Employees will not engage in political activities while on duty or use their position as Miami Beach employees to influence others in their support or opposition to a candidate or issue.

**6.14.2**  Employees will not enter or remain within an official polling place without permission from Elections Officials except to cast a ballot or in the performance of their official duties.

## 6.15   Performance of Duties

**6.15.1**  Employees will remain at or within their assigned work areas during working hours unless otherwise authorized by a supervisor.

**6.15.2**  Officers will carry their badge and identification card on their person at all times when carrying a firearm, including a concealed firearm, except when engaged in covert assignments or when made impractical by the nature of activities being performed.

**6.15.3**  Employees will wear their issued identification card or badge conspicuously while in or about the Department's facilities, unless exempted by the Division Major ***or above***.

**6.15.4**  Employees will maintain the security of official Department identification and will not lend their identification card, access card or badge to another person, or permit them to be reproduced without the approval of the Chief of Police.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 37 of 49

MIAMIBEACH
POLICE
City 001507

**6.15.5**     Employees will identify themselves in person or over the phone and will display their official credentials when requested.  Employees will not attempt to hide their official identify unless such identification will hinder an investigation.

**6.15.6**     Employees will adhere to SOPs, regulations, directives, policies and procedures and will faithfully execute all duties and responsibilities of their assigned position.

**6.15.7**     Officers assigned to specialized duties or assignments are not relieved from taking proper police action outside the scope of their specialized assignment when necessary.

**6.15.8**     All calls for police service will be answered as soon as possible consistent with normal safety precautions and traffic laws.  Except under the most extraordinary circumstances or when otherwise directed by competent authority, no employee will fail to answer any assigned radio call or to monitor the appropriate channel of their radio.

**6.15.9**     Employees will be attentive to job duties and will avoid any appearance of loitering or otherwise neglecting work.

**6.15.10**    Employees will submit all reports required in the execution of their duties before concluding a tour of duty ***pursuant to policy***.

**6.15.11**    Sworn employees will respond to calls for assistance from citizens or other Department employees and will take appropriate action in emergencies or criminal occurrences while on and off duty.

**6.15.12**    Employees will be attentive to their job duties and will not knowingly refrain or cause another to refrain from the performance of their lawful duties required for the safety of persons or property.  Sworn employees will take appropriate action in response to emergencies where there is known danger to the lives of others, and in response to serious crimes, particularly those of violent nature, which comes to their attention while on or off duty.

**6.15.13**    Sworn employees will not avoid their required duties because of fear or cowardice.  Sworn employees are not expected or required to enter imminently hazardous situations without assistance.  However, they will not fail to come to the aid of another employee of the Department who is already engaged in an imminently hazardous situation.  Sworn employees will respond to the aid of persons in danger unless the probability of serious injury or losing their own life exceeds the probability of a successful rescue.

**6.15.14**    Employees are required to maintain job knowledge and skills necessary for the performance of official duties.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 38 of 49

MIAMIBEACH
POLICE
City 001508

**6.15.15**     Employees will maintain and demonstrate their knowledge of the law and criminal procedure, and will maintain proficiency in required interpersonal skills, care and use of vehicles and equipment and the use of firearms by demonstrating proficiency in accordance with established standards and qualification requirements.

**6.15.16**     Employees may be retested for proficiency as provided by policy, with each subsequent failure to qualify constituting an additional offense. Failure to maintain job skills after instruction or training will result in increasing the severity of disciplinary actions.

**6.15.17**     Employees sustaining any personal injury that might impair their fitness for duty, whether sustained on duty or off duty, will promptly provide written notification of the injury to their immediate supervisor ***who will in turn forward the information to the Chief of Police via the chain of command***.

**6.16    Hours of Duty**

**6.16.1**     Employees will report for duty in accordance with their assigned work schedules and will not be absent from duty without authorization or having made proper notification.  Failure to do so will be deemed neglect of duty. Employees unable to report for duty at their prescribed reporting time due to illness will notify the PSCD not less than one hour prior to nor one hour after their reporting time.  Employees who anticipate tardiness due to personal or transportation difficulties ***will*** notify the PSCD or their own supervisor as soon as possible.

**6.16.2**     Unless otherwise directed, employees will report to daily roll call at the time and place specified, properly uniformed and equipped.  There, they will give careful attention to orders and instructions for the tour of duty.

**6.16.3**     When a condition exists that is deemed by the Chief of Police or designee to be of an emergency nature, regular tours may be extended and/or days off, vacations and leaves of absence of any or all Department employees may be cancelled.

**6.16.4**     All employees will remain at their assignment and on duty until properly relieved or until dismissed.

**6.16.5**     Sworn employees will be assigned regular hours for Active Duty and, when not so assigned, they will be held to be always subject to duty. Although periodically relieved in the routine performance of duty, they are always subject to orders from proper authorities and to calls for assistance from citizens within the City of Miami Beach.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 39 of 49

MIAMIBEACH
POLICE
City 001509

**6.17   Sick Leave**

**6.17.1**   Employees will not feign illness or injury, falsely report themselves ill or injured, or otherwise deceive any supervisor as to the condition of their health for purposes of avoiding normal duties through the use of sick leave.  Performance of activity in conflict with stated purpose of sick leave will constitute evidence of abuse.  A record of claiming sick time in conjunction with days off, holidays or weekends off will be considered abuse.

**6.17.2**   Employees will not feign illness or injury, or falsely report themselves ill or injured, or otherwise deceive or attempt to deceive any supervisor as to their health for the purpose of making a fraudulent claim for family medical leave, insurance, worker's compensation, or disability retirement benefits.

**6.18   Harassment Policy** [26.1.3]

**6.18.1**   A commitment to maintain a work environment free of harassment is a condition of employment with the City of Miami Beach.  Each employee **_will_** be able to enjoy a non-hostile work place free of harassment.  Failure to comply with **_Department and City of Miami Beach policies_** will subject an employee to disciplinary action.

**6.18.2**   Employees will not make derogatory remarks concerning race, sex, religion, age, sexual orientation or national origin of any person **_or other recognized category_**.

**6.18.3**   Employees will not harass, threaten or coerce any other employee or person.

**6.18.4**   Employees will not engage in conduct defined by law and/or the Department's policy that constitutes any type of harassment. [26.1.3]

**6.19   Publicity**

**6.19.1**   Employees will not seek personal publicity in the course of their employment.  Stories, features or articles on radio or television or in magazines or newspapers **_or in/on social media platforms_** dealing with individual Department employees in other than day-to-day type news coverage, must receive prior approval from the Chief of Police or designee before such coverage is initiated.

**6.19.2**   Employees will obtain the approval of the Chief of Police or designee, in writing, before authorizing the use of their names, photos or official titles that identify them as employees of the Department in testimonials, advertisements of any commodity or commercial enterprises.



**6.19.3**      No employee will address any public or private gathering, or appear on radio or television programs, or write articles or manuscripts for publication, including social media, wherein they are identified as an employee, or wherein the subject matter relates to law enforcement and/or the Department unless authorized by the Chief of Police or designee.

## 6.20   Sleeping On-Duty

**6.20.1**      Sleeping on duty is strictly prohibited.  Employees who feel that they are overly fatigued have the obligation to make this fact known to their immediate supervisor.  Supervisors should temporarily transfer the affected individuals to assignments where the safety and welfare of others will not be jeopardized or relieve the individual from duty.

## 6.21   Compromising Criminal Cases

**6.21.1**      Employees will not involve themselves or interfere with cases being investigated by other officers or other government agencies, nor undertake any investigation or other official action not part of their regular duties unless ordered to do so by a supervisor or where a manifest injustice might otherwise occur.  In the latter case, the employee's supervisor will be notified immediately thereafter.

**6.21.2**      Employees will not attempt to have any traffic citation or criminal case reduced, voided or stricken from the calendar.  Employees having knowledge of such action and failing to inform their supervisor thereof will be subject to discipline.

**6.21.3**      Employees will not communicate in any manner, either directly or indirectly, any information which might assist persons accused of criminal acts or traffic *infractions* to escape the full process of law.

## 6.22   Conflicts of Interest

**6.22.1**      Employees will avoid official involvement in personal, civil, domestic or family disputes.  Such disputes will be referred for investigation by impartial on duty officers.  Officers will not attempt to exercise authority or make an arrest in their own quarrels but will contact a supervisor who will cause the matter to be investigated and action taken by impartial officers having no personal interest in the dispute.

## 6.23   Secondary Employment

**6.23.1**      Employees will not engage in any business or employment in their off-duty hours which, by its nature or by its demand upon them, produces conflict of interest and or detriment or impaired service to the Department.



**6.23.2**     Employees will obtain approval in conformance with Department and city policy before engaging in other employment, occupation, profession or commercial enterprise.

## 6.24     Recommending Attorneys or Bail Bondsmen

**6.24.1**     Employees will not recommend, advise or suggest to any person arrested, prisoner or any other person concerned with a prisoner in custody, the employment or services of any specific attorney or bail bondsman.

**6.24.2**     Employees will not become surety, guarantor or furnish bail for any person arrested or charged with a crime except members of their immediate family and then only upon notification *to the Chief of Police through the chain of command*.

## 6.25     Recommending Private Business or Company

**6.25.1**     Employees will not refer or recommend any private business or company to the public while the employee is acting in their official capacity or representing the Department.

## 6.26     Public Comment

**6.26.1**     Employees will not publicly criticize or ridicule the Department, its policies or employees by talking, writing or other expression where such comment or criticism tends to impair the operation of the Department, interfere with its efficiency, interfere with the ability of supervisors to maintain discipline, or where such comment is made with reckless disregard for truth or falsity; or when such comment is obscene; or where such comment is slanderous or defamatory; and where such comment is unlawful, jeopardizes an ongoing investigation or endangers the safety of any individual.

**6.26.2**     Employees who are authorized spokesmen for employee organizations or collective bargaining groups will not be restrained from public comment on the issues in question provided that such that such employee(s) make clear that they speak on behalf of their organization and not on behalf of the Department and that such comment does not violate the law.

## 6.27     Membership in Organizations

**6.27.1**     Employees may participate in organizations or activities that are concerned with the improvement of law enforcement working conditions and standards.  Employees may hold membership in and engage in the activity of fraternal or community organizations which are lawful and do not bring disrepute upon the employee or the Department.

**6.27.2**     Employees will not be members of, or attend meetings of, or be an advocate for any group or organization that would reflect negatively on the Department or adversely affect the employee's ability to perform their duties.

## 6.28   Conduct Unbecoming

**6.28.1**     Conduct unbecoming an employee of the Department is defined as any conduct or act which has an adverse impact upon the operation of the Department and destroys public respect and confidence in the Department and/or its employees.

**6.28.2**     Such conduct may include, but is not limited to, participation in any immoral, indecent or disorderly conduct, or conduct that causes substantial doubts concerning an employee's honesty, fairness, or respect for the rights of others, or the laws of the State or Nation, regardless of whether such act or conduct constitutes a crime.

**6.28.3**     Employees, whether on or off duty, will not commit any criminal offense under any laws of the United States, the State of Florida or any local jurisdiction in which the employee is present, except where permitted in the performance of duty under proper authority.

**6.28.4**     The following acts of employees will be deemed sufficient cause for disciplinary action, including counseling, reprimand, suspension, demotion or dismissal:

**6.28.4.1**     Has been convicted of a felony, or of a misdemeanor; or has been guilty of an immoral or criminal act.

**6.28.4.2**     Has been guilty of misuse of sick leave privilege or excessive tardiness or absenteeism without good cause.

**6.28.4.3**     Has willfully, wantonly or through culpable negligence, been guilty of brutality or cruelty to a prisoner or to a person in custody.

**6.28.4.4**     Has willfully violated any of the provisions of the Civil Service Act, Personnel Rules of the City of Miami Beach, City Work Rules, or Department Rules and Regulations, SOPs, General Orders and or policies and procedures of the Department.

**6.28.4.5**     Has violated any lawful or reasonable regulation or order or failed to obey any lawful or reasonable direction made and given by a supervisor.

**6.28.4.6**     Has been intoxicated, or under the influence of intoxicants or narcotics or controlled substances without prescription, barbiturates, or central nervous system stimulants as defined in FSS 893.2 and FSS 893.356(s)(a), while on duty or while wearing any portion of an issued uniform, whether on or off duty.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 43 of 49

MIAMIBEACH
POLICE
City 001513

**6.28.4.7**     Has used any amount of intoxicants or narcotics during on duty hours.

**6.28.4.8**     Has contracted a mental or physical ailment or defect which incapacitates them **for Department** service.

**6.28.4.9**     Has knowingly harbored a serious communicable disease that may endanger others, or knowingly exposes others to a serious communicable disease.

**6.28.4.10**    Has been guilty of actions which amount to insubordination or disgraceful conduct whether committed on duty or off.

**6.28.4.11**    Has been wantonly offensive in conduct or language toward the public or officers or other employees.

**6.28.4.12**    Is careless or negligent of the property of the city, or steals, misplaces or misuses equipment, materials, property or any other thing of value belonging to the city.

**6.28.4.13**    Has been incompetent, negligent or inefficient to such an extent that merit ratings fall below the reasonable minimum standard.

**6.28.4.14**    Has used, or threatened, or attempted to use political influence in securing promotion, leaves of absence, transfer, change in pay, change in character of work or revision of examination grade.

**6.28.4.15**    Has intentionally falsified time records or failed to report absences from duty to a superior in accordance with prescribed procedures.

**6.28.4.16**    Has been absent from duty without approved leave of absence from the Chief of Police, or contrary to prescribed procedures, or has failed to report after a leave of absence has expired, or within a reasonable time after such leave of absence will have been revoked or cancelled.

**6.28.4.17**    Has willfully refused and failed to appear before any grand jury, court, or judge, or officer, board or body authorized by law or the City Commission to conduct any hearing or inquiry relative to the official duties of such employee, or has refused and continues to refuse to answer any related questions concerning official duties which have been asked as a part of an official hearing or inquiry by the Department, the City Manager or by any other person authorized by the City Commission or the City Manager to conduct such a hearing or inquiry.

**6.28.4.18**    Has been guilty of gross negligence or gross inefficiency in the performance of their duties, where such negligence or inefficiency has or might result in loss or injury to the City, the public or to persons or property affected thereby.

**6.28.4.19** Has violated the provisions of Part II Code, Chapter 2 Administration, Article VII, Standards of Conduct for City Officers and Employees, of the City Code of the City of Miami Beach, ordinances of Miami-Dade County, or the laws of the State of Florida.

**6.28.4.20** Has been guilty of conduct unbecoming an employee of the Department or the city.

**6.28.4.21** Has guided, or in any manner has been concerned in assessing, soliciting or collecting money from any employee in the service of the City of Miami Beach for the purpose of making a gift to a public officer in violation of any City Ordinance or State Statute.

**6.28.4.22** Has been induced, has induced or has attempted to induce an employee in the service of the City of Miami Beach to commit an unlawful act, or to act in violation of lawful and reasonable Department or official regulation or order; or has taken any fee, gift or other valuable thing in the course of their work or in connection with it for their personal use from any citizen, when said contribution is made with the hope or expectation of receiving a favor or better treatment than is afforded to other citizens.

**6.28.4.23** Has made a false statement in the application for employment or has given false information on their pre-employment medical examination and the false information was discovered after employment.

**6.28.4.24** Has been refused surety bond by the city's bond carrier that carries the city fidelity bonds on all city employees when such bond is applied for as qualifications for employment or has been refused continuance of coverage under such surety bonds.

**6.28.4.25** Has solicited, accepted or received, either directly or indirectly, any gift, reward, present, service, loan, fee discount, donation, gratuity or other thing of value for the performance of any duty imposed upon them by virtue of their office aside from their official capacity, provided, however, that this rule and regulation does not apply in cases of meritorious service rendered by an employee of said service and has been specially authorized by the Chief of Police in each instance to receive such reward, gift, present, donation, gratuity or other thing of value.

**6.28.4.26** Has engaged in work slowdowns or restriction of work output or interfered with work in or about the Department including, but not limited to, instigating, leading, or participating in any walkout, strike, sit-down, stand-in, slowdown, refusal to return to duty at the scheduled time, or otherwise instigate, lead, or contribute to job actions that undermine supervisory authority and seriously affect discipline, morale or organizational effectiveness.

Effective Date: 7/03/00
Revised Date: 1/4/22

DRR
Page 45 of 49

MIAMIBEACH
POLICE
City 001515

**6.28.4.27**     Has committed any act which, as defined under Florida and Federal Law, constitutes sexual harassment, including but not limited to, making unwelcome sexual advances, requesting sexual favors, engaging in sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature.

**6.28.4.28**     ***Has committed any act which, as defined under Department policy, city policy, Florida and Federal Law, constitutes any type of harassment***. [26.1.3]

**6.28.4.29**     Has, while on or off duty, engaged in any conduct which the employee knows, or reasonably should know, constitutes unwelcome sexual advance or request for sexual favor, or unwelcome sexually motivated physical contact or unwelcome verbal or physical conduct or communication of a sexual nature.

**6.28.4.30**     ***Has, while on or off duty, engaged in any conduct which the employee knows, or reasonably should know, constitutes harassment of any type***. [26.1.3]

**6.28.4.31**     Has committed any acts which, as defined under Florida Law, constitute sexual assault or indecent exposure.  Sexual assault does not include a frisk or other search done in accordance with proper police procedures.

**6.28.4.32**     Has committed any acts which, as defined under Florida Law, constitute domestic violence and/or stalking or the violation of a court order restraining the employee from committing an act of domestic violence, having contact with the petitioner, or excluding the employee from the petitioner's home or workplace.

**6.28.4.33**     Has, in the course of performing their duties, engaged in any sexual contact or conduct constituting lewd behavior, including but not limited to, exposing themselves or otherwise making physical contact with the nude or partially nude body of any person, except as pursuant to Department policy or procedure.

**6.28.4.34**     Has been fighting or quarreling with employee(s) of the Department.

**6.28.4.35**     Has committed negligent use or discharge of a firearm, providing no injury or death resulted from the misuse.

**6.28.4.36**     Has failed to properly supervise subordinates.

**6.28.4.37**     Has failed to take appropriate disciplinary action.

**6.28.4.38**     Has received excessive moving vehicle violations or excessive unpaid parking violation tickets.

**6.28.4.39**     Has failed to use seatbelts.

Effective Date:  7/03/00
Revised Date:  1/4/22

DRR
Page 46 of 49

MIAMIBEACH
POLICE
City 001516

**6.28.4.40**   *Has violated any Department SOP, General Order, DRR, policy, procedure or practice.*

## 6.29   Careless Disregard

**6.29.1**   Repetitious violation of the Departmental Rules and Regulations, SOPs, General Orders, procedures, policies or practices will be indicative of careless disregard.

## 6.30   Signing of Documents

**6.30.1**   Employees will comply with direct instructions given by a supervisor in regard to signing any official Department document.  Unless otherwise specified, affixing one's signature, either written or electronic, to the document services as acknowledgement and/or receipt of the document and does not necessarily indicate agreement with its content.  In circumstances when personnel disagree with the content of a document, a written rebuttal may be submitted for attachment to the document.

## 6.40   Tortuous Acts

**6.40.1**   Employees will not commit by act of commission or omission, any flagrant or tortuous act while in the performance of their duties.  Violations of Civil Rights Acts under Color of Law (Title 18 U.S.C. 241 and 242) are federal offenses, punishable by fine and/or imprisonment ***in addition to Department discipline.***

## 6.41   Conflicting Statements

**6.41.1**   Employees will not knowingly make statements that contradict or are inconsistent with each other in an official or administrative inquiry.  The question of materiality will be determined by the Chief of Police or designee.  Proof of which statement is false will not be necessary.  It will be a defense that the individual making the statements believed each statement to be true at the time it was made.

## 6.42   Answering Questions in an Official Investigation

**6.42.1**   Employees must answer questions specifically, directly and narrowly related to the performance of their duties.  If an employee refuses to answer such questions without being required to waive their immunity with respect to the use of their answer, or fruits of their answers in a criminal prosecution, the privilege against self-incrimination will be of no barrier against disciplinary action.

## 6.43   Untruthfulness

**6.43.1**   Employees will not knowingly make untrue statements except as authorized in the performance of duties.

---



City 001517

**6.43.2**    Employees will not knowingly make false statements to a supervisor or any official of a government agency during an official or administrative inquiry.

## 6.44    Subpoenas and Court Appearances

**6.44.1**    Employees will report to the specified location at the time and date required by a subpoena.  Employees unable to respond to a subpoena due to sickness, injury, or other such causes, or because of conflict with another subpoena, will notify the appropriate authority originating the subpoena to obtain a release from the subpoena and notify the Court Liaison Section.

**6.44.2**    Employees subpoenaed to testify against the city or the Department or the county, in any trial or hearing, will notify their supervisor in writing, upon receipt of the subpoena.  ***Their supervisor will in turn notify the Chief of Police through the Chain of Command***.

**6.44.3**    Employees will not appear or give testimony as a character witness for any defendant in a criminal trial or inquiry without ***the prior*** written approval of the Chief of Police or designee.

## 6.45    Search of Arrested Persons [1.2.4]

**6.45.1**    Officers will adhere to Department arrest procedures and will exercise proper care in the arrest, transportation and detention of detainees to prevent escape, injury to self or others or damage to property.  Upon arrest, detainees will be searched carefully by the arresting officer. Weapons, contraband or evidence will be immediately confiscated and properly documented.  When a detainee cannot be thoroughly searched before transport or custody, the arresting officer will notify the person receiving the detainee.

