1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

3    JESSICA GUASTO,

4        Plaintiff,
                                Case No.: 1:22-cv-21004-DPG
5    v.

6    THE CITY OF MIAMI
     BEACH, FL., a Florida
7    municipality, et al.,

8        Defendants.
     ----------------------/
9

                        ZOOM DEPOSITION OF
10
                       RICHARD M. CLEMENTS
11
                  TAKEN ON BEHALF OF PLAINTIFF
12

13

     DATE TAKEN:    Tuesday, April 23, 2024
14
     TIME:             1:22 p.m. to 4:18 p.m.
15
     PLACE:          All parties appeared via videoconference
16

17

18

19

20

21

22

             Examination of the witness taken before:
23
                       Julie S. Evans
24           Court Reporter and Notary Public

25

```
 1   APPEARANCES:

 2   DANIEL J. BARROUKH, ESQUIRE (via Zoom)
     Derek Smith Law Group, PLLC
 3   701 Brickell Avenue
     Suite 1310
 4   Miami, Florida 33131

 5       On behalf of the Plaintiff.

 6

 7   MICHAEL LEWIS ELKINS, ESQUIRE (via Zoom)
     MLE Law
 8   1212 Northeast 16th Terrace
     Fort Lauderdale, Florida 33304-2323
 9
         On behalf of the Defendants.
10

11                       - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    EXAMINATION INDEX

2   ZOOM TESTIMONY OF RICHARD M. CLEMENTS
        DIRECT BY MR. BARROUKH                        4
3       CROSS BY MR. ELKINS                     104

4   CERTIFICATE OF OATH                         148

5   CERTIFICATE OF REPORTER                     149

6   ERRATA SHEET                                150

7
                      EXHIBIT INDEX
8
    Deposition
9    Exhibit 1        Salabarria Settlement Agreement        80

10   Exhibit 2        Charge of Discrimination by Rosa Carvajal   104

11   Exhibit 3        Determination and Notice of Rights, Rosa   106
                      Carvajal
12
     Exhibit 4        3/15/22 City of Miami Beach memorandum   107
13
     Exhibit 5        10/1/2018-9/30/2021 Collective Bargaining   114
14                    Agreement

15   Exhibit 6        Opinion & Award in Muley v. City of Miami   140
                      Beach
16

17                         - - - - -

18                 S T I P U L A T I O N S

19          It is hereby agreed and so stipulated by and

20  between the parties hereto, through their respective

21  counsel, that the reading and signing of the transcript

22  are expressly reserved.

23                         - - - - -

24

25

Page 4

P R O C E E D I N G S

1    THE COURT REPORTER:  Today is Tuesday, April
2  23, 2024.  The time is approximately 1:22 p.m.
3  This is the Zoom deposition of Richard Clements,
4  being taken in the matter of Gausto v. the City of
5  Miami Beach.  Will counsel please state their
6  appearance, beginning with Plaintiff's counsel.
7    MR. BARROUKH:  Daniel Barroukh, for the
8  Plaintiff.
9    MR. ELKINS:  Michael Elkins, on behalf of the
10 City of Miami Beach.
11   THE COURT REPORTER:  Please raise your right
12 hand.  Do you solemnly swear or affirm your
13 testimony will be the truth, the whole truth,
14 nothing but the truth, so help you God?
15   THE WITNESS:  I swear.
16 THEREUPON:
17         RICHARD M. CLEMENTS,
18 having first been duly sworn, testified as follows:
19        DIRECT EXAMINATION
20 BY MR. BARROUKH:
21   Q.  All right.  Good morning, Mr. Clements.  Could
22 you please state your whole name, for the record.
23   A.  Sure.  It's Richard M. Clements.
24   Q.  And how would you like me to address you for

Page 5

1  this deposition?
2    A.  You can refer to me as Richard or Rick; Rick is
3  my nickname.
4    Q.  Okay.  So, Rick, have you ever given a
5  deposition before?
6    A.  Yes, I have.
7    Q.  Have you ever given a civil deposition before?
8    A.  Yes, I have.
9    Q.  All right.  So I'm sure you've heard these
10 rules, but I'm just going to go over them quickly, to
11 ensure that we can speed this process along.  The first
12 rule is how you have to audible answers, no mm-hm's or
13 unh-unh's.  We have to say "yes" or "no," and no head
14 shaking.  Do you understand that?
15   A.  Yes.
16   Q.  All right.  And the second rule, probably the
17 most important rule is, we cannot interrupt each other.
18 There's a court reporter here, and she can only take
19 down one person at a time.  So I'm going to ask my
20 question in its entirety; I'm not going to interrupt you
21 when you give a full answer.  Does that make sense?
22   A.  Yes.
23   Q.  And I want to ensure we get your best testimony
24 here today.  So if you don't understand a question or
25 you think it's ambiguous, please ask me to rephrase the

Page 6

1  question.  Does that make sense?
2    A.  Yes.
3    Q.  And if you need a break at any time, just ask
4  for a break.  If it's in the line of questioning, I ask
5  that you allow me to finish the line of questions.  Does
6  that make sense?
7    A.  Yes.
8    Q.  All right.  Is there anything that would
9  prevent you from testifying truthfully here today?
10   A.  No.
11   Q.  And where are you conducting this deposition
12 from?
13   A.  In the offices of Mike Elkins.
14   Q.  And is there anyone in the room with you?
15   A.  Yes.
16   Q.  Who is in the room?
17   A.  Mike Elkins.
18   Q.  Thank you.  And did you do anything to prepare
19 for this deposition?
20   A.  Yes.
21   Q.  What did you do?
22   MR. ELKINS:  I'm just going to caution the
23 witness not to reveal any conversations between him
24 and myself or anything that we discussed.  So to
25 the extent you can answer without revealing the

Page 7

1  contents of any conversations, you're free to do
2  so.
3    THE WITNESS:  I just reviewed the material
4  associated with why we're here today.
5  BY MR. BARROUKH:
6    Q.  Okay.  And to piggyback off of what Attorney
7  Elkins is saying, any time I'm asking you a question,
8  I'm not asking you to reveal what was stated between you
9  or counsel.  And if the answer requires that, I'm going
10 to instruct you not to provide an answer, and I'm sure
11 Mr. Elkins will jump in and stop you.
12   So how many times did you meet with your
13 attorney prior to today, before the deposition, to
14 review the documents in question?
15   A.  Once.
16   Q.  And how long did you meet with the attorney?
17   A.  Approximately an hour, an hour and a half.
18   Q.  And what documents did you use to review during
19 the meeting?
20   MR. ELKINS:  Well, no, he can -- he can testify
21 as to any documents he reviewed, but he's not going
22 to testify about what documents I gave him.
23   MR. BARROUKH:  That's not what I asked him.  I
24 just asked what documents he reviewed.
25   MR. ELKINS:  Well, you asked what documents he

Page 8

1  reviewed during the meeting.  So that would be
2  privileged.
3      MR. BARROUKH:  Let me rephrase that then.
4  BY MR. BARROUKH:
5      Q.  What documents did you review prior to this
6  deposition?
7      A.  We reviewed the Internal Affairs case files,
8  and the --
9      MR. ELKINS:  Hold on, let me jump in, Chief.
10     We -- he's not testifying to anything that we
11     reviewed, so I ask that the court reporter strike
12     that because it was privileged.  But to the extent
13     you reviewed anything on your own, you are free to
14     testify about it.
15     THE WITNESS:  I reviewed the Internal Affairs
16     case file.  I also reviewed the EEOC complaints in
17     2020 and 2021.
18 BY MR. BARROUKH:
19     Q.  Okay.  And did you speak to anybody else,
20 besides your attorney, prior to this deposition today?
21     A.  No.
22     Q.  And outside of the I.A. case file and the EEOC
23 2020 and 2021 charges, did you review any other
24 documents for this -- for this deposition?
25     A.  I believe there may have been some emails

Page 9

1  associated with the actual folder that was provided to
2  me, and I reviewed those as well.
3      Q.  And what emails were included in that folder?
4      A.  There were some emails from myself to my
5  secretary at the time; there was also some emails that I
6  believe fall under the -- to my attorney, as well.
7      Q.  And don't tell me about what's in those emails
8  with your attorney.
9      A.  Yes.
10     MR. ELKINS:  I think, just to be clear, I think
11     he's referring to emails that have been produced in
12     this case.
13     MR. BARROUKH:  That's what I figured; I just
14     wanted to make sure.
15     THE WITNESS:  Yes.
16     MR. ELKINS:  I didn't mean to interrupt, I'm
17     sorry.
18     THE WITNESS:  And I also reviewed, if I may,
19     the allegation of employee misconduct that was
20     submitted.
21 BY MR. BARROUKH:
22     Q.  Okay.  And that allegation of employment
23 misconduct is the one written by Lieutenant Steven
24 Cosner; correct?
25     A.  There's actually two that I had the opportunity

Page 10

1  to review; but, yes, Lieutenant Cosner's allegation of
2  employee misconduct was one of the allegations that I
3  read.
4      Q.  And what was the other allegation of employee
5  misconduct?
6      A.  That was submitted by Lieutenants Doller, I
7  believe Flanigan, and Baldwin, in reference to an
8  incident that occurred earlier in 2020; I believe that
9  was the date.
10     Q.  Thank you.  And we'll get back to that.  But
11 for now, could you tell me, are you currently employed?
12     A.  I am.
13     Q.  And where -- who is your current employer?
14     A.  The Miami-Dade College.
15     Q.  And what is your current position with Miami-
16 Dade College?
17     A.  I am the director of basic training that
18 involves law enforcement, fire science, and law studies.
19     Q.  And what are your primary responsibilities and
20 duties in that role?
21     A.  To oversee the operation of the program or the
22 actual implementation of the operation of the program.
23     Q.  Okay.  And is there a title associated with
24 this position?
25     A.  Yes.  Hold on one second, I'll give you the

Page 11

1  formal title.
2      Q.  And I'm going to ask you not to --
3      MR. ELKINS:  Don't look at --
4      THE WITNESS:  It is the director of the School
5      of Justice, I guess, would be probably more the
6      formal title you're looking at.  But, if I may, it
7      encompasses the fire science program and then also
8      the criminal justice degree program on the academic
9      side.
10 BY MR. BARROUKH:
11     Q.  All right.  And what individuals do you work
12 with, on a daily basis; is it students, or is it
13 employees?  Could you tell me more about that, please.
14     A.  I work, on a daily basis, with the directors of
15 those particular fields and the chairperson that
16 oversees the criminal justice academic side; so it would
17 be the director of basic training for law enforcement;
18 the director of the fire science component, or the fire
19 academy; and then, then going back into the academic
20 field, which would be the director or the chairperson of
21 the academic side of the criminal justice program.
22     Q.  All right.  And could you provide a brief
23 overview of your professional background, leading to
24 this role?
25     A.  I have 33 years of law enforcement experience,

Page 12

obviously, with four and a half of those years being the
chief of police. I've been affiliated with the Miami-
Dade College for over 26 years as a training adviser,
and that's been continuous service with Miami-Dade
College North. And I was actually approached by the
college president and asked to fill a position that,
again, was relayed to me by him, of need, as it pertains
to the continuance of the program.

Q. Well, first, I want to say thank you for your
service. Just, 33 years is a significant amount of
time, so thank you.

I was wondering, during your time in the police
department, could you give me a breakdown of your
positions held, experience, and thus forth?

A. Well, I started with the department in 1990,
and I was in Uniform Patrol. I was in the Uniform
Patrol Division for seven years. During that seven
years, I was on bikes; I was assigned to a uniform --
actually, I'm sorry, not a uniform, an undercover
narcotics unit that worked out of the Patrol Division;
and then, subsequently, I was allowed to go to the
police academy as a training advisor in 1997; that's
where I started my time there with the college.

I did a brief stint there, primarily due to the
time limitations associated with that particular class,

Page 13

which was Basic Law Enforcement Class 185, and I came
back to the department and resumed my time with the
Patrol Division. I was promoted to the rank of
sergeant, in I believe it was 2000 or 2001, where once
again I was in the Patrol Division.

And then I was subsequently removed to the
Office of the Major of Patrol Division, working with him
on, not only community-oriented policing strategies and
philosophy, but crime prevention in Kalea (ph), and I
did that for a number of years. Oh, by the way; I'm
sorry, I missed one. I was assigned to the Motor Unit
in 2000; so again I was there for a year to a year and a
half, prior to my promotion.

I was with the Patrol Division as -- they refer
to it as an executive officer, for about four or five
years, until I was promoted to the rank of lieutenant,
where once again I remained in the Patrol Division for a
short period of time before I was transferred to the
Investigations Unit, where I was the Property Crimes
Lieutenant. From Property Crimes Lieutenant
perspective, I was promoted to the rank of captain in
2008 and subsequently given the responsibility of the
Strategic Investigations Unit commander for a period of
about two and a half years.

I was subsequently moved back to Patrol, I

Page 14

believe in 2000... I want to say, again going back to
the timeline, it's probably 2011-2012, where I became an
area captain. And that was again just responsibility
for a geographical area. In 2014, I was moved back to
Investigations, to be the captain there. And I was
subsequently promoted -- no, I was moved back to Patrol
-- it goes back -- it's been a long time.

Q. I get it.

A. Yeah. I went back to Patrol in 2015. And then
we had Chief Oates, who came into the department; and I
was subsequently promoted to the rank of major, shortly
after he arrived, in I it was believe 2016 to 2017. I
stayed a major for two years; I was in charge of
Investigations and Support Services for two years.

And then I was subsequently promoted to the
rank of deputy chief in 2017. I was the deputy chief
for two years, from 2017 to 2019. And in July -- June/
July of 2019, I was promoted to chief, where I finished
out my career in October of 2023, like I say, after 33
years.

Q. Thank you. And that is a lot, I'm telling you.
Yeah, if I'm looking down or whatnot, I'm just taking
notes; I don't mean to be disrespectful.

So when you shifted from the sergeant to
lieutenant or lieutenant to captain role, in the early

Page 15

mid-2000s, did you take any managerial courses or H.R.
courses, along those lines?

A. Yes, I did; I did take some courses.

Q. And could you talk to me about those? And even
if you took more of those types of courses when you
became a major, deputy chief, or chief, can you talk to
me about those courses and trainings.

A. With my -- prior to my promotion and actually
in conjunction with my promotion in 2008, I attended the
Northwestern School of Police & Staff Command; that was
a 10-week course in Evanston, Illinois. When Dan Oates
came to the Miami Beach Police Department, he sent me to
the Police Executive Research Forum, and I believe the
dates on that were 2014-2015, that timeframe. And then
prior to my promotion to chief, I attended the FBI
National Academy, and I believe that was in 2018.

Q. Okay. And could you discuss any of the changes
or developments in law enforcement policies or
procedures regarding complaints during your time with
the police department.

MR. ELKINS: Objection to form.

You can answer.

THE WITNESS: I think that what we learned was
that the -- again, what I learned going up the
chain was that the documentation and referral was

Page 16

always the way to handle any type of a complaint
that was, again, brought to your attention or
brought to the department's or the city's
attention.
BY MR. BARROUKH:
   Q. Did you have any training about specifically
diversity, inclusion, or equity, in any of these classes
or courses that you had?
   A. Could you explain specifically what you mean by
that?
   Q. What do you think I -- what do you think I mean
by that, when I say a training on diversity?
      MR. ELKINS: Objection to form; you can answer.
      THE WITNESS: I think that the most important
   thing with diversity is recognizing, you know, that
   there are different segments within the community,
   of not only police, but then also who you employ,
   and that we have to be sensitive to those
   differences that we encounter.
BY MR. BARROUKH:
   Q. And the same as to your philosophy or approach
regarding equity and inclusion; what do you believe?
      MR. ELKINS: Objection to form; you can answer.
      THE WITNESS: I think, number one, equity would
   be providing equal opportunity, again, by virtue of

Page 17

the term itself; inclusion would be making sure
that voices are heard to that and, more
importantly, tailoring your response around, you
know, not only your policies and procedures, but
then also your goals as an agency; what do you want
to see that enhances that.
BY MR. BARROUKH:
   Q. And did you receive any training on handling
complaints of discrimination or harassment within the
department, itself?
   A. Yes. We received training that the City put
on, as it pertains to what you're talking about, the
latter aspect of it, which is if someone who comes forth
with a complaint, a harassment complaint. And then, as
far as internal administrative complaints, yes, we did
receive training from an internal perspective.
   Q. And what did the training entail; meaning, how
many weeks was it, were there lectures? If you can give
me some insight on that.
      MR. ELKINS: Objection to form.
   You can answer.
      THE WITNESS: It would be more of a review of
   existing policy, pertaining to what the person
   receiving the complaints responsibilities were, in
   order to properly address the complaint.

Page 18

BY MR. BARROUKH:
   Q. Okay. And can you describe any previous
instances where employees raised concern of
discrimination or harassment?
      MR. ELKINS: Objection to form.
   You can answer.
      THE WITNESS: Well, again, to your question,
   when someone came forth with a complaint involving
   harassment, our directive from the City was to
   refer it to EEOC. Okay? And that's predominantly
   what we did in all cases where that type of a
   complaint came forward.
BY MR. BARROUKH:
   Q. And how many complaints did the City -- let me
rephrase that. How many complaints did you personally
recommend go to the EEOC or refer to the EEOC?
   A. I don't recall; I would say, I think at
minimum, one. But, you know, there are different
avenues for the employee to be able to take in order to
be able to do that. They can go to Internal Affairs;
they can go to the City directly and file a complaint.
So it would not necessarily fall just in my purview, as
it pertains to referrals.
   Q. And did the City have a preference as to which
reporting mechanism was used; whether, like you just

Page 19

said, it was Internal Affairs or another city process or
the EEOC?
      MR. ELKINS: Objection to form.
   You can answer.
      THE WITNESS: I didn't think the City was
   focused specifically on the avenue, as much as it
   was focused on receiving the complaint.
BY MR. BARROUKH:
   Q. And there were no policies, to your knowledge,
that suppressed reporting in the City, was there?
   A. No.
   Q. And did you ever have involvement in overseeing
or implementing anti-harassment training courses?
   A. The anti-harassment training courses, not only
were they FDLE-mandated -- meaning Florida Department of
Law Enforcement-mandated -- but also internally through
our in-service, we ensured that employees understood
their rights under those two provisions.
   Q. And what were some of the training that they
received for anti-harassment purposes?
   A. They would be aware of particular actions that
could deem to be -- that could be deemed or qualify as
being harassment. As innocent as it may seem, the
employees needed to be understanding that those could be
misinterpreted, and they had to be very aware of that.

Page 20

1  But then also employees who felt that they were harassed
2  also could be advised of those same aspects so that, if
3  they felt that way, they knew the avenue that they could
4  take in order to be able to resolve that issue.
5      Q. And could you discuss the disciplinary aspect
6  if an officer reported harassment and there was found --
7  it was that there was harassment, what was the approach
8  to disciplining that officer?
9      MR. ELKINS: Objection to form.
10     You can answer.
11     THE WITNESS: The discipline would be based
12     primarily on the action. You know, it could be
13     anything from counseling, to a written warning, to
14     something that's more egregious; it could be,
15     again, a written reprimand, to termination,
16     depending on the nature of the allegation. But,
17     that said, we would work with Human Resources in
18     order to be able to help with the investigation and
19     provide them the necessary information that they
20     needed in order to be able to come to that
21     conclusion.
22  BY MR. BARROUKH:
23     Q. So it was a collective process in determining
24  discipline for these employees; correct?
25     MR. ELKINS: Objection to form.

Page 21

1      THE WITNESS: Yes.
2  BY MR. BARROUKH:
3      Q. And what individuals were involved in
4  determining the discipline? You mentioned H.R. was
5  involved; is there anybody else?
6      MR. ELKINS: Objection to form.
7      You can answer.
8      THE WITNESS: It would be specifically Human
9      Resources. Okay? And again, potentially also
10     involving counsel. But, you know, again, that's on
11     an individual basis and whether or not it was
12     needed. But I would probably assume that, more
13     oftentimes than not, counsel was always brought
14     into the equation.
15  BY MR. BARROUKH:
16     Q. Do you believe that through Human Resources and
17  potentially counsel, if necessary, they ensured
18  transparency in the disciplinary process?
19     MR. ELKINS: Objection to form.
20     THE WITNESS: I would say -- sorry.
21     MR. ELKINS: You can answer.
22     THE WITNESS: I would say, yes. And, you know,
23     when you look at that, I think that they take all
24     measures into account, when coming to a conclusion.
25     So, yes, I do; I believe that they would look at

Page 22

1  all measures associated with that, in coming to a
2  viable conclusion.
3  BY MR. BARROUKH:
4      Q. Could you give me an example of an instance
5  where disciplinary actions were taken against an
6  employee during your tenure?
7      MR. ELKINS: Objection to form.
8      You can answer.
9      THE WITNESS: During my tenure?
10  BY MR. BARROUKH:
11     Q. Yes.
12     A. I don't recall one during my tenure, where that
13  actually came about, where there was a substantiation,
14  or that it fell to that level. I don't recall one.
15     MR. ELKINS: Let me try to clarify the
16     question. Are you asking about discipline relating
17     to harassment allegations, Daniel? Or are you
18     asking about discipline, in general?
19     MR. BARROUKH: Relating to -- honestly, I'm
20     asking more in general.
21  BY MR. BARROUKH:
22     Q. I'm trying to understand the disciplinary
23  process, in terms of how discipline is measured and
24  substantiated when being assigned to an individual who
25  committed a wrongdoing.

Page 23

1      MR. ELKINS: Are you asking about if there was
2      discipline in the Chief's tenure relating to
3      somebody who was found to have harassed someone?
4      Or are you just asking, in general, an example of
5      somebody who was disciplined during the Chief's
6      tenure? Those are two different events.
7      MR. BARROUKH: Let's do both.
8  BY MR. BARROUKH:
9      Q. Let's do both. Let's start with an individual
10  who was found guilty of harassing another employee.
11     MR. ELKINS: Objection to form.
12     You can answer.
13     THE WITNESS: During my tenure as chief, I
14     don't recall there being one where it was brought
15     to our attention that the harassment was
16     substantiated and that discipline action or
17     corrective action needed to be taken. Does that
18     answer that question?
19  BY MR. BARROUKH:
20     Q. Yes. Thank you. And now as to the next
21  question. In general, could you discuss an instance of
22  wrongdoing that required discipline and further explain
23  the process of disciplining that individual who
24  committed the wrongdoing?
25     MR. ELKINS: Objection to form.

Page 24

THE WITNESS: Yes. There were several instances where there were either violations of either policy, administrative policy, potentially even referrals to the state attorney's office, you know, for review, as to whether or not the action was deemed to be criminal in nature, that I had to deal with during my four years.

BY MR. BARROUKH:

Q. And could you provide me a little more insight on who you discussed with, in determining a discipline or -- I'm sorry, in determining a discipline?

MR. ELKINS: We'll object to the form. You can answer.

THE WITNESS: The way that the process worked is the allegation of misconduct would come forward. If it was not deemed to be -- it was not deemed to be criminal in nature, where the state attorney was going to take the case, then it would be referred back to us for review. And a comprehensive review or investigation would be done to determine what allegations or -- I'm sorry, allegations warranted intervention or correction, and what administrative policies had been violated in the process.

BY MR. BARROUKH:

Q. Were there a variety of potential disciplinary

Page 25

measures that you could select, or that H.R. could select from, to apply in an instance of misconduct?

MR. ELKINS: Objection to form. You can answer.

THE WITNESS: There were a range of conclusions that you could come to, based on the nature of the allegation. And they could range anything from a written warning, to a written reprimand, to suspension, to subsequent termination.

BY MR. BARROUKH:

Q. And, as you mentioned, your role in this decision-making process was one amongst several individuals who would come to this conclusion; correct? The conclusion for a discipline; is that correct?

MR. ELKINS: Objection to form. You can answer.

THE WITNESS: Okay. So once Internal Affairs -- again, the determining -- they made the determination of fact. Okay? They brought that to a disciplinary review panel, and they presented the case, if you will, for the review of the allegation to the discipline panel, who made the initial recommendation for discipline, based on the totality of the circumstances around the event.

BY MR. BARROUKH:

Page 26

Q. Okay. Thank you. So moving forward. Could you please describe the process for your employees to file complaints or grievances within the police department?

MR. ELKINS: Objection to form. You can answer.

MR. BARROUKH: Michael, what's the objection there?

MR. ELKINS: Overbroad and vague as to what the term "complaint" means; overbroad and vague as to what the term "grievances" means. Grievances can be filed by the union, a grievance could be a complaint to a supervisor. A complaint, in general, could be any number of things. So the question is completely vague and ambiguous. But he is free to answer.

THE WITNESS: I'm sorry, sir. I'll address your question with regards to the complaint. The complaint can basically be -- I'm sorry, go ahead.

BY MR. BARROUKH:

Q. Mr. Clements, do you need me to provide additional explanation, or do you think --

A. No. I'm sorry; I didn't mean to interrupt you. I think go into the complaint aspect of it, versus the grievance. But that would be your choice.

Page 27

Q. Yes. Let's start with the complaint.

A. Okay. A complaint can come about as a result of one employee complaining about the actions of another, which generally would be brought forth to their supervisor, based on the nature of the complaint. If the complaint was serious in nature, the complainant could bypass that process and go directly to Internal Affairs with the allegation.

Q. Okay. And a complaint to Internal Affairs -- strike that. Was a complaint to Internal Affairs limited to any specific allegation of misconduct?

A. No. Okay. There could be ones that Internal Affairs would review, that they would make determination that the infraction was minor in nature and could be handled down on the division level. But that would be something that they would do after the complaint was reviewed, to ensure that there was a... what's the term I want -- there was a set of eyes looking at it from all angles, I guess is the best way to look at it, the analogy I would look at.

Q. Understood. And you said that there was a disciplinary panel following any misconduct that was determined. Did Internal Affairs have a voice on that panel?

MR. ELKINS: Objection to form.

Page 28

1    You can answer.
2      THE WITNESS:  Yes.  Their -- did they have a
3    voice concerning the conclusion?  No.  They
4    presented the facts associated with the allegation,
5    and the panel made the recommendation for
6    discipline, based on the facts presented.
7  BY MR. BARROUKH:
8    Q.  Okay.  And as for grievances, other than an
9  individual employee bringing the grievance in the police
10 department?
11     MR. ELKINS:  Objection to form.
12   You can answer.
13     THE WITNESS:  The grievance is brought to the
14   forth to the grievance committee and/or by the
15   grievance, itself; they could file a grievance on
16   their own, if they choose to.  Generally
17   speaking -- well, actually, do you want to know a
18   little bit more about the grievance process, or is
19   that --
20 BY MR. BARROUKH:
21   Q.  Yes, please.
22   A.  A grievance is generally filed over work
23 conditions, okay, and what the employee deems to be a
24 violation of those work conditions that either leads to
25 some type of a negative output, but not necessarily that

Page 29

1  which rises to the level of an administrative violation.
2    Q.  So is there a specific step required to
3  initiate a grievance during this process?
4    A.  There's no step required.  It's how the
5  grievance is processed.  So once the grievance is
6  received, it's considered, that's a step process; it
7  will be Step 1, Step 2, and then ultimately to
8  arbitration.  That's where the step process comes into
9  play.
10   Q.  And were all actions of filing -- excuse me,
11 let me rephrase that.  Can you file a grievance for any
12 action?
13   A.  Sure.
14   Q.  Is there any mechanism that would limit an
15 employee's ability to file a grievance?
16   A.  I think the mechanism that's in place right
17 now, which is the Fraternal Order of Police, which
18 reviews the grievances to determine if it's a violation
19 of the work rules or contract rules, if you will, or
20 contract stipulations, is the mechanism that's in place.
21   Q.  All right.  So if I'm understanding correctly,
22 the Fraternal Order of Police, FOP, or the police union,
23 has the determination in proceeding with the grievance
24 or not; is that correct?
25   A.  The FOP has the ability to be able to support

Page 30

1  the grievance, or the grievance can be looked at as an
2  individual grievance, or a class action grievance if it
3  involves more than one member of the bargaining unit.
4  They can also say, "We're not going to support this,
5  because we don't believe that it rises to the level of a
6  violation of the contract."
7    Q.  So a grievance brought by an individual without
8  the support of the union would seem to be a much weaker
9  grievance, in terms of the validity of the grievance; is
10 that correct?
11     MR. ELKINS:  Objection to form.
12     THE WITNESS:  Can I answer?
13     MR. ELKINS:  You can answer.
14     THE WITNESS:  Okay.  I think that it would not
15   have the weight of the union.  Because the FOP is
16   the bargaining unit for the rank and file; and, you
17   know, having that, now you have a legal commitment
18   or a commitment, you know, in order to be able to
19   explore -- not necessarily legal, but a commitment
20   to explore the way that the grievance can be
21   resolved.
22 BY MR. BARROUKH:
23   Q.  Okay.  And I'm relatively new to police
24 terminology.  Could you please tell me what you mean by
25 "rank and file"?

Page 31

1    A.  I'm sorry.  Anyone that's a member of the
2  bargaining unit, which would be the lieutenant's rank
3  and below.  So below that would be -- just so you know,
4  the bargaining members there that they currently
5  represent, are detention officers, police officers,
6  sergeants, and lieutenants; and I believe that that's
7  predominantly the members of the bargaining unit, at
8  least it was when I left.
9    Q.  And are police officers, sergeants, lieutenants
10 provided with instructions on how to file a grievance?
11     MR. ELKINS:  Objection to form.
12     You can answer.
13     THE WITNESS:  Yes.
14 BY MR. BARROUKH:
15   Q.  And, therefore, they're also instructed with --
16 or provided instruction on how to report discrimination
17 or harassment; is that correct?
18   A.  I think that they can use the FOP as a venue,
19 in order to be able to deal with those inquiries, yes.
20   Q.  But like you said, the FOP is not the sole
21 avenue of resolution for a complaint of harassment or
22 discrimination; is that correct?
23   A.  That's accurate.
24   Q.  And is there a time frame for how long the
25 investigation will last for a report or allegation of

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 11 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 32

1  misconduct?
2      MR. ELKINS:  Go ahead.
3      THE WITNESS:  No, I just want to make sure.
4  There is a 180-day rule, okay, that's pursuant to
5  the allegation of misconduct, but that's provided
6  that the case is not pulled because it's being
7  investigated by the state attorney's office.  If
8  the state attorney elects to look at the case, the
9  case is deemed as being pulled, which means the
10  clock stops; and until they make that
11  determination, the department cannot conduct a
12  concurrent investigation associated with that
13  allegation.
14  BY MR. BARROUKH:
15      Q.  Are there any other ways to control the 180-day
16  statute?
17      A.  Pursuant to the policy as it stands now, yes.
18  The City and the FOP would have to agree to waive the
19  180-day rule, and it could be something involving a
20  grievance that's a little bit more complex and involves
21  a number of people, with more steps that need to be
22  taken in order to resolve it.
23      Q.  All right.  And how are the investigators
24  assigned to each case or investigation, after there's a
25  report or grievance made?

Page 33

1      MR. ELKINS:  Objection to form.
2      You can answer.
3      THE WITNESS:  That's assigned by the commander
4      of the Internal Affairs Unit, okay, as to who will
5      handle that particular case.  And, usually, it's
6      two; you have a primary and a backup that are
7      assigned to the investigation.
8  BY MR. BARROUKH:
9      Q.  And is that the sole role of the commander of
10  Internal Affairs, designating investigators?
11      A.  It's not the sole role, no.
12      Q.  What are the other roles for the commander of
13  Internal Affairs?
14      A.  It would be meeting frequently with all of
15  their investigators, to discuss the status of the case;
16  to oversee questions involving how the investigation is
17  to be conducted, in other words like a process
18  associated with that, what needed to be done; and then,
19  ultimately, to review the findings of the investigative
20  components that were assigned to it; and then bring
21  forth the findings to the review panel or the
22  disciplinary panel for their proposal on corrective
23  action.
24      Q.  And could you discuss their role in determining
25  the facts or issuing a finding?

Page 34

1      A.  Well, they're there to determine the facts of
2  the case, and they present the facts of the case.  They
3  stay away from determining what the outcome would be, as
4  it pertains to the discipline or corrective action; they
5  leave that up to the panel.  They're very careful not to
6  do that, because that's not their job.
7      Q.  So Internal Affairs is a neutral third party,
8  so to speak; is that correct?
9      MR. ELKINS:  Objection to the form.
10      You can answer.
11      THE WITNESS:  I would say that, no.  They work
12      within the context of the police department and
13      they understand the role that they play, which is
14      identifying either people who have either violated
15      administrative policy, you know, or have not
16      violated administrative policy.  But they bring
17      that conclusion forward to the disciplinary panel,
18      and they put everything on the table, all
19      considerations to be taken into account that
20      involve their individual role.
21  BY MR. BARROUKH:
22      Q.  And are individuals accused of misconduct
23  allowed -- provided an opportunity to present their side
24  of the story, during this investigation?
25      MR. ELKINS:  Objection to form.

Page 35

1      You can answer.
2      THE WITNESS:  Yes.
3  BY MR. BARROUKH:
4      Q.  And how are they allowed to present their side
5  of the story?
6      A.  There are -- once a determination has been made
7  for discipline, if the employee wishes to have a meeting
8  with the chief, okay, and all the involved parties, to
9  include the Fraternal Order of Police and union
10  representation, to discuss the implementation of
11  discipline, they can.  That's a predetermination
12  hearing.
13      And what they do is they provide, I believe,
14  considerations that I might want to take into account
15  when determining the final discipline.  Because the
16  committee, itself, makes a recommendation for discipline
17  doesn't always mean that that's going to be the final
18  discipline; it's just a recommendation, at that point.
19      Q.  Do you have an approximate percent of what
20  recommended discipline by Internal Affairs ultimately
21  becomes the true discipline?
22      MR. ELKINS:  Objection to form.  Internal
23      affairs doesn't make disciplinary recommendations;
24      he's testified to that.
25      MR. BARROUKH:  All right.

Page 36

BY MR. BARROUKH:

Q. And you did say there was a predetermination hearing. Could you restate who can request a predetermination hearing or who implements a predetermination hearing?

A. The Fraternal Order of Police, on behalf of the employee, will make a request for a predetermination hearing. That involves their attorney. The attorney would present the circumstances that they believe should be presented in rendering that final conclusion of the employee's corrective action. Also involved in that process would be a representative from Human Resources as well.

Q. And how are findings and conclusion from investigations communicated to the parties involved?

A. Yes.

MR. ELKINS: He asked you, how.

THE WITNESS: Oh, I'm sorry, I thought I heard you say "is." I apologize.

BY MR. BARROUKH:

Q. No problem. So how are the findings and conclusions of an investigation communicated to the parties involved?

A. They are written, and then they also go through the FOP president, in the event that we have a

Page 37

subsequent meeting afterwards, to discuss the final determination.

Q. And during these meetings and interviews and questionings, what measures are taken to protect the privacy and confidentiality of individuals who complain or report?

MR. ELKINS: Objection to form.
You can answer.

THE WITNESS: I think if someone comes forward and is coming forth as a complainant in these issues, we do everything that we can to protect their identity, especially if the allegation is very sensitive in nature. But, ultimately, you know, we will go by -- in those particular cases, we'll go by the lead of Human Resources.

And, again, I don't want to assume that you're talking about a harassment issue. You know, we do -- Internal Affairs does take anonymous complaints, and we are responsible and obligated to look at even those anonymous complaints, to see if there's a basis for us to further review that.

BY MR. BARROUKH:

Q. And if the complaint is not anonymous and there are meetings held and investigations conducted, are these meetings recorded?

Page 38

MR. ELKINS: Objection to form.

THE WITNESS: Internal Affairs goes ahead and reports all interactions with complainants on cases. And that also includes those which are handled by the EEOC component of the City.

BY MR. BARROUKH:

Q. And are the outcome of these investigations appealable?

MR. ELKINS: Objection to form.

THE WITNESS: I'm sorry, could you say that one more time, please.

BY MR. BARROUKH:

Q. Are the outcomes of these investigations -- even though you said the panel issues a disciplinary determination or whatnot, are employees provided with an option for appealing the outcome of these investigations?

MR. ELKINS: Objection to form. The panel is issuing a recommendation, not a determination.
You can answer, Chief.

THE WITNESS: Again, there is an avenue for an employee to go ahead and to challenge the ruling, and that's usually filed through the grievance process, through mediation.

BY MR. BARROUKH:

Page 39

Q. And you mentioned that there are anonymous -- there are individuals who may remain anonymous in reporting harassment. Are there any other resources or support services available to these employees who feel like they're being harassed or discriminated against?

MR. ELKINS: Objection to form.
You can answer.

THE WITNESS: I think that the way that we best satisfy that desire for the employee to be anonymous is to refer them to Human Resources for follow-up. I think that, again, the purpose for that -- and that's what Human Resources' directive is, is to have people feel that they can come freely to the City and not necessarily have to go to the avenue of the police department if they feel that representation might not necessarily meet their expectations. So they can go to the City, in order to be able to remain anonymous in that particular instance.

BY MR. BARROUKH:

Q. Understood. And are there any measures, to the same extent, that prevent retaliation after they file a complaint or a report?

A. Absolutely.

Page 40

1  Q. And could you talk to me about those, please?
2  A. That would involve anything that's brought
3 forth under the Whistleblower Statute. So again, you
4 know, we're very much aware of an employee's rights to
5 come forward and make an allegation and, more
6 importantly, to assure that their rights are respected
7 during the investigative process.
8  Q. And how does the department address concerns
9 about potential conflicts of interest in the handling of
10 complaints and investigation?
11   MR. ELKINS: Objection to form.
12   THE WITNESS: I think if there is a conflict of
13   interest, that the person who is in charge of the
14   investigation or potentially someone who may be
15   involved in that has to recuse themselves from that
16   investigation, and then another person would be
17   assigned to the investigative aspects of that.
18 BY MR. BARROUKH:
19  Q. Thank you. Moving forward. During your tenure
20 as police chief, were you made aware of any specific
21 allegations of misconduct?
22   MR. ELKINS: Objection to form.
23   You can answer.
24   THE WITNESS: As a police chief, yes.
25 BY MR. BARROUKH:

Page 41

1  Q. And how were these reports or allegations
2 brought to your attention?
3   MR. ELKINS: Objection to form.
4   You can answer.
5   THE WITNESS: Through the commander of the
6   Internal Affairs Unit.
7 BY MR. BARROUKH:
8  Q. And did you have any protocols or specific
9 guidelines to follow when the commander of the Internal
10 Affairs Unit brought these to your attention, these
11 complaints and reports to your attention?
12  A. We have a protocol on how the allegations are
13 reviewed, on how the investigations take place, that
14 deal, like I said earlier, with time frames associated
15 with that and then, ultimately, how the findings would
16 be presented.
17  Q. And who must abide by these protocols?
18  A. Anyone that handles the investigation, from the
19 person that initiates the complaint, okay, which would
20 be, you know, "how am I going to forward that complaint
21 for review," to those who receive it, to those who
22 investigate it, to ultimately the decision on how that
23 is to be remedied.
24  Q. And does the department maintain a record for
25 documentation of previous instances of officer

Page 42

1 misconduct?
2   MR. ELKINS: Objection to form.
3   You can answer.
4   THE WITNESS: Yes.
5 BY MR. BARROUKH:
6  Q. And how can you access those records, if they
7 are accessible?
8  A. Sorry, say that again, the whole question.
9  Q. I said, how can you access those records, if
10 they are accessible?
11  A. You can make a request, under the Freedom of
12 Information Act, to get a copy of your -- it's called
13 IA-Prof (sic), your IA profile, to see, again if there
14 are allegations filed against you, who did that; who
15 actually -- if it was anonymous, it will say
16 "anonymous"; it will say who the initiating person was,
17 with regards to the complaint; it will show what the
18 initial allegation is and then what the final
19 disposition is, what the final disposition is.
20  Q. And you said that these allegations are brought
21 against an individual; is that correct?
22   MR. ELKINS: Objection to form.
23   You can answer.
24   THE WITNESS: Yes.
25 BY MR. BARROUKH:

Page 43

1  Q. How is an accusation -- or, excuse me, an
2 allegation brought against an individual; is there a
3 form? Is there a phone number they report to?
4  A. Actually, there is a form that can be submitted
5 internally, you know, by a supervisor who oversees
6 inappropriate behavior on the part of their subordinate
7 or another member of the department; and that form can
8 be filled out and subsequently delivered to Internal
9 Affairs. Internal Affairs can also receive phone calls.
10 But either way, there's a system of documentation that
11 has to occur in conjunction with the filing of a report,
12 if it's deemed to be something that we have to
13 investigate.
14  Q. Does an individual filing this report or making
15 a report need to take responsibility over the report?
16   MR. ELKINS: Objection to --
17 BY MR. BARROUKH:
18  Q. And I can rephrase, if you need me to.
19  A. Could you, please?
20  Q. Sure. Does the individual who reports to
21 Internal Affairs need to take responsibility for making
22 the report?
23   MR. ELKINS: Objection to form.
24   You can answer.
25   THE WITNESS: In terms of making sure that the

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 14 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 44

report gets submitted, yes.

BY MR. BARROUKH:

Q. And in terms of taking ownership of the report, that they were the individual who made the report, as well?

A. The person filing the report or coming forward with regards to the allegation, it just depends on whether or not it's internal or external. You know, we can receive a complaint from someone who walks into the station and who says that they just witnessed or were a party to have an officer acting either unprofessionally, unethically, or unlawfully, and they could file a report.

The supervisor or the officer that's taking the report is responsible for the completion of the allegation of misconduct and the subsequent forwarding of that report to Internal Affairs, and a supervisor that would witness that would be responsible for completing the same allegation of employee misconduct and making sure that the report was also forwarded to Internal Affairs to review.

Q. And does this allegation of employee misconduct form need to be signed when it's submitted, to have effect?

A. It should be signed, yes. As part of the

Page 45

protocol is that it should be signed when it's submitted. But, either way, the report is going to be looked at. That's just more of the finishing of the documentation of the report.

Q. So the validity of the report and the allegation of employee misconduct is not lessened if there's no signature on the document then; is that correct?

A. It's still something that we're going to look at, regardless of whether there's a signature on it or not, because it is an allegation. It's very similar if you look at it, like, an anonymous one; you know, because someone doesn't sign their name to it it doesn't necessarily mean we're not going to look at it in the same light.

Q. That's fair. That makes sense. Are you familiar with what the police department calls a Last Chance Agreement?

A. Yes, I am.

Q. To your knowledge, what is a Last Chance Agreement?

A. It's an opportunity for an employee to resume their career, whether it be, you know, in the law enforcement side or civilian side associated with the city, after an event occurs that is deemed to be

Page 46

potentially -- I guess a termination could arise from it, but you're willing able to afford the employee the opportunity to continue on, under certain circumstances.

Q. And you said that it applies in situations where the conduct of the individual could lead to termination; correct?

A. Serious in nature and potentially could lead to termination.

Q. And what defines "serious in nature"?

A. Anything at all that is a violation of public trust; the responsibility within the particular entity that they're involved with, whether it be, again, police or fire; misrepresenting the organization in a negative light; something that would bring embarrassment to the City, in terms of what the person's responsibilities were and duties were; and ultimately, doing something that's unlawful, you know, and that again violates public trust.

Q. But not -- but a Last Chance Agreement is not issued in every instance of an employee action that results in distrust -- in the public or that results in embarrassment in the public or even unlawful actions; isn't that correct?

MR. ELKINS: Objection to form.

You can answer.

Page 47

THE WITNESS: I think it would apply specifically to what we were dealing with at that time and, more importantly, you know, again, we look at a variety of different things associated with that; you know, the employee's previous I.A. history, their disciplinary history. There's a lot of factors that weigh into it, you know, whether or not a Last Chance Agreement is something that's appropriate.

BY MR. BARROUKH:

Q. And by "I.A. history," do you mean if they have been reported or if they've filed numerous reports?

A. No. Not filing, no. It would be, they were the subject of an investigation or an allegation.

Q. And to take that a step further, not only -- to my understanding, not only do they have to be the subject of an investigation, but they have to be found to have committed the misconduct; is that correct?

A. Yes. And/or other aspects of administration violations associated with the initial complaint. So it might not just necessarily, you know, an allegations, per se, but there might be other things around that we find as a result of the investigation that warrant serious consideration towards the final outcome.

Q. But to be clear, do you believe a Last Chance

Deposition of Richard M. Clements                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 48

1  Agreement is a punishment?
2       MR. ELKINS:  Objection to form.
3    You can answer.
4       THE WITNESS:  No, I don't.  In fact, for me, I
5    think it's potentially offering the person a second
6    shot at what would have been something that was a
7    final decision on their employment.  Yeah, that's
8    what I think.
9  BY MR. BARROUKH:
10      Q.  Would you ask an employee who has not committed
11   any misconduct to enter into a Last Chance Agreement?
12      MR. ELKINS:  Objection to form.
13    You can answer.
14      THE WITNESS:  No.  There would be no cause to
15   put someone on a Last Chance Agreement if they had
16   not committed some type of a serious administrative
17   violation or action.
18  BY MR. BARROUKH:
19      Q.  So you say there needs to be cause to place an
20   individual on a Last Chance Agreement; correct?
21      MR. ELKINS:  Objection to form; misstates his
22   testimony.
23  BY MR. BARROUKH:
24      Q.  Could you restate your statement, please, then,
25   where you -- I don't want to speak for you or

Page 49

1  misrepresent what you're saying.  I'm going to ask you
2  again the same question, so hopefully I can understand
3  better.
4       A.  Sure.
5       Q.  Would you ask an employee who has not committed
6  any misconduct to enter into a Last Chance Agreement?
7       MR. ELKINS:  Objection to form.  The City
8  doesn't ask employees to sign a Last Chance
9  Agreement.  You can answer.
10      THE WITNESS:  I wouldn't -- again, someone that
11   has not committed misconduct, I don't know what the
12   purpose behind a Last Chance Agreement would be, at
13   that point.  To me, a Last Chance Agreement, to me,
14   represents a second chance, okay?  An opportunity
15   to be able to restart their career in a more
16   positive way.
17  BY MR. BARROUKH:
18      Q.  Do you believe that a Last Chance Agreement is
19   a form of discipline?
20      MR. ELKINS:  Objection to form.
21    You can answer.
22      THE WITNESS:  I don't -- no.  I think it's a
23   part of the resolution package, per se.  I
24   apologize, if I reached over.  I believe it's a
25   form of -- it's a guide by which we give the

Page 50

1  employee and an expectation that we have, in
2  conjunction with their continued employment.
3  BY MR. BARROUKH:
4       Q.  But you would need to -- correct me if I'm
5  wrong.  I understand that you would need to commit
6  misconduct or take a certain action that does not abide
7  by the policies of the City, to be placed on a Last
8  Chance Agreement; is that correct?
9       MR. ELKINS:  Objection to form.
10      THE WITNESS:  I think that to say that it
11   doesn't abide by the City is not entirely accurate,
12   because the City would have to endorse that and
13   then we would have to work with Human Resources to
14   make sure that we were on track with what we were
15   trying to do with, for lack of a better term,
16   rehabilitating the employee's career and giving
17   them the opportunity to succeed.
18  BY MR. BARROUKH:
19      Q.  So to be clear, have you ever asked an employee
20   with no record of misconduct to enter into a Last
21   Chance
22   Agreement?
23      MR. ELKINS:  Objection to form.  He doesn't ask
24   employees to enter into Last Chance Agreements.
25      MR. BARROUKH:  I said, "have you asked," not
     the City.

Page 51

1       MR. ELKINS:  Objection to form.  Nobody asks.
2       MR. BARROUKH:  He can answer the question,
3  though?
4       MR. ELKINS:  He can answer.
5       THE WITNESS:  No, I have not.
6  BY MR. BARROUKH:
7       Q.  In your capacity as -- in your prior capacity
8  as police chief, did you ask an employee or discuss with
9  an employee to enter into a Last Chance Agreement?
10      MR. ELKINS:  Objection to form.
11    You can answer, Chief.
12      THE WITNESS:  I have not directly had
13   conversations with the employee about entering into
14   a Last Chance Agreement.  I think that would come
15   in predetermination meetings, to determine the
16   final outcome.  But that was never done on a one-
17   to-one basis; it would be done as a collective.
18  BY MR. BARROUKH:
19      Q.  I understand.  And are you aware of -- or
20   excuse me.  Are you familiar with Arthur Elliot Hazzi?
21      A.  I know Officer Hazzi.
22      Q.  How do you know Officer Hazzi?
23      A.  He works as a neighborhood resource officer for
24   Area 2, I believe.
25      Q.  And are you aware that a lawsuit was filed

Deposition of Richard M. Clements          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 52

1  against Mr. Hazzi, in 2009?
2      A.  I guess so.  I mean, if you say so.  Back in
3  2009, I was a captain, you know.  So again, am I aware
4  of it?  Potentially, yes, I guess.  I don't know for
5  sure.
6      Q.  Are you aware with the accusations against
7  Officer Hazzi that he kicked a person in the head, in or
8  around 2009?
9      A.  I remember there being a situation involving
10 Officer Hazzi; as to the specifics of the case, I can't
11 comment on that.  I don't know specifically what it was
12 involving.
13     Q.  All right.  So Officer Hazzi currently works at
14 the police department today; is that correct?
15     A.  Yes.
16     Q.  Do you know if Officer Hazzi was ever fired
17 during your tenure with the police department?
18     A.  You know, I believe that he may have been.
19 And, again, I believe he got his job back through the
20 litigation process or arbitration.  But as to the
21 specifics of how the job he got back and what the
22 circumstances were around it, I don't know.
23     Q.  You say he got his job back through the
24 mediation process; correct?
25     A.  I'm assuming.  I don't know that for sure, but

Page 53

1  I'm assuming -- again, he did get his job back.
2      MR. ELKINS:  Objection to form; misstates his
3      testimony.  He said, mediation or arbitration.
4      MR. BARROUKH:  Okay.
5  BY MR. BARROUKH:
6      Q.  Could you discuss the mediation process with
7  me, please.
8      MR. ELKINS:  Objection to form.
9      THE WITNESS:  The mediation process, it would
10     be the parties that are involved to be able to sit
11     and present both sides of the story, or both sides
12     of the account of the incident.  They would talk
13     about the City's position, and then they would
14     listen to the employee's position.  They would talk
15     about the employee's previous history as an
16     employee there, you know, what they have done in
17     whatever time frame that they've been.  And then,
18     more importantly, they would look at the event that
19     got everybody in the room.  The mediator would then
20     try to be able to get to a point where both sides
21     would find there to be an equitable solution;
22     meaning, that both sides obtained what they were
23     looking to get, at the conclusion of the mediation.
24 BY MR. BARROUKH:
25     Q.  And could you please describe the arbitration

Page 54

1  process, with regards to an officer who was terminated
2  appealing for their job to be reinstated.
3      A.  Pretty much the same process, but the
4  arbitrator would come to a decision, based on the
5  totality of the circumstances and they later would come
6  back with a conclusion that was binding.
7      The mediator would try to negotiate the deal,
8  prior to it getting to arbitration.  Once it got to
9  arbitration, he would present the sides.  And then the
10 arbitrator would make the determination of how they were
11 going to rule, based on the totality of the
12 circumstances.
13     Q.  And under what circumstances would an officer
14 end up in arbitration?
15     A.  If the steps leading up in the grievance
16 process and/or the resolution did not produce that
17 outcome, both parties could agree to go to binding
18 arbitration at that point and let the arbitrator decide.
19     Q.  And what employees are allowed to proceed in
20 arbitration?
21     A.  I don't know that anyone is not restricted to
22 go to arbitration, if arbitration is requested.  And
23 again, remember, the FOP, more oftentimes than not -- in
24 fact, I don't remember if there's a case where the FOP
25 has not been involved in the arbitration process, that

Page 55

1  they've actually brought forth the arbitration process
2  through the contractual basis, and it's usually a
3  grievance.
4      Q.  Thank you.  And are you familiar with Officer
5  Jerome Berrian?
6      A.  Yes.
7      Q.  How are you familiar with Officer Jerome
8  Berrian?
9      A.  I've known now Sergeant Berrian since 1997,
10 when he joined the police department.
11     Q.  I apologize; I didn't realize he was a
12 sergeant.
13     A.  That's okay.
14     Q.  And were you the acting chief while Sergeant
15 Berrian was employed by the City?
16     A.  Was I the acting chief?
17     Q.  Excuse me.  Were you the chief of police while
18 Sergeant Berrian was employed by the City?
19     A.  As part of my time there, yes, I ascended up
20 the ranks to chief while Sergeant Berrian was -- he's
21 currently with the City now.
22     Q.  And are you aware that in 2011, then Lieutenant
23 Berrian was involved in an incident where a police
24 officer drunkenly crashed into an ATV and multiple
25 civilians, causing them to sustain significant injuries?

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 17 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 56

1  A.  I was aware that Sergeant Berrian, as a result
2  of the initial incident that occurred with the two
3  officers that were on the beach, was involved in the
4  subsequent findings by Internal Affairs as to, not
5  necessarily his role in that accident, but what he was
6  doing that may have led to a lack of supervision on
7  their part.
8  Q.  And what was Jerome Berrian's role that
9  resulted in a lack of supervision in that incident?
10  A.  If I'm not mistaken, I believe he was a shift
11  commander and he was not present at the time that the
12  accident occurred.
13  Q.  When you say he was not present, was he off the
14  clock?
15  A.  I don't believe so.  But then again, I'd have
16  to go back to the case file from Internal Affairs to be
17  able to review the information.
18  Q.  And do you know if Lieutenant -- at the time
19  Lieutenant Berrian was placed on a Last Chance Agreement
20  for failing to supervise, at this time?
21  A.  No, sir, I do not.
22  Q.  And could you please restate where Mr. Berrian
23  is currently employed?
24  A.  He's with the City of Miami Beach.
25  Q.  And what is Mr. Berrian's title today?

Page 57

1  A.  I believe he's still a sergeant.
2  Q.  Do you believe Jerome Berrian's character and
3  Jerome Berrian as an individual should be defined by his
4  involvement in that 2011 ATV crash?
5      MR. ELKINS:  Objection to form.
6      THE WITNESS:  I can answer?
7      MR. ELKINS:  You can answer.
8      THE WITNESS:  I don't know.  And I don't know
9      -- I mean, I do not think that that should define,
10     overall, his character.
11  BY MR. BARROUKH:
12  Q.  Why not?
13      MR. ELKINS:  Objection to form.
14      You can answer.
15      THE WITNESS:  Well, I mean, it was an incident
16      that occurred in, as you said, 2009, and I know
17      that since 2009, all the way to the time that I
18      left, that Sergeant Berrian has been a model
19      supervisor; he's been absolutely fantastic, and
20      more importantly, he learned from the incident.
21  BY MR. BARROUKH:
22  Q.  And are you aware of Assistant Chief Paul
23  Acosta?
24  A.  I do.
25  Q.  Are you familiar with Assistant Chief Paul

Page 58

1  Acosta?
2  A.  I am.
3  Q.  And how are you familiar with Paul Acosta?
4  A.  I've known Paul since he's been on the
5  department; he came on the department, I believe, in
6  1995.  We were on the SWAT team together for a number of
7  years; we were on the Motor Unit for a brief period of
8  time until I was promoted.  I've seen Paul go up through
9  the ranks as well; and when I left, he was the assistant
10  chief in charge of the administrative section of the
11  police department, when I left.
12  Q.  So you've known Paul for a very long time,
13  apparently?
14  A.  Yes.
15  Q.  And are you aware that, in 2011, then
16  Lieutenant Acosta was involved in the same ATV incident
17  as Officer -- or at the time, Lieutenant Berrian, as
18  well?
19  A.  I don't recall -- to be perfect -- again, I'll
20  refer him as Deputy Chief Acosta now -- I don't recall
21  Deputy Chief Acosta being involved, if that.  I could be
22  wrong; again, I don't know.  Again, if the file says
23  that -- I haven't had a chance to review that file -- I
24  would assume that that's accurate.  But I have not
25  reviewed the file, to be able to say that, one way or

Page 59

1  the other.
2  Q.  Are you aware that at-the-time Deputy Chief
3  Acosta was off-duty when he was supposed to be working
4  during the ATV accident?
5      MR. ELKINS:  Objection to form.
6      THE WITNESS:  I do not remember that.
7  BY MR. BARROUKH:
8  Q.  Are you aware that, at the time, Mr. Acosta
9  lied about being off-duty when he was supposed to be on
10  duty?
11      MR. ELKINS:  Objection to form.
12      THE WITNESS:  Once again, I have not reviewed
13      the case file, the Internal Affairs case file, in
14      order to be able to determine the validity of that
15      statement or even to answer the question.
16  BY MR. BARROUKH:
17  Q.  Okay.  Let me represent to you that Mr. Acosta
18  lied about -- through his own testimony, lied about not
19  being -- let me rephrase this; so I'll strike that.
20      Mr. Acosta represented he was on duty as a
21      supervisor that night when, in fact, he was not
22      supervising or at work.  Another lieutenant clocked him
23      in, lied about it, and ultimately confessed to it.  Are
24      you aware of that?
25      MR. ELKINS:  Objection to form.

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 18 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 60

1   THE WITNESS:  I am not aware of that finding,
2   per se.  Again, I haven't had an opportunity to
3   review that particular case file.
4   BY MR. BARROUKH:
5   Q.  So you don't know if at-the-time Lieutenant
6   Acosta was placed on a Last Chance Agreement?
7   A.  I do not know that, no.
8   Q.  And do you know where Mr. Acosta is currently
9   employed?
10  A.  He's still with the City of Miami Beach.
11  Q.  And what is his title today?
12  A.  He's the deputy chief.
13  Q.  How many promotions do you need, to go from
14  sergeant to deputy chief?
15  A.  Well, it would be sergeant, lieutenant,
16  captain, major, assistant chief, and then deputy chief.
17  Q.  And how many years does it take to get that
18  many -- how many years did it take him to get that many
19  promotions?
20  A.  Well, if your statement was that this occurred
21  in 2009, he was -- I'm sorry, go ahead.
22  Q.  I'm sorry, I didn't mean to cut you off.  I'm
23  saying 2011, not 2009.
24  A.  I apologize.
25  Q.  That's fine.

Page 61

1   A.  2011 to 2023 when I left, in October of 2023
2   was when he was promoted to the rank of deputy chief.
3   Q.  So Mr. Acosta had 12 years to gain, let's call
4   it five promotions, from that alleged incident; is that
5   correct?
6   A.  If that's the correct math, yes.  Math is not
7   one of my strong suits, so I'm not going to say.
8   Q.  Me neither, but my numbers are adding up, so
9   we're good.  Do you believe that Deputy Chief Acosta
10  should be defined by his involvement in the 2011 ATV
11  crash?
12  MR. ELKINS:  Objection to form.
13  THE WITNESS:  No.  Once again, I think, again,
14  if what you say about the investigation revealed
15  that, if he was afforded the opportunity to, again,
16  resurrect his career and move in that direction, I
17  think that Deputy Chief Acosta has done a very good
18  job.
19  BY MR. BARROUKH:
20  Q.  Are you familiar with Detective Phillip Archer?
21  A.  Yes.
22  Q.  How are you familiar with Detective Phillip
23  Archer?
24  A.  Once again, I've known him since he came on the
25  department, I believe in the mid-1990s.

Page 62

1   Q.  Are you aware that in 2013 Detective Archer was
2   caught on camera punching a handcuffed woman in the
3   face?
4   A.  I remember that.
5   Q.  Are you familiar with the disciplinary action
6   that was taken against Detective Archer?
7   A.  I'm not familiar with the -- I mean, I know he
8   kept his job until he subsequently retired, a few years
9   ago.  But as far as the overall outcome of the
10  discipline, in terms of what he received, no, I do not
11  recall what specifically he was given.
12  Q.  And do you know if he was placed on a Last
13  Chance Agreement for his 2013 involvement in punching a
14  woman in the face while she was handcuffed?
15  A.  I do not know that.
16  Q.  And you've said that Mr. Archer is currently
17  retired; is that correct?
18  A.  I believe so.  He may be a reserve officer with
19  the City, but I don't necessarily -- I don't know.  He
20  may be a reserve officer with The Beach, but currently
21  his status is retired from a full-time capacity from The
22  Beach.
23  Q.  And what's his -- to your knowledge, was his
24  retirement voluntary -- or was his retirement from a
25  full-time capacity position voluntary?

Page 63

1   A.  Yes.
2   Q.  Do you believe that Detective Archer should be
3   defined by his actions in the 2013 events that I've
4   previously described?
5   MR. ELKINS:  Objection to form.
6   THE WITNESS:  Once again, no.  I think, given
7   the opportunity to be able to change paths and to
8   get back onto where, you know, you were, is again
9   giving him that opportunity to do so.
10  BY MR. BARROUKH:
11  Q.  And are you familiar with Officer Steven
12  Serrano?
13  A.  I am.
14  Q.  How are you familiar with Officer Serrano?
15  A.  He is a new officer that started just a few
16  years ago.  We actually trained him in the police
17  academy.
18  Q.  What type of training did you provide Officer
19  Serrano?
20  A.  As I mentioned earlier in my deposition, I've
21  been involved with the School of Justice as a training
22  advisor for 26 years, so I was actually a training
23  advisor for his class, which was a part-time class;
24  which was a 6:30 to 10:30 class, Monday through Friday,
25  for about eight months.  So he went through on a part-

Page 64

1  time basis.

2      Q.  And are you aware that Officer Serrano, in
3  2021, was charged in connection to the alleged beating
4  of a tourist inside of a hotel?

5      A.  I was and am.

6      Q.  Are you aware that he was charged with two
7  official misconduct charges and one battery charge?

8      A.  Yes.

9      Q.  Did you take any disciplinary action against
10 Officer Serrano for his alleged beating of a tourist?

11     A.  Was he terminated, is that your question?

12     Q.  My question is -- sure.  Let's start with that.
13 Was Officer Serrano terminated for his connection?

14     A.  He was not.

15     Q.  Did you take any disciplinary action against
16 Officer Serrano for his connection in the alleged
17 beating of a tourist?

18     A.  He was relieved of duty without pay, pending
19 the conclusion of the investigation by the state
20 attorney's office.

21     Q.  How long was he relieved of duty for?

22     A.  I believe -- I think he may still be relieved
23 of duty.  Because, again, as of October 23rd of last
24 year, he was still relieved of duty.  Now, I know that
25 there's been some court proceedings since then, but I'm

Page 65

1  not 100 percent sure of what his status is.

2      Q.  Did you place Officer Serrano on a Last Chance
3  Agreement?

4          MR. ELKINS:  Objection to form.
5      You can answer.

6          THE WITNESS:  I did not.  Because the
7      administrative process of what we do -- remember,
8      we don't determine the criminal aspects of it.
9      That's the state; right?  So when a case comes back
10     to us from the state is where we determine whether
11     or not the administrative -- there's administrative
12     violations that we need to address.  So, no.

13 BY MR. BARROUKH:

14     Q.  Okay.  So is there still a chance for further
15 disciplinary action to be taken by the police department
16 against Officer Serrano --

17     A.  Yes.

18     Q.  -- for his involvement in --

19     A.  Sorry.

20     Q.  That's okay.

21     A.  I apologize; I thought you were done with your
22 question.  Go ahead.

23     Q.  I understand.  So there is still a chance for
24 the department to take disciplinary action against
25 Officer Serrano following the completion of the state's

Page 66

1  investigation; is that correct?

2      A.  Yes.

3      Q.  And if you were chief, what disciplinary action
4  would you take in this matter?

5          MR. ELKINS:  Objection to form.

6          THE WITNESS:  The allegation hasn't been
7      completely resolved by the state attorney's office;
8      and then subsequent to that, remember, we haven't
9      done any of our administrative inquiry, so at this
10     point, I would be speculating, other than just to
11     tell you there would definitely be an
12     administrative review of Officer Serrano's actions
13     at that event.

14 BY MR. BARROUKH:

15     Q.  I understand.  And I was asking you to
16 speculate, because there are not many people who were in
17 the position of chief and had the ability to act in that
18 capacity.

19         But you did previously state, and correct me if
20 I'm wrong, that a Last Chance Agreement could be awarded
21 or discussed/agreed upon/entered into if there was an
22 event that brought embarrassment to the City; is that
23 correct?

24     A.  Yes.

25     Q.  Do you believe that this is an event that

Page 67

1  brought embarrassment to the City?

2          MR. ELKINS:  Objection; form.

3          THE WITNESS:  Once again, without getting the
4      totality of the event or the totality of the
5      information associated with the allegation, it's
6      difficult for me to come to that conclusion,
7      because there may be other things that I just don't
8      know.  Remember, we can't do a concurrent
9      investigation while the state has jurisdiction over
10     this incident.

11 BY MR. BARROUKH:

12     Q.  That's fair.  I could go through this same line
13 of questioning for the following officers, but in the
14 interests of time, I'll just ask you a general summary.
15 Is that all right?

16         So for Officers Kevin Perez, Robert Sabater,
17 and Officer David Rivas and Sergeant Jose Perez, they
18 were all involved in this 2021 event; is that correct?

19     A.  Yes.

20     Q.  And to your knowledge, none of them have been
21 placed on a Last Chance Agreement to this point in time;
22 is that correct?

23     A.  So if I may, I'm going to split the group up --
24 if I may?

25     Q.  Absolutely.

Deposition of Richard M. Clements                         Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 68

A. Officer Kevin Perez and Officer Jose Perez, which did go through the state attorney process, the actual criminal process associated with that, and they entered into an agreement with the state and/or, I think in Kevin Perez's incident, he was actually adjudicated guilty of the actual crime. They would not have gotten a Last Chance Agreement with me, primarily because we never plot them to do for what it was they did in connection with that incident.

The others we looked at, which is Officer Seranno, Officer Rivas, and Officer Sabater, were being reviewed by the state; the state subsequently went ahead in two of those cases and did not go forward, and that case was kicked back to Internal Affairs for review. But that was after I left; so how that was handled internally, I don't know.

Q. And you previously said that Last Chance Agreements would be accessible via a public records search; is that correct?

A. I think that that would fall under the auspices of the public records law.

Q. So if I run a public records search and I don't find a Last Chance Agreement on these individuals, is it fair to assume that there is no Last Chance Agreement for these individuals?

Page 69

MR. ELKINS:  Objection to form.  There's no such thing as an individual running a public records search.

You can answer.  You can make a public records request, and the City will respond to it.  But nonetheless, Chief, you can answer.

THE WITNESS:  Yeah.  What they came to, as far as conclusions go, no, I can't comment on that.  I don't know what, if any, discipline or corrective action was taken after the case was kicked back by the state attorney's office to Internal Affairs for review.

BY MR. BARROUKH:

Q. And are you familiar with Officer Muley?

A. Yes.

Q. How are you familiar with Officer Muley?

A. I've known Mike for a very long time -- Sergeant Muley, for a very long time and am very aware of some of the issues that he had to go through in his career.

Q. And I didn't mean any disrespect by calling him officer instead of sergeant.

A. No, no.

Q. Could you please discuss Sergeant Muley's involvement, or his actions, once he ultimately received

Page 70

a DUI while on duty?

MR. ELKINS:  Objection to form; misstates what happened to Muley.

You can continue, Chief.

THE WITNESS:  Yes.  It wasn't a DUI, per se. But it was drinking on duty.  It was under Chief Oates' administration.  Chief Oates came in and took action, by which Mike, I think subsequently -- or Sergeant Muley, I'm sorry, was subsequently relieved of his duties and was terminated and then had to come back through the arbitration process to get his job back, if I'm not mistaken.

BY MR. BARROUKH:

Q. Is it correct that Sergeant Muley was seen at a Fat Tuesdays taking tequila shots with civilians, while on duty?

A. I don't know that he was seen taking tequila shots.  I think what he was seen was that he was drinking out of a cup that was later identified as an acholic beverage that was provided to him by the establishment, but I don't think he was doing tequila shots.

Q. And at any point, Did Sergeant Muley take his weapon out that night, in public?

A. At one point, the video depicts sergeant Muley

Page 71

taking his firearm out.  He did not point it at anyone, but he did unholster it and point it down towards the ground.

Q. And you stated that Sergeant Muley was terminated; correct?

A. It's my understanding that Sergeant Muley was terminated.

Q. However, Sergeant Muley has since been reinstated; correct?

A. Sergeant Muley went through the arbitration process and got his job back, yes.

Q. And was Sergeant Muley promoted, after getting his job back?

A. No.  I think his rank when he was terminated was sergeant, and he ended up maintaining his rank when he came back.

Q. And are you familiar with Officer Shelandra Battle?

A. Yes.

Q. How are you familiar with Officer Battle?

A. Just vaguely, by knowing that she was a young officer in the department, and that's pretty much it.  I mean, again, not necessarily anything comes to mind.

Q. Are you aware that, in 2022, Officer Battle was arrested and charged with felony domestic violence and

Page 72

1  several misdemeanors?
2      A.  Yes.  I'm sorry; you're refreshing my memory.
3  Yes.  Absolutely, yes, I am.  Mm-hm.
4      Q.  And did you take any disciplinary action
5  against Officer Battle?
6      A.  We did.
7      Q.  And what was the disciplinary action?
8      A.  We relieved her of duty, pending the completion
9  of the investigation.
10     Q.  Is that investigation still ongoing?
11     A.  Not to my knowledge.  No, it's not.
12     Q.  And what was the finding of the investigation?
13     A.  I believe the investigation was conducted by
14  the Broward State Attorney's Office and, because the
15  victim refused to cooperate in this particular instance,
16  they did not go forward with the continuance of the --
17  the criminal side of it.
18     Q.  And what disciplinary action did Miami Beach
19  Police Department take against Officer Battle?
20     A.  Obviously, I don't recall offhand.  I know that
21  there was disciplinary action taken, but I don't
22  remember the extent by which it was.  But I know that
23  there were some things that we were concerned about and,
24  more importantly, she had not been an employee that had
25  come across from the Internal Affairs perspective, prior

Page 73

1  to that.  Again, we had taken disciplinary action; I
2  don't remember what action was taken.  I apologize for
3  that.
4      Q.  Do you believe that the severity of a rank-and-
5  file member's actions contributes to their discipline?
6      MR. ELKINS:  Objection to form.
7      You can answer.
8      THE WITNESS:  Yes, I do.
9  BY MR. BARROUKH:
10     Q.  Did you place Officer Battle on a Last Chance
11  Agreement?
12     MR. ELKINS:  Objection to form.  The City
13  doesn't place anyone on Last Chance Agreements.
14  You can answer.
15     THE WITNESS:  I don't know; I'm not 100 percent
16  sure.  I will tell you that we have made a
17  distinction between that which occurs in someone's
18  personal life versus, you know, what someone does
19  under color of law or while they're working, in
20  looking at how we handle that.
21     We do take into account that things are going
22  to happen sometimes, you know, that are
23  unfortunate, but that hopefully we could assist in
24  the corrective action associated with it.  And my
25  understanding of it was, with Officer Battle this

Page 74

1  was done off-duty; it was not done under color of
2  law, and it was more of a domestic-related issue.
3  BY MR. BARROUKH:
4      Q.  Do you believe that Officer Battle's actions
5  embarrassed the City?
6      MR. ELKINS:  Objection to form.
7      You can answer.
8      THE WITNESS:  I would say, yes, to a degree.
9  Only because the expectations are higher for a
10  police officer.  But, you know, did she do it under
11  the color of law, no, she did not.  And I think it
12  still warranted concern on our part.  But to that
13  degree, if you want to compare Officer Battle to
14  Sergeant Perez and Officer Perez's actions, you
15  know, there's a difference there; in my eyes, there
16  is.  Again, under color of law, when you're doing
17  something -- I'll just leave it at that.
18  BY MR. BARROUKH:
19     Q.  I agree with you.  I do.  So moving forward.
20  How did you come to know Jessica Salabarria, formerly
21  Jessica Guasto?
22     MR. ELKINS:  I don't mean to interrupt you
23  asking your question.  But it's been almost an hour
24  and a half.  So can we take five?
25     MR. BARROUKH:  Absolutely.  It shouldn't be too

Page 75

1  much longer, but we can take a break.
2      MR. ELKINS:  If you don't have too much longer,
3  do you mind if we take ten?
4      MR. BARROUKH:  Yeah.  Sorry, if you guys asked
5  sooner, I would have definitely.  I would say
6  absolute maximum, 30 minutes is my guess.
7      THE COURT REPORTER:  We're off the record.
8      (A brief recess was taken.)
9      THE COURT REPORTER:  We're back on the record.
10  BY MR. BARROUKH:
11     Q.  How did you come to know Jessica Salabarria,
12  formerly Jessica Guasto?
13     A.  Through her employment with the City of Miami
14  Beach.
15     Q.  And what was your professional relationship
16  with my client, during her tenure with the police
17  department?
18     A.  I believe she started sometime in the mid-2014-
19  2015 area; so again, not really one where I was her
20  supervisor, per se, immediate supervisor, but through
21  the ranks, whether I was a captain, a major, a deputy
22  chief, or a chief.
23     Q.  And you, ultimately, began supervising her when
24  you became chief; is that correct?
25     A.  Indirectly, yes.  As a chief of police, you're

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 22 of 283

Deposition of Richard M. Clements                                          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 76

1  responsible for everybody you oversee, yes.

2     Q.  And how frequently did you interact with my

3  client, in your capacity as chief of police?

4     A.  Not often; you know, occasionally on roll calls

5  or things of that nature, but not too often.

6     Q.  Did you interact with her more than one time?

7     A.  Oh, yeah.

8     Q.  More than five times?

9     A.  I would say, yes.  Because it was a significant

10  period of time, you know.  So again, it could have been

11  even passing in the hallway, there could be.  Probably

12  less and less, as it pertains to the higher I went.  In

13  the day-to-day, you didn't see people too often.

14     Q.  And did you ever have any personal interactions

15  or conversations with my client, outside of work-related

16  matters?

17     A.  Not to my knowledge, no.

18     Q.  And how would you characterize your working

19  relationship with my client and her colleagues in the

20  department, to your knowledge?

21        MR. ELKINS:  Objection to form.

22     You can answer.

23        THE WITNESS:  With her, professionally.  I

24     don't know who her colleagues would be.  That's

25     very vague.  Again, unless you say a specific.

Page 77

1  BY MR. BARROUKH:

2     Q.  That's fair.  Were you aware of any colleagues

3  that were unhappy or harbored ill will towards my

4  client?

5        MR. ELKINS:  Objection to form.

6        THE WITNESS:  Ill will, no.

7  BY MR. BARROUKH:

8     Q.  Are you aware of anybody in the department that

9  just did not like my client and did not want to work

10  with her?

11        MR. ELKINS:  Objection to form.

12        THE WITNESS:  I don't know.  Again, was it ever

13     brought to my attention that someone did not want

14     to work with her, no.

15  BY MR. BARROUKH:

16     Q.  And did my client ever complain or report

17  conduct that she complained about or report conduct that

18  she experienced during her tenure with the police

19  department?

20        MR. ELKINS:  Objection to form.

21     You can answer.

22        THE WITNESS:  Yes.

23  BY MR. BARROUKH:

24     Q.  How many times did she complain about or report

25  conduct, during her tenure with the police department?

Page 78

1     A.  Two times that I can specifically recall.

2     Q.  And could you please tell me about each

3  instance.

4     A.  Well, one was a 2020 incident complaint, and

5  the other one was a subsequent complaint filed after the

6  implementation of her letter of resignation.

7     Q.  And regarding that first 2020 EEOC charge, what

8  were her complaints or reports in the charge?

9        MR. ELKINS:  Objection to form.  The charge

10     speaks for itself, and the witness doesn't have the

11     charge in front of him.

12     You can answer, if you can.

13        THE WITNESS:  I believe that they had -- it had

14     to do with actions and/or the treatment that she

15     received from co-workers; again, inappropriate --

16     either inappropriate conduct or inappropriate

17     comments that were made in her presence.

18  BY MR. BARROUKH:

19     Q.  And are you aware of that, during her tenure with

20  the police department, my client was demoted after she

21  initially obtained the sergeant status?

22     A.  Yes.

23     Q.  And why was my client demoted?

24     A.  It was demoted under -- I'm sorry.  She was

25  demoted under Chief Oates, where I believe -- again, not

Page 79

1  having reviewed the file, but I believe it had to do

2  with her supervisory responsibilities.

3     Q.  And you're aware that she was reinstated to the

4  title of sergeant?

5     A.  I was.  I'm the one that presided over that

6  process.

7     Q.  And why did you reinstate my client?

8     A.  Again, I believe in second chances and

9  opportunities, you know; and during the process, we

10  heard the presentations, and I believe it warranted that

11  move.

12     Q.  Regarding the 2020 EEOC charge, are you aware

13  that my client agreed to a Last Chance Agreement in

14  settling that complaint or that charge of

15  discrimination?

16        MR. ELKINS:  Objection to form; misstates the

17     totality of why the Last Chance Agreement was

18     entered into.

19     You can answer.

20        THE WITNESS:  Agreed.  The Last Chance

21     Agreement wasn't because of the incident; that

22     really had nothing to do with it.  It was a

23     component of issues that were going on with then

24     Sergeant Salabarria at the time, but it was not in

25     conjunction with the EEOC complaint, but rather the

Page 80

1  Internal Affairs complaint.
2  BY MR. BARROUKH:
3      Q.  And to your knowledge, what were the issues
4  with Sergeant Salabarria at the time?
5          MR. ELKINS:  Objection to form.  The Internal
6      Affairs report speaks for itself, which the witness
7      doesn't have in front of him.  But nonetheless, the
8      witness can answer, if he knows.
9          THE WITNESS:  Again, if you could be specific
10     about which complaint or which issue that you're
11     talking about.
12         MR. BARROUKH:  I might need a few minutes to
13     pull up this report.  Would you want to go on
14     another break?
15         MR. ELKINS:  Yes.
16         THE COURT REPORTER:  We're off the record.
17         (A brief recess was taken.)
18         MR. BARROUKH:  I'm going to share my screen and
19     mark this document as Exhibit 1 (screen share
20     began).
21 BY MR. BARROUKH:
22     Q.  Can you see this document?
23     A.  I can.
24     Q.  Do you know what this document is?
25     A.  It's a settlement agreement, as it's titled.

Page 81

1      Q.  And this is a settlement agreement between my
2  client, Jessica Salabarria, the Fraternal Order of
3  Police Lodge 8, and the City of Miami Beach; do you see
4  that?
5      A.  I do.
6      Q.  And do you see where it says... Sorry, I'm
7  having some issues.
8      A.  Take your time.
9      Q.  Do you see where it says, "Whereas, Salabarria
10 is the subject of an ongoing Internal Affairs
11 investigation, I.A. Case No.: 2021-010."  Correct?
12     A.  Yes.
13     Q.  Do you recall what that Internal Affairs
14 investigation was?
15     A.  Yes, I do.
16     Q.  Could you please tell me about that Internal
17 Affairs investigation.
18     A.  The investigation started during the Covid
19 outbreak.  It involved shift commanders who were
20 responsible for the daytime mobilization or activation,
21 who were checking on the whereabouts of then Sergeant
22 Salabarria.  Apparently, she was not at a roll call that
23 they were administering.  They called her, and she
24 indicated that she was in the department, on the fifth
25 floor.

Page 82

1      And they thought it odd; they went up to the
2  fifth floor, and they actually caught her coming up the
3  back stairwell, I believe; not necessarily where she
4  said that she was.  That led to an examination of her
5  whereabouts, which led to the subsequent investigation
6  about her being out of the city without approval during
7  city time.
8      Q.  And what was your response to this Internal
9  Affairs investigation?
10         MR. ELKINS:  Objection to form.  You can
11     answer.
12         THE WITNESS:  After the investigation, the
13     culmination of the investigation, sir, is that what
14     you're referring to?
15 BY MR. BARROUKH:
16     Q.  Yes, sir.
17         MR. ELKINS:  Same objection.  Go ahead.
18         THE WITNESS:  We -- we, in the process of going
19     to predetermination, we were able to determine that
20     Sergeant Salabarria did, in fact, was, in fact, out
21     of City during those times, that she was untruthful
22     in her whereabouts as a result of the radio
23     communications and, more importantly, evidence that
24     we obtained through the investigation; and that the
25     hours were significant, to indicate that it was

Page 83

1      more than just one instance.  That and the fact
2      that it was going on during Covid, the initial
3      stages of Covid, and again, the unsurety about what
4      we could do in order to keep people from getting
5      sick or ill was still being discussed; and then
6      more importantly, you know, again, the supervision
7      was incredibly important during that time.
8  BY MR. BARROUKH:
9      Q.  And was this the only instance of misconduct by
10 my client at this time?
11     A.  I'm sorry, I didn't hear the first part of that
12 question.
13     Q.  And was this allegation of misconduct that led
14 to the Internal Affairs investigation, where she was not
15 where she was supposed to be --
16     A.  Yes.
17     Q.  -- the only instance of misconduct at the time?
18     A.  The initial -- yes.  The initial allegation was
19 centered on -- actually, yeah, it was centered on being
20 untruthful, as well, and then also being dereliction of
21 duty being in the city.
22     Q.  And how many more instances of misconduct, to
23 your knowledge, do you recall my client committing?
24         MR. ELKINS:  Objection to form.
25         You can answer.

Page 84

THE WITNESS:  The previous misconduct that was the investigation that occurred under Chief Oates' administration was the only other one that I was aware of.  And, again -- you know, again, that's pretty much it, as far as I know.

BY MR. BARROUKH:

Q.  And where it says, "EEOC charge withdrawn with prejudice and discipline," do you see that?

A.  I do.

Q.  And you can agree that it says "Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the Attached Notice of Withdrawal With Prejudice and immediately filing same with EEOC."  Do you see that?

A.  I do.

Q.  "Additionally, as discipline for the matters that are the subject of the investigation, Salabarria agrees to accept the following, a 160-hour suspension." Do you see that?

A.  I do.

Q.  And do you also see here, the total amount due to the City is $3,531.20; is that correct?

A.  I see that.

Q.  And could you tell me what my client was being

Page 85

suspended 160 hours for and why she was paying the City $3,531.20?

MR. ELKINS:  Objection to form.
    You can answer.

THE WITNESS:  For the administrative violations in question, the accumulation of time where she was not working in the city, and that loss corresponded with the number of hours she was outside of the city when she was supposed to be working.

BY MR. BARROUKH:

Q.  Is this a common penalty, to suspend an officer who committed misconduct?

MR. ELKINS:  Objection to form.

THE WITNESS:  I think it's relative to -- are you talking about the overall suspension?  Once again, I think it refers back to the egregiousness of the allegation and egregiousness of the findings of the investigation.  You know, so as significant as this was, then, yes, at that point, the suspension, again, could be 160 hours.

BY MR. BARROUKH:

Q.  All right.  And I just want to confirm.  This is your signature, on the bottom right-hand corner of the page?

A.  My initials, yes.

Page 86

Q.  Initials, excuse me.  And again, on the second page, these are your initials?

A.  Yes.

Q.  Third page?

A.  Yes.

Q.  And this is your signature here; correct?

A.  Yes.

Q.  All right.

MR. ELKINS:  The City will stipulate he signed it.

MR. BARROUKH:  I'll stop the screen share.

BY MR. BARROUKH:

Q.  And my client agreed to enter into a Last Chance Agreement; is that correct?

A.  Yes.

Q.  And she agreed as part of the settlement of the EEOC charge of 2020 in June; is that correct?

A.  Yes.

Q.  At the time -- strike that.

At the time of the settlement, could you please go over all of the misconduct that my client had allegedly committed?

MR. ELKINS:  Objection to form.  You can answer.

THE WITNESS:  Again, without seeing the

Page 87

completed document in front of me, I can't give you specifically what the violations were of Department SOP work roles, but I knew that they did -- my guess is that they did center in and around conduct unbecoming, untruthfulness, failure to supervise, things of that nature, associated with the particular incident in question.

BY MR. BARROUKH:

Q.  And without any refreshing documents, to your knowledge, what was the cause of my client's misconduct?

MR. ELKINS:  Objection to form.
    You can answer.

BY MR. BARROUKH:

Q.  Excuse me.  What was the result of my client's misconduct?

MR. ELKINS:  Objection to the form.
    You can answer.

THE WITNESS:  The stipulation, the settlement agreement; everything that you've mentioned that we went through was what was agreed upon and what we, as a department, the City, rather, and the union on behalf of Ms. Salabarria came to a conclusion.

BY MR. BARROUKH:

Q.  I'm more talking about if there is actual harm that we can point to.  You know, for example, when we

Page 88

1  were discussing Officer Hazzi, Sergeant Berrian, these
2  other officers, an individual was beaten or there is
3  footage of officers beating individuals in uniform.  Is
4  there anything that you can point to as a result of this
5  conduct by my client?
6          MR. ELKINS:  Objection to form.
7      You can answer, Chief, if you can.
8          THE WITNESS:  I don't know that I can.  I can
9      just say that never was supervision more necessary
10     than what we had during Covid, because we were --
11     we did have, you know, in-field roll calls and
12     things like that; we tried to keep our members away
13     from each other, to avoid contamination issues and
14     potential serious illness issues.  So it was
15     something that, during that time and given what we
16     knew about this outbreak or what we didn't know
17     about the outbreak that really focused on the
18     concept of supervision and, more importantly, that
19     first line supervision.
20 BY MR. BARROUKH:
21     Q.  So what type of measures did you place to
22 prevent contamination, at this time -- at the
23 department, during this time?
24         MR. ELKINS:  Objection to form.
25     You can answer.

Page 89

1          THE WITNESS:  Detailed roll calls, where a
2      sergeant would meet with their squad at a
3      predetermined location, where they would go ahead
4      and they would account for all their personnel;
5      they would make sure that their personnel were
6      tested, so that anybody coming in with a fever or
7      cold-like symptoms was immediately sent over for
8      whatever types of testing were available during
9      that time, if any; but, more importantly, to
10     account for their people, because we weren't having
11     centralized roll call.
12 BY MR. BARROUKH:
13     Q.  Are you aware of any other officers that were
14 not at roll call when they were supposed to be?
15     A.  I don't know that.  It has not been brought to
16 my attention.
17     Q.  So to your knowledge, only my client not being
18 at roll call was brought to your attention; is that what
19 I'm understanding?
20         MR. ELKINS:  Objection to form.
21     You can answer.
22         THE WITNESS:  I think it was brought to my
23     attention when they attempted to locate
24     Ms. Salabarria and were determining that she was
25     not there, where she said she was.  And that's what

Page 90

1      started the actual investigation.
2  BY MR. BARROUKH:
3      Q.  Are you aware of any other officers or rank-
4  and-file members who were not on site or not in the area
5  they were supposed to be while they were on duty?
6          MR. ELKINS:  Objection to form.  You can --
7          THE WITNESS:  There is one other person that
8      came about as a result of this inquiry, and it
9      happened to be Officer Guasto was also involved in
10     the incident -- or involved in the investigation.
11 BY MR. BARROUKH:
12     Q.  And did Nicholas Guasto enter into a Last
13 Chance Agreement?
14     A.  I don't know.  I don't think so, no.
15     Q.  Why not?
16     A.  I believe at that point in time, I think it was
17 more of the issues with regards to the role that they
18 played within the department and the perspective on what
19 we deemed to be more appropriate, as far as a resolution
20 to the incident.
21     Q.  But you believe -- just so I'm understanding.
22 You believed that it was appropriate for my client to be
23 placed on a Last Chance Agreement as a result of her
24 actions; is that correct?
25         MR. ELKINS:  Objection to form; misstates the

Page 91

1      facts.  She wasn't placed on anything.  It was an
2      agreed-to -- it was an agreed-to, contractually
3      negotiated document between the City, her two
4      lawyers, and the union; she was not placed on
5      anything.
6          Chief, you can answer.
7          THE WITNESS:  That's accurate; she agreed to go
8      into that.  And more importantly, as a supervisor,
9      the expectations are higher, and we expected her to
10     perform better in that case.
11 BY MR. BARROUKH:
12     Q.  And, ultimately, was my client terminated for
13 allegations of not being where she was supposed to be?
14         MR. ELKINS:  Objection to form.
15     You can answer.
16         THE WITNESS:  She was not terminated.
17 BY MR. BARROUKH:
18     Q.  Did you ask my client to resign?
19     A.  I did not ask your client to resign, at that
20 time.
21     Q.  I'm just asking, generally.  Did you ask my
22 client to resign?
23     A.  We asked your client to enter into the Last
24 Chance Agreement with the understanding that any future
25 events in violation of the Last Chance Agreement could

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 26 of 283

Deposition of Richard M. Clements                          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 92

1  result in the implementation of a letter of resignation,
2  during the duration --
3      Q.  And did you implement my client's letter of
4  resignation?
5      A.  Yes, I did.
6      Q.  And why did you implement the letter of
7  resignation?
8      A.  There was an incident involving -- once again,
9  a supervisory issue that was involving Ms. Salabarria,
10 where once again she did not respond as she was directed
11 to and she did not -- she did not deliver the directions
12 or the assignments that she was given for that
13 particular evening.  When she was confronted about it,
14 once again it was determined that she wasn't truthful.
15 And at that point, as a supervisor, we deemed the
16 appropriate course of action was to implement the letter
17 of the resignation.
18     Q.  Do you believe that my client -- strike that.
19         Are you familiar with the January 19, 2021
20 meeting between yourself, my client, and members of the
21 executive board of FOP?
22     A.  I am.
23     Q.  And what -- could you please tell me what
24 happened at this meeting.
25     A.  At that meeting, Ms. Salabarria was afforded

Page 93

1  the opportunity to review the allegation of employee
2  misconduct and really provide me with something that
3  would explain why she did not follow through or follow
4  with instructions that she'd been given by the commander
5  that evening.
6      Q.  And backing up a little bit.  Could you please
7  tell me who was at that meeting?
8      A.  Again, I'm going to go just by recollection and
9  memory.  I think Deputy Chief Wayne Jones was there; I
10 believe there were four members of the executive board
11 of the FOP, to include the grievance chairperson;
12 Officer Salabarria was there; at that point, she was
13 Sergeant Salabarria.  And I'm just trying to remember
14 who else.  I think -- again -- oh, and Lieutenant
15 Cosner, who was the commander who had brought the
16 allegation.  And he was there just specifically to be
17 able -- if there were questions about the allegations of
18 employee misconduct, we could ask him for clarification.
19     Q.  Did my client have an attorney present at this
20 meeting?
21     A.  She did not.
22     Q.  Did my client ask for an attorney at this
23 meeting?
24     A.  She did not.
25     Q.  Would you -- would you state that an individual

Page 94

1  is lying, if they said you did not allow my client to
2  have an attorney at that meeting?
3      A.  If the allegation was that I said she could not
4  have an attorney at that meeting, that is not true; that
5  conversation was never had.  And, more importantly, the
6  FOP who represented her, if they felt that an attorney
7  needed to be there, could have gone ahead and made that
8  request as well.
9      Q.  Are you aware that two members of the FOP have
10 stated you denied her an attorney, prior to commencing
11 that meeting?
12     A.  I don't recall ever having a conversation with
13 the FOP and saying -- with any other member other than
14 the union president that the meeting was going to be
15 scheduled for the 19th and that they were welcome to be
16 there.  Now, this notice was done in advance.  The FOP
17 does represent their members, their bargaining unit
18 members.  And, again, there was never an ask at that
19 meeting for an attorney.
20     Q.  Prior to the meeting starting, did you hear
21 through the -- did you speak with any members of FOP?
22     A.  You mean, as far as that goes?  I'm sorry.
23     Q.  So you said the meeting on January 19, 2021,
24 involved several FOP members, my client, and Lt. Cosner.
25 Before the meeting started, did you speak with any of

Page 95

1  these individuals?
2      A.  I may have spoken to President Ozeata; but as
3  far as anyone else, no.
4      Q.  And President Ozeata, at the time, did not ask
5  if my client could have an attorney at the meeting?
6      A.  Not to me.
7      Q.  You -- okay.  And regarding the actual notice
8  of the meeting, you said there was advance notice; who
9  sent out -- or who scheduled the meeting?
10     A.  I believe my secretary did.  Again, she was
11 asked to set up the meeting for the 19th, to make sure
12 that the FOP was aware of it and that we wanted to meet
13 with Ms. Salabarria to discuss the allegations.
14     Q.  Who asked your secretary to set up that
15 meeting?
16     A.  That would be me.
17     Q.  And did you conduct any investigation prior to
18 scheduling that meeting about my client's conduct?
19     A.  We had Internal Affairs look into the initial
20 allegation; you know, again, to be able to see what had
21 been done at that time.  And the meeting was set up to
22 -- for her, meaning Jessica, to review the allegation of
23 employee misconduct and provide, at least me, with a
24 reason; you know, what was the reason why this occurred.
25 So again, that was the intent.

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 27 of 283

Deposition of Richard M. Clements                          Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 96

1      Again, I think it's important to note that I
2  didn't have to have that meeting; you know, there was a
3  Last Chance Agreement that I could have just implemented
4  and said, "Hey, we have enough here to be able to move
5  forward." I really wanted to afford her the opportunity
6  to at least address the allegations, to see if there was
7  some reason why this happened, and what it was.
8      Q. Did the Internal Affairs investigation close or
9  was it finalized, prior to the meeting?
10      MR. ELKINS: Objection to form.
11      THE WITNESS: No --
12      MR. ELKINS: Hold on. I have no idea what you
13     mean by Internal Affairs investigation.
14      You can answer, Chief, if you know.
15      THE WITNESS: No. Again, with that, we had
16     what was initially brought to our attention and
17     again offering Ms. Salabarria the opportunity to at
18     least address those concerns, to see if there was
19     something there that we didn't see.
20  BY MR. BARROUKH:
21      Q. Why would you not let Internal Affairs complete
22  their report before disciplining my client?
23      MR. ELKINS: Objection to form; misstates the
24     order of events and testimony.
25      You can answer, Chief.

Page 97

1      THE WITNESS: Again, at this point, I had
2     enough, I honestly believed, to go ahead and to
3     say, "We're just going to initiate and implement
4     your letter of resignation," you know, based on the
5     totality of the initial circumstances that we had.
6     But I really wanted to at least afford her the
7     opportunity to at least address those concerns, to
8     see if there was some way we could somehow or other
9     make sense of why she once again did not follow
10     through with her supervisory responsibilities.
11  BY MR. BARROUKH:
12      Q. And correct me if I'm wrong, but you stated
13  that at the meeting, my client's dishonesty or
14  untruthfulness resulted in her termination; is that
15  correct?
16      A. No. What was said at the meeting when she was
17  afforded the opportunity to explain her actions or her
18  inactions, she gave a reason as to why she didn't go to
19  zone and why she didn't follow through with the
20  directive and, once again, I wanted to look into; I
21  wanted to see, "Hey, is there truth to this."
22      And we found out that her explanation that she
23  was working on an employee valuation was, in fact, not
24  true. That did not come until later on in January and,
25  you know, that was not what I had hoped would come about

Page 98

1  as a result of that. So again, at that point, to me,
2  it's not the first time; it's actually the second time,
3  where as a supervisor, she just didn't do what she
4  needed to do.
5      Q. Have you ever terminated another employee at
6  the police department for dishonesty or untruthfulness?
7      A. No, not dishonesty or untruthfulness. It's
8  usually by action; it could be potentially as a result
9  of a criminal investigation or a pending criminal
10  investigation.
11      Q. Have you terminated an employee for failing to
12  go to a zone when they were supposed to?
13      MR. ELKINS: Objection to form; misstates his
14     testimony. You can answer.
15      THE WITNESS: No. No. But there is discipline
16     associated with failure to carry out your work, in
17     conjunction with that assignment.
18  BY MR. ELKINS:
19      Q. And has there been a further investigation
20  brought into that Internal Affairs allegation by Steven
21  Cosner against my client, following her termination?
22      A. I believe that we had enough at that point in
23  time to implement the letter of resignation, you know,
24  without going further into it. And again, like I said
25  earlier on, I conducted that meeting, even though I

Page 99

1  didn't have to. And what I heard did not satisfy, from
2  my perspective, a reason to keep Jessica still employed
3  with Miami Beach.
4      Q. And prior to the meeting, had you made a
5  decision whether to terminate my client or not?
6      A. No.
7      Q. So your entire decision was based on what her
8  testimony and what she told you at that meeting; is that
9  correct?
10      A. I'm sorry?
11      Q. Sorry, not entirely based. But do you believe
12  that my client could have prevented termination if she
13  gave a different response at that meeting?
14      MR. ELKINS: Objection to form.
15      You can answer.
16      THE WITNESS: I think that again, the answer
17     that we got and that I received there was not
18     truthful, you know; and what I was looking for was
19     something that, number one, was based on truth,
20     that could explain why it was that, from a
21     supervisory perspective, she didn't follow the
22     directive given to her by the shift commander. So
23     did I make a conclusion at that point? No. Did I
24     -- after I got that information, did I then go
25     ahead and implement the letter of resignation?

Page 100

1    Yes.
2  BY MR. BARROUKH:
3    Q.  And how many Last Chance Agreements have you
4  been a party to, as chief of police?
5    A.  I think there's been three.  I think a total of
6  three.
7    Q.  And could you tell me the names of these
8  individuals?
9    A.  Greg McVey, I believe, has a Last Chance
10 Agreement; Monique Winfall (ph), who is a civilian who
11 works in the police department; and Jessica Salabarria.
12   Q.  And I didn't catch the first name, but does
13 Officer McVey still work for the City of Miami Beach?
14   A.  Yes, he does.
15   Q.  In what capacity?
16   A.  He works in the training unit; he's an officer.
17   Q.  And in what capacity does Monique work?
18   A.  His name is Sadiq Maniquan (ph) -- I'm sorry,
19 it's very difficult thing for me to spell as well; I'll
20 apologize.  But he works is one of our homeless outreach
21 coordinators.  He is a civilian, but he does work with
22 our homeless outreach team and has done so for many
23 years.
24   Q.  And are there any other employees that you're
25 aware of who filed EEOC charges --

Page 101

1    MR. ELKINS:  Objection to form --
2  BY MR. BARROUKH:
3    Q.  -- sorry, during your time as chief?
4    MR. ELKINS:  Objection to form.
5    You can answer, if you remember.
6    THE WITNESS:  Others, yes, I do.
7  BY MR. BARROUKH:
8    Q.  And how many have there been, to your
9  knowledge?
10   A.  I think at least two, not including Jessica,
11 which would be three.
12   Q.  And could you give me the names of those two
13 individuals?
14   A.  One is Eric Schultz, the other one would be
15 Rosa Carvajal.
16   Q.  And what is Eric Schultz's position?
17   A.  He's an officer.
18   Q.  And is Officer Schultz still employed with the
19 City of Miami Beach?
20   A.  He is.
21   Q.  Do you know if an EEOC charge was settled?
22   A.  I do not know that.
23   Q.  And what is Ms. Carvajal's position?
24   A.  She is a lieutenant.
25   Q.  And do you know if her EEOC charge has been

Page 102

1  settled?
2    A.  I believe it was.  I'm not 100 percent sure.
3    Q.  When were these charges filed?  Each charge
4  independently.
5    A.  I believe that Lieutenant Carvajal filed in
6  2022; and I believe that Officer Schultz filed sometime
7  in '23.
8    Q.  And what did Lieutenant Carvajal file an EEOC
9  charge for, to the best of your knowledge?
10   MR. ELKINS:  Objection.
11   THE WITNESS:  I think it had to do with
12   disparate treatment by a female, not being treated
13   fairly.  That's Lieutenant Carvajal.
14 BY MR. BARROUKH:
15   Q.  And I know you said you weren't entirely
16 familiar with the settlement.  But do you remember any
17 of the terms of Ms. Carvajal's EEOC charge and the
18 settlement?
19   MR. ELKINS:  Objection to form.
20   You can answer.
21   THE WITNESS:  When we were working with the
22   City on the EEOC aspects of it, if I'm not
23   mistaken, I think the City was not able to
24   substantiate her complaint or her concerns
25   regarding disparity of treatment, that what she had

Page 103

1  provided them did not rise to that level and that a
2  lot of that might have been misperception.  But
3  once again, they did a complete investigation.  I
4  would probably be more inclined to have Human
5  Resources answer that than myself.
6  BY MR. BARROUKH:
7    Q.  That's fair.  And regarding Officer Schultz,
8  are you familiar -- or to your knowledge, what was his
9  EEOC charge regarding?
10   A.  I think it was reasonable accommodation, if I'm
11 not mistaken.  He has a significant issue involving an
12 injury that he sustained that we were concerned about
13 his ability to continue doing the job, based on that
14 injury.  So there were some steps that were taken on
15 behalf of the City, by H.R., to determine if he was fit
16 for duty, to continue performing the job in question.
17 But that was done, again, out of concern for his safety
18 and obviously for his well-being.
19   Q.  Outside of, I guess, several allegations or
20 instances where my client was not where she was supposed
21 to be, could you tell me about her performance as an
22 officer and sergeant?
23   A.  Well, again, as I stated earlier in my
24 deposition, my interactions were minimal, you know, and
25 really you don't hear about everyone.  The police

Page 104

1 department, right now, I think is about 437 sworn. You
2 know, so really you deal with the totality, not
3 necessarily with the line issue. Did her performance
4 come to my desk or to my direction or to my attention?
5 Not too often. You know, so again, for that point, no,
6 I really couldn't tell you how her performance was.
7      MR. BARROUKH: I think that's all the questions
8 I have for today. Michael, if you have anything?
9      MR. ELKINS: I do, yes. A lot. So first of
10 all, I'm going to kind of work backwards. How many
11 exhibits did you mark, Daniel?
12      MR. BARROUKH: I believe just the one.
13      MR. ELKINS: Okay.
14           CROSS-EXAMINATION
15 BY MR. ELKINS:
16      Q. I'm going to share my screen here, Chief. I'm
17 going to show you what I'm marking as Exhibit 2.
18 (Screen share began.) I will represent to you that this
19 is a copy of Rosa Carvajal's EEOC charge of
20 discrimination. Do you see that?
21      A. I do.
22      Q. And I believe she checked off "sex" and
23 "retaliation" as the basis of her charge?
24      A. Yes.
25      Q. You see that there? Okay. And are there

Page 105

1 allegations listed in this charge?
2      A. Yes.
3      Q. And I believe at the end, she says that she's
4 been discriminated against and harassed on the basis of
5 her sex and in retaliation from her long record of prior
6 advocacy on behalf of female officers in the Miami Beach
7 Police Department. Do you see that?
8      A. I see that.
9      Q. Okay. Now, you testified, I think, that you
10 believe but you maybe weren't sure if this charge was
11 settled; right?
12      A. Yes.
13      Q. Did you ever sign a settlement agreement for
14 Rosa Carvajal?
15      A. No.
16      Q. Did you ever see a settlement agreement for
17 Rosa Carvajal?
18      A. No.
19      Q. And because this was part of the police
20 department, would you have had to have signed a
21 settlement agreement?
22      A. Yes.
23      Q. Is it possible that the charge was not settled?
24      A. Yes.
25      Q. Okay. Now I'm going to show you what I'm

Page 106

1 marking as Exhibit 3, which I'll represent to you is
2 Rosa Carvajal's Determination and Notice of Rights,
3 issued by the EEOC. Do you see this document?
4      A. I do.
5      Q. And this was a determination -- I'll just read
6 it. It says "The EEOC issues the following
7 determination. The EEOC will not proceed further with
8 its investigation and makes no determination about
9 whether further investigation would establish violations
10 of the statute."
11           And this was issued on February 16 of 2024. Do
12 you see that?
13      A. Yes.
14      Q. Were you the chief then?
15      A. No.
16      Q. Who was the chief?
17      A. Wayne Jones.
18      Q. Is Rosa Carvajal still employed with the City?
19      A. Yes.
20      Q. And what is her rank?
21      A. Lieutenant.
22      Q. And was her rank always lieutenant, even when
23 she filed her EEOC charge?
24      A. Yes.
25      Q. Did you take any action against Rosa Carvajal

Page 107

1 for filing her EEOC charge?
2      A. No.
3      Q. Have you previously described Rosa Carvajal as
4 one of your rising stars?
5      A. Yes.
6      Q. Did you still consider her a rising star, even
7 after she filed her EEOC charge?
8      A. Absolutely.
9      Q. Sitting here today, are you aware if Rosa
10 Carvajal ever sued the City?
11      A. No.
12      Q. Do you know if she sued the City while you were
13 chief?
14      A. No.
15      Q. Well, did she not sue the City, or do you know?
16      A. I do not know. And I've not been advised that
17 she sued the City, in any way.
18      Q. And you referred earlier to a report, so I'm
19 going to mark this as Exhibit 4.
20           Do you recall Rosa Carvajal making an internal
21 complaint of employment discrimination to the City?
22      A. Yes.
23      Q. And did the City investigate Rosa Carvajal's
24 complaints of discrimination?
25      A. Yes.

Page 108

1  Q. And did the City issue a final report?

2  A. Yes, they did.

3  Q. Is this report a report that Human Resources

4  issued in response to Rosa Carvajal's complaints of

5  discrimination?

6  A. It is issued, yes.

7  Q. And what were the City's conclusions, if you

8  recall based upon -- actually, withdrawn.

9     Now, the report that I've marked, I believe --

10 one second. What I'm marking as Exhibit 4 does not

11 contain the exhibits; I believe there are a bunch of

12 exhibits to this. So I will come back with the report

13 that has all the exhibits for the court reporter.

14    So just so I'm clear. Under your watch as

15 chief of police, Rosa Carvajal made an internal

16 complaint of discrimination based on sex; correct?

17 A. Yes.

18 Q. And then the City internally investigated that

19 complaint; correct?

20 A. Yes, they did.

21 Q. And issued this report which is Exhibit 4;

22 correct?

23 A. Yes.

24 Q. And then Rosa Carvajal went ahead and filed an

25 EEOC charge of discrimination; correct?

Page 109

1  A. Yes.

2  Q. Also alleging sex discrimination; is that true?

3  A. Yes.

4  Q. And this was all under your watch, when you

5  were chief; correct?

6  A. Yes.

7  Q. And Rosa Carvajal was never demoted; correct?

8  A. She was never demoted.

9  Q. And she's retained her rank as lieutenant;

10 correct?

11 A. Yes.

12 Q. And she continues to be employed by the City

13 today?

14 A. Yes.

15 Q. Okay. (Screen share ended.)

16    I'm going to go back to the beginning of your

17 testimony, Chief. You had testified earlier about ways

18 individuals can make complaints to --

19    MR. ELKINS: Dan, how do I pronounce your last

20    name again? I know I keep asking, but I don't want

21    to insult you and pronounce it wrong.

22    MR. BARROUKH: Barroukh.

23    MR. ELKINS: Barroukh. And if I mispronounce

24    that, please correct me. It is not intentional.

25    MR. BARROUKH: I will. No worries.

Page 110

1  BY MR. ELKINS:

2  Q. Mr. Barroukh asked you a series of questions

3  about individuals and how they can complain to H.R., for

4  things like discrimination and harassment; do you

5  remember that?

6     MR. BARROUKH: Objection.

7     THE WITNESS: Yes.

8     MR. ELKINS: I'm sorry?

9     MR. BARROUKH: I said, objection.

10 BY MR. ELKINS:

11 Q. And you listed a number of things people could

12 do, and you talked about referring complaints. Do you

13 remember that?

14 A. Yes.

15 Q. And I think you testified about referring

16 complaints to the EEOC; do you remember that?

17 A. Yes.

18 Q. Did you mean, referring complaints to Human

19 Resources?

20 A. Yes.

21 Q. Stating the EEOC, was that a misstatement?

22 A. It was. Because, again, it would be handled by

23 Human Resources. Yes.

24 Q. Right. But to your knowledge, has the City

25 ever told an employee, "Go file an EEOC charge"?

Page 111

1  A. No.

2  Q. Sometimes though, correct me if I'm wrong, the

3  Police Department will receive a complaint and then that

4  individual, or the complaint, will be referred to H.R.?

5  A. That's a mandate.

6  Q. Okay. Not the EEOC?

7  A. No.

8  Q. So when you said, the City refers people to

9  EEOC, you were incorrect; is that true?

10 A. Yes. Or it was an inaccurate statement. I

11 muddled it together.

12 Q. Either one?

13 A. Yes.

14 Q. The City does not refer people to the EEOC?

15 A. No.

16 Q. All right. You talked extensively about

17 discipline and complaints and grievances with

18 Mr. Barroukh. Do you remember that?

19 A. Yes.

20 Q. I want to clarify a few things with you. Do

21 all issues of misconduct have to go through Internal

22 Affairs?

23 A. No.

24 Q. In fact, many issues of misconduct never see

25 the light of day in Internal Affairs; correct?

Page 112

1   A. True.
2   Q. Okay. However, are issues of misconduct and
3   discipline related to them always -- do they always
4   involve the union?
5   A. Oh, yes.
6   Q. So if an employee does receive a written
7   reprimand or a warning or a suspension or a demotion or
8   a -- anything like that, the union is involved in any of
9   those; correct?
10  A. Yes.
11  Q. But not necessarily Internal Affairs; correct?
12  A. True.
13  Q. Okay. And oftentimes, other officers will make
14  complaints; by way of example, a supervisor might make a
15  complaint that an employee didn't do something
16  correctly; right?
17  A. Yes.
18  Q. That complaint will not necessarily go to
19  Internal Affairs; right?
20  A. If it rises to a level that is considered to be
21  minimal, no, it won't go to Internal Affairs.
22  Q. Many times those issues are resolved between
23  the department, the department head, and perhaps maybe
24  you or one of your subordinates, and the union --
25  A. Yes.

Page 113

1   Q. And the employee?
2   A. Yes.
3   Q. Okay. Now, you talked about grievances. But
4   isn't it true that in the context of police departments
5   and labor law, grievance is a term of art; correct?
6   A. Yes.
7   Q. And grievances are usually filed by the union
8   on behalf of employees as a result of some discipline or
9   something the union doesn't agree with; is that correct?
10  MR. BARROUKH: Objection.
11  THE WITNESS: Yes.
12  BY MR. ELKINS:
13  Q. Employees don't just file grievances with rank
14  and file or with commanders; right?
15  A. I'm sorry, say the question again.
16  Q. Employees don't file, in the term of art,
17  grievances with their command staff or their
18  supervisors; grievances are things the union files;
19  correct?
20  MR. BARROUKH: Objection.
21  THE WITNESS: Yes.
22  BY MR. ELKINS:
23  Q. So if the union does not agree, by way of
24  example, with a particular piece of discipline that the
25  City issued -- even when the union is involved -- the

Page 114

1   union can, under the collective bargaining agreement,
2   grieve the discipline; correct?
3   A. Yes.
4   Q. And they do that by filing a grievance; right?
5   A. Yes.
6   Q. Bear with me, I need to pull up an exhibit. So
7   just hang tight everybody. All right. I'm going to
8   show you a copy of what I'm going to mark as Exhibit 5.
9   MR. ELKINS: And again, Ms. Evans, I will get
10  everything to you by Dropbox this evening after the
11  deposition.
12  THE COURT REPORTER: Okay.
13  MR. ELKINS: One second. Sorry. (Screen share
14  began.)
15  BY MR. ELKINS:
16  Q. I'm showing you a document, Chief, which has
17  been marked as Exhibit 5. Do you see this document?
18  A. I do.
19  Q. This is the collective bargaining agreement
20  between the City and the Fraternal Order of Police,
21  covering the period October 1, 2018 through September
22  30, 2021. Do you recognize this?
23  A. I do.
24  Q. You've seen this document many times before;
25  right?

Page 115

1   A. Yes, I have.
2   Q. You've dealt with it in your role, a number of
3   times; correct?
4   A. Yes.
5   Q. All right. Article 3 is entitled the Grievance
6   Procedure. Do you see that?
7   A. Yes.
8   Q. So this is a defined procedure for when the
9   union is going to bring or move a grievance forward;
10  right?
11  A. Yes.
12  Q. This has nothing to do, correct me if I'm
13  wrong, Chief, with an employee that might make a
14  complaint against another employee; right?
15  MR. BARROUKH: Objection.
16  THE WITNESS: That's true. Yes.
17  BY MR. ELKINS:
18  Q. And this also has nothing to do with what
19  happens prediscipline; correct?
20  A. True.
21  Q. Grievances are initiated, generally, by the
22  union, post-discipline, if the union and the employee
23  don't agree with the discipline; correct?
24  A. Agreed.
25  Q. And oftentimes, disciplinary issues are

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 32 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 116

1  resolved -- correct me if I'm wrong -- through
2  negotiation between the City, the union, and the
3  employee, and they never make it to the grievance
4  procedure; right?
5      A. True.
6      Q. Okay. So let's go through the procedure,
7  because I know you testified about that a little bit,
8  and I want to clarify how it works under this collective
9  bargaining agreement and then talk about earlier
10 collective bargaining agreements.
11     So post-discipline -- and we'll get into the
12 pre-discipline in a minute. But post-discipline, right,
13 it says here that, "The FOP shall have the right to
14 initiate and process grievances on its own behalf or on
15 behalf of the named members of the bargaining unit."
16 Right? Do you see that?
17     A. Yes, I do.
18     Q. So under this agreement, it's the FOP that
19 initiates grievances; right?
20     A. Yes.
21     Q. And they could do that on behalf of the entire
22 FOP, which would like be a class action grievance;
23 right?
24     A. Yes.
25     Q. Or they can do it on behalf of an individual;

Page 117

1  right?
2      A. Yes.
3      Q. Okay. But an individual cannot do it on their
4  own, pursuant to this paragraph; is that correct?
5      A. That's accurate.
6      Q. I believe you just testified earlier that they
7  could?
8      A. Again, I misspoke on that.
9      Q. And when you spoke on that, you didn't have the
10 collective bargaining agreement in front of you, did
11 you?
12     A. I did not.
13     Q. Okay. Then it says, "However, the FOP shall
14 have the right in its full discretion to process
15 grievances on behalf of bargaining unit members who are
16 not members of the FOP, provided it notifies said
17 employee of its decision not to proceed."
18     And that's for situations where someone could
19 be in the bargaining unit, but not a member of the FOP;
20 right?
21     A. Yes.
22     Q. They don't pay union dues, because they don't
23 want to be a member?
24     A. Yes.
25     Q. Okay.

Page 118

1      MR. BARROUKH: Michael, you cut out for a
2  minute. You may be speaking a little quick for the
3  microphone. I just want to make sure it's all on
4  the record.
5      MR. ELKINS: I appreciate you telling me that.
6  BY MR. ELKINS:
7      Q. So grievances start, in Section 3.2, with Step
8  1; right, Chief?
9      A. Yes.
10     Q. And you participated, in your term as chief of
11 police, in innumerable numbers of Step 1's; correct?
12     A. Yes.
13     Q. And this says that "The grievance shall be
14 presented in writing on the grievance form supplied by
15 the City to the employee's unit or division commander or
16 a designated representative, who shall answer within 5
17 workdays after such receipt." Do you see that?
18     A. Yes.
19     Q. And then it says, "The employee will also
20 provide the FOP with a copy of said grievance." Right?
21     A. Yes.
22     Q. And then Step 2 has some requirements of the
23 FOP, and it says if it's not settled at Step 1 and an
24 appeal is desired, it's referred in writing to the
25 police chief or his designee. Do you see that?

Page 119

1      A. Yes, I do.
2      Q. So you also participated in a number of Step
3  2's, under this process; correct?
4      A. Yes. I did.
5      Q. And I want to be very clear. The Step 2's are
6  happening when we're talking about discipline, post
7  discipline being instituted; correct?
8      A. Yes.
9      Q. That means that the City has already
10 disciplined the employee and now the union is grieving
11 the discipline; right?
12     A. Yes.
13     Q. Now, you also process grievances for other
14 things, though; right?
15     A. Yes.
16     Q. Like for example, the union might say that you
17 have altered the schedule incorrectly under the
18 collective bargaining agreement; I believe that's one we
19 dealt with many times?
20     A. Absolutely.
21     Q. And they would file a grievance on that issue
22 correct?
23     A. Yes.
24     Q. Or they would argue that you're not processing
25 overtime correctly, and they'd file a grievance; right?

Page 120

1  A.  Yes.

2  Q.  But we're not talking about those here.  These

3  questions are limited to the union grieving discipline.

4  Okay?

5  A.  Yes.

6  Q.  All right.  And so it says here, "The police

7  chief shall discuss the grievance within 10 workdays

8  with the employee and the FOP grievance committee, at a

9  time designated by the police chief.  If no settlement

10  is reached, the police chief shall give the City's

11  written answer to the employee and the FOP grievance

12  committee within 5 workdays following their meeting."

13  Do you see that?

14  A.  Yes.

15  Q.  And you've done that many times before;

16  correct?

17  A.  Yes.

18  Q.  And these are what we would call due process

19  rules, that are in place to protect officers so they

20  have the contractual rights negotiated by the union;

21  right?

22  A.  Yes.

23  Q.  And that's negotiated between the union and the

24  City, in the collective bargaining process; right?

25  A.  Yes.

Page 121

1  Q.  Then Step 3.  "If the grievance is not settled

2  in Step 2 and both the employee and FOP grievance

3  committee desire to appeal, or if it is a class

4  grievance filed by the FOP and at least one employee of

5  the named class and FOP grievance committee desire to

6  appeal, it shall be appealed in writing to the city

7  manager or his designee for Labor Relations within 15

8  workdays after the City's answer in Step 2."

9  And then it goes on to say, "Within 15 workdays

10  after the grievance is submitted to H.R., the parties

11  shall confer to pick a neutral third party as a

12  mediator."  Do you see that?

13  A.  I do.

14  Q.  And you testified about mediation earlier.  Do

15  you remember that?

16  A.  I did.  I left out that part about going to --

17  Q.  That's not my question.  Just answer my

18  questions.  Okay?

19  A.  Okay.

20  Q.  Okay.  This Step 3 that was in place for this

21  collective bargaining agreement which dates, just so

22  we're clear, October 1, 2018 through September 30, 2021,

23  which is basically mediation.  Step 3 is mediation?

24  A.  Yes.

25  Q.  Has Step 3 always been mediation, if you

Page 122

1  remember?

2  A.  (No response.)

3  Q.  Well, let me ask it this way.  I'll withdraw

4  that question.

5  A.  I'm sorry.

6  Q.  I'll withdraw the question.

7  Under prior collective bargaining agreements,

8  was there something called a Step 3 hearing?

9  A.  Yes.

10  Q.  What do you remember the Step 3 hearing to be?

11  A.  Where both parties agree to waive, I believe,

12  Step 3 and go to arbitration; at least that's my...

13  Q.  Okay.  I'll state for you, that's incorrect.

14  Do you remember, under prior collective

15  bargaining agreements, that the parties would go to a

16  neutral third party and present their cases and that

17  neutral third party would render a decision?  Do you

18  remember that?

19  A.  Yes, I do.

20  Q.  And that was known as a Step 3 Hearing; do you

21  remember that?

22  A.  Yes.

23  Q.  Okay.  And then, was that process changed and

24  collectively bargained in this collective bargaining

25  agreement, starting in 2018?

Page 123

1  A.  It does.  It looks like it's the same process;

2  but, again, I'm not 100 percent sure, from going back on

3  the previous contract.  I don't remember.

4  Q.  Okay.

5  A.  I'm just going by what I'm seeing here.

6  Q.  Okay.  I understand that.  So listen to my

7  question.

8  A.  Okay.

9  Q.  Prior to this collective bargaining agreement.

10  A.  Right.

11  Q.  Before it.  Was there a -- was Step 3 basically

12  an adversarial proceeding, where each side would present

13  its argument and a neutral third party would render a

14  written decision?

15  A.  Yes.

16  Q.  Okay.  That's not the same as mediation, is it?

17  A.  No.

18  Q.  Is there anything in this Step 3 process, that

19  you see right now, that talks about an adversarial

20  proceeding, where both sides give their case and a third

21  party renders a decision?

22  A.  Not adversarial, no.

23  Q.  Okay.  It's mediation; right?

24  A.  Yes.

25  Q.  Which is different; correct?

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 34 of 283

Deposition of Richard M. Clements                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 124

1  A. Absolutely.
2  Q. Was that changed, for this collective
3 bargaining agreement, from the prior one?
4  A. Yes.
5  Q. So all those disciplines that Mr. Barroukh
6 talked to you about earlier -- Hazzi and a whole bunch
7 of other people -- they were under a collective
8 bargaining agreement where there was no mediation; isn't
9 that true?
10  MR. BARROUKH: Objection.
11  THE WITNESS: It's accurate.
12 BY MR. ELKINS:
13  Q. All right. And then we have Section 3.3,
14 Binding Arbitration; correct, Chief?
15  A. Yes.
16  Q. And again, to be clear, we are post discipline
17 here; right?
18  A. Yes.
19  Q. And this says, "If the grievance is not
20 resolved in Step 3 of the grievance procedure, the FOP
21 grievance committee may refer the grievance to binding
22 arbitration within 15 workdays after the declaration of
23 impasse from Step 3." Do you see that?
24  A. I see that.
25  Q. So under that sentence, who can bring an

Page 125

1 arbitration?
2  A. At this point, the FOP grievance committee.
3  Q. Right. Arbitration is not something that, I
4 think you testified, is mutually agreed to; right?
5 That's actually not true, is it?
6  A. No, it's not.
7  Q. The FOP has a right to bring an unresolved
8 grievance to arbitration, in some circumstances; right?
9  A. Yes.
10  Q. Okay. And then the parties select an
11 arbitrator, through mutual agreement; right?
12  A. Yes.
13  Q. So when you testified earlier that arbitration
14 was mutually agreed to, that was incorrect; right?
15  A. It was incorrect. And, again, I didn't have
16 the document.
17  Q. You didn't have the collective bargaining
18 agreement in front of you?
19  A. No, I did not.
20  Q. And let's talk about what is arbitration. And
21 correct me if I'm wrong, but arbitration is like a mini
22 trial; right?
23  A. It is.
24  Q. If the FOP is grieving a discipline, what's
25 happening is the FOP is saying, "This discipline is

Page 126

1 inappropriate, Mr. Or Mrs. Arbitrator; we want you to
2 overturn it"; correct?
3  A. Yes.
4  Q. And the City is arguing, "Mr. or
5 Ms. Arbitrator, sustain the discipline; what we did was
6 appropriate, and we had every right to do it"; correct?
7  A. Yes.
8  Q. So oftentimes -- correct me if I'm wrong, Chief
9 -- arbitrators will rule against the City and force
10 employees back to work; right?
11  A. Yes.
12  Q. Is that what happened to Hazzi?
13  A. Did they force him back to work?
14  Q. Did the arbitrator rule against the City?
15  A. It did.
16  Q. Okay. So Hazzi was initially fired, wasn't he?
17  A. Yes.
18  Q. And then the union, through the grievance
19 procedure, fought for him to get his job back; right?
20  A. Yes.
21  Q. And the arbitrator rules against the City and
22 forced the City to put him back to work; correct?
23  A. Yes.
24  Q. And I believe I was the lawyer on this case;
25 right?

Page 127

1  A. I believe so.
2  Q. And you were not the chief of police during
3 Hazzi; correct?
4  A. I was not.
5  Q. And you were not the decision-maker during
6 Hazzi, were you?
7  A. I was not.
8  Q. Which is worse, being fired and having to fight
9 for your job at arbitration, or getting a Last Chance
10 Agreement?
11  MR. BARROUKH: Objection.
12  THE WITNESS: Getting fired.
13 MR. ELKINS:
14  Q. Right. So a lot of times, the City would fire
15 people and not even offer them a Last Chance Agreement;
16 right?
17  A. That's accurate.
18  Q. In fact, many of the individuals that
19 Mr. Barroukh talked to you about were individuals that
20 were never offered Last Chance Agreements?
21  A. That's accurate.
22  Q. They were fired, and then they had to get their
23 job back some other way; correct?
24  A. Absolutely.
25  Q. (Screen share ended.) And there's some

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 35 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 128

1  limitations in the collective bargaining agreement, as
2  to what's grievable; correct?
3     A. Yes.
4     Q. There are certain types of minor discipline
5  generally are not grievable; is that right?
6     A. It would be below a certain threshold.
7     Q. It might be a like verbal reprimand or
8  something. That's not grievable; right?
9     A. Verbal counseling with a warning would not be
10 grievable.
11    Q. Okay. Now, you testified earlier about the
12 180-day rule. But the 180-day rule does not apply to
13 all types of potential disciplinary issues, does it?
14    A. No.
15    Q. It only applies in the context of Internal
16 Affairs investigations; right?
17    A. Yes.
18    Q. And that's generally because, if it's not with
19 Internal Affairs, it's probably not, with some
20 exceptions, rising to the level where there needs to be
21 this long investigation; right?
22    A. That's accurate.
23    Q. Many times, these disciplinary issues are
24 resolved in combination with Human Resources and the
25 union and your department or the other department head?

Page 129

1     A. Yes.
2     Q. Okay. You talked about a "pre-d".
3     A. Predetermination.
4     Q. You testified about predetermination. So let's
5  talk about that. When you're referring to pre-d, are
6  you referring to what's called a "predetermination
7  hearing"?
8     A. Yes.
9     Q. Okay. And correct me if I'm wrong, but a
10 predetermination hearing is when the City wants to
11 institute discipline -- you know, generally like a
12 written warning -- it is required to provide the officer
13 something called a "predetermination hearing"; isn't
14 that correct?
15    A. That's accurate.
16    Q. And a predetermination hearing is when
17 everybody comes together and the union, in conjunction
18 with the officer who might be disciplined, provides what
19 we would call mitigating evidence for the City to
20 consider, before it disciplines somebody?
21    A. Yes.
22    Q. So when you testified earlier that a
23 predetermination hearing is requested, that's actually
24 not true, is it?
25    A. No, it's not.

Page 130

1     Q. Predetermination hearings are required before
2  being disciplined --
3     A. And I thought I said that before. My apologies
4  if I did not.
5     Q. That's why we're here, to redirect, Chief.
6        And a predetermination hearing is a formal
7  process; right?
8     A. Yes.
9     Q. And again, we're talking about officers who
10 have their rights under the collective bargaining
11 agreement; right?
12    A. Yes.
13    Q. Now, officers on Last Chance Agreements,
14 however, do they waive the grievance procedure and the
15 rights that we just discussed?
16    A. Yes.
17    Q. Okay. So as to Jessica, was she required to
18 have a predetermination hearing?
19    A. No.
20    Q. Was she able to take advantage of the grievance
21 process?
22    A. No.
23    Q. She waived those rights; correct?
24    A. She did.
25    Q. Okay. Now, does the City place officers on --

Page 131

1  or individuals; forget officers, just employees in
2  general. Can the City just place someone on a Last
3  Chance Agreement?
4     A. No.
5     Q. Why not?
6     A. It has to be agreed upon.
7     Q. By the union and the individual employee?
8     A. Yes.
9     Q. And are Last Chance Agreements the product of
10 mutual negotiations between the employee, their union
11 representative, and the City?
12    A. Yes.
13    Q. And they're agreed to; right?
14    A. Yes.
15    Q. The City does not force Last Chance Agreements
16 on anyone, does it?
17    A. No.
18    Q. And in Jessica's case, was her agreement
19 negotiated with her union?
20       MR. BARROUKH: Objection.
21       THE WITNESS: Yes.
22 BY MR. ELKINS:
23    Q. And was it negotiated with her two lawyers?
24    A. Yes.
25    Q. Okay. Now, as we talked about -- you testified

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 132

1 about Internal Affairs investigations. I think you were
2 asked, what does the City do to protect confidentiality.
3 And I think it was a little murky as to with complaints
4 and I.A. investigations, so I want to clear some of that
5 up.
6     A. Okay.
7     Q. Are pending -- if an Internal Affairs
8 investigation is pending, so it's still happening, is
9 that investigation confidential, at that point?
10    A. Yes.
11    Q. There can be no disclosure of an impending I.A.
12 investigation; correct?
13    A. Absolutely,
14    Q. If someone were going to do a public records
15 request for information on a pending I.A. investigation,
16 they would not get that information, would they?
17    A. Would not, no.
18    Q. Once the investigation is complete, however, is
19 the Internal Affairs result and the investigative file
20 generally public?
21    A. Yes.
22    Q. You were asked about meetings being recorded.
23 At an Internal Affairs investigation -- so putting
24 Internal Affairs Investigations aside, does the City
25 record meetings?

Page 133

1     A. No.
2     Q. Have you ever been involved in a meeting where
3 it was recorded, that wasn't an Internal Affairs formal
4 investigation?
5     A. No.
6     Q. The City doesn't do that, does it?
7     A. No.
8     Q. And there's no policy requirement to do it, is
9 there?
10    A. No.
11    Q. Okay. I think you talked about the Freedom of
12 Information Act, earlier?
13    A. Yes.
14    Q. Correct me if I'm wrong, the law that allows
15 for the disclosure of records from the City is the
16 Florida Sunshine Law, not the Freedom of Information
17 Act; correct?
18    A. Yes.
19    Q. The Freedom of Information Act is a federal
20 law?
21    A. Yes.
22    Q. This is the state law; right?
23    A. Yes.
24    Q. And the Sunshine Law requires the City to keep
25 records of everything; right?

Page 134

1     A. It does.
2     Q. The City doesn't destroy anything?
3     A. No.
4     Q. And as to the Allegation of Employee Misconduct
5 form, there's nothing that requires it to be signed;
6 correct?
7     A. No.
8     Q. And the lack of signature doesn't impact the
9 validity of the allegations contained therein; is that
10 right?
11    A. No. It's still within the context of the
12 complaint or the allegation.
13    Q. Okay. As to Officer Hazzi, how many -- who was
14 the chief of police during Officer Hazzi's discipline or
15 termination, if you even remember?
16    A. If it was mid 2000s, around there --
17    Q. Probably -- let's assume, for purposes of your
18 testimony, it was around 2009.
19    A. That would be Don DeLucca.
20    Q. Okay. And then, what about if he had his
21 arbitration in 2012, who would have been the chief of
22 police then?
23    A. That would have been Carlos Noriega.
24    Q. And then who was the chief after Noriega?
25    A. Ray Martinez.

Page 135

1     Q. And who was the chief after Ray Martinez?
2     A. Dan Oates.
3     Q. And then it was you; right?
4     A. Yes.
5     Q. So you are four chiefs-of-police, your tenure,
6 removed from Hazzi; correct?
7     A. Yes.
8     Q. And you were not a decision-maker in Hazzi?
9     A. No.
10    Q. Is there anybody, even in your time -- or
11 anybody who involved with Jessica that was also a
12 decision-maker in Hazzi?
13    A. No.
14    Q. Okay. How about for Berrian; were you the
15 chief during Berrian?
16    A. No.
17    Q. And that involved -- that was something -- that
18 involved something known -- colloquially, right -- as
19 the "ATV incident"; right?
20    A. Yes.
21    Q. And that was over Memorial Day weekend; right?
22    A. It was Fourth of July.
23    Q. Oh, it was Fourth of July weekend; I apologize.
24 And that was a pretty public and well-known incident;
25 right?

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 37 of 283

Deposition of Richard M. Clements                        Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 136

1  A. Yes.
2  Q. There were a lot of arbitrations relating to
3  that incident, weren't there?
4  A. Yes.
5  Q. A lot of officers were fired as a result of
6  their conduct during what I'm going to colloquially
7  refer to as the Memorial Day incident; right?
8  A. The Fourth of July incident.
9  Q. Fourth of July incident, I'm sorry. Fourth of
10  July ATV incident?
11  A. Yes.
12  Q. A lot of officers were fired; right?
13  A. There was two.
14  Q. They were fired; correct?
15  A. Yes.
16  Q. They weren't offered Last Chance Agreements?
17  A. They were not.
18  Q. And were they put back to work by an
19  arbitrator?
20  A. No.
21  Q. Well, were any of them put back to work? If
22  you remember; it's okay if you don't. I'll withdrew the
23  question.
24      The point is, some officers were just fired;
25  right?

Page 137

1  A. Yes.
2  Q. And they weren't offered Last Chance
3  Agreements?
4  A. No.
5  Q. And, certainly, the union can bring up a Last
6  Chance Agreement, can't it?
7  A. Yes.
8  Q. And it frequently does ask for that, doesn't
9  it?
10  A. Yes.
11  Q. And sometimes the City declines them; right?
12  A. Yes.
13  Q. So Last Chance Agreements are not exclusively
14  offered by the City; right?
15  A. No.
16  Q. They are the product of negotiation; right?
17  A. Yes.
18  Q. Who was the chief of police during Phillip
19  Archer's discipline in 2013 that you were referred to
20  earlier?
21  A. Chief Oates.
22  Q. Were you the decision-maker with respect to
23  Archer?
24  A. No.
25  Q. Okay. Now, Steven Serrano was brought up. And

Page 138

1  correct me if I'm wrong, but Serrano was part of a group
2  of officers, colloquially, that were part of an incident
3  -- well, withdrawn.
4      Serrano was part of a group of officers
5  involved in an incident that I will colloquially refer
6  to as the Royal Palm incident; right?
7  A. True.
8  Q. Are you familiar with that incident?
9  A. I am.
10  Q. That's the incident at the hotel; correct?
11  A. Yes.
12  Q. Where individuals recording officers
13  potentially engaging in conduct that wasn't appropriate;
14  right?
15  A. That's accurate.
16  Q. Okay. Now, with respect to all of those
17  officers, did the City immediately suspend them?
18  A. Yes.
19  Q. Were some of the officers involved suspended
20  without pay?
21  A. Yes.
22  Q. And then they were all relieved of duty;
23  correct?
24  A. Yes.
25  Q. And then their investigations on the civil

Page 139

1  side, with Internal Affairs, were pulled because the
2  state attorney's office brought criminal charges against
3  all of them; right?
4  A. Yes.
5  Q. Did some of those officers get acquitted of
6  their criminal charges?
7  A. Some of them, the charges were dropped.
8  Q. Right.
9  A. Not acquitted, but dropped.
10  Q. Okay. So the charges were dropped; right?
11  A. Yes.
12  Q. And this was all very public; correct?
13  A. Yes.
14  Q. Okay. But the officer or officers, whichever,
15  that were ultimately convicted, were they brought back
16  to work?
17  A. They were not.
18  Q. They were not offered Last Chance Agreements,
19  were they?
20  A. They were not.
21  Q. They were just fired; right?
22  A. Yes.
23  Q. Okay. All right. You were questioned -- hold
24  on about Jessica -- hold on. Let's take about Muley for
25  a minute. Actually, I need a moment, I'm going share

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 38 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 140

1  what I'm going to mark as Exhibit 6.  Sorry, I'm doing
2  this on the fly, because I didn't expect to have to
3  introduce exhibits.  So I apologize.  All right.
4       I'm showing you a document which I have marked
5  as Exhibit 6.  Okay.  I'll represent to you that this is
6  the opinion and award in the arbitration between the FOB
7  and Michael Muley v. The City of Miami Beach.
8       Do you see that, Chief?
9    A.  I do.
10   Q.  Were you the chief of police during Muley's
11  discipline and during his arbitration?
12   A.  No.
13   Q.  Who was the chief of police?
14   A.  Dan Oates.
15   Q.  Okay.  So the allegations that started against
16  Muley were basically that he got drunk while on an off-
17  duty assignment; right?
18   A.  Yes.
19   Q.  While he was in uniform; correct?
20   A.  Yes.
21   Q.  And he was seen on CCTV cameras, stumbling
22  around the city, drunk; right?
23   A.  Yes.
24   Q.  And what did the City do to him?
25   A.  They immediately relieved him of duty.

Page 141

1    Q.  And what was the ultimate discipline issued?
2    A.  I don't know.
3    Q.  Did they offer him a Last Chance Agreement?
4    A.  They did not.
5    Q.  Okay.  And did he ultimately end up back at
6  work?
7    A.  Yes.
8    Q.  Did the City voluntarily put him back to work?
9    A.  No.
10   Q.  Why did he end up him back at work?
11   A.  Through arbitration.
12   Q.  And this is the arbitrator award, where the
13  arbitrator tells the City, you're putting him back to
14  work; right?
15   A.  Yes.
16   Q.  So let's scroll to the end here, through the
17  24-page decision.  Okay.  The arbitrator said, this is
18  the arbitrator's ruling, "The City has established just
19  cause for discipline against Michael Muley; however, the
20  City was required to follow its own requirements before
21  terminating Muley's employment.
22       "In balancing the obligations of the City of
23  Miami Beach to its citizenry and its collective
24  bargaining agreement with the FOP, I make the following
25  award:  1. Muley shall be permitted to undergo

Page 142

1  evaluation regarding his alcohol issues and possible
2  rehabilitation, in accordance with the agreements
3  referenced in my award; 2. Should Muley be deemed able
4  to undergo rehabilitation, he may elect to be placed in
5  a residential treatment program for a period of several
6  months consistent with Chief Oates' informal policy; 3.
7  If Muley successfully completes that rehabilitation, he
8  will be subject to a fitness-for-duty evaluation prior
9  to any reinstatement; 4. In the event Muley is deemed
10  fit for duty, he shall be reinstated at the time with no
11  loss of rank or seniority, and, 5. If Muley is not found
12  fit for duty at that time, he will not be reinstated to
13  the Miami Beach Police Department."
14       Do you see that?
15   A.  I do.
16   Q.  So this effectively gave Muley a last chance;
17  right?
18   A.  Yeah, it reads that way.  It looks so.
19   Q.  If he had not been found fit for duty, he would
20  not have been reinstated; correct?
21   A.  He would not have been.
22   Q.  Was he ultimately found fit for duty?
23   A.  Yes, he was.
24   Q.  And so was he forced to be reinstated by an
25  arbitrator award?

Page 143

1    A.  Yes.
2    Q.  The City didn't voluntarily do that, did they?
3    A.  No.
4    Q.  And is this the result of the union bringing a
5  grievance on Sergeant Muley's behalf, grieving his
6  ultimate discipline of termination?
7    A.  Yes.
8    Q.  But the union didn't do that with Jessica, did
9  it?
10   A.  It did not.
11   Q.  And they couldn't, because she waived those
12  rights; correct?
13   A.  Yes, she did.
14   Q.  Pursuant to her Last Chance Agreement; right?
15   A.  Yes.
16   Q.  Which she had counsel from two attorneys and a
17  union representative; right?
18   A.  That's accurate.
19   Q.  And they all signed off on it; correct?
20   A.  Yes.
21   Q.  So she's very different than Sergeant Muley;
22  correct?
23   A.  Yes.
24   Q.  (Screen share ended.)  Let me just go back over
25  my notes.  Did Nick Guasto ever achieve a rank above

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 39 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

Page 144

1  police officer?
2      A.  No.
3      Q.  So he was not a supervisor at the time of the
4  I.A. investigation involving him and Jessica; correct?
5      A.  No, he was not.
6      Q.  Was that one of your considerations in allowing
7  him to remain employed?
8      A.  Yes.
9      Q.  And was that one of your considerations --
10  well, actually, strike that.  And Nick Guasto has paid
11  out a lot more money than Jessica, didn't he?
12      A.  He did.
13      Q.  Regarding the January 19, 2021 meeting, there
14  was discussion about an attorney and whether Jessica
15  asked for one.  If Jessica or the FOP had asked for an
16  attorney to be present, would you have agreed?
17      A.  Absolutely.
18      Q.  Would you have postponed the meeting?
19      A.  Yes.
20      Q.  Did anyone ask for an attorney?
21      A.  No.
22      Q.  At any point in that meeting, did the FOP step
23  up and say, "This is inappropriate"?
24      A.  No.
25      Q.  Did anyone from the FOP raise any violations

Page 145

1  under Chapter 112, the Police Officer's Bill of Rights?
2      A.  No.
3      Q.  Did anyone from the City interrogate Jessica
4  during this meeting?
5      A.  No.
6      Q.  She just gave an explanation?
7      A.  Yes.  She was given the allegation of the
8  employee misconduct and asked to give an explanation.
9      Q.  Okay.  When Jessica was demoted and lost her
10  sergeant stripes, who made that decision?
11      A.  Dan Oates.
12      Q.  Who was the one that made the decision to
13  reinstate her as sergeant?
14      A.  I was.
15      Q.  Did you make that decision over objections from
16  other people?
17      A.  Yes.
18      Q.  Was there a groundswell in the department, to
19  not to give her her stripes back?
20      A.  Absolutely.
21      Q.  And did you do that against that groundswell?
22      A.  Yes.
23      Q.  Why?
24      A.  I believed that she could resurrect her career,
25  that she could make the proper decisions moving forward.

Page 146

1      Q.  And why did you agree to have a meeting, in
2  January of 2021, before implementing her letter of
3  resignation?
4      A.  Once again, I was looking for a reason to be
5  able to keep her on the track; I wanted her to succeed.
6      Q.  One second.  Okay.
7          You were asked some questions about the Last
8  Chance Agreement, the settlement agreement, and the EEOC
9  charge.
10      A.  Mm-hm.
11      Q.  Did the Last Chance -- although the Last Chance
12  Agreement is an exhibit to the settlement agreement, did
13  the EEOC charge, the 2020 EEOC charge, play any role in
14  your request or requirement or negotiation of the Last
15  Chance Agreement?
16      A.  No.
17      Q.  The Last Chance Agreement is part -- correct me
18  if I'm wrong -- of the discipline relating to her
19  conduct from the 2020 I.A. investigation; right?
20      A.  Yes.
21      Q.  Did the EEOC charge and the fact that she filed
22  an EEOC charge have anything to do with the Last Chance
23  Agreement?
24      A.  No.
25      Q.  Did the 2020 EEOC charge have anything to do

Page 147

1  with you implementing Jessica's letter of resignation?
2      A.  No.
3          MR. ELKINS:  Nothing further.
4          MR. BARROUKH:  Nothing from me.
5          MR. ELKINS:  Ms. Evans, we're going to read,
6      and we're going to order.  I'm ordering, Ms. Evans.
7      What I'm going to do, because the exhibits I have
8      are pretty large, I'm going to have to create a
9      Dropbox for you.  I just sent you an email.  If you
10      could reply to that email, so I know you've gotten
11      it, then give me a day to email you the exhibits.
12      I'm ordering a mini.
13          MR. BARROUKH:  And I just sent you an email.  I
14      will let you know when I want to order the
15      transcript.
16          (Thereupon, the deposition was terminated at
17      4:18 p.m.)
18
19
20
21
22
23
24
25

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 40 of
283
Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

1                     CERTIFICATE OF OATH

2    STATE OF FLORIDA   )
     COUNTY OF ORANGE   )
3
             I, Julie S. Evans, Professional Court Reporter,
4
     Notary Public, State of Florida, certify that RICHARD M.
5
     CLEMENTS appeared before me via Zoom on April 23, 2024,
6
     and was duly sworn.
7
             Witness my hand and official seal this 6th day
8
     of May 2024.
9

10

11                      _____

12                      JULIE S. EVANS
                        Professional Court Reporter
13                      Notary Public, State of Florida
                        My Commission No. HH473772
14                      Expires:  1/21/2028

15

16

17

18

19

20

21

22

23

24

25

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 41 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

```
 1                  CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA   )
      COUNTY OF ORANGE   )
 3

 4            I, Julie S. Evans, Professional Court Reporter,

      do hereby certify that I was authorized to and did
 5

      stenographically report the deposition of RICHARD M.
 6

      CLEMENTS; that a review of the transcript was requested;
 7

      and that the foregoing transcript, page number 1 through
 8

      147, is a true and complete record of my stenographic
 9

      notes.
10

11            I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorneys or counsel connected with the action, nor am I

15    financially interested in the action.

16
              Dated this 6th day of May 2024.
17

18

19            _____

              Julie S. Evans
20            Professional Court Reporter

21

22

23

24

25
```

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 42 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

```
 1                        ERRATA SHEET

 2

           I, RICHARD M. CLEMENTS, wish to make the following
 3    alterations:

 4

      Page            Line            Correction
 5
      _____
 6
      _____
 7
      _____
 8
      _____
 9
      _____
10
      _____
11
      _____
12
      _____
13
      _____
14
      _____
15
      _____
16
      _____
17
      _____
18
      _____
19
      _____
20
      _____
21

22    Under penalties of perjury, I declare that I have read
      my deposition and that it is true and correct subject to
23    any changes in form or substance entered here.

24    _____      _____
           Date                      RICHARD M. CLEMENTS
25
```

## WORD INDEX

**< $ >**
**$3,531.20** 84:*23* 85:2

**< 1 >**
**1** 3:*9* 29:7 80:*19*
114:*21* 118:8, *23*
121:*22* 141:*25* 149:2
**1/21/2028** 148:*13*
**1:22** 1:*8* 4:*3*
**1:22-cv-21004-DPG**
1:*4*
**10** 120:7
**10/1/2018-9/30/2021**
3:*11*
**10:30** 63:*24*
**100** 65:*1* 73:*15*
102:*2* 123:*2*
**104** 3:*3, 10*
**106** 3:*11*
**107** 3:*11*
**10-week** 15:*11*
**112** 145:*1*
**114** 3:*11*
**12** 61:*3*
**1212** 2:*8*
**1310** 2:*3*
**140** 3:*15*
**147** 149:2
**148** 3:*4*
**149** 3:*5*
**15** 121:7, *9* 124:*22*
**150** 3:*6*
**16** 106:*11*
**160** 85:*1, 20*
**160-hour** 84:*19*
**16th** 2:*8*
**180-day** 32:*4, 15, 19*
128:*12*
**185** 13:*1*
**19** 92:*19* 94:*23*
144:*13*
**1990** 12:*15*
**1995** 58:*6*
**1997** 12:*22* 55:*9*
**19th** 94:*15* 95:*11*
**1's** 118:*11*

**< 2 >**

**2** 3:*10* 29:7 51:*24*
104:*17* 118:*22* 121:*2,*
*8* 142:*3*
**2000** 13:*4, 12* 14:*1*
**2000s** 134:*16*
**2001** 13:*4*
**2008** 13:*22* 15:*9*
**2009** 52:*1, 3, 8* 57:*16,*
*17* 60:*21, 23* 134:*18*
**2011** 55:*22* 57:*4*
58:*15* 60:*23* 61:*1, 10*
**2011-2012** 14:*2*
**2012** 134:*21*
**2013** 62:*1, 13* 63:*3*
137:*19*
**2014** 14:*4*
**2014-2015** 15:*14*
**2015** 14:*9* 75:*19*
**2016** 14:*12*
**2017** 14:*12, 16, 17*
**2018** 15:*16* 114:*21*
121:*22* 122:*25*
**2019** 14:*17, 18*
**2020** 8:*17, 23* 10:8
78:*4, 7* 79:*12* 86:*17*
146:*13, 19, 25*
**2021** 8:*17, 23* 64:*3*
67:*18* 92:*19* 94:*23*
114:*22* 121:*22*
144:*13* 146:*2*
**2021-010** 81:*11*
**2022** 71:*24* 102:6
**2023** 14:*19* 61:*1*
**2024** 1:*8* 4:*3* 106:*11*
148:*2* 149:*15*
**23** 1:*8* 4:*3* 102:7
148:*2*
**23rd** 64:*23*
**24-page** 141:*17*
**26** 12:*3* 63:*22*
**2's** 119:*3, 5*

**< 3 >**

**3** 3:*11* 106:*1* 115:*5*
121:*1, 20, 23, 25*
122:8, *10, 12, 20*
123:*11, 18* 124:*20, 23*
142:*6*
**3.2** 118:*7*

**3.3** 124:*13*
**3/15/22** 3:*11*
**30** 75:6 114:*22*
121:*22*
**33** 11:*25* 12:*10*
14:*19*
**33131** 2:*4*
**33304-2323** 2:*8*

**< 4 >**

**4** 3:*2, 11* 107:*19*
108:*10, 21* 142:*9*
**4:18** 1:*8* 147:*17*
**437** 104:*1*

**< 5 >**

**5** 3:*11* 114:8, *17*
118:*16* 120:*12*
142:*11*

**< 6 >**

**6** 3:*15* 140:*1, 5*
**6:30** 63:*24*
**6th** 148:2 149:*15*

**< 7 >**

**701** 2:*3*

**< 8 >**

**8** 81:*3*
**80** 3:9

**< A >**

**abide** 41:*17* 50:6, *11*
**ability** 29:*15, 25*
66:*17* 103:*13*
**able** 18:*19, 20* 20:*4,*
*18, 20* 29:*25* 30:*18*
31:*19* 39:*19* 46:2
49:*15* 53:*10, 20*
56:*17* 58:*25* 59:*14*
63:7 82:*19* 93:*17*
95:*20* 96:*4* 102:*23*
130:*20* 142:*3* 146:*5*
**absolute** 75:6
**Absolutely** 39:*25*
57:*19* 67:*25* 72:*3*
74:*25* 107:8 119:*20*
124:*1* 127:*24* 132:*13*
144:*17* 145:*20*

**academic** 11:8, *16, 19,*
*21*
**academy** 11:*19*
12:*22* 15:*16* 63:*17*
**accept** 84:*19*
**access** 42:6, *9*
**accessible** 42:7, *10*
68:*18*
**accident** 56:5, *12*
59:*4*
**accommodation**
103:*10*
**account** 21:*24* 34:*19*
35:*14* 53:*12* 73:*21*
89:*4, 10*
**accumulation** 85:6
**accurate** 31:*23*
50:*11* 58:*24* 91:7
117:*5* 124:*11* 127:*17,*
*21* 128:*22* 129:*15*
138:*15* 143:*18*
**accusation** 43:*1*
**accusations** 52:6
**accused** 34:*22*
**achieve** 143:*25*
**acholic** 70:*20*
**Acosta** 57:*23* 58:*1, 3,*
*16, 20, 21* 59:*3, 8, 17,*
*20* 60:6, *8* 61:*3, 9, 17*
**acquitted** 139:*5, 9*
**Act** 42:*12* 66:*17*
133:*12, 17, 19*
**acting** 44:*11* 55:*14,*
*16*
**action** 20:*12* 23:*16,*
*17* 24:*5* 29:*12* 30:2
33:*23* 34:*4* 36:*11*
46:*20* 48:*17* 50:6
62:5 64:*9, 15* 65:*15,*
*24* 66:*3* 69:*10* 70:8
72:*4, 7, 18, 21* 73:*1, 2,*
*24* 92:*16* 98:8
106:*25* 116:*22*
149:*14, 15*
**actions** 19:*21* 22:5
27:*3* 29:*10* 46:*22*
63:*3* 66:*12* 69:*25*
73:5 74:*4, 14* 78:*14*
90:*24* 97:*17*
**activation** 81:*20*

**actual** 9:*1* 10:22
68:*3, 6* 87:24 90:*1*
95:7
**adding** 61:*8*
**additional** 26:22
**Additionally** 84:*17*
**address** 4:25 17:25
26:*17* 40:8 65:12
96:*6, 18* 97:7
**addressing** 39:*16*
**adjudicated** 68:5
**administering** 81:*23*
**administration** 47:*19*
70:7 84:*3*
**administrative** 17:*15*
24:*3, 22* 29:*1* 34:*15,*
*16* 48:16 58:*10* 65:7,
*11* 66:9, *12* 85:5
**advance** 94:*16* 95:8
**advantage** 130:*20*
**adversarial** 123:*12,*
*19, 22*
**advised** 20:2 107:*16*
**adviser** 12:*3*
**advisor** 12:22 63:22,
*23*
**advocacy** 105:*6*
**Affairs** 8:7, *15* 18:*20*
19:*1* 25:17 27:8, *9,*
*10, 13, 23* 33:4, *10, 13*
34:7 35:20, *23* 37:*18*
38:2 41:6, *10* 43:9,
*21* 44:*17, 21* 56:4, *16*
59:13 68:14 69:*11*
72:25 80:*1, 6* 81:*10,*
*13, 17* 82:9 83:*14*
95:19 96:8, *13, 21*
98:20 111:22, *25*
112:*11, 19, 21* 128:*16,*
*19* 132:*1, 7, 19, 23, 24*
133:*3* 139:*1*
**affiliated** 12:2
**affirm** 4:*13*
**afford** 46:2 96:5
97:6
**afforded** 61:*15*
92:25 97:*17*
**agency** 17:5
**ago** 62:9 63:*16*

**agree** 32:*18* 54:*17*
74:*19* 84:*10, 11*
113:9, *23* 115:*23*
122:*11* 146:*1*
**agreed** 3:*15* 79:*13,*
*20* 86:*13, 16* 87:20
91:7 115:24 125:*4,*
*14* 131:6, *13* 144:*16*
**agreed-to** 91:2
**Agreement** 3:9, *14*
45:*18, 21* 46:*19* 47:8
48:*1, 11, 15, 20* 49:6,
*9, 12, 13, 18* 50:8, *21*
51:9, *14* 56:*19* 60:6
62:*13* 65:*3* 66:*20*
67:*21* 68:*4, 7, 23, 24*
73:11 79:*13, 17, 21*
80:25 81:*1* 84:*11*
86:*14* 87:*19* 90:*13,*
*23* 91:24, *25* 96:*3*
100:*10* 105:*13, 16, 21*
114:*1, 19* 116:9, *18*
117:*10* 119:*18*
121:*21* 122:*25* 123:9
124:*3, 8* 125:*11, 18*
127:*10, 15* 128:*1*
130:*11* 131:*3, 18*
137:6 141:*3, 24*
143:*14* 146:8, *12, 15,*
*17, 23*
**Agreements** 50:*23*
68:*18* 73:*13* 100:*3*
116:*10* 122:7, *15*
127:20 130:*13* 131:*9,*
*15* 136:16 137:*3, 13*
139:*18* 142:2
**agrees** 84:*19*
**ahead** 26:*19* 32:2
38:*2, 22* 60:*21* 65:22
68:*12* 82:*17* 89:*3*
94:7 97:2 99:*25*
108:*24*
**al** 1:*7*
**alcohol** 142:*1*
**allegation** 9:*19, 22*
10:*1, 4* 20:*16* 24:*15*
25:*7, 21* 27:8, *11*
28:4 31:25 32:*5, 13*
37:*12* 40:*15* 42:*18*
43:2 44:7, *16, 19, 22*

45:6, *11* 47:*14* 66:6
67:*5* 83:*13, 18* 85:*17*
93:*1, 16* 94:*3* 95:*20,*
*22* 98:20 134:*4, 12*
145:7
**allegations** 10:*2*
22:*17* 24:*21* 40:*21*
41:*1, 12* 42:*14, 20*
47:*21* 91:*13* 93:*17*
95:*13* 96:6 103:*19*
105:*1* 134:9 140:*15*
**alleged** 61:*4* 64:*3, 10,*
*16*
**allegedly** 86:22
**alleging** 109:2
**allow** 6:5 94:*1*
**allowed** 12:2*1* 34:23
35:*4* 54:*19*
**allowing** 144:6
**allows** 133:*14*
**alterations** 150:*3*
**altered** 119:*17*
**ambiguous** 5:*25*
26:*15*
**amount** 12:*10* 84:22
**analogy** 27:20
**and/or** 28:*14* 47:*19*
54:*16* 68:*4* 78:*14*
**and-file** 90:*4*
**angles** 27:*19*
**anonymous** 37:*18, 20,*
*23* 39:*1, 2, 10, 19*
42:*15, 16* 45:*12*
**answer** 5:2*1* 6:25
7:*9, 10* 15:22 16:*13,*
*23* 17:2*1* 18:6 19:4
20:*10* 21:7, *21* 22:8
23:*12, 18* 24:*13* 25:4,
*16* 26:6, *16* 28:*1, 12*
30:*12, 13* 31:*12* 33:2
34:*10* 35:*1* 37:8
38:20 39:7 40:*23*
41:4 42:*3, 23* 43:24
46:25 48:*3, 13* 49:9,
*21* 51:2, *4, 11* 57:6, *7,*
*14* 59:*15* 65:5 69:*4,*
*6* 73:*7, 14* 74:7
76:22 77:*21* 78:*12*
79:*19* 80:8 82:*11*
83:25 85:4 86:24

87:*12, 17* 88:7, *25*
89:2*1* 91:6, *15* 96:*14,*
*25* 98:*14* 99:*15, 16*
101:*5* 102:*20* 103:*5*
118:*16* 120:*11* 121:*8,*
*17*
**answers** 5:*12*
**anti-harassment**
19:*13, 14, 20*
**anybody** 8:*19* 21:5
77:8 89:6 135:*10, 11*
**apologies** 130:*3*
**apologize** 36:*19*
49:24 55:*11* 60:24
65:*21* 73:2 100:*20*
135:*23* 140:*3*
**apparently** 58:*13*
81:22
**appeal** 118:*24* 121:*3,*
*6*
**appealable** 38:8
**appealed** 121:*6*
**appealing** 38:*16* 54:2
**appearance** 4:7
**APPEARANCES** 2:*1*
**appeared** 1:*8* 148:2
**applies** 46:*4* 128:*15*
**apply** 25:2 47:*1*
128:*12*
**appreciate** 118:5
**approach** 16:2*1* 20:7
**approached** 12:5
**appropriate** 47:9
90:*19, 22* 92:*16*
126:6 138:*13*
**approval** 82:6
**approximate** 35:*19*
**approximately** 4:*3*
7:*17*
**April** 1:*8* 4:2 148:2
**arbitration** 29:8
52:20 53:*3, 25* 54:8,
*9, 14, 18, 20, 22, 25*
55:*1* 70:*11* 71:*10*
122:*12* 124:*14, 22*
125:*1, 3, 8, 13, 20, 21*
127:9 134:2*1* 140:6,
*11* 141:*11*
**arbitrations** 136:*2*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 45 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**arbitrator**  54:*4, 10, 18*  125:*11*  126:*1, 5, 14, 21*  136:*19*  141:*12, 13, 17*  142:*25*
**arbitrators**  126:*9*
**arbitrator's**  141:*18*
**Archer**  61:*20, 23*  62:*1, 6, 16*  63:*2*  137:*23*
**Archer's**  137:*19*
**area**  14:*3, 4*  51:*24*  75:*19*  90:*4*
**argue**  119:*24*
**arguing**  126:*4*
**argument**  123:*13*
**arrested**  71:*25*
**arrived**  14:*12*
**art**  113:*5, 16*
**Arthur**  51:*20*
**Article**  115:*5*
**ascended**  55:*19*
**aside**  132:*24*
**asked**  7:*23, 24, 25*  12:*6*  36:*17*  50:*19, 24*  75:*4*  91:*23*  95:*11, 14*  110:*2*  132:*2, 22*  144:*15*  145:*8*  146:*7*
**asking**  7:*7, 8*  22:*16, 18, 20*  23:*1, 4*  66:*15*  74:*23*  91:*21*  109:*20*
**asks**  51:*1*
**aspect**  17:*13*  20:*5*  26:*24*
**aspects**  20:*2*  40:*17*  47:*19*  65:*8*  102:*22*
**assigned**  12:*18*  13:*11*  22:*24*  32:*24*  33:*3, 7, 20*  40:*17*
**assignment**  98:*17*  140:*17*
**assignments**  92:*12*
**assist**  73:*23*
**Assistant**  57:*22, 25*  58:*9*  60:*16*
**associated**  7:*4*  9:*1*  10:*23*  12:*25*  22:*1*  28:*4*  32:*12*  33:*18*  41:*14*  45:*24*  47:*4, 20*  67:*5*  68:*3*  73:*24*  87:*6*  98:*16*

**assume**  21:*12*  37:*16*  58:*24*  68:*24*  134:*17*
**assuming**  52:*25*  53:*1*
**assure**  40:*6*
**Attached**  84:*13*
**attempted**  89:*23*
**attended**  15:*9, 15*
**attention**  16:*2, 4*  23:*15*  41:*2, 10, 11*  77:*13*  89:*16, 18, 23*  96:*16*  104:*4*
**at-the-time**  59:*2*  60:*5*
**Attorney**  7:*6, 13, 16*  8:*20*  9:*6, 8*  24:*17*  32:*8*  36:*8*  68:*2*  93:*19, 22*  94:*2, 4, 6, 10, 19*  95:*5*  144:*14, 16, 20*  149:*12*
**attorneys**  143:*16*  149:*14*
**attorney's**  24:*4*  32:*7*  64:*20*  66:*7*  69:*11*  72:*14*  139:*2*
**ATV**  55:*24*  57:*4*  58:*16*  59:*4*  61:*10*  135:*19*  136:*10*
**audible**  5:*12*
**auspices**  68:*20*
**authorized**  149:*2*
**available**  39:*4*  89:*8*
**Avenue**  2:*3*  19:*6*  20:*3*  31:*21*  38:*21*  39:*15*
**avenues**  18:*19*
**avoid**  88:*13*
**Award**  3:*15*  140:*6*  141:*12, 25*  142:*3, 25*
**awarded**  66:*20*
**aware**  19:*21, 25*  40:*4, 20*  51:*19, 25*  52:*3, 6*  55:*22*  56:*1*  57:*22*  58:*15*  59:*2, 8, 24*  60:*1*  62:*1*  64:*2, 6*  69:*18*  71:*24*  77:*2, 8*  78:*19*  79:*3, 12*  84:*4*  89:*13*  90:*3*  94:*9*  95:*12*  100:*25*  107:*9*

**< B >**

**back**  10:*10*  11:*19*  13:*2, 25*  14:*1, 4, 6, 7, 9*  24:*19*  52:*2, 19, 21, 23*  53:*1*  54:*6*  56:*16*  63:*8*  65:*9*  68:*14*  69:*10*  70:*11, 12*  71:*11, 13, 16*  75:*9*  82:*3*  85:*16*  108:*12*  109:*16*  123:*2*  126:*10, 13, 19, 22*  127:*23*  136:*18, 21*  139:*15*  141:*5, 8, 10, 13*  143:*24*  145:*19*
**background**  11:*23*
**backing**  93:*6*
**backup**  33:*6*
**backwards**  104:*10*
**balancing**  141:*22*
**Baldwin**  10:*7*
**bargained**  122:*24*
**Bargaining**  3:*11*  30:*3, 16*  31:*2, 4, 7*  94:*17*  114:*1, 19*  116:*9, 10, 15*  117:*10, 15, 19*  119:*18*  120:*24*  121:*21*  122:*7, 15, 24*  123:*9*  124:*3, 8*  125:*17*  128:*1*  130:*10*  141:*24*
**BARROUKH**  2:*2*  3:*2*  4:*8, 21*  7:*5, 23*  8:*3, 4, 18*  9:*13, 21*  11:*10*  16:*5, 20*  17:*7*  18:*1, 13*  19:*8*  20:*22*  21:*2, 15*  22:*3, 10, 19, 21*  23:*7, 8, 19*  24:*8, 24*  25:*10, 25*  26:*7, 20*  28:*7, 20*  30:*22*  31:*14*  32:*14*  33:*8*  34:*21*  35:*3, 25*  36:*1, 20*  37:*22*  38:*6, 12, 25*  39:*21*  40:*18, 25*  41:*7*  42:*5, 25*  43:*17*  44:*2*  47:*10*  48:*9, 18, 23*  49:*17*  50:*3, 18, 24*  51:*2, 6, 18*  53:*4, 5, 24*  57:*11, 21*  59:*7, 16*  60:*4*  61:*19*  63:*10*  65:*13*  66:*14*  67:*11*  69:*13*  70:*13*  73:*9*

74:*3, 18, 25*  75:*4, 10*  77:*1, 7, 15, 23*  78:*18*  80:*2, 12, 18, 21*  82:*15*  83:*8*  84:*6*  85:*10, 21*  86:*11, 12*  87:*8, 13, 23*  88:*20*  89:*12*  90:*2, 11*  91:*11, 17*  96:*20*  97:*11*  98:*18*  100:*2*  101:*2, 7*  102:*14*  103:*6*  104:*7, 12*  109:*22, 23, 25*  110:*2, 6, 9*  111:*18*  113:*10, 20*  115:*15*  118:*1*  124:*5, 10*  127:*11, 19*  131:*20*  147:*4, 13*
**based**  20:*11*  25:*6, 23*  27:*5*  28:*6*  54:*4, 11*  97:*4*  99:*7, 11, 19*  103:*13*  108:*8, 16*
**basic**  10:*17*  11:*17*  13:*1*
**basically**  26:*19*  121:*23*  123:*11*  140:*16*
**basis**  11:*12, 14*  21:*11*  37:*21*  51:*17*  55:*2*  64:*1*  104:*23*  105:*4*
**battery**  64:*7*
**Battle**  71:*18, 20, 24*  72:*5, 19*  73:*10, 25*  74:*13*
**Battle's**  74:*4*
**BEACH**  1:*6*  3:*11, 15*  4:*6, 11*  15:*12*  56:*3, 24*  60:*10*  62:*20, 22*  72:*18*  75:*14*  81:*3*  99:*3*  100:*13*  101:*19*  105:*6*  140:*7*  141:*23*  142:*13*
**Bear**  114:*6*
**beaten**  88:*2*
**beating**  64:*3, 10, 17*  88:*3*
**began**  75:*23*  80:*20*  104:*18*  114:*14*
**beginning**  4:*7*  109:*16*
**BEHALF**  1:*8*  2:*5, 8*  4:*10*  36:*6*  87:*22*  103:*15*  105:*6*  113:*8*

116:*14*, *15*, *21*, *25*
117:*15*  143:*5*
**behavior**  43:*6*
**believe**  8:*25*  9:*6*
10:*7, 8*  13:*4*  14:*1, 12*
15:*13, 16*  16:*22*
21:*16, 25*  30:*5*  31:*6*
35:*13*  36:*9*  47:*25*
49:*18, 24*  51:*24*
52:*18, 19*  56:*10, 15*
57:*1, 2*  58:*5*  61:*9, 25*
62:*18*  63:*2*  64:*22*
66:*25*  72:*13*  73:*4*
74:*4*  75:*18*  78:*13, 25*
79:*1, 8, 10*  82:*3*
90:*16, 21*  92:*18*
93:*10*  95:*10*  98:*22*
99:*11*  100:*9*  102:*2, 5,
6*  104:*12, 22*  105:*3,
10*  108:*9, 11*  117:*6*
119:*18*  122:*11*
126:*24*  127:*1*
**believed**  90:*22*  97:*2*
145:*24*
**Berrian**  55:*5, 8, 9, 15,
18, 20, 23*  56:*1, 19, 22*
57:*3, 18*  58:*17*  88:*1*
135:*14, 15*
**Berrian's**  56:*8, 25*
57:*2*
**best**  5:*23*  27:*19*
39:*8*  102:*9*
**better**  49:*3*  50:*15*
91:*10*
**beverage**  70:*20*
**bikes**  12:*18*
**Bill**  145:*1*
**binding**  54:*6, 17*
124:*14, 21*
**bit**  28:*18*  32:*20*
93:*6*  116:*7*
**board**  92:*21*  93:*10*
**bottom**  85:*23*
**break**  6:*3, 4*  75:*1*
80:*14*
**breakdown**  12:*13*
**Brickell**  2:*3*
**brief**  11:*22*  12:*24*
58:*7*  75:*8*  80:*17*

**bring**  33:*20*  34:*16*
46:*14*  115:*9*  124:*25*
125:*7*  137:*5*
**bringing**  28:*9*  143:*4*
**brought**  16:*2, 3*
21:*13*  23:*14*  25:*19*
27:*4*  28:*13*  30:*7*
40:*2*  41:*2, 10*  42:*20*
43:*2*  55:*1*  66:*22*
67:*1*  77:*13*  89:*15, 18,
22*  93:*15*  96:*16*
98:*20*  137:*25*  139:*2,
15*
**Broward**  72:*14*
**bunch**  108:*11*  124:*6*
**bypass**  27:*7*

**< C >**
**call**  61:*3*  81:*22*
89:*11, 14, 18*  120:*18*
129:*19*
**called**  42:*12*  81:*23*
122:*8*  129:*6, 13*
**calling**  69:*21*
**calls**  43:*9*  45:*17*
76:*4*  88:*11*  89:*1*
**camera**  62:*2*
**cameras**  140:*21*
**capacity**  51:*7*  62:*21,
25*  66:*18*  76:*3*
100:*15, 17*
**captain**  13:*21*  14:*3,
5, 25*  52:*3*  60:*16*
75:*21*
**career**  14:*19*  45:*23*
49:*15*  50:*16*  61:*16*
69:*20*  145:*24*
**careful**  34:*5*
**Carlos**  134:*23*
**carry**  98:*16*
**Carvajal**  3:*10, 11*
101:*15*  102:*5, 8, 13*
105:*14, 17*  106:*18, 25*
107:*3, 10, 20*  108:*15,
24*  109:*7*
**Carvajal's**  101:*23*
102:*17*  104:*19*  106:*2*
107:*23*  108:*4*
**Case**  1:*4*  8:*7, 16, 22*
9:*12*  24:*18*  25:*21*

32:*6, 8, 9, 24*  33:*5, 15*
34:*2*  52:*10*  54:*24*
56:*16*  59:*13*  60:*3*
65:*9*  68:*14*  69:*10*
81:*11*  91:*10*  123:*20*
126:*24*  131:*18*
**cases**  18:*11*  37:*14*
38:*4*  68:*13*  122:*16*
**catch**  100:*12*
**caught**  62:*2*  82:*2*
**cause**  48:*14, 19*
87:*10*  141:*19*
**causing**  55:*25*
**caution**  6:*22*
**CCTV**  140:*21*
**center**  87:*4*
**centered**  83:*19*
**centralized**  89:*11*
**certain**  46:*3*  50:*6*
128:*4, 6*
**certainly**  137:*5*
**CERTIFICATE**  3:*4,
5*  148:*1*  149:*1*
**certify**  148:*2*  149:*2,
11*
**chain**  15:*25*
**chairperson**  11:*15, 20*
93:*11*
**challenge**  38:*22*
**Chance**  45:*18, 20*
46:*19*  47:*8, 25*  48:*11,
15, 20*  49:*6, 8, 12, 13,
14, 18*  50:*8, 20, 23*
51:*9, 14*  56:*19*  58:*23*
60:*6*  62:*13*  65:*2, 14,
23*  66:*20*  67:*21*  68:*7,
17, 23, 24*  73:*10, 13*
79:*13, 17, 20*  86:*14*
90:*13, 23*  91:*24, 25*
96:*3*  100:*3, 9*  127:*9,
15, 20*  130:*13*  131:*3,
9, 15*  136:*16*  137:*2, 6,
13*  139:*18*  141:*3*
142:*16*  143:*14*  146:*8,
11, 15, 17, 22*
**chances**  79:*8*
**change**  63:*7*
**changed**  122:*23*
124:*2*

**changes**  15:*17*
150:*23*
**Chapter**  145:*1*
**character**  57:*2, 10*
**characterize**  76:*18*
**Charge**  3:*10*  14:*13*
40:*13*  58:*10*  64:*7*
78:*7, 8, 9, 11*  79:*12,
14*  84:*7, 12*  86:*17*
101:*21, 25*  102:*3, 9,
17*  103:*9*  104:*19, 23*
105:*1, 10, 23*  106:*23*
107:*1, 7*  108:*25*
110:*25*  146:*9, 13, 21,
22, 25*
**charged**  64:*3, 6*
71:*25*
**charges**  8:*23*  64:*7*
100:*25*  102:*3*  139:*2,
6, 7, 10*
**checked**  104:*22*
**checking**  81:*21*
**Chief**  8:*9*  12:*2*
14:*10, 16, 18*  15:*6, 15*
23:*13*  35:*8*  38:*20*
40:*20, 24*  51:*8, 11*
55:*14, 16, 17, 20*
57:*22, 25*  58:*10, 20,
21*  59:*2*  60:*12, 14, 16*
61:*2, 9, 17*  66:*3, 17*
69:*6*  70:*4, 6, 7*  75:*22,
24, 25*  76:*3*  78:*25*
84:*2*  88:*7*  91:*6*  93:*9*
96:*14, 25*  100:*4*
101:*3*  104:*16*  106:*14,
16*  107:*13*  108:*15*
109:*5, 17*  114:*16*
115:*13*  118:*8, 10, 25*
120:*7, 9, 10*  124:*14*
126:*8*  127:*2*  130:*5*
134:*14, 21, 24*  135:*1,
15*  137:*18, 21*  140:*8,
10, 13*  142:*6*
**Chief's**  23:*2, 5*
**chiefs-of-police**  135:*5*
**choice**  26:*25*
**choose**  28:*16*
**circumstances**  25:*24*
36:*9*  46:*3*  52:*22*

54:5, *12, 13* 97:5 125:8

**citizenry** 141:*23*

**CITY** 1:*6* 3:*11, 15* 4:5, *11* 17:*11* 18:*9, 14, 21, 24* 19:*1, 5, 10* 32:*18* 38:5 39:*14, 18* 45:25 46:*15* 49:7 50:*7, 11, 12, 25* 55:*15, 18, 21* 56:24 60:*10* 62:*19* 66:22 67:*1* 69:5 73:*12* 74:5 75:*13* 81:*3* 82:6, 7, *21* 83:*21* 84:23 85:*1, 7, 9* 86:9 87:*21* 91:*3* 100:*13* 101:*19* 102:22, *23* 103:*15* 106:*18* 107:*10, 12, 15, 17, 21, 23* 108:*1, 18* 109:*12* 110:*24* 111:*8, 14* 113:*25* 114:*20* 116:2 118:*15* 119:*9* 120:*24* 121:*6* 126:*4, 9, 14, 21, 22* 127:*14* 129:*10, 19* 130:*25* 131:2, *11, 15* 132:*2, 24* 133:*6, 15, 24* 134:2 137:*11, 14* 138:*17* 140:*7, 22, 24* 141:8, *13, 18, 20, 22* 143:*2* 145:*3*

**city's** 16:*3* 53:*13* 108:*7* 120:*10* 121:*8*

**civil** 5:*7* 138:*25*

**civilian** 45:*24* 100:*10, 21*

**civilians** 55:25 70:*15*

**clarification** 93:*18*

**clarify** 22:*15* 111:*20* 116:*8*

**class** 12:*25* 13:*1* 30:*2* 63:*23, 24* 116:22 121:*3, 5*

**classes** 16:*7*

**clear** 9:*10* 47:*25* 50:*19* 108:*14* 119:5 121:22 124:*16* 132:*4*

**CLEMENTS** 1:*8* 3:*2* 4:*4, 18, 22, 24*

26:*21* 148:*2* 149:*2* 150:*1, 24*

**client** 75:*16* 76:*3, 15, 19* 77:4, *9, 16* 78:*20, 23* 79:*7, 13* 81:*2* 83:*10, 23* 84:*25* 86:*13, 21* 88:*5* 89:*17* 90:22 91:*12, 18, 19, 22, 23* 92:*18, 20* 93:*19, 22* 94:*1, 24* 95:*5* 96:22 98:*21* 99:*5, 12* 103:*20*

**client's** 87:*10, 14* 92:*3* 95:*18* 97:*13*

**clock** 32:*10* 56:*14*

**clocked** 59:*22*

**close** 96:*8*

**cold-like** 89:*7*

**colleagues** 76:*19, 24* 77:*2*

**Collective** 3:*11* 20:*23* 51:*17* 114:*1, 19* 116:*8, 10* 117:*10* 119:*18* 120:*24* 121:*21* 122:*7, 14, 24* 123:*9* 124:*2, 7* 125:*17* 128:*1* 130:*10* 141:*23*

**collectively** 122:*24*

**College** 10:*14, 16* 12:*3, 5, 6, 23*

**colloquially** 135:*18* 136:*6* 138:*2, 5*

**color** 73:*19* 74:*1, 11, 16*

**combination** 128:*24*

**come** 20:*20* 24:*15* 25:*6, 13* 27:*2* 39:*13* 40:*5* 51:*14* 54:*4, 5* 67:*6* 70:*11* 72:*25* 74:*20* 75:*11* 97:*24, 25* 104:*4* 108:*12*

**comes** 17:*13* 29:*8* 37:*9* 65:*9* 71:*23* 129:*17*

**coming** 21:*24* 22:*1* 37:*10* 44:*6* 82:*2* 89:*6*

**Command** 15:*10* 113:*17*

**commander** 13:*23* 33:*3, 9, 12* 41:*5, 9* 56:*11* 93:*4, 15* 99:*22* 118:*15*

**commanders** 81:*19* 113:*14*

**commencing** 94:*10*

**comment** 52:*11* 69:*8*

**comments** 78:*17*

**Commission** 148:*13*

**commit** 50:*5*

**commitment** 30:*17, 18, 19*

**committed** 22:*25* 23:*24* 47:*18* 48:*10, 16* 49:*5, 11* 85:*12* 86:*22*

**committee** 28:*14* 35:*16* 120:*8, 12* 121:*3, 5* 124:*21* 125:*2*

**committing** 83:*23*

**common** 85:*11*

**communicated** 36:*15, 22*

**communications** 82:*23*

**community** 16:*16*

**community-oriented** 13:*8*

**compare** 74:*13*

**complain** 37:*5* 77:*16, 24* 110:*3*

**complainant** 27:*6* 37:*10*

**complainants** 38:*3*

**complained** 77:*17*

**complaining** 27:*3*

**complaint** 16:*1* 17:*14, 25* 18:*8, 12, 21* 19:*7* 26:*10, 13, 18, 19, 24* 27:*1, 2, 5, 6, 9, 10, 16* 31:*21* 37:*23* 39:*17, 24* 41:*19, 20* 42:*17* 44:*9* 47:*20* 78:*4, 5* 79:*14, 25* 80:*1, 10* 102:*24* 107:*21* 108:*16, 19* 111:*3, 4* 112:*15, 18* 115:*14* 134:*12*

**complaints** 8:*16* 15:*19* 17:*9, 15, 24* 18:*14, 15* 26:*3* 37:*18, 20* 40:*10* 41:*11* 78:8 107:*24* 108:*4* 109:*18* 110:*12, 16, 18* 111:*17* 112:*14* 132:*3*

**complete** 96:*21* 103:*3* 132:*18* 149:*2*

**completed** 87:*1*

**completely** 26:*15* 66:*7*

**completes** 142:*7*

**completing** 44:*19*

**completion** 44:*15* 65:*25* 72:*8*

**complex** 32:*20*

**component** 11:*18* 38:*5* 79:*23*

**components** 33:*20*

**comprehensive** 24:*19*

**concept** 88:*18*

**concern** 18:*3* 74:*12* 103:*17*

**concerned** 72:*23* 103:*12*

**concerning** 28:*3*

**concerns** 40:*8* 96:*18* 97:*7* 102:*24*

**conclusion** 20:*21* 21:*24* 22:*2* 25:*13, 14* 28:*3* 34:*17* 36:*10, 14* 53:*23* 54:*6* 64:*19* 67:*6* 87:*22* 99:*23*

**conclusions** 25:*5* 36:*22* 69:*8* 108:*7*

**concurrent** 32:*12* 67:*8*

**conditions** 28:*23, 24*

**conduct** 32:*11* 46:*5* 77:*17, 25* 78:*16* 87:*4* 88:*5* 95:*17, 18* 136:*6* 138:*13* 146:*19*

**conducted** 33:*17* 37:*24* 72:*13* 98:*25*

**conducting** 6:*11*

**confer** 121:*11*

**confessed** 59:*23*

**confidential** 132:*9*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 48 of 283

Deposition of Richard M. Clements                      Jessica Guasto v. The City of Miami Beach, FL, et al.

confidentiality 37:5 132:2
confirm 85:22
conflict 40:12
conflicts 40:9
confronted 92:13
conjunction 15:9 43:11 50:2 79:25 98:17 129:17
connected 149:14
connection 64:3, 13, 16 68:9
consider 107:6 129:20
consideration 47:24
considerations 34:19 35:14 144:6, 9
considered 29:6 112:20
consistent 142:6
contain 108:11
contained 134:9
contamination 88:13, 22
contents 7:1
context 34:12 113:4 128:15 134:11
continuance 12:8 72:16
continue 46:3 70:4 103:13, 16
continued 50:2
continues 109:12
continuous 12:4
contract 29:19, 20 30:6 123:3
contractual 55:2 120:20
contractually 91:2
contributes 73:5
control 32:15
conversation 94:5, 12
conversations 6:23 7:1 51:13 76:15
convicted 139:15
cooperate 72:15
coordinators 100:21
copy 42:12 104:19 114:8 118:20
corner 85:23

correct 9:24 20:24 25:13, 14 29:24 30:10 31:17, 22 34:8 42:21 45:8 46:6, 23 47:18 48:20 50:4, 8 52:14, 24 61:5, 6 62:17 66:1, 19, 23 67:18, 22 68:19 70:14 71:5, 9 75:24 81:11 84:23 86:6, 14, 17 90:24 97:12, 15 99:9 108:16, 19, 22, 25 109:5, 7, 10, 24 111:2, 25 112:9, 11 113:5, 9, 19 114:2 115:3, 12, 19, 23 116:1 117:4 118:11 119:3, 7, 22 120:16 123:25 124:14 125:21 126:2, 6, 8, 22 127:3, 23 128:2 129:9, 14 130:23 132:12 133:14, 17 134:6 135:6 136:14 138:1, 10, 23 139:12 140:19 142:20 143:12, 19, 22 144:4 146:17 150:22
correction 24:22 150:3
corrective 23:17 33:22 34:4 36:11 69:9 73:24
correctly 29:21 112:16 119:25
corresponded 85:7
Cosner 9:24 93:15 94:24 98:21
Cosner's 10:1
counsel 3:15 4:6, 7 7:9 21:10, 13, 17 143:16 149:12, 14
counseling 20:13 128:9
COUNTY 148:2 149:2
course 15:11 92:16
courses 15:1, 2, 3, 5, 7 16:8 19:13, 14

COURT 1:1, 24 4:2, 12 5:18 8:11 64:25 75:7, 9 80:16 108:13 114:12 148:2, 12 149:2, 20
covering 114:21
Covid 81:18 83:2, 3 88:10
co-workers 78:15
crash 57:4 61:11
crashed 55:24
create 147:8
crime 13:9 68:6
Crimes 13:19, 20
criminal 11:8, 16, 21 24:6, 17 65:8 68:3 72:17 98:9 139:2, 6
CROSS 3:3
CROSS-EXAMINATION 104:14
culmination 82:13
cup 70:19
current 10:13, 15
currently 10:11 31:4 52:13 55:21 56:23 60:8 62:16, 20
cut 60:22 118:1

< D >
Dade 10:16 12:3
daily 11:12, 14
Dan 15:11 109:19 135:2 140:14 145:11
DANIEL 2:2 4:8 22:17 104:11
DATE 1:8 10:9 150:24
Dated 149:15
dates 15:14 121:21
David 67:17
day 111:25 135:21 136:7 147:11 148:2 149:15
daytime 81:20
day-to-day 76:13
deal 24:7 31:19 41:14 54:7 104:2
dealing 47:2

dealt 115:2 119:19
decide 54:18
decision 41:22 48:7 54:4 99:5, 7 117:17 122:17 123:14, 21 141:17 145:10, 12, 15
decision-maker 127:5 135:8, 12 137:22
decision-making 25:12
decisions 145:25
declaration 124:22
declare 150:22
declines 137:11
deem 19:22
deemed 19:22 24:6, 16 32:9 43:12 45:25 90:19 92:15 142:3, 9
deems 28:23
Defendants 1:8 2:8
define 57:9
defined 57:3 61:10 63:3 115:8
defines 46:9
definitely 66:11 75:5
degree 11:8 74:8, 13
deliver 92:11
delivered 43:8
DeLucca 134:19
demoted 78:20, 23, 24, 25 109:7, 8 145:9
demotion 112:7
denied 94:10
department 12:13, 15 13:2 14:10 15:12, 20 17:10 19:15 26:4 28:10 32:11 34:12 39:15 40:8 41:24 43:7 45:17 52:14, 17 55:10 58:5, 11 61:25 65:15, 24 71:22 72:19 75:17 76:20 77:8, 19, 25 78:20 81:24 87:2, 21 88:23 90:18 98:6 100:11 104:1 105:7, 20 111:3 112:23 128:25 142:13 145:18
departments 113:4

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 49 of 283

Deposition of Richard M. Clements                                      Jessica Guasto v. The City of Miami Beach, FL, et al.

**department's** 16:*3*
**depending** 20:*16*
**depends** 44:*7*
**depicts** 70:*25*
**DEPOSITION** 1:*8*
  3:*6*  4:*4*  5:*1, 5, 7*
  6:*11, 19*  7:*13*  8:*6, 20,*
  *24*  63:*20*  103:*24*
  114:*11*  147:*16*  149:*2*
  150:*22*
**deputy** 14:*16*  15:*6*
  58:*20, 21*  59:*2*  60:*12,*
  *14, 16*  61:*2, 9, 17*
  75:*21*  93:*9*
**Derek** 2:*2*
**dereliction** 83:*20*
**describe** 18:*2*  26:*2*
  53:*25*
**described** 63:*4*  107:*3*
**designated** 118:*16*
  120:*9*
**designating** 33:*10*
**designee** 118:*25*
  121:*7*
**desire** 39:*9*  121:*3, 5*
**desired** 118:*24*
**desk** 104:*4*
**destroy** 134:*2*
**Detailed** 89:*1*
**Detective** 61:*20, 22*
  62:*1, 6*  63:*2*
**detention** 31:*5*
**Determination** 3:*11*
  25:*19*  27:*13*  29:*23*
  32:*11*  35:*6*  37:*2*
  38:*15, 19*  54:*10*
  106:*2, 5, 7, 8*
**determine** 24:*20*
  29:*18*  34:*1*  51:*15*
  59:*14*  65:*8, 10*  82:*19*
  103:*15*
**determined** 27:*23*
  92:*14*
**determining** 20:*23*
  21:*4*  24:*10, 11*  25:*18*
  33:*24*  34:*3*  35:*15*
  89:*24*
**developments** 15:*18*
**difference** 74:*15*
**differences** 16:*19*

**different** 16:*16*
  18:*18*  23:*6*  47:*4*
  99:*13*  123:*25*  143:*21*
**difficult** 67:*6*  100:*19*
**DIRECT** 3:*2*  4:*20*
**directed** 92:*10*
**direction** 61:*16*  104:*4*
**directions** 92:*11*
**directive** 18:*9*  39:*12*
  97:*20*  99:*22*
**directly** 18:*21*  27:*7*
  51:*12*
**director** 10:*17*  11:*4,*
  *17, 18, 20*
**directors** 11:*14*
**disciplinary** 20:*5*
  21:*18*  22:*5, 22*  24:*25*
  25:*20*  27:*22*  33:*22*
  34:*17*  35:*23*  38:*14*
  47:*6*  62:*5*  64:*9, 15*
  65:*15, 24*  66:*3*  72:*4,*
  *7, 18, 21*  73:*1*  115:*25*
  128:*13, 23*
**discipline** 20:*11, 24*
  21:*4*  22:*16, 18, 23*
  23:*2, 16, 22*  24:*10, 11*
  25:*14, 22, 23*  28:*6*
  34:*4*  35:*7, 11, 15, 16,*
  *18, 20, 21*  49:*19*
  62:*10*  69:*9*  73:*5*
  84:*8, 17*  98:*15*
  111:*17*  112:*3*  113:*8,*
  *24*  114:*2*  115:*23*
  119:*6, 7, 11*  120:*3*
  124:*16*  125:*24, 25*
  126:*5*  128:*4*  129:*11*
  134:*14*  137:*19*
  140:*11*  141:*1, 19*
  143:*6*  146:*18*
**disciplined** 23:*5*
  119:*10*  129:*18*  130:*2*
**disciplines** 124:*5*
  129:*20*
**disciplining** 20:*8*
  23:*23*  96:*22*
**disclosure** 132:*11*
  133:*15*
**discretion** 117:*14*
**discriminated** 39:*5*
  105:*4*

**Discrimination** 3:*10*
  17:*9*  18:*4*  31:*16, 22*
  79:*15*  104:*20*  107:*21,*
  *24*  108:*5, 16, 25*
  109:*2*  110:*4*
**discuss** 15:*17*  20:*5*
  23:*21*  33:*15, 24*
  35:*10*  37:*1*  51:*8*
  53:*6*  69:*24*  95:*13*
  120:*7*
**discussed** 6:*24*  24:*10*
  83:*5*  130:*15*
**discussed/agreed**
  66:*21*
**discussing** 88:*1*
**discussion** 144:*14*
**dishonesty** 97:*13*
  98:*6, 7*
**disparate** 102:*12*
**disparity** 102:*25*
**disposition** 42:*19*
**disrespect** 69:*21*
**disrespectful** 14:*23*
**distinction** 73:*17*
**DISTRICT** 1:*1*
**distrust** 46:*21*
**diversity** 16:*7, 12, 15*
**Division** 12:*17, 20*
  13:*3, 5, 7, 14, 17*
  27:*15*  118:*15*
**document** 45:*7*
  80:*19, 22, 24*  87:*1*
  91:*3*  106:*3*  114:*16,*
  *17, 24*  125:*16*  140:*4*
**documentation** 15:*25*
  41:*25*  43:*10*  45:*4*
**documents** 7:*14, 18,*
  *21, 22, 24, 25*  8:*5, 24*
  87:*9*
**doing** 46:*16*  56:*6*
  70:*21*  74:*16*  103:*13*
  140:*1*
**Doller** 10:*6*
**domestic** 71:*25*
**domestic-related** 74:*2*
**Don** 134:*19*
**drinking** 70:*6, 19*
**Dropbox** 114:*10*
  147:*9*

**dropped** 139:*7, 9, 10*
**drunk** 140:*16, 22*
**drunkenly** 55:*24*
**due** 12:*24*  84:*22*
  120:*18*
**dues** 117:*22*
**DUI** 70:*1, 5*
**duly** 4:*19*  148:*2*
**duration** 92:*2*
**duties** 10:*20*  46:*16*
  70:*10*
**duty** 59:*10, 20*  64:*18,*
  *21, 23, 24*  70:*1, 6, 16*
  72:*8*  83:*21*  90:*5*
  103:*16*  138:*22*
  140:*17, 25*  142:*10, 12,*
  *19, 22*

**< E >**
**earlier** 10:*8*  41:*14*
  63:*20*  98:*25*  103:*23*
  107:*18*  109:*17*  116:*9*
  117:*6*  121:*14*  124:*6*
  125:*13*  128:*11*
  129:*22*  133:*12*
  137:*20*
**early** 14:*25*
**EEOC** 8:*16, 22*
  18:*10, 16*  19:*2*  38:*5*
  78:*7*  79:*12, 25*  84:*7,*
  *14*  86:*17*  100:*25*
  101:*21, 25*  102:*8, 17,*
  *22*  103:*9*  104:*19*
  106:*3, 6, 7, 23*  107:*1,*
  *7*  108:*25*  110:*16, 21,*
  *25*  111:*6, 9, 14*  146:*8,*
  *13, 21, 22, 25*
**effect** 44:*24*
**effectively** 142:*16*
**egregious** 20:*14*
**egregiousness** 85:*16,*
  *17*
**eight** 63:*25*
**either** 24:*2, 3*  28:*24*
  34:*14*  43:*10*  44:*11*
  45:*2*  78:*16*  111:*12*
**elect** 142:*4*
**elects** 32:*8*
**ELKINS** 2:*7*  3:*3*
  4:*10*  6:*13, 17, 22*  7:*7,*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 50 of 283

Deposition of Richard M. Clements                                    Jessica Guasto v. The City of Miami Beach, FL, et al.

11, 20, 25   8:9   9:10,
16   11:3   15:21   16:13,
23   17:20   18:5   19:3
20:9, 25   21:6, 19, 21
22:7, 15   23:1, 11, 25
24:12   25:3, 15   26:5,
9   27:25   28:11   30:11,
13   31:11   32:2   33:1
34:9, 25   35:22   36:17
37:7   38:1, 9, 18   39:6
40:11, 22   41:3   42:2,
22   43:16, 23   46:24
48:2, 12, 21   49:7, 20
50:9, 22   51:1, 4, 10
53:2, 8   57:5, 7, 13
59:5, 11, 25   61:12
63:5   65:4   66:5   67:2
69:1   70:2   73:6, 12
74:6, 22   75:2   76:21
77:5, 11, 20   78:9
79:16   80:5, 15   82:10,
17   83:24   85:3, 13
86:9, 23   87:11, 16
88:6, 24   89:20   90:6,
25   91:14   96:10, 12,
23   98:13   99:14
101:1, 4   102:10, 19
104:9, 13, 15   109:19,
23   110:1, 8, 10
113:12, 22   114:9, 13,
15   115:17   118:5, 6
124:12   127:13
131:22   147:3, 5
**Elliot**   51:20
**email**   147:9, 10, 11, 13
**emails**   8:25   9:3, 4, 5,
7, 11
**embarrassed**   74:5
**embarrassment**
46:14, 22   66:22   67:1
**employ**   16:17
**employed**   10:11
55:15, 18   56:23   60:9
99:2   101:18   106:18
109:12   144:7
**employee**   9:19   10:2,
4   18:19   22:6   23:10
27:3   28:9, 23   35:7
36:7   38:22   39:9
44:19, 22   45:6, 22

46:2, 20   48:10   49:5
50:1, 19   51:8, 9, 13
53:16   72:24   93:1, 18
95:23   97:23   98:5, 11
110:25   112:6, 15
113:1   115:13, 14, 22
116:3   117:17   118:19
119:10   120:8, 11
121:2, 4   131:7, 10
134:4   145:8   149:12,
13
**employees**   11:13
18:3   19:17, 24   20:1,
24   26:2   38:15   39:4
49:8   50:23   54:19
100:24   113:8, 13, 16
126:10   131:1
**employee's**   29:15
36:11   40:4   47:5
50:16   53:14, 15
118:15
**employer**   10:13
**employment**   9:22
48:7   50:2   75:13
107:21   141:21
**encompasses**   11:7
**encounter**   16:19
**ended**   71:15   109:15
127:25   143:24
**endorse**   50:12
**enforcement**   10:18
11:17, 25   13:1   15:18
45:24
**Enforcement-
mandated**   19:16
**engaging**   138:13
**enhances**   17:6
**ensure**   5:11, 23   27:17
**ensured**   19:17   21:17
**entail**   17:17
**enter**   48:11   49:6
50:20, 23   51:9   86:13
90:12   91:23
**entered**   68:4   79:18
150:23
**entering**   51:13
**entire**   99:7   116:21
**entirely**   50:11   99:11
102:15

**entirety**   5:20
**entitled**   115:5
**entity**   46:11
**equal**   16:25
**equation**   21:14
**equitable**   53:21
**equity**   16:7, 22, 24
**Eric**   101:14, 16
**ERRATA**   3:6   150:1
**especially**   37:12
**ESQUIRE**   2:2, 7
**establish**   106:9
**established**   141:18
**establishment**   70:21
**et**   1:7
**evaluation**   142:1, 8
**Evans**   1:8   114:9
147:5, 6   148:2, 11
149:2, 19
**Evanston**   15:11
**evening**   92:13   93:5
114:10
**event**   25:24   36:25
45:25   53:18   66:13,
22, 25   67:4, 18   142:9
**events**   23:6   63:3
91:25   96:24
**everybody**   53:19
76:1   114:7   129:17
**evidence**   82:23
129:19
**Examination**   1:8   3:1
4:20   82:4
**example**   22:4   23:4
87:25   112:14   113:24
119:16
**exceptions**   128:20
**exclusively**   137:13
**excuse**   29:10   43:1
51:20   55:17   86:1
87:14
**executing**   84:11, 13
**executive**   13:15
15:13   92:21   93:10
**EXHIBIT**   3:6, 9, 10,
11, 15   80:19   104:17
106:1   107:19   108:10,
21   114:6, 8, 17   140:1,
5   146:12

**exhibits**   104:11
108:11, 12, 13   140:3
147:7, 11
**existing**   17:23
**expect**   140:2
**expectation**   50:1
**expectations**   39:18
74:9   91:9
**expected**   91:9
**experience**   11:25
12:14
**experienced**   77:18
**Expires**   148:13
**explain**   16:9   23:22
93:3   97:17   99:20
**explanation**   26:22
97:22   145:6, 8
**explore**   30:19, 20
**expressly**   3:15
**extensively**   111:16
**extent**   6:25   8:12
39:23   72:22
**external**   44:8
**eyes**   27:18   74:15


< F >
**face**   62:3, 14
**fact**   25:19   48:4
54:24   59:21   82:20
83:1   97:23   111:24
127:18   146:21
**factors**   47:7
**facts**   28:4, 6   33:25
34:1, 2   91:1
**failing**   56:20   98:11
**failure**   87:5   98:16
**fair**   45:16   67:12
68:24   77:2   103:7
**fairly**   102:13
**fall**   9:6   18:22   68:20
**familiar**   45:17   51:20
55:4, 7   57:25   58:3
61:20, 22   62:5, 7
63:11, 14   69:14, 16
71:17, 20   92:19
102:16   103:8   138:8
**fantastic**   57:19
**far**   17:15   62:9   69:7
84:5   90:19   94:22

95:*3*
**Fat** 70:*15*
**FBI** 15:*15*
**FDLE-mandated** 19:*15*
**February** 106:*11*
**federal** 133:*19*
**feel** 39:*4, 13, 15*
**fell** 22:*14*
**felony** 71:*25*
**felt** 20:*1, 3* 94:*6*
**female** 102:*12* 105:*6*
**fever** 89:*6*
**field** 11:*20*
**fields** 11:*15*
**fifth** 81:*24* 82:2
**fight** 127:*8*
**figured** 9:*13*
**file** 8:*16, 22* 18:*21*
26:*3* 28:*15* 29:*11, 15*
30:*16, 25* 31:*10*
39:*23* 44:*12* 56:*16*
58:*22, 23, 25* 59:*13*
60:*3* 73:*5* 79:*1*
102:*8* 110:*25* 113:*13,
14, 16* 119:*21, 25*
132:*19*
**filed** 26:*12* 28:*22*
38:*23* 42:*14* 47:*12*
51:*25* 78:*5* 100:*25*
102:*3, 5, 6* 106:*23*
107:*7* 108:*24* 113:*7*
121:*4* 146:*21*
**files** 8:*7* 113:*18*
**filing** 29:*10* 43:*11,
14* 44:6 47:*13* 84:*14*
107:*1* 114:*4*
**fill** 12:*6*
**filled** 43:*8*
**final** 35:*15, 17* 36:*10*
37:*1* 42:*18, 19* 47:*24*
48:*7* 51:*16* 108:*1*
**finalized** 96:*9*
**financially** 149:*15*
**find** 47:*23* 53:*21*
68:*23*
**finding** 33:*25* 60:*1*
72:*12*

**findings** 33:*19, 21*
36:*14, 21* 41:*15* 56:*4*
85:*17*
**fine** 60:*25*
**finish** 6:*5*
**finished** 14:*18*
**finishing** 45:*3*
**fire** 10:*18* 11:*7, 18*
46:*13* 127:*14*
**firearm** 71:*1*
**fired** 52:*16* 126:*16*
127:*8, 12, 22* 136:*5,
12, 14, 24* 139:*21*
**first** 4:*19* 5:*11* 12:*9*
78:*7* 83:*11* 88:*19*
98:*2* 100:*12* 104:*9*
**fit** 103:*15* 142:*10, 12,
19, 22*
**fitness-for-duty** 142:*8*
**five** 13:*15* 61:*4*
74:*24* 76:*8*
**FL** 1:*6*
**Flanigan** 10:*7*
**floor** 81:*25* 82:*2*
**FLORIDA** 1:*1, 6*
2:*4, 8* 19:*15* 133:*16*
148:*2, 12* 149:*2*
**fly** 140:*2*
**FOB** 140:*6*
**focused** 19:*6, 7* 88:*17*
**folder** 9:*1, 3*
**follow** 41:*9* 93:*3*
97:*9, 19* 99:*21*
141:*20*
**following** 27:*22*
65:*25* 67:*13* 84:*19*
98:*21* 106:*6* 120:*12*
141:*24* 150:*1*
**follows** 4:*19*
**follow-up** 39:*11*
**footage** 88:*3*
**FOP** 29:*22, 25* 30:*15*
31:*18, 20* 32:*18*
36:*25* 54:*23, 24*
84:*11* 92:*21* 93:*11*
94:*6, 9, 13, 16, 21, 24*
95:*12* 116:*13, 18, 22*
117:*13, 16, 19* 118:*20,
23* 120:*8, 11* 121:*2, 4,
5* 124:*20* 125:*2, 7, 24,*

25 141:*24* 144:*15, 22,
25*
**force** 126:*9, 13*
131:*15*
**forced** 126:*22* 142:*24*
**foregoing** 149:*2*
**forget** 131:*1*
**form** 15:*21* 16:*13, 23*
17:*20* 18:*5* 19:*3*
20:*9, 25* 21:*6, 19*
22:*7* 23:*11, 25* 24:*12*
25:*3, 15* 26:*5* 27:*25*
28:*11* 30:*11* 31:*11*
33:*1* 34:*9, 25* 35:*22*
37:*7* 38:*1, 9, 18* 39:*6*
40:*11, 22* 41:*3* 42:*2,
22* 43:*3, 4, 7, 23*
44:*23* 46:*24* 48:*2, 12,
21* 49:*7, 19, 20, 25*
50:*9, 22* 51:*1, 10*
53:*2, 8* 57:*5, 13* 59:*5,
11, 25* 61:*12* 63:*5*
65:*4* 66:*5* 67:*2* 69:*1*
70:*2* 73:*6, 12* 74:*6*
76:*21* 77:*5, 11, 20*
78:*9* 79:*16* 80:*5*
82:*10* 83:*24* 85:*3, 13*
86:*23* 87:*11, 16* 88:*6,
24* 89:*20* 90:*6, 25*
91:*14* 96:*10, 23*
98:*13* 99:*14* 101:*1, 4*
102:*19* 118:*14* 134:*5*
150:*23*
**formal** 11:*1, 6* 130:*6*
133:*3*
**formerly** 74:*20* 75:*12*
**Fort** 2:*8*
**forth** 12:*14* 17:*13*
18:*8* 27:*4* 28:*14*
33:*21* 37:*10* 40:*3*
55:*1*
**Forum** 15:*13*
**forward** 18:*12* 24:*15*
26:*1* 34:*17* 37:*9*
40:*5, 19* 41:*20* 44:*6*
68:*13* 72:*16* 74:*19*
96:*5* 115:*9* 145:*25*
**forwarded** 44:*20*
**forwarding** 44:*16*
**fought** 126:*19*

**found** 20:*6* 23:*3, 10*
47:*17* 97:*22* 142:*11,
19, 22*
**four** 12:*1* 13:*15*
24:*7* 93:*10* 135:*5*
**Fourth** 135:*22, 23*
136:*8, 9*
**frame** 31:*24* 53:*17*
**frames** 41:*14*
**Fraternal** 29:*17, 22*
35:*9* 36:*6* 81:*2*
114:*20*
**free** 7:*1* 8:*13* 26:*16*
**Freedom** 42:*11*
133:*11, 16, 19*
**freely** 39:*14*
**frequently** 33:*14*
76:*2* 137:*8*
**Friday** 63:*24*
**front** 78:*11* 80:*7*
87:*1* 117:*10* 125:*18*
**full** 5:*21* 117:*14*
**full-time** 62:*21, 25*
**further** 23:*22* 37:*21*
47:*15* 65:*14* 98:*19,
24* 106:*7, 9* 147:*3*
149:*11*
**future** 91:*24*

**< G >**
**gain** 61:*3*
**Gausto** 4:*5*
**general** 22:*18, 20*
23:*4, 21* 26:*14* 67:*14*
131:*2*
**generally** 27:*4* 28:*16,
22* 91:*21* 115:*21*
128:*5, 18* 129:*11*
132:*20*
**geographical** 14:*4*
**getting** 54:*8* 67:*3*
71:*12* 83:*4* 127:*9, 12*
**give** 5:*21* 10:*25*
12:*13* 17:*18* 22:*4*
49:*25* 87:*1* 101:*12*
120:*10* 123:*20* 145:*8,
19* 147:*11*
**given** 5:*4, 7* 13:*22*
62:*11* 63:*6* 88:*15*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 52 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

92:*12*  93:*4*  99:*22*
145:*7*
**giving**  50:*16*  63:*9*
**go**  5:*10*  12:*21*  18:*16*,
*20, 21*  26:*19, 24*  27:*7*
32:*2*  36:*24*  37:*14, 15*
38:*22*  39:*14, 18*
54:*17, 22*  56:*16*  58:*8*
60:*13, 21*  65:*22*
67:*12*  68:*2, 13*  69:*8,
19*  72:*16*  80:*13*
82:*17*  86:*21*  89:*3*
91:*7*  93:*8*  97:*2, 18*
98:*12*  99:*24*  109:*16*
110:*25*  111:*21*
112:*18, 21*  116:*6*
122:*12, 15*  143:*24*
**goals**  17:*5*
**God**  4:*15*
**goes**  14:*7*  38:*2*
94:*22*  121:*9*
**going**  5:*10, 19, 20*
6:*22*  7:*9, 21*  11:*2, 19*
14:*1*  15:*24*  24:*18*
30:*4*  35:*17*  41:*20*
45:*2, 9, 14*  49:*1*
54:*11*  61:*7*  67:*23*
73:*21*  79:*23*  80:*18*
82:*18*  83:*2*  93:*8*
94:*14*  97:*3*  98:*24*
104:*10, 16, 17*  105:*25*
107:*19*  109:*16*  114:*7,
8*  115:*9*  121:*16*
123:*2, 5*  132:*14*
136:*6*  139:*25*  140:*1*
147:*5, 6, 7, 8*
**Good**  4:*22*  61:*9, 17*
**gotten**  68:*6*  147:*10*
**Greg**  100:*9*
**grievable**  128:*2, 5, 8,
10*
**grievance**  26:*12, 25*
28:*9, 13, 14, 15, 18, 22*
29:*3, 5, 11, 15, 23*
30:*1, 2, 7, 9, 20*  31:*10*
32:*20, 25*  38:*23*
54:*15*  55:*3*  93:*11*
113:*5*  114:*4*  115:*5, 9*
116:*3, 22*  118:*13, 14,
20*  119:*21, 25*  120:*7,*

*8, 11*  121:*1, 2, 4, 5, 10*
124:*19, 20, 21*  125:*2,
8*  126:*18*  130:*14, 20*
143:*5*
**grievances**  26:*3, 11*
28:*8*  29:*18*  111:*17*
113:*3, 7, 13, 17, 18*
115:*21*  116:*14, 19*
117:*15*  118:*7*  119:*13*
**grieve**  114:*2*
**grieving**  119:*10*
120:*3*  125:*24*  143:*5*
**ground**  71:*3*
**groundswell**  145:*18,
21*
**Group**  2:*2*  67:*23*
138:*1, 4*
**GUASTO**  1:*3*  74:*21*
75:*12*  90:*9, 12*
143:*25*  144:*10*
**guess**  11:*5*  27:*19*
46:*1*  52:*2, 4*  75:*6*
87:*4*  103:*19*
**guide**  49:*25*
**guidelines**  41:*9*
**guilty**  23:*10*  68:*6*
**guys**  75:*4*

**< H >**
**H.R**  15:*1*  21:*4*  25:*1*
103:*15*  110:*3*  111:*4*
121:*10*
**half**  7:*17*  12:*1*
13:*13, 24*  74:*24*
**hallway**  76:*11*
**hand**  4:*13*  148:*2*
**handcuffed**  62:*2, 14*
**handle**  16:*1*  33:*5*
73:*20*
**handled**  27:*15*  38:*5*
68:*15*  110:*22*
**handles**  41:*18*
**handling**  17:*8*  40:*9*
**hang**  114:*7*
**happen**  73:*22*
**happened**  70:*3*  90:*9*
92:*24*  96:*7*  126:*12*
**happening**  119:*6*
125:*25*  132:*8*
**happens**  115:*19*

**harassed**  20:*1*  23:*3*
39:*5*  105:*4*
**harassing**  23:*10*
**harassment**  17:*9, 14*
18:*4, 9*  19:*23*  20:*6, 7*
22:*17*  23:*15*  31:*17,
21*  37:*17*  39:*3*  110:*4*
**harbored**  77:*3*
**harm**  87:*24*
**Hazzi**  51:*20, 21, 22*
52:*1, 7, 10, 13, 16*
88:*1*  124:*6*  126:*12,
16*  127:*3, 6*  134:*13*
135:*6, 8, 12*
**Hazzi's**  134:*14*
**head**  5:*13*  52:*7*
112:*23*  128:*25*
**hear**  83:*11*  94:*20*
103:*25*
**heard**  5:*9*  17:*2*
36:*18*  79:*10*  99:*1*
**hearing**  35:*12*  36:*3,
4, 5, 8*  122:*8, 10, 20*
129:*7, 10, 13, 16, 23*
130:*6, 18*
**hearings**  130:*1*
**held**  12:*14*  37:*24*
**help**  4:*15*  20:*18*
**hereto**  3:*15*
**Hey**  96:*4*  97:*21*
**HH473772**  148:*13*
**higher**  74:*9*  76:*12*
91:*9*
**history**  47:*6, 11*
53:*15*
**Hold**  8:*9*  10:*25*
96:*12*  139:*23, 24*
**homeless**  100:*20, 22*
**honestly**  22:*19*  97:*2*
**hoped**  97:*25*
**hopefully**  49:*2*  73:*23*
**hotel**  64:*4*  138:*10*
**hour**  7:*17*  74:*23*
**hours**  82:*25*  85:*1, 8,
20*
**Human**  20:*17*  21:*8,
16*  36:*12*  37:*15*
39:*10, 12*  50:*13*
103:*4*  108:*3*  110:*18,*

*23*  128:*24*

**< I >**
**I.A**  8:*22*  47:*5, 11*
81:*11*  132:*4, 11, 15*
144:*4*  146:*19*
**IA**  42:*13*
**IA-Prof**  42:*13*
**idea**  96:*12*
**identified**  70:*19*
**identifying**  34:*14*
**identity**  37:*12*
**ill**  77:*3, 6*  83:*5*
**Illinois**  15:*11*
**illness**  88:*14*
**immediate**  75:*20*
**immediately**  84:*14*
89:*7*  138:*17*  140:*25*
**impact**  134:*8*
**impasse**  124:*23*
**impending**  132:*11*
**implement**  92:*3, 6, 16*
97:*3*  98:*23*  99:*25*
**implementation**
10:*22*  35:*10*  78:*6*
92:*1*
**implemented**  96:*3*
**implementing**  19:*13*
146:*2*  147:*1*
**implements**  36:*4*
**important**  5:*17*
16:*14*  83:*7*  96:*1*
**importantly**  17:*3*
40:*6*  47:*3*  53:*18*
57:*20*  72:*24*  82:*23*
83:*6*  88:*18*  89:*9*
91:*8*  94:*5*
**inaccurate**  111:*10*
**inactions**  97:*18*
**inappropriate**  43:*6*
78:*15, 16*  126:*1*
144:*23*
**incident**  10:*8*  53:*12*
55:*23*  56:*2, 9*  57:*15,
20*  58:*16*  61:*4*  67:*10*
68:*5, 9*  78:*4*  79:*21*
87:*7*  90:*10, 20*  92:*8*
135:*19, 24*  136:*3, 7, 8,
9, 10*  138:*2, 5, 6, 8, 10*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 53 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

**inclined** 103:*4*
**include** 35:*9* 93:*11*
**included** 9:*3*
**includes** 38:*4*
**including** 101:*10*
**inclusion** 16:*7, 22*
17:*1*
**incorrect** 111:*9*
122:*13* 125:*14, 15*
**incorrectly** 119:*17*
**incredibly** 83:*7*
**independently** 102:*4*
**INDEX** 3:*1, 6*
**indicate** 82:*25*
**indicated** 81:*24*
**Indirectly** 75:*25*
**individual** 21:*11*
22:*24* 23:*9, 23* 28:*9*
30:*2, 7* 34:*20* 42:*21*
43:*2, 14, 20* 44:*4*
46:*5* 48:*20* 57:*3*
69:*2* 88:*2* 93:*25*
111:*4* 116:*25* 117:*3*
131:*7*
**individuals** 11:*11*
21:*3* 25:*13* 34:*22*
37:*5* 39:*2* 68:*23, 25*
88:*3* 95:*1* 100:*8*
101:*13* 109:*18* 110:*3*
127:*18, 19* 131:*1*
138:*12*
**in-field** 88:*11*
**informal** 142:*6*
**information** 20:*19*
42:*12* 56:*17* 67:*5*
99:*24* 132:*15, 16*
133:*12, 16, 19*
**infraction** 27:*14*
**initial** 25:*22* 42:*18*
47:*20* 56:*2* 83:*2, 18*
95:*19* 97:*5*
**initially** 78:*21* 96:*16*
126:*16*
**initials** 85:*25* 86:*1, 2*
**initiate** 29:*3* 97:*3*
116:*14*
**initiated** 115:*21*
**initiates** 41:*19*
116:*19*

**initiating** 42:*16*
**injuries** 55:*25*
**injury** 103:*12, 14*
**innocent** 19:*23*
**innumerable** 118:*11*
**inquiries** 31:*19*
**inquiry** 66:*9* 90:*8*
**in-service** 19:*17*
**inside** 64:*4*
**insight** 17:*19* 24:*9*
**instance** 22:*4* 23:*21*
25:*2* 39:*20* 46:*20*
72:*15* 78:*3* 83:*1, 9,*
*17*
**instances** 18:*3* 24:*2*
41:*25* 83:*22* 103:*20*
**institute** 129:*11*
**instituted** 119:*7*
**instruct** 7:*10*
**instructed** 31:*15*
**instruction** 31:*16*
**instructions** 31:*10*
93:*4*
**insult** 109:*21*
**intent** 95:*25*
**intentional** 109:*24*
**interact** 76:*2, 6*
**interactions** 38:*3*
76:*14* 103:*24*
**interest** 40:*9, 13*
**interested** 149:*15*
**interests** 67:*14*
**Internal** 8:*7, 15*
17:*15, 16* 18:*20* 19:*1*
25:*17* 27:*7, 9, 10, 12,*
*23* 33:*4, 10, 13* 34:*7*
35:*20, 22* 37:*18* 38:*2*
41:*6, 9* 43:*8, 9, 21*
44:*8, 17, 21* 56:*4, 16*
59:*13* 68:*14* 69:*11*
72:*25* 80:*1, 5* 81:*10,*
*13, 16* 82:*8* 83:*14*
95:*19* 96:*8, 13, 21*
98:*20* 107:*20* 108:*15*
111:*21, 25* 112:*11, 19,*
*21* 128:*15, 19* 132:*1,*
*7, 19, 23, 24* 133:*3*
*139:1*
**internally** 19:*16*

43:*5* 68:*16* 108:*18*
**interrogate** 145:*3*
**interrupt** 5:*17, 20*
9:*16* 26:*23* 74:*22*
**intervention** 24:*22*
**interviews** 37:*3*
**introduce** 140:*3*
**investigate** 41:*22*
43:*13* 107:*23*
**investigated** 32:*7*
108:*18*
**investigation** 20:*18*
24:*20* 31:*25* 32:*12,*
*24* 33:*7, 16* 34:*24*
36:*22* 40:*10, 14, 16*
41:*18* 47:*14, 17, 23*
61:*14* 64:*19* 66:*1*
67:*9* 72:*9, 10, 12, 13*
81:*11, 14, 17, 18* 82:*5,*
*9, 12, 13, 24* 83:*14*
84:*2, 18* 85:*18* 90:*1,*
*10* 95:*17* 96:*8, 13*
98:*9, 10, 19* 103:*3*
106:*8, 9* 128:*21*
132:*8, 9, 12, 15, 18, 23*
133:*4* 144:*4* 146:*19*
**Investigations** 13:*19,*
*23* 14:*5, 14* 36:*15*
37:*24* 38:*7, 13, 17*
41:*13* 128:*16* 132:*1,*
*4, 24* 138:*25*
**investigative** 33:*19*
40:*7, 17* 132:*19*
**investigators** 32:*23*
33:*10, 15*
**involve** 34:*20* 40:*2*
112:*4*
**involved** 21:*3, 5*
35:*8* 36:*11, 15, 23*
40:*15* 46:*12* 53:*10*
54:*25* 55:*23* 56:*3*
58:*16, 21* 63:*21*
67:*18* 81:*19* 90:*9, 10*
94:*24* 112:*8* 113:*25*
133:*2* 135:*11, 17, 18*
138:*5, 19*
**involvement** 19:*12*
57:*4* 61:*10* 62:*13*
65:*18* 69:*25*

**involves** 10:*18* 30:*3*
32:*20* 36:*8*
**involving** 18:*8* 21:*10*
32:*19* 33:*16* 52:*9, 12*
92:*8, 9* 103:*11* 144:*4*
**issue** 20:*4* 37:*17*
74:*2* 80:*10* 92:*9*
103:*11* 104:*3* 108:*1*
119:*21*
**issued** 46:*20* 106:*3,*
*11* 108:*4, 6, 21*
113:*25* 141:*1*
**issues** 37:*11* 38:*14*
69:*19* 79:*23* 80:*3*
81:*7* 88:*13, 14* 90:*17*
106:*6* 111:*21, 24*
112:*2, 22* 115:*25*
128:*13, 23* 142:*1*
**issuing** 33:*25* 38:*19*
**its** 5:*20* 106:*8*
116:*14* 117:*14, 17*
123:*13* 141:*20, 23*

**< J >**
**January** 92:*19* 94:*23*
97:*24* 144:*13* 146:*2*
**Jerome** 55:*5, 7* 56:*8*
57:*2, 3*
**JESSICA** 1:*3* 74:*20,*
*21* 75:*11, 12* 81:*2*
95:*22* 99:*2* 100:*11*
101:*10* 130:*17*
135:*11* 139:*24* 143:*8*
144:*4, 11, 14, 15*
145:*3, 9*
**Jessica's** 131:*18*
147:*1*
**job** 34:*6* 52:*19, 21,*
*23* 53:*1* 54:*2* 61:*18*
62:*8* 70:*12* 71:*11, 13*
103:*13, 16* 126:*19*
127:*9, 23*
**joined** 55:*10*
**Jones** 93:*9* 106:*17*
**Jose** 67:*17* 68:*1*
**Julie** 1:*8* 148:*2, 11*
149:*2, 19*
**July** 14:*17, 18*
135:*22, 23* 136:*8, 9,*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 54 of 283

Deposition of Richard M. Clements                           Jessica Guasto v. The City of Miami Beach, FL, et al.

10
**jump**  7:*11*  8:*9*
**June**  14:*17*  86:*17*
**jurisdiction**  67:*9*
**Justice**  11:*5, 8, 16, 21*
63:*21*

**< K >**
**Kalea**  13:*9*
**keep**  83:*4*  88:*12*
99:*2*  109:*20*  133:*24*
146:*5*
**kept**  62:*8*
**Kevin**  67:*16*  68:*1, 5*
69:*10*
**kind**  104:*10*
**knew**  20:*3*  87:*3*
88:*16*
**know**  16:*15*  17:*4*
18:*18*  20:*12*  21:*10,*
22  24:*5*  28:*17*  30:*17,*
18  31:*3*  34:*15*  37:*14,*
17  40:*4*  41:*20*  43:*5*
44:*8*  45:*12, 23*  46:*17*
47:*3, 5, 7, 21*  49:*11*
51:*21, 22*  52:*3, 4, 11,*
16, 18, 22, 25  53:*16*
54:*21*  56:*18*  57:*8, 16*
58:*22*  60:*5, 7, 8*  62:*7,*
12, 15, 19  63:*8*  64:*24*
67:*8*  68:*16*  69:*9*
70:*17*  72:*20, 22*
73:*15, 18, 22*  74:*10,*
15, 20  75:*11*  76:*4, 10,*
24  77:*12*  79:*9*  80:*24*
83:*6*  84:*4, 5*  85:*18*
87:*25*  88:*8, 11, 16*
89:*15*  90:*14*  95:*20,*
24  96:*2, 14*  97:*4, 25*
98:*23*  99:*18*  101:*21,*
22, 25  102:*15*  103:*24*
104:*2, 5*  107:*12, 15,*
16  109:*20*  116:*7*
129:*11*  141:*2*  147:*10,*
14
**knowing**  71:*21*
**knowledge**  19:*9*
45:*20*  62:*23*  67:*20*
72:*11*  76:*17, 20*  80:*3*

83:*23*  87:*10*  89:*17*
101:*9*  102:*9*  103:*8*
110:*24*
**known**  55:*9*  58:*4, 12*
61:*24*  69:*17*  122:*20*
135:*18*
**knows**  80:*8*

**< L >**
**labor**  113:*5*  121:*7*
**lack**  50:*15*  56:*6, 9*
134:*8*
**large**  147:*8*
**Lauderdale**  2:*8*
**Law**  2:*2, 7*  10:*18*
11:*17, 25*  13:*1*  15:*18*
19:*16*  45:*23*  68:*21*
73:*19*  74:*2, 11, 16*
113:*5*  133:*14, 16, 20,*
22, 24
**lawsuit**  51:*25*
**lawyer**  126:*24*
**lawyers**  91:*4*  131:*23*
**lead**  37:*15*  46:*5, 7*
**leading**  11:*23*  54:*15*
**leads**  28:*24*
**learned**  15:*23, 24*
57:*20*
**leave**  34:*5*  74:*17*
**lectures**  17:*18*
**led**  56:*6*  82:*4, 5*
83:*13*
**left**  31:*8*  57:*18*  58:*9,*
11  61:*1*  68:*15*
121:*16*
**legal**  30:*17, 19*
**lessened**  45:*6*
**letter**  78:*6*  92:*1, 3, 6,*
16  97:*4*  98:*23*  99:*25*
146:*2*  147:*1*
**level**  22:*14*  27:*15*
29:*1*  30:*5*  103:*1*
112:*20*  128:*20*
**LEWIS**  2:*7*
**lied**  59:*9, 18, 23*
**Lieutenant**  9:*23*
10:*1*  13:*16, 20*  14:*25*
55:*22*  56:*18, 19*
58:*16, 17*  59:*22*  60:*5,*
15  93:*14*  101:*24*

102:*5, 8, 13*  106:*21,*
22  109:*9*
**Lieutenants**  10:*6*
31:*6, 9*
**lieutenant's**  31:*2*
**life**  73:*18*
**light**  45:*15*  46:*14*
111:*25*
**limit**  29:*14*
**limitations**  12:*25*
128:*1*
**limited**  27:*11*  120:*3*
**line**  6:*4, 5*  67:*12*
88:*19*  104:*3*  150:*3*
**lines**  15:*2*
**listed**  105:*1*  110:*11*
**listen**  53:*14*  123:*6*
**litigation**  52:*20*
**little**  24:*9*  28:*18*
32:*20*  93:*6*  116:*7*
118:*2*  132:*3*
**locate**  89:*23*
**location**  89:*3*
**Lodge**  81:*3*
**long**  7:*16*  14:*7*
31:*24*  58:*12*  64:*21*
69:*17, 18*  105:*5*
128:*21*
**longer**  75:*1, 2*
**look**  11:*3*  21:*23, 25*
27:*19, 20*  32:*8*  37:*19*
45:*9, 12, 14*  47:*4*
53:*18*  95:*19*  97:*20*
**looked**  30:*1*  45:*3*
68:*10*
**looking**  11:*6*  14:*22*
27:*18*  53:*23*  73:*20*
99:*18*  146:*4*
**looks**  123:*1*  142:*18*
**loss**  85:*7*  142:*11*
**lost**  145:*9*
**lot**  14:*21*  47:*6*
103:*2*  104:*9*  127:*14*
136:*2, 5, 12*  144:*11*
**Lt**  94:*24*
**lying**  94:*1*

**< M >**
**maintain**  41:*24*
**maintaining**  71:*15*

**Major**  13:*7*  14:*11,*
13  15:*6*  60:*16*  75:*21*
**making**  17:*1*  43:*14,*
21, 25  44:*20*  107:*20*
**manager**  121:*7*
**managerial**  15:*1*
**mandate**  111:*5*
**Maniquan**  100:*18*
**mark**  80:*19*  104:*11*
107:*19*  114:*8*  140:*1*
**marked**  108:*9*
114:*17*  140:*4*
**marking**  104:*17*
106:*1*  108:*10*
**Martinez**  134:*25*
135:*1*
**material**  7:*3*
**math**  61:*6*
**matter**  4:*5*  66:*4*
**matters**  76:*16*  84:*17*
**maximum**  75:*6*
**McVey**  100:*9, 13*
**mean**  9:*16*  14:*23*
16:*9, 11*  26:*23*  30:*24*
35:*17*  45:*14*  47:*11*
52:*2*  57:*9, 15*  60:*22*
62:*7*  69:*21*  71:*23*
74:*22*  94:*22*  96:*13*
110:*18*
**meaning**  17:*17*
19:*15*  53:*22*  95:*22*
**means**  26:*10, 11*
32:*9*  119:*9*
**measured**  22:*23*
**measures**  21:*24*  22:*1*
25:*1*  37:*4*  39:*22*
88:*21*
**mechanism**  18:*25*
29:*14, 16, 20*
**mediation**  38:*24*
52:*24*  53:*3, 6, 9, 23*
121:*14, 23, 25*  123:*16,*
23  124:*8*
**mediator**  53:*19*  54:*7*
121:*12*
**meet**  7:*12, 16*  39:*17*
89:*2*  95:*12*
**meeting**  7:*19*  8:*1*
33:*14*  35:*7*  37:*1*
92:*20, 24, 25*  93:*7, 20,*

23  94:2, *4*, *11*, *14*, *19*,
*20*, *23*, *25*  95:5, *8*, *9*,
*11*, *15*, *18*, *21*  96:2, *9*
97:13, *16*  98:25  99:4,
*8*, *13*  120:12  133:2
144:13, *18*, *22*  145:4
146:1
**meetings**  37:3, *24*, *25*
51:15  132:22, *25*
**member**  30:3  31:1
43:7  94:13  117:19,
*23*
**members**  31:4, *7*
88:12  90:4  92:20
93:10  94:9, *17*, *18*, *21*,
*24*  116:15  117:15, *16*
**member's**  73:5
**memorandum**  3:11
**Memorial**  135:21
136:7
**memory**  72:2  93:9
**mentioned**  21:4
25:11  39:1  63:20
87:19
**MIAMI**  1:6  2:4
3:11, *15*  4:6, *11*
10:15  12:2  15:12
56:24  60:10  72:18
75:13  81:3  99:3
100:13  101:19  105:6
140:7  141:23  142:13
**Miami-Dade**  10:14
12:4
**MICHAEL**  2:7  4:10
26:7  104:8  118:1
140:7  141:19
**microphone**  118:3
**mid**  134:16
**mid-1990s**  61:25
**mid-2000s**  15:1
**mid-2014**  75:18
**Mike**  6:13, *17*  69:17
70:8
**mind**  71:23  75:3
**mini**  125:21  147:12
**minimal**  103:24
112:21
**minimum**  18:18
**minor**  27:14  128:4

**minute**  116:12  118:2
139:25
**minutes**  75:6  80:12
**misconduct**  9:19, *23*
10:2, *5*  24:15  25:2
27:11, *22*  32:1, *5*
34:22  40:21  42:1
44:16, *19*, *22*  45:6
47:18  48:11  49:6, *11*
50:6, *20*  64:7  83:9,
*13*, *17*, *22*  84:1  85:12
86:21  87:10, *15*  93:2,
*18*  95:23  111:21, *24*
112:2  134:4  145:8
**misdemeanors**  72:1
**misinterpreted**  19:25
**misperception**  103:2
**mispronounce**  109:23
**misrepresent**  49:1
**misrepresenting**  46:13
**missed**  13:11
**misspoke**  117:8
**misstatement**  110:21
**misstates**  48:21  53:2
70:2  79:16  90:25
96:23  98:13
**mistaken**  56:10
70:12  102:23  103:11
**mitigating**  129:19
**MLE**  2:7
**Mm-hm**  72:3  146:10
**mm-hm's**  5:12
**mobilization**  81:20
**model**  57:18
**moment**  139:25
**Monday**  63:24
**money**  144:11
**Monique**  100:10, *17*
**months**  63:25  142:6
**morning**  4:22
**Motor**  13:11  58:7
**move**  61:16  79:11
96:4  115:9
**moved**  13:25  14:4, *6*
**moving**  26:1  40:19
74:19  145:25
**muddled**  111:11
**Muley**  3:15  69:14,
*16*, *18*  70:3, *9*, *14*, *23*,
*25*  71:4, *6*, *8*, *10*, *12*

139:24  140:7, *16*
141:19, *25*  142:3, *7*, *9*,
*11*, *16*  143:21
**Muley's**  69:24
140:10  141:21  143:5
**multiple**  55:24
**municipality**  1:7
**murky**  132:3
**mutual**  125:11
131:10
**mutually**  125:4, *14*

**< N >**
**name**  4:23  45:13
100:12, *18*  109:20
**named**  116:15  121:5
**names**  100:7  101:12
**narcotics**  12:20
**National**  15:16
**nature**  20:16  24:6,
*17*  25:6  27:5, *6*, *14*
37:13  46:7, *9*  76:5
87:6
**necessarily**  18:22
28:25  30:19  39:14,
*17*  45:14  47:21  56:5
62:19  71:23  82:3
104:3  112:11, *18*
**necessary**  20:19
21:17  88:9
**need**  6:3  12:7  26:21
32:21  43:15, *18*, *21*
44:23  50:4, *5*  60:13
65:12  80:12  114:6
139:25
**needed**  19:24  20:20
21:12  23:17  33:18
94:7  98:4
**needs**  48:19  128:20
**negative**  28:25  46:13
**negotiate**  54:7
**negotiated**  91:3
120:20, *23*  131:19, *23*
**negotiation**  116:2
137:16  146:14
**negotiations**  131:10
**neighborhood**  51:23
**neither**  61:8
**neutral**  34:7  121:11
122:16, *17*  123:13

**never**  51:16  68:8
88:9  94:5, *18*  109:7,
*8*  111:24  116:3
127:20
**new**  30:23  63:15
**Nicholas**  90:12
**Nick**  143:25  144:10
**nickname**  5:3
**night**  59:21  70:24
**Noriega**  134:23, *24*
**North**  12:5
**Northeast**  2:8
**Northwestern**  15:10
**Notary**  1:24  148:2,
*12*
**note**  96:1
**notes**  14:23  143:25
149:2
**Notice**  3:11  84:13
94:16  95:7, *8*  106:2
**notifies**  117:16
**number**  13:10  16:24
26:14  32:21  43:3
58:6  85:8  99:19
110:11  115:2  119:2
149:2
**numbers**  61:8  118:11
**numerous**  47:12

**< O >**
**Oates**  14:10  15:11
70:7  78:25  84:2
135:2  137:21  140:14
142:6  145:11
**OATH**  3:4  148:1
**object**  24:12
**Objection**  15:21
16:13, *23*  17:20  18:5
19:3  20:9, *25*  21:6,
*19*  22:7  23:11, *25*
25:3, *15*  26:5, *7*
27:25  28:11  30:11
31:11  33:1  34:9, *25*
35:22  37:7  38:1, *9*,
*18*  39:6  40:11, *22*
41:3  42:2, *22*  43:16,
*23*  46:24  48:2, *12*, *21*
49:7, *20*  50:9, *22*
51:1, *10*  53:2, *8*  57:5,
*13*  59:5, *11*, *25*  61:12

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 56 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

63:5  65:4  66:5  67:2
69:1  70:2  73:6, 12
74:6  76:21  77:5, 11,
20  78:9  79:16  80:5
82:10, 17  83:24  85:3,
13  86:23  87:11, 16
88:6, 24  89:20  90:6,
25  91:14  96:10, 23
98:13  99:14  101:1, 4
102:10, 19  110:6, 9
113:10, 20  115:15
124:10  127:11
131:20
**objections**  145:15
**obligated**  37:19
**obligations**  141:22
**obtained**  53:22
78:21  82:24
**obviously**  12:1  72:20
103:18
**occasionally**  76:4
**occur**  43:11
**occurred**  10:8  56:2,
12  57:16  60:20  84:2
95:24
**occurs**  45:25  73:17
**October**  14:19  61:1
64:23  114:21  121:22
**odd**  82:1
**off-duty**  59:3, 9  74:1
**offer**  127:15  141:3
**offered**  127:20
136:16  137:2, 14
139:18
**offering**  48:5  96:17
**offhand**  72:20
**Office**  13:7  24:4
32:7  64:20  66:7
69:11  72:14  139:2
**officer**  13:15  20:6, 8
41:25  44:11, 14
51:21, 22, 23  52:7, 10,
13, 16  54:1, 13  55:4,
7, 24  58:17  62:18, 20
63:11, 14, 15, 18  64:2,
10, 13, 16  65:2, 16, 25
66:12  67:17  68:1, 10,
11  69:14, 16, 22
71:17, 20, 22, 24  72:5,
19  73:10, 25  74:4, 10,

13, 14  85:11  88:1
90:9  93:12  100:13,
16  101:17, 18  102:6
103:7, 22  129:12, 18
134:13, 14  139:14
144:1
**Officer's**  145:1
**offices**  6:13
**official**  64:7  148:2
**oftentimes**  21:13
54:23  112:13  115:25
126:8
**Oh**  13:10  36:18
76:7  93:14  112:5
135:23
**Okay**  5:4  7:6  8:19
9:22  10:23  15:17
18:2, 10  21:9  25:17,
19  26:1  27:2, 9, 12
28:8, 23  30:14, 23
32:4  33:4  35:8
41:19  49:14  53:4
55:13  59:17  65:14,
20  95:7  104:13, 25
105:9, 25  109:15
111:6  112:2, 13
113:3  114:12  116:6
117:3, 13, 25  120:4
121:18, 19, 20  122:13,
23  123:4, 6, 8, 16, 23
125:10  126:16
128:11  129:2, 9
130:17, 25  131:25
132:6  133:11  134:13,
20  135:14  136:22
137:25  138:16
139:10, 14, 23  140:5,
15  141:5, 17  145:9
146:6
**Once**  7:15  13:4, 17
25:17  29:5  35:6
54:8  59:12  61:13, 24
63:6  67:3  69:25

85:15  92:8, 10, 14
97:9, 20  103:3
132:18  146:4
**ones**  27:12
**ongoing**  72:10  81:10
**operation**  10:21, 22
**Opinion**  3:15  140:6
**opportunities**  79:9
**opportunity**  9:25
16:25  34:23  45:22
46:3  49:14  50:17
60:2  61:15  63:7, 9
93:1  96:5, 17  97:7,
17
**option**  38:16
**ORANGE**  148:2
149:2
**order**  17:25  18:19
20:4, 18, 20  29:17, 22
30:18  31:19  32:22
35:9  36:6  39:18
59:14  81:2  83:4
96:24  114:20  147:6,
14
**ordering**  147:6, 12
**organization**  46:13
**outbreak**  81:19
88:16, 17
**outcome**  34:3  38:7,
16  47:24  51:16
54:17  62:9
**outcomes**  38:13
**output**  28:25
**outreach**  100:20, 22
**outside**  8:22  76:15
85:8  103:19
**overall**  57:10  62:9
85:15
**Overbroad**  26:9, 10
**oversee**  10:21  33:16
76:1
**overseeing**  19:12
**oversees**  11:16  43:5
**overtime**  119:25
**overturn**  126:2
**overview**  11:23
**ownership**  44:3
**Ozeata**  95:2, 4

**< P >**
**p.m**  1:8  4:3  147:17
**package**  49:23
**page**  85:24  86:2, 4
149:2  150:3
**paid**  144:10
**Palm**  138:6
**panel**  25:20, 22
27:22, 24  28:5  33:21,
22  34:5, 17  38:14, 18
**paragraph**  117:4
**part**  43:6  44:25
49:23  55:19  56:7
63:25  74:12  83:11
86:16  105:19  121:16
138:1, 2, 4  146:17
**participated**  118:10
119:2
**particular**  11:15
12:25  19:21  33:5
37:14  39:16, 19
46:11  60:3  72:15
87:7  92:13  113:24
**parties**  1:8  3:15
35:8  36:15, 23  53:10
54:17  121:10  122:11,
15  125:10  149:12, 13
**part-time**  63:23
**party**  34:7  44:11
100:4  121:11  122:16,
17  123:13, 21
**passing**  76:11
**paths**  63:7
**Patrol**  12:16, 17, 20
13:3, 5, 7, 14, 17, 25
14:6, 9
**Paul**  57:22, 25  58:3,
4, 8, 12
**pay**  64:18  117:22
138:20
**paying**  85:1
**penalties**  150:22
**penalty**  85:11
**pending**  64:18  72:8
98:9  132:7, 8, 15
**people**  32:21  34:14
39:13  66:16  76:13
83:4  89:10  110:11
111:8, 14  124:7
127:15  145:16

percent 35:*19* 65:*1*
73:*15* 102:2 123:2
Perez 67:*16, 17* 68:*1*
74:*14*
Perez's 68:*5* 74:*14*
perfect 58:*19*
perform 91:*10*
performance 103:*21*
104:*3, 6*
performing 103:*16*
period 13:*18, 23*
58:7 76:*10* 114:*21*
142:5
perjury 150:*22*
permitted 141:*25*
person 5:*19* 17:*23*
40:*13, 16* 41:*19*
42:*16* 44:6 48:*5*
52:7 90:7
personal 73:*18* 76:*14*
personally 18:*15*
personnel 89:*4, 5*
person's 46:*15*
perspective 13:*21*
17:*16* 72:*25* 90:*18*
99:2, *21*
pertaining 17:*23*
pertains 12:7 17:*12*
18:*23* 34:*4* 76:*12*
ph 13:*9* 100:*10, 18*
Phillip 61:*20, 22*
137:*18*
philosophy 13:*9*
16:*21*
phone 43:*3, 9*
pick 121:*11*
piece 113:*24*
piggyback 7:6
PLACE 1:*8* 29:*16,
20* 41:*13* 48:*19* 65:2
73:*10, 13* 88:*21*
120:*19* 121:*20*
130:*25* 131:2
placed 50:7 56:*19*
60:6 62:*12* 67:*21*
90:*23* 91:*1, 4* 142:4
Plaintiff 1:*4, 8* 2:*5*
4:9
Plaintiff's 4:7

play 29:*9* 34:*13*
146:*13*
played 90:*18*
please 4:6, *12, 23*
5:*25* 11:*13* 26:2
28:*21* 30:*24* 38:*11*
40:*1* 43:*19* 48:*24*
53:7, *25* 56:*22* 69:*24*
78:2 81:*16* 86:*20*
92:*23* 93:6 109:*24*
PLLC 2:2
plot 68:*8*
point 35:*18* 49:*13*
53:*20* 54:*18* 66:*10*
67:*21* 70:*23, 25* 71:*1,
2* 85:*19* 87:*25* 88:*4*
90:*16* 92:*15* 93:*12*
97:*1* 98:*1, 22* 99:*23*
104:*5* 125:2 132:9
136:*24* 144:*22*
police 12:2, *12, 22*
15:*10, 12, 13, 20*
16:*17* 26:3 28:9
29:*17, 22* 30:*23* 31:*5,
9* 34:*12* 35:*9* 36:6
39:*15* 40:*20, 24*
45:*17* 46:*12* 51:8
52:*14, 17* 55:*10, 17,
23* 58:*11* 63:*16*
65:*15* 72:*19* 74:*10*
75:*16, 25* 76:*3* 77:*18,
25* 78:*20* 81:*3* 98:6
100:*4, 11* 103:*25*
105:7, *19* 108:*15*
111:*3* 113:*4* 114:*20*
118:*11, 25* 120:6, *9,
10* 127:2 134:*14, 22*
137:*18* 140:*10, 13*
142:*13* 144:*1* 145:*1*
policies 15:*18* 17:*4*
19:*9* 24:*23* 50:7
policing 13:8
policy 17:*23* 24:*3*
32:*17* 34:*15, 16*
133:8 142:6
position 10:*15, 24*
12:6 53:*13, 14* 62:*25*
66:*17* 101:*16, 23*
positions 12:*14*
positive 49:*16*

possible 105:*23*
142:*1*
post 119:6 124:*16*
post-discipline
115:*22* 116:*11, 12*
postponed 144:*18*
potential 24:*25* 40:*9*
88:*14* 128:*13*
potentially 21:*9, 17*
24:*3* 40:*14* 46:*1, 7*
48:*5* 52:*4* 98:8
138:*13*
pre-d 129:2, *5*
predetermination
35:*11* 36:2, *4, 5, 7*
51:*15* 82:*19* 129:*3, 4,
6, 10, 13, 16, 23* 130:*1,
6, 18*
predetermined 89:*3*
prediscipline 115:*19*
pre-discipline 116:*12*
predominantly 18:*10*
31:7
preference 18:*24*
prejudice 84:8, *12, 14*
prepare 6:*18*
presence 78:*17*
present 34:2, *23*
35:*4* 36:*9* 53:*11*
54:9 56:*11, 13* 93:*19*
122:*16* 123:*12*
144:*16*
presentations 79:*10*
presented 25:*20*
28:*4, 6* 36:*10* 41:*16*
118:*14*
presided 79:*5*
president 12:6 36:*25*
94:*14* 95:2, *4*
Pretty 54:*3* 71:*22*
84:*5* 135:*24* 147:8
prevent 6:9 39:*23*
88:*22*
prevented 99:*12*
prevention 13:*9*
previous 18:2 41:*25*
47:*5* 53:*15* 84:*1*
123:*3*
previously 63:*4*
66:*19* 68:*17* 107:*3*

primarily 12:*24*
20:*12* 68:7
primary 10:*19* 33:6
prior 7:*13* 8:5, *20*
13:*13* 15:8, *15* 51:7
54:8 72:*25* 94:*10, 20*
95:*17* 96:9 99:*4*
105:5 122:7, *14*
123:9 124:*3* 142:8
privacy 37:5
privileged 8:2, *12*
probably 5:*16* 11:5
14:2 21:*12* 76:*11*
103:4 128:*19* 134:*17*
problem 36:*21*
Procedure 115:6, *8*
116:4, 6 124:*20*
126:*19* 130:*14*
procedures 15:*19*
17:4
proceed 54:*19* 106:7
117:*17*
proceeding 29:*23*
123:*12, 20*
proceedings 64:*25*
process 5:*11* 19:*1*
20:*23* 21:*18* 22:*23*
23:*23* 24:*14, 23*
25:*12* 26:2 27:7
28:*18* 29:*3, 6, 8*
33:*17* 36:*12* 38:*24*
40:7 52:*20, 24* 53:*6,
9* 54:*1, 3, 16, 25* 55:*1*
65:7 68:2, *3* 70:*11*
71:*11* 79:6, *9* 82:*18*
116:*14* 117:*14* 119:*3,
13* 120:*18, 24* 122:*23*
123:*1, 18* 130:7, *21*
processed 29:*5*
processing 119:*24*
produce 54:*16*
produced 9:*11*
product 131:*9*
137:*16*
professional 11:*23*
75:*15* 148:2, *12*
149:2, *20*
professionally 76:*23*
profile 42:*13*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 58 of 283

Deposition of Richard M. Clements                                      Jessica Guasto v. The City of Miami Beach, FL, et al.

**program** 10:*21*, *22*
11:*7*, *8*, *21* 12:*8*
142:*5*
**promoted** 13:*3*, *16*,
*21* 14:*6*, *11*, *15*, *18*
58:*8* 61:*2* 71:*12*
**promotion** 13:*13*
15:*8*, *9*, *15*
**promotions** 60:*13*, *19*
61:*4*
**pronounce** 109:*19*, *21*
**proper** 145:*25*
**properly** 17:*25*
**Property** 13:*19*, *20*
**proposal** 33:*22*
**protect** 37:*4*, *11*
120:*19* 132:*2*
**protocol** 41:*12* 45:*1*
**protocols** 41:*8*, *17*
**provide** 7:*10* 11:*22*
20:*19* 24:*9* 26:*21*
35:*13* 63:*18* 93:*2*
95:*23* 118:*20* 129:*12*
**provided** 9:*1* 31:*10*,
*16* 32:*5* 34:*23* 38:*15*
70:*20* 103:*1* 117:*16*
**provides** 129:*18*
**providing** 16:*25*
**provisions** 19:*18*
**Public** 1:*24* 46:*10*,
*18*, *21*, *22* 68:*18*, *21*,
*22* 69:*2*, *4* 70:*24*
132:*14*, *20* 135:*24*
139:*12* 148:*2*, *12*
**pull** 80:*13* 114:*6*
**pulled** 32:*6*, *9* 139:*1*
**punching** 62:*2*, *13*
**punishment** 48:*1*
**purpose** 39:*11* 49:*12*
**purposes** 19:*20*
134:*17*
**pursuant** 32:*4*, *17*
117:*4* 143:*14*
**purview** 18:*22*
**put** 17:*11* 34:*18*
48:*15* 126:*22* 136:*18*,
*21* 141:*8*
**putting** 132:*23*
141:*13*

**< Q >**
**qualify** 19:*22*
**question** 5:*20*, *24*
6:*1* 7:*7*, *14* 18:*7*
22:*16* 23:*18*, *21*
26:*15*, *18* 42:*8* 49:*2*
51:*2* 59:*15* 64:*11*, *12*
65:*22* 74:*23* 83:*12*
85:*6* 87:*7* 103:*16*
113:*15* 121:*17* 122:*4*,
*6* 123:*7* 136:*23*
**questioned** 139:*23*
**questioning** 6:*4*
67:*13*
**questionings** 37:*4*
**questions** 6:*5* 33:*16*
93:*17* 104:*7* 110:*2*
120:*3* 121:*18* 146:*7*
**quick** 118:*2*
**quickly** 5:*10*

**< R >**
**radio** 82:*22*
**raise** 4:*12* 144:*25*
**raised** 18:*3*
**range** 25:*5*, *7*
**rank** 13:*3*, *16*, *21*
14:*11*, *16* 30:*16*, *25*
31:*2* 61:*2* 71:*14*, *15*
90:*3* 106:*20*, *22*
109:*9* 113:*13* 142:*11*
143:*25*
**rank-and** 73:*4*
**ranks** 55:*20* 58:*9*
75:*21*
**Ray** 134:*25* 135:*1*
**reached** 49:*24*
120:*10*
**read** 10:*3* 106:*5*
147:*5* 150:*22*
**reading** 3:*15*
**reads** 142:*18*
**realize** 55:*11*
**really** 75:*19* 79:*22*
88:*17* 93:*2* 96:*5*
97:*6* 103:*25* 104:*2*, *6*
**reason** 95:*24* 96:*7*
97:*18* 99:*2* 146:*4*
**reasonable** 103:*10*

**recall** 18:*17* 22:*12*,
*14* 23:*14* 58:*19*, *20*
62:*11* 72:*20* 78:*1*
81:*13* 83:*23* 94:*12*
107:*20* 108:*8*
**receipt** 118:*17*
**receive** 17:*8*, *16*
41:*21* 43:*9* 44:*9*
111:*3* 112:*6*
**received** 17:*11* 19:*20*
29:*6* 62:*10* 69:*25*
78:*15* 99:*17*
**receiving** 17:*24* 19:*7*
**recess** 75:*8* 80:*17*
**recognize** 114:*22*
**recognizing** 16:*15*
**recollection** 93:*8*
**recommend** 18:*16*
**recommendation**
25:*23* 28:*5* 35:*16*, *18*
38:*19*
**recommendations**
35:*23*
**recommended** 35:*20*
**record** 4:*23* 41:*24*
50:*20* 75:*7*, *9* 80:*16*
105:*5* 118:*4* 132:*25*
149:*2*
**recorded** 37:*25*
132:*22* 133:*3*
**recording** 138:*12*
**records** 42:*6*, *9*
68:*18*, *21*, *22* 69:*3*, *4*
132:*14* 133:*15*, *25*
**recuse** 40:*15*
**redirect** 130:*5*
**refer** 5:*2* 13:*14*
18:*10*, *16* 39:*10*
58:*20* 111:*14* 124:*21*
136:*7* 138:*5*
**reference** 10:*7*
**referenced** 142:*3*
**referral** 15:*25*
**referrals** 18:*23* 24:*4*
**referred** 24:*18*
107:*18* 111:*4* 118:*24*
137:*19*
**referring** 9:*11* 82:*14*
110:*12*, *15*, *18* 129:*5*,

*6*
**refers** 85:*16* 111:*8*
**refreshing** 72:*2* 87:*9*
**refused** 72:*15*
**regarding** 15:*19*
16:*22* 78:*7* 79:*12*
95:*7* 102:*25* 103:*7*, *9*
142:*1* 144:*13*
**regardless** 45:*10*
**regards** 26:*18* 42:*17*
44:*7* 54:*1* 90:*17*
**rehabilitating** 50:*16*
**rehabilitation** 142:*2*,
*4*, *7*
**reinstate** 79:*7* 145:*13*
**reinstated** 54:*2* 71:*9*
79:*3* 142:*10*, *12*, *20*,
*24*
**reinstatement** 142:*9*
**related** 112:*3*
**relating** 22:*16*, *19*
23:*2* 136:*2* 146:*18*
**Relations** 121:*7*
**relationship** 75:*15*
76:*19*
**relative** 85:*14*
149:*11*, *13*
**relatively** 30:*23*
**relayed** 12:*7*
**relieved** 64:*18*, *21*, *22*,
*24* 70:*10* 72:*8*
138:*22* 140:*25*
**remain** 39:*2*, *19*
144:*7*
**remained** 13:*17*
**remedied** 41:*23*
**remember** 52:*9*
54:*23*, *24* 59:*6* 62:*4*
65:*7* 66:*8* 67:*8*
72:*22* 73:*2* 93:*13*
101:*5* 102:*16* 110:*5*,
*13*, *16* 111:*18* 121:*15*
122:*1*, *10*, *14*, *18*, *21*
123:*3* 134:*15* 136:*22*
**removed** 13:*6* 135:*6*
**render** 122:*17*
123:*13*
**rendering** 36:*10*
**renders** 123:*21*

**rephrase** 5:*25* 8:*3*
18:*15* 29:*11* 43:*18*
59:*19*

**reply** 147:*10*

**report** 31:*16*, *25*
32:*25* 37:6 39:*24*
43:*3*, *11*, *14*, *15*, *22*
44:*1*, *3*, *4*, *6*, *13*, *15*, *17*,
*20* 45:*2*, *4*, *5* 77:*16*,
*17*, *24* 80:*6*, *13* 96:*22*
107:*18* 108:*1*, *3*, *9*, *12*,
*21* 149:2

**reported** 20:6 47:*12*

**Reporter** 1:*24* 3:*5*
4:*2*, *12* 5:*18* 8:*11*
75:7, *9* 80:*16* 108:*13*
114:*12* 148:2, *12*
149:*1*, *2*, *20*

**reporting** 18:*25*
19:*10* 39:*3*

**reports** 38:*3* 41:*1*, *11*
43:*20* 47:*12* 78:*8*

**represent** 31:*5* 59:*17*
94:*17* 104:*18* 106:*1*
140:*5*

**representation** 35:*10*
39:*16*

**representative** 36:*12*
118:*16* 131:*11*
143:*17*

**represented** 59:*20*
94:6

**represents** 49:*14*

**reprimand** 20:*15*
25:*8* 112:7 128:7

**request** 36:*3*, *7*
42:*11* 69:*5* 94:*8*
132:*15* 146:*14*

**requested** 54:*22*
129:*23* 149:2

**required** 23:*22* 29:*2*,
*4* 129:*12* 130:*1*, *17*
141:*20*

**requirement** 133:*8*
146:*14*

**requirements** 118:*22*
141:*20*

**requires** 7:*9* 133:*24*
134:*5*

**Research** 15:*13*

**reserve** 62:*18*, *20*

**reserved** 3:*15*

**residential** 142:*5*

**resign** 91:*18*, *19*, *22*

**resignation** 78:*6*
92:*1*, *4*, *7*, *17* 97:*4*
98:*23* 99:*25* 146:*3*
147:*1*

**resolution** 31:*21*
49:*23* 54:*16* 90:*19*

**resolve** 20:*4* 32:*22*

**resolved** 30:*21* 66:7
112:*22* 116:*1* 124:*20*
128:*24*

**resource** 51:*23*

**Resources** 20:*17*
21:*9*, *16* 36:*12* 37:*15*
39:*3*, *10*, *12* 50:*13*
103:*5* 108:*3* 110:*19*,
*23* 128:*24*

**respect** 137:*22*
138:*16*

**respected** 40:*6*

**respective** 3:*15*

**respond** 69:*5* 92:*10*

**response** 17:*3* 82:*8*
99:*13* 108:*4* 122:*2*

**responsibilities** 10:*19*
17:*24* 46:*15* 79:*2*
97:*10*

**responsibility** 13:*22*
14:*3* 43:*15*, *21* 46:*11*

**responsible** 37:*19*
44:*15*, *18* 76:*1* 81:*20*

**restart** 49:*15*

**restate** 36:*3* 48:*24*
56:*22*

**restricted** 54:*21*

**result** 27:*2* 47:*23*
56:*1* 82:*22* 87:*14*
88:*4* 90:*8*, *23* 92:*1*
98:*1*, *8* 113:*8* 132:*19*
136:*5* 143:*4*

**resulted** 56:*9* 97:*14*

**results** 46:*21*

**resume** 45:*22*

**resumed** 13:*2*

**resurrect** 61:*16*

145:*24*

**retained** 109:*9*

**retaliation** 39:*23*
104:*23* 105:*5*

**retired** 62:*8*, *17*, *21*

**retirement** 62:*24*

**reveal** 6:*23* 7:*8*

**revealed** 61:*14*

**revealing** 6:*25*

**review** 7:*14*, *18* 8:*5*,
*23* 10:*1* 17:*22* 24:*5*,
*19* 25:*20*, *21* 27:*13*
33:*19*, *21* 37:*21*
41:*21* 44:*21* 56:*17*
58:*23* 60:*3* 66:*12*
68:*14* 69:*12* 93:*1*
95:*22* 149:2

**reviewed** 7:*3*, *21*, *24*
8:*1*, *7*, *11*, *13*, *15*, *16*
9:*2*, *18* 27:*17* 41:*13*
58:*25* 59:*12* 68:*12*
79:*1*

**reviews** 29:*18*

**RICHARD** 1:*8* 3:*2*
4:*4*, *18*, *24* 5:*2* 148:*2*
149:*2* 150:*1*, *24*

**Rick** 5:*2*, *4*

**right** 4:*12*, *22* 5:*9*,
*16* 6:*8* 11:*11*, *22*
29:*16*, *21* 32:*23*
35:*25* 52:*13* 65:*9*
67:*15* 85:*22* 86:*8*
104:*1* 105:*11* 110:*24*
111:*16* 112:*16*, *19*
113:*14* 114:*4*, *7*, *25*
115:*5*, *10*, *14* 116:*4*,
*12*, *13*, *16*, *19*, *23*
117:*1*, *14*, *20* 118:*8*,
*20* 119:*11*, *14*, *25*
120:*6*, *21*, *24* 123:*10*,
*19*, *23* 124:*13*, *17*
125:*3*, *4*, *7*, *8*, *11*, *14*,
*22* 126:*6*, *10*, *19*, *25*
127:*14*, *16* 128:*5*, *8*,
*16*, *21* 130:*7*, *11*
131:*13* 133:*22*, *25*
134:*10* 135:*3*, *18*, *19*,
*21*, *25* 136:*7*, *12*, *25*
137:*11*, *14*, *16* 138:*6*,
*14* 139:*3*, *8*, *10*, *21*, *23*

140:*3*, *17*, *22* 141:*14*
142:*17* 143:*14*, *17*
146:*19*

**right-hand** 85:*23*

**Rights** 3:*11* 19:*18*
40:*4*, *6* 106:*2* 120:*20*
130:*10*, *15*, *23* 143:*12*
145:*1*

**rise** 103:*1*

**rises** 29:*1* 30:*5*
112:*20*

**rising** 107:*4*, *6*
128:*20*

**Rivas** 67:*17* 68:*11*

**Robert** 67:*16*

**role** 10:*20* 11:*24*
14:*25* 25:*11* 33:*9*, *11*,
*24* 34:*13*, *20* 56:*5*, *8*
90:*17* 115:*2* 146:*13*

**roles** 33:*12* 87:*3*

**roll** 76:*4* 81:*22*
88:*11* 89:*1*, *11*, *14*, *18*

**room** 6:*14*, *16* 53:*19*

**Rosa** 3:*10*, *11*
101:*15* 104:*19*
105:*14*, *17* 106:*2*, *18*,
*25* 107:*3*, *9*, *20*, *23*
108:*4*, *15*, *24* 109:*7*

**Royal** 138:*6*

**rule** 5:*12*, *16*, *17*
32:*4*, *19* 54:*11* 126:*9*,
*14* 128:*12*

**rules** 5:*10* 29:*19*
120:*19* 126:*21*

**ruling** 38:*22* 141:*18*

**run** 68:*22*

**running** 69:*2*

**< S >**

**Sabater** 67:*16* 68:*11*

**Sadiq** 100:*18*

**safety** 103:*17*

**Salabarria** 3:*9* 74:*20*
75:*11* 79:*24* 80:*4*
81:*2*, *9*, *22* 82:*20*
84:*10*, *18* 87:*22*
89:*24* 92:*9*, *25* 93:*12*,
*13* 95:*13* 96:*17*
100:*11*

**satisfy** 39:*9* 99:*1*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 60 of 283

Deposition of Richard M. Clements                     Jessica Guasto v. The City of Miami Beach, FL, et al.

saying 7:7 49:1
60:23 94:13 125:25
says 44:10 58:22
81:6, 9 84:7, 10
105:3 106:6 116:13
117:13 118:13, 19, 23
120:6 124:19
schedule 119:17
scheduled 94:15 95:9
scheduling 95:18
School 11:4 15:10
63:21
Schultz 101:14, 18
102:6 103:7
Schultz's 101:16
science 10:18 11:7,
18
screen 80:18, 19
86:11 104:16, 18
109:15 114:13
127:25 143:24
scroll 141:16
se 47:22 49:23 60:2
70:5 75:20
seal 148:2
search 68:19, 22 69:3
second 5:16 10:25
48:5 49:14 79:8
86:1 98:2 108:10
114:13 146:6
secretary 9:5 95:10,
14
section 58:10 118:7
124:13
see 17:6 37:20
42:13 76:13 80:22
81:3, 6, 9 84:8, 15, 20,
22, 24 95:20 96:6, 18,
19 97:8, 21 104:20,
25 105:7, 8, 16 106:3,
12 111:24 114:17
115:6 116:16 118:17,
25 120:13 121:12
123:19 124:23, 24
140:8 142:14
seeing 86:25 123:5
seen 58:8 70:14, 17,
18 114:24 140:21
segments 16:16

select 25:1, 2 125:10
seniority 142:11
sense 5:21 6:1, 6
45:16 97:9
sensitive 16:18 37:13
sent 15:12 89:7
95:9 147:9, 13
sentence 124:25
September 114:21
121:22
Seranno 68:11
sergeant 13:4 14:24
55:9, 12, 14, 18, 20
56:1 57:1, 18 60:14,
15 67:17 69:18, 22,
24 70:9, 14, 23, 25
71:4, 6, 8, 10, 12, 15
74:14 78:21 79:4, 24
80:4 81:21 82:20
88:1 89:2 93:13
103:22 143:5, 21
145:10, 13
sergeants 31:6, 9
series 110:2
serious 27:6 46:7, 9
47:24 48:16 88:14
Serrano 63:12, 14, 19
64:2, 10, 13, 16 65:2,
16, 25 137:25 138:1,
4
Serrano's 66:12
service 12:4, 10
Services 14:14 39:4
set 27:18 95:11, 14,
21
settled 101:21 102:1
105:11, 23 118:23
121:1
Settlement 3:9 80:25
81:1 86:16, 20 87:18
102:16, 18 105:13, 16,
21 120:9 146:8, 12
settling 79:14
seven 12:17
severity 73:4
sex 104:22 105:5
108:16 109:2
shaking 5:14
share 80:18, 19
86:11 104:16, 18

109:15 114:13
127:25 139:25
143:24
she'd 93:4
SHEET 3:6 150:1
Shelandra 71:17
shift 56:10 81:19
99:22
shifted 14:24
short 13:18
shortly 14:11
shot 48:6
shots 70:15, 18, 22
show 42:17 104:17
105:25 114:8
showing 114:16
140:4
sic 42:13
sick 83:5
side 11:9, 16, 21
34:23 35:4 45:24
72:17 123:12 139:1
sides 53:11, 20, 22
54:9 123:20
sign 45:13 49:8
105:13
signature 45:7, 10
85:23 86:6 134:8
signed 44:23, 25
45:1 86:9 105:20
134:5 143:19
significant 12:10
55:25 76:9 82:25
85:18 103:11
signing 3:15
similar 45:11
simultaneously 84:12
sir 26:17 56:21
82:13, 16
sit 53:10
site 90:4
Sitting 107:9
situation 52:9
situations 46:4
117:18
Smith 2:2
sole 31:20 33:9, 11
solemnly 4:13
solution 53:21

somebody 23:3, 5
129:20
someone's 73:17
sooner 75:5
SOP 87:3
sorry 9:17 12:19
13:11 21:20 24:11,
21 26:17, 19, 23 31:1
36:18 38:10 42:8
60:21, 22 65:19 70:9
72:2 75:4 78:24
81:6 83:11 94:22
99:10, 11 100:18
101:3 110:8 113:15
114:13 122:5 136:9
140:1
SOUTHERN 1:1
speak 8:19 34:8
48:25 94:21, 25
speaking 28:17 118:2
speaks 78:10 80:6
specific 27:11 29:2
40:20 41:8 76:25
80:9
specifically 16:6, 9
19:6 21:8 47:2
52:11 62:11 78:1
87:2 93:16
specifics 52:10, 21
speculate 66:16
speculating 66:10
speed 5:11
spell 100:19
split 67:23
spoke 117:9
spoken 95:2
squad 89:2
Staff 15:10 113:17
stages 83:3
stairwell 82:3
stands 32:17
star 107:6
stars 107:4
start 23:9 27:1
64:12 118:7
started 12:15, 23
63:15 75:18 81:18
90:1 94:25 140:15
starting 94:20 122:25

**state**  4:6, 23  24:4, 17
32:7, 8  64:19  65:9,
10  66:7, 19  67:9
68:2, 4, 12  69:11
72:14  93:25  122:13
133:22  139:2  148:2,
12  149:2
**stated**  7:8  71:4
94:10  97:12  103:23
**statement**  48:24
59:15  60:20  111:10
**STATES**  1:1
**state's**  65:25
**Stating**  110:21
**station**  44:10
**status**  33:15  62:21
65:1  78:21
**statute**  32:16  40:3
106:10
**stay**  34:3
**stayed**  14:13
**stenographic**  149:2
**stenographically**
149:2
**step**  29:2, 4, 6, 7, 8
47:15  118:7, 11, 22,
23  119:2, 5  121:1, 2,
8, 20, 23, 25  122:8, 10,
12, 20  123:11, 18
124:20, 23  144:22
**steps**  32:21  54:15
103:14
**Steven**  9:23  63:11
98:20  137:25
**stint**  12:24
**stipulate**  86:9
**stipulated**  3:15
**stipulation**  87:18
**stipulations**  29:20
**stop**  7:11  86:11
**stops**  32:10
**story**  34:24  35:5
53:11
**Strategic**  13:23
**strategies**  13:8
**strike**  8:11  27:10
59:19  86:19  92:18
144:10
**stripes**  145:10, 19

**strong**  61:7
**students**  11:12
**studies**  10:18
**stumbling**  140:21
**subject**  47:14, 17
81:10  84:18  142:8
150:22
**submitted**  9:20  10:6
43:4  44:1, 23  45:2
121:10
**subordinate**  43:6
**subordinates**  112:24
**subsequent**  25:9
37:1  44:16  56:4
66:8  78:5  82:5
**subsequently**  12:21
13:6, 22, 25  14:6, 11,
15  43:8  62:8  68:12
70:8, 9
**substance**  150:23
**substantiate**  102:24
**substantiated**  22:24
23:16
**substantiation**  22:13
**succeed**  50:17  146:5
**successfully**  142:7
**sue**  107:15
**sued**  107:10, 12, 17
**Suite**  2:3
**suits**  61:7
**summary**  67:14
**Sunshine**  133:16, 24
**supervise**  56:20  87:5
**supervising**  59:22
75:23
**supervision**  56:6, 9
83:6  88:9, 18, 19
**supervisor**  26:13
27:5  43:5  44:14, 17
57:19  59:21  75:20
91:8  92:15  98:3
112:14  144:3
**supervisors**  113:18
**supervisory**  79:2
92:9  97:10  99:21
**supplied**  118:14
**Support**  14:14  29:25
30:4, 8  39:4
**supposed**  59:3, 9
83:15  85:9  89:14

90:5  91:13  98:12
103:20
**suppressed**  19:10
**Sure**  4:24  5:9  7:10
9:14  17:1  29:13
32:3  43:20, 25  44:20
49:4  50:14  52:5, 25
64:12  65:1  73:16
89:5  95:11  102:2
105:10  118:3  123:2
**suspend**  85:11
138:17
**suspended**  85:1
138:19
**suspension**  25:9
84:19  85:15, 20
112:7
**sustain**  55:25  126:5
**sustained**  103:12
**SWAT**  58:6
**swear**  4:13, 16
**sworn**  4:19  104:1
148:2
**symptoms**  89:7
**system**  43:10

**< T >**
**table**  34:18
**tailoring**  17:3
**take**  5:18  15:1, 3
18:19  20:4  21:23
24:18  35:14  37:18
41:13  43:15, 21
47:15  50:6  60:17, 18
64:9, 15  65:24  66:4
70:23  72:4, 19  73:21
74:24  75:1, 3  81:8
106:25  130:20
139:24
**TAKEN**  1:8  4:5
22:5  23:17  32:22
34:19  37:4  62:6
65:15  69:10  72:21
73:1, 2  75:8  80:17
103:14
**talk**  15:4, 6  40:1
53:12, 14  116:9
125:20  129:5
**talked**  110:12
111:16  113:3  124:6

127:19  129:2  131:25
133:11
**talking**  17:12  37:17
80:11  85:15  87:24
119:6  120:2  130:9
**talks**  123:19
**team**  58:6  100:22
**tell**  9:7  10:11  11:13
30:24  66:11  73:16
78:2  81:16  84:25
92:23  93:7  100:7
103:21  104:6
**telling**  14:21  118:5
**tells**  141:13
**ten**  75:3
**tenure**  22:6, 9, 12
23:2, 6, 13  40:19
52:17  75:16  77:18,
25  78:19  135:5
**tequila**  70:15, 17, 21
**term**  17:1  26:10, 11
27:17  50:15  113:5,
16  118:10
**terminate**  99:5
**terminated**  54:1
64:11, 13  70:10  71:5,
7, 14  91:12, 16  98:5,
11  147:16
**terminating**  141:21
**termination**  20:15
25:9  46:1, 6, 8  97:14
98:21  99:12  134:15
143:6
**terminology**  30:24
**terms**  22:23  30:9
43:25  44:3  46:15
62:10  102:17
**Terrace**  2:8
**tested**  89:6
**testified**  4:19  35:24
105:9  109:17  110:15
116:7  117:6  121:14
125:4, 13  128:11
129:4, 22  131:25
**testify**  7:20, 22  8:14
**testifying**  6:9  8:10
**TESTIMONY**  3:2
4:14  5:23  48:22
53:3  59:18  96:24

98:*14*  99:*8*  109:*17*
134:*18*
**testing**  89:*8*
**Thank**  6:*18*  10:*10*
12:*9*, *11*  14:*21*  23:*20*
26:*1*  40:*19*  55:*4*
**thing**  16:*15*  69:*2*
100:*19*
**things**  26:*14*  47:*4*,
*22*  67:*7*  72:*23*  73:*21*
76:*5*  87:*6*  88:*12*
110:*4*, *11*  111:*20*
113:*18*  119:*14*
**think**  5:*25*  9:*10*
15:*23*  16:*11*, *14*, *24*
18:*17*  19:*5*  21:*23*
26:22, *24*  29:*16*
30:*14*  31:*18*  37:*9*
39:*8*, *11*  40:*12*  47:*1*
48:*5*, *8*  49:*22*  50:*10*
51:*14*  57:*9*  61:*13*, *17*
63:*6*  64:*22*  68:*4*, *20*
70:*8*, *18*, *21*  71:*14*
74:*11*  85:*14*, *16*
89:22  90:*14*, *16*  93:*9*,
*14*  96:*1*  99:*16*  100:*5*
101:*10*  102:*11*, *23*
103:*10*  104:*1*, *7*
105:*9*  110:*15*  125:*4*
132:*1*, *3*  133:*11*
**third**  34:*7*  86:*4*
121:*11*  122:*16*, *17*
123:*13*, *20*
**thought**  36:*18*  65:*21*
82:*1*  130:*3*
**three**  100:*5*, *6*  101:*11*
**threshold**  128:*6*
**tight**  114:*7*
**TIME**  1:*8*  4:*3*  5:*19*
*6*:*3*  7:*7*  9:*5*  12:*11*,
*12*, *23*, *25*  13:*2*, *18*
14:*7*  15:*19*  31:*24*
38:*11*  41:*14*  47:*3*
53:*17*  55:*19*  56:*11*,
*18*, *20*  57:*17*  58:*8*, *12*,
*17*  59:*8*  64:*1*  67:*14*,
*21*  69:*17*, *18*  76:*6*, *10*
79:*24*  80:*4*  81:*8*
82:*7*  83:*7*, *10*, *17*
85:*6*  86:*19*, *20*  88:*15*,

*22*, *23*  89:*9*  90:*16*
91:*20*  95:*4*, *21*  98:*2*,
*23*  101:*3*  120:*9*
135:*10*  142:*10*, *12*
144:*3*
**timeframe**  15:*14*
**timeline**  14:*2*
**times**  7:*12*  76:*8*
77:*24*  78:*1*  82:*21*
112:*22*  114:*24*  115:*3*
119:*19*  120:*15*
127:*14*  128:*23*
**title**  10:*23*  11:*1*, *6*
56:*25*  60:*11*  79:*4*
**titled**  80:*25*
**Today**  4:*2*  5:*24*  6:*9*
7:*4*, *13*  8:*20*  52:*14*
56:*25*  60:*11*  104:*8*
107:*9*  109:*13*
**told**  99:*8*  110:*25*
**to-one**  51:*17*
**total**  84:*22*  100:*5*
**totality**  25:*24*  54:*5*,
*11*  67:*4*  79:*17*  97:*5*
104:*2*
**tourist**  64:*4*, *10*, *17*
**track**  50:*14*  146:*5*
**trained**  63:*16*
**training**  10:*17*  11:*17*
12:*3*, *22*  16:*6*, *12*
17:*8*, *11*, *16*, *17*  19:*13*,
*14*, *19*  63:*18*, *21*, *22*
100:*16*
**trainings**  15:*7*
**transcript**  3:*15*
147:*15*  149:*2*
**transferred**  13:*18*
**transparency**  21:*18*
**treated**  102:*12*
**treatment**  78:*14*
102:*12*, *25*  142:*5*
**trial**  125:*22*
**tried**  88:*12*
**true**  35:*21*  94:*4*
97:*24*  109:*2*  111:*9*
112:*1*, *12*  113:*4*
115:*16*, *20*  116:*5*
124:*9*  125:*5*  129:*24*
138:*7*  149:*2*  150:*22*
**trust**  46:*11*, *18*

**truth**  4:*14*, *15*  97:*21*
99:*19*
**truthful**  92:*14*  99:*18*
**truthfully**  6:*9*
**try**  22:*15*  53:*20*  54:*7*
**trying**  22:*22*  50:*15*
93:*13*
**Tuesday**  1:*8*  4:*2*
**Tuesdays**  70:*15*
**two**  9:*25*  13:*24*
14:*13*, *14*, *17*  19:*18*
23:*6*  33:*6*  56:*2*  64:*6*
68:*13*  78:*1*  91:*3*
94:*9*  101:*10*, *12*
131:*23*  136:*13*
143:*16*
**type**  16:*1*  18:*11*
28:*25*  48:*16*  63:*18*
88:*21*
**types**  15:*5*  89:*8*
128:*4*, *13*

**< U >**
**ultimate**  141:*1*  143:*6*
**ultimately**  29:*7*
33:*19*  35:*20*  37:*13*
41:*15*, *22*  46:*16*
59:*23*  69:*25*  75:*23*
91:*12*  139:*15*  141:*5*
142:*22*
**unbecoming**  87:*5*
**undercover**  12:*19*
**undergo**  141:*25*
142:*4*
**understand**  5:*14*, *24*
22:*22*  34:*13*  49:*2*
50:*5*  51:*19*  65:*23*
66:*15*  123:*6*
**understanding**  19:*24*
29:*21*  47:*16*  71:*6*
73:*25*  89:*19*  90:*21*
91:*24*
**understood**  19:*17*
27:*21*  39:*22*
**unethically**  44:*12*
**unfortunate**  73:*23*
**unhappy**  77:*3*
**unholster**  71:*2*
**unh-unh's**  5:*13*

**Uniform**  12:*16*, *18*,
*19*  88:*3*  140:*19*
**union**  26:*12*  29:*22*
30:*8*, *15*  35:*9*  87:*21*
91:*4*  94:*14*  112:*4*, *8*,
*24*  113:*7*, *9*, *18*, *23*, *25*
114:*1*  115:*9*, *22*
116:*2*  117:*22*  119:*10*,
*16*  120:*3*, *20*, *23*
126:*18*  128:*25*
129:*17*  131:*7*, *10*, *19*
137:*5*  143:*4*, *8*, *17*
**unit**  12:*20*  13:*11*, *19*,
*23*  30:*3*, *16*  31:*2*, *7*
33:*4*  41:*6*, *10*  58:*7*
94:*17*  100:*16*  116:*15*
117:*15*, *19*  118:*15*
**UNITED**  1:*1*
**unlawful**  46:*17*, *22*
**unlawfully**  44:*12*
**unprofessionally**
44:*11*
**unresolved**  125:*7*
**unsurety**  83:*3*
**untruthful**  82:*21*
83:*20*
**untruthfulness**  87:*5*
97:*14*  98:*6*, *7*
**upon/entered**  66:*21*
**use**  7:*18*  31:*18*
**usually**  33:*5*  38:*23*
55:*2*  98:*8*  113:*7*

**< V >**
**vague**  26:*9*, *10*, *15*
76:*25*
**vaguely**  71:*21*
**validity**  30:*9*  45:*5*
59:*14*  134:*9*
**valuation**  97:*23*
**variety**  24:*25*  47:*4*
**venue**  31:*18*
**verbal**  128:*7*, *9*
**versus**  26:*24*  73:*18*
**viable**  22:*2*
**victim**  72:*15*
**video**  70:*25*
**videoconference**  1:*8*
**violated**  24:*23*  34:*14*,

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 63 of 283

Deposition of Richard M. Clements
Jessica Guasto v. The City of Miami Beach, FL, et al.

*16*

**violates** 46:*17*

**violation** 28:*24* 29:*1*, *18* 30:6 46:*10* 48:*17* 91:*25*

**violations** 24:2 47:*20* 65:*12* 85:5 87:2 106:9 144:*25*

**violence** 71:*25*

**virtue** 16:*25*

**voice** 27:*23* 28:*3*

**voices** 17:2

**voluntarily** 141:*8* 143:2

**voluntary** 62:*24*, *25*

**< W >**

**waive** 32:*18* 122:*11* 130:*14*

**waived** 130:*23* 143:*11*

**walks** 44:9

**want** 5:*23* 12:9 14:*1* 17:5 27:*18* 28:*17* 32:*3* 35:*14* 37:*16* 48:*25* 74:*13* 77:9, *13* 80:*13* 85:*22* 109:*20* 111:*20* 116:*8* 117:*23* 118:*3* 119:5 126:*1* 132:*4* 147:*14*

**wanted** 9:*14* 95:*12* 96:5 97:6, *20*, *21* 146:5

**wants** 129:*10*

**warning** 20:*13* 25:*8* 112:7 128:9 129:*12*

**warrant** 47:*23*

**warranted** 24:*21* 74:*12* 79:*10*

**watch** 108:*14* 109:*4*

**way** 13:*10* 16:*1* 20:*3* 24:*14* 27:*19* 30:*20* 39:8 43:*10* 45:*2* 49:*16* 57:*17* 58:*25* 97:8 107:*17* 112:*14* 113:*23* 122:*3* 127:*23* 142:*18*

**Wayne** 93:9 106:*17*

**ways** 32:*15* 109:*17*

**weaker** 30:*8*

**weapon** 70:*24*

**weekend** 135:*21*, *23*

**weeks** 17:*18*

**weigh** 47:7

**weight** 30:*15*

**welcome** 94:*15*

**Well** 7:*20*, *25* 9:2, *6* 12:*9*, *15* 18:7 28:*17* 34:*1* 36:*13* 44:5 57:*15* 58:9, *18* 60:*15*, *20* 78:4 83:*20* 94:8 100:*19* 103:*23* 107:*15* 122:*3* 136:*21* 138:*3* 144:*10*

**well-being** 103:*18*

**well-known** 135:*24*

**went** 14:9 63:*25* 68:*12* 71:*10* 76:*12* 82:*1* 87:*20* 108:*24*

**we're** 7:*4* 30:*4* 40:*4* 45:9, *14* 61:9 75:7, *9* 80:*16* 97:*3* 119:*6* 120:2 121:*22* 130:*5*, *9* 147:*5*, *6*

**whatnot** 14:*22* 38:*15*

**whereabouts** 81:*21* 82:*5*, *22*

**whichever** 139:*14*

**Whistleblower** 40:*3*

**willing** 46:2

**Winfall** 100:*10*

**wish** 150:*1*

**wishes** 35:7

**withdraw** 84:*12* 122:*3*, *6*

**Withdrawal** 84:*13*

**withdrawn** 84:7 108:*8* 138:*3*

**withdrew** 136:*22*

**witness** 1:*8* 4:*16* 6:*23* 7:*3* 8:*15* 9:*15*, *18* 11:*4* 15:*23* 16:*14*, *24* 17:*22* 18:7 19:5 20:*11* 21:*1*, *8*, *20*, *22* 22:9 23:*13* 24:*1*, *14* 25:*5*, *17* 26:*17* 28:2, *13* 30:*12*, *14* 31:*13* 32:*3* 33:*3* 34:*11* 35:2 36:*18* 37:9

38:2, *10*, *21* 39:*8* 40:*12*, *24* 41:5 42:*4*, *24* 43:*25* 44:*18* 47:*1* 48:*4*, *14* 49:*10*, *22* 50:*10* 51:*5*, *12* 53:9 57:6, *8*, *15* 59:6, *12* 60:*1* 61:*13* 63:6 65:6 66:6 67:*3* 69:7 70:5 73:8, *15* 74:8 76:23 77:6, *12*, *22* 78:*10*, *13* 79:20 80:6, *8*, *9* 82:*12*, *18* 84:*1* 85:5, *14* 86:*25* 87:*18* 88:8 89:*1*, *22* 90:7 91:7, *16* 96:*11*, *15* 97:*1* 98:*15* 99:*16* 101:6 102:*11*, *21* 110:7 113:*11*, *21* 115:*16* 124:*11* 127:*12* 131:*21* 148:2

**witnessed** 44:*10*

**woman** 62:2, *14*

**wondering** 12:*12*

**words** 33:*17*

**work** 11:*11*, *14* 20:*17* 28:*22*, *24* 29:*19* 34:*11* 50:*13* 59:22 77:9, *14* 87:*3* 98:*16* 100:*13*, *17*, *21* 104:*10* 126:*10*, *13*, *22* 136:*18*, *21* 139:*16* 141:6, *8*, *10*, *14*

**workdays** 118:*17* 120:7, *12* 121:*8*, *9* 124:*22*

**worked** 12:*20* 24:*14*

**working** 13:7 59:*3* 73:*19* 76:*18* 85:7, *9* 97:*23* 102:*21*

**work-related** 76:*15*

**works** 51:*23* 52:*13* 100:*11*, *16*, *20* 116:*8*

**worries** 109:*25*

**worse** 127:*8*

**writing** 118:*14*, *24* 121:*6*

**written** 9:*23* 20:*13*, *15* 25:*8* 36:*24* 112:6 120:*11* 123:*14* 129:*12*

**wrong** 50:5 58:*22* 66:*20* 97:*12* 109:*21* 111:2 115:*13* 116:*1* 125:*21* 126:*8* 129:9 133:*14* 138:*1* 146:*18*

**wrongdoing** 22:*25* 23:22, *24*

**< Y >**

**Yeah** 14:9, *22* 48:7 69:7 75:4 76:7 83:*19* 142:*18*

**year** 13:*12* 64:*24*

**years** 11:*25* 12:*1*, *3*, *10*, *17*, *18* 13:*10*, *16*, *24* 14:*13*, *14*, *17*, *20* 24:7 58:7 60:*17*, *18* 61:*3* 62:8 63:*16*, *22* 100:*23*

**young** 71:*21*

**< Z >**

**zone** 97:*19* 98:*12*

**ZOOM** 1:*8* 2:2, *7* 3:2 4:*4* 148:2

## WORD LIST

**< $ >**
**$3,531.20**  *(2)*

**< 1 >**
**1**  *(9)*
**1/21/2028**  *(1)*
**1:22**  *(2)*
**1:22-cv-21004-DPG**  *(1)*
**10**  *(1)*
**10/1/2018-9/30/2021**  *(1)*
**10:30**  *(1)*
**100**  *(4)*
**104**  *(2)*
**106**  *(1)*
**107**  *(1)*
**10-week**  *(1)*
**112**  *(1)*
**114**  *(1)*
**12**  *(1)*
**1212**  *(1)*
**1310**  *(1)*
**140**  *(1)*
**147**  *(1)*
**148**  *(1)*
**149**  *(1)*
**15**  *(3)*
**150**  *(1)*
**16**  *(1)*
**160**  *(2)*
**160-hour**  *(1)*
**16th**  *(1)*
**180-day**  *(5)*
**185**  *(1)*
**19**  *(3)*
**1990**  *(1)*
**1995**  *(1)*
**1997**  *(2)*
**19th**  *(2)*
**1's**  *(1)*

**< 2 >**
**2**  *(8)*
**2000**  *(3)*
**2000s**  *(1)*
**2001**  *(1)*

**2008**  *(2)*
**2009**  *(8)*
**2011**  *(6)*
**2011-2012**  *(1)*
**2012**  *(1)*
**2013**  *(4)*
**2014**  *(1)*
**2014-2015**  *(1)*
**2015**  *(2)*
**2016**  *(1)*
**2017**  *(3)*
**2018**  *(4)*
**2019**  *(2)*
**2020**  *(10)*
**2021**  *(10)*
**2021-010**  *(1)*
**2022**  *(2)*
**2023**  *(3)*
**2024**  *(6)*
**23**  *(4)*
**23rd**  *(1)*
**24-page**  *(1)*
**26**  *(2)*
**2's**  *(2)*

**< 3 >**
**3**  *(16)*
**3.2**  *(1)*
**3.3**  *(1)*
**3/15/22**  *(1)*
**30**  *(3)*
**33**  *(1)*
**33131**  *(1)*
**33304-2323**  *(1)*

**< 4 >**
**4**  *(6)*
**4:18**  *(2)*
**437**  *(1)*

**< 5 >**
**5**  *(6)*

**< 6 >**
**6**  *(3)*
**6:30**  *(1)*
**6th**  *(2)*

**< 7 >**

**701**  *(1)*

**< 8 >**
**8**  *(1)*
**80**  *(1)*

**< A >**
**abide**  *(3)*
**ability**  *(4)*
**able**  *(25)*
**absolute**  *(1)*
**Absolutely**  *(12)*
**academic**  *(4)*
**academy**  *(4)*
**accept**  *(1)*
**access**  *(2)*
**accessible**  *(3)*
**accident**  *(3)*
**accommodation**  *(1)*
**account**  *(7)*
**accumulation**  *(1)*
**accurate**  *(12)*
**accusation**  *(1)*
**accusations**  *(1)*
**accused**  *(1)*
**achieve**  *(1)*
**acholic**  *(1)*
**Acosta**  *(15)*
**acquitted**  *(2)*
**Act**  *(5)*
**acting**  *(3)*
**action**  *(33)*
**actions**  *(14)*
**activation**  *(1)*
**actual**  *(7)*
**adding**  *(1)*
**additional**  *(1)*
**Additionally**  *(1)*
**address**  *(8)*
**addressing**  *(1)*
**adjudicated**  *(1)*
**administering**  *(1)*
**administration**  *(3)*
**administrative**  *(14)*
**advance**  *(2)*
**advantage**  *(1)*
**adversarial**  *(3)*
**advised**  *(2)*
**adviser**  *(1)*

**advisor**  *(3)*
**advocacy**  *(1)*
**Affairs**  *(57)*
**affiliated**  *(1)*
**affirm**  *(1)*
**afford**  *(3)*
**afforded**  *(3)*
**agency**  *(1)*
**ago**  *(2)*
**agree**  *(10)*
**agreed**  *(13)*
**agreed-to**  *(2)*
**Agreement**  *(77)*
**Agreements**  *(16)*
**agrees**  *(1)*
**ahead**  *(13)*
**al**  *(1)*
**alcohol**  *(1)*
**allegation**  *(39)*
**allegations**  *(18)*
**alleged**  *(4)*
**allegedly**  *(1)*
**alleging**  *(1)*
**allow**  *(2)*
**allowed**  *(4)*
**allowing**  *(1)*
**allows**  *(1)*
**alterations**  *(1)*
**altered**  *(1)*
**ambiguous**  *(2)*
**amount**  *(2)*
**analogy**  *(1)*
**and/or**  *(5)*
**and-file**  *(1)*
**angles**  *(1)*
**anonymous**  *(10)*
**answer**  *(83)*
**answers**  *(1)*
**anti-harassment**  *(3)*
**anybody**  *(6)*
**apologies**  *(1)*
**apologize**  *(9)*
**apparently**  *(2)*
**appeal**  *(3)*
**appealable**  *(1)*
**appealed**  *(1)*
**appealing**  *(2)*
**appearance**  *(1)*
**APPEARANCES**  *(1)*

appeared  (2)
applies  (2)
apply  (3)
appreciate  (1)
approach  (2)
approached  (1)
appropriate  (6)
approval  (1)
approximate  (1)
approximately  (2)
April  (3)
arbitration  (29)
arbitrations  (1)
arbitrator  (13)
arbitrators  (1)
arbitrator's  (1)
Archer  (7)
Archer's  (1)
area  (5)
argue  (1)
arguing  (1)
argument  (1)
arrested  (1)
arrived  (1)
art  (2)
Arthur  (1)
Article  (1)
ascended  (1)
aside  (1)
asked  (18)
asking  (11)
asks  (1)
aspect  (3)
aspects  (5)
assigned  (8)
assignment  (2)
assignments  (1)
assist  (1)
Assistant  (4)
associated  (17)
assume  (5)
assuming  (2)
assure  (1)
Attached  (1)
attempted  (1)
attended  (2)
attention  (12)
at-the-time  (2)
Attorney  (23)

attorneys  (2)
attorney's  (7)
ATV  (7)
audible  (1)
auspices  (1)
authorized  (1)
available  (2)
Avenue  (6)
avenues  (1)
avoid  (1)
Award  (6)
awarded  (1)
aware  (33)

< B >
back  (46)
background  (1)
backing  (1)
backup  (1)
backwards  (1)
balancing  (1)
Baldwin  (1)
bargained  (1)
Bargaining  (28)
BARROUKH  (144)
based  (14)
basic  (3)
basically  (4)
basis  (9)
battery  (1)
Battle  (8)
Battle's  (1)
BEACH  (21)
Bear  (1)
beaten  (1)
beating  (4)
began  (4)
beginning  (2)
BEHALF  (15)
behavior  (1)
believe  (65)
believed  (3)
Berrian  (16)
Berrian's  (3)
best  (1)
better  (3)
beverage  (1)
bikes  (1)
Bill  (1)

binding  (4)
bit  (4)
board  (2)
bottom  (1)
break  (4)
breakdown  (1)
Brickell  (1)
brief  (5)
bring  (7)
bringing  (2)
brought  (26)
Broward  (1)
bunch  (2)
bypass  (1)

< C >
call  (7)
called  (5)
calling  (5)
calls  (5)
camera  (1)
cameras  (1)
capacity  (8)
captain  (7)
career  (7)
careful  (1)
Carlos  (1)
carry  (1)
Carvajal  (16)
Carvajal's  (6)
Case  (29)
cases  (5)
catch  (1)
caught  (2)
cause  (4)
causing  (1)
caution  (1)
CCTV  (1)
center  (1)
centered  (2)
centralized  (1)
certain  (4)
certainly  (1)
CERTIFICATE  (4)
certify  (3)
chain  (1)
chairperson  (3)
challenge  (1)
Chance  (66)

chances  (1)
change  (1)
changed  (2)
changes  (2)
Chapter  (1)
character  (2)
characterize  (1)
Charge  (36)
charged  (3)
charges  (8)
checked  (1)
checking  (1)
Chief  (83)
Chief's  (2)
chiefs-of-police  (1)
choice  (1)
choose  (1)
circumstances  (9)
citizenry  (1)
CITY  (104)
city's  (5)
civil  (2)
civilian  (3)
civilians  (2)
clarification  (1)
clarify  (3)
class  (9)
classes  (1)
clear  (8)
CLEMENTS  (11)
client  (37)
client's  (5)
clock  (2)
clocked  (1)
close  (1)
cold-like  (1)
colleagues  (3)
Collective  (21)
collectively  (1)
College  (6)
colloquially  (4)
color  (4)
combination  (1)
come  (19)
comes  (6)
coming  (6)
Command  (2)
commander  (11)
commanders  (2)

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 66 of 283

Deposition of Richard M. Clements    Jessica Guasto v. The City of Miami Beach, FL, et al.

commencing *(1)*
comment *(2)*
comments *(1)*
Commission *(1)*
commit *(1)*
commitment *(3)*
committed *(9)*
committee *(8)*
committing *(1)*
common *(1)*
communicated *(2)*
communications *(1)*
community *(1)*
community-oriented *(1)*
compare *(1)*
complain *(4)*
complainant *(2)*
complainants *(1)*
complained *(1)*
complaining *(1)*
complaint *(46)*
complaints *(22)*
complete *(4)*
completed *(1)*
completely *(2)*
completes *(1)*
completing *(1)*
completion *(3)*
complex *(1)*
component *(3)*
components *(1)*
comprehensive *(1)*
concept *(1)*
concern *(3)*
concerned *(2)*
concerning *(1)*
concerns *(4)*
conclusion *(15)*
conclusions *(4)*
concurrent *(2)*
conditions *(2)*
conduct *(13)*
conducted *(4)*
conducting *(1)*
confer *(1)*
confessed *(1)*
confidential *(1)*
confidentiality *(2)*

confirm *(1)*
conflict *(1)*
conflicts *(1)*
confronted *(1)*
conjunction *(6)*
connected *(1)*
connection *(4)*
consider *(2)*
consideration *(1)*
considerations *(4)*
considered *(1)*
consistent *(1)*
contain *(1)*
contained *(1)*
contamination *(2)*
contents *(1)*
context *(4)*
continuance *(2)*
continue *(4)*
continued *(1)*
continues *(1)*
continuous *(1)*
contract *(4)*
contractual *(2)*
contractually *(1)*
contributes *(1)*
control *(1)*
conversation *(2)*
conversations *(4)*
convicted *(1)*
cooperate *(1)*
coordinators *(1)*
copy *(4)*
corner *(1)*
correct *(99)*
correction *(2)*
corrective *(6)*
correctly *(3)*
corresponded *(1)*
Cosner *(4)*
Cosner's *(1)*
counsel *(10)*
counseling *(2)*
COUNTY *(2)*
course *(2)*
courses *(8)*
COURT *(16)*
covering *(1)*
Covid *(4)*

co-workers *(1)*
crash *(2)*
crashed *(1)*
create *(1)*
crime *(2)*
Crimes *(2)*
criminal *(12)*
CROSS *(1)*
CROSS-EXAMINATION *(1)*
culmination *(1)*
cup *(1)*
current *(2)*
currently *(8)*
cut *(2)*

< D >
Dade *(2)*
daily *(2)*
Dan *(5)*
DANIEL *(4)*
DATE *(3)*
Dated *(1)*
dates *(2)*
David *(1)*
day *(6)*
daytime *(1)*
day-to-day *(1)*
deal *(5)*
dealing *(1)*
dealt *(2)*
decide *(1)*
decision *(13)*
decision-maker *(4)*
decision-making *(1)*
decisions *(1)*
declaration *(1)*
declare *(1)*
declines *(1)*
deem *(1)*
deemed *(11)*
deems *(1)*
Defendants *(2)*
define *(1)*
defined *(1)*
defines *(1)*
definitely *(2)*
degree *(3)*
deliver *(1)*

delivered *(1)*
DeLucca *(1)*
demoted *(7)*
demotion *(1)*
denied *(1)*
department *(51)*
departments *(1)*
department's *(1)*
depending *(1)*
depends *(1)*
depicts *(1)*
DEPOSITION *(18)*
deputy *(14)*
Derek *(1)*
dereliction *(1)*
describe *(3)*
described *(2)*
designated *(2)*
designating *(1)*
designee *(2)*
desire *(3)*
desired *(1)*
desk *(1)*
destroy *(1)*
Detailed *(1)*
Detective *(5)*
detention *(1)*
Determination *(14)*
determine *(9)*
determined *(2)*
determining *(9)*
developments *(1)*
difference *(1)*
differences *(1)*
different *(7)*
difficult *(1)*
DIRECT *(2)*
directed *(1)*
direction *(2)*
directions *(1)*
directive *(4)*
directly *(3)*
director *(5)*
directors *(1)*
disciplinary *(26)*
discipline *(53)*
disciplined *(4)*
disciplines *(2)*
disciplining *(3)*

disclosure  (2)
discretion  (1)
discriminated  (2)
Discrimination  (14)
discuss  (12)
discussed  (4)
discussed/agreed  (1)
discussing  (1)
discussion  (1)
dishonesty  (3)
disparate  (1)
disparity  (1)
disposition  (2)
disrespect  (1)
disrespectful  (1)
distinction  (1)
DISTRICT  (2)
distrust  (1)
diversity  (3)
Division  (9)
document  (12)
documentation  (4)
documents  (9)
doing  (6)
Doller  (1)
domestic  (1)
domestic-related  (1)
Don  (1)
drinking  (2)
Dropbox  (2)
dropped  (3)
drunk  (2)
drunkenly  (1)
due  (3)
dues  (1)
DUI  (1)
duly  (2)
duration  (1)
duties  (3)
duty  (20)

< E >
earlier  (16)
early  (1)
EEOC  (40)
effect  (1)
effectively  (1)
egregious  (1)
egregiousness  (2)

eight  (1)
either  (10)
elect  (1)
elects  (1)
ELKINS  (143)
Elliot  (1)
email  (4)
emails  (6)
embarrassed  (1)
embarrassment  (4)
employ  (1)
employed  (10)
employee  (55)
employees  (18)
employee's  (8)
employer  (1)
employment  (6)
encompasses  (1)
encounter  (1)
ended  (4)
endorse  (1)
enforcement  (6)
Enforcement-
mandated  (1)
engaging  (1)
enhances  (1)
ensure  (1)
ensured  (2)
entail  (1)
enter  (8)
entered  (3)
entering  (1)
entire  (2)
entirely  (3)
entirety  (1)
entitled  (1)
entity  (1)
equal  (1)
equation  (1)
equitable  (1)
equity  (3)
Eric  (2)
ERRATA  (2)
especially  (1)
ESQUIRE  (2)
establish  (1)
established  (1)
establishment  (1)
et  (1)

evaluation  (2)
Evans  (8)
Evanston  (1)
evening  (3)
event  (10)
events  (4)
everybody  (4)
evidence  (2)
Examination  (4)
example  (6)
exceptions  (1)
exclusively  (1)
excuse  (6)
executing  (2)
executive  (4)
EXHIBIT  (19)
exhibits  (7)
existing  (1)
expect  (1)
expectation  (1)
expectations  (3)
expected  (1)
experience  (2)
experienced  (1)
Expires  (1)
explain  (5)
explanation  (4)
explore  (1)
expressly  (1)
extensively  (1)
extent  (4)
external  (1)
eyes  (2)

< F >
face  (2)
fact  (11)
factors  (1)
facts  (6)
failing  (2)
failure  (2)
fair  (5)
fairly  (1)
fall  (3)
familiar  (20)
fantastic  (1)
far  (7)
Fat  (1)
FBI  (1)

FDLE-mandated  (1)
February  (1)
federal  (1)
feel  (3)
fell  (1)
felony  (2)
felt  (3)
female  (2)
fever  (1)
field  (1)
fields  (1)
fifth  (2)
fight  (1)
figured  (1)
file  (29)
filed  (17)
files  (2)
filing  (8)
fill  (1)
filled  (1)
final  (10)
finalized  (1)
financially  (1)
find  (3)
finding  (3)
findings  (7)
fine  (1)
finish  (1)
finished  (1)
finishing  (1)
fire  (6)
firearm  (1)
fired  (10)
first  (9)
fit  (5)
fitness-for-duty  (1)
five  (4)
FL  (1)
Flanigan  (1)
floor  (2)
FLORIDA  (10)
fly  (1)
FOB  (1)
focused  (3)
folder  (2)
follow  (7)
following  (9)
follows  (1)
follow-up  (1)

footage *(1)*
FOP *(41)*
force *(3)*
forced *(2)*
foregoing *(1)*
forget *(1)*
form *(99)*
formal *(4)*
formerly *(2)*
Fort *(1)*
forth *(9)*
Forum *(1)*
forward *(15)*
forwarded *(1)*
forwarding *(1)*
fought *(1)*
found *(8)*
four *(5)*
Fourth *(5)*
frame *(2)*
frames *(1)*
Fraternal *(6)*
free *(3)*
Freedom *(4)*
freely *(1)*
frequently *(3)*
Friday *(1)*
front *(5)*
full *(2)*
full-time *(2)*
further *(10)*
future *(1)*

< G >
gain *(1)*
Gausto *(1)*
general *(7)*
generally *(9)*
geographical *(1)*
getting *(6)*
give *(13)*
given *(10)*
giving *(2)*
go *(47)*
goals *(1)*
God *(1)*
goes *(4)*
going *(50)*
Good *(3)*

gotten *(2)*
Greg *(1)*
grievable *(4)*
grievance *(59)*
grievances *(17)*
grieve *(1)*
grieving *(4)*
ground *(1)*
groundswell *(2)*
Group *(4)*
GUASTO *(7)*
guess *(8)*
guide *(1)*
guidelines *(1)*
guilty *(2)*
guys *(1)*

< H >
H.R *(7)*
half *(5)*
hallway *(1)*
hand *(2)*
handcuffed *(2)*
handle *(3)*
handled *(4)*
handles *(1)*
handling *(2)*
hang *(1)*
happen *(1)*
happened *(5)*
happening *(3)*
happens *(1)*
harassed *(4)*
harassing *(1)*
harassment *(14)*
harbored *(1)*
harm *(1)*
Hazzi *(18)*
Hazzi's *(1)*
head *(4)*
hear *(3)*
heard *(5)*
hearing *(15)*
hearings *(1)*
held *(2)*
help *(2)*
hereto *(1)*
Hey *(2)*
HH473772 *(1)*

higher *(3)*
history *(4)*
Hold *(5)*
homeless *(2)*
honestly *(2)*
hoped *(1)*
hopefully *(2)*
hotel *(2)*
hour *(3)*
hours *(4)*
Human *(13)*

< I >
I.A *(9)*
IA *(1)*
IA-Prof *(1)*
idea *(1)*
identified *(1)*
identifying *(1)*
identity *(1)*
ill *(3)*
Illinois *(1)*
illness *(1)*
immediate *(1)*
immediately *(4)*
impact *(1)*
impasse *(1)*
impending *(1)*
implement *(6)*
implementation *(4)*
implemented *(1)*
implementing *(3)*
implements *(1)*
important *(4)*
importantly *(12)*
inaccurate *(1)*
inactions *(1)*
inappropriate *(6)*
incident *(30)*
inclined *(1)*
include *(2)*
included *(1)*
includes *(1)*
including *(1)*
inclusion *(3)*
incorrect *(4)*
incorrectly *(1)*
incredibly *(1)*
independently *(1)*

INDEX *(2)*
indicate *(1)*
indicated *(1)*
Indirectly *(1)*
individual *(23)*
individuals *(18)*
in-field *(1)*
informal *(1)*
information *(10)*
infraction *(1)*
initial *(9)*
initially *(3)*
initials *(3)*
initiate *(3)*
initiated *(1)*
initiates *(1)*
initiating *(1)*
injuries *(1)*
injury *(2)*
innocent *(1)*
innumerable *(1)*
inquiries *(1)*
inquiry *(2)*
in-service *(1)*
inside *(1)*
insight *(2)*
instance *(10)*
instances *(5)*
institute *(1)*
instituted *(1)*
instruct *(1)*
instructed *(1)*
instruction *(1)*
instructions *(2)*
insult *(1)*
intent *(1)*
intentional *(1)*
interact *(2)*
interactions *(3)*
interest *(2)*
interested *(1)*
interests *(1)*
Internal *(62)*
internally *(4)*
interrogate *(1)*
interrupt *(5)*
intervention *(1)*
interviews *(1)*
introduce *(1)*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 69 of 283

Deposition of Richard M. Clements          Jessica Guasto v. The City of Miami Beach, FL, et al.

**investigate** (3)
**investigated** (2)
**investigation** (58)
**Investigations** (15)
**investigative** (4)
**investigators** (3)
**involve** (3)
**involved** (28)
**involvement** (6)
**involves** (4)
**involving** (10)
**issue** (9)
**issued** (8)
**issues** (18)
**issuing** (2)
**its** (9)

**< J >**
**January** (5)
**Jerome** (5)
**JESSICA** (20)
**Jessica's** (2)
**job** (16)
**joined** (1)
**Jones** (2)
**Jose** (2)
**Julie** (5)
**July** (7)
**jump** (2)
**June** (2)
**jurisdiction** (1)
**Justice** (5)

**< K >**
**Kalea** (1)
**keep** (6)
**kept** (1)
**Kevin** (3)
**kicked** (3)
**kind** (1)
**knew** (3)
**know** (104)
**knowing** (1)
**knowledge** (15)
**known** (7)
**knows** (1)

**< L >**
**labor** (2)

**lack** (4)
**large** (1)
**Lauderdale** (1)
**Law** (21)
**lawsuit** (1)
**lawyer** (1)
**lawyers** (2)
**lead** (3)
**leading** (2)
**leads** (1)
**learned** (3)
**leave** (2)
**lectures** (1)
**led** (4)
**left** (7)
**legal** (2)
**lessened** (1)
**letter** (10)
**level** (7)
**LEWIS** (1)
**lied** (4)
**Lieutenant** (23)
**Lieutenants** (3)
**lieutenant's** (1)
**life** (1)
**light** (3)
**limit** (1)
**limitations** (2)
**limited** (2)
**line** (6)
**lines** (1)
**listed** (2)
**listen** (2)
**litigation** (1)
**little** (7)
**locate** (1)
**location** (1)
**Lodge** (1)
**long** (9)
**longer** (2)
**look** (14)
**looked** (3)
**looking** (7)
**looks** (2)
**loss** (2)
**lost** (1)
**lot** (9)
**Lt** (1)
**lying** (1)

**< M >**
**maintain** (1)
**maintaining** (1)
**Major** (6)
**making** (4)
**manager** (1)
**managerial** (1)
**mandate** (1)
**Maniquan** (1)
**mark** (5)
**marked** (3)
**marking** (3)
**Martinez** (2)
**material** (4)
**math** (2)
**matter** (2)
**matters** (2)
**maximum** (1)
**McVey** (2)
**mean** (20)
**meaning** (4)
**means** (4)
**measured** (1)
**measures** (6)
**mechanism** (4)
**mediation** (13)
**mediator** (3)
**meet** (5)
**meeting** (41)
**meetings** (6)
**member** (1)
**members** (14)
**member's** (1)
**memorandum** (1)
**Memorial** (2)
**memory** (2)
**mentioned** (5)
**MIAMI** (21)
**Miami-Dade** (2)
**MICHAEL** (7)
**microphone** (1)
**mid** (1)
**mid-1990s** (1)
**mid-2000s** (1)
**mid-2014** (1)
**Mike** (4)
**mind** (2)
**mini** (2)

**minimal** (2)
**minimum** (1)
**minor** (2)
**minute** (3)
**minutes** (2)
**misconduct** (41)
**misdemeanors** (1)
**misinterpreted** (1)
**misperception** (1)
**mispronounce** (1)
**misrepresent** (1)
**misrepresenting** (1)
**missed** (1)
**misspoke** (1)
**misstatement** (1)
**misstates** (7)
**mistaken** (4)
**mitigating** (1)
**MLE** (1)
**Mm-hm** (2)
**mm-hm's** (1)
**mobilization** (1)
**model** (1)
**moment** (1)
**Monday** (1)
**money** (1)
**Monique** (2)
**months** (2)
**morning** (1)
**Motor** (2)
**move** (4)
**moved** (3)
**moving** (4)
**muddled** (1)
**Muley** (25)
**Muley's** (1)
**multiple** (1)
**municipality** (1)
**murky** (1)
**mutual** (2)
**mutually** (2)

**< N >**
**name** (5)
**named** (2)
**names** (2)
**narcotics** (1)
**National** (1)
**nature** (12)

Case 1:22-cv-21004-MD Document 69-16 Entered on FLSD Docket 06/03/2024 Page 70 of 283

Deposition of Richard M. Clements                    Jessica Guasto v. The City of Miami Beach, FL, et al.

necessarily *(14)*
necessary *(3)*
need *(15)*
needed *(7)*
needs *(2)*
negative *(2)*
negotiate *(1)*
negotiated *(5)*
negotiation *(3)*
negotiations *(1)*
neighborhood *(1)*
neither *(1)*
neutral *(5)*
never *(10)*
new *(2)*
Nicholas *(1)*
Nick *(2)*
nickname *(1)*
night *(2)*
Noriega *(2)*
North *(1)*
Northeast *(1)*
Northwestern *(1)*
Notary *(3)*
note *(1)*
notes *(3)*
Notice *(6)*
notifies *(1)*
number *(12)*
numbers *(2)*
numerous *(1)*

< O >
Oates *(11)*
OATH *(2)*
object *(1)*
Objection *(101)*
objections *(1)*
obligated *(1)*
obligations *(1)*
obtained *(3)*
obviously *(3)*
occasionally *(1)*
occur *(1)*
occurred *(7)*
occurs *(2)*
October *(5)*
odd *(1)*
off-duty *(3)*

offer *(2)*
offered *(5)*
offering *(2)*
offhand *(1)*
Office *(8)*
officer *(71)*
officers *(27)*
Officer's *(1)*
offices *(1)*
official *(2)*
oftentimes *(5)*
Oh *(6)*
Okay *(80)*
Once *(22)*
ones *(1)*
ongoing *(2)*
operation *(2)*
Opinion *(2)*
opportunities *(1)*
opportunity *(16)*
option *(1)*
ORANGE *(2)*
order *(20)*
ordering *(2)*
organization *(1)*
outbreak *(3)*
outcome *(7)*
outcomes *(1)*
output *(1)*
outreach *(2)*
outside *(4)*
overall *(3)*
Overbroad *(2)*
oversee *(3)*
overseeing *(1)*
oversees *(1)*
overtime *(1)*
overturn *(1)*
overview *(1)*
ownership *(1)*
Ozeata *(2)*

< P >
p.m *(4)*
package *(1)*
page *(5)*
paid *(1)*
Palm *(1)*
panel *(11)*

paragraph *(1)*
part *(15)*
participated *(2)*
particular *(13)*
parties *(13)*
part-time *(1)*
party *(8)*
passing *(1)*
paths *(1)*
Patrol *(11)*
Paul *(6)*
pay *(3)*
paying *(1)*
penalties *(1)*
penalty *(1)*
pending *(6)*
people *(13)*
percent *(5)*
Perez *(5)*
Perez's *(2)*
perfect *(1)*
perform *(1)*
performance *(3)*
performing *(1)*
period *(6)*
perjury *(1)*
permitted *(1)*
person *(10)*
personal *(2)*
personally *(1)*
personnel *(2)*
person's *(1)*
perspective *(6)*
pertaining *(1)*
pertains *(5)*
ph *(3)*
Phillip *(3)*
philosophy *(2)*
phone *(2)*
pick *(1)*
piece *(1)*
piggyback *(1)*
PLACE *(13)*
placed *(9)*
Plaintiff *(4)*
Plaintiff's *(1)*
play *(3)*
played *(1)*
please *(22)*

PLLC *(1)*
plot *(1)*
point *(25)*
police *(66)*
policies *(5)*
policing *(7)*
policy *(8)*
position *(9)*
positions *(1)*
positive *(1)*
possible *(1)*
post *(2)*
post-discipline *(3)*
postponed *(1)*
potential *(4)*
potentially *(10)*
pre-d *(2)*
predetermination *(17)*
predetermined *(1)*
preddiscipline *(1)*
pre-discipline *(1)*
predominantly *(2)*
preference *(1)*
prejudice *(3)*
prepare *(1)*
presence *(1)*
present *(12)*
presentations *(1)*
presented *(6)*
presided *(1)*
president *(5)*
Pretty *(5)*
prevent *(3)*
prevented *(1)*
prevention *(1)*
previous *(6)*
previously *(4)*
primarily *(3)*
primary *(2)*
prior *(20)*
privacy *(1)*
privileged *(2)*
probably *(8)*
problem *(1)*
Procedure *(7)*
procedures *(2)*
proceed *(3)*
proceeding *(3)*
proceedings *(1)*

process  *(47)*
processed  *(1)*
processing  *(1)*
produce  *(1)*
produced  *(1)*
product  *(2)*
professional  *(6)*
professionally  *(1)*
profile  *(1)*
program  *(7)*
promoted  *(10)*
promotion  *(4)*
promotions  *(3)*
pronounce  *(2)*
proper  *(1)*
properly  *(1)*
Property  *(2)*
proposal  *(1)*
protect  *(4)*
protocol  *(2)*
protocols  *(2)*
provide  *(11)*
provided  *(9)*
provides  *(1)*
providing  *(1)*
provisions  *(1)*
Public  *(17)*
pull  *(2)*
pulled  *(3)*
punching  *(2)*
punishment  *(1)*
purpose  *(2)*
purposes  *(2)*
pursuant  *(4)*
purview  *(1)*
put  *(7)*
putting  *(2)*

**< Q >**
qualify  *(1)*
question  *(29)*
questioned  *(1)*
questioning  *(2)*
questionings  *(1)*
questions  *(8)*
quick  *(1)*
quickly  *(1)*

**< R >**

radio  *(1)*
raise  *(2)*
raised  *(1)*
range  *(2)*
rank  *(18)*
rank-and  *(1)*
ranks  *(3)*
Ray  *(2)*
reached  *(2)*
read  *(4)*
reading  *(1)*
reads  *(1)*
realize  *(1)*
really  *(9)*
reason  *(6)*
reasonable  *(1)*
recall  *(14)*
receipt  *(1)*
receive  *(7)*
received  *(7)*
receiving  *(2)*
recess  *(2)*
recognize  *(1)*
recognizing  *(1)*
recollection  *(1)*
recommend  *(1)*
recommendation  *(5)*
recommendations  *(1)*
recommended  *(1)*
record  *(10)*
recorded  *(3)*
recording  *(1)*
records  *(10)*
recuse  *(1)*
redirect  *(1)*
refer  *(10)*
reference  *(1)*
referenced  *(1)*
referral  *(1)*
referrals  *(2)*
referred  *(5)*
referring  *(7)*
refers  *(2)*
refreshing  *(2)*
refused  *(1)*
regarding  *(10)*
regardless  *(1)*
regards  *(5)*
rehabilitating  *(1)*

rehabilitation  *(3)*
reinstate  *(2)*
reinstated  *(7)*
reinstatement  *(1)*
related  *(1)*
relating  *(5)*
Relations  *(1)*
relationship  *(2)*
relative  *(3)*
relatively  *(1)*
relayed  *(1)*
relieved  *(8)*
remain  *(3)*
remained  *(3)*
remedied  *(1)*
remember  *(26)*
removed  *(2)*
render  *(2)*
rendering  *(1)*
renders  *(1)*
rephrase  *(6)*
reply  *(1)*
report  *(36)*
reported  *(2)*
Reporter  *(16)*
reporting  *(3)*
reports  *(6)*
represent  *(6)*
representation  *(2)*
representative  *(4)*
represented  *(2)*
represents  *(1)*
reprimand  *(4)*
request  *(7)*
requested  *(3)*
required  *(7)*
requirement  *(2)*
requirements  *(2)*
requires  *(3)*
Research  *(1)*
reserve  *(2)*
reserved  *(1)*
residential  *(1)*
resign  *(1)*
resignation  *(10)*
resolution  *(4)*
resolve  *(2)*
resolved  *(6)*
resource  *(1)*

Resources  *(14)*
respect  *(2)*
respected  *(1)*
respective  *(1)*
respond  *(2)*
response  *(5)*
responsibilities  *(5)*
responsibility  *(5)*
responsible  *(5)*
restart  *(1)*
restate  *(3)*
restricted  *(1)*
result  *(15)*
resulted  *(2)*
results  *(2)*
resume  *(1)*
resumed  *(1)*
resurrect  *(1)*
retained  *(1)*
retaliation  *(3)*
retired  *(3)*
retirement  *(2)*
reveal  *(2)*
revealed  *(1)*
revealing  *(1)*
review  *(26)*
reviewed  *(17)*
reviews  *(1)*
RICHARD  *(10)*
Rick  *(3)*
right  *(100)*
right-hand  *(1)*
Rights  *(11)*
rise  *(1)*
rises  *(3)*
rising  *(3)*
Rivas  *(2)*
Robert  *(1)*
role  *(14)*
roles  *(2)*
roll  *(7)*
room  *(3)*
Rosa  *(17)*
Royal  *(1)*
rule  *(10)*
rules  *(5)*
ruling  *(2)*
run  *(1)*
running  *(1)*

**< S >**
**Sabater** *(2)*
**Sadiq** *(1)*
**safety** *(1)*
**Salabarria** *(20)*
**satisfy** *(2)*
**saying** *(5)*
**says** *(15)*
**schedule** *(1)*
**scheduled** *(2)*
**scheduling** *(1)*
**School** *(3)*
**Schultz** *(4)*
**Schultz's** *(1)*
**science** *(3)*
**screen** *(9)*
**scroll** *(1)*
**se** *(5)*
**seal** *(1)*
**search** *(3)*
**second** *(10)*
**secretary** *(3)*
**section** *(3)*
**see** *(39)*
**seeing** *(2)*
**seen** *(6)*
**segments** *(1)*
**select** *(3)*
**seniority** *(1)*
**sense** *(5)*
**sensitive** *(2)*
**sent** *(5)*
**sentence** *(1)*
**September** *(2)*
**Seranno** *(1)*
**sergeant** *(41)*
**sergeants** *(2)*
**series** *(1)*
**serious** *(6)*
**Serrano** *(13)*
**Serrano's** *(1)*
**service** *(2)*
**Services** *(2)*
**set** *(4)*
**settled** *(6)*
**Settlement** *(14)*
**settling** *(1)*
**seven** *(2)*

**severity** *(1)*
**sex** *(4)*
**shaking** *(1)*
**share** *(10)*
**she'd** *(1)*
**SHEET** *(2)*
**Shelandra** *(1)*
**shift** *(3)*
**shifted** *(1)*
**short** *(1)*
**shortly** *(1)*
**shot** *(1)*
**shots** *(3)*
**show** *(4)*
**showing** *(2)*
**sic** *(1)*
**sick** *(1)*
**side** *(10)*
**sides** *(6)*
**sign** *(3)*
**signature** *(5)*
**signed** *(7)*
**significant** *(6)*
**signing** *(1)*
**similar** *(1)*
**simultaneously** *(1)*
**sir** *(4)*
**sit** *(4)*
**site** *(1)*
**Sitting** *(1)*
**situation** *(1)*
**situations** *(2)*
**Smith** *(1)*
**sole** *(3)*
**solemnly** *(1)*
**solution** *(1)*
**somebody** *(3)*
**someone's** *(1)*
**sooner** *(1)*
**SOP** *(1)*
**sorry** *(33)*
**SOUTHERN** *(1)*
**speak** *(5)*
**speaking** *(2)*
**speaks** *(2)*
**specific** *(6)*
**specifically** *(10)*
**specifics** *(2)*
**speculate** *(1)*

**speculating** *(1)*
**speed** *(1)*
**spell** *(1)*
**split** *(1)*
**spoke** *(1)*
**spoken** *(1)*
**squad** *(1)*
**Staff** *(2)*
**stages** *(1)*
**stairwell** *(1)*
**stands** *(1)*
**star** *(1)*
**stars** *(1)*
**start** *(1)*
**started** *(8)*
**starting** *(2)*
**state** *(26)*
**stated** *(5)*
**statement** *(4)*
**STATES** *(1)*
**state's** *(1)*
**Stating** *(1)*
**station** *(1)*
**status** *(4)*
**statute** *(3)*
**stay** *(1)*
**stayed** *(1)*
**stenographic** *(1)*
**stenographically** *(1)*
**step** *(28)*
**steps** *(3)*
**Steven** *(4)*
**stint** *(1)*
**stipulate** *(1)*
**stipulated** *(1)*
**stipulation** *(1)*
**stipulations** *(1)*
**stop** *(2)*
**stops** *(1)*
**story** *(3)*
**Strategic** *(1)*
**strategies** *(1)*
**strike** *(6)*
**stripes** *(2)*
**strong** *(1)*
**students** *(1)*
**studies** *(1)*
**stumbling** *(1)*
**subject** *(6)*

**submitted** *(7)*
**subordinate** *(1)*
**subordinates** *(1)*
**subsequent** *(7)*
**subsequently** *(12)*
**substance** *(1)*
**substantiate** *(1)*
**substantiated** *(2)*
**substantiation** *(1)*
**succeed** *(2)*
**successfully** *(1)*
**sue** *(1)*
**sued** *(3)*
**Suite** *(1)*
**suits** *(1)*
**summary** *(1)*
**Sunshine** *(2)*
**supervise** *(2)*
**supervising** *(2)*
**supervision** *(6)*
**supervisor** *(14)*
**supervisors** *(1)*
**supervisory** *(4)*
**supplied** *(1)*
**Support** *(5)*
**supposed** *(9)*
**suppressed** *(1)*
**Sure** *(23)*
**suspend** *(2)*
**suspended** *(2)*
**suspension** *(5)*
**sustain** *(2)*
**sustained** *(1)*
**SWAT** *(1)*
**swear** *(2)*
**sworn** *(3)*
**symptoms** *(1)*
**system** *(1)*

**< T >**
**table** *(1)*
**tailoring** *(1)*
**take** *(31)*
**TAKEN** *(18)*
**talk** *(8)*
**talked** *(8)*
**talking** *(8)*
**talks** *(1)*
**team** *(2)*

Case 1:22-cv-21004-MD   Document 69-16   Entered on FLSD Docket 06/03/2024   Page 73 of 283

Deposition of Richard M. Clements          Jessica Guasto v. The City of Miami Beach, FL, et al.

tell  *(14)*
telling  *(2)*
tells  *(1)*
ten  *(1)*
tenure  *(13)*
tequila  *(3)*
term  *(8)*
terminate  *(1)*
terminated  *(12)*
terminating  *(1)*
termination  *(10)*
terminology  *(1)*
terms  *(7)*
Terrace  *(1)*
tested  *(1)*
testified  *(14)*
testify  *(3)*
testifying  *(2)*
TESTIMONY  *(11)*
testing  *(1)*
Thank  *(9)*
thing  *(3)*
things  *(14)*
think  *(61)*
third  *(7)*
thought  *(4)*
three  *(3)*
threshold  *(1)*
tight  *(1)*
TIME  *(62)*
timeframe  *(1)*
timeline  *(1)*
times  *(12)*
title  *(6)*
titled  *(1)*
Today  *(12)*
told  *(2)*
to-one  *(1)*
total  *(2)*
totality  *(8)*
tourist  *(3)*
track  *(2)*
trained  *(1)*
training  *(17)*
trainings  *(1)*
transcript  *(4)*
transferred  *(1)*
transparency  *(1)*
treated  *(1)*

treatment  *(4)*
trial  *(1)*
tried  *(1)*
true  *(17)*
trust  *(2)*
truth  *(5)*
truthful  *(2)*
truthfully  *(1)*
try  *(3)*
trying  *(3)*
Tuesday  *(2)*
Tuesdays  *(1)*
two  *(19)*
type  *(6)*
types  *(4)*

< U >
ultimate  *(2)*
ultimately  *(14)*
unbecoming  *(1)*
undercover  *(1)*
undergo  *(2)*
understand  *(10)*
understanding  *(8)*
understood  *(3)*
unethically  *(1)*
unfortunate  *(1)*
unhappy  *(1)*
unholster  *(1)*
unh-unh's  *(1)*
Uniform  *(6)*
union  *(37)*
unit  *(18)*
UNITED  *(1)*
unlawful  *(2)*
unlawfully  *(1)*
unprofessionally  *(1)*
unresolved  *(1)*
unsurety  *(1)*
untruthful  *(2)*
untruthfulness  *(4)*
upon/entered  *(1)*
use  *(2)*
usually  *(5)*

< V >
vague  *(4)*
vaguely  *(1)*
validity  *(4)*

valuation  *(1)*
variety  *(2)*
venue  *(1)*
verbal  *(2)*
versus  *(2)*
viable  *(1)*
victim  *(1)*
video  *(1)*
videoconference  *(1)*
violated  *(3)*
violates  *(1)*
violation  *(7)*
violations  *(7)*
violence  *(1)*
virtue  *(1)*
voice  *(2)*
voices  *(1)*
voluntarily  *(2)*
voluntary  *(2)*

< W >
waive  *(3)*
waived  *(1)*
walks  *(1)*
want  *(24)*
wanted  *(7)*
wants  *(1)*
warning  *(5)*
warrant  *(1)*
warranted  *(3)*
watch  *(2)*
way  *(19)*
Wayne  *(2)*
ways  *(2)*
weaker  *(1)*
weapon  *(1)*
weekend  *(2)*
weeks  *(1)*
weigh  *(1)*
weight  *(1)*
welcome  *(1)*
Well  *(26)*
well-being  *(1)*
well-known  *(1)*
went  *(8)*
we're  *(17)*
whatnot  *(2)*
whereabouts  *(3)*
whichever  *(1)*

Whistleblower  *(1)*
willing  *(1)*
Winfall  *(1)*
wish  *(1)*
wishes  *(1)*
withdraw  *(3)*
Withdrawal  *(1)*
withdrawn  *(3)*
withdrew  *(1)*
witness  *(112)*
witnessed  *(1)*
woman  *(2)*
wondering  *(1)*
words  *(1)*
work  *(27)*
workdays  *(6)*
worked  *(2)*
working  *(8)*
work-related  *(1)*
works  *(6)*
worries  *(1)*
worse  *(1)*
writing  *(3)*
written  *(10)*
wrong  *(14)*
wrongdoing  *(3)*

< Y >
Yeah  *(8)*
year  *(3)*
years  *(22)*
young  *(1)*

< Z >
zone  *(2)*
ZOOM  *(6)*

## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, Salabarria is the subject of an on-going Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2020-04794 ("EEOC Charge"); and

WHEREAS, the Investigation and EEOC charge are all pending and constitute all the charges, investigations and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of further investigation, litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.      Recitals. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.      EEOC Charge Withdrawn With Prejudice and Discipline. Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the attached Notice of Withdrawal with Prejudice and immediately filing same with the EEOC. Additionally, as discipline for the matters that are the subject of the Investigation, Salabarria agrees to accept the following:

      a.   A One Hundred and Sixty (160) hour suspension,

      b.   Payback of Eighty-Six (86) total hours, of which Forty-Four (44) Hours is regular time and Twenty-Four (24) hour is overtime. The regular rate is Forty-Four Dollars and 14/100 ($44.14) for a total of One Thousand Nine Hundred Forty-Two Dollars and 00/100 ($1,942.16) of regular time. The overtime hourly rate is Sixty-Six Dollars and 21/100 ($66.21), for a total amount of One

1

**Exhibit**

**1**

Clements 4/23/2024 J.E.

Thousand Five Hundred Eighty-Nine Dollars and 04/100 ($1,589.04). **Accordingly, the Total Amount due to the City is Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) ("the Total Amount")**. Salabarria can pay the Total Amount via a cashier's check made payable to the City of Miami Beach on or before January 4, 2021. If the City does not receive full payment on or before 5:00 p.m. on January 4, 2021, then the City is authorized to deduct the remaining amounts due from Salabarria's vacation leave bank.

c. Salabarria will execute the attached Last Chance Agreement, which contains additional provisions. The Last Chance Agreement is incorporated by reference into this Agreement.

d. Permanent deletion, from all platforms (platforms includes but is not limited to: Apple Podcasts, Stitcher, Spotify, Spotify Podcasts, Google Play Music, Google Podcasts, iHeart Radio, and any other social media and/or electronic platform) the podcast titled: "Cafecitos y Chisme with Nick & Jess."

e. Salabarria will immediately have a meeting with the Chief of Police wherein she will address the claims made in the Charge, including but not limited to identifying the names of all persons who allegedly engaged in the conduct addressed in the Charge. The refusal to name the persons who have allegedly engaged in the conduct in the Charge shall be grounds for immediate termination, as discussed in the attached Last Chance Agreement. Salabarria shall be entitled to have a Union Representative with her during this meeting.

f. Release Of Claims, Covenant Not To Sue. Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement. The claims released also include any claims under the United States Constitution, including but not limited to claims arising under the First Amendment or any other claims whatsoever.

2

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf. Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

g.      Effect; Precedent.    The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein.  The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind, with the exception of any labor proceeding involving Salabarria. The parties further agree that Salabarria's prior settlement agreement may also be used in any labor proceeding involving Salabarria.

h.      Consideration.  The consideration for this Agreement is the City's early conclusion of the Investigation. The parties acknowledge that the City could continue the Investigation. The parties further acknowledge that continuing the Investigation would likely be detrimental to Salabarria. Therefore, the City is giving up its right to continue the Investigation in exchange fro Salabarria's agreement to the provisions and terms of this Agreement. The mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

i.      Miscellaneous.  This Agreement (which includes the exhibits attached hereto that are incorporated by reference), is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral.  The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever.  This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release,"

3

is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

**CITY OF MIAMI BEACH**

By ___ Paul J. Aguila
City Manager
2B3D6240F92B45D...

12/23/2020 | 1:34 EST
DATE

**JESSICA SALABARRIA**

_____
JESSICA SALABARRIA

12/18/2020
DATE

**FRATERNAL ORDER OF POLICE, LODGE 8**

By _____
KEVIN MILLAN
President

12/18/2020
DATE

**CHIEF OF POLICE**

_____
RICK CLEMENTS
Chief of Police

4

**Exhibit 2**

Clements 4/23/2024 J.E.

510-2022-01818

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ___ FEPA<br>_X_ EEOC | NUMBER<br>**TBA** |

<table>
<tr><td colspan="3" align="center">Florida Commission on Human Relations <span>and EEOC</span><br>State or Local Agency, if any<br>Social Security No.: xxx-xx- 4342</td></tr>
<tr><td colspan="2">NAME (Indicate Mr., Ms., Mrs.)<br><br>Ms. Rosa Carvajal</td><td>TELEPHONE (Include Area Code)<br><br>917-319-9733</td></tr>
<tr><td colspan="2">STREET ADDRESS          CITY, STATE AND ZIP CODE<br>c/o Sharp Law Firm, P.A., 1600 West State Road 84, Suite C<br>Fort Lauderdale, FL 33315</td><td>DATE OF BIRTH<br><br>5/30/1983</td></tr>
<tr><td colspan="3">NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMATED AGAINST ME (if more than one list below.)</td></tr>
<tr><td>(1) NAME<br>City of Miami Beach/Miami Beach Police Dept.</td><td>NUMBER OF EMPLOYEES, MEMBERS<br>500+</td><td>TELEPHONE (Include Area Code)<br><br>(305) 673-7000</td></tr>
<tr><td colspan="2">STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>1700 Convention Center Drive  Miami Beach, FL 33139</td><td>COUNTY<br>Miami-Dade</td></tr>
<tr><td>(2) NAME<br><br>N/A</td><td>NUMBER OF EMPLOYEES, MEMBERS<br><br>Tba</td><td>TELEPHONE (Include Area Code)<br><br>N/A</td></tr>
<tr><td colspan="2">STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>N/A</td><td>COUNTY<br><br>N/A          N/A</td></tr>
</table>

| CAUSE OF DISCRIMINATION BASED ON (Check Appropriate box(es) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ___RACE____COLOR__XXX_SEX____RELIGION____NATIONAL ORIGIN<br><br>_XXX_RETALIATION____AGE____DISABILITY____OTHER (*specify) | *Earliest* May 2021  *Latest*  to present<br><br>____CONTINUED ACTION |

My name is Rosa Carvajal and I have been employed by the City of Miami Beach and the Miami Beach Police Department as a sworn law enforcement officer since July 2008. In June 2015, I was promoted to the rank of Sergeant and in September 2019 I was promoted to Lieutenant. Due to a longstanding bias against women within upper ranks of MBPD, out of 37 total positions, there are still only three female Lieutenants (including myself) and one female Captain.

Although I earned each of my promotions through hard work, high examination scores and my ranking on the eligibility lists, I have still been subjected to frequent discrimination based on my sex and treated differently by many of my male counterparts because I am a woman. For example, after I was competitively selected for a coveted Field Training Sergeant position in 2015, a less-qualified male sergeant grieved my selection via the FOP union and was somehow granted my position, which resulted in me being removed from the program entirely. To my knowledge, no male officer with MBPB has ever been required to forfeit their rank or position in order to settle a grievance filed by another officer.

In January 2017, I became pregnant and was assigned to Internal Affairs, where I remained until my promotion to Lieutenant in September 2019, based my exam score and ranking on the eligibility list. While in IA, I was a point of contact for internal discrimination complaints and I received and investigated several complaints from female officers. At least one of these complaints involved a female officer who was being harassed by a male member of the command staff, who became openly hostile and belligerent towards myself and the complaining officer and tried to interfere with the investigation. After my promotion to Lieutenant, I also received complaints in late 2019 from three female officers about being excluded from the Field Training Officer (FTO) program in favor of male officers. This was a matter of significant concern to me as a female, since the FTO program provides experience that is critical for advancing to a higher rank withing MBPD, and it has traditionally been dominated by the male officers in MBPD with the command staff's apparent blessing.

EEOC-MDO
Received 01/03/2022

When it became known that I was advocating on behalf of the female officers who had been excluded from FTO opportunities, two male Lieutenants began to openly harass me and interfere with my attempts to investigate. Other supervisors also became hostile towards me and when I started to serve public records requests for documents to support the claims of the female officers.  In an attempt to discredit me, I was falsely accused of trying to undermine the FTO program and eliminate the additional comp time that was given to FTO and FTS.

This hostility increased after one of my public records requests resulted in the production of a number of interdepartmental emails between different male officers going back almost a decade (including some current members of the command staff) that included several graphic racist and sexist "jokes" and memes that should have resulted in severe discipline or termination under MBPD policies but were apparently never even investigated by MBPB. In addition, I received documents showing that a male sergeant named Jose Reina was non-competitively promoted to a FTS position in 2015 at around the same time I was removed from my FTS position to settle another male sergeant's grievance that I had been unfairly selected. I brought these findings to the FOP grievance committee for further action, only to receive more hostility from the committee members, who included Sgt. Jose Reina's wife and then FOP President Kevin Milan. Shortly after that I was verbally attacked and harassed by other senior members of the command staff  regarding my public records request.

Due to the emotional distress from this backlash, I decided to remain quiet and "off-grid" until May 2021, when I placed a memo of interest for a newly-created Field Training Lieutenant (FTL) position. I was selected for the position along with two men, Lt. Cosner and Lt. Rabelo. Unfortunately, it soon became evident that my male counterparts were not going to allow me to participate equally in the creation or administration of the field training program and that female officers were unlikely to be given equal opportunities to participate.  Lt. Cosner essentially seized control of the program from day one, and since then I have been routinely marginalized and excluded from the decision-making process for virtually every aspect of the program, while Lt. Rabelo is given an equal voice and included by Lt. Cosner in the day-to-day operation of the training program. When I advocated for the selection of a highly qualified female sergeant named Michelle Sayegh as one of three Field Training Sergeants in late August, I was overruled by Cosner and Rabelo who selected a male sergeant instead. After I disagreed with the decision, my working relationship with Lt. Cosner began to deteriorate and he became very critical and hostile whenever I questioned his decisions regarding the field training program.

Because I did not want to be scapegoated and removed from my FTL position like I was from my prior FTS position in 2016, beginning in October 2021, I submitted a series of informal complaints through my chain of command about once again being treated differently based on my sex. My informal complaints were ultimately referred to Human Resources in November 2021, and I met with an HR representative on November 21, 2021 to discuss my concerns in more detail. During the interview, the HR representative seemed disinterested and bored until I mentioned my history of advocating for female officers within MBPD and showed her some of the racist and sexist emails I had received from my public records request back in December 2019. When she saw the emails, her demeanor changed to one of concern and she said she would have follow ups with the City's IT department to obtain more information. I told her about the harassment that I and my husband received in 2019 and 2020 after certain people within MBPD learned that I had obtained the emails and that I was afraid that they would come for us via social media and/or doxing if they knew I had mentioned it again.

I believe that the discrimination and harassment to which I am being subjected in my current FTL position with MBPD is based on my sex (female) and in retaliation for my long record of prior advocacy on behalf of female officers in MBPD.  I also fear retaliation against myself and my husband (who is also employed by MBPD as a sworn law enforcement officer) for my recent disclosures to Human Resources as part of the formal discrimination complaint I filed on November 21, 2021, which included information about inappropriate racist and sexist emails sent several years ago by some current male members of the MBPD command staff.

EEOC-MDO
Received 01/03/2022

| | |
|---|---|
| __X__ I want this charge filed with both the EEOC and the State or Local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (When necessary for State and Local Requirements |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct<br><br>See Attached Page for Notarial Certificate. | SIGNATURE OF COMPLAINANT |
| Date          12/31/2021                    Charging Party (*Signature*) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month and year)<br>**31st**          December   2021 |

EEOC Form 5 (Rev. 06/92)

12/31/2021

EEOC-MDO
Received 01/03/2022

**JURAT**

State/Commonwealth of _____FLORIDA_____ )

☐City ☑County of _____Orange_____ )

On___12/31/2021___, before me, _____La Jon Llamar Dantzler_____,
      *Date*                                                    *Notary Name*

the foregoing instrument was subscribed and sworn (or affirmed) before me by:

## Rosa M Carvajal
_____.
*Name of Affiant(s)*

☐   Personally known to me  **-- OR --**

☐   Proved to me on the basis of the oath of_____ **-- OR --**
                                             *Name of Credible Witness*

☑   Proved to me on the basis of satisfactory evidence:_____driver license_____
                                             *Type of ID Presented*

Type of Identification Produced: DL C612733836900

LA JON LLAMAR DANTZLER
Notary Public - State of Florida
Commission # HH 189036
Expires on September 21, 2025

WITNESS my hand and official seal.

Notary Public Signature: _____

Notary Name:_____La Jon Llamar Dantzler_____

Notary Commission Number:__HH 189036__

Notary Commission Expires:_09/21/2025_

*Notarized online using audio-video communication*

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: _____EEOC Doc_____

Document Date: _____12/31/2021_____

Number of Pages (including notarial certificate):_____4_____

The foregoing instrument was Acknowledged before me by means of Online Notarization

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/16/2024

**To:** Ms. Rosa Carvajal
15842 SW 44TH ST
MIAMI, FL 33185
Charge No: 510-2022-01818

EEOC Representative and email:   EDRAS REGISME
Investigator
Edras.Regisme@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 510-2022-01818.

On behalf of the Commission,

Digitally Signed By:Evangeline Hawthorne
02/16/2024

Evangeline Hawthorne
Director

Exhibit

**3**

Clements 4/23/2024 J.E.

**Cc:**

Michael  Elkins
MLE Law
633 South Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301

Lana  Hernandez
1700 CONVENTION CENTER DR
Miami Beach, FL 33139

Teri  Guttman Valdes
Teri Guttman Valdes LLC
1501 Venera Avenue, Suite 300
CORAL GABLES, FL 33146

Christopher C Sharp
SHARP LAW FIRM, P.A.
1600 West State Road 84 Suite C
Fort Lauderdale, FL 33315


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 510-2022-01818 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 510-2022-01818 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# MIAMIBEACH

City of Miami Beach, 1700 Convention Center Drive, Miami Beach, Florida 33139, www.miamibeachfl.gov
DEPARTMENT OF HUMAN RESOURCES
Marla Alpízar, Director

## MEMORANDUM

TO:          Lieutenant Rosa Carvajal
             Lieutenant Octavio Rabelo
             Lieutenant Steven Cosner

FROM:        Marla Alpizar, Director of Human Resources *Marla Alpizar*

DocuSigned by:
DE462A0AF40D43C...

DATE:        March 15, 2022

SUBJECT:     Human Resources Internal Investigation of Complaint of Lt. Rosa Carvajal

---

On November 16, 2021, Lieutenant Rosa Carvajal sent an email to Lieutenant Steven Cosner, Lieutenant Octavio Rabelo, Major Enrique Doce, Deputy Chief of Police Wayne Jones and Lieutenant Paul Ozaeta, the Fraternal Organization of Police (FOP) President. Therein, Lieutenant Carvajal makes allegations that she is being subjected to a hostile work environment by Lieutenant Rabelo and Lieutenant Cosner. A copy of the November 16, 2021, email chain ("Initiating Email") is attached as Exhibit A.

On November 16, 2021, Lieutenant Rabelo forwarded the Initiating Email to Assistant Chief of Police Paul Acosta. On that same date, Assistant Chief Acosta forwarded the Initiating Email to Chief of Police Rick Clements. Additionally, on that same date Assistant Chief Acosta contacted me by telephone, informing me of the contents of the Initiating Email. On November 17, 2021, Assistant Chief Acosta provided me a copy of the Initiating Email. Based on the contents of the Initiating Email, at the direction of then Director of Human Resources Michael Smith[1], I began an investigation into the allegations made therein.

On December 31, 2021, as this investigation was being conducted, Lieutenant Carvajal filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC Charge"). A copy of the EEOC Charge is attached as Exhibit B. Therein, Lieutenant Carvajal alleges that she was subjected to discrimination based on her gender (female), subjected to a hostile work environment and retaliated against. *See* Exh. B. Upon receipt of the EEOC Charge, I incorporated the allegations therein into this investigation.

---

[1]       Michael Smith retired from the City of Miami Beach on November 30, 2021. Thereafter, I was made the Interim Director of Human Resources. On January 20, 2022, the City Commission consented to my appointment as Director of Human Resources.

Exhibit

**4**

Clements 4/23/2024 J.E.

## PRELIMINARY BACKGROUND

On July 21, 2008, Lieutenant Carvajal was hired by the City as a Police Officer. On June 29, 2015, she was promoted to Sergeant. On September 16, 2019, she was promoted to Lieutenant. As a lieutenant, Lieutenant Carvajal is a regular shift supervisor on the midnight shift. In May 2021, Lieutenant Carvajal was assigned to the Police Department's Field Training Officer Program ("FTO Program") as a Field Training Lieutenant ("FTL"). Lieutenant Carvajal's duties as an FTL are in addition to her regular duties as a midnight shift commander.

Also in May 2021, Lieutenant Cosner was assigned to the FTO Program as an FTL. Just like Lieutenant Carvajal, Lieutenant Cosner is a regular shift supervisor on the midnight shift, and his duties as an FTL are also in addition to his duties as a midnight shift commander. He has been involved in the FTO program since 1998 (23+ years) as a Field Training Officer.

Lieutenant Rabelo was hired on January 18, 1994, as a Police Officer. In 2002, he was promoted to Sergeant effective May 9.  On April 23, 2007, he was promoted to Lieutenant and is the most senior in this classification.  He is assigned as the Support Services Lieutenant and works on day shift.  He has a long involvement with the FTO Program.  Per Lieutenant Rabelo, he was a FTL from August 2007 to January 2011, and had multiple additional assignments as FTL.

### The FTO Program

The FTO Program exists for the City to train new police officers and individuals promoted from police officer to sergeant. Essentially, FTO is split into two (2) distinct parts, the field training of new police officers and the training of police officers promoted to sergeant. Before field training, new officers spend 8-10 weeks in classroom training; this is provided by the Training Department. The FTO Program also provides scenario-based training ("SBT") for new police officers. Historically, the FTL's report outside of their regular chain of command to a Police Department Major for matters related to the FTO Program. Lieutenants may apply and interview for this assignment, which is made at the discretion of the Chief of Police. This assignment comes with a 5% additional premium pay and additional overtime or compensatory time opportunities.

### Training New Police Officers

This area of the FTO Program is commonly referred to as the "PPO" program. New police officer field training takes fourteen (14) weeks. The "rookie" police officers are generally trained by Field Training Officers ("FTOs"). FTOs are supervised by the FTLs. Upon completion of the fourteen (14) weeks of field training, the new police officers are assigned to a shift. They are on probation, are strictly supervised but are on patrol alone. The probationary period lasts approximately five (5) to (6) months. During this time, new police officers also go through about 40 hours of SBT. New police officers must pass review by an FTO Review Board before they are released from probation.

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

## Training New Sergeants

New sergeant training varies dramatically from training new police officers. First, the program is shorter (up to 8 weeks). Second, the program focuses significantly on supervisory skills. Finally, the program occurs less often than the program for new police officers. This is so because the training only occurs when there are police officers promoted to sergeant. The new Sergeants are trained by Field Training Sergeants ("FTSs"). FTSs are supervised by the FTLs.

The essence of Lieutenant Carvajal's allegations stem from issues concerning the supervisory authority over FTO, and the above-referenced program components within the FTO Program.

## THE INVESTIGATION

### Witness Interviews

The following persons were interviewed on the following dates:

| WITNESS NAME | INTERVIEW DATES |
|---|---|
| Lieutenant Octavio "Toby" Rabelo | 11/17/21; 11/18/21; 02/03/22 |
| Lieutenant Steven Cosner | 11/18/21; 12/3/21 |
| Lieutenant Rosa Carvajal | 11/18/21; 11/21/21; 11/29/21; 2/24/22 |
| Major Enrique Doce | 11/22/21 |
| Captain Javier Matias | 11/24/22; 3/2/22 |
| Deputy Chief Wayne Jones | 11/29/22 |
| Captain Daniel Morgalo | 2/18/22 |

The following is a summary of the witness interviews. As to witnesses interviewed more than once, the summary addresses all of the information from each interview but does not distinguish between interview dates.

### Lieutenant Carvajal

Lieutenant Carvajal was interviewed on November 18, 2021; November 21, 2021; November 29, 2021[2], and February 24, 2022[3]. Lieutenant Carvajal asserts that her allegations span

---

[2]     Chief Clements was present for the November 29, 2021, interview. The interview took place at approximately 5:30 a.m. and lasted approximately five (5) hours. During the interview Chief Clements thanked Lieutenant Carvajal for coming forward and informed her that she was the future of the Police Department going forward and that people would look to her for leadership. Chief Clements further expressed concern at her allegation that there was a general perception that women were not heard in the Police Department.

[3]     All of the November interviews were conducted by the City's Human Resources Department. The interview on February 24, 2022, was conducted by Michael Elkins, the City's outside labor and employment counsel. At that meeting, Lieutenant Carvajal was advised by Mr. Elkins that he was interviewing her in his capacity as the City's attorney and that he was not an independent investigator. Lieutenant Carvajal's

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

from July 20, 2021 – present day. She identifies several specific incidents that she believes, taken as a whole, constitute a hostile work environment and gender discrimination. Each is addressed below.

### The July 20, 2021, Email from Lieutenant Cosner

During a July 19-20, 2021, email exchange between Lieutenant Carvajal and Lieutenant Cosner regarding the division of responsibilities in the FTO Program, Lieutenant Cosner used a sports analogy in describing leadership structure. A copy of the July 19-20, 2021, email exchange is attached as Exhibit C. Lieutenant Carvajal views the sports analogy as discriminatory because sports are predominantly male dominated. It should be noted that while this was obviously a "terse" email exchange, Lieutenant Cosner did not make any references to Lieutenant Carvajal's gender or address her in an inappropriate manner. *See* Exh. C.

### Lieutenant Rabelo's August 4, 2021 "Me Too" Comment

On August 4, 2021, during a tense exchange between Lieutenant Rabelo and Lieutenant Carvajal, Lieutenant Rabelo told Lieutenant Carvajal: "I will not be 'me too'd' out of the program." Lieutenant Carvajal alleges that this comment is sexist. Lieutenant Rabelo does not deny making this comment. He does, however state that the comment was taken out of context.

During this same conversation, Lieutenant Carvajal alleges that Lieutenant Rabelo also said words to the effect of: "I don't know how you and Captain Rivero were selected for IA, I guess some people look good on paper."[4] Lieutenant Rabelo says that he is misquoted out of context.[5] Lieutenant Carvajal alleges that these comments demonstrate gender discrimination and hostile work environment.[6]

### The August 2021 Selection of FTSs

In August 2021, Lieutenants Carvajal Cosner and Rabelo were selecting new FTSs. There were three (3) FTS positions available. The FTSs selected were:

1. Danielle Marottta (female);

---

counsel, Christopher Sharp, was present for the entirety of the meeting. The meeting was arranged between Mr. Elkins and Mr. Sharp with Mr. Sharp's and Lieutenant Carvajal's consent.

[4]     When asked if he witnessed this comment, Lieutenant Cosner said, "I do recall the conversation, but the comment was not directed at Marlen Rivero or Rosa Carvajal; it was not about IA; it was a reference to sergeants in general – not women – who get special assignments [early].  They are then [later] sent back to patrol and don't have the experience needed to supervise patrol squads."

[5]     Lieutenant Rabelo claimed that he was conveying an issue that when Lieutenant Carvajal went back to patrol [as a Lieutenant], she was in charge of 60-70 people on her shift without gaining experience supervising [as a Sergeant] 6-7 people on patrol [as she was assigned to work in IA].

[6]     It should be noted that Captain Marlen Rivero is female, and as a Captain outranks Lieutenant Rabelo. Moreover, Captain Rivero is currently supervising Lieutenants Rabelo, Cosner and Carvajal in their duties with the FTO Program.

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

2. Michael Marcelinho (male); and

3. Luis Perez (male).

Lieutenant Carvajal suggested Sergeant Michelle Sayegh ("Sergeant Sayegh") for one of the open positions. Lieutenants Cosner and Rabelo opposed Sergeant Sayegh. Lieutenant Carvajal views this as hostile work environment and gender discrimination. Specifically, Lieutenant Carvajal alleges that no matter who she suggested, Lieutenants Cosner and Rabelo would oppose. Notably, when asked about the selection of Sergeant Marotta (female), Lieutenant Carvajal stated that Sergeant Marotta's selection was unanimous. Lieutenant Carvajal further alleges that the reason Lieutenants Cosner and Rabelo didn't want Sergeant Sayegh is because Sergeant Sayegh is a woman.

This allegation is confusing. It strains reason that if Lieutenants Cosner and Rabelo were engaging in gender discrimination they would also agree to the selection of Sergeant Marotta, a female. Further, if Lieutenants Cosner and Rabelo were purposely refusing to accept anyone suggested or supported by Lieutenant Carvajal, then it would be impossible for unanimous consent on the selection of Sergeant Marotta.[7] In the end, Lieutenants Cosner and Rabelo compromised with Lieutenant Carvajal, agreeing that Sergeant Sayegh would be made an alternate FTS. This further supports the conclusion that Lieutenants Cosner's and Rabelo's decisions were not motivated by gender.

### The Back and Forth Regarding 50/50 Responsibility

The emails between Lieutenants Carvajal, Cosner and Rabelo show significant discussion about the division of responsibilities. A copy of some of the emails regarding this issue are attached as Composite Exhibit D. Lieutenant Carvajal alleges that these emails (plus others), and the general discussion of the division of responsibility, constitutes a hostile work environment. *See* Exh. D. Notably, the emails do not contain any derogatory comments from Lieutenants Cosner and/or Rabelo to Lieutenant Carvajal. Rather, the emails reflect a genuine dispute as to who is in charge of what aspects of the FTO Program. There is nothing in the emails to suggest that the dispute is based on gender. Further, there is nothing in the emails to suggest harassing behavior from Lieutenants Cosner and/or Rabelo. *See* Exh. D.

When asked how she thought the Chief assigned the responsibilities of the FTO Program, Lieutenant Carvajal stated that she understood the responsibility to be divided between her and Lieutenant Cosner 50/50 and she thinks of the FTO Program primarily as the new officer training program. She indicated that "I'm only interested in the new hire (PPO) program." She said that the Chief indicated that Lieutenant Rabelo was to train them for a "couple of months." Lieutenant Carvajal's understanding was that Lieutenant Rabelo was in charge of the new Sergeant training. She stated that when asked by Lieutenant Rabelo, she agreed to take over the responsibility of the new Sergeant training from him, but not with any relinquishing of 50/50 responsibility of the PPO

---

[7] I also note that Sergeant Kenne Espada (male) was not favored to be selected by Lieutenant Carvajal. Lieutenant Rabelo stated, "She didn't want him. Espada was [also] offered an alternate [slot]. Her voice was heard. She did not want him in the program; we listened to her and [he] was not included."

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

Program. Lieutenant Carvajal did not discuss the division of labor regarding the FTO Program. Her primary focus was on decision-making in the Program.

### Lieutenant Rabelo's "Really 15 Minutes Before" Comment

In approximately August or September 2021, Lieutenant Carvajal alleges that she attended a meeting of the newly promoted sergeants. Lieutenant Carvajal stated that she arrived approximately fifteen (15) minutes before a ceremony for the promoted sergeants. She claims that upon her arrival, Lieutenant Rabelo said to her, in front of everyone: "Really, 15 minutes before?" Lieutenant Carvajal alleges that this one comment, taken in conjunction with the aforementioned incidents, constitutes an incident of hostile work environment.

### The EEOC Charge

Many of the allegations in the EEOC Charge are addressed above. Lieutenant Carvajal was asked about her allegation that there is a "longstanding bias against women within upper ranks of MBPD." *See* Exh. B. Below are examples of incidents that Lieutenant Carvajal believes supports the above allegation.

First, she believes that because Lieutenants Rabelo and Cosner are friends with Command Staff[8] they are able to influence the Command Staff to be biased against women. When asked for a specific example of this allegation she could not provide one.

Second, she alleges that Assistant Chief Acosta has discriminated and/or retaliated against her on three (3) occasions. Each is addressed below.

### Assistant Chief Acosta Allegations

### The TEAMS Meeting

Lieutenant Carvajal alleges that sometime after the Initiating Email, Assistant Chief Acosta required her to attend a TEAMS[9] meeting while on her day off. There were numerous other Police Department personnel in the meeting, including Captain Marlen Rivero and several male Police Department employees. Upon joining the meeting, Assistant Chief Acosta was on video, and he required everyone in attendance (men and women) to appear via video. Lieutenant Carvajal was the only attendee who, despite Assistant Chief Acosta's directive, to not appear via video.

After the meeting, Captain Rivero contacted Lieutenant Carvajal and informed her that Assistant Chief Acosta was upset that she refused to appear on video, and that the next time he requires a video appearance she must appear via video.

---

[8]    The ranks of Captain, Major, Assistant Chief of Police, Deputy Chief of Police and Chief of Police are the "Command Staff."

[9]    TEAMS is a video meeting platform similar to Zoom.

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

Lieutenant Carvajal asserts that the above incident is retaliation for her allegations in the Initiating Email and also demonstrates gender discrimination. Addressing the latter first, Assistant Chief Acosta required everyone on the meeting (men and woman) to appear via video.[10] Therefore, there is no gender discrimination. Addressing the former, Lieutenant Carvajal was not disciplined, therefore there is no retaliation. Moreover, it strains reason that Assistant Chief Acosta was retaliating against Lieutenant Carvajal when his directive was for everyone to appear via video.

## The 2019 Meeting

In 2019, Lieutenant Carvajal was assisting a new female Police Officer with a sensitive matter. A meeting was scheduled with the new Police Officer, Lieutenant Carvajal, Assistant Chief Acosta, Chief Clements and members of the FOP.[11] While everyone was waiting to meet with Chief Clements, there was a slight delay causing the meeting to start late. According to Lieutenant Carvajal, Assistant Chief Acosta came into the lobby area yelling: "where the fuck is she?" Lieutenant Carvajal alleges that Assistant Chief Acosta yelled at the new female Police Officer about being late. Lieutenant Carvajal admits that Assistant Chief Acosta did not yell at her. Further, during the actual meeting there were no further incidents.

The only other specific incident referenced by Lieutenant Carvajal dates back to 2010. As this incident is too remote, it is not addressed herein.

## Additional Allegations

Lieutenant Carvajal identifies several discreet incidents occurring between 2015 and 2019, that she alleges demonstrate gender discrimination. These incidents are as follows:

> i.  In 2015, her removal from the FTO Program due to the resolution of a grievance filed by one of her colleagues.
>
> ii.  In 2019, her discovery that, in 2016, a male sergeant was assigned to an FTS position that she believes should have been assigned to her.[12]

Lieutenant Carvajal believes that the resolution of the 2015 grievance, and the union's position in 2019 were discriminatory based on her gender. She presents no evidence, other than her belief, that resolution of these matters was based on her gender.

---

[10]     Assistant Chief Acosta is modeling a video meeting requirement also instituted by the City of Miami Beach's City Manager Alina T. Hudak (female).

[11]     The FOP is the police union.

[12]     Lieutenant Carvajal brought this issue to her union's attention. She stated that the union informed her that they would process a grievance on her behalf, but that they believed she would likely not succeed. She chose not to pursue the grievance.

DocuSign Envelope ID: 29438F1G-NFDB-4A73-A9A7-4CDCDE34155B

### Lieutenant Rabelo

Lieutenant Rabelo expressed disheartenment at the Initiating Email. Lieutenant Rabelo stated that he believes Lieutenant Carvajal has a lot of talent and good ideas. He believes, however, that she is not willing to put in the necessary work. By way of example, he alleges that he has heard her say that she will not do anything on her days off[13]. Lieutenant Rabelo, based on his years of experience with the FTO Program, believes extra work is necessary.

Lieutenant Rabelo's understanding of the division of labor in the FTO Program was that he was responsible for training Lieutenants Carvajal and Cosner and that Lieutenants Carvajal and Cosner would divide the day-to-day duties (the work) 50/50. If they could not a consensus as to the division of the work, Lieutenant Rabelo would be the tie breaker. Lieutenant Rabelo also understood that Lieutenants Carvajal and Cosner had worked it out that Lieutenant Cosner would be "responsible" for the PPO Program (due to his experience) and that Lieutenant Carvajal agreed to be "responsible" for the new Sergeant Training. Lieutenant Rabelo stated that Lieutenant Carvajal always wanted to be in charge of the PPO Program, and really did not want to work with the newly promoted sergeants. This is evidenced by the Initiating Email wherein Lieutenant Carvajal states that she only agreed to take over the new sergeant program as long as she had 50% "authority" over the PPO Program. Lieutenant Rabelo stated that he heard that Major Doce did not want him to remain involved with the FTO Program.[14]

Lieutenant Rabelo denies engaging in discrimination based on gender or creating a hostile work environment. He is concerned that Lieutenant Carvajal does not take criticism well, and he expressed those concerns to Assistant Chief Acosta and Deputy Chief Jones.

As to Lieutenant Carvajal's allegation concerning the "Really 15 Minutes Before" comment, Lieutenant Rabelo stated that he and Lieutenant Carvajal spoke after this training in an attempt to clear the air. He thought it was productive and everything was okay after their meeting.

Lieutenant Rabelo essentially has concerns about Lieutenant Carvajal's willingness to do the work that he believes is required in the FTO Program. Lieutenant Rabelo believes that Lieutenant Cosner, due to his experience, should run the FTO program. He further stated that he was not in favor of a "50/50" division of responsibility between Lieutenants in the FTO Program.

Moreover, Lieutenant Rabelo stated that Lieutenant Carvajal never approached him about a "hostile work environment." He believes there was ample opportunity to do so, yet she never once addressed the issue with him directly. Further, according to Lieutenant Rabelo, any time Lieutenant Carvajal does not get what she wants or is criticized, she claims it is because she is a woman. Lieutenant Rabelo says that Lieutenant Carvajal has a lot of talent and "visionary ideas." Specifically, Lieutenant Rabelo complimented Lieutenant Carvajal for presenting a business plan for the FTO Program and a mock-up "New Rookie Book" during her intercview. Based on his

---

[13]    This work would be compensated as overtime or compensatory time.

[14]    Both Major Doce and Deputy Chief Wayne Jones expressed that they felt that Lieutenant Rabelo's work in the FTO Program was complete and they wanted his involvement to end.

DocuSign Envelope ID: 29438F1G-AFDB-4A73-A9A7-4CDCDE341F5B

recent work with her, however, he questions if she has the work ethic, drive, or leadership qualities to effectively enact that vision.

In short, Lieutenant Rabelo believes a significant issue is that Lieutenant Carvajal will not accept anything that is not her way, and that despite his best efforts, she views everything as "discrimination." He also believes that it is a significant problem that she has denigrated the FTO program as "failed" and "antiquated."[15] Lieutenant Rabelo objects to her characterization of the FTO Program and feels it is a well-developed and effective program; he takes extraordinary pride in his past involvement in both the overall FTO Program, which he largely developed.

## Lieutenant Cosner

Lieutenant Cosner's understanding of the division of labor in the FTO Program was that he would be over the PPO "rookie" program, Lieutenant Carvajal would be over the new sergeant program, and that she would be trained on the PPO program. He stated that his email about "coaches" was not sexist, it was just a sports analogy, nothing more. Lieutenant Cosner believes that he and Lieutenant Carvajal are not splitting the work 50/50. He believes that he is doing 85-90% of the work, which is causing him frustration.

By way of example, on October 14, 2021, Lieutenant Cosner completed a task for Phil Patron relating to the Police Department's CALEA[16] certification. Lieutenant Cosner thought that Lieutenant Carvajal would have completed the task on October 7, 2021 when he was out for a week. Mr. Patron had complained that the information was late to members of the Executive Staff. Lieutenant Cosner spoke to Chief Clements about the work division. He stated that both the Chief and Deputy Chief Jones confirmed to him that he is in charge of PPO and that Lieutenant Carvajal was in charge of the new sergeants training.

On November 12, 2021, Lieutenant Cosner sent an email to Lieutenant Carvajal that he characterized as a "routine email inquiring about the status of two tasks." He stated that he was perturbed about her response, in which she commented to him: "you are not my supervisor." He went to his supervisor, Major Doce and stated, "I can't work like this." On November 14, 2021, he followed up the conversation with a detailed "timeline" email to Major Doce, outlining how much work he was doing on the PPO Program versus how much Lieutenant Carvajal was doing. A copy of the November 14, 2021, timeline email is attached as Exhibit E. Therein, he stated "11/12/2021 I sent a routine email to RC inquiring about the status of 2 tasks. The response was highly inappropriate and unprofessional. I did not respond but I did type my answers within the email in red font for my records.  See email: FW: Forms for Scenario Based Training."

There were three email exchanges between the Lieutenants immediately preceding the Initiating Email. *See* Exh. A. On Friday, November 12, 2021, Lieutenant Cosner sent out an FTO

---

[15]     Lieutenant Carvajal said that she felt that the "program was failing" and that "I felt that new ideas were needed and wanted." When asked, Chief Clements stated he was not satisfied with how the program was being run by the previous FTL, but that the program itself was not a failing program. He does welcome fresh ideas. He is interested that the field training of a new officer continues to be very well-documented.

[16]     Commission on Accreditation for Law Enforcement Agencies.

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341E5B

Interview Schedule. On Monday, November 15, 2021, Lieutenant Carvajal took issue that two rookie officers that she had encouraged to apply were not on the Interview List. On November 15, 2021, Lieutenant Cosner explained the reasons he disagreed with her and why they were not scheduled to interview. In this email he reiterates to her his understanding of the division of responsibilities and thinks that she has agreed to them. He also stated to her, "I have sent emails to both you and Lieutenant Rableo advising you of my progress on various issues or tasks as a matter of courtesy. It allows for us to be transparent and aware of the overall status of the Program. Yet when I sent an email asking for a status on tasks that you said you were going to work on, your response email was inappropriate and unprofessional.[17]"

Lieutenant Cosner stated that he was never put on notice that Lieutenant Carvajal believed there was a hostile work environment. He stated that he has numerous emails that show that they have been working together, and that she is only highlighting a select few to skew the appearance of things. Lieutenant Cosner stated that he was more than willing to meet with Lieutenant Carvajal to again discuss the division of duties. He further stated that he and Lieutenant Rabelo both got back to Lieutenant Carvajal with dates to meet, but they were unable to get a date that worked for everyone. Eventually, no one, including Lieutenant Carvajal, followed up on having the meeting. A copy of the email exchanges from October 19, 2021 regarding the meeting are attached as Exhibit F; *see also* Exh. D.

As to the allegation that Lieutenant Carvajal is not allowed to do anything on her own, Lieutenant Cosner stated that Lieutenant Carvajal rarely asserts herself. Lieutenant Cosner stated that he has not stood in her way. For example, when Lieutenant Carvajal said she was going to schedule and take over the Scenario Based Training and he did not object.

Lieutenant Cosner denies that he has treated Lieutenant Carvajal any differently based on her gender. He further denies creating a hostile work environment. He believes that the emails speak for themselves.

### **Captain Matias**

Lieutenant Carvajal alleges that Captain Matias, if ever called to testify in a formal proceeding, would state that Lieutenants Rabelo and Cosner discriminated against her based on her gender. Captain Matias denies this. In fact, Captain Matias specifically stated that he never witnessed any of the acts alleged by Lieutenant Carvajal. Further, he never spoke to Lieutenants Cosner or Rabelo about the allegations. Captain Matias did listen to Lieutenant Carvajal's complaints on October 12, 2021. He then reported those complaints to Major Doce. Captain Matias and Major Doce spoke to Lieutenant Carvajal about her complaints in a TEAMS meeting on October 13, 2021, and assured her that her complaints were being taken seriously. In listening to

---

[17]     Lieutenant Carvajal took issue with this comment. "I thought my email was professional. I go over wanting to make joint decisions." She is referring to her November 15 email regarding who she suggests should be interviewed for FTO. Lieutenant Cosner was referring to her November 12 email regarding not providing an update on SBT tasks. She stated in her interview for this investigation, "He calls me "unprofessional." She stated in her meeting with the Chief that he said, "You're unprofessional."

Lieutenant Carvajal's complaints, Captain Matias advised her to document any incidents (he made clear he would advise any individual who had complaints to do this, he was not commenting on the veracity of the complaints), he further told her that he was taking her complaints seriously (this too was not an endorsement of the veracity of the complaints). In short, Captain Matias specifically stated that he does not know whether Lieutenants Rabelo and/or Cosner actually engaged in any of the acts alleged.

Finally, Lieutenant Carvajal provided a text message exchange between her and Captain Matias from October 11, 2021. A copy of the text message exchange is attached as Exhibit G. Therein, Captain Matias uses the phrase: "and disgusted with the usual suspects." In addressing the text message exchange, Captain Matias was clear that he was not commenting on whether Lieutenants Rabelo and/or Cosner actually engaged in any discriminatory/harassing conduct. Rather, he was simply trying to convey to Lieutenant Carvajal that he was taking her complaint seriously, that he was not dismissing her, and that he wanted her to feel comfortable bringing her allegations forward.

### **Major Doce**

Captain Matias brought Lieutenant Carvajal's concerns to Major Doce's attention. On October 13, 2021, Major Doce spoke to Lieutenant Carvajal and Captain Matias was also present. He assured her that Chief Clements would take these allegations seriously. Major Doce then went to Deputy Chief Jones who wanted to speak to Lieutenant Carvajal to address the issues. Lieutenant Carvajal provides the July 19-20, 2021, emails to Major Doce on October 18, 2021. A copy of the October 18, 2021, email (which includes the July 19-20 emails) is attached as Exhibit H. A few days later Major Doce informed Chief Clements of the allegations and further explained that Deputy Chief Jones was handling the issue.

Major Doce then met with Lieutenant Cosner. Lieutenant Cosner offered to leave the FTO Program. He further stated that Lieutenant Carvajal does not do her part. Major Doce assured Lieutenant Cosner that the matter would be worked out. Major Doce further told Lieutenant Cosner that he believed that Chief Clements wanted both Lieutenants Cosner and Carvajal to run the program and that at some point Lieutenant Rabelo's involvement would end.

Major Doce believes that the parties should have gone to Command Staff much earlier to resolve this, he does not think the back and forth was helpful for anyone. "I didn't like either tone. They should have done [the back and forth] in an in-person meeting." Major Doce stated that he does not think Lieutenant Cosner "does anything because of women" he just thinks he is not good at communicating. He thinks Lieutenants Cosner and Carvajal are both good leaders.

Major Doce stated "Although the FTO Program is run out of my shop, [Deputy Chief] Wayne Jones has taken a big interest in it because he wanted to revamp it. There were training elements missing. There were new trainees who were coming out of the FTO Program and not knowing how to do certain things…I wanted to make sure new Lieutenants would do what Deputy Chief Jones wanted with benchmarks. I found out FTO meetings without me in the room." Major Doce asked the scheduling assistant Robin to make sure he was in these meetings with the Deputy Chief and Chief so that he could be more involved.

He also stated, "[Lieutenant] Toby Rabelo is supposed to let go of the program. I was pushing the Chiefs to let me know when Toby was done so I can steer instead of him. Maybe this [me too] statement has something to do with me wanting to transition him out. I was told, "he'll be done by December [2021]."

**Deputy Chief Jones**

Deputy Chief Jones was aware that there were issues between the parties. He had been told that Lieutenant Carvajal was not completing tasks that were assigned to her. He believes that Lieutenant Cosner complained to Chief Clements. He was told by Major Doce "Rosa feels she's being pushed out. She is concerned and needs to meet with you." Deputy Chief Jones spoke with Lieutenant Carvajal on October 19, 2021, and she relayed to him her concerns. A follow up meeting was scheduled for October 28, which was canceled. It was rescheduled for November 18, 2021. It was cancelled due to the Initiating Email and the commencement of this investigation.

According to Deputy Chief Jones, due to Lieutenant Cosner's experience and the fact that he is in DROP[18], the plan was to have him run the program with Lieutenant Carvajal and the hope was that eventually Lieutenant Carvajal would take over the program. During this period, they both were to be "coached" by Lieutenant Rabelo.

Ultimately, the FTO Program falls under Deputy Chief Jones' jurisdiction. He does believe that Lieutenant Rabelo does not need to be in the FTO Program any further. "The training wheels need to come off….His continued involvement complicates things."

**Captain Morgalo**

In mid-October 2020, Lieutenant Carvajal complained to Captain Morgalo that she had been treated in an unprofessional and disrespectful manner by three coworkers and that she believed that this treatment was based on her gender. Captain Morgalo asked Lieutenant Carvajal if she wanted to make a formal complaint and she did not.[19] The complaint was about treatment from Sergeant Kenneth Bolduc, Sergeant Timothy Roll and Lieutenant Andrew Dohler. He does not know if any unequal treatment actually occurred. At Lieutenant Carvajal's request, Captain Morgalo spoke to the three individuals involved, informing them of the complaint. They each assured Captain Morgalo that they would be careful in future interactions to treat her with respect and to avoid any perceived discourtesy. On December 15, 2020, Captain Morgalo drafted a Memorandum to File documenting Lieutenant Carvajal's complaint and the steps taken thereafter. A copy of the December 15, 2020, Memorandum is attached as Exhibit I. Therein, Morgalo documented that: "Lt. Carvajal was satisfied with how these allegations were addressed and did not request any further action be taken." *See* Exh. I.

---

[18]    DROP is the City's Deferred Retirement Option Program.

[19]    In her interview, Lieutenant Carvajal stated that she believes Captain Morgalo fully, completely and properly handled her complaint.

12

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341E5B

## ANALYSIS

There is no question that there exists very real disagreement between Lieutenants Carvajal, Cosner and Rabelo. However, considering the facts as a whole, I find that there is not a hostile work environment or gender discrimination.

As to hostile work environment, a review of the email exchanges provided by all parties shows tension, conflict and real disagreement between the parties. Workplace conflict is common. The existence of workplace conflict, even serious conflict, does not mean there is a "hostile work environment." Further, the specific allegations, taken either individually or as a whole do not support that there is a hostile work environment. Lieutenant Cosner's use of a sports analogy is not inappropriate. The alleged "back and forth over 50/50 responsibility" is not a hostile work environment; as stated above, this is a disagreement among co-workers, nothing more. Moreover, Lieutenant Carvajal has not suffered any discipline or negative employment actions. She has not been disciplined, she has not suffered a reduction in pay, she has not had her hours reduced or been removed from the FTO Program. To the contrary, several witnesses testified that the intention is for Lieutenant Carvajal to be fully trained to administer the FTO Program. By all accounts, Lieutenant Carvajal is a rising star. Accordingly, I find that there is no hostile work environment.

As to gender discrimination, there are simply no allegations to support that either Lieutenants Rabelo or Cosner engaged in gender discrimination. In fact, the allegations show the opposite. By way of example, the allegation regarding the selection of new FTSs makes clear that a woman was selected for one of the open positions, and that the selection was unanimous. If Lieutenants Cosner and/or Rabelo were engaging in gender discrimination, they would not have selected a woman for one of the positions. It is true that they did not want to select Sergeant Sayegh. However, given that a woman was selected, it is clear that the refusal to select Sergeant Sayegh was not based on gender.

Moreover, in reviewing the specific email exchanges between the parties, I do not find that any of their interactions are based on gender.[20] Just as every workplace conflict is not a hostile work environment, every negative interaction between male and female employees is not gender discrimination. There is also no evidence that Lieutenants Rabelo or Cosner did or did not listen to Lieutenant Carvajal because she was female. There is evidence that they made efforts to listen to her; a lack of agreement is not gender discrimination. Here, I do not find anything to support

---

[20]     On December 7, 2019, Lieutenant Carvajal, for her own personal purpose (i.e. not a police matter) initiated a public records request for the emails of nine (9) Police Officers. On December 23, 2019, in response, she was given access to all of their emails (current and historic emails) for her to do her own searches. This level of access is not authorized unless there is an IA Investigation. More to the point, the City never grants system-level access like this in response to a member of the public who places a public records request. Normally, City staff would do searches, redact information that is not a public record, and a requester would have to pay for materials and time to complete their request. Lieutenant Carvajal never informed the City that she had the unauthorized access. I believe that her ability to access their emails could have contributed to their conflict.

DocuSign Envelope ID: 29438F1C-NFDB-4A73-A9A7-4CDCDE341F5B

that claim that Lieutenants Rabelo and Cosner treated Lieutenant Carvajal any differently because of her gender. Accordingly, I find that there was no gender discrimination by them.

None of the other allegations have any indications of gender discrimination. While Lieutenant Carvajal alleges that she is the victim of gender discrimination, in fact in eight years she has been promoted twice, she has held multiple coveted assignments in the Police Department, and she was co-selected for the FTO Program by Chief Clements.

I find that the real problem is that the City failed to effectively communicate to the parties how the duties and responsibilities of the FTO Program would be divided between Lieutenants Carvajal, Cosner and Rabelo. As evidenced by the witness interviews, each witness held a variation on an understanding as to how the responsibilities were to be divided. Moreover, there is nothing in writing as to how the duties and responsibilities were to be divided. The genesis of the entire conflict between Lieutenants Carvajal, Cosner and Rabelo stems from the fact that each party has a different vision of work responsibilities and supervisory roles. When supervisory employees have a different view of each other's responsibilities, especially in a paramilitary organization like a police department, conflict is bound to arise. That is what happened in this case.

There were missed opportunities to resolve the request for clarity on roles, responsibilities, and workload in May (when the co-leadership assignment was made), in July (when the Lieutenants tried to resolve it themselves), in mid-October (when this was escalated to Major Doce, Deputy Chief Jones, and Chief Clements separately), and in mid-November (when Lieutenants Carvajal and Cosner both complained about the other).

The line of supervision for the FTO Program where the FTO Lieutenants would report to a Major then Deputy Chief Jones worked well in the past. But, in this case when there were multiple Lieutenants involved who could not resolve the conflict between themselves, the lack of a day-to-day supervisor before to direct assignments and who was respected as the final authority was not helpful.

In selecting both Lieutenants Carvajal and Cosner to be the FTLs, and Lieutenant Rabelo to mentor and train them, Chief Clements expected everyone to work together professionally and respectfully. Chief Clements anticipated that Lieutenants Carvajal and Cosner would be eager to learn from Lieutenant Rabelo; that they would all put in exceptional effort; and that although they would be guided by his vision for the program, they would be fully self-directed. He did not anticipate this level of conflict.

Thus, the City has taken remedial measures to rectify this matter. In order to make sure that Lieutenant Carvajal felt that her concerns were fully heard, one multi-hour audience was given by Chief Clements, Deputy Chief Jones, then-HR Director Michael Smith and then-HR Assistant Director Marla Alpizar. This meeting, which began at 5:30am, was held during her midnight shift so that she did not have to also come in during the day shift. At this meeting, the Chief expressed to Lieutenant Carvajal the hope that he held for her future in the Department and his esteem of her abilities and potential.

DocuSign Envelope ID: 29438F1C-AFDB-4A72-A8A7-4CDCDE244EEB

As this investigation was being conducted, the Chief moved to assign Captain Marlen Rivero to directly supervise and evaluate the FTLs regarding all FTO matters effective December 3, 2021. They were given clear and specific assignments in order to divide the work of the FTO Program; from this point the Lieutenants were no longer self-directed on work relating to their FTL responsibilities.

Contemporaneous with the issuance of this Report, Chief Clements is issuing a written directive further defining roles and responsibilities in the FTO Program. A copy of the written directive is attached as Exhibit J. In order to better facilitate communication in the future, in addition to the directives from Chief Clements, the remaining parties in the FTO Program (Lieutenants Carvajal and Cosner) will attend employee coaching on conflict resolution to learn to better deal with work conflicts.

## <u>CONCLUSION</u>

Based on the foregoing, the City finds that Lieutenants Cosner and Rabelo did not engage in gender discrimination or subject Lieutenant Carvajal to a hostile work environment. However, as stated above, the City did not clearly define the roles and responsibilities within the FTO Program and is taking remedial measures to correct the issue.

# EXHIBIT A

| | |
|---|---|
| **From:** | Acosta, Paul |
| **To:** | Alpizar, Marla |
| **Cc:** | Jones, Wayne; Clements, Rick; Smith, Michael - HR Dir. |
| **Subject:** | Fwd: FTL URGENT MATTER - RE: Field Training Unit Interview Schedule |
| **Date:** | Wednesday, November 17, 2021 6:44:44 AM |
| **Attachments:** | image001.jpg |
| | image001.jpg |
| | image002.png |

Good morning Marla,

The email below is the centerpiece and the purpose of my call yesterday afternoon. Please review for our meeting this morning when you get a moment.

Thank you,

PA

Get Outlook for iOS

---

**From:** Acosta, Paul <PaulAcosta@miamibeachfl.gov>
**Sent:** Tuesday, November 16, 2021 8:00:06 AM
**To:** Clements, Rick <RickClements@miamibeachfl.gov>
**Cc:** Jones, Wayne <WayneJones@miamibeachfl.gov>
**Subject:** Fwd: FTL URGENT MATTER - RE: Field Training Unit Interview Schedule

FYI - and discussion.

Get Outlook for iOS

---

**From:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Sent:** Tuesday, November 16, 2021 3:39 AM
**To:** Acosta, Paul
**Cc:** Guerrero, Samir
**Subject:** Fwd: FTL URGENT MATTER - RE: Field Training Unit Interview Schedule


Sent from my iPhone

Begin forwarded message:


> **From:** "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov>
> **Date:** November 16, 2021 at 2:01:59 AM EST
> **To:** "Cosner, Steven" <StevenCosner@miamibeachfl.gov>
> **Cc:** "Rabelo, Octavio" <OctavioRabelo@miamibeachfl.gov>, "Doce, Enrique"
> <EnriqueDoce@miamibeachfl.gov>, "Jones, Wayne"
> <WayneJones@miamibeachfl.gov>, "Ozaeta, Paul"
> <PaulOzaeta@miamibeachfl.gov>

**Subject: FTL URGENT MATTER - RE: Field Training Unit Interview Schedule**

Lt. Cosner

This will be my last email to you regarding the obvious hostile work environment you and your cohort have created and the very issues I have been stating have been occurring. Out of respect to the DC and the Major, this will be my last email statement directed to you regarding this matter.

You clearly missed the point of my last email, as you believe you have unilateral decision making over the PPO program. I do not disagree that maybe Ofc. Bess and Ofc. Velladares should not be FTOs. The point is, and has always been, that you make unilateral decisions over the program and do not include me.

From day one I knew my suspicions were correct despite my better judgment. I decided I would be a leader and work with you and Lt. Rabelo regardless of my suspicions. This was an error.

Responses to your email:

==Number 1-== You are a liar when you say we "discussed" Bess and Velladares during SBT. Our interaction went this way outside of the DT room in-between scenarios:

    Sgt. Bolduc- To me and you - Hey Bess and Velladares would be good for the program.
    Me – They would be good, they applied and would be a good choice. (MY OPINION)
    Lt. Cosner – Mumbled under your breath and said I don't know about that.

I walked away and you and I never discussed Bess or Velladares or any other PPO allowed to interview, such as Sanchez and Fitoria.

==Number 2-== The explanation about the high liability classes and SWAT is not an assertion, it is my logical opinion based on the facts presented, as they both have been entrusted with what I explained in my email. But again you clearly missed the point.

The point is not that I disagree with your assessment or if they should or shouldn't be allowed to be FTOs. The point is that you unilaterally made the decision without collaboration or meeting with me knowing that I had

encouraged them.  Furthermore you unilaterally decided that Fitoria and Sanchez could interview, both are still on probation.

**Number 3**- My comment of being champions of success had nothing to do with selecting them for the program. My point was to at least let them interview like you allowed two other PPOs to interview. We have discussed how positive the interview process is for officers in order to gain experience. On the last interview process many officers expressed how great the experience was because it was the first time they had ever gone through that type of process. THAT is the point of setting them up for success.

**Number 4**- There is no rush to select Bess or Velladares, not sure where you read that. I think they should've been allowed to **INTERVIEW.** My point is YOU and only YOU decided not to allow them to interview. I was not part of that decision.

**Number 5**- YOU decided to speak to Bess after YOU decided he could not interview. Of course Bess placed a memo of interest because I, an FTL encouraged him. Encouraging officers to be a part of an **interview process** is not placing them in any type of uncomfortable position. YOU placed them in the uncomfortable position by deciding on your own that they couldn't interview. Had you not unilaterally decided it, then they wouldn't  have been uncomfortable.

I did not "Push" anyone to do anything. These officers are experienced officers and are grown men. I advised them they would be great assets and should put in the memo if they wished. The OB stated the Chief of Police had the authority to waive the requirements. There was no mention of probation status on the OB for this opening. YOU undermined me, that's the fact. If anyone was made to feel uncomfortable it was due to YOUR actions.

**Number 6**- Again you are a liar, I agreed to take over the New Sergeant Program as long as I had 50% authority over the PPO program. That clearly has not been happening. I never agreed to fully relinquish the PPO program. I adamantly stated to you and Lt. Rabelo, that I did not put in for the New Sergeant Program but the PPO program. Lt. Rabelo even stated that if we really thought about it, other Lts could grieve the fact an FTL opening for New Sergeants was never announced. Then it was suggested I step down. I absolutely declined that offer.

Furthermore I had asked you and Lt. Rabelo several times to meet so that we can place everything in writing as to each of our responsibilities. To this day that has not occurred, nothing has been finalized. This I know is by design. No email has been sent, no formal discussion has been finalized.

As a matter of fact, Lt. Rabelo continues to be completely in charge of the program. Because of course "I don't have the experience". The new sergeant training was outdated and disorganized. The instructors were not prepared and PowerPoints were old and completely outdated. The systems in place are antiquated for both programs. I even attempted to schedule the new acting sergeant, and even after all this time and the so called training provided by Lt. Rabelo, he proceeded to speak to Cap. Feldman, Lt. Reina and FTS Marotta and scheduled A/Sgt Delgado on his two week FTO phase. A schedule and Telestaff was created by Lt. Rabelo even after I emailed FTS Marotta. Yet you both claim I have a say. How can I revamp or take charge of the program when someone is completely still running it?

I refute the claim that I do not have the experience to jump into the program due to the so called intricacies. You and Lt. Rabelo were involved in the program when you both claimed Lt. Flanagan solely ran it to the ground. You nor Lt. Rabelo cared enough then to politic the need of a second or third LT to "fix" the issues or how the knowledge of intricacies were necessary for the job. Furthermore, the program has not been successful in the past couple of years.

As far as your comment regarding the new sergeant program, "I have allowed you the space to make any decisions you felt necessary", why do you believe you allow me to do anything? You do not interject with the New Sergeant Program because your cohort does it for you. You have never interfered with "decisions" because to this date I haven't been allowed to do anything on my own. You haven't imposed yourself because you couldn't care less for the New Sergeant Program. Besides, your counterpart has the program and you both run each as you please, under the facade that there is a difference between both of you and that one is a "trainer". To this date ZERO FTS has come to me regarding issues with the new sgt program, yet you have been privy to their complaints but chosen to remain silent as you stated,  a failure on your part again. Why not tell me directly about the complaints? Hence, you have no interest in the program or its success because you can always claim I "run it" although I do not. The goal is and has always been to make sure I fail.

**Number 7-** You copying me in your 100 emails per day on decisions you make on your own means nothing when it comes to teamwork and collaboration. You do not prioritize, you add more and more unnecessary tasks to PPOs, FTOs and FTSs because your methods and systems are antiquated.  You keep mentioning the emails as if that validates your teamwork and inclusion of me in the decisions being made.

I will close with this:

You claim my email was inappropriate and unprofessional because I told you directly, unlike you and your cohort who continue to go behind my back to meet with the bosses to talk about me and attempt to have me kicked out of the program. You really believe you are the only person that can run the PPO program but I disagree wholeheartedly. You also believe you are my superior by the way you communicate and ask questions, which may be your own personality flaw. You have serious issues with women and POC and I can prove it. You are probably the last person who should be running the PPO program. Also do not forget you have been part of the failed FTO program for many years and have done nothing about it.

I'll leave you with a few quotes from you and Lt. Rabelo. If you want to talk about inappropriate and unprofessional look at yourself in the mirror.

- "There could only be one quarterback in the program" – Sexist statement, stated by Lt. Cosner in an email. . . . What do you think I am to the program?  A cheerleader?  A number two? Your subordinate?

- "You know there could only be one quarterback,  what did you expect Rosa for him not to defend himself?" – Sexist. Stated by Lt. Rabelo while we exited the Training Unit. . . I replied by saying "I figured you helped him, but you know what you say, if it is not documented it didn't happen".

- "I will not be Me too'd out of the program" – Sexist statement.  Referring to the Me Too movement where women have come out against these very issues. Stated by Lt. Rabelo.

- "I don't understand why you (me) and Marlen (Captain Rivero) were selected to go to IA without experience" - Sexist statement, stated by Lt. Rabelo. I have no idea why she was brought up during the FTL meeting in the training room. Made to intimidate and underscore our success. Why only mention females? Are there no men in the agency that have been selected without "experience"? Is experience subjective based on your gender?

- "Some people look good on paper" – Personal and Sexist attack on me for having vast experience, as my resume speaks for itself. Stated by Lt. Rabelo to undermine my selection to FTL. This was said immediately after the Cap.

Rivero statement.

- "I was Me too'd out of Payroll and I'll be damned if it happens again" – This was proceeded with a conversation about Ana Delmonte and Yamilet Acosta. Stated by Lt. Rabelo

Lt. Cosner, you were present during some of these statements. Did you tell Lt. Rabelo how "inappropriate and unprofessional" the statements were? Did you send an email to declare your disgust with the statements? Did you express any support for me? The answer is NO. You sat there with a smirk on your face because your counterpart was showing how it is done. Lets not even go over the statements made against Sgt. Michelle Sayegh.

Things that were done prior to announcement and selection of FTL:

- Lt. Cosner meeting with new PPO, FTO and FTS and stating you would be taking over the program. Those meetings were in an official capacity which you had with several FTO/PPO teams. You were actively telling anyone that could hear, YOU were the new FTL before announcements were made of an opening and any selections made.

- Lt. Rabelo meeting with the Chiefs to ensure I was not selected on my own because you and him claimed I had no experience. During an FTL meeting Lt. Rabelo gloated about his meetings with the chiefs and his idea to split the programs and how I would fail if given the PPO program alone. I wonder if this was retaliation for the CL incident in 2019 in which he sent Lt. Flanagan to harass me about my PRR regarding females not being selected to the FTO program.

- Major Doce advised you (Lt. Cosner) and I that we were the only ones that put in for the program. He stated to both of us he wanted me for the PPO Program and you for the New Sergeant. You immediately began to panic and stated that maybe we should run both and I should run the New Sergeant Program. I declined as I only wanted to be a part of the PPO program. That was the beginning of the campaign against me. This occurred right outside of the LTs office.

There are many more statements, facts and documentation to further illustrate that the above is all true. Even after these disgusting statements were made to me, I continued to work alongside you and chose to ignore it for the sake of the PPO program. That was a lapse of judgment on my part, a wolf will always be a

wolf even if in sheep's clothing. I even told both of you that I had prayed about our disconnect and was happy we were able to start working on our differences. Unbeknownst to me, bosses were approached and discussions were had to destroy my name.

Please take this email as a notice that I will no longer tolerate this hostile work environment, discrimination, sexism and retaliation against me and my family. I know how wolves work, if they can't get to me my family is next.

I'll leave you with this quote that has helped me deal with the inequality and sexism in this place. Maybe one day you will find God and Jesus to better yourself and have a good heart.

Joshua 1:9 "Be strong and courageous. Do not be afraid; do not be discouraged, for the lord you God will be with you wherever you go.



**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov

*Mission: Prevent crime and enhance public safety.*

*Vision: We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

*Values: Professional, Accountable, Honest and Proud.*

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** Monday, November 15, 2021 11:22 AM
**To:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>; Doce, Enrique <EnriqueDoce@miamibeachfl.gov>
**Subject:** RE: Field Training Unit Interview Schedule

Good morning Rosa,

I am aware that you encouraged Bess and Velladares to interview. We had that discussion at SBT and I expressed my wholehearted disagreement at that time. Yet,

you still encouraged them to interview.  I agreed with you at the time that they would be great candidates, when the time is right.  The fact remains that they just finished FTO themselves on August 1st.  They have nearly nine months of probation remaining.

Your assertion that they have already been placed in a high liability position in the Department is something that I would argue also.  PPO Velladares has been allowed to train with the SWAT team, but to my knowledge has not been made a full operator. My understanding for this is that they are waiting for him to get off probation.  PPO Bess has been teaching in a classroom setting. The RTR training you mention has been done by Ofc. Castillo and Ofc. Collado.  PPO Bess has trained in the Police Video Encounters.  Hardly a high liability course.  However, even if he was training in the RTR course, it is an in service course required of all officers. It is not placing him in a position where he may be required to be involved in the termination of another Probationary Police Officer. By placing two officers in a position to train Probationary Police Officers while on probation themselves we are going to potentially place the FTP and the Department in a position of liability.

Your later statement referring to us as champions of setting our officers up for success is very true.  I wish nothing but the highest levels off success for each and every officer within our agency.  That being said, I don't believe that placing PPOs in a position of even greater liability is doing anything to further their chances for success.  Rather, it seems to be placing them in a position where they have a greater threat of not making probation should something happen which causes them to get fired.  Being a champion means looking out equally for the Program and the Department, if not more so, as the success of both will foster an environment of success for our FTOs and PPOs as well

PPO Margarita Sanchez, while still on probation now, will be off probation in December 2021, as you mentioned.  Therefore, she will be off of probation right after the list of selections is decided.  Should she be someone that is selected, she will be off probation before the list expires after 6 months.  PPOs Bess and Velladares will still be on probation at that time.  I do not fully understand what the rush is to select them.  They will be off probation in 9 months.  They can interview during the next selection period and be placed on the list at that time.  They would be eligible after approximately 3 months on the list and have the ability to be selected at that time.  This significantly reduces the liability to the Program AND the PPOs.

I spoke to PPO Bess but have not yet had an opportunity to speak to PPO Velladares in person.  I explained to him my reasonings for this decision and further expressed my thoughts about his great work and progress to this point.  I advised him that I would love to select both him and Velladares when they got off probation and felt that they would be great additions to the Program.  He was understanding and expressed to me that he didn't want me to feel that he was arrogant enough to believe he should put in for the position at this time but that he only put in a memo at your direction.  I feel that you pushing them in this direction knowing that I was fully against it, and why, has placed these PPOs in a quite uncomfortable position.

I go back now to several conversations that were had during the FTL meetings attended by you, me, and Lt. Rabelo where we discussed the responsibilities of each of us within the program.   We have discussed that you would be in charge of the FTO Program for Sergeants and that I would be in charge of the FTO Program for Officers.  You have agreed to that several times.  The understanding was that since you had not ever been a part of the Program, you should be able to learn about the intricacies before jumping in fully.  There is a lot to learn about the program and how it runs and what makes it successful.  As the FTL in charge of the FTO Program for Sergeants, I have allowed you the space to make any decisions you felt necessary.  You and Lt. Rabelo have been responsible for the training of the new sergeants and the assignments.  I have never interfered in your decisions and I have never imposed myself in any part of the operations of that program.  I have only offered thoughts and insight during FTL meetings.  I have never even given direction to FTSs when they approach me about an issue with that Program.  I always advise them that they need to speak with you.

I will close by saying that I agree with you in that there is a disconnect that needs to be worked out.  However, I do not understand when you state that I am undermining you.  Since May 25, 2021, I have had multiple discussions with you.  We have had multiple meetings and I have copied you in an inordinate number of emails regarding virtually every aspect of the Program.  Your response at one point was that you felt I was sending too many emails.  I have sent emails to both you and Lt. Rabelo advising you of my progress on various issues or tasks as a matter of courtesy.  It allows for us to be transparent and aware of the overall status of the Program.  Yet when I sent an email asking for a status on tasks that you said you were going to work on, your response email was inappropriate and unprofessional.  You have claimed that your voice isn't being heard, yet on several occasions we have discussed issues where that claim is made by you and your voice was in fact heard as accommodations were made to support your voice even though we may not have agreed with it.  This disconnect is something that is going to have a continued negative effect on the Program, and I believe it needs to be remedied sooner rather than later.


SC

---

**From:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Sent:** Monday, November 15, 2021 1:22 AM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>; Doce, Enrique <EnriqueDoce@miamibeachfl.gov>
**Subject:** RE: Field Training Unit Interview Schedule

Good evening Team,

I reviewed the below list of candidates and noticed that Officer Bess and Officer

Velladares were not included.

Was a discussion held regarding this without my knowledge and a final decision made without my input?  As I have said before I am 50% responsible for the PPO Program but yet again I am not being included. I was not aware they were removed.

I want to clarify that I am fully aware that the Chief of Police has all the rights accorded to him to do as he pleases and I will never challenge his decision making. But if you, Lt. Cosner, held a meeting with any of the bosses regarding any specific FTP matter, I should have been a part of the discussion or at a minimum notified that a meeting took place and that in this case some officers were removed. If no meeting was held, then I am not sure why a decision was made without collaboration.

Lt. Cosner, you knew from SBT that I encouraged both Bess and Velladares to interview when Sgt. Bolduc mentioned he wanted them for the program as well. Yet the decision to exclude them was made without my input.

If you would've asked for my input I would've told you that both officers have been placed in high liability positions by the Department prior to their end of probation. Ofc. Bess has been training the entire Department on RTRs and Police Video Encounters/ PRRs and Ofc. Velladares was selected to train with our SWAT team.

Both Ofc. Bess and Ofc. Velladares, although on probation, have been selected to represent our agency. Furthermore, both officers have the experience, skillset and training to be at a minimum considered for an <u>interview</u>. We hire experienced talented officers and sometimes, particularly when a need arises, the Department should tap into those resources.  I am not inclined to allow just any "experienced" PPO be selected for FTO or any other position, but clearly the Department recognizes that these two officers are exceptional enough as to entrust them with high liability training and unit.

We claim to be champions of setting our officers for success and at a minimum we should have allowed them to <u>interview</u> just like Probationary Officer Margarita Sanchez was allowed. Clearly all three officers deserve a chance to be FTOs or at a minimum <u>interview</u>. (I am aware she will be off probation December 2021).

I will reiterate so that my words are not twisted when a potential undisclosed meeting is held, I am aware the Chief has the right to "waive the minimum 3 years' experience pursuant to other considerations and as it benefits the agency"

as per the OB. My issue and concern is your failure to include me in the decision making and direction of the FTP (PPO) because, I speculate, "you run the program". And because I was not included or notified, I am still unaware if the exclusion came from the Chief or Lt. Cosner.

We have the freedom to encourage any officer to <u>interview</u> for positions when openings are announced, ultimately selections are never guaranteed because those are made at the discretion of the Chief and the panel's recommendation. It is very concerning that after an FTL (Me) encouraged two officers to place a memo of interest (OB silent on probation status), another FTL decided that those officers will not be allowed to <u>interview</u> without my knowledge. Those types of actions place us in a negative light due to the clear difference of opinions. It shows how disconnected we are and how one FTL is undermining the other.

If the 3 years' experience can be waived why can't they <u>interview</u>? I wonder how the two officers were notified of their inability to <u>interview</u> after I told them to do so. Was a meeting held with the officers? Please let me know how the decision was made so that I can at a minimum explain it to them. Interestingly, only the two officers I spoke to were denied the interview.



**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
<u>rosacarvajal@miamibeachfl.gov</u>
***Mission:*** *Prevent crime and enhance public safety*.

***Vision:*** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

***Values:*** *Professional, Accountable, Honest and Proud.*

---

**From:** Cosner, Steven <<u>StevenCosner@miamibeachfl.gov</u>>
**Sent:** Friday, November 12, 2021 11:46 PM
**To:** Alba, Eduard <<u>EduardAlba@miamibeachfl.gov</u>>; Albaladejo, Rodolfo <<u>RodolfoAlbaladejo@miamibeachfl.gov</u>>; Brown-Rosquete, Stephanne <<u>StephanneBrown-Rosquete@miamibeachfl.gov</u>>; Fitoria, Henry <<u>HenryFitoria@miamibeachfl.gov</u>>; Gonzalez, Pablo

<PabloGonzalez@miamibeachfl.gov>; Monge, Grettel
<GrettelMonge@miamibeachfl.gov>; Sanchez, Margarita
<MargaritaSanchez@miamibeachfl.gov>; Santana Lopez, Ernesto
<ErnestoSantanaLopez@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>; Carvajal, Rosa
<RosaCarvajal@miamibeachfl.gov>; Spina-Taylor, Elise
<elisespinataylor@miamibeachfl.gov>; Hernandez, Robert
<RobertHernandez@miamibeachfl.gov>
**Subject:** Field Training Unit Interview Schedule

Greetings FTO candidates,

Please see the below schedule for your upcoming Field Training Officer interviews.  The interviews will be held on the below dates and times and will be in one of the training unit classrooms.  Please ensure that you are on time and have the required documentation.  If you are unable to attend for any reason please email myself or Lt. Carvajal as soon as possible.  We wish you all the best of luck.

| FTO Interview Schedule | | |
|---|---|---|
| Name | 11/22/2021 | 11/23/2021 |
| Alba, Eduard | 7:00 AM | |
| Albaladejo, Rodolfo | 8:00 AM | |
| Brown-Rosquete, Stephanne | 9:00 AM | |
| Fitoria, Henry | 10:00 AM | |
| Gonzalez, Pablo | | 7:00 AM |
| Monge, Grettel | | 8:00 AM |
| Sanchez, Margarita | | 9:00 AM |
| Santana-Lopez, Ernesto | | 10:00 AM |



**Steve Cosner, Lieutenant**
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
**Field Training Program Commander**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns

**Vision**:  A safe and welcoming environment for everyone

**Values**: Honorable, Professional, Resilient

**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

# EXHIBIT B

510-2022-01818

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ____ FEPA<br>X  EEOC | NUMBER<br>**TBA** |

| Florida Commission on Human Relations _____ and EEOC |
|---|
| State or Local Agency, if any |

Social Security No.: xxx-xx- 4342

| NAME (Indicate Mr., Ms., Mrs.)<br><br>Ms. Rosa Carvajal | TELEPHONE (Include Area Code)<br><br>917-319-9733 |
|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br>c/o Sharp Law Firm, P.A., 1600 West State Road 84, Suite C<br>Fort Lauderdale, FL 33315 | DATE OF BIRTH<br><br>5/30/1983 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMATED AGAINST ME (*if more than one list below.*)

| (1) NAME<br>City of Miami Beach/Miami Beach Police Dept. | NUMBER OF EMPLOYEES, MEMBERS<br>500+ | TELEPHONE (Include Area Code)<br><br>(305) 673-7000 |
|---|---|---|
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>1700 Convention Center Drive  Miami Beach, FL 33139 | | COUNTY<br>Miami-Dade |
| (2) NAME<br><br>N/A | NUMBER OF EMPLOYEES, MEMBERS<br><br>Tba | TELEPHONE (Include Area Code)<br><br>N/A |
| STREET ADDRESS          CITY, STATE AND ZIP CODE<br><br>N/A | COUNTY<br><br>N/A | N/A |

| CAUSE OF DISCRIMINATION BASED ON (*Check Appropriate box(es)*)<br><br>____RACE____COLOR  **XXX**  SEX____RELIGION____NATIONAL ORIGIN<br><br>**XXX** RETALIATION____AGE____DISABILITY_____OTHER (*specify) | DATE DISCRIMINATION TOOK PLACE<br><br>*Earliest* May 2021  *Latest*  to present<br><br>____CONTINUED ACTION |
|---|---|

My name is Rosa Carvajal and I have been employed by the City of Miami Beach and the Miami Beach Police Department as a sworn law enforcement officer since July 2008. In June 2015, I was promoted to the rank of Sergeant and in September 2019 I was promoted to Lieutenant. Due to a longstanding bias against women within upper ranks of MBPD, out of 37 total positions, there are still only three female Lieutenants (including myself) and one female Captain.

Although I earned each of my promotions through hard work, high examination scores and my ranking on the eligibility lists, I have still been subjected to frequent discrimination based on my sex and treated differently by many of my male counterparts because I am a woman. For example, after I was competitively selected for a coveted Field Training Sergeant position in 2015, a less-qualified male sergeant grieved my selection via the FOP union and was somehow granted my position, which resulted in me being removed from the program entirely. To my knowledge, no male officer with MBPB has ever been required to forfeit their rank or position in order to settle a grievance filed by another officer.

In January 2017, I became pregnant and was assigned to Internal Affairs, where I remained until my promotion to Lieutenant in September 2019, based my exam score and ranking on the eligibility list. While in IA, I was a point of contact for internal discrimination complaints and I received and investigated several complaints from female officers. At least one of these complaints involved a female officer who was being harassed by a male member of the command staff, who became openly hostile and belligerent towards myself and the complaining officer and tried to interfere with the investigation. After my promotion to Lieutenant, I also received complaints in late 2019 from three female officers about being excluded from the Field Training Officer (FTO) program in favor of male officers. This was a matter of significant concern to me as a female, since the FTO program provides experience that is critical for advancing to a higher rank withing MBPD, and it has traditionally been dominated by the male officers in MBPD with the command staff's apparent blessing.

EEOC-MDO
Received 01/03/2022

When it became known that I was advocating on behalf of the female officers who had been excluded from FTO opportunities, two male Lieutenants began to openly harass me and interfere with my attempts to investigate. Other supervisors also became hostile towards me and when I started to serve public records requests for documents to support the claims of the female officers. In an attempt to discredit me, I was falsely accused of trying to undermine the FTO program and eliminate the additional comp time that was given to FTO and FTS.

This hostility increased after one of my public records requests resulted in the production of a number of interdepartmental emails between different male officers going back almost a decade (including some current members of the command staff) that included several graphic racist and sexist "jokes" and memes that should have resulted in severe discipline or termination under MBPD policies but were apparently never even investigated by MBPB. In addition, I received documents showing that a male sergeant named Jose Reina was non-competitively promoted to a FTS position in 2015 at around the same time I was removed from my FTS position to settle another male sergeant's grievance that I had been unfairly selected. I brought these findings to the FOP grievance committee for further action, only to receive more hostility from the committee members, who included Sgt. Jose Reina's wife and then FOP President Kevin Milan. Shortly after that I was verbally attacked and harassed by other senior members of the command staff regarding my public records request.

Due to the emotional distress from this backlash, I decided to remain quiet and "off-grid" until May 2021, when I placed a memo of interest for a newly-created Field Training Lieutenant (FTL) position. I was selected for the position along with two men, Lt. Cosner and Lt. Rabelo. Unfortunately, it soon became evident that my male counterparts were not going to allow me to participate equally in the creation or administration of the field training program and that female officers were unlikely to be given equal opportunities to participate. Lt. Cosner essentially seized control of the program from day one, and since then I have been routinely marginalized and excluded from the decision-making process for virtually every aspect of the program, while Lt. Rabelo is given an equal voice and included by Lt. Cosner in the day-to-day operation of the training program. When I advocated for the selection of a highly qualified female sergeant named Michelle Sayegh as one of three Field Training Sergeants in late August, I was overruled by Cosner and Rabelo who selected a male sergeant instead. After I disagreed with the decision, my working relationship with Lt. Cosner began to deteriorate and he became very critical and hostile whenever I questioned his decisions regarding the field training program.

Because I did not want to be scapegoated and removed from my FTL position like I was from my prior FTS position in 2016, beginning in October 2021, I submitted a series of informal complaints through my chain of command about once again being treated differently based on my sex. My informal complaints were ultimately referred to Human Resources in November 2021, and I met with an HR representative on November 21, 2021 to discuss my concerns in more detail. During the interview, the HR representative seemed disinterested and bored until I mentioned my history of advocating for female officers within MBPD and showed her some of the racist and sexist emails I had received from my public records request back in December 2019. When she saw the emails, her demeanor changed to one of concern and she said she would have follow ups with the City's IT department to obtain more information. I told her about the harassment that I and my husband received in 2019 and 2020 after certain people within MBPD learned that I had obtained the emails and that I was afraid that they would come for us via social media and/or doxing if they knew I had mentioned it again.

I believe that the discrimination and harassment to which I am being subjected in my current FTL position with MBPD is based on my sex (female) and in retaliation for my long record of prior advocacy on behalf of female officers in MBPD. I also fear retaliation against myself and my husband (who is also employed by MBPD as a sworn law enforcement officer) for my recent disclosures to Human Resources as part of the formal discrimination complaint I filed on November 21, 2021, which included information about inappropriate racist and sexist emails sent several years ago by some current male members of the MBPD command staff.

| | |
|---|---|
| __X__ I want this charge filed with both the EEOC and the State or Local agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (When necessary for State and Local Requirements |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct

See Attached Page for Notarial Certificate.

Date          12/31/2021          Charging Party (*Signature*) | SIGNATURE OF COMPLAINANT

12/31/2021

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month and year)
31st          December   2021 |

EEOC Form 5 (Rev. 06/92)

**JURAT**

State/Commonwealth of _____ FLORIDA _____ )

☐City ☑County of _____ Orange _____ )

On_____ 12/31/2021 _____, before me, _____ La Jon Llamar Dantzler _____,
   *Date*                                                    *Notary Name*

the foregoing instrument was subscribed and sworn (or affirmed) before me by:

**Rosa M Carvajal**
_____.
*Name of Affiant(s)*

☐   Personally known to me  **-- OR --**

☐   Proved to me on the basis of the oath of_____**-- OR --**
                                                *Name of Credible Witness*

☑   Proved to me on the basis of satisfactory evidence:_____ driver  license _____
                                                              *Type of ID Presented*

Type of Identification Produced: DL C612733836900

LA JON LLAMAR DANTZLER
Notary Public - State of Florida
Commission # HH 189036
Expires on September 21, 2025

WITNESS my hand and official seal.

Notary Public Signature: _____

Notary Name:_____ La Jon Llamar Dantzler _____

Notary Commission Number:_____ HH 189036 _____

Notary Commission Expires:_ 09/21/2025 _____

*Notarized online using audio-video communication*

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: _____ EEOC  Doc _____

Document Date: _____ 12/31/2021 _____

Number of Pages (including notarial certificate):_____ 4 _____

The foregoing instrument was Acknowledged before me by means of Online Notarization

# EXHIBIT C

## Carvajal, Rosa

**From:** Carvajal, Rosa
**Sent:** Tuesday, July 20, 2021 7:30 PM
**To:** Cosner, Steven
**Subject:** Re: FTO Program

Hi Steve,

Thank you for your detailed reply although I didn't think it was necessary as I wanted to have a discussion with you regarding my concerns in person or over the phone. I would've texted you what was in the email but it would've been really long. But I understand that everything should be documented.

Nevertheless, I thank you for your input and understand your position. However, I have not had an issue with you taking the lead with the program when it comes to time sensitive items. And yes I've been copied in all the emails as I should because I'm part of the program. My only concern was that I want to be a part of the decision making to help guide the FTO program to be better than before.

I do not want to take your role as the "quarterback" away and understand why we both can't be doing the same things. All I want to make sure is that we both understand that we are equally responsible for the direction we take the program in, both the FTO and New Supervisor program.

There is nothing more to my previous email than to let you know I want to ensure we are on the same page about the direction we are taking the program and that I want to be an active participant in the decision making when it comes to the overall direction of the program.

Thanks,
Rosa

Sent from my iPhone

> On Jul 20, 2021, at 6:33 PM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:
>
> Rosa,
>
> I read your email and I understand where you are coming from yet I am a bit perplexed.  I have to disagree when you say that your voice isn't heard.  We have had several discussions about different issues where you and I have had a difference of opinion, yet I've heard what your thoughts were and went in your direction even though I may not have agreed with it.  Such as the issue with FTO Schultz.  However, there are certain things that are time sensitive and need to be taken care of.  Being that we only work one night together, it isn't logistically feasible to get together on everything regarding the program.  Since I have the "institutional knowledge" of the program, I am going to move forward with things such as PPO/FTO assignments and the changes that were made to accommodate the Rolling Loud schedule.
>
> With regards to the SBT scenarios and the new supervisor scenarios, we've yet to even discuss those.  I showed you the supervisor scenarios that we designed and you thought they were great. The scenarios for both were set in place years ago.  As for changes and updates, we just mentioned that it would be something to address but has yet to happen.  Obviously, when that occurs we will collaborate and come up with the best choices.

1

The same goes for the interview questions. It was discussed that we need to come up with a series of questions but that has yet to be discussed either. The only thing I've done regarding that thus far is asking Lt. Flanagan if he still had his questions on file to use as a guideline.

The last thing you mentioned is the meeting agenda. Last week when we discussed that, you said you had some ideas for the agenda. I haven't seen them. You never sent them to me. I have things I am going to put on the agenda and started to put together a PowerPoint for the meeting. As soon as you advise me what your topics are, I will place them on the agenda and we can collaborate to add them to the PowerPoint. When I sent the email out to the FTO Unit about the meeting, I only gave them the date, which was changed at your request. I only told them to keep an eye out for the agenda. I didn't send an agenda at that time because I knew you had things to add to it. This is another one of those things that is time sensitive though because Rolling Loud is going to affect our time to work on this. So please forward what you have and we can try to get together when you have time to meet this weekend.

I would like to point out that I have CC'd you on every email that I have sent out regarding the FTO Program. I believe I may have had only a response or two out of the several dozen emails I've sent. I've sat with you in the office and shown you how to navigate the DOR software and how to review the Trackers. Since we have only one night in common, that entire night should be spent discussing the program and training you in the workings of it unless more pressing issues arise.

As far as working together as a team, I agree with you. But something to keep in mind is that a team has one quarterback, one first baseman, one goalie and one head coach. Having two head coaches doesn't work. This is why I brought up that concern at the meeting with the chiefs. It has absolutely nothing to do with you. Even if it was Toby and I, I would not think it was a good idea. It's about the logistics and the experience. This is why the idea of each of us being the head coach of one of the teams was the direction we were going. It allows autonomy for each of us to run our teams while having an assistant coach to step in and help out, or cover for the other coach when he or she is gone. I understood that you had stipulated to this during our meetings with Toby and also with the email he sent on July 16th about the training class for new supervisors. I do agree that going forward we will be able to make this program the best it can be.

If you like we can discuss further when I come in tomorrow night if you are able to get away for a little bit.

Thanks.

SC

On Jul 19, 2021 01:16, "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov> wrote:
Steve,

Today I was reviewing a couple of emails and documents since we started the program together and I had an uneasy feeling regarding my role in the program.

I want to meet with you in person or we can speak over the phone regarding my concerns, but I wanted to inform you beforehand.

For whatever reason the Chiefs decided to select both of us to the program; as described by them during our selection meeting I can see why. You bring the institutional knowledge to the program and I can bring a "fresh look" to the program to bring innovation and help expand the program. As a team we can make the program the best it has ever been.

My perception is that there is a push for you to solely be in charge of the FTO program and for me to be in charge of the Probationary Supervisors. At this time you have taken a leadership role in pushing forward with the FTO program because I am still training and learning the intricacies of the FTL position. However, I do not want to be boxed in one role; I put in for FTL because of my passion for training new officers. Every decision, changes and progress with the FTO program and the Probationary Supervisor Program should be reviewed by both of us equally and before anything is officially sent out it should be agreed upon by both of us.

2

Here are a few things that have not been conferred with me about for final decision:

- PPO Assignments to FTOs – I would like to have input
- SBT scenarios and New Supervisor Scenarios
- Interview questions
- Meeting Agenda (Last week I had a list of items to discuss but it appears you have an agenda already)

I do want to clarify that in now way I am saying that this is intentional or that there is a hidden agenda to make this happen. I think because of the many tasks at hand this is the path of least resistance to keep pushing forward without failing the program and PPOs. As I continue to learn I want my voice to be heard to make sure you and I are on the same page and understand that we are 50/50 responsible for both programs.

My dream for the programs and the Department in general is that we are fair and provide our officers opportunities to improve.

Let me know when you want to meet so I can plan ahead.

Stay safe and thank you,
<image001.jpg>
**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov
*Mission:  Prevent crime and enhance public safety.*

*Vision:  We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

*Values: Professional, Accountable, Honest and Proud.*

3

# EXHIBIT D

Monday, March 14, 2022 at 09:49:33 Eastern Daylight Time

**Subject:**   Re: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

**Date:**   Tuesday, October 19, 2021 at 7:57:52 AM Eastern Daylight Time

**From:**   Rabelo, Octavio

**To:**   Carvajal, Rosa

**CC:**   Cosner, Steven

**Attachments:** image001.jpg

Tomorrow is fine. Can you send a teams evite?

Ty

Sent from my iPhone

> On Oct 19, 2021, at 5:41 AM, Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov> wrote:

We can try Wednesday morning.

<image001.jpg>

**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov
*Mission:*  *Prevent crime and enhance public safety.*

*Vision:*  *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

*Values: Professional, Accountable, Honest and Proud.*

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** Monday, October 18, 2021 3:55 PM
**To:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Cc:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Subject:** Re: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

Tomorrow or Wednesday morning is still good for me.

On Oct 18, 2021 08:33, "Rabelo, Octavio" <OctavioRabelo@miamibeachfl.gov> wrote:
GM,

I am off Thursday the 21 at through the 25th folks, out of state and unavailable. Let me know if any of the dates I have work for you both.

Sent from my iPhone

> On Oct 17, 2021, at 9:53 PM, Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov> wrote:
>
> Good evening,
>
> I want to have an FTL meeting to discuss all items, Toby please let me know if Thursday works for you as well so I can make arrangements with my family for my son's school.
>
> This should be a meeting to formally discuss our responsibilities in the programs and what projects each of us is overseeing.
>
> I will complete the SBT schedule and OT breakdown and have it for the meeting on Thursday morning for final team approval. I will send a meeting link and invite pending each of your responses.
>
> Thanks,
> <image001.jpg>
> **Rosa Carvajal, Lieutenant**
> MIAMI BEACH POLICE DEPARTMENT
> Operations Division
> 1100 Washington Ave, Miami Beach, FL 33139
> Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
> rosacarvajal@miamibeachfl.gov
> *Mission:  Prevent crime and enhance public safety.*
>
> *Vision:  We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*
>
> *Values: Professional, Accountable, Honest and Proud.*
>
> ---
>
> **From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>

**Sent:** Sunday, October 17, 2021 11:57 AM
**To:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Cc:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Subject:** RE: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

I can do Teams either day.  Just send a link.  Not sure if you are wanting to discuss just the FTS training on that meeting or make it an FTL meeting to discuss the other things. Otherwise we can meet on Thursday morning.

With regards to SBT, splitting the group on portions will be good but I don't  believe the whole week is necessary for 7 PPO's.  It is usually on days like the traffic stops.  For example, when we do DV and other scenarios that utilize the DT room its more about space availability.  But if we have enough FTOs and role players, and we can find a secondary location then give it a shot.

On Oct 17, 2021 08:46, "Rabelo, Octavio" <OctavioRabelo@miamibeachfl.gov> wrote:

> Hello,
>
> I am available via teems Monday, Tuesday or Wednesday between 7am and 10am.  Let me know.
>
> FYI, with all the competing schedules (new sergeant FTS and ours) the best way to ensure the new FTS get the training on the New Sergeant FTO Program will be through TEAMS Training.  Marcelin, Marrotta, Perez and Sayegh all have different schedules so I will send them a teams invite respectively to get them trained up.  I met with Berrian and Bolduc Friday and informed them the current FTSs will need to provide additional guidance as requested by the new FTS.  It is incumbent on the new FTS to ask for assistance…
>
> Rosa, I will copy you on the evites just let me know which one you choose to attend.  I recommend selecting the first one as I was just informed by Jose Reina that Edward Delgado is an Acting Sergeant and we will be doing his two week assignment forthwith.
>
> Toby Rabelo, *Lieutenant of Police*
>
> MIAMI BEACH POLICE DEPARTMENT
>
> Support Services Division | Business Resource Unit

MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, ext 5648  /  Fax: 786-394-5205

octaviorabelo@miamibeachfl.gov

**Mission:**  *Address Crime and Community Concerns*

**Vision:**  *A Safe and Welcoming Environment for Everyone*

**Values:**  *Honorable, Professional, Resilient*

**Goals:**  *Use Innovative Approaches to Address Crime;*

*Maintain and Enhance a Professional and Well-Trained Work Force*

*Enhance the Public's Perception of the MBPD*



---

**From:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Sent:** Saturday, October 16, 2021 11:32 AM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Subject:** Re: Scenario Based Training Staffing and Scheduling - Tentative Date
November 1 to November 4

Steve,

So we don't double the work, I'll be scheduling SBT. I'll copy you on all my replies since I have all of the replies from the team. Let's meet so we can figure out who will be part of team A with me and Team B with you on all for days of SBT. I want to make sure I schedule an entire SBT so I can know how to do it on my own, obviously before sending out final schedule we will meet to approve it.

We are also in dire need of an FTL meeting to finalize each of our responsibilities. I don't want anything to be overlooked because we are either doing the same work or we think either of us are. And also we never finalized anything after several meetings and discussions regarding the PPO program and my involvement in it. Nothing has been formally finalized and written down.

Finally, let's discuss the direction of the New Sergeant FTO program.

I am available Monday, Tuesday, Wednesday morning. This week I have to take my son to school Thursday & Friday. Let me know what day you both want to meet.

Rosa

Sent from my iPhone

> On Oct 15, 2021, at 12:32 AM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:
>
> Good evening everyone,
>
> The Training Unit has advised that the PPOs will be released for SBT on Monday, November 8th.  That will be the first day of SBT and if will run until Thursday November 11th.  As requested in the below email from Lt. Carvajal, please advise your availability for that week.  We are needing a prompt reply by each of you so that the schedule can be put together.  I know some of you have already replied to the initial email.  Any of you who replied only to Lt. Carvajal please send another response to both her and I.  This is the start of a busy period for the Program so its going to be all hands on deck.  Thank you all.
>
> SC

*<image002.png>*

*Steve Cosner, Lieutenant*

**MIAMI BEACH POLICE DEPARTMENT**

**Operations Division/Third Platoon/Area 2**

**Field Training Program Commander**

1100 Washington Ave, Miami Beach, FL 33139

Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976

[StevenCosner@miamibeachfl.gov](mailto:StevenCosner@miamibeachfl.gov)

**Mission**:  Address Crime and Community Concerns

**Vision**:  A safe and welcoming environment for everyone

**Values**: Honorable, Professional, Resilient

**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

---

**From:** Carvajal, Rosa <[RosaCarvajal@miamibeachfl.gov](mailto:RosaCarvajal@miamibeachfl.gov)>
**Sent:** Monday, October 11, 2021 11:39 PM
**To:** Camacho, Elbys <[ElbysCamacho@miamibeachfl.gov](mailto:ElbysCamacho@miamibeachfl.gov)>; Muley, Mike <[MikeMuley@miamibeachfl.gov](mailto:MikeMuley@miamibeachfl.gov)>; Bolduc, Kenneth <[KennethBolduc@miamibeachfl.gov](mailto:KennethBolduc@miamibeachfl.gov)>; Dionne, Martin <[MartinDionne@miamibeachfl.gov](mailto:MartinDionne@miamibeachfl.gov)>; Berrian, Jerome <[JeromeBerrian@miamibeachfl.gov](mailto:JeromeBerrian@miamibeachfl.gov)>; Marotta, Danielle <[DanielleMarotta@miamibeachfl.gov](mailto:DanielleMarotta@miamibeachfl.gov)>; Perez, Luis <[LuisPerez2@miamibeachfl.gov](mailto:LuisPerez2@miamibeachfl.gov)>; Marcelin, Michael <[MichaelMarcelin@miamibeachfl.gov](mailto:MichaelMarcelin@miamibeachfl.gov)>; Molina, Daniel <[DanielMolina@miamibeachfl.gov](mailto:DanielMolina@miamibeachfl.gov)>; Piedra, Angel <[AngelPiedra@miamibeachfl.gov](mailto:AngelPiedra@miamibeachfl.gov)>; Otero, Michael

<MichaelOtero@miamibeachfl.gov>; Quintero, Rey
<ReyQuintero@miamibeachfl.gov>; Rodriguez, Monica
<MonicaRodriguez@miamibeachfl.gov>; Vegoda, Joshua
<JoshuaVegoda@miamibeachfl.gov>; Moreno, Daniella
<DaniellaMoreno@miamibeachfl.gov>; Suarez, Ronald
<RonaldSuarez@miamibeachfl.gov>; Schultz, Eric
<EricSchultz@miamibeachfl.gov>; Palacios, Javier
<JavierPalacios@miamibeachfl.gov>; El-Jourdi, Rabih <RabihEl-Jourdi@miamibeachfl.gov>; Fequiere, Elizabeth
<ElizabethFequiere@miamibeachfl.gov>; Vidal, Elizabeth
<ElizabethVidal@miamibeachfl.gov>; Yero, Jorge
<JorgeYero@miamibeachfl.gov>; Anderson, Donald
<DonaldAnderson@miamibeachfl.gov>; Baumer, Werner
<WernerBaumer@miamibeachfl.gov>; Bolanos, Fabio
<FabioBolanos@miamibeachfl.gov>; Butler, Terrence
<TerrenceButler@miamibeachfl.gov>; Pomares, Makin
<MakinPomares@miamibeachfl.gov>; Vazquez, Frank
<FrankVazquez@miamibeachfl.gov>; Sayegh, Michelle
<MichelleSayegh2@miamibeachfl.gov>
**Cc:** Cosner, Steven <StevenCosner@miamibeachfl.gov>; Rabelo, Octavio
<OctavioRabelo@miamibeachfl.gov>; Thayer, Vivian
<VivianThayer@miamibeachfl.gov>
**Subject:** Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4
**Importance:** High

Good evening team,

We are initiating the process of scheduling the Scenario Based Training week for the current Post Academy PPO group. As of this writing there are a total of seven (7) PPOs, one of them who completed SBT the last go around but who will need to go through it again.

This class is larger and we will need as much participation as possible in order to have a successful and organized SBT week. Lt. Cosner and I are currently working on the logistics for SBT and will keep you informed as we move forward to finalize locations and resources.

We will be splitting the PPOs into two teams in order to get them through the scenarios in 10 hours. Which means we will be running concurrent scenarios on all days.

The PPOs are scheduled to be sworn in on Thursday October 28; we will have them the week of November 1st. We are anticipating conducting SBT the week of **November 1, 2021**. As you all know this might change based on the needs of the Post Academy and equipment distribution. We might need to postpone SBT.  In order to plan ahead, I am also requesting your availability for the week of **November 8, 2021**. Volunteer for as many days as you want.

**Reply to this email and provide the following:**

- Days you are available for both the week of Nov 1 and Week of Nov 8 (Monday to Thursday only).

  - **WEEK 1** - Nov 1 (Monday) – Nov 2 (Tuesday) – Nov 3 (Wednesday) – Nov 4 (Thursday)

  - **WEEK 2** – Nov 8 (Monday) – Nov 9 (Tuesday) – Nov 10 (Wednesday) – Nov 11 (Thursday - By Unit seniority due to Holiday Pay)

- Your shift (Days, Noons or Mids)

- If it is your regular day off or are On-duty for each day you volunteer

- if you want **OT, DO or "Training on Workday"**(Please note we are responsible for the OT of the program as well as the current staffing needs of Patrol. We will try our best to provide opportunities for all).

- Hours available (Preference will be provided to those who can participate the entire 10 hours).

- If you are interested in being a role player.

If you have any questions please call me or email me.

Thank you,

<image003.jpg>

**Rosa Carvajal, Lieutenant**

MIAMI BEACH POLICE DEPARTMENT

Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857

rosacarvajal@miamibeachfl.gov

***Mission:*** *Prevent crime and enhance public safety*.

***Vision:*** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

***Values:*** *Professional, Accountable, Honest and Proud.*

Monday, March 14, 2022 at 09:50:17 Eastern Daylight Time

**Subject:** RE: FTO 40 Hr Course - FTL Meeting

**Date:** Friday, September 24, 2021 at 11:59:53 AM Eastern Daylight Time

**From:** Cosner, Steven

**To:** Carvajal, Rosa

**CC:** Rabelo, Octavio

**Attachments:** image001.jpg, image002.png

Good morning,

I reviewed the attachments and the Training Manual is an older version.  I will forward the newer version that we updated a couple weeks ago.  Also, as I am looking through the PowerPoint I see that there are references to various chapters.  Is there a workbook that goes along with the PowerPoint for the FTOs to follow along with?

On Sep 24, 2021 09:25, "Cosner, Steven" <StevenCosner@miamibeachfl.gov> wrote:
I can do a teems with you at 3.

On Sep 23, 2021 05:56, "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov> wrote:
Ill review the attachments today. Can we meet tomorrow Friday afternoon? Maybe 3pm?

MIAMI**BEACH**

**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov
*Mission:  Prevent crime and enhance public safety.*

*Vision:  We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

*Values: Professional, Accountable, Honest and Proud.*

**From:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Sent:** Tuesday, September 21, 2021 7:33 AM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>; Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Subject:** RE: FTO 40 Hr Course - FTL Meeting

GM,

See attached Power Point.   (F:\POLI\PATR\$ALL\FTO Program\FTO Powerpoints) The Lesson Plan and Outline should be on file with the Training Unit.  I also recommend you both review the CALEA Folder and get with Patrone on what new CALEA Standards the program may have, if any… (F:\POLI\PATR\$ALL\FTO Program\Calea Stuff\Calea Stuff)

I am available either THU or FRI, except from 945 an to 12 ref Telestaff Update Mtg… Let me know please.

Toby Rabelo, *Lieutenant of Police*

MIAMI BEACH POLICE DEPARTMENT
Support Services Division | Business Resource Unit
MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, ext 5648  /  Fax: 786-394-5205
octaviorabelo@miamibeachfl.gov

**Mission:**  *Address Crime and Community Concerns*

**Vision:**  *A Safe and Welcoming Environment for Everyone*

**Values:**  *Honorable, Professional, Resilient*

**Goals:**  *Use Innovative Approaches to Address Crime;*
  *Maintain and Enhance a Professional and Well-Trained Work Force*
  *Enhance the Public's Perception of the MBPD*



**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** Tuesday, September 21, 2021 6:22 AM
**To:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Subject:** Re: FTO 40 Hr Course - FTL Meeting

I know the PowerPoint is in the F drive.  I think I have it in my cloud drive also because I was updating it about 2 months ago.  If you all want to do a Teams meeting on Thursday afternoon or Friday I think it would be good to get the schedule pinned down.  Just let me know and I will make myself available.

On Sep 21, 2021 01:07, "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov> wrote:
Good morning team,

Where can I find the Lesson Plan and all training documents for the upcoming training? Couldn't find it in the FTO file.

Also, are we meeting to go over the training schedule and what each of us is responsible for? As well as to discuss agenda for Friday's meeting and Feedback from SBT?

Thanks,

MIAMIBEACH

**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov

**Mission:** *Prevent crime and enhance public safety*.

**Vision:** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

**Values:** *Professional, Accountable, Honest and Proud.*

Monday, March 14, 2022 at 09:51:25 Eastern Daylight Time

**Subject:** Time Off

**Date:** Wednesday, October 6, 2021 at 4:19:10 PM Eastern Daylight Time

**From:** Cosner, Steven

**To:** Carvajal, Rosa, Rabelo, Octavio

Good afternoon,

I have taken this week off.  I will return to regular shift next Wednesday.  I am available by phone, text, or email if either of you need to get ahold of me.  Rosa,  I will forward an email I received from Phil Patrone about the paperwork he needs to obtain from the FTP.  Originally, he said he needed paperwork regarding the selection process for FTO/FTS but the follow up is asking about the Rookie Book which is a whole other animal.  He is going to be in tomorrow morning about 0430 so if you can meet with him to verify what he needs and advise in an email I would appreciate it.

I am currently working with Dolan Consulting Group to obtain four 2-hour online training courses for the FTO's and FTS's that will be a great addition to the training of our team.  I will update you all as I get further along in the process.

We need a hard date for the next group of PPO's for SBT.  Once we get that I can start working on the schedule.

I see that we have 4 going to ITW.  That is fantastic.  It will be a huge step forward for the program.  In addition to that we need to discuss our options for expanding the program as soon as possible because of our shortage of FTO's.  I know that Monica Rodriguez is getting scheduled for the FTO course but I would like to schedule another 40 hour in-house soon, even for those who have already attended the county's class, so that we can have our team getting trained specifically to the requirements of our program.

Rosa,

If you can assist on gathering any info that will help these issues move forward quickly it would be great.  If you are available tomorrow or Friday to discuss on Teams please let me know and I will work it into my schedule.  Thanks.

SC

Monday, March 14, 2022 at 09:52:03 Eastern Daylight Time

**Subject:** Re: FTO Program

**Date:** Tuesday, July 20, 2021 at 7:33:42 PM Eastern Daylight Time

**From:** Cosner, Steven

**To:** Carvajal, Rosa

**Attachments:** image001.jpg

Rosa,

I read your email and I understand where you are coming from yet I am a bit perplexed.  I have to disagree when you say that your voice isn't heard.  We have had several discussions about different issues where you and I have had a difference of opinion, yet I've heard what your thoughts were and went in your direction even though I may not have agreed with it.  Such as the issue with FTO Schultz.  However, there are certain things that are time sensitive and need to be taken care of.  Being that we only work one night together, it isn't logistically feasible to get together on everything regarding the program.  Since I have the "institutional knowledge" of the program, I am going to move forward with things such as PPO/FTO assignments and the changes that were made to accommodate the Rolling Loud schedule.

With regards to the SBT scenarios and the new supervisor scenarios, we've yet to even discuss those.  I showed you the supervisor scenarios that we designed and you thought they were great. The scenarios for both were set in place years ago.  As for changes and updates, we just mentioned that it would be something to address but has yet to happen.  Obviously, when that occurs we will collaborate and come up with the best choices.

The same goes for the interview questions.  It was discussed that we need to come up with a series of questions but that has yet to be discussed either. The only thing I've done regarding that thus far is asking Lt. Flanagan if he still had his questions on file to use as a guideline.

The last thing you mentioned is the meeting agenda. Last week when we discussed that, you said you had some ideas for the agenda.  I haven't seen them.  You never sent them to me.  I have things I am going to put on the agenda and started to put together a PowerPoint for the meeting.  As soon as you advise me what your topics are, I will place them on the agenda and we can collaborate to add them to the PowerPoint.  When I sent the email out to the FTO Unit about the meeting, I only gave them the date, which was changed at your request.  I only told them to keep an eye out for the agenda.  I didn't send an agenda at that time because I knew you had things to add to it. This is another one of those things that is time sensitive though because Rolling Loud is going to affect our time to work on this.  So please forward what you have and we can try to get together when you have time to meet this weekend.

I would like to point out that I have CC'd you on every email that I have sent out regarding the FTO Program.  I believe I may have had only a response or two out of the several dozen emails I've sent.  I've sat with you in the office and shown you how to navigate the DOR software and how to review the Trackers.  Since we have only one night in common, that entire night should be spent discussing the program and training you in the workings of it unless more pressing issues arise.

As far as working together as a team, I agree with you.  But something to keep in mind is that a team has one quarterback, one first baseman, one goalie and one head coach.  Having two head coaches doesn't work.  This is why I brought up that concern at the meeting with the chiefs.  It has absolutely nothing to do with you.  Even if it was Toby and I, I would not think it was a good idea.  It's about the logistics and the experience.  This is why the idea of each of us being the head coach of one of the teams was the direction we were going.  It allows autonomy for each of us to run our teams while having an assistant coach to step in and help out, or cover for the other coach when he or she is gone.  I understood that you had stipulated to this during our meetings with Toby and also with the email he sent on July 16th about the training class for new supervisors.  I do agree that going forward we will be able to make this program the best it can be.

If you like we can discuss further when I come in tomorrow night if you are able to get away for a little bit.

Thanks.

SC

On Jul 19, 2021 01:16, "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov> wrote:

Steve,

Today I was reviewing a couple of emails and documents since we started the program together and I had an uneasy feeling regarding my role in the program.

I want to meet with you in person or we can speak over the phone regarding my concerns, but I wanted to inform you beforehand.

For whatever reason the Chiefs decided to select both of us to the program; as described by them during our selection meeting I can see why. You bring the institutional knowledge to the program and I can bring a "fresh look" to the program to bring innovation and help expand the program. As a team we can make the program the best it has ever been.

My perception is that there is a push for you to solely be in charge of the FTO program and for me to be in charge of the Probationary Supervisors. At this time you have taken a leadership role in pushing forward with the FTO program because I am still training and learning the intricacies of the FTL position. However, I do not want to be boxed in one role; I put in for FTL because of my passion for training new officers. Every decision, changes and progress with the FTO program and the Probationary Supervisor Program should be reviewed by both of us equally and before anything is officially sent out it should be agreed upon by both of us.

Here are a few things that have not been conferred with me about for final decision:

- PPO Assignments to FTOs – I would like to have input
- SBT scenarios and New Supervisor Scenarios
- Interview questions
- Meeting Agenda (Last week I had a list of items to discuss but it appears you have an agenda already)

I do want to clarify that in now way I am saying that this is intentional or that there is a hidden agenda to make this happen. I think because of the many tasks at hand this is the path of least resistance to keep pushing forward without failing the program and PPOs. As I continue to learn I want my voice to be heard to make sure you and I are on the same page and understand that we are 50/50 responsible for both programs.

My dream for the programs and the Department in general is that we are fair and provide our officers opportunities to improve.

Let me know when you want to meet so I can plan ahead.

Stay safe and thank you,

MIAMI**BEACH**

**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov
*Mission:  Prevent crime and enhance public safety.*

*Vision:  We aspire to be a world-class agency, which protects our diverse community and serves as a*

*model for character, innovation and service to meet the challenges of tomorrow.*

**Values:** *Professional, Accountable, Honest and Proud.*

Monday, March 14, 2022 at 09:53:27 Eastern Daylight Time

**Subject:** FW: Forms for Scenario Based Training
**Date:** Friday, November 12, 2021 at 10:12:05 PM Eastern Standard Time
**To:** Cosner, Steven
**Attachments:** image001.png, image001.png



*Steve Cosner, Lieutenant*
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
**Field Training Program Commander**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

---

**From:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Sent:** Friday, November 12, 2021 12:53 PM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>; Doce, Enrique <EnriqueDoce@miamibeachfl.gov>
**Subject:** Re: Forms for Scenario Based Training

We agreed that the forms will remain memo format for now as you have created them.  You said that you would reformat them after the last SBT due to time constraints

I'm still currently working on the lesson plan. Nobody in the program decided to update it in the last couple of years even though many SBTs have been completed. It doesn't get changed unless there is a reason to change it. I'm not sure if anyone was actually following it since it was not updated. Since I'm scheduling SBT I'll try my best to have it ready for the next one. Also none of my questions were answered via email regarding which scenarios were used I sent an email with the scenarios, who created them, how they were followed, etc. I was going to use these answers to create a new SBT Lesson Plan. If an email was sent with the answers please let me know. Furthermore, during the last SBT, last week, we were finally able to determine how future SBTs will be done moving forward. I will be using that to update it. These are new changes that would warrant a revised lesson plan.

**Page 1 of 4**

Did you update the FTO 40 hr Course Lesson Plan that was given to you when I had to go to the Hospital on September 27? Not yet.  I advised Lt. Spina that it was not a priority and that I would begin a revision after the new year.  The revisions are fairly minor and can wait until then. I haven't seen a draft yet. Or was no update done? I'm asking because I was the one that asked Joann for the lesson plan and I haven't received it back It was retrieved from Joann a few days prior to the class commencing and you had it in your possession to review since we will be holding the class soon for the new FTOs. The only thing I received for the course was the PowerPoint. I want to get ready for the next one so I would like to see it. When did you review the lesson plan prior to the 40 hr FTO course?  I wasn't able to get ahold of the plan until half way through the first day of class.  I returned the plan to Joann after the class was over.

Lastly, whenever I have an updated item I will make sure to forward it to the team as I always do. I do not need to provide you with a follow up in a timeframe because you are not my supervisor. In no way is this an appropriate response.  I send updates to Toby and Rosa constantly as a mater or respect and teamwork.  Not because of a supervisory role.  This is also counter to the email Rosa sent on July 19.

Updates will be provided when we actually meet as FTLs on pending items Why?  I send emails constantly to advise of my progress on various projects or if any item is urgent we can always speak via TEAMS to resolve. We are dealing with a lot of moving parts, new policy items that I am writing and revising, revamping the program, growing the program, These are not specific tasks and encompass the tasks as a whole training and retraining That's what we do, PRP I am writing that policy, community impact task I am developing that and implementing it into the policy, interviews I have submitted the OB entries, scheduled all interviews and reserved locations for all of the interviews, faulty DOR system I have been working directly with Lexis Nexis via email and phone and attended multiple Teams meetings (along with Rabelo and Loperfido.)  The one meeting you logged in for, you didn't have a single comment to add to the conversation, SBT we have both contributed to scheduling and attended the last SBT.  You only attended a day or two at the first SBT.  I made arrangements for locations, training new FTS These training meetings were done via Teams and were just a few hours long.  According to Rabelo you only attended one of the sessions and have made no efforts to contact him with regards to the FTS program, supervising new Sergeants This is not a time consuming task. and supervising our own shifts with our own officers and sergeants along with our different duties for our AORs. Again, this is what we do.  I have the same day to day tasks and get all of the other FTP tasks accomplished as well.

Unfortunately it seems no prioritizing is being done. Instead we take on 20 different projects at once but yet none are actually complete. This may apply to your projects, such as the challenge coin which you agreed to take on back in July and have not done anything about yet.

RC

Sent from my iPhone


On Nov 12, 2021, at 2:30 AM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:


Rosa,

I hadn't received a follow-up on any of this.  Have you been able to get those forms done or the SBT lesson plan updated?  We are just over a month out from the next SBT and still have to do interviews and teach the 40 hour class for the new FTOs.

SC



*Steve Cosner, Lieutenant*

**MIAMI BEACH POLICE DEPARTMENT**

**Operations Division/Third Platoon/Area 2**
**Field Training Program Commander**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

**From:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Sent:** Thursday, October 28, 2021 5:38 AM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Cc:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Subject:** Re: Forms for Scenario Based Training

These are okay but are a bit basic more like a memo than a form. I can edit it to be a form and build in a tittle for both that shows FTP and SBT in a form format. I'll send it our later today to see if you both like it or would like to use the one you sent.

Also, these changes will need to be included in the updated SBT Lesson Plan which I will be updating.

Let's finalize the items in the SBT in order to update it so that at a minimum we have an updated one for the next SBT.

I need to know what scenarios were used the last SBT to compare to what is in the latest SBT Lesson Plan and to coordinate next week. I want SBT to be structured and following the SBT Lesson Plan.

RC

Sent from my iPhone

On Oct 28, 2021, at 4:34 AM, Cosner, Steven <StevenCosner@miamibeachfl.gov>

**Page 3 of 4**

wrote:

Over the years we have had various documentation styles that we tried at the conclusion of each training day.  During the last SBT I started having the FTO generate an overall summary or the PPO's performance for the day.  I also had the PPO write a narrative (as if in a case report) to document one of the scenarios that they encountered.  The attached forms were designed this evening.  I want to begin utilizing this on each SBT to maintain standards of documentation.

SC

*<image001.png>*
*Steve Cosner, Lieutenant*
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
**Field Training Program Commander**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976
StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

<SBT PPO Daily Narrative.docx>
<SBT Daily Training Summary.docx>

Monday, March 14, 2022 at 09:54:29 Eastern Daylight Time

**Subject:** Re: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

**Date:** Monday, October 18, 2021 at 9:33:23 AM Eastern Daylight Time

**From:** Rabelo, Octavio

**To:** Carvajal, Rosa

**CC:** Cosner, Steven

**Attachments:** image001.jpg

GM,

I am off Thursday the 21 at through the 25th folks, out of state and unavailable. Let me know if any of the dates I have work for you both.

Sent from my iPhone

On Oct 17, 2021, at 9:53 PM, Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov> wrote:

Good evening,

I want to have an FTL meeting to discuss all items, Toby please let me know if Thursday works for you as well so I can make arrangements with my family for my son's school.

This should be a meeting to formally discuss our responsibilities in the programs and what projects each of us is overseeing.

I will complete the SBT schedule and OT breakdown and have it for the meeting on Thursday morning for final team approval. I will send a meeting link and invite pending each of your responses.

Thanks,
<image001.jpg>

**Rosa Carvajal, Lieutenant**
MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov
***Mission:*** *Prevent crime and enhance public safety*.

***Vision:*** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

***Values:*** *Professional, Accountable, Honest and Proud.*

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** Sunday, October 17, 2021 11:57 AM
**To:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Cc:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Subject:** RE: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

I can do Teams either day. Just send a link.  Not sure if you are wanting to discuss just the FTS training on that meeting or make it an FTL meeting to discuss the other things. Otherwise we can meet on Thursday morning.

With regards to SBT, splitting the group on portions will be good but I don't  believe the whole week is necessary for 7 PPO's.  It is usually on days like the traffic stops.  For example, when we do DV and other scenarios that utilize the DT room its more about space availability.  But if we have enough FTOs and role players, and we can find a secondary location then give it a shot.

On Oct 17, 2021 08:46, "Rabelo, Octavio" <OctavioRabelo@miamibeachfl.gov> wrote:

> Hello,
>
> I am available via teems Monday, Tuesday or Wednesday between 7am and 10am.  Let me know.
>
> FYI, with all the competing schedules (new sergeant FTS and ours) the best way to ensure the new FTS get the training on the New Sergeant FTO Program will be through TEAMS Training.  Marcelin, Marrotta, Perez and Sayegh all have different schedules so I will send them a teams invite respectively to get them trained up.  I met with Berrian and Bolduc Friday and informed them the current FTSs will need to provide additional guidance as requested by the new FTS.  It is incumbent on the new FTS to ask for assistance…
>
> Rosa, I will copy you on the evites just let me know which one you choose to attend.  I recommend selecting the first one as I was just informed by Jose Reina that Edward Delgado is an Acting Sergeant and we will be doing his two week assignment forthwith.
>
> Toby Rabelo, *Lieutenant of Police*
>
> MIAMI BEACH POLICE DEPARTMENT
>
> Support Services Division | Business Resource Unit
>
> MIAMI BEACH POLICE DEPARTMENT
> 1100 Washington Avenue, Miami Beach, FL 33139
> Tel: 305-673-7776, ext 5648  /  Fax: 786-394-5205
>
> octaviorabelo@miamibeachfl.gov

**Mission:**  *Address Crime and Community Concerns*

**Vision:**  *A Safe and Welcoming Environment for Everyone*

**Values:**  *Honorable, Professional, Resilient*

**Goals:**  *Use Innovative Approaches to Address Crime;*

*Maintain and Enhance a Professional and Well-Trained Work Force*

*Enhance the Public's Perception of the MBPD*



---

**From:** Carvajal, Rosa <<u>RosaCarvajal@miamibeachfl.gov</u>>
**Sent:** Saturday, October 16, 2021 11:32 AM
**To:** Cosner, Steven <<u>StevenCosner@miamibeachfl.gov</u>>
**Cc:** Rabelo, Octavio <<u>OctavioRabelo@miamibeachfl.gov</u>>
**Subject:** Re: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

Steve,

So we don't double the work, I'll be scheduling SBT. I'll copy you on all my replies since I have all of the replies from the team. Let's meet so we can figure out who will be part of team A with me and Team B with you on all for days of SBT. I want to make sure I schedule an entire SBT so I can know how to do it on my own, obviously before sending out final schedule we will meet to approve it.

We are also in dire need of an FTL meeting to finalize each of our responsibilities. I don't want anything to be overlooked because we are either doing the same work or we think either of us are. And also we never finalized anything after several meetings and discussions regarding the PPO program and my involvement in it. Nothing has been formally finalized and written down.

Finally, let's discuss the direction of the New Sergeant FTO program.

I am available Monday, Tuesday, Wednesday morning. This week I have to take my son to school Thursday & Friday. Let me know what day you both want to meet.

Rosa

Sent from my iPhone

> On Oct 15, 2021, at 12:32 AM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:
>
> Good evening everyone,
>
> The Training Unit has advised that the PPOs will be released for SBT on Monday, November 8th.  That will be the first day of SBT and if will run until Thursday November 11th.  As requested in the below email from Lt. Carvajal, please advise your availability for that week.  We are needing a prompt reply by each of you so that the schedule can be put together.  I know some of you have already replied to the initial email.  Any of you who replied only to Lt. Carvajal please send another response to both her and I.  This is the start of a busy period for the Program so its going to be all hands on deck.  Thank you all.
>
> SC
>
> <image002.png>
>
> *Steve Cosner, Lieutenant*
>
> **MIAMI BEACH POLICE DEPARTMENT**

**Operations Division/Third Platoon/Area 2**

**Field Training Program Commander**

1100 Washington Ave, Miami Beach, FL 33139

Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976

StevenCosner@miamibeachfl.gov


**Mission**:  Address Crime and Community Concerns

**Vision**:  A safe and welcoming environment for everyone

**Values**: Honorable, Professional, Resilient

**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

---

**From:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Sent:** Monday, October 11, 2021 11:39 PM
**To:** Camacho, Elbys <ElbysCamacho@miamibeachfl.gov>; Muley, Mike <MikeMuley@miamibeachfl.gov>; Bolduc, Kenneth <KennethBolduc@miamibeachfl.gov>; Dionne, Martin <MartinDionne@miamibeachfl.gov>; Berrian, Jerome <JeromeBerrian@miamibeachfl.gov>; Marotta, Danielle <DanielleMarotta@miamibeachfl.gov>; Perez, Luis <LuisPerez2@miamibeachfl.gov>; Marcelin, Michael <MichaelMarcelin@miamibeachfl.gov>; Molina, Daniel <DanielMolina@miamibeachfl.gov>; Piedra, Angel <AngelPiedra@miamibeachfl.gov>; Otero, Michael <MichaelOtero@miamibeachfl.gov>; Quintero, Rey <ReyQuintero@miamibeachfl.gov>; Rodriguez, Monica <MonicaRodriguez@miamibeachfl.gov>; Vegoda, Joshua <JoshuaVegoda@miamibeachfl.gov>; Moreno, Daniella <DaniellaMoreno@miamibeachfl.gov>; Suarez, Ronald <RonaldSuarez@miamibeachfl.gov>; Schultz, Eric <EricSchultz@miamibeachfl.gov>; Palacios, Javier <JavierPalacios@miamibeachfl.gov>; El-Jourdi, Rabih <RabihEl-Jourdi@miamibeachfl.gov>; Fequiere, Elizabeth <ElizabethFequiere@miamibeachfl.gov>; Vidal, Elizabeth <ElizabethVidal@miamibeachfl.gov>; Yero, Jorge <JorgeYero@miamibeachfl.gov>; Anderson, Donald <DonaldAnderson@miamibeachfl.gov>; Baumer, Werner <WernerBaumer@miamibeachfl.gov>; Bolanos, Fabio <FabioBolanos@miamibeachfl.gov>; Butler, Terrence <TerrenceButler@miamibeachfl.gov>; Pomares, Makin <MakinPomares@miamibeachfl.gov>; Vazquez, Frank <FrankVazquez@miamibeachfl.gov>; Sayegh, Michelle <MichelleSayegh2@miamibeachfl.gov>
**Cc:** Cosner, Steven <StevenCosner@miamibeachfl.gov>; Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>; Thayer, Vivian <VivianThayer@miamibeachfl.gov>
**Subject:** Scenario Based Training Staffing and Scheduling - Tentative Date November 1

to November 4
**Importance:** High

Good evening team,

We are initiating the process of scheduling the Scenario Based Training week for the current Post Academy PPO group. As of this writing there are a total of seven (7) PPOs, one of them who completed SBT the last go around but who will need to go through it again.

This class is larger and we will need as much participation as possible in order to have a successful and organized SBT week. Lt. Cosner and I are currently working on the logistics for SBT and will keep you informed as we move forward to finalize locations and resources.

We will be splitting the PPOs into two teams in order to get them through the scenarios in 10 hours. Which means we will be running concurrent scenarios on all days.

The PPOs are scheduled to be sworn in on Thursday October 28; we will have them the week of November 1st. We are anticipating conducting SBT the week of <mark>November 1, 2021</mark>. As you all know this might change based on the needs of the Post Academy and equipment distribution. We might need to postpone SBT.  In order to plan ahead, I am also requesting your availability for the week of <mark>November 8, 2021</mark>. Volunteer for as many days as you want.

<mark>Reply to this email and provide the following:</mark>

- Days you are available for both the week of Nov 1 and Week of Nov 8 (Monday to Thursday only).

    .

    ○ **WEEK 1** - Nov 1 (Monday) – Nov 2 (Tuesday) – Nov 3

(Wednesday) – Nov 4 (Thursday)

.

- **WEEK 2** – Nov 8 (Monday) – Nov 9 (Tuesday) – Nov 10 (Wednesday) – Nov 11 (Thursday - By Unit seniority due to Holiday Pay)

- Your shift (Days, Noons or Mids)

- If it is your regular day off or are On-duty for each day you volunteer

- if you want **OT, DO or "Training on Workday"**(Please note we are responsible for the OT of the program as well as the current staffing needs of Patrol. We will try our best to provide opportunities for all).

- Hours available (Preference will be provided to those who can participate the entire 10 hours).

- If you are interested in being a role player.

If you have any questions please call me or email me.

Thank you,

**Rosa Carvajal, Lieutenant**

MIAMI BEACH POLICE DEPARTMENT

Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857

[rosacarvajal@miamibeachfl.gov](mailto:rosacarvajal@miamibeachfl.gov)

**Mission:**  *Prevent crime and enhance public safety***.**

**Vision:**  *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

**Values:** *Professional, Accountable, Honest and Proud.*

Monday, March 14, 2022 at 09:55:12 Eastern Daylight Time

**Subject:** RE: FTO General Meeting

**Date:**      Friday, July 16, 2021 at 10:16:52 AM Eastern Daylight Time

**From:**      Rabelo, Octavio

**To:**        Cosner, Steven, Carvajal, Rosa

I agree, however, since Rosa will be handling the FTO Program for Sergeants she should be there all week.  Lets look at staffing and see how that can be accomplished. Whatever day she cant be there we can ensure she shadows on the next orientation.

TY

Toby Rabelo, Lieutenant of Police
MIAMI BEACH POLICE DEPARTMENT
Support Services Division | Business Resource Unit
MIAMI BEACH POLICE DEPARTMENT
1100 Washington Avenue, Miami Beach, FL 33139
Tel: 305-673-7776, ext 5648  /  Fax: 786-394-5205
octaviorabelo@miamibeachfl.gov

Mission:  Address Crime and Community Concerns

Vision:  A Safe and Welcoming Environment for Everyone

Values:  Honorable, Professional, Resilient

Goals:  Use Innovative Approaches to Address Crime;
        Maintain and Enhance a Professional and Well-Trained Work Force
        Enhance the Public's Perception of the MBPD


-----Original Message-----
From: Cosner, Steven <StevenCosner@miamibeachfl.gov>
Sent: Friday, July 16, 2021 9:14 AM
To: Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
Cc: Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
Subject: RE: FTO General Meeting

We can schedule the meeting for Friday.  Not a big issue.  However, for the supervisor training, we probably won't be able to change our schedules because there is no other lieutenant on Midnights.  We are only observing and assisting minimally so we don't need to be there for the whole day.  I am planning on staying after shift for a few hours each day and probably coming in for a half day on Monday and Tuesday.




Steve Cosner, Lieutenant
MIAMI BEACH POLICE DEPARTMENT
Operations Division/Third Platoon/Area 2 Field Training Program Commander
1100 Washington Ave, Miami Beach, FL 33139

Tel: 305-673-7776, ext. 5526  /  Fax: 786-394-4976 StevenCosner@miamibeachfl.gov

Mission:  Address Crime and Community Concerns
Vision:  A safe and welcoming environment for everyone
Values: Honorable, Professional, Resilient Our Daily Goals: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

-----Original Message-----
From: Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
Sent: Friday, July 16, 2021 8:20 AM
To: Cosner, Steven <StevenCosner@miamibeachfl.gov>
Cc: Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
Subject: FTO General Meeting

Steve,

I had to move my vacation for my son's birthday to the week of the July 26 due to the New Sgt training the following week.

If we do have the general FTO meeting this month let's have it on Friday July 30th, instead of the 29th so I can attend.

Also, are we participating in the supervisor training week as observers? If so, are our schedules changed for that week?

Thanks,
Rosa



Sent from my iPhone

# EXHIBIT E

**From:** Cosner, Steven
**To:** Alpizar, Marla
**Date:** Thursday, November 18, 2021 12:51:39 PM
**Attachments:** image001.png
Re FTO Program.msg
Re Challenge Coins.msg
Fwd Save $24.00! Build Your Own Bundle.msg
FW Sale Labor Day Picks.msg
FTP Thoughts.msg
FW Forms for Scenario Based Training.msg
Cosner FTP Progress.docx

---

**From:** Cosner, Steven
**Sent:** Sunday, November 14, 2021 9:34 PM
**To:** Doce, Enrique <EnriqueDoce@miamibeachfl.gov>
**Subject:** Notes reference the Field Training Program

Sir,

Per our conversation and your request, please review the below information regarding the Field Training Program:

**07/15/2021**
Had Teams meeting at 0700 with Lexis Nexis rep to discuss issues and modifications to the DOR system. Lt. Carvajal chose to leave 10 minutes before the meeting to go and visit an officer with a non-service connected/non-emergency illness that could have been handled after the meeting. Returned after the meeting was over and I had to repeat everything that was discussed.

**07/19/2021**
Received email from RC discussing concerns about her involvement in the program. See email: Re: FTO Program

**07/31/2021**
I completed an audit on the DOR system with the below results:

RC first login to the system was July 6
The last login was July 10
RC had a total of 5 logins during that 4-day period
The last DOR approved was July 10

RC has 55 entries in the Activity Log (approvals or rejections) all done in the 4 day window
Currently there are DORs needing final approval in the system for 4 PPOs that are assigned to her:

**BESS – 10 DORs**
**CANO- 17 DORs**
**Reynoso- 18 DORs**
**Velladares- 9 DORs**

As opposed to my activity:

Zero pending DORs needing my approval
My first login was June 3
Last login was tonight
Total of 90 logins (including 5 from before getting the FTL position)
Last DOR approved yesterday.
I have 150 entries in the activity log (Including approvals, rejections, DOR substitutions and assignment creations and 5 DOR approvals prior to getting FTL position)
I ultimately ended up completing the DORs (54 total) that were pending in RC's dashboard.
This was all as of July 31, 2021 and there may be more activity in the system for RC since this was noted.

**07/2021**
RC was given the task of getting the challenge coins made for the FTP in or about July 2021.  There have been several emails with information to follow-up on the task.  See emails: Fwd: Save $24.00! Build Your Own Bundle, FW: [Sale] Labor Day Picks, Re: Challenge Coins, and FTP Thoughts

I asked RC about the progress for this task during the FTP meeting on October 1 and she said she had not done anything with it yet.  This has now been sitting for 4 months with no movement.

**09/13-16/2021**
SBT was scheduled for this week.  RC only showed for an introduction on the first day and then showed for the last day to assist.

**10/01/2021**
FTP Meeting.  Started with an FTS meeting.  When discussing the Community Impact Project, as I was explaining the structure and vision for the project RC began to speak out about why she felt it was a bad idea.  That she felt this was something the sergeants should be doing with their squads and not putting it on the PPO.  This was in direct contradiction with the project and what I was explaining to the Sgts.  This was not the time or place for those comments.  They went against the Chiefs direction and caused the Sgts. to see conflict among the leaders of the program.  A short while later, she left the meeting to get cleared at FastCare and took FTO Vidal with her who then missed the last half of the meeting.

**10/19/2021**
See email Re: Scenario Based Training Staffing and Scheduling - Tentative Date November 1 to November 4

RC emailed TR and I and wanted to schedule a Teams meeting.  She provided dates that worked for her and dates that didn't due to family obligations.  TR and I both responded that we were available on the same dates she was available.  After not getting a confirmation, I inquired about the Teams link and confirmation. RC began to respond with different dates that she originally said were not good for her.  There was some confusion and she tried to turn the entire thing on TR and me.

**11/2-5/2021**

SBT week.  RC disagreed several times with me or the direction the SBT was going.  She allowed that conversation to occur in front of Sgts and FTOs which created an environment of uncertainty and confusion.  On the last occasion the disagreement became slightly heated, regarding handcuffing options and I went into the hallway.  I explained to her that this was a conversation that needed to be had in the hall and not with a bunch of subordinates around.  She told me that she didn't mind having that conversation there because they were all senior officers.  However, PPO Bizot was in the room observing.  RC refused to separate herself from the group and then began to question me as to why I let Bizot into the training.  She was running as the lead for this SBT per her own request and if she didn't want Bizot there she should have asked her to leave.  However, it is not uncommon for officers who are not involved in SBT to observe for periods of time.  This pattern of behavior is unprofessional and will be a detriment to the FTP.

Additionally, RC asked FTO Vidal to produce a PowerPoint for instruction in Felony Stops.  The PowerPoint was very good but RC never used it.

**11/12/2021**

I sent a routine email to RC inquiring about the status of 2 tasks.  The response was highly inappropriate and unprofessional.  I did not respond but I did type my answers within the email in red font for my records.  See email: <mark>FW: Forms for Scenario Based Training</mark>

In addition to the emails noted above that reference specific incidents, I have also attached a list of activities, projects, and accomplishments that I have completed and/or am in progress with.  On the last email RC sent, she referenced that she felt that we were taking on too many projects and not getting anything done.  The truth of the matter is that I AM getting projects done while still covering my day to day responsibilities.  This is not to say the RC has not been active in the FTP.  However, I would estimate that 90% of the work being done is falling on my lap.  There have been some good ideas by RC that should be implemented into the FTP but she is only mentioning them and then takes no action to put them in place.  Lastly, the work environment is not conducive to a successful outcome.  There is growing animosity and tension that I do not feel is going to improve as this has been a pattern from the very shortly after the announcement was made to for us to be the Field Training Lieutenants.



**Steve Cosner, Lieutenant**
**MIAMI BEACH POLICE DEPARTMENT**
**Operations Division/Third Platoon/Area 2**
**Field Training Unit Commander**
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 5526 / Fax: 786-394-4976

StevenCosner@miamibeachfl.gov

**Mission**:  Address Crime and Community Concerns
**Vision**:  A safe and welcoming environment for everyone
**Values**: Honorable, Professional, Resilient
**Our Daily Goals**: Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department

# EXHIBIT F

**From:** Carvajal, Rosa
**To:** Cosner, Steven; Rabelo, Octavio
**Cc:** Doce, Enrique
**Subject:** RE: Teams Meeting
**Date:** Tuesday, October 19, 2021 9:05:00 PM
**Attachments:** image001.jpg

Steve and Toby

Thank you for all the quotes I have my emails and text messages. I can meet tonight all the way up to 0615 when I 06.

I said I was able to make arrangements for Thursday morning if Toby was available and he wasn't because Steve wanted to meet Thursday.

From Steve:

"I can do Teams either day. Just send a link. Not sure if you are wanting to discuss just the FTS training on that meeting or make it an FTL meeting to discuss the other things. ==Otherwise we can meet on Thursday morning.==  "

I did say I was available Monday, Tuesday and Wednesday this week, but if you must know my son is sick and I need to assist my disabled mother in the morning. So therefore Wednesday morning is no longer available for me this week.

I'm 09 now until 0615. Let me know what time you want me schedule the teams meeting in order to send the link.

I did work last night and replied to your text when I woke up. I am a mother so during my time off my priority is my son. If there is a delay in response on the days I work during my off time is due to my sleep schedule and/or my family.

Clearly there is a disconnect that needs to be addressed, hence why I wanted to meet in the first place.

Regards,



**Rosa Carvajal, Lieutenant**

MIAMI BEACH POLICE DEPARTMENT
Operations Division
1100 Washington Ave, Miami Beach, FL 33139
Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857
rosacarvajal@miamibeachfl.gov

***Mission:*** *Prevent crime and enhance public safety.*
***Vision:*** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*
***Values:*** *Professional, Accountable, Honest and Proud.*

**From:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Sent:** Tuesday, October 19, 2021 6:33 PM
**To:** Rabelo, Octavio <OctavioRabelo@miamibeachfl.gov>
**Cc:** Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov>
**Subject:** Re: Teams Meeting

Additionally, this is from your original email on Saturday. You specifically said you weren't available on Thursday. We both replied to you with days we were available based on your schedule.

"I am available Monday, Tuesday, Wednesday morning. This week I have to take my son to school Thursday & Friday. Let me know what day you both want to meet."

On Oct 19, 2021 18:16, "Rabelo, Octavio" <OctavioRabelo@miamibeachfl.gov> wrote:

Hello Rosa and Steve,

Before I informed you both of my unavailability for Thursday (which is in telestaff), I believe Rosa advised that was not a good day for her reference her kiddos. Monday, Tuesday and Wednesday were always available for all of us…

Rosa, are you not working this evening? Couldn't we have a call during your shift or now as it seems you are available?

Again, I will reiterate what I said on our group text - see below. Rosa and Steve, I am available now, later or tomorrow before you 06. If the talking points needing to be discussed are that important let's do it now.

Group Text:

If you guys recall, In our last meeting we all agreed for me to take a step back and let you both run with things based on the mentoring thus far. (Rosa, in that meeting you and I agreed you would take a more active role in the New FTOP for Sergeants upon notification of the next round of promotions.) (Reminder, An acting was just announced)

therefore I will leave the SBT part to you and Steve - of course I am only a call / email away for any questions or concerns.

I am not sure why you feel we need to meet physically since all of our schedules are so complicated, if the time is an issue I can avail myself earlier for a teams call. I had texted you to call me, still available for a call if you can.

Sent from my iPhone

> On Oct 19, 2021, at 5:39 PM, Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov> wrote:
>
> Steve,
>
> We were trying to figure out what day worked best for all of us. Initially Thursday morning was an option but Toby was unavailable. Monday & Tuesday I was available as well. I did reply this morning at 5:40am so we can try tomorrow morning, unfortunately I am no longer available.
>
> The link was not sent because the meeting was not finalized; and it does not take too long to do once a meeting is set.
>
> We can try for next week. Let me know when an in person meeting date is available.
>

> Thanks,

> Rosa

>

>

> Sent from my iPhone

>

>> On Oct 19, 2021, at 1:19 PM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:

>>

>> Rosa,

>>

>> Both Toby and I have responded several times to the request for a Teams meeting this week. We have not received a link yet. Are you still holding this meeting?

# EXHIBIT G



**Captain Javier Matias** ›

Mon, Oct 11, 9:50 PM

> Hi Captain, are u still 05?
>
> I emailed you regarding meeting with you.

No, I left. I was handling a sensitive matter.

I will be in tomorrow later.

> Ok 👍

I have to do a community function.

You work tomorrow?

> Yes

I apologize for today.

Ok

I will do my best to meet with you. The Major will also be in late tomorrow.

> No worries, I wasn't sure if you got my email

  Text Message 



Captain Javier Matias ›

I will do my best to meet with you. The Major will also be in late tomorrow.

No worries, I wasn't sure if you got my email.

Have a good night.

I handling matter since 0500 this morning insane.

Yes

Did not ignore.

Very concerned

QRU, thank you.

Drive safely. We'll speak soon

And disgusted with the usual suspects

Ok

Wed, Oct 13, 2:08 PM

1500 will call you with Major

  Text Message

Captain Javier Matias >

Yes

Did not ignore.

Very concerned

QRU, thank you.

Drive safely. We'll speak soon

And disgusted with the usual suspects

Ok

Wed, Oct 13, 2:08 PM

1500 will call you with Major

Thanks Cap, I'll call you then to see if zoom or teams is better.

QSL

Sent an invite for teams at 1500

Ok logging in now

Thu, Oct 21, 6:20 PM




Text Message

# EXHIBIT H

| | |
|---|---|
| **From:** | Carvajal, Rosa |
| **To:** | Doce, Enrique |
| **Subject:** | Re: FTO Program |
| **Date:** | Monday, October 18, 2021 4:13:11 PM |

Thank you sir. I missed his call due to my hours of sleep. I texted him to know when he would like to speak. I'll keep you posted.

Rosa

Sent from my iPhone

> On Oct 18, 2021, at 9:41 AM, Doce, Enrique <EnriqueDoce@miamibeachfl.gov> wrote:
>
>
> I spoke with Wayne and I need you now to talk with him. Please reach out when you are up and brief him as well. I spoke in good detail and need you to fill in the gaps.
>
> HD
>
>
>
> **Enrique H. Doce**, **MPA**, Major
> MIAMI BEACH POLICE DEPARTMENT
> Patrol/ Operations Division
> 1100 Washington Ave Miami Beach, Florida 33139
> Tel: 305-673-7776, Ext. 5449 | Fax: 786-394-4944
> enriquedoce@miamibeachfl.gov
>
> ***Mission:*** *Address Crime and Community Concerns*
> ***Vision:*** *A safe and welcoming environment for everyone*
> ***Values:*** *Honorable, Professional, Resilient*
> ***Our Daily Goals:*** *Use innovative approaches to address crime, maintain and enhance a professional and well trained workforce, enhance the public's perception of the Miami Beach Police Department*
>
>
>
>> On Oct 18, 2021, at 3:13 AM, Carvajal, Rosa <RosaCarvajal@miamibeachfl.gov> wrote:
>>
>>
>> Please see below.
>> Thanks
>> <image001.jpg>

**Rosa Carvajal, Lieutenant**

MIAMI BEACH POLICE DEPARTMENT

Operations Division

1100 Washington Ave, Miami Beach, FL 33139

Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857

rosacarvajal@miamibeachfl.gov

*Mission: Prevent crime and enhance public safety*.

*Vision: We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

*Values: Professional, Accountable, Honest and Proud.*

---

**From:** Carvajal, Rosa
**Sent:** Tuesday, July 20, 2021 7:30 PM
**To:** Cosner, Steven <StevenCosner@miamibeachfl.gov>
**Subject:** Re: FTO Program

Hi Steve,

Thank you for your detailed reply although I didn't think it was necessary as I wanted to have a discussion with you regarding my concerns in person or over the phone. I would've texted you what was in the email but it would've been really long. But I understand that everything should be documented.

Nevertheless, I thank you for your input and understand your position. However, I have not had an issue with you taking the lead with the program when it comes to time sensitive items. And yes I've been copied in all the emails as I should because I'm part of the program. My only concern was that I want to be a part of the decision making to help guide the FTO program to be better than before.

I do not want to take your role as the "quarterback" away and understand why we both can't be doing the same things. All I want to make sure is that we both understand that we are equally responsible for the direction we take the program in, both the FTO and New Supervisor program.

There is nothing more to my previous email than to let you know I want to ensure we are on the same page about the direction we are taking the program and that I want to be an active participant in the decision making when it comes to the overall direction of the program.

Thanks,
Rosa


Sent from my iPhone


On Jul 20, 2021, at 6:33 PM, Cosner, Steven <StevenCosner@miamibeachfl.gov> wrote:

Rosa,

I read your email and I understand where you are coming from yet I am a bit perplexed. I have to disagree when you say that your voice isn't heard. We have had several discussions about different issues where you and I have had a difference of opinion, yet I've heard what your thoughts were and went in your direction even though I may not have agreed with it. Such as the issue with FTO Schultz. However, there are certain things that are time sensitive and need to be taken care of. Being that we only work one night together, it isn't logistically feasible to get together on everything regarding the program. Since I have the "institutional knowledge" of the program, I am going to move forward with things such as PPO/FTO assignments and the changes that were made to accommodate the Rolling Loud schedule.

With regards to the SBT scenarios and the new supervisor scenarios, we've yet to even discuss those. I showed you the supervisor scenarios that we designed and you thought they were great. The scenarios for both were set in place years ago. As for changes and updates, we just mentioned that it would be something to address but has yet to happen. Obviously, when that occurs we will collaborate and come up with the best choices.

The same goes for the interview questions. It was discussed that we need to come up with a series of questions but that has yet to be discussed either. The only thing I've done regarding that thus far is asking Lt. Flanagan if he still had his questions on file to use as a guideline.

The last thing you mentioned is the meeting agenda. Last week when we discussed that, you said you had some ideas for the agenda. I haven't seen them. You never sent them to me. I have things I am going to put on the agenda and started to put together a PowerPoint for the meeting. As soon as you advise me what your topics are, I will place them on the agenda and we can collaborate to add them to the PowerPoint. When I sent the email out to the FTO Unit about the meeting, I only gave them the date, which was changed at your request. I only told them to keep an eye out for the agenda. I didn't send an agenda at that time because I knew you had things to add to it. This is another one of those things that is time sensitive though because Rolling Loud is going to affect our time to work on this. So please forward what you have and we can try to get together when you have time to meet this weekend.

I would like to point out that I have CC'd you on every email that I have sent out regarding the FTO Program. I believe I may have had only a response or two out of the several dozen emails I've sent. I've sat with you in the office and shown you how to navigate the DOR software and how to review the Trackers. Since we have only one night in common, that entire night should be spent discussing the program and training you in the workings of it unless more pressing issues arise.

As far as working together as a team, I agree with you. But something to keep in mind is that a team has one quarterback, one first baseman, one goalie and one head coach. Having two head coaches doesn't work. This is why I brought up that

concern at the meeting with the chiefs. It has absolutely nothing to do with you. Even if it was Toby and I, I would not think it was a good idea. It's about the logistics and the experience. This is why the idea of each of us being the head coach of one of the teams was the direction we were going. It allows autonomy for each of us to run our teams while having an assistant coach to step in and help out, or cover for the other coach when he or she is gone. I understood that you had stipulated to this during our meetings with Toby and also with the email he sent on July 16th about the training class for new supervisors. I do agree that going forward we will be able to make this program the best it can be.

If you like we can discuss further when I come in tomorrow night if you are able to get away for a little bit.

Thanks.

SC

On Jul 19, 2021 01:16, "Carvajal, Rosa" <RosaCarvajal@miamibeachfl.gov> wrote:

Steve,

Today I was reviewing a couple of emails and documents since we started the program together and I had an uneasy feeling regarding my role in the program.

I want to meet with you in person or we can speak over the phone regarding my concerns, but I wanted to inform you beforehand.

For whatever reason the Chiefs decided to select both of us to the program; as described by them during our selection meeting I can see why. You bring the institutional knowledge to the program and I can bring a "fresh look" to the program to bring innovation and help expand the program. As a team we can make the program the best it has ever been.

My perception is that there is a push for you to solely be in charge of the FTO program and for me to be in charge of the Probationary Supervisors. At this time you have taken a leadership role in pushing forward with the FTO program because I am still training and learning the intricacies of the FTL position. However, I do not want to be boxed in one role; I put in for FTL because of my passion for training new officers. Every decision, changes and progress with the FTO program and the Probationary Supervisor Program should be reviewed by both of us equally and before anything is officially sent out it should be agreed upon by both of us. Here are a few things that have not been conferred with me about for final decision:

- PPO Assignments to FTOs – I would like to have input
- SBT scenarios and New Supervisor Scenarios
- Interview questions
- Meeting Agenda (Last week I had a list of items to

discuss but it appears you have an agenda already)

I do want to clarify that in now way I am saying that this is intentional or that there is a hidden agenda to make this happen. I think because of the many tasks at hand this is the path of least resistance to keep pushing forward without failing the program and PPOs. As I continue to learn I want my voice to be heard to make sure you and I are on the same page and understand that we are 50/50 responsible for both programs.

My dream for the programs and the Department in general is that we are fair and provide our officers opportunities to improve.

Let me know when you want to meet so I can plan ahead.

Stay safe and thank you,

<image001.jpg>

**Rosa Carvajal, Lieutenant**

MIAMI BEACH POLICE DEPARTMENT

Operations Division

1100 Washington Ave, Miami Beach, FL 33139

Tel: 305-673-7776, ext. 3971 Fax: 786-394-4857

rosacarvajal@miamibeachfl.gov

**Mission:** *Prevent crime and enhance public safety*.

**Vision:** *We aspire to be a world-class agency, which protects our diverse community and serves as a model for character, innovation and service to meet the challenges of tomorrow.*

**Values:** *Professional, Accountable, Honest and Proud.*

# EXHIBIT I



MIAMIBEACH

# POLICE

MEMORANDUM
OPERATIONS DIVISION

TO:     File

FROM:   Captain Daniel Morgalo

DATE:   December 15, 2020

SUBJECT:  Gender Discrimination Allegation

On October 15th, 2020, I initiated a Teams Meeting with Lieutenant Rosa Carvajal at her request. During the meeting, Lt. Carvajal related to me three incidents which had occurred in the preceding days during which she believed she had been treated in an unprofessional and disrespectful manner by three fellow supervisors. Lt. Carvajal stated that she had been treated in a disrespectful manner by Sergeants Kenneth Bolduc and Timothy Roll and Lieutenant Andrew Dohler in three separate instances and she believed this treatment was based on her gender. Lt. Carvajal did not relate any specific statements or actions which alluded to her perception that these incidents were motivated by her gender, however, she was adamant that the disparaging treatment by her fellow supervisors was based on her gender. Lt. Carvajal did not identify any employees who may have witnessed the interactions she was relaying to me.

During the conversation, I explained to Lt. Carvajal that our department policy related to discrimination and harassment provides numerous options for how we can proceed forward in this inquiry. I explained that if she felt comfortable, she may confront the supervisors in question directly, she could have me speak to these supervisors on her behalf, she could file an EEOC complaint directly with HR or she could have this allegation formally investigated by the Internal Affairs Unit. Lt. Carvajal declined to have the allegation formally investigated by Internal Affairs and asked me to speak to the supervisors in question and advise them how their interaction with Lt. Carvajal made her feel with the intent to bring their attention to agency policies, discourage any further negative interactions and improve the work environment moving forward.

I advised Lt. Carvajal that in accordance with law and agency policies, she and all employees of the department are entitled to work in an environment free from any type of discrimination, real or perceived. I ended the conversation by promising to speak with all the supervisors in question and follow up with her. I asked that she diligently document any further incidents which may occur and immediately report them to me immediately.

Once Lt. Carvajal acknowledged that she was satisfied with the plan to address her concerns, the meeting was concluded.

In the ensuing days, I first spoke to Sergeant Kenneth Bolduc and brought to his attention that he had been involved in an interaction with Lt. Carvajal during which his behavior left Lieutenant Carvajal feeling as if he was not affording her the proper courtesy and respect she was entitled to as an officer of superior rank to him because she was a female. Additionally, I advised Sgt. Bolduc that Lt. Carvajal declined to have a formal complaint filed in this instance and asked me to bring this negative perception of his behavior to his attention in the hopes that it would improve their professional interactions moving forward. Sgt. Bolduc made no admission of wrongdoing and was apologetic that the Lieutenant felt that he had acted in an unprofessional manner. He assured me that he had no ill feelings toward Lieutenant Carvajal and would apologize to her in an effort to resolve this incident.

I subsequently spoke to Sergeant Tim Roll and brought to his attention that he had been involved in an interaction with Lt. Carvajal during which his behavior left Lieutenant Carvajal feeling as if he was not affording her the proper courtesy and respect she was entitled to as an officer of superior rank to him because she was a female. Sgt. Roll made no admissions of wrongdoing and did not recall any specific instances where he had treated Lt. Carvajal in a discourteous manner. Sgt. Roll assured me that he would never treat Lt. Carvajal in a disrespectful or unprofessional manner and assured me he would endeavor to treat her with the utmost courtesy and respect moving forward.

I subsequently spoke to Lt. Dohler and brought to his attention that he had been involved in an interaction with Lt. Carvajal during which his behavior left Lieutenant Carvajal feeling as if he was not affording her the proper courtesy and respect she was entitled to as an officer of equal rank to him because she was a female. I advised Lt. Dohler that Lt. Carvajal declined to have a formal complaint filed in this instance and asked me to bring this negative perception of his behavior to his attention in the hopes that it would improve their professional interactions moving forward. Lt Dohler did not recall any specific instance where he had treated Lt. Carvajal in an unprofessional manner and made no admissions of wrongdoing. Lt. Dohler assured me that he would be careful in his future interactions with Lt. Carvajal to avoid any perceived discourtesy on Lt. Carvajal's part.

After speaking with all the involved parties, I briefed Lt. Carvajal on the outcome and she expressed that there had been no further negative interactions with these or any other employees since our initial conversation. Lt. Carvajal was satisfied with how these allegations were addressed and did not request any further action be taken. I asked that she immediately report any future incidents to me, her immediate supervisors or to any of the named entities in the department policy.

# EXHIBIT J



Memorandum
Office of the Chief of Police

**To:** Major H. Doce
Captain M. Rivero
Lieutenant S. Cosner
Lieutenant R. Carvajal

**From:** Chief Richard M. Clements

**Date:** March 15, 2022

**Subject:** **Structure of the Field Training Program (FTP)**

Effective immediately, and upon receipt of this memorandum, and until this memorandum or Department policy or procedure are otherwise rescinded or modified, the Department's Post Academy Orientation Program and the Field Training Program (or FTP) and are structured as follows:

- An eight-week Post Orientation Program, to include a one-week Scenario based training component, and
- A fourteen-week Field Training Program (FTP).
- A Probationary Police Officer (PPO) Neighborhood/Area Concern Project.

A Captain, who will be appointed by the Chief of Police, will oversee and evaluate the administrative functions of the FTP. At this time, Captain Marlen Rivero will assume that role and be charged with coordinating this effort. Captain Rivero will ensure that:

- Administrative duties are distributed accordingly by area of assignment.
- Ensure that the facets of the program remain current.
- Coordinate FTP meetings and address all FTP related issues.
- Oversee the Field Training Sergeant (FTS) and Field Training Officer (FTO) meetings.
- Approve of all PPO phase assignment (in coordination with both FTP Lieutenants)
- Oversee the FTS and FTO selection process.

As for the overall training program, Lieutenant Carvajal will assume the lead role in the eight-week (8) Post Academy Training. During this stage, she will liaison with the Training Unit on FTP relevant aspects addressed during this orientation period. These aspects include:

- Coordinating remedial training issues/deficiencies encountered and identified, during the eight-week post orientation program (to also include the SBT component) and the fourteen-week FTP.
- Coordinating remedial training issues/deficiencies encountered and identified
- Coordinating the one-week Scenario Based Training (or SBT) that concludes the post orientation process.

- Coordinate the Probationary Police Officer Neighborhood/Area Concern Project near the completion of the PPO's probationary period.

As soon as Probationary Police Officers (PPO) are released from the Post Academy eight-week (8) training program, they will enter the fourteen-week (14) FTP.  Lieutenant Cosner will assume the lead in this stage of their training.

Lieutenant Cosner will lead and monitor the day-to-day intricacies of the FTP fourteen-week program and will oversee the following:

- Review of the Daily Observation Reports (DOR's) submitted by the Field Training Officer FTO).
- Lead the discussion regarding the DORs at meetings with the Captain, Lieutenant Carvajal, the FTS' and FTO's associated with the FTP program.
- Identify training and performance deficiencies, document and report the same, and bring them forth to Captain Rivero and Lieutenant Carvajal for follow-up.
- Lead the effort to properly place PPOs with the appropriate FTOs during the different stages of the FTP fourteen-week training program.
- Coordinate final PPO review of the entire FTP program (to include the eight-week post training, the fourteen-week FTP training, and the Neighborhood Project).

Further, Lieutenant Carvajal will also oversee the periodic training for newly promoted Lieutenants and Sergeants.

Finally, Lieutenants Cosner and Carvajal will perform all FTP duties and responsibilities in strict compliance with Department Standard Operating Procedure #104, Field Training Program and Probationary Period Review. This means that Lieutenants Cosner and Carvajal will work together and in a professional manner. I expect that in the event of a dispute, they will work together professionally, as leaders should. In the event of a dispute that cannot be resolved, they will bring their dispute to the Captain for resolution.

**AGREEMENT**

**BETWEEN**


**CITY OF MIAMI BEACH, FLORIDA**


**and**


**MIAMI BEACH FRATERNAL ORDER OF POLICE**

**WILLIAM NICHOLS LODGE NO. 8**



**Period Covered**

**October 1, 2018 through September 30, 2021**

**Exhibit**

**5**

Clements 4/23/2024 J.E.

City 001694

**TABLE OF CONTENT**

**PAGE NUMBER**

**AGREEMENT & PREAMBLE**................................................................................................1

**ARTICLE 1.   RECOGNITION** ........................................................................................2

**ARTICLE 2.   DEDUCTION OF DUES** ...........................................................................3
Section 2.1.   Check-off ..............................................................................................3
Section 2.2.   Legal Services Trust Fund ...................................................................3
Section 2.3.   Indemnification. ....................................................................................4

**ARTICLE 3.   GRIEVANCE PROCEDURE** .....................................................................5

Section 3.1.   Definition of Grievance and Time Limit for Filing ...............................5
Section 3.2.   Grievance Procedure ...........................................................................5
     Step 1.........................................................................................................5
     Step 2.........................................................................................................5
     Step 3.........................................................................................................6
Section 3.3.   Binding Arbitration ................................................................................6
Section 3.4.   Authority of Arbitrator ...........................................................................6
Section 3.5.   Expenses of Arbitration ........................................................................7
Section 3.6.   Processing Grievances .........................................................................7
Section 3.7.   Election of Remedies. ...........................................................................7
Section 3.8.   Probationary Period ..............................................................................7
Section 3.9.   FOP Grievance Committee ...................................................................8
Section 3.10. Waiver of Time Limitations or Steps .....................................................8

**ARTICLE 4.   NO STRIKE AND NO LOCKOUT** ............................................................9
Section 4.1.   No Strike................................................................................................9
Section 4.2.   No Lockout ............................................................................................9

**ARTICLE 5.   MANAGEMENT RIGHTS** .........................................................................10

**ARTICLE 6.   POLICE EQUIPMENT** ..............................................................................11

**ARTICLE 7.   HOURS OF WORK AND OVERTIME**........................................................12
Section 7.1.   Purpose .................................................................................................12
Section 7.2.   Normal Workweek .................................................................................12
Section 7.3.   Four-Day Workweek ..............................................................................12
Section 7.4.   Weekly Overtime ...................................................................................12
Section 7.5.   Distribution of Overtime Opportunity ....................................................13
Section 7.6.   No Pyramiding. ......................................................................................14

City 001695

**TABLE OF CONTENT**

<u>PAGE NUMBER</u>

**ARTICLE 8.    WAGES AND FRINGE BENEFITS**……………………………………………… 15
   Section 8.1.    Across-the-Board Wage Increases ...……………………………………15
   Section 8.2.    Police Vehicle Policy.......................................................................... 15
   Section 8.3.    Compensation Plan ...............................................................…........ 17
   Section 8.4.    Step and Longevity Increases ..............................................………18
   Section 8.5.    Shift Differential ....................................................................………18
   Section 8.6.    Hazardous Duty Pay ............................................................……… 19
   Section 8.7.    Holidays................................................................................……… 19
   Section 8.8.    Vacation Benefits .........................................................................…19
   Section 8.9.    Sick and Vacation Leave Accrual and Payment on Termination ……….20
   Section 8.10.   Sick Leave Sell Back Program........................................................20
   Section 8.11    Bereavement ................................................................................ 21
   Section 8.12.   Court Time Compensation ............................................................21
   Section 8.13.   Out-Of-Classification Pay..............................................................22
   Section 8.14.   Standby Pay ................................................................................. 22
   Section 8.15.   Call-In Pay, On-Call Pay and Telephone Calls …………………………… 22
   Section 8.16.   Sunglasses and Prescription Glasses...........................................23
   Section 8.17.   Field Training Officer .................................................................... 23
   Section 8.18.   Injury Service Connected (ISC)..................................................... 23
   Section 8.19.   Special Assignment Allowance ..................................................... 24
   Section 8.20.   Extra Weapon .............................................................................. 24
   Section 8.21.   Quality of Life................................................................................ 25
   Section 8.22.   Forced Holdover ........................................................................... 25
   Section 8.23.   Pension  ........................................................................................ 25
   Section 8.24.   Premium Pay Supplement Contingent Upon the Department Obtaining and Maintaining Certain Accreditations ..............................................33
   Section 8.25.   Buyback of Probationary Time .......................................................33
   Section 8.26.   "Me Too" with the IAFF ................................................................. 34
   Section 8.27.   CJSTC Police Instructor Incentive Pay ........................................ 34
   Section 8.28    Second Language Pay ..................................................................35
   Section 8.29    Arson Investigator (Certified) ........................................................35
   Section 8.30    Arson Investigator (Trainee) .........................................................35
   Section 8.31    Drug Recognition Expert (DRE) ....................................................36
   Section 8.32    CJIS Pay ......................................................................................36
   Section 8.33    Crisis Intervention Team (CIT) ......................................................36
   Section 8.34    Marine Pay ...................................................................................36

**ARTICLE 9.    FOP HEALTH TRUST** ...................................................................... 37
   Section 9.1. ............................................................................................................37
   Section 9.2. ............................................................................................................38

City 001696

**TABLE OF CONTENT**

                                                                              **PAGE NUMBER**

Section 9.3. ...................................................................................................38
Section 9.4   Health Trust Plan.....................................................................39
Section 9.5   Indemnification .......................................................................39
Section 9.6   Employment Eligibility .............................................................39
Section 9.7   Post Employment Coverage ....................................................39
Section 9.8   Voluntary Benefits Plan ...........................................................39
Section 9.9   Post Employment Health Program (PEHP)...............................39

**ARTICLE 10.  EDUCATIONAL LEAVE AND TUITION REFUND**...........................................41

**ARTICLE 11.  GENERAL PROVISIONS**
Section 11.1.   Safety and Health ..................................................................42
Section 11.2.   FOP Activity and Non-Discrimination .....................................42
Section 11.3.   Reduction In Work Force .......................................................42
Section 11.4.   Uniforms and Clothing Allowance ..........................................43
Section 11.5.   Disclosure of Records ...........................................................43
Section 11.6.   Transfers ...............................................................................44
Section 11.7.   Meeting Between Parties .......................................................44
Section 11.8.   Negotiating Sessions .............................................................44
Section 11.9.   Job Descriptions ....................................................................44
Section 11.10. Defense of Members ..............................................................44
Section 11.11. Personnel Rules and Departmental Manual.............................45
Section 11.12. Incorporation of Personnel Rules ...........................................45
Section 11.13. Medical Leave of Absence .....................................................45

**ARTICLE 12.  SEPARABILITY** ................................................................46

**ARTICLE 13.  TIME BANK**........................................................................47

**ARTICLE 14.  DRUG TESTING** ................................................................49

**ARTICLE 15.  DISEASE PRESUMPTION** ................................................ 51

**ARTICLE 16.  PROMOTIONS** ................................................................. 53
Section 16.1. ................................................................................................ 53
Section 16.2. ................................................................................................ 53
Section 16.3. ................................................................................................ 53
Section 16.4. ................................................................................................ 54
Section 16.5.   Seniority Points......................................................................54
Section 16.6.   Education Points.....................................................................54

City 001697

## TABLE OF CONTENT

<u>**PAGE NUMBER**</u>

Section 16.7.   Book Committee ........................................................................ 55
Section 16.8.   Written Test Scoring ..................................................................55
Section 16.9.   Assessment Center Test Challenges ......................................... 56
Section 16.10. .................................................................................................56
Section 16.11. ................................................................................................. 56
Section 16.12  Promotional Eligibility for Employees Under Investigation ..........................57

**ARTICLE 17.  FOP PRESIDENT** ............................................................................ 58
Section 17.1. .................................................................................................. 58
Section 17.2. .................................................................................................. 58
Section 17.3. .................................................................................................. 59

**ARTICLE 18.  COMPENSATORY TIME** ................................................................ 60

**ARTICLE 19.  ENTIRE AGREEMENT** ................................................................ 61

**ARTICLE 20.  TERM OF AGREEMENT** ................................................................62

**ELECTION OF REMEDY FORM** ........................................................................ 63

**HEARING EXAMINER RULES** ……….................................................................. 64

**APPENDIX A – COMPENSATION PLAN** ……….....................................................……...66

City 001698

## **AGREEMENT**

THIS AGREEMENT, made and entered into this __ day of _____, 2019, by and between the CITY OF MIAMI BEACH, FLORIDA (herein called the "City"), and the MIAMI BEACH FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 (herein called the "FOP").

## **PREAMBLE**

WHEREAS, the FOP has been selected as the sole and exclusive bargaining representative by a majority of employees in the certified bargaining unit set forth in Article 1, and has been recognized by the City pursuant to the laws of the State of Florida as the sole and exclusive bargaining representative for said employees; and

WHEREAS, it is the intention of the parties to this Agreement to provide in manner which is binding and superior to ordinances and personnel rules of the City, for a salary schedule, fringe benefits, and conditions of employment of the employees covered by this Agreement, and to provide for the continued and efficient operation of the City's Police Department; and to provide for an orderly and prompt method of handling and processing grievances; and

WHEREAS, the FOP and the City agree to seek and maintain high standards for the operation of the Police Department;

NOW, THEREFORE, the parties agree as follows:

FOP - 1

City 001699

**ARTICLE 1**
**RECOGNITION**

The City recognizes the FOP as the sole and exclusive bargaining representative for the purpose of wages, hours, and other terms and conditions of employment for employees in the following classifications in the Police Department (hereafter "employees"):

Trainees

Police Officers

Sergeants of Police

Lieutenant of Police

Detention Officers

All other employees in other existing classifications are specially excluded.

City 001700

**ARTICLE 2**
**DEDUCTION OF DUES**

**Section 2.1 – Check-off**

Upon receipt of a lawfully executed written authorization from an employee which is presented to the City by an official designated by the FOP in writing, the City agrees during the term of this Agreement to deduct biweekly FOP dues of such employees from their pay and remit such deductions to the FOP Treasurer within fourteen (14) calendar days however, such authorization is revocable at the employee's will upon thirty (30) days' written notice to the City and the FOP. The City shall deduct the dues from the FOP members who have authorized such a deduction in the following manner:  Each member's biweekly wages shall be reduced by the amount equal to one and one half percent (1.5%) of the annual minimum of the pay range of the Police Officer Classification, divided by twenty-six (26) pay periods.

For example:
The current annual minimum for the Police Officer Classification is $53,309.01.
$53,309.01 x .015=$799.64 / 26 = $30.76
$30.76 shall be deducted biweekly from the member's paycheck.

The FOP shall be responsible for advising the City of any change in the percentage of dues calculation in writing.  The City shall revise the calculation for each authorized deduction whenever a change to the annual minimum of the pay range of the Police Officer Classification is made, or whenever so notified in writing by the FOP of a change in the percentage.

The City agrees to use diligence in making prompt delivery of monies owed to the FOP.  The charge for dues deductions shall be calculated by multiplying one average run of check-offs by four (4) and multiplying the product by seven cents ($0.07).  The City shall notify the FOP of the amount owed no later than September 1 of each year.  The FOP shall make payment to the City no later than September 30 of each year.  The FOP will notify the City in writing of the exact amount of such uniform membership dues to be deducted.  The FOP will notify the City thirty (30) days prior to any change in its dues structure or if there are additions or deletions to the established check-off list.

**Section 2.2 – Legal Services Trust Fund**

 If the FOP establishes a Legal Services Trust Fund, upon receipt of a lawfully executed written authorization from an employee which is presented to the City by an official designated by the FOP in writing, the City agrees during the term of this Agreement to take biweekly deductions from such employees from their pay and remit such deductions to the Trustee within fourteen (14) calendar days; however, such authorization is revocable at the employee's will upon thirty (30)

City 001701

days' written notice to the City and the FOP. There will be no charge to the FOP for Legal Services Trust Fund deductions.

The FOP will notify the City in writing of the exact amount of such uniform Legal Services Trust Fund deductions.  The FOP will notify the City thirty (30) days prior to any change in the deduction structure or if there are additions or deletions to the established Legal Services Trust Fund deduction structure.

## Section 2.3 – Indemnification

The FOP agrees to indemnify and to hold the City harmless against any and all claims, suits, orders, or judgments brought or issued against the City as a result of any action taken or not taken by the City under the provisions of this Article; provided, that the City will not be indemnified or held harmless for any intentional tort.  This indemnification is not intended to cover claims made by, or on behalf of the FOP.

City 001702

**ARTICLE 3**
**GRIEVANCE PROCEDURE**

**Section 3.1 – Definition of Grievance and Time Limit for Filing**

A grievance is a dispute involving the interpretation or application of the express terms of this Agreement, excluding matters not covered by this Agreement; or where Personnel Board rules and regulations are involved; provided that disciplinary actions, including discharges, may be grieved under this Article, as provided herein.   See Section 3.7 (Election of Remedies) for procedures to be utilized in particular circumstances.   No grievance shall be entertained or processed unless it is submitted within twenty (20) workdays (excluding Saturday, Sunday, or holidays recognized by the City) after the occurrence of the first event giving rise to the grievance or within  twenty (20) workdays after the employee, through the use of reasonable diligence, should have obtained knowledge of the occurrence of the first event giving rise to the grievance.

**Section 3.2 – Grievance Procedure**

The FOP shall have the right to initiate and process grievances on its own behalf or on behalf of named members of the bargaining unit.   However, the FOP shall have the right in its sole discretion not to process grievances on behalf of bargaining unit members who are not members of the FOP, provided it notifies said employee of its decision not to proceed.  Grievances shall be processed, individually, as follows:

> **Step 1**: The grievance shall be presented, in writing on the Grievance Form supplied by the City, to the employee's unit or division commander or a designated representative, who shall answer within five (5) workdays after such receipt. The employee will also provide the FOP with a copy of said grievance.

> **Step 2**: If the grievance is brought by the FOP on its own behalf, or if the grievance is brought on behalf of an individual(s) and is not settled in Step 1 and an appeal is desired, it shall be referred in writing to the Police Chief or his designee.  The Election of Remedy Form shall be completed and signed by the FOP and/or the grievant, and attached to the Step 2 grievance.  The Police Chief shall discuss the grievance within ten (10) workdays with the employee and the FOP grievance committee at a time designated by the Police Chief.  If no settlement is reached, the Police Chief shall give the City's written answer to the employee and the FOP grievance committee within five (5) workdays following their meeting.

> **Step 3**: If the grievance is not settled in Step 2 and both the employee and FOP grievance committee desire to appeal, or if it is a class grievance filed by the

City 001703

FOP and at least one employee of the named class and FOP grievance committee desire to appeal, it shall be appealed in writing to the City Manager or his designee for Labor Relations within fifteen (15) workdays after the City's answer in Step 2.  Within fifteen (15) workdays after the grievance is submitted is to HR, the parties shall confer to pick a neutral third-party as a mediator. After the mediator is selected, the parties shall schedule a mediation, which shall happen within thirty (30) workdays after the selection of the mediator. The parties can agree to extend this deadline, and it is understood that the selected mediator's schedule may require an extension. The parties shall evenly split the costs of the mediator. The rules of mediation that are applicable in the Florida Courts shall apply, in full. For the avoidance of confusion, this means that anything and everything discussed during mediation is confidential and may not be introduced in any other proceeding, ever. This confidentiality provision shall be interpreted as inclusive. Both parties must have a decision-maker present at the mediation. If the parties are unable to resolve the matter at mediation the mediator shall declare an impasse.

## Section 3.3 – Binding Arbitration

If the grievance is not resolved in Step 3 of the grievance procedure, the FOP grievance committee may refer the grievance to binding arbitration within fifteen (15) workdays after the declaration of impasse from Step 3. The parties may select an arbitrator by mutual agreement. Nonetheless, the parties shall jointly request the Federal Mediation and Conciliation Service to submit a panel of five (5) arbitrators.  Both the City and the FOP shall have the right to strike two names.  The name remaining after the last party strikes shall be the arbitrator.  The parties shall notify the arbitrator of their selection and request the arbitrator's availability for a hear.

Written reprimands shall be settled at Step III.

## Section 3.4 – Authority of Arbitrator

The arbitrator shall have no right to amend, modify, ignore, add to, or subtract from the provisions of this Agreement.  He shall consider and decide only the specific issue submitted to him in writing by the City and the FOP and shall have no authority to make a decision on any other issue not so submitted to him.  The arbitrator shall submit in writing his decision within thirty (30) days following the submission of briefs by the parties. Either party may elect to make a closing argument at the hearing. A party can BOTH make a closing argument and submit a written brief. Written briefs shall be due on a date agreed to by the parties. The parties may agree to extend the deadline for submission of written briefs, and the deadline for the decision from the arbitrator.

City 001704

The decision shall be based solely upon his interpretation of the meaning or application of the express terms of this Agreement to the facts of the grievance presented.  If the arbitrator acts in accordance with this Section, the decision of the arbitrator shall be final and binding.

## Section 3.5 – Expenses of Arbitration

The fee and expenses of the arbitrator and the cost of a court reporter's attendance and written transcript shall be divided equally between the City and the FOP; provided, however, each party shall be responsible for compensating its own representatives or witnesses.

## Section 3.6 – Processing Grievances

All grievance discussions and investigations shall take place in a manner which does not interfere with the operation of the Police Department.  Any time spent by the Grievance Committee of the FOP in discussions or processing grievances at Step 1, 2, or 3 during their working hours shall not result in a loss of earnings or benefits.

## Section 3.7 – Election of Remedies

Disciplinary actions may be grieved (1) under the grievance/arbitration provisions contained in this Article or (2) to a Hearing Examiner, who shall be selected by utilizing the procedures outlined in Section 3.3 of this Article.  A grievance involving the interpretation or application of this Agreement may be grieved solely under the grievance/arbitration provisions contained in this Article.  Grievances regarding certain non-disciplinary matters, such as disagreements as to the waiving or application of changes to personnel rules or other work rules or policies may be filed via the Personnel Board procedures.

The decision of the hearing officer shall be final & binding.  The cost of a Hearing Examiner shall be borne by the City.  Any proceedings before the Hearing Examiner shall be conducted pursuant to the attached Hearing Examiner Rules.

## Section 3.8 – Probationary Period

Nothing herein shall in any way affect the discretion presently accorded the Police Chief with respect to employees in their probationary period following hire or in their probationary period following promotion.  It is specifically understood by the parties that the exercise of the Police Chief's discretion in this regard shall not in any way be subject to the grievance procedure set forth herein. Newly hired employees shall remain in probationary status for twelve (12) months after completion of the Field Training Officer (FTO) program and have no right to utilize the

City 001705

grievance procedure for any matter concerning discharge, suspension or other discipline during such period.

Employees promoted to the rank of Sergeant of Police or Lieutenant of Police shall remain in probationary status for nine (9) months after completion of the Supervisor FTO program designed by the Chief of Police, with input from the Union. In no event will the Supervisor FTO program be longer than eight (8) weeks.

### Section 3.9 – FOP Grievance Committee

The FOP shall appoint a Grievance Committee of not more than three (3) members, and shall notify in writing the Police Chief and the City Manager's designee for Labor Relations of the name or names of the employee or employees serving on this committee and of any changes in the numbers of this committee.  The members of this committee may not conduct any investigation while on duty without receiving the permission of the Police Chief, or in his absence, the duly authorized representative acting in his behalf; however, such permission shall not be unreasonably withheld.  Department clerical personnel will not be used by the grievance committee in grievance matters.  The grievance committee shall not unreasonably use other departmental resources for the purpose of conducting grievance-related work.

### Section 3.10 – Waiver of Time Limitations or Steps

The parties may mutually agree in writing to extend any of the time limitations set forth above for the processing of grievances and may also waive any of the intermediate steps of the grievance procedure in writing.

City 001706

**ARTICLE 4**
**NO STRIKE AND NO LOCKOUT**

**Section 4.1 – No Strike**

The parties hereby recognize the provisions of Chapter 447, Florida Statutes, which define strikes, prohibit strikes, and establish penalties in the case of a strike, and incorporate those statutory provisions herein by reference.

**Section 4.2 – No Lockout**

The City will not lockout any employees during the term of this Agreement as a result of a labor dispute with the FOP.

City 001707

**ARTICLE 5**
**MANAGEMENT RIGHTS**

It is recognized that except as stated herein, the City shall retain all rights and authority necessary for it to operate and direct the affairs of the City and the Police Department in all of its various aspects, including, but not limited to, the right to direct the work force; to plan, direct, and control all the operations and services of the Police Department; to determine the methods, means, organizations, and personnel by which such operations and services are to be conducted; to assign and transfer employees; to schedule the working hours; to hire and promote; to demote, suspend, discipline or discharge for just cause, or relieve employees due to lack of work or for other legitimate reasons; to make and enforce reasonable rules and regulations; to change or eliminate existing methods, equipment, or facilities; provided, however, that the exercise of any of the above rights shall not conflict with any of the expressed written provisions of this Agreement and that a grievance may be filed alleging such a conflict.

The City shall not employ more than eighty (80) Reserve Police Officers.  No Reserve Police Officers will be authorized to perform off-duty work as a police officer, unless reasonable efforts to fill an off-duty job with bargaining unit member fails.  Reserve Officers shall be compensated one dollar ($1.00) per fiscal year. The cap on reserve officers can be adjusted by mutual agreement of the City Manager or designee and FOP President.

Should the Department determine, in the discretion of the Chief with the concurrence of the FOP President, to utilize reserve officers to staff special events or other circumstances, such reserve officers will be compensated by the City at the prevailing off-duty rate.

City 001708

**ARTICLE 6**
**POLICE EQUIPMENT**

The City agrees to issue equipment which includes four sets of class B and E uniform shirts and pants or shorts on annual basis. Footwear, duty gear, department issued weapons, ammunition, handcuffs, expandable batons, light and heavy jackets, rain gear and traffic templates, shall be issued as needed.  Additionally, the City will supply an initial issue whistle to all patrol officers. To the extent that a flashlight is a required article of equipment, the City shall provide it.  The City will reimburse employees for the cost of replacement of protective vests up to a maximum of $750.00, when needed. However, as long as the City is a recipient of the U.S. Department of Justice Bulletproof Vest Partnership (BVP) Grant, the City will reimburse employees for the cost of replacement of protective vests up to a maximum of $1,000.00, when needed.  If the City is no longer a recipient of the BVP Grant, then the reimbursement rate shall be $750.00.

If the Department transitions to new or different types of equipment, all employees shall receive the equipment and applicable training within one (1) year of the transition or within a reasonable timeframe.

Necessary ammunition will be issued to each employee every twelve (12) months to guarantee reliability of the ammunition.

**Retiree Service Weapon**

A bargaining unit member who retires in good standing from the City shall receive his/her service firearm upon retirement or upon separation from the Police Officer Reserve Program, provided that the member does not retire in lieu of termination.  The Police Chief (or designee) shall have the right to deny this benefit for any justifiable reason to be approved in conjunctions with the Human Resources Director (or designee).

All bargaining unit members who retire due to in-service connected injuries/disabilities regardless of creditable years of service with the City's Police Department shall be eligible to receive their service firearm.  Any sworn employee who retires and remains as a reserve police officer shall receive his or her retiree weapon when they separate from the Police Officer Reserve Program.

Note:  The Chief of Police may require the wearing of body armor at any time in response to specific events or threats. When the Chief directs that it be worn, members will wear only body armor authorized or approved by the Department. Members who do not have body armor will not be required to wear any, until the Department either supplies it to them or reimburses their purchased and approved body armor.

City 001709

**ARTICLE 7**
**HOURS OF WORK AND OVERTIME**

**Section 7.1 – Purpose**

This Article is intended to define the normal hours of work and to provide the basis for the calculation and payment of overtime.  It shall not be construed as a guarantee of hours of work per day or per week, or of days of work per week.

**Section 7.2 – Normal Workweek**

The normal workweek shall consist of forty (40) hours per week and such additional time (subject to Section 7.4 and 7.5 below) as may, from time to time, be required in the judgment of the City to serve the citizens of the City.  The workweek shall begin with the employee's first regular shift each week.  All hours scheduled in the normal workday will be consecutive.  An employee called in early in advance of his normal shift starting time will not be sent home early on such day for the purpose of avoiding overtime unless such employee is in agreement with the request to leave early; provided, however, that except as limited by Section 7.3 below, the City shall retain its right to establish and modify normal work schedules.

**Section 7.3 – Four-Day Workweek**

The City shall extend the present policy of a four (4) day workweek to all employees in the bargaining unit except employees on light duty because of injuries or illness which are not service connected.  Employees who suffered a service connected injury or illness and who are permitted to work light duty may work up to thirty-two (32) weeks, measured non-consecutively from the date of injury, on light duty on a 4-10 schedule, or to receive ISC payments for thirty-two (32) weeks, or a combination of both.  Thereafter, the officer may be assigned to work a 5-8's shift in a light duty assignment during the pendency of his/her light duty.

Positions occupied by employees who are permitted to elect either a 4-10 or a 5-8 work schedule shall continue on that basis.

Detention Officers shall continue to work a 5-8 work schedule.

**Section 7.4 – Weekly Overtime**

Any member of the bargaining unit required to perform work outside of his/her regularly assigned shift shall receive pay at time-and-one-half their current hourly rate, subject to the provisions of the following paragraph.

City 001710

The parties understand and agree that Section 207(k) of the Fair Labor Standards Act Regulations shall apply to hours of work for employees covered under this agreement. Accordingly, the normal biweekly work period shall consist of eighty (80) hours in a fourteen (14) day period.  Hours worked in excess of the eighty (80) hour biweekly work period shall be compensated at the rate of one and one-half times the employee's regular rate of pay; however, sick leave, excluding sick leave taken under the Family and Medical Leave Act (FMLA) and court sick leave (only after having worked at least sixteen (16) consecutive hours), shall not count as hours worked for purposes of overtime calculation.  Leave without pay, excluding leave taken under the Family and Medical Leave Act (FMLA), shall not count as hours worked for purposes of overtime calculation. Hours worked on an off-duty assignment shall not count as hours worked for purposes of overtime calculation.  All other hours in paid status shall count as hours worked for the purposes of overtime calculation.

### Section 7.5 – Distribution of Overtime Opportunity

    a)    Overtime is recognized as being of three (3) general types within the Police Department:

        1.    **Carry-over Overtime –** Overtime for work carried over from an employee's regular duty assignment (e.g., uniform officer on arrest; detectives' on-going investigations).  "Carry-over Overtime" shall not be subject to equal distribution rules.

        **2.**    **Staffing Overtime** – Overtime due to staffing needs.  Staffing Overtime shall be distributed on a rotating basis, as equally as practicably possible, among employees in the particular work unit who are qualified to perform the particular overtime work, by departmental seniority. The Staffing Overtime list must be exhausted before returning to the top of the list.

            Employees who are not in the particular work unit or division will not be assigned to Staffing Overtime unless reasonable attempts to assign employees from within the work unit or division have failed.

        3.    **Special Event Overtime** – Overtime for planned events or assignments.  Special Event Overtime shall be distributed on a rotating basis, as equally as practicably possible, among all sworn employees in the Department who are qualified to perform the particular overtime work, by departmental seniority. The Chief of Police will develop and maintain a list of recurring special events.  The

FOP - 13

City 001711

Union President will be notified of special event pre-action and post-action meetings; his or her attendance is optional

b)  Records for Staffing Overtime will be maintained at the Platoon or work section level. Records for Special Event Overtime will be maintained at the Department level.

c)  Pay for overtime work will be paid no later than  two (2) full pay periods following the pay period in which the overtime/court attendance slip is submitted and approved by the employee's supervisor.

**Section 7.6 – No Pyramiding**

Compensation shall not be paid more than once for the same hours with the exception of the assignment of "guaranteed minimum hours" provided for in Section 8.12, entitled Court Time Compensation, when the court time does not fall completely within the employee's regular shift or assigned overtime shift. In contrast, if the court time completely falls within the employee's regular or overtime shift, no guaranteed minimum court time hours shall be paid.

City 001712

**ARTICLE 8**
**WAGES AND FRINGE BENEFITS**

**Section 8.1 – Across-the-Board Wage Increases**

a) Effective with the first pay period ending in October 2018, there shall be a zero percent (0%) across-the-board wage increase.

b) Effective with the first pay period ending in April 1, 2020, there shall be a one percent (1%) across-the-board wage increase. This across-the-board wage increase shall increase the minimums and maximums of the pay ranges for those classifications covered by this Agreement.

c) Effective with the first pay period ending in April 1, 2021, there shall be a one percent (1%) across-the-board wage increase. This across-the-board wage increase shall increase the minimums and maximums of the pay ranges for those classifications covered by this Agreement.

**Section 8.2 – Police Vehicle Policy**

In an effort to reduce the long-term costs to the City in maintenance, repairs and liability, a take-home vehicle program will continue on a phased-in process to the extent that funds are available in compliance with State and Federal law from the Police Confiscated Fund.

Bargaining unit members who are participants in the Take-Home Vehicle Program as of October 1, 1997, shall continue in the Take-Home Vehicle Program as prescribed by the City Commission approved Policy and the Department S.O.P. Thereafter, priority for allocation of take-home cars shall be given to all eligible personnel by Departmental seniority.

To defray the operating expense incurred by the City as a result of the non-official use of take-home vehicles, employees shall be assessed a user fee. The fee shall be based on the location of their primary residence as shown below:

| LOCATION | BIWEEKLY FEE |
|---|---|
| Miami Beach | -0- |
| Dade County (other than Miami Beach) | $25.00 |
| Broward County | $30.00 |
| Palm Beach County (as limited below) | $45.00 or $75.00 |

The take-home vehicle program shall be available to any sworn officer who was hired before July 18th, 2001 [the ratification date of 2000-2003 Agreement] who resides in Miami-Dade or Broward County. Except as stated in this section, the take-home vehicle program shall not be available to any sworn officer who is hired on or after July 18th, 2001 [the ratification date of the 2000-2003

City 001713

Agreement] (except police applicants in the background process) and resides outside of Miami-Dade County but is available to a sworn officer who is living outside Miami-Dade County and moves back to Miami-Dade County.

As of July 2010, there were one hundred ten (110) cars allocated in the take home vehicle program for Broward County. Going forward, a number of vehicles to be determined (but no less than one hundred ten (110) vehicles) by the mutual agreement of the Police Chief and the FOP will be allocated for Broward County.

The four (4) police officers currently residing in Palm Beach County will be allowed to retain their take home cars and will continue to pay at their current rates (i.e., the $45.00 or $75.00 that applied to each of them respectively per the terms of the 2003-2006 Agreement) for their vehicles. When each one of these four (4) employees separate from City employment, the number of Palm Beach cars will be reduced as each employee leaves.  Whenever one (1) of the four (4) Palm Beach County cars is eliminated, the number of Broward County take home cars will be increased by that same number.

Employees may not park their cars in a location so as to circumvent the restrictions outlined in this section.

The Union agrees that each bargaining unit employee who is assigned a take-home vehicle will purchase at his or her expense an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, within 30 days of this effective date of this agreement. In addition, the employee must maintain an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, for so long as he or she is assigned a take-home vehicle. Employees who are initially assigned a take-home vehicle, subsequent to date of ratification of this agreement, shall be required to obtain and maintain an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, prior to vehicle assignment. Any employee without the required insurance coverage, as stipulated herein, may have the take-home vehicle privilege revoked at the City's discretion. If the insurance industry no longer provides the extended non-owner coverage endorsement or non-owner auto insurance coverage, there will be a re-opener in order for the City and Union to discuss the provisions set forth in this section only.

City 001714

**Section 8.3 – Compensation Plan**

a)     **Entry Level Pay - Hired on or after October 1, 1997**

      1.  Police Officer

          a)  Non-Certified Hire - A newly hired, non-certified Police Officer will be placed in the Police Officer Trainee Step 1 rate of pay while attending the Police Academy and until he/she receives notification of passing the State Certification examination. The pay period following the notification of passing the State Certification examination the bargaining unit employee will be placed in Police Officer Trainee Step 2 rate of pay for the duration of his/her first year of service. Upon completing his/her first year of service, in accordance with Section 5 below, the bargaining unit employee shall be placed in Step A.

          b)  Non-Florida Certified Hire Academy Required - A newly hired, Non-Florida certified Police Officer who is required to attend the Police Academy will be placed in the Police Officer Trainee Step 2 rate of pay while attending the Academy and until he/she receives notification of passing the State Certification examination. The pay period following the notification of passing the State Certification examination, the bargaining unit employee will be placed in Police Officer Trainee Step 3 rate of pay for the duration of his/her first year of service. Upon completing his/her first year of service, in accordance with Section 5 below, the bargaining unit employee shall be placed in Step A.

          c)  Certified Hire with less than one (1) year of experience - A newly hired Police Officer with less than one (1) year of experience who is not required to attend the Police Academy shall be placed in the Police Officer Trainee Step 3 rate of pay for his/her first six (6) months of service and Step A for the duration of his/her first year of service.

          d)  Certified Hire with or greater than one (1) year but less than three (3) years of experience - A newly hired Police Officer with or greater than one (1) year but less than three (3) years of experience shall be placed in Step A for the duration of his/her first year of service.

City 001715

e) Certified Hire with or greater than three (3) years of experience - A newly hired Police Officer with or greater than three (3) years of experience shall be placed in Step B for the duration of his/her first year of service.

2. <u>Detention Officer</u>
A newly hired Detention Officer will be placed in Step A of the pay scale for the duration of his/her first year of service.

b) **<u>State Certification Re-examination</u> –** In the event a newly hired Police Officer who is required to take the State Certification examination fails to pass said examination, he/she shall be placed on a leave of absence without pay until such time as he/she passes the State Certification examination. Said bargaining unit employee shall sign up for the next scheduled examination in the State of Florida and take the examination at his/her expense. In the event the bargaining unit employee fails the re-examination, his/her employment with the City shall terminate.

## Section 8.4 – Step and Longevity Increases

All step and longevity increases shall become effective on the payroll period commencing nearest the employee's anniversary date, as per current practice. A step increase shall be awarded based upon the employee receiving a satisfactory evaluation during that rating period, as per current practice.

Effective October 1, 2015, one (1) additional step (Step I) shall be added to the maximum pay range for the classification of Detention Officer. The additional step will increase the maximum of the range for the aforementioned classification by five percent (5%). The minimum pay range shall remain as is and there shall be no immediate pay increase for any employees. Those employees at the maximum of the range (Step H) as of October 1, 2015, will move into the new step (Step I) on October 1, 2015, with their anniversary date remaining unchanged. Thereafter, any employee in the aforementioned classification who is at the maximum step of the range, (Step H), shall be eligible to proceed to Step I upon reaching his or her next anniversary date.

## Section 8.5 – Shift Differential

At the time this Agreement was executed, the City maintained three standard shifts of work to-wit: a first shift starting at approximately 11:00 p.m.; a second shift (also called "Day Shift") starting at approximately 7:00 a.m.; and a third shift (also called "Afternoon Shift") starting at approximately 3:00 p.m.

If the City rearranges the shift scheduling or establishes any new shift, shift differential pay shall follow the below formula based on the time period in which a majority of hours are worked by the

City 001716

employee.  If a majority of the non-standard shift hours are after 3:00 p.m., all the shift differential pay for all post 3:00 p.m. hours, effective October 1, 2006, shall be seventy-five cents ($.75) per hour.  If a majority of the non-standard hours are after 11:00 p.m., all the shift differential pay for all post 11:00 p.m. hours, effective October 1, 2006 shall be one dollar ($1.00) per hour. However, effective September 30, 2015, if a majority of the non-standard shift hours are after 3:00 p.m., the shift differential pay for all post 3:00 p.m. hours shall be fifty cents ($.50) per hour, which shall be added the employee's hourly rate; and if a majority of the non-standard hours are after 11:00 p.m., the shift differential pay for all post 11:00 p.m. hours shall be seventy-five cents ($.75) per hour, which shall be added to the employee's hourly rate.

## Section 8.6 – Hazardous Duty Pay

All employees covered by this Agreement, shall receive hazardous duty pay in the amount of one hundred twenty-five dollars ($125) per pay period. Hazardous Duty Pay shall not be considered as pensionable earnings.

## Section 8.7 – Holidays

Consistent with the City Commission holiday resolution and current department practices, the holiday benefits presently enjoyed by the employees covered by this Agreement shall continue. Employees shall be paid double time for all hours worked on a holiday.  Employees whose regularly scheduled day off falls on a holiday shall be given another day off.

**The following holidays shall be recognized as follows:**

| Holidays | Recognized Date |
| --- | --- |
| New Year's Day* | January 1 |
| Independence Day | July 4 |
| Veterans Day | November 11 |
| Christmas Day* | December 25 |

**\*Effective the first full pay period upon ratification, members working midnight shift on Christmas Eve and New Year's Eve shall also be paid double time for all hours worked.**

## Section 8.8 – Vacation Benefits

Consistent with applicable ordinances, the vacation benefits presently enjoyed by the employees covered by this Agreement shall continue.  Employees shall be allowed to take vacation time off upon completion of their entry FTO program.

City 001717

In the event an employee is not allowed to take a vacation because of scheduling by the City, he will, at the option of the City, either be paid in lieu of vacation time not used, or be allowed to accumulate into the next calendar year pursuant to existing rules governing accumulation. However, in no event shall an employee be penalized by losing accumulated vacation time because he was unable to use it because of departmental needs. This Section shall not apply to sick leave accumulation.

## Section 8.9 – Sick and Vacation Leave Accrual and Payment on Termination

Effective upon ratification of this agreement, all employees covered by this Agreement shall, under applicable ordinances, rules, and regulations, be allowed to accrue no more than 500 hours on an annual basis, and, except in accordance with provisions for postponement of vacation leave as set forth in Article 8, Section 7, of this Agreement; be permitted to transfer sick leave in excess of 360 hours to vacation leave at the rate of two days' sick leave to one day vacation leave to be used in the pay period year when transferred; be permitted a maximum payment at time of termination, death, or retirement of, no more than 620 hours vacation leave and seventy-five percent (75%) of sick leave to a maximum of 620 hours.  Employees shall be permitted to carry vacation hours over the five hundred (500) hour cap until March 31st of the following year.

## Section 8.10 – Sick Leave Sell Back Program

An annual sick leave sell back program, payable on a dollar for dollar basis, has been established and implemented as stated in this section.  The annual sick leave sell back period shall cover each fiscal year, from October 1st to September 30th.  Payments for each annual sick leave sell back period will be made in the last pay period in November after the closing of the applicable sell back period.

The sick leave sell back program will allow qualified employees to sell back their annual sick leave accrual during the sell back period, minus any sick and emergency vacation leave utilized during the same period, to be reduced on an hour for hour basis., Employees who have completed twenty (20) years of service or more, before the start of the applicable sell back period, may sell back up to 136 hours minus any sick and emergency vacation leave utilized during the same period, to be reduced on an hour for hour basis.  Leave utilized under the Family and Medical Leave Act (FMLA) shall not reduce the sick leave sell back amount.

In order to qualify for participation in the sick leave sell back program, employees must: (1) Have been employed by the City throughout the entire sick leave sell back period being measured; and (2) Maintain at least three hundred (300) hours of combined accumulated sick and vacation leave, after each sell back date. Employees who have completed five (5) years of service or less, before the start of the applicable sell back period, must maintain at least two hundred (200) hours of combined accumulated sick and vacation leave, after each sell back date. The sick leave hours

City 001718

sold back as part of this program cannot cause the employee's accumulated sick and vacation leave to fall below the aforementioned minimum established thresholds.

### Section 8.11 – Bereavement

When there is a death in the immediate family (mother, father, grandparents, grandchildren, current spouse's parents, brother, sister, current spouse, children or stepchildren or domestic partner as defined in the Domestic Partner Leave Ordinance of an employee), he or she shall be allowed four (4) days off for each death for the purpose of making arrangements and/or attending the funeral, without loss of pay and without charge to accrued sick leave or vacation days of said employee. At his or her request, the employee shall be provided two (2) additional work days off, which shall be charged to the employee's accrued sick or vacation leave bank.  In such circumstances, additional time off may be granted at the discretion of the Police Chief and shall be chargeable to the accrued sick or vacation leave of such employee.  Requests for additional time off shall be submitted in writing to the Police Chief.

The City shall be responsible for funeral expenses for any employee killed in the line of duty, up to a maximum of $20,000.

### Section 8.12 – Court Time Compensation

For attendance at court during off-duty hours for purposes related to employment with the City, employees shall be provided with time and one-half pay for such time spent at court with the following minimum hourly guarantees:

a) During an employee's off-duty hours, a minimum of four (4) hours per day shall be guaranteed until September 30, 2015, at which time the minimum hours per day shall decrease to three and one-half (3 ½) hours. However, if an employee's first court appearance begins within one (1) hour of the start of his/her regularly assigned shift or ends within one (1) hour after the end of his/her regularly assigned shift, a minimum of two (2) hours per day shall be guaranteed.

b) For the employee's second off-duty appearance in the same day, an additional two (2) hour minimum shall apply after the expiration of four hours (or two hours if the initial two-hour minimum was in effect).

c) For the employee's third off-duty appearance in the same day, an additional one (1) hour minimum shall apply after the expiration of six hours (or four hours if the initial two-hour minimum was in effect).

d) No Pyramiding.  Compensation shall not be paid more than once for the same hours.

City 001719

**Section 8.13 – Out-of-Classification Pay**

When an employee is assigned by the shift commander to perform at the level of a higher rank, he shall be paid for the duration of the assignment at an hourly rate of pay of  three dollars ($3.00) higher than his/her regular rate; provided that this shall in no way constitute an obligation to assign an employee to a higher classification under any circumstances and it is recognized that the City retains the right to determine when and for how long an employee will be temporarily assigned to a higher classification.

**Section 8.14 – Standby Pay**

When an employee is placed on standby during off-duty hours by order of the shift commander for the purpose of being available to return to duty to handle emergency crowd control or natural disasters, he will be paid one-half (1/2) of his regular base rate for all standby time up to a maximum of eight (8) full-time hours in a twenty-four (24) hour period, starting with the time he is notified to stand by.  Standby remuneration shall cease at the earlier of sixteen (16) hours in a twenty-four (24) hour period or when the employee is notified by order of the shift commander that the standby order is rescinded.  Standby hours shall not be considered as hours worked for purposes of overtime.

**Section 8.15 – Call-In Pay, On Call Pay, and Telephone Calls**

a. Call-In Pay

An employee who is called to perform work outside of his regularly assigned shift will be paid a minimum of two (2) hours' compensation at the straight time hourly rate or time and one-half the regular hourly rate, subject to the provisions of Article 7.4, Weekly Overtime, except when contiguous to the employee's regular schedule.

b. On Call Pay

Effective the first full pay period upon ratification, employees who are designated as on call status will receive a two and half percent (2.5%) supplement pay per pay period on a monthly basis.

Those designated as on call status include the following:
- Criminal Investigations Division
- Hostage Negotiations Team
- SWAT Techs
- Special Weapons and Tactics Team
- Tech Services
- PEU
- Homeless Resource Officers (HRO)
- Intelligence Unit
- PIO

City 001720

- IA
- FOP President
- Traffic Homicide Investigators
- K-9
- Neighborhood Resource Officers

Members receiving this benefit must be available to the Department when called. Unreasonable failure to respond when called may result in removal of this benefit for up to one year, at the discretion of the Chief.

Investigative Supervisor Availability Pay is eliminated effective upon ratification of this Agreement.

c. Telephone Calls

Any off-duty employee who receives a telephone call from a supervisor regarding a matter that pertains to an investigation or incident arising from his/her most recent (last) work shift, shall be paid a 30-minute minimum at straight time or time and one half the regular hourly rate, subject to the provisions of Article 7.4, Weekly Overtime, for the first off duty call on a given day. Subsequent calls that occur after the initial 30 minutes will be compensated in 30-minute increments not to exceed two hours for all matters.

### Section 8.16 – Sunglasses and Prescription Glasses

The City agrees to reimburse employees for the purchase or repair of sunglasses and prescription eyeglasses with a maximum allowable reimbursement of one hundred fifty ($150.00) dollars per employee in a twelve (12) month period, when they are lost or damaged while the employee is engaged in active police work such as arrests, pursuit, physical conflict or vehicular accidents.

### Section 8.17 – Field Training Officer

Bargaining unit employees who are assigned to the Field Training Officer (FTO) program by the Police Chief shall receive five percent (5%) of their base rate of pay on a biweekly basis, for as long as they are assigned to the program. The Chief of Police will assign, reassign, or remove FTOs at least annually.  The Police Chief, or his/her designee, in his/her sole discretion, may assign Officers to Field Training Officer (FTO) assignment.

### Section 8.18 – Injury Service Connected (ISC)

For two (2) sixteen (16) week periods, the City agrees to compensate any member of the bargaining unit with the difference between the weekly disability workers' compensation benefit received or which the employee is entitled to receive, and his or her regular rate of pay for any time lost from work due to injuries sustained under the following circumstances:

City 001721

a) While on duty and entitled to be paid by the City; or

b) While reasonably exercising police officer functions within the City limits of Miami Beach while off duty; or while working a departmentally sanctioned off-duty job; or

c) While exercising police officer functions when there is a physical danger to a person and the employee takes reasonable action off duty in the state of Florida; or

d) When operating a City vehicle, being duly authorized to do so by the City; or while on a reasonably direct travel route to or from work and home in their private vehicle while within the City limits.

e) In the circumstances described above (subparagraphs 1 through 4), the City agrees that it is and will consider itself the employer and the employee the City's employee.

After the advice and comments of the Police Chief and the FOP President, the City Manager, at his sole discretion, may extend the above described ISC payments beyond thirty-two (32) weeks. This decision is not subject to grievance or arbitration.   The approvals for receipt of this compensation as presently required shall be continued.

## Section 8.19 – Special Assignment Allowance

Employees assigned on a permanent basis to motorcycles or the training unit shall receive a special assignment pay of five percent (5%) of their base pay.

Employees assigned to work a 5-8 shift shall receive a special assignment pay of two and one-half percent (2 ½%).  Employees who are on 5-8 light duty because of non-service connected injury or illness shall not receive the special assignment pay. Employees who are on 5-8 light duty because of service-connected injury or illness, where the City doctor approves a 40-hour work schedule, and who have demonstrated the ability to work a 40-hour workweek, shall receive the special assignment pay for all hours worked on 5-8's.  If the injury service connected light duty employee takes off work and receives ISC payments, the employee will not receive the two and one-half percent (2-1/2%) special assignment pay for time not worked.

## Section 8.20 – Extra Weapon

Employees will be allowed to carry a concealed, extra weapon while on duty, as approved by the range master.

City 001722

**Section 8.21 – Quality of Life**

The City agrees to continue a Quality of Life Program.  The Quality of Life supplement pay shall be $26.00 per pay period for those employees participating in the program.

The Police Chief or his designee shall develop certification requirements which employees must meet to be eligible for any Quality of Life supplement payments. The Quality of Life supplement will be made available to all qualifying Bargaining Unit Members.

**Section 8.22 – Forced Holdover**

If an employee is forced to stay beyond the hours of his/her shift such additional hours will be paid at double the regular rate. This provision applies to minimum staffing or mandatory overtime as a result of being forced to stay beyond the hours of a pre-planned shift due to a special event. This provision does not include unexpected occurrences such as natural or manmade disasters. The City will give a fourteen (14) calendar day notice whenever practical for planned overtime events. This does not apply to unplanned overtime or extensions of regular shifts. Forced Holdover will not be subject to the provisions contained in Article 7.4 Weekly Overtime calculations.

**Section 8.23 – Pension**

The pension benefits as they currently exist shall continue, except that the City shall amend the pension plan upon ratification of this Agreement, to provide the following benefits for plan members who retire on or after September 30, 2013 (except as otherwise specified below):

A.    Military Buy Back: Upon completion of five (5) years of creditable service under the pension system, (ten years for members hired after ratification of this agreement), members may purchase additional creditable service under the system for up to two (2) years of prior military service, in increments of up to three percent (3%) per year of service for a maximum additional multiplier of six percent (6%), purchased at ten percent (10%) or ten and one half percent (10.5%), (for new hires required to contribute 10.5% to the plan as set forth in sections G and H herein), of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year of military service purchased, with the cost prorated for fractional years of service. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave, valued at the employee's hourly rate at the time of purchase. Such purchased creditable service will be available for use as a benefit, including for purposes of reaching normal retirement eligibility. In no event may the purchased service be used for purposes of vesting credits.

The purchase of additional military service must be completed within twenty-four (24) months following a member's completion of five years of creditable service under the pension plan (ten years for members hired after ratification of this agreement). If a member does not complete the purchase within the twenty-four (24) month period, he/she shall not be eligible for the purchase in the future. These

City 001723

provisions shall be applicable upon attaining ten (10) years of creditable service under the Miami Beach Police/Fire Pension plan for employees hired on or after ratification of this agreement.

**Prior Police Service Buy Back**: Upon ratification, all bargaining unit employees shall have a window between July 1, 2021 and September 30, 2021 in which to purchase up to two years creditable service in increments of up to three percent per year of service for up to two years of prior service. For purposes of determining credit for prior service, in addition to service as a police officer in this state, credit may be given for federal, other state, or county service as long as such service is recognized by the Criminal Justice Standards and Training Commission within the Department of Law Enforcement as provided in chapter 943 or the police officer provides proof to the board of trustees that such service is equivalent to the service required to meet the definition of a police officer. The creditable service shall be purchased at 10% or 10.5% (for employees required to contribute 10.5% to the plan as set forth in sections G and H herein) of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year purchased. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave valued at the employee's hourly rate at the time of purchase, with the cost prorated for fractional years of service. In the event the employee separates from employment after purchase of such creditable service but prior reaching 10 years of creditable service, the employee shall be reimbursed amounts paid in. Such purchased creditable service will be available for use as a benefit, including for purposes of reaching normal retirement eligibility, upon completion of 10 years of creditable service under the pension system. In no event may the purchased service be used for purposes of vesting credits.

**Non Prior Service Buy Back**: Upon ratification, all bargaining unit employees shall have a window between July 1, 2021 and September 30, 2021 in which to purchase up to two years creditable service in increments of up to three percent per year of service for a maximum additional multiplier of six percent (6%), purchased at 10% or 10.5% (for employees required to contribute 10.5% to the plan as set forth in sections G and H herein) of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year purchased. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave valued at the employee's hourly rate at the time of purchase. Such purchased creditable service will be available for use as a benefit upon completion of 10 years of creditable service under the pension system. In the event the employee separates from employment after purchase of such creditable service but prior reaching 10 years of creditable service, the employee shall be reimbursed amounts paid in. In no event may the purchased service be used for purposes of vesting credits.

The total amount of creditable service available for purchase shall not exceed a total two years (6%) for any combination of the above buy back options, or when an employee has participated in a prior by-back in the Miami Beach Police/Fire Pension system of six percent (6%) or more.

B.    All compensation for work performed pursuant to Off-Duty Assignments, as outlined in the Department's Standard Operating Procedures (SOP's), shall be included in a member's salary for pension purposes, and shall be used in the

City 001724

calculation of member contributions and benefits. Provided, in no event shall overtime pay and/or off-duty pay, exceed the caps presently specified in the Miami Beach Police and Fire Pension Ordinance. Overtime in excess of 300 hours per year or payments for unused sick and and/or vacation leave may not be included in compensation for pension purposes.

C.  DEFERRED RETIREMENT OPTION PLAN (DROP)

    **1.** **Eligibility** – Any active employee member of the Miami Beach Police and Firefighters Pension Plan may enter into the DROP on the first day of any month following the date upon which the employee first became eligible for a normal service retirement, subject to the conditions expressed herein or as modified from time to time.

    **2.** **Conditions of Eligibility** – Upon becoming eligible to participate in the DROP, an employee may elect to enter that program for a period not to exceed sixty (60) months; however, employees who entered the DROP on or before September 30, 2015, may extend their DROP participation period by twelve (12) months, for a total maximum DROP participation period not to exceed seventy-two (72) months. Employees who entered the DROP on or after October 1, 2015, but prior to the date of ratification of this Agreement, may extend their DROP participation period by up to thirty-six (36) months, for a total maximum DROP participation period not to exceed ninety-six (96) months. Employees who enter the DROP on or after the date of ratification of this Agreement will be subject to a total maximum DROP participation period not to exceed ninety-six (96) months. Notwithstanding, participation may not continue beyond that date when the employee's combined years of creditable service and time in the DROP equals four hundred and fifty-six (456) months. Provided also that participation in DROP shall require the employee to complete and submit the following prior to start of DROP payments.

    a. Such forms as may be required by the Pension Board of Trustee's Plan Administrator. Election in the DROP is irrevocable once DROP payments begin.

    b. A waiver and an irrevocable resignation from employment with the actual date of termination being the date designated by the employee as the end of his/her DROP participation. The administration and timing of execution and delivery of the waiver and resignation forms shall meet the requirements of the Age Discrimination in Employment Act and the Older Worker's Benefits Protection Act, as same may be amended from time to time.

    c. Employees currently in the DROP, who meet the requirements set forth in Sections 1 and 2 above, and elect to extend their DROP participation period, must sign such forms as may be required by the Pension Board by no later than September 1, 2019.

    **3.** **Conditions of Employment for DROP Participants** – Employees shall be subject to termination of employment while in DROP to the same extent as they were in their pre-DROP status. A person who has elected the DROP remains an employee during the DROP period and receives all the

FOP - 27

City 001725

benefits of being an employee during the DROP period, except any form of pension contribution.

**4.     Effect of DROP Participation**

a. An employee's credited service and his/her accrued benefit under the Pension Plan shall be determined on the date of his/her election to participate in the DROP first becomes effective.

b. The employee shall not accrue any additional credited service while he/she is a participant in the DROP, or after termination of participation in the DROP.

c. A DROP participant is not eligible for disability benefits from the Plan.

d. An employee may participate in the DROP only once.

e. Effective with the start date of an employee's DROP participation, contribution to the Pension Plan by the employee and the normal cost contribution to the Pension Plan by the City, on behalf of the employee, shall cease.

**5.     Payments to DROP Account**. A DROP account shall be created for each member who elects to participate in the DROP. A DROP account shall consist of amounts transferred to the DROP from the Plan, which include the monthly retirement benefits, including any future cost of living increases, that would have been payable had the member elected to cease employment and receive a normal retirement benefit upon commencing participation in the DROP, and earnings on those amounts. With the exception of those employees who enter the DROP on or after September 1, 2012, through September 29, 2013, shall continue to receive a zero (0%) cost of living adjustment for the third (3rd) and fourth (4th) annual adjustment dates, regardless of whether the employee remains in the DROP for the applicable maximum participation period.

a. Employees who entered the DROP on or before September 30, 2015, and who choose to extend their DROP participation period by up to twelve (12) months, shall receive a zero (0%) retiree cost of living adjustment (COLA) for their sixth (6th) annual adjustment date. If these employees choose to extend their DROP participation period and separate from employment with the City at any time within the sixth (6th) year, they will not receive a retiree COLA on the sixth (6th) annual adjustment date, but will receive a retiree COLA on the seventh (7th) annual adjustment date and all annual retiree COLAs thereafter.

b. Employees who entered the DROP on or after October 1, 2015, but prior to the date of ratification of this Agreement, who choose to extend their DROP participation period by up to thirty-six (36) months shall receive a zero (0%) retiree COLA for their sixth (6th), seventh (7th), and eighth (8th) annual adjustment dates. If these employees separate from employment with the City at any time within the sixth (6th), seventh (7th), or eighth (8th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

City 001726

c. Employees entering the eight (8) year DROP on or after the date of ratification of this Agreement shall receive a zero (0%) retiree COLA for their sixth (6th), seventh (7th), and eighth (8th) annual adjustment dates. If these employees separate from employment with the City at any time within the sixth (6th), seventh (7th), or eighth (8th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

d. Employees hired after the date of ratification of this Agreement who enter the DROP shall receive a zero (0%) retiree COLA for their first (1st), second (2nd), third (3rd), and fourth (4th) annual adjustment dates. If these employees separate from employment with the City at any time within the first (1st), second (2nd), third (3rd), or fourth (4th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

6.      **DROP Account Earnings**

a. Members may direct their DROP money to any of the investment options offered and approved by the Board. Any losses incurred by the participant shall not be made up by the City or the Pension Plan. The selection of these programs shall be made by the participant on forms provided by the Board. Any and all interest and or earnings shall be credited to the participant's DROP account.

b. A member's DROP account shall only be credited or debited with earnings while the member is a participant in the DROP and, depending on the DROP Account Payment Options selected, after the member dies, retires, or terminates employment with the City of Miami Beach.

7.      **Payment of DROP Account Funds**

Upon termination of a member's employment (for any reason, whether by retirement, resignation, discharge, disability, or death), the retirement benefits payable to the member or to the member's beneficiary shall be paid to the member or beneficiary and shall no longer be paid to the member's DROP account. In the event of the member's death, payment shall be made directly to the member's beneficiary. No payments will be made from the DROP account until the member terminates employment.

8.      **DROP Account Payment Options** – Following the termination of a participant's employment, the participant shall select one of the following options to begin to receive payment from his/her DROP account. Said selection shall occur no later than 30 days prior to the end of the DROP participation period or within 30 days following the termination of a participant's employment if said termination of employment occurs prior to the end of the DROP participation period:

a.      **Lump Sum** – All accrued DROP benefits, plus interest, shall be paid from the DROP in a single lump sum payment.

City 001727

b. **Partial Lump Sum** – A member designated portion of accrued DROP benefits, plus interest, shall be paid from the DROP in a partial lump sum payment with the remainder being directly rolled over into an eligible retirement plan.

c. **Direct Rollover** – All accrued DROP benefits, plus interest, shall be paid from the DROP directly to the custodian of an eligible retirement plan.

d. Other method(s) of payment that are in compliance with the Internal Revenue Code and adopted by the Pension Board of Trustees.

9. **Death of DROP Participant** – If a DROP member dies before his/her account balances are paid out in full, the participant member's designated beneficiary shall have the same rights as the member to elect and receive the pay-out options set forth in Paragraph 8, above. DROP payments to a beneficiary shall be in addition to any other retirement benefits payable to the beneficiary.

10. **Administration of DROP Accounts**

a. The Pension Board of Trustees shall make such administrative rules as are necessary for the efficient operation of DROP but shall neither create any rule that is inconsistent with the legislation creating the DROP, nor any rule that would be a mandatory subject of collective bargaining.

b. At all times, the DROP will be administered so that the Plan remains qualified under the Internal Revenue Code and is in compliance with the Internal Revenue Code and applicable laws and regulations.

11. If any provision of this DROP should be found invalid, unlawful, or not enforceable by reason of any existing or subsequently enacted legislation, or by judicial authority, or by an IRS regulation/ruling, the City and the Union agree to meet within 30 days of such determination for the purpose of negotiating a resolution to the invalid provision(s).

In the event that provisions of the Internal Revenue Code operate to limit the benefit amount of employee coverage by the pension provision incorporated in this Agreement to an amount less than set forth in the pension Plan then the City and the Union shall negotiate a method to compensate the affected employee for the difference between the normal pension benefit and the limits allowed by the Internal Revenue Code provided that no such resolution shall jeopardize the exempt status of the Plan under the Internal Revenue Code.

12. A member who elects to participate in the DROP shall retain the earned balance of accrued sick and vacation leave as of date of entry into the DROP, and shall continue to earn sick and vacation leave during the DROP period, in accordance with the stipulations set forth in the collective bargaining agreement between the City and FOP. While in the DROP, the member shall have the one-time option of receiving payment for accrued sick and/or vacation leave, up to the maximum payout upon separation of

City 001728

employment allowed by the collective bargaining agreement between the City and FOP, provided that the employee shall retain at least one hundred twenty (120) hours of accrued sick leave after such payment. The one-time election to receive payment of leave balances shall be made in any one year of the DROP, by notifying the City no later than August 31 of that year. Employees may request such payment prior to entry into the DROP, but must be in the DROP at the time of payout. Payment will be made on the second pay period of February of the following year. Upon final separation from employment with the City, a member who has participated in the DROP shall be eligible to receive payment for the balance of all accrued sick and vacation leave as of the date of final separation, up to the maximum provided in the collective bargaining agreement, as reduced by the prior payout, if any. In no event shall payments for accrued sick or vacation leave be included in a member's earnings for the purposes of the plan.

D. Pension benefits for employees hired prior to July 14, 2010; all changes effective September 30, 2013, unless otherwise specified:

1. The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2. The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 47 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap, regardless of age.

3. The final average monthly earnings (FAME) shall be based on the member's two (2) highest paid years of creditable service, prior to retirement or separation from employment. Effective September 30, 2015, the final average monthly earnings (FAME) shall be based on the member's three (3) highest paid years of creditable service, prior to retirement or separation from employment.

4. The retiree cost of living adjustment (COLA) shall be two and one half percent (2.5%) annually.

5. The maximum pension benefit shall be 85% of pensionable income, with the exception that any member who attains a benefit of 85% of pensionable income or higher as of September 30, 2013, retains the maximum benefit of 90% of pensionable income.

6. An employee shall be vested after completion of five (5) years of creditable service.

7. Ten percent (10%) employee pension contribution.

E. Pension benefits for employees hired on or after July 14, 2010, but prior to September 30, 2013; all changes effective September 30, 2013, unless otherwise specified:

1. The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

City 001729

2.      The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 48 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap regardless of age.

3.      The final average monthly earnings (FAME) shall be based on the Member's three (3) highest paid years of creditable service, prior to retirement or separation from employment.

4.      The retiree cost of living adjustment (COLA) shall be one and one half percent (1.5%) annually.

5.      The maximum pension benefit shall be 85% of pensionable income.

6.      An employee shall be vested after completion of five (5) years of creditable service.

7.      Ten percent (10%) employee pension contribution.

F.    Pension benefits for employees hired on or after September 30, 2013, but prior to the date of ratification of this collective bargaining agreement:

1.      The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.      The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 48 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap regardless of age.

3.      The final average monthly earnings (FAME) shall be based on the Member's five (5) highest paid years of creditable service, prior to retirement or separation from employment.

4.      The retiree cost of living adjustment (COLA) shall be one and one half percent (1.5%) annually.

5.      The maximum pension benefit shall be 85% of pensionable income.

6.      An employee shall be vested after completion of five (5) years of creditable service.

7.      Ten and one half percent (10.5%) employee pension contribution.

G.    Pension benefits for employees hired after the date of ratification of this collective bargaining agreement:

1.      The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.      The normal retirement age shall be 52; however, under "Rule of 70" retirement, a member must attain a minimum age of 48 or reach the 85% benefit cap regardless of age.

3.      The final average monthly earnings (FAME) shall be based on the Member's five (5) highest paid years of creditable service, prior to retirement or separation from employment.

FOP - 32

City 001730

4.       The retiree cost of living adjustment (COLA) shall be one- and one-half percent (1.5%) annually.

5.       The maximum pension benefit shall be 85% of pensionable income.

6.       An employee shall be vested after completion of five (5) years of creditable service. Employees hired after the date of ratification of this agreement shall become vested after completion of ten (10) years of creditable service.

7.       Ten- and one-half percent (10.5%) employee pension contribution.

8.       Employees hired after the date of ratification of this agreement shall not be credited with any prior creditable time in the Miami Beach General Employee Pension Plan.

The pension breakdowns above are for illustrative purposes and do not encompass all pension benefits afforded to respective members. The full itemization of pension benefits is available in the plan summary for the Fire and Police Pension Plan, as well as the Fire and Police Pension Ordinance.

### Section 8.24 – Premium Pay Supplement Contingent Upon the Department Obtaining and Maintaining Certain Accreditations.

In recognition for obtaining and maintaining the accreditation described below, the following premium pay supplement will be paid under the following terms:

a)   All bargaining unit members shall be paid a premium pay supplement of $20.00 per pay period for as long as the Police Department maintains Accreditation by the Commission on Accreditation for Law Enforcement Agencies (CALEA).

If the accreditation provided for above is discontinued for reasons unrelated to the action or inaction of bargaining unit members, then the supplement shall continue.

### Section 8.25.  Buyback of Probationary Time.  Employees hired prior to ratification of this agreement may elect, by written notice served on the Board of Trustees, to receive creditable pension service time for any or all of their time served as probationary police officers.  In order to receive such creditable pension service time, employees should be allowed to purchase any or all of such time through the use of accrued annual leave, sick leave, cash or any combination thereof.  In the event such purchase is not made within six months of successful completion of probationary period, the amount paid shall include interest at the rate of three percent (3%) per annum excluding first six (6) months. Effective upon ratification, all newly hired employees shall participate in the pension plan upon date of hire.

City 001731

**Section 8.26 – "Me Too" with the IAFF**

The FOP reserves the right to a "me too" agreement with the IAFF should the City modify the IAFF agreement on parallel issues, with the exception of Court time and Alternate Holiday Pay.

**Section 8.27 – CJSTC Police Instructor Incentive Pay**

The City will pay, under the terms stated in this section, an incentive pay of two and one-half percent (2.5%) of the officer's base pay (as stated below) for up to a maximum of seventy-five (75) police officers who obtain and maintain certification from the Criminal Justice Standards and Training Council (CJSTC) as Police Instructors:

a) Effective upon ratification of this Agreement, no more than seventy-five (75) FOP employees will be eligible to receive the two and one-half percent (2.5%) Police Instructor Certification pay.

b) Additional FOP employees (up to the seventy-five(75) employees maximum) must be qualified for the incentive pay by meeting all of the following requirements: (1) a minimum of six (6) years of full-time experience as a certified law enforcement officer employed by a State, County or Municipal Police Department; and (2) passing the required CJSTC Police Instructor Training Course; and (3) have no record of disciplinary action during the twelve (12) month preceding the date of application for the benefit. (4) Employees must teach a minimum of two classes per calendar year. FOP employees will qualify (not to exceed the seventy-five (75) employee cap) on a first come basis, based on the date of each employee's submission of the completed written request to the Police Chief or designee.

c) Newly qualified FOP employees (up to the seventy-five (75) maximum limit), shall start receiving their two and one-half percent (2.5%) pay on the next payroll period beginning after the FOP employee has submitted to the Police Chief (or designee) a written request that includes a copy of the CJSTC Instructor Certification, and proof that he/she has met all other requirements as set forth in this section.

d) Employees shall remain solely responsible for obtaining and maintaining a State Certified CJSTC Certificate.  All costs involved in obtaining and/or maintaining the certification shall remain the responsibility of the employee.  Failure to have a current certification shall constitute an automatic disqualification from the two and one-half percent (2.5%) incentive pay.

e) The Chief of Police may remove an employee from the CJSTC certified police instructor roster after two (2) incidents wherein the employee refuses or fails to train when requested or exhibits poor performance as a trainer. Such removal from the roster shall

City 001732

constitute an automatic termination of the two and one-half percent (2.5%) instructor incentive pay.  After the first incident wherein the employee refuses or fails to train when requested or exhibits poor performance as a trainer, the Chief of Police shall provide notice to the employee, with a copy to the Union, advising that the second incident will result in his or her removal from the CJSTC certified police instructor roster and the cessation of the concomitant incentive pay.  After the second incident, the employee shall be removed from the CJSTC certified police instructor roster and the concomitant incentive pay shall be terminated, effective on the date of the second incident.

f) The value of the two and one-half percent (2.5%) incentive pay shall be determined based upon only the base wage of the officer, i.e. no additional incentives or other extra payments or benefits are included in the two and one-half percent (2.5%) pay. The total incentive pay for the Police Instructor Certification benefit will remain at two and one-half percent (2.5%) regardless of any additional certifications that the FOP employee may receive through the CJSTC.

## Section 8.28 – Second Language Pay

Employees who are conversationally proficient in a second of the following languages:  Spanish, Creole, Portuguese, Hebrew, French, Russian, German, Cantonese, Mandarin, Italian, Czech, Korean, or American Sign Language; shall be eligible to receive second language pay equal to two and one-half percent (2.5%) of their biweekly base pay. Proficiency will be determined by an employee obtaining a minimum rating of level 9 on the "Speaking and Listening Assessment" test administered by ALTA Language Services, Inc. via telephone and proctored by the Police Administration. The test may be scheduled with at least seven (7) work days' notice to the Police Administration. The employee will bear the cost of paying for the test.  The employee will be subject to requalification for the pay supplement every five (5) years.  Second language pay shall not be considered as pensionable earnings. If ALTA Language Services, Inc., no longer administers the aforementioned types of tests, there will be a re-opener in order for the City, with Union input, to select a new testing services provider.

## Section 8.29 – Arson Investigator (Certified)

Employees who perform arson investigation work, as designated by the Chief of Police, and are certified by the State of Florida as arson investigators, shall receive an additional five percent (5%) of their biweekly base pay, whenever assigned to perform arson investigation work.

## Section 8.30 – Arson Investigator (Trainee)

Employees who perform arson investigation work, as designated by the Chief of Police, and are in the process of obtaining their certification from the State of Florida as arson investigators,

City 001733

shall receive an additional two- and one-half percent (2.5%) of their base pay whenever assigned to perform arson investigation work.

## Section 8.31 – Drug Recognition Expert (DRE)

Employees certified as drug recognition experts (DRE), as designated by the Chief of Police, shall receive an additional five percent (5%) of their base pay upon receipt of their drug recognition expert certification.

## Section 8.32 – CJIS Pay

Effective the first full pay period upon ratification, employees who maintain their Criminal Justice Information Systems (CJIS) certification shall have an additional two percent (2%) of their base pay. Effective April 1, 2020, employees who maintain their Criminal Justice Information Systems (CJIS) certification shall have an additional two percent (2%) of their base pay for a total of four percent (4%).

## Section 8.33 – Crisis Intervention Team (CIT)

Effective the first full pay period upon ratification, employees who have already attended and passed the 40-hour crisis intervention team (CIT) training shall receive an additional two and a half percent (2.5%) of their base pay (non-pensionable).  Employees who attend this training after ratification of this Agreement must be vested in order to qualify for this pay. Employees who qualify for this pay will have to attend refresher training as directed by the Chief of Police to maintain their qualification for CIT pay.

## Section 8.34 – Marine Pay

Effective the first full pay period upon ratification, any employee who is assigned to the marine patrol unit on a full-time basis shall receive assignment pay equal to five percent (5%) of their biweekly base pay.

City 001734

**ARTICLE 9**
**FOP HEALTH TRUST**

**Section 9.1 –**

The City will continue to fund the current contribution amount for health care.    As of January 1, 2019, the City's contributions shall be:

Single:                              $662.19

Family:                             $1623.23

Future annual increases to the City monthly contributions will be made based upon the Annual Segal Health Plan Cost Trend Survey for Open Access PPOs/POS Plans. The increases shall be effective January 1 of each year beginning January 1, 2020. In no event shall the City monthly contributions be less than the prior year, even if the trend rate is negative.

Audited financial disclosure reports are to be presented from the Trust to the City Manager's designee for Labor Relations no later than March 1st of each year.

The City will make payments to the TRUST by the 15th of the month for the previous month.

In addition:

    a) For all current retirees and active employees on the payroll as of the date of ratification of this Agreement, all employees presently in the DROP, and all eligible dependents under the current eligibility rules, the City contribution for those current retirees and current employees who become future retirees for health coverage shall be equal to the City's Health Trust contribution formula for active employees. Furthermore, the contributions for those current retirees and current employees who become future retirees and their eligible dependents shall be no less than the current value of the contributions for active employees and their eligible dependents.  This Agreement shall be reduced to writing and made individual contracts and shall be vested benefit throughout retirement.

    b) Employees hired after July 14, 2010, who elect to be covered by the Miami Beach Fraternal Order of Police Insurance Trust Fund Plan, to the extent they choose to have medical benefits provided to them and their dependents during retirement, shall

City 001735

receive a health insurance stipend in lieu of a City contribution to the Trust on behalf of those employees after their retirement. As of September 30, 2018,the stipend shall be a monthly payment equal to $29.77 per each year of creditable service, subject to an annual increase based on the Miami-Ft. Lauderdale All Urban Consumer Price Index (U-CPI) as of September 30th of each fiscal year thereafter.  Additionally, upon separation of employment with the City, the individual's stipend shall continue to be adjusted annually every September 30th thereafter.

**Section 9.2 –**

a) All eligible employees and their dependents described in Section 7 shall be eligible to enroll in the FOP Health Trust Plan and shall not be eligible to participate in the City Plan during their employ or retirement for so long as the FOP Trust exists.

b) A non-bargaining unit sworn police officer who elects to enroll in the FOP Health Plan may apply to the Trust and will be enrolled upon leave of the Trustees, and thereafter will be deemed to be a covered employee provided he or she meets the following criteria:

   1. Must be on the City Police Department Payroll at the time of enrollment;

   2. Must be an FOP member for two years (or length of time in Department if less than two years) prior to enrollment, and must maintain membership throughout the period of coverage;

   3. Must meet insurability criteria satisfactory to Trustees; and

   4. Must make the election within thirty (30) days after appointment out of the bargaining unit.

**Section 9.3 –**

a) All covered employees and covered retirees shall be allowed to continue under the City's Dental Plan as it may exist.

b) The City shall also contribute to the Trust the amount of premium it is paying for term life insurance for covered employees and covered retirees.

FOP - 38

City 001736

**Section 9.4 Health Trust Plan  –**

The City shall be provided with a copy of the FOP Health Trust Plan booklet and the Trust Agreement, and any other information required by law.

**Section 9.5 Indemnification –**

The FOP shall indemnify and hold the City harmless against any claim, demand, suit, or liability, and for all legal costs arising in relation to the implementation or administration of the FOP Health Insurance Trust and Plan, except if the City's acts or omission give rise to its own liability.

**Section 9.6 Employment Eligibility –**

Employees in the bargaining unit eligible for inclusion in the Health Trust Plan must be employed at least ninety (90) days and be on the City Police Department payroll.

**Section 9.7 Post Employment Coverage –**

Employees covered by this Agreement who retire, resign, or are terminated by the City must be vested in the Police pension plan at the time of such retirement, resignation or termination in order to receive a contribution by the City towards his/her health insurance premium after such retirement, resignation or retirement.

**Section 9.8 Voluntary Benefits Plan –**

Employees in the bargaining unit shall be eligible to participate in the City's voluntary benefits plan, which may be modified by the City from time to time.  The voluntary benefits plan shall be administered by the City.

**Section 9.9 –  Post Employment Health Program (PEHP)**

Effective the first pay period ending in October 2013, all employees covered by this agreement shall contribute twenty-five dollars ($25.00) biweekly to the Post Employment Health Program (PEHP). Upon separation of employment from the City, or when participating in DROP, employees covered by this agreement shall contribute ten percent (10%) of their accrued leave payouts toward the PEHP.  Any and all fees/costs associated with administering the PEHP shall be incurred by the FOP. In no event will the City incur any costs associated with this program. Effective upon ratification of this Agreement, the Union shall determine the required employee contribution to the PEHP.  The Union will notify the City, in writing, when it desires to change the

City 001737

required employee contribution amounts, including the effective date of the change.  The Union will provide the City with at least thirty (30) days' notice prior to making such changes.

City 001738

**ARTICLE 10**
**EDUCATIONAL LEAVE AND TUITION REFUND**

Subject to applicable Personnel Rules, leave ordinances and tuition practice administrative procedures, an employee may request an educational leave of absence without pay to take a course or courses in a field related to the work assignment of said employee.

Upon ratification of this Agreement, employees covered by the bargaining unit are eligible for the tuition assistance program set forth in Resolution No. 2015-28891, adopted January 14, 2015, which provides the following levels of benefit:

Six Credit hours per semester for a total of twelve credits per calendar year will be reimbursed, as follows:

- Approved undergraduate, community college courses and non-credit/certificate courses will be reimbursed as follows:

    o 80% for courses in which the employee earns an A
    o 60% for courses in which the employee earns a B
    o 40% for courses in which the employee earns a C

- Approved graduate courses will be reimbursed as follows:

    o 80% for courses in which the employee earns an A
    o 60% for courses in which the employee earns a B

The levels of benefit identified above may be subject to change by the City Commission, but in no event shall be less than the levels of benefit identified below:

One course per semester/trimester/quarter equivalent to three credits for a total of twelve credits per calendar year will be reimbursed, as follows:

- Approved undergraduate community college courses and non-credit/certificate courses will be reimbursed at an amount not exceeding $158.25

- Approved undergraduate university courses will be reimbursed at an amount not exceeding $251.16

- Approved graduate courses will be reimbursed at an amount not exceeding $531.15

FOP - 41

City 001739

**ARTICLE 11**
**GENERAL PROVISIONS**

**Section 11.1 – Safety and Health**

The City and the FOP shall cooperate in matters of safety and health affecting the employees covered by this Agreement.

A voluntary law enforcement physical fitness assessment shall be established, the components of which will be mutually agreed upon between the Police Chief and the FOP President. Any employee covered by this Agreement who completes and passes the challenge shall receive a supplement of $75 per pay period effective upon ratification of this Agreement. The challenge will be administered by the Police Department. It will be administered on an annual basis. An employee will have thirty (30) days from the anniversary of his completion of the assessment to schedule the next assessment (for that year). Employees must complete and pass the assessment each year in order to be eligible for continued receipt of the supplement. Physical fitness assessment pay shall not be considered as pensionable earnings.

**Section 11.2 – FOP Activity and Non-Discrimination**

Neither the City nor the FOP shall discriminate against any employee due to that employee's membership, non-membership participation, lack of participation, or activities on behalf of, or his refraining from activity on behalf of the FOP.

No employee covered by this Agreement shall be discriminated against because of race, creed, national origin, religion, sex, sexual orientation, ethnic background or age in accordance with applicable State and Federal laws. The FOP agrees to cooperate with the City in complying with Federal, State and local laws requiring affirmative action to assure equal employment opportunity. The parties will comply with the Americans with Disabilities Act.

**Section 11.3 – Reduction In Work Force**

When there is a reduction in the work force, employees will be laid off in accordance with their length of time in grade service and their ability to perform the work available and applicable veteran's preference laws. When two or more employees have equal ability, the employee with the least amount of service will be the first one to be laid off. When the working force is increased after a layoff, employees will be recalled in the order of seniority, with employees with greater seniority recalled first. Notice of recall shall be sent to the employee at the last known address by registered mail or certified mail. If an employee fails to report to work within thirty (30) days

City 001740

from date of receiving notice of recall, he shall be considered to have quit.  No new employee will be hired into the bargaining unit as long as any bargaining unit employee remains on lay-off status.

During the course of this Agreement, no employee will be laid off and no employee will be demoted (except for disciplinary demotions).

## Section 11.4 – Uniforms and Clothing Allowance

The City will continue its present policy concerning uniforms. The uniformed personnel's monthly maintenance allowance shall be sixty dollars ($60.00) per month for a total of $720.00 per year to be paid out in twenty-six (26) biweekly payments.

For those sworn employees assigned to work in civilian clothes, they shall receive a monthly allowance of eighty-five dollars ($85.00) per month for a total of $1,020.00 per year to be paid out in twenty-six (26) biweekly payments.

When transferred into the Criminal Investigation Unit or other unit requiring civilian clothes, the City will advance the employee, at his/her request, the sum of four hundred twenty five dollars ($425.00) for the purchase of clothing.  The employee affected shall agree to relinquish the eighty-five dollar ($85.00) per month clothing allowance for the following five months, and shall also agree to reimburse the City for any pro-rata amount in the event of transfer, termination, resignation, or retirement prior to completion of five (5) months in the civilian clothes assignment. If the reimbursement is caused by a transfer, the reimbursable amount shall be collected at the rate of eighty-five dollars ($85.00) per month.

## Section 11.5 – Disclosure of Records

Employees will not have information contained within any of their files, including an Internal Affairs file, disclosed to persons other than managerial and supervisory employees unless the person requesting such information (including home telephone number, address, etc.) shall complete and sign a "Request for Information" form and present proper identification, provided, however, that information which is made confidential by State or Federal Statute shall not be disclosed except in accordance with the requirements of law. The request form shall have provision for the name, address, and telephone number of the person requesting the information and the reason for the request.  A copy of any such request form completed shall be left in the employee's personnel file and the employee shall be notified in writing via the City's electronic mail system.

City 001741

## Section 11.6 – Transfers

It shall be the sole right of the Police Chief or his designee to transfer employees of the Department.  When a transfer is a change in an employee's unit assignment, reasonable advance notice as is practicable under the circumstances shall be given.  If a transfer is a permanent change in an employee's shift or days off schedule, the employee shall be notified no less than five (5) workdays prior to the transfer in order that the employee may arrange for an orderly change.

The five (5) day notice may be waived by the employee and it need not be given when unforeseen needs of the Department or emergency conditions require that temporary changes be made with little or no advance notice.

## Section 11.7 – Meeting Between Parties

At the reasonable request of either party, the FOP President, or his representative, and the City Manager, or his designee for Labor Relations, shall meet at a mutually agreed upon time and place to discuss matters that require immediate discussion.

## Section 11.8 – Negotiating Sessions

Time and dates for negotiating sessions shall be mutually agreed upon.  Up to six (6) on-duty FOP representatives shall be permitted to attend negotiating sessions without loss of pay or benefits if they were otherwise scheduled to work.

## Section 11.9 – Job Descriptions

It is understood by the parties that the duties enumerated in the job description promulgated by the City are not always specifically described and are to be construed liberally.  The City agrees to notify the FOP President via electronic mail of any change in the job description of any classification in this bargaining unit.

## Section 11.10 – Defense of Members

In the event any action for civil damages is brought against a member of the bargaining unit hereunder individually, and the City is not made a party to any such action, and if the employee hereunder is found liable and a judgment for damages is rendered against him, the City will itself or through insurance pay such damages and counsel fees for the employee providing the employee's liability results from action of the employee arising out of and in the course of his

City 001742

employment hereunder, and further providing that such judgment against the employee does not result from the wanton and willful action of the employee.

## Section 11.11 – Personnel Rules and Departmental Manual

Copies of the Personnel Rules and Regulations will be kept by Majors and Captains whose copies will be available to members of the bargaining unit upon request.

The manual of the Police Department is provided and available to all employees in the department electronically through PowerDMS and proposed changes in said manual will be supplied to the President of the FOP or his designated representative before implementation and an opportunity to discuss the changes will be afforded.  Any changes to SOP's shall contain a detailed legislative style description of the proposed changes.

## Section 11.12 – Incorporation of Personnel Rules

The parties agree that the City's Personnel Rules are incorporated by reference in this Agreement and made a part hereof, except where a specific Rule is in conflict with the express language of this Agreement, the language of the Agreement shall prevail.

## Section 11.13 – Medical Leave of Absence

After this Agreement is ratified, any employee requesting time off without pay as a Medical Leave will be granted the time requested up to one (1) month, or longer at the Police Chief's discretion. Employees may use any accumulated leave time or comp time during this leave.

City 001743

**ARTICLE 12**
**<u>SEPARABILITY</u>**

If any provision of this Agreement is held to be in conflict with any law as finally determined by a court of competent jurisdiction, that portion of the Agreement in conflict with said law shall be inoperative and subject to immediate renegotiation for a replacement provision, but the remainder of the Agreement shall continue in full force and in effect.

City 001744

## ARTICLE 13
## TIME BANK

A Time Bank shall be authorized by the City of Miami Beach, whereby members of the bargaining unit may voluntarily donate accrued annual leave and sick leave to an FOP Time Bank  to be used as follows: (a) the President, or his designee(s), may draw from such Time Bank, thereby detaching said person(s) from the normal course of their City assigned duties in order that they may be permitted to perform duties in keeping with the obligations of the FOP to its membership, and/or (b) by FOP members pursuant to Ordinance No. 1335, and pursuant to rules and regulations to be established by the FOP that is not otherwise inconsistent with this article or Ordinance No. 1335.  The FOP President, along with the Police Chief (or designee) will establish a committee of three (3) members whose purpose is to create the rules and regulations mentioned in subpart b herein. The composition of the Time Bank Committee shall be determined as follows: the FOP President shall appoint one (1) individual to serve on the Time Bank Committee; the Police Chief (or designee) shall appoint one (1) individual that shall serve on the Time Bank Committee and both the FOP President and the Police Chief shall jointly appoint one (1) active FOP bargaining unit member to serve on the Time Bank Committee.  The Time Bank shall not be utilized for the purpose of attending collective bargaining sessions between the FOP and the City of Miami Beach.

Time will be deposited into the Time Bank only after the contributor voluntarily signs an authorization card detailing the type and amount of time to be donated.  After review by the FOP President or his representative, these cards are to be forwarded on a quarterly basis to the Police Chief for his review, and if appropriate, approval.  If approved, the Police Chief will then forward this material to the Support Services Division, who shall take appropriate action to implement the provisions of this section.

Time deposits shall be in hourly increments, with three (3) hours being the minimum amount accepted.

The President, in his own behalf or on behalf of his designee(s), shall fill out the appropriate form to be supplied by the city for each employee authorized to draw from the Time Bank.  Said form shall be submitted by the President at least five (5) days in advance of anticipated use.  This form shall also include the statement that:

"Upon deduction of time by the City, the undersigned officer agrees to hold the City harmless for any error or omissions in making said deduction or allocating the deducted time to the time pool."

This request shall be reviewed by the Police Chief, or his designee, and approved subject to the manning requirements of the department.  Such approval shall not be arbitrarily withheld.  Such approval, once having been authorized, may be rescinded subject to the manning requirements of the department.

FOP - 47

City 001745

Time donated to the Time Bank shall be converted to the salary dollar equivalent of the donor(s), and time used shall be in salary dollar equivalents of the employee(s) using the pool time. Time donations shall not increase in value. For purposes of computation, only base pay and longevity will be used. Time donated but not used will not be retrievable and will remain in the Time Bank for so long as this provision is effective. In the event the Time Bank is discontinued, the FOP shall be entitled to use the hours remaining pursuant to the provisions of this section.

Any injury received or any accident incurred by an employee whose time is being compensated by the FOP Time Bank, shall not be considered a line-of-duty injury, nor shall such injury or accident be considered to have been incurred in the course and scope of the employee(s) employment by the City of Miami Beach within the meaning of Chapter 440, Florida Statutes, as amended.

City 001746

**ARTICLE 14**
**DRUG TESTING**

a) All employees are subject to random, unannounced testing for use of substances as set forth below. The use of legal controlled substances is permitted only when prescribed to the employee by a licensed health care provider and is properly used by the employee.

b) Upon reasonable suspicion by a lieutenant or higher ranking officer, that an employee has used a drug as defined in Florida Statutes Section 440.102(1)(c), as that section may be amended or renumbered, and as listed herein; or has used alcohol in violation of any rule, order, policy, procedure, or law; or has intentionally misused a legal controlled substance to the extent that his or her job performance is affected, shall be directed and required to submit to drug and alcohol testing.

c) Testing is subject to the following conditions:

   1. An accredited, State licensed clinical testing laboratory will be selected by the City. A split specimen will be taken. If the results are positive, and the employee challenges the results, the second portion of the split specimen will be tested at another accredited, State licensed clinical laboratory of the employee's choice and at the employee's expense. One portion will be tested by each laboratory. All positive tests for illegal or controlled substances shall be confirmed by Gas Chromatography Mass Spectrometry (GC/MS) or equivalent testing method.

   2. Testing for alcohol shall be by breath-testing unless the employee is or claims to be unable to provide an adequate sample. In such a case, a blood test will be performed. Any refusal by an employee to consent to the blood test will result in a positive result.

   3. A breath alcohol level of 0.04 or higher and it's equivalent blood test outcome shall constitute a positive result. Below are the substance categories tested for.

   4. In all cases, the employee shall fully cooperate with testing, including executing any release or authorization necessary for the City to obtain the tests results.

   5. The employee must provide a usable specimen/sample.

City 001747

| Drug | Initial Test Level | GC/MS   Confirmation Test Level |
|------|--------------------|----------------------------------|
| Amphetamine | 1000 ng/ml | 500 ng/ml |
| Barbiturates | 300 ng/ml | 150 ng/ml |
| Benzodiazepines | 300 ng/ml | 150 ng/ml |
| Cocaine metabolites | 300 ng/ml | 150 ng/ml |
| Marijuana metabolites | 50 ng/ml | 15 ng/ml |
| Methadone | 300 ng/ml | 150 ng/ml |
| Methaqualone | 300 ng/ml | 150 ng/ml |
| Methylenedioxyamphetamine (MDA) Analogues | 500 ng/ml | 250 ng/ml |
| Opiates | 2000 ng/ml | 2000 ng/ml |
| Phencyclidine | 25 ng/ml | 25 ng/ml |
| Propoxyphene | 300 ng/ml | 150 ng/ml |

d)  Any positive test or any refusal to submit to testing or to cooperate with testing, including executing releases or authorizations and providing multiple specimens if needed, may be grounds for termination of employment.

e)  This Article supersedes any agreement, memorandum of understanding, rule, procedure, or order to the extent of any conflict therewith.

**f)  Last Chance Agreement**

In the event an employee tests positive for either drugs or alcohol as the result of a random or reasonable suspicion drug/alcohol test, the following shall apply:

At the sole discretion of the City Manager, in consultation with the Police Chief, the employee may be offered a last chance agreement; said agreement does not preclude concurrent disciplinary action. If a last chance agreement is extended to the employee, after he/she is cleared to return to work by a Substance Abuse Professional (SAP) to be selected by the City, the employee shall be subject to unannounced testing administered by the City's Human Resources Department, for a period of no  longer than two (2) years. An employee may only be eligible for one last chance agreement during his/her employment with the City.  Employees who test positive a second time for drugs or alcohol as the result of an unannounced, random or reasonable suspicion drug/alcohol test, shall be terminated from employment with the City. A Substance Abuse Professional is a licensed physician, psychologist, social worker, employee assistance professional or certified addiction counselor with knowledge of and clinical experience in the diagnosis and treatment of alcohol and controlled substance-related disorders.

If an employee who is offered a last chance agreement has his/her certification revoked through the Florida Department of Law Enforcement, he/she shall immediately be terminated from employment with the Miami Beach Police Department and shall have no right to grieve, oppose the termination, and no right to any other position with the City.

City 001748

**ARTICLE 15**
**DISEASE PRESUMPTION**

A. **Heart Disease Presumption**

Any condition or impairment of health of any detention or sworn officer caused by heart disease resulting in total or partial disability or death shall be presumed to have been accidental and to have been suffered in the line of duty unless the contrary be shown by satisfactory evidence; provided, however, that such detention or sworn officer shall have successfully passed a physical examination upon entering into such service as a detention or sworn officer, which examination failed to reveal any evidence of heart disease.  If at any time this Section is placed before an arbitrator for interpretation or application, what is "satisfactory evidence" shall be determined by the arbitrator.  If rights of detention or sworn officers are placed before the Bureau of Workers Compensation, then what is "satisfactory evidence" will be determined by the Bureau in accordance with Workers Compensation law.  Nothing herein shall be construed to be a waiver or limitation of any benefit provided under Florida Statute 112.18.

B. **Infectious Disease Presumption**

Any documented post-exposure condition or impairment of health caused by Human Immunodeficiency Virus/ Acquired Immune Deficiency Syndrome (HIV/AIDS), Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis shall be presumed to have been accidental and to have been suffered in the line of duty, subject to the following conditions, unless the contrary be shown by competent evidence.

To qualify for the presumption, the following criteria must be met:

> There must be an on-the-job documented exposure that meets scientific standards or criteria, and the significant on-the-job exposure must be stated, in writing, by a licensed medical doctor.  For example, contact with blood is not an exposure unless the employee's skin, where the contact occurred, is not intact. Additionally, the person whose blood came into contact with the employee's broken skin must have one of the blood borne infectious diseases considered herein.

Current Employees:

1. Current employees must undergo a post-employment medical examination, administered by a qualified medical doctor to be selected by the City. The results must reveal no evidence of HIV, AIDS, Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis. Employees who refuse to comply with this post-employment examination requirement shall not be eligible for the presumption.

FOP - 51

City 001749

2. Current employees shall be required to sign a City-approved medical release form authorizing the physician to provide the examination results directly to the City.

New Employees

3. New employees, hired after ratification of this agreement, must complete a pre-employment medical examination, administered by a qualified medical doctor to be selected by the City, and the results must reveal no evidence of HIV, AIDS, Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis.

4. New employees, whose test results reveal evidence of any of the aforementioned infectious diseases, shall not be eligible for the presumption for the disease for which they tested positive.

All current and new employees shall be tested at a health facility selected by the City.  The FOP Health Trust shall incur the cost associated with testing all current employees who are members of the Health Trust; those employees who are not members of the Health Trust shall incur the cost of their testing.  The City shall incur the cost of testing all employees hired after the ratification of this agreement.

All medical examination results, for both current and new employees, shall be released to the City's Risk Manager.

FOP - 52

City 001750

**ARTICLE 16**
**PROMOTIONS**

**Section 16.1 –**

Advancement to the ranks of Sergeant and Lieutenant shall be by examinations that measure the knowledge, skills, and ability of personnel and by seniority.  A promotional examination will be given every two (2) years, unless the FOP President and the City Manager or his designee for Labor Relations mutually agrees to some other schedule.  Effective with the first test given after ratification, the following revisions to Article 16 shall apply.

The City agrees to a reopener with the FOP on the testing process for promotions to Sergeant and Lieutenant.

**Section 16.2 –**

Eligible applicants for the promotional examination for Sergeant and Lieutenant shall be given a two-part examination, consisting of a validated, written test, which shall comprise fifty percent (50%) of the final examination score, and an Assessment Center. The Assessment levels shall have a weight of fifty percent (50%) of the total score.  The written portion shall be given first and applicants for Sergeant or Lieutenant positions must successfully pass the written test with a raw score of seventy percent (70%) to be eligible, at a later date, to take the Assessment Center portion of the examination.  Passing scores for the Assessment Center shall be set only by the test developer.  If there are not a significant number of minorities promoted after the next round of promotional testing after the effective date of this Agreement, the parties will meet to review the respective weights and re-negotiate the Article, if necessary.

**Section 16.3 –**

All police officers who on the written test date have four (4) years of seniority from date of appointment to Police Officer or Police Officer Trainee, and performance evaluations of satisfactory or above for the preceding twenty-four (24) month period shall be eligible to take the Sergeant's test.  All Sergeants who on the written test date have two (2) years seniority from the date of appointment as Sergeant and performance evaluations of satisfactory or above for the preceding twenty-four (24) month period shall be eligible to take the Lieutenant's test.  Applicants must, in both cases, apply on or before the application cutoff date and time in accordance with Personnel Rules.

The City Manager or his designee for Human Resources may refuse to permit an applicant to take the examination on the grounds of conduct disgraceful to the Department and his/her officer

City 001751

status; or refused advancement from probationary status.  In the latter case, if at least three (3) years have elapsed since such failure of probationary advancement, such candidate will be considered qualified.  Should any applicant, so disqualified for any of these alleged reasons, contest such disqualification, he shall have access to the grievance procedure under this contract.

## Section 16.4 –

The City Manager or his designee for Human Resources shall cause to be developed validated examinations which closely measure the knowledge, skills, and abilities of a Miami Beach Sergeant of Police and a Miami Beach Lieutenant of Police, administer such examinations, and prepare a promotional register, one for Sergeants and one for Lieutenants, containing the names of persons who have passed the test, ranked in the order of such examination scores.  Promotions shall be by rank order.

The FOP shall facilitate participation of bargaining unit employees in providing information in order to conduct the job analyses and develop the tests within the time frames requested by the process; provided that such participation shall be on duty time.

## Section 16.5 – Seniority Points

a)  0.2 point shall be added to an employee's Sergeant's passing examination score for each completed year of service, to a maximum of 25 years.

b)  0.25 points shall be added to an employee's Lieutenant's passing examination score for each completed year in grade as a Sergeant.

## Section 16.6 – Education Points

a)  0.02 points shall be added to an employee's Sergeants passing examination score for each completed credit of post-secondary education from an accredited institution of higher learning.

b)  0.02 points shall be added to an employee's Lieutenants passing examination score for each completed credit of post-secondary education from an accredited institution of higher learning.

No combination of seniority and/or education points shall exceed six (6) points per employee. Seniority and education points, in accordance with the above specifications, will be added to the combined score after the candidate has successfully passed all components for the promotional

City 001752

examination.   Veteran's Preference points will be added after the addition of seniority and education points, in accordance with state law.

Example:

(Written Examination Raw Score *0.50) + (Assessment Center Score *0.50) + Education points + Seniority points + Veterans Preference points = Final Score

## Section 16.7 – Book Committee

A committee consisting of the Human Resources Director, Police Chief, the FOP President and the test developer or their designees, along with two incumbents, one designated by the Police Chief and one designated by the FOP President,  shall select the books and test material from which technical knowledge questions on the written test and Assessment Center will be drawn. Final selection shall be made after consultation with the test developer.  Without exception, no member of the Book Committee shall be a candidate for the promotional examination for which the list is compiled.

Such selection or changes therein, shall only be made after a representative of the FOP shall have a reasonable opportunity to meet and provide input on the selection process.

The test material chosen for the written test and for the Assessment Center shall be described and announced by the City to the FOP and its members at least three (3) months before such test.

The provisions of the 2012-2015 collective bargaining agreement between the City and FOP shall remain in effect solely as it pertains to the book committee for the 2016/2017 Police Sergeant and Police Lieutenant promotional process.

Overview, Orientation, and Preparation sessions for the written test and for the Assessment Center test or the behavioral assessment test shall be given at least thirty (30) days prior to each test.

## Section 16.8 – Written Test Scoring

Within 24 hours after the administration of the written test, an applicant scoring session will be conducted.  Each examinee will be able to review a copy of his/her own answer sheet and the scoring key (for his/her use during the review session only), with the correct response, the name of the reading source and location from which each written test question was drawn.

City 001753

Challenges will be written and submitted to the test developer during a minimum of two (2) post-test review sessions occurring on separate days and conducted within ten (10) calendar days of test completion.  The Human Resources Director, FOP President and the test developer or their designees shall conclusively decide all challenges by a majority vote.

## Section 16.9 – Assessment Center Test Challenges

Upon completion of the determination of a score for the Assessment Center Test, each examinee shall be furnished with his/her test result.  Human Resources shall establish a reasonable time period within which each examinee may review his/her examination at a post-test review appointment. Challenges regarding the components of this portion of the examination must be made in writing to the test developer within ten (10) calendar days after the post-test review appointment.  The Human Resources Director, FOP President and the test developer, or their designees, shall conclusively decide all challenges by a majority vote.  For each examinee who submitted a challenge, each examinee's own challenge and response will be available no later than eight (8) weeks after the date of the last examinee's submission of challenges.

## Section 16.10 –

Promotional examinations for the position of Sergeant of Police and Lieutenant of Police will be given at least once every twenty-four (24) months, so as to provide continuous active promotional lists.  The City agrees to begin the promotional process no later than nine (9) months prior to expiration of a certified promotional list. Formal examination scores and a promotional list shall be certified and posted within two (2) weeks after completion of all challenges in Section 16.8 above.  Promotional lists shall expire twenty-four (24) months after the certification and posting of the results of the promotional examination.

## Section 16.11 –

In the event of same day promotions, seniority rank in the new position shall be determined, in the order of standing on the promotional list.  If there is a tie in the final scores that places more than one examinee in the same position on the promotional list, these examinee's ranking order on the promotional list shall be determined in the order of the examinee's seniority in the rank that they presently hold (i.e., a tie score between two (2) sergeants will be determined by awarding the highest ranking to the examinee with the most seniority as a sergeant, and a tie score between two (2) officers will be determined by awarding the higher ranking to the examinee with the most seniority as an officer, etc.).

City 001754

**Section 16.12 – Promotional Eligibility for Employees Under Investigation**

An employee under any type of investigation who has been relieved of duty, with or without pay, shall be removed from any promotional eligibility list and will be bypassed for promotion.  Upon conclusion of the investigation:

1(a).    If an employee is bypassed for promotion pursuant to this article, and the charge(s) leading to the investigation are found to be anything other than substantiated, or, if the employee receives discipline less than a one (1) day suspension without pay, he or she shall be made whole in every respect, including promotion, compensation and seniority, irrespective of whether an active eligibility list is in effect upon conclusion of the investigation.

1(b).   If an employee is removed from the eligibility list pursuant to this article, and the charge(s) leading to the investigation are found to be anything other than substantiated, or, if the employee receives discipline less than a one (1) day suspension without pay, he or she shall be returned to their position on the eligibility list, provided the list is still in effect (active) upon conclusion of the investigation.

2.        If the charge(s) leading to the investigation are found to be substantiated and result in discipline consisting of a one (1) day suspension without pay or greater, the employee shall continue to be removed from any promotional eligibility list and will be bypassed for promotion. In such case, the employee will be eligible to apply and compete for promotion in subsequent testing cycles without limitation.

City 001755

## ARTICLE 17
## FOP PRESIDENT

### Section 17.1 –

The Miami Beach Fraternal Order of Police, William Nichols Lodge No. 8, Lodge President shall have the option, for each fiscal year, of closed "D.D." (Detached Duty), as outlined in Section 17.2 below, or to conduct union business (under the conditions described in Section 17.2 below), through the use of a time bank.  The FOP President shall notify the Police Chief in writing by September 15 of each contract year, whether he or she elects to utilize the 1500 hour time back provision or the D.D. provisions contained in Section 17.2 below, during the following contract year.  Unused time bank hours from one contract year shall rollover to the next contract year, not to exceed a total maximum of 3000 hours per contract year.  Time for attendance at negotiations for a successor agreement is addressed in Article 11.8 of this Agreement.

### Section 17.2 –

The Miami Beach Fraternal Order of Police, Lodge No. 8, Lodge President shall be released and detached from full time duties as a sworn law enforcement officer while serving as Lodge President and shall be carried full-time in a pay status to be shown on the payroll as "D.D." (Detached Duty).  The following conditions shall apply:

a) For the purpose of recording time, the Lodge President will notify the Police Chief of all absences, including vacations, sick leave, meeting attendances, out of town trips, etc. The Lodge President shall be required to work a 40-hour workweek.

b) The Lodge President will be available at the FOP office currently located at 999 11th Street, Miami Beach, Florida 33139, for consultation with the Police Department Management or the City Administrators between normal working hours.

c) Should the Lodge President wish to change offices, (s)he will notify the Police Chief, in writing, at least five (5) working days prior to the proposed change.  Said notice will include the address and the telephone number of the new office for the FOP Lodge President.

d) In the absence of the Lodge President, the Lodge President's designee may represent the Fraternal Order of Police.

City 001756

e) The FOP will not send additional employees in a pay status to attend City Commission or Personnel Board meetings without approval of the Police Chief or his designee.

f) All applicable Miami Beach Police Department rules, regulations and order shall apply to the person who is the President of the Lodge and on D.D.

**Section 17.3 –**

The Management of the Miami Beach Police Department or the City Administration reserves the right to rescind the provisions of this Article in the event that it is found to be illegal.  Canceling the Article shall not preclude further discussions of any Lodge Presidents' release for Union business.

City 001757

**ARTICLE 18**
**COMPENSATORY TIME**

Employees shall no longer accrue more than 150 hours of compensatory time in a calendar year. Employees will not be permitted to have more than 240 hours of compensatory time in their time bank. Employees assigned to the Motor Unit will continue to be able to accrue 320 hours of compensatory time as per the Settlement Agreement.

City 001758

**ARTICLE 19**
**ENTIRE AGREEMENT**

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.  Therefore, the City and the FOP, for the duration of this Agreement, except as provided in the Florida Statutes, or as specifically excepted by provisions of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter referred to, or with respect to any subject or matter not specifically referred to, or covered in this Agreement, even though such subject or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.  This Article shall not be construed to in any way limit or restrict the parties from negotiating, as provided in the Florida Laws, or any succeeding agreement to take effect upon the termination of this Agreement or any succeeding term of this Agreement.

City 001759

## ARTICLE 20
## TERM OF AGREEMENT

This Agreement shall be effective as of the 1st day of October 2018 and shall remain in full force and effect until the 30th day of September, 2021.

It shall be automatically renewed from year to year thereafter unless either party shall notify the other in writing at least thirty (30) days prior to the anniversary date it desire to modify this Agreement.

EXECUTED by the parties hereto on this_____ day of _____2019.

MIAMI BEACH FRATERNAL ORDER          CITY OF MIAMI BEACH, FLORIDA
OF POLICE, LODGE NO. 8


By: _____            By: _____

     Kevin Milan                         Jimmy Morales
     FOP President                       City Manager


By: _____            By: _____

     Alejandro Bello                     Dan Gelber
     FOP Secretary                       Mayor


_____        By: _____
Approved by Vote of the City Commission
                                         Richard Clements
                                         Police Chief

on the _____day of _____, 2019.


ATTEST:


_____        Date _____
Rafael E. Granado
City Clerk


FOP - 62

City 001760

## FRATERNAL ORDER OF POLICE
## FOP LODGE NO. 8
## ELECTION  OF  REMEDY  FORM

Grievance No. _____

1._____        I/We elect to utilize the Grievance Procedure contained in the current Contract between the City of Miami Beach, Florida, and the FOP.  In making this election, I/we understand that selection of another forum, as defined by the FOP Contract, shall bar any consideration of the Grievance under the FOP collective bargaining agreement.

2._____        I/We elect to utilize another forum for my/our grievance, and in doing so, I/we understand that this election shall bar any consideration of this matter under the FOP collective bargaining agreement.

_____        _____
Signature                                                                        Date

Subject of Grievance/Appeal: _____

FOP - 63

City 001761

**Addendum:  Hearing Examiner Rules**

## HEARING EXAMINER RULES

**SECTION 1:   REQUEST FOR HEARING:**  Any member of the bargaining unit may appeal from disciplinary action within ten (10) days after the delivery or mailing to him/her of such written notice, by filing a written request for a hearing to the Hearing Examiner or his/her designee.  If the tenth day falls on a Saturday or Sunday, he/she will have the ability to file for an appeal on the following Monday.

**SECTION 2:   DISCIPLINARY HEARINGS:**

(a)     The City Manager or his/her designee not later than ten (10) days after receipt of such appeal, shall fix a place and time for holding a public hearing within a reasonable time thereafter.  Written notice of such time and place shall be delivered or mailed promptly to both the Appellant and the Appointing Officer.

Only the Hearing Examiner may grant a continuance to either party for good and sufficient cause.  No continuance shall be granted to either party unless such request for continuance is received in writing by the City Manager or his designee at least ten (10) days prior to the date of said scheduled hearing of appeal.

(b)     The Hearing Examiner may, at the request of the Appointing Officer or the Appellant, call or request any person or records for the purpose of ascertaining the facts.

(c)     The Appointing Officer or a representative designated by him/her, shall have the right to be present at such hearing and to be represented by the City Attorney.

(d)     The Appellant shall have the right to be present at such hearing and to be represented by an attorney of his/her choice.

Said attorney shall be an attorney duly admitted and licensed to practice in the State of Florida.  In the event that the Appellant does not retain an attorney, said Appellant may have an advisor of his/her choice present.  Such advisor shall not have the right to interrogate any witnesses or to enter objections to any testimony or evidence presented to the Hearing Examiner, nor may such advisor speak in the Appellant's behalf.

FOP - 64

City 001762

(e)     The findings of the Hearing Examiner shall be based upon competent substantial evidence of record.

(f)     The Appointing Officer shall have the burden of presenting evidence to support the truth of the charges as contained in the written notice.

(g)     The Appellant shall have the right to present evidence to refute the charges brought against him/her.

(h)     The Appellant shall have the right to be confronted by his/her accuser, and the Appellant and the Appointing Officer shall each have the right to cross-examine the witnesses of the other.

(i)     After both the Appointing Officer and the Appellant shall have presented their testimony and evidence, the Hearing Examiner shall receive argument in summation. The Appointing Officer shall have both the opening and closing argument.

(j)     After the completion of closing oral argument, the Hearing Examiner shall consider the testimony and evidence presented before the Hearing Examiner to determine the truth or untruth of the charges.

(k)     Within five (5) working days after the completion of the hearing, the Hearing Examiner shall issue his or her findings as to the truth or untruth of the charges in writing. The City Manager or his/her designee shall promptly deliver or mail a copy of such findings to the Appointing Officer and to the Appellant.

(l)     A copy of the written statement given the officer or employee, a copy of any reply thereto, and a copy of the findings of the Hearing Examiner shall be filed as a Public Record in the Human Resources Department.

City 001763

| Job Classification (Range) | | | | | Effective First Pay Period Ending in October 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Longevity 1=2.5% | 2=5.0% | 3=7.5% | 4=10% | 5=11% | | | | |
| | | | | | 7 years | 10 years | 15 years | 20 years | 25 years | | | | |
| STEP | | 1 | 2 | 3 | A | B | C | D | E | F | G | H | I |
| 5305 | Detention Officer | | | | 45,631.56 | 48,954.62 | 52,520.26 | 56,344.86 | 60,448.70 | 64,851.28 | 69,574.18 | 74,641.32 | 78,373.36 |
| | | | | | 1,755.06 | 1,882.87 | 2,020.01 | 2,167.11 | 2,324.95 | 2,494.28 | 2,675.93 | 2,870.82 | 3,014.36 |
| | | | | | 21.94 | 23.54 | 25.25 | 27.09 | 29.06 | 31.18 | 33.45 | 35.89 | 37.68 |
| 8001 | Police Officer Trainee | 49,817.82 | 52,748.28 | 55,679.00 | | | | | | | | | |
| | | 1,916.07 | 2,028.78 | 2,141.50 | | | | | | | | | |
| | | 23.95 | 25.36 | 26.77 | | | | | | | | | |
| 5011 | Police Officer | | | | 58,609.20 | 61,541.18 | 64,606.36 | 67,949.44 | 71,290.96 | 74,880.78 | 78,531.18 | 82,493.58 | 86,618.22 |
| | | | | | 2,254.20 | 2,366.97 | 2,484.86 | 2,613.44 | 2,741.96 | 2,880.03 | 3,020.43 | 3,172.83 | 3,331.47 |
| | | | | | 28.18 | 29.59 | 31.06 | 32.67 | 34.27 | 36.00 | 37.76 | 39.66 | 41.64 |
| 5010 | Sergeant of Police | | | | | | | | | 86,577.92 | 90,907.70 | 95,488.12 | 100,262.50 |
| | | | | | | | | | | 3,329.92 | 3,496.45 | 3,672.62 | 3,856.25 |
| | | | | | | | | | | 41.62 | 43.71 | 45.91 | 48.20 |
| 5009 | Lieutenant of Police | | | | | | | | 95,488.12 | 100,193.08 | 105,266.72 | 110,527.56 | 116,054.12 |
| | | | | | | | | | 3,672.62 | 3,853.58 | 4,048.72 | 4,251.06 | 4,463.62 |
| | | | | | | | | | 45.91 | 48.17 | 50.61 | 53.14 | 55.80 |

FOP - 66

City 001764

**City of Miami Beach**
**Compensation Plan**

**Effective First Pay Period Ending in October 2020**

| Job Classification (Range) STEP | 1 | 2 | 3 | A (1=2.5% 7 years) | B (2=5.0% 10 years) | C (3=7.5% 15 years) | D (4=10% 20 years) | E (5=11% 25 years) | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5305 Detention Officer | | | | 46,087.88 | 49,444.17 | 53,045.46 | 56,908.31 | 61,053.19 | 65,499.79 | 70,269.92 | 75,387.73 | 79,157.09 |
| | | | | 1,772.61 | 1,901.70 | 2,040.21 | 2,188.78 | 2,348.20 | 2,519.22 | 2,702.69 | 2,899.53 | 3,044.50 |
| | | | | 22.16 | 23.77 | 25.50 | 27.36 | 29.35 | 31.49 | 33.78 | 36.24 | 38.06 |
| 8001 Police Officer Trainee | 50,316.00 | 53,275.76 | 56,235.79 | | | | | | | | | |
| | 1,935.23 | 2,049.07 | 2,162.92 | | | | | | | | | |
| | 24.19 | 25.61 | 27.04 | | | | | | | | | |
| 5011 Police Officer | | | | 59,195.29 | 62,156.59 | 65,252.42 | 68,628.93 | 72,003.87 | 75,629.59 | 79,316.49 | 83,318.52 | 87,484.40 |
| | | | | 2,276.74 | 2,390.64 | 2,509.71 | 2,639.57 | 2,769.38 | 2,908.83 | 3,050.63 | 3,204.56 | 3,364.78 |
| | | | | 28.46 | 29.88 | 31.37 | 32.99 | 34.62 | 36.36 | 38.13 | 40.06 | 42.06 |
| 5010 Sergeant of Police | | | | | | | | | 87,443.70 | 91,816.78 | 96,443.00 | 101,265.13 |
| | | | | | | | | | 3,363.22 | 3,531.41 | 3,709.35 | 3,894.81 |
| | | | | | | | | | 42.04 | 44.14 | 46.37 | 48.69 |
| 5009 Lieutenant of Police | | | | | | | | 96,443.00 | 101,195.01 | 106,319.39 | 111,632.84 | 117,214.66 |
| | | | | | | | | 3,709.35 | 3,892.12 | 4,089.21 | 4,293.57 | 4,508.26 |
| | | | | | | | | 46.37 | 48.65 | 51.12 | 53.67 | 56.35 |

FOP - 67

City 001765

**City of Miami Beach**
**Compensation Plan**

**Effective First Pay Period Ending in October 2021**

| Job Classification (Range) STEP | | 1 | 2 | 3 | A Longevity 1=2.5% 7 years | B 2=5.0% 10 years | C 3=7.5% 15 years | D 4=10% 20 years | E 5=11% 25 years | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5305 | Detention Officer | | | | 46,548.76 | 49,938.61 | 53,575.91 | 57,477.39 | 61,663.72 | 66,154.79 | 70,972.62 | 76,141.61 | 79,948.66 |
| | | | | | 1,790.34 | 1,920.72 | 2,060.61 | 2,210.67 | 2,371.68 | 2,544.42 | 2,729.72 | 2,928.52 | 3,074.95 |
| | | | | | 22.38 | 24.01 | 25.76 | 27.63 | 29.65 | 31.81 | 34.12 | 36.61 | 38.44 |
| 8001 | Police Officer Trainee | 50,819.16 | 53,808.52 | 56,798.15 | | | | | | | | | |
| | | 1,954.58 | 2,069.56 | 2,184.54 | | | | | | | | | |
| | | 24.43 | 25.87 | 27.31 | | | | | | | | | |
| 5011 | Police Officer | | | | 59,787.24 | 62,778.16 | 65,904.94 | 69,315.22 | 72,723.91 | 76,385.89 | 80,109.65 | 84,151.71 | 88,359.24 |
| | | | | | 2,299.51 | 2,414.54 | 2,534.81 | 2,665.97 | 2,797.07 | 2,937.92 | 3,081.14 | 3,236.60 | 3,398.43 |
| | | | | | 28.74 | 30.18 | 31.69 | 33.32 | 34.96 | 36.72 | 38.51 | 40.46 | 42.48 |
| 5010 | Sergeant of Police | | | | | | | | | 88,318.14 | 92,734.95 | 97,407.43 | 102,277.78 |
| | | | | | | | | | | 3,396.85 | 3,566.73 | 3,746.44 | 3,933.76 |
| | | | | | | | | | | 42.46 | 44.58 | 46.83 | 49.17 |
| 5009 | Lieutenant of Police | | | | | | | | 97,407.43 | 102,206.96 | 107,382.58 | 112,749.17 | 118,386.81 |
| | | | | | | | | | 3,746.44 | 3,931.04 | 4,130.10 | 4,336.51 | 4,553.34 |
| | | | | | | | | | 46.83 | 49.14 | 51.63 | 54.21 | 56.92 |

FOP - 68

City 001766

FEDERAL MEDIATION AND CONCILIATION SERVICE
Case No. 15-56993-3

---------------------------------X
In the Matter of Arbitration      :   RBJ Case No. 15-183

        -between-                  :

FRATERNAL ORDER OF POLICE,        :
LODGE NO. 8, and MICHAEL MULEY
                                   :
        Grievants,                     **OPINION AND AWARD**
                                   :

and                                :

CITY OF MIAMI BEACH,              :

        Employer.                  :
---------------------------------X

Appearances:

     CITY OF MIAMI BEACH, by:
          David Miller, Esq. and Michael Elkins, Esq.
           Of Bryant Miller

     Also present for the City:
          Sergeant Thomas Payne
          Lieutenant Richard Weissman

     FOP Local 8, by:

          Eugene Gibbons, Esq.

     Also present for the Union:
          Michael Muley, Grievant
          Bobbie Jenkins

Before:

     Roger B. Jacobs, Impartial Arbitrator

Exhibit

**6**

Clements 4/23/2024 J.E.

City 001930

<u>O P I N I O N</u>

This proceeding arose as a result of a grievance filed by FOP Local 8 (the "Union" or "FOP") regarding the discharge of Michael Muley (the "Grievant").

The parties, having been unable to resolve their dispute, have submitted this matter to arbitration pursuant to the collective bargaining agreement. The undersigned was designated as the Arbitrator.

Hearings were held on June 6, 7, and 8, 2016 in Miami Beach, Florida. At such hearings, the Union and the Company were present; the parties were represented as shown above by the appearances and were afforded a full opportunity to present evidence both oral and written, examine and cross-examine witnesses under oath and otherwise to present in full their respective positions, arguments and proofs. The parties also submitted post-hearing memoranda setting forth their arguments as well as supplemental submissions responsive to questions I posed.[1]

This Opinion and its accompanying Award are based upon the record as thus constituted.

**THE ISSUE**

The parties agreed upon the following issue and remedy.

Was there just cause for the termination of Michael Muley? If not, what shall the remedy be?

---

[1]At the conclusion of the hearings, the parties agreed that briefs would be submitted by July 21, 2016, directly to the Arbitrator. The date was extended to August 1, 2015. Briefs shall be referenced as follows:
    City of Miami Beach Brief - "MB at ___"
    FOP Brief - "FOP at ___"

The supplemental submissions shall be referenced as follows:
    City of Miami Beach Supplemental Brief - "MB Supp. Br. at ___"
    FOP Supplemental Brief - "FOP Supp. Br. at __."

City 001931

## BACKGROUND

The Collective Bargaining Agreement ("CBA") was submitted as JT-2 and I will rely upon it for the scope of my authority and to define matters at issue. Excerpts of the CBA are attached as Appendix A.

This case primarily involved Sgt. Muley being intoxicated while handling an off duty assignment at Mango's Bar in Miami Beach, Florida, on July 14, 2014. Sgt. Muley admitted that he was intoxicated at that time and also pulled his Smith & Wesson Revolver M&P 40 MM partially from his holster. His behavior was corroborated by video evidence as well as testimony.[2] As a result, the City of Miami Beach brought seventeen charges against Sgt. Muley. Ex. 3A.

## POSITIONS OF THE PARTIES

### City of Miami Beach

Based upon the totality of the circumstances, termination of Michael Muley was justified. The facts met the City's burden of proof to establish just cause for dismissal. The City case "is simple" and Muley's intentional misconduct cannot be justified under any circumstances. MB at 1. Muley created a spectacle that damaged public confidence. Id. The City denied it acted improperly and said "ultimately that does not matter." MB at 2. The City said that what matters is Muley's "15 year history of extreme uncontrolled binge drinking."[3]

Despite Grievant's long record of service, his behavior on July 14, 2014 was so egregious and in violation of Miami Beach protocols for police, that he should be terminated. His misconduct occurred while he was on duty. Thus, returning him

---

[2] The testimony was transcribed by a court reporter, Marla Schreiber. References to transcripts shall be as follows: "Tr. at ___."

[3] The only evidence presented was drinking on July 14, 2014. On cross-examination, Muley admitted he had an episodic drinking issue but no other specific events were presented before me.

City 001932

to service would undermine the confidence of the Department and public.  There was a "rock bottom line for Chief Oates:  [T]here is no place for consuming alcohol on duty."  MB at 10.

Muley's level of intoxication was extreme.  MB at 4. (Blood alcohol level of 0.287 percent.)  In addition, Grievant had a history of uncontrolled behavior even if there were no prior instances of aberrant conduct working as an officer in the City of Miami Beach.  There was no basis for mitigation.  The issues that caused Muley's problems still existed.  "He is writing a check he cannot cash.  No addict can make that guarantee.  Neither can he."  MB at 22-23.

The City contends it is simply too dangerous to return the Grievant back to work.  "The result of his extreme intoxication was not only predictable, but was intended."  MB at 4.  As the Chief said, he (the Chief) needed to manage risk and the risk in this case to the public outweighed the potential harm to Michael Muley.

Muley had been a fine officer prior to this incident. However, he crossed the line on July 14, 2014.  An officer cannot be drunk on duty.  "[S]ympathy cannot excuse the inexcusable, cannot absolve the intentional misconduct he committed, and cannot justify putting the public at renewed risk."  MB at 1.  It is that simple.  Returning Muley to duty sends a bad message both to the police force and to the citizens of Miami Beach.

The City urged that the "sole issue before the Arbitrator is whether the degree of discipline - discharge - was warranted in this case."  MB at 6.  The City said whatever standard of just cause is applied, discharge was appropriate.  MB at 7. Relying upon another Miami Beach case, the City quoted that "[a]llowing this officer a second chance in this case would be

4

City 001933

unjustified." MB at 7, citing <u>Gutierrez and City of Miami Beach</u>.[4]

<u>The Union</u>

The penalty in this case was too harsh based upon the service record of Muley; his lack of prior discipline; and the mitigation factors that should be taken into account. In addition, the acts and conduct of the City in this case following Muley's hospitalization were simply outrageous.[5] The City also failed to follow applicable CBA provisions for the treatment of alcohol and drug issues. FOP at 5. The City failed to send Muley for evaluation and did not offer treatment to Muley as required by its own regulations.[6] "Chief Oates did not need another test; Muley had already provided his urine sample." FOP at 6.

The City also violated Muley's constitutional and statutory rights by invading his hospital room after he was off duty from work. The FOP argued that "[a]ny compelling interest that the public employer may have had to obtain a blood sample had been satisfied by way of the agreed to urine sample." <u>Id</u>. At 6. While Muley was hospitalized, someone from the City filed a Workers Compensation claim in his name in an effort to evade the privacy laws and to obtain Muley's blood test results. The City

---

[4]In <u>Gutierrez</u>, the arbitrator concluded use of urinalysis was appropriate for alcohol testing. A urine sample was given by Muley. It was never addressed on the record. In addition, in <u>Gutierrez</u> the arbitrator stated that the City came to the arbitration "with unclean hands." The testimony of former Chief Raymond Martinez was that it was "not unusual for officers to be photographed with tourists." P. 19. He also discussed the "culture" issue which was <u>not</u> before me in this case.

[5]"[T]he City is also not without sin and has in fact acted in bad faith…." FOP Supp. Br. at 3.

[6]The City and the Union bargained to reach a "reasonable suspicion drug testing process … in Article 15." FOP at 4. This protocol requires officers to be subject to urinalysis. <u>Id</u>.

City 001934

breached Muley's rights to privacy.[7] The order to draw blood was illegal and unnecessary since Muley had already provided a urine sample. FOP at 7. Thus, "Chief Oates' order was not in keeping with the plain language of the CBA." Id.

Consideration of Muley's service record justified a penalty less than termination. The FOP reviewed the charges against Muley in detail. The primary focus was on Muley's refusal to agree to a blood test and that test was wrong based upon the CBA. FOP at 9.

The Union urged that "p]roper evaluation and assessment of Muley's personal issues including his battles with alcohol abuse, medical, financial and family problems taken in conjunction with the previous Barret Robbins shooting, and the every day job related stressors that go hand in glove with police work cannot be simply ignored or brushed off…." FOP at 12. Muley's condition was general and common knowledge in the MBPD and that knowledge should be imputed to the City. The City had treated others differently and sought to make an example out of Muley instead of helping him. Thus, termination under the circumstances was not justified and a lesser penalty should be imposed.

The FOP also said "the real reason Chief Oates could not save Muley's career is because City politics not true leadership got in the way of doing the right thing in this case." FOP at 14.

### FINDINGS OF FACT

There is little disagreement on the basic facts in this dispute. Michael Muley (hereinafter Muley or Grievant) had been employed by the City of Miami Beach Police Department (MBPD)

---

[7] "[T]he City was hell bent on obtaining Muley's blood alcohol results." FOP Supp. Brief at p. 3.

City 001935

from 2000 until his termination on March 13, 2015. He had attained the rank of sergeant and was a highly decorated and dedicated officer. Ex. UN1.

MULEY BACKGROUND

Muley had prior service as a police officer in the City of Tallahassee for about eight years. He had grown up in the northern Florida area and received an athletic scholarship to Eastern Kentucky University where he was a varsity athlete for five years. He is married to Lycette and has three teenage sons. He has also adopted his niece.

Muley was a highly decorated officer. He received the Medal of Valor at least twice and was officer of the year on several occasions. Prior to the incident leading up to his dismissal, he was considered an outstanding cop.

Muley described the impact of a shooting incident in 2005 with Barrett Robbins, a former NFL player. Muley said he was hospitalized and had psychological trauma that continued for years due to the events as well as protracted litigation that followed. He said the Robbins' matter "just wouldn't stop and took a toll on his family." Tr. at 481. He said he was deposed fifteen times.[8]

No other issue of discipline was discussed on the record before me.

Personal Issues. Muley said he began to drink in 2002 when his dad died. He said that for eight months, he drove from Miami to Tallahassee, and back to Miami, each weekend. After his dad died, his mother also had financial difficulties. He continued to care for her and provide her with financial assistance. He said he had a compulsive drinking problem --

---

[8]He met with Michael A. Rosen for treatment. Muley discussed the stresses with Rosen including the stress of dealing with his mom. Muley met with Rosen on February 25, 2011, March 4, 2011, March 18, 2011 and April 2, 2011.

City 001936

because "I pushed myself to the limit." Tr. at 528. The problem continued but he never missed work.

Muley said he sought treatment in 2011 under the City Employee Assistance Program (EAP). It was a confidential program.

Muley said "when things piled up I overdrank." From 2011 to the incident (on July 14, 2014) he had no alcohol. He regularly attended meetings and worked midnights. He attended meetings at the St. David's Church in Davie, Florida and also took other officers to the program.

<u>Marital Issues</u>. His wife was very demanding, had a hot temper, and was aggressive and "in your face." She objected to Mike sending money to his mother, they "battled" over issues and there were tough times. He said frequently he slept elsewhere to avoid problems with her.

<u>EVENTS OF JULY 13-14, 2014</u>

**July 13, 2014:**

Muley had driven with his wife and family to Cooperstown, New York, to participate in a baseball tournament. He was the coach of his son's team, the Pembroke Lake Bulldogs. Muley slept in the barracks with the team. Tr. at 492. He testified credibly that after an argument with his wife, she drove him to the Albany airport on July 13, 2014. She told him to exit the car and that she had already purchased an air ticket for his return to Miami. She also told him she would be seeking a divorce upon her return. Tr. at 495.

Muley was met upon arrival in Florida by his friend and fellow police colleague Oscar Placencia. Oscar offered no comments about the incident. However, Lt. Eugene Rodriguez of the MBPD, and a friend, testified it was "freaking humiliating to have your wife put you on a flight and send you home. It was simply outrageous." Tr. at 402-403.

8

City 001937

**July 14, 2014:**

Muley was asked by Officer Schultz to cover for Schultz that night at Mango's, an off duty location about two blocks from the police headquarters. Tr. at 493. Muley had been there many times before.

Muley arrived late, at about 11:00 p.m. He admitted that he was late during his testimony.[9] Muley spent about one hour at the location and then went to the station to do paper work. Tr. at 499. He returned to Mango's a few hours later. Shortly thereafter, he began to consume shots of vodka with cranberry juice. His drinking was captured on video and was not contradicted. Muley admitted to having several drinks while on duty at Mango's and becoming intoxicated. Tr. at 505. The video evidence showed drinking at least at 3:21 a.m., 3:36 a.m. and also at Fat Tuesdays. Ex. 1.

Significantly, Muley can also be seen pulling his revolver partially from the holster - he said to demonstrate the new holster. Tr. at 508. The sequence took about four seconds on the video. Police regulations are clear -- the weapon is not to be removed unless it is in use. He was in violation of the regulation. The weapon was loaded when being worn by an officer. Tr. at 216. There was no safety on the weapon. Tr. at 212.

Muley also admitted having pizza from Mango's and putting some in his police vehicle. He admitted that he ate food and did not pay for it.[10]

At about 4:12 a.m., Muley was escorted to the Waldorf Hotel by Wayne Smith, a bouncer at Mango's. Muley can be seen on the

---

[9]No payment record was submitted in evidence for that off duty assignment.
[10]However, other officers testified that it was a routine and consistent practice for officers on off duty assignments to have food provided to them.

City 001938

video walking to the hotel and then leaving very soon thereafter. He walked unsteadily on Ocean Court Alley. He held on to a post at one point for balance.

**Muley did not dispute any of these facts.**

Sometime after 4:00 a.m., the City had received an anonymous call stating that an officer was drunk walking on the street. Sgt. Thomas Payne of Internal Affairs (IA) was assigned to coordinate the investigation. He contacted Lt. Michael George who went to the scene. Lt. George testified that he found Muley and he asked Muley if he was alright. Muley said he was not. Muley said he did not feel well and had personal issues. Muley admitted to George that he had been drinking. Tr. at 179.

Muley got into the police vehicle driven by George and was taken to the side of the station by the cannon. Several other officers were called to the scene, both for the Internal IA investigation and from the FOP. Sgt. Bello, President of the FOP, spoke to Muley. Bello requested medical assistance which was provided by Fire Rescue. Muley was taken in that vehicle to Mt. Sinai Hospital where he went in to a room in the ER and was admitted to the Hospital. Muley remained at the hospital for several days and had extensive surgery. He was given morphine for pain.

Muley had been relieved of duty at the station and his holster and weapon were removed at that time. He was not on duty at the hospital and had not submitted time for payment for his work at Mango's.

MT. SINAI HOSPITAL

Muley tried without success to perform a breathalyzer test administered by the outside vendor designated in the CBA. He had abdominal issues that made a sustained breath impossible for him. Tr. at 517. Muley provided a urine sample whose contents

10

City 001939

and analysis were not presented on the record.  The urine sample was drawn about 7:20 a.m. and known to the officers on the scene.

Captain Mildred Pfrogner, in charge of IA, also came to the hospital to oversee the investigation.  She had been in touch with Chief Daniel Oates who had directed her to obtain a blood draw from the Grievant.  Muley refused three times.  On the video in evidence Muley said he understood the order, that he had been given medicine, and that he would not consent on advice of counsel.  Tr. at 518-519.

Multiple charges against Muley were related to this refusal and for "insubordination" for refusing this order.  Muley did not deny this refusal.

Several officers were present in Muley's room at the hospital on July 14, 2014.  At some point, hospital staff asked MBPD personnel to leave Muley's room.  Tr. at 225.

## BLOOD TESTING

A related issue arose with regard to obtaining his blood alcohol level.  After Muley refused to provide a blood sample, MBPD obtained that information from a workers' compensation report filed by the city without Muley's permission.  Chief Oates admitted that he only became aware of Muley having a .287 ethanol reading from Muley's workers' compensation report which the City utilized.  Thus, to the extent the City raised a question about lack of knowledge regarding his medical condition, at least as of July 2014, that argument is simply not credible.

## WORKERS' COMPENSATION FILING

Muley had not requested, consented to, nor filed a workers' compensation claim. Tr. at 541.  Lt. George filed one on behalf of Muley that was withdrawn the following day by the City.  It was withdrawn once the City received the information it wanted.

11

City 001940

At no time did Muley authorize the claim to be filed and was not aware it had been done. The report - which is in evidence - was made available to Miami Beach approximately the same day or next day and had a full discussion of his medical conditions, although individual prior hospitalizations were not enumerated. Ex. C4.

The report was transmitted on July 15, 2014. The exact date it was received by the City of Miami Beach was unclear. No testimony explained how it was filed and by whom. However, the City argued that it was a business record maintained by the City. Counsel stated "It is part of the internal affairs report." Tr. 557. It was attached to the final action to terminate. Tr. 587. The report referenced Muley's prior medical history – without dates – including several abdominal issues and surgeries. It stated treatment in July, 2011 in some detail.

Moreover, it also stated "Patient does not want medical information shared with anyone – this includes family and members of the police force." Ex. C4 (emphasis added). His request was not honored. The City, apparently, had its contents during the entire pendency of this investigation![11]

Muley did not return to service as a police officer after July 14, 2014. He was suspended with pay until his discharge on March 13, 2015.

---

[11]The FOP said "the City has strenuously argued … they were never made aware of the fact that Muley was suffering with personal medical issues, nor did they have any proof of it. The contents of the City's own documents clearly refute the City's baseless assertion in this regard. FOP Supp. Br. at 2.

City 001941

## CHIEF OATES' DECISION

Daniel Oates, the Chief of Police in Miami Beach, ultimately concluded that he could not tolerate the risk of retaining Muley on the force. He testified credibly about his twenty years of prior experience in the NYPD.[12]

Chief Oates had been instrumental in setting up alcohol treatment programs in Aurora, Colorado and Ann Arbor, Michigan where he had also been Chief, prior to coming to Miami Beach. In Miami Beach, he stated that he had an "informal arrangement" with the City Manager but not a formal program. At least two current officers were assisted in residential programs. However, Chief Oates testified that neither was intoxicated on duty, unlike Muley. Being drunk on duty, however, was unacceptable under any circumstances.

## TESTING, DRUG TESTING, REASONABLE BELIEF TESTING

There are several applicable provisions regarding testing. Article 14 of the CBA provided that the Chief may direct an employee to "submit to a urinalysis…." Article 14.b also provided for a last chance agreement for positive test for alcohol or drugs at the sole discretion of the City Manager. However, no such agreement was placed before me on this record so I did not focus on that provision.

The City of Miami Beach also had policies governing drug and alcohol misuse prevention which provided as follows:

> 3. Refusal to take the required tests or lack of cooperation with the testing procedures will be considered a "test positive" and will be handled accordingly.

> 7. All employees who test positive to a drug or alcohol test must be evaluated and released to duty by

---

[12]A seminal event for Oates occurred on St. Patrick's Day, in the early 1980's, regarding misuse of alcohol by officers. He was concerned about alcohol abuse by officers.

City 001942

the Substance Abuse Professional (SAP) before returning to work.  Ex. 4(a) (emphasis added.)

Reasonable suspicion testing was discussed on page four. The provision applicable to Muley provided as follows:

2.   RESULTS OF POSITIVE TESTS

º   Safety-sensitive employees, with an alcohol test of 0.04 or greater must be removed from their job duties, including safety-sensitive functions and cannot return until the employee undergoes evaluation and rehabilitation as determined by the SAP.   The employee must undergo a breathalyzer test with a result of less than 0.02 before he/she can return to duty.   Other employees will be subject to the same standard.
(emphasis added.)

º   A safety-sensitive employee, with positive results of drug tests will not be permitted to return to safety-sensitive functions or other job duties until:   the employee undergoes evaluation and rehabilitation as determined by the SAP.  The employee must undergo a return to duty test with a negative result.   Other employees will be subject to a similar standard depending on the nature of their functions.
(emphasis added.)

º   Safety-sensitive employees with positive test results will also be subject to a minimum of 6 unannounced tests over a 12 month period and may be tested for up to 5 years.  All other employees may be similarly evaluated as deemed appropriate by the SAP.

It is undisputed that these protocols were not followed. Chief Oates admitted that he did not send Muley for evaluation or rehabilitation at any time.   Tr. at 338.   The only comment regarding compliance by the City was that - "None of that matters.  The City denies it acted improperly, but it ultimately does not matter."  MB at 2.

The MBPD also had guidelines regarding reasonable suspicion/drug testing – Ex. 4F; SOP 135.   The SOP defined a

14

City 001943

protocol to be used for "any employee for whom there is a reasonable suspicion…." The City did not follow this procedure with Muley.

There is also a drug testing protocol for police codified in SOP #135. The SOP required immediate evaluation of the employee. The SOP stated:

> If reasonable suspicion exists, the employee shall be taken immediately for evaluation in accordance with Federal Statute 49 CFR Part 391.00(c), City Policy, and any bargaining unit contract that may apply.

The SOP also specifically dealt with reasonable suspicion drug testing, where and how it was to be conducted. It stated in pertinent part, II.6, that "[a]ll reasonable suspicion tests will get both the drug test and an alcohol breathalyzer test."[13]

## ANALYSIS

There was no question on this record that Muley was intoxicated on duty and he withdrew his weapon at Mango's while drunk. Most of the other charges — by the Chief's own admission — were cumulative and not determinative in his decision-making.

## MITIGATING FACTORS

Several officers testified that Muley was the most highly decorated officer on the force. His heroism was demonstrated through much testimony.[14] Muley also testified credibly that he lived through the Robbins' attack and incident for many years. He said he was provided with only thirty minutes of counseling to deal with that situation even though he was sued personally after the individual was released from prison.

---

[13]The Memorandum of Understanding between the parties dated June 10, 1991 also provided that for reasonable suspicion testing "blood will normally be used for blood alcohol test and when a urine sample is impractical." Ex. 4G. It does not, however, address a conflict between different testing modalities or when there is a refusal for one test because another has already occurred. In this case, urine was provided and blood testing refused. The protocol provided that a refusal was considered a "positive" test result.
[14]See Ex. UN1 for his numerous commendations.

15

City 001944

Muley's level of stress from the job and personal matters seemed extreme as presented at this hearing.  He testified about long standing marital issues as typified by his forced return from Albany the day before the July 14 incident.

Another complicating factor was the timing of a new Chief of Police for MBPD.  Chief Oates joined the Miami Beach on June 9.  This incident arose on July 14.  Thus, a "perfect storm" was set in place.

A new chief cannot be expected to be fully familiar with Muley or any of the other 390 or so officers on the force.  However, lack of familiarity does not excuse the City from compliance with the terms of its CBA as well as other obligations to City employees.

<u>LEVEL OF INTOXICATION</u>

Muley was asked three times to submit to a blood test.  He refused.  He admitted to drinking and never denied that fact.

It was not clear why his <u>level of intoxication</u>, if that is the correct term, was relevant after his admission.  The reasonable suspicion guidelines stated that for reasonable suspicion alcohol use on the job the employee "will be required to go for an evaluation…"  This provision was ignored by the City.

Further, it provided that "all employees who test positive to … alcohol test must be evaluated and released to duty by the Substance Abuse Professional (SAP)."

Muley was not sent for evaluation and rehabilitation and was not seen by a SAP.  The Chief admitted non-compliance.

Muley was relieved of duty on July 14, 2014 but not separated from service until March 13, 2015 with full pay and benefits during his suspension.  He could have been sent for evaluation and possible rehabilitation during those intervening nine months.

City 001945

Significantly, Chief Oates testified that obtaining the blood test was not particularly important, in hindsight, since there was overwhelming evidence of Muley's behavior. Tr. at 357.

MBPD RECORDS

The City introduced documents as business records showing Lt. George filed a workers' compensation claim on behalf of Muley. It was submitted into evidence as a record of the City. The city exhibit was obviously in its possession including its words and contents. No witness explained how the document came to be initiated by the City although its purpose was transparent.

The City made an end around to obtain Muley's medical information, including ethanol level. Muley testified — without contradiction — that he did not file nor authorize anyone to file a workers' compensation claim on his behalf. The form had five substantive pages and a brief factual history on the top of the second page. It had personal medical information regarding his prior treatment including surgeries.

Testimony from the City that it lacked knowledge regarding Muley's prior medical condition is not credible. While the Chief was new on July 14, 2014, this document was dated that same day and was obviously obtained by the city at or around that date. In addition, various officers testified, without contradiction, that they were aware, at various degrees, of medical issues suffered by Muley. It was generally known by the Miami Beach PD that Muley had prior and serious medical conditions.

FIRST REPORT OF ILLNESS OR INJURY (EX. 3K) REPORT

This report was signed by Lt. George on July 14, 2014. For employee, it stated "unable to sign" meaning Muley. There was no indication that Muley was ever even made aware of this filing

17

City 001946

by Lt. George or asked to sign.   The report noted that Muley did not lose time from work and checked "other" for cause of accident.   The only factual notation was "Mike Muley advised he was experiencing abdominal pain."   No evidence was presented by Lt. George regarding this report or filing.   Since Muley was not asked about the workers' compensation or First Report in the hospital he could not sign it.

For the purposes of this grievance, I need not decide what violations of standards and laws, if any, occurred by the filing and transmittal of a workers' compensation claim on behalf of Muley without his permission and authorization.   His comments on the report are, however, noted and troubling.[15]   He specifically wanted his privacy maintained and it was not.

DISCIPLINARY STEPS BY MIAMI BEACH

Muley was relieved of duty on July 14, 2014.   His holster and weapon were taken.   He never returned to service.   IA began its investigation right at the hospital.   IA personnel were "asked to leave the hospital room by the hospital compliance officer" according to the IA report (at page 50).

At 12:50 a.m. "Relieved of duty" paper work was signed by attorney Bushel.   It noted that Muley needed to follow the workers' compensation procedures upon release from the hospital and call IA.   However, the workers' compensation claim was withdrawn by the City before Muley even left the hospital.

The Internal Affairs report was submitted by Sgt. Thomas Payne on November 3, 2014 and signed by Captain Pfrogner the same day.   The report was fifty-five pages and was submitted in evidence at the hearing in this matter.

---

[15]The FOP said "[w]hy the City executed the initial claim of work related injury document is a mystery to Muley and how the City obtained certain private medical information is highly questionable."   FOP Supp. Br. at 2.

City 001947

On <u>December 1, 2014</u> a Disposition Panel issued its report to the Chief of Police with its recommendation for Muley's termination.   The panel found violations of all of the provisions charged.   It also found Muley's intoxication became an incident which "several local news broadcast networks aired…some repeatedly.   The story was also printed by the Miami Herald" and created negative media attention which adversely impacted the Miami Beach PD.

The Internal Affairs report was approved by Chief Oates on <u>December 4, 2014</u>.

Muley was notified of a pre-determination hearing on <u>January 9, 2015</u> and an identical list of charges was provided. Ex. 3A.   The document was entitled "Intent to terminate."

A pre-determination hearing was held on <u>February 4, 2015</u>.

A request for approval of termination was sent from Angela Menendez, Sr. Human Resources Specialist to Jimmy Morales, City Manager on <u>March 13, 2015</u>.   It was signed by both Chief Oates and Manager Morales.

Muley's grievance was dated <u>March 29, 2015</u> regarding his termination.

The findings on behalf of the City Manager were signed <u>July 1, 2015</u> by Lee Kraftchick sustaining the termination of Muley. The report noted that the FOP raised the issue of workplace and personal stress.   The decision found discharge appropriate due to the severity of the misconduct while admitting Muley had been an excellent officer and was suffering from significant stress on the date of the misconduct.

<u>COMPLIANCE WITH CBA AND OTHER APPLICBLE REGULATIONS</u>

The City failed to follow its protocol for reasonable suspicion.   Article 14 of the Agreement provided for urinalysis based upon a reasonable belief.   Muley provided a urine sample. The results were never put on the record before me.   The City of

19

City 001948

Miami Beach had a contractual obligation, according to its CBA, regarding drug testing.  The City did not follow this protocol.

City of Miami Beach policies also provided that "[a]ll employees who test positive to a drug or alcohol test must be evaluated and released to duty by the Substance Abuse Professional (SAP) before returning to work."  If there was a positive test, according to this policy, for safety sensitive employees they must be removed from their job duties and cannot return until "the employee undergoes evaluation and rehabilitation as determined by the SAP."

The City of Miami Beach Police Department also did not follow the City's policy for safety-sensitive employees.  The policy provided for employees to undergo evaluation and rehabilitation as determined by the substance abuse professional.  No such testing was ever ordered for Muley nor was he seen by an SAP.  Thus, I do not agree with the City's comment that even if it acted improperly "it ultimately does not matter."  It does matter.

The just cause analysis must involve a balance of Muley's acts which clearly were in violation of his duties as a police officer with his prior service as well as the specific nature of his misconduct.  Muley was charged with seventeen infractions based upon his conduct on July 14, 2014.  During his testimony, Chief Oates testified that by far the most significant facts were Muley's high level of intoxication and the partial withdrawal of his weapon from the holster while intoxicated on July 14, 2014.  Chief Oates also stated that the media attention made Muley's conduct even more problematic.

Muley's policy violations are relatively straightforward, clear, and generally admitted.  They are very significant and troubling.

City 001949

However, the conduct and policy violations by the Miami Beach Police Department are also significant and must impact my analysis of the "reasonableness" of the discipline in this case.[16]

The City did not follow its own protocols and never sent Muley for evaluation as required.

Since the City urged that I rely upon the workers' compensation filing and accept it as a business record, I do. A review of the workers' compensation report has a detailed and lengthy recitation of Muley's medical history. This document was known to City personnel on or about July 14, 2014. Thus, its arguments to the contrary regarding medical issues for Muley are unfounded.

Additionally, in the workers' compensation report, it specifically stated that the patient did not want anyone, including his family or the police department, to be made aware of his condition. His request was ignored.

Muley provided a urine sample which appeared to satisfy the reasonable suspicion obligation.[17]

Muley refused to provide a blood sample but that evidence was obtained by the City anyway.[18] In that regard, Chief Oates admitted that, in hindsight, the test was unnecessary since Muley both admitted being intoxicated and clearly was intoxicated on the video evidence.

---

[16] See Riley Stokes Corp., 7 LA 764 (1947), cited by the City, where the majority of the Arbitration Board ruled it was "their right and duty to examine into the reasonableness of the penalty…." I must do the same.

[17] The City argued that Muley's blood alcohol level was more than three times the legal standard to drive. Yet, no evidence supported the conclusion that he was going to drive. MB Supp. Br. at 2.

[18] Also see, McCartney's, 84 LA 799 (1985), finding that failure to "afford the grievant an essential element of due process guaranteed by the just cause provision" of the Agreement was a serious deficiency. I agree. Id. at 806.

City 001950

## ANALYSIS AND AWARD

Based upon the entire record before me, I find Michael Muley was intoxicated on duty and partially raised his weapon from his holster on July 14, 2014, in violation of police regulations and rules of conduct.

He had pizza provided by the establishment, which was also a violation of the rules. Credible testimony, however, established that it was a routine practice for officers on off duty assignments at food establishments to eat without cost on those assignments.

Chief Oates testified that many of the charges against Muley were cumulative. His main focus was on the drunkenness while in uniform; the display of Muley's weapon; and the potential for further harm and disgrace to the police force. The Chief also commented that the public knowledge about the incident brought dishonor to the department and an overall problem for the City.

No scientific evidence was presented on the nature of alcoholism as a disease nor was such a diagnosis presented on the record. However, during cross-examination, Muley accepted the characterization of himself as an alcoholic. Contrary to the MBPD argument, he did not offer the "disease" as a justification for his behavior at any time. Rather, he simply asked for another chance, primarily based upon his record of service.

I also rely, in part, on a comment by counsel for the City of Miami Beach who stated as follows: "There is [sic] multiple SOP's, multiple regulations and a collective bargaining agreement all that needs to be read together." Tr. at 127. I agree and have applied all of those to conclude that the City

City 001951

did not follow its obligations under the regulations as well as the collective bargaining agreement with the FOP.

The City has established just cause for discipline against Michael Muley. However, the City was required to follow its own requirements before terminating Muley's employment.

In balancing the obligations of the City of Miami Beach to its citizenry and its Collective Bargaining Agreement with the FOP, I make the following award:

(1)  Muley shall be permitted to undergo evaluation regarding his alcohol issues and possible rehabilitation in accordance with the agreements referenced in my Award;

(2)  Should Muley be deemed able to undergo rehabilitation, he may elect to be placed in a residential treatment program for a period of several months consistent with Chief Oates' informal policy;

(3)  If Muley successfully completes that rehabilitation, he will be subject to a fitness for duty evaluation <u>prior</u> to any reinstatement;

(4)  In the event Muley is deemed fit for duty, he shall be reinstated at that time with no loss of rank or seniority; and

(5)  If Muley is not found fit for duty at that time, he will not be reinstated to the MBPD.

I shall retain jurisdiction over the remedy in this matter.

City 001952

The Grievance filed by Fraternal Order of Police, Lodge No. 8 regarding the termination of Michael Muley is sustained in part and denied in part.

By: _____
Roger B. Jacobs

Sworn to and subscribed before
me this 24th day of
August, 2016.

_____
Notary Public

**LUCIA SANTULLI**
**NOTARY PUBLIC**
**NEW JERSEY**
**MY COMMISSION EXPIRES 10-23-16**

City 001953

LUCIA SANTELLI
NOTARY PUBLIC
NEW JERSEY
MY COMMISSION EXPIRES 10-23-16

City 001954