Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2                       MIAMI DIVISION

3                CASE NO. 1:22-cv-21004-DPG

4

5

    JESSICA GUASTO,
6

7                       Plaintiff,

8      vs.

9

    THE CITY OF MIAMI BEACH, FL,
10     a Florida municipality,

11

                        Defendant.
12   _____/

13

14

                        2 South Biscayne Boulevard
15                      Miami, Florida
                        Tuesday, February 6, 2024
16                      9:00 a.m. to 3:00 p.m.

17

18

       VIDEOTAPED DEPOSITION OF JESSICA SALABARRIA (GUASTO)
19

20        Taken before Marlene Gutierrez, Notary

21   Public, State of Florida at Large, pursuant to Notice

22   of Taking Deposition filed in the above cause.

23

24                      - - - - - -

25

Page 2

1  APPEARANCES:
2      PAUL A. DARAGJATI, ESQ.
       ROSE DARAGJATI, ESQ.
3   Paul A. Daragjati, PLC
    4745 Sutton Park Court
4   Suite 503
    Jacksonville, Florida 32224
5   paul@daragjatilaw.com
    On behalf of the Plaintiff.
6
7
    MICHAEL L. ELKINS, ESQ.
8   MLE Law
    1212 Northeast 16th Terrace
9   Fort Lauderdale, Florida 33304
    melkins@mlelawfirm.com
10  On behalf of the Defendant.
11
    HENRY J. HUNNEFELD, ESQ. (Via Zoom)
12  BENJAMIN J. BRAUN, ESQ.
    City of Miami Beach
13  1700 Convention Center Drive
    Fourth Floor
14  Miami Beach, Florida 33139
    henryhunnefeld@miamibeachfl.com
15  On behalf of the Defendant.
16
17
18  ALSO PRESENT:
19  JAVIER ORDONEZ, Videographer
20
21      - - - - - -
22
23
24
25

Page 3

1               I N D E X
2
    Witness
3
    JESSICA SALABARRIA (GUASTO)
4
    Direct Examination By Mr. Elkins        5
5
6
7
            DEFENDANT'S EXHIBITS
8
9   Number      Description            page
10  Exhibit 1   charge of discrimination    39
11  Exhibit 2   settlement agreement        41
12  Exhibit 3   photo from Instagram        61
13  Exhibit 4   charge of discrimination    74
14  Exhibit 5   charge of discrimination   107
15  Exhibit 6   plaintiff's responses to   111
                interrogatories
16
    Exhibit 7   settlement agreement       128
17
18
19
20
21
22
23
24
25

Page 4

1       THE VIDEOGRAPHER:  Good morning.  We are going
2   on the record at 8:58 a.m. on February 6th, 2024.
3   This is media unit 1 of the video-recorded
4   deposition of Jessica Guasto taken by counsel in the
5   matter of Jessica Guasto v. City of Miami Beach.
6   The location of this deposition is 2 South Biscayne
7   Boulevard in Miami, Florida.
8   My name is Javier Ordonez.  I am the videographer.
9   The court reporter is Marlene Gutierrez.  And we are
10  both here with the firm Veritext.
11  Will counsel please introduce themselves for the
12  record, after which the court reporter will swear in
13  the witness.
14      MR. DARAGJATI:  Paul Daragjati and Rose
15  Daragjati on behalf of Jessica Guasto, the
16  plaintiff.
17      MR. ELKINS:  Michael Elkins on behalf of the
18  City of Miami Beach, and appearing via Zoom, Henry
19  Hunnefeld and Benjamin Braun from the city
20  attorney's office.
21      THE COURT REPORTER:  Ma'am, would you raise
22  your right hand, please.
23
24
25

Page 5

1  Thereupon --
2       JESSICA SALABARRIA (GUASTO)
3  was called as a witness by the Defendant and, having
4  been first duly sworn, and responding, "Yes," was
5  examined and testified as follows:
6          DIRECT EXAMINATION
7  BY MR. ELKINS:
8   Q   Good morning.
9   A   Good morning.
10  Q   How do you want me to address you?  Is it
11  Mrs. Guasto or Ms. Guasto?
12  A   Jessica Guasto or Salabarria is fine, because I
13  recently just got my name changed back to Salabarria.
14  Q   Okay.  So we'll talk about that in a little bit.
15      Have you ever given a deposition before?
16  A   Yes.
17  Q   Okay.  When?
18  A   In criminal court, for cases where I've arrested
19  defendants.
20  Q   How many times have you been deposed?
21  A   Off the top of my head, I don't have a number.
22  Q   Best guess.
23  A   I don't have a number.
24  Q   Have you ever been deposed in a civil case?
25  A   No.

2 (Pages 2 - 5)

1    Q   Okay.  So civil depositions might be a little
2  bit different, so I'm going to go over a few ground
3  rules for today.  Hopefully, it'll make this go a
4  little bit faster.
5        The first rule is that even though you're on
6  video today, we have a court reporter here who's taking
7  down everything we say, so you have to give audible
8  answers.  You can't nod your head or, like, say "mmm"
9  and "ah."  Do you understand that?
10   A   Okay.
11   Q   The second rule, probably the most important
12 one, and definitely the one we both have to follow, is
13 that the court reporter can't take down two people
14 talking at the same time.  So we both have to do our
15 best to not talk over each other.  I know at points
16 you're probably going to be able to anticipate the
17 answers to some of my questions and you might have the
18 urge to just answer, but I'm going to ask that you try
19 to refrain from doing that.  By the same token, I am
20 going to try to refrain from interrupting you or
21 cutting you short or doing anything like that, which
22 will make life a lot easier for all of us.
23       Do you understand that?
24   A   I understand.
25   Q   Okay.  At no point today in any of my questions,

1  no matter what I ask you, am I asking you to tell me
2  what you spoke to your lawyer about in any context.  So
3  for every question I ask, do not reveal to me anything
4  that you spoke to your lawyer about, even if the
5  question -- if answering it would require you to tell
6  me what you talked to your lawyer about, I'm not asking
7  that.  And I'm sure your lawyer will jump in and make
8  sure that you don't do that, but I just want to be
9  clear.
10       Do you understand that?
11   A   I understand.
12   Q   Okay.  Did you do anything to prepare for this
13 deposition?
14   A   Yes.  With my attorney.
15   Q   Okay.  And did you meet with your attorney?
16   A   Yes.
17   Q   When did you meet with him?
18   A   I met with him on several dates.
19   Q   Okay.  What were the dates?
20   A   Off the top of my head, one was yesterday, and
21 then subsequent to that, a few days before this
22 deposition.
23   Q   How long did you meet with him yesterday?
24   A   Off the top of my head, I don't have the
25 approximate time, but it was lengthy.

1    Q   Okay.  Was it more or less than two hours?
2    A   I don't remember.
3    Q   More or less than four hours?
4    A   I don't remember.
5    Q   Okay.  Did you review any documents in
6  preparation for this deposition?
7    A   Yes, we did.
8    Q   Did you independently review any documents?
9    A   Yes, I did.
10   Q   Okay.  Tell me what documents you independently
11 reviewed.
12   A   So I reviewed my EEOC complaints.  I reviewed
13 the court complaints.  I reviewed the -- the documents
14 that were submitted from the city, with allegations, as
15 well as the letter that the chief wrote to -- to --
16 to -- I forgot the word -- basically the letter that he
17 wrote when he subsequently removed -- separated me from
18 the city.
19       I'm sorry about that.
20   Q   It's okay.
21       What else, if anything?
22   A   Just other documents.  I don't know on the top
23 of my head.
24   Q   Okay.  And I asked you earlier, you know, how
25 you prefer to be addressed, and you mentioned that you

1  just recently had your name changed back to Salabarria;
2  is that correct?
3    A   That is correct.
4    Q   So you recently divorced?
5    A   Yes.
6    Q   When did you get divorced?
7    A   I believe it was in June of last year.
8    Q   June of 2023?
9    A   Yes.
10   Q   Okay.  Okay.  And have you talked with Mr. Nick
11 Guasto about this case since the divorce?
12   A   No.
13   Q   Okay.  Are you currently working?
14   A   No.
15   Q   Where were you last employed?
16   A   I was last employed with Opa-locka Police
17 Department.
18   Q   Okay.  When -- what were the dates of those --
19 that employment?
20   A   October of 2023 till November of 2023.
21   Q   What was your role there?
22   A   Police officer.
23   Q   What was your rate of pay?
24   A   Approximately 40,000 a year.
25   Q   And who was your direct supervisor?

Page 10

1   A   My direct supervisor was Lawrence Holborow.
2   Q   How do you spell his last name?
3   A   H-O-L-B-O-R-O-W.
4   Q   And why do you no longer work there?
5   A   Because I was separated from Opa-locka.
6   Q   Why?
7   A   An incident occurred in Opa-locka, and since I
8   was on probation, they didn't give me a reason and they
9   separated me.
10   Q   What was the incident?
11   A   The incident was a complaint.
12   Q   What was the complaint?
13   A   The complaint was me complaining about an
14   officer who stepped on my shoe, unwarranted and
15   unwanted.  And I brought it up to my chain of command,
16   and subsequent to that, I was separated.  And he also
17   spoke to me in derogatory manners.  So I let my chain
18   of command know, and subsequent to that, I was
19   separated.
20   Q   I'm not ignoring you.  I'm just taking notes.
21   A   That's fine.
22   Q   So I apologize for the delay.
23      Okay.  Let me go back to that.  You said that an
24   officer stepped on your shoe?
25   A   Yes.  Intentionally and purposefully.

Page 11

1   Q   Like in an attempt to hurt you?
2   A   I don't know what his intention was, but I know
3   that it was unwarranted and unwanted.  And I -- and it
4   was inappropriate.
5   Q   Did he like slam his foot down on your shoe?
6   Was it -- I'm just trying to get a little bit more
7   detail on exactly what you mean by stepped on your
8   shoe.
9   A   Yes.  He walked up to me and stepped on my shoe.
10   His intention, I don't know, but I told him to cease.
11   I --
12   Q   Like -- I'm sorry.  Continue.  I apologize.
13   A   I told him to cease, and I said it was
14   inappropriate.  And I brought it up to my chain of
15   command.
16   Q   Did he do it, like, violently?
17   A   Yes.
18   Q   Okay.  And what's his name?
19   A   I don't remember his first name.
20   Q   What's his last name?
21   A   His last name is -- give me a second, because I
22   don't --
23   Q   Take your time.
24   A   I worked -- I barely worked with him, so I don't
25   remember his name right now.

Page 12

1   Q   You don't remember his first or last name?
2   A   I believe -- I don't remember for sure his first
3   name, but his last name is -- starts with an L, like
4   Lafore or Lafavore, one of those two.
5   Q   Was he an officer or a sergeant or a lieutenant?
6   A   He was an officer.
7   Q   Okay.  And so you made a complaint about this
8   officer -- we'll call him Lafave for purposes of the
9   deposition -- to your chain of command about him, as
10   you described, violently stepping on your foot?
11   A   Yes.
12   Q   And then you also said he spoke to you in a
13   derogatory manner; is that right?
14   A   Yes.  When I --
15   Q   What did he do?
16   A   -- told him to cease.
17   Q   What did he say?
18   A   He said a lot of profanity.
19   Q   Okay.  And who did you complain to?
20   A   I complained to my lieutenant, which was
21   Lieutenant Holborow.
22   Q   Did you file like a formal complaint?
23   A   I did, yes.
24   Q   Okay.  Make sure to let me finish the question.
25   A   I'm sorry.

Page 13

1   Q   That's okay.  It's just because she can't take
2   us down talking at the same time.  So we just have to
3   be super careful, because she's the most important
4   person in this room, the court reporter.  I know you're
5   not doing it on purpose.
6      So let me ask again.  Did you file a formal
7   complaint?
8   A   Yes, I did.
9   Q   What's that called at Opa-locka?  Is there a
10   name?
11   A   There was no name.  I just filed a complaint and
12   sent it up my chain of command through my lieutenant.
13   Q   And was this in November of 2023?
14   A   Yes.
15   Q   And how long is the probationary period for a
16   police officer at Opa-locka?
17   A   I believe a year.
18   Q   And you said earlier, though, that they let you
19   go because you were within your probationary period?
20   A   Yes.
21   Q   But if you were let go in -- okay.  I see.  So
22   it was not a long period of time that you worked there?
23   It was --
24   A   That is correct.
25   Q   -- one month.

Page 14

1    I was thinking it was over a year, but
2 October 2023 to November 2023 is a month.
3        So you make this complaint, and they don't --
4 instead of doing anything about it, they just
5 terminated you?
6    A  Yes.
7    Q  And they didn't give you a reason why?
8    A  No.
9    Q  How long after you made the complaint did they
10 let you go?
11   A  Between a week to two weeks.
12   Q  Okay.  Have you filed any kind of complaint
13 against Opa-locka --
14   A  No.
15   Q  -- an EEOC charge or anything?
16   A  No.
17   Q  Are you planning to?
18   A  I filed for a hearing.
19   Q  With?
20   A  With the city.  Because there was no
21 investigation.  There was no -- my complaint went
22 unheard.  There was no due process.  There was no steps
23 that they took to remedy my complaint or to investigate
24 my complaint.  And so I filed with the city for a
25 hearing, and I'm waiting on that.

Page 15

1    Q  When you say filed with the city for a hearing,
2 is that like under their personnel rules?
3    A  Yes.
4    Q  Is it like -- make sure you don't interrupt.
5 I'm sorry.  Again, it's going to make her job a lot
6 easier.
7        You're saying you filed for a hearing under,
8 like, the personnel rules or the civil service rules?
9    A  Yes.
10   Q  Was it -- do you know if it's civil service
11 rules or personnel rules?
12   A  I believe it's the personnel rules.
13   Q  Okay.  When's that hearing taking place?
14   A  I don't have a date.
15   Q  Okay.  And I presume at that point, you were not
16 part of the union or part of the -- didn't have any
17 rights under the union or the collective bargaining
18 agreement, correct?
19   A  That is correct.
20   Q  And what's the union over there?  Is it FOP or
21 PBA?
22   A  PBA.
23   Q  Okay.  So they obviously didn't take any action
24 on this?
25   A  No.

Page 16

1    Q  Okay.  Have you looked for employment since
2 November of 2023?
3    A  Yes.
4    Q  Okay.  Where have you sought employment?
5    A  I looked through employment through Indeed, and
6 I've applied to various jobs.
7    Q  What jobs?
8    A  It varies from jobs with education, with
9 director of security, with private sector jobs --
10   Q  Can you --
11   A  -- just anything that has to do with public
12 administration.
13   Q  Name for me the companies that you've applied
14 for employment with since your separation in November
15 of 2023.
16   A  So from the top of my head, I recollect one,
17 which is Florida Commission of Offenders.
18   Q  What is that?
19   A  That is a review of documentations of offenders
20 where they're requesting for clemency or to be put on
21 probation.  And you're an investigator that reviews
22 their -- their request, and you send up a report
23 through your chain, through the Florida Commission.
24   Q  What's the job that you applied for there?
25   A  As an investigator.

Page 17

1    Q  When did you do that?
2    A  About a month ago.
3    Q  And how did you do it?  Like online?  Did you --
4    A  Through Indeed.
5    Q  Through Indeed.
6        What other companies did you apply for
7 employment at?
8    A  A lot of companies.  I can't name them off the
9 top of my head.
10   Q  Can you name any of them besides this one?
11   A  No.
12   Q  So just so I got it straight, from November 2023
13 till present day, you can only remember one company
14 that you've applied for employment with?
15   A  Yes.
16   Q  Okay.  Are there records through Indeed of the
17 companies that you've applied for employment with since
18 November 2023?
19   A  Yes.
20   Q  And where are those records?
21   A  If I log on, they're there, probably.  I don't
22 know how long they keep the records.
23   Q  Did you independently keep any records?
24   A  No.
25   Q  So if they're not stored in Indeed, then they

5 (Pages 14 - 17)

Page 18

1 don't exist?
2   A  I don't know how Indeed works.
3   Q  You understand, though, that because of your
4 lawsuit, you're under a duty to preserve documents,
5 correct?
6   A  Yes.
7   Q  And you know that you have a duty to mitigate
8 your damages, right?
9   A  Yes.
10   Q  And you understand that applications for
11 employment are evidence, potentially, of your
12 satisfaction or nonsatisfaction of that duty, right?
13   A  Yes.
14   Q  And you're not saving the -- your job
15 applications?
16   A  Like I said, I do it through Indeed.  It doesn't
17 give you an option to download them.  It goes directly
18 to the employer.
19   Q  Have you kept any lists?
20   A  No.
21   Q  So other than Indeed, for November 2023 going
22 forward, there's no other record of where you've
23 applied for employment?
24   A  As far as the date -- which dates are you asking
25 me?  Because you --

Page 19

1   Q  November 2023 --
2   A  Okay.
3   Q  -- forward.
4   A  November 2023, that is the only place that I
5 have applied, which is the Florida Commission.
6   Q  That's the only job you've applied for?
7   A  I'm sorry.  That's the only job that I remember
8 that I -- that I have the name of.  But there has been
9 various through Indeed.  You just go through the list
10 and you apply to the ones that you seem interested in.
11 And the list is there.  It's 50, 60 jobs.
12   Q  And of those 50 or 60 jobs, you can't remember a
13 single other one?
14   A  They're usually through directors of security,
15 public safety.  I don't have the name.
16   Q  Okay.  Did you do any other type of job
17 applications or job searches from November 2023
18 forward, or just through Indeed?
19   A  It has been just through Indeed.
20   Q  No recruiter of any kind?
21   A  No.
22   Q  Okay.  Where did you work before Opa-locka
23 Police Department?  What was the job right before that?
24   A  I worked at Brickell City Centre as a director
25 of security.

Page 20

1   Q  Is that the name of the company, Brickell City
2 Centre?
3   A  Yes.
4   Q  What were the dates of employment there?
5   A  So it was March of 2023 till, I believe, August
6 of 2023.
7   Q  What was your rate of pay there?
8   A  It was salary, and it was about 80,000 a year.
9   Q  How much did you earn when you were working
10 there, total, if you remember?
11   A  I don't recall.
12   Q  Okay.  Who was your supervisor?
13   A  My supervisor is Michael Serrano -- was Michael
14 Serrano.
15   Q  S-E-R-R-A-N-O?
16   A  Yes.
17   Q  Okay.  And why did you not work there anymore?
18 What happened?
19   A  So there was an incident that occurred where a
20 violent male subject assaulted myself and another
21 security guard while carrying out our duties as
22 security officers.  And subsequent to that, he was
23 arrested for a felony and convicted.  And he pled and
24 he has -- he's providing a letter of apology as well as
25 completing alcohol and drug abuse courses as part of

Page 21

1 his plea.
2        And so during that incident that occurred,
3 subsequent to that, the director of the mall asked for
4 me to be removed from -- from the director of security
5 position because of the incident that occurred, even
6 though the subject was arrested.  I followed all
7 procedures, and I carried out my duties.  And you're an
8 at-will employee at that point.  And I have all the
9 evidence and reports and videos that show the assault.
10 And he was arrested, and he wrote me a letter of
11 apology.
12   Q  Okay.  You said a lot there, which I appreciate,
13 so I'm going to back up and try to break that down a
14 little bit and make sure that I understand it.
15        First of all, you said the director of the mall
16 asked that you be removed?  Did I hear that right?
17   A  Yes.
18   Q  What's the name of the director of the mall?
19   A  His name is Dave Johnson.
20   Q  Dave Johnson.
21        And I'm sorry, one thing I forgot to cover
22 earlier -- and I should have said this at the
23 beginning.  A couple of basic things.  One, if you need
24 a break at any time, just let me know.  This is not
25 intended to keep you sitting there as long as possible.

Page 22

1 So you can take a break whenever you need. I just ask
2 that you not take a break when there's a question
3 pending, and obviously, don't speak to your counsel
4 about your testimony on any break.
5     Do you understand that?
6 A Yes.
7 Q And, of course, if I ask a question and you
8 don't understand the question or you need me to clarify
9 it, absolutely ask me to do so.
10     Do you understand that?
11 A Yes.
12 Q Okay. I'm sorry I didn't tell you that earlier.
13     So when did this incident happen?
14 A It happened around September or August, either
15 early August or late September. I don't recall the
16 exact date.
17 Q Well, you said you only worked there until
18 August.
19 A Yes.
20 Q So the incident wouldn't have happened in
21 September, right?
22 A I'm sorry. Yes. So it had to be either in the
23 beginning of August -- so somewhere between July, like
24 late July, and early August.
25 Q Okay.

Page 23

1 A I don't have the date on top of my head.
2 Q And the incident involved like a customer at the
3 mall; is that right?
4 A Yes.
5 Q Who was apparently on drugs and alcohol and was
6 violent?
7 A Yes.
8 Q And then you and other officers interacted with
9 this individual?
10 A Yes.
11 Q Who were the other officers with you?
12 A It was another security officer. His name is
13 Dwight Cruz.
14 Q And what did the -- what's the name of the
15 individual who was, you know, on drugs and alcohol and
16 all that? What's his name?
17 A I don't know his name off the top of my head,
18 but I have it with me.
19 Q You have it with you?
20 A I'm sorry. I have it in my records.
21 Q Okay. And what records do you have of this?
22 A Just a copy of the plea and the apology letter
23 that I'm waiting for.
24 Q So this individual is violent at the mall, and
25 you interact with him with another security guard. And

Page 24

1 what do you -- what do you guys do?
2 A We basically intervened, because that was our
3 duty to do so, and we attempted to escort the
4 individual out of the mall. And he decided to get
5 physical with the officer and I, and he struck me
6 several times. And subsequent to that, the police came
7 and arrested him. And that was the extent of the
8 incident. It was captured on CCTV, and the officers
9 had probable cause to arrest him. And he was taken and
10 transported to jail. The state attorney upped it to a
11 felony, and he pled.
12 Q He pled to the felony?
13 A Yes.
14 Q So why is it or what was the reason that
15 Mr. Johnson asked for your removal?
16 A I don't know.
17 Q Well, tell --
18 A I know that I was at will. I don't know if that
19 incident was something that -- I don't know. I don't
20 know the question to that. I just know that I did my
21 job and I did what I had to do, and I became a victim
22 of this belligerent male that was causing a scene and
23 assaulting myself and another officer.
24 Q When you say you became a victim of this male,
25 the guy who was drunk -- we'll call him the consumer at

Page 25

1 the mall -- you mean because he struck you, or
2 because --
3 A Yes.
4 Q -- you lost your job, or both?
5 A Both. But he did strike me. And subsequent to
6 that, because of that incident, I was let go.
7 Q Were you written up?
8 A No.
9 Q Were you talked to about it?
10 A No.
11 Q So I'm just trying to make sure I understand
12 exactly how the separation from employment occurred.
13 The incident happens, and then you go into work the
14 next day, several days later, and they just tell you,
15 We're going to terminate your employment?
16 A Yes. So what occurred was, after the incident,
17 I tried to speak to the director of security about the
18 incident, and he never got back with me. And then a
19 few days later, I was told that they're moving in a
20 different direction with another director.
21 Q The director of security is Dan or Michael?
22 A Dave.
23 Q Dave. Sorry. Yes. Dave Johnson.
24 A Yes.
25 Q Was there a problem with the incident that

7 (Pages 22 - 25)

Page 26

1 caused you to want to talk to the director of security
2 about it?
3    A  Well, it's my job to have a meeting with him
4 about the incident, because I report to him and I had
5 the duty to go over the incident with him and give him
6 details of what had occurred.  And my security and I
7 went to go speak to him and he said he was busy at the
8 moment, and he never got back to me.
9    Q  Okay.  And did you ever follow up as to why you
10 were let go?
11    A  I did not.
12    Q  Did you bring any claim or are there any pending
13 claims against Brickell City Centre for that
14 termination?
15    A  No.
16    Q  Okay.
17    A  Again, when you're at will, you really are at
18 will of the employer for any reason, that they can just
19 let you go, when it comes to the private sector.  So in
20 that case, I did my job, I completed what I had to do,
21 this individual was arrested, and I did nothing wrong.
22    Q  Why do you believe you were let go?
23    A  I don't know.
24    Q  Okay.  And where did you work before Brickell
25 City Centre?

Page 27

1    A  I worked at Miami Dade College as a public -- a
2 public safety director.
3    Q  One second.  I have a quick question, going back
4 to Brickell City Centre.  Maybe I didn't hear you
5 correctly, but I thought your job title was director of
6 security.
7    A  So, yes, but there's a director of the mall that
8 oversees me as a director of security.
9    Q  Okay.  Can you just break down for me like
10 the -- kind of the org chart of how that works.
11    A  So the director of the mall is in charge of the
12 structure of the mall, any projects, as well as the
13 director of security, whoever that may be.  So he's
14 basically an added layer.
15    Q  And so where do you fit, if we have the director
16 of -- Dave Johnson is the director of mall security?
17    A  He's the director of the entire mall, like the
18 property manager.
19    Q  Okay.  I see.  And then where does Michael
20 Serrano fit in this hypothetical chart?
21    A  He is -- he would be my supervisor.
22    Q  And what's his title -- or what was his title?
23    A  An account manager.
24    Q  His title was account manager?
25    A  Yes.

Page 28

1    Q  What does that mean?
2    A  So, basically, he provides security officers to
3 the mall for us to -- to hire and interview.  He
4 provides our security officers.
5    Q  Like through third parties?
6    A  Yes.
7    Q  So you worked directly for Brickell City
8 Centre --
9    A  Yes.
10    Q  -- which is a company, I take it?
11    A  Yes.
12    Q  Okay.  And then the -- are you saying that the
13 security guards that worked underneath you are
14 contracted through a third-party company?
15    A  Yes.
16    Q  Okay.  And so was there anybody else above you
17 besides Mr. Serrano?
18    A  Dave Johnson.
19    Q  Right.  I mean between -- between you and
20 Mr. Serrano.
21    A  No.
22    Q  Okay.  So it would go Dave Johnson, who's
23 basically in charge of the whole mall, like the
24 property manager?
25    A  Yes.

Page 29

1    Q  Then Michael Serrano, and then you, in the
2 context of security?
3    A  Yes.
4    Q  And your title was director of security?
5    A  Yes.
6    Q  How many directors -- other directors of
7 security were there?
8    A  It was myself and two assistants.
9    Q  Was anyone else let go as part of that incident
10 that you described?
11    A  No.
12    Q  Just you?
13    A  Yes.
14    Q  Okay.  Okay.  And you said you worked at Miami
15 Dade College?
16    A  Yes.
17    Q  Okay.  When did you work there?
18    A  In May of 2022 till January of 2023.
19    Q  And what did you earn there?  What was your
20 salary?
21    A  About 60,000 a year.
22    Q  Who was your supervisor?
23    A  My supervisor was Nelson -- I don't know how to
24 pronounce his last name, but it starts with an
25 M-A-G-N-A, like Magana.

Page 30

1    Q   That's fine.  I'm sure the court reporter
2  prefers you spell it out --
3    A   Okay.
4    Q   -- so it's easier.
5        And what was your job title?
6    A   Public safety director.
7    Q   And why did you leave Miami Dade College?
8    A   For the opportunity to work at Brickell City
9  Centre, because the monetary salary was not enough for
10  me to pay my bills.
11    Q   So you resigned?
12    A   Yes.
13    Q   Were you ever disciplined at Miami Dade College?
14    A   No.
15    Q   No write-ups?  No verbal counselings?  Nothing
16  like that?
17    A   No.
18    Q   Is there a reason you had a two-month break
19  between Miami Dade College and Brickell City Centre?
20    A   Waiting for Brickell City Centre to approve
21  my -- my hiring.
22    Q   So you resigned from Miami Dade College before
23  you were approved to work at Brickell City Centre?
24    A   Yes, but I knew that I was going to get the job.
25    Q   How did you know?

Page 31

1    A   Because they had told me.  It was just a matter
2  of getting everything through HR and submitting the
3  paperwork.  It was a process, and they kept delaying my
4  start date.
5    Q   Any idea why?
6    A   I don't know.
7    Q   Okay.  And where did you work before Miami Dade
8  College?
9    A   The Miami Beach Police Department.
10    Q   Okay.  And your employment at City of Miami
11  Beach ended January 2021, correct?
12    A   That is correct.
13    Q   Okay.  So you didn't work anywhere or did you
14  work anywhere between January 2021 and May 2022?
15    A   So I had, here and there sporadically, a private
16  investigator's job, but that wasn't a -- a fixed income
17  or a -- those jobs just came here and there whenever
18  they needed an investigator.
19    Q   Who is "they"?
20    A   When the company needed an investigator.
21    Q   What company?
22    A   GPS Security.
23    Q   Okay.  So you worked as a contractor for GPS
24  Security, or were you a W-2 employee?
25    A   I believe a W-2 employee.  I was a private

Page 32

1  investigator, and whenever they had cases, they would
2  assign it to me, if I wanted to take them, or if they
3  had -- or if they needed several investigators.  But
4  they had a lot of investigators that were senior to me,
5  so the jobs that I got were few, far, and between.
6    Q   So from January 2021 until May of 2022, you
7  worked as a private investigator for GPS Security.  Do
8  I have that right?
9    A   Yes.
10    Q   But you were not working full-time; is that
11  correct?
12    A   I only worked whenever they had a case.
13    Q   Okay.  How many cases did you work on for them?
14    A   A few.  I don't know by the top of my head.
15    Q   More than ten or less than ten?
16    A   More than ten.
17    Q   More than 50?
18    A   I don't recall.
19    Q   How were you paid?
20    A   Through direct deposit.
21    Q   I understand that.  But were you paid as a --
22  per job, per hour, per salary?  Was it a salary?  Like,
23  what was the way you were paid?
24    A   Per hour.
25    Q   And what was the rate of pay per hour?

Page 33

1    A   Depending on what the client wanted to pay the
2  company.  So between $20 an hour to $30 an hour.  It
3  depends on how much the client wanted to pay.
4    Q   Do you remember how much you earned from GPS
5  Security?
6    A   I don't know.
7    Q   Okay.  Did you have benefits with them?
8    A   No.
9    Q   How about with Miami Dade College?  Did you have
10  benefits?
11    A   Yes.
12    Q   What were the benefits?
13    A   Health and dental.
14    Q   Anything else?
15    A   I don't remember now.
16    Q   You don't remember if there was a 401(k) or
17  anything like that?
18    A   401(k), there was.
19    Q   Did you contribute?
20    A   I don't know.
21    Q   Okay.
22    A   I believe it was automatic, but I didn't look
23  into it.
24    Q   And then how about with Brickell City Centre?
25    A   Health and dental, and I believe 401(k).

9 (Pages 30 - 33)

1   Q   Did you contribute to that?
2   A   Again, I think it's automatic.  They
3   automatically take it from your check.
4   Q   You think they automatically take a 401(k)
5   contribution?
6   A   I think so.
7   Q   Okay.
8   A   I'm not a hundred percent sure.
9   Q   Would that be reflected in your paychecks, if
10  they did or didn't?
11  A   It should.  I don't know.
12  Q   How about with Opa-locka Police Department?
13  What were the benefits there?
14  A   I didn't have any, because I was on probation.
15  Q   So no health, no dental, obviously no pension?
16  A   Correct.
17  Q   Okay.  And so sitting here today, just going
18  back so we can wrap this part up, you're currently
19  unemployed, correct?
20  A   That is correct.
21  Q   When's the last time you went on a job
22  interview?
23  A   About a week, two weeks ago.
24  Q   Where did you interview?
25  A   At the Florida Commission --

1   Q   Okay.
2   A   -- which I'm in the hiring process.  So I will
3   be getting that -- that job, from what I was told.
4   Q   Who told you that?
5   A   The hiring director.
6   Q   Any idea when it starts?
7   A   I believe late in February.
8   Q   And what's the job title, again?
9   A   Investigator.
10  Q   And what's the rate of pay?
11  A   I believe it is 44,000 a year.
12  Q   Is that here in South Florida?
13  A   Yes.
14  Q   Any benefits?
15  A   Not until you pass probation.
16  Q   How long is that?
17  A   A year and a half.
18  Q   That's a long probationary period.
19  A   It's a private company.
20  Q   And should you pass the probationary period,
21  what are the benefits then?
22  A   Health, life insurance, and I believe dental.
23      MR. ELKINS:  Okay.  I have to use the restroom
24  again, so let's take five.
25      THE VIDEOGRAPHER:  The time is 9:35 a.m.  We're

1   going off the record.
2       (A break was taken from 9:35 a.m. to
3       9:42 a.m.)
4       THE VIDEOGRAPHER:  The time is 9:42 a.m.  We're
5   back on the record.
6   BY MR. ELKINS:
7   Q   Just a brief follow-up on Miami Dade College.  I
8   just want to confirm, you were never written up there?
9   A   No.  Not from what I recall, no.
10  Q   And you never received any kind of counseling or
11  anything?
12  A   No.
13  Q   And you didn't resign in lieu of termination?
14  A   No.
15  Q   Never had any disciplinary issues there?
16  A   No.
17  Q   Okay.  Great.
18      Okay.  What was your first role at the City of
19  Miami Beach?
20  A   I was a police officer.
21  Q   Okay.  And when were you hired?
22  A   January of 2020 -- I'm sorry.  January 2012.
23  Q   Okay.  Do you remember who did your interview?
24  A   We did not have an interview.
25  Q   Okay.  How did you get hired?

1   A   Through the background investigator.
2   Q   Okay.  And what was your -- what was your
3   first -- who was in your chain of command when you
4   first started working there?
5   A   My first chain of command?  I don't know.  This
6   was over ten years ago.  I don't know.
7   Q   Okay.  Were you eventually promoted?
8   A   Yes.
9   Q   When were you promoted?
10  A   In 2017.
11  Q   Okay.  And what were you promoted to?
12  A   To sergeant.
13  Q   Who promoted you?
14  A   The City of Miami Beach.
15  Q   Obviously.  Which person was in charge that --
16  that promoted you?
17  A   So it's a test that you take.  It's not up to
18  any person.
19  Q   Who was the chief then?
20  A   The chief was Daniel Oates.
21  Q   Did anything happen with your promotion to
22  sergeant?
23  A   Can you be specific.
24  Q   Were you able to successfully complete your
25  probationary period as sergeant?

