**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.:1:22-cv-21004-DPG

JESSICA GUASTO,
        PLAINTIFF,
VS.

THE CITY OF MIAMI BEACH, FL,
A FLORIDA MUNICIPALITY,
        DEFENDANT.
_____/

DEPOSITION OF:          SGT. ARLEY FLAHERTY

DATE:                   MARCH 28, 2024

TIME:                   9:15 A.M. - 10:12 A.M.

PLACE:                  VIA ZOOM REMOTE CONFERENCING

REPORTED BY:            TIMOFEY GARBUZ
                        COURT REPORTER
                        NOTARY PUBLIC, STATE OF FLORIDA

**2**

1 APPEARANCES:
2 DANIEL B. BARROUKH, ESQ.
  DEREK SMITH LAW GROUP, PLLC
3 520 BRICKELL KEY DRIVE
  SUITE O-301
4 MIAMI, FLORIDA  33131-2433
  (786) 688-2335
5 DANIELB@DEREKSMITHLAW.COM
      COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
6
7
8 MICHAEL L. ELKINS, ESQ.
  MLE LAW
9 1212 NORTHEAST 16TH TERRACE
  FORT LAUDERDALE, FLORIDA  33304
10 (954)401-2608
  MELKINS@MLELAWFIRM.COM
11      COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.
12
13
14              * * * * * * * * *
15           S T I P U L A T I O N S
16
17      It is hereby stipulated and agreed by and
18 between counsel for the respective parties, and the
19 deponent, that the reading and signing of the deposition
20 are hereby reserved.
21
22
23
24
25

**3**

1              I N D E X
2 WITNESS                                    PAGE
3 SGT. ARLEY FLAHERTY
4 Direct Examination by Mr. Elkins              4
5 Cross Examination by Mr. Barroukh            47
6 Redirect Examination by Mr. Elkins          49
7
8              E X H I B I T S
9 DEPOSITION          DESCRIPTION          PAGE
10 Exhibit Number 1   Memorandum from Clements to   33
                      Guasto
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1              P R O C E E D I N G S
2              * * * *
3      THE REPORTER:  Whenever you're ready, Counsel,
4 please state your names and whom you represent for the
5 record.  And I'll swear in the witness.
6      MR. ELKINS:  I'm ready.
7      THE REPORTER:  Go ahead, Counsel.  Please state
8 your names and whom you represent for the record.
9      MR. BARROUKH:  All right.  Daniel Barroukh for the
10 plaintiffs.
11      MR. ELKINS:  Michael Elkins on behalf of the
12 defendant, City of Miami Beach.
13      THE REPORTER:  Sergeant, do you swear and affirm
14 that the statements you give in this matter shall be
15 the truth, the whole truth and nothing but the truth so
16 help you God?
17      THE WITNESS:  I swear.
18      THE REPORTER:  We may proceed.
19           SGT. ARLEY FLAHERTY,
20 Having been first duly sworn, testified as follows:
21           DIRECT EXAMINATION
22 BY MR. ELKINS:
23      **Q.  One second.**
24      **Okay.  Good morning, Sergeant Flaherty.**
25      A.  Good morning.

5

**Q. How are you today?**
A. I'm fine. A little tired. Worked last night.
**Q. I appreciate your time in being here.**
**Can you just state your full name for the record, please.**
A. Sure. It's Arley Flaherty, A-r-l-e-y. And last name is F-l-a-h-e-r-t-y.
**Q. And where are you currently employed?**
A. The Miami Beach Police Department.
**Q. How long have you worked there?**
A. February of this year made 20 years.
**Q. Have you ever been deposed before?**
A. Yes, I have.
**Q. On how many times?**
A. Many.
**Q. Enumerable, right?**
A. Yes, yes.
**Q. Let me ask a different question. Maybe it will be a little bit clearer. Have you ever been deposed in a civil case?**
A. You know, I don't recall right now.
**Q. Okay. So I presume you've been deposed, like I said, enumerable times in criminal cases --**
A. Yes.
**Q. -- and probably in court for testimony. So this**

6

**is a little bit different. So I'm going to go over just a few real simple ground rules that will hopefully allow us to get you out of here as quickly as humanly possible, okay?**
A. Okay.
**Q. First thing is: We have our court reporter here, Tim, who is taking down everything we say. But as great as Tim is, he cannot accurately transcribe two people talking at the same time.**
**And so, while you're probably going to anticipate a lot of my questions and be able to answer them quickly, I just ask that you kind of hold your breath, let me finish the question, and then answer it. Otherwise, our court reporter is going to struggle all day.**
A. Okay.
**Q. Does that make sense?**
A. Yes.
**Q. All right. Second -- I forgot what I was going to say there for a second.**
**The court reporter is taking down everything we say. This isn't a video deposition, so you have to give audible answers. You can't, like, nod your head or give ums and ahs; do you understand that?**
A. Yes, I do.
**Q. All right. If at any time you don't understand my question, you're free to ask me to repeat it, to clarify it.**

7

**And if you need a break at any time, that's fine. I just ask that you not take a break while a question is pending. Does that make sense?**
A. Yes.
**Q. Okay. Perfect.**
**And obviously, I'm asking you questions based on your personal knowledge today. So unless I actually ask you to kind of give me an approximation or to guess, I don't want you to guess unless specifically asked to do so. Do you understand that?**
A. I understand.
**Q. Okay. First thing is: Did you and I speak at any point before this deposition?**
A. Yes, we did.
**Q. When did we speak?**
A. Last week.
**Q. Okay. And what did we talk about?**
A. About the case.
**Q. Okay. And did I talk to you about the allegations in Ms. Guasto's complaint?**
A. Yes, you did.
**Q. Did I ask you to testify in any specific way?**
A. No.
**Q. Okay. Did I tell you that it was important to tell the truth?**

8

A. Yes.
**Q. Okay. Understanding you are not a management employee, correct?**
A. I am not.
**Q. Are you a member of the FOP?**
A. I am a member, but can you -- is it -- are you asking if I'm executive or just an actual member?
**Q. First, I'm asking if you're a member?**
A. I am.
**Q. Okay. And what is the FOP?**
A. It is the union that represents the police department, police officers.
**Q. City of Miami Beach Police Department is unionized through the Fraternal Order of Police, correct?**
A. Yes, it is, yes.
**Q. I think Lodge Number 48; is that right?**
A. We are 6.
**Q. Right. Forty-eight, six, same thing. Strike that.**
**And we'll get back to that in a moment.**
**How long -- and you said you've been employed with the City in the police department for 20 years -- 20-plus years?**
A. Twenty years.
**Q. Okay. Can you just give us a brief description or**

Sgt. Arley Flaherty

9

1  a history of your employment at the police department?
2      A.  Yes.  I started off as a regular patrol.  I then
3  did a bike -- bike unit.  After that, for about nine years,
4  I was part of our vice squad at the time that did narcotics,
5  prostitution, human trafficking, a little bit of everything.
6  I was -- during that time I was also detached to a money
7  laundering task with the State Attorney's Office.
8          Once I got promoted, I went back to the road.  I
9  then went for about two to three years to what we call
10  RDAing, our -- our re -- it's like an area that's re --
11  we're grants.  It's a CityCenter if you're familiar with
12  that, where the courthouse is, and it's just a specialized
13  unit.
14         And then for the last six years, four to five --
15  actually, five years, I've been part of the -- I am the
16  background unit and recruitment supervisor.
17     Q.  When were you promoted to sergeant?
18     A.  I was promoted in August of 2015.
19     Q.  And then, the hierarchy of the police department
20  as I understand it runs, generally speaking, sometimes
21  there's some changes depending upon at the top, but
22  generally runs Chief of Police at the top, sometimes there's
23  an Assistant Chief, sometimes there isn't, it just depends.
24  Right?
25     A.  That's --

10

1      Q.  Is that correct so far?
2      A.  Yes.
3      Q.  And then, below it, Assistant Chief would be your
4  Majors, correct?
5      A.  Yes.
6      Q.  And then, Captain below that; is that right?
7      A.  Yes.
8      Q.  And then, Lieutenant, correct?
9      A.  Yes.
10     Q.  Then Sergeant, right?
11     A.  Yes, yes.
12     Q.  And then, Police Officer?
13     A.  Yes.
14     Q.  Then within Police Officer, Sergeant or
15  Lieutenant, generally speaking, there are different
16  detachments or duties or assignments, so you could be, for
17  example, a Sergeant, but in the motors unit or a police
18  officer who is a detective also; is that right, things like
19  that?
20     A.  Correct.  That's correct.
21     Q.  And it's my understanding -- correct me if I'm
22  wrong -- that the FOP bargaining unit, the employees within
23  that unit consists of police officers or police employees
24  that are sworn that are the rank of Lieutenant and below; is
25  that right?

11

1      A.  That's correct.
2      Q.  The management employees are Captain and above; is
3  that right?
4      A.  Yes.
5      Q.  Okay.  Perfect.
6          Tell me about -- what is your current role within
7  the FOP?
8      A.  I currently am just a member.
9      Q.  Okay.  And -- but previous you were part of the
10  executive board or committee?
11     A.  I was.  I was part of the executive board in two
12  different capacities.
13     Q.  Okay.  What were those capacities?
14     A.  I first was a Trustee.  And then, my last was -- I
15  was a First Vice President.
16     Q.  So let's start with when were you a Trustee.  And
17  what is a Trustee?
18     A.  I -- I do not recall the years back when I was a
19  Trustee.  Pretty much, it's just to make sure that
20  everything within the union is going how it's supposed to
21  be.  We usually review the -- the by-laws.  We review the
22  financial statements.  We just ensure that everything is up
23  to date and that the lodge is running how it's supposed to
24  be running.  There's three of us.
25     Q.  By "lodge," you mean the local unions, correct?

12

1      A.  Correct, correct.
2      Q.  And then, what was your other role?
3      A.  And then, I was the First Vice President.
4      Q.  And when were you the First Vice President?
5      A.  I was the First Vice President.  So there is a
6  term going on right now.  This one, he is -- what year?  We
7  are in 2024?  So he was 2022.  So I was from -- it's a
8  two-year term.  So I want to say I was -- prior to this one,
9  so 20 -- 2021 to 20 -- 2020 to 2022.  That was my term, the
10  two-year term.
11     Q.  And the title was First Vice President?
12     A.  Yes, it's President, First Vice President, then
13  Second Vice President.
14     Q.  So can you describe for me the internal
15  organizational structure of the FOP?  I think you kind of
16  just did a little bit, but give me the full picture.
17     A.  Yes.  Shame on me, I don't remember everybody's
18  position.  But it's President, First Vice President, Second
19  Vice President.  We have a Treasurer, a Secretary, Inner
20  Guard, Outer Guard, Sergeant-at-Arms and a Chaplain and the
21  three Trustees.
22     Q.  And generally speaking, what's the role of the FOP
23  in the context of how it relates to the City, to management,
24  and to disciplinary issues with employees?
25     A.  They obviously represent the employee when any

Sgt. Arley Flaherty

13

1  type of discipline is set forth.  Anything that may go
2  against our contract that might be in a violation or
3  something usually FOP is there to represent the -- the
4  member.
5      Q.  And by "contract," you're referring to the
6  Collective Bargaining Agreement; is that correct?
7      A.  That's correct.
8      Q.  And the Collective Bargaining Agreement confers
9  certain rights to the bargaining unit employees, correct?
10     A.  That's correct.
11     Q.  And that's an agreement that's bargained between
12  the City's management and the union; is that right?
13     A.  That's correct.
14     Q.  Within that agreement I believe there is a
15  grievance procedure; is that right?
16     A.  There is.  There is a grievance committee within
17  the FOP.
18     Q.  What is the grievance committee?
19     A.  So the grievance committee consists of three
20  members.  It's usually -- it's usually from the executive
21  board unless the President and First Vice President decide
22  to bring in, like, a -- a member that's not part of the
23  executive board, just somebody who may have knowledge or
24  something or shows interest.
25         I've been a member of the grievance committee.

