Page 142

```
 1                UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                     MIAMI DIVISION

 4              CASE NO.:1:22-cv-21004-DPG

 5   JESSICA GUASTO,

 6          PLAINTIFF,
     VS.
 7
     THE CITY OF MIAMI BEACH, FL,
 8   A FLORIDA MUNICIPALITY,

 9          DEFENDANT.

10   _____/

11          VOLUME 2 (PAGES 142-177)

12   CONTINUED VIDEO
     DEPOSITION OF:      JESSICA (GUSTO) SALABARRIA
13
     DATE:              FEBRUARY 13, 2024
14
     TIME:              10:14 A.M. - 11:11 A.M.
15
     PLACE:             VIA ZOOM REMOTE CONFERENCING
16
     REPORTED BY:       TAMARA MASCI TANNEN, RPR, FPR-C
17                      STENOGRAPHIC COURT REPORTER
                        NOTARY PUBLIC, STATE OF FLORIDA
18

19

20

21

22

23

24

25
```

COASTAL REPORTING, INC. (954) 523-5326

Page 143

```
 1   APPEARANCES:

 2   PAUL A. DARAGJATI, ESQ.
     ROSE DARAGJATI, ESQ.
 3   PAUL A. DARAGJATI, PLC
     4745 SUTTON PARK COURT
 4   SUITE 503
     JACKSONVILLE, FLORIDA  32224
 5   PAUL@DARAGJATILAW.COM
          COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.

 6

 7

 8   MICHAEL L. ELKINS, ESQ.
     MLE LAW
 9   1212 NORTHEAST 16TH TERRACE
     FORT LAUDERDALE, FLORIDA  33304
10   (954) 401-2608
     MELKINS@MLELAWFIRM.COM
11          COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.

12

13   ALSO PRESENT:

14   ERICK CLAVIJO, VIDEOGRAPHER, COASTAL VIDEO

15

16                  * * * * * * * * *

17            S T I P U L A T I O N S

18

19          It is hereby stipulated and agreed by and

20   between counsel for the respective parties, and the

21   deponent, that the reading and signing of the deposition

22   are hereby waived.

23

24

25
```

COASTAL REPORTING, INC. (954) 523-5326

Page 144

```
 1                   I N D E X

 2   WITNESS                                        PAGE

 3   JESSICA GUASTO

 4   Direct Examination by Mr. Elkins               146

 5

 6                 E X H I B I T S

 7   DEPOSITION          DESCRIPTION              PAGE

 8   Exhibit Number 7   Complaint                  163

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COASTAL REPORTING, INC. (954) 523-5326

Page 145

```
 1                P R O C E E D I N G S

 2                     * * * *

 3          THE VIDEOGRAPHER:  We're now on the video record.

 4   Today is Tuesday, the 13th day of February, 2024.  The

 5   time is approximately 10:14 A.M.

 6          And we are conducting a deposition conference via

 7   Zoom for the purpose of taking the video deposition of

 8   Jessica Guasto taken by the Plaintiff in the matter of

 9   -- in case number 122-CV-21004-DPG.  And the case is

10   Jessica Guasto versus the City of Miami Beach, Florida,

11   which is filed in the U.S. District Court of the

12   Southern District of Florida, Miami Division.

13          The court reporter is Tamara Masci Tannen from

14   Coastal Reporting.  My name is Erick Clavijo.  I am the

15   videographer on behalf of Coastal Video.  I am not

16   related to any party on this action, nor am I

17   financially interested in the outcome.

18          Would all counsel please state their appearances

19   for the record, after which the court reporter will

20   swear in the witness.