## 6.46    Wearing Uniform While Under Disciplinary Suspension

**6.46.1**    Employees will not wear the official uniform, or other articles of clothing that bears the official insignia or otherwise identifies the person as a member of the Department, while under disciplinary suspension.

## 6.47    Property and Evidence [84.1.1]

**6.47.1**    Property and evidence, received in connection with official duties, will be processed in accordance with established procedures.  Employees will not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with, or withhold any property or evidence held in connection with an investigation or other official action.



**6.48   Radio Transmissions**

**6.48.1**   Employees will use their radios in accordance with established procedures and will avoid the use of sarcasm, impertinent remarks, or other improper radio transmissions including interfering with radio broadcasting. Employees will not use the radio for non-police functions or personal business.  Employees are to monitor their radios at all times.



City 001519

Thursday, May 19, 2022 at 09:20:11 Eastern Daylight Time

**Subject:** FW: Area 3 Details
**Date:** Monday, December 28, 2020 at 3:55:27 AM Eastern Standard Time
**From:** Cosner, Steven
**To:** Salabarria, Jessica
**Attachments:** image001.png

> **Plaintiffs' Exhibit**
>
> **5**
>
> Cosner 5/17/2024 M.F.

Forgot to send this to you.  Please assign.  I need a DAL and stats by 0615.

*Steve Cosner, Lieutenant*
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department



**From:** Dionne, Martin <MartinDionne@miamibeachfl.gov>
**Sent:** Friday, December 25, 2020 11:44 PM
**To:** Serrano, Steven <StevenSerrano@miamibeachfl.gov>; Romero Sierra, Hansel <HanselRomeroSierra@miamibeachfl.gov>; Garrido, Christopher <ChristopherGarrido@miamibeachfl.gov>; Otero, Michael <MichaelOtero@miamibeachfl.gov>; Horton, Reginald <ReginaldHorton@miamibeachfl.gov>; Zapata, Juan <JuanZapata@miamibeachfl.gov>
**Cc:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Subject:** Area 3 Details

Guys,
**Please see below directives from Captain George. Please make sure you call off the details on a nightly basis. If you generate any stats or notice anything noteworthy, please let me know.**

**Thank You**

**Mule Detail**
- Mule/Golf Cart -Patrols Ocean Terrace, Library Parking Lot, Altos Del Mar Park, Bandshell Park, Beachwalk and surrounding area. This detail needs to be staffed for the **entire shift (24 hrs)** and can be rotated.
- Open Space Park & Altos Del Mar Park –  **Dayshift** Officers to sweep the park to ensure camps have not been established. **Afternoon** and **Midnight** shift conduct nightly sweeps of the park to enforce closure.
- Beach Area Check Garrido

**Business Corridor**

- 73-75 Street/Collins Ave Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators: Otero/Zapata

NOBE Oceanside Park Otero/Zapata **Call off as 7800 Blk Collins Avenue**

- North Shore Library and rear parking lot/restrooms: Garrido
- 72-77 Street/Ocean Terrace (UNIDAD & the Bandshell): Garrido
- Parking Lots along Collins Ave.: Serrano- **Please pay particular attention to the parking lot at 80th and Collins. Check the alley way ref complaints of drug activity**.

**Traffic Details / Area Checks**

- Parkview Island Romero
- Parkview Park, Tatum Park and North Shore Park: Romero
- Traffic Enforcement on Collins Avenue between 79-85 Street: Otero/Zapata
- Traffic Enforcement on Collins Ave from 63-65 Street (Loud vehicle and motorcycles): Otero/Zapata

**Crespi/Hawthorne Loop Vehicle**

- Food Detail / 87th Street & Collins (0630-0830) - only on Wednesdays until further notice
- Biscayne Point Dionne
- Hawthorne/Crespi/Stillwater Romero **Call of as 1000 BLK of Stillwater Drive**
- All Parks in your AOR (i.e., Stillwater Park and Crespi Park) Romero

1300 BLK of Marseille: **Pease drive up and down with your cruise lights on. This is a high visibility detail.**

1600 BLK of Bay Drive: **Please drive up and down with your cruise lights on. This is a high visibility detail.**

**1070 S. Shore Drive. - Mitchell**

**71st Street Loop Vehicle**

- Normandy Shores Horton **Call off as 2600 BLK of Biarritz**
- Normandy Isles Horton
- 71 Street Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators. Horton

Please pay particular attention to the 1600 BLK of Bay Drive

| From: | Cosner, Steven <StevenCosner@miamibeachfl.gov> |
|---|---|
| Subject: | Salabarria Documents |
| To: | melkins@mlelawfirm.com <melkins@mlelawfirm.com> |
| Sent: | January 8, 2021 12:11 AM (UTC-05:00) |
| Attached: | FW_ Details Area 3.eml, Fwd_ Stats.eml, Area 3 Details _ Midnight Shift Statistics 12_27-12_28.eml, Screenshot_20201229-013023 Salabarria Text.png, Screenshot_20201229-031004 (002) Serrano.png, Screenshot_20201229-031016 (002) Garrido.png, Screenshot_20201229-031030 (002) Albaladejo.png, Screenshot_20201229-031039 (002) Ocejo.png, Screenshot_20201229-031049 (002) Baumer.png, Screenshot_20201229-031058 (002) Romero H.png, Screenshot_20201229-031121 Squad.png, Screenshot_20201230-235607 (004) Salabarria.png, Screenshot_20201230-235907 (002) Romero W.png, JS AVL Detail_12.27 to 12.28.pdf |

Attached are the screenshots documenting phone calls and text messages, the emails and the AVL report.  I will forward the Administrative Action Form in a second email.  Thanks.

SC



**Steve Cosner, Lieutenant**
**MIAMI BEACH POLICE DEPARTMENT**

**Operations Division/Third Platoon/Area 2**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526 / Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

Plaintiffs' Exhibit

6

Cosner 5/17/2024 M.F.

**From:** Romero Sierra, Hansel <HanselRomeroSierra@miamibeachfl.gov>
**Subject:** FW: Details Area 3
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** December 28, 2020 5:59 AM (UTC-05:00)
**Attached:** image001.jpg

---

**From:** Salabarria, Jessica <JessicaSalabarria@miamibeachfl.gov>
**Sent:** Monday, December 28, 2020 5:42 AM
**To:** Serrano, Steven <StevenSerrano@miamibeachfl.gov>; Garrido, Christopher <ChristopherGarrido@miamibeachfl.gov>; Albaladejo, Rodolfo <RodolfoAlbaladejo@miamibeachfl.gov>; Baumer, Werner <WernerBaumer@miamibeachfl.gov>; Suarez, Andy <AndySuarez@miamibeachfl.gov>; Romero Sierra, Hansel <HanselRomeroSierra@miamibeachfl.gov>
**Subject:** Details Area 3
**Importance:** High

**Squad per our conversation please note the below details for our shift.**

**Thank you.**

**Details:**

**Mule Detail**
- Mule/Golf Cart -Patrols Ocean Terrace, Library Parking Lot, Altos Del Mar Park, Bandshell Park, Beachwalk and surrounding area. This detail needs to be staffed for the **entire shift (24 hrs)** and can be rotated.
- Open Space Park & Altos Del Mar Park â€" **Dayshift** Officers to sweep the park to ensure camps have not been established. **Afternoon** and **Midnight** shift conduct nightly sweeps of the park to enforce closure.
- Beach Area Check Garrido

**Business Corridor**
â€¢       73-75 Street/Collins Ave Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators: Romero/Albaladejo
NOBE Oceanside Park Romero/Albaladejo **Call off as 7800 Blk Collins Avenue**
â€¢       North Shore Library and rear parking lot/restrooms: Garrido
â€¢       72-77 Street/Ocean Terrace (UNIDAD & the Bandshell): Garrido
â€¢       Parking Lots along Collins Ave.: Serrano- **Please pay particular attention to the parking lot at 80th and Collins. Check the alley way ref complaints of drug activity.**

**Traffic Details / Area Checks**
â€¢       Parkview Island Romero
â€¢       Parkview Park, Tatum Park and North Shore Park: Romero
â€¢       Traffic Enforcement on Collins Avenue between 79-85 Street: Baumer/Suarez
â€¢       Traffic Enforcement on Collins Ave from 63-65 Street (Loud vehicle and motorcycles):  Baumer/Suarez

**Crespi/Hawthorne Loop Vehicle**
â€¢       Food Detail / 87th Street & Collins (0630-0830) - only on Wednesdays until further notice
â€¢       Biscayne Point Romero
â€¢       Hawthorne/Crespi/Stillwater Romero **Call of as 1000 BLK of Stillwater Drive**
â€¢       All Parks in your AOR (i.e., Stillwater Park and Crespi Park) Romero

1300 BLK of Marseille:   **Pease drive up and down with your cruise lights on. This is a high visibility detail.**
1600 BLK of Bay Drive:   **Please drive up and down with your cruise lights on. This is a high visibility detail.**

**1070 S. Shore Drive. - Mitchell**


**71st Street Loop Vehicle**

â€¢        Normandy Shores <mark>Ocejo</mark> **Call off as 2600 BLK of Biarritz**

â€¢        Normandy Isles <mark>Ocejo</mark>

â€¢        71 Street Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators. <mark>Ocejo</mark>


<mark>Please pay particular attention to the 1600 BLK of Bay Drive</mark>

MIAMIBEACH

**Jessica Salabarria**, Sergeant
Operations Division
MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, Ext. 3123  |  Fax: 786-394-4950
jessicasalabarria@miamibeachfl.gov

**Mission:** Address Crime and Community Concerns
**Vision:** A safe and welcoming environment for everyone
**Values:** Honorable, Professional, Resilient
**Our Daily Goals:** Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the publicâ€™s perception of the Miami Beach Police Department

| | |
|---|---|
| **From:** | Ocejo, Richard <RichardOcejo@miamibeachfl.gov> |
| **Subject:** | Fwd: Stats |
| **To:** | Cosner, Steven <StevenCosner@miamibeachfl.gov> |
| **Sent:** | December 28, 2020 6:06 AM (UTC-05:00) |
| **Attached:** | image001.jpg |

Begin forwarded message:

**From:** "Salabarria, Jessica" <JessicaSalabarria@miamibeachfl.gov>
**Date:** December 28, 2020 at 5:21:48 AM EST
**To:** "Garrido, Christopher" <ChristopherGarrido@miamibeachfl.gov>, "Serrano, Steven" <StevenSerrano@miamibeachfl.gov>, "Romero Sierra, Hansel" <HanselRomeroSierra@miamibeachfl.gov>, "Baumer, Werner" <WernerBaumer@miamibeachfl.gov>, "Suarez, Andy" <AndySuarez@miamibeachfl.gov>, "Albaladejo, Rodolfo" <RodolfoAlbaladejo@miamibeachfl.gov>, "Ocejo, Richard" <RichardOcejo@miamibeachfl.gov>
**Subject: Stats**

Squad please respond to this email with your statistics for tonight. I 06 at 0545, thank you.

MIAMIBEACH
**Jessica Salabarria**, Sergeant
Operations Division
MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, Ext. 3123 | Fax: 786-394-4950
jessicasalabarria@miamibeachfl.gov

**Mission:** Address Crime and Community Concerns
**Vision:** A safe and welcoming environment for everyone
**Values:** Honorable, Professional, Resilient
**Our Daily Goals:** Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the publicâ€™s perception of the Miami Beach Police Department

| | |
|---|---|
| **From:** | Salabarria, Jessica <JessicaSalabarria@miamibeachfl.gov> |
| **Subject:** | Area 3 Details / Midnight Shift Statistics 12/27-12/28 |
| **To:** | Cosner, Steven <StevenCosner@miamibeachfl.gov> |
| **Sent:** | December 28, 2020 5:36 AM (UTC-05:00) |
| **Attached:** | image001.jpg |

**Midnight Shift Statistics 12/27-12/28:**


Serrano- 1 UTC 5, written warnings, 1 report other
Baumer/PPO Suarez- 2 case reports, 1 arrest form, 4 warnings, 1 report other
Garrido â€" 1 warning citation
Albaladejo- 1 arrest form
Hansel- 3 UTC 1 written warning
Ocejo- 2 UTC 1 Tow


**Details:**

**Mule Detail**
- Mule/Golf Cart -Patrols Ocean Terrace, Library Parking Lot, Altos Del Mar Park, Bandshell Park, Beachwalk and surrounding area. This detail needs to be staffed for the **entire shift (24 hrs)** and can be rotated.
- Open Space Park & Altos Del Mar Park â€" **Dayshift** Officers to sweep the park to ensure camps have not been established. **Afternoon** and **Midnight** shift conduct nightly sweeps of the park to enforce closure.
- Beach Area Check Garrido

**Business Corridor**
â€¢        73-75 Street/Collins Ave Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators: Romero/Albaladejo
NOBE Oceanside Park Romero/Albaladejo **Call off as 7800 Blk Collins Avenue**
â€¢        North Shore Library and rear parking lot/restrooms: Garrido
â€¢        72-77 Street/Ocean Terrace (UNIDAD & the Bandshell): Garrido
â€¢        Parking Lots along Collins Ave.: Serrano- **Please pay particular attention to the parking lot at 80<sup>th</sup> Collins. Check the alley way ref complaints of drug activity**.

**Traffic Details / Area Checks**
â€¢        Parkview Island Romero
â€¢        Parkview Park, Tatum Park and North Shore Park: Romero
â€¢        Traffic Enforcement on Collins Avenue between 79-85 Street: Baumer/Suarez
â€¢        Traffic Enforcement on Collins Ave from 63-65 Street (Loud vehicle and motorcycles):  Baumer/Suarez

**Crespi/Hawthorne Loop Vehicle**
â€¢        Food Detail / 87th Street & Collins (0630-0830) - only on Wednesdays until further notice
â€¢        Biscayne Point Romero
â€¢        Hawthorne/Crespi/Stillwater Romero **Call of as 1000 BLK of Stillwater Drive**
â€¢        All Parks in your AOR (i.e., Stillwater Park and Crespi Park) Romero

1300 BLK of Marseille:  **Pease drive up and down with your cruise lights on. This is a high visibility detail.**
1600 BLK of Bay Drive:  **Please drive up and down with your cruise lights on. This is a high visibility detail.**

**1070 S. Shore Drive. - Mitchell**


**71st Street Loop Vehicle**

- â€¢     Normandy Shores <mark>Ocejo</mark> **Call off as 2600 BLK of Biarritz**
- â€¢     Normandy Isles <mark>Ocejo</mark>
- â€¢     71 Street Business Corridor (Park and Walk). Officers should be visible and making contact with business staff. Midnight Shift to enforce curfew violators. <mark>Ocejo</mark>

<mark>Please pay particular attention to the 1600 BLK of Bay Drive</mark>

MIAMI**BEACH**

**Jessica Salabarria**, Sergeant
Operations Division
MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, Ext. 3123 | Fax: 786-394-4950
jessicasalabarria@miamibeachfl.gov

**Mission:** Address Crime and Community Concerns
**Vision:** A safe and welcoming environment for everyone
**Values:** Honorable, Professional, Resilient
**Our Daily Goals:** Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the publicâ€™s perception of the Miami Beach Police Department

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Subject:** Salabarria AAF
**To:** Prieto, AJ <AJPrieto@miamibeachfl.gov>
**Sent:** January 8, 2021 12:35 AM (UTC-05:00)
**Attached:** Salabarria AAF.pdf

Hello AJ,

I was advised to forward this to you.  Please review and advise if there is anything else you need me to take care of. Thanks.

SC



*Steve Cosner, Lieutenant*
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

**Plaintiffs' Exhibit**

**7**

Cosner 5/17/2024 M.F.

MIAMIBEACH
# POLICE
# Administrative Action Form

D#

| Employee:<br>Salabarria, Jessica | Job Title:<br>Sergeant of Police | Division:<br>Operations/Patrol | Date:<br>12/30/2020 |
|---|---|---|---|
| Level of Action:<br>Documentation of Verbal Conference: | | Written Warning: | Letter of<br>Reprimand: |
| Violation of City Work Rule: | | Title: | |
| Violation of Department SOP #: DRR 3.8.2, DRR 6.5.4, DRR 6.15.1, 6.15.6, 6.15.9, DRR 6.28.3.6, 6.28.3.10, 6.28.3.20, 6.28.3.34, DRR 6.34.1, DRR 6.39.1, DRR 6.40.1 | | Title: Insubordination, Integrity, Performance of Duties, Conduct Unbecoming, Untruthfulness, Supervisor Responsibility, Radio Transmissions | |
| Violation of General Special Order #: | | Title: | |

**Documentation of Incident:** On Sunday night, 12/27/2020 at approximately 2200 hours, I advised Sergeant Jessica Salabarria that we needed a Sergeant on overtime for the midnight shift.  I told her that she was the next supervisor to be forced to work over since we did not have any volunteers for the position.  She was told that she would be assigned to Area 3 and would be working from 0000-0600 hours.  She acknowledged the order and within several minutes she provided me with an overtime slip completed by her in which she documented in her own handwriting that she was working in Area 3.  She left the sergeant's office shortly thereafter.  At approximately 0355 hours, I forwarded an email to Sergeant Salabarria with the details and watch orders that needed to be assigned to the Area 3 officers for completion prior to the end of their shift.  I then sent a text message to her cellular phone advising her to check her email at 0359 hours.  After a few minutes I did not receive an acknowledgement of the text message, so I tried to call her phone at 0404 hours.  Then phone rang repeatedly and went to voicemail.  I tried to raise her via the police radio immediately afterwards.  The dispatcher raised her multiple times with no response.  Sergeant Wilson Romero advised via radio that he would try to call her.  He called me at 0411 hours to advise that he could not reach her and that her phone rang through to voicemail.  I again tried to have the dispatcher raise her, and after several attempts by name and unit number, she finally responded.  The tone of her voice sounded as if she was just waking up.  I spoke with her via the supervisor channel and asked her where she was.  She told me that she was "05".  I responded by asking if she meant, "05 at the NESS".  She said no and that she was at the main station.  I asked if she was aware that she was assigned to Area 3 and she answered affirmatively.  I then ordered her to respond to Area 3 and to check her email.

I became involved in a vehicle stop along 71 street that resulted in an arrest at 0416.  Officer Ocejo was one of the officers who responded as back-up.  After the subject was transported, I waited on scene with Officer Ocejo as he waited for a tow truck.  I asked Officer Ocejo to check his email to see if the details had been forwarded by Sergeant Salabarria.  He told me that he did not have any emails from her.  This was at approximately 0520 hours.  At 0543 hours, I received an unsolicited text message from Sergeant Salabarria advising that she had emailed me the squad stats and the detail assignments.  She claimed that she had told the officers via landline and email of their detail assignments.  The email that she sent me was sent at 0536 hours.  It included the squad stats and detail assignments.  I called Officer Hansel Romero and asked him if he had received any emails, texts, or phone calls from Sergeant Salabarria advising him of detail assignments.  He said that he did not and that she had only asked for stats in an email that was sent at 0521 hours.  That email was forwarded to me by Officer Ocejo.  I began

Revised 01/22/2014

calling all the officers assigned to Area 3 and inquired the same of each of them.  Every one of the officers advised that they had not received a call or text advising of the details.  Officer Romero then forwarded an email that he received from Sergeant Salabarria at 0542 hours.  The email had been sent to each of the Area 3 officers.  It was the detail assignments and began with a highlighted line stating, "squad per our conversation please note the below details for our shift".  I found this very concerning because it was now the second time that she had claimed to have had a conversation with the officers about their assignments when all six of them claimed that never happened and they did not report to any assigned details during the shift.

I sent an email to Lieutenant Jorge Garcia asking for a Detail Report for Sergeant Salabarria's assigned marked vehicle via the AVL system.  My inquiry was for her vehicle movement from 2200 hours on 12/27/2020 through 0600 hours on 12/28/2020.  The Detail Report showed that her vehicle had been parked at the station from 2200 hours on 12/27/2020 until 0423 hours on 12/28/2020 which was a few minutes after we spoke on the supervisor channel. For a total of 6 hours and 23 minutes.  It is unknown how long the vehicle had been parked prior to that.  The report indicated that she left the station and drove directly to 73rd Street and Ocean Terrace where she again parked her vehicle at 0440 hours.  The vehicle remained in that position until 0533 hours for a total of 53 minutes.  She then left that location and drove directly to the MBPD headquarters.

Note that of the six officers assigned to Area 3 on the shift in question 4 of them have 2 years of experience or less.

Sergeant Salabarria's actions show a willful effort to deceive a supervisor and a failure to obey a direct order from said supervisor.  She failed to report to her assigned zone and failed to supervise the officers under her watch.  She failed on multiple occasions to respond to the police radio and showed extreme neglect in the performance of her duties.