Page 38

```
 1   A   I did complete my probationary period.
 2   Q   Was there ever a grievance filed over that?
 3   A   Yes, there was.
 4   Q   What was that grievance about?
 5   A   So it was a grievance regarding wrongful
 6  termination by the city.
 7   Q   Okay.  Can you be more specific.
 8   A   Is there a specific question that you can ask
 9  me?
10   Q   Can you be more specific about the subject
11  matter of your grievance regarding your probationary
12  period as a sergeant.
13   A   So the grievance was because the chief at the
14  time said it -- he had demoted me over performance
15  issues.  However, there was no documentation of any
16  type of performance issues.  In fact, all of my
17  lieutenants said that I was passing my performance
18  satisfactorily.
19       So when the union brought this to Daniel Oates's
20  attention, he switched his statement, or story, on why
21  he was demoting me and said it was because I was a
22  subject of an internal affairs investigation.  And so
23  the union said that there was another male officer who
24  had just gotten promoted to sergeant that was also
25  under an internal affairs investigation and he was not
```

Page 39

```
 1  demoted.  So the chief's decision to demote me was
 2  unjust, and he didn't have a reason to demote me.
 3   Q   What was the result of that grievance?
 4   A   I settled with the city to get my promotion
 5  back, with seniority and no back pay.
 6   Q   Did you also file an EEOC charge?
 7   A   I did.
 8   Q   Okay.  So I'm going to show you what I'm going
 9  to mark --
10       MR. ELKINS:  Can everybody see the document?
11       MR. DARAGJATI:  Yeah.
12       MR. ELKINS:  That's a success.
13  BY MR. ELKINS:
14   Q   I'm going to show you what I'm going to mark as
15  Exhibit 1.
16       MR. ELKINS:  I'll -- Madam Court Reporter, I'll
17    just put the documents in the -- well, I'll
18    email them to you, since you don't have the chat.
19       (Defendant's Exhibit 1 was marked for
20        identification.)
21  BY MR. ELKINS:
22   Q   Have you ever seen this document before?
23   A   Yes, I have.
24   Q   What is this document?
25   A   It's my EEOC complaint.
```

Page 40

```
 1   Q   Okay.  One second.  My pen's not working.
 2       Okay.  What was the basis of your EEOC charge?
 3   A   The basis of the EEOC charge is the fact that --
 4  again, the chief at the time said that he was demoting
 5  me because I did not meet probation due to performance
 6  issues.  Mind you, he demoted me shy of a few days of
 7  me passing my probation.  And my lieutenants that I was
 8  working for at the time stated that there was no
 9  performance issues and that I was, indeed, meeting
10  performance standards and that I was going to
11  successfully pass my probation.
12       So then he switched the reasoning for why he was
13  demoting me, to the fact that there was an open
14  internal affairs case at the time over a call for
15  service that occurred in my shift involving other
16  officers, and I was the sergeant during that incident.
17  And so he said it was because there was an open
18  internal affairs investigation.  However, there was a
19  male sergeant who was in the same position as me, where
20  he was under an internal affairs investigation, the
21  case was being reviewed by the state attorney's office,
22  and he was not demoted.  So I believe, and the union
23  believed, which they filed a grievance, that I was
24  retaliated based on my sex and based on the fact that I
25  was a female.
```

Page 41

```
 1   Q   So you believe that Chief Oates discriminated
 2  against you on the basis of your gender?
 3   A   That is correct.
 4   Q   Okay.  And do you still believe that today?
 5   A   I still believe that today.
 6   Q   Okay.  And so I'm going to show you what I'm
 7  going to mark as Exhibit 2.
 8       MR. ELKINS:  Can everybody see that?
 9       (Defendant's Exhibit 2 was marked for
10        identification.)
11  BY MR. ELKINS:
12   Q   Have you seen this document before?
13       Sorry.  I didn't mean to keep scrolling.
14   A   Yes.
15   Q   Okay.  What is this document?
16   A   The settlement agreement for 2019, I believe.
17  I -- I don't know which document this is.
18   Q   Well, it's for your -- it says union grievance
19  number 2018-11.
20   A   Okay.
21   Q   That was the grievance, I believe, that you
22  filed relating to your promotional status as a
23  sergeant --
24   A   Okay.
25   Q   -- correct?
```

11 (Pages 38 - 41)

1      And then it also talks about your EEOC charge,
2 EEOC charge number 510-2018-06495.  Do you see that?
3    A  Yes.
4    Q  Okay.  And if we look at that charge, do the
5 charge numbers match?
6    A  Yes.
7    Q  Okay.  So this is the settlement agreement for
8 both your union grievance and the EEOC charge, correct?
9    A  Yes.
10   Q  Okay.  And in this, I believe -- correct me if
11 I'm wrong -- you agreed to accept a 20-hour soft
12 suspension as discipline for the IA case, correct?
13   A  That is correct.
14   Q  And you were allowed to return to work as a
15 sergeant, with an effective start date of August 12,
16 2019?
17   A  That is correct.
18   Q  And you got retroactive pay, correct?
19   A  I didn't -- I did not get retro pay.  I got --
20   Q  It says here --
21   A  I'm sorry.  I thought it was back pay.  I got --
22 my rate went back to sergeant, and the only retroactive
23 pay that I got was -- after I signed the -- this
24 agreement, there were a few days where I still hadn't
25 been put back to sergeant, so they retroacted me for

1 those days --
2    Q  Right.
3    A  -- not for the time that I was out as a
4 sergeant.
5    Q  And then you agreed to additional probationary
6 time of six months?
7    A  Yes.
8    Q  And you had to attend FTO for one month?
9    A  Yes.
10   Q  And you were assigned a field training officer,
11 correct?
12   A  Yes.
13   Q  Okay.  And in exchange for that, you also
14 released your claims against the city, right?
15   A  Yes.
16   Q  Okay.  And so, of course, you didn't file a
17 lawsuit on either this EEOC charge or the grievance,
18 obviously?
19   A  That is correct.
20   Q  Okay.
21   A  Because at the end of the day, what was most
22 important to me was to be back as a sergeant, that I
23 worked so hard to do, and that I put all my dedication,
24 and it was wrongfully taken from me during that time.
25      And I agreed to settle this agreement because

1 all I wanted to do was just go back to being a
2 sergeant.  I didn't agree with the terms of it, but the
3 union said it was the best way to resolve this.  And by
4 that, me going back to being reinstated as a sergeant,
5 I didn't want to fight it anymore.
6    Q  When you say you didn't agree with the terms,
7 what terms did you not agree with?
8    A  Well, I didn't think it was fair for --
9    Q  Do you want me to put the document back up?
10   A  Yes, please.
11   Q  I'm sorry.  I don't want to ask you questions
12 about a document that you don't have in front of you.
13 Give me one second.
14      Can you see it?
15   A  No.
16   Q  You can't?
17   A  No.
18      MR. DARAGJATI:  I don't see it either.
19      MR. ELKINS:  Really?
20      MR. DARAGJATI:  No.
21      MR. ELKINS:  Okay.  Hold on.
22 BY MR. ELKINS:
23   Q  Oh, okay.  It says it's loading.
24      How about now?
25   A  No.

1      MR. DARAGJATI:  We see it now.
2      THE WITNESS:  I don't see it.
3      Now I see it.
4 BY MR. ELKINS:
5    Q  It says that the internet connection is
6 unstable, but we should be okay now.  Can you see it --
7    A  Yes.
8    Q  -- Ms. -- and I'll call you Ms. Salabarria.
9    A  That's fine.
10   Q  Okay.  All right.  What terms did you not agree
11 with?
12   A  So I did not agree with receiving a soft
13 suspension for that discipline IA case, because the
14 officers involved in that case didn't receive any
15 discipline with that case.  I believe that it was,
16 again, retaliatory against me and they used the fact
17 that I was -- I filed the EEOC and I was getting my
18 stripes back, getting my promotion back.  That was
19 their way of justifying why they had demoted me.
20   Q  Who is "they"?
21   A  The city.
22   Q  What other terms --
23   A  Because -- I'm sorry.
24   Q  Go ahead.  No, no, no.  My apologies.
25   A  They sent this case to the state attorney's

1 office, and the state attorney's office cleared any
2 type of wrongdoing. And the only person that received
3 discipline with this case was me, again the only
4 female.
5     Q   What other terms do you not agree with -- or did
6 you not agree with?
7     A   Well, since I had passed my probationary period
8 and I was going to pass it -- there was no lieutenants
9 that said I was not going to pass my probationary
10 period. I was, again, put on probation for six months,
11 and I had to go through the FTO program for a month,
12 again something that they have not done to anybody else
13 but me.
14    Q   Okay. So you didn't agree with the FTO training
15 part?
16    A   No.
17    Q   Okay. What other terms did you not agree with?
18       If you need me to scroll, just let me know.
19    A   No. That's it. I basically settled with the
20 city because what was most important to me was getting
21 my -- my rank back, that I worked very hard for. And I
22 didn't want to continue to endure to fight the terms of
23 this agreement, and so I settled. But what happened
24 did happen and it's -- it's something that I
25 experienced and it's my story, and I know exactly what

1 happened with this case and how I was mistreated during
2 this case.
3     Q   Do you routinely sign agreements with terms that
4 you don't agree to? Is that common for you?
5     A   It's -- I didn't agree with it, like I said.
6 And like I said, I wanted for this to go away, in the
7 sense of I just wanted to get my promotion back, my
8 rank back, which was the most important thing to me.
9 And I felt like I had to make this sacrifice, even
10 though I didn't believe that I did anything wrong. I
11 did it because it was the only way for me to get my
12 promotion back, even though I didn't agree with it.
13    Q   You understand, though, you obviously could have
14 fought the grievance through the grievance process
15 that's in the collective bargaining agreement, right?
16    A   Yes.
17    Q   You could've gone to arbitration, right?
18    A   Yes. I believe those are hypothetical
19 questions. And at the time, I did what I felt was
20 right, and I did what I felt I needed to do, because I
21 had -- I felt like I had no other avenue. And the
22 union had spoken to the city, and they came up with
23 this offer. And so that's why I did what I did at that
24 time.
25    Q   Respectfully, it's not a hypothetical. I'm

1 asking you if you were able to, if you could have taken
2 advantage of the full grievance process in the
3 collective bargaining agreement. Let me ask it another
4 way. Were you somehow prevented from taking advantage
5 of the grievance process?
6     A   No, but when I spoke to the -- to the union
7 about this incident, about me not agreeing to these
8 terms, they said it was the only way and that that's
9 the last offer that the city was going to give.
10       And, again, I believe I answered this question
11 already. That's what I did at that time, because what
12 was most important to me was getting back to work and
13 getting back to my rank.
14    Q   Did the union tell you they wouldn't support a
15 grievance going forward?
16    A   I don't know exactly what they told me at that
17 time, since it was a while ago, but they had mentioned
18 that it was the best thing for me to do at the moment,
19 if all I wanted back was just my promotion.
20    Q   And you weren't forced to sign this, were you?
21    A   No.
22    Q   And that's -- I'm showing you page 3. That's
23 your signature, right?
24    A   Yes.
25    Q   Okay. So even though you didn't agree with the

1 terms, you signed it, understanding you could've fought
2 the grievance going forward?
3     A   I understand.
4     Q   Okay. And you certainly could've let the EEOC
5 charge play out and file a lawsuit against the city,
6 based on those allegations, couldn't you?
7     A   Again, I believe that's a hypothetical question.
8     Q   That's okay. You have to answer those.
9     A   Okay. I --
10    Q   Let me -- let me clarify for you, which I
11 probably should have clarified at the beginning. You
12 basically have to answer my questions, unless your
13 lawyer instructs you not to answer based upon some sort
14 of privilege, like the attorney-client privilege.
15 Other than that, I have wide latitude to ask you
16 questions, which includes hypotheticals. Okay?
17    A   Okay. So what was your question, again?
18    Q   You could have fought the grievance through
19 arbitration, and you could have let the EEOC charge
20 play out and then filed a lawsuit on that basis,
21 correct?
22    A   That is correct.
23    Q   Okay. But you voluntarily chose to sign this,
24 correct?
25    A   Yes.

Page 50

1  Q  Okay.
2  A  Because like I said, at the time, I felt like it
3  was the best thing for my person and for my career
4  to settle with the city, even though I didn't agree
5  with the terms.
6  Q  Okay.
7  A  And like I said, what I -- what was most
8  important to me was just getting back to work. Money
9  wasn't important to me. What was important to me
10  was -- was being reinstated to what I worked hard for
11  and what I earned myself through my dedication.
12  Q  When did you first meet Steven Cosner?
13  A  In 2014.
14  Q  How did you meet him?
15  A  I'm sorry. I believe in 2012, when I started.
16  Q  Okay. What was the nature of your relationship
17  with Mr. Cosner?
18  A  Which day are you talking about? 2012 or 2014?
19  Q  Walk me from the beginning, 2012 through '14.
20  A  So, in 2012, I had just started, and he was part
21  of the FTO postacademy scenarios. So I obviously knew
22  who he was because he participated in the scenarios,
23  but that was the extent of me knowing him back in 2012,
24  up until -- in 2014, where I had to -- I'm sorry --
25  where I bid for my shift and I ended up working on

Page 51

1  midnights with a senior squad that included Steven
2  Cosner.
3  Q  Okay. And what was the general nature of your
4  relationship? Was it friendly? Was it romantic? Was
5  it professional?
6  A  It was professional and it was friendship.
7  Q  Okay.
8  A  Again, we worked together in the same squad. I
9  tried to build a rapport with all of my squad members,
10  and I tried to maintain a good working relationship
11  with everybody that was on my squad. And when you work
12  with somebody -- I'm sorry. When you work with a squad
13  of people weekly, for hours, you start to build that
14  rapport and that acquaintance, and you become friends
15  with each other.
16  Q  Was it anything ever more than friendship?
17  A  No.
18  Q  Did you ever have sex with Mr. Cosner?
19  A  No.
20  Q  So if he testifies that you guys did have sex on
21  multiple occasions, he's lying?
22  A  Yes.
23  Q  Okay. And you never had any romantic
24  relationship with him whatsoever?
25  A  No.

Page 52

1  Q  Did he ever harass you in any way?
2  A  Yes.
3  Q  Okay. How and when?
4  A  So, in 2014, at the time, I was working
5  midnights and I was going through an unfortunate
6  incident where there was a male sergeant, a senior male
7  sergeant, that was stalking me within the city and
8  outside of the city. This male sergeant was
9  substantiated in his actions of what he was doing to me
10  while he was harassing me, and he was subsequently told
11  to resign or he would be terminated. I was going
12  through that at the moment while I was on the shift and
13  squad with Steven Cosner.
14       At the time, he, Steven Cosner, had shown
15  interest in me romantically, and I had told him that I
16  didn't want any type of romantic relationship with him.
17  He provided this grotesque greeting card to me that was
18  unwelcomed and unwanted, and I confided in other
19  individuals in my squad, as well as veteran officers,
20  about his actions. And they had told me that since I
21  was a young officer in the police department -- I was
22  22 years old when this happened. Cosner was in his
23  40s. He had a lot of tenure in the police department,
24  and a lot of influence, because he had been there for a
25  long time. So they told me to -- not to cut off my

Page 53

1  friendship with him abruptly, because he's the type of
2  person that's vindictive in his ways and he's known for
3  that. And since I had already been going through this
4  issue with the sergeant, where he had stalked me, I
5  didn't want to again bring up another incident that was
6  occurring with another male officer. So I kept him at
7  arm's length and I tried to maintain a friendship with
8  him. I told him that his advances were unwarranted and
9  I didn't want anything to do with him and -- but I told
10  him that we could maintain a friendship. Because,
11  again, I was scared. I was 22 years old. I had just
12  passed my probation. I had just started, and the last
13  thing that I wanted to do was continue to bring up
14  complaints of sexual harassment. And all I wanted was
15  for that to stop.
16       So, yes, I did maintain a friendship with him,
17  until he crossed the line and couldn't take no for an
18  answer. And when I finally told him, Listen, I am
19  dating somebody else, I'm not welcoming your advances,
20  he didn't take it well and our friendship ended
21  subsequent to that. And we never spoke again, for
22  years later. We would see each other in the hallway,
23  and he would not speak to me, he would not acknowledge
24  me, he would not look at me. And I believe he carried
25  that vendetta, that animosity, that -- for me rejecting

1 him back in 2014, that culminated to the incident that
2 occurred in 2021 -- I'm sorry -- yes, in 2020.
3   Q   December of 2020?
4   A   December of 2020.
5   Q   Late December of 2020?
6   A   Yes.
7   Q   Okay.  So there was a lot there, so I'm going to
8 go back and go through it a little bit.
9       First of all, I just want to make sure I
10 understand.  You believe that Cosner was angry at you
11 six, almost seven years later, and --
12   A   Yes.
13   Q   Hold on.
14   A   I'm sorry.
15   Q   That's okay.
16       -- and that that's -- you're referring to the
17 allegation of officer misconduct that he wrote about
18 you in December 2020.  You believe that that is due to
19 you rejecting him in 2014?
20   A   Absolutely.
21   Q   Do you have any evidence of that?
22   A   I don't have any evidence of that, but I can go
23 over what I believe happened and his actions towards
24 me, and the fact that, like you said, all these years,
25 he would purposefully ignore me.  When he became a

1 lieutenant, I passed him in the hallway.  I was a
2 sergeant; he was a lieutenant.  I said "good evening."
3 He ignored me.  And I can tell that that animosity was
4 still there.  He sat right behind me in the sergeant's
5 office, never said a word to me, would ignore me, would
6 not speak to me.  And that is not normal for peers to
7 be acting that way.
8       Again, after I told him I did not want to have a
9 relationship with him, he did not speak to me ever
10 again.  He was upset.  And like I said, I was there, I
11 lived it, I know what happened, and I experienced it.
12   Q   And I want to make sure I go back and unpack a
13 lot of what you talked about earlier.  But between 2014
14 and December of 2020, besides ignoring you, did he ever
15 do anything else to you?
16   A   Yes.
17   Q   What did he do?
18   A   There was an incident where he was working -- we
19 were both sergeants at the time, and there was an
20 incident where he had a -- he was working midnights and
21 I was working day shift.  I was an incoming sergeant,
22 and he was an outgoing sergeant.  So he raised me on
23 the radio to go over to channel 13, which is a
24 supervisor channel.  And in that channel, he asked me
25 to approve an A form that he had not approved yet, that

1 involved a DUI and that involved a use of force.
2   Q   And this is 2017ish?
3   A   '17ish?  Yes.  Either '17ish or '18.  I don't
4 recall.
5   Q   But you said it -- you said it was -- you were a
6 new sergeant.  So I believe you were promoted to
7 sergeant in '17.
8   A   Yes.  Yes.
9   Q   One at a time.
10   A   So he asked me to approve that A form, and I
11 told him I was not going to approve that A form,
12 because it involved a DUI that happened on his shift
13 with a use of force.  And per our policies, we do not
14 approve other sergeant's A forms that include uses of
15 force, unless directed to by a lieutenant for exigent
16 circumstances or any directives that they would give
17 you.
18       But I told him that I was not going to sign that
19 A form, I was not working when that A form was written,
20 when that incident occurred, and when that use of force
21 occurred.  And he was upset with me and abruptly
22 changed to the other -- to the main channel.  I believe
23 there were some words exchanged, in the sense of him
24 saying, Well, you're a sergeant, you can approve it.  I
25 said, With all due respect, I'm not going to approve

1 that A form, which involved a serious crime of a DUI
2 with injuries and with a use of force.  And he was
3 upset by that.
4   Q   Did he write you up?
5   A   We were both sergeants, so, no, he did not write
6 me up.  And I was not insubordinate to him, and he was
7 not insubordinate to me.  We're peers at this point.
8 But he asked me if I can approve this A form.  And the
9 liability that that A form entails, with that use of
10 force, I was not going to approve that for him.
11   Q   Did you file a complaint against him?
12   A   No.
13   Q   So I asked you, like, what other things did he
14 do to you from 2014, before the incident in
15 December 2020, that demonstrated to you that he was
16 holding a grudge or angry at you for rejecting him,
17 besides ignoring you, and you're telling me that he
18 asked you to fill out an A form that you -- or approve
19 an A form that you believe you should not have been
20 approving, correct?
21   A   That is correct.
22   Q   Okay.
23   A   But his tone and the way that he spoke to me
24 over the radio was inappropriate and was in haste, and
25 I can tell that he was angry.  Again, I was there and I

1 lived through that, and I know exactly what happened.
2 At that point, we were both sergeants. He had no
3 authority over me. And the one and only day that he
4 ever has authority over me is when he became a
5 lieutenant, and the one and only day that I worked for
6 him, these so-called allegations are made by him.
7   Q   And you believe that in 2017, his request for
8 you to approve this form was because of his anger from
9 your rejection in 2014, or your supposed rejection?
10   A   No. His anger was, again, by me not wanting to
11 approve this A form, but he was overly angry and I can
12 tell. And since we had not spoken to each other since
13 2014 -- and, again, every time we see each other in the
14 hallway, every time he sits next to me, he ignores me
15 and he does not speak to me. That is not normal for
16 your peers to be doing to you. So, yes, I believe the
17 way that he took that rejection, he continued to hold
18 that grudge and that animosity towards me.
19   Q   Okay. Going backwards from your earlier
20 testimony, when we were talking about how you got to
21 know Lieutenant Cosner, then Sergeant Cosner, I guess,
22 in 2014 you said there was a male sergeant stalking
23 you?
24   A   Yes.
25   Q   Who was that?

1   A   Albert Estrevez.
2   Q   And you made a complaint about that?
3   A   Yes, I did.
4   Q   And he was asked to resign?
5   A   Yes. His actions were substantiated. They
6 found evidence of him doing so, of him stalking me off
7 and on duty.
8   Q   And he was asked to resign for that?
9   A   And they gave him the option to resign or he
10 would be terminated.
11   Q   And did he resign?
12   A   And he resigned.
13   Q   Okay.
14   A   And the only reason why I even found out that he
15 was stalking me was because a neighbor in my
16 neighborhood told me that there was a Miami Beach
17 supervisor vehicle that was continuously passing
18 through my neighborhood, in front of my house, parking
19 a block from my house, parking close to my house, at
20 odd hours of the night, on multiple occasions, on
21 multiple instances. And I brought that up to my chain
22 of command, and they investigated it and they found an
23 egregious number of times where he was stalking me at
24 my house, and while on duty as well. He would
25 follow -- whatever calls that I had, he would be like a

1 block away or be in the near vicinity.
2   Q   Okay. And you had spoken to Cosner about this?
3 This was sort of how the two of you became friendly,
4 through communicating about this?
5   A   No.
6   Q   I thought you testified earlier that while you
7 were going through this is when you first started
8 becoming friendly with Lieutenant Cosner. Did I not
9 hear that correctly?
10   A   That is not correct.
11   Q   Okay. Can you clarify that, then.
12   A   I said that I was working in his squad while
13 this incident had occurred, while I was going through
14 this incident. I was working with him and other male
15 officers, senior officers, that had a lot of tenure
16 over me, on this midnight shift. And I was going
17 through that incident while I was working on that
18 squad.
19   Q   Got it.
20       Were you and Cosner good friends?
21   A   We were good friends.
22   Q   Did you socialize outside of work?
23   A   No.
24   Q   Did he ever meet your family?
25   A   No.

1   Q   Okay. And you never went out with him for a
2 drink or to dinner or anything like that?
3   A   No.
4   Q   You never went to his house?
5   A   No.
6   Q   He never went to your house?
7   A   No.
8   Q   He never met anyone in your family?
9   A   No.
10   Q   Okay. So I'm going to show what I'm going to
11 mark as Exhibit 3. Let me know when you can see it.
12   A   I can see it.
13       (Defendant's Exhibit 3 was marked for
14       identification.)
15 BY MR. ELKINS:
16   Q   Okay. These are screenshots of Lieutenant
17 Cosner's Instagram --
18   A   Okay.
19   Q   -- from 2014 and '15, I believe. Am I right
20 that your -- in this first one, your Instagram, I
21 guess, at the time, was forever_camelot; is that right?
22   A   That is correct.
23   Q   Okay. And so you commented on his Instagram
24 here, correct?
25   A   That is correct.

16 (Pages 58 - 61)

1   Q   Okay.  And then the same thing for page 2, Bates
2   number 001354.  That's you again, right,
3   forever_camelot?
4   A   Yes.
5   Q   Okay.  And I think this is from December 25th,
6   2013, I think at the bottom, right?
7   A   Okay.
8   Q   All right.  And then, here, there's somebody
9   named luluu_74.  Do you know who that is?
10  A   Yes.
11  Q   Who is that?
12  A   That is my mother.
13  Q   And so, here, your mother is liking his
14  Instagram?
15  A   Yes.
16  Q   Any idea why?
17  A   So my mother works at the Hialeah Police
18  Department.  She's a clerk.  And she is very much into
19  the brotherhood of police work and befriending as many
20  police officers, kind of like a community, a
21  brotherhood.
22     So, usually, on Facebook, it says things like
23  people that you may know and it says -- usually, it
24  says their occupation or they have mutual friends in
25  common.  And it's not uncommon at all for you to add

1   persons that you think you may know or think that -- in
2   her case, that are police officers.  And she has
3   multiple people from Miami Beach on her friends list,
4   and apparently, Cosner is one of them.  But it's not
5   uncommon at all.  It's a common practice.  It's
6   something that you do in social media, to network, to
7   connect.  And my mother did befriend not only him, but
8   multiple people from Miami Beach.
9   Q   Okay.  So we'll go to the next one.  Same thing
10  here.  It looks like your mother is liking that post,
11  too, page 4?
12  A   (No verbal response.)
13  Q   Same thing, page 5?
14  A   I can't see.
15  Q   Can you not see it?
16  A   I can see, but it's not changing pages.
17  Q   I think it might be multiple pages of the same
18  thing.
19  A   Okay.
20  Q   Hold on.  Yeah, you're right, it's not changing
21  pages.  Sorry.  I think the internet connection here is
22  a little unstable.
23     Okay.  Here we go.  So page 8, this is you
24  commenting on Cosner's Instagram post from June 20th,
25  2014; is that correct?

1   A   Yes.
2   Q   Okay.  Let me go back.
3      Okay.  And I think page 7 is your mom again.  Do
4   you see that?
5   A   That's the same one that you --
6   Q   Right.
7   A   -- pointed out multiple times.
8   Q   Okay.
9   A   It's not more than -- the one that you've shown
10  me has been the one that you've said multiple times.
11  Q   Correct.
12     And then page 9, it looks like it's your mom
13  liking again different posts?
14  A   Yes.
15  Q   This looks like a picture of Lieutenant Cosner,
16  I'm going to guess with his daughter, maybe.
17  A   Okay.
18  Q   And then the same thing, page 10, your mom
19  liking this again?
20  A   Okay.
21  Q   Another like.
22     Page 11, your mom again, correct?
23  A   Okay.
24  Q   And then page 12 is you liking his Facebook post
25  from June of 2015?

1   A   Okay.
2   Q   So is this after he -- before or after he, like,
3   propositioned you?
4   A   It was before and after.
5   Q   Before and after?
6   A   Yes.
7   Q   So even after he attempted to take the
8   relationship past friends and you rejected him, you
9   were still liking his social media?
10  A   Yes.  So like I stated, I had spoken to several
11  of my colleagues, veteran officers, veteran female
12  officers, and at the time, you know, a retired sergeant
13  who worked in this -- in the squad and in this shift.
14  And the advice that I was given -- I was a 22-year-old
15  female at the time, and the advice that I was given was
16  go along to get along, in the sense of don't abruptly
17  end any type of friendships, you've already been
18  through a lot with the case that -- of the officer
19  stalking you, you don't want to, you know -- it's not
20  going to be healthy for your -- for your career if you
21  make another complaint, just continue to be friends
22  with your squad mates, get along politically, try to
23  maintain these friendships so that you don't have
24  issues moving forward, especially with Cosner, who has
25  been known to be vindictive and hostile towards certain

1 people that he doesn't like.
2     And since he had a lot of influence and a lot of
3 tenure in the police department, I was scared and
4 worried that if I had cut off my friendship with him,
5 that he was going to make my career, while I'm working,
6 difficult, because he had a lot of influence in my
7 squad. And I was trying to maintain a working
8 relationship with everyone. But I had told him
9 multiple times that I wasn't interested in him. And it
10 culminated to the point where I had to tell him, That
11 is it, our friendship is done, you have crossed the
12 line multiple times, I gave you multiple chances, and
13 now this friendship is done and it's over. And we had
14 not spoken ever since.
15     Q  And he ignored you, for the most part, for the
16 bulk of almost seven years, correct?
17     A  Yes.
18     Q  So he didn't -- he didn't do anything to you in
19 the seven-year period, correct?
20     A  Well, he couldn't do anything to me, because we
21 were both the same rank.
22     Q  Well, if he couldn't do anything to you, then
23 why were you worried about him being vindictive?
24     A  Because we were working in the same squad and he
25 had a lot of influence with our sergeant and he had a

1 lot of influence within that squad and within the
2 department.
3     And I had just gone through a very traumatizing
4 incident with this sergeant who was stalking me, and
5 the last thing that I wanted was another issue, another
6 complaint, when all I wanted was just to go and do my
7 job and be left alone. And sometimes you have to do
8 things to survive, like maintain friendships that you
9 don't want, because you're trying to survive, you're
10 trying to maintain your livelihood. And working and
11 being employed was my livelihood.
12     And I was petrified and worried and scared that
13 if I continued to make complaints over these advances,
14 that it was going to culminate to me getting more
15 retaliation or me being in a position where I wasn't
16 going to be liked in the police department, I wasn't
17 going to be successful in the police department,
18 because a lot of these people had influence with
19 command staff, with sergeants. And my peers told me
20 just try to lay low, don't cut off friendships
21 abruptly, and just maintain what you're doing now.
22     Q  When you say more retaliation, what retaliation
23 were you experiencing back then? Because as I
24 understand it -- correct me if I'm wrong -- you made a
25 complaint about Mr. Estrevez, which was sustained and

1 he was ultimately told either quit or you're going to
2 be fired. So what do you mean by more retaliation?
3     A  That is correct. So Estrevez worked on the
4 midnight squad, and now -- and he had been working
5 there for a long time, 20-plus years. And like I said,
6 he had a lot of influence within the police department.
7 He had been there a long time. And because of his
8 termination, a lot of his friends and followers were
9 very upset by that. And I started to experience
10 incidents that were occurring to me, where my personal
11 vehicle's tires were slashed, my gas tank was filled
12 with salt water and sand.
13     And I made a complaint to internal affairs, and
14 they said they couldn't substantiate because they
15 didn't have the evidence, but they moved me to -- off
16 the road, to protect me from any further retaliation.
17 And so they put me to work in the red-light camera,
18 under -- under accident investigations unit.
19     Q  And when was this, what year?
20     A  That was in 2014, 2015, around that time.
21     Q  Did you make a complaint about the tires being
22 slashed also?
23     A  Yes, I did.
24     Q  So was it one complaint, about both the tires
25 and the gas tank?

1     A  Yes. I couldn't take it anymore. I tried to
2 go -- I basically -- like I said, I didn't want to
3 continue to bring up things that was occurring to me,
4 but it just emulted to a multiple of things and now
5 it's affecting my personal vehicle, it's affecting my
6 health, it's affecting my mental health. And I got to
7 a point where I had to go and tell them, Hey, this is
8 what's going on.
9     And so my vehicle was towed from the police
10 station after that incident happened, and a sergeant at
11 the time had to give me a ride home. So I got to the
12 point where I brought this up to internal affairs.
13 They reviewed it. They said they couldn't find any
14 evidence, because there was no cameras in the garage at
15 the time. And their fix to my complaints were to put
16 me in the red-light camera and assign me there as an
17 AIU investigator. And I was there for about three,
18 almost four years.
19     Q  So you made a complaint, and even though the
20 city was not able to determine who either, you know,
21 slashed your tires or filled your gas tank, they took
22 action to protect you?
23     A  Yes.
24     Q  Okay. Who were the veteran officers that you
25 referenced that you spoke to about Cosner?

1    A  So I don't remember.  At the time, I do know
2  that there were veterans officers, who had retired
3  shortly after that.  There's been multiple officers
4  that had retired after that.  But during that time, it
5  was senior officers from that -- from the midnight
6  squad and from my squad.  And I can't tell you now who
7  was in my squad during that time.
8    Q  Do you remember their ranks?
9    A  Officers and a sergeant.
10    Q  Do you remember the sergeant's name?
11    A  Yes.
12    Q  What was the name of the sergeant?
13    A  His last name is Rojo.
14    Q  Rojo?
15    A  Yes.
16    Q  So you remember, it sounds like, a lot of
17  details relating to Cosner, relating to the gas tank,
18  relating to the tires being slashed, relating to the
19  card that he gave you, the 2017 radio call, but you
20  don't remember the names of these officers that you've
21  referenced multiple times, that you confided in, that
22  told you not to make complaints?  You don't remember
23  one name?
24    A  I gave you a name.  I gave you Sergeant Rojo.
25    Q  You don't remember his full name?

1    A  I don't remember now.
2    Q  And you don't remember anyone else's name?
3    A  No, not at the time.  I had just started.  I was
4  brand-new to that squad, and there's multiple officers
5  in the shift.  I don't remember the names right now of
6  who I specifically spoke to that day.  If I told you
7  who I specifically spoke to, I would be lying.  So I
8  don't know who I specifically spoke to, but I do know
9  that I was scared enough to confide in my peers.
10    Q  You just don't remember -- other than someone
11  with the -- sergeant with the name Rojo, you don't
12  remember the names of any of these other peers that you
13  confided in?
14    A  No, not off the top of my head of who I
15  specifically spoke to.
16    Q  Do you have notes about what you talked to?
17    A  No.
18    Q  Is it a coincidence that your mom is liking
19  Lieutenant Cosner's Instagram posts around the same
20  time that all of this is happening?  That's a
21  coincidence?  It just so happens to be that, hey, she
22  friend-requests a lot of people from Miami Beach, and
23  by happenstance, during this exact time period, she's
24  also liking his posts?
25    A  So, first of all, I can't tell you what my mom

1  is doing with her Instagram or her Facebook.  I don't
2  monitor her Instagram and her Facebook.
3    So, like I said, I didn't live with my mom at
4  the time.  I don't know what she's doing with her
5  Facebook or her Instagram.  But I do know that my mom
6  has befriended a lot of police officers from different
7  agencies, not only Hialeah, Miami Beach, and other
8  multiple agencies.  She is into the brotherhood of
9  police work.  She likes to network with other officers.
10  And she has multiple people from Miami Beach, and she
11  probably likes all of their stuff too.
12    Q  Well, if you don't know what she does with her
13  Instagram, how do you know she's probably liking
14  everybody else's stuff too?
15    A  Because that's what she does.  She likes a bunch
16  of posts, from a bunch of people, all the time.
17    Q  So you do have some knowledge of what she does?
18    A  Some knowledge.  Like I said, she adds a bunch
19  of officers from different agencies, she likes to
20  network with law enforcement, and she's very heavily
21  into that.  She's very friendly, in the sense that she
22  will like anybody's post and network with as many
23  people as she can.
24    Q  Did you confide in your mom about the situation
25  with Cosner?

1    A  No.
2    Q  Why not?
3    A  Because I didn't want to.
4    Q  Why didn't you want to?
5    A  I didn't feel like I wanted to bring it up to my
6  mom and worry her of what was going on.
7    Q  And where did she work at the time?
8    A  Hialeah Police Department.
9    Q  Is she a police officer?
10    A  No.
11    Q  What did she do there?
12    A  She's a clerk.
13    Q  Does she still work there?
14    A  Yes.
15    Q  Okay.  Just so I've got it -- and I know I asked
16  it, but I just want to make sure -- other than Cosner's
17  2017 request for you to approve an A form, between your
18  rejecting him in '14 or early '15, and December -- late
19  December of 2020, you had no other interaction with him
20  whatsoever?
21    A  From what time frame to what time frame?
22    Q  From the time frame that you ended the
23  friendship, you know, '14 or '15ish, somewhere in that
24  neighborhood, through late December 2020, other than
25  this 2017 request to fill out -- or approve the A form,

Page 74

1 you had no other interaction with him?
2   A  No.
3   Q  And whenever you two saw each other, he would
4 ignore you?
5   A  Yes.  That is correct.
6   Q  And did you ever attempt to talk to him?
7   A  No.
8   Q  You ignored him as well?
9   A  Yes.
10  Q  Okay.
11  A  And, again, I did so because of the way he took
12 my rejection and the animosity that he had towards me
13 telling him that I was not interested.  And I had tried
14 on multiple times to be cordial, and he continued to
15 ignore me.  So, yes, I had nothing else to speak to him
16 about.  I had tried.  I'd done my best that I could,
17 like I said, to maintain cordial working relationships
18 with my peers.  And he was very upset about my
19 rejection, and he continued to ignore me.
20       (Defendant's Exhibit 4 was marked for
21       identification.)
22 BY MR. ELKINS:
23  Q  All right.  Let me know if you can see this
24 document.
25  A  I can see it.