14

1  It's -- like I said, it's three members that are -- are
2  picked, and they're the ones who help with the grievances
3  that the officer wants to file.
4      Q.  Does the grievance committee review potential
5  officer grievances to determine if they have merit or not?
6      A.  Yes, they do.
7      Q.  Okay.  Tell me about that process in general.
8  What does that look like?
9      A.  So usually, the officer will bring whatever, if
10 it's -- if it's a disciplinary matter, they will bring
11 whatever the discipline was.  If they feel that it was done
12 injust, they may have proof or something.  An example would
13 be maybe time away or -- or court -- something -- missing
14 court or something.  They could show that they were in
15 court, but maybe the check-in wasn't properly, you know,
16 functioning that day, you know, especially like during
17 COVID.
18         So they may have gotten written up for missing a
19 certain amount of court time.  And they'll show the proof.
20 And -- and, you know, we'll -- we'll just try to take it up
21 to the -- it will first go to the level of here, the Chief,
22 show them the proof, and -- you know, it could -- it could
23 be resolved before it goes over to human resources.
24     Q.  Got it.  But at the end of the day, does the
25 grievance committee generally make a determination as to

15

1  whether a grievance has some initial merit in order to go
2  forward?
3      A.  Yes, it does.
4      Q.  One second.
5         And does the Collective Bargaining Agreement talk
6  about something called, "just cause," if you recall?
7      A.  I don't recall.
8      Q.  Okay.  But within the Collective Bargaining
9  Agreement, it deals with whether or not an officer can be
10 terminated or disciplined and what the standard is for that,
11 correct?
12     A.  Yes, yes.
13     Q.  Have you been involved with or are you aware of
14 occasions where officers give up some of their rights under
15 the Collective Bargaining Agreement?
16     A.  Yes.
17     Q.  And that could happen sometimes through something
18 called a "Last Chance Agreement," right?
19     A.  That's correct.
20     Q.  Are you familiar with Last Chance Agreements?
21     A.  I have been, yes.
22     Q.  Okay.  Can you talk about your familiarity with
23 those agreements?
24     A.  I was privy to two -- two cases.  And it's pretty
25 much -- it's pretty much what it says, last chance.  They're

16

1  given a last chance based on whatever the -- whatever the --
2  I guess the best word is "allegations" or whatever they were
3  being reprimanded for, they're given a last chance.  And if
4  they violate anything, that's it.  They have no more
5  chances.
6      Q.  And they -- basically, Last Chance Agreements,
7  generally speaking, they waive their rights under the
8  Collective Bargaining Agreement, i.e. just -- the City
9  having to establish just cause and the ability to grieve the
10 discipline, be it a write-up or a termination; is that a
11 fair characterization?
12     A.  That is.  That is.  Pretty much, that's it.
13     Q.  You said you were involved in two Last Chance
14 Agreements previously; is that right?
15     A.  I was.
16     Q.  Were you involved as a representative from the FOP
17 for an employee that was subject to a Last Chance Agreement?
18     A.  I was one of the representatives.  There's usually
19 a person who will take charge like the -- the Chairman.  In
20 that case, we have a Chairman.  I forgot to tell you
21 Chairman of the grievance.  So I was there as part of the
22 FOP, yes.
23     Q.  And does the FOP also have an in-house lawyer?
24     A.  We do.
25     Q.  Who is that?

Sgt. Arley Flaherty

---

17

1    A.  Gene Gibbons and his partner -- I can't
2 remember -- Buschell, I think.
3    **Q.  Robert Buschell?**
4    A.  Yes.  Those are the --
5       MR. ELKINS:  Tim last name Buschell,
6    B-u-s-c-h-e-l-l.
7 BY MR. ELKINS:
8    **Q.  But who primarily handles the work for the FOP?**
9 **Is it Gene or Robert?**
10   A.  For the most part, it's Gene.  If he happens to be
11 dealing with another city, it's Rob.  But it's -- it's Gene.
12   **Q.  Okay.  And does Gene generally represent or work**
13 **with FOP employees on disciplinary matters like Last Chance**
14 **Agreements?**
15   A.  Yes, he does.
16   **Q.  Is he basically the designated FOP lawyer for**
17 **members of the FOP?**
18   A.  Yes, he is.
19   **Q.  Do FOP members, absent their dues -- I understand**
20 **they have to pay dues.  Put the dues aside.  Do they have to**
21 **pay any additional money for Gene's services?**
22   A.  No.
23   **Q.  And are FOP members allowed to also hire their own**
24 **private counsel?**
25   A.  Yes, they can.

---

18

1    **Q.  In addition to using Gene?**
2    A.  Yes.
3    **Q.  Does that happen frequently or do they usually use**
4 **Gene?**
5    A.  It's happened.
6    **Q.  So sometimes an employee could have two lawyers,**
7 **not one?**
8    A.  Exactly.
9    **Q.  Okay.  And does Gene generally work with employees**
10 **relating to the Settlement Agreements and Last Chance**
11 **Agreements?**
12   A.  Yes, he does.
13   **Q.  And have you had experience with that with other**
14 **employees?**
15   A.  Where they used Gene for that?
16   **Q.  Yes.**
17   A.  Yes.  Yes.
18   **Q.  Okay.  Do you know Jessica Guasto, or formerly**
19 **known as Jessica Salabarria, maybe currently known as**
20 **Jessica Salabarria.  It's unclear to me.  Her name changes**
21 **frequently.  But do you know her?**
22   A.  I do know her.
23   **Q.  How do you know her?**
24   A.  She was an employee here on the beach.
25   **Q.  And did you have an opportunity to interact with**

---

19

1 her while she was an employee at the beach?
2    A.  Yes, I did.
3    **Q.  Can you describe, generally speaking, your**
4 **interactions or base of knowledge about her?**
5    A.  It was obviously a -- a fellow officer, then a
6 fellow sergeant.  And then, during the -- while she was
7 going through her grievances, I was part of the FOP at that
8 time.
9    **Q.  Okay.  When you refer to "grievances," what are**
10 **you referring to?**
11   A.  I know she -- she's had multiple grievances, so I
12 was just aware of them.  I may not have been present at all
13 the ones that she had.
14       I also was involved -- they had given her an
15 opportunity at one time to, like, a mentoring program with
16 three other -- with three supervisors.  They wanted to have
17 three female supervisors.  But it never got to where she was
18 with me.  I think she only had one, and then she no longer
19 completed the mentoring program.
20   **Q.  Well, tell me -- tell me about the mentoring**
21 **program.  What was the basis of that, the genesis of it,**
22 **when was it?**
23   A.  This was one of the times that -- or I think the
24 only time -- I don't recall -- when she was no longer a
25 sergeant.  I think she got to become a sergeant again and

---

20

1 they were giving her the opportunity to be with other
2 sergeants and lieutenants, you know, to maybe guide her.  I
3 guess that's what the Chief at the time had in mind.
4    **Q.  Okay.  Who was the chief at the time?**
5    A.  It was Dan Oats.
6    **Q.  Okay.  So it was the Chief before Chief Clements,**
7 **correct?**
8    A.  Correct.
9    **Q.  And was Dan Oats the Chief at the time that**
10 **Jessica was promoted to sergeant, and then ultimately**
11 **demoted, and then reinstated?**
12   A.  I -- I don't recall.
13   **Q.  Okay.  That's fine.**
14       **What was your understanding about this mentoring**
15 **program and how it worked and what was supposed to happen?**
16   A.  My understanding is that they wanted to give her
17 an opportunity to -- she hadn't been a sergeant for a while,
18 so it was to get, you know, back into the swing of things.
19 And -- and they wanted her, I guess, you know, with a female
20 maybe so she felt more comfortable is what they had told me.
21       But like I said, she never got to shadow me.  I
22 guess that would be the best word.  And it was going to be
23 three females, but it never got to that.
24   **Q.  Well, what did it ultimately get to?**
25   A.  If I recall, she left to rehab.

---

Sgt. Arley Flaherty

21

1  Q.  She left to where?
2  A.  Rehab.
3  Q.  What kind of rehab?
4  A.  I don't necessarily -- I'm not sure what it is.
5  I'm going by hearsay.
6  Q.  Okay.  Well, based on hear -- what did you hear
7  about the rehab?
8  A.  Sex rehab.
9  Q.  For sex addiction?
10  A.  Yes.
11  Q.  Okay.  Is that common knowledge in the police
12  department that you're aware of?
13  A.  About a sex rehab or for her in particular?
14  Q.  Of Jessica in general.
15  A.  Yes.
16  Q.  And do you know why she had to go to sex rehab?
17  A.  I don't know if she elected or they told her.
18  It's just, she had a reputation in the department, I guess.
19  Q.  What was her reputation?
20  A.  That she had multiple partners here.
21  Q.  Multiple as in many?
22  A.  Yes.
23  Q.  And was that a reputation amongst non-management
24  employees, i.e. employees of the rank of lieutenant and
25  below, which you of course are?

22

1  A.  Yes, everyone.
2      MR. BARROUKH:  Objection to form.
3  BY MR. ELKINS:
4  Q.  You can answer the question.  You may hear
5  opposing counsel object to form.  That's fine.  You can --
6  you can still answer the question.  I'll rephrase the
7  question.
8      Based upon your knowledge, was that reputation
9  known amongst non-management employees, i.e. the rank of
10  lieutenant and below?
11  A.  Yes, everyone.
12  Q.  And what is your -- what is your understanding of
13  the basis for that reputation?
14  A.  Can you be a little bit -- I'm not sure what
15  you're asking.
16  Q.  What is your understanding of how Jessica earned
17  that reputation?
18  A.  That she was sleeping around with multiple people
19  in the organization.
20  Q.  Okay.  Are you aware of her podcasts that she had
21  regarding her particular relationships?
22  A.  I did see one that they showed me.
23  Q.  Okay.  Well, first of all, who is "they"?
24  A.  Just, it was officers that happened to have seen
25  it in my unit and they just showed it to me.

23

1  Q.  You mean heard it.  Because it was a podcast?
2  A.  Correct.
3  Q.  Okay.  And what did you hear on the podcast?
4  A.  It was just --
5      MR. BARROUKH:  Object.  Form.
6      THE WITNESS:  -- women talking.  I think that day
7  they were talking about the beach, if I'm -- if I'm not
8  mistaken.
9  BY MR. ELKINS:
10  Q.  "They," being her and her then boyfriend/future
11  husband/now ex-husband, Nicholas Guasto?
12  A.  It was Nicholas, yes, her and Nicholas.  It was
13  like a type of talking back and forth.
14  Q.  On a podcast that the world could hear?
15  A.  Correct.
16  Q.  And they were talking about City of Miami Beach
17  and the police department, correct?
18  A.  That particular day I only heard -- they were
19  talking about something with the beach.
20  Q.  But you don't remember the details of it?
21  A.  No, sir.
22  Q.  Did you ever have an occasion to supervise
23  Jessica?
24  A.  I did not.
25  Q.  Are you familiar with the relationship between

24

1  Jessica and Lieutenant Steven Cosner?
2  A.  Yes.
3  Q.  And what is your understanding based on your
4  knowledge of that relationship?
5  A.  It -- it -- once again, it's -- it was hearsay
6  that they were together, they were always seen together,
7  riding together, so it was common knowledge that they were
8  together.
9  Q.  And by common knowledge that they were together,
10  do you mean common knowledge that they were sleeping
11  together?
12  A.  It was -- it was said that they were a couple,
13  yes.
14  Q.  And this goes back to approximately, like, 2014 or
15  '15; does that sound about right, or maybe longer even?
16  A.  I -- I don't recall the -- the time.
17  Q.  Do you have any information about how that
18  relationship ended or why it ended?
19  A.  No, I don't.
20  Q.  Do you have any information or knowledge about the
21  other people in the department that Jessica has slept with?
22  A.  A few.
23  Q.  Okay.  What information do you have on that?
24  A.  You just have the typical guy who either said
25  he -- you know, he was with her one time or you have the

25

1 ones who knew about somebody else. You have the ones that
2 say why certain officers left was because of their
3 relationship with Jessica, so --
4     **Q. Do you have information about officers who left**
5 **the City of Miami Beach due to their relationship with**
6 **Jessica?**
7     A. That was what was said, that the officers who left
8 were because the relationship they had with her.
9     **Q. What specific information do you have on that?**
10     A. Either that their wives had caught them or they
11 themselves got jammed up here, things like that.
12     **Q. Do you remember approximately how many officers**
13 **that was that you were aware of?**
14     A. That left? I could only recall two.
15     **Q. And who were they?**
16     A. I only know one's name, which was Estevez. I
17 don't recall the other one's name.
18     **Q. Do you know Estevez's full name?**
19     A. I can't remember right now.
20     **Q. Did you ever -- have you ever had any personal**
21 **issues -- any issues between you and Jessica directly?**
22     A. I -- I haven't, but it was told to me she didn't
23 care for me, so --
24     **Q. Who told you that?**
25     A. Huh?