21          MR. DARAGJATI:  My name is Paul Daragjati.  With

22   me is my associate Rose Daragjati.  We represent the

23   Plaintiff, Jessica Guasto, who is also present.

24          MR. ELKINS:  Michael Elkins on behalf of the

25   Defendant, City of Miami Beach.
```

COASTAL REPORTING, INC. (954) 523-5326

1      THE REPORTER:  Jessica, raise your right hand,
2    please.  Do you swear that the testimony you are about
3    to give will be the truth, the whole truth, and nothing
4    but the truth so help you God?
5      THE WITNESS:  Yes.
6      THE REPORTER:  Thank you.  You may proceed.
7         **JESSICA GAUSTO** SALABARRIA,
8    Having been first duly sworn, testified as follows:
9      MR. ELKINS:  Okay.  Tammy, I'm going to refer to
10    Jessica as Ms. Salabarria, which is her -- she had her
11    last name changed recently.  So to avoid any confusion
12    just so you know when we refer to Ms. Salabarria, it's
13    Ms. -- also Jessica.  Does that make sense?
14      THE REPORTER:  Yes.
15         **DIRECT EXAMINATION**
16  BY MR. ELKINS:
17    Q.   Okay.  Ms. Salabarria, this is continuation of
18  your deposition from February 6th.  Do you remember all the
19  rules that we went over at that deposition?
20    **A.   Yes.**
21    Q.   Okay.  And you understand that you're still under
22  oath, correct?
23    **A.   Yes.**
24    Q.   Did you talk to anybody about that deposition?
25    **A.   No.**

1    Q.   Did you talk to your lawyer about it?
2    **A.   No.**
3    Q.   Okay.  And nobody else?
4    **A.   No.**
5    Q.   I think where we had left off in that
6  deposition was we were talking about your 2020 -- I think
7  July 2020 EEOC charge.  Do you remember that?
8    **A.   Yes.**
9    Q.   Okay.  I'm going to go through a few other things
10  here before we get back to that.  So I'm going to show
11  you --
12    **A.   Excuse me.**
13    Q.   -- hold on.  Okay.  I'm showing you what we had
14  marked as Exhibit 6.  Do you see this document?
15    **A.   Yes.  I can see it.**
16    Q.   Okay.  And this was your responses to the City's
17  interrogatories?
18    **A.   Yes.**
19    Q.   And I don't remember if we did this before, so I'm
20  going to do it now.  Did you -- is that your signature on
21  these?
22    **A.   Yes.**
23    Q.   Okay.  So I want to go through these this morning.
24  So we had asked you to list a number of witnesses:  Names,
25  addresses, emails address, of people who would have

1  knowledge about any of the facts in this lawsuit.  Do you
2  see that?
3    **A.   Yes.**
4    Q.   Okay.  Let me ask you this:  What is your
5  understanding of the current claims that you have against
6  the City?
7    **A.   So my current claims that is my understanding is
8  that it's for retaliation for -- for filing an EEOC and for
9  being retaliated against by filing that EEOC, and then
10  subsequently after settling with the City, I was fired,
11  terminated, separated from the City on my first day back;
12  and therefore, that's where the retaliation charge is.**
13    Q.   And so, your claim is, so I understand it, that
14  you -- you understand that for retaliation, you have to have
15  engaged in some sort of protected activity and then the City
16  fired you for engaging in that protected activity.  You
17  understand that, right?
18    **A.   Yes.**
19    Q.   And in this case, the protected activity that you
20  claim forms the basis of your retaliation is the 2020 EEOC
21  charge; do I have that right?
22    **A.   Yes.**
23    Q.   Okay.  And your position in this lawsuit is that
24  the City fired you because you filed that EEOC charge,
25  correct?

1    **A.   Yes.**
2    Q.   Okay.  And that EEOC charge was in I think July of
3  2020, correct?
4    **A.   That is correct.**
5    Q.   And then you were fired in January of 2021, right?
6    **A.   Yes.**
7    Q.   So about seven -- give or take a few weeks, but
8  approximately seven months later?
9    **A.   Yes.  However, there wasn't -- the settlement for
10  that EEOC wasn't settled until sometime in December.  So it
11  was -- it wasn't that it was settled in June or July.  It
12  was -- it was settled within December.  And then, subsequent
13  to that, the very next month after settling, my very first
14  day back, Lieutenant Cosner, he filed these baseless
15  unsubstantiated allegations.  And from there, I was
16  separated from the City my very first day back.**
17    Q.   What's the significance of settlement relative to
18  your claims of retaliation?  Why is that -- why does that
19  matter to you?
20    **A.   Well, because at the time Chief Clements was very
21  adamant through -- through proxy through Nicholas Guasto and
22  the FOP to -- to have me get rid of the -- the EEOC.  And he
23  was having backdoor conversations with Nicholas and asking
24  him to have me get rid of the EEOC and that that would be
25  the only way to settle, to have me settle with the City.**

Page 150

And he was very adamant about that EEOC being withdrawn.

And then, during my settlement meeting, when I was supposed to go in there and speak on -- on the issues that I was having that was -- that it was written on the EEOC, we never got into any of those claims. We never -- the -- Chief Clements never spoke to me, didn't ask me questions about my concerns. So to me, his main motivation was to get that EEOC withdrawn and to have me settle.

And then, subsequent to there, the first chance that they took -- the City took to get me terminated to get me separated was my very first day back.

And that's why it's significant to me, the -- the timing of it, the baseless allegations that Lieutenant Cosner wrote that were never investigated, were never substantiated. And I got separated on allegations. It's -- that's why I -- I believe it's significant.

Q.   So you believe that the City never investigated Lieutenant Cosner's allegations; did I hear that right?

A.   That is correct.

Q.   Were they required to?

A.   Yes, they were.

Q.   Weren't you an employee at-will after your Last Chance Agreement?

MR. DARAGJATI:   Object to form.

BY MR. ELKINS:

Page 151

Q.   You can answer.

A.   Does that mean I -- I answer?

Q.   Yes.

MR. DARAGJATI:   Yes, you can answer.

THE WITNESS:   Okay.   So my Last Chance Agreement, if you read it, on my Last Chance Agreement, it doesn't say anything about waiving my Officer Bill of Rights, nor do -- does it say anything about me waiving any of my due processes or any of the City's policies and SOPs concerning my due processes.

So from my understanding of the LCA, I never waived my statutory Officer Bill of Rights, nor did I waive any of my due process rights.   And also, the -- the LCA is very ambiguous; it's not specific.   It doesn't state specifics.   It only says you can't arbitrate and you can't grieve.   But it does not say anywhere on that LCA that I waive any of my Officer Bill of Rights.

BY MR. ELKINS:

Q.   You understand that there's a difference between what the police officer -- the protections of the Police Officer Bill of Rights and whether or not the City has to show just cause to terminate you; you -- you understand those are two completely different things?

A.   So what I understand is that no matter if I'm

Page 152

at-will or not, there has to be an investigation.   There has to be a --

Q.   Are you sure about that?

A.   Yes, through my Officer Bill of Rights.   And --

Q.   And did --

A.   -- that wasn't done.

Q.   And at any point in time -- so it sounds like you're very well-versed in the Police Officer Bill of Rights.

At any point in time, did you take advantage of the administrative mechanisms in there to complain that your Police Officer Bill of Rights were violated?

A.   I did.   So I was brought to this meeting that was on January 19th.   It was labeled as an invite from the Chief's secretary.   I had no idea what this invite, this meeting entailed.   It just said an invite.   When I get there, it's the Chiefs -- Chief Clements, the command staff, the Internal Affairs commander, AJ Prieto, and then I see Cosner there, as well as the FOP that was already there summoned by the -- Chief of Police.

So I asked what this meeting was about.   And Reggie Lester told me it was about an allegation.   Again, I had no idea what this meeting was about.   He wasn't very shared what it was about, just that it was an investigation -- an allegation, I'm sorry.

Page 153

And so, I told him I do not want to go into that meeting.   This is discipline in nature.   It looks like discipline in nature.   Why is the Internal Affairs commander in this meeting?   And he went to Richard Clements and told Richard Clements that I was not going to go -- I did not want to participate in this meeting without an attorney.   And so, Richard Clements relayed to Reggie Lester that if I didn't attend this meeting, that I would be terminated right there on the spot.

And at that point, I was terrified that I was going to be terminated.   And so, I sat in the meeting.   However, I didn't want to answer any of the questions.   And again, I had asked for my representative of my choice to be in this meeting, which was denied several times.

Q.   You had actually four -- three or four members of the FOP in that meeting, isn't that true?

A.   Like I stated, the FOP was summoned by the Chief, not by me.   I did not ask for any of those members of the FOP to be there.

Q.   That's not my question.   My question is:   They were there.   Yes or no?

A.   Yes, they were there summoned by the Chief of Police.

Q.   I'm not asking you --

A.   And my --

Page 154

Q. -- who summoned who. My question is -- and it's a
yes or no question -- were there three or four members of
the FOP present at this meeting?

A. Yes.

Q. And one of them was the president of the FOP,
correct?

A. That is correct.

Q. And the other members were the executive board
members of the FOP, correct?

A. That is correct.

Q. Okay. At any point in that meeting, did any of
your FOP representatives -- and you're referring to the
meeting prior, just before your separation from employment,
correct?

A. Yes.

Q. Okay. At any point in time, did you or any member
of the FOP allege or take advantage of the procedures in
Florida Statute Section 112.534, which I'm assuming you're
familiar with since you seem to know your Police Officer's
Bill of Rights and how they apply. Did that happen?

A. So again, I was in this meeting and I refused to
answer. And I didn't want to participate in this meeting.
And I asked for my representative of choice, which was for
an attorney to be present. And I was told that I could not
leave the meeting, that I had to continue in this meeting,

Page 155

and that if I did not, I was going to be terminated.

So I sat there and I answered very little and I --
and I didn't participate in giving any type of responses
that I knew were of investigatory purposes. This was an
investigation that they were trying to conduct without my
rights.

Q. That's a nice answer, but it's not answering my
question.

So I want you to listen to my question and answer
the question I'm asking you. I know you have a series of
responses you're going to give. That's not -- but you're
not answering the question.

The question is: At any point in time, during
this meeting or after, did you or any member of the FOP
initiate any of the procedures of Florida Statute 112.534
alleging that the meeting was an improper investigation and
that the investigator was violating Chapter 112? Did that
happen; yes or no?

A. Yes, it did.

Q. Who did it and when and how?

A. Reggie Lester advised the Chief of Police that it
was against my rights.

Q. What did he do?

A. That's what he said. And he told the Chief that
-- about this meeting being in violation of my rights and he

Page 156

gave a direct order and said that if we did not participate
in this meeting, I was going to be terminated. That is my
answer.

Q. And did -- at any point in time after that then,
did the agent -- did you or the FOP request that the Chief
or that their designee cease the interview?

A. Yes, they did. And again, Richard Clements said
this meeting was going to continue.

Q. And how come nobody after the meeting or --
Or let me ask you this: After the meeting did
anybody file a grievance or anything against the City for
violating your 112 rights?

A. There was a grievance that was written, not
directly after the meeting, but it was -- there was a
grievance that was conducted by John Kuno who was my
previous counsel.

Q. Yeah, that's after your termination, though. I'm
talking about before you were separated from employment.

A. Before I was separated from employment, no.

Q. And at any point in time, after Reggie told the
Chief this was a 112 violation, did they initiate within
three working days a written notice of violation and a
request for a compliance review hearing; did that happen?

A. No, that did not happen.

Q. Why not? Why didn't you do it?

Page 157

A. I don't know. I -- I -- I know that I told the
FOP to -- to do it, to -- to protect me and --

Q. Who -- hold on. You told the FOP to go ahead and
within the three working days file the written notice of
violation under Section 112.534?

A. Yes, I had many conversations with the FOP that I
wanted to grieve this.

Q. Well, I'm not asking if you wanted to grieve it.
Listen to what I'm asking you.

Florida Statute 112.534 is the procedure that a
police officer or correctional officer can use, must use,
when there is a 112 investigatory violation.

Part of that procedure is that if the interview
continues within three working days, there has to be a
written notice of violation and a request for a compliance
review hearing that must be filed with the agency, in this
case the City, the agency head or their designee.

Did that happen?

A. That did not happen.

Q. Why not? Why didn't you do it?

A. Because I -- my FOP was supposed to do it and I
don't know how to do that. I'm not an FOP. That's why
they're my representatives. And I -- and I asked them to
file a grievance. I asked them to protect me. I asked them
that this -- this meeting was in violation of my 112 rights

1  and my due processes.  And -- and I -- and again, the -- the
2  -- the meeting when it -- when it concluded, I didn't hear
3  anything back.  There was nothing else that was said.  And
4  from one -- from the 19th to the 25th, I was kept in the
5  dark, not only from the administration, but from the FOP as
6  well.
7       Q.   You --
8       A.   And then, the -- the day before they -- they
9  separated me, I was told not to come into work, again not
10  being told why.  And then, on Monday is when they then
11  separated me from the City.
12      Q.   You would agree with me that the -- the Police
13  Officer's Bill of Rights is pretty important in the context
14  of police work, correct?
15      A.   That is correct.  And that's something that I
16  cannot waive, not even through a LCA contract.  It's