**I have read the Administrative Action Form and understand it.  Additionally, I have been provided with an employee's Administrative Action Response Form and it has been explained to me.**
Employee's Initials

| | |
|---|---|
| Employee's Signature: _____<br><br>Print Name:_____ Date: | Lieutenant Signature:_____<br><br>Print Name:_____ Date: |
| Preparer's Signature: _____<br><br>Print Name: _____ Date: | Captain Signature: _____<br><br>Print Name:_____ Date: |
| Witness Signature: _____<br><br>Print Name:_____ Date: | Division Commander Signature:_____<br><br>Print Name:_____ Date: |

Revised 01/22/2014

| Witness Signature: _____ | Chief of Police Signature:_____ |
|---|---|
| Print Name:_____ Date: | Print Name:_____ Date: |

**Miami Beach Police**

Internal Affairs Unit

Officer Resume

Lieutenant Steven P. Cosner [02/0526/15570]

---

Part I - Personal Information

---

Name:  Lieutenant Steven P. Cosner
Network Log-In: 15570   Badge No: 02/0526   Hire Dt: 02/27/1996

Division:  Patrol Division
District:  Area 3
Shift:  Midnight Shift

---

Part II - Incidents

---

**Internal Affairs  IA #: I2001-014   Case #:**

Received date: Nov 15, 2001   Occurred date:  Apr 18, 2001

Classification:
Allegation(s):

    RECLASSIFIED - RECLASSIFIED - Nov 19, 2001
      RECLASSIFIED

Disciplinary action(s)
    <None>

**General Investigation  IA #: G2001-022   Case #:**

Received date: Nov 19, 2001   Occurred date:  Apr 18, 2001

Classification:
Allegation(s):

    Issuance of an arrest warrant by another Jurisdiction - Closed - Jan 24, 2002

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: U2002-00039   Case #: 2002-00039Closed**

Received date: Jan 10, 2002   Occurred date:  Jan 1, 2002

Classification:
Allegation(s):
    <None>

Disciplinary action(s)

**Plaintiffs' Exhibit**

**8**

Cosner 5/17/2024 M.F.

<None>

### Internal Affairs  IA #: I2002-018   Case #: 02-13485Closed

Received date: Apr 16, 2002   Occurred date:  Apr 16, 2002

Classification:
Allegation(s):

    Theft (over) - Unfounded - Jul 23, 2002

Disciplinary action(s)
    <None>

### Shift Level  IA #: S2002-018   Case #: 02-18500

Received date: May 31, 2002   Occurred date:  May 27, 2002

Classification:
Allegation(s):

    Failure to secure property - CLOSED - Jul 17, 2003

Disciplinary action(s)
    <None>

### Response to Resistance  IA #: U2002-18168   Case #: 2002-18168Closed

Received date: Jun 6, 2002   Occurred date:  May 25, 2002

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

### Response to Resistance  IA #: U2002-34254   Case #: 2002-34254Closed

Received date: Oct 14, 2002   Occurred date:  Oct 8, 2002

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

### Discipline  IA #: D2003-087   Case #: 1621BYV

Received date: Jul 17, 2003   Occurred date:  May 2, 2003

Classification:
Allegation(s):

    Failed to appear in court - Administrative Action -
     MBPD Manual: SOP# 097 (Absence or Tardiness for Court)

Disciplinary action(s)
    Doc of Verbal Conference Jul 15, 2003   Days/hrs suspended: 0

**Internal Affairs  IA #: I2003-034   Case #: 03-13064**

Received date: Oct 1, 2003   Occurred date:  Apr 20, 2003

Classification:
Allegation(s):

    False Arrest - EXONERATED - Dec 11, 2003
      MBPD Manual: SOP# 001 (Arrest Procedures)

Disciplinary action(s)
    <None>

**Discipline  IA #: D2004-059   Case #: Closed**

Received date: Aug 10, 2004   Occurred date:  Apr 23, 2004

Classification:
Allegation(s):

    Failed to appear in court - Administrative Action - Jul 24, 2004
      MBPD Manual: SOP# 097 (Absence or Tardiness for Court)

Disciplinary action(s)
    Doc of Verbal Conference Aug 10, 2004   Days/hrs suspended: 0

**Response to Resistance  IA #: U2004-36773   Case #: 2004-36773**

Received date: Sep 24, 2004   Occurred date:  Sep 11, 2004

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: U2005-02626   Case #: 2005-2626Closed**

Received date: Jan 21, 2005   Occurred date:  Jan 21, 2005

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: U2005-10036   Case #: 2005-10036Closed**

Received date: Mar 18, 2005   Occurred date:  Mar 18, 2005

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: U2005-27136 (R)   Case #: 2005-27136Closed**

Received date: Jul 23, 2005   Occurred date:  Jul 23, 2005

Classification:
Allegation(s):
  <None>

Disciplinary action(s)
  <None>

**Response to Resistance  IA #: C2005-007   Case #: C2005-007 Closed**

Received date: Sep 15, 2005   Occurred date:  Sep 15, 2005

Classification:
Allegation(s):
  <None>

Disciplinary action(s)
  <None>

**Response to Resistance  IA #: C2005-017   Case #: 2005-37398Closed**

Received date: Oct 14, 2005   Occurred date:  Oct 14, 2005

Classification:
Allegation(s):
  <None>

Disciplinary action(s)
  <None>

**Response to Resistance  IA #: C2006-047   Case #: 2006-9747Closed**

Received date: Apr 3, 2006   Occurred date:  Mar 18, 2006

Classification:
Allegation(s):
  <None>

Disciplinary action(s)
  <None>

**Internal Affairs  IA #: I2006-020   Case #: Closed**

Received date: May 22, 2006   Occurred date:  May 22, 2006

Classification:
Allegation(s):

   Courtesy and Respect - SUBSTANTIATED - Nov 7, 2006
    MBPD Manual: DRR# 6.7 (Courtesy and Respect)
   Off Duty/Seconday Employment - SUBSTANTIATED - Nov 7, 2006
    MBPD Manual: SOP# 011 (Off-Duty/Second Employ)
   Unlawful Compensation - SUBSTANTIATED - Nov 7, 2006
    MBPD Manual: DRR# 6.8 (Unlawful Compensation)

Disciplinary action(s)
   Suspension 20 Hours D2007-004 Jan 31, 2007   Days/hrs suspended: 20

**Response to Resistance  IA #: C2006-170   Case #: 2006-27546Closed**

Received date: Jul 29, 2006   Occurred date:  Jul 29, 2006

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Miscellaneous  IA #: M2006-010   Case #: 2006-47179Closed**

Received date: Dec 19, 2006   Occurred date:  Dec 27, 2006

Classification:
Allegation(s):

    Assault - WITHDRAWAL - Jan 3, 2007

Disciplinary action(s)
    <None>

**Discipline  IA #: D2007-004   Case #: Closed**

Received date: Feb 1, 2007   Occurred date:  May 22, 2006

Classification:
Allegation(s):

    Off Duty/Seconday Employment - SUSPENSION - Jan 20, 2007
    Personnel Rule X, 1 (b) < Open allegation >
      MBPD Manual: DRR# 6.28.3.11 (Wantonly Offensive Conduct/Language)

Disciplinary action(s)
    <None>

Charges:

    Courtesy & Respect [] -

    SOp #11 - Off Duty & Secondary Employment [] -  Nov 16, 2006

**Response to Resistance  IA #: C2007-087   Case #: 2007-18225Closed**

Received date: May 10, 2007   Occurred date:  May 10, 2007

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2008-071   Case #: 2008-17809**

Received date: May 9, 2008   Occurred date:  May 9, 2008

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
   &lt;None&gt;

**Response to Resistance  IA #: C2008-170   Case #: 2008-37829Closed**

Received date: Oct 8, 2008    Occurred date:  Oct 8, 2008

Classification:
Allegation(s):
   &lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Response to Resistance  IA #: C2008-175   Case #: 2008-38697Closed**

Received date: Oct 15, 2008    Occurred date:  Oct 15, 2008

Classification:
Allegation(s):
   &lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Response to Resistance  IA #: C2008-186   Case #: 2008-41062Closed**

Received date: Nov 1, 2008    Occurred date:  Nov 1, 2008

Classification:
Allegation(s):
   &lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Response to Resistance  IA #: C2009-091   Case #: 2009-18752Closed**

Received date: May 16, 2009    Occurred date:  May 16, 2009

Classification:
Allegation(s):
   &lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Response to Resistance  IA #: C2010-106   Case #: 2010-64978Closed**

Received date: Jun 23, 2010    Occurred date:  Jun 23, 2010

Classification:
Allegation(s):
   &lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Discipline  IA #: D2010-115   Case #: Closed**

Received date: Nov 6, 2010   Occurred date:  Oct 30, 2010

Classification:
Allegation(s):

    Court Attendance, Court Overtime, and Accountability - Administrative Action - Nov 6, 2010
     MBPD Manual: SOP# 097 (Absence or Tardiness for Court)

Disciplinary action(s)
    Verbal Conference Dec 4, 2010   Days/hrs suspended: 0

**Response to Resistance  IA #: C2010-179   Case #: 2010-131686Close**

Received date: Dec 10, 2010   Occurred date:  Dec 10, 2010

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2011-011   Case #: 2011-5594Closed**

Received date: Jan 15, 2011   Occurred date:  Jan 15, 2011

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2011-015   Case #: 2011-12468Closed**

Received date: Feb 3, 2011   Occurred date:  Feb 3, 2011

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2011-023   Case #: 2011-21699Closed**

Received date: Feb 26, 2011   Occurred date:  Feb 26, 2011

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2011-036   Case #: 2011-29168Closed**

Received date: Mar 14, 2011   Occurred date:

Classification:
Allegation(s):

&lt;None&gt;

Disciplinary action(s)
   &lt;None&gt;

**Discipline  IA #: D2011-045   Case #: Closed**

Received date: Mar 18, 2011   Occurred date:  Feb 24, 2011

Classification:
Allegation(s):

   Court Attendance, Court Overtime, and Accountability - Administrative Action - Mar 25, 2011
    MBPD Manual: SOP# 097 (Absence or Tardiness for Court)

Disciplinary action(s)
   Written Warning Mar 25, 2011   Days/hrs suspended: 0

**Discipline  IA #: D2011-116   Case #: RESCINDED**

Received date: Jun 24, 2011   Occurred date:

Classification:
Allegation(s):

   Patrol Functions and Responsibilities - RESCINDED - Aug 30, 2011
    MBPD Manual: SOP# 117 (Patrol Functions/Responsibilities

Disciplinary action(s)
   RESCINDED Aug 30, 2011   Days/hrs suspended: 0

**Discipline  IA #: D2011-132   Case #: CLOSED**

Received date: Aug 25, 2011   Occurred date:  Aug 25, 2011

Classification:
Allegation(s):

   Sleeping on Duty - Administrative Action - Aug 25, 2011
    MBPD Manual: DRR# 6.20 (Sleeping on Duty)

Disciplinary action(s)
   Written Warning Aug 25, 2011   Days/hrs suspended: 0

**Discipline  IA #: D2012-001   Case #:**

Received date: Jan 6, 2012   Occurred date:

Classification:
Allegation(s):

   Court Attendance, Court Overtime, and Accountability - SUBSTANTIATED - Jan 6, 2012
    MBPD Manual: SOP# 097 (Absence or Tardiness for Court)

Disciplinary action(s)
   Written Warning Jan 21, 2012   Days/hrs suspended: 0

**Response to Resistance  IA #: C2012-037   Case #: 2012-22695Closed**

Received date: Mar 6, 2012   Occurred date:  Mar 6, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-036   Case #: 2012-22648Closed**

Received date: Mar 6, 2012   Occurred date:  Mar 5, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-102   Case #: 202-54824Closed**

Received date: May 27, 2012   Occurred date:  May 27, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-120   Case #: 2012-65851Closed**

Received date: Jun 28, 2012   Occurred date:  Jun 28, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-161   Case #: 2012-94152Closed**

Received date: Sep 7, 2012   Occurred date:  Sep 7, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-177   Case #: 2012-102494Close**

Received date: Sep 29, 2012   Occurred date:  Sep 29, 2012

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2012-183   Case #: Close2012-105152**

Received date: Oct 6, 2012   Occurred date:  Oct 6, 2012

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2012-197   Case #: 2012-114866CL**

Received date: Nov 3, 2012   Occurred date:  Nov 3, 2012

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2013-040   Case #: 2013-29696 CLOSE**

Received date: Mar 16, 2013   Occurred date:

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2013-059   Case #: 2013-33290 CLOSE**

Received date: Mar 24, 2013   Occurred date:

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2013-062   Case #: 2013-36854CLOSED**

Received date: Mar 31, 2013   Occurred date:  Mar 31, 2013

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**(PC) Personnel Complaint  IA #: PC2013-013   Case #: 2013-81498Closed**

Received date: Jul 22, 2013   Occurred date:  Jul 20, 2013

Classification:

Allegation(s):

    Courtesy and Respect - UNSUBSTANTIATED - Jan 20, 2014
     MBPD Manual: DRR# 6.7 (Courtesy and Respect)
    Excessive Use of Force - UNSUBSTANTIATED - Jan 20, 2014
     MBPD Manual: SOP# 017 (Use of Force)
    Excessive Use of Force - UNSUBSTANTIATED - Jan 20, 2014
     MBPD Manual: DRR# 5.1 (Use of Force)

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2013-174   Case #: 2013-112373**

Received date: Oct 2, 2013   Occurred date:  Oct 2, 2013

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance  IA #: C2014-002   Case #: 2014-954**

Received date: Jan 3, 2014   Occurred date:  Jan 3, 2014

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**(PC) Personnel Complaint  IA #: PC2014-006   Case #: 14-closed**

Received date: Feb 27, 2014   Occurred date:  Jan 3, 2014

Classification:
Allegation(s):

    Excessive Use of Force - CLOSED - RECLASSIFIED - May 8, 2014
     MBPD Manual: DRR# 5.1 (Use of Force)

Disciplinary action(s)
   <None>

**General Investigation  IA #:   Case #: Closed**

Received date: Feb 27, 2014   Occurred date:  Jan 3, 2014

Classification:
Allegation(s):

    Excessive Use of Force < Open allegation >
     MBPD Manual: DRR# 5.1 (Use of Force)

Disciplinary action(s)
   <None>

**General Investigation  IA #: GI2014-001   Case #:**

Received date: Feb 27, 2014    Occurred date:  Jan 3, 2014

Classification:
Allegation(s):

    Excessive Use of Force - CLOSED - RECLASSIFIED - May 8, 2014
    MBPD Manual: DRR# 5.1 (Use of Force)

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2014-089   Case #: 2014-54571**

Received date: May 16, 2014    Occurred date:  May 16, 2014

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2015-031   Case #: 2015-29140CLSD**

Received date: Jun 4, 2015    Occurred date:  Mar 24, 2015

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2015-113   Case #: 2015-91568 CLSD**

Received date: Nov 13, 2015    Occurred date:  Sep 27, 2015

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2018-149   Case #: 2018-00106706CLS   Role - COP - Witness Supervisor**

Received date: Nov 2, 2018    Occurred date:  Nov 2, 2018

Classification:
Allegation(s):
    <None>

Disciplinary action(s)
    <None>

**Response to Resistance  IA #: C2020-070   Case #: 2020-23118CLSD   Role - COP - Involved Supervisor**

Received date: Mar 15, 2020    Occurred date:  Mar 15, 2020

Classification:

Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance   IA #: C2020-099   Case #: 2020-33587CLSD   Role - COP - Involved Officer**

Received date: May 2, 2020    Occurred date:  May 2, 2020

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

**Response to Resistance   IA #: C2020-109   Case #: 2020-41571CLSD   Role - COP - Involved Supervisor**

Received date: Jun 3, 2020    Occurred date:  Jun 3, 2020

Classification:
Allegation(s):
   <None>

Disciplinary action(s)
   <None>

Printed: Jul 07, 2022 14:07    By: Ofc. Assoc.5 Priscilla Olivera

Plaintiffs' Exhibit

**9**

Cosner 5/17/2024 M.F.

## PART B:  DEFINITION OF TERMS

**Chapter 1**   Except as otherwise provided, whenever in the Rules and Regulations the following words or terms are used, they have the meanings respectively ascribed to them as follows:

1.1      <u>Accountability:</u>
The state of being held responsible by a higher authority for specified job-related results.

1.2      <u>Accreditation:</u>
A voluntary, self-motivated approach by which organizations seek to achieve, objectively verify, and maintain high quality in their operations through periodic evaluations.

1.3      <u>Acting:</u>
Serving temporarily in a position to which the employee is assigned by competent authority, usually in a position of higher rank.  All the authority, responsibilities, and duties of the higher rank devolve upon the acting employee.

1.4      <u>Active Duty:</u>
See Tour of Duty.

1.5      <u>ADA:</u>
The Americans with Disabilities Act (ADA) of 1990 requires departments of any State or Local Government to ensure that qualified individuals with disabilities can participate in, and receive the benefits of, any program, service or activity.

1.6      <u>AFSCME:</u>
American Federation of State, County and Municipal Employees.   See Miami Beach Municipal Employees Contract.

1.7      <u>Amend:</u>
To alter by adding, deleting, or rephrasing.  To improve, make better.  To remove the faults or errors of, rectify.

1.8      <u>Appointment:</u>
The designation of a person by the appointing authority to any position within the Department.

1.9      <u>Assistant Chief of Police:</u>
The second in command of the Department with Division Commanders reporting directly to him.

1.10     <u>Authority:</u>
The power to enforce laws, determine, or judge; a person or group invested with this power.

1.11     <u>Canon of Ethics:</u>
The rules or standards governing the conduct of members of a profession.

1.12     <u>Captain:</u>
District or Unit Commander.

1.13     <u>Chain of Command:</u>
The unbroken line of authority from the Chief of Police down through a single subordinate at each level of command, to the level of execution.

1.14     <u>Chief of Police:</u>
The Executive Head of the Department.




1.15       <u>City Employee Policy Handbook</u>
The rules and regulations as set forth by the City governing types of absences from work, the reporting of those absences, rest periods, lunch hours, etc.

1.16       <u>City Ordinance:</u>
A law enacted by the City Commission of the City of Miami Beach, Florida.

1.17       <u>City Personnel Rules:</u>
The rules and regulations as set forth by the city governing the conduct of all city employees.

1.18       <u>Civilian:</u>
An employee of the Department whose position does not require certification under Florida Statute 943.

1.19       <u>Command Staff:</u>
Consists of the Police Chief, Assistant Chiefs, Majors, Captains and Police Commanders.

1.20       <u>Commanding Officer:</u>
Chief, Assistant Chief, Majors, Captains, Police Commanders, Lieutenants, Managers, Sergeants or Supervisors who are in charge of Divisions, Districts, Units, Sections, Squads, Offices, Shifts, or Staffs. Any officer assigned to exercise command. During the absence of the Commanding officer, the officer designated to relieve such Commanding officer is in command and during that time is the acting Commanding officer.

1.21       <u>Communications Workers of America Contract:</u>
An agreement between the City of Miami Beach, Florida and the Communications Workers of America (CWA), Local 3178. The City recognizes the CWA as the sole and exclusive representative of all the following employees: (Police Department personnel are **bolded**)

| | |
|---|---|
| **Account Clerk I, II, III** | Electrical Helper |
| **Administrative Aide I, II** | Electrical Inspector |
| Administrative Assistant I | Electrician |
| Administrative Secretary | Elevator Inspector |
| Air Conditioning Helper | Engineering Assistant I, II, III |
| Air Conditioning Mechanic | Engineering Inspector |
| Building Inspector | Lifeguard I, II |
| Buyer | Lifeguard Lieutenant |
| Carpenter | Mason |
| Civil Engineer I, II | Masonry Helper |
| Clerk | Mechanical Inspector |
| **Clerk Typist** | Museum Assistant |
| Code Compliance Field Supervisor | Painter |
| Code Compliance Officer I, II | Parking Enforcement Specialist I, II |
| Coin Room Money Handler | Parking Meter Technician I, II |
| Commission Reporter I, II | Permit Clerk |
| **Communications Operator** | Photographer |
| Communications Technician I | Planner |
| **Community Services Specialist** | Planning Technician |
| **Complaint Operator II** | Plumber |
| **Data Entry Clerk** | Plumber Helper |
| **Dispatcher** | Plumbing Inspector |
| **Dispatcher Trainee** | Pool Guard I, II |
| Duplicating Equipment Operator | Secretary |

1.22       <u>Complaint:</u>
A report by a citizen, or individual, requesting some degree of police service, responded to by an employee of the Department.

1.23    Component:
        See Organizational Component

1.24    Conduct Unbecoming:
        Any conduct or act, which has an adverse impact upon the operation of the Department, and
        destroys public respect and confidence in the Department and its employees.

1.25    Covert Assignment:
        A position in an operation conducted to avoid detection, which is divulged only to those
        directly involved in the operation.

1.26    Culpable Negligence:
        Being found at fault for a negligent act.

1.27    Days Off:
        Every employee of the Department shall be excused from duty on designated days each
        week without the loss of pay.   The time and manner of excusing employees of the
        Department from duty shall be determined by the Chief of Police and/or his designee.

1.28    Department:
        The Police Department of the City of Miami Beach, Florida.

1.29    Department Manual:
        A manual issued to all employees of the Department which contains the following:
        Department Rules and Regulations, Standard Operating Procedures and Appendixes: City
        Personnel Rules, City Employee Policy Handbook, Fraternal Order of Police Contract,
        Government Supervisors Association Contract, Communication Workers of America Contract
        and Miami Beach Municipal Employees Union Contract.

1.30    Department Rules and Regulations (DRR):
        Written directives issued by the Chief which define police purpose, duty and conduct of all
        Department employees.  It also contains City Personnel Rules, City Work Rules, and copies
        of Department employee's Union Contracts.  The DRR is a part of the Department Manual.

1.31    Department SOPs:
        Written Directives issued by the Chief relating to permanent directives concerned with
        policies or procedures.  SOPs are a part of the Department Manual.

1.32    Detail:
        Employees of the Department, sometimes from more than one organizational component,
        grouped together for the accomplishment of a specified mission.  When not engaged in a
        continuing operation, the detail is called a special detail.

1.33    Detective:
        Officers assigned to an investigative function.  The designation is an assignment and not a
        promotion.