Page 75

1   Q  Okay.  Do you recognize this document?
2   A  Yes.
3   Q  What is it?
4   A  It's an EEOC complaint.
5   Q  Okay.  Is this an EEOC complaint that you filed?
6   A  Yes.
7   Q  Okay.  So this is your second EEOC complaint
8 against the city, correct?
9   A  That is correct.
10  Q  Okay.  And the date, I believe, that you filed
11 this was July 13th, 2020?
12  A  That is when it was filed.
13  Q  Okay.  And did you file this after you were
14 placed under investigation by internal affairs?
15  A  Do you have the document that shows the date
16 that I was placed under internal affairs?
17  Q  I don't have that specific document, but I can
18 get you that date.  I mean, I can represent to you that
19 this was filed after you were placed under
20 investigation.  I'm just asking if you remember that.
21  A  Again, I don't remember that, but I would like
22 to see the document.
23  Q  Okay.  Well, you don't remember if you filed
24 this before or after you were placed under
25 investigation?

Page 76

1   A  I don't remember the date that I was filed under
2 investigation.
3   Q  Okay.  Did you fill out this charge, or did
4 someone fill it out for you?
5   A  Somebody filled it out for me.
6   Q  Who?
7   A  Michael Pancier, at the time.
8   Q  Okay.  And I don't want to know what you talked
9 with Michael about.  We'll get to that later.
10      What's the basis of this charge?
11  A  So the basis of this charge is because at the
12 time, after I had just gotten my rank back, I was
13 experiencing -- I was working with numerous male
14 lieutenants, and I was experiencing a lot of
15 inappropriate and -- behavior and inappropriate
16 comments while working with these lieutenants.  And I
17 gave the examples in that EEOC complaint.
18      So one of them would be, they would watch porn
19 inside the sergeant's office.  They would banter back
20 and forth about penis enlargements, about people that
21 sleep around to get ahead in the department.  And I was
22 growing very uncomfortable with the way that these
23 lieutenants were conducting themselves in my presence.
24 And, you know, I would have conversations with my
25 lieutenants, and they would turn it into a joke.

Page 77

1       For example, at one point, I told Lieutenant
2 Flanagan that there was going to be an officer that was
3 going to be late for work.  He had requested a couple
4 of hours in the beginning of the shift.  And I said
5 because he was getting some dental work, he was getting
6 a dental filling.  And his response to me was, Oh, so
7 he was getting a -- he was getting a rectal filling,
8 which I found absolutely appalling and disgusting.
9 And -- and the fact that I was constantly hearing these
10 type of comments and having to be subjected to this
11 type of behavior in my working office, in my space, I
12 went and I spoke to the FOP about what was going on
13 throughout my -- my shifts, throughout my time there.
14      And at the time, I was in a relationship with
15 Nicholas Guasto, who was my significant other, and he
16 got a firsthand account of some of the behavior that
17 was going on.  So he went to Wayne Jones at the time
18 and had like about a two- to three-hour meeting in
19 regards to this behavior and these inappropriate
20 incidents that I was being subjected to.  And so it
21 fell on deaf ears.  Wayne Jones at the time said that
22 he was going to meet with me, that he was going to
23 bring these individuals in and speak with them, along
24 with Chief Clements.  The FOP said that they were going
25 to meet with Chief Clements and speak to him about what

20 (Pages 74 - 77)

1  was going on, which they did.

2      But, again, nothing occurred after that, no --

3  there was no follow-up. They didn't bring me in to ask

4  me who was -- who was behaving in this way on -- you

5  know, my concerns weren't heard. They fell on deaf

6  ears, and nobody did anything to -- to stop it. So it

7  culminated to me filing another EEOC complaint.

8    Q  When did Nick meet with Wayne?

9    A  Sometime in February of -- it was around the

10  Super Bowl. I remember that.

11   Q  Of 2020?

12   A  Whenever the -- '20? Yes. So it was in 2020,

13  February of 2020, that he met with Wayne Jones.

14   Q  And you were dating Nick at the time?

15   A  Yes.

16   Q  Did you ever date anybody else who worked for

17  the city?

18   A  No.

19   Q  Only Nick Guasto?

20   A  I'm sorry. There was one individual. His name

21  was Henry Doce. And I was in a relationship with him

22  prior to Nick.

23   Q  How long were you in a relationship with Henry

24  Doce?

25   A  Approximately five, six years. Approximately.

1    Q  Was that like generally public knowledge at the

2  city?

3    A  Yes. It was a serious relationship. We lived

4  together. We were, you know, in a relationship for a

5  good amount of time.

6    Q  How about Steven Feldman? Were you ever in a

7  relationship with him?

8    A  No.

9    Q  How about a casual relationship?

10   A  No.

11   Q  Any other casual relationships?

12   A  No.

13   Q  Okay. Okay. It says here that you started to

14  receive sexually explicit text messages from a command

15  staff member. Who was the command staff member?

16   A  The command staff member was Steven Feldman.

17   Q  Okay. When did you receive those messages?

18   A  It was during the time that I had just recently

19  got reinstated to sergeant.

20   Q  So 2018, '19ish --

21   A  Yes.

22   Q  -- somewhere around there?

23      And you never reported them?

24   A  No.

25   Q  Why not?

1    A  Because I was scared. He's a command staff

2  member, with a lot of influence, a lot of influence and

3  a lot of power in that police department. And I was

4  petrified again; why am I in a position again where I

5  am harassed by these male officers, these male command

6  staff members, these people of authority, these older

7  people than me, these people with a lot of tenure in

8  this police department?

9    Q  Well, you said "again" -- well, what was the

10  basis of your fear? Because from what I've heard from

11  you so far, any complaints you've made were addressed

12  by the city.

13   A  That is not what I said.

14   Q  Well, you made the complaint about the officer

15  stalking you.

16   A  Yes.

17   Q  And that had been addressed, correct?

18   A  Yes.

19   Q  And then you had resolved your grievance and

20  earlier EEOC charge, correct? Is that correct?

21   A  Yes.

22   Q  And with Cosner, you rejected his advances, and

23  then again, Sands, was one incident in 2017. At the

24  time of this EEOC charge in 2020, you and Cosner had no

25  contact whatsoever. So what exactly were you fearing

1  from a retaliation standpoint?

2    A  Well, I had just gotten my stripes back, my

3  sergeant's position back, and I was scared that this

4  very known, powerful command staff member would have

5  influence in me coming forward and telling the city

6  what was -- what was going on with him. And I was

7  scared to be demoted again and to be retaliated

8  against.

9      My complaints happened, and they continued to

10  happen. Yes, they have been resolved differently, some

11  of them, but the point of the matter is that they

12  continue to happen. This behavior continues to happen.

13  It is a toxic environment, where they condone this type

14  of behavior. So, yes, the complaints have been -- have

15  been addressed, but the complaints continue to happen.

16  And that's what I was scared of, of more continued

17  behavior.

18   Q  Do you still have the text messages that he sent

19  you?

20   A  I do not.

21   Q  What happened to them?

22   A  I was scared, so I deleted them.

23   Q  When did you delete them?

24   A  I don't have the date.

25   Q  Okay. It says here you had an issue in October

Page 82

1 or November of '19, where Lieutenant Garcia was
2 screenshotting your personal pictures of your social
3 media and forwarding it to the whole police station?
4    A  That is correct.
5    Q  What type of pictures was he screenshotting?
6    A  So he -- I don't know how he managed to get
7 pictures of Nick and I, personal pictures that Nick had
8 put on his Instagram, but he was basically taking
9 screenshots of our pictures and sending them around the
10 police station, saying things like, How could Jessica
11 date Nick, who is fat and ugly?  He was telling --
12 making fun of the fact that him and I were together, to
13 multiple people who came forward and told Nick what he
14 was doing, as well as Nick telling me what he was
15 doing.
16       And so Nick actually asked him in my presence
17 why he was doing that, and he told him because he
18 could.  And he did it.  And this incident happened,
19 where he confronted him, in the main police station, on
20 the second floor, with multiple people present.
21    Q  And other than the EEOC charge, did you complain
22 about that conduct?
23    A  I had been complaining about that conduct,
24 again --
25    Q  To who?

Page 83

1    A  -- through Wayne Jones and through the FOP.
2    Q  And why didn't the FOP do anything about it?
3    A  They did.  They spoke to the chief of police,
4 and they told him what was going on.  And, again, like
5 I said, it fell on deaf ears.  Nothing was done about
6 it.
7    Q  Did you tell the FOP that nothing was done about
8 it?
9    A  Yes.  And they told me as well.
10    Q  And why didn't they take any action after that?
11    A  They continued to try to take action, but,
12 again, the city -- the -- I'm sorry -- the chief did
13 not want to hear or resolve any of my complaints.
14    Q  And by "chief," are you referring to Chief
15 Clements?
16    A  That is correct.
17    Q  Who from the FOP talked to Chief Clements about
18 this issue with Lieutenant Garcia?
19    A  Kevin Millan.
20    Q  Anyone else?
21    A  I believe Robert Azicri.
22    Q  Anyone else?
23    A  I don't remember off the top of my head.
24    Q  Anything in writing about this complaint?
25    A  Yes.

Page 84

1    Q  What was in writing about it?
2    A  I have messages between myself and Kevin Millan,
3 talking to him about these complaints and these issues.
4 And on that same date, I met with him for about three
5 hours in the FOP office.  And then from there, he went
6 and spoke to Chief Clements.  He called me on that same
7 day, saying that the chief was going to bring me in to
8 speak to me about my complaints, and it never happened.
9 It never transpired.
10    Q  What day?
11    A  I don't have the date on the top of my head, but
12 I do have that information.
13    Q  Where is that information?
14    A  My counsel has it.
15    Q  Is there any reason it wasn't produced?
16    A  I believe it was, through text messages.
17    Q  Oh, okay.  And we're talking about Lieutenant
18 Garcia here?
19    A  My messages about Lieutenant Garcia and some of
20 the issues that I was going through with Kevin Millan.
21 Yes, that exchange.
22    Q  Okay.  And Lieutenant Garcia's issues also
23 include his requests for you to go to breakfast and
24 work out with him in the gym?
25    A  Yes.  He would ask me to go to breakfast, and I

Page 85

1 would say no on multiple occasions, to the point where
2 he brought me into the office and said, This is the way
3 that we build rapport, and I expect you to come to
4 breakfast with the rest of the sergeants and the
5 lieutenants.  On that one occasion, I did go with him,
6 with the rest of my squad mates, and it turned -- with
7 the rest of the sergeants and some of the lieutenants,
8 and it turned into me sitting in a cafe with all these
9 male officers talking about the waitresses inside the
10 restaurant, talking about sexual connotations, to the
11 point where I said, I'm leaving, I have to go do
12 administrative work.  And I left from -- from those
13 breakfasts.  It was severely uncomfortable and so
14 inappropriate, and that's the main reason why I
15 refrained from going.
16    Q  And was that part of your complaints?
17    A  Yes.
18    Q  Okay.  And then you say here that you were
19 subjected to a hostile work environment when your
20 supervisors and others openly engaged in sexually
21 inappropriate and offensive comments and viewing
22 pornographic videos in the workplace on their cell
23 phones.  Who -- what supervisors did that?
24    A  The ones on my EEOC, as well as other sergeants
25 and lieutenants.

22 (Pages 82 - 85)

1   Q   What are their names?

2   A   There's multiple sergeants inside the sergeant

3   room at any given time.  It was a huge banter going on

4   back and forth, where you can hear and see the contents

5   of porn that they were displaying, with multiple

6   sergeants there, with lieutenants coming in and out,

7   laughing, joking.

8   Q   Well, you said here "my supervisors."  So who

9   are the supervisors you're referring to?

10   A   So some of them included Lieutenant Garcia, some

11   of them included Lieutenant Flanagan, who were my

12   superiors, and then my peers were multiple sergeants

13   that were in the room.

14   Q   Okay.  Well, what are their names?  Well, let me

15   ask it a different way.  What sergeants did you observe

16   engaging in sexually inappropriate and offensive

17   comments and/or viewing pornographic videos on their

18   cell phones?

19   A   So I don't have the specific names of who was

20   doing that at the time.  I do know that I was inside

21   this room of -- filled with multiple sergeants,

22   multiple lieutenants, and I can hear and see them

23   putting on their cell phone porn, and then joking and

24   bantering back and forth very loudly.

25   Q   So you filed an EEOC charge accusing, quote,

1   others openly engaging in sexually inappropriate and

2   offensive comments and viewing pornographic videos in

3   the workplace on their cell phones, and you can't name

4   a single person besides the supervisors?

5   A   So I did name the supervisors.

6   Q   I know.  I said --

7   A   And then --

8   Q   Hold on.

9       I said besides the supervisors.  I'm asking

10   about the -- who are the others?

11   A   Okay.  So, like I said, at the time, I'm in a

12   room full of multiple sergeants, with all this banter

13   going back and forth, 10, 15 sergeants in there at any

14   given time, walking in and out, and showing this

15   content, laughing about this content.  My desk was in a

16   position where I can't name you the specific people,

17   but I did see and hear what they were speaking about.

18   And it was loud.  They were putting porn on their phone

19   in a loud volume.  I don't have the specifics of who

20   was doing it, but I do know that it was going on.

21   Q   So out of these 14 or 15 people, you can't name

22   one person, correct?

23   A   No.

24   Q   Okay.  And then it says the lieutenants and

25   sergeants would openly laugh and make comments like,

1   This is how so-and-so got the new position, or this is

2   what you have to do around here to get in a specialized

3   unit.  Who are the lieutenants and sergeants that made

4   these comments?

5   A   Again, like I said, Lieutenant Garcia.

6   Lieutenant Flanagan was one of them.  Lieutenant

7   Garcia.  Lieutenant Dohler was one of them.  Multiple.

8   This was a common behavior where multiple of

9   lieutenants and sergeants were conducting themselves

10   in.

11   Q   What about sergeants?  Can you name any specific

12   ones?

13   A   I can't name any specific ones.

14   Q   Okay.

15   A   Again, they're all bunched up together.  They're

16   all inside this office, bantering back and forth.  And

17   I was trying my best to stay away from that -- that

18   behavior and that crowd, as my desk was off to the

19   left.

20   Q   And it says, I've been subjected to listening to

21   my colleagues talk about penis enlargements and detail

22   how the procedure is done.  Who are the colleagues that

23   talked about this?

24   A   So we have cubicles in the sergeant's office,

25   and you can hear sergeants speaking about this and

1   joking about it --

2   Q   But you don't know --

3   A   -- very loudly.

4       No, I do not know who -- who it was that said

5   it, but I know that it happened.

6   Q   Did you ever tell anyone to stop?

7   A   I did not tell anybody to stop.  I would just

8   walk away or leave the office.  And when I would do

9   that, I would get accused of being an introvert, and I

10   would get accrued of not being a team player and not

11   being with my peers.

12   Q   Why is it that you can't remember a single name

13   of any sergeants that did any of this conduct?  You

14   have multiple allegations that are pretty specific, you

15   use the broad term "sergeants," but you can't name one

16   sergeant, one of the 14 or 15?  You didn't recognize

17   anyone's voices?  Nothing like that?

18   A   I didn't recognize anyone's voices.  I know that

19   I sat at my desk, and I know that I heard what I heard

20   and saw on the phones this type of content.

21   Q   Well, let me ask you this:  If you didn't

22   recognize their voices and you didn't know their names,

23   how do you know they were sergeants?

24   A   Because it's the sergeants' office, where all

25   the sergeants are in there doing their administrative

23 (Pages 86 - 89)

1 work. Where they're in, you can hear the radio. You
2 can hear them coming on the radio and saying specific,
3 you know, calls on the radio or acknowledging radio --
4 the radio. You can tell and you know that it was a
5 sergeant.
6    Q   But there were also lieutenants in there
7 as well, and you know who they are, right?
8    A   Yes.
9    Q   And it's possible there could have been other
10 people in there that weren't sergeants. I mean, you
11 really don't know, right?
12    A   You do know, because in the sergeants' office,
13 you can see the sergeants' desks, and you can see that
14 there's sergeants in there. And there is not -- it's
15 not common at all for an officer to be in there.
16    Q   So you could visibly see the sergeants in the
17 office when these types of comments were being made and
18 when the porn was being viewed, but you can't, sitting
19 here today, name one that engaged in any of the conduct
20 that you reference on the first page of this 2020 EEOC
21 charge? Do I have that right?
22    A   No. I sat in my desk. It was off to the left.
23 I can see and hear them playing porn, them talking all
24 this banter. I can see them coming in and out. But I
25 don't know who directly was doing it. I was trying to

1 concentrate on what was in front of me, which was my
2 desk and my administrative work that I was conducting,
3 and I tried to not look at this type of behavior. And
4 when it got so egregious, I would just walk out and try
5 to put blinders on and not see and not try to engage in
6 any of this type of behavior.
7    Q   Who are the colleagues that you had to listen to
8 disparage black supervisors and use derogatory comments
9 like, quote, these negros are entitled and racist, end
10 quote?
11    A   That was multiple of my lieutenants.
12    Q   What are their names?
13    A   One of them said it directly to me, which was at
14 the time -- I believe he's a captain now -- Lieutenant
15 Baldwin. It was during the riots. And I had reported
16 to him directly, and he was giving me some information
17 for the shift when he said that quote to me.
18    Q   Anyone else?
19    A   Lieutenant Flanagan would say things like --
20 there was an incident that occurred on the beach, where
21 Andrew Gillum, who I believe was a political person,
22 got in trouble on the beach. And he made some
23 derogatory comments about him, saying that he was
24 probably having black anal sex and engaging in -- in
25 sexual behaviors and drugs and that's why he got in

1 trouble. And then he proceeded to dry hump a partition
2 in the sergeants' office, in front of me.
3    Q   I have one question here. Who specifically made
4 the comment, These negros are entitled and racist? Who
5 said that?
6    A   That is Lieutenant Baldwin, at the time.
7    Q   When did he say that?
8    A   Like I said, during the riots.
9    Q   Do you remember what year that was?
10    A   I don't recall.
11    Q   What was the time frame of this general conduct,
12 the porn in the office, the penis enlargement
13 discussion, these racist comments? Like, what year was
14 all this going on?
15    A   It was a constant, every year, all year.
16    Q   All day, every day?
17    A   All day.
18    Q   Did you ever make any written complaints about
19 any of this prior to your EEOC charge?
20    A   Like I said, I had enough of this type of
21 behavior that I was deeply offended by it. And by
22 proxy, I had -- Nick Guasto spoke to -- because he had
23 that good rapport with Wayne Jones, and he spoke to him
24 about everything that was going on. And he was in
25 there for about three hours with Wayne Jones. And,

1 again, I spoke to the FOP about it prior to this EEOC.
2       MR. ELKINS:  Okay. Let's take five.
3       THE VIDEOGRAPHER:  The time is 10:58 a.m.
4    We're going off the record.
5       (A break was taken from 10:58 a.m. to
6       11:17 a.m.)
7       THE VIDEOGRAPHER:  The time is 11:17 a.m.
8    We're back on the record.
9 BY MR. ELKINS:
10    Q   Okay. You mentioned this meeting between Nick,
11 I guess your then-boyfriend, then soon-to-be future
12 husband, I guess -- between Nick and Wayne Jones. It
13 was like a three-hour meeting you talked about?
14    A   Yes.
15    Q   When did that meeting take place?
16    A   In February of 2020.
17    Q   Were you present for the meeting?
18    A   I was not.
19    Q   Was anyone else present for the meeting, that
20 you know of?
21    A   Yes.
22    Q   Who?
23    A   Lieutenant -- at the time, he was Lieutenant --
24 either Lieutenant Garcia or Captain Garcia at the time.
25 I don't remember. But Eric Garcia.

24 (Pages 90 - 93)

Page 94

1   Q   Not the same Garcia from the EEOC charge?
2   A   No.
3   Q   Different, right?
4   A   Yes.
5   Q   Okay.  Anyone else?
6   A   Steven Feldman was present as well.
7   Q   Okay.  And how did you learn of the contents of
8   the meeting?  Did Nick tell you?
9   A   So I had asked to -- I'm sorry.  Nick had told
10  me that he was going to speak to Wayne Jones about my
11  concerns and my complaints that I was experiencing
12  throughout.  And so I asked if I could be present in
13  the meeting, and Wayne Jones had told him that he would
14  rather speak to him and then Nick can relay to me the
15  information, but that he was very much open to hearing
16  Nick's concerns -- or --
17  Q   And this happened -- go ahead.  I'm sorry.
18  A   -- that he was very much open to having a
19  discussion with Nick regarding my concerns.
20  Q   And this happened February 2020.  So that would
21  include -- the concerns, I'm assuming, that were
22  addressed in this meeting were on this first page of
23  this EEOC charge?  And I ask that because the second
24  page deals with, it looks like, allegations from after
25  February 2020.  So do I have that right?

Page 95

1   A   Can you rephrase your question, because --
2   Q   Yeah.
3   A   -- I don't understand what you're asking me.
4   Q   Nick's February 2020 meeting with Wayne --
5   A   Yes.
6   Q   -- where he addressed your concerns, the
7   concerns that he was addressing were concerns obviously
8   that occurred from February 2020 backwards, correct?
9   A   No.  It was a culmination of -- basically, Nick
10  went in there and had discussed with him from A through
11  Z, in the sense of what I have experienced in my
12  career, in my tenure, from the moment I got there, all
13  the way to the present date in February.
14  Q   So February 2020 backwards?
15  A   Yes.
16  Q   Okay.  And it looks like, from this EEOC charge,
17  the allegations on page 1 are from February 2020
18  backwards, correct?
19      Take a minute and look at it.  I'm not trying to
20  trap you.  I just want to make sure I've got the time
21  lines correct.
22  A   So it's correct that -- can you lower it,
23  please.  No.  Like go to the next page.
24      So it's correct that it has -- it was from
25  February backwards, but also forward as well, because

Page 96

1   there's incidents that are from May of 2020 and from
2   April of 2022.
3   Q   Yeah, but I'm asking you about what Nick talked
4   to Wayne about.  How could, in May -- in February of
5   2020, Nick talk to Wayne about things that happened in
6   April and May of 2020?  They hadn't happened yet.
7   A   Okay.  I understand your question now.
8       So, yes, it was from everything before February,
9   before -- from -- all the way to my beginning of my
10  tenure with the police department.
11  Q   Right.  So including February 2020 backwards?
12  A   Yes.
13  Q   But Nick did not talk to Wayne about anything
14  occurring March 2020, April 2020, May 2020, June 2020,
15  all of this stuff on the second page?
16  A   That is correct.
17  Q   Oh, okay.  Okay.  Got it.
18  A   That is correct.  And obviously because it
19  hadn't happened yet.  We were still --
20  Q   Correct.
21  A   -- in February.
22  Q   Correct.
23  A   However, the FOP did speak to the chief about
24  everything post-February 2020 and everything after
25  February of 2020 --

Page 97

1   Q   Did they --
2   A   -- to --
3   Q   Go ahead.
4   A   They met with Chief Clements and spoke to him
5   about all of these complaints that are on this EEOC.
6   Q   Before the EEOC charge was filed?
7   A   I believe before and after.
8   Q   Well, we'll get to after.
9   A   Okay.
10  Q   Who from the FOP spoke to Chief Clements, and
11  when?
12  A   So I don't have the date with me right now, but
13  I do know that it was Kevin Millan and Robert Azicri,
14  were two of them.  I know that -- it was somebody.
15  Reggie Lester also spoke to the chief, as well, of what
16  was transpiring.  So they're all part of the FOP.
17  Q   And did you make written complaints to them
18  about each of these post-February 2020 allegations on
19  page 2 of the 2020 EEOC charge?
20  A   Well, I had a meeting with them, an in-person
21  meeting, for about two and a half, three hours.
22  Q   You and the FOP?
23  A   Yes, I did.
24  Q   And who was present at that meeting?
25  A   In that meeting, Kevin Millan was present and

25 (Pages 94 - 97)

1 Robert Azicri was present.

2 Q  And when was that meeting?

3 A  I don't have the date with me at this moment

4 right now, but I -- it did occur.

5 Q  You don't even remember what month

6 approximately?

7 A  I don't.  I would have to look at my records.

8 Q  What records would you have to look at?

9 A  The text messages between Kevin Millan and I,

10 when he asked me to come over to the FOP office to

11 speak.

12 Q  And was that before or after you filed the EEOC

13 charge?

14 A  I believe that was after.  I mean, I'm sorry,

15 before.

16 Q  Okay.  Why didn't the FOP take any formal action

17 on your behalf?

18 A  The FOP did take formal action --

19 Q  What did they do?

20 A  -- on my behalf.

21    They spoke to Richard Clements and advised him

22 of the incidents that were going on and my complaints.

23 And the chief had told them that he was going to handle

24 it.

25 Q  But you don't believe the chief did handle it?

1 A  He did not handle it.

2 Q  Okay.  So why didn't the FOP take any action

3 then?

4 A  They continued to ask Clements to handle it, and

5 it continued to not be heard.

6 Q  But they never filed a grievance, correct, on

7 your behalf?

8 A  There was no grievance to file.  It's a

9 complaint that you can -- you can notify anybody of a

10 complaint.  I notified my FOP.  My FOP told me that

11 they were going to notify the chief of police, who did

12 not take any action.

13 Q  Did you go to internal affairs about any of the

14 complaints?

15 A  No.  I went to the FOP, and the FOP went to

16 Richard Clements, who said he was going to handle it.

17 Q  And when the chief didn't handle it, did you go

18 to internal affairs?

19 A  No.  I went back to the FOP, and I advised him

20 that I still had not been spoken to.  And they said

21 they were going to follow up with Richard Clements.

22 Q  At any point did you go to internal affairs

23 about any of these complaints?

24 A  No, I did not.

25 Q  Okay.

1 A  Again, in our policies, it states that you can

2 go to whoever to report harassment and any type of

3 retaliation or any type of inappropriate behavior.  And

4 that's who I felt the most comfortable with, was to

5 tell the FOP what was going on, because internal

6 affairs is part of the chief's office.  They work

7 directly for the chief.  So in that sense, yes, I went

8 to the FOP, who went directly to the chief.

9 Q  On page 2 of the EEOC charge, where you say, In

10 or about February of 2020, I had another lieutenant

11 asking several sergeants whom he saw speaking to me if

12 they were sleeping with me.

13    Who's that lieutenant?

14 A  That lieutenant is Lieutenant Dohler.

15 Q  And who were the sergeants?

16 A  There were several sergeants that came up to me.

17 I don't remember who they were.  Again, we were in the

18 sergeants' office.  There was always a multiple of

19 sergeants there at a time.  And I was told, Hey,

20 Lieutenant Dohler is asking, you know, every time they

21 see you with another sergeant, if -- if there's -- if

22 they're sleeping with you.

23 Q  And who's the major that inappropriately grabbed

24 your wrist?

25 A  That was Major De La Espriella.

1 Q  Did you make a complaint about him doing that?

2 A  No, because, again, I told the FOP about all of

3 these complaints.  Everything that is here on this

4 document, I had told the FOP.  I told them about

5 Lieutenant Garcia.  I told them about Lieutenant

6 Dohler.  I told them about Lieutenant Baldwin.  I told

7 them about Major De La Espriella.  I let -- I had a

8 meeting with them for two-plus hours, and I told them

9 all of what was going on.

10 Q  Is there a reason that through the bulk of this

11 EEOC charge, you don't actually name people?  I mean,

12 if you had told the FOP and you made all of these

13 internal complaints, I'm assuming you gave them names.

14 But why in the EEOC charge do you say another

15 lieutenant, a major, a male sergeant?  How come you

16 don't name anybody?

17 A  I don't know.  I know that that's the way my

18 attorney at the time wrote this document.  But I did

19 name names to the FOP.  And I did relay that

20 information to them to relay to the chief.  And in this

21 document, it does name some people.

22 Q  It names some, but there's plenty of others that

23 aren't named.

24    So who is the male sergeant that was verbally

25 counseled for violating the state emergency order?

1    A   At that time, that was -- I don't know for sure.
2   I believe it was either Lieutenant -- I'm sorry --
3   Sergeant Del Castillo or it was -- it could've been --
4   it had to be a sergeant that worked in the
5   entertainment district.  That's what I remember at the
6   time.  So I don't know if it was him or the other
7   sergeant that worked on the opposite side of the week
8   with him.  But I'm not -- I'm not certain which one it
9   was.
10    Q   And who was the lieutenant in March or April of
11   2020 that made the comment about the rectum filling?
12    A   That was Lieutenant Flanagan.
13    Q   And that's the same -- that's also Lieutenant
14   Flanagan that you're referring to a few weeks later,
15   the lieutenant that started to imitate sexual acts in
16   the workplace?
17    A   Yes.  The one that I had described earlier about
18   him dry humping a partition.
19    Q   Okay.  Who's the lieutenant that demanded you to
20   respond to their office and see your personal cell
21   phone, to check its battery, in April of 2020?
22    A   That was Lieutenant Flanagan.
23    Q   And that's the same lieutenant throughout this
24   whole paragraph, correct?
25    A   That is correct.

1    Q   Okay.  And then looking down in June 2020, who's
2   the lieutenant that made comments in front of you that
3   it's the Hispanics causing riots in Miami and making
4   the protests violent?
5    A   That was Lieutenant Baldwin, the same who had
6   made that previous comment about -- I believe it's on
7   the first page.
8    Q   Which comment are you referring to?
9    A   The one that says, I had to listen to some of my
10   colleagues disparage black supervisors and use
11   derogatory comments.
12    Q   The same lieutenant?
13    A   Yes.
14    Q   Lieutenant Baldwin?
15    A   Yes.
16    Q   Okay.  Got it.
17        All right.  So if I'm understanding right -- I
18   just want to make sure I get it -- for all of the
19   complaints up through February 2020, Nick Guasto talked
20   to Wayne Jones about those.  And you were also talking
21   to the FOP about those, or did just Nick talk to Wayne?
22    A   No.  Nick spoke to Wayne, and I spoke to the
23   FOP.
24    Q   Okay.
25    A   And I had wanted to be included in the meeting

1   with Wayne Jones, but he had said it would be better if
2   it was just Nick.
3    Q   And then thereafter, you had multiple meetings
4   with the FOP about all of these complaints that flowed
5   from February 2020 through June 2020, correct?
6    A   That is correct.
7    Q   Do you remember how many meetings you had with
8   the FOP?
9    A   I know there were multiple.  There was in person
10   and there was over the phone.
11    Q   Do you remember how many?
12    A   More than a handful.
13    Q   And was it always -- was Kevin Millan in every
14   single one of them?
15    A   He was the FOP president at the time.  Yes.
16    Q   Okay.  And did you ever express any
17   dissatisfaction with how the FOP handled these
18   complaints?
19    A   At the time, I did not, because I believed in
20   good faith that they were going to handle my
21   complaints.  At the time, Kevin Millan had continued to
22   speak to the chief.  So he had reached out to me every
23   single time he did, so I believed that he was doing
24   what he had to do by letting the administration know of
25   my complaints.  So, no.  He had let the chief know

1   multiple times.
2        I'm dissatisfied with how management, to include
3   Richard Clements, did not handle my complaints and did
4   not give me the opportunity to speak with him about
5   these complaints.
6    Q   During this time period you're talking about?
7    A   Yes.
8    Q   And is Lieutenant Cosner mentioned in your 2020
9   EEOC charge that we just reviewed?
10    A   The one that we just reviewed?  No.
11    Q   Correct.
12    A   No.
13    Q   Is he part of any of those allegations at all?
14    A   No.
15    Q   Okay.  And it's the 2020 EEOC charge that is the
16   protected activity that you believe you were retaliated
17   against, when you were ultimately separated from
18   employment.  Do I have that right?
19    A   It is the EEOC charge that my counsel present
20   filed, as well as the 2020.
21    Q   Well, you're talking about your 2021 EEOC
22   charge?
23    A   Yes.
24    Q   Well, your 2021 EEOC charge -- correct me if I'm
25   wrong -- came after you were terminated, correct?

27 (Pages 102 - 105)

1    A   Yes.
2    Q   Right?
3    A   Yes.
4    Q   Okay.  So there's no way the city could've
5  retaliated against you, because you were already
6  separated.  Does that make sense?
7    A   That makes sense.  Sorry.  I did not understand
8  your question.
9    Q   I figured you didn't.  I'm not trying to trap
10  you.  That's why I want to clarify it.
11       So the protected activity that you believe
12  caused the city to retaliate against you is this 2020
13  EEOC charge we just went over, correct?
14    A   Yes.
15    Q   Okay.  Your position, as I understand it, in the
16  remaining claims from this lawsuit is that you were
17  fired because you filed that 2020 EEOC charge?
18    A   Not only that, but because of these frivolous
19  allegations that Lieutenant Cosner wrote.  And I
20  believe that the city retaliated against me and
21  separated my employment over allegations that were
22  never substantiated, that were never proven, and
23  basically were just allegations.  So in -- with the
24  EEOC and with that incident that happened with
25  Lieutenant Cosner, I do believe that the city

1  retaliated against me and separated me unjustly.
2    Q   So you think part of the reason the city
3  separated is because it relied on unproven,
4  unsubstantiated, uninvestigated allegations?
5    A   That is correct.
6       MR. ELKINS:  Okay.  I think now is a good time
7  to eat, because I'm kind of hungry.  An hour?
8       MR. DARAGJATI:  That's fine.
9       THE VIDEOGRAPHER:  Off the record.  The time is
10  11:36 a.m.  We're going off the record.
11       (A break was taken from 11:36 a.m. to
12       12:32 p.m.)
13       THE VIDEOGRAPHER:  The time is 12:32 p.m.
14  We're back on the record.
15  BY MR. ELKINS:
16    Q   Okay.  I think I had asked you earlier, so I
17  just want to double-check it, that for the 2020 EEOC
18  charge, which covered events up to February 2020, and
19  then events right after February 2020 through
20  June 2020, if Cosner was involved in anything in that
21  charge, and I think you said he was not.
22    A   That is correct.
23       (Defendant's Exhibit 5 was marked for
24       identification.)
25  BY MR. ELKINS:

1    Q   Okay.  So I'm going to show you -- do you see
2  this document?
3    A   Yes.
4    Q   Okay.  This is your 2021 EEOC charge, which I
5  believe is the third EEOC charge you filed against the
6  city.  Correct?
7    A   That is correct.
8    Q   Okay.  Now, in this charge -- I'm going to
9  scroll down.  Right at the top here you say, On the
10  first day back to work after CP signed the agreement --
11  that's you, I believe, charging party -- Respondent
12  Cosner, who was previously involved in the conduct
13  leading to the 2020 charge -- so I'm confused.  Was he
14  involved in the 2020 charge or not?
15    A   He was not involved in the 2020 charge.
16    Q   Why did you put it in your 2021 charge that he
17  was?
18    A   So in the conduct leading to the 2020 charge,
19  which means everything that happened from the beginning
20  of -- of my tenure there, he was part of that conduct
21  leading up to the 2020 charge.  So I didn't file
22  anything against Cosner in 2014, moving on to 2020, but
23  he did have conduct leading up to the 2020 charge.  I
24  just had not reported it, like I said, because I was
25  scared to report his behavior towards me.