26

1     **Q. Who told you that?**
2     A. Just, for example, the times when I would try to
3 go, you know, represent her, because I was FOP, it would be,
4 you know, either the President would tell me, hey, she said
5 she doesn't want you in there, but I had to be in there. I
6 mean, I was part of the grievance committee. I was part of
7 the board.
8     **Q. Are you -- are you referring to the January 2021**
9 **meeting --**
10     A. Yes.
11     **Q. -- with Chief Clements?**
12     A. Yes.
13     **Q. Okay. We are going to get to that --**
14     A. Oh, okay.
15     **Q. We are going to get to that pretty shortly here.**
16 **Because again, I don't want to keep you too long.**
17     A. Okay.
18     **Q. So we are going to get to that.**
19     But other than that January meeting, did you have
20 any other occasion to represent Jessica as a member of the
21 FOP?
22     A. No.
23     **Q. And you never supervised her?**
24     A. I did not supervise her.
25     **Q. So you never issued any discipline to her?**

27

1     A. I have not issued any discipline to her.
2     **Q. And just to button that up, you've never written**
3 **her up, given her a verbal reprimand, recommend her for**
4 **suspension, recommended her for termination, nothing like**
5 **that?**
6     A. No, I have not.
7     **Q. Never done a personnel -- never done an evaluation**
8 **on her, correct?**
9     A. No.
10     **Q. You've never had any input into an evaluation -- a**
11 **personnel evaluation?**
12     A. No.
13     **Q. Have you ever had -- excluding January 2021, have**
14 **you ever had any input into any other discipline with her**
15 **prior to January 2021?**
16     A. Like I said, she had other grievances. I was
17 aware of them, but it was just discussed within the
18 grievance committee. It's not like I had any decisions. It
19 was amongst everybody.
20     **Q. And in the past, prior to January 2021, have the**
21 **FOP ever denied a grievance for Jessica; in other words,**
22 **refused to bring her grievances forward?**
23     A. Not that I'm aware of.
24     **Q. Okay. So let's talk about January of 2021. So**
25 **you were -- you were part of a meeting, I believe that**

28

1 occurred on -- let me double-check this. January -- hold
2 on. Nineteenth. Do you recall that? January 19th, 2021.
3 It was a meeting where Wayne was there, the Chief, Paul,
4 Reggie, Eldon, Cosner. Do you recall that meeting?
5     A. I -- is that the last chance meeting?
6     **Q. We can call it the last chance meeting, sure.**
7     A. Yes, I was there.
8     **Q. Give me -- I just need to change the labels on a**
9 **few things here. One second. All right.**
10     Well, first of all, before we get to that, how did
11 it -- how did it come up that you were at that meeting?
12     A. So for two reasons: One, because I was the Vice
13 President at the time, I -- I -- what year was it?
14     **Q. 2021.**
15     A. Yes. So I was Vice President. But we also made
16 sure that if -- and not just for her, if there was a female
17 involved in any type of grievance or any type of meeting,
18 just so they could feel comfortable, we felt that it was,
19 you know, to have another female in there with them, so --
20     **Q. Now, prior to this January 2021 meeting, did you**
21 **have any involvement with Jessica in any of her other**
22 **grievances other than being on the grievance committee?**
23     A. Yeah, that was it.
24     **Q. Okay. So this 2021 meeting, this was your first,**
25 **we'll call it "foray" into any of the issues that Jessica**

29

1  was having with the police department at that time, correct?
2      A.  That I was present.  Because I was obviously aware
3  of all her other ones.  I was present at this one.
4      Q.  Were you and the other FOP members called to Chief
5  Clements' office in advance of the meeting with Jessica?
6      A.  Yes, we did go before.
7      Q.  Okay.  And did you have -- did you and other FOP
8  grievance committee members and the President, did you have
9  a chance to talk to the Chief before the meeting?
10     A.  Yes, we did.
11         MR. BARROUKH:  Objection.  Form.
12         MR. ELKINS:  What's the form objection with that
13     question?  I asked her if they had a chance to talk to
14     the Chief.  What's the form problem with that question?
15         MR. BARROUKH:  Are you asking --
16         MR. ELKINS:  I didn't ask what they said.  I just
17     asked her based on her knowledge, did they have a
18     conversation with the Chief before the -- before the
19     meeting.  What's the form issue with that question?
20         MR. BARROUKH:  I believe it's vague as to asking
21     if they spoke with the Chief separately from her --
22     from Sergeant Flaherty there as well as speaking with
23     Sergeant Flaherty there.
24         MR. ELKINS:  That's nonsense.  I asked her if her
25     and the FOP collectively had a chance to speak with the

30

1  Chief.  So again, I ask, what's the form issue?  Is it
2  a compound question?
3         MR. BARROUKH:  I stated the form issue is vague.
4         MR. ELKINS:  Okay.
5         MR. BARROUKH:  The question was vague.
6  BY MR. ELKINS:
7      Q.  The question is the same.  You can answer it.  Did
8  you and/or the FOP grievance committee members have an
9  occasion to talk to the Chief in advance on the day of this
10 January 19th, 2021 meeting?
11     A.  Yes, we did.
12     Q.  What did you guys talk about?
13     A.  He just advised about how she had violated the --
14 the Last Chance Agreement and that they were going to bring
15 her up so that she was told.
16     Q.  Did he tell you that any decisions had been made
17 with respect to her prior to the meeting?
18     A.  Yes, that she was going to be terminated because
19 of the Last Chance Agreement that she violated.
20     Q.  Okay.  Did he ask you whether you agreed with the
21 termination or not, or did he indicate that, you know, you
22 were being called in there to represent her?
23     A.  We were there to represent us, so that's why he
24 had us there.
25     Q.  Okay.  So the Chief had told you in advance of the

31

1  January 19, 2021 meeting that it was his belief she violated
2  her Last Chance Agreement, and so she was going to be
3  terminated?
4      A.  Correct.
5      Q.  But was he going to give her a chance to explain
6  herself prior to the termination?
7      A.  Yes.
8      Q.  Do you know if the Chief was required to even give
9  her a chance to explain herself given the Last Chance
10 Agreement?
11     A.  No, he's not.
12     Q.  He could have just fired her without any
13 explanation from her, correct?
14     A.  Correct.
15     Q.  She was effectively an employee-at-will at that
16 point, correct?
17     A.  Yes, she was.  Yes.
18     Q.  Was the Chief doing her, like, a favor by asking
19 -- by trying to get an explanation from her?
20     A.  I wouldn't be able to tell you.  I would imagine.
21     Q.  Okay.  But at that time, the FOP -- you and your
22 fellow FOP grievance committee members, including the
23 President, the First Vice President and the Second Vice
24 President, all were present and the Grievance Chair -- you
25 were the First Vice President at the time -- you were all

32

1  aware of the Last Chance Agreement, correct?
2      A.  Yes, we were.
3      Q.  You were aware that the Chief had no obligation to
4  talk to her before terminating her?
5      A.  Correct.
6      Q.  Okay.  Is it common that sometimes prior to a
7  meeting with the bargaining unit member, that the union
8  representatives will be called to go to the supervisor
9  before the meeting?  Does that happen?
10     A.  I didn't understand what you said.  I'm sorry.
11     Q.  Yeah, that's fine.  So you and your fellow FOP
12 members were with the Chief before the meeting, correct?
13     A.  Correct.
14     Q.  That -- in terms of other meetings, other
15 disciplinary matters, is it common that sometimes the FOP
16 representatives will be at the meeting before the rank and
17 file employee, like, in advance?
18     A.  Yes, yes.  Yes, it is.
19     Q.  And is that because the City sometimes has to have
20 the meeting quickly --
21         Sorry, my dog's barking in the background.
22         -- that sometimes the City has to do the meeting
23 quickly; and so, they'll -- they want to have a
24 representative present before the employee shows up?
25     A.  Yes.  It could be for that or, you know, let us

Sgt. Arley Flaherty

33

1   know so we could speak to her or him or whatever the
2   situation is before.
3       Q.  And also, to generally avoid any opportunity for
4   management to question an employee or even look like they're
5   talking to an employee without their representative?
6       A.  Absolutely.
7       Q.  So if the FOP representatives are present before
8   the meeting starts, that solidifies that there was never any
9   contact between management and rank and file in a
10  disciplinary meeting before then?
11      A.  Correct.
12      Q.  Before the meeting?
13      A.  Correct.
14      Q.  Okay.  So I'm going to show you what I'm going to
15  mark as Exhibit 1.
16          (Deposition Exhibit Number 1 marked for
17  identification.)
18  BY MR. ELKINS:
19      Q.  Are you able to see this document?
20      A.  I can.
21      Q.  Okay.  Give me one second.  Okay.  So this is a
22  memorandum written to Jessica from Chief Clements.  Have you
23  ever seen this before?
24      A.  I probably did see it that day.  I just don't
25  recall it right now.

34

1       Q.  Okay.  And this outlines essentially what happened
2   in this meeting and who was present?
3       A.  Correct.
4       Q.  Okay.  So the first thing I want to do is talk
5   about who was present at the meeting.  It says here on
6   January 19th, 2021, I held a meeting with you to discuss the
7   allegations in the AEM.
8           That's the Allegation of Employee Misconduct filed
9   by Steven Cosner, which I presume you're familiar with?
10      A.  Yes.
11      Q.  Had you read that prior to the meeting?
12      A.  I had.
13      Q.  Okay.  And it says:  Present at the meeting was
14  Wayne Jones, who was at the time the Deputy Chief, Paul
15  Ozaeta, who was at the time the FOP President, who was the
16  Lieutenant, you, the FOP First Vice President, Reggie
17  Lester, the Second Vice President, Doug Brown, who is now a
18  Captain, but at the time was the Grievance Chair, Cosner --
19  Lieutenant Cosner, and A.J. Prieto, who at the time was the
20  Captain of Internal Affairs.  Do you see that?
21      A.  Yes, I do.
22      Q.  Is that an accurate list of who was present at the
23  meeting?
24      A.  Yes.
25      Q.  Let me ask you this:  Do bargaining unit employees

35

1   ordinarily have the FOP President, First Vice President,
2   Second Vice President and Grievance Chairman at their
3   meetings with management regarding discipline?  Is that
4   normal?
5       A.  So, like I said, it could have been done just with
6   the Second Vice President or just with me.  But I -- I was
7   -- I was the female involved, you know, to give her a sense
8   of -- of comfort.  And I do not recall if I was on the
9   grievance committee at the time or it was Reggie Lester.
10  That's why maybe he was there.  Definitely you needed the
11  Chairman of the grievance committee because he was the one
12  involved with the grievance.
13          But yeah, it could be -- it could be the whole
14  executive board or it could be three of us.  It's -- it's
15  never been, you know, an issue.
16      Q.  But is it common that a rank and file employee
17  would have the entire executive board of the FOP present for
18  a disciplinary meeting?  Is that normal or is that unique
19  based on your experience?
20      A.  It -- it could happen.
21      Q.  Okay.  Is it fair to say, though, that Jessica was
22  represented during this meeting?
23      A.  She was very represented.
24      Q.  Okay.  At any point in time in the meeting, do you
25  recall Jessica saying that she wanted an attorney there?

36

1       A.  No.
2       Q.  Did she request anybody to be there?
3       A.  Yes.
4       Q.  Who did she request to be there?
5       A.  She wanted her then husband/boyfriend, Guasto, to
6   come in with her.
7       Q.  Nicholas Guasto?
8       A.  Correct.
9       Q.  And do you remember what his rank was at the time?
10      A.  Officer.
11      Q.  Okay.  So he wasn't a supervisor of any kind?
12      A.  No.
13      Q.  Did he have any kind of role in the FOP besides
14  being a member?
15      A.  I do not recall if at that time he did or he did
16  not.
17      Q.  Okay.  What was the -- what happened with her
18  request to have her husband present?
19      A.  It was denied.
20      Q.  Who denied it?
21      A.  The Chief.
22      Q.  Okay.  And did you see any problem?  Was there any
23  problem with the Chief denying her request to have her
24  husband there?
25      A.  No.

37

1    Q.  Why not?
2    A.  Because he was also involved in a similar
3  allegation, so it would have -- it would have jeopardized
4  his grievance at the time.
5    Q.  I mean, does she generally have a right, though,
6  to have her husband present at disciplinary meetings in
7  general?
8    A.  It's never been a common practice, so I wouldn't
9  be able to answer.  But he -- because he had a similar
10  allegation, it just -- it would have been a conflict of
11  interest, I guess would be the best word.
12    Q.  Was the fact that he wasn't there, did that cause
13  her to have any less representation?
14    A.  Not at all.
15    Q.  At the end of the day, she still had the
16  President, the First Vice President, the Second Vice
17  President and the Grievance Chairman all present, correct?
18    A.  That's correct.
19    Q.  Plus a female, being you, correct?
20    A.  Yes.
21    Q.  Okay.  Was -- at any point in the meeting was
22  Jessica told by the Chief or anyone else that if she gets up
23  and leaves, she'll be fired?
24    A.  No.
25    Q.  What is your recollection of what happened in this

38

1  meeting?
2    A.  My recollection is they went over the -- the
3  allegations that had been made by -- the reprimand by
4  Lieutenant Cosner at the time.  They gave her an opportunity
5  to explain; in other words, counter the allegations.
6        And then, the next thing I recall is the then
7  Internal Affairs commander, which was Prieto, pretty much,
8  you know, just went line by line, everything she was
9  countering and said, you know, all his proof and his
10  findings to -- to show that she was -- she was not being
11  truthful.
12    Q.  Okay.  Now, did you have a chance to review any
13  findings from Captain Prieto or anybody else?
14    A.  I -- I personally don't remember.  But I think the
15  President did.
16    Q.  Okay.  But did -- did you not look at Cosner's
17  allegation and -- and what he had alleged and what she had
18  said and how that played out?
19    A.  Yes, I did -- I did see it.
20    Q.  What was your conclusion about that, if anything?
21    A.  He had done his homework.  He had all his -- he
22  had all his backing also, pretty much similar to what the
23  Internal Affairs, who has a little bit more access than he
24  does, to -- to, like, key cards and entries.  But what he
25  was capable of -- of finding out himself contradicted what

39

1  she was alleging that she hadn't done.
2    Q.  At any point in time in this meeting, did you or
3  any other member of the FOP tell the City that this was an
4  improper interrogation under Chapter 112?
5    A.  No.
6    Q.  I'm sorry?
7    A.  No.
8    Q.  And do -- do you know if Reggie Lester said that?
9    A.  I don't recall, but no.
10    Q.  Okay.  Did you believe that there was any improper
11  interrogation going on at this meeting?
12    A.  No, there wasn't.
13    Q.  If there was an improper interrogation going on,
14  would you have said something?
15    A.  Absolutely.
16    Q.  Are you familiar with the Police Officer Bill of
17  Rights and how Chapter 112 works?
18    A.  As best as I can, yes.
19    Q.  You're certainly with familiar with the idea that
20  if an officer is going to be interrogated, there are certain
21  requirements, correct?
22    A.  Absolutely, yes.
23    Q.  But in your view, this particular meeting was
24  because of her Last Chance Agreement, correct?
25    A.  That's correct.