17  statutory.
18      Q.   I -- I understand that.  I know you believe that
19  the Police Officer Bill of Rights governs your employment
20  status.  We'll talk about that in a little bit.
21           But I -- what I'm trying to figure out is:  If
22  you're -- you had four FOP members at this meeting, all --
23  according to you, they alleged a violation of 112, but
24  nobody ever filed anything in writing with the City after
25  the fact within -- under Florida Statute 112.534 Subsection

1  (1)(c), that there was a 112 violation.  And you're saying
2  that you told them to do that.  But you didn't do it in
3  writing, correct?
4       A.   That is correct.
5       Q.   So you're -- so the FOP just blew off this alleged
6  112 violation?
7       A.   So the FOP who was summoned by the Chief, yes,
8  they did not protect your rights.  The only person that --
9  that was there standing up for me was Reggie Lester who had
10  told the Chief to stop this meeting.
11      Q.   Why didn't you bring any claim against the FOP for
12  not protecting you?
13      A.   Because I did not know that I could do that.  I
14  was not educated in that -- in that matter during at the
15  time.
16      Q.   When did you become educated in that matter?
17      A.   Recently, as in a few months ago.
18      Q.   How did you get educated on that?
19      A.   I started reading.
20      Q.   So you think -- in your world here, I just want to
21  make sure I understand this, because there was also a
22  November meeting that you allege was an improper 112
23  interrogation as well.
24           So your testimony is that the November meeting
25  where you had two lawyers and the FOP president there was an

1  improper interrogation.  And the January meeting where you
2  had four members of the FOP, including the president and the
3  entire executive board, that that was an improper 112
4  interrogation, correct?  Both those meetings in your view
5  were improper 112 interrogations, correct?
6       A.   That is correct.
7       Q.   Okay.  And nobody, your two lawyers, Michael
8  Pancier and Eugene Gibbons, they didn't protect you.  And
9  the FOP president didn't protect you.  And no one on the FOP
10  executive board protected you.  And the FOP and Eugene, none
11  of them ever took advantage of Florida Statute 112.534 on
12  your behalf, correct?
13      A.   That is correct.
14      Q.   So everybody from the multiple lawyers and
15  multiple top level FOP personnel, all of them dropped the
16  ball on you, correct?
17      A.   That is correct.
18      Q.   And you have yet to bring a single claim against
19  any of them for them supposedly not protecting your rights;
20  isn't that true?
21      A.   That is correct.  And like I stated, I did not
22  know that I could do that, that I can file a claim with my
23  FOP, and --
24      Q.   You --
25      A.   -- and again -- excuse me.  Sorry.  So like I

1  stated before, the FOP was summoned by the Chief.  And at
2  the end of the day, the FOP, they're not an entity separate
3  from the police department.  They work for the Chief.  They
4  work in the organization.  They were summoned by the -- by
5  the Chief.  And at the end of the day they have to work
6  under the Chief.
7            So it was very concerning to me that I get to this
8  meeting and my FOP was already there and I had no idea what
9  was going on.  They knew before the meeting and they knew
10  after the meeting and they never told me what was going on.
11  And --
12      Q.   You never brought any claim against them?
13      A.   In the November meeting, they -- they did that to
14  me, but for Nicholas Guasto, they didn't do that to him.
15  They protected him.  They followed all his rights.  And so,
16  the disparity there is that I am a female.  Nick was a male.
17  And they don't -- they did not protect me, the female.
18      Q.   The FOP?
19      A.   The FOP and management.  That is correct.
20      Q.   So this was also because you're a female?
21      A.   Yes.  Yes, I was --
22      Q.   And --
23      A.   Mm-hmm.  Sorry.  Go ahead.
24      Q.   I just want to -- my real -- my question was very
25  simple:  To this day, you have never brought a claim against

Page 162

1    the FOP, correct; yes or no?
2        A.   **That is correct.  That is correct.**
3        Q.   And you never brought a claim against either of
4    your prior lawyers, Gene Gibbons or Michael Pancier,
5    correct?
6        A.   **That is correct.**
7        Q.   But you hired --
8        A.   **However -- I'm sorry.**
9        Q.   Hold on.  You hired a lawyer almost immediately
10   after your separation from employment, didn't you?
11       A.   **Yes.**
12       Q.   In fact, you filed a grievance in February, on
13   February 19th, 2021, through your lawyer, correct?
14       A.   **Yes.**
15       Q.   And your lawyer, Mr. Kuno, holds himself out as
16   labor attorney, correct?
17       A.   **Yes.**
18       Q.   Why didn't you bring a claim against the FOP
19   through your labor lawyer then that they violated -- that
20   they didn't protect your rights?
21       A.   **Again, it was something that I did not know that I**
22   **could do at the time.  And now I know, and now I have known,**
23   **you know, as of recently, that's what I've done.  I've**
24   **educated myself to know my protections and my rights because**
25   **of what I went through.  And Kuno did file a grievance.  And**

Page 163

1    **that grievance went unsupported by the union, the same**
2    **people that did not protect me.**
3        Q.   But you knew enough to sue the City, Chief
4    Clements and Cosner individually, didn't you?
5        A.   **Yes, I did.**
6        Q.   And you understand that the claims against Chief
7    Clements and Lieutenant Cosner were dismissed with prejudice
8    by the judge, correct?
9        A.   **That is correct.**
10       Q.   And you understand that all your claims relating
11   to the Last Chance Agreement, the Settlement Agreement, and
12   everything that occurred that caused you to enter into those
13   agreements, you understand all those claims were dismissed
14   with prejudice by the judge, correct?
15       A.   **Yes.**
16       Q.   So I'm going to show you what I'm going to mark as
17   Exhibit 7.  And then we'll get back to your interrogatory
18   answers.  Can you see the document?
19       A.   **Yes, I can see it.**
20            (Deposition Exhibit Number 7 marked for
21   identification.)
22   BY MR. ELKINS:
23       Q.   This is your Complaint.  Do you recognize this?
24       A.   **Yes.**
25       Q.   Okay.  Did you review this before it was filed?

Page 164

1        A.   **Yes.**
2        Q.   Okay.  I'm going to go to Paragraph 27.  Okay.  Do
3    you see Paragraph 27?
4        A.   **Yes.**
5        Q.   Can you read that for us, please?
6        A.   **The LCA required to give up her rights under the**
7    **Collective Bargaining Agreement between the City and FOP**
8    **making her an at-will employee without protections of the**
9    **just cause standard for discipline under the Collective**
10   **Bargaining Agreement.**
11       Q.   And Paragraph 28?
12       A.   **Under the LCA, Chief Clements could terminate**
13   **Guasto for any violation of the City of Miami MBPD policy or**
14   **procedure with the Chief being the judge of compliance with**
15   **those policies and procedures.**
16       Q.   Okay.  So you pled in your lawsuit -- correct me
17   if I'm wrong -- that that the Last Chance Agreement turned
18   you into an at-will employee, right?
19       A.   **Yes.**
20       Q.   So you could be fired for any reason or no reason,
21   correct?
22       A.   **It doesn't say no reason.**
23       Q.   You understand what "at-will employee" means?
24       A.   **Yes.**
25       Q.   What does it mean to you?

Page 165

1        A.   **It means that the City -- that I was working**
2    **at-will with the City.  However, I didn't understand in the**
3    **LCA, like I said, it doesn't waive any of my Officer Bill of**
4    **Rights or my due processes, something that I did not waive**
5    **that I understood I did not waive.  That's what I**
6    **understood.**
7        Q.   But my question to you is:  You understand that
8    employment at-will is a legal term of art, right?
9        A.   **Yes.**
10       Q.   Okay.  And you understand that it has a defined
11   legal meaning, correct?
12       A.   **Yes.**
13       Q.   Okay.  And you understand, or do you understand
14   that employment at-will means that an employer can fire
15   someone for any reason or no reason; do you understand that?
16       A.   **Yes.**
17       Q.   You understand that it has nothing to do with your
18   Police Officer Bill of Rights?
19       A.   **No, I do not understand that.**
20       Q.   Okay.  Fair enough.  Let's --
21       A.   **What I -- what I don't understand is being a**
22   **police officer, anybody can make any allegation against you.**
23   **That's the nature of the job.  So anybody could have alleged**
24   **anything.  That doesn't mean that I committed those things**
25   **or did those things.**

Page 166

1    And so, that's why my Officer Bill of Rights are
2  there to protect me.  And that's why the due process rights
3  are there to protect me as well, so that I -- so that
4  somebody making a false allegation doesn't cause me my -- my
5  employment.
6    Q.   I think that -- do you -- you understand the
7  difference between what the Police Officer Bill of Rights
8  protects and what you're protected with through the just
9  cause standard in your Collective Bargaining Agreement?  Do
10  you understand the difference between those two things?
11    A.   I understand it.  However, I know that on my LCA,
12  I didn't waive it.
13    Q.   Hmm.  You mean -- so you think you were also
14  protected from the Collective Bargaining Agreement as well?
15    A.   No.  I understand that I was protected under my
16  Officer Bill of Rights, something that I did not waive.
17    Q.   So you believe that the Police Officer Bill of
18  Rights says that the City, when you become an at-will
19  employee, can't fire you for any reason or no reason?
20    A.   I know that there's protections under that.
21    Q.   Okay.  All right.  Let's talk about your
22  interrogatory answers again.  Okay.
23    I asked you -- well, the City asked you to list
24  witnesses that -- or individuals that would have knowledge
25  of the facts and circumstances alleged in the pleadings in

Page 167

1  this lawsuit.  Do you see this?
2    A.   Yes.
3    Q.   Why didn't you list former Chief Clements?  You've
4  talked about him extensively in this deposition.  He's
5  referenced in your Complaint.  You sued him individually.
6  I'm curious why he wasn't listed as a witness?
7    A.   So I thought these were for witnesses that -- that
8  can support some of the things that I -- that I'm claiming
9  happened.  That's why I didn't list him.  Obviously, I -- I
10  know that he's involved in all my claims --
11    Q.   Well --
12    A.   -- and my, you know, my allegations against the
13  City.
14    Q.   Well, let's look at the question and see if it
15  even says that.  It says, please provide the name, physical
16  address, email address, telephone number, place of
17  employment and job title of any person, any person, who has,
18  claims to have or who you believe may have knowledge or
19  information pertaining to any fact alleged in the pleadings
20  filed in this lawsuit, action or any fact underlying the
21  subject matter of lawsuit.  Do you see that?
22    A.   Yes.
23    Q.   Does it say facts that support your claims or does
24  it talk about any facts?
25    A.   It says any facts.

Page 168

1    Q.   But --
2    A.   But I believe that --
3    Q.   Hold on.
4    A.   Mm-hmm.
5    Q.   Does Chief Clements have information as to the
6  facts alleged in your lawsuit?
7    A.   Yes.
8    Q.   Okay.  But you didn't list him, did you?
9    A.   No.
10    Q.   What other individuals have knowledge about the
11  facts in your lawsuit that you didn't -- that you didn't
12  list?
13    A.   That I didn't list?
14    Q.   Yeah.
15    A.   Agent Prieto, who was the Commander of Internal
16  Affairs at the time.
17    Q.   Who else?
18    A.   Steven Cosner, who was the lieutenant working the
19  nights in question.
20    Q.   Who else?
21    A.   Off the top of my head I -- I don't have names.
22    Q.   Why didn't you list Eugene Gibbons or Michael
23  Pancier?
24    A.   Because this is in regards to the 2020 EEOC and
25  then the allegations that Cosner -- that -- that Cosner had

Page 169

1  written against me, so I believed that this was tied into
2  that -- into the -- after I had gotten rid of the -- the --
3  after I had dismissed the EEOC charge through the
4  settlement, the allegations of -- that Cosner had against
5  me.
6    That's why I didn't tie them into that.  I thought
7  it was just when it came to the retaliation of me being
8  terminated.
9    Q.   Why didn't you list the former city HR director,
10  Michael Smith?
11    A.   The same reason.
12    Q.   The same reason?
13    A.   Yes.
14    Q.   Was he not the HR director when you were separated
15  from your employment?
16    A.   Yes, he was.
17    Q.   So wouldn't he have information about that?
18    A.   Yes, he does.
19    Q.   But you didn't list him?
20    A.   No, I did not.
21    Q.   And my question is:  Why?
22    A.   Again, I believe that this was talking about the
23  -- the night in question with the allegations of Cosner
24  before that the -- the meeting.  That's why I didn't list
25  them.

Page 170

1    Q.   All right.  So we then asked you to provide
2  information on what each witness would testify to.  I'm
3  going to go back to Nick.  I'm going to start with Reginald
4  Lester.  You said:  "Member of the FOP has knowledge of my
5  complaints of harassment, retaliation of the FOP, was in the
6  January 19th meeting and observed Chief Clements threaten to
7  terminate me after I requested representation of my -- my
8  choice and for my attorney."  Do you see that?
9    A.   Yes.
10   Q.   What other information would Reginald Lester
11 testify to?
12   A.   So he would testify to the fact that, like it says
13 there, that the Chief threatened to terminate me during that
14 meeting.  He would testify to the fact that while I was
15 sitting in that meeting, I didn't want to answer any of the
16 questions that Chief Richard Clements was asking me.  He
17 would testify to the fact that, again, I said that this was
18 in violation of my 112 rights and my due processes.  That's
19 what he would testify to.
20   Q.   What about Robert Jenkins; what -- what meetings
21 was he witness to?
22   A.   He was a witness to the meetings with December,
23 the day that I signed the LCA, the Settlement Agreement.
24 And prior to that, while he was president, I've had