1.34    Discretion:
        Freedom to act or judge on one's own.

1.35    District:
        A component of the Department in the Patrol Division that is commanded by a Captain and
        reports to a Major.  A District and a Unit are at the same level.  The City is also divided
        geographically into three districts.

1.36    Division:
        A component of the Department that operates under the direction of a Division Commander
        holding the rank of Major and reports directly to the Assistant Chief of Police.

1.37    Division Order:

Written orders from a Division Commander that are temporary in nature to announce policies or procedures with respect to that Division and will be incorporated as SOPs into the Department Manual at a later date.  No Division Order will supersede or alter a General Order.

1.38    Division SOP:
Written directives issued by a Division Commander relating to permanent directives concerned with policies or procedures within that Division.  SOPs are a part of the Department Manual.  No Division SOP will supersede or alter a Department SOP.

1.39    Domestic Violence:
Florida Statute; an act of battery, sexual battery, assault, sexual assault, or any criminal offense resulting in physical injury or death of one family or household member by another.

1.40    Drug Recognition Expert:
An officer(s) certified by the National Highway Traffic Safety Authority (NHTSA) and International Association of Chief's of Police (IACP) to perform drug recognition evaluations.

1.41    Duty:
An act or course of action required by position, law or custom.  A service, function, or task assigned to an employee.

1.42    E.E.O.C.:
Equal Employment Opportunity Commission.

1.43    Employee:
Any person, regardless of position, sworn or non-sworn, who is employed by the Department.

1.44    Exculpatory Evidence:
Evidence that shows clearance from an accusation or charge.

1.45    Extenuating Circumstances:
Something arising suddenly out of the current of events; any event or occasional action or remedy; a sudden and unexpected happening or an unforeseen occurrence or condition.

1.46    F.C.I.C.:
Florida Crime Information Center

1.47    Fidelity Bond:
A bond purchased to guard against monetary loss by persons in a relationship of special trust or confidence.

1.48    Flagrant Act:
An act, civil or criminal, or in violation of Department Rules & Regulations, or policies that is so obviously bad or wrong that it is more conspicuous.

1.49    F.D.L.E.:
Florida Department of Law Enforcement

1.50    Florida Statute Chapter 119:
Is known as the Florida Public Records Act; it directs that all documents created and/or maintained by a governmental entity be made available for public inspection.

1.51    Fraternal Order of Police Contract:
An agreement between the City of Miami Beach, Florida and the Miami Beach Fraternal Order of Police William Nichols Lodge No. 8.  The City recognizes the F.O.P. as the sole and exclusive bargaining representative for the purpose of wages, hours, and other terms and conditions of employment for:  Police Officer Trainees, Police Officers, Sergeants, Lieutenants and Detention Officers.



1.52    Function:
        A general term for the required or expected activity of a person or an organizational
        component; e.g. patrol function.

1.53    General Order:
        Written orders from the Chief of Police that are temporary in nature to announce policies or
        procedures and will be incorporate as SOPs into the Department Manual at a later date.

1.54    Goal:
        A relatively broad statement of the end or result that one intends ultimately to achieve. A goal
        usually requires a relatively long time span to achieve and, whenever possible, should be
        stated in a way that permits measurement of its achievement.

1.55    Government Supervisors Association of Florida Contract:
        An agreement between the City of Miami Beach, Florida and the Government Supervisors
        Association of Florida (GSAF) OPEIU, Local 100. The City recognizes the GSAF as the sole
        and exclusive representative of the following employees (Police Department personnel are
        **bolded**):

| | |
|---|---|
| Air Conditioning Supervisor | Plumbing Supervisor |
| Beach Patrol Operations Supervisor | **Property Management Operations Supervisor** |
| City Surveyor | Pumping Operations Supervisor |
| **Communications Supervisor** | Recreation Supervisor I |
| **Crime Scene Supervisor** | Senior Building Inspector |
| Electrician Supervisor | Senior Engineering Inspector |
| Electronics/Instruments Supervisor | Sewer Field Operations Supervisor |
| Fleet Operations Supervisor | Street Lighting Operations Supervisor |
| Maintenance Supervisor | Street Operation Supervisor |
| Metered Service Supervisor | Tennis Center Supervisor |
| Paint Supervisor | Warehouse Supervisor |
| Park Operations Supervisor | Water Field Operations Supervisor |
| Parking Facilities Supervisor | Water Service Representative |
| Parking Operations Supervisor | |

1.56    Headquarters:
        The police buildings that house the staff offices of the various Divisions and functions that
        are responsible for policing the City of Miami Beach.

1.57    Human Resources Department:
        The City department responsible for all employee matters dealing with City Employees.

1.58    Immediately:
        Is to be construed to mean "as soon as possible and practicable."

1.59    Incident:
        An event that requires law enforcement action or the dispatching of officers in response to
        citizen requests for law enforcement services. This includes any incident, whether criminal
        or non-criminal for which there has been a response to the scene, an investigation, or the
        preparation of a verbal or written report.

1.60    Incompetence:
        Incapable of the satisfactory performance of duties. The lack of any of the following qualities
        is evidence of incompetence; courage, honesty, emotional stability, sound judgement,
        alertness, decisiveness, power to observe, initiative, energy, intelligence, or the ability to get
        along with people.

1.61    Index:
        To table, file, or catalogue. Alphabetized listing of names, places, or subjects to simplify
        reference. The Appendixes are not included in the index.

1.62    Insubordination:
        The willful disobedience of any order lawfully issued by a supervisor, or any disrespectful, mutinous, insolent or abusive language toward a supervisor.

1.63    Intoxilyzer 5000 Maintenance and Repair Officer:
        An officer certified by FDLE, CMI, Inc. and IPTM (Institute of Police Traffic Management), to perform any maintenance and repair of the Intoxilyzer 5000.

1.64    Lawful Order:
        An order in keeping with the performance of any duty, issued either verbally or written over the signature of the Chief or a commanding officer, or prescribed by law or by the manual, or for the preservation of good order, efficiency, and proper discipline of the Department.

1.65    Length of service:
        The length of continuous time an employee has been employed by the City of Miami Beach.

1.66    Lieutenant:
        A Unit or Section Commander.

1.67    Major:
        A Division Commander who reports directly to the Assistant Chief of Police.

1.68    Male Pronoun "He" or "His":
        Whenever used in this manual may refer to either male or female employee, as the case may be.

1.69    Manager:
        A non-sworn supervisory employee responsible for commanding a Unit, Section or Shift in the Department.

1.70    Manual:
        See Department Manual.

1.71    Maritime Law:
        Laws pertaining to waterways and water vessels.

1.72    Materiality:
        Important substance.

1.73    May:
        Is permissible.

1.74    Memorandum:
        An informal, written document that may or may not convey an order; it is generally used to clarify, inform, or inquire.

1.75    Miami Beach Municipal Employees Union Contract:
        Agreement between the City of Miami Beach, Florida and the Miami Beach Municipal Employees Union, AFSCME Local #1554.  The City recognizes the Union as the exclusive bargaining representative of all the following employees: (Police Department personnel are **bolded**)

| | |
|---|---|
| Assistant Pumping Mechanic | Equipment Mechanic |
| Building Attendant | Fire Equipment Mechanic |
| Community Center Director | Guard |
| Control Room Operator | Heavy Equipment Operator I, II |
| Custodial Supervisor | Laborer I, II |
| Custodial Worker | Maintenance Mechanic |
| Equipment Attendant | Maintenance Worker I, II, III, IV |




| | |
|---|---|
| Nursery Supervisor | Stores Clerk |
| Park Attendant I, II | Street Supervisor I |
| Park Mechanic | Tree Maintenance Supervisor |
| Park Supervisor I | Tree Trimmer |
| Police Utility Worker | **Utility Worker** |
| Pumping Mechanic | Waste Collector |
| Recreation Attendant | Waste Driver Supervisor |
| Recreation Director | Water Meter Technician |
| Recreation Guard I, II | Water Meter Reader |
| Recreation Operations Mechanic | Water Pipefitter |
| Sewer Pipefitter | Water Supervisor |
| Sewer Supervisor | Welder |
| Shop Clerk | Welder Supervisor |
| Stable Worker | Whiteway Supervisor I |
| Storekeeper | |

1.76    Motor Vehicles:
Every vehicle which is self-propelled, including automobiles, vans, motorcycles, and trucks.

1.77    N.C.I.C.:
National Crime Information Center.

1.78    Neglect of Duty:
Failure to perform duties as required by statute, ordinance, work rules and regulations, SOPs, or Departmental directives, written or verbal.  Examples include:  failure to take appropriate action on the   commission of a crime, disorder, or other act or condition deserving police attention; absence without leave; failure to report for duty at the time and place designated, unnecessary absence from assigned zone during tour of duty; failure to perform duties prescribed in Rules and Regulations; failure to conform to Department operating procedures.

1.79    Oath:
A solemn, formal declaration or promise to fulfill a pledge.

1.80    Objective:
An end or result that one intends to attain in order to achieve partial fulfillment of a goal.  An objective is a sub-goal or an element of a goal, and therefore, requires a shorter time to accomplish than does a goal.

1.81    Off Duty:
The state of an employee during the hours not "on-duty" when free of the responsibility of performing usual routine duties.

1.82    Office:
A component of the Department performing a specific function that reports to a Manager, a Lieutenant, a Sergeant, or a Supervisor.  The exceptions being the Media Relations Office, the Police Athletic League Office, the Fraternal Order of Police Office, and the Police Budget Office,  which report directly to the Chief of Police.

1.83    Official Bulletin:
A Bulletin prepared under the direction of the Assistant Chief, published twice a week to ensure that all employees of the Department are kept fully informed and have up to date information.



1.84    Official Correspondence:
        Letters written on official Miami Beach Police Department letterhead, written in the name of
        the Chief, with the authorized employee placing their name on the letter and signing it.

1.85    Officiously:
        Unduly forward manner.

1.86    On-Duty:
        The state of an employee during the hours of the day (shift) when actively engaged in the
        performance of duties. Technically, an employee is on duty and subject to call at all times.

1.87    Order:
        An instruction, either written or oral, given by a Supervisor and/or Acting Supervisor to a
        Subordinate.

1.88    Organizational Component:
        A subdivision of the Department, such as a Division, District, Unit, Section, Shift, Squad,
        Office, Staff, or a position that is established and staffed on a full-time basis to provide a
        specific function. Each component is named based on the rank of the commanding officer
        the component reports to.

1.89    Police Commander:
        A sworn or non-sworn employee commanding a Unit.

1.90    Police Officer:
        An employee of the Department who has police powers. The term is applied without regard
        to gender, division or duty. See Sworn Officer.

1.91    Policy:
        A written directive that is a broad statement of the Department's principles.

1.92    Post:
        A fixed point or location to which an officer is assigned for duty. It is the desk, office or other
        place to which an officer is assigned at the Station; it is also the location where an officer is
        assigned for specific duty, such as an intersection or crosswalk for traffic duty.

1.93    Procedure:
        The official method of dealing with any given situation prescribed by the Department Manual.

1.94    Proficiency:
        The additional skills, knowledge, and abilities that are needed to remain competent in
        performing the duties and responsibilities of a job.

1.95    Promotion:
        A change in the employment status of an employee to a position of greater responsibility or
        higher rank.

1.96    Promulgated:
        Announce officially.

1.97    Rank:
        Each class of officer within the Department has a rank. The titles of the ranks are:

|  |  |
|---|---|
| Chief of Police | Lieutenant |
| Assistant Chief of Police | Sergeant |
| Major | Police Officer |
| Captain | Detention Officer |
| Police Commander | Police Officer Trainee |

1.98    Ranking Officer:
The officer having the highest rank.  Officers of the same rank shall grade accordingly to the date of their appointment to that rank. If the dates of appointment are the same, then the total continuous length of service time will prevail.  When two or more officers are on duty together, the officer of the highest rank is in command and shall be held responsible for the operation.  For a special detail and for a special period, an officer may be designated by the Commanding officer to take command without regard to rank.  [12.1.2c][12.1.2d]

1.99    Report:
A written communication, unless otherwise specified, relating to police matters.

1.100   Reserve Officer:
A volunteer, state certified, sworn law enforcement officer, with or without compensation, who possesses the same powers and performs the same duties as a regular, full time officer.  Reserve officers have qualifications and training equivalent to full time, regular, sworn officers performing like functions and are utilized to supplement the Department's day-to-day delivery of law enforcement services.

1.101   Section:
A component under a Unit, commanded by a Lieutenant, Sergeant, Manager, Non-sworn Supervisor, or a Sworn Employee and reports to a Captain, a Police Commander, or a Manager.  A Section is the same level as a Shift.

1.102   Selective Traffic Enforcement Program:
The assignment of personnel to traffic enforcement activities at times and locations where hazardous or congested conditions exist.  Such assignments are usually based on such factors as traffic volume, accident experience, frequency of traffic violations, and emergency and service need.

1.103   Seniority:
A position of higher standing determined first by rank, then by time in rank, then by length of service time in the Department.

1.104   Sergeant:
The rank above Police Officer.  Sergeants generally supervise activities at the operational level.

1.105   Serious Physical Injury:
A bodily injury that creates a substantial risk of death; causes serious, permanent disfigurement; or results in long-term loss or impairment of the functioning of any bodily member or organ.

1.106   Sexual Harassment:
Unwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature, constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

1.107   Shall:
Is expressive of authority that is mandatory.

1.108   Shift:
A component under a District or Unit, commanded by a Lieutenant or Manager.  A Shift is the same level as a Section.

1.109   Shift Commander:
A sworn employee assigned to the Patrol Division who is the Senior Officer in charge.

1.110     S.O.P. (Standard Operating Procedure):
          The accepted abbreviation for Standard Operating Procedure. See Department SOP.

1.111     Span of Control:
          The number of persons reporting to any one supervisor.

1.112     Special Event:
          An activity, such as a parade, festival, athletic contest, or public demonstration, that results
          in the need for control of traffic, crowds or crimes.

1.113     Special Incident Notification:
          A written report used by a Commanding Officer to advise of any emergency, serious crime,
          or unusual occurrence to the Chief of Police as soon as possible.

1.114     Squad:
          A component under a Section or Shift commanded by a Sergeant or Supervisor and reports
          to a Lieutenant.

1.115     Staff:
          A component under an Office performing a specific function that reports to a Lieutenant,
          Manager, or a Non-Sworn Supervisor.

1.116     Staff Inspection:
          An inspection conducted by personnel who do not have control of the persons, facilities, or
          procedures being inspected.

1.117     State Law:
          The statutes of the State of Florida.

1.118     Subordinate:
          Lower in rank.

1.119     Supervise:
          To assign, direct or manage the activities of a subordinate.

1.120     Supervisor:
          An employee appointed to coordinate, direct, and oversee other employees, either
          temporarily or permanently.

1.121     Surety Bond:
          A bond where one assumes responsibility of another.

1.122     Suspension:
          The act of temporarily denying an employee the privilege of performing his duties.  In
          consequence of dereliction or other violation of rules, regulations, or orders.  Suspension is
          either a first step in the disciplinary process, or the penalty assessed.

1.123     Sworn Officer:
          A certified law enforcement officer, subject to an oath of office and possessing those general
          peace officer powers prescribed by the Florida Constitution, Florida State Statutes and the
          City of Miami Beach Ordinance.

1.124     Table of Organization:
          A chart establishing the span of control and delineating chain of command within the
          structure of the Department and is updated at least annually.

1.125     Termination:
          The act of terminating (ending) the service of the employee with the Department.

1.126    <u>Title:</u>
The distinguishing name of an assigned position within the Department.

1.127    <u>Tortuous Act:</u>
An act giving rise to tort liability.

1.128    <u>Tour of Duty:</u>
The time during which the employees are on duty.

1.129    <u>Traffic Law Enforcement:</u>
Law enforcement as it applies to statutes, ordinances and legally authorized regulations relating to the use of streets and highways and ownership and operation of motor vehicles and other road vehicles.

1.130    <u>Unit:</u>
A component of the Department that is commanded by a Captain, Police Commander, Lieutenant or a Manager and reports to a Major. The exception being the Internal Affairs Unit which reports directly to the Chief of Police. A Unit is at the same level as a District.

1.131    <u>Use of Force:</u>
A defensive response by an officer to overcome a person's physical resistance to an officer's performance of a legal duty, to protect an officer or another person from physical resistance or acts of aggression that are likely to cause bodily harm, or is used to apprehend a fleeing criminal suspect.

1.132    <u>Written Directive:</u>
Any written document used to guide or affect the performance or conduct of Department employees. The term includes Procedures, Rules and Regulations, General Orders, Division Orders, SOPs, Memorandums and instructional material.

1.133    <u>Written Directive Checklist:</u>
A form provided with all manual changes, additions and/or deletions. It explains all amendments and where they are to be inserted into the Manual.

1.134    <u>Written Directive Receipt:</u>
A form which employees are responsible to sign, acknowledging the receipt of each Department Directive they receive. It is each employee's responsibility to review and comply with all Department Directives. For Department Manuals, General Orders and Division Orders, the employee will be required to sign a "Written Directive Receipt" form.

1.135    <u>Written Directive System:</u>
A formal system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties.



**PART C:  THE ORGANIZATION OF THE MIAMI BEACH POLICE DEPARTMENT**  [11.1.1]

**Chapter 2**      **ORGANIZATIONAL STRUCTURE**

The organizational structure of the Department shall consist of four Divisions; the Patrol Division, the Criminal Investigations Division, the Technical Services Division, and the Support Services Division.  Each Division includes various Districts, Sections, and Units which are grouped by function as determined by the Chief of Police to best serve the citizens of the City of Miami Beach.

The organizational structure of the Chief of Police's Office shall consist of:  The Chief of Police, the Assistant Chief of Police, the Internal Affairs Unit, the Media Relations Office, the Police Athletic League Office, the Fraternal Order of Police President's Office, and the Police Budget Office; each is directly responsible to the Chief of Police.

The Department's organizational structure is depicted on an organizational chart indicating the ranks of employees in the chain of command.  The organizational chart for the Department shall be posted in an area accessible to all employees, contained in the DRR, and any other location approved by the Chief of Police.  The organizational chart shall be reviewed and updated as needed. [11.1.2]

**2.1**          **Office of the Chief of Police**

Major functions:
1)    Chief Executive Officer of the Miami Beach Police Department.
2)    Maintain liaison with other police departments and law enforcement agencies.
3)    Oversee the overall operation of the Department.

2.1.1          Assistant Chief of Police

Major functions:
1)    Assistant to the Chief of Police of the Miami Beach Police Department.
2)    Supervise and maintain a liaison between the different Divisions and the Chief.
3)    Plan for response to unusual occurrences. [46.1.1]
4)    Is the Acting Chief of Police in the absence of the Chief of Police.

2.1.2          Internal Affairs Unit

Major functions:
1)    Receive all complaints.
2)    Investigate officer involved shootings.
3)    Liaison with City Attorneys Office for pending criminal/civil litigation involving the Department.
4)    Recommend policy/procedure changes to Chief of Police with reference to Internal Affairs investigations.
5)    Maintain appropriate files as directed by state statute including, but not limited to, complaints, investigations, use of force, special investigations. [52.1.10]

2.1.3          Media Relations Office  [54.1.1]

Major functions:
1)    Prepare news releases for the media.
2)    Represent the Department at various functions as directed by the Chief of Police.
3)    Coordinate the Department's media activities.

2.1.4        Police Athletic League Office [44.2.5]

Major functions:
1) Manage a wide range of youth programs for the Department and the City of Miami Beach.
2) Coordinate and supervise the Police Explorer Program.

2.1.5        Fraternal Order of Police President's Office

Major functions:
1) Serve as the representative of the Fraternal Order of Police Union.

2.1.6        Police Budget Office [17.2.1]

Major functions:
1) Coordinates, implements, and administers the Department's budget and purchasing activities.

**2.2**        **Patrol Division**

The Patrol Division operates under the direction of a Division Commander holding the rank of Major and is comprised of the following sections and units:

2.2.1        Community Police Districts

The Community Police Districts are each under the direction of a Captain and are comprised of a North District, a Middle District and a South District.

Major functions:
1) Patrol the streets of the City in marked or unmarked vehicles.
2) Respond to calls for police service.
3) Take appropriate action when observing crime, persons in distress, or situations where police assistance is needed.
4) Enforce all laws as authorized.
5) Provide tactical patrol to address specific crime problems.
6) Provide mobile patrol.
7) Provide field training.
8) Provide and coordinate law enforcement for major events and special incidents.
9) Maintain public order.
10) Attend civic functions and meetings.
11) Provide community service.
12) Coordinates inter-department task force - community problem solving meetings with other city departments for community enhancement initiatives.
13) Provide Area of Responsibility Program.
14) Provide Community Enhancement Program - forms for referrals to other city departments.
15) Contact persons listed as liaison for district homeowners associations and attendance at meetings by District Captains.

2.2.2        Special Operations Unit

The Special Operations Unit operates under the direction of a Lieutenant and is comprised of the Selective Traffic Enforcement Program Squad, the Marine Patrol Squad, Accident Investigation and DUI Squad, Crime Prevention Squad, the Crime Watch Office and Bicycle/Beat Squad.

Effective Date: 07/03/00
Revised Date:                            DRR
Page 23            MIAMI BEACH POLICE

2.2.3    Selective Traffic Enforcement Program Squad [61.1]

Major functions:
1)    Provide traffic enforcement.
2)    Perform selective enforcement
3)    Perform speed enforcement
4)    Address traffic related problems and violations
5)    Assist with special events, demonstrations, and escorts.