1    Q   But he's not part of the 2020 charge, correct?
2    A   Not specifically, not there in that 2020 charge.
3    Q   Okay.
4    A   But he's involved in the conduct leading up to
5  the 2020 charge.
6    Q   Got it.
7       Do you know if Cosner was even aware that you
8  had filed a 2020 EEOC charge?
9    A   Yes.
10    Q   How do you know he was -- if he was or was not
11  aware?
12    A   Because he sat right in back of me in the
13  sergeants' office, and it was common knowledge of my
14  EEOC charge, as well as my LCA that was implemented.
15  And so he sat behind me.  It was a common occurrence
16  where sergeants in the sergeants' office were talking
17  about my EEOC charge, as well as my LCA, where they
18  would openly make comments about my EEOC charge and my
19  LCA.  And he sat right in back of me, and he was privy
20  to a lot of this information.  And he would see when
21  the FOP would come in -- into the office to ask me to
22  step out to come speak to them.  And it was common
23  knowledge throughout the whole entire station,
24  specifically the sergeants' office where this
25  information was known and it was open and it was out

1 there.
2   Q  Do you have any evidence directly that he knew?
3 Like, did he tell you he knew?  Did someone tell you
4 that he knew?
5   A  No.
6   Q  You're just -- what I'm hearing is, you're
7 assuming he knew because, based on what you're telling
8 me, he overheard conversations about your LCA, which I
9 believe you're referring to your last chance agreement,
10 correct?
11   A  That is correct.
12   Q  And your 2020 EEOC charge?
13   A  That is correct.
14     And it was -- like I said, it was common
15 knowledge.  It was discussions that would happen
16 openly.  And at times, I was present for those
17 conversations, where I had to tell them, Hey, do not
18 discuss my EEOC in the office, in the sergeants'
19 office.
20   Q  Did you have to tell Cosner that?
21   A  No, I did not tell Cosner that.
22   Q  Did you hear him discussing it?
23   A  No.
24   Q  Okay.  You're talking about other sergeants that
25 you heard talking about it?

1   A  Yes.
2   Q  Who?
3   A  A lot of my peers.  For instance, Mike Muley
4 would speak about it.  Jerome Berrian would speak about
5 it.  Other sergeants, like Frank Del Castillo, would
6 talk about it.  Just different sergeants would speak
7 about it or ask me about it.  And I would tell them,
8 Hey, I'm not going to discuss that with you, or I can't
9 discuss that with you.
10     And there were many of times where Cosner was in
11 the office and was sitting in back of me when these
12 conversations were taking place.  Again, I didn't have
13 any interaction with him, but if he's in the office, I
14 assume that he heard it.
15   Q  Okay.  But you don't know for sure?
16   A  I mean, he's sitting in back of me, so, again, I
17 assume that he heard it.  It was loud enough that I
18 know that he would be able to hear.
19   Q  All right.  I'm going to show you what I'm going
20 to mark as Exhibit 6.
21     (Defendant's Exhibit 6 was marked for
22     identification.)
23 BY MR. ELKINS:
24   Q  Let me scroll up.  Do you recognize this
25 document?  Are you able to see it, first of all?

1   A  Yes.
2   Q  Okay.  Do you recognize it?
3   A  Yes.
4   Q  This is your responses to interrogatories that
5 we sent in this case, correct?
6   A  Yes.
7   Q  All right.  I'm going to scroll down.
8     And I presume that's your signature?
9   A  Yes.
10   Q  Right?  Jessica Salabarria Guasto?
11   A  Yes.
12   Q  Okay.  And you had it notarized, correct?
13   A  That is correct.
14   Q  All right.  So you signed these answers under
15 oath, correct?
16   A  Yes.
17   Q  Okay.  I'm going to go to interrogatory
18 number 9.  I had asked you earlier if you filed your
19 2020 EEOC charge after you were placed under
20 investigation by internal affairs.  And I think you
21 wrote in your interrogatory answers:  Plaintiff filed
22 an EEOC charge in July 2020.  Prior to filing her
23 complaint in May 2020, the Miami Beach Police
24 Department gave plaintiff and her then-husband,
25 Nicholas Guasto, notice that they were being

1 investigated for being outside the city limits while on
2 duty.
3   A  Okay.
4   Q  So you filed your EEOC charge after you were
5 placed under investigation, correct?
6   A  That is correct.
7   Q  Okay.
8   A  But that has nothing to do with -- with what I
9 was being investigated for or the EEOC charge.  I had
10 -- I had taken multiple steps and opportunities to try
11 to get these complaints that I had resolved.  And when
12 it wasn't getting resolved, when I kept not hearing
13 anything from the chief or from the city, I had no
14 other choice but to file the EEOC.  But it had nothing
15 to do with the investigation.
16   Q  I didn't ask you if it did.  All I asked you
17 was, did you file the EEOC charge after being placed
18 under investigation?  And I think the answer to that --
19 correct me if I'm wrong -- is you did.
20   A  That correct.  I just wanted to elaborate.
21   Q  You're free to do so.
22     Okay.  So at some point, I believe on
23 November 2nd, 2020, there was a meeting that you were
24 present for regarding both your EEOC charge and the
25 pending internal affairs investigation.  Do you

1 remember that meeting?

2 A Yes.

3 Q Did you attend that meeting?

4 A Yes.

5 Q Okay. And did you have two lawyers at that

6 meeting?

7 A Yes.

8 Q And that was Michael Pancier and Gene Gibbons,

9 correct?

10 A That is correct.

11 Q Do you remember who from the city was at that

12 meeting?

13 A I remember that Michael Smith was at that

14 meeting, from my recollection. I believe Richard

15 Clements. And you were present. And I don't recall

16 who else was present off the top of my head right now.

17 Q A.J., I think, the internal affairs --

18 A Yes, that's correct.

19    Do you have the document that you're referring

20 to?

21 Q I'm not referring to any documents.

22 A Okay.

23 Q Okay. And you understood that that meeting was

24 a confidential settlement meeting to discuss your EEOC

25 charge and the pending IA investigation, correct?

1 A That is correct.

2 Q Okay. You had previously made allegations that

3 that meeting turned into an improper 112 interrogation.

4 Are you familiar with that?

5 A Yes.

6 Q Okay. At any point in that meeting, did either

7 of your two lawyers stop the meeting and allege that it

8 was an improper 112 investigation?

9 A No, they did not.

10 Q Okay. And correct me if I'm wrong, but wasn't

11 the president of the FOP at the time, Kevin Millan,

12 present at that meeting?

13 A Yes, he was -- he was present.

14 Q Did he ever stop the meeting and say, This is an

15 improper 112 investigation?

16 A Not from what I recall.

17 Q And one of your lawyers was your union attorney,

18 Eugene Gibbons, correct?

19 A That is correct.

20 Q And as I understand it -- correct me if I'm

21 wrong -- Mr. Gibbons has extensive experience in

22 internal affairs matters and 112 interviews; is that

23 correct?

24 A I don't know that to be true or not.

25 Q Okay. Were you comfortable with him as your FOP

1 attorney at the time?

2 A I was not comfortable with him as my FOP

3 attorney at the time.

4 Q Why not?

5 A Because when I had previously had the issue

6 where I got wrongfully demoted, again I expressed that

7 I didn't want to settle with these terms. And Gene

8 Gibbons was pushing for me to settle with these terms,

9 saying that the FOP would not be able to continue to

10 fight it or would not -- it was -- it would be in my

11 best interest. And I kept telling him that I did not

12 agree with the terms of the settlement. However, like

13 I stated before, I settled because all I wanted was

14 just to be reinstated back to sergeant, and that meant

15 more to me than continuing to fight for monies, when

16 money wasn't important to me. What was important to me

17 was my rank.

18    So in that meeting, I didn't feel properly

19 represented. I felt like the FOP was working for

20 management, and I felt that they didn't do their due

21 diligence and their job to stop this meeting, this

22 so-called meeting, that turned into an interrogation,

23 where they violated my 112 officer bill of rights.

24 Q You're referring to the November 2nd, 2020

25 meeting?

1 A Yes.

2 Q And so sitting here today, are you continuing to

3 allege that your 112 police officer bill of rights were

4 violated during that meeting?

5 A Yes.

6 Q At any point in time in that meeting, did you

7 stand up and say, This is an improper 112 meeting?

8 A Well, when I tried to let my counsel know what

9 was --

10 Q Hold on. I don't want to know what you talked

11 to your lawyer about.

12 A Oh, I'm sorry. I apologize.

13 Q Yeah. Don't tell me -- I'm saying this

14 respectfully. Do not tell me what your lawyers told

15 you. So when I'm asking -- and I should have made this

16 clear, so let me clarify for you. I'm talking about

17 what happened in that room, the room that you were in

18 with your lawyers, plus all the personnel from the

19 city. Does that make sense?

20 A That makes sense.

21 Q Anything you talked to them about privately, do

22 not tell me that.

23 A Okay.

24 Q I'm not asking about it.

25    Okay. So let me reask the question.

30 (Pages 114 - 117)

1     MR. ELKINS:  We'll strike from the record the

2   statement "when I told my counsel."  Strike that, so

3   that there's no waiver issue.

4   BY MR. ELKINS:

5   Q   During the meeting, did you ever speak up in the

6   room, in front of everybody, that it was an improper

7   112 investigation?

8   A   No.  In the meeting, I was intimidated.  I was

9   scared.  I didn't know what this meeting was about,

10  because the meeting was presented to me that it was

11  going to be a EEOC meeting where there was going to be

12  a settlement in regards to the EEOC and that all my

13  concerns were going to be heard by the chief and the

14  city.

15     However, when I sat there, they presented on a

16  PowerPoint one still shot from this investigation, and

17  they asked me questions to answer, what was on the

18  PowerPoint, in violation of my due processes and my 112

19  rights.  And I didn't want to discuss it.  I didn't --

20  I stayed quiet.  And I looked over to my attorney and

21  to the FOP.  And I believe that's when we had a break

22  in the meeting, and then from there, we went over to

23  another room and I had discussions with my counsel.

24  Q   Don't talk to me about --

25  A   I'm not.  I'm not.  I'm just saying what

1   happened.

2   Q   There were multiple breaks during that meeting,

3   correct?

4   A   Yes.

5   Q   Okay.  And at any point in time during the

6   display of the PowerPoint, did either of your lawyers

7   object to any questioning about what was going on with

8   the PowerPoint?

9   A   They did not.  And that's what was so concerning

10  to me, was the fact that they did not.  And there is a

11  clear violation of my 112 by this PowerPoint, and

12  nobody is saying anything to defend me or to uphold my

13  officer bill of rights.

14  Q   And at any point in time, did the president of

15  the FOP interject and say, This is an improper

16  investigation, during the PowerPoint?

17  A   No, he did not.

18     Again, I felt like I was being misrepresented.

19  I felt that they -- but when I say "they," the city and

20  the chief made it seem like this meeting was to discuss

21  the EEOC and to discuss my concerns.  And the meeting

22  invite said it was going to be a meeting invite for a

23  settlement and to discuss the EEOC.

24     And when I get there, I'm blindsided by this

25  PowerPoint that was presented, with internal affairs

1   sitting in the room, on a laptop, writing I don't know

2   what type of notes, that were never presented to me,

3   again in violation of my due process.  And they're

4   asking me to answer questions of something that -- a

5   document that I haven't even reviewed.  And so, yeah, I

6   was misrepresented.

7     And, again, I strongly believe that at the time,

8   the FOP and Gene Gibbons was more on management's side,

9   more than on my side.  They didn't protect me.

10  Q   Did you take any action against the FOP, Gene,

11  or your private lawyer, Michael Pancier?

12  A   No, I did not.

13  Q   You didn't file a ULP against the FOP?

14  A   No, I did not, because I had no knowledge of

15  what to do or how to do it.  Again, I was scared.  I

16  felt intimidated.  I felt -- I'm in a room full of all

17  these men and with all this authority, and I'm

18  basically left in this meeting out to dry.  Nobody's

19  speaking up, when there's clear violations.

20  Q   Well, to be fair, you're saying you were left in

21  this room, but you did have two lawyers and the

22  president of the FOP there on your behalf, correct?

23  A   That is correct.

24  Q   And one of those lawyers you hired on your own.

25  That's Michael Pancier, correct?

1   A   So the attorney that I hired was recommended by

2   Gene Gibbons, who told me he cannot file the EEOC, so

3   he asked me to --

4   Q   Hold on.

5   A   Oh, I'm sorry.  I'm so sorry.

6   Q   Let's strike any commentary about what Gene

7   Gibbons told her -- told you.

8     MR. ELKINS:  I'm sorry.  Can you read back my

9   question.

10     (The requested portion of the record was

11     read back by the reporter as above

12     recorded.)

13  BY MR. ELKINS:

14  Q   So let me clarify that question, to maybe help

15  you be able to answer it without revealing anything

16  that might be privileged.

17  A   Thank you.

18  Q   Gene Gibbons is a lawyer provided to you by

19  virtue of your prior membership in the FOP, correct?

20  A   That is correct.

21  Q   He's the FOP's counsel, correct?

22  A   That is correct.

23  Q   And you don't have to pay for him --

24  A   That is correct.

25  Q   -- right?

31 (Pages 118 - 121)

1     Since your FOP dues and that type of thing?
2     A   That is correct.
3     Q   But Michael Pancier was not through the FOP.
4  That was a lawyer that you, Jessica Salabarria, engaged
5  separate on your own.  Correct?
6     A   That is not correct.
7     Q   Okay.
8     A   I mean, it is --
9     Q   Explain that.
10    A   -- it is correct in a way, because I was the one
11 who hired him.  However, I was advised to do so and --
12    Q   Don't tell me what you were advised to do.
13    A   Okay.
14    Q   The fact is, you hired him on your own?
15    A   Yes.
16    Q   That's what matters.
17    A   Yes.
18    Q   Okay.  And is it fair to say that Gene was your
19 labor lawyer and Michael Pancier was your employment
20 lawyer, your private employment discrimination lawyer?
21    A   Yes.  Pancier was for the EEOC.
22    Q   And Gene was for the internal affairs
23 investigation and things of that nature?
24    A   That is correct.
25    Q   So if you weren't expecting there to be any

1  discussions about the internal affairs investigation,
2  why would Gene need to be there?
3     A   So that's exactly my point.  I was told that
4  this meeting was going to be EEOC-related and it was
5  going to be to discuss my concerns with the behavior
6  that was going on in the police department with all of
7  my lieutenants, the lieutenants that I named in the
8  EEOC, and the behavior that I discussed in the EEOC.
9        And when I get there, that was not the case.  It
10 was -- it turned into an interrogation, and they never
11 discussed the EEOC.  They never discussed any of my
12 accusers -- any of the accusers that I put on the EEOC.
13 They never spoke about the behavior that was going on.
14 They stopped me from speaking about the behavior that
15 was going on.  Specifically, the chief said, We're not
16 doing that here.  And so -- and so at some point after
17 the PowerPoint was presented and I refused to speak
18 about the PowerPoint, because I knew something was
19 wrong, that's when we took a break and the meeting
20 was -- was -- was paused at the moment.
21    Q   Did you record the meeting?
22    A   No, I did not.
23    Q   You didn't leave a phone in the room recording
24 anything?
25    A   No, I did not.

1     Q   Why -- when your former attorney, Jason Kuno,
2  was presented with allegations that you recorded the
3  meeting, why didn't you just have your lawyer refute
4  them?
5     A   I don't know what my lawyer did in his responses
6  to the city, but I do know that I read several
7  documentations where he said there is no recording.
8  And I believe that was also discussed through my
9  counsel at the moment.
10    Q   Mr. Kuno?
11    A   No.  My current one as well.
12    Q   I don't want to know what you talk about with
13 your current counsel.
14       Okay.  And so, eventually, after the meeting,
15 you're familiar that the parties -- the parties, the
16 city and your lawyers, engaged in some settlement
17 discussions?  Do you remember that?
18    A   Yes.
19    Q   Okay.  And those settlement discussions resulted
20 in two documents, a settlement agreement and a last
21 chance agreement, correct?
22    A   So on the day of the meeting where they
23 discussed settlements, which -- which was with the
24 chief present and the HR director -- you were in there
25 as well -- again, like you noted, the people that were

1  in the meeting, they said a settlement agreement was
2  presented to my side through the FOP.  But they never
3  specifically said what the settlement agreement would
4  be and that they would later on a later date let me
5  know what the settlement entailed.  It was vague.
6  There was no type of indication that the settlement
7  agreement would include any type of LCA.  In fact,
8  while I was sitting there, I didn't want to agree to a
9  settlement agreement.  However, I was told that if I
10 didn't agree to the settlement agreement, that I would
11 be terminated, based on the PowerPoint that was
12 presented on the big screen.
13    Q   Who told you that?
14    A   You did.
15    Q   I told you that?
16    A   Yes.
17    Q   What did I say?
18    A   You said, The city does not want you here,
19 you're not a good fit for the city, and the city's not
20 a good fit for you, and so it would be best right now
21 for you to settle; and if you don't agree, what's on
22 the PowerPoint up there right now is going to lead to
23 you being terminated, and if you don't agree to that
24 settlement, you're going to be terminated.
25       And that was said in front of everybody else

1 that was present in that meeting. And when I tried to
2 speak about the behavior that was occurring, there was
3 a comment that was mentioned that, So what if officers
4 and sergeants view porn in the office, they're a bunch
5 of cops, not choir boys.
6     And that was said in front of me, in my
7 presence, which was absolutely -- it was -- it was so
8 offensive and so hurtful to hear that being said in
9 front of everybody, to be said, So what if officers
10 watch porn, they're a bunch of police officers, not
11 choir boys. It was the most offensive and derogatory
12 term that I heard in that meeting. And I knew then and
13 there that there was no interest of listening to any of
14 my concerns and listening to any of my EEOC complaints.
15 And this was all about trying to get me to settle with
16 the city and to settle into -- agreeing into a
17 settlement agreement, that was not presented to me on
18 what the settlement terms would be, just that if I
19 didn't agree, I would be terminated based on the
20 PowerPoint.
21   Q  And I told you that?
22   A  That -- yes.
23   Q  Did your lawyers object when I supposedly said
24 this?
25   A  They did not.

1   Q  Did the president of the FOP object when I
2 supposedly said this?
3   A  They did not. Again, that's why I believe that
4 the FOP was not working for me but more so for
5 management.
6   Q  So I think what my question was -- and I
7 appreciate that answer -- was that after the meeting,
8 there were settlement discussions between the city and
9 your lawyers. Is that accurate or not?
10   A  All that was told was, Let's do a settlement,
11 the terms of the settlement are not -- we don't know
12 what the terms are going to be, but we will let you
13 know.
14     And, again, it was based on the fact that if I
15 didn't agree to the settlement, that I would be
16 terminated based on the PowerPoint.
17   Q  You were not presented the terms of any
18 settlement agreement at the November 2nd meeting, were
19 you?
20   A  No.
21   Q  The terms of -- and any negotiations of a
22 settlement were between the city and your lawyers,
23 correct?
24   A  That is correct.
25   Q  The city made proposals, and then your lawyers

1 made counterproposals, correct?
2   A  That is correct.
3   Q  So the settlement agreement and last chance
4 agreement that you ultimately signed was the product of
5 negotiation between your representatives and the city,
6 correct?
7   A  That is correct.
8   Q  Okay. So I'm showing you what I'm marking as
9 Exhibit 7, which you should have up on your screen.
10     (Defendant's Exhibit 7 was marked for
11     identification.)
12 BY MR. ELKINS:
13   Q  Can you see it?
14   A  I see a settlement agreement.
15   Q  Okay.
16   A  The first page?
17   Q  Yes.
18     And this relates to EEOC charge
19 number 510-2020-04794, which is the 2020 EEOC charge.
20     And then if I scroll down here, this has some
21 terms about you paying back some money to the city,
22 taking a suspension.
23     This is the settlement agreement that resulted
24 from that November 2nd meeting and then further
25 negotiations, correct?

1   A  That is correct.
2   Q  Okay. And you did sign this, didn't you?
3   A  That is correct.
4   Q  And you can -- I can see it's initialed on each
5 page. Are these your initials on each page?
6   A  That is correct.
7   Q  Okay. And is that your signature --
8   A  That is correct.
9   Q  -- on the settlement agreement?
10     And then there's a last chance agreement, right?
11   A  That is correct.
12   Q  And is that your signature -- I'm going to
13 scroll down the pages, but is that your signature on
14 each page?
15   A  Yes.
16   Q  Okay. And then the last chance agreement,
17 that's your signature, correct?
18   A  That is correct.
19   Q  Okay. And going through the terms here,
20 starting on page 1 and going to page 2, you ultimately
21 agreed to take a 160-hour suspension, correct?
22   A  That is correct.
23   Q  You agreed to pay back 86 total hours of time,
24 split up. I think 44 was regular time and 24 was
25 overtime. Correct?

33 (Pages 126 - 129)

Page 130

1    A   That is correct.
2    Q   And so I think the total amount you were paying
3    the city was $3,531.20, correct?
4    A   That is correct.
5    Q   And you paid that to the city?
6    A   Yes.
7    Q   Okay.  So unlike many settlement agreements, the
8    city didn't pay you anything; you paid the city?
9    A   That is correct.
10   Q   Okay.  You agreed to execute the last chance
11   agreement, correct?
12   A   That is correct.
13   Q   You agreed to delete your podcast Cafecitos -- I
14   can't pronounce the full name, but it's --
15   A   Cafecitos y Chisme with Nick & Jess.
16   Q   You agreed to delete that, correct?
17   A   Yes.
18       So when it came to the last chance agreement and
19   the settlement agreement, I did not want to agree to
20   any settlement agreement or any last chance agreement.
21   Again, I can't discuss what I spoke with my counsel,
22   but I do have information that -- that proves what --
23   what I wanted in lieu of the settlement agreement,
24   which did not include a last chance agreement or a
25   settlement agreement.  The city went back and forth

Page 131

1    with my representatives, and I was told that if I
2    didn't agree to the settlement agreement --
3        MR. DARAGJATI:  Hold on a second.  Do not talk
4    about --
5        THE WITNESS:  Okay.
6        MR. DARAGJATI:  -- conversations you had with
7    Gene or with Pancier.
8        THE WITNESS:  Okay.
9        MR. DARAGJATI:  Do you understand?
10       THE WITNESS:  Yes.
11   BY MR. ELKINS:
12   Q   Do you have anything else that you could testify
13   to that would not -- on this topic, that would not
14   involve your conversations with your counsel?
15   A   Not -- correct.  No.  Just that I didn't want to
16   sign this agreement and -- I wanted to take this --
17   this case to internal affairs, and I didn't want to
18   agree to a settlement agreement.  And I felt like I had
19   no other choice.
20   Q   And you didn't want to agree to the first
21   settlement agreement you signed, correct?
22   A   That is correct.
23   Q   And you were also being advised by the FOP
24   president as to this settlement agreement and last
25   chance agreement, correct?

Page 132

1    A   That is correct.
2    Q   Did he advise you to sign this?
3    A   Yes, he did.  And I kept telling him that I
4    didn't want to sign it, that I was scared that as soon
5    as I signed, I was going to be terminated.  And that's
6    exactly what happened.  On my first day back after
7    signing this agreement, Lieutenant Cosner made these
8    allegations against me, on my very first day, on the
9    only day that I've ever worked for him as -- in a
10   subordinate position.  And he writes these allegations,
11   and this LCA was implemented.
12   Q   Did anyone force you to sign this?
13   A   I felt forced.
14   Q   Why?
15   A   Because in the settlement meeting that was an
16   interrogation, I felt like I had no other choice but to
17   get -- but to agree to a settlement, because I was
18   being threatened with termination.
19   Q   The interrogation that the FOP president, your
20   labor lawyer, and your private attorney -- the
21   interrogation that none of them objected to?
22   A   That is correct.  But that's how I felt and
23   that's -- and, again, nobody at that point stood up for
24   me or guided me in the right way, and my concerns were
25   left unheard.  And I didn't want to go through a

Page 133

1    settlement.  I wanted to go through my due processes
2    and through my officer bill of rights and -- that's
3    what I wanted, to -- to go through the process, just
4    like everybody else, and not have to go through a
5    settlement agreement, because I knew what was going to
6    happen.  And ultimately, it did.
7    Q   Then why did you sign it?
8    A   Again, I was scared.  I was scared, because I
9    was being told in this meeting, in front of everybody,
10   that if I didn't agree to it, I was going to get
11   terminated.
12   Q   Well, you weren't presented this settlement
13   agreement at the November -- hold on.  You were not
14   presented this settlement agreement at the November 2nd
15   meeting, were you?
16   A   No.
17   Q   You were not presented any of these terms at the
18   November 2nd meeting?
19   A   No.
20       MR. ELKINS:  Let's take a break for two
21   minutes.  Let's go off the record.
22       THE VIDEOGRAPHER:  The time is 1:04 p.m.  We're
23   going off the record.
24       (A break was taken from 1:04 p.m. to
25       2:58 p.m.)

34 (Pages 130 - 133)

Page 134

1 THE VIDEOGRAPHER: The time is 2:58 p.m. We're
2 back on the record.
3 MR. ELKINS: So we've agreed, between the
4 lawyers, that we're going to suspend the deposition.
5 It's been rescheduled via Zoom for February 13th at
6 10:00 a.m.
7 I'll remind the witness that she's still in the
8 deposition, so she can't discuss her testimony with
9 counsel during the suspension.
10 And we will reconvene February 13th via Zoom.
11 Anything else, Paul?
12 MR. DARAGJATI: No. That encapsulates the
13 agreement.
14 Do you have a time when you want to do it?
15 MR. ELKINS: 10:00 a.m.
16 MR. DARAGJATI: 10:00 a.m.? Okay. That's
17 fine. Okay. Very good.
18 MR. ELKINS: Okay. Thank you.
19 THE VIDEOGRAPHER: Before we get off the video
20 record, are there any video orders today?
21 MR. DARAGJATI: Not from the plaintiff.
22 MR. ELKINS: Not from the city, no.
23 THE VIDEOGRAPHER: All right.
24 THE COURT REPORTER: Any record, transcript?
25 MR. ELKINS: No, I'm not going to order yet.

Page 135

1 MR. DARAGJATI: No, ma'am.
2 THE VIDEOGRAPHER: That concludes today's
3 testimony given by Ms. Jessica Guasto. The time is
4 now 3:00 p.m., and we are going off the record.
5        (Thereupon, the deposition was adjourned
6        at 3:00 p.m.)
7
8        EXCEPT FOR ANY CORRECTIONS
9        MADE ON THE ERRATA SHEET BY ME,
10        I CERTIFY THIS IS A TRUE AND
11        ACCURATE TRANSCRIPT.  FURTHER
12        DEPONENT SAYETH NOT.
13
14 _____
15 WITNESS' NAME
16
17 STATE OF FLORIDA   )
18              ) SS:
19 COUNTY OF MIAMI-DADE)
20
21        Sworn and subscribed to before me this _____ day
22 of _____ 2024.
23 PERSONALLY KNOW_____ OR I.D.
24 _____
25 _____

Page 136

1 Notary Public in and for the State of Florida at
2 Large.
3 My commission expires: July 20, 2025
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 137

1        ERRATA SHEET
  RE : Jessica Guasto v. City of Miami Beach
2 DEPO OF: Jessica Guasto
  TAKEN : February 6, 2024
3 ASSG# : 633790
  DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
4 Page # | Line # | Change   | Reason
  ___|_____|_____|_____
5
  ___|_____|_____|_____
6
  ___|_____|_____|_____
7
  ___|_____|_____|_____
8
  ___|_____|_____|_____
9
  ___|_____|_____|_____
10
  ___|_____|_____|_____
11
  ___|_____|_____|_____
12
  ___|_____|_____|_____
13
  ___|_____|_____|_____
14
  ___|_____|_____|_____
15
  ___|_____|_____|_____
16 State of Florida ) _____
  County of        )  Notary Public
17
  Under penalties of perjury, I declare that I have read
18 my deposition transcript, and it is true and correct
  subject to any changes in form or substance entered
19 here.
20 _____   _____
  Date          Signature
21
22
23
24
25

35 (Pages 134 - 137)

Page 138

CERTIFICATE OF OATH

1

2
3  STATE OF FLORIDA:
       :  SS
4  COUNTY  OF  DADE:

5
6       I, Marlene Gutierrez, Shorthand Reporter and
7  Notary Public, State of Florida, certify that JESSICA
8  GUASTO appeared before me on the 6th day of February,
9  2024, and was duly sworn.

10
11      WITNESS my hand and official seal this 14th day
12 of February, 2024.

13
14      _Marlene Gutierrez_
15      _____
16      Marlene Gutierrez
17      Notary Public-State of Florida
18      My Commission #GG126375
19      Expires: July 20, 2025

20
21
22 Personally known_____
23 Or Produced Identification_____
24 Type of Identification Produced_____
25

---

Page 139

REPORTER'S DEPOSITION CERTIFICATE

1

2

3
4  STATE OF FLORIDA:
5        :  SS
6  COUNTY  OF  DADE:

7
8       I, Marlene Gutierrez, Notary Public, certify
9  that I was authorized to and did stenographically
10 report the deposition of JESSICA GUASTO; that a review
11 of the transcript was requested; and that the
12 transcript is a true and complete record of my
13 stenographic notes.

14
15      I further certify that I am not a relative,
16 employee, attorney, or counsel of any of the parties,
17 nor am I financially interested in the action.

18
19      Dated this 14th day of February, 2024.
20      _Marlene Gutierrez_
21      _____
22      MARLENE GUTIERREZ
23
24
25

---

Page 140

1    VERITEXT FLORIDA REPORTING COMPANY
        2 South Biscayne Boulevard
2         Suite 2250
        Miami, Florida 33131
3       (305) 371-1884
          (305) 377-1100 (fax)
4
    February 13, 2024
5
    Jessica Guasto
6   EMAIL: paul@daragjatilaw.com
7   RE   :  Jessica Guasto Vs. City of Miami Beach
    DEPO OF:  Jessica Guasto
8   TAKEN :  February 6, 2023
    Number of pgs: 136
9
10  The above-referenced transcript is available for
    review.
11
       JESSICA GUASTO should read the testimony to
12  verify its accuracy.  If there are any changes, JESSICA
    GUASTO should note those with the reason on the
13  attached Errata Sheet.
14     JESSICA GUASTO should, please, date and sign the
    Errata Sheet and email to the deposing attorney as well
15  as to Veritext at Transcripts-fl@veritext.com and
    copies will be email to all ordering parties.
16
       It is suggested that the completed errata be
17  returned 30 days from receipt of testimony, as
    considered reasonable under Federal rules*, however,
18  there is no Florida statute to this regard.
    If the witness fails to do so, the transcript may be
19  used as if signed.
20
21  Yours,
22  Veritext Legal Solutions
23
24
25

---

Page 141

1    VERITEXT FLORIDA REPORTING CO.
        2 South Biscayne Boulevard, #2250
2         Miami, Florida 33131
        (305) 376-8800
3
    February 13, 2024
4
    MICHAEL L. ELKINS, ESQ.
5   MLE Law
    1212 Northeast 16th Terrace
6   Fort Lauderdale, Florida 33304
    melkins@mlelawfirm.com
7
    RE:     Jessica Guasto vs. City of Miami Beach
8   DEPO OF:  Jessica Guasto
    TAKEN:    February 6, 2024
9
    Dear Counsel:
10  The original transcript of the deposition listed above
    is enclosed for your file.  The witness did not waive
11  reading and signing and has been sent a letter
    notifying them to read and sign their deposition
12  transcript.
    The witness will be provided a copy of their deposition
13  transcript for reading, and we will forward to you any
    corrections made by the witness at that time, along
14  with an original signature page which should be
    attached to the original transcript which is in your
15  possession.
16  Sincerely,
17
18  Marlene Gutierrez
19
20
21
22
23
24
25

36 (Pages 138 - 141)

**[& - 2nd]**                                                                 Page 142

| & | | | |
|---|---|---|---|
| **&**   130:15 | | | |

**0**

**001354**   62:2

**1**

**1**   3:10 4:3 39:15
39:19 95:17
129:20
**10**   64:18 87:13
**107**   3:14
**10:00**   134:6,15
134:16
**10:58**   93:3,5
**11**   64:22
**111**   3:15
**112**   115:3,8,15
115:22 116:23
117:3 118:7,18
119:11
**11:17**   93:6,7
**11:36**   107:10,11
**12**   42:15 64:24
**1212**   2:8 141:5
**128**   3:16
**12:32**   107:12,13
**13**   55:23 140:4
141:3
**136**   140:8
**13th**   75:11
134:5,10
**14**   50:19 73:18
73:23 87:21
89:16

**14th**   138:11
139:19
**15**   61:19 73:18
87:13,21 89:16
**15ish**   73:23
**160**   129:21
**16th**   2:8 141:5
**17**   56:7
**1700**   2:13
**17ish**   56:3,3
**18**   56:3
**19**   82:1
**19ish**   79:20
**1:04**   133:22,24
**1:22**   1:3

**2**

**2**   1:14 3:11 4:6
31:24,25 41:7,9
62:1 97:19
100:9 129:20
140:1 141:1
**20**   33:2 42:11
68:5 78:12
136:3 138:19
**2012**   36:22
50:15,18,19,20
50:23
**2013**   62:6
**2014**   50:13,18
50:24 52:4 54:1
54:19 55:13
57:14 58:9,13
58:22 61:19
63:25 68:20
108:22

**2015**   64:25
68:20
**2017**   37:10 58:7
70:19 73:17,25
80:23
**2017ish**   56:2
**2018**   79:20
**2018-11**   41:19
**2019**   41:16
42:16
**2020**   36:22 54:2
54:3,4,5,18
55:14 57:15
73:19,24 75:11
78:11,12,13
80:24 90:20
93:16 94:20,25
95:4,8,14,17
96:1,5,6,11,14
96:14,14,14,24
96:25 97:18,19
100:10 102:11
102:21 103:1,19
104:5,5 105:8
105:15,20
106:12,17
107:17,18,19,20
108:13,14,15,18
108:21,22,23
109:1,2,5,8
110:12 112:19
112:22,23
113:23 116:24
128:19