40

1    Q.  This is a meeting that the City didn't even have
2  to have with her; is that the FOP's viewpoint and yours?
3    A.  You broke up.  What was that?
4    Q.  And this was a meeting that the City didn't even
5  have to have with her; is that correct?
6    A.  That's correct.
7    Q.  And are you -- and assuming there was a 112
8  violation, how would that get dealt with with the FOP?
9    A.  The grievance, they would have stopped the -- the
10  interrogation, not the interrogation, the -- the meeting and
11  they would have immediately called Gene Gibbons and -- and
12  tried, you know, taken care of it.
13    Q.  Gene Gibbons, being the FOP lawyer, correct?
14    A.  Correct.
15    Q.  And are you familiar with the administrative
16  process to resolve alleged 112 violations?
17    A.  I haven't been involved in it, no.
18    Q.  Okay.  Understood.
19        So the move here for the FOP, be it the President,
20  First Vice President, Second Vice President or Grievance
21  Chair would have been to stop the meeting and call Gene
22  Gibbons?
23    A.  Correct.
24    Q.  Did anybody do that here?
25    A.  No.

Sgt. Arley Flaherty

41

1    Q.  At any point in time, did Jessica say in the
2  meeting that she thought this was an improper interrogation?
3    A.  No.
4    Q.  Okay.  Did you ask any questions of anybody in
5  this meeting?
6    A.  I did not.
7    Q.  You didn't ask any questions of Cosner?
8    A.  I asked Cosner a question in the meeting prior to
9  that meeting when we met with the Chief.
10   Q.  Before -- before --
11   A.  Before we met with -- before we met with -- before
12  we met with Jessica and everybody else.
13   Q.  Okay.  So let's go back to that.  One second.
14  Okay.  So let's go back to that.
15       On that same day, which was January 19th, prior to
16  the meeting where Jessica was President -- was present --
17   A.  Right.
18   Q.  -- you and -- and I believe Paul, Reggie, Delvin
19  -- let me get the other names here -- yeah, Paul, Reggie,
20  and Delvin all met with the Chief and Cosner before the
21  meeting?
22   A.  Correct.  I -- I don't recall who was in the room
23  at that time.  I know it was the Chief, myself, and Cosner.
24  I don't remember if every -- if the other board members had
25  gotten there yet.  But I was there, the Chief was there and

42

1  Cosner was there.
2    Q.  And what did you ask Cosner?
3    A.  I just asked him -- you know, I wanted to make
4  sure that this had nothing to do with any type of -- not --
5  I guess retaliation based on the, you know, the rumors about
6  their -- their relationship.
7    Q.  The rumors about their relationship from
8  approximately eight or nine years ago?
9    A.  Correct.
10   Q.  And what did he say?
11   A.  That's --
12   Q.  And what did he say?
13   A.  That's exactly what he said.  He said that it was
14  a very long time ago and that, no.  And then, that's when he
15  was telling us, you know, I -- I followed up.  I made sure,
16  you know, gave her the benefit of the doubt, but these are
17  my findings.
18       And that's when we saw his -- his write-up and all
19  his, you know, what he had done to -- to follow -- follow up
20  his allegations.
21   Q.  Which included talking to the officers that were
22  on duty that night about whether or not Jessica had actually
23  called them to tell them about the duty assignments,
24  correct?
25   A.  That's correct, yes.

43

1    Q.  At any point did the Chief or Cosner talk to you
2  about Jessica's 2020 EEOC charge; did that ever come up?
3    A.  No.
4    Q.  Are you aware at all of the City implementing her
5  voluntary resignation letter and finding a violation of her
6  Last Chance Agreement because either the Chief or Cosner or
7  some other decision-maker was retaliating against her for
8  filing a 2020 EEOC charge?
9    A.  No.
10   Q.  Did the 2020 EEOC charge even come up in the
11  meeting, either -- I think I asked you this, but I'll ask it
12  again -- either before you met with Jessica and everyone
13  from the City or during the meeting with Jessica?
14   A.  That I recall, no.
15   Q.  Have you heard anything in the department that the
16  City implemented her letter of resignation and found a
17  violation of her Last Chance Agreement because she filed a
18  2020 EEOC charge?
19   A.  No.
20   Q.  Were you even aware of the 2020 EEOC charge at the
21  time of the meeting?
22   A.  No.
23   Q.  Did she make you aware of it during the meeting?
24   A.  That I recall?  No.
25   Q.  Did she make you aware of it after the meeting?

44

1    A.  I don't think it was her.  I think it was just
2  talked about in general.
3    Q.  So why didn't the FOP file a grievance on
4  Jessica's behalf after she was terminated?
5    A.  Because part of her I guess settlement or her
6  grievance was she had that last chance.  There wouldn't have
7  been grounds for a grievance after the fact.
8    Q.  Did the FOP analyze -- you were the -- at the
9  time, the First Vice President, so I assume were part of the
10  conversations about whether a grievance was warranted,
11  correct?
12   A.  Correct.
13   Q.  And did the FOP analyze Jessica's situation
14  relative to her Last Chance Agreement and her Settlement
15  Agreement and the allegations against her to determine
16  whether or not it should file a grievance on her behalf?
17   A.  It was -- it was -- it was talked about.  But we
18  also obviously went to this attorney, you know, to get his
19  guidance.
20   Q.  Yeah.  I don't -- and I don't want to know what
21  you talked with the -- I don't want to invade the
22  attorney-client privilege of the FOP and its lawyer.
23   A.  Correct.
24   Q.  Because first of all, the lawyer is not here to
25  assert that privilege.  And obviously, Gene and I go way

45

1  back.  So don't tell me what you spoke to the lawyer about
2  or what he said.
3       Absent anything you talked about with Gene, did
4  the FOP grievance committee analyze whether or not there was
5  a valid grievance to file on behalf of Jessica relating to
6  her separation from employment?
7    A.  I believe they did do that.  The grievance
8  committee did that.
9    Q.  And were you part of that?
10   A.  I was part of it.
11   Q.  And what was --
12   A.  Not of the grievance committee, but as part of --
13  the Vice President, I was advised.
14   Q.  What was the conclusion that the FOP reached?
15   A.  That there wasn't merit for a grievance.
16   Q.  So did the FOP ultimately do anything after
17  Jessica's termination on her behalf?
18   A.  No.  No.
19   Q.  Is that because it determined there was no basis
20  for it?
21   A.  Correct.
22   Q.  Have you ever heard or were you aware of anybody
23  or of anybody indicating that Jessica's separation of her
24  employment was related to or because of or had anything to
25  do with her 2020 EEOC charge of discrimination?

46

1    A.  No.
2    Q.  Are you familiar with the allegations that she's
3  made in this lawsuit?
4    A.  I am not.
5    Q.  Are you familiar, though, that at least she's
6  alleging that the City retaliated against her and that her
7  termination was improper retaliation; are you at least
8  familiar with that?
9    A.  Yes.
10   Q.  And is that because we discussed it?
11   A.  Yes.
12       MR. ELKINS:  Just give me five minutes.  Let's
13  take a break for five minutes.  I might be done, but I
14  want to double-check some things.
15       THE WITNESS:  Okay.
16       MR. ELKINS:  I'll be right back.
17       (Recess was taken.)
18  BY MR. ELKINS:
19   Q.  I just have one or two more questions.
20       Are you aware of or have you heard of any sort of
21  agreement, plot, conspiracy between FOP executive board
22  members, like the President, you, grievance committee
23  people, the lawyers, and city management to essentially
24  railroad Jessica and terminate her no matter what she did?
25  Are you -- have you ever heard anything like that?

47

1    A.  No.
2       MR. BARROUKH:  Objection.  Compound.
3  BY MR. ELKINS:
4    Q.  You can answer.
5    A.  No.
6       MR. ELKINS:  Nothing further.
7       MR. BARROUKH:  I do have a few questions.  I'll
8  keep it quick.
9           CROSS EXAMINATION
10  BY MR. BARROUKH:
11   Q.  You mentioned, Sergeant Flaherty, that you were
12  aware of Steven Cosner's AEM; is that correct?
13   A.  Correct.
14   Q.  Did you read the AEM?
15   A.  I read it at the time.
16   Q.  Did you see if the AEM was signed?
17   A.  I don't recall right now.
18   Q.  Do you believe the AEM should be signed if it's
19  being filed?
20   A.  I -- it -- yes.
21   Q.  Do you believe there is a problem if an AEM is
22  filed without a signature from an officer?
23       MR. ELKINS:  Objection.
24       THE WITNESS:  Not necessarily.
25       MR. ELKINS:  Hold on.  Objection to form.

48

1       You can answer.
2  BY MR. ELKINS:
3    Q.  I didn't hear your response.  Could you please
4  restate it?
5    A.  It's happened where the officer was unable to sign
6  it.
7    Q.  And how is an AEM typically submitted?
8       MR. ELKINS:  Objection to form.
9       You can answer.
10       THE WITNESS:  Answer?
11       MR. ELKINS:  Yeah, you can answer.
12       THE WITNESS:  Usually all -- whoever writes it in
13  the -- the officer, everybody signs it all the way up
14  to where -- whatever level it's going to go to.
15  BY MR. ELKINS:
16   Q.  So the AEM typically follows the chain of command;
17  is that correct?
18   A.  Usually, yes.
19   Q.  And now, back to the January 19th, 2021 meeting.
20  Did the Chief tell you why she was being terminated?
21   A.  He had said that she had violated her Last Chance
22  Agreement.
23   Q.  And are meetings like this supposed to be
24  recorded?
25   A.  That I recall?  We've never recorded one.

Sgt. Arley Flaherty

49

1    **Q.  Do you normally record meetings regarding**
2  **grievances at the police department?**
3    A.  None that I've been involved in, no.
4    MR. BARROUKH:  All right.  Thank you.  That's all
5  I have.
6    THE WITNESS:  That's it?
7    MR. ELKINS:  I have a few followups from that.
8    THE WITNESS:  Okay.
9    REDIRECT EXAMINATION
10  BY MR. ELKINS:
11    **Q.  The fact that -- I think you testified earlier**
12  **that -- that it does happen that AEMs sometimes don't get**
13  **signed, correct?**
14    A.  Correct.
15    **Q.  Does the fact that it wasn't signed invalidate the**
16  **contents or the facts contained in the AEM?**
17    A.  No.
18    **Q.  Was the AEM reviewed by the FOP grievance**
19  **committee?**
20    A.  Yes.
21    **Q.  Was the AEM reviewed by the top FOP executives?**
22    A.  Yes.
23    **Q.  Was the AEM reviewed by the Chief based on your**
24  **knowledge?**
25    A.  Yes.

50

1    **Q.  Was the AEM reviewed by City police management**
2  **based upon your knowledge?**
3    A.  I would imagine, yes.
4    MR. ELKINS:  Nothing further.
5    Tim, we are going to order a mini.  I just want a
6  mini.  And why don't I drop the exhibit in the chat for
7  you, if that will work?
8    THE REPORTER:  Wonderful.
9    Sergeant, do you know if you'd like to read or
10  waive this transcript?
11    THE WITNESS:  I'll read.
12    THE REPORTER:  Wonderful.
13    Daniel, would you like a copy?
14    MR. BARROUKH:  We'll hold off on a copy for now,
15  but I'll let you know.
16    THE REPORTER:  Wonderful.
17    Michael, go ahead and send me that.
18    (Deposition concluded at 10:12 A.M.)
19
20
21
22
23
24
25

51

1    CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4    I, TIMOFEY GARBUZ, Notary Public, State of Florida,
5  certify that SGT. ARLEY FLAHERTY personally appeared before
6  me via Zoom on the 28th day of March 2024 and was duly
7  sworn.
8    Signed this 28th day of March 2024.
9
10    _____
    TIMOFEY GARBUZ
11    Notary Public
    State of Florida
12    My Commission #HH 284028
    Expires July 5, 2026
13
14
15
16
17
18
19
20
21
22
23
24
25

52

1    REPORTER'S DEPOSITION CERTIFICATE
2
    STATE OF FLORIDA   )
3
    COUNTY OF PALM BEACH)
4
5    I, TIMOFEY GARBUZ, Court Reporter, certify that I was
    authorized to and did report the Deposition of SGT. ARLEY
6  FLAHERTY; that a review of the transcript was requested; and
    that the foregoing transcript, pages 1-50, is a true and
7  complete record of my stenographic notes.
8    I FURTHER CERTIFY that I am not a relative,
    employee, attorney or counsel of any of the parties,
9  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
10  financially interested in the action.
11    DATED this 14th day of April 2024.
12
13
14
    _____
15    TIMOFEY GARBUZ
    COURT REPORTER
16
17
18
19
20
21
22
23
24
25

Sgt. Arley Flaherty

53

1         E R R A T A   S H E E T
2   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES
3   IN RE:      GUASTO V CITY OF MIAMI BEACH
           CASE NO:     1:22-cv-21004-DPG
4   DATE:        MARCH 28, 2024
     DEPONENT NAME: SGT. ARLEY FLAHERTY
5
6   PAGE/LINE     CORRECTION          REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17           (Use other side if necessary)
18      Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated are true.
19
20   _____     _____
     SGT. ARLEY FLAHERTY              DATE
21
22
23
24
25