25 conversations with him about certain harassment that I was

Page 171

1  going through in the police department that I've discussed
2  in my EEOCs.
3         So he's very -- you know, he has a lot of
4  information about me speaking to him about these type of
5  behaviors and retaliation that I was going through as well
6  as him being involved with the time that I was demoted as
7  well.
8    Q.   Was he involved in your separation from employment
9  in January of 2021?
10   A.   No.
11   Q.   And was he involved at all?  Did you speak to him
12 after the January 19th meeting?
13   A.   I did have conversations with him.
14   Q.   And what were those conversations about?
15   A.   Just again of me telling him how I'm not being
16 properly represented by the FOP, that I was summoned to this
17 meeting and the FOP was already there, and my rights were
18 violated, and I was searching for answers, searching for
19 help so that I can remedy what I was going through and have
20 intervention to all of these rights being violated.
21   Q.   So --
22   A.   And he was a tenured -- he was a tenured FOP
23 president.  He was president of the state as well.  And I
24 was searching for somebody to help me when it came to this.
25   Q.   So after your January 19th, 2021 meeting, you

Page 172

1  talked to Bobby Jenkins about the 112 violations; is that
2  your testimony?
3    A.   Yes.  Yes.
4    Q.   And did Bobby Jenkins -- was he the state -- well,
5  was he the state FOP president at the time?
6    A.   I don't recall if it was after.  I don't remember
7  at the moment right now.
8    Q.   Did he ever file anything under 112.534 or
9  anything else to protect your 112 rights or assert a
10 violation of your 112 rights; did he do anything about it?
11   A.   No, because he wasn't the president at the time.
12 He was a former president, so he --
13   Q.   What did --
14   A.   -- there was nothing that he could have done about
15 it.
16   Q.   What did he tell you?
17   A.   I don't recall at the time, the extent of the
18 conversation, but he was trying to search for answers for
19 me.
20   Q.   Well, what was he doing to search for answers?
21   A.   He was trying to talk to the other FOP president.
22 You know, several times he said he would get back to me, but
23 throughout everything that was going on, we -- there was no
24 set plan or, you know, advice that he gave me.  But I tried.
25 I tried to reach out to as many FOP as I can.  And it all --

Page 173

1  it all -- nobody helped me.
2    Q.   Why haven't you sued the FOP recently?
3    A.   So at the time, I haven't.  But that's after I've
4  learned that I can, that's, you know, something that I'm
5  looking into.
6    Q.   Okay.  And you're saying --
7         MR. DARAGJATI:  Mike, Mike, I'm sorry.  I need a
8  break at this point.
9         MR. ELKINS:  Okay.
10        MR. DARAGJATI:  If we can take a break before you
11 go on to your next question, because she just made some
12 statements that placed me in a difficult situation.
13        MR. ELKINS:  Oh, okay.  Why don't we do this:
14 Take your break.  Paul, you have my cell, right?
15        MR. DARAGJATI:  I do.  Yeah, I'll -- I'll call
16 you.  I've got to call --
17        MR. ELKINS:  You call me.  We'll go on a break,
18 everybody.
19        THE VIDEOGRAPHER:  Going off the -- going off the
20 video record at 10:53 A.M.
21        (Recess was taken.)
22        THE VIDEOGRAPHER:  And we are back on the video
23 record at 11:10 A.M.
24        MR. DARAGJATI:  Okay.  During the break I had a
25 conversation with my client and with Mr. Elkins.  I

Page 174

1   advised both of them that based upon some testimony
2   that my client gave, she has placed me in a conflict
3   situation, as I'm the statewide counsel to the State of
4   Florida FOP.
5          I can no longer represent Ms. Guasto in this
6   matter.  I can't even continue this deposition today.
7   So I'll -- this evening I'll be moving to withdraw as
8   counsel for Ms. Guasto.
9          My understanding from the City is that it would be
10  unopposed.  And we've also had conversations about the
11  discovery scheduling order.  Based upon my withdrawal,
12  I have no objection to any request by the City for an
13  extension of the discovery timetable to complete
14  discovery.
15         MR. ELKINS:  Yeah.  Michael Elkins, on behalf of
16  the City.  I just want to clarify that the
17  conversations that Paul had with his client and with
18  the City were separate.
19         MR. DARAGJATI:  Right, that is correct, yes.
20         MR. ELKINS:  We didn't have them together, number
21  one.  Number two, yes, the motion to withdraw will be
22  unopposed.
23         And I you just want to remind Ms. Salabarria that
24  the deposition is suspended pending her either getting
25  new counsel or representing herself, however she

Page 175

1   chooses to proceed, but that she remains under oath and
2   should not talk about this deposition while it is
3   suspended.  And that's it for today, I guess.
4          MR. DARAGJATI:  All right.  Thank you, everyone.
5          THE VIDEOGRAPHER:  This concludes the video
6   deposition of Jessica Guasto.  Going off the video
7   record at 11:11 A.M.
8          THE VIDEOGRAPHER:  Mr. Elkins, will you need a
9   copy of the video?
10         MR. ELKINS:  I do not need a copy of the video.
11  Tammy, I'm going to order, not rush, just a mini.
12  Don't give me all the other bells and whistles.
13         THE VIDEOGRAPHER:  Mr. Daragjati, would you need a
14  copy of the video?
15         MR. DARAGJATI:  No, sir, I do not.
16         THE VIDEOGRAPHER:  Okay.  Thank you, very much.
17         (Deposition adjourned at 11:11 A.M.)
18
19
20
21
22
23
24
25

**COASTAL REPORTING, INC. (954) 523-5326**

Page 176

1                   CERTIFICATE OF OATH
2   STATE OF FLORIDA
3   COUNTY OF BROWARD
4          I, TAMARA MASCI TANNEN, RPR, Notary Public, State of
5   Florida, certify that JESSICA GAUSTO personally appeared
6   before me on the 13th day of February 2024 and was duly
7   sworn.
8          Signed this 13th day of February 2024.
9
10                          _____
                            TAMARA MASCI TANNEN, RPR, FPR-C
11                          Notary Public
                            State of Florida
12                          My Commission #HH 93523
                            Expires March 7, 2025
13
14
15
16
17
18
19
20
21
22
23
24
25

**COASTAL REPORTING, INC. (954) 523-5326**

Page 177

1               REPORTER'S DEPOSITION CERTIFICATE
2
3   STATE OF FLORIDA    )
    COUNTY OF PALM BEACH)
4
5          I, TAMARA MASCI TANNEN, Registered Professional
    Reporter, certify that I was authorized to and did
6   stenographically report the Continued Videotaped Deposition
    of JESSICA GAUSTO; that a review of the transcript was not
7   requested; and that the foregoing transcript, pages 142-is a
    true and complete record of my stenographic notes.
8
9          I FURTHER CERTIFY that I am not a relative,
    employee, attorney or counsel of any of the parties,
    nor am I a relative or employee of any of the parties'
10  attorney or counsel connected with the action, nor am I
    financially interested in the action.
11
12         DATED this 3rd day of March 2024.
13
14
15
16         TAMARA MASCI TANNEN, RPR, FPR-C
17
18
19
20
21
22
23
24
25

**COASTAL REPORTING, INC. (954) 523-5326**

BY MR. ELKINS: [3] 146/16 150/25 151/19
MR. DARAGJATI: [10] 145/21 150/24 151/4 173/7 173/10 173/15 173/24 174/19 175/4 175/15
MR. ELKINS: [8] 145/24 146/9 173/9 173/13 173/17 174/15 174/20 175/10
THE REPORTER: [3] 146/1 146/6 146/14
THE VIDEOGRAPHER: [7] 145/3 173/19 173/22 175/5 175/8 175/13 175/16
THE WITNESS: [1] 151/5

**1**
10:14 [2] 142/14 145/5
10:53 [1] 173/20
112 [15] 155/17 156/12 156/21 157/12 157/25 158/23 159/1 159/6 159/22 160/3 160/5 170/18 172/1 172/9 172/10
112.534 [7] 154/18 155/15 157/5 157/10 158/25 160/11 172/8
11:10 [1] 173/23
11:11 [3] 142/14 175/7 175/17
1212 [1] 143/9
122-CV-21004-DPG [1] 145/9
13 [1] 142/13
13th [3] 145/4 176/6 176/8
142-177 [1] 142/11
142-is [1] 177/7
16TH [1] 143/9
177 [1] 142/11
19th [6] 152/14 158/4 162/13 170/6 171/12 171/25

**2**
2020 [5] 147/6 147/7 148/20 149/3 168/24
2021 [4] 149/5 162/13 171/9 171/25
2024 [5] 142/13 145/4 176/6 176/8 177/12
2025 [1] 176/12
25th [1] 158/4
2608 [1] 143/4
27 [2] 164/2 164/3
28 [1] 164/11

**3**
32224 [1] 143/4
33304 [1] 143/9
3rd [1] 177/12

**4**
401-2608 [1] 143/10
4745 [1] 143/3

**5**
503 [1] 143/4

**6**
6th [1] 146/18

**9**
93523 [1] 176/12
954 [1] 143/10

**A**
A.M [7] 142/14 142/14 145/5 173/20 173/23 175/7 175/17
about [34] 146/2 146/24 147/1 147/6 148/1 149/7 150/1 150/7 151/7 151/8 152/3 152/21 152/22 152/23 152/24 155/25 156/18 158/20 166/21 167/4 167/24 168/10 169/17 169/22 170/20 170/25 171/4 171/4 171/14 172/1 172/10 172/14 174/10 175/2
according [1] 158/23
action [4] 145/16 167/20 177/10 177/10
activity [3] 148/15 148/16 148/19
actually [1] 153/15
adamant [2] 149/21 150/1
address [3] 147/25 167/16 167/16
addresses [1] 147/25
adjourned [1] 175/17
administration [1] 158/5
administrative [1] 152/11
advantage [3] 152/10 154/17 160/11
advice [1] 172/24
advised [2] 155/21 174/1
Affairs [3] 152/18 153/3 168/16
after [21] 145/19 148/10 149/13 150/22 155/14 156/4 156/9 156/10 156/14 156/17 156/20 158/24 161/10 162/10 169/2 169/3 170/7 171/12 171/25 172/6 173/3
again [12] 152/22 153/13 154/21 156/7 158/1 158/9 160/25 162/21 166/22 169/22 170/17 171/15
against [15] 148/5 148/9 155/22 156/11 159/11 160/18 161/12

161/25 162/3 162/18 163/6 168/2 168/17 169/1 169/4
agency [1] 157/16 157/17
agent [2] 156/5 168/15
ago [1] 159/17
agree [1] 158/12
agreed [1] 143/19
Agreement [11] 150/23 151/5 151/6 163/11 163/11 164/7 164/10 164/17 166/9 166/14 170/23
agreements [1] 163/13
ahead [2] 157/3 161/23
AJ [1] 152/18
all [16] 145/18 146/18 158/22 160/15 161/15 163/10 163/13 166/21 167/10 170/1 171/11 171/20 172/25 173/1 175/4 175/12
allegation [4] 152/22 152/25 165/22 166/4
allegations [8] 149/15 150/13 150/15 150/18 167/12 168/25 169/4 169/23
allege [2] 154/17 159/22
alleged [6] 158/23 159/5 165/23 166/25 167/19 168/6
alleging [1] 155/16
almost [1] 162/9
already [3] 152/19 161/8 171/17
also [8] 143/13 145/23 146/13 151/13 159/21 161/20 166/13 174/10
am [7] 145/14 145/15 145/16 161/16 177/8 177/9 177/10
ambiguous [1] 151/14
answer [9] 151/1 151/2 151/4 153/12 154/22 155/7 155/9 156/3 170/15
answered [1] 155/2
answering [2] 155/7 155/12
answers [5] 163/18 166/22 171/18 172/18 172/20
any [41]
anybody [4] 146/24 156/11 165/22 165/23
anything [9] 151/7 151/8 156/11 158/3 158/24 165/24 172/8 172/9 172/10
anywhere [1] 151/17
appearances [2] 142/18 145/18
appeared [1] 176/5
APPEARING [2] 143/5 143/11
apply [1] 154/20

approximately [2] 145/5 145/8
arbitrate [1] 151/16
are [8] 143/22 145/6 146/2 151/24 152/3 166/1 166/3 173/22
art [1] 165/8
as [24] 146/8 146/10 147/14 152/14 152/19 152/19 158/5 159/17 159/23 162/15 162/23 163/16 166/3 166/14 167/6 168/5 171/5 171/6 171/6 171/23 172/25 172/25 174/3 174/7
ask [4] 148/4 150/6 153/18 156/10
asked [10] 147/24 152/21 153/13 154/23 157/23 157/24 157/24 166/23 166/23 170/1 170/16
asking [6] 149/23 153/24 155/10 157/8 157/9 170/16
assert [1] 172/9
associate [1] 145/22
assuming [1] 154/18
attend [1] 153/8
attorney [6] 153/6 154/24 162/16 170/8 177/9 177/10
authorized [1] 177/5
avoid [1] 146/11

**B**
back [10] 147/10 148/11 149/14 149/16 150/11 158/3 163/17 170/3 172/22 173/22
backdoor [1] 149/23
ball [1] 160/16
Bargaining [4] 164/7 164/10 166/9 166/14
based [2] 174/1 174/11
baseless [2] 149/14 150/13
basis [1] 148/20
be [17] 146/3 149/24 152/1 152/2 153/8 153/11 153/13 153/19 154/24 155/1 156/2 157/14 157/16 164/20 174/7 174/9 174/21
BEACH [4] 142/7 145/10 145/25 177/3
because [10] 148/24 149/20 157/21 159/13 159/21 161/20 162/24 168/24 172/11 173/11
become [2] 159/16 166/18
been [1] 146/8
before [12] 147/10 147/19 154/13 156/18 156/19 158/8 161/1 161/9 163/25 169/24 173/10 176/6
behalf [6] 143/5 143/11

145/15 145/24 160/12 174/5
behaviors [1] 171/5
being [10] 148/9 150/1 155/25 158/10 164/14 165/21 169/7 171/6 171/15 171/20
believe [7] 150/16 150/17 158/18 166/17 167/18 168/2 169/22
believed [1] 169/1
bells [1] 175/12
between [5] 143/20 151/20 164/7 166/7 166/10
Bill [16] 151/7 151/12 151/18 151/22 152/4 152/8 152/12 154/20 158/13 158/19 165/3 165/18 166/1 166/7 166/16 166/17
bit [1] 158/20
blew [1] 159/5
board [3] 154/8 160/3 160/10
Bobby [2] 172/1 172/4
both [2] 160/4 174/1
break [5] 173/8 173/10 173/14 173/14 173/17 173/24
bring [1] 159/11
brought [4] 152/13 161/12 161/25 162/3
BROWARD [1] 176/3

**C**
call [3] 173/15 173/16 173/17
came [2] 169/7 171/24
can [16] 147/15 151/1 160/22 163/18 163/19 164/5 165/14 165/22 167/8 171/19 172/25 173/4
can't [4] 151/15 151/16 166/19 174/6
cannot [1] 158/16
case [5] 142/4 145/9 145/9 148/19 157/17
cause [3] 151/23 164/9 166/4 166/9
caused [1] 163/12
cease [1] 156/6
cell [1] 173/14
certain [1] 170/25
CERTIFICATE [2] 175/18 177/1
certify [1] 176/5 177/5 177/8
chance [6] 150/9 150/23 151/5 151/6 163/11 164/17
changed [1] 146/11
Chapter [1] 155/17
charge [6] 147/7 148/12 148/21 148/24 149/2 169/3
Chief [25] 149/20

**C**

Chief... **[24]** 150/6
152/17 152/20 153/17
153/22 155/21 155/24
156/5 156/21 159/7
159/10 161/1 161/3
161/5 161/6 163/3
163/6 164/12 164/14
167/3 168/5 170/6
170/13 170/16
**Chief's [1]** 152/15
**Chiefs [1]** 152/17
**choice [3]** 153/13
154/23 170/8
**chooses [1]** 175/1
**circumstances [1]**
166/25
**city [30]** 142/7 145/10
145/25 148/6 148/10
148/11 148/15 148/24
149/16 149/25 150/10
150/17 151/22 156/11
157/17 158/11 158/24
163/3 164/7 164/13
165/1 165/2 166/18
166/23 167/13 169/9
174/9 174/12 174/16
174/18
**City's [2]** 147/16 151/9
**claim [9]** 148/13
148/20 159/11 160/18
160/22 161/12 161/25
162/3 162/18
**claiming [1]** 167/8
**claims [10]** 148/5
148/7 149/18 150/5
163/6 163/10 163/13
167/10 167/18 167/23
**clarify [1]** 174/16
**CLAVIJO [2]** 143/14
145/14
**Clements [14]** 149/20
150/6 152/17 153/4
153/5 153/7 156/7
163/4 163/7 164/12
167/3 168/5 170/6
170/16
**client [3]** 173/25 174/2
174/17
**COASTAL [3]** 143/14
145/14 145/15
**Collective [4]** 164/7
164/9 166/9 166/14
**come [2]** 156/9 158/9
**command [1]** 152/17
**commander [2]** 152/18
153/3 168/15
**Commission [1]**
176/12
**committed [1]** 165/24
**complain [1]** 152/11
**Complaint [3]** 144/8
163/23 167/5
**complaints [1]** 170/5
**complete [2]** 174/13
177/7
**completely [1]** 151/24
**compliance [3]** 156/23

157/15 164/14
**concerning [2]** 151/10
161/7
**concerns [1]** 150/7
**concluded [1]** 158/2
**concludes [1]** 175/5
**conduct [1]** 155/5
**conducted [1]** 156/15
**conducting [1]** 145/6
**conference [1]** 145/6
**CONFERENCING [1]**
142/15
**conflict [1]** 174/2
**confusion [1]** 146/11
**connected [1]** 177/10
**context [1]** 158/13
**continuation [1]**
146/17
**continue [3]** 154/25
156/8 174/6
**CONTINUED [2]**
142/12 177/6
**continues [1]** 157/14
**contract [1]** 158/16
**conversation [2]**
172/18 173/25