2.2.4    Marine Patrol Squad

Major functions:
1)    Patrol the jurisdictional waters of the City of Miami Beach.
2)    Respond to calls for police service.
3)    Enforce all maritime laws as authorized.
4)    Provide community programs and education of maritime laws and vessel safety.

2.2.5    Accident Investigation and DUI Squad [61.2]

Major functions:
1)    Provide traffic accident investigations including traffic homicides.
2)    Investigate all hit and run accidents.
3)    Provide intoxilyzer maintenance officer.
4)    Provide the Drug Recognition Expert (DRE) coordinator.
5)    Coordinate DUI enforcement and sobriety check points.

2.2.6    Crime Prevention Squad [45.1.1]

Major functions:
1)    Provide citizen awareness
2)    Conduct crime prevention surveys, coordinate, supervise and staff various crime prevention programs.
3)    Conduct active solicitation of persons/groups interested in crime prevention.
4)    Coordinate and manage the Citizen's Police Academy.

2.2.7    Crime Watch Office [45.1.2]

Major functions:
1)    Provide a Crime Watch Coordinator
2)    Assist in the organizing of crime watch groups in residential and business areas.
3)    Maintain liaison with the crime watch groups and other interested community groups.
4)    Coordinate community relations type events which are related to crime prevention functions.

2.2.8    Bicycle/Beat Squad [41.1.4]

Major functions:
1)    Provide patrol functions in a specific area while on either a bicycle or on foot.

**2.3    Criminal Investigations Division [42.1]**

The Criminal Investigations Division operates under the direction of a Division Commander holding the rank of Major and is comprised of the following units:



2.3.1       Criminal Investigations Unit

The Criminal Investigations Unit operates under the direction of a Unit Commander holding the rank of Captain.

Major functions:
1)    Investigate reported unsolved crimes.
2)    Identify and disseminate crime trends, locate suspects, arrest offenders, and assist the State Attorney's Office for successful prosecution of cases.
3)    Collect, evaluate, analyze, interpret, and disseminate criminal data in major crime categories which may be of immediate or potential value. **[15.1.1]**
4)    Develop and implement proactive policing strategies.
5)    Provide dignitary protection for visiting dignitaries.

2.3.2       Juvenile Section **[44.1]**

Major functions:
1)    Supervise and direct the Juvenile Squad, the Housing Authority Office, the Gang Squad, the School Resource Officer Squad, and the School Crossing Guards Office.
2)    Manage the Department's delivery of juvenile services.

2.3.3       Juvenile Squad

Major functions:
1)    Conduct investigations in which a juvenile is either the victim or the suspect, other than death investigations.
2)    Investigate all missing persons cases, elderly abuse cases and all bicycle theft cases.
3)    Provide prevention and control of juvenile delinquency.
4)    Track sexual predators registered with the State of Florida who reside in Miami Beach.

2.3.4       Housing Authority Office

Major function:
1)    Identify family problems and refer to appropriate governmental or private agencies for assistance.
2)    Provide enforcement and initiate investigations when deemed appropriate.
3)    Provide housing residents with information concerning resources within the police, the community and other municipal departments.
4)    Provide police community relations through working with youth groups as a role model, attending tenant and community meetings.

2.3.5       Gang Squad

Major functions:
1)    Investigate all gang related crimes other than death investigations
2)    Collect intelligence on gang activity.
3)    Work with other agencies to track gang members

2.3.6       School Resource Officer Squad **[44.2.4]**

Major functions:
1)    Serve as representatives of the Police Department at their assigned school.
2)    Focus on the prevention of juvenile delinquency through frequent contacts with children and through programs specifically developed to respond to those factors and conditions which give rise to delinquency.
3)    Administer the D.A.R.E. program.

2.3.7      School Crossing Guards Office [61.3.5]

Major functions:
1) Direct children and other pedestrians at school crosswalks while maintaining safety procedures.

2.3.8      Persons Section

Major function:
1) Supervise and direct the Homicide Squad, Domestic Violence/Career Criminal Squad, Persons Crimes Squad, VISA Office, and Robbery Office.

2.3.9      Homicide Squad

Major function:
1) Investigate all cases where an unnatural death has occurred, except traffic homicides.

2.3.10      Domestic Violence/Career Criminal Squad

Major functions:
1) Provide crisis intervention and victim support.
2) Provide victim assistance to members of the community who require referral and other types of assistance.
3) Target select career criminals for apprehension and prosecution.

2.3.11      Persons Crime Squad

Major functions:
1) Investigate all crimes against persons except those that are assigned to other squads.
2) Investigate arson cases.

2.3.12      VISA Office

Major functions:
1) This office includes the "Visual Identification System" and the "Ten Most Wanted Section".
2) Positively identify subjects of criminal activity when no leads are apparent other than visual.
3) Reduce the number of fugitives in our community by informing the citizens of our city of our "Ten Most Wanted" fugitives.

2.3.13      Robbery Office

Major function:
1) A reactive and proactive squad that targets street robberies and related offenses.

2.3.14      Property Section

Major functions:
1) Supervise and direct the Crime Scene Squad, the Auto Crimes Squad, the Property Crimes Squad and the Pawn Shop Office.

2.3.15      Crime Scene Squad  [42.2.1] [83.1]

Major functions:
1) Utilize forensic and technical sciences to provide crime scene investigation services for the Police Department.
2) Provide crime scene documentation by photography, video and drawings.
3) Collect latent prints.
4) Preserve and collect evidence.

5)   Analyze, compare and form opinions regarding fingerprint evidence.

2.3.16   Auto Crimes Squad

Major functions:
1)   Investigate crimes involving the theft and/or burglary of motor vehicles.

2.3.17   Property Crimes Squad

Major function:
1)   Investigate crimes involving theft of property and vandalism.

2.3.18   Pawn Shop Office

Major function:
1)   Reduce crime by providing an effective method of locating stolen property, identifying and arresting individuals dealing in these items.
2)   Ensure that the pawn shops are properly documenting and reporting items in accordance of State Statutes and City Ordinances.

2.3.19   Strategic Investigations Unit [43.1]

The Strategic Investigations Unit operates under the direction of a Unit Commander holding the rank of Captain.

Major functions:
1)   Initiate investigations into narcotics, illegal gambling, prostitution, illegal liquor, activist/terrorist, illegal weapons, gather, process and disseminate information concerning people and organizations that are, or are believed to be, involved in illegal activities.

2.3.20   Vice, Intelligence, Narcotics (VIN) Section

Major functions:
1)   Supervise and direct the Organized Crime Squad, the Street Narcotics Squad, the Detached Duty Squad, and the Confiscations Office.
2)   Supervise the High Intensity Drug Trafficking Area (HIDTA) Grant.

2.3.21   Organized Crime Squad

Major functions:
1)   Investigate gambling, prostitution and all vice related crimes taking place within the City's jurisdiction.
2)   Provide for the identification, collection and analysis of intelligence relating to organized crime and investigations of sensitive matters.

2.3.22   Street Narcotics Squads

Major functions:
1)   Provide for the investigation and suppression of all illegal narcotics activities taking place within the city's jurisdiction.
2)   Provide an undercover tactical unit.

2.3.23     Detached Duty Squad

Major functions:
1)   Assign detectives to various task forces, including the Drug Enforcement Agency (DEA) multi-agency task force, South Florida Impact and High Intensity Drug Trafficking Area (HIDTA).
2)   Provide long term narcotics, organized crime and money laundering investigations.

2.3.24     Confiscations Office [74.4.1]

Major functions:
1)   Utilize the Federal "Comprehensive Crime Control Act of 1984" and the Florida Contraband Forfeiture Act" to remove contraband and crime related property from the community and discourage criminal activity by depriving criminals of proceeds.
2)   Produce substantial revenue for the Police Department.

**2.4**     **Technical Services Division**

The Technical Services Division operates under the direction of a Division Commander holding the rank of Major and is comprised of the following Units:

2.4.1     Information Resources Unit

The Information Resource Unit operates under the direction of a Unit Commander holding the rank of Captain.

Major functions:
1)   Ensuring compatibility between technology and departmental goals and objectives.
2)   Overseeing expenditures associated with the acquisition, operation, and maintenance of automated systems.
3)   Recommending policy guidelines for future planning in the area of automation.
4)   Establishing departmental priorities in the field of automated systems in conjunction with the annual budget and the Department's Multiyear Plan.
5)   Ensuring compatibility of equipment and coordination of automated systems.

2.4.2     Information Systems Management Section

Major function:
1)   Implement and manage the Computer Aided Dispatch (CAD) System and the Records Management System (RMS).
2)   Provide technical support with the City of Miami Beach Radio System and equipment.
3)   Act as liaison between PSCU and Patrol on 911 Communication issues.
4)   Locate, demonstrate and evaluate new communication equipment and technology.

2.4.3     Crime Analysis Section [15.1]

Major functions:
1)   Collect and analyze data on criminal offenses and provide intelligence reports for strategic responses.

2.4.4     Records Management Section [82.1]

The Records Management Section operates under the direction of a Unit Commander holding the position of Manager.

2.4.5     False Alarm Office

Major functions:
1)   Register all alarm users

 2)   Maintain false alarms records and billing

2.4.6       Validations Office

Major functions:
1)   Complete the monthly validation package received from FCIC/NCIC.

2.4.7       Records Office

Major functions:
1)   Supervise and direct the Data Entry Staff and the Customer Service Staff.
2)   Manage the Department's delivery of records services.

2.4.8       Data Entry Staff

Major function:
1)   Receive, enter, maintain and store the Police Department's records and files daily.

2.4.9       Customer Service Staff

Major functions:
1)   Provide the public access to routine public records, police history reports and fingerprinting.
2)   Provide the Police Department records.

2.4.10      Public Safety Communications Unit [81.1]

The Public Safety Communications Unit operates under the direction of a Unit Commander holding the rank of Captain.

2.4.11      Public Safety Communications Shifts

Major functions:
1)   Receive incoming requests for police and fire service.
2)   Maintain state certification and validation for NCIC/FCIC computers per Florida Department of Law Enforcement (FDLE) requirements.
3)   Dispatch calls for police and fire service.
4)   Summon support services such as fire, rescue, ambulances, tow trucks, etc.
5)   Utilize telecommunications to include want and warrant checks, drivers' license checks, vehicle registration checks, and interagency communications.
6)   Monitor the alarm board.
7)   Receive and forward all visitor and telephone calls within the building.
8)   Monitor intercity frequencies and local government frequency.
9)   Log and maintain records of all above listed functions.
10)  Monitor status of police officers to maximize officer safety.

2.4.12      Recording Service Section

Major functions:
1)   Processes and maintains master tapes used to record telephone and radio transmissions within PSCB.
2)   Provides sworn depositions and makes court appearances based on expert knowledge and understanding of 911 policies and procedures.
3)   Processes and maintains statistical data pertaining to telephone and radio transmissions.
4)   Researches, duplicates, and coordinates various audio tape requests received by the Communications Division from law enforcement, judicial government services, and public records requests pursuant to the applicable state guidelines.



2.4.13     Professional Standards Unit

The Professional Standards Unit operates under the direction of a Unit Commander holding the position of Manager.  The Unit is comprised of the Staff Inspection Section, the Accreditation Management Section, and the Planning & Research Section.

2.4.14     Staff Inspection Section

Major functions:
1)    Conduct Staff Inspections. **[53.2.1]**
2)    Conduct audits and reviews.

2.4.15     Accreditation Management Section

Major functions:
1)    Develop and maintain accreditation standards, reports, and files.
2)    Act as a resource for future changes in policies/procedures to insure compliance after accreditation.

2.4.16     Planning & Research Section **[11.6.1]**

Major functions:
1)    Responsible for the evaluation, research, and development of administrative and operational procedures, policy guidelines, and liaison with other criminal justice planning agencies.
2)    Review and prepare law enforcement surveys.

**2.5**     **Support Services Division**

The Support Services Division operates under the direction of a Division Commander holding the rank of Major and is comprised of the following units:

2.5.1     Personnel Resources Unit

The Personnel Resources Unit operates under the direction of a Unit Commander holding the rank of Police Commander.

Major functions:
1)    Provide staff, training and specialized services to the other divisions within the Police Department and the City.

2.5.2     Background Section **[32.2.1]**

Major functions:
1)    Coordinate the hiring process for new applicants with the City's Human Resources Department.
2)    Perform background investigations of all employees who are considered for employment, either full-time, part-time or volunteer.
3)    Prepare individual files for each applicant for review.
4)    Conduct and coordinate recruitment efforts.

2.5.3     Training Section **[33.1]**

Major functions:
1)    Research, develop, and administer in-service training.
2)    Maintain mandatory retraining and in-service training records.
3)    Training of new recruits.
4)    Liaison with all police academies.
5)    Administer the career development program.
6)    Administer the Intern Program.

2.5.4        Range and Firearms Office **[1.3.11] [16.3.6]**

Major functions:
1)   Provide for the firearms qualification and training of all sworn employees.
2)   Manage and maintain the firearms training facility.
3)   Repair and maintenance of firearms and related equipment under their authority.

2.5.5        Property Management Unit **[84.1]**

The Property Management Unit operates under the direction of a Unit Commander holding the rank of Captain.

2.5.6        Property and Evidence Section

Major functions:
1)   Supervise and direct the Property and Evidence Office, Fleet Management Office, Vehicle Research Office and the Quartermaster Office.

2.5.7        Property and Evidence Office

Major functions:
1)   Store, maintain, record, and control all property and evidence obtained through the performance of the police function.
2)   Attempt to locate and notify owners of property.
3)   Dispose of property per statutes and court orders.

2.5.8        Fleet Management Office

Major functions:
1)   Track the use and maintenance of all city owned marked and unmarked police vehicles.
2)   Coordinate the purchase of all Department vehicles in conjunction with Fleet Management Division of the City General Services Administration.

2.5.9        Vehicle Research Office **[61.4.3]**

Major functions:
1)   Facilitate a cooperative effort between the Department, towing firms and citizens who have had their vehicles towed.
2)   Ensure that all towed and impounded vehicles are properly accounted for and handled in conformance with applicable laws and ordinances.

2.5.10       Quartermaster Office **[22.2.8] [17.5.1]**

Major functions:
1)   Maintain inventory and supplies for the Department.
2)   Issue and track all uniforms and equipment.

2.5.11       Business Resources Unit

The Business Resources Unit operates under the direction of a Unit Commander holding the rank of Captain.  All departmental grants are written and managed by this Unit.

2.5.12       Payroll Section

Major functions:
1)   Monitor, process and audit all payroll data related to the monetary and leave earnings of each employee assigned to the Police Department.
2)   Insure the Department's compliance in the areas of contractual obligations, City Rules and Regulations, and the Departmental Guidelines pertaining to payroll.



2.5.13        Off-Duty Section **[22.3.3]**

Major functions:
1) Coordinate, direct, plan and supervise all off-duty police services.
2) Receive, evaluate and screen all requests for off-duty police services before assigning qualified employees an off-duty job.
3) Maintain all records and facilitate payments of fees imposed by the City.
4) Liaison with the City's Special Event Office and other city departments.

2.5.14        Court Liaison Section **[74.1]**

Major functions:
1) Assure attendance by Police Department employees at all judicial proceedings arising from the law enforcement efforts of the Department.
2) Represent the Police Department to the State Attorney's Office, Public Defender's Office, Judges, Clerk's Office and any other organization involved in the criminal justice system, as related to court appearances and employee conduct.
3) Responsible for all incoming subpoenas and entering them into a computerized tracking system, and delivering them to the appropriate officer.
4) Provide notification of all assignment and schedule changes to the Clerk of the Court's Office, Miami-Dade County computer system enabling appearances to be coordinated with each officer's on-duty schedule wherever possible.
5) Approve court overtime and ensure that departmental guidelines are adhered to.

**2.6        Descending Order of Authority [12.1.2]**

In the event of the sudden unexpected absence of the Chief of Police, the most senior ranking officer will assume the duties of the Chief of Police until relieved by a higher authority. Command authority automatically succeeds in the following order, unless otherwise directed:
    a. Assistant Chief of Police
    b. Senior Major
    c. Senior Captain
    d. Senior Police Commander
    e. Senior Lieutenant
    f. Senior Sergeant
    g. Senior Officer

All other absences will be preceded by a memorandum which will appoint a temporary replacement for the expected time of the Chief of Police's absence. The appointed employee shall assume all duties and responsibilities afforded the Chief of Police and carry out and enforce all policies, and procedures, rules and regulations. **[12.1.2a] [12.1.2b] [12.1.2d]**

**2.7        Chief of Police**

The Chief of Police is the Chief Administrative Officer of the Department and the final Departmental authority on all matters of policy, operations and discipline. The Chief of Police is responsible for the planning, directing, coordinating, controlling, and staffing of all activities of the Department for its continued and efficient operation; for the enforcement of Rules & Regulations within the Department; for the Department's relationship with the citizens, the city government, and other agencies for providing and defining the Mission of the Department; and for the successful accomplishment of that mission. **[12.1.1]**

**2.8        Assistant Chief of Police**

It shall be the duty of the Assistant Chief of Police to see that the orders and policies of the Chief of Police are carried out and, during the absence of the Chief of Police, perform all the duties regularly the responsibility of the Chief of Police. **[12.2.1]**



**2.9**      **Commanding Officers** [26.1.5]

Commanding officers consist of Majors, Captains, Police Commanders, Lieutenants, Sergeants, Managers, and Supervisors who are in charge of Divisions, Districts, Units, Sections, Shifts, Staffs, and Squads. Commanding officers have direct supervision and control, subject to the orders of the Chief of Police, over all officers and other employees of the Department assigned to their command. They are responsible for their efficiency and effectiveness and shall coordinate the functions and activities of the various units of their command. They shall promote harmony among the employees of their command. They are responsible for the cooperation of their command with all other divisions of the Department. They shall act in cases not regularly assigned to their command when the delay necessary to inform the proper unit might result in a failure of the Department to perform a police duty.

2.9.1      Commanding officers are also responsible for:

2.9.1.1      Ensuring that each employee of their command has a current copy of the Department Manual containing all amendments, changes, and corrections thereto and shall see that each employee of their command is properly instructed in their duties and performs such duties in the manner prescribed by the Department Manual. [26.1.1]

2.9.1.2      Preparing, transmitting, filing, using, and preserving official records, reports, returns, forms, affidavits, warrants, subpoenas, and other papers of legal process, as well as correspondence originating in, or forwarded to, their command.

2.9.1.3      Clearly understanding the Mission of the Department as outlined by the Chief of Police and coordinate activities under their respective commands consistent with this Mission. [11.5.1]

2.9.1.4      Inspection of all buildings and offices within their command, and the furnishings and equipment thereof, with a view toward preserving the good order, repair, safety, and sanitation of same.

2.9.1.5      The proper care, economical use, efficiency and service ability of the equipment assigned for their use and the use of the employees of their command.

2.9.1.6      Observance and enforcement of all Department Rules and Regulations, SOPs, City Personnel Rules, City Work Rules, General Orders, Fraternal Order of Police Contract, General Employees Contract, Government Supervisors Association of Florida, and the Communications Workers of America Contract.

2.9.2      Commanding officers shall be responsible for the preservation of the health, welfare, and safety of any person in the custody of, in the care of, or detained by, any employee of the respective commands of such commanding officers, and shall also be responsible for the preservation and safeguarding of all property of such persons.

2.9.2.1      Commanding officers shall not allow violence to be used in the questioning or management of any person in the custody of, or in the care of, or who is detained by, any employee under their command except when force is reasonable and necessary in the maintaining of custody and control. [1.3.1]

2.9.2.2      Any incident detrimental to the health, welfare and safety of such persons while in the custody, or in the care of, or who is under detention by an employee of their command shall immediately be reported by such commanding officer to the Chief of Police via a "Special Incident Notification".

2.9.2.3      Commanding officers shall take all precautions to insure the safety of persons in an intoxicated condition. When any prisoner is in need of medical attention, or there is doubt as to the physical or mental condition of a prisoner, the commanding officer shall insure or shall immediately procure medical assistance, and shall be guided by the recommendations of the authorized medical professional. In emergency cases, such commanding officer shall

immediately order the prisoner sent to a hospital.  Commanding officers shall make an immediate, accurate, and complete written "Special Incident Notification" to the Chief of Police of death, or injury to, or loss of property of any prisoner in the custody or care of, or detained by any employee under their command.

2.9.3   Commanding officers shall be responsible for supervision of roll-calls for employees during their hours of duty, and shall be responsible for inspection of the employees of their commands, and for determining the fitness for duty of same; the communication of all information and orders; the giving of requested instructions and advice, notation and reporting of illnesses, absentees, and tardiness; notation and reporting of any want of cleanliness or neatness in person or in uniform and the correction of any negligence in attire, and the inspection of all equipment, including arms and ammunition, to determine if the same is in good working order.  The responsibilities herein outlined may be delegated, but such delegation shall not relieve such commanding officers of the responsibility for the neglect of duty or inefficiency of the employees to whom such responsibilities are delegated. **[26.1.5] [53.1.1] [11.3.2]**

2.9.4   Commanding officers shall be responsible for the accuracy, preservation and safekeeping of all records of their command during their hours of duty, and shall not authorize their removal, except on police business, or under due process of law, nor shall they allow any alterations of such records, except for the purpose of correcting a clerical misprint or other error, and where such alteration is made, such commanding officers shall give the reasons therefore.  **[82.2.4]**

2.9.5   Commanding officers shall, without specific instructions, establish the required details and assignments necessary to carry out the functions of the Department and of their command in particular.  They shall be guided in their assignment of  employees by the number of employees available to them for assignment and the necessity for assigning their subordinates where they will be most useful and efficient.  **[16.1.2]**

2.9.6   During the temporary absence of a commanding officer, when no other provision is made by the Chief of Police, command automatically devolves upon the subordinate present next in seniority to such commanding officer.   **[11.3.1]**

Seniority shall be determined, first by rank, second by continuous service in the rank, then by length of service time in the Department.