**2021**   31:11,14
32:6 54:2
105:21,24 108:4
108:16
**2022**   29:18
31:14 32:6 96:2
**2023**   9:8,20,20
13:13 14:2,2
16:2,15 17:12
17:18 18:21
19:1,4,17 20:5,6
29:18 140:8
**2024**   1:15 4:2
135:22 137:2
138:9,12 139:19
140:4 141:3,8
**2025**   136:3
138:19
**20th**   63:24
**21004**   1:3
**22**   52:22 53:11
65:14
**2250**   140:2
141:1
**24**   129:24
**25th**   62:5
**2:58**   133:25
134:1
**2nd**   113:23
116:24 127:18
128:24 133:14
133:18

| **3** | | | |
| --- | --- | --- | --- |

**3**  3:12 48:22
  61:11,13
**3,531.20**  130:3
**30**  33:2 140:17
**305**  140:3,3
  141:2
**3120**  138:14
  139:20
**32224**  2:4
**33131**  140:2
  141:2
**33139**  2:14
**33304**  2:9 141:6
**371-1884**  140:3
**376-8800**  141:2
**377-1100**  140:3
**39**  3:10
**3:00**  1:16 135:4
  135:6

| **4** |
| --- |

**4**  3:13 63:11
  74:20
**40,000**  9:24
**401**  33:16,18,25
  34:4
**40s**  52:23
**41**  3:11
**44**  129:24
**44,000**  35:11
**4745**  2:3

| **5** |
| --- |

**5**  3:4,14 63:13
  107:23

**50**  19:11,12
  32:17
**503**  2:4
**510-2018-064...**
  42:2
**510-2020-047...**
  128:19

| **6** |
| --- |

**6**  1:15 3:15
  111:20,21 137:2
  140:8 141:8
**60**  19:11,12
**60,000**  29:21
**61**  3:12
**633790**  137:3
**6th**  4:2 138:8

| **7** |
| --- |

**7**  3:16 64:3
  128:9,10
**74**  3:13 62:9

| **8** |
| --- |

**8**  63:23
**80,000**  20:8
**86**  129:23
**8:58**  4:2

| **9** |
| --- |

**9**  64:12 112:18
**9:00**  1:16
**9:35**  35:25 36:2
**9:42**  36:3,4

| **a** |
| --- |

**a.j.**  114:17

**a.m.**  1:16 4:2
  35:25 36:2,3,4
  93:3,5,6,7
  107:10,11 134:6
  134:15,16
**able**  6:16 37:24
  48:1 69:20
  111:18,25 116:9
  121:15
**above**  1:22
  28:16 121:11
  140:10 141:10
**abruptly**  53:1
  56:21 65:16
  67:21
**absolutely**  22:9
  54:20 77:8
  126:7
**abuse**  20:25
**accept**  42:11
**accident**  68:18
**account**  27:23
  27:24 77:16
**accrued**  89:10
**accuracy**  140:12
**accurate**  127:9
  135:11
**accused**  89:9
**accusers**  123:12
  123:12
**accusing**  86:25
**acknowledge**
  53:23
**acknowledging**
  90:3

**acquaintance**
  51:14
**acting**  55:7
**action**  15:23
  69:22 83:10,11
  98:16,18 99:2
  99:12 120:10
  139:17
**actions**  52:9,20
  54:23 59:5
**activity**  105:16
  106:11
**acts**  102:15
**actually**  82:16
  101:11
**add**  62:25
**added**  27:14
**additional**  43:5
**address**  5:10
**addressed**  8:25
  80:11,17 81:15
  94:22 95:6
**addressing**  95:7
**adds**  72:18
**adjourned**
  135:5
**administration**
  16:12 104:24
**administrative**
  85:12 89:25
  91:2
**advances**  53:8
  53:19 67:13
  80:22

[advantage - approximately]                                    Page 144

**advantage** 48:2
48:4
**advice** 65:14,15
**advise** 132:2
**advised** 98:21
99:19 122:11,12
131:23
**affairs** 38:22,25
40:14,18,20
68:13 69:12
75:14,16 99:13
99:18,22 100:6
112:20 113:25
114:17 115:22
119:25 122:22
123:1 131:17
**affecting** 69:5,5
69:6
**agencies** 72:7,8
72:19
**ago** 17:2 34:23
37:6 48:17
**agree** 44:2,6,7
45:10,12 46:5,6
46:14,17 47:4,5
47:12 48:25
50:4 116:12
125:8,10,21,23
126:19 127:15
130:19 131:2,18
131:20 132:17
133:10
**agreed** 42:11
43:5,25 129:21
129:23 130:10

130:13,16 134:3
**agreeing** 48:7
126:16
**agreement** 3:11
3:16 15:18
41:16 42:7,24
43:25 46:23
47:15 48:3
108:10 110:9
124:20,21 125:1
125:3,7,9,10
126:17 127:18
128:3,4,14,23
129:9,10,16
130:11,18,19,20
130:20,23,24,25
131:2,16,18,21
131:24,25 132:7
133:5,13,14
134:13
**agreements**
47:3 130:7
**ah** 6:9
**ahead** 45:24
76:21 94:17
97:3
**aiu** 69:17
**albert** 59:1
**alcohol** 20:25
23:5,15
**allegation** 54:17
**allegations** 8:14
49:6 58:6 89:14
94:24 95:17
97:18 105:13

106:19,21,23
107:4 115:2
124:2 132:8,10
**allege** 115:7
117:3
**allowed** 42:14
**amount** 79:5
130:2
**anal** 91:24
**andrew** 91:21
**anger** 58:8,10
**angry** 54:10
57:16,25 58:11
**animosity** 53:25
55:3 58:18
74:12
**answer** 6:18
49:8,12,13
53:18 113:18
118:17 120:4
121:15 127:7
**answered** 48:10
**answering** 7:5
**answers** 6:8,17
112:14,21
**anticipate** 6:16
**anybody** 28:16
46:12 78:16
89:7 99:9
101:16
**anybody's**
72:22
**anymore** 20:17
44:5 69:1

**anyone's** 89:17
89:18
**apologies** 45:24
**apologize** 10:22
11:12 117:12
**apology** 20:24
21:11 23:22
**appalling** 77:8
**apparently** 23:5
63:4
**appearances** 2:1
**appeared** 138:8
**appearing** 4:18
**applications**
18:10,15 19:17
**applied** 16:6,13
16:24 17:14,17
18:23 19:5,6
**apply** 17:6
19:10
**appreciate**
21:12 127:7
**approve** 30:20
55:25 56:10,11
56:14,24,25
57:8,10,18 58:8
58:11 73:17,25
**approved** 30:23
55:25
**approving**
57:20
**approximate**
7:25
**approximately**
9:24 78:25,25

98:6
**april** 96:2,6,14
102:10,21
**arbitration**
47:17 49:19
**arm's** 53:7
**arrest** 24:9
**arrested** 5:18
20:23 21:6,10
24:7 26:21
**asked** 8:24 21:3
21:16 24:15
55:24 56:10
57:8,13,18 59:4
59:8 73:15
82:16 94:9,12
98:10 107:16
112:18 113:16
118:17 121:3
**asking** 7:1,6
18:24 48:1
75:20 87:9 95:3
96:3 100:11,20
117:15,24 120:4
**assault** 21:9
**assaulted** 20:20
**assaulting** 24:23
**assg** 137:3
**assign** 32:2
69:16
**assigned** 43:10
**assistants** 29:8
**assume** 111:14
111:17

**assuming** 94:21
101:13 110:7
**attached** 140:13
141:14
**attempt** 11:1
74:6
**attempted** 24:3
65:7
**attend** 43:8
114:3
**attention** 38:20
**attorney** 7:14
7:15 24:10
49:14 101:18
115:17 116:1,3
118:20 121:1
124:1 132:20
139:16 140:14
**attorney's** 4:20
40:21 45:25
46:1
**audible** 6:7
**august** 20:5
22:14,15,18,23
22:24 42:15
**authority** 58:3,4
80:6 120:17
**authorized**
139:9
**automatic** 33:22
34:2
**automatically**
34:3,4
**available**
140:10

**avenue** 47:21
**aware** 109:7,11
**azicri** 83:21
97:13 98:1

**b**

**b** 10:3
**back** 5:13 9:1
10:23 21:13
25:18 26:8 27:3
34:18 36:5 39:5
39:5 42:21,22
42:25 43:22
44:1,4,9 45:18
45:18 46:21
47:7,8,12 48:12
48:13,19 50:8
50:23 54:1,8
55:12 64:2
67:23 76:12,19
81:2,3 86:4,24
87:13 88:16
93:8 99:19
107:14 108:10
109:12,19
111:11,16
116:14 121:8,11
128:21 129:23
130:25 132:6
134:2
**background**
37:1
**backwards**
58:19 95:8,14
95:18,25 96:11

**baldwin** 91:15
92:6 101:6
103:5,14
**banter** 76:19
86:3 87:12
90:24
**bantering** 86:24
88:16
**barely** 11:24
**bargaining**
15:17 47:15
48:3
**based** 40:24,24
49:6,13 110:7
125:11 126:19
127:14,16
**basic** 21:23
**basically** 8:16
24:2 27:14 28:2
28:23 46:19
49:12 69:2 82:8
95:9 106:23
120:18
**basis** 40:2,3
41:2 49:20
76:10,11 80:10
**bates** 62:1
**battery** 102:21
**beach** 1:9 2:12
2:14 4:5,18 31:9
31:11 36:19
37:14 59:16
63:3,8 71:22
72:7,10 91:20
91:22 112:23

137:1 140:7
141:7
**becoming** 60:8
**befriend** 63:7
**befriended** 72:6
**befriending**
62:19
**beginning** 21:23
22:23 49:11
50:19 77:4 96:9
108:19
**behalf** 2:5,10,15
4:15,17 98:17
98:20 99:7
120:22
**behaving** 78:4
**behavior** 76:15
77:11,16,19
81:12,14,17
88:8,18 91:3,6
92:21 100:3
108:25 123:5,8
123:13,14 126:2
**behaviors** 91:25
**believe** 9:7 12:2
13:17 15:12
20:5 26:22
31:25 33:22,25
35:7,11,22
40:22 41:1,4,5
41:16,21 42:10
45:15 47:10,18
48:10 49:7
50:15 53:24
54:10,18,23

56:6,22 57:19
58:7,16 61:19
75:10 83:21
84:16 91:14,21
97:7 98:14,25
102:2 103:6
105:16 106:11
106:20,25 108:5
108:11 110:9
113:22 114:14
118:21 120:7
124:8 127:3
**believed** 40:23
104:19,23
**belligerent**
24:22
**benefits** 33:7,10
33:12 34:13
35:14,21
**benjamin** 2:12
4:19
**berrian** 111:4
**best** 5:22 6:15
44:3 48:18 50:3
74:16 88:17
116:11 125:20
**better** 104:1
**bid** 50:25
**big** 125:12
**bill** 116:23
117:3 119:13
133:2
**bills** 30:10
**biscayne** 1:14
4:6 140:1 141:1

**bit** 5:14 6:2,4
11:6 21:14 54:8
**black** 91:8,24
103:10
**blinders** 91:5
**blindsided**
119:24
**block** 59:19
60:1
**bottom** 62:6
**boulevard** 1:14
4:7 140:1 141:1
**bowl** 78:10
**boyfriend** 93:11
**boys** 126:5,11
**brand** 71:4
**braun** 2:12 4:19
**break** 21:13,24
22:1,2,4 27:9
30:18 36:2 93:5
107:11 118:21
123:19 133:20
133:24
**breakfast** 84:23
84:25 85:4
**breakfasts**
85:13
**breaks** 119:2
**brickell** 19:24
20:1 26:13,24
27:4 28:7 30:8
30:19,20,23
33:24
**brief** 36:7

**bring** 26:12
53:5,13 69:3
73:5 77:23 78:3
84:7
**broad** 89:15
**brotherhood**
62:19,21 72:8
**brought** 10:15
11:14 38:19
59:21 69:12
85:2
**build** 51:9,13
85:3
**bulk** 66:16
101:10
**bunch** 72:15,16
72:18 126:4,10
**bunched** 88:15
**busy** 26:7

|  c  |
| --- |

**cafe** 85:8
**cafecitos** 130:13
130:15
**call** 12:8 24:25
40:14 45:8
70:19
**called** 5:3 13:9
58:6 84:6
116:22
**calls** 59:25 90:3
**camelot** 61:21
62:3
**camera** 68:17
69:16

**cameras** 69:14
**captain** 91:14
  93:24
**captured** 24:8
**card** 52:17
  70:19
**career** 50:3
  65:20 66:5
  95:12
**careful** 13:3
**carried** 21:7
  53:24
**carrying** 20:21
**case** 1:3 5:24
  9:11 26:20
  32:12 40:14,21
  42:12 45:13,14
  45:15,25 46:3
  47:1,2 63:2
  65:18 112:5
  123:9 131:17
**cases** 5:18 32:1
  32:13
**castillo** 102:3
  111:5
**casual** 79:9,11
**cause** 1:22 24:9
**caused** 26:1
  106:12
**causing** 24:22
  103:3
**cctv** 24:8
**cease** 11:10,13
  12:16

**cell** 85:22 86:18
  86:23 87:3
  102:20
**center** 2:13
**centre** 19:24
  20:2 26:13,25
  27:4 28:8 30:9
  30:19,20,23
  33:24
**certain** 65:25
  102:8
**certainly** 49:4
**certificate** 138:1
  139:1
**certify** 135:10
  138:7 139:8,15
**chain** 10:15,17
  11:14 12:9
  13:12 16:23
  37:3,5 59:21
**chance** 110:9
  124:21 128:3
  129:10,16
  130:10,18,20,24
  131:25
**chances** 66:12
**change** 137:4
**changed** 5:13
  9:1 56:22
**changes** 137:3
  137:18 140:12
**changing** 63:16
  63:20
**channel** 55:23
  55:24,24 56:22

**charge** 3:10,13
  3:14 14:15
  27:11 28:23
  37:15 39:6 40:2
  40:3 42:1,2,4,5
  42:8 43:17 49:5
  49:19 76:3,10
  76:11 80:20,24
  82:21 86:25
  90:21 92:19
  94:1,23 95:16
  97:6,19 98:13
  100:9 101:11,14
  105:9,15,19,22
  105:24 106:13
  106:17 107:18
  107:21 108:4,5
  108:8,13,14,15
  108:16,18,21,23
  109:1,2,5,8,14
  109:17,18
  110:12 112:19
  112:22 113:4,9
  113:17,24
  114:25 128:18
  128:19
**charging** 108:11
**chart** 27:10,20
**chat** 39:18
**check** 34:3
  102:21 107:17
**chief** 8:15 37:19
  37:20 38:13
  40:4 41:1 77:24
  77:25 83:3,12

  83:14,14,17
  84:6,7 96:23
  97:4,10,15
  98:23,25 99:11
  99:17 100:7,8
  101:20 104:22
  104:25 113:13
  118:13 119:20
  123:15 124:24
**chief's** 39:1
  100:6
**chisme** 130:15
**choice** 113:14
  131:19 132:16
**choir** 126:5,11
**chose** 49:23
**circumstances**
  56:16
**city** 1:9 2:12 4:5
  4:18,19 8:14,18
  14:20,24 15:1
  19:24 20:1
  26:13,25 27:4
  28:7 30:8,19,20
  30:23 31:10
  33:24 36:18
  37:14 38:6 39:4
  43:14 45:21
  46:20 47:22
  48:9 49:5 50:4
  52:7,8 69:20
  75:8 78:17 79:2
  80:12 81:5
  83:12 106:4,12
  106:20,25 107:2

108:6 113:1,13
114:11 117:19
118:14 119:19
124:6,16 125:18
125:19 126:16
127:8,22,25
128:5,21 130:3
130:5,8,8,25
134:22 137:1
140:7 141:7
**city's** 125:19
**civil** 5:24 6:1
15:8,10
**claim** 26:12
**claims** 26:13
43:14 106:16
**clarified** 49:11
**clarify** 22:8
49:10 60:11
106:10 117:16
121:14
**clear** 7:9 117:16
119:11 120:19
**cleared** 46:1
**clemency** 16:20
**clements** 77:24
77:25 83:15,17
84:6 97:4,10
98:21 99:4,16
99:21 105:3
114:15
**clerk** 62:18
73:12
**client** 33:1,3
49:14

**close** 59:19
**coincidence**
71:18,21
**colleagues**
65:11 88:21,22
91:7 103:10
**collective** 15:17
47:15 48:3
**college** 27:1
29:15 30:7,13
30:19,22 31:8
33:9 36:7
**come** 85:3 98:10
101:15 109:21
109:22
**comes** 26:19
**comfortable**
100:4 115:25
116:2
**coming** 81:5
86:6 90:2,24
**command** 10:15
10:18 11:15
12:9 13:12 37:3
37:5 59:22
67:19 79:14,15
79:16 80:1,5
81:4
**comment** 92:4
102:11 103:6,8
126:3
**commentary**
121:6
**commented**
61:23

**commenting**
63:24
**comments** 76:16
77:10 85:21
86:17 87:2,25
88:4 90:17 91:8
91:23 92:13
103:2,11 109:18
**commission**
16:17,23 19:5
34:25 136:3
138:18
**common** 47:4
62:25 63:5 88:8
90:15 109:13,15
109:22 110:14
**communicating**
60:4
**community**
62:20
**companies**
16:13 17:6,8,17
**company** 17:13
20:1 28:10,14
31:20,21 33:2
35:19 140:1
**complain** 12:19
82:21
**complained**
12:20
**complaining**
10:13 82:23
**complaint** 10:11
10:12,13 12:7
12:22 13:7,11

14:3,9,12,21,23
14:24 39:25
57:11 59:2
65:21 67:6,25
68:13,21,24
69:19 75:4,5,7
76:17 78:7
80:14 83:24
99:9,10 101:1
112:23
**complaints** 8:12
8:13 53:14
67:13 69:15
70:22 80:11
81:9,14,15
83:13 84:3,8
85:16 92:18
94:11 97:5,17
98:22 99:14,23
101:3,13 103:19
104:4,18,21,25
105:3,5 113:11
126:14
**complete** 37:24
38:1 139:12
**completed**
26:20 140:16
**completing**
20:25
**concentrate**
91:1
**concerning**
119:9
**concerns** 78:5
94:11,16,19,21

95:6,7,7 118:13
119:21 123:5
126:14 132:24
**concludes** 135:2
**condone** 81:13
**conduct** 82:22
82:23 89:13
90:19 92:11
108:12,18,20,23
109:4
**conducting**
76:23 88:9 91:2
**confide** 71:9
72:24
**confided** 52:18
70:21 71:13
**confidential**
114:24
**confirm** 36:8
**confronted**
82:19
**confused** 108:13
**connect** 63:7
**connection** 45:5
63:21
**connotations**
85:10
**considered**
140:17
**constant** 92:15
**constantly** 77:9
**consumer** 24:25
**contact** 80:25
**content** 87:15
87:15 89:20

**contents** 86:4
94:7
**context** 7:2 29:2
**continue** 11:12
46:22 53:13
65:21 69:3
81:12,15 116:9
**continued** 58:17
67:13 74:14,19
81:9,16 83:11
99:4,5 104:21
**continues** 81:12
**continuing**
116:15 117:2
**continuously**
59:17
**contracted**
28:14
**contractor**
31:23
**contribute**
33:19 34:1
**contribution**
34:5
**convention** 2:13
**conversations**
76:24 110:8,17
111:12 131:6,14
**convicted** 20:23
**copies** 140:15
**cops** 126:5
**copy** 23:22
141:12
**cordial** 74:14,17

**correct** 9:2,3
13:24 15:18,19
18:5 31:11,12
32:11 34:16,19
34:20 41:3,25
42:8,10,12,13
42:17,18 43:11
43:19 49:21,22
49:24 57:20,21
60:10 61:22,24
61:25 63:25
64:11,22 66:16
66:19 67:24
68:3 74:5 75:8,9
80:17,20,20
82:4 83:16
87:22 95:8,18
95:21,22,24
96:16,18,20,22
99:6 102:24,25
104:5,6 105:11
105:24,25
106:13 107:5,22
108:6,7 109:1
110:10,11,13
112:5,12,13,15
113:5,6,19,20
114:9,10,18,25
115:1,10,18,19
115:20,23 119:3
120:22,23,25
121:19,20,21,22
121:24 122:2,5
122:6,10,24
124:21 127:23

127:24 128:1,2
128:6,7,25
129:1,3,6,8,11
129:17,18,21,22
129:25 130:1,3
130:4,9,11,12
130:16 131:15
131:21,22,25
132:1,22 137:18
**corrections**
135:8 141:13
**correctly** 27:5
60:9
**cosner** 50:12,17
51:2,18 52:13
52:14,22 54:10
58:21,21 60:2,8
60:20 63:4
64:15 65:24
69:25 70:17
72:25 80:22,24
105:8 106:19,25
107:20 108:12
108:22 109:7
110:20,21
111:10 132:7
**cosner's** 61:17
63:24 71:19
73:16
**could've** 47:17
49:1,4 102:3
106:4
**counsel** 4:4,11
22:3 84:14
105:19 117:8

118:2,23 121:21
124:9,13 130:21
131:14 134:9
139:16 141:9
**counseled**
101:25
**counseling**
36:10
**counselings**
30:15
**counterpropos...**
128:1
**county** 135:19
137:16 138:4
139:6
**couple** 21:23
77:3
**course** 22:7
43:16
**courses** 20:25
**court** 1:1 2:3
4:9,12,21 5:18
6:6,13 8:13 13:4
30:1 39:16
134:24
**cover** 21:21
**covered** 107:18
**cp** 108:10
**crime** 57:1
**criminal** 5:18
**crossed** 53:17
66:11
**crowd** 88:18
**cruz** 23:13

**cubicles** 88:24
**culminate** 67:14
**culminated** 54:1
66:10 78:7
**culmination**
95:9
**current** 124:11
124:13
**currently** 9:13
34:18
**customer** 23:2
**cut** 52:25 66:4
67:20
**cutting** 6:21
**cv** 1:3

**d**

**d** 3:1
**dade** 27:1 29:15
30:7,13,19,22
31:7 33:9 36:7
135:19 138:4
139:6
**damages** 18:8
**dan** 25:21
**daniel** 37:20
38:19
**daragjati** 2:2,2
2:3 4:14,14,15
39:11 44:18,20
45:1 107:8
131:3,6,9
134:12,16,21
135:1
**daragjatilaw.c...**
2:5 140:6

**date** 15:14
18:24 22:16
23:1 31:4 42:15
75:10,15,18
76:1 78:16
81:24 82:11
84:4,11 95:13
97:12 98:3
125:4 137:20
140:14
**dated** 139:19
**dates** 7:18,19
9:18 18:24 20:4
**dating** 53:19
78:14
**daughter** 64:16
**dave** 21:19,20
25:22,23,23
27:16 28:18,22
**day** 17:13 25:14
43:21 50:18
55:21 58:3,5
71:6 84:7,10
92:16,16,17
108:10 124:22
132:6,8,9
135:21 138:8,11
139:19
**days** 7:21 25:14
25:19 40:6
42:24 43:1
140:17
**de** 100:25 101:7
**deaf** 77:21 78:5
83:5

**deals** 94:24
**dear** 141:9
**december** 54:3
54:4,5,18 55:14
57:15 62:5
73:18,19,24
**decided** 24:4
**decision** 39:1
**declare** 137:17
**dedication**
43:23 50:11
**deeply** 92:21
**defend** 119:12
**defendant** 1:11
2:10,15 5:3
**defendant's** 3:7
39:19 41:9
61:13 74:20
107:23 111:21
128:10
**defendants** 5:19
**definitely** 6:12
**del** 102:3 111:5
**delay** 10:22
**delaying** 31:3
**delete** 81:23
130:13,16
**deleted** 81:22
**demanded**
102:19
**demonstrated**
57:15
**demote** 39:1,2
**demoted** 38:14
39:1 40:6,22

**[demoted - doing]**                                      Page 151

45:19 81:7
116:6
**demoting** 38:21
40:4,13
**dental** 33:13,25
34:15 35:22
77:5,6
**department**
9:17 19:23 31:9
34:12 52:21,23
62:18 66:3 67:2
67:16,17 68:6
73:8 76:21 80:3
80:8 96:10
112:24 123:6
**depending** 33:1
**depends** 33:3
**depo** 137:2
140:7 141:8
**deponent**
135:12
**deposed** 5:20,24
**deposing** 140:14
**deposit** 32:20
**deposition** 1:18
1:22 4:4,6 5:15
7:13,22 8:6 12:9
134:4,8 135:5
137:18 139:1,10
141:10,11,12
**depositions** 6:1
**derogatory**
10:17 12:13
91:8,23 103:11
126:11

**described** 12:10
29:10 102:17
**description** 3:9
**desk** 87:15
88:18 89:19
90:22 91:2
**desks** 90:13
**detail** 11:7
88:21
**details** 26:6
70:17
**determine** 69:20
**different** 6:2
25:20 64:13
72:6,19 86:15
94:3 111:6
**differently**
81:10
**difficult** 66:6
**diligence** 116:21
**dinner** 61:2
**direct** 3:4 5:6
9:25 10:1 32:20
**directed** 56:15
**direction** 25:20
**directives** 56:16
**directly** 18:17
28:7 90:25
91:13,16 100:7
100:8 110:2
**director** 16:9
19:24 21:3,4,15
21:18 25:17,20
25:21 26:1 27:2
27:5,7,8,11,13

27:15,16,17
29:4 30:6 35:5
124:24
**directors** 19:14
29:6,6
**disciplinary**
36:15
**discipline** 42:12
45:13,15 46:3
**disciplined**
30:13
**discriminated**
41:1
**discrimination**
3:10,13,14
122:20
**discuss** 110:18
111:8,9 114:24
118:19 119:20
119:21,23 123:5
130:21 134:8
**discussed** 95:10
123:8,11,11
124:8,23
**discussing**
110:22
**discussion**
92:13 94:19
**discussions**
110:15 118:23
123:1 124:17,19
127:8
**disgusting** 77:8
**disparage** 91:8
103:10

**display** 119:6
**displaying** 86:5
**dissatisfaction**
104:17
**dissatisfied**
105:2
**district** 1:1,1
102:5
**division** 1:2
**divorce** 9:11
**divorced** 9:4,6
**doce** 78:21,24
**document** 39:10
39:22,24 41:12
41:15,17 44:9
44:12 74:24
75:1,15,17,22
101:4,18,21
108:2 111:25
114:19 120:5
**documentation**
38:15
**documentations**
16:19 124:7
**documents** 8:5
8:8,10,13,22
18:4 39:17
114:21 124:20
**dohler** 88:7
100:14,20 101:6
**doing** 6:19,21
13:5 14:4 52:9
58:16 59:6
67:21 72:1,4
82:14,15,17

**[doing - entailed]** Page 152

86:20 87:20
89:25 90:25
101:1 104:23
123:16
**double** 107:17
**download** 18:17
**dpg** 1:3
**drink** 61:2
**drive** 2:13
**drug** 20:25
**drugs** 23:5,15
91:25
**drunk** 24:25
**dry** 92:1 102:18
120:18
**due** 14:22 40:5
54:18 56:25
116:20 118:18
120:3 133:1
**dues** 122:1
**dui** 56:1,12 57:1
**duly** 5:4 138:9
**duties** 20:21
21:7
**duty** 18:4,7,12
24:3 26:5 59:7
59:24 113:2
**dwight** 23:13

**e**

**e** 3:1 20:15
**earlier** 8:24
13:18 21:22
22:12 55:13
58:19 60:6
80:20 102:17

107:16 112:18
**early** 22:15,24
73:18
**earn** 20:9 29:19
**earned** 33:4
50:11
**ears** 77:21 78:6
83:5
**easier** 6:22 15:6
30:4
**eat** 107:7
**education** 16:8
**eeoc** 8:12 14:15
39:6,25 40:2,3
42:1,2,8 43:17
45:17 49:4,19
75:4,5,7 76:17
78:7 80:20,24
82:21 85:24
86:25 90:20
92:19 93:1 94:1
94:23 95:16
97:5,6,19 98:12
100:9 101:11,14
105:9,15,19,21
105:24 106:13
106:17,24
107:17 108:4,5
109:8,14,17,18
110:12,18
112:19,22 113:4
113:9,14,17,24
114:24 118:11
118:12 119:21
119:23 121:2

122:21 123:4,8
123:8,11,12
126:14 128:18
128:19
**effective** 42:15
**egregious** 59:23
91:4
**either** 22:14,22
39:17 43:17
44:18 56:3 68:1
69:20 93:24
102:2 115:6
119:6
**elaborate**
113:20
**elkins** 2:7 3:4
4:17,17 5:7
35:23 36:6
39:10,12,13,16
39:21 41:8,11
44:19,21,22
45:4 61:15
74:22 93:2,9
107:6,15,25
111:23 118:1,4
121:8,13 128:12
131:11 133:20
134:3,15,18,22
134:25 141:4
**else's** 71:2 72:14
**email** 39:18
140:6,14,15
**emergency**
101:25

**employed** 9:15
9:16 67:11
**employee** 21:8
31:24,25 139:16
**employer** 18:18
26:18
**employment**
9:19 16:1,4,5,14
17:7,14,17
18:11,23 20:4
25:12,15 31:10
105:18 106:21
122:19,20
**emulted** 69:4
**encapsulates**
134:12
**enclosed** 141:10
**ended** 31:11
50:25 53:20
73:22
**endure** 46:22
**enforcement**
72:20
**engage** 91:5
**engaged** 85:20
90:19 122:4
124:16
**engaging** 86:16
87:1 91:24
**enlargement**
92:12
**enlargements**
76:20 88:21
**entailed** 125:5

**entails** 57:9
**enter** 137:3
**entered** 137:18
**entertainment** 102:5
**entire** 27:17 109:23
**entitled** 91:9 92:4
**environment** 81:13 85:19
**eric** 93:25
**errata** 135:9 137:1 140:13,14 140:16
**escort** 24:3
**especially** 65:24
**espriella** 100:25 101:7
**esq** 2:2,2,7,11 2:12 141:4
**estrevez** 59:1 67:25 68:3
**eugene** 115:18
**evening** 55:2
**events** 107:18 107:19
**eventually** 37:7 124:14
**everybody** 39:10 41:8 51:11 72:14 118:6 125:25 126:9 133:4,9

**evidence** 18:11 21:9 54:21,22 59:6 68:15 69:14 110:2
**exact** 22:16 71:23
**exactly** 11:7 25:12 46:25 48:16 58:1 80:25 123:3 132:6
**examination** 3:4 5:6
**examined** 5:5
**example** 77:1
**examples** 76:17
**except** 135:8
**exchange** 43:13 84:21
**exchanged** 56:23
**execute** 130:10
**exhibit** 3:10,11 3:12,13,14,15 3:16 39:15,19 41:7,9 61:11,13 74:20 107:23 111:20,21 128:9 128:10
**exhibits** 3:7
**exigent** 56:15
**exist** 18:1
**expect** 85:3
**expecting** 122:25

**experience** 68:9 115:21
**experienced** 46:25 55:11 95:11
**experiencing** 67:23 76:13,14 94:11
**expires** 136:3 138:19
**explain** 122:9
**explicit** 79:14
**express** 104:16
**expressed** 116:6
**extensive** 115:21
**extent** 24:7 50:23

## f

**facebook** 62:22 64:24 72:1,2,5
**fact** 38:16 40:3 40:13,24 45:16 54:24 77:9 82:12 119:10 122:14 125:7 127:14
**fails** 140:19
**fair** 44:8 120:20 122:18
**faith** 104:20
**familiar** 115:4 124:15
**family** 60:24 61:8

**far** 18:24 32:5 80:11
**faster** 6:4
**fat** 82:11
**fax** 140:3
**fear** 80:10
**fearing** 80:25
**february** 1:15 4:2 35:7 78:9,13 93:16 94:20,25 95:4,8,13,14,17 95:25 96:4,8,11 96:21,24,25 97:18 100:10 103:19 104:5 107:18,19 134:5 134:10 137:2 138:8,12 139:19 140:4,8 141:3,8
**federal** 140:17
**feel** 73:5 116:18
**feldman** 79:6,16 94:6
**fell** 77:21 78:5 83:5
**felony** 20:23 24:11,12
**felt** 47:9,19,20 47:21 50:2 100:4 116:19,20 119:18,19 120:16,16 131:18 132:13 132:16,22

**[female - fought]**

**female** 40:25
46:4 65:11,15
**field** 43:10
**fight** 44:5 46:22
116:10,15
**figured** 106:9
**file** 12:22 13:6
39:6 43:16 49:5
57:11 75:13
99:8 108:21
113:14,17
120:13 121:2
141:10
**filed** 1:22 13:11
14:12,18,24
15:1,7 38:2
40:23 41:22
45:17 49:20
75:5,10,12,19
75:23 76:1
86:25 97:6
98:12 99:6
105:20 106:17
108:5 109:8
112:18,21 113:4
**filing** 78:7
112:22
**fill** 57:18 73:25
76:3,4
**filled** 68:11
69:21 76:5
86:21
**filling** 77:6,7
102:11

**finally** 53:18
**financially**
139:17
**find** 69:13
**fine** 5:12 10:21
30:1 45:9 107:8
134:17
**finish** 12:24
**fired** 68:2
106:17
**firm** 4:10
**first** 5:4 6:5
11:19 12:1,2
21:15 36:18
37:3,4,5 50:12
54:9 60:7 61:20
71:25 90:20
94:22 103:7
108:10 111:25
128:16 131:20
132:6,8
**firsthand** 77:16
**fit** 27:15,20
125:19,20
**five** 35:24 78:25
93:2
**fix** 69:15
**fixed** 31:16
**fl** 1:9 140:15
**flanagan** 77:2
86:11 88:6
91:19 102:12,14
102:22
**floor** 2:13 82:20

**florida** 1:1,10
1:15,21 2:4,9,14
4:7 16:17,23
19:5 34:25
35:12 135:17
136:1 137:16
138:3,7,17
139:4 140:1,2
140:18 141:1,2
141:6
**flowed** 104:4
**follow** 6:12 26:9
36:7 59:25 78:3
99:21
**followed** 21:6
**followers** 68:8
**follows** 5:5
**foot** 11:5 12:10
**fop** 15:20 77:12
77:24 83:1,2,7
83:17 84:5 93:1
96:23 97:10,16
97:22 98:10,16
98:18 99:2,10
99:10,15,15,19
100:5,8 101:2,4
101:12,19
103:21,23 104:4
104:8,15,17
109:21 115:11
115:25 116:2,9
116:19 118:21
119:15 120:8,10
120:13,22
121:19 122:1,3

125:2 127:1,4
131:23 132:19
**fop's** 121:21
**force** 56:1,13,15
56:20 57:2,10
132:12
**forced** 48:20
132:13
**forever** 61:21
62:3
**forgot** 8:16
21:21
**form** 55:25
56:10,11,19,19
57:1,8,9,18,19
58:8,11 73:17
73:25 137:18
**formal** 12:22
13:6 98:16,18
**former** 124:1
**forms** 56:14
**fort** 2:9 141:6
**forth** 76:20 86:4
86:24 87:13
88:16 130:25
**forward** 18:22
19:3,18 48:15
49:2 65:24 81:5
82:13 95:25
141:13
**forwarding**
82:3
**fought** 47:14
49:1,18

**found** 59:6,14
59:22 77:8
**four** 8:3 69:18
**fourth** 2:13
**frame** 73:21,21
73:22 92:11
**frank** 111:5
**free** 113:21
**friend** 71:22
**friendly** 51:4
60:3,8 72:21
**friends** 51:14
60:20,21 62:24
63:3 65:8,21
68:8
**friendship** 51:6
51:16 53:1,7,10
53:16,20 66:4
66:11,13 73:23
**friendships**
65:17,23 67:8
67:20
**frivolous** 106:18
**front** 44:12
59:18 91:1 92:2
103:2 118:6
125:25 126:6,9
133:9
**fto** 43:8 46:11
46:14 50:21
**full** 32:10 48:2
70:25 87:12
120:16 130:14
**fun** 82:12

**further** 68:16
128:24 135:11
139:15
**future** 93:11

**g**

**g** 29:25
**garage** 69:14
**garcia** 82:1
83:18 84:18,19
86:10 88:5,7
93:24,24,25
94:1 101:5
**garcia's** 84:22
**gas** 68:11,25
69:21 70:17
**gender** 41:2
**gene** 114:8
116:7 120:8,10
121:2,6,18
122:18,22 123:2
131:7
**general** 51:3
92:11
**generally** 79:1
**getting** 31:2
35:3 45:17,18
46:20 48:12,13
50:8 67:14 77:5
77:5,7,7 113:12
**gg126375**
138:18
**gibbons** 114:8
115:18,21 116:8
120:8 121:2,7
121:18