54

1   DATE:  MARCH 28, 2024
2   SGT. ARLEY FLAHERTY
     ARLEYFLAHERTY@MIAMIBEACHFL.GOV
3
     IN RE:  GUASTO V CITY OF MIAMI BEACH
4
5        Deposition of Arley Flaherty
6        This letter is to advise you that the transcript
     taken in the above-referenced deposition has been
7   transcribed.  Please contact our office at (954)523-5326 to
     make arrangements to read and sign or sign below to waive
8   review of the transcript.
9        It is suggested that the review of this transcript
     be completed within 30 days of your receipt of this letter
10  as considered reasonable under Federal Rules*; however,
     there is no Florida Statute to this regard.
11
         The original of this transcript has been forwarded
12  to the ordering party and your errata, once received, will
     be forwarded to all ordering parties for inclusion in the
13  transcript.
14  Very truly yours,
15
16  Timofey Garbuz, Court Reporter
17  Waiver:
18  I, _____, hereby waive the reading and signing
19  of my deposition transcript.
20  _____     _____
     DEPONENT                        DATE
21
22  *Federal Civil Procedure Rule 30(e)Florida Civil Procedure
     Rule 1.310(e).
23
24
25

**A**

**A-r-l-e-y** 5:6
**A.J** 34:19
**A.M** 1:15,15
   50:18
**ability** 16:9
**able** 6:10 31:20
   33:19 37:9
**above-referen...**
   54:6
**absent** 17:19
   45:3
**Absolutely** 33:6
   39:15,22
**access** 38:23
**accurate** 34:22
**accurately** 6:7
**action** 52:9,10
**actual** 8:7
**addiction** 21:9
**addition** 18:1
**additional** 17:21
**administrative**
   40:15
**advance** 29:5
   30:9,25 32:17
**advise** 54:6
**advised** 30:13
   45:13
**AEM** 34:7 47:12
   47:14,16,18,21
   48:7,16 49:16
   49:18,21,23
   50:1
**AEMs** 49:12
**Affairs** 34:20
   38:7,23
**affirm** 4:13
**ago** 42:8,14
**agreed** 2:17
   30:20
**agreement** 13:6
   13:8,11,14
   15:5,9,15,18
   16:8,17 30:14

30:19 31:2,10
32:1 39:24
43:6,17 44:14
44:15 46:21
48:22
**agreements**
   15:20,23 16:6
   16:14 17:14
   18:10,11
**ahead** 4:7 50:17
**ahs** 6:22
**allegation** 34:8
   37:3,10 38:17
**allegations** 7:19
   16:2 34:7 38:3
   38:5 42:20
   44:15 46:2
**alleged** 38:17
   40:16
**alleging** 39:1
   46:6
**allow** 6:2
**allowed** 17:23
**amount** 14:19
**analyze** 44:8,13
   45:4
**and/or** 30:8
**answer** 6:10,12
   22:4,6 30:7
   37:9 47:4 48:1
   48:9,10,11
**answers** 6:21
**anticipate** 6:9
**anybody** 36:2
   38:13 40:24
   41:4 45:22,23
**APPEARANC...**
   2:1
**appeared** 51:5
**APPEARING**
   2:5,11
**appreciate** 5:3
**approximately**
   24:14 25:12
   42:8

**approximation**
   7:8
**April** 52:11
**area** 9:10
**Arley** 1:13 3:3
   4:19 5:6 51:5
   52:5 53:4,20
   54:2,5
**ARLEYFLA...**
   54:3
**arrangements**
   54:7
**aside** 17:20
**asked** 7:9 29:13
   29:17,24 41:8
   42:3 43:11
**asking** 7:6 8:7,8
   22:15 29:15,20
   31:18
**assert** 44:25
**assignments**
   10:16 42:23
**Assistant** 9:23
   10:3
**assume** 44:9
**assuming** 40:7
**attorney** 35:25
   44:18 52:8,9
**Attorney's** 9:7
**attorney-client**
   44:22
**audible** 6:21
**August** 9:18
**authorized** 52:5
**avoid** 33:3
**aware** 15:13
   19:12 21:12
   22:20 25:13
   27:17,23 29:2
   32:1,3 43:4,20
   43:23,25 45:22
   46:20 47:12

**B**

**B** 2:2 3:8

**B-u-s-c-h-e-l-l**
   17:6
**back** 8:20 9:8
   11:18 20:18
   23:13 24:14
   41:13,14 45:1
   46:16 48:19
**background**
   9:16 32:21
**backing** 38:22
**bargained** 13:11
**bargaining**
   10:22 13:6,8,9
   15:5,8,15 16:8
   32:7 34:25
**barking** 32:21
**Barroukh** 2:2
   3:5 4:9,9 22:2
   23:5 29:11,15
   29:20 30:3,5
   47:2,7,10 49:4
   50:14
**base** 19:4
**based** 7:6 16:1
   21:6 22:8 24:3
   29:17 35:19
   42:5 49:23
   50:2
**basically** 16:6
   17:16
**basis** 19:21
   22:13 45:19
**beach** 1:9 4:12
   5:9 8:13 18:24
   19:1 23:7,16
   23:19 25:5
   52:3 53:3 54:4
**behalf** 2:5,11
   4:11 44:4,16
   45:5,17
**belief** 31:1
**believe** 13:14
   27:25 29:20
   39:10 41:18
   45:7 47:18,21

**benefit** 42:16
**best** 16:2 20:22
   37:11 39:18
**bike** 9:3,3
**Bill** 39:16
**bit** 5:19 6:1 9:5
   12:16 22:14
   38:23
**board** 11:10,11
   13:21,23 26:7
   35:14,17 41:24
   46:21
**boyfriend/fut...**
   23:10
**break** 7:1,2
   46:13
**breath** 6:11
**BRICKELL** 2:3
**brief** 8:25
**bring** 13:22 14:9
   14:10 27:22
   30:14
**broke** 40:3
**BROWARD**
   51:3
**Brown** 34:17
**Buschell** 17:2,3
   17:5
**button** 27:2
**by-laws** 11:21

**C**

**C** 4:1
**call** 9:9 28:6,25
   40:21
**called** 15:6,18
   29:4 30:22
   32:8 40:11
   42:23
**capable** 38:25
**capacities** 11:12
   11:13
**Captain** 10:6
   11:2 34:18,20
   38:13

cards 38:24
care 25:23 40:12
case 1:6 5:20
    7:18 16:20
    53:3
cases 5:23 15:24
caught 25:10
cause 15:6 16:9
    37:12
certain 13:9
    14:19 25:2
    39:20
certainly 39:19
CERTIFICATE
    51:1 52:1
certify 51:5 52:5
    52:8
chain 48:16
Chair 31:24
    34:18 40:21
Chairman 16:19
    16:20,21 35:2
    35:11 37:17
chance 15:18,20
    15:25 16:1,3,6
    16:13,17 17:13
    18:10 28:5,6
    29:9,13,25
    30:14,19 31:2
    31:5,9,9 32:1
    38:12 39:24
    43:6,17 44:6
    44:14 48:21
chances 16:5
change 28:8
changes 9:21
    18:20 53:2
Chaplain 12:20
Chapter 39:4,17
characterizati...
    16:11
charge 16:19
    43:2,8,10,18
    43:20 45:25
chat 50:6

check-in 14:15
chief 9:22,23
    10:3 14:21
    20:3,4,6,6,9
    26:11 28:3
    29:4,9,14,18
    29:21 30:1,9
    30:25 31:8,18
    32:3,12 33:22
    34:14 36:21,23
    37:22 41:9,20
    41:23,25 43:1
    43:6 48:20
    49:23
city 1:9 4:12
    8:13,22 12:23
    16:8 17:11
    23:16 25:5
    32:19,22 39:3
    40:1,4 43:4,13
    43:16 46:6,23
    50:1 53:3 54:4
City's 13:12
CityCenter 9:11
civil 5:19 54:21
    54:21
clarify 6:25
clearer 5:19
Clements 3:10
    20:6 26:11
    33:22
Clements' 29:5
Collective 13:6,8
    15:5,8,15 16:8
collectively
    29:25
come 28:11 36:6
    43:2,10
comfort 35:8
comfortable
    20:20 28:18
command 48:16
commander
    38:7
Commission

51:12
committee 11:10
    13:16,18,19,25
    14:4,25 26:6
    27:18 28:22
    29:8 30:8
    31:22 35:9,11
    45:4,8,12
    46:22 49:19
common 21:11
    24:7,9,10 32:6
    32:15 35:16
    37:8
complaint 7:20
complete 52:7
completed 19:19
    54:9
compound 30:2
    47:2
concluded 50:18
conclusion
    38:20 45:14
CONFEREN...
    1:16
confers 13:8
conflict 37:10
connected 52:9
considered
    54:10
consists 10:23
    13:19
conspiracy
    46:21
contact 33:9
    54:7
contained 49:16
contents 49:16
context 12:23
contract 13:2,5
contradicted
    38:25
conversation
    29:18
conversations
    44:10

copy 50:13,14
correct 8:3,14
    10:1,4,8,20,20
    10:21 11:1,25
    12:1,1 13:6,7,9
    13:10,13 15:11
    15:19 20:7,8
    23:2,15,17
    27:8 29:1 31:4
    31:13,14,16
    32:1,5,12,13
    33:11,13 34:3
    36:8 37:17,18
    37:19 39:21,24
    39:25 40:5,6
    40:13,14,23
    41:22 42:9,24
    42:25 44:11,12
    44:23 45:21
    47:12,13 48:17
    49:13,14
CORRECTION
    53:6
Cosner 24:1
    28:4 34:9,18
    34:19 38:4
    41:7,8,20,23
    42:1,2 43:1,6
Cosner's 38:16
    47:12
counsel 2:5,11
    2:18 4:3,7
    17:24 22:5
    52:8,9
counter 38:5
countering 38:9
COUNTY 51:3
    52:3
couple 24:12
course 21:25
court 1:3,18
    5:25 6:5,12,19
    14:13,14,15,19
    52:5,15 54:16
courthouse 9:12

COVID 14:17
criminal 5:23
Cross 3:5 47:9
current 11:6
currently 5:8
    11:8 18:19

_____

D

D 3:1 4:1
Dan 20:5,9
Daniel 2:2 4:9
    50:13
DANIELB@D...
    2:5
date 1:14 11:23
    53:4,20 54:1
    54:20
DATED 52:11
day 6:13 14:16
    14:24 23:6,18
    30:9 33:24
    37:15 41:15
    51:6,8 52:11
days 54:9
dealing 17:11
deals 15:9
dealt 40:8
decide 13:21
decision-maker
    43:7
decisions 27:18
    30:16
declare 53:18
defendant 1:11
    2:11 4:12
Definitely 35:10
Delvin 41:18,20
demoted 20:11
denied 27:21
    36:19,20
denying 36:23
department 5:9
    8:12,13,22 9:1
    9:19 21:12,18
    23:17 24:21

29:1 43:15
49:2
**depending** 9:21
**depends** 9:23
**deponent** 2:19
53:4 54:20
**deposed** 5:12,19
5:22
**deposition** 1:13
2:19 3:9 6:20
7:13 33:16
50:18 52:1,5
54:5,6,19
**Deputy** 34:14
**DEREK** 2:2
**describe** 12:14
19:3
**description** 3:9
8:25
**designated**
17:16
**detached** 9:6
**detachments**
10:16
**details** 23:20
**detective** 10:18
**determination**
14:25
**determine** 14:5
44:15
**determined**
45:19
**different** 5:18
6:1 10:15
11:12
**Direct** 3:4 4:21
**directly** 25:21
**disciplinary**
12:24 14:10
17:13 32:15
33:10 35:18
37:6
**discipline** 13:1
14:11 16:10
26:25 27:1,14

35:3
**disciplined**
15:10
**discrimination**
45:25
**discuss** 34:6
**discussed** 27:17
46:10
**DISTRICT** 1:3
1:4
**DIVISION** 1:5
**document** 33:19
53:18
**dog's** 32:21
**doing** 31:18
**double-check**
28:1 46:14
**doubt** 42:16
**Doug** 34:17
**DRIVE** 2:3
**drop** 50:6
**due** 25:5
**dues** 17:19,20,20
**duly** 4:20 51:6
**duties** 10:16
**duty** 42:22,23

**E**

**E** 3:1,8 4:1,1
53:1,1,1
**earlier** 49:11
**earned** 22:16
**EEOC** 43:2,8,10
43:18,20 45:25
**effectively** 31:15
**eight** 42:8
**either** 24:24
25:10 26:4
43:6,11,12
**Eldon** 28:4
**elected** 21:17
**Elkins** 2:8 3:4,6
4:6,11,11,22
17:5,7 22:3
23:9 29:12,16

29:24 30:4,6
33:18 46:12,16
46:18 47:3,6
47:23,25 48:2
48:8,11,15
49:7,10 50:4
**employed** 5:8
8:21
**employee** 8:3
12:25 16:17
18:6,24 19:1
32:17,24 33:4
33:5 34:8
35:16 52:8,9
**employee-at-w...**
31:15
**employees** 10:22
10:23 11:2
12:24 13:9
17:13 18:9,14
21:24,24 22:9
34:25
**employment** 9:1
45:6,24
**ended** 24:18,18
**ensure** 11:22
**ENTER** 53:2
**entire** 35:17
**entries** 38:24
**enumerable**
5:16,23
**errata** 54:12
**especially** 14:16
**ESQ** 2:2,8
**essentially** 34:1
46:23
**establish** 16:9
**Estevez** 25:16
**Estevez's** 25:18
**evaluation** 27:7
27:10,11
**everybody** 27:19
41:12 48:13
**everybody's**
12:17