**conversations [7]**
149/23 157/6 170/25
171/13 171/14 174/10
174/17
**copy [3]** 175/9 175/10
175/14
**correct [37]**
**correctional [1]** 157/11
**Cosner [10]** 149/14
150/14 152/19 163/4
163/7 168/18 168/25
168/25 169/4 169/23
**Cosner's [1]** 150/18
**could [8]** 154/24
159/13 160/22 162/22
164/12 164/20 165/23
172/14
**counsel [10]** 143/5
143/11 143/20 145/18
156/16 174/3 174/8
174/25 177/9 177/10
**COUNTY [2]** 176/3
177/3
**court [6]** 142/1 142/17
142/23 145/11 145/13
145/19
**curious [1]** 167/6
**current [2]** 148/5 148/7
**cv [2]** 142/4 145/9

**D**

**DARAGJATI [6]** 143/2
143/2 143/3 145/21
145/22 175/13
**DARAGJATILAW.COM**
**[1]** 143/5
**dark [1]** 158/5
**DATE [1]** 142/13
**DATED [1]** 177/12
**day [13]** 145/4 148/11
149/14 149/16 150/11
158/8 161/2 161/5
161/25 170/23 176/6

176/8 177/12
**days [4]** 150/22 157/4
157/14
**December [3]** 149/10
149/12 170/22
**DEFENDANT [3]** 142/9
143/11 145/25
**defined [1]** 165/10
**demoted [1]** 171/6
**denied [1]** 153/14
**department [2]** 161/3
171/1
**deponent [1]** 143/21
**deposition [18]** 142/12
143/21 144/7 145/6
145/7 146/18 146/19
146/24 147/6 163/20
167/4 174/6 174/24
175/2 175/6 175/17
177/1 177/6
**DESCRIPTION [1]**
144/7
**designee [2]** 156/6
157/17
**did [57]**
**didn't [32]** 150/6 153/8
153/12 154/22 155/3
156/25 157/20 158/2
159/2 159/11 160/8
160/9 161/14 162/10
162/18 162/20 163/4
165/2 166/12 167/3
167/9 168/8 168/11
168/11 168/13 168/22
169/6 169/9 169/19
169/24 170/15 174/20
**difference [3]** 151/20
166/7 166/10
**different [1]** 151/24
**difficult [1]** 173/12
**direct [2]** 146/15 156/1
**directly [1]** 156/14
**director [2]** 169/9
169/14
**discipline [3]** 153/2
153/3 164/9
**discovery [3]** 174/11
174/13 174/14
**discussed [1]** 171/1
**dismissed [3]** 163/7
163/13 169/3
**disparity [1]** 161/16
**DISTRICT [4]** 142/1
142/2 145/11 145/12
**DIVISION [2]** 142/3
145/12
**do [37]**
**document [1]** 147/14
163/18
**does [10]** 146/13
149/18 151/2 151/8
151/16 164/25 167/23
167/23 168/5 169/18
**doesn't [6]** 151/6
151/15 164/22 165/3
165/24 166/4
**doing [1]** 172/20
**don't [11]** 147/19 157/1
157/22 161/17 165/21

176/8 177/12
168/2 172/6 172/6
172/11 173/13 173/12
**done [3]** 152/6 162/23
172/14
**DPG [2]** 142/4 145/9
**dropped [1]** 160/15
**due [7]** 151/9 151/10
151/13 158/1 165/4
166/2 170/18
**duly [2]** 146/8 176/6
**during [5]** 150/2
155/13 159/14 170/13
173/24

**E**

**each [1]** 170/2
**educated [4]** 159/14
159/16 159/18 162/24
**EEOC [14]** 147/7 148/8
148/9 148/20 148/24
149/2 149/10 149/22
149/24 150/1 150/4
150/8 168/24 169/3
**EEOCs [1]** 171/2
**either [2]** 162/3 174/24
**ELKINS [6]** 143/8
145/24 163/22 173/25
174/15 175/8
**else [5]** 147/3 158/3
168/17 168/20 172/9
**email [1]** 167/16
**emails [1]** 147/25
**employee [7]** 150/22
164/8 164/18 164/23
166/19 177/9 177/9
**employer [1]** 165/14
**employment [11]**
154/13 156/18 156/19
158/19 162/10 165/8
165/14 166/5 167/17
169/15 171/8
**end [2]** 161/2 161/5
**engaged [1]** 148/15
**engaging [1]** 148/16
**enough [3]** 163/3
165/20
**entailed [1]** 152/16
**enter [1]** 163/12
**entire [1]** 160/3
**entity [1]** 161/2
**ERICK [2]** 143/14
145/14
**ESQ [3]** 143/2 143/2
143/8
**Eugene [3]** 160/8
160/10 168/22
**even [3]** 158/16 167/15
174/6
**evening [1]** 174/7
**ever [3]** 158/24 160/11
172/8
**everybody [2]** 160/14
173/18
**everyone [1]** 175/4
**everything [2]** 163/12
172/23
**EXAMINATION [1]**
146/15
**excuse [2]** 147/12

168/25 172/6 172/6
executive [3] 154/8
160/3 160/10
**Exhibit [3]** 147/14
163/17 163/20
**Exhibit 6 [1]** 147/14
**Expires [1]** 176/12
**extension [1]** 174/13
**extensively [1]** 167/4
**extent [1]** 172/17

**F**

**fact [7]** 158/25 162/12
167/19 167/20 170/12
170/14 170/17
**facts [7]** 148/1 166/25
167/23 167/24 167/25
168/6 168/11
**Fair [1]** 165/20
**false [1]** 166/4
**familiar [1]** 154/19
**FEBRUARY [7]** 142/13
145/4 146/18 162/12
162/13 176/6 176/8
**February 19th [1]**
162/13
**February 6th [1]**
146/18
**female [3]** 161/16
161/17 161/20
**few [2]** 147/9 149/7
159/17
**figure [1]** 158/21
**file [6]** 156/11 157/4
157/24 160/22 162/25
172/8
**filed [8]** 145/11 148/24
149/14 157/16 158/24
162/12 163/25 167/20
**filing [2]** 148/8 148/9
**financially [1]** 145/17
177/10
**fire [2]** 165/14 166/19
**fired [5]** 148/10 148/16
148/24 149/5 164/20
**first [6]** 146/8 148/11
149/13 149/16 150/9
150/11
**FL [1]** 142/7
**FLORIDA [17]** 142/2
142/8 142/17 143/4
143/9 145/10 145/12
154/18 155/15 157/10
158/25 160/11 174/4
176/2 176/5 176/11
177/2
**followed [1]** 161/15
**follows [1]** 146/8
**FOP [47]**
**foregoing [1]** 177/7
**form [1]** 150/24
**former [3]** 167/3 169/9
172/12
**forms [1]** 148/20
**FORT [1]** 143/9
**four [5]** 153/15 153/15
154/2 158/22 160/2
**FPR [3]** 142/16 176/10
177/16

**F**

FPR-C [3]  142/16
176/10 177/16
FURTHER [1]  177/8

**G**

GAUSTO [4]  142/12
146/7 176/5 177/6
gave [3]  156/1 172/24
174/2
Gene [1]  162/4
get [11]  147/10 149/22
149/24 150/7 150/10
150/10 152/16 159/18
161/7 163/17 172/22
getting [1]  174/24
Gibbons [3]  160/8
162/4 168/22
give [5]  146/3 149/7
155/11 164/6 175/12
giving [1]  155/3
go [11]  147/9 147/23
150/3 153/1 153/5
157/3 161/23 164/2
170/3 173/11 173/17
God [1]  146/4
going [25]  146/9 147/9
147/10 147/20 153/5
153/11 155/1 155/11
156/2 156/8 161/9
161/10 163/16 163/16
164/2 170/3 170/3
171/1 171/5 171/19
172/23 173/19 173/19
175/6 175/11
got [3]  150/5 150/15
173/16
gotten [1]  169/2
governs [1]  158/19
grievance [7]  156/11
156/13 156/15 157/24
162/12 162/25 163/1
grieve [3]  151/16 157/7
157/8
GUASTO [10]  142/5
145/8 145/10 145/23
149/21 161/14 164/13
174/5 174/8 175/6
guess [1]  175/3

**H**

had [23]  146/10 147/5
147/13 147/24 152/15
152/23 153/13 153/15
154/25 157/6 158/22
159/9 159/25 160/2
161/8 168/25 169/2
169/3 169/4 170/24
173/24 174/10 174/17
hand [1]  146/1
happen [6]  154/20
155/18 156/23 156/24
157/18 157/19
happened [1]  167/9
harassment [2]  170/5
170/25
has [10]  151/22 152/1
152/1 157/14 165/10
165/17 167/17 170/4

171/3 174/2
have [28]  147/23 148/5
148/14 148/14 148/21
149/22 149/24 149/25
150/8 155/10 160/18
161/5 161/25 162/22
165/23 166/24 167/18
167/18 168/5 168/10
168/21 169/17 171/13
171/19 172/14 173/14
174/12 174/20
haven't [2]  173/2 173/3
having [3]  146/8
149/23 150/4
he [42]
he's [3]  167/4 167/10
171/3
head [2]  157/17 168/21
hear [2]  150/18 158/2
hearing [2]  156/23
157/16
help [3]  146/4 171/19
171/24
helped [1]  173/1
her [5]  146/10 146/10
164/6 164/8 174/24
here [2]  147/10 159/20
hereby [2]  143/19
143/22
herself [1]  174/25
HH [1]  176/12
him [15]  149/24 153/1
161/14 161/15 167/4
167/5 167/9 168/8
169/19 170/25 171/4
171/6 171/11 171/13
171/15
himself [1]  162/15
hired [2]  162/7 162/9
his [3]  150/7 161/15
174/17
hmm [3]  161/23 166/13
168/4
hold [4]  147/13 157/3
162/9 168/3
holds [1]  162/15
how [6]  154/20 155/20
156/9 157/22 159/18
171/15
however [6]  149/9
153/12 162/8 165/2
166/11 174/25
HR [2]  169/9 169/14

**I**

I'll [4]  173/15 173/15
174/7 174/7
I'm [29]  146/9 147/9
147/10 147/13 147/19
151/25 152/25 153/24
154/18 155/10 156/17
157/8 157/9 157/22
158/21 162/8 163/16
163/16 164/2 164/17
167/6 167/8 170/2
170/3 171/15 173/4
173/7 174/3 175/11
I've [6]  162/23 162/23
170/24 171/1 173/3

173/16
idea [3]  152/15 152/23
161/8
identification [1]
163/21
immediately [1]  162/9
important [1]  158/13
improper [5]  155/16
159/22 160/1 160/3
160/5
including [1]  160/2
individually [1]  163/4
165/5
individuals [2]  166/24
168/10
information [6]  167/19
168/5 169/17 170/2
170/10 170/10 171/4
initiate [2]  155/15
156/21
interested [2]  145/17
177/10
Internal [3]  152/18
153/3 168/15
interrogation [3]
159/23 160/1 160/4
interrogations [1]
160/5
interrogatories [1]
147/17
interrogatory [2]
163/17 166/22
intervention [1]  171/20
interview [2]  156/6
157/13
investigated [2]
150/14 150/17
investigation [4]  152/1
152/24 155/5 155/16
investigator [1]  155/17
investigatory [2]  155/4
157/12
invite [3]  152/14
152/15 152/16
involved [4]  167/10
171/6 171/8 171/11
is [64]
isn't [2]  153/16 160/20
issues [1]  150/3
it [66]
it's [10]  146/12 148/8
150/12 150/15 150/16
151/14 152/17 154/1
155/7 158/16

**J**

JACKSONVILLE [1]
143/4
January [7]  149/5
152/14 160/1 170/6
171/9 171/12 171/25
January 19th [4]
152/14 170/6 171/12
171/25
Jenkins [3]  170/20
172/1 172/4
JESSICA [12]  142/5
142/12 145/8 145/10
145/23 146/1 146/7

146/10 146/13 175/6
170/5 177/6
job [2]  165/23 167/17
John [1]  156/15
judge [3]  163/8 163/14
164/14
July [3]  147/7 149/2
149/11
July 2020 [1]  147/7
June [1]  149/11
just [16]  146/12 151/23
152/16 152/24 154/13
159/5 159/20 161/24
164/9 166/8 169/7
171/15 173/11 174/16
174/23 175/11

**K**

kept [1]  158/4
knew [4]  155/4 161/9
161/9 163/3
know [21]  146/12
154/19 155/10 157/1
157/1 157/22 158/18
159/13 160/22 162/21
162/22 162/23 162/24
166/11 166/20 167/10
167/12 171/3 172/22
172/24 173/4
knowledge [5]  148/1
166/24 167/18 168/10
170/4
known [1]  162/22
Kuno [3]  156/15
162/15 162/25

**L**

labeled [1]  152/14
labor [2]  162/16 162/19
last [6]  146/11 150/22
151/5 151/6 163/11
164/17
later [1]  149/8
LAUDERDALE [1]
143/9
LAW [1]  143/8
lawsuit [8]  148/1
148/23 164/16 167/1
167/20 167/21 168/6
168/11
lawyer [5]  147/1 162/9
162/13 162/15 162/19
lawyers [4]  159/25
160/7 160/14 162/4
LCA [9]  151/11 151/14
151/17 158/16 164/6
164/12 165/3 166/11
170/23
learned [1]  173/4
leave [1]  154/25
left [1]  147/5
legal [2]  165/8 165/11
Lester [6]  152/22 153/7
155/21 159/9 170/4
170/10
let [2]  148/4 156/10
let's [3]  165/20 166/21
167/14
level [1]  160/15

lieutenant [5]  149/14
159/13 150/18 163/7
168/18
like [7]  152/7 153/2
153/17 160/21 160/25
165/3 170/12
list [11]  147/24 166/23
167/3 167/9 168/8
168/12 168/13 168/22
169/9 169/19 169/24
listed [1]  167/6
listen [2]  155/9 157/9
little [2]  155/2 158/20
longer [1]  174/5
look [1]  167/14
looking [1]  173/5
looks [1]  153/2
lot [1]  171/3

**M**

made [1]  173/11
main [1]  150/7
make [3]  146/13
159/21 165/22
making [2]  164/8 166/4
male [1]  161/16
management [1]
161/19
many [2]  157/6 172/25
March [2]  176/12
177/12
mark [1]  163/16
marked [2]  147/14
163/20
MASCI [6]  142/16
145/13 176/4 176/10
177/5 177/16
matter [7]  145/8
149/19 151/25 159/14
159/16 167/21 174/6
may [2]  146/6 167/18
MBPD [1]  164/13
me [51]
mean [4]  151/2 164/25
165/24 166/13
meaning [1]  165/11
means [3]  164/23
165/1 165/14
mechanisms [1]
152/11
meeting [45]
meetings [3]  160/4
170/20 170/22
MELKINS [1]  143/10
member [3]  154/16
155/14 170/4
members [7]  153/15
153/18 154/2 154/8
154/9 158/22 160/2
MIAMI [6]  142/3 142/7
145/10 145/12 145/25
164/13
MICHAEL [7]  143/8
145/24 160/7 162/4
168/22 169/10 174/15
Mike [2]  173/7 173/7
mini [1]  175/11
MLE [1]  143/8
MLELAWFIRM.COM
[1]  143/10

**M**

Mm [2]  161/23 168/4
Mm-hmm [2]  161/23
168/4
moment [1]  172/7
Monday [1]  158/10
month [1]  149/13
months [2]  149/8
159/17
morning [1]  147/23
motion [1]  174/21
motivation [1]  150/7
moving [1]  174/7
MR [2]  163/22 175/13
Mr. [3]  162/15 173/25
175/8
Mr. Elkins [2]  173/25
175/8
Mr. Kuno [1]  162/15
Ms [3]  146/10 146/12
146/13
Ms. [4]  146/17 174/5
174/8 174/23
Ms. Guasto [2]  174/5
174/8
Ms. Salabarria [2]
146/17 174/23
much [1]  175/16
multiple [2]  160/14
160/15
MUNICIPALITY [1]
142/8
must [2]  157/11 157/16
my [74]
myself [1]  162/24

**N**

name [4]  145/14
145/21 146/11 167/15
names [2]  147/24
168/21
nature [3]  153/2 153/3
165/23
need [4]  173/7 175/8
175/10 175/13
never [11]  150/5 150/5
150/6 150/14 150/14
150/17 151/11 161/10
161/12 161/25 162/3
new [1]  174/25
next [2]  149/13 173/11
nice [1]  155/7
Nicholas [3]  149/21
149/23 161/14
Nick [2]  161/16 170/3
night [1]  169/23
nights [1]  168/19
no [28]  146/25 147/2
147/4 151/25 152/15
152/23 153/21 154/2
155/18 156/19 156/24
160/9 161/8 162/1
164/20 164/22 165/15
165/19 166/15 166/19
168/9 169/20 171/10
172/11 172/23 174/5
174/12 175/15
NO.:1:22 [1]  142/4

**NO.:1:22-cv-21004-DP**
**G [1]**  142/4
nobody [1]  147/3
156/9 158/24 160/7
173/1
none [1]  160/10
NORTHEAST [1]  143/9
not [52]
NOTARY [3]  142/17
176/4 176/11
notes [1]  177/7
nothing [4]  146/3
158/3 165/17 172/14
notice [3]  156/22 157/4
157/15
November [3]  159/22
159/24 161/13
now [5]  145/3 147/20
162/22 162/22 172/7
number [6]  145/9
147/24 163/20 167/16
174/20 174/21

**O**

oath [3]  146/22 175/1
176/1
Object [1]  150/24
objection [1]  174/12
observed [1]  170/6
Obviously [1]  167/9
occurred [1]  163/12
off [6]  147/5 159/5
168/21 173/19 173/19
175/6
officer [18]  151/7
151/12 151/17 151/21
151/22 152/4 152/8
152/12 157/11 157/11
158/19 165/3 165/18
165/22 166/1 166/7
166/16 166/17
Officer's [2]  154/19
158/13
Oh [1]  173/13
okay [31]  146/9 146/17
146/21 147/3 147/5
147/9 147/13 147/16
147/23 148/4 148/23
149/2 151/5 154/11
154/16 160/7 163/25
164/2 164/2 164/16
165/10 165/13 165/20
166/21 166/22 168/8
173/6 173/9 173/13
173/24 175/16 175/14
one [4]  154/5 158/4
160/9 174/21
only [4]  149/25 151/15
158/5 159/8
order [3]  156/1 174/11
175/11
organization [1]  161/4
other [6]  147/9 154/8
168/10 170/10 172/21
175/12
out [3]  158/21 162/15
172/25
outcome [1]  145/17
over [1]  146/19

**P**

PAGE [2]  144/2 144/7
pages [2]  142/11 177/7
PALM [1]  177/3
Pancier [2]  160/8
162/4 168/23
Paragraph [3]  164/2
164/3 164/11
PARK [1]  143/3
Part [1]  157/13
participate [4]  153/6
154/22 155/3 156/1
parties [2]  143/20
177/9
parties' [1]  177/9
party [1]  145/16
PAUL [6]  143/2 143/3
143/5 145/21 173/14
174/17
pending [1]  174/24
people [2]  147/25
163/2
person [3]  159/8
167/17 167/17
personally [1]  176/5
personnel [1]  160/15
pertaining [1]  167/19
physical [1]  167/15
place [2]  142/15
167/16
placed [2]  173/12
174/2
PLAINTIFF [4]  142/6
143/5 145/8 145/23
plan [1]  172/24
PLC [1]  143/3
pleadings [2]  166/25
167/19
please [4]  145/18
146/2 164/5 167/15
pled [1]  164/14
point [9]  152/7 152/10
153/10 154/11 154/16
155/13 156/4 156/20
173/8
police [18]  151/21
151/21 152/8 152/12
152/20 153/23 154/19
155/21 157/11 158/12
158/14 158/19 161/3
165/18 165/22 166/7
166/17 171/1
policies [2]  151/9
164/15
policy [1]  164/13
position [1]  148/23
prejudice [2]  163/7
163/14
present [4]  143/13
145/23 154/3 154/24
president [11]  154/5
159/25 160/2 160/9
170/24 171/23 171/23
172/5 172/11 172/12
172/21
pretty [1]  158/13
previous [1]  156/16
Prieto [1]  152/18

168/15
prior [3]  154/13 162/4
170/24
procedure [3]  157/10
157/13 164/14
procedures [2]  154/17
155/15 164/15
proceed [2]  146/6
175/1
process [2]  151/13
166/2
processes [5]  151/9
151/10 158/1 165/4
170/18
Professional [1]  177/5
properly [1]  171/16
protect [11]  157/2
157/24 159/8 160/8
160/9 161/17 162/20
163/2 166/2 166/3
172/9
protected [8]  148/15
148/16 148/19 160/10
161/15 166/8 166/14
166/15
protecting [2]  159/12
160/19
protections [4]  151/21
162/24 164/8 166/20
protects [1]  166/8
provide [2]  167/15
170/1
proxy [1]  149/21
PUBLIC [3]  142/17
176/4 176/11
purpose [1]  145/7
purposes [1]  155/4

**Q**

question [16]  153/20
153/20 154/1 154/2
155/8 155/9 155/10
155/12 155/13 161/24
165/7 167/14 168/19
169/21 169/23 173/11