2.9.7   The relative rank of line officers of the Department for the purposes of determining responsibilities of command only, shall be numerically designated as follows:

1) Chief of Police             4) Captain                7) Sergeant
2) Assistant Chief of Police   5) Police Commander       8) Police Officer
3) Major                       6) Lieutenant

2.9.8   Whenever commanding officers, in the necessary performance of their duties, give orders to any subordinate employee not attached to their command, such commanding officer must exercise great care that such orders do not conflict with those of the commanding officer of the said subordinate employee.  However, commanding officers are responsible for taking appropriate action where there is a serious breach of discipline, improper conduct by an employee in a period of emergency or when supervisory action is necessary and lacking.  That Commanding officer shall advise the employee's direct supervisor of his actions as soon as possible.  **[12.1.3] [26.1.5]**

2.9.9   Commanding officers are authorized to place an employee temporarily in the position of an employee of higher rank.

2.9.10  Commanding officers shall not countermand an order issued by a superior officer without sufficient reason.



2.9.11    Commanding officers shall exercise their authority over their subordinates with kindness, firmness, and justice and shall require each subordinate to perform their own duty.

2.9.12    Commanding officers shall exercise their authority without bias or prejudice and shall not, under any circumstances, or in any manner, obligate himself to any person of a lesser rank.

2.9.13    Commanding officers are not only responsible for their own conduct and performance of police duties, but that of their subordinates as well.  They shall set an example to all subordinates in energy, sobriety, courtesy, dignity, courage, truthfulness, skill, discipline and careful painstaking attention to duty.  They shall at all times appear neatly attired and clean in person and equipment.

2.9.14    Commanding officers should report any emergency, serious crime, or unusual occurrence to their immediate superior.  They shall make copies of all serious or unusual incidents reported during their hours of duty and forward them to the office of the Chief of Police via a Special Incident Notification.  Examples of serious incidents are:  homicide, rape, traffic homicide, armed robbery, home invasion, any crime involving the use of weapons or resulting in personal injury, and any other incident deemed of importance.  They shall notify the Chief of Police, or his designee, personally and as soon as possible in the event of a homicide, rape, shooting, or serious injury involving any employee of their command.

2.9.15    Commanding officers shall personally respond to any emergency or occurrence of a serious or unusual nature which arises, unless their presence at the station would be of more value under the circumstances, in which case, they shall assign a competent supervisor to take command at the scene of the emergency.  They shall also, whenever possible, respond to calls where employees of their command are involved in controversy or accident.

2.9.16    Commanding officers shall be responsible for the prompt service of all official notices, summons, or subpoenas which may be sent to them by proper authority.

2.9.17    Commanding officers shall maintain a pleasant, courteous, and dignified attitude and shall recognize every caller's presence without unnecessary delay.  They shall accord respect, courtesy, sincerity, and patient attention to every citizen calling at the police station.  Under no circumstances shall they belittle a seemingly trivial request, complaint, or piece of information.

2.9.18    Commanding officers shall, upon going on duty, thoroughly familiarize themselves with all police business that has been transacted since their last tour of duty and which may affect them or their command in any way.  Ignorance of such police business shall be no excuse for the improper performance of any of their duties.

2.9.19    Commanding officers shall be guided by Chapter 119, Florida Statute in handling requests for inspection or release of public records. **[82.1.1]**

2.9.20    In the event of the death, resignation, suspension, or dismissal of any employee of the Department, the commanding officer to whose command the employee was last assigned shall ensure that any Department-issued property in his/her possession has been returned to the Property Management Unit per SOP #077. **[17.5]**

2.9.21    Commanding officers shall be responsible for the punctual attendance of all employees within their command and shall be responsible for each employee's attendance, overtime, court time, vacations, sick leaves, leaves of absence, and suspension records as required by the City.

2.9.22    Commanding officers shall maintain strict and constant scrutiny of all employees of their commands with a view to ascertaining their efficiency and fitness for service.  They shall prepare performance evaluations for each of the officers of their command at such intervals and upon such forms as may be required by the City. **[26.1.5]**



2.9.23     Commanding officers are responsible for the efficiency, discipline and morale of all employees of their command. They shall investigate, or cause to be investigated, all complaints by citizens and reports by employees of the Department of misconduct, incompetency, neglect of duty, or any violations of the Department Rules and Regulations, SOPs, and General Orders on the part of anyone under their command, and they shall submit an "Allegation of Employee Misconduct Form". They shall also report any incompetent employee who may be assigned to their command. The report shall include recommendations as to the action to be taken. Commanding officers shall be strictly charged with the responsibility of maintaining discipline, without laxity or discrimination, among employees of their command. Repeated leniency toward employees in their command shall be deemed neglect of duty on the part of such Commanding officers. **[26.1.5] [26.1.4] [52.1.1]**

2.9.24     A commanding officer who initiates any disciplinary action against a subordinate has the responsibility of forwarding a complete written record of the case to the disciplined employee, with a copy to the Internal Affairs Unit, and a copy to the Personnel Resources Unit for entry into the employee's personnel file. **[26.1.4] [52.1.1]**

2.9.25     Commanding officers shall submit a detailed report to the Chief of Police any time a large scale event occurs. Examples of large scale events are civil disturbances or any event which requires a major call-out of Department employees. This report shall be submitted in a Special Incident Notification and shall include a summary of the preparation needed, manpower used, problems encountered, number of arrests made, and any other information deemed of importance.

2.9.26     Commanding officers shall be governed by the Department Rules and Regulations, SOPs, and General Orders set forth for Commanding officers and the orders of the Department.

2.9.27     Commanding officers shall communicate and explain all orders and provide all necessary information to their subordinates. They shall issue clear, concise, and definite orders to their subordinates. Vague, ambiguous, ill defined orders and commands that cannot be executed are confusing to subordinates and prejudicial to the efficiency, good order, and morale of the Department. They are responsible for the proper execution of their orders.

2.9.28     Commanding officers shall not perform the duties regularly assigned to a subordinate when the subordinate is available to perform them, but shall require each subordinate officer to perform their own duties.

2.9.29     Commanding officers shall see that their subordinates make all required reports promptly, accurately, and completely, and on the proper forms.

2.9.30     Commanding officers are required to forward through channels all written communications received from their subordinates requesting a transfer or containing a grievance or suggestion.

2.9.31     Commanding officers who observe or are informed of a willful neglect of duty or misconduct by an employee not assigned to their command shall immediately investigate the matter to determine the facts and make a written report on an "Allegation of Employee Misconduct Form". **[26.1.5] [52.1.1]**



2.10        Organizational Chart - Miami Beach Police Department [11.1.2]



2.11        Organizational Chart - Office of the Chief of Police [11.1.2]



2.12        Organizational Chart - Patrol Division [11.1.2]



2.13        Organizational Chart - Criminal Investigations Division [11.1.2]



MIAMI BEACH POLICE

2.14       Organizational Chart - Technical Services Division [11.1.2]



2.15        Organizational Chart - Support Services Division [11.1.2]



**2.16**       **Organizational Components**

2.16.1       Each component of the Department will be named based on the rank of the commander it reports to.

2.16.2       Components

| Component | Commanded By | Reports To |
|---|---|---|
| Division | Major | Assistant Chief |
| District | Captain | Major |
| Unit | Captain, Police Commander, Lieutenant, Manager | Major |
| Section/Shift | Lieutenant, Sergeant, Non-sworn Police Supervisor, Sworn Employee, Manager, Officer | Captain, Police Commander, Manager |
| Squad | Sergeant, Non-Sworn Supervisor | Lieutenant |
| Office | Employee | Manager, Lieutenant, Sergeant, Non-Sworn Supervisor |
| Staff | Employee | Supervisor |
| **Exceptions:** | | |
| Police Budget Office | Non-Sworn Supervisor | Chief |
| Media Relations Office | Employee | Chief |
| PAL Office | Sworn Employee | Chief |
| FOP Office | Sworn Employee | Chief |
| Internal Affairs Unit | Captain | Chief |

2.16.3       Component Ranking

1.       Division
2.       District/Unit
3.       Section/Shift
4.       Squad
5.       Office
6.       Staff

| Component | Commanded By | Reports To |
|---|---|---|
| **Division** | | |
| Criminal Investigations Division | Major | Assistant Chief |
| Patrol Division | Major | Assistant Chief |



| Component | Commanded By | Reports To |
|---|---|---|
| Support Services Division | Major | Assistant Chief |
| Technical Services Division | Major | Assistant Chief |

**District**

| | | |
|---|---|---|
| Middle District | Captain | Major |
| North District | Captain | Major |
| South District | Captain | Major |

**Unit**

| | | |
|---|---|---|
| Business Resources Unit | Captain | Major |
| Criminal Investigations Unit | Captain | Major |
| Information Resources Unit | Captain | Major |
| Internal Affairs Unit* | Captain | Chief |
| Personnel Resources Unit | Commander | Major |
| Professional Standards Unit | Manager | Major |
| Property Management Unit | Captain | Major |
| Public Safety Communications Unit | Captain | Major |
| Special Operations Unit | Lieutenant | Major |
| Strategic Investigations Unit | Captain | Major |

**Section**

| | | |
|---|---|---|
| Accreditation Management Section | Officer | Manager |
| Backgrounds Section | Sergeant | Commander |
| Court Liaison Section | Sergeant | Captain |
| Crime Analysis Section | Analyst | Captain |
| Information Resources Management Section | Information Tech III | Captain |
| Juvenile Section | Lieutenant | Captain |
| Off-Duty Section | Sergeant | Captain |
| Payroll Section | Supervisor | Captain |
| Persons Crimes Section | Lieutenant | Captain |
| Planning & Research Section | | Manager |
| Property Crimes Section | Lieutenant | Captain |
| Property & Evidence Section | Supervisor | Captain |
| Records Management Section | Manager | Captain |



| Component | Commanded By | Reports To |
|---|---|---|
| Recording Service Section | | Captain |
| Staff Inspection Section | Sergeant | Manager |
| Training Section | Sergeant | Commander |
| VIN Section | Lieutenant | Captain |

**Shift**

| Component | Commanded By | Reports To |
|---|---|---|
| First Shift (PSCU) | Manager | Captain |
| Second Shift (PSCU) | Manager | Captain |
| Third Shift (PSCU) | Manager | Captain |

**Squad**

| Component | Commanded By | Reports To |
|---|---|---|
| AIU/DUI Squad | Sergeant | Lieutenant |
| Auto Crimes Squad | Sergeant | Lieutenant |
| Bicycle/Beat Squad | Sergeant | Lieutenant |
| Crime Prevention Squad | Sergeant | Lieutenant |
| Crime Scene Squad | Supervisor | Lieutenant |
| Detached Duty Squad | Sergeant | Lieutenant |
| Domestic Violence/Career Criminal Squad | Sergeant | Lieutenant |
| Gang Squad | Sergeant | Lieutenant |
| Homicide Squad | Sergeant | Lieutenant |
| Juvenile Squad | Sergeant | Lieutenant |
| Marine Patrol Squad | Sergeant | Lieutenant |
| Organized Crime Squad | Sergeant | Lieutenant |
| Person Crimes Squad | Sergeant | Lieutenant |
| Property Crimes Squad | Sergeant | Lieutenant |
| School Resource Officer Squad | Sergeant | Lieutenant |
| Selective Traffic Enforcement Program Squad | Sergeant | Lieutenant |
| Street Narcotics Squad | Sergeant | Lieutenant |

**Office**

| Component | Commanded By | Reports To |
|---|---|---|
| Confiscations Office | Officer | Sergeant |
| Crime Watch Office | Coordinator | Sergeant |
| False Alarm Office | Administrative Aide II | Manager |

| Component | Commanded By | Reports To |
|---|---|---|
| Fleet Management Office | Fleet Specialist | Supervisor |
| Fraternal Order of Police President's Office* | Officer | Chief |
| Housing Authority Office | Officer | Sergeant |
| Media Relations Office* | Officer | Chief |
| Quartermaster Office | Technician I | Supervisor |
| Police Athletic League* | Officer | Chief |
| Pawn Shop Office | Officer | Sergeant |
| Police Budget Office* | Financial Assistant | Chief |
| Property and Evidence Office | Technician II | Supervisor |
| Range & Firearms Office | Firearms Specialist | Sergeant |
| Records Office | Supervisor | Manager |
| Robbery Office | Officer | Sergeant |
| School Crossing Guard Office | PSS | Sergeant |
| Validations Office | Complaint Operator II | Manager |
| Vehicle Research Office | Technician I | Supervisor |
| VISA Office | Administrative Aide II | Sergeant |

**Staff**

| Component | Commanded By | Reports To |
|---|---|---|
| Customer Service Staff | Records Technician | Supervisor |
| Data Entry Staff | Data Entry Clerk | Supervisor |

* Exceptions

**PART D:  RULES OF PROFESSIONAL CONDUCT**

**Chapter 3        EMPLOYEES**

3.1        Span of Control and Authority:

3.1.1        Each Miami Beach Police Department (MBPD) employee is accountable to only one supervisor at any given time. **[11.2.1]**

3.1.2        Only one supervisor shall be designated as the commander of any one Division, District, Unit, Section, Shift, Squad, or Office and shall be accountable for the effective direction, coordination, and control of that organizational component.  **[11.3.2] [11.2.2]**

3.1.3        Supervisors shall be accountable for the performance of employees under their immediate supervision.

3.1.4        Employees shall report to, and be responsible to, their supervisor and follow the chain of command thereafter.  Employees may report to a sworn or non-sworn supervisor.  This insures that each employee is responsible to only one supervisor at any given time. **[11.2.1]**

3.1.5        The number of immediate subordinates of each supervisor is limited to 12 under normal day-to-day operations.  There will be instances, dictated by circumstance, when this policy may be modified.  Division commanders shall be responsible for reviewing the span of control of all supervisors under their command to assure efficiency is maintained.   Division commanders should consider:  **[16.1.2]**

- The extent to which supervisors must carry out non-managerial tasks.
- Demands on supervisors' time from Department sources outside the unit.
- The specialty of tasks performed by the unit.

3.1.6        Shift Commanders will authorize additional supervisory personnel, on an overtime basis, if necessary, when the span of control exceeds a 12 to 1 ratio.  Example:  If there is only one (1) Patrol Sergeant on duty on a particular shift and two (2) Patrol Lieutenants are working, shift commanders will designate the alternate Lieutenant or assign a Patrol Officer (Acting Sergeant) to the first-line supervisory function.

3.1.7        In order to carry out its functions, the Police Department is divided into several organizational components delineating the span of control and the ranks of the members of the chain of command within the Department, as per the Table of Organization. The Police Department shall be divided into the Office of the Chief of Police and the various Divisions as approved, the head of which shall report directly to the Assistant Chief of Police.

3.1.7.1        The chain of command shall be preserved in order to maintain principles of good administration and shall not be by-passed except under emergency conditions or unusual situations.

3.1.8        In order to achieve effective direction and coordination, the span of control of the Chief of Police is:

Assistant Chief of Police
    Sergeant

Internal Affairs Unit
    Captain/Police Commander
    Sergeant
    Clerk Typist

Media Relations Office
    Police Officer

F.O.P. President's Office
    Any sworn Officer elected to this office

Police Athletic League Office
    Any sworn Officer appointed to this office

Police Budget Office
    Police Financial Assistant
    Account Clerk

Staff
    Office Associate V
    Administrative Aide I

3.1.9        The span of control for the **Patrol Division Commander is:**

Sergeant
Clerk Typist

South District Commander
    Captain
        First Shift
            Lieutenant
            Sergeant
            Police Officer
            Detention Officer
            Public Safety Specialist
        Second Shift
            Lieutenant
            Sergeant
            Police Officer
            Detention Officer
            Public Safety Specialist
        Third Shift
            Lieutenant
            Sergeant
            Police Officer
            Detention Officer
            Public Safety Specialist

Middle District Commander
    Captain
        First Shift
            Lieutenant
            Sergeant
            Police Officer
        Second Shift
            Lieutenant
            Sergeant
            Police Officer
        Third Shift
            Lieutenant
            Sergeant
            Police Officer

North District Commander
    Captain
        First Shift
            Lieutenant
            Sergeant
            Police Officer
            Public Safety Specialist

        Second Shift
            Lieutenant
            Sergeant
            Police Officer
            Public Safety Specialist
        Third Shift
            Lieutenant
            Sergeant
            Police Officer

Special Operations Unit
    Lieutenant
    Selective Traffic Enforcement Program Squad
        Sergeant
        Police Officer
    Marine Patrol Squad
        Sergeant
        Police Officer
    AIU/DUI Squad
        Sergeant
        Police Officer
    Crime Prevention Squad
        Sergeant
        Police Officer
    Crime Watch Office
        Crime Watch Coordinator
    Bicycle/Beat Squad
        Sergeant
        Police Officer

3.1.10     The span of control for the **Criminal Investigations Division Commander is:**

Criminal Investigations Unit
    Captain
    Administrative Aide II
    Clerk Typist

Juvenile Section - Lieutenant
    Juvenile Squad
        Sergeant
        Police Officer
        Housing Authority Office
            Police Officer
    Gang Squad
        Sergeant
        Police Officer
    School Resource Officer Squad
        Sergeant
        Police Officer
        School Crossing Guards Office
            Public Safety Specialists
            School Guard

Persons Crimes Section - Lieutenant
    Homicide Squad
        Sergeant
        Police Officer
    Domestic Violence/Career Criminal Squad
        Sergeant
        Police Officer
        Domestic Violence Coordinator
    Persons Squad - Days
        Sergeant
        Police Officer
        VISA Office
            Administrative Aide II
    Persons Squad - Afternoons
        Sergeant
        Police Officer
        Robbery Office
            Police Officer

Property Crimes Section - Lieutenant
    Crime Scene Squad
        Senior I.D. Technician
        I.D. Technician II
        I.D. Technician I
        Police Photographer
    Auto Crimes Squad
        Sergeant
        Police Officer
    Property Crimes Squad - Days
        Sergeant
        Police Officer
        Pawnshop Office
            Police Officer
            Public Safety Specialist
    Property Crimes Squad - Afternoons
        Sergeant
        Police Officer



Strategic Investigations Unit
Captain
Vice, Intelligence & Narcotics Section (VIN Section)
Lieutenant
Administrative Aide I
Crime Analyst
Organized Crime Squad
Sergeant
Police Officer
Street Narcotics North Squad
Sergeant
Police Officer
Street Narcotics South Squad
Sergeant
Police Officer
Confiscations Office
Police Officer
Detached Duty Squad
Sergeant
Police Officer

3.1.11      The Span of Control for the **Technical Services Division Commander is:**

Clerk Typist

Information Resources Unit
Captain

Information Systems Management Section
Information Technologist III
Police Officer
Information Technologist II
Crime Analysis Section
Crime Analyst
Records Management Section
Manager
False Alarm Office
Administrative Aide II
Validations Office
Complaint Operator II
Records Office
Police Records Supervisor
Data Entry Staff
Data Entry Clerk
Customer Service Staff
Administrative Aide I
Records Technician

Public Safety Communications Unit
Captain
Clerk Typist
First Shift -       Manager
Communications Supervisor
Dispatcher
Complaint Operator II
Communication Operator
Second Shift -     Manager
Communications Supervisor
Dispatcher

---



Third Shift -     Complaint Operator II
                  Communication Operator
                  Manager
                  Communications Supervisor
                  Dispatcher
                  Complaint Operator II
                  Communication Operator

Recording Service Section
        Communications Records Custodian

Professional Standards Unit
        Manager
                Staff Inspections Section
                        Sergeant
                Accreditation Management Section
                        Police Officer
                        Office Associate V
                Planning & Research Section

3.1.12          The Span of Control for the **Support Services Division Commander is:**

Administrative Aide I
Clerk Typist

Personnel Resources Unit
        Captain/Police Commander
        Background Section
                Sergeant
                Police Officer
        Training Section
                Sergeant
                Police Officer
                Administrative Aide I
        Range and Firearms Office
                Firearms Specialist

Property Management Unit
        Captain
        Property and Evidence Section
                Property and Evidence Technician II
        Property and Evidence Office
                Property Evidence Technician I
                Municipal Service Worker III
        Fleet Management Office
                Police Fleet Specialist
        Vehicle Research Office
                Property Evidence Technician I
        Quartermaster Office
                Property Evidence Technician I

Business Resources Unit
        Captain/Police Commander
        Payroll Section
                Administrative Aide II
                Account Clerk I
        Off-Duty Section
                Sergeant
                Administrative Aide II
                Data Entry Clerk



Court Liaison Section
   Sergeant
   Office Associate V
   Data Entry Clerk

**3.2**     **Knowledge and Conformity to Department Rules and Regulations, SOPs or General Orders** [26.1.1]

3.2.1     Employees shall thoroughly familiarize themselves with, conform to and abide by, the Department Rules and Regulations, SOPs, General Orders, City Work Rules, City Personnel Rules, and all union contracts. Employees must have a working knowledge of all laws and ordinances in force. In the event of improper action or breach of discipline, it will be presumed that the employee involved was familiar with the law and/or order in question. Upon return from any extended absence, they shall familiarize themselves with all changes that may have occurred during such absence.