**gillum** 91:21
**give** 6:7 10:8
11:21 14:7
18:17 26:5
44:13 48:9
56:16 69:11
105:4
**given** 5:15 65:14
65:15 86:3
87:14 135:3
**giving** 91:16
**go** 6:2,3 10:23
13:19,21 14:10
19:9 25:6,13
26:5,7,10,19,22
28:22 29:9 44:1
45:24 46:11
47:6 54:8,8,22
55:12,23 63:9
63:23 64:2
65:16 67:6 69:2
69:7 84:23,25
85:5,11 94:17
95:23 97:3
99:13,17,22
100:2 112:17
132:25 133:1,3
133:4,21
**goes** 18:17
**going** 4:1 6:2,16
6:18,20 15:5
18:21 21:13
25:15 27:3
30:24 34:17
36:1 39:8,8,14

39:14 40:10
41:6,7 44:4 46:8
46:9 48:9,15
49:2 52:5,11
53:3 54:7 56:11
56:18,25 57:10
58:19 60:7,13
60:16 61:10,10
64:16 65:20
66:5 67:14,16
67:17 68:1 69:8
73:6 77:2,3,12
77:17,22,22,24
78:1 81:6 83:4
84:7,20 85:15
86:3 87:13,20
92:14,24 93:4
94:10 98:22,23
99:11,16,21
100:5 101:9
104:20 107:10
108:1,8 111:8
111:19,19 112:7
112:17 118:11
118:11,13 119:7
119:22 123:4,5
123:6,13,15
125:22,24
127:12 129:12
129:19,20 132:5
133:5,10,23
134:4,25 135:4
**good** 4:1 5:8,9
51:10 55:2
60:20,21 79:5

92:23 104:20
107:6 125:19,20
134:17
**gotten** 38:24
76:12 81:2
**gps** 31:22,23
32:7 33:4
**grabbed** 100:23
**great** 36:17
**greeting** 52:17
**grievance** 38:2
38:4,5,11,13
39:3 40:23
41:18,21 42:8
43:17 47:14,14
48:2,5,15 49:2
49:18 80:19
99:6,8
**grotesque** 52:17
**ground** 6:2
**growing** 76:22
**grudge** 57:16
58:18
**guard** 20:21
23:25
**guards** 28:13
**guasto** 1:5,18
3:3 4:4,5,15 5:2
5:11,11,12 9:11
77:15 78:19
92:22 103:19
112:10,25 135:3
137:1,2 138:8
139:10 140:5,7
140:7,11,12,14

141:7,8
**guess** 5:22 58:21
61:21 64:16
93:11,12
**guided** 132:24
**gutierrez** 1:20
4:9 138:6,16
139:8,22 141:18
**guy** 24:25
**guys** 24:1 51:20
**gym** 84:24

**h**

**h** 10:3
**half** 35:17 97:21
**hallway** 53:22
55:1 58:14
**hand** 4:22
138:11
**handful** 104:12
**handle** 98:23,25
99:1,4,16,17
104:20 105:3
**handled** 104:17
**happen** 22:13
37:21 46:24
81:10,12,12,15
110:15 133:6
**happened** 20:18
22:14,20 46:23
47:1 52:22
54:23 55:11
56:12 58:1
69:10 81:9,21
82:18 84:8 89:5
94:17,20 96:5,6

96:19 106:24
108:19 117:17
119:1 132:6
**happening**
71:20
**happens** 25:13
71:21
**happenstance**
71:23
**harass** 52:1
**harassed** 80:5
**harassing** 52:10
**harassment**
53:14 100:2
**hard** 43:23
46:21 50:10
**haste** 57:24
**head** 5:21 6:8
7:20,24 8:23
16:16 17:9 23:1
23:17 32:14
71:14 83:23
84:11 114:16
**health** 33:13,25
34:15 35:22
69:6,6
**healthy** 65:20
**hear** 21:16 27:4
60:9 83:13 86:4
86:22 87:17
88:25 90:1,2,23
110:22 111:18
126:8
**heard** 78:5
80:10 89:19,19

99:5 110:25
111:14,17
118:13 126:12
**hearing** 14:18
14:25 15:1,7,13
77:9 94:15
110:6 113:12
**heavily** 72:20
**help** 121:14
**henry** 2:11 4:18
78:21,23
**henryhunnefeld**
2:14
**hey** 69:7 71:21
100:19 110:17
111:8
**hialeah** 62:17
72:7 73:8
**hire** 28:3
**hired** 36:21,25
120:24 121:1
122:11,14
**hiring** 30:21
35:2,5
**hispanics** 103:3
**holborow** 10:1
12:21
**hold** 44:21
54:13 58:17
63:20 87:8
117:10 121:4
131:3 133:13
**holding** 57:16
**home** 69:11

hopefully  6:3
hostile  65:25
  85:19
hour  32:22,24
  32:25 33:2,2
  42:11 77:18
  93:13 107:7
  129:21
hours  8:1,3
  51:13 59:20
  77:4 84:5 92:25
  97:21 101:8
  129:23
house  59:18,19
  59:19,24 61:4,6
hr  31:2 124:24
huge  86:3
hump  92:1
humping
  102:18
hundred  34:8
hungry  107:7
hunnefeld  2:11
  4:19
hurt  11:1
hurtful  126:8
husband  93:12
  112:24
hypothetical
  27:20 47:18,25
  49:7
hypotheticals
  49:16

**i**

i.d.  135:23
ia  42:12 45:13
  114:25
idea  31:5 35:6
  62:16
identification
  39:20 41:10
  61:14 74:21
  107:24 111:22
  128:11 138:23
  138:24
ignore  54:25
  55:5 74:4,15,19
ignored  55:3
  66:15 74:8
ignores  58:14
ignoring  10:20
  55:14 57:17
imitate  102:15
implemented
  109:14 132:11
important  6:11
  13:3 43:22
  46:20 47:8
  48:12 50:8,9,9
  116:16,16
improper  115:3
  115:8,15 117:7
  118:6 119:15
inappropriate
  11:4,14 57:24
  76:15,15 77:19
  85:14,21 86:16
  87:1 100:3

inappropriately
  100:23
incident  10:7,10
  10:11 20:19
  21:2,5 22:13,20
  23:2 24:8,19
  25:6,13,16,18
  25:25 26:4,5
  29:9 40:16 48:7
  52:6 53:5 54:1
  55:18,20 56:20
  57:14 60:13,14
  60:17 67:4
  69:10 80:23
  82:18 91:20
  106:24
incidents  68:10
  77:20 96:1
  98:22
include  56:14
  84:23 94:21
  105:2 125:7
  130:24
included  51:1
  86:10,11 103:25
includes  49:16
including  96:11
income  31:16
incoming  55:21
independently
  8:8,10 17:23
indication  125:6
individual  23:9
  23:15,24 24:4
  26:21 78:20

individuals
  52:19 77:23
influence  52:24
  66:2,6,25 67:1
  67:18 68:6 80:2
  80:2 81:5
information
  84:12,13 91:16
  94:15 101:20
  109:20,25
  130:22
initialed  129:4
initials  129:5
injuries  57:2
inside  76:19
  85:9 86:2,20
  88:16
instagram  3:12
  61:17,20,23
  62:14 63:24
  71:19 72:1,2,5
  72:13 82:8
instance  111:3
instances  59:21
instructs  49:13
insubordinate
  57:6,7
insurance  35:22
intended  21:25
intention  11:2
  11:10
intentionally
  10:25
interact  23:25

**interacted** 23:8
**interaction**
73:19 74:1
111:13
**interest** 52:15
116:11 126:13
**interested** 19:10
66:9 74:13
139:17
**interject** 119:15
**internal** 38:22
38:25 40:14,18
40:20 68:13
69:12 75:14,16
99:13,18,22
100:5 101:13
112:20 113:25
114:17 115:22
119:25 122:22
123:1 131:17
**internet** 45:5
63:21
**interrogation**
115:3 116:22
123:10 132:16
132:19,21
**interrogatories**
3:15 112:4
**interrogatory**
112:17,21
**interrupt** 15:4
**interrupting**
6:20
**intervened** 24:2

**interview** 28:3
34:22,24 36:23
36:24
**interviews**
115:22
**intimidated**
118:8 120:16
**introduce** 4:11
**introvert** 89:9
**investigate**
14:23
**investigated**
59:22 113:1,9
**investigation**
14:21 38:22,25
40:18,20 75:14
75:20,25 76:2
112:20 113:5,15
113:18,25
114:25 115:8,15
118:7,16 119:16
122:23 123:1
**investigations**
68:18
**investigator**
16:21,25 31:18
31:20 32:1,7
35:9 37:1 69:17
**investigator's**
31:16
**investigators**
32:3,4
**invite** 119:22,22
**involve** 131:14

**involved** 23:2
45:14 56:1,1,12
57:1 107:20
108:12,14,15
109:4
**involving** 40:15
**issue** 53:4 67:5
81:25 83:18
116:5 118:3
**issues** 36:15
38:15,16 40:6,9
65:24 84:3,20
84:22
**it'll** 6:3

**j**

**j** 2:11,12
**jacksonville** 2:4
**jail** 24:10
**january** 29:18
31:11,14 32:6
36:22,22
**jason** 124:1
**javier** 2:19 4:8
**jerome** 111:4
**jess** 130:15
**jessica** 1:5,18
3:3 4:4,5,15 5:2
5:12 82:10
112:10 122:4
135:3 137:1,2
138:7 139:10
140:5,7,7,11,12
140:14 141:7,8
**job** 15:5 16:24
18:14 19:6,7,16

19:17,23 24:21
25:4 26:3,20
27:5 30:5,24
31:16 32:22
34:21 35:3,8
67:7 116:21
**jobs** 16:6,7,8,9
19:11,12 31:17
32:5
**johnson** 21:19
21:20 24:15
25:23 27:16
28:18,22
**joke** 76:25
**joking** 86:7,23
89:1
**jones** 77:17,21
78:13 83:1
92:23,25 93:12
94:10,13 103:20
104:1
**july** 22:23,24
75:11 112:22
136:3 138:19
**jump** 7:7
**june** 9:7,8 63:24
64:25 96:14
103:1 104:5
107:20
**justifying** 45:19

**k**

**k** 33:16,18,25
34:4
**keep** 17:22,23
21:25 41:13

**kept** 18:19 31:3 53:6 113:12 116:11 132:3

**kevin** 83:19 84:2,20 97:13 97:25 98:9 104:13,21 115:11

**kind** 14:12 19:20 27:10 36:10 62:20 107:7

**knew** 30:24 50:21 110:2,3,4 110:7 123:18 126:12 133:5

**know** 6:15 8:22 8:24 10:18 11:2 11:2,10 13:4 15:10 17:22 18:2,7 21:24 23:15,17 24:16 24:18,18,19,20 24:20 26:23 29:23 30:25 31:6 32:14 33:6 33:20 34:11 37:5,6 41:17 46:18,25 48:16 55:11 58:1,21 61:11 62:9,23 63:1 65:12,19 69:20 70:1 71:8 71:8 72:4,5,12 72:13 73:15,23

74:23 76:8,24 78:5 79:4 82:6 86:20 87:6,20 89:2,4,5,18,19 89:22,23 90:3,4 90:7,11,12,25 93:20 97:13,14 100:20 101:17 101:17 102:1,6 104:9,24,25 109:7,10 111:15 111:18 115:24 117:8,10 118:9 120:1 124:5,6 124:12 125:5 127:11,13 135:23

**knowing** 50:23

**knowledge** 72:17,18 79:1 109:13,23 110:15 120:14

**known** 53:2 65:25 81:4 109:25 138:22

**kuno** 124:1,10

**l**

**l** 2:7 10:3 12:3 141:4

**la** 100:25 101:7

**labor** 122:19 132:20

**lafave** 12:8

**lafavore** 12:4

**lafore** 12:4

**laptop** 120:1

**large** 1:21 136:2

**late** 22:15,24 35:7 54:5 73:18 73:24 77:3

**latitude** 49:15

**lauderdale** 2:9 141:6

**laugh** 87:25

**laughing** 86:7 87:15

**law** 2:8 72:20 141:5

**lawrence** 10:1

**lawsuit** 18:4 43:17 49:5,20 106:16

**lawyer** 7:2,4,6,7 49:13 117:11 120:11 121:18 122:4,19,20,20 124:3,5 132:20

**lawyers** 114:5 115:7,17 117:14 117:18 119:6 120:21,24 124:16 126:23 127:9,22,25 134:4

**lay** 67:20

**layer** 27:14

**lca** 109:14,17,19 110:8 125:7 132:11

**lead** 125:22

**leading** 108:13 108:18,21,23 109:4

**learn** 94:7

**leave** 30:7 89:8 123:23

**leaving** 85:11

**left** 67:7 85:12 88:19 90:22 120:18,20 132:25

**legal** 140:22

**length** 53:7

**lengthy** 7:25

**lester** 97:15

**letter** 8:15,16 20:24 21:10 23:22 141:11

**letting** 104:24

**liability** 57:9

**lieu** 36:13 130:23

**lieutenant** 12:5 12:20,21 13:12 55:1,2 56:15 58:5,21 60:8 61:16 64:15 71:19 77:1 82:1 83:18 84:17,19 84:22 86:10,11 88:5,6,6,7 91:14 91:19 92:6 93:23,23,24 100:10,13,14,14

100:20 101:5,5
101:6,15 102:2
102:10,12,13,15
102:19,22,23
103:2,5,12,14
105:8 106:19,25
132:7
**lieutenants**
38:17 40:7 46:8
76:14,16,23,25
85:5,7,25 86:6
86:22 87:24
88:3,9 90:6
91:11 123:7,7
**life**  6:22 35:22
**light**  68:17
69:16
**liked**  67:16
**likes**  72:9,11,15
72:19
**liking**  62:13
63:10 64:13,19
64:24 65:9
71:18,24 72:13
**limits**  113:1
**line**  53:17 66:12
137:4
**lines**  95:21
**list**  19:9,11 63:3
**listed**  141:10
**listen**  53:18 91:7
103:9
**listening**  88:20
126:13,14

**lists**  18:19
**little**  5:14 6:1,4
11:6 21:14 54:8
63:22
**live**  72:3
**lived**  55:11 58:1
79:3
**livelihood**  67:10
67:11
**loading**  44:23
**location**  4:6
**locka**  9:16 10:5
10:7 13:9,16
14:13 19:22
34:12
**log**  17:21
**long**  7:23 13:15
13:22 14:9
17:22 21:25
35:16,18 52:25
68:5,7 78:23
**longer**  10:4
**look**  33:22 42:4
53:24 91:3
95:19 98:7,8
**looked**  16:1,5
118:20
**looking**  103:1
**looks**  63:10
64:12,15 94:24
95:16
**lost**  25:4
**lot**  6:22 12:18
15:5 17:8 21:12
32:4 52:23,24

54:7 55:13
60:15 65:18
66:2,2,6,25 67:1
67:18 68:6,8
70:16 71:22
72:6 76:14 80:2
80:2,3,7 109:20
111:3
**loud**  87:18,19
111:17
**loudly**  86:24
89:3
**low**  67:20
**lower**  95:22
**luluu**  62:9
**lying**  51:21 71:7

**m**

**m**  29:25
**ma'am**  4:21
135:1
**madam**  39:16
**made**  12:7 14:9
58:6 59:2 67:24
68:13 69:19
80:11,14 88:3
90:17 91:22
92:3 101:12
102:11 103:2,6
115:2 117:15
119:20 127:25
128:1 132:7
135:9 141:13
**magana**  29:25
**main**  56:22
82:19 85:14

**maintain**  51:10
53:7,10,16
65:23 66:7 67:8
67:10,21 74:17
**major**  100:23
100:25 101:7,15
**make**  6:3,22 7:7
12:24 14:3 15:4
15:5 21:14
25:11 47:9 54:9
55:12 65:21
66:5 67:13
68:21 70:22
73:16 87:25
92:18 95:20
97:17 101:1
103:18 106:6
109:18 117:19
**makes**  106:7
117:20
**making**  82:12
103:3
**male**  20:20
24:22,24 38:23
40:19 52:6,6,8
53:6 58:22
60:14 76:13
80:5,5 85:9
101:15,24
**mall**  21:3,15,18
23:3,24 24:4
25:1 27:7,11,12
27:16,17 28:3
28:23

managed  82:6
management
  105:2 116:20
  127:5
management's
  120:8
manager  27:18
  27:23,24 28:24
manner  12:13
manners  10:17
march  20:5
  96:14 102:10
mark  39:9,14
  41:7 61:11
  111:20
marked  39:19
  41:9 61:13
  74:20 107:23
  111:21 128:10
marking  128:8
marlene  1:20
  4:9 138:6,16
  139:8,22 141:18
match  42:5
mates  65:22
  85:6
matter  4:5 7:1
  31:1 38:11
  81:11
matters  115:22
  122:16
mean  11:7 25:1
  28:1,19 41:13
  68:2 75:18
  90:10 98:14

101:11 111:16
  122:8
means  108:19
meant  116:14
media  4:3 63:6
  65:9 82:3
meet  7:15,17,23
  40:5 50:12,14
  60:24 77:22,25
  78:8
meeting  26:3
  40:9 77:18
  93:10,13,15,17
  93:19 94:8,13
  94:22 95:4
  97:20,21,24,25
  98:2 101:8
  103:25 113:23
  114:1,3,6,12,14
  114:23,24 115:3
  115:6,7,12,14
  116:18,21,22,25
  117:4,6,7 118:5
  118:8,9,10,11
  118:22 119:2,20
  119:21,22
  120:18 123:4,19
  123:21 124:3,14
  124:22 125:1
  126:1,12 127:7
  127:18 128:24
  132:15 133:9,15
  133:18
meetings  104:3
  104:7

melkins  2:9
  141:6
member  79:15
  79:15,16 80:2
  81:4
members  51:9
  80:6
membership
  121:19
men  120:17
mental  69:6
mentioned  8:25
  48:17 93:10
  105:8 126:3
messages  79:14
  79:17 81:18
  84:2,16,19 98:9
met  7:18 61:8
  78:13 84:4 97:4
miami  1:2,9,15
  2:12,14 4:5,7,18
  27:1 29:14 30:7
  30:13,19,22
  31:7,9,10 33:9
  36:7,19 37:14
  59:16 63:3,8
  71:22 72:7,10
  103:3 112:23
  135:19 137:1
  140:2,7 141:2,7
miamibeachfl....
  2:14
michael  2:7
  4:17 20:13,13
  25:21 27:19

29:1 76:7,9
  114:8,13 120:11
  120:25 122:3,19
  141:4
midnight  60:16
  68:4 70:5
midnights  51:1
  52:5 55:20
mike  111:3
millan  83:19
  84:2,20 97:13
  97:25 98:9
  104:13,21
  115:11
mind  40:6
minute  95:19
minutes  133:21
misconduct
  54:17
misrepresented
  119:18 120:6
mistreated  47:1
mitigate  18:7
mle  2:8 141:5
mlelawfirm.c...
  2:9 141:6
mmm  6:8
mom  64:3,12,18
  64:22 71:18,25
  72:3,5,24 73:6
moment  26:8
  48:18 52:12
  95:12 98:3
  123:20 124:9

**monetary** 30:9

**money** 50:8
116:16 128:21

**monies** 116:15

**monitor** 72:2

**month** 13:25
14:2 17:2 30:18
43:8 46:11 98:5

**months** 43:6
46:10

**morning** 4:1 5:8
5:9

**mother** 62:12
62:13,17 63:7
63:10

**moved** 68:15

**moving** 25:19
65:24 108:22

**muley** 111:3

**multiple** 51:21
59:20,21 63:3,8
63:17 64:7,10
66:9,12,12 69:4
70:3,21 71:4
72:8,10 74:14
82:13,20 85:1
86:2,5,12,21,22
87:12 88:7,8
89:14 91:11
100:18 104:3,9
105:1 113:10
119:2

**municipality**
1:10

**mutual** 62:24

**n**

**n** 3:1 20:15
29:25

**name** 4:8 5:13
9:1 10:2 11:18
11:19,20,21,25
12:1,3,3 13:10
13:11 16:13
17:8,10 19:8,15
20:1 21:18,19
23:12,14,16,17
29:24 70:10,12
70:13,23,24,25
71:2,11 78:20
87:3,5,16,21
88:11,13 89:12
89:15 90:19
101:11,16,19,21
130:14 135:15

**named** 62:9
101:23 123:7

**names** 70:20
71:5,12 86:1,14
86:19 89:22
91:12 101:13,19
101:22

**nature** 50:16
51:3 122:23

**near** 60:1

**need** 21:23 22:1
22:8 46:18
123:2

**needed** 31:18,20
32:3 47:20

**negotiation**
128:5

**negotiations**
127:21 128:25

**negros** 91:9
92:4

**neighbor** 59:15

**neighborhood**
59:16,18 73:24

**nelson** 29:23

**network** 63:6
72:9,20,22

**never** 25:18
26:8 36:8,10,15
51:23 53:21
55:5 61:1,4,6,8
79:23 84:8,9
99:6 106:22,22
120:2 123:10,11
123:13 125:2

**new** 56:6 71:4
88:1

**nicholas** 77:15
112:25

**nick** 9:10 78:8
78:14,19,22
82:7,7,11,13,14
82:16 92:22
93:10,12 94:8,9
94:14,19 95:9
96:3,5,13
103:19,21,22
104:2 130:15

**nick's** 94:16
95:4

**night** 59:20

**nobody's**
120:18

**nod** 6:8

**nonsatisfaction**
18:12

**normal** 55:6
58:15

**northeast** 2:8
141:5

**notarized**
112:12

**notary** 1:20
136:1 137:16
138:7,17 139:8

**note** 140:12

**noted** 124:25

**notes** 10:20
71:16 120:2
139:13

**notice** 1:21
112:25

**notified** 99:10

**notify** 99:9,11

**notifying**
141:11

**november** 9:20
13:13 14:2 16:2
16:14 17:12,18
18:21 19:1,4,17
82:1 113:23
116:24 127:18
128:24 133:13
133:14,18

**number** 3:9
5:21,23 41:19
42:2 59:23 62:2
112:18 128:19
140:8
**numbers** 42:5
**numerous** 76:13

**o**

**o** 10:3,3,3 20:15
**oates** 37:20 41:1
**oates's** 38:19
**oath** 112:15
138:1
**object** 119:7
126:23 127:1
**objected** 132:21
**observe** 86:15
**obviously** 15:23
22:3 34:15
37:15 43:18
47:13 50:21
95:7 96:18
**occasion** 85:5
**occasions** 51:21
59:20 85:1
**occupation**
62:24
**occur** 98:4
**occurred** 10:7
20:19 21:2,5
25:12,16 26:6
40:15 54:2
56:20,21 60:13
78:2 91:20 95:8

**occurrence**
109:15
**occurring** 53:6
68:10 69:3
96:14 126:2
**october** 9:20
14:2 81:25
**odd** 59:20
**offended** 92:21
**offenders** 16:17
16:19
**offensive** 85:21
86:16 87:2
126:8,11
**offer** 47:23 48:9
**office** 4:20
40:21 46:1,1
55:5 76:19
77:11 84:5 85:2
88:16,24 89:8
89:24 90:12,17
92:2,12 98:10
100:6,18 102:20
109:13,16,21,24
110:18,19
111:11,13 126:4
**officer** 9:22
10:14,24 12:5,6
12:8 13:16
23:12 24:5,23
36:20 38:23
43:10 52:21
53:6 54:17
65:18 73:9 77:2
80:14 90:15

116:23 117:3
119:13 133:2
**officers** 20:22
23:8,11 24:8
28:2,4 40:16
45:14 52:19
60:15,15 62:20
63:2 65:11,12
69:24 70:2,3,5,9
70:20 71:4 72:6
72:9,19 80:5
85:9 126:3,9,10
**official** 138:11
**oh** 44:23 77:6
84:17 96:17
117:12 121:5
**okay** 5:14,17
6:1,10,25 7:12
7:15,19 8:1,5,10
8:20,24 9:10,10
9:13,18 10:23
11:18 12:7,19
12:24 13:1,21
14:12 15:13,15
15:23 16:1,4
17:16 19:2,16
19:22 20:12,17
21:12 22:12,25
23:21 26:9,16
26:24 27:9,19
28:12,16,22
29:14,14,17
30:3 31:7,10,13
31:23 32:13
33:7,21 34:7,17

35:1,23 36:17
36:18,21,23,25
37:2,7,11 38:7
39:8 40:1,2 41:4
41:6,15,20,24
42:4,7,10 43:13
43:16,20 44:21
44:23 45:6,10
46:14,17 48:25
49:4,8,9,16,17
49:23 50:1,6,16
51:3,7,23 52:3
54:7,15 57:22
58:19 59:13
60:2,11 61:1,10
61:16,18,23
62:1,5,7 63:9,19
63:23 64:2,3,8
64:17,20,23
65:1 69:24
73:15 74:10
75:1,5,7,10,13
75:23 76:3,8
79:13,13,17
81:25 84:17,22
85:18 86:14
87:11,24 88:14
93:2,10 94:5,7
95:16 96:7,17
96:17 97:9
98:16 99:2,25
102:19 103:1,16
103:24 104:16
105:15 106:4,15
107:6,16 108:1

108:4,8 109:3
110:24 111:15
112:2,12,17
113:3,7,22
114:5,22,23
115:2,6,10,25
117:23,25 119:5
122:7,13,18
124:14,19 128:8
128:15 129:2,7
129:16,19 130:7
130:10 131:5,8
134:16,17,18
**old** 52:22 53:11
65:14
**older** 80:6
**ones** 19:10
85:24 88:12,13
**online** 17:3
**opa** 9:16 10:5,7
13:9,16 14:13
19:22 34:12
**open** 40:13,17
94:15,18 109:25
**openly** 85:20
87:1,25 109:18
110:16
**opportunities**
113:10
**opportunity**
30:8 105:4
**opposite** 102:7
**option** 18:17
59:9

**order** 101:25
134:25
**ordering** 140:15
**orders** 134:20
**ordonez** 2:19
4:8
**org** 27:10
**original** 141:10
141:14,14
**outgoing** 55:22
**outside** 52:8
60:22 113:1
**overheard**
110:8
**overly** 58:11
**oversees** 27:8
**overtime** 129:25
**own** 120:24
122:5,14

**p**

**p.m.** 1:16
107:12,13
133:22,24,25
134:1 135:4,6
**page** 3:9 48:22
62:1 63:11,13
63:23 64:3,12
64:18,22,24
90:20 94:22,24
95:17,23 96:15
97:19 100:9
103:7 128:16
129:5,5,14,20
129:20 137:4
141:14

**pages** 63:16,17
63:21 129:13
**paid** 32:19,21
32:23 130:5,8
**pancier** 76:7
114:8 120:11,25
122:3,19,21
131:7
**paperwork** 31:3
**paragraph**
102:24
**park** 2:3
**parking** 59:18
59:19
**part** 15:16,16
20:25 29:9
34:18 46:15
50:20 66:15
85:16 97:16
100:6 105:13
107:2 108:20
109:1
**participated**
50:22
**parties** 28:5
124:15,15
139:16 140:15
**partition** 92:1
102:18
**party** 28:14
108:11
**pass** 35:15,20
40:11 46:8,9
**passed** 46:7
53:12 55:1

**passing** 38:17
40:7 59:17
**past** 65:8
**paul** 2:2,3,5
4:14 134:11
140:6
**paused** 123:20
**pay** 9:23 20:7
30:10 32:25
33:1,3 35:10
39:5 42:18,19
42:21,23 121:23
129:23 130:8
**paychecks** 34:9
**paying** 128:21
130:2
**pba** 15:21,22
**peers** 55:6 57:7
58:16 67:19
71:9,12 74:18
86:12 89:11
111:3
**pen's** 40:1
**penalties** 137:17
**pending** 22:3
26:12 113:25
114:25
**penis** 76:20
88:21 92:12
**pension** 34:15
**people** 6:13
51:13 62:23
63:3,8 66:1
67:18 71:22
72:10,16,23

76:20 80:6,7,7
82:13,20 87:16
87:21 90:10
101:11,21
124:25
**percent** 34:8
**performance**
38:14,16,17
40:5,9,10
**period** 13:15,19
13:22 35:18,20
37:25 38:1,12
46:7,10 66:19
71:23 105:6
**perjury** 137:17
**person** 13:4
37:15,18 46:2
50:3 53:2 87:4
87:22 91:21
97:20 104:9
**personal** 68:10
69:5 82:2,7
102:20
**personally**
135:23 138:22
**personnel** 15:2
15:8,11,12
117:18
**persons** 63:1
**petrified** 67:12
80:4
**pgs** 140:8
**phone** 86:23
87:18 102:21
104:10 123:23

**phones** 85:23
86:18 87:3
89:20
**photo** 3:12
**physical** 24:5
**picture** 64:15
**pictures** 82:2,5
82:7,7,9
**place** 15:13 19:4
93:15 111:12
**placed** 75:14,16
75:19,24 112:19
113:5,17
**plaintiff** 1:7 2:5
4:16 112:21,24
134:21
**plaintiff's** 3:15
**planning** 14:17
**play** 49:5,20
**player** 89:10
**playing** 90:23
**plc** 2:3
**plea** 21:1 23:22
**please** 4:11,22
44:10 95:23
140:14
**pled** 20:23
24:11,12
**plenty** 101:22
**plus** 68:5 101:8
117:18
**podcast** 130:13
**point** 6:25 15:15
21:8 57:7 58:2
66:10 69:7,12

77:1 81:11 85:1
85:11 99:22
113:22 115:6
117:6 119:5,14
123:3,16 132:23
**pointed** 64:7
**points** 6:15
**police** 9:16,22
13:16 19:23
24:6 31:9 34:12
36:20 52:21,23
62:17,19,20
63:2 66:3 67:16
67:17 68:6 69:9
72:6,9 73:8,9
80:3,8 82:3,10
82:19 83:3
96:10 99:11
112:23 117:3
123:6 126:10
**policies** 56:13
100:1
**political** 91:21
**politically** 65:22
**porn** 76:18 86:5
86:23 87:18
90:18,23 92:12
126:4,10
**pornographic**
85:22 86:17
87:2
**portion** 121:10
**position** 21:5
40:19 67:15
80:4 81:3 87:16

88:1 106:15
132:10
**possession**
141:15
**possible** 21:25
90:9
**post** 63:10,24
64:24 72:22
96:24 97:18
**postacademy**
50:21
**posts** 64:13
71:19,24 72:16
**potentially**
18:11
**power** 80:3
**powerful** 81:4
**powerpoint**
118:16,18 119:6
119:8,11,16,25
123:17,18
125:11,22
126:20 127:16
**practice** 63:5
**prefer** 8:25
**prefers** 30:2
**preparation** 8:6
**prepare** 7:12
**presence** 76:23
82:16 126:7
**present** 2:18
17:13 82:20
93:17,19 94:6
94:12 95:13
97:24,25 98:1

105:19 110:16
113:24 114:15
114:16 115:12
115:13 124:24
126:1
**presented**
118:10,15
119:25 120:2
123:17 124:2
125:2,12 126:17
127:17 133:12
133:14,17
**preserve** 18:4
**president**
104:15 115:11
119:14 120:22
127:1 131:24
132:19
**presume** 15:15
112:8
**pretty** 89:14
**prevented** 48:4
**previous** 103:6
**previously**
108:12 115:2
116:5
**prior** 78:22
92:19 93:1
112:22 121:19
**private** 16:9
26:19 31:15,25
32:7 35:19
120:11 122:20
132:20

**privately**
117:21
**privilege** 49:14
49:14
**privileged**
121:16
**privy** 109:19
**probable** 24:9
**probably** 6:11
6:16 17:21
49:11 72:11,13
91:24
**probation** 10:8
16:21 34:14
35:15 40:5,7,11
46:10 53:12
**probationary**
13:15,19 35:18
35:20 37:25
38:1,11 43:5
46:7,9
**problem** 25:25
**procedure**
88:22
**procedures** 21:7
**proceeded** 92:1
**process** 14:22
31:3 35:2 47:14
48:2,5 120:3
133:3
**processes**
118:18 133:1
**produced** 84:15
138:23,24

**product** 128:4
**profanity** 12:18
**professional**
51:5,6
**program** 46:11
**projects** 27:12
**promoted** 37:7
37:9,11,13,16
38:24 56:6
**promotion**
37:21 39:4
45:18 47:7,12
48:19
**promotional**
41:22
**pronounce**
29:24 130:14
**properly** 116:18
**property** 27:18
28:24
**proposals**
127:25
**propositioned**
65:3
**protect** 68:16
69:22 120:9
**protected**
105:16 106:11
**protests** 103:4
**proven** 106:22
**proves** 130:22
**provided** 52:17
121:18 141:12
**provides** 28:2,4

**providing** 20:24
**proxy** 92:22
**public** 1:21
16:11 19:15
27:1,2 30:6 79:1
136:1 137:16
138:7,17 139:8
**purpose** 13:5
**purposefully**
10:25 54:25
**purposes** 12:8
**pursuant** 1:21
**pushing** 116:8
**put** 16:20 39:17
42:25 43:23
44:9 46:10
68:17 69:15
82:8 91:5
108:16 123:12
**putting** 86:23
87:18

**q**

**question** 7:3,5
12:24 22:2,7,8
24:20 27:3 38:8
48:10 49:7,17
92:3 95:1 96:7
106:8 117:25
121:9,14 127:6
**questioning**
119:7
**questions** 6:17
6:25 44:11
47:19 49:12,16
118:17 120:4

**quick** 27:3
**quiet** 118:20
**quit** 68:1
**quote** 86:25
　91:9,10,17

**r**

**r** 10:3 20:15,15
**racist** 91:9 92:4
　92:13
**radio** 55:23
　57:24 70:19
　90:1,2,3,3,4
**raise** 4:21
**raised** 55:22
**rank** 46:21 47:8
　48:13 66:21
　76:12 116:17
**ranks** 70:8
**rapport** 51:9,14
　85:3 92:23
**rate** 9:23 20:7
　32:25 35:10
　42:22
**rather** 94:14
**reached** 104:22
**read** 121:8,11
　124:6 137:17
　140:11 141:11
**reading** 141:11
　141:13
**really** 26:17
　44:19 90:11
**reask** 117:25
**reason** 10:8
　14:7 24:14

26:18 30:18
39:2 59:14
84:15 85:14
101:10 107:2
137:4 140:12
**reasonable**
　140:17
**reasoning** 40:12
**recall** 20:11
　22:15 32:18
　36:9 56:4 92:10
　114:15 115:16
**receipt** 140:17
**receive** 45:14
　79:14,17
**received** 36:10
　46:2
**receiving** 45:12
**recently** 5:13
　9:1,4 79:18
**recognize** 75:1
　89:16,18,22
　111:24 112:2
**recollect** 16:16
**recollection**
　114:14
**recommended**
　121:1
**reconvene**
　134:10
**record** 4:2,12
　18:22 36:1,5
　93:4,8 107:9,10
　107:14 118:1
　121:10 123:21