**ex-husband**
23:11
**exactly** 18:8
42:13
**Examination** 3:4
3:5,6 4:21 47:9
49:9
**example** 10:17
14:12 26:2
**excluding** 27:13
**executive** 8:7
11:10,11 13:20
13:23 35:14,17
46:21
**executives** 49:21
**exhibit** 3:10
33:15,16 50:6
**experience**
18:13 35:19
**Expires** 51:12
**explain** 31:5,9
38:5
**explanation**
31:13,19

**F**

**F-l-a-h-e-r-t-y**
5:7
**fact** 37:12 44:7
49:11,15
**facts** 49:16
53:18
**fair** 16:11 35:21
**familiar** 9:11
15:20 23:25
34:9 39:16,19
40:15 46:2,5,8
**familiarity**
15:22
**far** 10:1
**favor** 31:18
**February** 5:11
**Federal** 54:10
54:21
**feel** 14:11 28:18

**fellow** 19:5,6
31:22 32:11
**felt** 20:20 28:18
**female** 19:17
20:19 28:16,19
35:7 37:19
**females** 20:23
**file** 14:3 32:17
33:9 35:16
44:3,16 45:5
**filed** 34:8 43:17
47:19,22
**filing** 43:8
**financial** 11:22
**financially**
52:10
**finding** 38:25
43:5
**findings** 38:10
38:13 42:17
**fine** 5:2 7:1
20:13 22:5
32:11
**finish** 6:11
**fired** 31:12
37:23
**first** 4:20 6:5
7:12 8:8 11:14
11:15 12:3,4,5
12:11,12,18
13:21 14:21
22:23 28:10,24
31:23,25 34:4
34:16 35:1
37:16 40:20
44:9,24
**five** 9:14,15
46:12,13
**FL** 1:9
**Flaherty** 1:13
3:3 4:19,24 5:6
29:22,23 47:11
51:5 52:6 53:4
53:20 54:2,5
**Florida** 1:4,10

1:18 2:4,9 51:2
51:4,11 52:2
54:10
**follow** 42:19,19
**followed** 42:15
**follows** 4:20
48:16
**followups** 49:7
**FOP** 8:5,10
10:22 11:7
12:15,22 13:3
13:17 16:16,22
16:23 17:8,13
17:16,17,19,23
19:7 26:3,21
27:21 29:4,7
29:25 30:8
31:21,22 32:11
32:15 33:7
34:15,16 35:1
35:17 36:13
39:3 40:8,13
40:19 44:3,8
44:13,22 45:4
45:14,16 46:21
49:18,21
**FOP's** 40:2
**foray** 28:25
**foregoing** 52:6
53:18
**forgot** 6:17
16:20
**form** 22:2,5 23:5
29:11,12,14,19
30:1,3 47:25
48:8
**formerly** 18:18
**FORT** 2:9
**forth** 13:1 23:13
**Forty-eight** 8:18
**forward** 15:2
27:22
**forwarded**
54:11,12
**found** 43:16

**four** 9:14
**Fraternal** 8:14
**free** 6:25
**frequently** 18:3
18:21
**full** 5:4 12:16
25:18
**functioning**
14:16
**further** 47:6
50:4 52:8

**G**

**G** 4:1
**Garbuz** 1:17
51:4,10 52:5
52:15 54:16
**Gene** 17:1,9,10
17:11,12 18:1
18:4,9,15
40:11,13,21
44:25 45:3
**Gene's** 17:21
**general** 14:7
21:14 37:7
44:2
**generally** 9:20
9:22 10:15
12:22 14:25
16:7 17:12
18:9 19:3 33:3
37:5
**genesis** 19:21
**Gibbons** 17:1
40:11,13,22
**give** 4:14 6:20,21
7:8 8:25 12:16
15:14 20:16
28:8 31:5,8
33:21 35:7
46:12
**given** 16:1,3
19:14 27:3
31:9
**giving** 20:1

**go** 4:7 6:1 13:1
14:21 15:1
21:16 26:3
29:6 32:8
41:13,14 44:25
48:14 50:17
**God** 4:16
**goes** 14:23 24:14
**going** 6:1,9,13
6:17 11:20
12:6 19:7
20:22 21:5
26:13,15,18
30:14,18 31:2
31:5 33:14,14
39:11,13,20
48:14 50:5
**Good** 4:24,25
**gotten** 14:18
41:25
**grants** 9:11
**great** 6:6
**grievance** 13:15
13:16,18,19,25
14:4,25 15:1
16:21 26:6
27:18,21 28:17
28:22 29:8
30:8 31:22,24
34:18 35:2,9
35:11,12 37:4
37:17 40:9,20
44:3,6,7,10,16
45:4,5,7,12,15
46:22 49:18
**grievances** 14:2
14:5 19:7,9,11
27:16,22 28:22
49:2
**grieve** 16:9
**ground** 6:2
**grounds** 44:7
**GROUP** 2:2
**Guard** 12:20,20
**Guasto** 1:7 3:10

18:18 23:11
36:5,7 53:3
54:4
**Guasto's** 7:20
**guess** 7:8,9 16:2
20:3,19,22
21:18 37:11
42:5 44:5
**guidance** 44:19
**guide** 20:2
**guy** 24:24
**guys** 30:12

**H**

**H** 3:8 53:1
**handles** 17:8
**happen** 15:17
18:3 20:15
32:9 35:20
49:12
**happened** 18:5
22:24 34:1
36:17 37:25
48:5
**happens** 17:10
**head** 6:21
**hear** 21:6,6 22:4
23:3,14 48:3
**heard** 23:1,18
43:15 45:22
46:20,25
**hearsay** 21:5
24:5
**held** 34:6
**help** 4:16 14:2
**hey** 26:4
**HH** 51:12
**hierarchy** 9:19
**hire** 17:23
**history** 9:1
**hold** 6:11 28:1
47:25 50:14
**homework**
38:21
**hopefully** 6:2

**Huh** 25:25
**human** 9:5
14:23
**humanly** 6:3
**husband** 36:18
36:24 37:6
**husband/boyf...**
36:5
**husband/now**
23:11

**I**

**i.e** 16:8 21:24
22:9
**idea** 39:19
**identification**
33:17
**imagine** 31:20
50:3
**immediately**
40:11
**implemented**
43:16
**implementing**
43:4
**important** 7:24
**improper** 39:4
39:10,13 41:2
46:7
**in-house** 16:23
**included** 42:21
**including** 31:22
**inclusion** 54:12
**indicate** 30:21
**indicating** 45:23
**information**
24:17,20,23
25:4,9
**initial** 15:1
**injust** 14:12
**Inner** 12:19
**input** 27:10,14
**interact** 18:25
**interactions**
19:4

**interest** 13:24
37:11
**interested** 52:10
**internal** 12:14
34:20 38:7,23
**interrogated**
39:20
**interrogation**
39:4,11,13
40:10,10 41:2
**invade** 44:21
**invalidate** 49:15
**involved** 15:13
16:13,16 19:14
28:17 35:7,12
37:2 40:17
49:3
**involvement**
28:21
**issue** 29:19 30:1
30:3 35:15
**issued** 26:25
27:1
**issues** 12:24
25:21,21 28:25

**J**

**jammed** 25:11
**January** 26:8,19
27:13,15,20,24
28:1,2,20
30:10 31:1
34:6 41:15
48:19
**jeopardized**
37:3
**Jessica** 1:7 18:18
18:19,20 20:10
21:14 22:16
23:23 24:1,21
25:3,6,21
26:20 27:21
28:21,25 29:5
33:22 35:21,25
37:22 41:1,12

41:16 42:22
43:12,13 45:5
46:24
**Jessica's** 43:2
44:4,13 45:17
45:23
**Jones** 34:14
**July** 51:12

**K**

**keep** 26:16 47:8
**key** 2:3 38:24
**kind** 6:11 7:8
12:15 21:3
36:11,13
**knew** 25:1
**know** 5:21 14:15
14:16,20,22
18:18,21,22,23
19:11 20:2,18
20:19 21:16,17
24:25 25:16,18
26:3,4 28:19
30:21 31:8
32:25 33:1
35:7,15 38:8,9
39:8 40:12
41:23 42:3,5
42:15,16,19
44:18,20 50:9
50:15
**knowledge** 7:7
13:23 19:4
21:11 22:8
24:4,7,9,10,20
29:17 49:24
50:2
**known** 18:19,19
22:9

**L**

**L** 2:8,15
**labels** 28:8
**LAUDERDA...**
2:9
**laundering** 9:7

**LAW** 2:2,8
**lawsuit** 46:3
**lawyer** 16:23
17:16 40:13
44:22,24 45:1
**lawyers** 18:6
46:23
**leaves** 37:23
**left** 20:25 21:1
25:2,4,7,14
**Lester** 34:17
35:9 39:8
**let's** 11:16 27:24
41:13,14 46:12
**letter** 43:5,16
54:6,9
**level** 14:21 48:14
**lieutenant** 10:8
10:15,24 21:24
22:10 24:1
34:16,19 38:4
**lieutenants** 20:2
**line** 38:8,8
**list** 34:22
**little** 5:2,19 6:1
9:5 12:16
22:14 38:23
**local** 11:25
**lodge** 8:16 11:23
11:25
**long** 5:10 8:21
26:16 42:14
**longer** 19:18,24
24:15
**look** 14:8 33:4
38:16
**lot** 6:10

**M**

**Majors** 10:4
**management** 8:2
11:2 12:23
13:12 33:4,9
35:3 46:23
50:1

**March** 1:14 51:6
51:8 53:4 54:1
**mark** 33:15
**marked** 33:16
**matter** 4:14
14:10 46:24
**matters** 17:13
32:15
**mean** 11:25 23:1
24:10 26:6
37:5
**meeting** 26:9,19
27:25 28:3,4,5
28:6,11,17,20
28:24 29:5,9
29:19 30:10,17
31:1 32:7,9,12
32:16,20,22
33:8,10,12
34:2,5,6,11,13
34:23 35:18,22
35:24 37:21
38:1 39:2,11
39:23 40:1,4
40:10,21 41:2
41:5,8,9,16,21
43:11,13,21,23
43:25 48:19
**meetings** 32:14
35:3 37:6
48:23 49:1
**MELKINS@...**
2:10
**member** 8:5,6,7
8:8 11:8 13:4
13:22,25 26:20
32:7 36:14
39:3
**members** 13:20
14:1 17:17,19
17:23 29:4,8
30:8 31:22
32:12 41:24
46:22
**memorandum**

3:10 33:22
**mentioned** 47:11
**mentoring** 19:15
19:19,20 20:14
**merit** 14:5 15:1
45:15
**met** 41:9,11,11
41:12,20 43:12
**Miami** 1:5,9 2:4
4:12 5:9 8:13
23:16 25:5
53:3 54:4
**Michael** 2:8 4:11
50:17
**mind** 20:3
**mini** 50:5,6
**minutes** 46:12
46:13
**Misconduct** 34:8
**missing** 14:13,18
**mistaken** 23:8
**MLE** 2:8
**moment** 8:20
**money** 9:6 17:21
**morning** 4:24,25
**motors** 10:17
**move** 40:19
**multiple** 19:11
21:20,21 22:18
**MUNICIPAL...**
1:10

**N**

**N** 2:15 3:1 4:1
**name** 5:4,7 17:5
18:20 25:16,17
25:18 53:4
**names** 4:4,8
41:19
**narcotics** 9:4
**necessarily** 21:4
47:24
**necessary** 53:17
**need** 7:1 28:8
**needed** 35:10

never 19:17
20:21,23 26:23
26:25 27:2,7,7
27:10 33:8
35:15 37:8
48:25
Nicholas 23:11
23:12,12 36:7
night 5:2 42:22
nine 9:3 42:8
Nineteenth 28:2
nod 6:21
non-managem...
21:23 22:9
nonsense 29:24
normal 35:4,18
normally 49:1
NORTHEAST
2:9
Notary 1:18
51:4,11
notes 52:7
Number 3:10
8:16 33:16

**O**

O 2:15 4:1
O-301 2:3
OATH 51:1
Oats 20:5,9
object 22:5 23:5
objection 22:2
29:11,12 47:2
47:23,25 48:8
obligation 32:3
obviously 7:6
12:25 19:5
29:2 44:18,25
occasion 23:22
26:20 30:9
occasions 15:14
occurred 28:1
office 9:7 29:5
54:7
officer 10:12,14

10:18 14:3,5,9
15:9 19:5
36:10 39:16,20
47:22 48:5,13
officers 8:12
10:23 15:14
22:24 25:2,4,7
25:12 42:21
Oh 26:14
okay 4:24 5:22
6:3,4,14 7:5,12
7:17,19,24 8:2
8:10,25 11:5,9
11:13 14:7
15:8,22 17:12
18:9,18 19:9
20:4,6,13 21:6
21:11 22:20,23
23:3 24:23
26:13,14,17
27:24 28:24
29:7 30:4,20
30:25 31:21
32:6 33:14,21
33:21 34:1,4
34:13 35:21,24
36:11,17,22
37:21 38:12,16
39:10 40:18
41:4,13,14
46:15 49:8
once 9:8 24:5
54:12
one's 25:16,17
ones 14:2 19:13
25:1,1 29:3
opportunity
18:25 19:15
20:1,17 33:3
38:4
opposing 22:5
order 8:14 15:1
50:5
ordering 54:12
54:12

ordinarily 35:1
organization
22:19
organizational
12:15
original 54:11
Outer 12:20
outlines 34:1
Ozaeta 34:15