questions [3]  150/6
153/12 170/16

**R**

raise [1]  146/1
reach [1]  172/25
read [2]  151/6 164/5
reading [2]  143/21
159/19
real [1]  161/24
reason [9]  164/20
164/20 164/22 165/15
165/15 166/19 166/19
169/11 169/12
recall [2]  172/6 172/17
recently [4]  146/11
159/17 162/23 173/2
Recess [1]  173/21
recognize [1]  163/23
record [6]  145/3
145/19 173/20 173/23
175/7 177/7
refer [2]  146/9 146/12
referenced [1]  167/5

referring [1]  154/12
refused [1]  152/21
regards [1]  168/24
Reggie [5]  152/22
153/7 155/21 156/20
159/9
Reginald [2]  170/3
170/10
Registered [1]  177/5
related [1]  145/16
relating [1]  163/10
relative [3]  149/17
177/8 177/9
relayed [1]  153/7
remains [1]  175/1
remedy [1]  171/19
remember [4]  146/18
147/7 147/19 172/6
remind [1]  174/23
REMOTE [1]  142/15
report [1]  177/6
REPORTED [1]  142/16
reporter [4]  142/17
145/13 145/19 177/5
REPORTER'S [1]
176/13
Reporting [1]  145/14
represent [2]  145/22
174/5
representation [1]
170/7
representative [2]
153/13 154/23
representatives [2]
154/12 157/23
represented [1]  171/16
representing [1]
174/25
request [4]  156/5
156/23 157/15 174/12
requested [2]  170/7
177/7
required [2]  150/20
164/6
respective [1]  143/20
responses [3]  147/16
155/3 155/11
retaliated [1]  148/9
retaliation [8]  148/8
148/12 148/14 148/20
149/18 169/7 170/5
171/5
review [4]  156/23
157/16 163/25 177/6
Richard [5]  153/4
153/5 153/7 156/7
170/16
rid [3]  149/22 149/24
169/2
right [14]  146/1 146/17
148/21 149/5 150/18
153/8 164/18 165/8
166/21 170/1 172/7
173/14 174/19 175/4
rights [34]  151/7
151/12 151/13 151/18
151/22 152/4 152/9
152/12 154/20 155/6
155/22 155/25 156/12

**R**

rights... **[21]** 157/25
158/13 158/19 159/8
160/19 161/15 162/20
162/24 164/6 165/4
165/18 166/1 166/2
166/7 166/16 166/18
170/18 171/17 171/20
172/9 172/10
**Robert [1]** 170/20
**ROSE [2]** 143/2 145/22
**RPR [4]** 142/16 176/4
176/10 177/16
**rules [1]** 146/19
**rush [1]** 175/11

**S**

**said [9]** 152/16 155/24
156/1 156/7 158/3
165/3 170/4 170/17
172/22
**SALABARRIA [6]**
142/12 146/7 146/10
146/12 146/17 174/23
**same [3]** 163/1 169/11
169/12
**sat [2]** 153/11 155/2
**say [5]** 151/7 151/8
151/16 164/22 167/23
**saying [2]** 159/1 173/6
**says [6]** 151/15 166/18
167/15 167/15 167/25
170/12
**scheduling [1]** 174/11
**search [2]** 172/18
172/20
**searching [3]** 171/18
171/18 171/24
**secretary [1]** 152/15
**Section [2]** 154/18
157/5
**see [11]** 147/14 147/15
148/2 152/18 163/18
163/19 164/3 167/1
167/14 167/21 170/8
**seem [1]** 154/19
**sense [1]** 146/13
**separate [2]** 161/2
174/18
**separated [9]** 148/11
149/16 150/11 150/15
156/18 156/19 158/9
158/11 169/14
**separation [3]** 154/13
162/10 171/8
**series [1]** 155/10
**set [1]** 172/24
**settle [3]** 149/25
149/25 150/8
**settled [3]** 149/10
149/11 149/12
**settlement [6]** 149/9
149/17 150/2 163/11
169/4 170/23
**settling [2]** 148/10
149/13
**seven [2]** 149/7 149/8
**several [2]** 153/14

172/22
**shared [1]** 152/24
**she [5]** 146/10 173/11
174/2 174/25 175/1
**should [1]** 175/2
**show [3]** 147/10
151/23 163/16
**showing [1]** 147/13
**signature [1]** 147/20
**signed [2]** 170/23
176/8
**significance [1]** 149/17
**significant [2]** 150/12
150/16
**signing [1]** 143/21
**simple [1]** 161/25
**since [1]** 154/19
**single [1]** 160/18
**sir [1]** 175/15
**sitting [1]** 170/15
**situation [2]** 173/12
174/3
**Smith [1]** 169/10
**so [57]**
**some [4]** 148/15 167/8
173/11 174/1
**somebody [2]** 166/4
171/24
**someone [1]** 165/15
**something [5]** 158/15
162/21 165/4 166/16
173/4
**sometime [1]** 149/10
**SOPs [1]** 151/9
**sorry [5]** 152/25
160/25 161/23 162/8
173/7
**sort [1]** 148/15
**sounds [1]** 152/7
**SOUTHERN [2]** 142/2
145/12
**speak [2]** 150/3 171/11
**speaking [1]** 171/4
**specific [1]** 151/14
**specifics [1]** 151/15
**spoke [1]** 150/6
**spot [1]** 153/9
**staff [1]** 152/17
**standard [2]** 164/9
166/9
**standing [1]** 159/9
**start [1]** 170/3
**started [1]** 159/19
**state [11]** 142/17
145/18 151/15 171/23
172/4 172/5 174/3
176/2 176/4 176/11
177/2
**stated [2]** 153/17
160/21 161/1
**statements [1]** 173/12
**STATES [1]** 142/1
**statewide [1]** 174/3
**status [1]** 158/20
**Statute [5]** 154/18
155/15 157/10 158/25
160/11
**statutory [2]** 151/12
158/17

**stenographic [2]**
142/17 177/1
**stenographically [1]**
177/6
**Steven [1]** 168/18
**still [1]** 146/21
**stipulated [1]** 143/19
**stop [1]** 159/10
**subject [1]** 167/21
**Subsection [1]** 158/25
**subsequent [2]** 149/12
150/9
**subsequently [1]**
148/10
**substantiated [1]**
150/15
**sue [1]** 163/3
**sued [2]** 167/5 173/2
**SUITE [1]** 143/4
**summoned [8]** 152/20
153/17 153/22 154/1
159/7 161/1 161/4
171/16
**support [2]** 167/8
167/23
**supposed [2]** 150/3
157/21
**supposedly [1]** 160/19
**sure [2]** 152/3 159/21
**suspended [2]** 174/24
175/3
**SUTTON [1]** 143/3
**swear [2]** 145/20 146/2
**sworn [2]** 146/8 176/7

**T**

**take [5]** 149/7 152/10
154/17 173/10 173/14
**taken [2]** 145/8 173/21
**taking [1]** 145/7
**talk [7]** 146/24 147/1
158/20 166/21 167/24
172/21 175/2
**talked [2]** 167/4 172/1
**talking [3]** 147/6
156/18 169/22
**TAMARA [6]** 142/16
145/13 176/4 176/10
177/5 177/16
**Tammy [2]** 146/9
175/11
**TANNEN [6]** 142/16
145/13 176/4 176/10
177/5 177/16
**telephone [1]** 167/16
**tell [1]** 172/16
**telling [1]** 171/15
**tenured [2]** 171/22
171/22
**term [1]** 165/8
**terminate [1]** 151/23
164/12 170/7 170/13
**terminated [7]** 148/11
150/10 153/8 153/11
155/1 156/2 169/8
**termination [1]** 156/17
**TERRACE [1]** 143/9
**terrified [1]** 153/10
**testified [1]** 146/8

**testify [6]** 170/2 170/11
170/12 170/14 170/17
170/19
**testimony [4]** 146/2
159/24 172/2 174/1
**Thank [3]** 146/6 175/4
175/16
**that [233]**
**that's [22]** 148/12
150/12 150/16 153/20
155/7 155/11 155/24
156/17 157/22 158/15
162/23 165/5 165/23
166/1 166/2 167/9
169/6 169/24 170/18
173/3 173/4 175/3
**their [3]** 145/18 156/6
157/17
**them [14]** 154/5 157/23
157/24 157/24 159/2
160/11 160/15 160/19
160/19 161/12 169/6
169/25 174/1 174/20
**then [15]** 148/9 148/15
149/5 149/12 150/2
150/9 152/18 156/4
158/8 158/10 158/10
162/19 163/17 168/25
170/1
**there [33]** 149/9 149/15
150/3 150/9 152/1
152/1 152/11 152/17
152/19 152/19 153/9
153/19 153/21 153/22
154/2 155/2 156/13
156/14 157/12 157/14
158/3 159/1 159/9
159/21 159/25 161/8
161/16 166/2 166/3
170/13 171/17 172/14
172/23
**there's [2]** 151/20
166/20
**therefore [1]** 148/12
**these [6]** 147/21
147/23 149/14 167/7
171/4 171/20
**they [31]** 150/10
150/20 150/21 153/20
153/22 154/20 155/5
155/7 156/21 158/8
158/8 158/10 158/23
159/8 160/8 161/3
161/3 161/4 161/5
161/9 161/9 161/10
161/13 161/13 161/14
161/15 161/15 161/17
161/17 162/19 162/20
**they're [2]** 157/23
161/2
**things [6]** 147/9 151/24
165/24 165/25 166/10
167/8
**think [6]** 147/5 147/6
149/2 159/20 166/6
166/13
**this [64]**
**those [11]** 150/5
151/24 153/14 160/4

163/12 163/13 164/15
167/21 163/25 166/10
171/14
**though [1]** 156/17
**thought [2]** 167/7
169/6
**threaten [1]** 170/6
**threatened [1]** 170/13
**three [5]** 153/15 154/2
156/22 157/4 157/14
**through [15]** 147/9
147/23 149/21 149/21
149/21 152/4 158/16
162/13 162/19 162/25
166/8 169/3 171/1
171/5 171/19
**throughout [1]** 172/23
**tie [1]** 169/6
**tied [1]** 169/1
**time [17]** 142/14 145/5
149/20 152/7 152/10
154/16 155/13 156/4
156/20 159/15 162/22
168/16 171/6 172/5
172/11 172/17 173/3
**times [2]** 153/14
172/22
**timetable [1]** 174/14
**timing [1]** 150/13
**title [1]** 167/17
**today [3]** 145/4 174/6
175/3
**together [1]** 174/20
**told [13]** 152/22 153/1
153/4 154/24 155/24
156/20 157/1 157/3
158/9 158/10 159/2
159/10 161/10
**took [3]** 150/10 150/10
160/11
**top [2]** 160/15 168/21
**transcript [2]** 177/6
177/7
**tried [2]** 172/24 172/25
**true [3]** 153/16 160/20
177/7
**truth [3]** 146/3 146/3
146/4
**trying [4]** 155/5 158/21
172/18 172/21
**Tuesday [1]** 145/4
**turned [1]** 164/17
**two [5]** 151/24 159/25
160/7 166/10 174/21
**type [2]** 155/3 171/4

**U**

**U.S [1]** 145/11
**under [11]** 146/21
157/5 158/25 161/6
164/6 164/9 164/12
166/15 166/20 172/8
175/1
**underlying [1]** 167/20
**understand [26]**
146/21 148/13 148/14
148/17 151/20 151/23
151/25 158/18 159/21
163/6 163/10 163/13

**U**

**understand... [14]**
164/23 165/2 165/7
165/10 165/13 165/13
165/15 165/17 165/19
165/21 166/6 166/10
166/11 166/15
**understanding [4]**
148/5 148/7 151/11
174/9
**understood [2]** 165/5
165/6
**union [1]** 163/1
**UNITED [1]** 142/1
**unopposed [2]** 174/10
174/22
**unsubstantiated [1]**
149/15
**unsupported [1]** 163/1
**until [1]** 149/10
**up [2]** 159/9 164/6
**upon [2]** 174/1 174/11
**us [1]** 164/5
**use [2]** 157/11 157/11

**V**

**versed [1]** 152/8
**versus [1]** 145/10
**very [14]** 149/13
149/13 149/16 149/20
150/1 150/11 151/14
152/8 152/23 155/2
161/7 161/24 171/3
175/16
**via [2]** 142/15 145/6
**video [12]** 142/12
143/14 145/3 145/7
145/15 173/20 173/22
175/5 175/6 175/9
175/10 175/14
**videographer [1]**
143/14 145/15
**Videotaped [1]** 177/6
**view [1]** 160/4
**violated [4]** 152/12
162/19 171/18 171/20
**violating [2]** 155/17
156/12
**violation [13]** 155/25
156/21 156/22 157/5
157/12 157/15 157/25
158/23 159/1 159/6
164/13 170/18 172/10
**violations [1]** 172/1
**VOLUME [1]** 142/11
**VS [1]** 142/6

**W**

**waive [8]** 151/13
151/17 158/16 165/3
165/4 165/5 166/12
166/16
**waived [2]** 143/22
151/12
**waiving [2]** 151/7
151/8
**want [11]** 147/23 153/1
153/6 153/12 154/22
155/9 159/20 161/24

170/15 174/16 174/23
**wanted [2]** 157/7 157/8
**was [120]**
**wasn't [7]** 149/9
149/10 149/11 152/6
152/23 167/6 172/11
**way [1]** 149/25
**we [19]** 145/6 145/22
146/12 146/19 147/5
147/6 147/10 147/13
147/19 147/24 150/4
150/5 156/1 170/1
172/23 173/10 173/13
173/22 174/20
**we'll [3]** 158/20 163/17
173/17
**We're [1]** 145/3
**we've [1]** 174/10
**weeks [1]** 149/7
**well [16]** 149/20 152/8
152/19 157/8 158/6
159/23 166/3 166/14
166/23 167/11 167/14
171/5 171/7 171/23
172/4 172/20
**well-versed [1]** 152/8
**went [4]** 146/19 153/4
162/25 163/1
**were [24]** 147/6 149/5
150/14 150/14 150/20
150/21 152/12 153/21
153/22 154/2 154/8
155/4 155/5 156/18
160/5 161/4 163/7
163/13 166/13 167/7
169/14 171/14 171/17
174/18
**Weren't [1]** 150/22
**what [36]** 147/13 148/4
151/21 151/25 152/15
152/21 152/23 152/24
155/23 155/24 157/9
158/21 161/8 161/10
162/23 162/25 163/16
164/23 164/25 165/5
165/21 165/21 166/7
166/8 168/10 170/2
170/10 170/19 170/20
170/20 170/20 171/14
171/19 172/13 172/16
172/20
**What's [1]** 149/17
**when [13]** 146/12
150/2 152/16 155/20
157/12 158/2 158/2
158/10 159/16 166/18
169/7 169/14 171/24
**where [4]** 147/5 148/12
159/25 160/1
**whether [1]** 151/22
**which [6]** 145/11
145/19 146/10 153/14
154/18 154/23
**while [3]** 170/14
170/24 175/2
**whistles [1]** 175/12
**who [15]** 145/23
147/25 154/1 154/1
155/20 156/15 157/3

159/7 159/9 167/17
167/18 168/15 168/17
168/18 168/20
**whole [1]** 146/3
**why [25]** 149/18
149/18 150/12 150/16
153/3 156/25 156/25
157/20 157/20 157/22
158/10 159/11 162/18
166/1 166/2 167/3
167/6 167/9 168/22
169/6 169/9 169/21
169/24 173/2 173/13
**will [13]** 145/19 146/3
150/22 152/1 164/8
164/18 164/23 165/2
165/8 165/14 166/18
174/21 175/8
**withdraw [2]** 174/7
174/21
**withdrawal [1]** 174/11
**withdrawn [2]** 150/1
150/8
**within [5]** 149/12
156/21 157/4 157/14
158/25
**without [3]** 153/6
155/5 164/8
**witness [7]** 144/2
145/20 146/5 167/6
170/2 170/21 170/22
**witnesses [3]** 147/24
166/24 167/7
**work [5]** 158/9 158/14
161/3 161/4 161/5
**working [5]** 156/22
157/4 157/14 165/1
168/18
**world [1]** 159/20
**would [15]** 145/18
147/25 149/24 153/8
158/12 166/24 170/2
170/10 170/12 170/14
170/17 170/19 172/22
174/9 175/13
**wouldn't [1]** 169/17
**writing [2]** 158/24
159/3
**written [6]** 150/4
156/13 156/22 157/4
157/15 169/1
**wrong [1]** 164/17
**wrote [1]** 150/14

**Y**

**Yeah [4]** 156/17 168/14
173/15 174/15
**yes [56]**
**yet [1]** 160/18
**you [158]**
**you're [12]** 146/21
152/8 154/12 154/18
155/11 155/11 158/22
159/1 159/5 161/20
166/8 173/6
**You've [1]** 167/3
**your [50]**

**Z**

**ZOOM [2]** 142/15 145/7



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.:**

JESSICA GUASTO,

       Plaintiff,

v.

THE CITY OF MIAMI BEACH, FL,
a Florida municipality,
RICHARD M. CLEMENTS,
in his individual capacity,
and STEVEN COSNER,
in his individual capacity.

       Defendants.

_____/

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

     Plaintiff Jessica Guasto ("Plaintiff" or "Guasto") sues The City of Miami Beach, FL ("City"), Chief Richard M. Clements ("Clements") in his individual capacity, and Lieutenant Steven Cosner ("Cosner"), in his individual capacity, and states as follows:

## <u>INTRODUCTION</u>

     1.    This is an action for damages and equitable relief by the Plaintiff against the Defendants under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq. ("Title VII"), for sex discrimination and retaliation, the Florida Civil Rights Act of 1992, § 760.10, Fla. Stat. ("FCRA") for sex discrimination and retaliation, violation of her right to equal protection under the 14th Amendment to the United States Constitution brought under 42 U.S.C. § 1983, conspiracy to violate her civil rights under the United States Constitution, breach of contract, fraudulent misrepresentation, and recission under state law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII and 42 U.S.C. § 1983. This court also has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

4.      Guasto is a Hispanic female, sui juris, and at all times material, a resident of Miami-Dade County and citizen of Florida.

5.      Defendant, The City of Miami Beach, is a political subdivision and a unit of local government of the State of Florida, duly created and existing pursuant to Article VIII, Section 2 of the Constitution of the State of Florida, and is situated within the geographic jurisdiction of this Court. The City of Miami Beach is an employer as defined by 29 U.S.C. § 203 and § 760.20, Fla. Stat.

6.      Richard M. Clements is the Chief of the City of Miami Beach Police Department. Upon information and belief, Clements resides in Broward County, Florida and is a citizen of Florida.

7.      Steven Cosner is a lieutenant employed by the City of Miami Beach Police Department. Upon information and belief, Cosner resides in Broward County, Florida and is a citizen of Florida.

## **GENERAL ALLEGATIONS**

8.      Guasto was hired by the Miami Beach Police Department ("MBPD") on January 30, 2012. Guasto had wanted to become a police officer since she was an adolescent, had an undergraduate degree in public administration and since the events giving rise to this action, has completed her master's degree in public administration.

9.      Guasto was promoted to the rank of MBPD police sergeant on May 1, 2017.

10.     During her tenure with the MBPD, various members of the MBPD sexually harassed Jessica to the point where it was persistent, severe, and disruptive to her work.