3.2.2     All employees are responsible for maintaining a copy of the Department Manual, keeping it current and having a thorough knowledge of its content.

3.2.3     All employees are responsible for the information distributed through the Official Bulletin. See SOP #022 - Written Directive, Section VIII.

**3.3**     **Orders**

3.3.1     Employees shall strictly obey and properly execute any lawful order, issued either verbally or written, from any senior ranking commanding officer. The term "lawful order" shall be construed as an order in keeping with the performance of any duty prescribed by law, Department Rules and Regulations, SOPs, and General Order, or for the preservation of order, efficiency, or proper discipline. [12.1.3]

3.3.2     Orders from superiors to subordinates shall be clear and understandable in language, civil in tone, and issued in the pursuit of Departmental business.

3.3.3     Orders given by an employee of equal or lesser rank shall be obeyed when said employee is merely relaying the orders of a superior. [12.1.3]

3.3.4     Under normal operating conditions, the highest ranking employee present at an incident will assume command of the situation. When employees of the same organizational component of equal rank are at a scene, the senior employee shall assume command. When employees of two or more organizational components are involved in an incident, the ranking employee present from the organizational component responsible for the follow up investigation and/or conclusion of the case shall assume responsibility for, and take command of, the investigation. The Chief of Police has the authority to designate command authority in any situation as needed. [12.1.2c] [12.1.2d]

3.3.5     Subordinates in doubt as to the nature, meaning, or details of a lawful order shall seek clarification from the person issuing the order.

**3.4**     **Orders of the Chief of Police** [12.1.1]

3.4.1     Any written or verbal order posted or communicated bearing the signature or name of the Chief of Police shall have the same effect and be construed as a part of the Department Rules and Regulations, SOPs, or General Orders of the Department.

3.4.2     The approval of the Chief of Police is necessary before an order is issued effecting the entire Department. The Chief of Police's signature must be obtained as evidence of that approval.

3.4.3     An order issued by a commanding officer pertaining to the personnel of their particular command shall be considered an order of that command.

**3.5**     **Conflicting Orders**

3.5.1     Upon receipt of an order conflicting with any previous order or instructions, the employee affected will advise the person issuing the second order of this fact. Responsibility for countermanding the original instruction shall then rest with the individual issuing the second

order. If so directed, the subordinate shall obey the second order. The individual issuing the second order shall, as soon as practical, inform such commanding officer of the action taken. The subordinate shall not be held accountable for disobeying the original order. Conflicting orders shall be issued only when clearly necessary. **[12.1.3]**

**3.6**      **Unjust Orders and/or Orders Contrary to Regulations**

3.6.1      No commanding officer shall knowingly issue an order which is unjust or is in violation of any order or command issued by the Chief of Police or a commanding officer. Commanding officers have the discretion to take temporary action contrary to Department Rules and Regulations, SOPs or General Orders when circumstances justify doing so, but the commanding officer doing so will be held accountable for such decisions.

3.6.2      Employees who are given orders which they feel to be unjust or contrary to Department Rules and Regulations, SOPs or General Orders, must first obey the order to the best of their ability. They may then proceed to appeal as provided by Department Rules and Regulations, SOPs, or General Orders. In any case where there is sound reason to believe that such orders or instructions are inconsistent or unjust, it is the right of any employee receiving same to respectfully call it to the attention of the person issuing the order.

**3.7**      **Unlawful Orders** **[12.1.3]**

3.7.1      No commanding officer shall knowingly issue any order which is in violation of, or tends to nullify, any law or ordinance. Since obedience to any unlawful order is never a defense for any unlawful action, no employee is required to obey any order which is contrary to federal, state, county, or local law or ordinance. Responsibility for refusal to obey rests with the employee who shall be strictly held accountable to justify the action.

3.7.2      Employees who receive an order that, in their opinion, is unlawful, unjust, or improper, shall report it in writing to the Chief of Police through the chain of command. Appeals for relief from such orders shall be made at this time.

**3.8**      **Insubordination**

3.8.1      Employees shall not speak derogatorily or critically to other Department employees, or to any person outside the Department, regarding the orders or instructions issued by any commanding officer.

3.8.2      Failure or deliberate refusal of any employee to obey a lawful order given by a commanding officer shall be considered insubordination. Ridiculing commanding officers or their orders, whether in their presence or during their absence, is also insubordination. **[26.1.1]**

**Chapter 4**      **DUTY TO CONFORM TO LAW** [26.1.1]

**4.1**      **Duty to Conform to the Law**

4.1.1      Persons employed in law enforcement are highly visible representatives of the legal system and bear a heavy burden for maintaining, through their own conduct, the honor and integrity of all governmental institutions.  Therefore, the conduct of employees of the Department shall not violate the law.  Violation of an ordinance or state or federal statute, in addition to the possibility of legal and criminal prosecution, serves as fundamental grounds for disciplinary action.

**4.2**      **Duty to Conform to the Procedural Criminal Law**

4.2.1      All persons are guaranteed basic civil rights, including, but not limited to, freedom of speech, press, assemblage and petition; freedom from unreasonable arrest, search and seizure; freedom from self-incrimination; right to counsel; right to privacy; and due process and equal protection of the law.  All employees are responsible for ensuring that civil rights are not violated.

**4.3**      **Duties Toward Those in Police Custody or Care**

4.3.1      All employees shall take appropriate action to insure the preservation of the health, welfare, safety, and property of any person within the custody or care of the Department.  Employees shall further assure that no violence, indignities, or discourtesies are used in the management of any person within the custody or care of the Department and that, when needed, such persons obtain necessary medical attention.

**4.4**      **Commanding and Supervisory Responsibility**

4.4.1      Commanding officers are specifically charged with strict enforcement of the provisions of this chapter through exercising either their line or staff supervisory authority.

**Chapter 5**      **USE OF FORCE**  Also see SOP# 017 - Use of Force.  [26.1.1]

**5.1**      **Use of Force**

5.1.1      When in the course of official duties, a sworn employee is required by circumstances to utilize physical force against an individual, the degree and kind of force shall be calculated **only** to overcome unlawful resistance.  Excessive and unnecessary force is prohibited. [1.3.1]

5.1.2      Any use of force will be documented on a "Control of Persons Report".

**5.2**      **Deadly Force Policy**

5.2.1      Sworn employees will use deadly force only in accordance with standard procedures of the Department, and will not violate or exceed statutory provisions governing the use of deadly force.

5.2.2      Sworn employees are authorized to use only such force as necessary, including deadly force, to protect life (prevent death or substantial harm to the sworn employees or another). [1.3.2]

**5.3**      **Excessive Force**

5.3.1      Sworn employees will not strike or use physical force on any person to the extent that injuries, which reasonably require professional medical treatment, are inflicted, unless necessary in self defense, or in defense of another, or to overcome actual physical resistance to arrest, or to prevent escape.  Any use of force will be documented on a  "Control of Persons Report".

---



**Chapter 6**       **EMPLOYEE REQUIREMENTS**

**6.1**            **Telephone Numbers and Residential Addresses**

6.1.1            Employees are required to have telephones at their place of residence.  Pager numbers are not acceptable in lieu of a residential telephone.  It is the employee's responsibility to ensure that their correct phone numbers and residential addresses are recorded in the Support Services Division.  Changes in telephone numbers and residential addresses shall be reported to the Support Services Division within 24 hours of such change.  The Support Services Division will be responsible for notifying the appropriate divisions and the Public Safety Communications Unit of the change.

6.1.2            This information is confidential pursuant to Chapter 119, Florida Statutes.  Any employee who improperly uses or distributes this information will be disciplined.

6.1.3            Employees shall not use the Department or any Department facility as a mailing address for private or personal purposes without written permission of the Chief of Police and/or his designee.

6.1.4            The exception being that any sworn police officer may register a personally owned vehicle using the Department's street address or the use of a post office box with or without the street address of the Department.   This exception is authorized by the Department of Highway Safety and Motor Vehicles.

6.1.4.1          A badge and identification card and/or a notarized statement on the Department's letterhead verifying employment of the officer must be presented to the auto tag agency.   This statement must include the officer's badge number.  The officer will be required to show this statement with each transaction on a license plate, as it will not be retained by the tag agencies.

**6.2**            **Personal Appearance**  Also see SOP #129 - Uniform Standards & Personal Appearance. **[26.1.1]**

6.2.1            All employees shall maintain a neat, clean appearance and shall dress in good taste. Personnel permitted to wear civilian clothing shall conform to standards of cleanliness, neatness, and the standards set forth by the Department.

**6.3**            **Personal Conduct [26.1]**

6.3.1            Employees are members of a team working together with a primary objective of serving the community.  Individuals who fail to follow the necessary rules and regulations, policies and procedures governing conduct, not only penalize themselves, but do a disservice to all other members of the Department and to the Community.

6.3.2            All Officers must be fully aware of the ethical responsibilities of their position and must strive constantly to live up to the highest possible standards of professional policing.  An officer acts as an official representative of government who is required and trusted to work within the law. The Officer's powers and duties are conferred by state statute.  The fundamental duties of an officer include serving the community, safeguarding lives and property, protecting the innocent, keeping the peace and ensuring the rights of all to liberty, equality and justice.

6.3.3            All Officers shall perform all duties impartially, without favor,  affection, or ill will and without regard to status, sex, race, national origin, religion, political belief, or station in life.  All citizens will be treated equally with courtesy, consideration, and dignity. Officers will never allow personal feelings, animosities, or friendship to influence official conduct.  Laws will be enforced appropriately and courteously and, in carrying out their responsibilities, officers will strive to obtain maximum cooperation from the public.  Officers will conduct themselves in appearance and deportment in such a manner as to inspire confidence and respect for the position of public trust they hold.

**6.4**        **Authority** [26.1.1]

6.4.1        Officers shall not exceed their authority in the enforcement of the law.

6.4.2        Officers shall not disobey the law or rules of criminal procedure in such areas as interrogation, arrest, detention, searches, seizures, use of informants and preservation of evidence.

6.4.3        Officers shall not restrict the freedoms of individuals, whether by arrest or detention, in violation of the Constitution and the Laws of the United States and the State of Florida.

**6.5**        **Integrity** [26.1.1]

6.5.1        Officers will not knowingly make false accusations of any criminal ordinance, traffic or other law violations.   This provision shall not prohibit the use of deception during criminal investigations or interrogations as permitted under law.

6.5.2        Employees shall truthfully, completely and impartially report, testify and present evidence, including exculpatory evidence, in all matters of an official nature.

6.5.3        Employees learning of conduct or observing conduct which is in violation of any law or policy of this Department by another Officer(s) and/or non-sworn employee(s) of the Department shall take necessary action and report the incident to the officer's/employee's immediate supervisor, who shall be required to prepare an "Allegation of Employee Misconduct Form". The failure of the supervisor to adhere to the aforementioned rule will subject him/her to disciplinary action. [26.1.5]

6.5.4        No employee shall intentionally make false reports, either written or verbal, or enter or cause to be entered in any departmental book, record, or report any inaccurate, false or improper information.

**6.6**        **Responsibility** [26.1.1]

6.6.1        Employees will not consume alcoholic beverages of any kind while on duty, except as authorized in the performance of official duties.   Employees will not report for duty with the odor of alcoholic beverages on their breath, or while under the influence of alcohol, which would adversely affect their job performance.

Employees shall not bring intoxicating beverages into any police building or vehicle except that has been seized as evidence, contraband, unsecured property, or a prisoner's property.

Employees shall not consume intoxicating beverages on Department premises or vehicles.

Employees shall not consume intoxicating beverages while in uniform or while wearing any identifiable part of a Departmental Uniform while off duty.

Employees, while off duty and partaking of alcoholic beverages and/or frequenting premises established primarily for consumption or sale of alcoholic beverages, will do so only as private individuals and will not display departmental identification unless necessary to perform official duties.

While off-duty, employees may be subject to disciplinary action if found to be disorderly and intoxicated in a public place.

6.6.2        Employees will not use any controlled substance except when prescribed in the treatment of an illness by a physician or dentist.   An employee shall immediately notify his supervisor before reporting for duty when prescribed medication is used that might affect their ability to perform their duties.

6.6.3 Employees will not enter or frequent places established primarily for: the sale, storage, or consumption of alcoholic beverages; the sale or display of sexually explicit pictures or materials; or nude or semi-nude performances while on duty and/or in uniform, except in discharge of official duties.

Employees are prohibited from visiting, attending, entering or patronizing, other than strictly in the line of duty with the knowledge and consent of their immediate police supervisor, any premises or establishment where illegal activities are known, believed or reasonably suspected to take place.

6.6.4 Employees will avoid regular or continuous association with persons, other than immediate family, who are known to have the lifestyle of continuing criminal activity, (i.e., racketeering, drug use, sexual offenses, burglary, theft, or dealing in stolen property), or are known to be under investigation by the Department, or another law enforcement agency for felony investigations.

6.6.5 Employees who are under criminal investigation and/or arrested by another law enforcement agency shall notify their Division Commander immediately of such investigation and/or arrest.

6.6.6 Employees shall not, while on duty, partake in wagering or gambling, included but not limited to, parimutuel wagering or purchase or redemption of lottery tickets.

Exception:  The foregoing prohibition shall not apply when the employee is engaging in any departmentally sanctioned activity.

**6.7 Courtesy and Respect [26.1.1]**

6.7.1 Employees will courteously and promptly adhere to policies and procedures established for the investigation of complaints of alleged misconduct by Department personnel.

6.7.2 Employees will be polite and courteous in contacts with the public and other Department personnel.

6.7.3 Employees shall not ridicule, mock, deride, taunt, belittle, willfully embarrass, humiliate or shame any person or do anything reasonably calculated to incite a person to violence.

**6.8 Unlawful Compensation [26.1.1]**

6.8.1 Employees shall not use their official position, identification cards or badges:
1. For personal or financial gain, for themselves or another person.
2. For obtaining privileges not otherwise available to them except in the performance of duty.
3. For avoiding consequences of unlawful or prohibited actions.

6.8.2 Employees shall not lend to another person their identification cards, badges, uniforms or any other police equipment or permit these items to be photographed or reproduced without the written approval of the Chief of Police.

6.8.3 Employees shall not authorize the use of their names, photographs, or titles in a manner that identifies the employee of this Department in connection with advertisement for any product, commodity or commercial enterprise without the written approval of the Chief of Police first.

6.8.4 Employees shall maintain a neutral position with regard to the merits of any labor dispute, political protest, or other public demonstration while acting in an official capacity.

6.8.5 Employees shall not accept any gift, gratuity, or reward in money or other consideration for services rendered in the line of duty to the public or to any person, business or agency except that authorized in writing by the Chief.

6.8.7 Any unauthorized gift, gratuity, loan, fee reward, service or other thing coming into the possession of any employee shall be forwarded immediately to the Office of the Chief of



Police. The Chief shall make all reasonable attempts to return the item to the donor. Failing in this, the item shall be donated to a charitable organization.

6.8.8     Employees shall not accept or solicit referral fees, rebates, or so-called "kickbacks" from individuals or companies receiving business because of Department activities. Such referral fees, rebates, or "kickbacks" include money, services, favors, gifts, discounts, considerations, or anything of service value. All such activities are prohibited, but not limited to, those received from polygraph services, security services, tow truck operators, ambulance services, hospitals, clinics, auto repair shops, lawyers, undertaker, restaurants, and companies selling or providing equipment or services to the Department. (This does not apply to Department activities that are charitable in nature, such as the Holiday Toy Giveaway, Police Athletic League activities, P.O.A.T., and any other similarly related charitable activities).

**6.9**     **Inappropriate Influence**  [26.1.1]

6.9.1     Employees shall, unless required by law or policy, refrain from becoming involved in official matters, or influencing actions of other employees in official matters, impacting the employee's family, relatives, persons with whom the employee has or has had a significant personal relationship or with whom the employee has or has had business or employment relationships.

6.9.2     Officers shall not use the authority of their position as employees, or information available to them due to their status as employees, for any purpose of personal gain including, but not limited to, initiating or furthering personal and/or intimate interactions of any kind with persons with whom the officer has had contact with.

**6.10**     **Confidentiality**  [26.1.1]

6.10.1     Employees shall not knowingly violate any departmental restrictions for the release or dissemination of information, except in the course of official duties or as required by law, or publicly disclose information likely to endanger or embarrass victims, witnesses or complainants.

6.10.2     Employees shall not divulge the identity of persons giving confidential information except as required by law or Department policy.

6.10.3     Employees shall not make known to <u>any</u> persons the contents of any directive or order, which they may receive, if such disclosure would destroy the intended effect of that order or police activity.

6.10.4     All information, not prohibited by Departmental Orders, shall be given courteously and accurately to persons requesting same.

6.10.5     Employees shall not reveal the identity, presence, activities or description of undercover, plainclothes and narcotics officers except in the strict discharge of their duty.

6.10.6     Except in the strict discharge of duty, employees shall not reveal the existence of or any information regarding Department projects, investigations, or operations aimed at the apprehension of criminals or the suppression of vice activities.

**6.11**     **Training**

6.11.1     All employees shall attend in-service, specialized, promotional and other training at the discretion of the Chief. Such attendance shall be considered a duty assignment. Certificates of completion and other relevant documents pertaining to such activities will be filed, when submitted, in the employee's personnel file. It is the employee's responsibility to provide the certificate and/or other relevant documents to the Support Services Division for filing. [33.1.2] [33.5.1]

6.11.2    If a supervisor determines that infractions or poor work quality are the result of a lack of knowledge of procedures or policy, the supervisor may request training through their Division Commander to the Training Section. The purpose of additional training is to assist the employee in correcting and improving his performance level. Training may be conducted during reasonable hours on the Department's time. **[26.1.4a]**

**6.12       Civil Litigation**

6.12.1    Employees shall not seek in any way, nor shall they accept from any person, money or other compensation for damages sustained or expenses incurred by them in the line of duty without first notifying the Chief, in writing via chain of command, of such action and first receiving written approval.

6.12.2    Employees who have received sick leave or salary for illness or injury sustained off-duty shall notify the Chief in writing via chain of command, of any intent to seek, sue, solicit, or accept compensation for damages before any action is taken, and shall include the facts of the claim and the name of the respondent.

6.12.3    Employees served with notices that they are being sued as a result of actions performed in the line of duty shall immediately send written notification of this to the Chief of Police via the chain of command. This notice shall include all of the facts of the incident and details relating to the civil suit.

**6.13       Department Equipment  [26.1.1] [17.5.1]**

6.13.1    Employees shall notify their immediate supervisor of any loss, damage, defects, or hazardous conditions of any City of Miami Beach equipment or property as soon as such are discovered.

6.13.2    Employees will not intentionally mark, mar, alter, or deface any Department facility or equipment.

6.13.3    Employees will not place unauthorized or objectionable material on Department bulletin boards or intentionally mark, mar, alter, deface, or remove printed or written notices properly placed upon the bulletin boards.

6.13.4    Employees will not appropriate any Department property for their own use, either on a temporary or permanent basis.

6.13.5    Employees will utilize Department equipment for its intended purpose in accordance with established procedures, and will not subject such equipment to loss, or damage through careless handling or abuse or intentional abuse.

6.13.6    Employees shall not use unauthorized or non-approved equipment.  **[1.3.9]**

**6.14       Political Activity**

6.14.1    Employees will not engage in political activities while on duty or use their position as Miami Beach employees to influence others in their support or opposition to a candidate or issue.

6.14.2    Employees will not enter or remain within an official polling place without permission from Elections Officials, except to cast a ballot or in the performance of their official duties.

**6.15       Performance of Duties  [26.1.1]**

6.15.1    Employees will remain at or within their assigned work areas during working hours unless otherwise authorized by a supervisor.

6.15.2    Officers will carry their badge and identification card on their person at all times when carrying a firearm, including a concealed firearm, except when engaged in covert assignments or when made impractical by the nature of activities being performed.

6.15.3    Employees will wear issued identification cards or badge conspicuously while in or about the Department's facilities, unless exempted by their Division Commander.

6.15.4    Employees will maintain the security of official Department identification and will not lend their identification card, access card, or badge to another person, or permit them to be reproduced without the approval of the Chief.

6.15.5    Employees shall identify themselves and display their official credentials when requested. Employees shall not attempt to hide their official identity, unless such identification will hinder an investigation.

6.15.6    Employees will adhere to SOPs, regulations and directives, and will faithfully execute all duties and responsibilities of their assigned position.

6.15.7    Officers assigned to specialized duties or assignments are not relieved from taking proper police action outside the scope of their specialized assignment when necessary.

6.15.8    All calls for police service shall be answered as soon as possible consistent with normal safety precaution and traffic laws.  Except under the most extraordinary circumstances or when otherwise directed by competent authority, no employee shall fail to answer any assigned radio call or to monitor the appropriate channel of their radio.

6.15.9    Employees will be attentive to job duties and will avoid any appearance of  loitering or otherwise neglecting work.

6.15.10   Employees will submit all reports required in the execution of their duties <u>before</u> concluding a tour of duty, except as authorized by a supervisor.

6.15.11   Sworn employees will respond to calls for assistance from citizens or other Department employees, and will take appropriate action in emergencies or criminal occurrences while on and off duty.

6.15.12   Employees will be attentive to their job duties and will not knowingly refrain or cause another to refrain from the performance of their lawful duties required for the safety of persons or property.  Sworn employees will take appropriate action in response to emergencies where there is known danger to the lives of others, and in response to serious crimes, particularly those of violent nature, which comes to their attention while on or off duty.