133:21,23 134:2
134:20,24 135:4
139:12
**recorded** 4:3
　121:12 124:2
**recording**
　123:23 124:7
**records** 17:16
　17:20,22,23
　23:20,21 98:7,8
**recruiter** 19:20
**rectal** 77:7
**rectum** 102:11
**red** 68:17 69:16
**reference** 90:20
**referenced**
　69:25 70:21
　140:10
**referring** 54:16
　83:14 86:9
　102:14 103:8
　110:9 114:19,21
　116:24
**reflected** 34:9
**refrain** 6:19,20
**refrained** 85:15
**refused** 123:17
**refute** 124:3
**regard** 140:18
**regarding** 38:5
　38:11 94:19
　113:24
**regards** 77:19
　118:12

**reggie** 97:15
**regular** 129:24
**reinstated** 44:4
　50:10 79:19
　116:14
**rejected** 65:8
　80:22
**rejecting** 53:25
　54:19 57:16
　73:18
**rejection** 58:9,9
　58:17 74:12,19
**related** 123:4
**relates** 128:18
**relating** 41:22
　70:17,17,18,18
**relationship**
　50:16 51:4,10
　51:24 52:16
　55:9 65:8 66:8
　77:14 78:21,23
　79:3,4,7,9
**relationships**
　74:17 79:11
**relative** 139:15
**relay** 94:14
　101:19,20
**released** 43:14
**relied** 107:3
**remaining**
　106:16
**remedy** 14:23
**remember** 8:2,4
　11:19,25 12:1,2
　17:13 19:7,12

20:10 33:4,15
33:16 36:23
70:1,8,10,16,20
70:22,25 71:1,2
71:5,10,12
75:20,21,23
76:1 78:10
83:23 89:12
92:9 93:25 98:5
100:17 102:5
104:7,11 114:1
114:11,13
124:17
**remind**  134:7
**removal**  24:15
**removed**  8:17
21:4,16
**rephrase**  95:1
**report**  16:22
26:4 100:2
108:25 139:10
**reported**  79:23
91:15 108:24
**reporter**  4:9,12
4:21 6:6,13 13:4
30:1 39:16
121:11 134:24
138:6
**reporter's**  139:1
**reporting**  140:1
141:1
**reports**  21:9
**represent**  75:18
**representatives**
128:5 131:1

**represented**
116:19
**request**  16:22
58:7 73:17,25
**requested**  77:3
121:10 139:11
**requesting**
16:20
**requests**  71:22
84:23
**require**  7:5
**rescheduled**
134:5
**resign**  36:13
52:11 59:4,8,9
59:11
**resigned**  30:11
30:22 59:12
**resolve**  44:3
83:13
**resolved**  80:19
81:10 113:11,12
**respect**  56:25
**respectfully**
47:25 117:14
**respond**  102:20
**respondent**
108:11
**responding**  5:4
**response**  63:12
77:6
**responses**  3:15
112:4 124:5
**rest**  85:4,6,7

**restaurant**
85:10
**restroom**  35:23
**result**  39:3
**resulted**  124:19
128:23
**retaliate**  106:12
**retaliated**  40:24
81:7 105:16
106:5,20 107:1
**retaliation**
67:15,22,22
68:2,16 81:1
100:3
**retaliatory**
45:16
**retired**  65:12
70:2,4
**retro**  42:19
**retroacted**
42:25
**retroactive**
42:18,22
**return**  42:14
**returned**  140:17
**reveal**  7:3
**revealing**
121:15
**review**  8:5,8
16:19 139:10
140:10
**reviewed**  8:11
8:12,12,13
40:21 69:13
105:9,10 120:5

**reviews**  16:21
**richard**  98:21
99:16,21 105:3
114:14
**ride**  69:11
**right**  4:22 11:25
12:13 18:8,12
19:23 21:16
22:21 23:3
28:19 32:8 43:2
43:14 45:10
47:15,17,20
48:23 55:4
61:19,21 62:2,6
62:8 63:20 64:6
71:5 74:23 90:7
90:11,21 94:3
94:25 96:11
97:12 98:4
103:17,17
105:18 106:2
107:19 108:9
109:12,19
111:19 112:7,10
112:14 114:16
121:25 125:20
125:22 129:10
132:24 134:23
**rights**  15:17
116:23 117:3
118:19 119:13
133:2
**riots**  91:15 92:8
103:3

**road** 68:16
**robert** 83:21
  97:13 98:1
**rojo** 70:13,14,24
  71:11
**role** 9:21 36:18
**romantic** 51:4
  51:23 52:16
**romantically**
  52:15
**room** 13:4 86:3
  86:13,21 87:12
  117:17,17 118:6
  118:23 120:1,16
  120:21 123:23
**rose** 2:2 4:14
**routinely** 47:3
**rule** 6:5,11
**rules** 6:3 15:2,8
  15:8,11,11,12
  140:17

**s**

**s** 20:15
**sacrifice** 47:9
**safety** 19:15
  27:2 30:6
**salabarria** 1:18
  3:3 5:2,12,13
  9:1 45:8 112:10
  122:4
**salary** 20:8
  29:20 30:9
  32:22,22
**salt** 68:12

**sand** 68:12
**sands** 80:23
**sat** 55:4 89:19
  90:22 109:12,15
  109:19 118:15
**satisfaction**
  18:12
**satisfactorily**
  38:18
**saving** 18:14
**saw** 74:3 89:20
  100:11
**sayeth** 135:12
**saying** 15:7
  28:12 56:24
  82:10 84:7 90:2
  91:23 116:9
  117:13 118:25
  119:12 120:20
**says** 41:18 42:20
  44:23 45:5
  62:22,23,24
  79:13 81:25
  87:24 88:20
  103:9
**scared** 53:11
  66:3 67:12 71:9
  80:1 81:3,7,16
  81:22 108:25
  118:9 120:15
  132:4 133:8,8
**scenarios** 50:21
  50:22
**scene** 24:22

**screen** 125:12
  128:9
**screenshots**
  61:16 82:9
**screenshotting**
  82:2,5
**scroll** 46:18
  108:9 111:24
  112:7 128:20
  129:13
**scrolling** 41:13
**seal** 138:11
**searches** 19:17
**second** 6:11
  11:21 27:3 40:1
  44:13 75:7
  82:20 94:23
  96:15 131:3
**sector** 16:9
  26:19
**security** 16:9
  19:14,25 20:21
  20:22 21:4
  23:12,25 25:17
  25:21 26:1,6
  27:6,8,13,16
  28:2,4,13 29:2,4
  29:7 31:22,24
  32:7 33:5
**see** 13:21 27:19
  39:10 41:8 42:2
  44:14,18 45:1,2
  45:3,6 53:22
  58:13 61:11,12
  63:14,15,16

64:4 74:23,25
  75:22 86:4,22
  87:17 90:13,13
  90:16,23,24
  91:5 100:21
  102:20 108:1
  109:20 111:25
  128:13,14 129:4
**seem** 19:10
  119:20
**seen** 39:22
  41:12
**send** 16:22
**sending** 82:9
**senior** 32:4 51:1
  52:6 60:15 70:5
**seniority** 39:5
**sense** 47:7 56:23
  65:16 72:21
  95:11 100:7
  106:6,7 117:19
  117:20
**sent** 13:12 45:25
  81:18 112:5
  141:11
**separate** 122:5
**separated** 8:17
  10:5,9,16,19
  105:17 106:6,21
  107:1,3
**separation**
  16:14 25:12
**september**
  22:14,15,21

**sergeant** 12:5
  37:12,22,25
  38:12,24 40:16
  40:19 41:23
  42:15,22,25
  43:4,22 44:2,4
  52:6,7,8 53:4
  55:2,21,22 56:6
  56:7,24 58:21
  58:22 65:12
  66:25 67:4
  69:10 70:9,12
  70:24 71:11
  79:19 86:2
  89:16 90:5
  100:21 101:15
  101:24 102:3,4
  102:7 116:14
**sergeant's** 55:4
  56:14 70:10
  76:19 81:3
  88:24
**sergeants** 55:19
  57:5 58:2 67:19
  85:4,7,24 86:2,6
  86:12,15,21
  87:12,13,25
  88:3,9,11,25
  89:13,15,23,24
  89:25 90:10,12
  90:13,14,16
  92:2 100:11,15
  100:16,18,19
  109:13,16,16,24
  110:18,24 111:5

111:6 126:4
**serious** 57:1
  79:3
**serrano** 20:13
  20:14 27:20
  28:17,20 29:1
**service** 15:8,10
  40:15
**settle** 43:25 50:4
  116:7,8 125:21
  126:15,16
**settled** 39:4
  46:19,23 116:13
**settlement** 3:11
  3:16 41:16 42:7
  114:24 116:12
  118:12 119:23
  124:16,19,20
  125:1,3,5,6,9,10
  125:24 126:17
  126:18 127:8,10
  127:11,15,18,22
  128:3,14,23
  129:9 130:7,19
  130:20,23,25
  131:2,18,21,24
  132:15,17 133:1
  133:5,12,14
**settlements**
  124:23
**seven** 54:11
  66:16,19
**several** 7:18
  24:6 25:14 32:3
  65:10 100:11,16

124:6
**severely** 85:13
**sex** 40:24 51:18
  51:20 91:24
**sexual** 53:14
  85:10 91:25
  102:15
**sexually** 79:14
  85:20 86:16
  87:1
**sheet** 135:9
  137:1 140:13,14
**shift** 40:15
  50:25 52:12
  55:21 56:12
  60:16 65:13
  71:5 77:4 91:17
**shifts** 77:13
**shoe** 10:14,24
  11:5,8,9
**short** 6:21
**shorthand**
  138:6
**shortly** 70:3
**shot** 118:16
**show** 21:9 39:8
  39:14 41:6
  61:10 108:1
  111:19
**showing** 48:22
  87:14 128:8
**shown** 52:14
  64:9
**shows** 75:15

**shy** 40:6
**side** 102:7 120:8
  120:9 125:2
**sign** 47:3 48:20
  49:23 56:18
  129:2 131:16
  132:2,4,12
  133:7 140:14
  141:11
**signature** 48:23
  112:8 129:7,12
  129:13,17
  137:20 138:14
  139:20 141:14
**signed** 42:23
  49:1 108:10
  112:14 128:4
  131:21 132:5
  140:19
**significant**
  77:15
**signing** 132:7
  141:11
**sincerely** 141:16
**single** 19:13
  87:4 89:12
  104:14,23
**sits** 58:14
**sitting** 21:25
  34:17 85:8
  90:18 111:11,16
  117:2 120:1
  125:8
**situation** 72:24

**[six - stepped]**

**six** 43:6 46:10 54:11 78:25

**slam** 11:5

**slashed** 68:11 68:22 69:21 70:18

**sleep** 76:21

**sleeping** 100:12 100:22

**smith** 114:13

**social** 63:6 65:9 82:2

**socialize** 60:22

**soft** 42:11 45:12

**solutions** 140:22

**somebody** 51:12 53:19 62:8 76:5 97:14

**soon** 93:11 132:4

**sorry** 8:19 11:12 12:25 15:5 19:7 21:21 22:12,22 23:20 25:23 36:22 41:13 42:21 44:11 45:23 50:15,24 51:12 54:2,14 63:21 78:20 83:12 94:9,17 98:14 102:2 106:7 117:12 121:5,5,8

**sort** 49:13 60:3

**sought** 16:4

**sounds** 70:16

**south** 1:14 4:6 35:12 140:1 141:1

**southern** 1:1

**space** 77:11

**speak** 22:3 25:17 26:7 53:23 55:6,9 58:15 74:15 77:23,25 84:8 94:10,14 96:23 98:11 104:22 105:4 109:22 111:4,4,6 118:5 123:17 126:2

**speaking** 87:17 88:25 100:11 120:19 123:14

**specialized** 88:2

**specific** 37:23 38:7,8,10 75:17 86:19 87:16 88:11,13 89:14 90:2

**specifically** 71:6 71:7,8,15 92:3 109:2,24 123:15 125:3

**specifics** 87:19

**spell** 10:2 30:2

**split** 129:24

**spoke** 7:2,4 10:17 12:12

48:6 53:21 57:23 69:25 71:6,7,8,15 77:12 83:3 84:6 92:22,23 93:1 97:4,10,15 98:21 103:22,22 123:13 130:21

**spoken** 47:22 58:12 60:2 65:10 66:14 99:20

**sporadically** 31:15

**squad** 51:1,8,9 51:11,12 52:13 52:19 60:12,18 65:13,22 66:7 66:24 67:1 68:4 70:6,6,7 71:4 85:6

**ss** 135:18 138:3 139:5

**staff** 67:19 79:15,15,16 80:1,6 81:4

**stalked** 53:4

**stalking** 52:7 58:22 59:6,15 59:23 65:19 67:4 80:15

**stand** 117:7

**standards** 40:10

**standpoint** 81:1

**start** 31:4 42:15 51:13

**started** 37:4 50:15,20 53:12 60:7 68:9 71:3 79:13 102:15

**starting** 129:20

**starts** 12:3 29:24 35:6

**state** 1:21 24:10 40:21 45:25 46:1 101:25 135:17 136:1 137:16 138:3,7 138:17 139:4

**stated** 40:8 65:10 116:13

**statement** 38:20 118:2

**states** 1:1 100:1

**station** 69:10 82:3,10,19 109:23

**status** 41:22

**statute** 140:18

**stay** 88:17

**stayed** 118:20

**stenographic** 139:13

**stenographica...** 139:9

**step** 109:22

**stepped** 10:14 10:24 11:7,9

**stepping** 12:10

**steps** 14:22
   113:10

**steven** 50:12
   51:1 52:13,14
   79:6,16 94:6

**stood** 132:23

**stop** 53:15 78:6
   89:6,7 115:7,14
   116:21

**stopped** 123:14

**stored** 17:25

**story** 38:20
   46:25

**straight** 17:12

**strike** 25:5
   118:1,2 121:6

**stripes** 45:18
   81:2

**strongly** 120:7

**struck** 24:5 25:1

**structure** 27:12

**stuff** 72:11,14
   96:15

**subject** 20:20
   21:6 38:10,22
   137:18

**subjected** 77:10
   77:20 85:19
   88:20

**submitted** 8:14

**submitting** 31:2

**subordinate**
   132:10

**subscribed**
   135:21

**subsequent** 7:21
   10:16,18 20:22
   21:3 24:6 25:5
   53:21

**subsequently**
   8:17 52:10

**substance**
   137:18

**substantiate**
   68:14

**substantiated**
   52:9 59:5
   106:22

**success** 39:12

**successful** 67:17

**successfully**
   37:24 40:11

**suggested**
   140:16

**suite** 2:4 140:2

**super** 13:3
   78:10

**superiors** 86:12

**supervisor** 9:25
   10:1 20:12,13
   27:21 29:22,23
   55:24 59:17

**supervisors**
   85:20,23 86:8,9
   87:4,5,9 91:8
   103:10

**support** 48:14

**supposed** 58:9

**supposedly**
   126:23 127:2

**sure** 7:7,8 12:2
   12:24 15:4
   21:14 25:11
   30:1 34:8 54:9
   55:12 73:16
   95:20 102:1
   103:18 111:15

**survive** 67:8,9

**suspend** 134:4

**suspension**
   42:12 45:13
   128:22 129:21
   134:9

**sustained** 67:25

**sutton** 2:3

**swear** 4:12

**switched** 38:20
   40:12

**sworn** 5:4
   135:21 138:9

---

## t

**take** 6:13 11:23
   13:1 15:23 22:1
   22:2 28:10 32:2
   34:3,4 35:24
   37:17 53:17,20
   65:7 69:1 83:10
   83:11 93:2,15
   95:19 98:16,18
   99:2,12 120:10
   129:21 131:16
   133:20

**taken** 1:20 4:4
   24:9 36:2 43:24
   48:1 93:5
   107:11 113:10
   133:24 137:2
   140:8 141:8

**talk** 5:14 6:15
   26:1 74:6 88:21
   96:5,13 103:21
   111:6 118:24
   124:12 131:3

**talked** 7:6 9:10
   25:9 55:13
   71:16 76:8
   83:17 88:23
   93:13 96:3
   103:19 117:10
   117:21

**talking** 6:14
   13:2 50:18
   58:20 84:3,17
   85:9,10 90:23
   103:20 105:6,21
   109:16 110:24
   110:25 117:16

**talks** 42:1

**tank** 68:11,25
   69:21 70:17

**team** 89:10

**tell** 7:1,5 8:10
   22:12 24:17
   25:14 48:14
   55:3 57:25
   58:12 66:10
   69:7 70:6 71:25

83:7 89:6,7 90:4
94:8 100:5
110:3,3,17,20
110:21 111:7
117:13,14,22
122:12
**telling**  57:17
74:13 81:5
82:11,14 110:7
116:11 132:3
**ten**  32:15,15,16
37:6
**tenure**  52:23
60:15 66:3 80:7
95:12 96:10
108:20
**term**  89:15
126:12
**terminate**  25:15
**terminated**  14:5
52:11 59:10
105:25 125:11
125:23,24
126:19 127:16
132:5 133:11
**termination**
26:14 36:13
38:6 68:8
132:18
**terms**  44:2,6,7
45:10,22 46:5
46:17,22 47:3
48:8 49:1 50:5
116:7,8,12
126:18 127:11

127:12,17,21
128:21 129:19
133:17
**terrace**  2:8
141:5
**test**  37:17
**testified**  5:5
60:6
**testifies**  51:20
**testify**  131:12
**testimony**  22:4
58:20 134:8
135:3 140:11,17
**text**  79:14 81:18
84:16 98:9
**thank**  121:17
134:18
**thing**  21:21 47:8
48:18 50:3
53:13 62:1 63:9
63:13,18 64:18
67:5 122:1
**things**  21:23
57:13 62:22
67:8 69:3,4
82:10 91:19
96:5 122:23
**think**  34:2,4,6
44:8 62:5,6 63:1
63:1,17,21 64:3
107:2,6,16,21
112:20 113:18
114:17 127:6
129:24 130:2

**thinking**  14:1
**third**  28:5,14
108:5
**thought**  27:5
42:21 60:6
**threatened**
132:18
**three**  69:17
77:18 84:4
92:25 93:13
97:21
**till**  9:20 17:13
20:5 29:18
**time**  6:14 7:25
11:23 13:2,22
21:24 32:10
34:21 35:25
36:4 38:14 40:4
40:8,14 43:3,6
43:24 47:19,24
48:11,17 50:2
52:4,14,25
55:19 56:9
58:13,14 61:21
65:12,15 68:5,7
68:20 69:11,15
70:1,4,7 71:3,20
71:23 72:4,16
73:7,21,21,22
76:7,12 77:13
77:14,17,21
78:14 79:5,18
80:24 86:3,20
87:11,14 91:14
92:6,11 93:3,7

93:23,24 95:20
100:19,20
101:18 102:1,6
104:15,19,21,23
105:6 107:6,9
107:13 115:11
116:1,3 117:6
119:5,14 120:7
129:23,24
133:22 134:1,14
135:3 141:13
**times**  5:20 24:6
59:23 64:7,10
66:9,12 70:21
74:14 105:1
110:16 111:10
**tires**  68:11,21
68:24 69:21
70:18
**title**  27:5,22,22
27:24 29:4 30:5
35:8
**today**  6:3,6,25
34:17 41:4,5
90:19 117:2
134:20
**today's**  135:2
**together**  51:8
79:4 82:12
88:15
**token**  6:19
**told**  11:10,13
12:16 25:19
31:1 35:3,4
48:16 52:10,15

52:20,25 53:8,9
53:18 55:8
56:11,18 59:16
66:8 67:19 68:1
70:22 71:6 77:1
82:13,17 83:4,9
94:9,13 98:23
99:10 100:19
101:2,4,4,5,6,6
101:8,12 117:14
118:2 121:2,7,7
123:3 125:9,13
125:15 126:21
127:10 131:1
133:9
**tone** 57:23
**took** 14:23
58:17 69:21
74:11 123:19
**top** 5:21 7:20,24
8:22 16:16 17:9
23:1,17 32:14
71:14 83:23
84:11 108:9
114:16
**topic** 131:13
**total** 20:10
129:23 130:2
**towards** 54:23
58:18 65:25
74:12 108:25
**towed** 69:9
**toxic** 81:13
**training** 43:10
46:14

**transcript**
134:24 135:11
137:3,18 139:11
139:12 140:10
140:19 141:10
141:12,13,14
**transcripts**
140:15
**transpired** 84:9
**transpiring**
97:16
**transported**
24:10
**trap** 95:20
106:9
**traumatizing**
67:3
**tried** 25:17 51:9
51:10 53:7 69:1
74:13,16 91:3
117:8 126:1
**trouble** 91:22
92:1
**true** 115:24
135:10 137:18
139:12
**try** 6:18,20
21:13 65:22
67:20 83:11
91:4,5 113:10
**trying** 11:6
25:11 66:7 67:9
67:10 88:17
90:25 95:19
106:9 126:15

**tuesday** 1:15
**turn** 76:25
**turned** 85:6,8
115:3 116:22
123:10
**two** 6:13 8:1
12:4 14:11 29:8
30:18 34:23
60:3 74:3 77:18
97:14,21 101:8
114:5 115:7
120:21 124:20
133:20
**type** 19:16
38:16 46:2
52:16 53:1
65:17 77:10,11
81:13 82:5
89:20 91:3,6
92:20 100:2,3
120:2 122:1
125:6,7 138:24
**types** 90:17

**u**

**ugly** 82:11
**ulp** 120:13
**ultimately** 68:1
105:17 128:4
129:20 133:6
**uncomfortable**
76:22 85:13
**uncommon**
62:25 63:5
**under** 15:2,7,17
18:4 38:25

40:20 68:18,18
75:14,16,19,24
76:1 112:14,19
113:5,18 137:17
140:17
**underneath**
28:13
**understand** 6:9
6:23,24 7:10,11
18:3,10 21:14
22:5,8,10 25:11
32:21 47:13
49:3 54:10
67:24 95:3 96:7
106:7,15 115:20
131:9
**understanding**
49:1 103:17
**understood**
114:23
**unemployed**
34:19
**unfortunate**
52:5
**unheard** 14:22
132:25
**uninvestigated**
107:4
**union** 15:16,17
15:20 38:19,23
40:22 41:18
42:8 44:3 47:22
48:6,14 115:17
**unit** 4:3 68:18
88:3

united   1:1
unjust   39:2
unjustly   107:1
unpack   55:12
unproven   107:3
unstable   45:6
    63:22
unsubstantiated
    107:4
unwanted   10:15
    11:3 52:18
unwarranted
    10:14 11:3 53:8
unwelcomed
    52:18
uphold   119:12
upped   24:10
ups   30:15
upset   55:10
    56:21 57:3 68:9
    74:18
urge   6:18
use   35:23 56:1
    56:13,20 57:2,9
    89:15 91:8
    103:10
used   45:16
    140:19
uses   56:14
usually   19:14
    62:22,23

v

v   4:5 137:1
vague   125:5

varies   16:8
various   16:6
    19:9
vehicle   59:17
    69:5,9
vehicle's   68:11
vendetta   53:25
verbal   30:15
    63:12
verbally   101:24
verify   140:12
veritext   4:10
    140:1,15,22
    141:1
veritext.com
    140:15
veteran   52:19
    65:11,11 69:24
veterans   70:2
vicinity   60:1
victim   24:21,24
video   4:3 6:6
    134:19,20
videographer
    2:19 4:1,8 35:25
    36:4 93:3,7
    107:9,13 133:22
    134:1,19,23
    135:2
videos   21:9
    85:22 86:17
    87:2
videotaped   1:18
view   126:4

viewed   90:18
viewing   85:21
    86:17 87:2
vindictive   53:2
    65:25 66:23
violated   116:23
    117:4
violating   101:25
violation   118:18
    119:11 120:3
violations
    120:19
violent   20:20
    23:6,24 103:4
violently   11:16
    12:10
virtue   121:19
visibly   90:16
voices   89:17,18
    89:22
volume   87:19
voluntarily
    49:23
vs   1:8 140:7
    141:7

w

w   10:3 31:24,25
waiting   14:25
    23:23 30:20
waitresses   85:9
waive   141:10
waiver   118:3
walk   50:19 89:8
    91:4

walked   11:9
walking   87:14
want   5:10 7:8
    26:1 36:8 44:5,9
    44:11 46:22
    52:16 53:5,9
    54:9 55:8,12
    65:19 67:9 69:2
    73:3,4,16 76:8
    83:13 95:20
    103:18 106:10
    107:17 116:7
    117:10 118:19
    124:12 125:8,18
    130:19 131:15
    131:17,20 132:4
    132:25 134:14
wanted   32:2
    33:1,3 44:1 47:6
    47:7 48:19
    53:13,14 67:5,6
    73:5 103:25
    113:20 116:13
    130:23 131:16
    133:1,3
wanting   58:10
watch   76:18
    126:10
water   68:12
way   32:23 44:3
    45:19 47:11
    48:4,8 52:1 55:7
    57:23 58:17
    74:11 76:22
    78:4 85:2 86:15

95:13 96:9
101:17 106:4
122:10 132:24
**wayne**  77:17,21
78:8,13 83:1
92:23,25 93:12
94:10,13 95:4
96:4,5,13
103:20,21,22
104:1
**ways**  53:2
**we've**  134:3
**week**  14:11
34:23 102:7
**weekly**  51:13
**weeks**  14:11
34:23 102:14
**welcoming**
53:19
**went**  14:21 26:7
34:21 42:22
61:1,4,6 77:12
77:17 84:5
95:10 99:15,15
99:19 100:7,8
106:13 118:22
130:25
**whatsoever**
51:24 73:20
80:25
**when's**  15:13
34:21
**wide**  49:15
**witness**  3:2 4:13
5:3 45:2 131:5,8

131:10 134:7
135:15 138:11
140:19 141:10
141:12,13
**word**  8:16 55:5
**words**  56:23
**work**  10:4 19:22
20:17 25:13
26:24 29:17
30:8,23 31:7,13
31:14 32:13
42:14 48:12
50:8 51:11,12
60:22 62:19
68:17 72:9 73:7
73:13 77:3,5
84:24 85:12,19
90:1 91:2 100:6
108:10
**worked**  11:24
11:24 13:22
19:24 22:17
27:1 28:7,13
29:14 31:23
32:7,12 43:23
46:21 50:10
51:8 58:5 65:13
68:3 78:16
102:4,7 132:9
**working**  9:13
20:9 32:10 37:4
40:1,8 50:25
51:10 52:4
55:18,20,21
56:19 60:12,14

60:17 66:5,7,24
67:10 68:4
74:17 76:13,16
77:11 116:19
127:4
**workplace**
85:22 87:3
102:16
**works**  18:2
27:10 62:17
**worried**  66:4,23
67:12
**worry**  73:6
**wrap**  34:18
**wrist**  100:24
**write**  30:15 57:4
57:5 137:3
**writes**  132:10
**writing**  83:24
84:1 120:1
**written**  25:7
36:8 56:19
92:18 97:17
**wrong**  26:21
42:11 47:10
67:24 105:25
113:19 115:10
115:21 123:19
**wrongdoing**
46:2
**wrongful**  38:5
**wrongfully**
43:24 116:6
**wrote**  8:15,17
21:10 54:17

101:18 106:19
112:21

**x**

**x**  3:1

**y**

**y**  130:15
**yeah**  39:11
63:20 95:2 96:3
117:13 120:5
**year**  9:7,24
13:17 14:1 20:8
29:21 35:11,17
65:14 66:19
68:19 92:9,13
92:15,15
**years**  37:6 52:22
53:11,22 54:11
54:24 66:16
68:5 69:18
78:25
**yesterday**  7:20
7:23
**young**  52:21

**z**

**z**  95:11
**zoom**  2:11 4:18
134:5,10

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of

the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | 510-2018-06495 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Miss Jessica Salabarria** | | **1991** |

| Street Address | City, State and ZIP Code |
|---|---|
| **460 East 51st Street, Hialeah, FL 33013** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **MIAMI BEACH POLICE DEPARTMENT** | **15 - 100** | **(305) 673-7901** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1100 Washington Avenue,  Miami Beach, FL 33139** | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **06-01-2018**   Latest **08-07-2018**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am a female.  I have been a police officer since 2012.  In June of 2018, I was placed on a performance action plan. On August 7, 2018, Daniel Oates, Chief of Police, informed me that I was being demoted from the position of Sergeant to Officer because I was not meeting performance standards.  This is not true.  Lieutenant Marlen Rivero, Lieutenant Scott Flanagan, and Lieutenant Eduardo Garcia, whom supervised me during this period, stated that I was meeting performance standards and that I will successfully pass the probationary period.

On August 7, 2018, when Ms. Rivero and Michael Muley, Sergeant, informed Mr. Oates that I should not be demoted because I successfully passed the probationary standards. However, he informed them that I was not being demoted because of my performance but due to an open internal affairs case that was filed against me.  However, Kenny Espada, male Sergeant Police Officer, who currently has an open active internal case, passed his probationary period and was not demoted.

I believe that I was discriminated against due to my sex/female in violation of Title VII of the 1964 Civil Rights Act, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| **Aug 31, 2018** _____ <br> Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**EXHIBIT**

1

City 001225

EXHIBIT

2

<u>SETTLEMENT AGREEMENT</u>

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, the FOP, with and on behalf of Salabarria filed the following grievance:

Union Grievance No. 2018-11 ("Grievance"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2018-06495 ("EEOC Charge"); and

WHEREAS, the above-listed grievance and EEOC charge are all pending and constitute all the charges and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.      <u>Recitals</u>. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.      <u>EEOC Charge and Grievance Withdrawn With Prejudice; Discipline and Reinstatement</u>. Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw, with prejudice, the Grievance and Salabarria will file a Notice of Withdrawal with Prejudice of her EEOC Charge. Additionally, Salabarria agrees to accept a twenty (20) hour soft-suspension as discipline for IA Case No. I2017-028. The City agrees that Salabarria shall return to work as a Sergeant in the Police Department, with an effective start date as Sergeant of August 12, 2019 and entitled to the appropriate Sergeant pay retroactive upon full execution of this agreement. Salabarria agrees that she shall be considered a Probationary Sergeant for a total

1

City 001227

of six (6) months[1], that she will attend FTO for a period of one (1) month (which is part of not additional to) the probationary and that she will be assigned a Field Training Officer.

3.    Release Of Claims, Covenant Not To Sue.  Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement.

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf.  Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

4.    Effect; Precedent.  The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein.  The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may

---

[1]    Upon successful completion of her Probationary Period, Salabarria's Seniority shall be restored from May 1, 2017, which is her original promotion date.

2

City 001228

not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind.