**P**

P 2:15 4:1
PAGE 3:2,9
PAGE/LINE
53:6
pages 52:6
PALM 52:3
part 9:4,15 11:9
11:11 13:22
16:21 17:10
19:7 26:6,6
27:25 44:5,9
45:9,10,12
particular 21:13
22:21 23:18
39:23
parties 2:18 52:8
54:12
parties' 52:9
partner 17:1
partners 21:20
party 54:12
patrol 9:2
Paul 28:3 34:14
41:18,19
pay 17:20,21
penalties 53:18
pending 7:2
people 6:7 22:18
24:21 46:23
Perfect 7:5 11:5
perjury 53:18
person 16:19
personal 7:7
25:20

personally 38:14
51:5
personnel 27:7
27:11
picked 14:2
picture 12:16
PLACE 1:16
PLAINTIFF 1:8
2:5
plaintiffs 4:10
played 38:18
please 4:4,7 5:5
48:3 54:7
PLLC 2:2
plot 46:21
Plus 37:19
podcast 23:1,3
23:14
podcasts 22:20
point 7:13 31:16
35:24 37:21
39:2 41:1 43:1
police 5:9 8:11
8:12,13,14,22
9:1,19,22
10:12,14,17,23
10:23 21:11
23:17 29:1
39:16 49:2
50:1
position 12:18
possible 6:3
potential 14:4
practice 37:8
present 19:12
29:2,3 31:24
32:24 33:7
34:2,5,13,22
35:17 36:18
37:6,17 41:16
President 11:15
12:3,4,5,11,12
12:12,13,18,18
12:19 13:21,21
26:4 28:13,15

29:8 31:23,23
31:24,25 34:15
34:16,17 35:1
35:1,2,6 37:16
37:16,17 38:15
40:19,20,20
41:16 44:9
45:13 46:22
presume 5:22
34:9
pretty 11:19
15:24,25 16:12
26:15 38:7,22
previous 11:9
previously 16:14
Prieto 34:19
38:7,13
primarily 17:8
prior 12:8 27:15
27:20 28:20
30:17 31:6
32:6 34:11
41:8,15
private 17:24
privilege 44:22
44:25
privy 15:24
probably 5:25
6:9 33:24
problem 29:14
36:22,23 47:21
procedure 13:15
54:21,21
proceed 4:18
process 14:7
40:16
program 19:15
19:19,21 20:15
promoted 9:8,17
9:18 20:10
proof 14:12,19
14:22 38:9
properly 14:15
prostitution 9:5
Public 1:18 51:4

51:11
**Put** 17:20

**Q**

**question** 5:18
6:12,25 7:2
22:4,6,7 29:13
29:14,19 30:2
30:5,7 33:4
41:8
**questions** 6:10
7:6 41:4,7
46:19 47:7
**quick** 47:8
**quickly** 6:3,10
32:20,23

**R**

**R** 4:1 53:1,1
**railroad** 46:24
**rank** 10:24
21:24 22:9
32:16 33:9
35:16 36:9
**RDAing** 9:10
**reached** 45:14
**read** 34:11 47:14
47:15 50:9,11
53:18 54:7
**reading** 2:19
54:18
**ready** 4:3,6
**real** 6:2
**REASON** 53:6
**reasonable**
54:10
**reasons** 28:12
**recall** 5:21 11:18
15:6,7 19:24
20:12,25 24:16
25:14,17 28:2
28:4 33:25
35:8,25 36:15
38:6 39:9
41:22 43:14,24
47:17 48:25

**receipt** 54:9
**received** 54:12
**Recess** 46:17
**recollection**
37:25 38:2
**recommend**
27:3
**recommended**
27:4
**record** 4:5,8 5:4
49:1 52:7
**recorded** 48:24
48:25
**recruitment**
9:16
**Redirect** 3:6
49:9
**refer** 19:9
**referring** 13:5
19:10 26:8
**refused** 27:22
**regard** 54:10
**regarding** 22:21
35:3 49:1
**Reggie** 28:4
34:16 35:9
39:8 41:18,19
**regular** 9:2
**rehab** 20:25
21:2,3,7,8,13
21:16
**reinstated** 20:11
**related** 45:24
**relates** 12:23
**relating** 18:10
45:5
**relationship**
23:25 24:4,18
25:3,5,8 42:6,7
**relationships**
22:21
**relative** 44:14
52:8,9
**remember** 12:17
17:2 23:20

25:12,19 36:9
38:14 41:24
**REMOTE** 1:16
**repeat** 6:25
**rephrase** 22:6
**report** 52:5
**REPORTED**
1:17
**reporter** 1:18
4:3,7,13,18 6:5
6:13,19 50:8
50:12,16 52:5
52:15 54:16
**REPORTER'S**
52:1
**represent** 4:4,8
12:25 13:3
17:12 26:3,20
30:22,23
**representation**
37:13
**representative**
16:16 32:24
33:5
**representatives**
16:18 32:8,16
33:7
**represented**
35:22,23
**represents** 8:11
**reprimand** 27:3
38:3
**reprimanded**
16:3
**reputation** 21:18
21:19,23 22:8
22:13,17
**request** 36:2,4
36:18,23
**requested** 52:6
**required** 31:8
**requirements**
39:21
**reserved** 2:20
**resignation** 43:5

43:16
**resolve** 40:16
**resolved** 14:23
**resources** 14:23
**respect** 30:17
**respective** 2:18
**response** 48:3
**restate** 48:4
**retaliated** 46:6
**retaliating** 43:7
**retaliation** 42:5
46:7
**review** 11:21,21
14:4 38:12
52:6 54:8,9
**reviewed** 49:18
49:21,23 50:1
**riding** 24:7
**right** 4:9 5:16,21
6:17,24 8:16
8:18 9:24 10:6
10:10,18,25
11:3 12:6
13:12,15 15:18
16:14 24:15
25:19 28:9
33:25 37:5
41:17 46:16
47:17 49:4
**rights** 13:9
15:14 16:7
39:17
**road** 9:8
**Rob** 17:11
**Robert** 17:3,9
**role** 11:6 12:2,22
36:13
**room** 41:22
**Rule** 54:21,22
**rules** 6:2 54:10
**rumors** 42:5,7
**running** 11:23
11:24
**runs** 9:20,22

**S**

**S** 2:15,15 3:8 4:1
53:1
**Salabarria**
18:19,20
**saw** 42:18
**saying** 35:25
**says** 15:25 34:5
34:13
**second** 4:23 6:17
6:18 12:13,18
15:4 28:9
31:23 33:21
34:17 35:2,6
37:16 40:20
41:13
**Secretary** 12:19
**see** 22:22 33:19
33:24 34:20
36:22 38:19
47:16
**seen** 22:24 24:6
33:23
**send** 50:17
**sense** 6:15 7:3
35:7
**separately** 29:21
**separation** 45:6
45:23
**sergeant** 4:13,24
9:17 10:10,14
10:17 19:6,25
19:25 20:10,17
29:22,23 47:11
50:9
**Sergeant-at-A...**
12:20
**sergeants** 20:2
**services** 17:21
**set** 13:1
**settlement** 18:10
44:5,14
**sex** 21:8,9,13,16
**SGT** 1:13 3:3
4:19 51:5 52:5

53:4,20 54:2
shadow 20:21
Shame 12:17
she'll 37:23
shortly 26:15
show 14:14,19
  14:22 33:14
  38:10
showed 22:22,25
shows 13:24
  32:24
side 53:17
sign 48:5 54:7,7
signature 47:22
signed 47:16,18
  49:13,15 51:8
signing 2:19
  54:18
signs 48:13
similar 37:2,9
  38:22
simple 6:2
sir 23:21
situation 33:2
  44:13
six 8:18 9:14
sleeping 22:18
  24:10
slept 24:21
SMITH 2:2
solidifies 33:8
somebody 13:23
  25:1
sorry 32:10,21
  39:6
sort 46:20
sound 24:15
SOUTHERN
  1:4
speak 7:12,15
  29:25 33:1
speaking 9:20
  10:15 12:22
  16:7 19:3
  29:22

specialized 9:12
specific 7:22
  25:9
specifically 7:9
spoke 29:21 45:1
squad 9:4
standard 15:10
start 11:16
started 9:2
starts 33:8
state 1:18 4:4,7
  5:4 9:7 51:2,4
  51:11 52:2
stated 30:3
  53:18
statements 4:14
  11:22
STATES 1:3
Statute 54:10
stenographic
  52:7
Steven 24:1 34:9
  47:12
stipulated 2:17
stop 40:21
stopped 40:9
Strike 8:18
structure 12:15
struggle 6:13
subject 16:17
submitted 48:7
suggested 54:9
SUITE 2:3
supervise 23:22
  26:24
supervised
  26:23
supervisor 9:16
  32:8 36:11
supervisors
  19:16,17
supposed 11:20
  11:23 20:15
  48:23
sure 5:6 11:19

21:4 22:14
  28:6,16 42:4
  42:15
suspension 27:4
swear 4:5,13,17
swing 20:18
sworn 4:20
  10:24 51:7

_____
          T
T 2:15,15 3:8
  53:1,1
take 7:2 14:20
  16:19 46:13
taken 40:12
  46:17 54:6
talk 7:17,19 15:5
  15:22 27:24
  29:9,13 30:9
  30:12 32:4
  34:4 43:1
talked 44:2,17
  44:21 45:3
talking 6:7 23:6
  23:7,13,16,19
  33:5 42:21
task 9:7
tell 7:24,25 11:6
  14:7 16:20
  19:20,20 26:4
  30:16 31:20
  39:3 42:23
  45:1 48:20
telling 42:15
term 12:6,8,9,10
terminate 46:24
terminated
  15:10 30:18
  31:3 44:4
  48:20
terminating
  32:4
termination
  16:10 27:4
  30:21 31:6

45:17 46:7
terms 32:14
TERRACE 2:9
testified 4:20
  49:11
testify 7:22
testimony 5:25
Thank 49:4
thing 6:5 7:12
  8:18 34:4 38:6
things 10:18
  20:18 25:11
  28:9 46:14
think 8:16 12:15
  17:2 19:18,23
  19:25 23:6
  38:14 43:11
  44:1,1 49:11
thought 41:2
three 9:9 11:24
  12:21 13:19
  14:1 19:16,16
  19:17 20:23
  35:14
Tim 6:6,7 17:5
  50:5
time 1:15 5:3 6:8
  6:24 7:1 9:4,6
  14:13,19 19:8
  19:15,24 20:3
  20:4,9 24:16
  24:25 28:13
  29:1 31:21,25
  34:14,15,18,19
  35:9,24 36:9
  36:15 37:4
  38:4 39:2 41:1
  41:23 42:14
  43:21 44:9
  47:15
times 5:14,23
  19:23 26:2
Timofey 1:17
  51:4,10 52:5
  52:15 54:16

tired 5:2
title 12:11
today 5:1 7:7
told 20:20 21:17
  25:22,24 26:1
  30:15,25 37:22
top 9:21,22
  49:21
trafficking 9:5
transcribe 6:7
transcribed 54:7
transcript 50:10
  52:6,6 53:2
  54:6,8,9,11,13
  54:19
Treasurer 12:19
tried 40:12
true 52:6 53:18
truly 54:14
Trustee 11:14
  11:16,17,19
Trustees 12:21
truth 4:15,15,15
  7:25
truthful 38:11
try 14:20 26:2
trying 31:19
Twenty 8:24
two 6:7 9:9
  11:11 15:24,24
  16:13 18:6
  25:14 28:12
  46:19
two-year 12:8
  12:10
type 13:1 23:13
  28:17,17 42:4
typical 24:24
typically 48:7,16

_____
          U
U 2:15
ultimately 20:10
  20:24 45:16
ums 6:21

unable 48:5
unclear 18:20
understand 6:22
    6:24 7:10,11
    9:20 17:19
    32:10
understanding
    8:2 10:21
    20:14,16 22:12
    22:16 24:3
Understood
    40:18
union 8:11 11:20
    13:12 32:7
unionized 8:13
unions 11:25
unique 35:18
unit 9:3,13,16
    10:17,22,23
    13:9 22:25
    32:7 34:25
UNITED 1:3
use 18:3 53:17
usually 11:21
    13:3,20,20
    14:9 16:18
    18:3 48:12,18

V

V 53:3 54:4
vague 29:20
    30:3,5
valid 45:5
verbal 27:3
vice 9:4 11:15
    12:3,4,5,11,12
    12:13,18,19
    13:21 28:12,15
    31:23,23,25
    34:16,17 35:1
    35:2,6 37:16
    37:16 40:20,20
    44:9 45:13
video 6:20
view 39:23

viewpoint 40:2
violate 16:4
violated 30:13
    30:19 31:1
    48:21
violation 13:2
    40:8 43:5,17
violations 40:16
voluntary 43:5
VS 1:8