11.     An MBPD lieutenant took screenshots of Guasto's personal pictures on social media and spread them around the police station. He then told Guasto she needed to be more of an "extrovert," which is code for being more sexually active with male police officers.

12.     Guasto's colleagues and supervisors would openly make sexually explicit comments to her, view pornography on their personal cell phones in front of her, discuss penis enlargements, and comment about other female supervisors being promoted due to exchanging sexual favors.

13.     At the time, Guasto asked the Fraternal Order of Police ("FOP"), the local police union, to assist her in reporting this behavior. The FOP reported the behavior to Chief Clements, but Clements did nothing to stop it.

14.     On July 17, 2020, Jessica Guasto filed a charge with the EEOC, describing in detail over two single spaced pages the offensive behavior she was subjected to.

15.     In May 2020, prior to filing the July 2020 EEOC charge, the MBPD gave Guasto and her husband Nicholas Guasto – also an MBPD officer – notice that they were being investigated for being outside the city limits while on duty.

16.     An allegation of being outside the city limits while on duty is not a termination level offense and the MBPD has a custom and practice of giving lenient penalties for this behavior under egregious circumstances.

17.     On September 22, 2020, Chief Clements told Nicholas Guasto that the only way to resolve the internal affairs investigation for minor discipline was for the Plaintiff to withdraw her July 2020 EEOC charge.

18.     At a later meeting the same day, Chief Clements told Nicholas Guasto to communicate with the Plaintiff's then-attorney to withdraw the July EEOC charge, in exchange for disposing of the internal affairs investigation with a small suspension and the MBPD would also address the Plaintiff's harassment complaints.

19.     On September 24, 2020, Chief Clements called Nicholas Guasto upset because the City's attorney found out Chief Clements was speaking with Nicholas Guasto about having the Plaintiff withdraw the July EEOC charge.

20.     In that phone conversation, Chief Clements gave Nicholas Guasto specific instructions on who to call and what to say to remove the implication that Chief Clements was involved in pressuring the Plaintiff to withdraw the July 2020 EEOC charge and that Chief Clements would not be able to "help" Nicholas Guasto and the Plaintiff if this problem was not fixed as he instructed them.

21.     Nicholas Guasto took no further action in response to Chief Clements' directive.

22.     On November 2, 2020, the Plaintiff attended a meeting pursuant to a request by the City attorney. The meeting was allegedly to discuss the harassment complaints and the July 2020 EEOC charge. In attendance for the City were the City's attorney, Chief Clements, the MBPD

Deputy Chief, a MBPD Assistant Chief, the MBPD Internal Affairs Commander, and the City Human Resources Director.

23.     Instead of a discussion of the EEOC charge, the meeting was an interrogation regarding the open internal investigation, where Chief Clements threatened Guasto several times with termination for the open internal affairs investigation if she did not agree to a "settlement" to dismiss the July 2020 EEOC charge. None of the City personnel discussed the harassment complaints or the EEOC charge.

24.     The City personnel did not disclose what the settlement would be and said they would let the Plaintiff know via email to the FOP attorney what their offer of settlement would be.

25.     The City proposed that in exchange for not terminating the Plaintiff pursuant to the internal affairs investigation, the City demanded that the Plaintiff enter into a Settlement Agreement where the Plaintiff would have to dismiss her July 2020 EEOC charge, agree to a 160 hour suspension, and also enter into a "Last Chance Agreement" ("LCA"), which was incorporated into the Settlement Agreement.

26.     The terms of the Settlement Agreement and the LCA were onerous and unprecedented.

27.     The LCA required Guasto to give up her rights under the collective bargaining agreement between the City and the FOP, making her an at-will employee without the protections of the "just cause" standard for discipline under the collective bargaining agreement.

28.     Under the LCA, Chief Clements could terminate Guasto for any violation of any City of MBPD policy or procedure, with Chief Clements being the judge of compliance with those policies and procedures.

29.     The LCA required Guasto to sign a letter of resignation so that if Chief Clements determined that Guasto was in non-compliance with City policy and procedure, the City could claim Guasto resigned instead of admitting that it terminated Guasto's employment.

30.     In comparison with the Plaintiff, similarly situated male officers of the MBPD are treated differently, are not threatened with termination and given much more lenient penalties for the same violation the Plaintiff was accused of committing. A few examples are as follows:

a.  In 2017 a male MBPD lieutenant was found to have been home while listed on duty and working on multiple occasions. A discipline panel, headed by then-Assistant Chief Clements recommended a letter of reprimand. Then-chief Oates suspended the lieutenant for 40 hours.

b.  In 2016, 13 male officers and one sergeant of the MBPD motorcycle unit had been compensated for hours they did not work, by leaving early, coming in late or not coming in at all for either overtime details or regular days of work. The officers were only given 10 hours of suspension each. The sergeant was classified as terminated after he failed to cooperate with the MBPD investigation and retired. The discipline panel was led by then-Assistant Chief Clements.

c.  In 2011, while investigating an incident where an officer ran a civilian over while walking on the beach, an audit was done of the supervisors in the area on attendance and other administrative issues. It was discovered that the male midnight shift lieutenant was violating the off-duty work policy by consistently coming to work late and leaving early to work off-duty yet was being compensated for working on-duty also. The lieutenant was given a minor suspension and subsequently promoted to a high-ranking position in the MBPD.

31.     The settlement agreement also provided that Guasto would meet with Chief Clements to provide information about her sexual harassment complaints so that the complaints could be investigated.

32.     On December 23, 2020, Guasto signed the agreement in good faith hoping to save her job and hoping that her complaints of harassment would be properly investigated and addressed.

33.     Guasto met with Chief Clements pursuant to the settlement agreement to provide information, but Chief Clements only asked for the name of a single staff person, close to him, involved in the sexual harassing behavior.

34.     Neither Chief Clements, the City nor the MBPD conducted any investigation into Guasto's sexual harassment complaints.

35.     On December 27, 2020, Guasto returned to work as a police sergeant, working the afternoon shift, from 3 pm to 11 pm. This was Guasto's first day back at work since signing the settlement and LCA.

36.     At the end of her afternoon shift, Guasto was mandated to work overtime through the ensuing midnight watch, 11 pm (Dec 27, 2020) to 7 am (Dec 28, 2020). Guasto was mandated to work for Lieutenant Steven Cosner.

37.     In 2014, while they were co-workers in patrol, Cosner pursued the Plaintiff romantically – including sending the Plaintiff a profane greeting card which showed a man exposing his penis to a woman.

38.     On multiple occasions Plaintiff rejected his advances. After being rejected, Cosner treated the Plaintiff poorly and refused to speak with her.

39.      Cosner was promoted to the rank of sergeant at the same time as Guasto and was recently promoted to lieutenant on December 27, 2020, so Cosner never worked in a supervisory role over Guasto before that date. In fact, Guasto never worked for Cosner any other time.

40.      Guasto worked the midnight shift from 11 pm (Dec 27, 2020) to 7 am (Dec 28, 2020) without incident.

41.      Upon information and belief, Cosner knew about the LCA and knew Guasto was an at-will employee who could be fired for any policy violation.

42.      Two days later, on December 30, 2020, Cosner submitted a formal allegation of employee misconduct, accusing Guasto of: 1) Failure to Supervise, 2) Conduct Unbecoming, 3) Insubordination, 4) Neglect of Duty, 5) Untruthfulness, 6) Performance of Duties, and 7) Failure to Monitor Radio.

43.      Cosner claimed in the complaint against Guasto that he gave her several specific assignments at the beginning of the shift, and that Guasto did not complete them and then lied about not completing the assignments.

44.      Cosner also claimed in the complaint that Guasto did not respond to her assigned area, was not monitoring the police radio, and insinuated that Guasto was sleeping.

45.      The allegations in the complaint were false.

46.      Chief Clements instructed Guasto to come to meet with him on January 19, 2021, telling Guasto that the attendees would be just Guasto, Chief Clements and the FOP president. When Guasto arrived for the meeting, the internal affairs commander and Cosner were also present.

47.      The internal affairs commander used the meeting as an interrogation, and the City subsequently fired Guasto on January 25, 2021.

48.     On July 7, 2021, the Plaintiff timely filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission. A copy of the charge is attached hereto as Exhibit A. The Plaintiff has complied with all conditions precedent to jurisdiction under Title VII and the FCRA in that Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations ("FCHR") within 300 days of the unfair employment practices alleged in this Complaint.

49.     On January 3, 2022, the EEOC issued the Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of receipt of that notice. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII and the FCRA. A copy of the Notice is attached hereto as Exhibit B.

50.     Guasto has retained the undersigned counsel to represent her in this action and has agreed to pay a reasonable attorney's fee for the firm's services.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII
### (The City of Miami Beach)

51.     Guasto repeats and realleges paragraphs 1 through 50 hereof, as if fully set forth herein.

52.     This is an action for discrimination based upon sex under Title VII.

53.     Plaintiff belongs to a protected category under Title VII in that she is a woman.

54.     Defendant, and its managers and agents, violated Title VII by discriminating against Plaintiff based upon her sex by subjecting her to unfavorable and disparate treatment when compared to male employees and discharging her.

55.     Defendant's stated reason for Plaintiff's termination is a pretext to conceal the unlawful nature of its conduct.

56.     Defendant is vicariously liable for all material adverse actions suffered by Plaintiff and all sex discrimination engaged in by Defendant's managers and supervisors.

57.     Defendant acted intentionally and with malice and reckless disregard for Plaintiff's rights under Title VII.

58.     As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff, prays that this Honorable Court will enter an Order:

a.     Declaring that Defendant violated Plaintiff's rights as protected by the laws of Title VII and ordering Defendant to institute policies, practices, training and programs that provide protection from discrimination against employees and that eradicate the effects of its past and present unlawful practices;

b.     Enjoining and restraining Defendant from engaging in acts of discrimination;

c.     Awarding Plaintiff back pay and the value of her lost employment benefits;

d.     Awarding Plaintiff reinstatement with full restoration of benefits or front pay in lieu of reinstatement;

e.     Awarding Plaintiff compensatory damages for her emotional distress, humiliation, embarrassment, and loss of reputation;

f.     Awarding Plaintiff her reasonable attorney's fees and costs incurred in this action;

g.     Awarding Plaintiff pre- and post-judgment interest; and

h.     Awarding any and all further relief as this Court may deem just and appropriate.

## COUNT II
## SEX DISCRIMINATION UNDER THE FCRA
### (The City of Miami Beach)

59.    Plaintiff reasserts the general allegations as set forth above in paragraphs 1-50 and

incorporates the same herein by this reference.

60.    This is an action for discrimination based upon sex under the FCRA.

61.    Plaintiff belongs to a protected category under the FCRA in that she is a woman.

62.    Defendant, and its managers and agents, violated the FCRA by discriminating

against Plaintiff based upon her sex by subjecting her to unfavorable and disparate treatment when

compared to male employees and discharging her.

63.    Defendant's reason for Plaintiff's termination is a pretext to conceal the unlawful

nature of its conduct.

64.    Defendant is vicariously liable for all material adverse actions suffered by Plaintiff

and all sex discrimination engaged in by Defendant's managers and supervisors.

65.    Defendant acted intentionally and with malice and reckless disregard for Plaintiff's

rights under the FCRA.

66.    As a result of Defendant's unlawful employment practices, Plaintiff has suffered

damages, including loss of wages; benefits and other compensation; harm to her personal and

business reputations; emotional distress, including, but not limited to, humiliation and

embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff prays that this Honorable Court will enter an Order:

a.    Declaring that Defendant violated Plaintiff's rights as protected by the laws of the

FCRA and ordering Defendant to institute policies, practices, training and programs

11

that provide protection from discrimination against employees and that eradicate the effects of its past and present unlawful practices;

b.  Enjoining and restraining Defendant from engaging in acts of discrimination;

c.  Awarding Plaintiff back pay and the value of her lost employment benefits;

d.  Awarding Plaintiff reinstatement with full restoration of benefits or front pay in lieu of reinstatement;

e.  Awarding Plaintiff compensatory damages for her emotional distress, humiliation, embarrassment, and loss of reputation;

f.  Awarding Plaintiff her reasonable attorney's fees and costs incurred in this action;

g.  Awarding Plaintiff pre- and post-judgment interest; and

h.  Awarding any and all further relief as this Court may deem just and appropriate.

**COUNT III**
**RETALIATION UNDER TITLE VII**
**(The City of Miami Beach)**

67.  Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