6.15.13   Sworn employees will not avoid their required duties because of fear or cowardice.  Sworn employees are not expected, or required to enter imminently hazardous situations without assistance.  However, they will not fail to come to the aid of another employee of the Department who is already engaged in an imminently hazardous situation.  Sworn employees will respond to the aid of persons in danger unless the probability of serious injury or losing their own life exceeds the probability of a successful rescue.

6.15.14   Employees are required to maintain job knowledge and skills necessary for the performance of official duties.

6.15.15   Employees will maintain and demonstrate their knowledge of the law and criminal procedure, and will maintain proficiency in required interpersonal skills, care and use of vehicles and equipment, and the use of firearms, by demonstrating proficiency in accordance with established standards and qualification requirements.

          Employees may be retested for proficiency as provided by policy, with each subsequent failure to qualify constituting an additional offense.  Failure to maintain job skills after instruction or training will result in increasing the severity of disciplinary actions.

6.15.16   Employees sustaining any personal injury that might impair their fitness for duty, whether sustained on duty or off duty, will promptly provide written notification of the injury to their supervisor.

**6.16**      **Hours of Duty:**   See SOP #057 - Attendance/Payroll, Classification, Duties and Responsibilities

6.16.1      Employees will report for duty in accordance with their assigned work schedules and will not be absent from duty without authorization or having made proper notification.  Failure to do so shall be deemed neglect of duty.  Employees unable to report for duty at their prescribed reporting time due to illness, shall notify the Public Safety Communications Unit not less than one hour prior to nor one hour after their reporting time.  Employees who anticipate tardiness due to personal or transportation difficulties should notify the PSCU or their own supervisor as soon as possible.

6.16.2      Unless otherwise directed, employees shall report to daily roll call at the time and place specified, properly uniformed and equipped.  There, they shall give careful attention to orders and instructions for the tour of duty.

6.16.3      When a condition exists that is deemed by the Chief, or his designee, to be of an emergency nature, regular tours may be extended and/or days off, vacations, and leaves of absence of any or all Department personnel may be canceled.

6.16.4      All employees shall remain at their assignment and on duty until properly relieved, or until dismissed.

6.16.5      Sworn employees shall be assigned regular hours for "Active Duty", and, when not so assigned, they shall be held to be always subject to duty.  Although periodically relieved in the routine performance of duty, they are always subject to orders from proper authorities and to calls for assistance from citizens within the City of Miami Beach.

**6.17**      **Sick Leave**   See SOP #057 - Attendance/Payroll, Classification, Duties and Responsibilities

6.17.1      Employees will not feign illness or injury, falsely report themselves ill or injured, or otherwise deceive any supervisor as to the condition of their health for purposes of avoiding normal duties through the use of sick leave.  Performance of activity in conflict with stated purpose of sick leave will constitute evidence of abuse.  A record of claiming sick time in conjunction with days off, holidays, or weekends off will be considered abuse.

6.17.2      Employees will not feign illness or injury, or falsely report themselves ill or injured, or otherwise deceive or attempt to deceive any supervisor as to their health for the purpose of making a fraudulent claim for family medical leave, insurance, worker's compensation, or disability retirement benefits.

**6.18**      **Harassment Policy** (See SOP #009)  [26.1.3]

6.18.1      A commitment to maintain a work environment free of harassment is a condition of employment with the City of Miami Beach.  Each employee should be able to enjoy a non-hostile work place free of harassment.  Failure to comply with this policy will subject an employee to disciplinary action.

6.18.2      Employees will not make derogatory remarks concerning race, sex, religion, age, sexual orientation or national origin of any person.

6.18.3      Employees will not harass, threaten or coerce any other employee or person.

6.18.4      Employees will not engage in conduct defined by law and/or the Department's policy that constitutes any type of harassment.

**6.19**      **Publicity**  [26.1.1]

6.19.1      Employees shall not seek personal publicity in the course of their employment.  Stories, features, or articles on radio or television or in magazines or newspapers, dealing with



individual Departmental employees in other than day to day type news coverage, must receive prior approval from the Chief, or his designee, before such coverage is initiated.

6.19.2     Employees will obtain the approval of the Chief or his designee, in writing, before authorizing the use of their names, photos, or official titles that identify them as employees of the Department in testimonials, advertisements of any commodity, or commercial enterprises.

6.19.3     No employee shall address any public or private gathering, or appear on radio or television programs, or write articles or manuscripts for publication wherein they are identified as an employee, or wherein the subject matter relates to law enforcement and/or the Department, unless authorized by the Chief or his designee.

**6.20     Sleeping on Duty** [26.1.1]

6.20.1     Sleeping on duty is strictly prohibited. Employees who feel that they are overly fatigued have the obligation to make this fact known to their immediate supervisor. Supervisors should temporarily transfer the affected individuals to assignments where the safety and welfare of others will not be jeopardized or relieve the individual from duty.

**6.21     Compromising Criminal Cases** [26.1.1]

6.21.1     Employees shall not involve themselves, or interfere with cases being investigated by other officers or other governmental agencies, nor undertake any investigation or other official action not part of their regular duties unless ordered to do so by a supervisor or where a manifest injustice might otherwise occur. In the later case, the employee's supervisor will be notified immediately thereafter.

6.21.2     Except in the interest of justice, employees shall not attempt to have any traffic citation or criminal case reduced, voided or stricken from the calendar. Employees having knowledge of such action and failing to inform their supervisor thereof shall be subject to discipline.

6.21.3     Employees shall not communicate in any manner, either directly or indirectly, any information which might assist persons accused of criminal acts to escape the full process of law. [54.1.1e] [54.1.1g]

**6.22     Conflicts of Interest** [26.1.1]

6.22.1     Employees will avoid official involvement in personal, civil, domestic or family disputes. Such disputes will be referred for investigation by impartial on duty officers. Officers will not attempt to exercise authority or make an arrest in their own quarrels, but will contact a supervisor who will cause the matter to be investigated and action taken by impartial officers having no personal interest in the dispute.

**6.23     Outside Employment** [26.1.1]

6.23.1     Employees shall not engage in any business or employment in their off-duty hours which, by its nature or by its demand upon them produces:
       a. Conflict of interest
       b. Detriment or impaired service to the Department.

6.23.2     Employees will obtain approval in conformance with the City policy <u>before</u> engaging in other employment, occupation, profession, or commercial enterprise.

**6.24     Recommending Attorneys or Bail Bondsmen** [26.1.1]

6.24.1     Employees will not recommend, advise, or suggest to any person arrested, prisoner, or any other person concerned with a prisoner in custody, the employment or services of any specific attorney or bail bondsman.

6.24.2    Employees will not become surety, guarantor, or furnish bail for any person arrested or charged with a crime except members of their immediate family and then only upon notification of his supervisor.

**6.25    Recommending Private Business or Company** [26.1.1]

6.25.1    Employees will not refer or recommend any private business or company to the public while the employee is acting in his official capacity or representing the Department.

**6.26    Public Comment** [26.1.1]

6.26.1    Employees shall not publicly criticize or ridicule the Department, its policies, or employees by talking, writing, or other expression where such comment or criticism tends to impair the operation of the Department, interfere with its efficiency, interfere with the ability of supervisors to maintain discipline, or where such comment is made with reckless disregard for truth or falsity; or when such comment is obscene; or where such comment is slanderous or defamatory; and where such comment is unlawful, jeopardizes an ongoing investigation, or endangers the safety of any individual.

6.26.2    Employees who are authorized spokesmen for employee organizations or collective bargaining groups shall not be restrained from public comment on the issues in question, provided that such comment is made:
    a. that such employee(s) make clear that they speak on behalf of their organization and not on behalf of the Department.
    b. that such comment does not violate the law.

**6.27    Membership in Organizations** [26.1.1]

6.27.1    Employees may participate in organizations or activities that are concerned with the improvement of law enforcement working conditions and standards.  Employees may hold membership in and engage in the activity of fraternal or community organizations which are lawful and do not bring disrepute upon the employee or the Department.

6.27.2    Employees will not be members of, or attend meetings of, or be an advocate for any group or organization that would reflect negatively on the Department or adversely affect the employee's ability to perform his duties.

**6.28    Conduct Unbecoming** [26.1.1]

6.28.1    Conduct unbecoming an employee of the Department is defined as any conduct or act, which has an adverse impact upon the operation of the Department, and destroys public respect and confidence in the Department and its employees.

    Such conduct may include, but is not limited to, participation in any immoral, indecent or disorderly conduct, or conduct that causes substantial doubts concerning a an employee's honesty, fairness, or respect for the rights of others, or the laws of the state or nation, regardless of whether such act or conduct constitutes a crime.

6.28.2    Employees, whether on or off duty, shall not commit any criminal offense under any laws of the United States, the State of Florida or any local jurisdiction in which the employee is present, except where permitted in the performance of duty under proper authority.

6.28.3    The following acts of employees shall be deemed sufficient cause for disciplinary action, including counseling, reprimand, suspension, demotion or dismissal.

6.28.3.1    Has been convicted of a felony, or of a misdemeanor; or has been guilty of an immoral or criminal act.

6.28.3.2    Has been guilty of misuse of sick leave privilege or excessive tardiness or absenteeism without good cause.

6.28.3.3    Has wilfully, wantonly or through culpable negligence, been guilty of brutality or cruelty to a prisoner or to a person in custody.

6.28.3.4    Has wilfully violated any of the provisions of the Civil Service Act, Personnel Rules of the City of Miami Beach, City Work Rules, or the Department Rules and Regulations, SOPs or General Orders of the Department.

6.28.3.5    Has violated any lawful or reasonable regulation or order, or failed to obey any lawful or reasonable direction made and given by a supervisor.

6.28.3.6    Has been intoxicated, or under the influence of intoxicants or narcotics (controlled substances without prescription, barbiturates, or central nervous system stimulants as defined in FSS 893.2 and FSS 893.356(s)(a)), while on duty or while wearing any portion of an issued uniform, whether on or off duty.

6.28.3.7    Has used any amount of intoxicants or narcotics during on duty hours.

6.28.3.8    Has contracted a mental or physical ailment or defect which incapacitates him for usefulness for city service.

6.28.3.9    Has knowingly harbored a serious communicable disease that may endanger others, or knowingly expose others to a serious communicable disease.

6.28.3.10   Has been guilty of actions which amount to insubordination or disgraceful conduct, whether committed on duty or off.

6.28.3.11   Has been wantonly offensive in conduct or language toward the public or city officers or other employees.

6.28.3.12   Is careless or negligent of the property of the city, or steals, misplaces or misuses equipment, materials, property or any other thing of value belonging to the city.

6.28.3.13   Has been incompetent, negligent or inefficient to such an extent that merit ratings fall below a reasonable minimum standard.

6.28.3.14   Has used, or threatened, or attempted to use political influence in securing promotion, leaves of absence, transfer, change in pay, change in character of work, or revision of examination grade.

6.28.3.15   Has intentionally falsified time records or failed to report absences from duty to a superior in accordance with prescribed procedures.

6.28.3.16   Has been absent from duty without approved leave of absence from the Chief, or contrary to prescribed procedures, or has failed to report after a leave of absence has expired, or within a reasonable time after such leave of absence shall have been revoked or canceled.

6.28.3.17   Has wilfully refused and failed to appear before any grand jury, court, or judge, or officer, board or body authorized by law or the City Commission to conduct any hearing or inquiry relative to the official duties of such employee, or has refused and continues to refuse to answer any related questions concerning official duties which have been asked as a part of an official hearing or inquiry by the Department, the City Manager or by any other person authorized by the City Commission or the City Manager to conduct such a hearing or inquiry.

6.28.3.18   Has been guilty of gross negligence or gross inefficiency in the performance of his duties, where such negligence or inefficiency has or might result in loss or injury to the city, the public, or to persons or property affected thereby.

6.28.3.19   Has violated the provisions of Part II Code, Chapter 2 Administration, Article VII, Standards of Conduct for City Officers and Employees, of the City Code of the City of Miami Beach, ordinances of Miami-Dade County, or the laws of the State of Florida. **(See Appendix G)**



6.28.3.20  Has been guilty of conduct unbecoming an employee of the city.

6.28.3.21  Has guided, or in any manner has been concerned in assessing, soliciting or collecting money from any employee in the service of the City of Miami Beach for the purpose of making a gift to a public officer in violation of any City Ordinance or State Statute.

6.28.3.22  Has been induced, has induced or has attempted to induce an employee in the service of the City of Miami Beach to commit an unlawful act, or to act in violation of lawful and reasonable Departmental or official regulation or order; or has taken any fee, gift or other valuable thing in the course of his work or in connection with it for his personal use from any citizen, when said contribution is made with the hope or expectation of receiving a favor or better treatment than is accorded to other citizens.

6.28.3.23  Has made a false statement in the application for employment or has given false information on their pre-employment medical examination and the false information was discovered after employment.

6.28.3.24  Has been refused surety bond by the City's bond carrier that carries the city fidelity bonds on all city employees when such bond is applied for as qualifications for employment, or has been refused continuance of coverage under such surety bonds.

6.28.3.25  Has solicited, accepted or received, either directly or indirectly, any gift, reward, present, service, loan, fee discount, donation, gratuity or other thing of value for the performance of any duty imposed upon them by virtue of their office aside from their official capacity, provided, however, that this rule and regulation does not apply in cases of meritorious service rendered by an employee of said service and has been specially authorized by the Chief in each instance to receive such reward, gift, present, donation, gratuity, or other thing of value.

6.28.3.26  Has engaged in work slow downs or restriction of work output, or interfered with work in or about the Department including, but not limited to, instigating, leading, or participating in any walkout, strike, sit-down, stand-in, slowdown, refusal to return to duty at the scheduled time, or otherwise instigate, lead, or contribute to job actions that undermine supervisory authority and seriously affect discipline, morale, or organizational effectiveness.

6.28.3.27  Has committed any act which, as defined under Florida and Federal Law, constitutes sexual harassment, including but not limited to, making unwelcome sexual advances, requesting sexual favors, engaging in sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature.

6.28.3.28  Has, while off duty, engaged in any conduct which the employee knows, or reasonably should know, constitutes unwelcome sexual advance or request for sexual favor, or unwelcome sexually motivated physical contact or unwelcome verbal or physical conduct or communication of a sexual nature.

6.28.3.29  Has committed any acts which, as defined under Florida Law, constitute sexual assault or indecent exposure.   Sexual assault does not include a frisk or other search done in accordance with proper police procedures.

6.28.3.30  Has committed any acts which, as defined under Florida Law, constitute (1) domestic violence and/or stalking, or (2) the violation of a court order restraining the employee from committing an act of domestic violence, having contact with the petitioner, or excluding the employee from the petitioner's home or workplace.

6.28.3.31  Has, in the course of performing their duties, engaged in any sexual contact or conduct constituting lewd behavior, including but not limited to, exposing themselves or otherwise making physical contact with the nude or partially nude body of any person, except as pursuant to a written policy of the Department.

6.28.3.32  Has been fighting or quarreling with employee(s) of the Department.

6.28.3.33     Has committed negligent use or discharge of a firearm, providing no injury or death resulted from the misuse.

6.28.3.34     Has failed to properly supervise subordinates.

6.28.3.35     Has failed to take appropriate disciplinary action.

6.28.3.36     Has received excessive moving vehicle violations or excessive unpaid parking violation tickets.

6.28.3.37     Has failed to use seatbelts.

**6.29          Careless Disregard**  [26.1.1]

6.29.1        Repetitious violation of the Departmental Rules and Regulations, SOPs, General Orders or procedures will be indicative of careless disregard.  Such disregard may be established whenever three or more substantiated violations occur within one year.

**6.30          Signing of Documents**  [26.1.1]

6.30.1        Employees will comply with direct instructions given by a supervisor in regard to signing any official Departmental document.  Unless otherwise specified, affixing one's signature to the document services as acknowledgment and/or receipt of the document and does not necessarily indicate agreement with its content.  In circumstances when personnel disagree with the content of a document, a written rebuttal may be submitted for attachment to the document.

**6.31          Tortuous Acts**  [26.1.1]

6.31.1        Employees will not commit by act of commission or omission, any flagrant or tortuous act while in the performance of their duties.  Violations of Civil Rights Acts under Color of Law (Title 18 U.S.C. 241 and 242) are federal offenses, punishable by fine and/or imprisonment.

**6.32          Conflicting Statements**  [26.1.1]

6.32.1        Employees will not knowingly make statements that contradict or are inconsistent with each other in an official or administrative inquiry.  The question of materiality will be determined by the Chief or his designee.  Proof of which statement is false will not be necessary.  It will be a defense that the individual making the statements believed each statement to be true at the time it was made.

**6.33          Answering Questions in an Official Investigation**  [26.1.1]

6.33.1        Employees must answer questions specifically, directly, and narrowly related to the performance of their duties.  If an employee refuses to answer such questions without being required to waive their immunity with respect to the use of their answer, or fruits of their answers in a criminal prosecution, the privilege against self incrimination will be of no barrier against disciplinary action.

**6.34          Untruthfulness**  [26.1.1]

6.34.1        Employees will not knowingly make untrue statements, except as authorized in the performance of duties.

6.34.2        Employees will not knowingly make false statements to a supervisor or any official of a government agency during an official or administrative inquiry.

**6.35          Subpoenas and Court Appearances**  [26.1.1] [74.1]

6.35.1 Employees will report to the specified location at the time and date required by a subpoena. Employees unable to respond to a subpoena due to sickness, injury, or other such causes, or because of conflict with another subpoena will notify the appropriate authority originating the subpoena to obtain a release from the subpoena and notify the Court Liaison Section.

6.35.2 Employees subpoenaed to testify against the City or the Department or the County, in any trial or hearing, will notify his supervisor in writing, upon receipt of the subpoena.

6.35.3 Employees will not appear or give testimony as a character witness for any defendant in a criminal trial or inquiry without written approval of the Chief or his designee.

**6.36  Search of Arrested Persons [26.1.1]**

6.36.1 Officers will adhere to Department arrest procedures and will exercise proper care in the arrest, transportation, and detention of prisoners to prevent escape, injury to self or others, or damage to property.  Upon arrest, prisoners will be searched carefully by the arresting officer.  Weapons, contraband, or evidence will be immediately confiscated and properly documented.  When a prisoner cannot be thoroughly searched before transport or custody, the arresting officer will notify the person receiving the prisoner.

**6.37  Wearing Uniform While Under Disciplinary Suspension [26.1.1]**

6.37.1 Employees will not wear the official uniform, or other articles of clothing that bears the official insignia or otherwise identifies the person as a member of the Department, while under disciplinary suspension.

**6.38  Property and Evidence** (See SOP #036 - Evidence and Property) **[26.1.1]**

6.38.1 Property and evidence, received in connection with official duties, will be processed in accordance with established procedures.  Employees will not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with, or withhold any property or evidence held in connection with an investigation or other official action.

**6.39  Supervisor Responsibility [26.1.1]**

6.39.1 Supervisors are charged with the responsibility of providing guidance and assistance to their subordinates and instilling positive work ethics.  Supervisors will be cognizant that such responsibility includes maintaining a working knowledge of the goals and objectives of the Department, and continuously working toward these goals and objectives.  Supervisors must exemplify leadership qualities consistent with the Department's Mission Statement.

**6.40  Radio Transmissions [26.1.1]**

6.40.1 Employees will use their radios in accordance with established procedures and will avoid use of sarcasm, impertinent remarks, or other improper radio transmissions including interfering with radio broadcasting.  Employees will not use the radio for non-police functions or personal business.  Employees are to monitor their radios at all times.





es and Regulations

# 1 - Department Rules and Regulations

[✎ View Document]

| visions | Review | Standards | Assignments | Signatures | Activity | Security |

8 (Archived) ▾   318 / 318

ded                                                                (View Report)

|  | Name | Due On |
|---|---|---|
| review the selected revision. | | |

### 318 Signatures Provided                         (View Report)

| Username | Name | Signed | |
|---|---|---|---|
| 00009 | RIVLIN, DANIEL | 12/6/2009 | ⓘ |
| 07319 | BOZA , ALFREDO | 9/9/2009 | ⓘ |
| 10831 | WILDER III , NEWELL | 4/28/2009 | ⓘ |
| 11078 | AZICRI , SAMUEL | 3/18/2009 | ⓘ |
| 11316 | TEPPERBERG , MARILYN | 7/15/2009 | ⓘ |
| 11468 | LONERGAN JR , RICHARD | 1/17/2012 | ⓘ |
| 12648 | ROJO , MARIO | 5/21/2009 | ⓘ |
| 12652 | KLUGER , GARY | 4/2/2009 | ⓘ |
| 12701 | SANCHEZ , GUSTAVO | 3/16/2009 | ⓘ |
| 12887 | RIVERA , JUAN | 7/15/2009 | ⓘ |
| 12908 | AMAYA , ALFREDO | 7/2/2009 | ⓘ |
| 12961 | SANCHEZ , JUAN | 4/8/2009 | ⓘ |
| 13056 | METZGAR , JESS | 3/11/2009 | ⓘ |
| 13071 | NASH , JAMES | 3/18/2009 | ⓘ |
| 13357 | RUDER , BERNIE | 3/16/2009 | ⓘ |
| 13365 | TEBOE , GLENN | 3/18/2009 | ⓘ |
| 13367 | HERNANDEZ , DAVID | 3/22/2009 | ⓘ |
| 13379 | DOCE , ENRIQUE | 3/11/2009 | ⓘ |
| 13643 | LAMACCHIO , TONY | 3/11/2009 | ⓘ |
| 13742 | MACLEOD , KENNETH | 3/12/2009 | ⓘ |
| 13756 | CLEMENTS , RICHARD | 4/2/2009 | ⓘ |