5.   <u>Consideration</u>.   The consideration for this Agreement are the mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

6.   <u>Miscellaneous</u>.   This Agreement is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral.   The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever.   This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship.   This Agreement shall be governed by and construed according to the laws of the State of Florida.   Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury.   The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience.   If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release," is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

CITY OF MIAMI BEACH

By_____
JIMMY MORALES
City Manager

_____9/17/19_____
DATE

JESSICA SALABARRIA

_____
JESSICA SALABARRIA

_____9/13/19_____
DATE

CHIEF OF POLICE

_____
RICK CLEMENTS
Chief of Police

3

City 001229

FRATERNAL ORDER OF
POLICE, LODGE 8

By _____
KEVIN MILLAN
President


____9/13/19____
DATE

City 001230





EXHIBIT

3



City 001354



facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/iYH7LsSMxs2IU93PxHNVd5nGUEY9yPk79aH9w0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Sutra of the Day
God gives us only what we handle. Ap God think BAD-A
sutralifestyles.com
Chris Swainston
midnightmarauder526
Likes
ooh.donna2023
DJHM1
Following
luluu_74
Lulu Casanueva
Follow
thinkabelle_22
Follow
No comments yet.
Start the conversation.
Liked by ooh.donna2023 and 3 others
December 26, 2013
Add a comment...
Post
65°F
Clear
Search
10:27 PM
1/31/2024



facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/iYH7LsSMxs2IU93PxHNVd5nGUEY9yPk79aH9w0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Sutra of the Day
God gives us only
what we
handle. Ap
God think
BAD-A
sutralifestyles.com
Chris Swainston
midnightmarauder526
Likes
ooh.donna2023
DJHM1
Following
luluu_74
Lulu Casanueva
Follow
thinkabelle_22
Follow
No comments yet.
Start the conversation.
Liked by ooh.donna2023 and 3 others
December 26, 2013
Add a comment...
Post
65°F
Clear
Search
10:27 PM
1/31/2024



facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/iYH7LsSMxs2IU93PxHNVd5nGUEY9yPk79aH9w0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Sutra of the Day
God gives us only
what we
handle. Ap
God think
BAD-A
sutralifestyles.com
Chris Swainston
midnightmarauder526
Likes
ooh.donna2023
DJHM1
Following
luluu_74
Lulu Casanueva
Follow
thinkabelle_22
Follow
No comments yet.
Start the conversation.
Liked by ooh.donna2023 and 3 others
December 26, 2013
Add a comment...
Post
65°F
Clear
Search
10:27 PM
1/31/2024





facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/iYH7LsSMxs2IU93PxHNVd5nGUEY9yPk79aH9w0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Sutra of the Day
God gives us only
what we
handle. Ap
God think
BAD-A
sutralifestyles.com
Chris Swainston
midnightmarauder526
Likes
ooh.donna2023
DJHM1
Following
luluu_74
Lulu Casanueva
Follow
thinkabelle_22
Follow
No comments yet.
Start the conversation.
Liked by ooh.donna2023 and 3 others
December 26, 2013
Add a comment...
Post
65°F
Clear
Search
10:27 PM
1/31/2024

facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/iYH7LsSMxs2IU93PxHNVd5nGUEY9yPk79aH9w0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
Sutra of the Day
God gives us only what we handle. Ap God think BAD-A
sutralifestyles.com
Chris Swainston
Likes
ooh.donna2023
DJHM1
Following
luluu_74
Lulu Casanueva
Follow
thinkabelle_22
Follow
midnightmarauder526
No comments yet.
Start the conversation.
Liked by ooh.donna2023 and 3 others
December 26, 2013
Add a comment...
Post
65°F
Clear
Search
10:27 PM
1/31/2024





facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/pdlzcDSM02Khbqgcw77JOwA6oWwltDlcr0oFM0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
WOMEN SAY MEN DON'T KNOW WHAT IT'S LIKE
TO TAKE A BRA OFF AFTER A LONG DAY AT WORK
midnightmarauder526
midnightmarauder526 @diana_princee LOL....Noooo. Superman. But that one is good too.
501w Reply
forever_camelot @not_playing_anymore save the day shirt?
501w Reply
midnightmarauder526 @diana_princee Thanks for throwing me under the bus. And I USED to wear it so I know. Now I just have a big S on my chest and a red cape.
501w Reply
forever_camelot Lmfao!!!! Well I know what that feels like and what removing my bra feels like so it's like a double pow! First of all you don't even wear that!
501w Reply
Liked by beach_fuzz and 8 others
June 20, 2014
Add a comment...
Post
64°F
Clear
Search
10:33 PM
1/31/2024

facbook - Search
Facebook
instagram - Search
Steve (@midnightmarauder526)
https://www.instagram.com/p/rA4G0jyM6KAduYy2F0uATc2pcfFWo4KEJPuaY0/
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile
More
midnightmarauder526
midnightmarauder526 Marlin game with my little girls!
496w
...tmarauder526 @cyn0919 The girls ask me all the time
...u guys are moving down here. They are so excited.
...'t wait to see you all again.
Likes
mitchtorres14
Mitch Torres
Following
kevin3877
Kevin Lan
Following
beach_fuzz
Ray Diaz
Following
themikenoriega
Mike Noriega
Following
luluu_74
Lulu Casanueva
Follow
r.cort25
Follow
Liked by beach_fuzz and 12 others
July 28, 2014
Add a comment...
Post
Breaking news
Unfolding now
Search
10:34 PM
1/31/2024



Likes
beach_fuzz
Ray Diaz
Following
themikenoriega
Mike Noriega
Following
r.cort25
Follow
luluu_74
Lulu Casanueva
Follow
orlymia
Orlando DaFonseca
Follow
ciao_bella8232
Kristy
Follow
midnightmarauder526
midnightmarauder526 Thanks @lisalo2370 these are the best times in my life. I love these little boogers.
Liked by beach_fuzz and 10 others
July 28, 2014
Add a comment...
https://www.instagram.com/p/rA4Mx7SM6ScXjE-yJkl7g01KovlqKcjjf7Klc0/
10:34 PM
1/31/2024



City 001363



facbook - Search
Steve Cosner | Facebook
https://www.facebook.com/profile/1487181692/search/?q=2014
Search Facebook
Search Results
in Steve Cosner
2014
Filters
Posts You've Seen
Most Recent
Tagged Location
Date Posted
Steve Cosner
June 19, 2015 ·
FOR SALE!!!!
It is with deep regret that I have to offer my beautiful motorcycle for sale. 2014 Harley Davidson Street Glide
Garage kept, excellent condition, high output 103 inch engine, Vance & Hines slash cut exhaust, detachable sissy bar, am/fm/weather stereo with blue tooth, voice recognition, USB, 12 volt outlet, chrome saddle bag bars (not installed), 6,000 miles. Please feel free to forward this to your contacts. More pics to follow. Anyone interested can message me. Thanks.
Steve Cosner
Andrew Barefoot
Betty Chapman Diamond
Sherr Nay Nay
Jessica Salabarria
Hector Fernandez, Brooke Jordan and 2 others
13 comments 2 shares
Like
Comment
Share
10:41 PM
1/31/2024



facbook - Search
Steve Cosner | Facebook
https://www.facebook.com/profile/1487181692/search/?q=2014
Dell
Google
DuckDuckGo — Pri...
Real Estate Investm...
Gmail
YouTube
Maps
BNB Inv. Academy (...
BNB Investor Acade...
Arc Home LLC - Ho...
Dashboard
Other favorites
Search Facebook
Search Results
in Steve Cosner
2014
Filters
Posts You've Seen
Most Recent
Tagged Location
Date Posted
Steve's Post
So sorry Steve. I know this has to hurt.
8y Like Reply
Steve Cosner replied · 1 Reply
Betty Chapman Diamond
I like it but I would want the color in PINK plus I don't know how to ride . Nice bike tho really !!
8y Like Reply
Betty Chapman Diamond replied · 2 Replies
Jessica Salabarria
That's terrible I'm sorry for your lost
8y Like Reply
Steve Cosner
Just temporary.
8y Like Reply
Andrew Barefoot
Joe much steve-o
8y Like Reply
Steve Cosner replied · 1 Reply
Write a comment...
2014 Harley Davidson
13 comments 2 shares
Like
Comment
Share
Upcoming Earnings
Search
10:42 PM
1/31/2024



facbook - Search
Steve Cosner | Facebook
https://www.facebook.com/profile/1487181692/search/?q=2014
Search Facebook
Search Results
in Steve Cosner
2014
Filters
Posts You've Seen
Most Recent
Tagged Location
Date Posted
Steve Cosner
January 1, 2015
Everybody wants to be a lion... until it's time to do lion shit!
Police Officers
Police Officers
December 31, 2014
The following post is rated R!
To all of our brothers and sisters who will brave the streets today, New Year's Eve 2014. Watch your 6!
Dawn Michelle
Jessica Salabarria
Dawn Michelle and 1 other
Like
Comment
Share
64°F
Clear
Search
10:44 PM
1/31/2024



facbook - Search
Steve Cosner | Facebook
https://www.facebook.com/profile/1487181692/search/?q=2014
Search Facebook
Search Results
in Steve Cosner
2014
Filters
Posts You've Seen
Most Recent
Tagged Location
Date Posted
Steve Cosner
February 13, 2014
They put 2 and 2 together. Lets see what happens now.
http://miamiherald.typepad.com/.../man-who-says-hes...
Al Boza, Kim Matt Schlegel and 6 others
16 comments
Like
Comment
Share
Steve Cosner
January 21, 2014
Just in case anyone was ever curious about what it would feel like to get stung in the face 100,000 times by angry bees. Just ride a motorcycle through the rain at 70 mph with nothing to cover your face. Damn!!!
Vincent Aprile, Hector Fernandez and 8 others
24 comments
Comment
Share
Vincent Aprile
Hector Fernandez
Kevin Winters
Ray Christenson Jr.
Rob N Sabrina
Ashlei Brown
Barbie Ochoa
Cindy Jordan
Jessica Salabarria
and 1 more...
Steve Cos
October 18
Read the Tweets
y. It just shows how narrow minded people can be. No idea of the facts or ho
police investigation works and as info starts coming out in support of Wilso
g conspiracy theories and wanting him prosecuted. I am so discouraged by what has happened to this country.
OPEN
SUNDAY
240
64°F
Clear
Search
10:45 PM
1/31/2024

City 001368

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA | |
| | ☒ EEOC | 510-2020-04794 |

| **Florida Commission on Human Relations** | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Jessica Sallabarria | | 1991 |

| Street Address | City, State and ZIP Code |
|---|---|
| 117 NW 42nd Ave # 1008, Miami Fl 33126. [Confidential per Fla. Stat. s. 119.071 – Do not disclose in FOIA] | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of Miami Beach – Police Department | 15-100 | 305-673-7901 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1100 Washington Avenue | Miami Beach, FL 33139 |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| ☐ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☒ NATIONAL ORIGIN | Earliest 09/2019 | Latest |
|---|---|---|---|---|---|---|
| ☒ RETALIATION | ☐ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | | | |
| ☐ OTHER (Specify) | | | | ☒ CONTINUING ACTION | | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female. I had a previous EEOC Claim against the City which was resolved in full when I reinstated to the position of Sergeant in September 2019. After I resolved my prior EEOC complaint, I started to receive sexually explicit text messages from a command staff member. I did not report the harassment for fear of retaliation as I was on a probationary status after being reinstated to Sergeant and given that another female sergeant in the department also reported sexual harassment and was retaliated against. Also, after I resolved my prior EEO Complaint, I had an issue in October or November of 2019 where Lieutenant Garcia was screenshotting personal pictures of my social media and forwarding it to the whole police station. Within a few days my personal pictures were on the phones of most of my colleagues. This was humiliating and mortifying. My colleagues were talking about the photograph and would come up to me to show me and when I asked, they said it come from Lieutenant Eduardo Garcia. Lieutenant Garcia used to ask me to join him for breakfast or to work out in the gym and when I would say no, he would get cold with me. He pulled me aside and attacked my personality, saying I needed to be more of an extrovert and less of an introvert.

From February 2020 and onward, I was subjected to a hostile environment such as when my supervisors and others openly engage in sexually inappropriate and offensive comments and viewing pornographic videos in the workplace on their cellphones. The Lieutenants and Sergeants would openly laugh and make comments like "this is how so and so got the new position, or this is what you have to do around here to get in a specialized unit." Captain M. Rivero has been present while sergeants and lieutenants make sexual innuendo comments and she would laugh about it and not stop the behavior. I have been subjected to listening to my colleagues talk about penis enlargements and detail how the procedure is done. I have had to listen to some of my colleagues disparage black supervisors and use derogatory comments like "these negros are entitled and racist." I continuously have to listen to all my male colleagues who hold supervisory positions talk about women and sex on a constant basis.

Continued on following page

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 7/13/2020 _____ Date    Charging Party Signature | 1/18/2020 SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) July 13th, 2020 |

EEOC Form 5 (11/09)

**EXHIBIT**

**4**

EEOC-MDO
Recieved 07/15/2020

EDUARDO PAZ
MY COMMISSION # GG 054055
EXPIRES: 00/9/2022
Bonded Thru Notary Public Underwriters

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Florida Commission on Human Relations** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

*Continued from page 1*

In or about February of 2020, I had another Lieutenant asking several sergeants whom he saw speaking to me if they were sleeping with me. This Lieutenant also made comments such as I could rule the department if sleep my way to the top. I've also had a Major inappropriately grabbing my wrist in an inappropriate manner under the guise to personally inspect my tattoo and then he started to ask me personal questions about my relationship status.

Another situation in Feb/Mar 2020 occurred when a male Sgt. was verbally counseled for violating a state emergency order by having lunch in a restaurant after the city and governor advised no person shall eat inside any establishment. He was seen eating inside a restaurant with two (2) other officers. The officers and the sergeant did not receive any discipline. Instead, I was punished by being switched with the sergeant in lieu of the sergeant receiving discipline. Lieutenant Flanagan, Lieutenant Baldwin, and Lieutenant Dohler advised me verbally of the switch in area of responsibility and stated they are making this switch to protect the male sergeant from receiving formal written discipline.

In March or April of 2020, I was having a conversation with a Lieutenant when I told him that an officer would be coming in a couple hours late due to a dental visit where he would be getting a tooth filling. The Lieutenant responded with "what is he doing? A rectum filling?" A few weeks later, the Lieutenant started to imitate sexual acts in the workplace and saying, "this is what Andrew Gillum was doing last night" he also made a comment that the Covid-19 temperature checks were going to be conducted through the rectum.

I've also been subjected to disparate treatment. For example, even though command staff has stated that we need to have less contact with the public due to Covid, In May 2020, Ast Chief Acosta threatened to send me home if my vehicle didn't move much from the station which is uncomfortable considering the fact sergeants and lieutenants sleep on duty in the office and in their cars while working in front of me or in front of their supervisors. Yet no one tells them to move their vehicles.

In April 2020, my personal cell phone had run out of battery during my tour of duty and I left it in the car charging. One of my Lieutenants demanded me to respond to the Lieutenant's office and demanded to see my personal cell phone to check its battery life. I stated that her phone was in the car charging and that it was out of battery. I felt targeted and harassed as I had never seen anyone else be required or having been demanded to produce their personal phone for inspection by a supervisor. As I exited, I was contacted by several other supervisors who were appalled at this treatment and advised me that the Lieutenant had planned to make this request of her. That he stated verbatim "I know she's lying and when she walks in here, I am going to ask to see her phone."

Also on April 22, 2020, I was on the phone with Lt. Dohler and told him I was running late because I had a personal emergency due to a gastrointestinal issue. I had severe stomach cramps and could not hold the pain or keep from using the restroom. I had to shower again. As I was on my way in, the Lieutenant radioed me and asked what restroom I was in. I advised the lieutenant that I would be in the 5th-floor range restroom because that was the restroom I was headed towards. I was running up the station garage stairs because I had to use that restroom and I knew that would be the only one stall restroom I could use to maintain privacy and dignity. When I arrived, the lieutenants would be waiting for me outside the restroom door in a tactical position sneaking around standing in front of the restroom. When I walked in, I found both lieutenants in that position and asked what they were doing. They demanded to know who was in the restroom and who was I with. I was confused as to why they would be asking her this when I told Lieutenant Dohler of my emergency. I was humiliated due to this incident. Later, the same lieutenant filed an internal affairs complaint based on this incident which is currently pending.

When the above comments and behavior takes place in the workplace, I remove myself from the situation, but then I am criticized for not being a team player or for being an introvert.

In June of 2020, I had Lieutenant make comments in front of me that it's the Hispanics causing riots in Miami and making the protests violent, knowing very well I am a Hispanic female.

I have also had co-workers tell me that they did not want to be associated with me specifically because of my prior harassment/discrimination complaints.

I believe that I was subjected to sexual harassment and sexual discrimination, national origin discrimination, and retaliation because of my objections and complaints of the discriminatory behavior in the workplace in violation of Title VII of the Civil Rights Act of 1964, as amended, the Florida Civil Rights Act of 1992, as amended.

EEOC-MDO
Recieved 07/15/2020

City 001233

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Florida Commission on Human Relations | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mrs. Jessica Guasto | | 1991 |

| Street Address | City, State and ZIP Code |
|---|---|
| 117 NW 42nd Ave # 1008, Miami Fl 33126. [Confidential per Fla. Stat. s. 119.071 – Do not disclose in FOIA] | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of Miami Beach – Miami Beach Police Department | 15-100 | 305-673-7901 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1100 Washington Avenue | Miami Beach, FL 33139 |

| DISCRIMINATION BASED ON | Earliest | Latest |
|---|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN | 09/2019 | |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | | |
| ☐ OTHER (Specify) | ☒ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Additional respondents responsible for discriminatory conduct:
Rick Clements, Chief of Police Miami Beach Police Department
Wayne Jones, Deputy Chief Miami Beach Police Dept.
Lt. Steven Cosner, Miami Beach Police Dept.
Cmdr. A.J. Prieto, Miami Beach Police Dept.

**EXHIBIT**

**5**

Charging Party (CP) is a female and was employed by the Responding Party (RP) in a supervisory position. CP has filed two previous EEOC charges against the RP, the first in 2019 after the CP was inappropriately demoted, and the second in 2020 after continuing discriminatory conduct by the RP after reinstatement to her supervisory position. The 2019 charge was resolved with the RP reinstating the CP to her supervisory position.

CP filed the second EEOC complaint in July 2020. RP initiated an internal investigation regarding work rule violations in May 2020. In December 2020, a meeting was held where the RP threatened to terminate CP's employment with RP for the alleged work rule violations, even though similar employees were given lesser penalties for equivalent alleged conduct. In exchange for withdrawing her charge with the EEOC, the RP gave CP equal punishment to other employees, but also had CP sign an agreement waiving her job security rights under the collective bargaining agreement and forcing CP to sign a letter of resignation.

*Continued on next page*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |

| 06/22/2021 | | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) 06/22/2021 |
|---|---|---|
| Date | Charging Party Signature | YINA RODRIGUEZ<br>NOTARY PUBLIC<br>STATE OF FLORIDA<br>Comm# GG324066<br>Expires 4/15/2023 |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| **Florida Commission on Human Relations** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

## *Continued From Page 1*

On the first day back to work after CP signed the agreement, Respondent Cosner, who was previously involved in the conduct leading to the 2020 charge, accused CP of further violations of workplace rules. The RP conducted a perfunctory investigation, led by Respondent Prieto. On January 19, 2021, Respondents Clements, Jones, Cosner and Prieto attended a meeting with CP to "discuss the allegations" against CP. In that meeting, the Respondents accused CP of falsifying documents without cognizable evidence. On January 25, 2021, Respondent Clements notified CP that the RP was "implementing" the letter of resignation and terminated CP's employment.

CP was terminated for engaging in a protected activity, filing the 2020 charge of discrimination and retaliation against RP. The RP's act in threatening more severe penalties for similar alleged conduct, compelling CP to agree to waive her rights under the collective bargaining agreement and the subsequent Cosner allegation of misconduct were merely pretext for discrimination and retaliation.

CP requests a finding of "cause" or "reasonable cause" under both the Florida and federal statutes prohibiting discrimination based on sex, national origin and retaliation, and an award of all damages, including liquidated damages, lost wages, compensatory damages, punitive damages, pain and suffering and emotional distress and attorney fees and costs.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-21004-DPG

**JESSICA GUASTO**,

      Plaintiff,

vs.

**THE CITY OF MIAMI BEACH, FL**,
a Florida municipality,

      Defendant.

_____/

### PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES

Jessica Guasto hereby responds to the Interrogatories directed to her by the Defendant.

**Interrogatory No. 1:**

Please provide the name, physical address, email address, telephone number, place of employment and job title of any person who has, claims to have, or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings filed in this Lawsuit action, or any fact underlying the subject matter of this Lawsuit.

**Response:**

1. Nicholas Guasto - City of Miami Beach Police Department - (954) 243-5446
2. Reginald Lester - City of Miami Beach Police Department - (305) 525-7354
3. Robert Jenkins - City of Miami Beach Police Department - (954) 257-5229
4. Kevin Millan - City of Miami Beach Police Department - (954) 240-2520
5. Steven Serrano - City of Miami Beach Police Department - (786) 269-6575
6. Steven Feldman - Captain City of Miami Beach Police Department
7. Delvin Brown - Captain City of Miami Beach Police Department
8. Eric Garcia - Major of City of Miami Beach Police Department
9. Wayne Jones - Police Chief of City of Miami Beach Police Department
10. John Burhmaster - Former Deputy Chief of City of Miami Beach Police Department - (305) 219-5959
11. Paul Ozaeta - City of Miami Beach Police Lieutenant – (954) 405-3120

1

EXHIBIT

6

**Interrogatory No. 2:**

Please state the specific nature and substance of the knowledge that the person(s) identified in your response to Interrogatory No. 1 may have.

**Response:**

Nicholas Guasto – Overall, has a strong understanding and firsthand knowledge of facts surrounding this lawsuit. Witness to meetings, witness to harassment/retaliation, met with Chief Richard Clements and had phone conversations several times in regard to me withdrawing my EEOC complaint, settlement agreement. Met with at the time Deputy Chief Wayne Jones on January 30th, 2020, to report harassment and retaliatory conduct I had been experiencing and receiving. Was a member of the FOP and has knowledge of my complaints of harassment to the FOP and violations of my officer bill of rights. Witness to discussions and conversations with the FOP of me not wanting to agree to the terms of an LCA and the Police Administration relaying to the FOP if I did not agree to an LCA I would be terminated.

Reginald Lester - Member of the FOP and has knowledge of my complaints of harassment/retaliation to the FOP. Was in the January 19th meeting and observed Chief Clements threaten to terminate me after I requested representation of my choice and for my attorney.

Robert Jenkins - FOP President at the time and has knowledge of my complaints of harassment/retaliation to the FOP. Was also witness to several meetings.

Kevin Millan - FOP President at the time and has knowledge of my complaints of harassment/retaliation to the FOP. Was also witness to several meetings. He also reported my complaints of harassment/retaliation to Chief Richard Clements and Deputy Chief Wayne Jones during a meeting on March 10th, 2020, after I had met with him at the FOP office to report harassment/retaliation in attendance was Robert Azicri who also met with the administration with Kevin Millan.

Steven Serrano – (Witness) Subordinate I supervised and relayed information to at the beginning of my midnight forced overtime shift from December 28th, 2020.

Steven Feldman - Was in attendance (witness) with Nicholas Guasto when he met with Chief Wayne Jones January 30th, 2020, to report my harassment/retaliation to Chief Wayne Jones. Also, in attendance (witness) to Nicholas Guasto meeting with Chief Richard Clements to discuss withdrawing my EEOC and discussing the settlement agreement. Would facilitate conversations between Nicholas Guasto and Chief Richard Clements regarding my EEOC, settlement agreement, and my harassment.

Delvin Brown - Was the Lieutenant on shift on December 27th, 2020, who advised me I was being forced onto the midnight shift under Steven Cosners supervision. Delvin Brown advised me to personally give him my overtime slip as Steven Cosner stated to Delvin Brown, he does not speak with me as we have "issues." Delvin Brown asked me questions on what happened between Steven Cosner and I. Delvin Brown was also present in the January 19th meeting.

Eric Garcia - Was in attendance (witness) with Nicholas Guasto when he met with Chief Wayne Jones on January 30th, 2020, to report my harassment/retaliation to Chief Wayne Jones.

Wayne Jones - At the time Deputy Chief Wayne Jones met with Nicholas Guasto on January 30th, 2020, when he reported harassment and retaliatory conduct I had been experiencing and receiving. In attendance in that meeting was Steven Feldman and Eric Garcia.

John Burhmaster - Has knowledge of hostile work environment and toxic culture within the City of Miami Beach Police Department. Also witness to harassment I experienced and unfair treatment I have received throughout my tenure. Witness to me reporting harassment and retaliation to Human Resources. Witness/ Main Investigator assigned to investigate an Internal Affairs complaint where a senior police sergeant was harassing and stalking me. The investigation resulted in the sergeant's actions to be substantiated and the Sergeant resigned in lieu of termination.

Paul Ozaeta - FOP President at the time and has knowledge of my complaints of harassment/retaliation to the FOP and to him. Was also witness to several meetings to include the January 19th meeting where the police administration violated my 112-officer bill of rights. Was witness to me requesting representation of my choice and when I requested an attorney to be present when Chief Richard Clements stated he would terminate me if I did not participate in the meeting without an attorney present. Also has first-hand knowledge and information regarding Steven Cosner credibility issues as well as knowledge of his history of harassing and retaliating against women within the Miami Beach Police Department.


**Interrogatory No. 3.**
Please state the name and address of all of your employers for the five (5) year period subsequent to your employment with the City through present day.

**Response:**
1. Gps Security – 250 NW 23rd Street # 305 Miami, Florida, 33127.
2. Miami Dade College – 1780 W 49th Street Hialeah, Florida, 33012.
3. Brickell City Centre – 701 S Miami Ave, Miami, Florida, 33131.
4. Opa Locka Police Department – 760 Fisherman Street, Opa-Locka, Florida, 33058.

**Interrogatory No. 4.**

State the names and physical addresses and email addresses of all persons and/or entities with whom you applied for employment after your separation from your employment with the City. For each person and/or entity listed, please provide the specific position applied for and the date of the application.

**Response:**

1. Gps Security – 250 NW 23rd Street # 305 Miami, Florida, 33127. – Private Investigator - February 2021.
2. Miami Dade College – 1780 W 49th Street Hialeah, Florida, 33012. – Public Safety Chief – May 2022.
3. Brickell City Centre – 701 S Miami Ave, Miami, Florida, 33131. Account Manager – March 2023.
4. Opa Locka Police Department – 760 Fisherman Street, Opa-Locka, Florida, 33058. – Reserve Police Officer – March 2023.

**Interrogatory No. 5**

State whether you have ever been a party in a lawsuit other than this Lawsuit. If yes, state whether you were a plaintiff or defendant; the court the action was filed in; and the case number.

**Response:**

I have not been a party to another lawsuit.

**Interrogatory No. 6**

Please list every charge of discrimination you have ever filed with the Equal Employment Opportunity Commission, the Florida Commission on Human Relations, or any other local or state equivalent agency. For each charge, list the date of the charge, the name of the entity the charge was/is against and the basis for the charge.

**Response:**

City of Miami Beach – 2018- Discrimination.
City of Miami Beach – 2019 – Retaliation.
City of Miami Beach – 2021 – Retaliation.

**Interrogatory No. 7**
Please provide and list in detail each category of your damages. For each category of damages, please list your specific damages, your factual basis for entitlement to the specific damages and the calculation of the specific damages.

**Economic Damages:** Wage loss: as of this writing approximately $300,000 base salary; overtime pay; off-duty pay; cost of living adjustments, loss of promotional opportunities, step raises, first responder bonus (Florida First Responder Recognition Payment Program); buyback program for accrued time from city employment; loss of benefits and expenses related to medical/insurance/dental insurance; loss of pension accrual and appreciation. Total damages to be determined through discovery but estimated to be approximately $500,000.

Attorney fees.

Plaintiff will not seek compensatory or any other non-equitable damages, will not seek a trial by jury, and will file a notice with the Court advising such.

**Interrogatory No. 8**
Please identify each document used or relied upon in the computation of each item or category of damage that you claim against the City in this Lawsuit.

Pay records, pension ordinance and medical records.


**Interrogatory No. 9**
For each claim of Retaliation (Counts III and IV in the Complaint) asserted by you against the City in this Action, please separately;

a.      Summarize the facts pertaining to or supporting the validity of such claim;

b.      Identify each person who may have knowledge of the facts summarized for each such claims; (Same as persons listed on integratory question # 1).

c.      Identify the facts about which each such person identified above may have knowledge; and (Same as persons listed and summarized on integratory question # 2).

d.      Identify the documents which pertain to or support the validity of each such claim. Nicholas Guasto signed affidavit.

**Response**
The facts described below apply to both claims of retaliation, as the City violated both Federal and Florida law.

Plaintiff filed an EEOC Charge in July 2020. Prior to filing her complaint, in May 2020, the MBPD gave Plaintiff and her then-husband, Nicholas Guasto, notice that they were being investigated for

being outside the city limits while on duty. The City failed to follow state statute and their own rules and regulations in conducting the internal investigation.

In September of 2020, MBPD Chief Clements had multiple discussions with N. Guasto regarding the EEO Charge. Clements told N. Guasto that the only way to resolve the case for minor discipline was for Plaintiff to withdraw her EEOC charge. By November the EEOC charge was still being investigated and Plaintiff and N. Guasto had still not been interviewed for the pending internal investigation. On November 2 a meeting took place to ostensibly discuss settling the pending EEOC charge. At that meeting, instead of settlement negotiations, the Chief threatened the Plaintiff with termination and conducted an interrogation regarding the open internal investigation. In attendance were Chief Clements, Deputy Chief Wayne Jones, Assistant Chief Paul Acosta, IA Commander Albert Prieto, HR Director Michael Smith, attorney Elkins, Past FOP President Kevin Millan, FOP Attorney Gene Gibbons, and Plaintiff's attorney Pancier. The Chief demanded Plaintiff answer questions about the investigation, and the city attorney displayed a PowerPoint presentation made for the case. The City IA commander, Albert Prieto, took notes and statements on his work laptop during the entire meeting. During this meeting Plaintiff was threatened several times with termination if she didn't agree to a settlement.

On December 18, Plaintiff met with the Chief and signed a settlement agreement and a last chance agreement. Plaintiff did not return to work until December 27, 2020, where she was assigned to her regular afternoon watch (2pm – 12am) in patrol. That evening, Plaintiff was mandated to work overtime during the midnight watch (12am – 6am). Plaintiff was mandated to work for Lt. S. Cosner, who in 2014 was a prime actor in sexually harassing Plaintiff while they were co-workers in patrol. December 27, 2020 was the only time Plaintiff ever worked in a subordinate position to Cosner. Cosner subsequently filed a complaint against the Plaintiff, alleging multiple false allegations against the Plaintiff. On Plaintiffs very first day back to work pursuant to the signing of the last chance agreement, Cosner subsequently initiated and filed a complaint against the Plaintiff, alleging multiple false allegations against the Plaintiff circumventing all levels of Cosner chain of command as required by department policy and emailed it directly to the Internal Affairs Commander and the City Attorney M. Elkins. The disciplinary form is named an AAF (Administrative Action Form) that was never presented to the Plaintiff and was not signed by the Plaintiff and or signed by Cosner as required and mandated by SOP and Policy.

There was no formal investigation of Cosner's allegations against Plaintiff Guasto. Chief Clements ordered Plaintiff to attend a meeting on January 19, 2021, where Cosner – the individual who sexually harassed Plaintiff and sent her a sexually perverse greeting card – was present. The meeting was essentially an interrogation based on Cosner's complaint. The FOP members:
- were not provided Cosner's Allegation of Employee Misconduct document prior to the meeting,
- were not provided the emails Cosner claims to have sent Plaintiff on December 30th,
- were not provided any notice of the nature of the meeting, and
- were not provided the vehicle locator documents Cosner claims to have viewed that showed Plaintiff's police vehicle stationary all night. were not provided names/statements of any and all witnesses.
- were not provided with all existing evidence.
- were not provided with the PowerPoint generated by Internal Affairs.

6

- were not provided with the Employee Administrative Action Response Form.
- were not provided with the names of the meeting attendees prior to the meeting.
- were denied representation of counsel when requested by the Plaintiff.

After the meeting, the City fired the Plaintiff on January 25, 2021.


**Interrogatory No. 10**
Please identify each document used or relied upon in answering these Interrogatories.

**Response**
See documents provided herewith.


**Interrogatory No. 11**
Please identify each person who assisted or provided information in preparing the Answers to these Interrogatories.

**Response**
Plaintiff


**Interrogatory No. 12**
To the extent you are claiming emotional distress damages and/or pain and suffering of any sort, please identify the names and addresses of all your health care providers who treated you for any emotional distress and/or pain and suffering that you are claiming. Please also execute the attached HIPPA Release form for each health care provider identified.

**Response**

Plaintiff will not seek compensatory or any other non-equitable damages, will not seek a trial by jury, and will file a notice with the Court advising such.

**Interrogatory No. 13**
For each provider identified in response to Interrogatory No. 12, please identify the condition for which each provider treated you and the dates of such treatment.

**Response**
See response above.


*Verification on next page*

## VERIFICATION

_____

JESSICA SALABARRIA (GUASTO)

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF Miami Dec{ )

BEFORE ME, the undersigned authority, personally appeared, __Jessica Salabarria (Guasto)__
known to me or who has produced ____FLDL____ as identification
and who did (did not) take an oath, states that he/she has read the foregoing responses to
interrogatories and same are true to the best of his/her knowledge and belief.

        WITNESS my hand and official seal in the County and State last aforesaid, this _8_ day
of _Jan_ ~~2023~~. 2024

                                        _____
                                        Official Notary Signature

        JOSE VIJIL                      Name of Notary Typed, Printed or Stamped
Notary Public-State of Florida
Commission # HH 450227
My Commission Expires                   Commission Number:
November 25, 2027

                                        Notary Public
                                        State of Florida at Large

MY COMMISSION EXPIRES:

Respectfully submitted,

**PAUL DARAGJATI PLC**

*Paul Daragjati*

**PAUL A. DARAGJATI, ESQ.**
Florida Bar No. 713813
Georgia Bar No. 491830
paul@daragjatilaw.com
**ROSE R. DARAGJATI, ESQ.**
Florida Bar No. 1025106
rose@daragjatilaw.com
4745 Sutton Park Ct., Ste. 503
Jacksonville, FL 32224
Telephone:     (904) 379-4117
Fax:              (904) 379-7108
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 8, 2024, I electronically delivered the foregoing to the attorneys of record listed below via electronic mail.

### SERVICE LIST

**Case No. 22-cv-21004-DPG**

Michael L. Elkins, Esq.
melkins@mlelawfirm.com
MLE Law
1212 Northeast 16th Terrace
Fort Lauderdale, FL 33304

Henry J. Hunnefeld, Esq.
henryhunnefeld@miamibeachfl.gov
Benjamin Z. Braun, Esq.
benjaminbraun@miamibeachfl.gov
Office of the City Attorney
City of Miami Beach
1700 Convention Center Dr
Miami Beach, FL 33139-1819

**EXHIBIT**

**7**

## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, Salabarria is the subject of an on-going Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2020-04794 ("EEOC Charge"); and

WHEREAS, the Investigation and EEOC charge are all pending and constitute all the charges, investigations and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of further investigation, litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.     Recitals.  The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.     EEOC Charge Withdrawn With Prejudice and Discipline.  Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the attached Notice of Withdrawal with Prejudice and immediately filing same with the EEOC. Additionally, as discipline for the matters that are the subject of the Investigation, Salabarria agrees to accept the following:

    a.  A One Hundred and Sixty (160) hour suspension,

    b.  Payback of Eighty-Six (86) total hours, of which Forty-Four (44) Hours is regular time and Twenty-Four (24) hour is overtime. The regular rate is Forty-Four Dollars and 14/100 ($44.14) for a total of One Thousand Nine Hundred Forty-Two Dollars and 00/100 ($1,942.16) of regular time. The overtime hourly rate is Sixty-Six Dollars and 21/100 ($66.21), for a total amount of One

1

DocuSign Envelope ID: CC3C604A-8185-4007-9FEB-8735D7C89F5F

Thousand Five Hundred Eighty-Nine Dollars and 04/100 ($1,589.04). **Accordingly, the Total Amount due to the City is Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) ("the Total Amount")**. Salabarria can pay the Total Amount via a cashier's check made payable to the City of Miami Beach on or before January 4, 2021. If the City does not receive full payment on or before 5:00 p.m. on January 4, 2021, then the City is authorized to deduct the remaining amounts due from Salabarria's vacation leave bank.

c.  Salabarria will execute the attached Last Chance Agreement, which contains additional provisions. The Last Chance Agreement is incorporated by reference into this Agreement.

d.  Permanent deletion, from all platforms (platforms includes but is not limited to: Apple Podcasts, Stitcher, Spotify, Spotify Podcasts, Google Play Music, Google Podcasts, iHeart Radio, and any other social media and/or electronic platform) the podcast titled: "Cafecitos y Chisme with Nick & Jess."

e.  Salabarria will immediately have a meeting with the Chief of Police wherein she will address the claims made in the Charge, including but not limited to identifying the names of all persons who allegedly engaged in the conduct addressed in the Charge. The refusal to name the persons who have allegedly engaged in the conduct in the Charge shall be grounds for immediate termination, as discussed in the attached Last Chance Agreement. Salabarria shall be entitled to have a Union Representative with her during this meeting.

f.  <u>Release Of Claims, Covenant Not To Sue.</u>  Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement. The claims released also include any claims under the United States Constitution, including but not limited to claims arising under the First Amendment or any other claims whatsoever.

City 001236

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf. Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

g.  _Effect; Precedent_.  The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind, with the exception of any labor proceeding involving Salabarria. The parties further agree that Salabarria's prior settlement agreement may also be used in any labor proceeding involving Salabarria.

h.  _Consideration_.  The consideration for this Agreement is the City's early conclusion of the Investigation. The parties acknowledge that the City could continue the Investigation. The parties further acknowledge that continuing the Investigation would likely be detrimental to Salabarria. Therefore, the City is giving up its right to continue the Investigation in exchange fro Salabarria's agreement to the provisions and terms of this Agreement. The mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

i.  _Miscellaneous_.  This Agreement (which includes the exhibits attached hereto that are incorporated by reference), is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral.  The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever.  This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release,"

3

City 001237

is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

**CITY OF MIAMI BEACH**

By _Paul J. Aguila_
City Manager

DATE _12/23/2020 | 1:34 EST_

**JESSICA SALABARRIA**

_____
JESSICA SALABARRIA

DATE _12/18/2020_

**FRATERNAL ORDER OF POLICE, LODGE 8**

By _____
KEVIN MILLAN
President

DATE _12/18/2020_

**CHIEF OF POLICE**

_____
RICK CLEMENTS
Chief of Police

4

City 001238

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY                    Page 1 of 7                    UNION        JESSICA

City 001240

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1. All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2. During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3. Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4. The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY

Page 2 of 7

UNION          JESSICA

City 001241

5.     Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6.     SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7.     Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command.  Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8.     For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

CITY                           Page 3 of 7            UNION          JESSICA

City 001242

9.     Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10.     Employee shall attend and cooperate with any training required by the Chief of Police.

11.     If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12.     In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement  that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.     The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

CITY                              Page 4 of 7                    UNION          JESSICA

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY                          Page 5 of 7                UNION          JESSICA

City 001244

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.     SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.     Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.     This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.     This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.     In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida.   **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY                                    Page 6 of 7                    UNION          JESSICA

City 001245

This Agreement is dated the _____ day of December 2020, in Miami-Dade County, Florida.

_____
**JESSICA SALABARRIA**

DocuSigned by:

*Paul J. Aguila*

2B3D6240F92B45D...
_____
**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: __12/18/2020__

Date: ___12/23/2020 | 1:34 EST___

**FRATERNAL ORDER OF POLICE**

_____  President
Signature & Title

*Kevin Millan*   President
Print Name & Title

__12/18/2020__
Date

_____
**CHIEF OF POLICE**

__12/15/2020__
Date

City 001246