W

waive 16:7 50:10
    54:7,18
Waiver 54:17
want 7:9 12:8
    26:5,16 32:23
    34:4 44:20,21
    46:14 50:5
wanted 19:16
    20:16,19 35:25
    36:5 42:3
wants 14:3
warranted 44:10
wasn't 14:15
    36:11 37:12
    39:12 45:15
    49:15
way 7:22 44:25
    48:13
Wayne 28:3
    34:14
we'll 8:20 14:20
    14:20 28:25
    50:14
we're 9:11
We've 48:25
week 7:16
went 9:8,9 38:2
    38:8 44:18
witness 3:2 4:5
    4:17 23:6
    46:15 47:24
    48:10,12 49:6
    49:8 50:11

wives 25:10
women 23:6
Wonderful 50:8
    50:12,16
word 16:2 20:22
    37:11
words 27:21
    38:5
work 17:8,12
    18:9 50:7
worked 5:2,10
    20:15
works 39:17
world 23:14
wouldn't 31:20
    37:8 44:6
WRITE 53:2
write-up 16:10
    42:18
writes 48:12
written 14:18
    27:2 33:22
wrong 10:22

X

X 3:1,8

Y

yeah 28:23
    32:11 35:13
    41:19 44:20
    48:11
year 5:11 12:6
    28:13
years 5:11 8:22
    8:23,24 9:3,9
    9:14,15 11:18
    42:8

Z

Zoom 1:16 51:6

0

1

1 3:10 33:15,16

1-50 52:6
1.310(e) 54:22
1:22-cv-21004...
    1:6 53:3
10:12 1:15 50:18
112 39:4,17 40:7
    40:16
1212 2:9
14th 52:11
15 24:15
16TH 2:9
19 31:1
19th 28:2 30:10
    34:6 41:15
    48:19

2

20 5:11 8:22
    12:9,9
20-plus 8:22
2014 24:14
2015 9:18
2020 12:9 43:2,8
    43:10,18,20
    45:25
2021 12:9 26:8
    27:13,15,20,24
    28:2,14,20,24
    30:10 31:1
    34:6 48:19
2022 12:7,9
2024 1:14 12:7
    51:6,8 52:11
    53:4 54:1
2026 51:12
28 1:14 53:4
    54:1
284028 51:12
28th 51:6,8

3

30 54:9
30(e)Florida
    54:21
33 3:10
33131-2433 2:4

33304 2:9

4

4 3:4
47 3:5
48 8:16
49 3:6

5

5 51:12
520 2:3

6

6 8:17
688-2335 2:4

7

786 2:4

8

9

9:15 1:15
954)401-2608
    2:10
954)523-5326
    54:7





## MEMORANDUM

TO:        Sergeant, Jessica Salabarria

FROM:      Rick Clements, Chief of Police

DATE:      January 25, 2021

RE:        Implementing Letter of Resignation

---

On December 18, 2020, you entered into a Last Chance Agreement ("Agreement"). A copy of that Agreement is attached as Exhibit A. Additionally, as part of the Agreement, on that same date you signed a Letter of Resignation ("Resignation"). A copy of that Resignation is attached as Exhibit B.

Based on the violations outlined below, and per the Agreement, I am implementing the Resignation, effective immediately and as of the date indicated on Resignation attached as Exhibit B.

Specifically, on December 30, 2020, Lieutenant, Steven Cosner submitted an Allegation of Employee Misconduct ("AEM"). A copy of the AEM is attached as Exhibit C. The allegations of the AEM are incorporated in full herein.

On January 19, 2021, I held a meeting with you to discuss the allegations in the AEM. In addition to you and I, also present at that meeting was:

- Wayne Jones, Deputy Chief
- Paul Ozaeta, Lieutenant (FOP President)
- Arley Flaherty, Sergeant (FOP First Vice President)
- Reggie Lester, Sergeant (FOP Second Vice President)
- Delvin Brown, Lieutenant (FOP Grievance Chairman)
- Steven Cosner, Lieutenant
- A.J. Prieto, Captain Internal Affairs.

During the meeting, you were provided a copy of the "AEM" and given the opportunity to review the "AEM" in full. After your review, you informed me that, despite being assigned to the North District, you did not report to the North District. Instead, you remained in your assigned City vehicle, stationary at the City's main police station. You further informed me that while in your vehicle at the police station (for what was at or around four (4) plus hours) you worked on administrative issues (an employee evaluation

City 001253

for Police Officer Vincent Stella) and worked on your "school work." The "school work" at issue is not work assigned by the City. You informed me that, independent from the City, you are working toward a Master's Degree.

Further, you acknowledged that you missed two radio calls specifically to you from Lieutenant Cosner and a phone call from Lieutenant Cosner to your personal cell phone. Ultimately, you did not respond to the North End Sub-Station (in the North District) until approximately 4:20 a.m., and only after being told to do so by Lieutenant Cosner. You further acknowledged that despite receiving an email from Lieutenant Cosner at approximately 3:20 a.m. directing you to have certain officers perform certain assignments, you did not issue the assignments until after 4:20 a.m., and only after speaking with Lieutenant Cosner. You again indicated to me that prior to speaking to Lieutenant Cosner at 4:20 a.m., you were focused on the employee evaluation and your independent school work.

In speaking with Lieutenant Cosner during this meeting, he indicated, among other things that you informed him that you had conveyed the assignment details, when in fact, you had not. You conveyed the assignment details after speaking to Lieutenant Cosner despite telling him you had already done so.

Moreover, Lieutenant Cosner indicated in this meeting that you did not leave the main police station during most of your shift and only left the police station when instructed to do so by Lieutenant Cosner.

The above is only a summary of the events of the January 19, 2021 meeting.

After the meeting, the City reviewed your City issued laptop computer, which is the computer that you would have used to work on Officer Stella's evaluation. A review of the laptop shows that Officer Stella's evaluation was not created until January 10, 2021. The City's Information Technology Department confirmed that Officer Stella's evaluation was not created or saved anywhere else on the City's system.

Pursuant to paragraph 4 of the Agreement, I determine that you have not complied with the Agreement and engaged in conduct that is beyond an individual, discreet or minor policy violation. Pursuant to paragraph 4 of the Agreement, my decision in this regard is not subject to review or explanation. Accordingly, as stated above, I am implementing your Resignation.

# EXHIBIT A

City 001255

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY

Page 1 of 7

UNION          JESSICA

City 001256

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1.      All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2.      During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3.      Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4.      The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

_____
CITY

Page 2 of 7

UNION                    JESSICA

City 001257

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

5.     Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6.     SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7.     Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command.  Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8.     For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

_____
CITY

Page 3 of 7

_____
UNION

_____
JESSICA

City 001258

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

9.      Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10.      Employee shall attend and cooperate with any training required by the Chief of Police.

11.      If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12.      In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement  that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.      The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

_____
CITY

_____
UNION

_____
JESSICA

City 001259

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY                              Page 5 of 7                    UNION              JESSICA

City 001260

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.     SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.     Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.     This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.     This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.     In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida. **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY                           Page 6 of 7                    UNION          JESSICA

City 001261

This Agreement is dated the _____ day of December 2020, in Miami-Dade County, Florida.

DocuSigned by:

Paul J. Aguila
2B3D6240F92B45D...

**JESSICA SALABARRIA**

**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: __12/18/2020__

Date: __12/23/2020 | 1:34 EST__

**FRATERNAL ORDER OF POLICE**

_____ President
Signature & Title

Kevin Millan    President
Print Name & Title

__12/18/2020__
Date

_____
**CHIEF OF POLICE**

__12/15/2020__
Date

Page 7 of 7

City 001262

# EXHIBIT B

City 001263

December 18, 2020

City of Miami Beach
Human Resources Department
Miami Beach City Hall
1700 Convention Center Drive
Miami Beach, FL 33139

      Re:   *Letter of Resignation as Part of Settlement Agreement and Last Chance Agreement*

To Whom It May Concern:

Pursuant to the Settlement Agreement and Last Chance Agreement to which this Letter of Resignation is attached, I resign my employment with the City of Miami Beach, effective January 25, 2021.

                             Very Truly Yours,

                             Jessica Salabarria.

City 001264

# EXHIBIT C

City 001265

## MIAMI BEACH POLICE DEPARTMENT
### Initial Report Concerning a Police Employee - Allegation of Employee Misconduct

| Date and Time Reported 12/30/2020    2345 hours | Received By (Employee Name) Lieutenant Steven Cosner | ( X ) In Person  (  ) By Phone (  ) Other _____ | |
|---|---|---|---|
| Date and Time Occurred 12/28/2020   0000-0600 hours | Location of Occurrence MBPD | | |
| Reporting Party's Name Lieutenant Steven Cosner | Race/Sex W/M | D.O.B | Address: 1100 Washigton Ave., Miami Beach, Florida 33139 | Telephone # |

**Specific Allegation (In Brief):** Failure to Supervise, Conduct Unbecoming, Insubordination, Neglect of Duty, Untruthfulness (lying/false statements), Performance of Duties, Failure to Monitor Radio

| Employee (s) Name | |
|---|---|
| 1. Sergeant Jessica Salabarria | 3. |
| 2. | 4. |

### Witnesses

| Name | Race/Sex | D.O.B | Address | Telephone |
|---|---|---|---|---|
| Lieutenant Steven Cosner | W/M | | Resident: MBPD | |
| Officer Werner Baumer | W/M | | Business: 1100 Washington Ave., Miami Beach, | |
| Officer Richard Ocejo | W/M | | FL 33139 | |
| Officer Steven Serrano | W/M | | | |
| Officer Christopher Garrido | W/M | | | |
| Officer Hansel Romero | W/M | | | |
| Officer Rodolfo Albaladejo | W/M | | | |
| | | | Resident | |
| | | | Business | |

### Details of Allegation

On Sunday night, 12/27/2020 at approximately 2200 hours, I advised Sergeant Jessica Salabarria that we needed a Sergeant on overtime for the midnight shift. I told her that she was the next supervisor to be forced to work over since we did not have any volunteers for the position. She was told that she would be assigned to Area 3 and would be working from 0000-0600 hours. She acknowledged the order and within several minutes she provided me with an overtime slip completed by her in which she documented in her own handwriting that she was working in Area 3. She left the sergeant's office shortly thereafter. At approximately 0355 hours, I forwarded an email to Sergeant Salabarria with the details and watch orders that needed to be assigned to the Area 3 officers for completion prior to the end of their shift. I then sent a text message to her cellular phone advising her to check her email at 0359 hours. After a few minutes I did not receive an acknowledgement of the text message, so I tried to call her phone at 0404 hours. Then phone rang repeatedly and went to voicemail. I tried to raise her via the police radio immediately afterwards. The dispatcher raised her multiple times with no response. Sergeant Wilson Romero advised via radio that he would try to call her. He called me at 0411 hours to advise that he could not reach her and that her phone rang through to voicemail. I again tried to have the dispatcher raise her, and after several attempts by name and unit

City 001266

number, she finally responded. The tone of her voice sounded as if she was just waking up. I spoke with her via the supervisor channel and asked her where she was. She told me that she was "05". I responded by asking if she meant, "05 at the NESS". She said no and that she was at the main station. I asked if she was aware that she was assigned to Area 3 and she answered affirmatively. I then ordered her to respond to Area 3 and to check her email.

I became involved in a vehicle stop along 71 street that resulted in an arrest at 0416. Officer Ocejo was one of the officers who responded as back-up. After the subject was transported, I waited on scene with Officer Ocejo as he waited for a tow truck. I asked Officer Ocejo to check his email to see if the details had been forwarded by Sergeant Salabarria. He told me that he did not have any emails from her. This was at approximately 0520 hours. At 0543 hours, I received an unsolicited text message from Sergeant Salabarria advising that she had emailed me the squad stats and the detail assignments. She claimed that she had told the officers via landline and email of their detail assignments. The email that she sent me was sent at 0536 hours. It included the squad stats and detail assignments. I called Officer Hansel Romero and asked him if he had received any emails, texts, or phone calls from Sergeant Salabarria advising him of detail assignments. He said that he did not and that she had only asked for stats in an email that was sent at 0521 hours. That email was forwarded to me by Officer Ocejo. I began calling all the officers assigned to Area 3 and inquired the same of each of them. Every one of the officers advised that they had not received a call or text advising of the details. Officer Romero then forwarded an email that he received from Sergeant Salabarria at 0542 hours. The email had been sent to each of the Area 3 officers. It was the detail assignments and began with a highlighted line stating, "squad per our conversation please note the below details for our shift". I found this very concerning because it was now the second time that she had claimed to have had a conversation with the officers about their assignments when all six of them claimed that never happened and they did not report to any assigned details during the shift.

I sent an email to Lieutenant Jorge Garcia asking for a Detail Report for Sergeant Salabarria's assigned marked vehicle via the AVL system. My inquiry was for her vehicle movement from 2200 hours on 12/27/2020 through 0600 hours on 12/28/2020. The Detail Report showed that her vehicle had been parked at the station from 2200 hours on 12/27/2020 until 0423 hours on 12/28/2020 which was a few minutes after we spoke on the supervisor channel. For a total of 6 hours and 23 minutes. It is unknown how long the vehicle had been parked prior to that. The report indicated that she left the station and drove directly to 73rd Street and Ocean Terrace where she again parked her vehicle at 0440 hours. The vehicle remained in that position until 0533 hours for a total of 53 minutes. She then left that location and drove directly to the MBPD headquarters.

Note that of the six officers assigned to Area 3 on the shift in question 4 of them have 2 years of experience or less.

Sergeant Salabarria's actions show a willful effort to deceive a supervisor and a failure to obey a direct order from said supervisor. She failed to report to her assigned zone and failed to supervise the officers under her watch. She failed on multiple occasions to respond to the police radio and showed extreme neglect in the performance of her duties.

City 001267