68.  This is an action for retaliation under Title VII.

69.  Defendant violated Title VII when it fired Plaintiff for having complained about the discriminatory treatment to which she was subjected.

70.  Defendant's reason for firing Plaintiff for violating policy and procedure is a pretext to conceal the unlawful nature of its conduct.

71.  Defendant is vicariously liable for all material adverse actions suffered by Plaintiff and all retaliation engaged in by Defendant's managers and supervisors.

72.     Defendant acted intentionally and with malice and reckless disregard for Plaintiff's rights under Title VII.

73.     But for reporting the unlawful race and sex discrimination to which she was subjected, Plaintiff would not have been fired.

74.     As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff prays that this Honorable Court will enter an Order:

a.      Declaring that Defendant violated Plaintiff's rights as protected by the laws of Title VII and ordering Defendant to institute policies, practices, training and programs that provide protection from discrimination against employees and that eradicate the effects of its past and present unlawful practices;

b.      Enjoining and restraining Defendant from engaging in acts of retaliation;

c.      Awarding Plaintiff back pay and the value of her lost employment benefits;

d.      Awarding Plaintiff reinstatement with full restoration of benefits or front pay in lieu of reinstatement;

e.      Awarding Plaintiff compensatory damages for her emotional distress, humiliation, embarrassment, and loss of reputation;

f.      Awarding Plaintiff her reasonable attorney's fees and costs incurred in this action;

g.      Awarding Plaintiff pre- and post-judgment interest; and

h.      Awarding any and all further relief as this Court may deem just and appropriate.

13

## COUNT IV
## RETALIATION UNDER THE FCRA
### (The City of Miami Beach)

75.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

76.     This is an action for retaliation under the FCRA

77.     Defendant violated the FCRA when it fired Plaintiff for having complained about the discriminatory treatment to which she was subjected.

78.     Defendant's reason for firing Plaintiff for violating policy and procedure is a pretext to conceal the unlawful nature of its conduct.

79.     Defendant is vicariously liable for all material adverse actions suffered by Plaintiff and all retaliatory acts engaged in by Defendant's managers and supervisors.

80.     Defendant acted intentionally and with malice and reckless disregard for Plaintiff's rights under the FCRA.

81.     But for reporting the unlawful sex discrimination to which she was subjected, Plaintiff would not have been fired by Defendant.

82.     As a result of Defendant's unlawful employment practices, Plaintiff has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff prays that this Honorable Court will enter an Order:

a.     Declaring that Defendant violated Plaintiff's rights as protected by the laws of the FCRA and ordering Defendant to institute policies, practices, training and programs

14

that provide protection from discrimination against employees and that eradicate the effects of its past and present unlawful practices;

b.     Enjoining and restraining Defendant from engaging in acts of retaliation;

c.     Awarding Plaintiff back pay and the value of her lost employment benefits;

d.     Awarding Plaintiff reinstatement with full restoration of benefits or front pay in lieu of reinstatement;

e.     Awarding Plaintiff compensatory damages for her emotional distress, humiliation, embarrassment, and loss of reputation;

f.     Awarding Plaintiff her reasonable attorney's fees and costs incurred in this action;

g.     Awarding Plaintiff pre- and post-judgment interest; and

h.     Awarding any and all further relief as this Court may deem just and appropriate.

**COUNT V**
**42 U.S.C. § 1983**
**SEX DISCRIMINATION IN VIOLATION OF THE 14TH AMENDMENT**
**(City of Miami Beach)**

83.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

84.     Defendant, as a political subdivision of the State of Florida, has taken action under color of law to deprive Plaintiff of her rights under the Equal Protection Clause of the United States Constitution and federal statutory law against discrimination on the basis of sex.

85.     Defendant's failure to enforce its own equal opportunity policies and its willingness to turn a blind eye and deaf ear to complaints of sex discrimination in the workplace resulted in a pattern, practice, policy and custom of allowing, tolerating and indeed, encouraging sex discrimination in the workplace.

15

86. Upon information and belief, the City of Miami Beach, under the leadership of Chief Clements as the ultimate policy and decision maker, has engaged in a pattern, practice, policy and custom of allowing, tolerating, and encouraging sex discrimination in the workplace, not the result of mere negligence, but instead reflecting a reckless disregard for, or knowing violation of the statutory and constitutional rights of female employees.

87. As a direct and proximate result of the actions and/or inactions of the City of Miami Beach, Plaintiff has been harmed and has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff prays that this Court will order Defendant to remedy discriminatory treatment of Plaintiff by:

a. Paying appropriate back pay;

b. Awarding Plaintiff reinstatement with full restoration of benefits or front pay in lieu of reinstatement;

c. Paying for lost benefits including medical insurance, pension and retirement plan;

d. Paying prejudgment interest;

e. Providing any other relief that is appropriate.

f. Enter an order against Defendant for compensatory damages; and

g. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to 42 U.S.C. § 1988(b).

## COUNT VI
## 42 U.S.C. § 1983
## SEX DISCRIMINATION IN VIOLATION OF THE 14TH AMENDMENT
### (Defendant Clements)

88.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

89.     Defendant Clements has acted under color of law to deprive Plaintiff of her rights under the Equal Protection Clause of the United States Constitution and federal statutory law against discrimination based on sex.

90.     The acts and omissions above were undertaken with Defendant Clements' willful, wanton, callous, and knowing disregard of the clearly established rights of the Plaintiff under the law to be free from sex discrimination in the workplace.

91.     As a direct and proximate result of the actions and/or inactions of Defendant, Plaintiff has been harmed and has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment against Defendant Clements, individually, for:

a.      actual, compensatory, and punitive damages; and

b.      a reasonable award of attorney's fees pursuant to 42 U.S.C. § 1988(b); and

c.      any other relief this Court deems just and proper.

**COUNT VI**
**42 U.S.C. § 1983**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS**
**(Defendants Clements and Cosner)**

92.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

92.     Defendants Clements and Cosner combined, conspired, confederated, and agreed with each other to violate Plaintiff's rights under the 14th Amendment to the United States Constitution and federal statutory law against discrimination on the basis of sex.

93.     As a direct and proximate direct and proximate result of the actions and/or inactions of Defendants, Plaintiff has been harmed and has suffered damages, including loss of wages; benefits and other compensation; harm to her personal and business reputations; emotional distress, including, but not limited to, humiliation and embarrassment; and other pecuniary and non-pecuniary losses.

WHEREFORE, Plaintiff demands judgment against Defendants Clements and Cosner, individually, for:

a.     actual, compensatory, and punitive damages; and

b.     a reasonable award of attorney's fees pursuant to 42 U.S.C. § 1988(b); and

c.     any other relief this Court deems just and proper.

**COUNT VII**
**BREACH OF CONTRACT UNDER FLORIDA LAW**
**(City of Miami Beach)**

94.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

95.     Plaintiff and defendant entered into a written contract, the Settlement Agreement and incorporated Last Chance Agreement referenced in paragraph 25 above.

18

96.     The written contract required the Plaintiff to withdraw her July 2020 EEOC Charge, give up a certain number of annual vacation hours and pay money to the City, in exchange for continued employment and the City investigating the Plaintiff's sexual harassment complaints, a copy being attached as exhibit C.

97.     Plaintiff performed all conditions precedent to be performed by Plaintiff or the conditions have occurred.

98.     The City did not conduct any investigation of the Plaintiff's sexual harassment complaints, and in fact terminated the Plaintiff's employment pursuant to unsubstantiated accusations.

WHEREFORE, Plaintiff requests judgment that the Settlement Agreement and Last Chance Agreement between the Plaintiff and the City of Miami Beach be canceled, that the parties be returned to the status quo antecedent the signing of the Settlement Agreement, for the costs of this suit, and for any other and further relief the court deems proper.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION UNDER FLORIDA LAW
### (City of Miami Beach)

99.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

100.    On, or about December 18, 2020, the Plaintiff entered into a Settlement Agreement with the City of Miami Beach.

101.    In that Settlement Agreement, the City represented to the Plaintiff that Chief Clements would meet with the Plaintiff and investigate the claims she made in her July 2020 EEOC Charge, in lieu of the Plaintiff prosecuting her claims with the EEOC and in a court of law.

102.     The representation was made for the purpose of inducing the Plaintiff to withdraw her July 2020 EEOC Charge.

103.     The representation was false and known by the City to be false at the time it was made because Chief Clements met with the Plaintiff to only ask the name of a single staff person involved in the sexually harassing behavior, and neither Chief Clements, the City nor the MBPD conducted any investigation into the Plaintiff's sexual harassment complaints.

104.     The representation induced Plaintiff to enter into the Settlement Agreement.

105.     As a result of the City's misrepresentation, the Plaintiff lost her grievance rights guaranteed to her by the collective bargaining agreement between the City and the FOP and was fired after her first day back at work after signing the Settlement Agreement and Last Chance Agreement, based on Cosner's unsubstantiated allegations.

WHEREFORE, Plaintiff requests judgment that the Settlement Agreement and Last Chance Agreement between Plaintiff and the City of Miami Beach be canceled, that the parties be returned to the status quo antecedent the signing of the Settlement Agreement, for the costs of this suit, and for any other and further relief the court deems proper.

## COUNT IX
### RESCISSION UNDER FLORIDA LAW
### (City of Miami Beach)

106.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations in Paragraphs 1-50 above.

107.     This is an action for rescission of the December 2020 Settlement Agreement and incorporated Last Chance Agreement.

108.    On, or about November 20, 2020, the City of Miami Beach represented to the Plaintiff that Chief Clements would meet with the Plaintiff to gather information so that the Plaintiff's sexual harassment complaints could be investigated.

109.    After that, on December 18, 2020, Plaintiff and the City entered into a written Settlement Agreement by which the City, through Chief Clements, agreed to meet with the Plaintiff and address the claims made in the July 2020 EEOC Charge, including but not limited to identifying the names of all persons who were alleged to have engaged in sexually harassing conduct as addressed in the Charge. A copy of the Settlement Agreement is attached to this Complaint and marked exhibit C.

110.    Pursuant to the Settlement Agreement, the City gave to Plaintiff the promises of continued employment and to investigate the July 2020 EEOC Charge, and Plaintiff gave to the City money in the form of cash payment and suspension hours, and signed the Last Chance Agreement, which contained additional provisions and was incorporated into the Settlement Agreement as consideration for the mutual promises and obligations of the Settlement Agreement.

111.    The representations made by the City set forth in Paragraph 2 of the Settlement Agreement, are now, and when made were, false and the City knew them to be false at the time that they were made.

112.    The City made the representations intending that they would induce Plaintiff to enter into the Agreement that Plaintiff seeks to rescind.

113.    Plaintiff entered into the Agreement in reliance on the false representations made by the City and had the Plaintiff known that the representations were false, the Plaintiff would not have entered into the Settlement Agreement and incorporated Last Chance Agreement.

114.    In entering into the Settlement Agreement, Plaintiff was not aware of the falsity of the representations made by the City, reasonably believed them to be true, and could not have discovered their falsity by the exercise of reasonable diligence.

115.    On March 5, 2021, Plaintiff sent a letter to the City advising the City that it was in breach of the Settlement Agreement and demanded arbitration, thus placing both parties in the position they occupied prior to entering the Settlement Agreement and notifying the City that Plaintiff would seek to have the contract judicially canceled.

116.    The invalidity of the Settlement Agreement does not appear on the face of it or from the face of any other instrument necessary to the use of the Settlement Agreement in evidence.

117.    Plaintiff has no plain, speedy, and adequate legal remedy that would be as efficient to attain the ends of justice and its prompt administration as a decree for rescission would be.

118.    Rescission of the Settlement Agreement would be fair and equitable and would not be unduly harsh on the City.

WHEREFORE, Plaintiff requests judgment that the Settlement Agreement and Last Chance Agreement between Plaintiff and the City of Miami Beach be canceled, that the parties be returned to the status quo antecedent the signing of the Settlement Agreement, for the costs of this suit, and for any other and further relief the court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Respectfully submitted,

**PAUL DARAGJATI PLC**

_____
PAUL A. DARAGJATI, ESQ.
Florida Bar No. 713813
Georgia Bar No. 491830
paul@daragjatilaw.com
4745 Sutton Park Ct., Ste. 503
Jacksonville, FL 32224
Telephone:     (904) 379-4117
Fax:             (904) 379-7108
*Counsel for Jessica Guasto*