**Page 1**

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
                   MIAMI DIVISION
              CASE NO.:1:22-cv-21004-DPG
JESSICA GUASTO,
          PLAINTIFF,
VS.

THE CITY OF MIAMI BEACH, FL,
A FLORIDA MUNICIPALITY,
          DEFENDANT.
_____/

DEPOSITION OF:          LT. PAUL OZAETA

DATE:                   APRIL 15, 2024

TIME:                   1:00 P.M. - 2:32 P.M.

PLACE:                  VIA ZOOM REMOTE CONFERENCING

REPORTED BY:            TIMOFEY GARBUZ, COURT REPORTER
                        NOTARY PUBLIC, STATE OF FLORIDA
```

**Page 2**

```
1 APPEARANCES:
2 DANIEL B. BARROUKH, ESQ.
  DEREK SMITH LAW GROUP, PLLC
3 520 BRICKELL KEY DRIVE
  SUITE O-301
4 MIAMI, FLORIDA  33131-2433
  (786) 688-2335
5 DANIELB@DEREKSMITHLAW.COM
       COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
6
7
8 MICHAEL L. ELKINS, ESQ.
  MLE LAW
9 1212 NORTHEAST 16TH TERRACE
  FORT LAUDERDALE, FLORIDA  33304
10 (954)401-2608
  MELKINS@MLELAWFIRM.COM
11      COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.
12
13
14            * * * * * * * * *
15         S T I P U L A T I O N S
16
17      It is hereby stipulated and agreed by and
18 between counsel for the respective parties, and the
19 deponent, that the reading and signing of the deposition
20 are hereby reserved.
21
22
23
24
25
```

**Page 3**

```
1              I N D E X
2 WITNESS                                        PAGE
3 PAUL OZAETA
4 Direct Examination by Mr. Elkins                  4
5 Cross Examination by Mr. Barroukh                59
6 Redirect Examination by Mr. Elkins               67
7
8              E X H I B I T S
9 DEPOSITION          DESCRIPTION                 PAGE
10 Exhibit Number 1   Collective Bargaining Agreement  18
11 Exhibit Number 2   Settlement Agreement             19
12 Exhibit Number 3   Meeting Jan 19, 2021             34
13 Exhibit Number 4   Florida Statute Section 112.534  53
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1           P R O C E E D I N G S
2           * * * *
3       THE REPORTER:  Okay.  Counsel, please state your
4 names and whom you represent for the record.
5       MR. BARROUKH:  Daniel Barroukh for the plaintiff,
6 Jessica Salabarria, formerly known as Jessica Guasto.
7       MR. ELKINS:  Michael Elkins, on behalf of
8 defendant, City of Miami Beach.
9       THE REPORTER:  Mr. Ozaeta, do you swear or affirm
10 that the statements you give in this matter shall be
11 the truth, the whole truth and nothing but the truth so
12 help you God?
13       THE WITNESS:  I affirm.
14       THE REPORTER:  We may proceed.
15              PAUL OZAETA,
16 Having been first duly sworn, testified as follows:
17              DIRECT EXAMINATION
18 BY MR. ELKINS:
19       Q.  Sorry.  I just had to close my door in case my dog
20 decides to bark at iguanas or anything else.
21       A.  It happens.
22       Q.  Indeed.  Okay.
23       Mr. Ozaeta, can you just state your full name for
24 the record, please.
25       A.  Sure.  My name is -- my legal name is Paul
```

PAUL Ozaeta

---

5

1  Alexander Ozaeta, O-z-a-e-t-a.
2      Q.  Great.  And would you prefer if I refer to you as
3  Mr. Ozaeta or Paul today seeing as you and I know each other
4  from the past?
5      A.  Paul is fine.  It's worked for 53 years;
6  hopefully, it will work for another 53.
7      Q.  Appreciate that.  Paul, have you ever -- I presume
8  you've been deposed before at some point in your law
9  enforcement career?
10     A.  Oh yes.
11     Q.  Many times, right?
12     A.  Yes, quite a few.
13     Q.  Have you ever been deposed in a civil case?
14     A.  Yes, I have.
15     Q.  Okay.
16     A.  It's been a while, but I have.
17     Q.  All right.  So since it's been a while, I'm just
18 going to go over a few rules to help us get through this a
19 little quicker.  Some of this stuff you may already know, so
20 I apologize in advance if this is basic stuff.
21     A.  No problem.
22     Q.  If we follow these rules, we should be done pretty
23 quick.
24     A.  Okay.
25     Q.  The first and probably most important rule is that

---

6

1  obviously, Tim is here as our court reporter and he's taking
2  down everything we say.  As great as Tim is, he cannot take
3  down two people talking at the same time.
4      A.  That's fair.
5      Q.  See, just like that, it's very important that we
6  don't talk over each other.  And I have to abide by this
7  rule too.
8         So I'm going to ask that you just wait for me to
9  finish my question.  Even if you kind of know what the
10 question is -- you're probably going to be able to
11 anticipate a lot of these questions -- just wait until I
12 finish and then pause for Tim and give your answer.  And I
13 will do my best not to interrupt you too.  Do you understand
14 that?
15     A.  That's good.  That works.
16     Q.  The second thing is, of course this isn't --
17 although this a deposition where he's recording what we say,
18 you know, via stenography, but there's no video of this, so
19 you have to give audible answers.  Like nodding your head
20 and ums and uhs don't work; does that make sense?
21     A.  Perfectly.
22     Q.  Okay.  Everything I'm asking you today is based on
23 your personal knowledge.  So unless I give you, like, a
24 hypothetical or I tell you, you know, what about or ask you
25 to guess, I don't want you to guess today.  So I just want

---

7

1  information based on your personal knowledge.  Do you
2  understand that?
3      A.  Yes.
4      Q.  Okay.  Have you talked to anybody about this
5  deposition before attending?
6      A.  No.
7      Q.  Did you do anything to prepare for this
8  deposition?
9      A.  No, I have no idea what you're going to ask me or
10 anything like that.
11     Q.  Okay.  Perfect.
12        You're currently employed by the City of Miami
13 Beach, correct?
14     A.  Yes, sir.
15     Q.  Can you just give -- rather than me asking a bunch
16 of questions, can you just give us a history of your
17 employment at the Beach?
18     A.  Okay.  I've been employed by the City of Miami
19 Beach since January of 2000.  Over the years I've been in
20 several parts of the department.  I've been in Internal
21 Affairs.  I've been the Union President.
22        I'm currently assigned to the detective bureau.
23 I'm the Lieutenant in charge of the street crime section.
24 Got promoted to Sergeant in 2008.  Promoted to Lieutenant in
25 2015.  And I've pretty much, I have a very well-rounded

---

8

1  career.  I've pretty much been everywhere in the department
2  in one capacity or another over the years.
3      Q.  When were you the Union President?
4      A.  Sorry?
5      Q.  When were you the president?
6      A.  I was the Union President, I was elected in 2020.
7  My actual term of office was from January 2021 until January
8  of 2023, so two years.  One term.
9      Q.  And what's your current assignment now?  I know
10 your rank, but what's your assignment?
11     A.  CID, Criminal Investigations Division.  I oversee
12 the street crimes section.
13     Q.  What does CID stand for?
14     A.  Criminal Investigations Division.
15     Q.  Right.  You did say that.
16        How long have you been in that role?
17     A.  Since November of last year.
18     Q.  Okay.  So the bulk of the questions today are
19 going to center around your time as the Union President.
20 And the -- when I'm referring to the Union, I'm talking
21 about the FOP, right?
22     A.  Yes.
23     Q.  Okay.  And just, again, what were the -- what was
24 the time period of that presidency, from -- was it
25 January 2021 until 2023?

---

PAUL Ozaeta

9

1   A.  Yes, sir.
2   Q.  And you guys work in two-year terms, correct?
3   A.  Yes.
4   Q.  Okay.  What is the makeup or what was the makeup
5   during your presidency of the, like, Union executive board?
6   Like, if we were to have an org. chart of the Union, what
7   would that look like?
8   A.  Okay.  I was the President.  Our particular lodge
9   has a First Vice President and a Second Vice President.
10  During my term, the First Vice President was Arley Flaherty,
11  who is a Sergeant in the police department.  The Second Vice
12  President was Reginald Lester, who was also a Sergeant in
13  the Miami Beach Police Department.
14      Down from there, we have the Lodge Secretary,
15  which is Sergeant Alex Bell.  He's still in that capacity.
16  Treasurer was Samuel Azicri, who is still in that capacity
17  Sergeant-At-Arms was Raymond Diaz, a Lieutenant in the
18  police department.  Who else?  Inner Guard I believe was
19  Eddie Garcia, who is a Lieutenant.  The Outer Guard was --
20  what's his name?
21  Q.  It's okay if you don't remember his name.
22  A.  Sergio Della Salas, who is an Officer in our
23  department.  Chaplain is another position that is -- was and
24  still is Christopher Mitchell, who is an officer in our
25  department.

10

1       We had three Trustees, which were Sergeant Javier
2   Fernandez, Officer Hector Fernandez -- and what's his
3   name -- Officer Daniel Moleta (phonetic).
4       Let's see, am I missing anybody?  We do have a lot
5   of officers in the ranks.
6   Q.  I'm not worried about the individual names, just
7   the titles, just the organization of it, the titles.
8   A.  Gotcha.  So basically, you have the President, the
9   two Vice Presidents, Sergeant-At-Arms, Inner and Outer
10  Guard, Chaplain, Treasurer, Secretary, State -- State -- I
11  believe State Delegate was the term, somebody that
12  represents the lodge over in the State Lodge -- that's
13  appointed by the President -- and three Trustees.
14  Q.  Is there a thing called a Grievance Committee?
15  A.  Yes, there is.
16  Q.  What is the Grievance Committee?
17  A.  The Grievance Committee is -- it acts on behalf of
18  the lodge.  They're officers that are picked.  In our Lodge,
19  we are allotted three members of the Grievance Committee.
20  Two of those members are picked by the President.  The third
21  member is picked by the First Vice President.  A Chair is
22  selected amongst the three.
23      And their function is to review, accept, take on
24  grievances for the membership.  They take in incoming
25  grievances, review them to see whether or not there's merit

11

1   to them, decide whether or not to proceed with them.  It's
2   not in the Union's best interest to pursue frivolous
3   grievances, of course.  And see the grievances out once they
4   are filed from start to finish.  Of course, a lot of times
5   there are grievances from previous administrations and mind
6   was no different.  There were grievances when I came in and
7   there were pending grievances when I left.
8   Q.  I think you said -- I just want to clarify -- one
9   of the functions of the Grievance Committee is to not -- or
10  to filter out grievances and not pursue grievances that are
11  frivolous; did I say that accurate?
12  A.  They're frivolous or pursuing them as not in the
13  best interest of the membership.
14  Q.  And are you referring to the overall membership?
15  A.  Yeah.  You do have to balance the good of the
16  individual member versus the good of the membership at large
17  because it is their money that's being used.
18  Q.  Understood.
19      And can you give an example, like, or a
20  definition, to the best of your ability, like, what is a
21  grievance in general?
22  A.  A grievance is basically, for lack of a better
23  term, a complaint arising from what is or could be a breach
24  of the terms of the contract, of course, in the -- not in
25  the favor of the member.  It would be the Union's part to

12

1   pursue grievances or the equivalent thereof on their behalf.
2   Q.  And are grievances sometimes brought by the Union
3   on its own for certain things?
4   A.  It can -- it can be.  It's possible.
5   Q.  And when you're referring to the contract, are you
6   referring to the Collective Bargaining Agreement between --
7   A.  Yes, sir.
8   Q.  -- the parties?  Okay.
9   A.  Yes.
10  Q.  And what is a Collective Bargaining Agreement?
11  A.  It's --
12      MR. BARROUKH:  Objection to form.
13  BY MR. ELKINS:
14  Q.  You can answer.
15  A.  I can?  Okay.
16  Q.  You can.
17  A.  I can.  Okay.  Okay.  Just want to make sure.  I
18  don't want to break the rules.
19  Q.  No, you're fine.
20  A.  Okay.  It's the Agreement between the City and the
21  Union as far as the terms and conditions, the terms and
22  working conditions and benefits and things that affect each
23  individual member, and the members collectively as well.
24  Q.  All right.  Is that -- is it negotiated between
25  the parties, the City and the Union?

PAUL Ozaeta

13

1    A.  Yes, the Collective Bargaining Agreement has a
2  term of three years, after which once it expires or -- the
3  best case -- you know, best case scenario prior to it
4  expiring, a new Agreement gets negotiated between the City
5  and the Union and put into place once the preceding one
6  ends.
7    Q.  And that's done through something called
8  collective bargaining, correct?
9    A.  Yes, sir.
10    Q.  Okay.  I'm going to show you a copy of what I've
11  marked as Exhibit 1.
12        (Deposition Exhibit Number 1 marked for
13  identification.)
14  BY MR. ELKINS:
15    Q.  Can you see this document?
16    A.  Yes, I do.
17    Q.  All right.  I'm going to -- I'm showing you the
18  front of it.  I don't know if you want me to scroll to
19  verify, I will a little bit, but --
20    A.  No, no, no.  I've seen this a million times.  I
21  know exactly what I'm looking at.
22    Q.  Okay.  What is this document?
23    A.  That is the contract -- the Collective Bargaining
24  Agreement that was in effect from October 1st of 2018 to
25  September 30th of 2021.  During my term I negotiated the

14

1  successor Agreement to that one.
2    Q.  But this -- this contract was in effect for at
3  least part of your term, correct?
4    A.  It was in force -- yes, it was in force up until
5  the new, the current contract was finally negotiated.  So it
6  was beyond the September 30th date, actually.
7    Q.  When you were talking about grievances pursuant to
8  the contract, this is the contract to which you were
9  referring, or at least one of them?
10    A.  Yes.  This is the main document from which
11  grievances arise.
12    Q.  And if I was talking about other contracts, it
13  would be successor Collective Bargaining Agreements after
14  this one expired, correct?
15    A.  Correct.  The successor Agreement, whatever terms
16  -- whatever terms from the successor Agreement that replaced
17  the previous one, the previous ones would be null and void.
18    Q.  Now, what are some of the other functions of the
19  Union besides dealing with grievances, in general?
20    A.  In general, the role of the Union is to advocate
21  for its membership, to give the members a mechanism whereby
22  they may address not only grievances, but any other concerns
23  for their working conditions, working environment.  And
24  basically, in general, to promote a harmonious relationship
25  between the City and its workforce, the workforce governed

15

1  by the Union, of course, and make -- make the workplace
2  better and stand up for the rights of our members.
3    Q.  Are you familiar with Jessica Salabarria?
4    A.  Yes, I am.  I know her personally.
5    Q.  Okay.  And what is the nature of your relationship
6  with her personally?
7    A.  Strictly professional.  And I have not interacted
8  with her since shortly after she ceased being employed by
9  the City of Miami Beach.  It's been awhile since I've had
10  any communication with her.
11    Q.  Were you the President of the Union at the time
12  that she ceased being employed with the City of Miami Beach?
13    A.  Yes, I was.
14    Q.  Okay.  So let's go backwards a little bit to that
15  time.  Your FOP presidency started I think January 1, 2021,
16  correct?
17    A.  It wasn't January 1st, but it was the middle of
18  the month.
19    Q.  Okay.
20    A.  Whatever the second Wednesday of January 2021.
21  That's when my presidency started.
22    Q.  And Jessica I think was separated from employment.
23  Like, around January 25'ish, somewhere in that neighborhood,
24  correct, of 2021?
25    A.  It was -- it was shortly thereafter.  To give you

16

1  a timeframe, days after I was sworn in as the incoming FOP
2  President, I came down with COVID-19 for the first time.  So
3  I believe by the time I was able to return to work, she was
4  already gone by then.
5    Q.  But you participated in a meeting involving
6  Jessica's employment in January of 2021, correct?
7    A.  Yes, remotely.
8    Q.  Yeah, you participated by Zoom and some other --
9  as I understand it -- and we are going to talk about the
10  meeting specifically -- but other members of the FOP --
11    A.  Were actually present, yes.
12    Q.  Hold on.  Remember, Tim can't take us down talking
13  at the same time.
14        Other members of the FOP, in particular the
15  executive committee, were present at the meeting, correct?
16    A.  Correct.
17    Q.  And that meeting also had the Chief of Police,
18  Rick Clements, at it, correct?
19    A.  Correct.
20    Q.  As well as A.J. Prieto, correct?
21    A.  Correct, and --
22    Q.  And --
23    A.  Yeah, go ahead.
24    Q.  No, no, no, continue.
25    A.  Correct.  He was the Commander of the Internal

PAUL Ozaeta

17

1  Affairs unit at the time.
2      **Q.  And Lieutenant Steven Cosner was at that meeting**
3  **in person, correct?**
4      A.  Yes, he was.
5      **Q.  Okay.  And we will get to that in a minute.**
6          **My question is this:  Prior to you being sworn in**
7  **as FOP President, did you have any involvement whatsoever in**
8  **Jessica's employment status prior to that?**
9      A.  Prior to --
10         MR. BARROUKH:  Objection to form.
11         MR. ELKINS:  What's the -- hold on.  What's the
12     form problem with that question?
13         MR. BARROUKH:  I believe -- I'm confused by the
14     question.  It seems vague to me.  If you could rephrase
15     it.
16         MR. ELKINS:  No, I think the question's fine.
17  BY MR. ELKINS:
18     **Q.  You can go ahead and answer it.**
19     A.  Okay.  Prior to me being President of the FOP --
20  our lodge of the FOP, my -- my interaction with Jessica was
21  I was her supervisor in patrol.  I was the patrol Lieutenant
22  on afternoon shift, and she was one of my sergeants.
23     **Q.  But this was prior to you becoming president?**
24     A.  Prior to becoming president, yes.
25     **Q.  And can you explain why it is that you ceased**

18

1  **being her supervisor when you became president?**
2      A.  Yes, because in our department, when you are
3  elected the President of the FOP Lodge, that becomes your
4  full-time assignment.  You're what they call "detached."  So
5  whatever you're doing before, you don't do that anymore.
6  Your job is to be president full-time until you're no longer
7  President.
8      **Q.  Got it.**
9          **So in your capacity as Jessica's supervisor --**
10     A.  Correct.
11     **Q.  -- were you involved in anything relating to her**
12  **discipline in 2020?**
13     A.  No, sir, not at all.
14     **Q.  Okay.  Were you at all privy to, part of, involved**
15  **in, heard about a meeting in November of 2020 between**
16  **Jessica and various City personnel?**
17     A.  I heard that she had a meeting where whatever case
18  that she was involved in that brought about this meeting,
19  was coming to its end where an Agreement was reached by
20  Jessica and the City.  And moving forward, her situation,
21  for lack of a better term, was going be governed by the
22  terms of that Agreement.
23     **Q.  Are you referring to a Settlement Agreement and a**
24  **Last Chance Agreement?**
25     A.  Yes.

19

1      **Q.  Okay.  Hold on.  I just need a second because I**
2  **marked the exhibits that I used there.  So I'm going to show**
3  **you what I've marked as Exhibit 2.**
4          **(Deposition Exhibit Number 2 marked for**
5  **identification.)**
6  BY MR. ELKINS:
7      **Q.  Wait one second.  Do you see this document?**
8      A.  Okay.  Yes.
9      **Q.  Okay.  I'll represent to you that this is a**
10  **Settlement Agreement between the City, Jessica and the FOP**
11  **and you --**
12     A.  Yes.
13     **Q.  Your FOP is Lodge Number 8, correct?**
14     A.  Yes, Wayne Nichols, yes.
15     **Q.  Okay.  I'm going to scroll down.  So you see**
16  **there's a bunch of signatures here?**
17     A.  Mm-hmm.
18     **Q.  Kevin Milan signed this on 12/18/2020, Jessica on**
19  **the same day, as well as the Chief, Ricky, at the time, and**
20  **then the City of Miami Beach Acting City Manager, Raul, at**
21  **the time; do you see that?**
22     A.  Yes.
23     **Q.  So let me ask you this:  When the FOP President**
24  **signs a Settlement Agreement, is that binding on the FOP as**
25  **well?**

20

1      A.  Yes.
2      **Q.  Okay.  Does that generally indicate that the FOP**
3  **has reviewed and agrees with the terms of the Agreement?**
4      A.  Yes.
5      **Q.  Does the FOP do that in its role as representing**
6  **and protecting the rights of its membership?**
7      A.  Whenever the FOP gets involved in a situation
8  under that capacity, yes, it's a function that the FOP does.
9      **Q.  Okay.  Now, attached to the Settlement Agreement**
10  **as an exhibit is something called Last Chance Agreement,**
11  **which I'm showing you right now.  Do you see that?**
12     A.  Yes, I do.
13     **Q.  And again, it has Fraternal Order of Police,**
14  **Jessica and the City; do you see that?**
15     A.  Yes.
16     **Q.  Okay.  And I'm scrolling.  You see the initials**
17  **here.  On each page you'll see them.**
18     A.  Yes.
19     **Q.  Okay.  And I'm going to scroll down.  And you see**
20  **here where the Acting City manager at the time signed the**
21  **Agreement, Jessica --**
22     A.  Yes.
23     **Q.  -- Kevin, on behalf of the FOP, and of course**
24  **Chief Clements at the time; do you see that?**
25     A.  Yes, I do.

PAUL Ozaeta

21

1    Q.  So same as before:  When the FOP signs a Last
2  Chance Agreement, is it binding on the FOP as well?
3    A.  Yes, it is.
4    Q.  And does that signature from the FOP president
5  indicate that the FOP has reviewed and approved the
6  Agreement?
7    A.  Yes.
8    Q.  Okay.  And does the FOP do that in its role as in
9  protecting the rights of its membership?
10    A.  Yes.
11    Q.  Okay.  So I'm going to stop the share for a
12  moment.
13      What's your understanding -- well, let me back up.
14      Did you have any role in negotiating the
15  Settlement Agreement and Last Chance Agreement that I showed
16  you?
17    A.  No, sir.
18    Q.  Why not?
19    A.  I was not the President, nor was I holding any
20  sort of office in the Union at the time.
21    Q.  But that Settlement Agreement and Last
22  Chance Agreement continued to be binding -- well, let me
23  rephrase.
24      Did that Last Chance Agreement and Settlement
25  Agreement continue to be binding on the FOP when the

22

1  Presidency changed from Kevin Milan to you?
2    A.  Just like every other Agreement that was signed by
3  a prior administration that was still in effect during my
4  Presidency, yes.
5    Q.  Okay.  So are you familiar with what Last Chance
6  Agreements are?
7    A.  Yes, I am.
8    Q.  Can you -- and I'm not referring to Jessica
9  specifically.  This is a general.  Based on your experience
10  in law enforcement, your experience with the FOP, what is
11  your understanding of what a Last Chance Agreement is?
12    A.  Last Chance Agreement is a Agreement -- I don't
13  like to be redundant, but --
14    Q.  You can.
15    A.  -- it's essentially a document setting forth the
16  condition where an employee will continue in their
17  employment under certain agreed-to parameters or guidelines,
18  such as avoiding any further discipline or any other
19  situations that would create discipline.  In other words,
20  it's a -- it's a promise to behave themselves, for lack of a
21  better term.
22    Q.  Now, going to the Collective Bargaining Agreement,
23  and labor law kind of in general and the fact that police
24  officers are employed through the government, are you aware
25  of police officers being guaranteed a certain level of

23

1  process or due process before they can be disciplined?
2    A.  Yes, absolutely.
3    Q.  And I think in the Collective Bargaining
4  Agreement, they're subject to a standard called "Just
5  Cause," correct?
6    A.  Yes.
7    Q.  Are you familiar with Just Cause?
8    A.  Yes.  Just Cause, you cannot be fired frivolously.
9  It has to be for a reason.
10    Q.  And the City, and under the Collective Bargaining
11  Agreement and the fact that the police officers are
12  employees of the government, they have a property interest
13  in their job, so are you familiar with the notion that the
14  City can't just fire an officer without going through a
15  certain amount of process, correct?
16    A.  Absolutely.
17    Q.  There generally has to be a predetermination
18  hearing and a few other -- a number of other things set up
19  in order to appropriately effectuate a separation, correct?
20    A.  Correct.  You can't just be fired on a whim.
21    Q.  Okay.  Correct.  And so, police officers are not
22  employees at-will, correct?
23    A.  No, not in the ranks of officer, Sergeant and
24  Lieutenant in our department.
25    Q.  Thank you for pointing that out.

24

1      And let's be clear about that.  The Collective
2  Bargaining Unit or the officers with rights are officers in
3  the ranks of Lieutenant, Sergeant and police officer,
4  correct?
5    A.  Correct.
6    Q.  Once an officer is promoted to Captain and above,
7  they cease being in the Bargaining Unit, correct?
8    A.  Correct.
9    Q.  And that's because Captain and above is command
10  staff, right?
11    A.  Correct, and employed by the Chief.
12    Q.  And those employees are at-will?
13    A.  Yes, they are.
14    Q.  Okay.  But going back to anybody under Captain,
15  your Bargaining Unit --
16    A.  Mm-hmm.
17    Q.  -- excuse me.  So there has to obviously be a
18  predetermination hearing, and then there is a disciplinary
19  panel, I believe.  There's a number of checkmarks or
20  guideposts before a termination can happen.  And then, even
21  after a termination, if the Union disagrees with that
22  termination, it can file a grievance, correct?
23    A.  Correct.
24    Q.  And that grievance --
25    A.  Otherwise legal action, yes.

25

1      Q.   And that grievance is through the grievance
2  procedure in the Collective Bargaining Agreement; is that
3  right?
4      A.   That's correct.
5      Q.   But when an employee is on a Last Chance
6  Agreement, do Last Chance Agreements generally tend to alter
7  the employee's status?
8      A.   They do.
9      Q.   And what do they generally change?
10     A.   It basically expedites the manner in which they
11  can be dismissed or disciplined with the manner.  It
12  essentially -- by going into that Agreement, the officer
13  makes a condition that they will conduct themselves a
14  certain way and be spared whatever discipline they were
15  going be given.
16          If they violate the terms of that Agreement, then
17  that opens them up to being hit with a discipline that the
18  Last Chance Agreement was going to eliminate pending that
19  both parties continued with their Agreement.
20     Q.   Or am I right that it could be they could
21  potentially be disciplined for something new if it violates
22  the Agreement and that new discipline generally isn't
23  subject to review under the grievance procedure or through
24  the Collective Bargaining Agreement or even a
25  predetermination hearing.  It sometimes vets the Chief with

26

1  ultimate authority; isn't that not true?
2          MR. BARROUKH:  Objection to form.
3  BY MR. ELKINS:
4      Q.   You can answer.
5      A.   If that's the terms laid out in the specific
6  Agreement and the officer signed it and the Union signed it
7  as well, then that's the terms of the Agreement.  That's
8  what they went with.
9          I mean, if I may give my personal opinion?
10     Q.   Sure.
11     A.   Last Chance Agreement, unless there is certain
12  conditions where you have an officer that has a substance
13  abuse problem, I personally think Last Chance Agreements are
14  strictly for suckers.
15     Q.   Okay.  Okay.  But if it's signed by your Union and
16  the officer was represented by counsel, would that change
17  your opinion?
18     A.   Well, it wouldn't change my opinion.  But if
19  that's something that the officer and the Union went into
20  willingly, shame on them.
21     Q.   And what --
22     A.   I wouldn't -- I wouldn't agree with it.
23     Q.   Fair enough.  But we're not here to talk about
24  what you would or would not agree to.
25     A.   Okay.

27

1      Q.   And what if the officer was represented not only
2  by the Union's lawyer, but their own personal lawyer and the
3  Union President, would you consider that to be a thorough
4  vetting and review of a Last Chance Agreement?
5      A.   Yes.  Regardless of how I feel about the Agreement
6  itself, yes, that would be a thorough vetting.
7      Q.   And the Union -- the Union has an in-house lawyer,
8  correct?
9      A.   Correct.
10     Q.   And that lawyer is Eugene Gibbons, right?
11     A.   Correct, he's one of two lawyers that we retained.
12     Q.   And I think his partner Bob Buschel is the other
13  one, right?
14     A.   Is the other one, yes.
15     Q.   You guys have used them for decades, if I'm not
16  mistaken, correct?
17     A.   At least a decade, if not a little longer, yes.
18     Q.   Fair to say the Union is pretty confident in his
19  representation?
20     A.   Yes, he does a very good job and he's got a very
21  successful track record.
22     Q.   And he has a longstanding history of handling
23  labor law issues on behalf of Union employees, right?
24     A.   Yes, he has.
25     Q.   Somewhere around 30 years; am I right?

28

1      A.   I would say so, yes.
2      Q.   Okay.  And does he generally review Last Chance
3  Agreements on behalf of the Union?
4      A.   Yes.
5      Q.   Okay.  I'm going to share with you again Jessica's
6  Last Chance Agreement --
7      A.   Okay.
8      Q.   -- which is marked as Exhibit 2.  Can you see the
9  screen?
10     A.   Yes.
11     Q.   Okay.  So let's take a look at some of the terms
12  here.  It says here page -- in Paragraph 3:  "Salabarria
13  shall refrain from violating any City or police department
14  policies, rules, or regulations, SOPs or personnel rules all
15  of which are incorporated herein by reference."
16          Do you see that?
17     A.   Yes.
18     Q.   Okay.  And then it says:  "The Chief of Police
19  shall exclusively assess the determination and determine
20  employee's compliance with this Agreement."
21          Do you see that?
22     A.   Yes, I do.
23     Q.   "The Chief's decision as to compliance with this
24  Agreement shall not be subject to any grievance and/or
25  review of any kind by Salabarria or the Union and is not

29

1  subject to explanation for review."
2       Do you see that?
3  A.  Yes, I do.
4  Q.  What does that mean to you as a former FOP
5  president?
6  A.  That means that the Union could not represent the
7  officer in any matters arising from a supposed violation of
8  this Last Chance Agreement.
9  Q.  Well, doesn't it mean that there can be no
10  grievance filed --
11  A.  Yes.
12  Q.  -- on the Chief's determination; is that correct?
13  A.  Correct.
14  Q.  It means that the Chief has the final say,
15  correct?
16  A.  That's what it says.
17  Q.  Okay.  And it means that the Chief doesn't have to
18  follow any of the procedures outlined in the Collective
19  Bargaining Agreement, correct?
20  A.  Correct.
21  Q.  Okay.  And this agreement was signed by the Union,
22  correct?
23  A.  Correct.
24  Q.  And Eugene Gibbons represented Jessica in this
25  matter, correct?

30

1  A.  I believe he did.
2  Q.  Are you aware that Jessica hired her own private
3  lawyer in this case?
4  A.  I'm aware that Jessica -- that Gene was not the
5  only attorney present on Jessica's behalf, so yes, she would
6  have had to bring in another attorney.
7  Q.  Okay.  And then, Paragraph 5 here says: "Failure
8  -- "
9       Well, actually, could you read Paragraph 5 for us,
10  please?
11  A.  "Failure to comply with any portion or requirement
12  of this Agreement, including, but not limited to, the
13  requirement not to violate any City or police department
14  policy, Standard Operating Procedures (SOPs) or personnel
15  rules as referenced in Paragraph 3 above, may result in the
16  immediate implementation of the attached Letter of
17  Resignation as referenced in Paragraph 9 below."
18  Q.  Okay.  Stop right there.  Stop right there.  That
19  was very fast.  Thank you.
20       MR. ELKINS:  Tim --
21       THE WITNESS:  I'm sorry.
22       MR. ELKINS:  That's okay.  That's okay.
23       Tim, were you able to get all of that?  Is our
24  court reporter there?  Tim?
25       THE REPORTER:  I got it.

31

1       THE WITNESS:  He gave a thumbs up.
2  BY MR. ELKINS:
3  Q.  Okay.  Sorry, I didn't see that.  Okay.
4       So let's parse this out for a second.
5       It says here:  "Will result in the immediate
6  implementation of the attached Letter of Resignation."
7       So you are familiar with the fact that when an
8  officer does a Last Chance Agreement, they usually sign a
9  Letter of Resignation that is held back unless and until
10  they violate the Agreement, right?
11  A.  Correct.
12  Q.  Okay.  And it says here:  "It results in the
13  immediate implementation."  That's what you read, correct?
14  A.  Correct.
15  Q.  So in order to immediately implement a Letter of
16  Resignation, there's obviously no additional procedures the
17  City would need to go through to do that; is that right?
18  A.  That's correct.  They are --
19  Q.  They would not have to have a predetermination
20  hearing, correct?
21  A.  Correct.
22  Q.  It would not have to interview the officer,
23  correct?
24  A.  Correct.
25  Q.  Okay.  If the City were to interview the officer,

32

1  that would be as a courtesy only, not a requirement; is that
2  right?
3  A.  That's correct.
4  Q.  Okay.  Can you continue reading?
5  A.  "It is the intent and understanding of the parties
6  that the violations contemplated to trigger the
7  implementation of the attached Letter of Resignation shall
8  not be for individual, discreet minor policy and procedural
9  violations."
10  Q.  Okay.  Continue.
11  A.  "The parties agree that repeated violation of the
12  same discreet minor policy may result in an event triggering
13  the implementation of the attached Letter of Resignation.
14  In that event, the employee and the Union understand and
15  agree there will be no recourse to review available pursuant
16  to any grievance, appeal or review process under any
17  federal, state or local statute ordinance Collective
18  Bargaining Agreement or in any other form or under any other
19  processor procedure."
20  Q.  Okay.  So let's start with the -- I'm going to
21  start with the last part first.
22  A.  Okay.
23  Q.  In the event that the last -- the Letter of
24  Resignation is implemented.
25  A.  Mm-hmm.

PAUL Ozaeta

33

1    Q.  Assuming that it's implemented for something other
2   than -- I want to make sure this is your understanding of
3   it.  Assuming it's implemented for something other than an
4   individual, discreet minor policy or procedural violation --
5    A.  Mm-hmm.
6    Q.  -- right?  Or implemented for a repeat -- a repeat
7   violation of an individual discreet or minor policy
8   violation, the employee and the Union are essentially
9   waiving any and all recourse whatsoever, correct?
10    A.  Correct.
11    Q.  And when I say, "Waiving any and all recourse," I
12   mean any and all recourse to challenge the decision,
13   correct?
14    A.  Correct.
15    Q.  So by way of example, if Ms. Salabarria's Letter
16   of Resignation was implemented, and the Union believed it
17   was implemented for something that fits into an individual,
18   discreet minor policy and procedural violation, would the
19   Union have then grieved that termination?
20    A.  Yes.
21    Q.  Okay.  But it didn't in this case, did it?
22    A.  No.
23    Q.  And you were the President when that decision was
24   made, correct?
25    A.  Correct.

34

1    Q.  Okay.  So we can agree that the Union's position
2   was that the implementation of Ms. Salabarria's Letter of
3   Resignation was not for a discreet or minor policy
4   violation, correct?
5    A.  Correct.
6    Q.  So let's go to the meeting that occurred -- hold
7   on.  Let me pull up --
8     MR. ELKINS:  It's going to be Exhibit 3.
9     (Deposition Exhibit Number 3 marked for
10   identification.)
11   BY MR. ELKINS:
12    Q.  Okay.  Let's go to the meeting, which I'll
13   represent to you occurred on January 19th, 2021.  This is
14   the meeting that you attended via Zoom?
15    A.  Mm-hmm.
16    Q.  Do you remember that meeting?
17    A.  Yes.
18    Q.  Okay.  What's your recollection of that meeting?
19    A.  I remember I was Zooming in.  There was a
20   computer.  I'm assuming it was a laptop that was my presence
21   in the room.  The laptop was on in the conference room.  The
22   only thing I could really testify to is anything that
23   occurred in the conference room.  Anything that occurred
24   outside of that room I wasn't able to hear it or see it,
25   so --

35

1    Q.  Okay.  Well, what occurred inside the conference
2   room?
3    A.  Okay.  When the parties entered the conference
4   room, it was Jessica, the Chief, the IA Commander, Cosner,
5   Lieutenant Cosner.  And from the Union present was:  First
6   Vice President Flaherty, Second Vice President Lester, and
7   the Chief -- the Chairman of the Grievance Committee at the
8   time was Delvin Brown.  And they were --
9    Q.  Delvin's now a Captain, correct?
10    A.  Yes, he is.
11    Q.  All right.  And what happened in the meeting?
12   What happened in the meeting that you recall?
13    A.  I recall -- what I recall at the meeting was they
14   sat down with Jessica.  They had A.J., the IA Commander, was
15   asking her some questions.  The situation in question was:
16   Jessica was an afternoon shift Sergeant.  Cosner was, and I
17   believe still is, a Lieutenant on midnight shift.  And it
18   was a very common occurrence at the time for officers from
19   afternoon shift to be held over onto midnight shift due to
20   personnel shortages.
21    Jessica on the particular night was held over.
22   She was under Cosner's supervision.  The question arose that
23   she was supposed to be I believe in the north end of the
24   City.  That's what her assignment for that evening was.
25   Cosner's allegation was that she never left the station.  He

36

1   gave her some orders to relay to her officers.  And she
2   didn't do it in a timely fashion.
3    I'm trying to remember what else.  But
4   essentially, A.J. was asking Jessica, okay, did you do this
5   on this night?  Did you do this at this time?  At what time
6   did you reach out to these guys?  Stuff of that nature.
7   Basically trying to establish a timeline of that work shift
8   for her.
9    Q.  So there were -- there were a few allegations
10   against Jessica, correct?
11    A.  Those are the ones that stand out to me.
12    Q.  One of them was she was not where she was supposed
13   to be.  That's just one of them, correct?
14    A.  Correct.
15    Q.  Okay.  At any point in that meeting, though, did
16   you or anyone of the -- hold on.  Let me look at how many.
17   Of the one, two, three other executive board members --
18    A.  Mm-hmm.
19    Q.  -- raise the issue that the meeting was an
20   improper interrogation under the Police Officer Bill of
21   Rights?
22    A.  It was my understanding that due to the terms of
23   the Last Chance Agreement, the Officer Bill of Rights was
24   not going to come into play, that the City could just invoke
25   the Letter of Resignation that she presented along with

PAUL Ozaeta

37

1 accepting the Last Chance Agreement, and that this meeting
2 was basically a courtesy.
3      **Q.  Okay.  So but the answer to my question is: --**
4      A.  Mm-hmm.
5      **Q.  -- just listen to my -- I hear what you're saying**
6 **and I appreciate that.  It's a fair answer, but I just want**
7 **to really drill down on this.**
8      A.  Okay.
9      **Q.  My question is:  At any point in the meeting, did**
10 **you or any of the other three executive board members say to**
11 **the Chief, to Cosner, to A.J. to anybody, hey, this meeting,**
12 **what you're doing is a violation of Chapter 112?**
13      A.  In the room that I was able to see what was going
14 on and listening, no.
15      **Q.  Okay.  That's what -- I'm only asking about your**
16 **knowledge of what happened.**
17      A.  Yeah, that's my knowledge.
18      **Q.  Okay.  And at any point in the meeting -- and let**
19 **me back up.  You said something earlier.  You said that it**
20 **was routine for officers to be held over their shift due to**
21 **personnel shortages, right?**
22      A.  Yes, sir.
23      **Q.  Okay.  Can you explain how that process works and**
24 **what that means?**
25      A.  Okay.  Basically, each shift has a required number

38

1 of personnel in order to staff it properly.  There has to be
2 a certain number of officers, a certain number of Sergeants
3 and at least one Lieutenant.
4      Any time that an oncoming shift is below those
5 numbers, if -- they first try to get volunteers to willingly
6 stay over.  If they can't get volunteers, then they force
7 people over unvoluntarily.  And I don't believe she
8 volunteered.  At the time this was going on, people were
9 over being forced constantly.  I've known of cases where a
10 particular Sergeant was held over each day he came in to
11 work for a whole week.  He was working a double shift, and
12 last-minute surprise.  So those -- there wasn't a lot of
13 volunteering going on, particularly the Sergeant's rank at
14 that time.  So --
15      **Q.  So --**
16      A.  Go ahead.
17      **Q.  No, no.  Continue.  I'm sorry.**
18      A.  No, I'm saying so if there was any, like I said,
19 certain numbers weren't being met for the oncoming shift and
20 they didn't have volunteers, they had no choice but to draw
21 from the previous shift.
22      **Q.  So was there anything unusual about Jessica being**
23 **forced to stay over on that particular shift?**
24      A.  No.  I mean, they would try -- the whole thing is
25 that they would do it fairly.  They wouldn't just force over

39

1 the same person over and over again if there's other
2 personnel available.  So they would try to do it evenly and
3 not try to do the same person twice in a row if possible.
4 If you were getting held over, it's because it was your
5 turn.
6      **Q.  And is "fairly" sometimes determined by seniority?**
7      A.  Yes.  And sometimes if you're the only option,
8 you're it.
9      **Q.  Okay.  So did the Union have any concerns relating**
10 **to Jessica having been held over on that December, I think**
11 **it was 26th or 27 shift where Cosner would have been her**
12 **supervisor that night?**
13      A.  No, we would have -- well, I wasn't the Union at
14 the time.  But the Union would be concerned for her just as
15 much as any other employee that was getting held over
16 unwillingly.
17      **Q.  Okay.  Are you familiar with any kind of a**
18 **romantic relationship between Jessica and Cosner?**
19      A.  I've heard of a romantic relationship.  I believe
20 I saw a picture once.  But aside from, you know, I've never,
21 like, gone on a double date with them or anything like that,
22 if that's what you're asking.
23      **Q.  Well, I wasn't asking about the double date.  But**
24 **I'm glad to know you did not go on one with them.**
25      A.  No.

40

1      **Q.  You mentioned a picture.  What kind of -- what**
2 **picture did you see?**
3      A.  I remember once along the line -- this was a long
4 time ago.  I remember somebody snapped a picture of Cosner
5 and Jessica walking together holding hands from the back,
6 though.
7      **Q.  Understood.**
8      A.  Yeah.
9      **Q.  And what were the -- what did you hear about the**
10 **nature of their relationship?**
11      A.  I heard that they had a relationship, that they
12 were seeing each other.  It was more than just a, you know,
13 they're -- they're close friends.  But I don't know
14 firsthand what that particular relationship entailed.
15      **Q.  Sure.  But did you also hear they were sleeping**
16 **together?**
17      A.  That's what a lot people assumed.  But again, I
18 don't know that for a fact.  And neither party ever admitted
19 to any such a thing, to me at least.
20      **Q.  Understood.**
21      A.  Mm-hmm.
22      **Q.  In relation to Jessica's separation or the**
23 **implementation of her Letter of Resignation, in your role as**
24 **Union president, was there any concern from the Union that**
25 **the separation or implementation of the letter was in**

41

1  retaliation by Cosner for Jessica rejecting him in any way,
2  if you remember?
3      A.  The thing is that the terms of that letter were so
4  black and white and concrete that it -- basically, we didn't
5  really have any leeway to fight on it.  I didn't have any
6  wiggle room at all with that Agreement.
7      Q.  When you say that Agreement, you're referring to
8  the Last Chance Agreement?
9      A.  Yes.
10     Q.  The Last Chance Agreement that was blessed by the
11 Union?
12     A.  Yes.
13     Q.  Okay.  But my question was:  Was there an issue
14 that -- that the Union thought this was a retaliatory
15 termination in some way?
16         MR. BARROUKH:  Objection form.
17 BY MR. ELKINS:
18     Q.  Which if it was, might have been outside the Last
19 Chance Agreement?  Well, let me -- let me withdraw the
20 question and rephrase.
21     A.  Yeah.
22     Q.  You didn't have any evidence that this was somehow
23 retaliatory?
24     A.  Evidence that I could say -- I didn't have a
25 smoking gun.

42

1      Q.  Well, what did you have?
2      A.  Anything that I could just say, hey, look, this is
3  BS.  This is being done for this reason.  I didn't have
4  anything I could stand on.  I didn't have anything --
5      Q.  What did you have that you didn't think you could
6  stand on?
7      A.  Well, all I knew was rumor and hearsay.  And from
8  the rumor and hearsay that I heard was from years prior.  So
9  that would have been -- that would have been, like, nothing
10 I could have really stood on and said, hey, listen, if they
11 were involved romantically and things went sour the month
12 before, then yes, all day long I could have made that
13 connection.
14        But from what I knew, it was years prior and it
15 would have been way too much coincidence to really be able
16 to concrete say this is happening because of this.
17     Q.  When you say "years prior," are you referring to,
18 like, 2015 -- '14, '15 years prior?
19     A.  Thereabouts.
20     Q.  So almost at that time -- she was dismissed in
21 2021 -- approximately, give or take, five-and-a-half to six
22 years prior?
23     A.  Yes.
24     Q.  But just so I can understand -- and you can tell
25 me if I'm wrong, what you're saying is, the Union considered

43

1  that Cosner and Jessica had been in a relationship, but
2  decided not to pursue it because the time that that
3  relationship went south was five or six years ago, so it
4  didn't deem a connection between her separation and whatever
5  happened in that relationship; is that fair to say?
6      A.  Correct.  It would have been very hard to make a
7  plausible argument that it was -- there was a connection.
8      Q.  Okay.  Let me ask you this question: --
9      A.  Mm-hmm.
10     Q.  -- did the Union have any evidence that Jessica's
11 separation was -- from employment was in retaliation for her
12 filing an EEOC Charge of Discrimination in July of 2020?
13 Well, let me withdraw that.  I'll ask you another question,
14 Paul.
15        Are you even familiar with Jessica's July 2020
16 EEOC Charge of Discrimination?
17     A.  No, I'm not.
18     Q.  Okay.  So if you're not familiar with it today, is
19 it fair to say you weren't familiar with it in January of
20 2021 either?
21     A.  Yes.
22     Q.  Okay.  So since you're not even familiar with it,
23 can we agree it wasn't something that the Union even had to
24 consider in January of 2021?
25     A.  I would say.  It wasn't on my radar.

44

1      Q.  Okay.  And at any point after Jessica's
2  termination, did it come -- did anyone bring to the Union
3  the argument or the claim that she was separated from
4  employment by the City in retaliation for filing that Charge
5  of Discrimination in July of 2020?
6      A.  No, because as far as we understood it by the
7  terms of the Last Chance Agreement, anything relating to
8  that situation was something we could not grieve or
9  otherwise fight.
10     Q.  And so, did the Union even attempt to -- did the
11 Union do anything after Jessica's separation to try to get
12 her job back?
13     A.  I was told, no, that under the terms of the
14 Agreement, there was nothing that we could do.
15     Q.  Well, you were told no, or you were part of the
16 decision-making process?
17     A.  Well, I was -- I wasn't part of the --
18     Q.  Let me -- Paul, wait a minute.  Hold on.  I don't
19 mean to interrupt you, but I'm going to.  I'm sorry.
20     A.  But --
21     Q.  I want to be clear.  I don't want you to testify
22 today as to what the Union lawyer told you because that's
23 attorney-client privilege.  And Gene's not here to defend
24 that privilege, but I'm not trying to get into that.
25     A.  Okay.

**45**

1    Q.  So I don't want you to tell me what Gene or any
2  other lawyer for the FOP told you.
3    A.  Okay.
4    Q.  What I do -- if you can tell me, all I'm asking
5  you is:  Did the Union do anything to try to get Jessica her
6  job back after she was separated?  I'm not asking the reason
7  why.  Does that make sense?
8    A.  Yes.
9    Q.  Okay.  Sorry.  Go ahead.
10    A.  The answer is no.
11    Q.  Okay.  Now, if you can answer this without
12  revealing attorney-client privilege communications, you are
13  free to do so.  My question is:  Why not?
14    A.  Because of the Agreement that she signed didn't
15  allow us to.
16    Q.  Okay.  And as I understand it, the Union did not
17  have any evidence that Jessica's separation was retaliatory
18  in any way; is that fair to say?
19    A.  Yeah, we didn't have evidence that the City was
20  violating the terms of the Agreement with the actions they
21  took.
22    Q.  Okay.  Another question -- and I think I'm almost
23  finished.  One second.  Okay.
24       At any point -- well, did you have any
25  conversations about the January 2021 meeting before you

**46**

1  entered the meeting room on Zoom?
2    A.  No.  I was -- I was -- with COVID, I wasn't really
3  talking to anybody.
4    Q.  Well, how did it come to be that you were in the
5  meeting?
6    A.  I got the -- when I was invited by the Chief that
7  this meeting was going on, even though I was out with COVID,
8  I was still reviewing my emails and I was still delegating
9  various responsibilities to the people in the Union that
10  needed to carry them out in my absence.
11       So I was advised of the meeting.  And that's why
12  the two Vice Presidents and the Grievance Committee Chairman
13  were physically present at the meeting.  And of course, I
14  wanted to not be out of the loop just because I was out, so
15  that's why I was Zooming in as well.
16    Q.  Did you talk to anyone about the meeting before it
17  occurred?
18    A.  I spoke to my Grievance Chair to discuss, you
19  know, that the meeting was going to go on.  Of course, you
20  know, I discussed with him and the two Vice Presidents that
21  I wanted him to be present.  We discussed basically what
22  could we do?  Where could we go based on this Agreement that
23  limited us?  And of course, I also spoke to our counsel and
24  I --
25    Q.  Don't tell me what you talked with your counsel

**47**

1  about.
2    A.  But, you know, we discussed basically, okay, we
3  have this Agreement that spells these things out.  What
4  could we really do?
5    Q.  I want to be clear.  An Agreement that was blessed
6  reviewed and signed by the FOP, correct?
7    A.  Yes, my predecessor, but yes, by the FOP.
8    Q.  Understood.  But your -- your lawyer?
9    A.  Mm-hmm, yes.
10    Q.  Is that a "yes"?  Okay.
11       I'm going to show you what I marked as Exhibit 3.
12  I can't remember if I showed this.  That's how bad my memory
13  is.
14       Have you seen this document before?
15    A.  Yes.
16    Q.  Okay.  This is the letter from the City
17  implementing Jessica's Letter of Resignation.  So when you
18  said you spoke to -- I think you referenced the titles of
19  some people that you spoke to before the January 19th
20  meeting.  I just want to go through that.
21       Did you speak with Arley Flaherty before the
22  meeting?
23    A.  Yes, we spoke.
24    Q.  And Reggie Lester?
25    A.  As well, yes.

**48**

1    Q.  And Delvin Brown?
2    A.  Yes.
3    Q.  And did you speak with the Chief, Rick Clements?
4    A.  Spoke to the Chief as far as he was setting up the
5  meeting, but he only told me the things he wanted me to be
6  privy to.
7    Q.  What did he tell you?
8    A.  That we are going to -- that this meeting was
9  going to go on.  He said that he wanted to -- basically said
10  that Cosner made these allegations about Jessica, and he
11  wanted to know if that was the truth or not.  He wanted to
12  hear it from her.
13    Q.  So was he granting the -- in your view, based on
14  your knowledge and your observation of that conversation and
15  your observation of the facts here, was -- did you believe
16  the Chief was granting this meeting as a courtesy?
17    A.  Yes.
18    Q.  Did the Chief indicate to you that he had already
19  made up his mind to terminate Jessica before the meeting?
20    A.  He said he wanted to see if she would tell him the
21  truth, and depending on whether or not he believed she was
22  being truthful is when he would make his decision.
23    Q.  Okay.  But pursuant to the Last Chance Agreement,
24  the Chief could have just fired her without having any
25  meeting, correct?

PAUL Ozaeta

49

1    A.  Yes.
2    Q.  Okay.  At any point in time, did you and the Chief
3  discuss Jessica having a lawyer in this meeting?
4    A.  I don't believe that came up.
5    Q.  Did anybody discuss that with you?
6    A.  Actually, let me rephrase that because now I'm
7  remembering.  Yeah, I remember the Chief stating that he was
8  going to have this meeting, but he didn't want the FOP
9  attorney present.  He did not want Gene Gibbons present
10  because being that the terms of the Agreement, her Bill of
11  Rights to be represented by representation of your choice
12  was not applicable.  So he would allow the officers of the
13  FOP, being myself, Flaherty, Lester, and Brown to be
14  present.  He did not want the Union attorney present.
15    Q.  Why then did you allow the meeting to go forward
16  if the Chief told you he wasn't going to allow the lawyer to
17  be there?
18    A.  Because he said that he would just go ahead and
19  fire her.
20    Q.  At any point in time during the meeting, did you
21  raise that issue?
22    A.  Not during the meeting.
23    Q.  Did you raise it after the meeting?
24    A.  No, I didn't, obviously.
25    Q.  So I just want to make sure you understand that

50

1  you're under oath here today the same way that you'd be
2  under oath in a court of law.
3        So your testimony is, just so I've got it clear,
4  the Chief of police told you in advance that he was -- that
5  he was not going to permit the FOP lawyer to be at the
6  meeting.  And the FOP's position was, okay, we are going to
7  go forward with the meeting?  Is that your testimony?
8    A.  Yes, because if we would have said no to the
9  meeting, he could have just fired her then and then -- there
10  and then.
11    Q.  Okay.  Is there anything in writing indicating
12  that the Chief said the FOP lawyer could not be present?
13    A.  No.
14    Q.  Why didn't the Union file a grievance or try to
15  take action after the meeting for the Chief's denial of the
16  lawyer being present?
17    A.  We believed that his decision to not have the
18  Union attorney present did not violate the terms of the Last
19  Chance Agreement.
20    Q.  Okay.  And let's be clear:  We are talking about
21  Chapter 112, the Police Officer Bill of Rights, correct?
22    A.  Correct.
23    Q.  Do you have some familiarity with the Police
24  Officer Bill of Rights?
25    A.  A little bit.

51

1    Q.  One of -- just a little bit, right?
2    A.  No, I do.  I do have familiarity with it.
3    Q.  Yeah.  And based upon your years of experience
4  both as a law enforcement officer, you worked in Internal
5  Affairs I think for many years?
6    A.  Yes.
7    Q.  You were the FOP President.  The Police Officer
8  Bill of Rights has been a major part of your law enforcement
9  career, correct?
10    A.  Correct.
11    Q.  And is it fair to say that the Police Officer Bill
12  of Rights essentially guarantees an officer that might be
13  disciplined certain rights when it comes to their
14  interrogation, right?
15    A.  Correct.  Unfortunately, like in any other rights,
16  like Miranda, the person that is protected by those rights
17  has the option to waive them.
18    Q.  That's right.
19        And also, is it also true that the remedy for a
20  violation of Chapter 112, the Police Officer Bill of Rights,
21  is not that the Officer gets their job back, but rather, the
22  investigator that disciplined the officer, or I should say
23  the investigator that violated the rights is disciplined for
24  the violation; is that accurate?
25    A.  Correct.

52

1    Q.  Chapter 112 has an administrative scheme to
2  address violations, right?
3    A.  Yes.
4    Q.  But at the end of the day, the remedy is not that
5  the officer is put back to work or a suspension is reduced
6  or anything like that, it's that if there's a violation, the
7  investigator is disciplined?
8    A.  Yes, disciplined, investigated, what have you.
9    Q.  And ultimately, whatever discipline the officer
10  suffers doesn't change due to a violation of the Police
11  Officer Bill of Rights?
12    A.  That's correct.  I mean, that can be argued during
13  the proceedings after the disciplinary action when there
14  would be the various hearings or a -- word escapes me.
15    Q.  Predetermination hearing?
16    A.  Beyond that.  The next one.
17    Q.  The arbitration?
18    A.  Or during the arbitration.  There's -- that's
19  where the remedy can be found.  It's not a guarantee by the
20  Bill of Rights situation.
21    Q.  But in this case, Jessica had waived her right to
22  a predetermination hearing, to an arbitration, to a
23  grievance, to anything like that through her Last Chance
24  Agreement, correct?
25    A.  Correct, to no representation at all.

PAUL Ozaeta

---

53

1  Q.  So even if there was a 112 violation -- and we are
2  not agreeing there was -- but let's assume there was, there
3  would -- the only remedy she would have had would have been
4  for the Union to raise the violation at the appropriate
5  time; and ultimately, if there was found to be a violation,
6  the remedy would have been discipline of the investigator,
7  correct?
8       A.  Under 112, yes.
9       Q.  Okay.  And I'm going to -- if you just give me a
10  moment.
11          And by continuing with the interview, the officer
12  can waive their 112 rights; is that not also correct?
13      A.  Yes.
14      Q.  And that happened here, didn't it?
15      A.  Yeah.
16      Q.  All right.  I'm showing you what I'm going to mark
17  as Exhibit 4.
18          (Deposition Exhibit Number 4 marked for
19  identification.)
20  BY MR. ELKINS:
21      Q.  But I'm going to show it to you online.  Hold on.
22  Okay.
23      A.  Mm-hmm.
24      Q.  I'm showing you what I'm marking as Exhibit 4,
25  which is Florida Statute Section 112.534, which is titled:

---

54

1  "Failure to Comply, Official Misconduct."  Right?  Do you
2  see that?
3       A.  Yes.
4       Q.  And this is what we were talking about when we
5  were referring to the administrative scheme set up to remedy
6  a 112 violation?
7       A.  Yes, sir.
8       Q.  Okay.  I just want to walk through this with you.
9       A.  Mm-hmm.
10      Q.  Okay.  The first part is:  "If any law enforcement
11  agency or correctional agency, including investigators and
12  Internal Affairs, or Professional Standards Divisions or an
13  assigned investigator intentionally fails to comply with the
14  core requirements of this part, the following procedures
15  apply."
16          Do you agree with that?
17      A.  Yes.
18      Q.  Okay.
19      A.  Yes.
20      Q.  So this lays out -- correct me if I'm wrong -- the
21  procedures that apply when there's a 112 violation?
22      A.  Correct.
23      Q.  Okay.  First, "The law enforcement officer or
24  correctional officer shall advise the investigator of the
25  intentional violation of the requirements of this part which

---

55

1  is alleged to have occurred."
2          So let's just start there:  Did the Union or
3  Jessica advise the City during this January 2021 meeting of
4  an intentional violation?
5       A.  No.
6       Q.  Okay.  Then it says:  "The Officer's Notice of
7  Violation is sufficient to notify the investigator of the
8  requirements of this part, which are alleged to have been
9  violated and the factual basis of each violation."
10          So let's go to the second part.
11      A.  Okay.
12      Q.  "If the investigator fails to cure the violation
13  or continues the violation after being notified by the law
14  enforcement officer or correctional officer, the officer
15  shall request the agency head or his or her designee be
16  informed of the alleged intentional violation."
17          Did any kind of request like that occur here?
18      A.  No.
19      Q.  "Once this request is made, the interview of
20  officer shall cease and the officer's refusal to respond to
21  further investigative questions does not constitute
22  insubordination or any similar type of policy violation."
23          Now, let me ask you this:  Was Jessica terminated
24  because she was deemed to be insubordinate during
25  questioning in this January 2021 meeting?

---

56

1       A.  No, not for being insubordinate.
2       Q.  For -- because not -- because she didn't answer
3  questions during this meeting?
4       A.  No, she answered the questions.
5       Q.  Okay.  And the City didn't deem her insubordinate
6  for her conduct during this meeting, correct?
7       A.  Correct.
8       Q.  Okay.  But let's continue so we go through the
9  whole scheme anyway.  "Thereafter, within three working days
10  a written Notice of Violation and request for a compliance
11  review hearing shall be filed with the agency head or
12  designee, which must contain sufficient information to
13  identify the requirements of this part, which are alleged to
14  have been violated and the factual basis of each violation."
15          So did the Union file any written Notice of
16  Violation or request a compliance review hearing?
17      A.  No.
18      Q.  Are you aware if Jessica did that on her own?
19      A.  No, I'm not.
20      Q.  "All evidence related to the investigation must
21  preserved for review and presentation at the compliance
22  review hearing.  For purposes of confidentiality, the
23  compliance review panel hearing shall be considered part of
24  the original investigation."
25          Okay.  Let's go to the next part.

---

PAUL Ozaeta

---

**57**

1    "Unless otherwise remedied by the agency before a
2  hearing, a compliance review hearing must be conducted
3  within 10 working days after the request for a compliance
4  review hearing is filed, unless by mutual agreement of the
5  officer and agency or for extraordinary reasons and
6  alternate dates chosen."
7       Now, again, I'm going to ask you one more time so
8  we can go to the next part.  Was there any compliance review
9  hearing ever even scheduled?
10     A.  No.
11     Q.  And no compliance review panel was ever formed,
12  correct?
13     A.  Correct.
14     Q.  Okay.  And according to this, it says:  It is --
15  I'm in Section E.
16     "It is the responsibility of the compliance review
17  panel to determine whether or not the investigator or agency
18  intentionally violated the requirements provided under this
19  part."
20        Do you see that?
21     A.  Yes.
22     Q.  Okay.  And then, going down to the last part, it
23  says in Section G -- I'm highlighting it -- "If the alleged
24  violation is sustained as intentional by the compliance
25  review panel, the agency head shall immediately remove the

---

**58**

1  investigator from any further involvement with the
2  investigation to the officer.  Additionally, the agency head
3  shall direct an investigation be initiated against the
4  investigator determined to have intentionally violated the
5  requirements provided for under this part for purposes of
6  agency disciplinary action."
7        In other words -- correct me if I'm wrong -- but
8  they're talking about disciplining the investigator,
9  correct?
10     A.  Correct.
11     Q.  If that investigation is sustained, the sustained
12  allegations against the investigator shall be forwarded to
13  the Criminal Justice Standards and Training Commission for
14  review as an act of official misconduct or misuse of
15  position."
16        Do you see that?
17     A.  Yes.
18     Q.  Okay.  In other words, the remedy for a 112
19  violation is discipline against the investigator, correct?
20     A.  Correct.
21        MR. ELKINS:  I think I might be done.  I just need
22  five minutes.  So can we go off the record?
23        THE REPORTER:  Off the record.
24        (Recess was taken.)
25        MR. ELKINS:  I don't have anything further.

---

**59**

1        MR. BARROUKH:  All right.
2           CROSS EXAMINATION
3  BY MR. BARROUKH:
4     Q.  Paul, is it all right if I refer to you as Paul?
5     A.  Please do.
6     Q.  All right.  First and foremost, thank you for your
7  service.
8     A.  Thank you.
9     Q.  To your knowledge, who terminated Jessica
10  Salabarria?
11     A.  The City of Miami Beach.
12     Q.  And to your knowledge, who from the City of Miami
13  Beach made the decision to terminate my client?
14        MR. ELKINS:  Objection to form.
15        You can answer.
16  BY MR. ELKINS:
17     Q.  You can answer.
18     A.  Okay.  Basically, the way it would work, the Chief
19  would make the recommendation and it would be -- have to be
20  approved by the Director of Human Resources.
21     Q.  And to your understanding, why was my client
22  terminated?
23     A.  From -- from concrete, they believe she violated
24  her Last Chance Agreement.
25     Q.  And to your knowledge, why did they believe she

---

**60**

1  violated her Last Chance Agreement?
2        MR. ELKINS:  Objection to form.
3  BY MR. BARROUKH:
4     Q.  You can answer.
5     A.  They believed she violated her Last Chance
6  Agreement because the situation that led to that Last Chance
7  Agreement was a question of her not being in her assigned
8  area.  And the situation that arose that caused that meeting
9  and eventually caused her to be terminated pertained to her
10  not being in her assigned area.
11     Q.  And are there, to your knowledge, any other
12  employees for the City of Miami Beach that were terminated
13  for the same reason that Jessica was terminated?
14     A.  Give me a minute.  Let me think about that one.  I
15  would have to do a deep dive, but none come to mind.
16     Q.  And are you aware of any other employees who were
17  on a Last Chance Agreement?
18     A.  Yes.
19     Q.  And what are their names?
20     A.  Michael Muley, who is a Sergeant, he was under a
21  Last Chance Agreement for a bit.  Who else?  He's the person
22  that comes to mind.  I don't know if there were any others.
23  Mr. Muley was on a Last Chance Agreement, definitely.  Like
24  I said, anybody else -- I mean, I'm doing this strictly from
25  memory.

PAUL Ozaeta

61

1    Q.  Okay.
2    A.  I didn't know what questions anybody was going to
3  ask me here.
4       Is it possible?  Yes.  But I can't say for a fact,
5  okay, this person, this person, this person aside from
6  Sergeant Muley.
7    Q.  And is Sergeant Muley still employed by the police
8  department today?
9    A.  Yes, he is.
10   Q.  And do you know why Sergeant Muley was placed on a
11 Last Chance Agreement?
12   A.  He had a situation where he was intoxicated on
13 duty.
14   Q.  But Mr. Muley was not terminated; is that correct?
15   A.  No.  He was -- I believe the Last Chance Agreement
16 was conditioned when he returned.
17   Q.  Can you talk to me about that, please?
18   A.  Yes.  He was initially terminated for -- he had an
19 incident where he was drinking on duty and ultimately
20 intoxicated.  He was terminated, got his job back in
21 arbitration.  And I believe one of the conditions of the
22 arbitration was the Last Chance Agreement that he complied
23 with.
24      This came to mind, there was another employee that
25 had a Last Chance Agreement.  Adaymis Rodriguez had a Last

62

1  Chance Agreement around 2015, I want to say, 2016 perhaps.
2    Q.  And could you -- if it's possible, could you spell
3  Adaymis for me, please?
4    A.  Okay.  A-d-a-y-m-i-s.  That's her first name.  And
5  Rodriguez is the last name.
6    Q.  Thank you.
7       And was Ms. Rodriguez terminated subsequent to her
8  Last Chance Agreement?
9    A.  She was not.
10   Q.  And you mentioned that you were present at the
11 January 2021 meeting, correct?
12   A.  Correct.
13   Q.  Do you remember Jessica asking for an attorney at
14 that meeting?
15   A.  I don't recall.
16   Q.  You stated that the Chief did not want Jessica to
17 have an attorney prior to that meeting; is that correct?
18      MR. ELKINS:  Objection to form.
19      THE WITNESS:  I know he specifically stated he
20 didn't want the Union's attorney there because of the
21 Last Chance Agreement.  I don't recall if that extended
22 to other attorneys or just to Eugene Gibbons
23 specifically.
24 BY MR. BARROUKH:
25   Q.  And do you know what department Mr. Muley and

63

1  Ms. Rodriguez work in?
2    A.  Currently or at the time?
3    Q.  Of.
4    A.  Okay.  Sergeant Muley at the time of his incident
5  was a patrol Sergeant.  Currently he's a Sergeant in the
6  training unit.  Officer Rodriguez at the time was a member
7  of a proactive plain clothes unit.  I don't remember the
8  exact name that unit had at the time.  Those things tend to
9  change.  But it was essentially an undercover selective
10 enforcement detail.  And she is currently assigned to
11 patrol.
12   Q.  Sorry, Paul, is your phone ringing, by any chance?
13   A.  No.
14      MR. ELKINS:  That was mine.  Sorry.
15      MR. BARROUKH:  No problem.  No problem.
16 BY MR. BARROUKH:
17   Q.  Sorry, Paul.  Let's continue.
18   A.  No problem.
19   Q.  And you said Ms. Rodriguez is in what department
20 currently?
21   A.  She is currently assigned to patrol.
22   Q.  Now, going back to my client's termination, you
23 stated that you were aware of Lieutenant Cosner's
24 allegations against her; is that correct?
25   A.  Correct.

64

1    Q.  And ordinarily, without a Last Chance Agreement,
2  do you believe that my client would have been terminated for
3  the same reason?
4       MR. ELKINS:  Objection to form.
5       THE WITNESS:  No.
6  BY MR. BARROUKH:
7    Q.  Why not?
8       MR. ELKINS:  Objection to form.
9       THE WITNESS:  I don't believe that the violation
10 in question from that incident rose to the level of
11 termination.
12 BY MR. BARROUKH:
13   Q.  Did you ask the Chief why he terminated her after
14 -- after the 2021 meeting?
15   A.  Yes.  He stated because she had a pattern of the
16 same violations over and over and he believed that she was
17 irredeemable.
18   Q.  Could you tell me more about these patterns?
19      MR. ELKINS:  Objection to form.
20      THE WITNESS:  She -- like I said, the invest --
21 the situation that led to the Last Chance Agreement was
22 a question of her being not in her assigned area.  I
23 believe she wasn't even in the City during the time in
24 question.
25      Prior to that there was a situation when she was

---

**65**

1    on probation as a Sergeant that she was also accused of
2    being outside of her assigned area.  And she was
3    demoted for that at the time, and subsequently was able
4    to win back her stripes.
5        Basically, she had a pattern of over and over
6    again of just not being where she was supposed to be.
7    BY MR. BARROUKH:
8    **Q.  On this occasion, subsequent to Mr. Cosner's**
9    **allegations, was there a formal investigation to support**
10   **whether or not his allegations were true?**
11   A.  No, there wasn't a formal investigation.
12   **Q.  Why was there no formal investigation subsequent**
13   **to his allegations against my client?**
14   A.  To my understanding, due to the terms of that Last
15   Chance Agreement, they didn't have to.  The Chief wanted to
16   give her an opportunity to hear from her what happened.  He
17   believed that she was being untruthful.  And he said that
18   was the reason he made -- he told me that was the decision
19   -- the reason he arrived at the decision he made.
20   **Q.  Typically, without a Last Chance Agreement in**
21   **effect, would there have been an investigation subsequent to**
22   **the allegation of misconduct?**
23   A.  Correct, yes.
24   **Q.  Do you think that was fair to Jessica not to have**
25   **an investigation subsequent to Mr. Cosner's allegation?**

---

**66**

1    MR. ELKINS:  Objection to form.
2    THE WITNESS:  No, I don't believe that was fair.
3    BY MR. BARROUKH:
4    **Q.  And prior to the meeting -- or let me back up.**
5    **How were you invited to the January 2021 meeting?**
6    A.  The Chief contacted me, I believe it was via phone
7    because at the time I was contagious, and told me he was
8    putting on this meeting, that I had the option to either
9    send people on my behalf and/or attend the remotely, which I
10   took advantage of both options. I sent my upper E-board,
11   Executive board.  And I attended remotely.
12   **Q.  And did you or anybody from your E-board prepare**
13   **Jessica for this meeting prior to the meeting commencing?**
14   A.  Me personally, no, because obviously, I was not
15   able to have contact with other folks.  She -- I don't
16   recall if she had any preparation with either of the other
17   E-board members or with the Chair from the Grievance
18   Committee.  She may have, but I can't say for a fact she
19   did.
20   **Q.  And are officers subsequent to an allegation of**
21   **misconduct typically provided with information of allegation**
22   **prior to the meeting?**
23   A.  Per the 112, yes, they get the opportunity to
24   review the entire case file under normal circumstances.
25   **Q.  And you did not review the allegation with Jessica**

---

**67**

1    **prior to the meeting; is that correct?**
2    A.  Correct.
3    **Q.  And to your knowledge, did any of your E-board or**
4    **anyone from the Grievance Committee review with Jessica**
5    **prior to the meeting?**
6    A.  I do not recall.  You'd have to ask them.
7    MR. BARROUKH:  All right.  That's all the
8    questions I have.  Thank you.
9    MR. ELKINS:  I have some brief followup.
10   THE WITNESS:  Okay.
11           REDIRECT EXAMINATION
12   BY MR. ELKINS:
13   **Q.  Mr. Ozaeta, putting aside what you personally**
14   **believe is fair or not fair, the truth is the City wasn't**
15   **required to conduct any investigation because of the Last**
16   **Chance Agreement signed by Jessica, signed by the Union,**
17   **approved by the Union lawyer and approved by Jessica's**
18   **lawyer, correct?**
19   A.  Correct.
20   **Q.  And that Last Chance Agreement was a valid and**
21   **enforceable Agreement, was it not?**
22   A.  Unfortunately, yes, right.
23   **Q.  And the Union never ever raised a 112 violation,**
24   **did it?**
25   A.  No, sir.

---

**68**

1    **Q.  Not only did it not raise it during the meeting,**
2    **it never raised it after Jessica's separation, did it?**
3    A.  Correct.
4    **Q.  And let's talk about Mr. Muley for a moment**
5    **because as luck would have it, I handled that case.**
6    **Sergeant Muley was fired initially, correct?**
7    A.  Correct.
8    **Q.  And he was fired because he not only was he drunk**
9    **on duty, he was caught on camera in the City of Miami Beach**
10   **taking shots at Fat Tuesdays, pulling out his gun and**
11   **dropping it in front of citizens, and then caught on CCTV**
12   **cameras stumbling through the City of Miami Beach drunk and**
13   **in uniform into a hotel.  Is that not correct?**
14   A.  That is correct.
15   **Q.  Okay.  And then, Mr. Muley fought through the**
16   **Union to get his job back through the FOP grievance process**
17   **because at the time of his termination and at the time of**
18   **the misconduct, Mr. Muley was not under a Last Chance**
19   **Agreement, was he?**
20   A.  Correct.  That came later.
21   **Q.  That's correct.  And so, the City went through the**
22   **entire disciplinary process with Sergeant Muley, i.e. there**
23   **was a predetermination hearing, the alleged discipline went**
24   **to a disciplinary panel.  After the predetermination**
25   **hearing, there was a termination and there was -- the**

---

PAUL Ozaeta

---

**69**

1  various steps of the grievance procedure were followed,
2  correct?
3      A.  Correct.
4      Q.  And then, after the grievance was not resolved at
5  Step 3, the Union went ahead and filed for an arbitration,
6  correct?
7      A.  Correct.
8      Q.  And in that arbitration, a third-party arbitrator
9  ruled that the City had to put Officer Muley back to work,
10  right?
11      A.  Correct.
12      Q.  And one of the conditions that the arbitrator put
13  on Officer Muley or Sergeant Muley was that he would be
14  subject to a Last Chance Agreement relating to alcohol use
15  and being on duty, correct?
16      A.  Correct.
17      Q.  So the City didn't impose that Last Chance
18  Agreement, the arbitrator did, correct?
19      A.  That's correct.
20      Q.  And Muley was disciplined in advance of a Last
21  Chance Agreement, not after, correct?
22      A.  Correct.
23      Q.  Is there any factual similarity whatsoever to
24  Muley and Salabarria?
25      A.  No, I do not believe so.

---

**70**

1      Q.  And since his Last Chance Agreement, has Muley
2  done anything to violate or did he do anything to violate
3  the Last Chance Agreement?
4      MR. BARROUKH:  Objection to form.
5  BY MR. ELKINS:
6      Q.  You can answer.
7      A.  No, he has not.  He's been a great employee.
8      Q.  And was the City required to conduct any
9  investigation whatsoever into Jessica's -- into the conduct
10  alleged by Cosner?
11      A.  No, not by the terms of the Last Chance Agreement.
12      Q.  So any meeting that the Chief conducted with
13  Jessica was out of courtesy, correct?
14      A.  Correct.
15      MR. ELKINS:  Nothing further.  Do you have
16  anything, Daniel?
17      MR. BARROUKH:  No, I'm all good.
18      MR. ELKINS:  Okay.  Paul, you have the opportunity
19  to read your transcript or you could waive it.  The
20  point of reading, just so you know, is that if you want
21  to -- generally, if you want to make sure that our
22  court reporter took everything down correctly.
23      Understand that if you read and you change an
24  answer, of course, then I or Daniel can bring you back
25  to question you on the change to that answer.  It's

---

**71**

1  totally up to you if you want to read or if you want to
2  waive the right to read.  If you waive, then you're
3  basically agreeing that the court reporter has taken
4  down everything correctly or you're trusting that he's
5  taken down everything correctly.  It's up to you.
6      THE WITNESS:  I'll read.
7      MR. ELKINS:  He'll read.
8      Tim, we are ordering.  Mini only.
9      THE REPORTER:  Daniel, would you like a copy?
10      MR. BARROUKH:  Tim, I'll get back to you as well
11  on this deposition as well as Reggie Lester and a few
12  of the other ones.  Thank you.
13      THE REPORTER:  Okay.  Wonderful.
14      MR. ELKINS:  All right.  Daniel --
15      MR. BARROUKH:  I'm sorry, I was going to ask,
16  yeah, Tim, could you -- I believe I have your
17  information already, but could you put it in the chat
18  as well, your email address?
19      THE REPORTER:  Sounds good.  Will do right now.
20      MR. BARROUKH:  Thank you.
21      THE REPORTER:  Okay.
22      (Deposition concluded at 2:32 P.M.)
23
24
25

---

**72**

1          CERTIFICATE OF OATH
2  STATE OF FLORIDA
3  COUNTY OF BROWARD
4      I, TIMOFEY GARBUZ, Notary Public, State of Florida,
5  certify that PAUL OZAETA personally appeared before me via
6  Zoom on the 15th day of April 2024 and was duly sworn.
7      Signed this 15th day of April 2024.
8
9          _____
          TIMOFEY GARBUZ
10          Notary Public
          State of Florida
11          My Commission #HH 284028
          Expires July 5, 2026
12
13
14
15
16
17
18
19
20
21
22
23
24
25

73

1        REPORTER'S DEPOSITION CERTIFICATE
2
STATE OF FLORIDA    )
3
COUNTY OF PALM BEACH)
4
5        I, TIMOFEY GARBUZ, Court Reporter, certify that I was
authorized to and did report the Deposition of PAUL OZAETA;
6   that a review of the transcript was requested; and that the
foregoing transcript, pages 1-71, a true and complete record
7   of my notes.
8        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
9   nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
10  financially interested in the action.
11       DATED this 20th day of April 2024.
12
13
14
        _____
15       TIMOFEY GARBUZ
         COURT REPORTER
16
17
18
19
20
21
22
23
24
25

74

1        E R R A T A   S H E E T
2   DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES
3   IN RE:      GUASTO V CITY OF MIAMI BEACH
            CASE NO:    1:22-cv-21004-DPG
4   DATE:       APRIL 15, 2024
    DEPONENT NAME: LT. PAUL OZAETA
5
6   PAGE/LINE      CORRECTION        REASON
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17        (Use other side if necessary)
18     Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated are true.
19
20  _____        _____
    LT. PAUL OZAETA                DATE
21
22
23
24
25

75

1   DATE:  APRIL 26, 2024
2   LT. PAUL OZAETA
3   PAULOZAETA@MIAMIBEACHFL.GOV
4
    IN RE:  GUASTO V CITY OF MIAMI BEACH
5       Deposition of Lt. Paul Ozaeta
6       This letter is to advise you that the transcript
    taken in the above-referenced deposition has been
7   transcribed.  Please contact our office at (954)523-5326 to
    make arrangements to read and sign or sign below to waive
8   review of the transcript.
9       It is suggested that the review of this transcript
    be completed within 30 days of your receipt of this letter
10  as considered reasonable under Federal Rules*; however,
    there is no Florida Statute to this regard.
11
        The original of this transcript has been forwarded
12  to the ordering party and your errata, once received, will
    be forwarded to all ordering parties for inclusion in the
13  transcript.
14  Very truly yours,
15
16  Timofey Garbuz, Court Reporter
17  Waiver:
18  I,_____, hereby waive the reading and signing
19  of my deposition transcript.
20
    _____        _____
    DEPONENT                DATE
21
    *Federal Civil Procedure Rule 30(e)Florida Civil Procedure
22  Rule 1.310(e).
23
24
25

| A | | | |
|---|---|---|---|
| **A-d-a-y-m-i-s** 62:4 | **advance** 5:20 50:4 69:20 | 36:23 37:1 41:6,7,8,10,19 | 66:9 |
| **A.J** 16:20 35:14 36:4 37:11 | **advantage** 66:10 | 44:7,14 45:14 45:20 46:22 | **answer** 6:12 12:14 17:18 |
| **abide** 6:6 | **advise** 54:24 55:3 75:6 | 47:3,5 48:23 49:10 50:19 | 26:4 37:3,6 45:10,11 56:2 |
| **ability** 11:20 | **advised** 46:11 | 52:24 57:4 | 59:15,17 60:4 |
| **able** 6:10 16:3 30:23 34:24 37:13 42:15 65:3 66:15 | **advocate** 14:20 | 59:24 60:1,6,7 60:17,21,23 | 70:6,24,25 |
| **above-referen...** 75:6 | **Affairs** 7:21 17:1 51:5 54:12 | 61:11,15,22,25 62:1,8,21 64:1 | **answered** 56:4 |
| **absence** 46:10 | **affect** 12:22 | 64:21 65:15,20 | **answers** 6:19 |
| **absolutely** 23:2 23:16 | **affirm** 4:9,13 | 67:16,20,21 68:19 69:14,18 | **anticipate** 6:11 |
| **abuse** 26:13 | **afternoon** 17:22 35:16,19 | 69:21 70:1,3 70:11 | **anybody** 7:4 10:4 24:14 37:11 46:3 |
| **accept** 10:23 | **agency** 54:11,11 55:15 56:11 | **Agreements** 14:13 22:6 | 49:5 60:24 61:2 66:12 |
| **accepting** 37:1 | 57:1,5,17,25 58:2,6 | 25:6 26:13 28:3 | **anymore** 18:5 |
| **accurate** 11:11 51:24 | **ago** 40:4 43:3 | **agrees** 20:3 | **anyway** 56:9 |
| **accused** 65:1 | **agree** 26:22,24 32:11,15 34:1 | **ahead** 16:23 17:18 38:16 | **apologize** 5:20 |
| **act** 58:14 | 43:23 54:16 | 45:9 49:18 69:5 | **appeal** 32:16 |
| **Acting** 19:20 20:20 | **agreed** 2:17 | **alcohol** 69:14 | **APPEARANC...** 2:1 |
| **action** 24:25 50:15 52:13 58:6 73:9,10 | **agreed-to** 22:17 | **Alex** 9:15 | **appeared** 72:5 |
| **actions** 45:20 | **agreeing** 53:2 71:3 | **Alexander** 5:1 | **APPEARING** 2:5,11 |
| **acts** 10:17 | **agreement** 3:10 3:11 12:6,10 12:20 13:1,4 | **allegation** 35:25 65:22,25 66:20 66:21,25 | **applicable** 49:12 |
| **actual** 8:7 | 13:24 14:1,15 14:16 18:19,22 | **allegations** 36:9 48:10 58:12 | **apply** 54:15,21 |
| **Adaymis** 61:25 62:3 | 18:23,24 19:10 19:24 20:3,9 | 63:24 65:9,10 65:13 | **appointed** 10:13 |
| **additional** 31:16 | 20:10,21 21:2 21:6,15,15,21 | **alleged** 55:1,8,16 56:13 57:23 | **appreciate** 5:7 37:6 |
| **Additionally** 58:2 | 21:22,24,25 22:2,11,12,12 | 68:23 70:10 | **appropriate** 53:4 |
| **address** 14:22 52:2 71:18 | 22:22 23:4,11 25:2,6,12,16 | **allotted** 10:19 | **appropriately** 23:19 |
| **administration** 22:3 | 25:18,19,22,24 26:6,7,11 27:4 | **allow** 45:15 49:12,15,16 | **approved** 21:5 59:20 67:17,17 |
| **administrations** 11:5 | 27:5 28:6,20 28:24 29:8,19 | **alter** 25:6 | **approximately** 42:21 |
| **administrative** 52:1 54:5 | 29:21 30:12 31:8,10 32:18 | **alternate** 57:6 | **April** 1:13 72:6 72:7 73:11 74:4 75:1 |
| **admitted** 40:18 | | **amount** 23:15 | **arbitration** 52:17,18,22 61:21,22 69:5 69:8 |
| | | **and/or** 28:24 | **arbitrator** 69:8 |
| | | | 69:12,18 |
| | | | **area** 60:8,10 64:22 65:2 |
| | | | **argued** 52:12 |
| | | | **argument** 43:7 44:3 |
| | | | **arising** 11:23 29:7 |
| | | | **Arley** 9:10 47:21 |
| | | | **arose** 35:22 60:8 |
| | | | **arrangements** 75:7 |
| | | | **arrived** 65:19 |
| | | | **aside** 39:20 61:5 67:13 |
| | | | **asking** 6:22 7:15 35:15 36:4 37:15 39:22,23 45:4,6 62:13 |
| | | | **assess** 28:19 |
| | | | **assigned** 7:22 54:13 60:7,10 63:10,21 64:22 65:2 |
| | | | **assignment** 8:9 8:10 18:4 35:24 |
| | | | **assume** 53:2 |
| | | | **assumed** 40:17 |
| | | | **assuming** 33:1,3 34:20 |
| | | | **at-will** 23:22 24:12 |
| | | | **attached** 20:9 30:16 31:6 32:7,13 |
| | | | **attempt** 44:10 |
| | | | **attend** 66:9 |
| | | | **attended** 34:14 66:11 |
| | | | **attending** 7:5 |
| | | | **attorney** 30:5,6 49:9,14 50:18 62:13,17,20 73:8,9 |

PAUL Ozaeta

**attorney-client**
44:23 45:12
**attorneys** 62:22
**audible** 6:19
**authority** 26:1
**authorized** 73:5
**available** 32:15
39:2
**avoiding** 22:18
**aware** 22:24
30:2,4 56:18
60:16 63:23
**awhile** 15:9
**Azicri** 9:16

**B**
**B** 2:2 3:8
**back** 21:13
24:14 31:9
37:19 40:5
44:12 45:6
51:21 52:5
61:20 63:22
65:4 66:4
68:16 69:9
70:24 71:10
**backwards**
15:14
**bad** 47:12
**balance** 11:15
**bargaining** 3:10
12:6,10 13:1,8
13:23 14:13
22:22 23:3,10
24:2,7,15 25:2
25:24 29:19
32:18
**bark** 4:20
**Barroukh** 2:2
3:5 4:5,5 12:12
17:10,13 26:2
41:16 59:1,3
60:3 62:24
63:15,16 64:6
64:12 65:7

66:3 67:7 70:4
70:17 71:10,15
71:20
**based** 6:22 7:1
22:9 46:22
48:13 51:3
**basic** 5:20
**basically** 10:8
11:22 14:24
25:10 36:7
37:2,25 41:4
46:21 47:2
48:9 59:18
65:5 71:3
**basis** 55:9 56:14
**Beach** 1:8 4:8
7:13,17,19
9:13 15:9,12
19:20 59:11,13
60:12 68:9,12
73:3 74:3 75:4
**becoming** 17:23
17:24
**behalf** 2:5,11 4:7
10:17 12:1
20:23 27:23
28:3 30:5 66:9
**behave** 22:20
**believe** 9:18
10:11 16:3
17:13 24:19
30:1 35:17,23
38:7 39:19
48:15 49:4
59:23,25 61:15
61:21 64:2,9
64:23 66:2,6
67:14 69:25
71:16
**believed** 33:16
48:21 50:17
60:5 64:16
65:17
**Bell** 9:15
**benefits** 12:22

**best** 6:13 11:2,13
11:20 13:3,3
**better** 11:22
15:2 18:21
22:21
**beyond** 14:6
52:16
**Bill** 36:20,23
49:10 50:21,24
51:8,11,20
52:11,20
**binding** 19:24
21:2,22,25
**bit** 13:19 15:14
50:25 51:1
60:21
**black** 41:4
**blessed** 41:10
47:5
**board** 9:5 36:17
37:10 66:11
**Bob** 27:12
**breach** 11:23
**break** 12:18
**BRICKELL** 2:3
**brief** 67:9
**bring** 30:6 44:2
70:24
**brought** 12:2
18:18
**BROWARD**
72:3
**Brown** 35:8 48:1
49:13
**BS** 42:3
**bulk** 8:18
**bunch** 7:15
19:16
**bureau** 7:22
**Buschel** 27:12

**C**
**C** 4:1
**call** 18:4
**called** 10:14

13:7 20:10
23:4
**camera** 68:9
**cameras** 68:12
**capacity** 8:2
9:15,16 18:9
20:8
**Captain** 24:6,9
24:14 35:9
**career** 5:9 8:1
51:9
**carry** 46:10
**case** 1:5 4:19
5:13 13:3,3
18:17 30:3
33:21 52:21
66:24 68:5
74:3
**cases** 38:9
**caught** 68:9,11
**Cause** 23:5,7,8
**caused** 60:8,9
**CCTV** 68:11
**cease** 24:7 55:20
**ceased** 15:8,12
17:25
**center** 8:19
**certain** 12:3
22:17,25 23:15
25:14 26:11
38:2,2,19
51:13
**CERTIFICATE**
72:1 73:1
**certify** 72:5 73:5
73:8
**Chair** 10:21
46:18 66:17
**Chairman** 35:7
46:12
**challenge** 33:12
**chance** 18:24
20:10 21:2,15
21:22,24 22:5
22:11,12 25:5

25:6,18 26:11
26:13 27:4
28:2,6 29:8
31:8 36:23
37:1 41:8,10
41:19 44:7
48:23 50:19
52:23 59:24
60:1,5,6,17,21
60:23 61:11,15
61:22,25 62:1
62:8,21 63:12
64:1,21 65:15
65:20 67:16,20
68:18 69:14,17
69:21 70:1,3
70:11
**change** 25:9
26:16,18 52:10
63:9 70:23,25
**changed** 22:1
**CHANGES** 74:2
**Chaplain** 9:23
10:10
**Chapter** 37:12
50:21 51:20
52:1
**charge** 7:23
43:12,16 44:4
**chart** 9:6
**chat** 71:17
**checkmarks**
24:19
**Chief** 16:17
19:19 20:24
24:11 25:25
28:18 29:14,17
35:4,7 37:11
46:6 48:3,4,16
48:18,24 49:2
49:7,16 50:4
50:12 59:18
62:16 64:13
65:15 66:6
70:12

Chief's 28:23
29:12 50:15
choice 38:20
49:11
chosen 57:6
Christopher
9:24
CID 8:11,13
circumstances
66:24
citizens 68:11
City 1:8 4:8 7:12
7:18 12:20,25
13:4 14:25
15:9,12 18:16
18:20 19:10,20
19:20 20:14,20
23:10,14 28:13
30:13 31:17,25
35:24 36:24
44:4 45:19
47:16 55:3
56:5 59:11,12
60:12 64:23
67:14 68:9,12
68:21 69:9,17
70:8 74:3 75:4
civil 5:13 75:21
75:21
claim 44:3
clarify 11:8
clear 24:1 44:21
47:5 50:3,20
Clements 16:18
20:24 48:3
client 59:13,21
64:2 65:13
client's 63:22
close 4:19 40:13
clothes 63:7
coincidence
42:15
collective 3:10
12:6,10 13:1,8
13:23 14:13

22:22 23:3,10
24:1 25:2,24
29:18 32:17
collectively
12:23
come 36:24 44:2
46:4 60:15
comes 51:13
60:22
coming 18:19
command 24:9
Commander
16:25 35:4,14
commencing
66:13
Commission
58:13 72:11
committee 10:14
10:16,17,19
11:9 16:15
35:7 46:12
66:18 67:4
common 35:18
communication
15:10
communicatio...
45:12
complaint 11:23
complete 73:6
completed 75:9
compliance
28:20,23 56:10
56:16,21,23
57:2,3,8,11,16
57:24
complied 61:22
comply 30:11
54:1,13
computer 34:20
concern 40:24
concerned 39:14
concerns 14:22
39:9
concluded 71:22
concrete 41:4

42:16 59:23
condition 22:16
25:13
conditioned
61:16
conditions 12:21
12:22 14:23
26:12 61:21
69:12
conduct 25:13
56:6 67:15
70:8,9
conducted 57:2
70:12
conference
34:21,23 35:1
35:3
CONFEREN...
1:15
confident 27:18
confidentiality
56:22
confused 17:13
connected 73:9
connection
42:13 43:4,7
consider 27:3
43:24
considered
42:25 56:23
75:10
constantly 38:9
constitute 55:21
contact 66:15
75:7
contacted 66:6
contagious 66:7
contain 56:12
contemplated
32:6
continue 16:24
21:25 22:16
32:4,10 38:17
56:8 63:17
continued 21:22

25:19
continues 55:13
continuing
53:11
contract 11:24
12:5 13:23
14:2,5,8,8
contracts 14:12
conversation
48:14
conversations
45:25
copy 13:10 71:9
core 54:14
correct 7:13 9:2
13:8 14:3,14
14:15 15:16,24
16:6,15,16,18
16:19,20,21,25
17:3 18:10
19:13 23:5,15
23:19,20,21,22
24:4,5,7,8,11
24:22,23 25:4
27:8,9,11,16
29:12,13,15,19
29:20,22,23,25
31:11,13,14,18
31:20,21,23,24
32:3 33:9,10
33:13,14,24,25
34:4,5 35:9
36:10,13,14
43:6 47:6
48:25 50:21,22
51:9,10,15,25
52:12,24,25
53:7,12 54:20
54:22 56:6,7
57:12,13 58:7
58:9,10,19,20
61:14 62:11,12
62:17 63:24,25
65:23 67:1,2
67:18,19 68:3

68:6,7,13,14
68:20,21 69:2
69:3,6,7,11,15
69:16,18,19,21
69:22 70:13,14
CORRECTION
74:6
correctional
54:11,24 55:14
correctly 70:22
71:4,5
Cosner 17:2
35:4,5,16
37:11 39:11,18
40:4 41:1 43:1
48:10 70:10
Cosner's 35:22
35:25 63:23
65:8,25
counsel 2:5,11
2:18 4:3 26:16
46:23,25 73:8
73:9
COUNTY 72:3
73:3
course 6:16 11:3
11:4,24 15:1
20:23 46:13,19
46:23 70:24
court 1:2,16 6:1
30:24 50:2
70:22 71:3
73:5,15 75:16
courtesy 32:1
37:2 48:16
70:13
COVID 46:2,7
COVID-19 16:2
create 22:19
crime 7:23
crimes 8:12
Criminal 8:11
8:14 58:13
Cross 3:5 59:2
cure 55:12

current 8:9 14:5
currently 7:12
  7:22 63:2,5,10
  63:20,21

**D**

D 3:1 4:1
Daniel 2:2 4:5
  10:3 70:16,24
  71:9,14
DANIELB@D...
  2:5
date 1:13 14:6
  39:21,23 74:4
  74:20 75:1,20
DATED 73:11
dates 57:6
day 19:19 38:10
  42:12 52:4
  72:6,7 73:11
days 16:1 56:9
  57:3 75:9
dealing 14:19
decade 27:17
decades 27:15
December 39:10
decide 11:1
decided 43:2
decides 4:20
decision 28:23
  33:12,23 48:22
  50:17 59:13
  65:18,19
decision-maki...
  44:16
declare 74:18
deem 43:4 56:5
deemed 55:24
deep 60:15
defend 44:23
defendant 1:10
  2:11 4:8
definitely 60:23
definition 11:20
Delegate 10:11

delegating 46:8
Della 9:22
Delvin 35:8 48:1
Delvin's 35:9
demoted 65:3
denial 50:15
department 7:20
  8:1 9:11,13,18
  9:23,25 18:2
  23:24 28:13
  30:13 61:8
  62:25 63:19
depending 48:21
deponent 2:19
  74:4 75:20
deposed 5:8,13
deposition 1:12
  2:19 3:9 6:17
  7:5,8 13:12
  19:4 34:9
  53:18 71:11,22
  73:1,5 75:5,6
  75:19
DEREK 2:2
DESCRIPTION
  3:9
designee 55:15
  56:12
detached 18:4
detail 63:10
detective 7:22
determination
  28:19 29:12
determine 28:19
  57:17
determined 39:6
  58:4
Diaz 9:17
different 11:6
direct 3:4 4:17
  58:3
Director 59:20
disagrees 24:21
disciplinary
  24:18 52:13

58:6 68:22,24
discipline 18:12
  22:18,19 25:14
  25:17,22 52:9
  53:6 58:19
  68:23
disciplined 23:1
  25:11,21 51:13
  51:22,23 52:7
  52:8 69:20
disciplining 58:8
discreet 32:8,12
  33:4,7,18 34:3
Discrimination
  43:12,16 44:5
discuss 46:18
  49:3,5
discussed 46:20
  46:21 47:2
dismissed 25:11
  42:20
DISTRICT 1:2
  1:3
dive 60:15
Division 1:4
  8:11,14
Divisions 54:12
document 13:15
  13:22 14:10
  19:7 22:15
  47:14 74:18
dog 4:19
doing 18:5 37:12
  60:24
door 4:19
double 38:11
  39:21,23
draw 38:20
drill 37:7
drinking 61:19
DRIVE 2:3
dropping 68:11
drunk 68:8,12
due 23:1 35:19
  36:22 37:20

52:10 65:14
duly 4:16 72:6
duty 61:13,19
  68:9 69:15

**E**

E 3:1,8 4:1,1
  57:15 74:1,1,1
E-board 66:10
  66:12,17 67:3
earlier 37:19
Eddie 9:19
EEOC 43:12,16
effect 13:24 14:2
  22:3 65:21
effectuate 23:19
either 43:20
  66:8,16
elected 8:6 18:3
eliminate 25:18
Elkins 2:8 3:4,6
  4:7,7,18 12:13
  13:14 17:11,16
  17:17 19:6
  26:3 30:20,22
  31:2 34:8,11
  41:17 53:20
  58:21,25 59:14
  59:16 60:2
  62:18 63:14
  64:4,8,19 66:1
  67:9,12 70:5
  70:15,18 71:7
  71:14
email 71:18
emails 46:8
employed 7:12
  7:18 15:8,12
  22:24 24:11
  61:7
employee 22:16
  25:5 32:14
  33:8 39:15
  61:24 70:7
  73:8,9

employee's 25:7
  28:20
employees 23:12
  23:22 24:12
  27:23 60:12,16
employment
  7:17 15:22
  16:6 17:8
  22:17 43:11
  44:4
ends 13:6
enforceable
  67:21
enforcement 5:9
  22:10 51:4,8
  54:10,23 55:14
  63:10
entailed 40:14
ENTER 74:2
entered 35:3
  46:1
entire 66:24
  68:22
environment
  14:23
equivalent 12:1
errata 75:12
escapes 52:14
ESQ 2:2,8
essentially 22:15
  25:12 33:8
  36:4 51:12
  63:9
establish 36:7
Eugene 27:10
  29:24 62:22
evening 35:24
evenly 39:2
event 32:12,14
  32:23
eventually 60:9
evidence 41:22
  41:24 43:10
  45:17,19 56:20
exact 63:8

PAUL Ozaeta

**exactly** 13:21
**Examination** 3:4
  3:5,6 4:17 59:2
  67:11
**example** 11:19
  33:15
**exclusively**
  28:19
**excuse** 24:17
**executive** 9:5
  16:15 36:17
  37:10 66:11
**exhibit** 3:10,11
  3:12,13 13:11
  13:12 19:3,4
  20:10 28:8
  34:8,9 47:11
  53:17,18,24
**exhibits** 19:2
**expedites** 25:10
**experience** 22:9
  22:10 51:3
**expired** 14:14
**expires** 13:2
  72:11
**expiring** 13:4
**explain** 17:25
  37:23
**explanation**
  29:1
**extended** 62:21
**extraordinary**
  57:5

————————
**F**
**fact** 22:23 23:11
  31:7 40:18
  61:4 66:18
**facts** 48:15
  74:18
**factual** 55:9
  56:14 69:23
**fails** 54:13 55:12
**Failure** 30:7,11
  54:1

**fair** 6:4 26:23
  27:18 37:6
  43:5,19 45:18
  51:11 65:24
  66:2 67:14,14
**fairly** 38:25 39:6
**familiar** 15:3
  22:5 23:7,13
  31:7 39:17
  43:15,18,19,22
**familiarity**
  50:23 51:2
**far** 12:21 44:6
  48:4
**fashion** 36:2
**fast** 30:19
**Fat** 68:10
**favor** 11:25
**federal** 32:17
  75:10,21
**feel** 27:15
**Fernandez** 10:2
  10:2
**fight** 41:5 44:9
**file** 24:22 50:14
  56:15 66:24
**filed** 11:4 29:10
  56:11 57:4
  69:5
**filing** 43:12 44:4
**filter** 11:10
**final** 29:14
**finally** 14:5
**financially**
  73:10
**fine** 5:5 12:19
  17:16
**finish** 6:9,12
  11:4
**finished** 45:23
**fire** 23:14 49:19
**fired** 23:8,20
  48:24 50:9
  68:6,8
**first** 4:16 5:25

  9:9,10 10:21
  16:2 32:21
  35:5 38:5
  54:10,23 59:6
  62:4
**firsthand** 40:14
**fits** 33:17
**five** 43:3 58:22
**five-and-a-half**
  42:21
**FL** 1:8
**Flaherty** 9:10
  35:6 47:21
  49:13
**Florida** 1:3,9,17
  2:4,9 3:13
  53:25 72:2,4
  72:10 73:2
  75:10
**folks** 66:15
**follow** 5:22
  29:18
**followed** 69:1
**following** 54:14
**follows** 4:16
**followup** 67:9
**FOP** 8:21 15:15
  16:1,10,14
  17:7,19,20
  18:3 19:10,13
  19:23,24 20:2
  20:5,7,8,23
  21:1,2,4,5,8,25
  22:10 29:4
  45:2 47:6,7
  49:8,13 50:5
  50:12 51:7
  68:16
**FOP's** 50:6
**force** 14:4,4 38:6
  38:25
**forced** 38:9,23
**foregoing** 73:6
  74:18
**foremost** 59:6

**form** 12:12
  17:10,12 26:2
  32:18 41:16
  59:14 60:2
  62:18 64:4,8
  64:19 66:1
  70:4
**formal** 65:9,11
  65:12
**formed** 57:11
**former** 29:4
**formerly** 4:6
**FORT** 2:9
**forth** 22:15
**forward** 18:20
  49:15 50:7
**forwarded**
  58:12 75:11,12
**fought** 68:15
**found** 52:19
  53:5
**Fraternal** 20:13
**free** 45:13
**friends** 40:13
**frivolous** 11:2
  11:11,12
**frivolously** 23:8
**front** 13:18
  68:11
**full** 4:23
**full-time** 18:4,6
**function** 10:23
  20:8
**functions** 11:9
  14:18
**further** 22:18
  55:21 58:1,25
  70:15 73:8

————————
**G**
**G** 4:1 57:23
**Garbuz** 1:16
  72:4,9 73:5,15
  75:16
**Garcia** 9:19

**Gene** 30:4 45:1
  49:9
**Gene's** 44:23
**general** 11:21
  14:19,20,24
  22:9,23
**generally** 20:2
  23:17 25:6,9
  25:22 28:2
  70:21
**getting** 39:4,15
**Gibbons** 27:10
  29:24 49:9
  62:22
**give** 4:10 6:12,19
  6:23 7:15,16
  11:19 14:21
  15:25 26:9
  42:21 53:9
  60:14 65:16
**given** 25:15
**glad** 39:24
**go** 5:18 15:14
  16:23 17:18
  31:17 34:6,12
  38:16 39:24
  45:9 46:19,22
  47:20 48:9
  49:15,18 50:7
  55:10 56:8,25
  57:8 58:22
**God** 4:12
**going** 5:18 6:8
  6:10 7:9 8:19
  13:10,17 16:9
  18:21 19:2,15
  20:19 21:11
  22:22 23:14
  24:14 25:12,15
  25:18 28:5
  32:20 34:8
  36:24 37:13
  38:8,13 44:19
  46:7,19 47:11
  48:8,9 49:8,16

50:5,6 53:9,16
53:21 57:7,22
61:2 63:22
71:15
**good** 6:15 11:15
11:16 27:20
70:17 71:19
**Gotcha** 10:8
**governed** 14:25
18:21
**government**
22:24 23:12
**granting** 48:13
48:16
**great** 5:2 6:2
70:7
**grievance** 10:14
10:16,17,19
11:9,21,22
24:22,24 25:1
25:1,23 28:24
29:10 32:16
35:7 46:12,18
50:14 52:23
66:17 67:4
68:16 69:1,4
**grievances** 10:24
10:25 11:3,3,5
11:6,7,10,10
12:1,2 14:7,11
14:19,22
**grieve** 44:8
**grieved** 33:19
**GROUP** 2:2
**guarantee** 52:19
**guaranteed**
22:25
**guarantees**
51:12
**Guard** 9:18,19
10:10
**Guasto** 1:6 4:6
74:3 75:4
**guess** 6:25,25
**guidelines** 22:17

**guideposts**
24:20
**gun** 41:25 68:10
**guys** 9:2 27:15
36:6

---

**H**

**H** 3:8 74:1
**handled** 68:5
**handling** 27:22
**hands** 40:5
**happen** 24:20
**happened** 35:11
35:12 37:16
43:5 53:14
65:16
**happening**
42:16
**happens** 4:21
**hard** 43:6
**harmonious**
14:24
**He'll** 71:7
**head** 6:19 55:15
56:11 57:25
58:2
**hear** 34:24 37:5
40:9,15 48:12
65:16
**heard** 18:15,17
39:19 40:11
42:8
**hearing** 23:18
24:18 25:25
31:20 52:15,22
56:11,16,22,23
57:2,2,4,9
68:23,25
**hearings** 52:14
**hearsay** 42:7,8
**Hector** 10:2
**held** 31:9 35:19
35:21 37:20
38:10 39:4,10
39:15

**help** 4:12 5:18
**hey** 37:11 42:2
42:10
**HH** 72:11
**highlighting**
57:23
**hired** 30:2
**history** 7:16
27:22
**hit** 25:17
**hold** 16:12 17:11
19:1 34:6
36:16 44:18
53:21
**holding** 21:19
40:5
**hopefully** 5:6
**hotel** 68:13
**Human** 59:20
**hypothetical**
6:24

---

**I**

**i.e** 68:22
**IA** 35:4,14
**idea** 7:9
**identification**
13:13 19:5
34:10 53:19
**identify** 56:13
**iguanas** 4:20
**immediate** 30:16
31:5,13
**immediately**
31:15 57:25
**implement**
31:15
**implementation**
30:16 31:6,13
32:7,13 34:2
40:23,25
**implemented**
32:24 33:1,3,6
33:16,17
**implementing**

47:17
**important** 5:25
6:5
**impose** 69:17
**improper** 36:20
**in-house** 27:7
**incident** 61:19
63:4 64:10
**including** 30:12
54:11
**inclusion** 75:12
**incoming** 10:24
16:1
**incorporated**
28:15
**indicate** 20:2
21:5 48:18
**indicating** 50:11
**individual** 10:6
11:16 12:23
32:8 33:4,7,17
**information** 7:1
56:12 66:21
71:17
**informed** 55:16
**initially** 61:18
68:6
**initials** 20:16
**initiated** 58:3
**Inner** 9:18 10:9
**inside** 35:1
**insubordinate**
55:24 56:1,5
**insubordination**
55:22
**intent** 32:5
**intentional**
54:25 55:4,16
57:24
**intentionally**
54:13 57:18
58:4
**interacted** 15:7
**interaction**
17:20

**interest** 11:2,13
23:12
**interested** 73:10
**Internal** 7:20
16:25 51:4
54:12
**interrogation**
36:20 51:14
**interrupt** 6:13
44:19
**interview** 31:22
31:25 53:11
55:19
**intoxicated**
61:12,20
**invest** 64:20
**investigated**
52:8
**investigation**
56:20,24 58:2
58:3,11 65:9
65:11,12,21,25
67:15 70:9
**Investigations**
8:11,14
**investigative**
55:21
**investigator**
51:22,23 52:7
53:6 54:13,24
55:7,12 57:17
58:1,4,8,12,19
**investigators**
54:11
**invited** 46:6 66:5
**invoke** 36:24
**involved** 18:11
18:14,18 20:7
42:11
**involvement**
17:7 58:1
**involving** 16:5
**irredeemable**
64:17
**issue** 36:19

41:13 49:21
**issues** 27:23

───────────
**J**
───────────
**Jan** 3:12
**January** 7:19
8:7,7,25 15:15
15:17,20,23
16:6 34:13
43:19,24 45:25
47:19 55:3,25
62:11 66:5
**Javier** 10:1
**Jessica** 1:6 4:6,6
15:3,22 17:20
18:16,20 19:10
19:18 20:14,21
22:8 29:24
30:2,4 35:4,14
35:16,21 36:4
36:10 38:22
39:10,18 40:5
41:1 43:1 45:5
48:10,19 49:3
52:21 55:3,23
56:18 59:9
60:13 62:13,16
65:24 66:13,25
67:4,16 70:13
**Jessica's** 16:6
17:8 18:9 28:5
30:5 40:22
43:10,15 44:1
44:11 45:17
47:17 67:17
68:2 70:9
**job** 18:6 23:13
27:20 44:12
45:6 51:21
61:20 68:16
**July** 43:12,15
44:5 72:11
**Justice** 58:13

───────────
**K**
───────────
**Kevin** 19:18

20:23 22:1
**KEY** 2:3
**kind** 6:9 22:23
28:25 39:17
40:1 55:17
**knew** 42:7,14
**know** 5:3,19 6:9
6:18,24 8:9
13:3,18,21
15:4 39:20,24
40:12,13,18
46:19,20 47:2
48:11 60:22
61:2,10 62:19
62:25 70:20
**knowledge** 6:23
7:1 37:16,17
48:14 59:9,12
59:25 60:11
67:3
**known** 4:6 38:9

───────────
**L**
───────────
**L** 2:8,15
**labor** 22:23
27:23
**lack** 11:22 18:21
22:20
**laid** 26:5
**laptop** 34:20,21
**large** 11:16
**last-minute**
38:12
**LAUDERDA...**
2:9
**law** 2:2,8 5:8
22:10,23 27:23
50:2 51:4,8
54:10,23 55:13
**lawyer** 27:2,2,7
27:10 30:3
44:22 45:2
47:8 49:3,16
50:5,12,16
67:17,18

**lawyers** 27:11
**lays** 54:20
**led** 60:6 64:21
**leeway** 41:5
**left** 11:7 35:25
**legal** 4:25 24:25
**Lester** 9:12 35:6
47:24 49:13
71:11
**let's** 10:4 15:14
24:1 28:11
31:4 32:20
34:6,12 50:20
53:2 55:2,10
56:8,25 63:17
68:4
**letter** 30:16 31:6
31:9,15 32:7
32:13,23 33:15
34:2 36:25
40:23,25 41:3
47:16,17 75:6
75:9
**level** 22:25 64:10
**Lieutenant** 7:23
7:24 9:17,19
17:2,21 23:24
24:3 35:5,17
38:3 63:23
**limited** 30:12
46:23
**line** 40:3
**listen** 37:5 42:10
**listening** 37:14
**little** 5:19 13:19
15:14 27:17
50:25 51:1
**local** 32:17
**lodge** 9:8,14
10:12,12,18,18
17:20 18:3
19:13
**long** 8:16 40:3
42:12
**longer** 18:6

27:17
**longstanding**
27:22
**look** 9:7 28:11
36:16 42:2
**looking** 13:21
**loop** 46:14
**lot** 6:11 10:4
11:4 38:12
40:17
**Lt** 1:12 74:4,20
75:2,5
**luck** 68:5

───────────
**M**
───────────
**main** 14:10
**major** 51:8
**makeup** 9:4,4
**manager** 19:20
20:20
**manner** 25:10
25:11
**mark** 53:16
**marked** 13:11
13:12 19:2,3,4
28:8 34:9
47:11 53:18
**marking** 53:24
**matter** 4:10
29:25
**matters** 29:7
**mean** 26:9 29:4
29:9 33:12
38:24 44:19
52:12 60:24
**means** 29:6,14
29:17 37:24
**mechanism**
14:21
**meeting** 3:12
16:5,10,15,17
17:2 18:15,17
18:18 34:6,12
34:14,16,18
35:11,12,13

36:15,19 37:1
37:9,11,18
45:25 46:1,5,7
46:11,13,16,19
47:20,22 48:5
48:8,16,19,25
49:3,8,15,20
49:22,23 50:6
50:7,9,15 55:3
55:25 56:3,6
60:8 62:11,14
62:17 64:14
66:4,5,8,13,13
66:22 67:1,5
68:1 70:12

**MELKINS@...**
2:10
**member** 10:21
11:16,25 12:23
63:6
**members** 10:19
10:20 12:23
14:21 15:2
16:10,14 36:17
37:10 66:17
**membership**
10:24 11:13,14
11:16 14:21
20:6 21:9
**memory** 47:12
60:25
**mentioned** 40:1
62:10
**merit** 10:25
**met** 38:19
**Miami** 1:4,8 2:4
4:8 7:12,18
9:13 15:9,12
19:20 59:11,12
60:12 68:9,12
74:3 75:4
**Michael** 2:8 4:7
60:20
**middle** 15:17
**midnight** 35:17

35:19
**Milan** 19:18
22:1
**million** 13:20
**mind** 11:5 48:19
60:15,22 61:24
**mine** 63:14
**Mini** 71:8
**minor** 32:8,12
33:4,7,18 34:3
**minute** 17:5
44:18 60:14
**minutes** 58:22
**Miranda** 51:16
**misconduct** 54:1
58:14 65:22
66:21 68:18
**missing** 10:4
**mistaken** 27:16
**misuse** 58:14
**Mitchell** 9:24
**MLE** 2:8
**Mm-hmm** 19:17
24:16 32:25
33:5 34:15
36:18 37:4
40:21 43:9
47:9 53:23
54:9
**Moleta** 10:3
**moment** 21:12
53:10 68:4
**money** 11:17
**month** 15:18
42:11
**moving** 18:20
**Muley** 60:20,23
61:6,7,10,14
62:25 63:4
68:4,6,15,18
68:22 69:9,13
69:13,20,24
70:1
**MUNICIPAL...**
1:9

**mutual** 57:4

**N**

**N** 2:15 3:1 4:1
**name** 4:23,25,25
9:20,21 10:3
62:4,5 63:8
74:4
**names** 4:4 10:6
60:19
**nature** 15:5 36:6
40:10
**necessary** 74:17
**need** 19:1 31:17
58:21
**needed** 46:10
**negotiated** 12:24
13:4,25 14:5
**negotiating**
21:14
**neighborhood**
15:23
**neither** 40:18
**never** 35:25
39:20 67:23
68:2
**new** 13:4 14:5
25:21,22
**Nichols** 19:14
**night** 35:21 36:5
39:12
**nodding** 6:19
**normal** 66:24
**north** 35:23
**NORTHEAST**
2:9
**Notary** 1:17
72:4,10
**notes** 73:7
**Notice** 55:6
56:10,15
**notified** 55:13
**notify** 55:7
**notion** 23:13
**November** 8:17

18:15
**null** 14:17
**number** 3:10,11
3:12,13 13:12
19:4,13 23:18
24:19 34:9
37:25 38:2,2
53:18
**numbers** 38:5
38:19

**O**

**O** 2:15 4:1
**O-301** 2:3
**O-z-a-e-t-a** 5:1
**oath** 50:1,2 72:1
**Objection** 12:12
17:10 26:2
41:16 59:14
60:2 62:18
64:4,8,19 66:1
70:4
**observation**
48:14,15
**obviously** 6:1
24:17 31:16
49:24 66:14
**occasion** 65:8
**occur** 55:17
**occurred** 34:6
34:13,23,23
35:1 46:17
55:1
**occurrence**
35:18
**October** 13:24
**office** 8:7 21:20
75:7
**officer** 9:22,24
10:2,3 23:14
23:23 24:3,6
25:12 26:6,12
26:16,19 27:1
29:7 31:8,22
31:25 36:20,23

50:21,24 51:4
51:7,11,12,20
51:21,22 52:5
52:9,11 53:11
54:23,24 55:14
55:14,14,20
57:5 58:2 63:6
69:9,13
**officer's** 55:6,20
**officers** 10:5,18
22:24,25 23:11
23:21 24:2,2
35:18 36:1
37:20 38:2
49:12 66:20
**official** 54:1
58:14
**Oh** 5:10
**okay** 4:3,22 5:15
5:24 6:22 7:4
7:11,18 8:18
8:23 9:4,8,21
12:8,15,17,11
12:20 13:10,22
15:5,14,19
17:5,19 18:14
19:1,8,9,15
20:2,9,16,19
21:8,11,21
22:5 23:21
24:14 26:15,15
26:25 28:2,5,7
28:11,18 29:17
29:21 30:7,18
30:22,22 31:3
31:3,12,25
32:4,10,20,22
33:21 34:1,12
34:18 35:1,3
36:4,15 37:3,8
37:15,18,23,25
39:9,17 41:13
43:8,18,22
44:1,25 45:3,9
45:11,16,22,23

47:2,10,16
48:23 49:2
50:6,11,20
53:9,22 54:8
54:10,18,23
55:6,11 56:5,8
56:25 57:14,22
58:18 59:18
61:1,5 62:4
63:4 67:10
68:15 70:18
71:13,21
**once** 11:3 13:2,5
24:6 39:20
40:3 55:19
75:12
**oncoming** 38:4
38:19
**ones** 14:17 36:11
71:12
**online** 53:21
**opens** 25:17
**Operating** 30:14
**opinion** 26:9,17
26:18
**opportunity**
65:16 66:23
70:18
**option** 39:7
51:17 66:8
**options** 66:10
**order** 20:13
23:19 31:15
38:1
**ordering** 71:8
75:12,12
**orders** 36:1
**ordinance** 32:17
**ordinarily** 64:1
**org** 9:6
**organization**
10:7
**original** 56:24
75:11
**Outer** 9:19 10:9

outlined 29:18
outside 34:24
   41:18 65:2
overall 11:14
oversee 8:11
Ozaeta 1:12 3:3
   4:9,15,23 5:1,3
   67:13 72:5
   73:5 74:4,20
   75:2,5

**P**

P 2:15 4:1
P.M 1:14,14
   71:22
page 3:2,9 20:17
   28:12
PAGE/LINE
   74:6
pages 73:6
PALM 73:3
panel 24:19
   56:23 57:11,17
   57:25 68:24
Paragraph
   28:12 30:7,9
   30:15,17
parameters
   22:17
parse 31:4
part 11:25 14:3
   18:14 32:21
   44:15,17 51:8
   54:10,14,25
   55:8,10 56:13
   56:23,25 57:8
   57:19,22 58:5
participated
   16:5,8
particular 9:8
   16:14 35:21
   38:10,23 40:14
particularly
   38:13
parties 2:18 12:8

12:25 25:19
32:5,11 35:3
73:8 75:12
parties' 73:9
partner 27:12
parts 7:20
party 40:18
   75:12
patrol 17:21,21
   63:5,11,21
pattern 64:15
   65:5
patterns 64:18
Paul 1:12 3:3
   4:15,25 5:3,5,7
   43:14 44:18
   59:4,4 63:12
   63:17 70:18
   72:5 73:5 74:4
   74:20 75:2,5
PAULOZAET...
   75:3
pause 6:12
penalties 74:18
pending 11:7
   25:18
people 6:3 38:7
   38:8 40:17
   46:9 47:19
   66:9
Perfect 7:11
Perfectly 6:21
period 8:24
perjury 74:18
permit 50:5
person 17:3 39:1
   39:3 51:16
   60:21 61:5,5,5
personal 6:23
   7:1 26:9 27:2
personally 15:4
   15:6 26:13
   66:14 67:13
   72:5
personnel 18:16

28:14 30:14
35:20 37:21
38:1 39:2
pertained 60:9
phone 63:12
   66:6
phonetic 10:3
physically 46:13
picked 10:18,20
   10:21
picture 39:20
   40:1,2,4
place 1:15 13:5
placed 61:10
plain 63:7
plaintiff 1:7 2:5
   4:5
plausible 43:7
play 36:24
please 4:3,24
   30:10 59:5
   61:17 62:3
   75:7
PLLC 2:2
point 5:8 36:15
   37:9,18 44:1
   45:24 49:2,20
   70:20
pointing 23:25
police 9:11,13,18
   16:17 20:13
   22:23,25 23:11
   23:21 24:3
   28:13,18 30:13
   36:20 50:4,21
   50:23 51:7,11
   51:20 52:10
   61:7
policies 28:14
policy 30:14
   32:8,12 33:4,7
   33:18 34:3
   55:22
portion 30:11
position 9:23

34:1 50:6
58:15
possible 12:4
   39:3 61:4 62:2
potentially
   25:21
preceding 13:5
predecessor
   47:7
predeterminat...
   23:17 24:18
   25:25 31:19
   52:15,22 68:23
   68:24
prefer 5:2
preparation
   66:16
prepare 7:7
   66:12
presence 34:20
present 16:11,15
   30:5 35:5
   46:13,21 49:9
   49:9,14,14
   50:12,16,18
   62:10
presentation
   56:21
presented 36:25
preserved 56:21
presidency 8:24
   9:5 15:15,21
   22:1,4
president 7:21
   8:3,5,6,19 9:8
   9:9,9,10,12
   10:8,13,20,21
   15:11 16:2
   17:7,19,23,24
   18:1,3,6,7
   19:23 21:4,19
   27:3 29:5
   33:23 35:6,6
   40:24 51:7
Presidents 10:9

46:12,20
presume 5:7
pretty 5:22 7:25
   8:1 27:18
previous 11:5
   14:17,17 38:21
Prieto 16:20
prior 13:3 17:6,8
   17:9,19,23,24
   22:3 42:8,14
   42:17,18,22
   62:17 64:25
   66:4,13,22
   67:1,5
private 30:2
privilege 44:23
   44:24 45:12
privy 18:14 48:6
proactive 63:7
probably 5:25
   6:10
probation 65:1
problem 5:21
   17:12 26:13
   63:15,15,18
procedural 32:8
   33:4,18
procedure 25:2
   25:23 32:19
   69:1 75:21,21
procedures
   29:18 30:14
   31:16 54:14,21
proceed 4:14
   11:1
proceedings
   52:13
process 23:1,1
   23:15 32:16
   37:23 44:16
   68:16,22
processor 32:19
professional
   15:7 54:12
promise 22:20

promote 14:24
promoted 7:24
  7:24 24:6
properly 38:1
property 23:12
protected 51:16
protecting 20:6
  21:9
provided 57:18
  58:5 66:21
Public 1:17 72:4
  72:10
pull 34:7
pulling 68:10
purposes 56:22
  58:5
pursuant 14:7
  32:15 48:23
pursue 11:2,10
  12:1 43:2
pursuing 11:12
put 13:5 52:5
  69:9,12 71:17
putting 66:8
  67:13

**Q**

question 6:9,10
  17:6,12,14
  35:15,22 37:3
  37:9 41:13,20
  43:8,13 45:13
  45:22 60:7
  64:10,22,24
  70:25
question's 17:16
questioning
  55:25
questions 6:11
  7:16 8:18
  35:15 55:21
  56:3,4 61:2
  67:8
quick 5:23
quicker 5:19

quite 5:12

**R**

R 4:1 74:1,1
radar 43:25
raise 36:19
  49:21,23 53:4
  68:1
raised 67:23
  68:2
rank 8:10 38:13
ranks 10:5 23:23
  24:3
Raul 19:20
Raymond 9:17
reach 36:6
reached 18:19
read 30:9 31:13
  70:19,23 71:1
  71:2,6,7 74:18
  75:7
reading 2:19
  32:4 70:20
  75:18
really 34:22 37:7
  41:5 42:10,15
  46:2 47:4
reason 23:9 42:3
  45:6 60:13
  64:3 65:18,19
  74:6
reasonable
  75:10
reasons 57:5
recall 35:12,13
  35:13 62:15,21
  66:16 67:6
receipt 75:9
received 75:12
Recess 58:24
recollection
  34:18
recommendati...
  59:19
record 4:4,24

27:21 58:22,23
  73:6
recording 6:17
recourse 32:15
  33:9,11,12
Redirect 3:6
  67:11
reduced 52:5
redundant
  22:13
refer 5:2 59:4
reference 28:15
referenced
  30:15,17 47:18
referring 8:20
  11:14 12:5,6
  14:9 18:23
  22:8 41:7
  42:17 54:5
refrain 28:13
refusal 55:20
regard 75:10
Regardless 27:5
Reggie 47:24
  71:11
Reginald 9:12
regulations
  28:14
rejecting 41:1
related 56:20
relating 18:11
  39:9 44:7
  69:14
relation 40:22
relationship
  14:24 15:5
  39:18,19 40:10
  40:11,14 43:1
  43:3,5
relative 73:8,9
relay 36:1
remedied 57:1
remedy 51:19
  52:4,19 53:3,6
  54:5 58:18

remember 9:21
  16:12 34:16,19
  36:3 40:3,4
  41:2 47:12
  49:7 62:13
  63:7
remembering
  49:7
REMOTE 1:15
remotely 16:7
  66:9,11
remove 57:25
repeat 33:6,6
repeated 32:11
rephrase 17:14
  21:23 41:20
  49:6
replaced 14:16
report 73:5
REPORTED
  1:16
reporter 1:16
  4:3,9,14 6:1
  30:24,25 58:23
  70:22 71:3,9
  71:13,19,21
  73:5,15 75:16
REPORTER'S
  73:1
represent 4:4
  19:9 29:6
  34:13
representation
  27:19 49:11
  52:25
represented
  26:16 27:1
  29:24 49:11
representing
  20:5
represents 10:12
request 55:15,17
  55:19 56:10,16
  57:3
requested 73:6

required 37:25
  67:15 70:8
requirement
  30:11,13 32:1
requirements
  54:14,25 55:8
  56:13 57:18
  58:5
reserved 2:20
Resignation
  30:17 31:6,9
  31:16 32:7,13
  32:24 33:16
  34:3 36:25
  40:23 47:17
resolved 69:4
Resources 46:9
respective 2:18
respond 55:20
responsibilities
  46:9
responsibility
  57:16
result 30:15 31:5
  32:12
results 31:12
retained 27:11
retaliation 41:1
  43:11 44:4
retaliatory
  41:14,23 45:17
return 16:3
returned 61:16
revealing 45:12
review 10:23,25
  25:23 27:4
  28:2,25 29:1
  32:15,16 56:11
  56:16,21,22,23
  57:2,4,8,11,16
  57:25 58:14
  66:24,25 67:4
  73:6 75:8,9
reviewed 20:3
  21:5 47:6

reviewing 46:8
Rick 16:18 48:3
Ricky 19:19
right 5:11,17
  8:15,21 12:24
  13:17 20:11
  24:10 25:3,20
  27:10,13,23,25
  30:18,18 31:10
  31:17 32:2
  33:6 35:11
  37:21 51:1,14
  51:18 52:2,21
  53:16 54:1
  59:1,4,6 67:7
  67:22 69:10
  71:2,14,19
rights 15:2 20:6
  21:9 24:2
  36:21,23 49:11
  50:21,24 51:8
  51:12,13,15,16
  51:20,23 52:11
  52:20 53:12
ringing 63:12
Rodriguez 61:25
  62:5,7 63:1,6
  63:19
role 8:16 14:20
  20:5 21:8,14
  40:23
romantic 39:18
  39:19
romantically
  42:11
room 34:21,21
  34:23,24 35:2
  35:4 37:13
  41:6 46:1
rose 64:10
routine 37:20
row 39:3
rule 5:25 6:7
  75:21,22
ruled 69:9

rules 5:18,22
  12:18 28:14,14
  30:15 75:10
rumor 42:7,8

## S

S 2:15,15 3:8 4:1
  74:1
Salabarria 4:6
  15:3 28:12,25
  59:10 69:24
Salabarria's
  33:15 34:2
Salas 9:22
Samuel 9:16
sat 35:14
saw 39:20
saying 37:5
  38:18 42:25
says 28:12,18
  29:16 30:7
  31:5,12 55:6
  57:14,23
scenario 13:3
scheduled 57:9
scheme 52:1
  54:5 56:9
screen 28:9
scroll 13:18
  19:15 20:19
scrolling 20:16
second 6:16 9:9
  9:11 15:20
  19:1,7 31:4
  35:6 45:23
  55:10
Secretary 9:14
  10:10
section 3:13 7:23
  8:12 53:25
  57:15,23
see 6:5 10:4,25
  11:3 13:15
  19:7,15,21
  20:11,14,16,17

20:19,24 28:8
  28:16,21 29:2
  31:3 34:24
  37:13 40:2
  48:20 54:2
  57:20 58:16
seeing 5:3 40:12
seen 13:20 47:14
selected 10:22
selective 63:9
send 66:9
seniority 39:6
sense 6:20 45:7
sent 66:10
separated 15:22
  44:3 45:6
separation 23:19
  40:22,25 43:4
  43:11 44:11
  45:17 68:2
September
  13:25 14:6
Sergeant 7:24
  9:11,12,15
  10:1 23:23
  24:3 35:16
  38:10 60:20
  61:6,7,10 63:4
  63:5,5 65:1
  68:6,22 69:13
Sergeant's 38:13
Sergeant-At-A...
  9:17 10:9
sergeants 17:22
  38:2
Sergio 9:22
service 59:7
set 23:18 54:5
setting 22:15
  48:4
Settlement 3:11
  18:23 19:10,24
  20:9 21:15,21
  21:24
shame 26:20

share 21:11 28:5
shift 17:22 35:16
  35:17,19,19
  36:7 37:20,25
  38:4,11,19,21
  38:23 39:11
shortages 35:20
  37:21
shortly 15:8,25
shots 68:10
show 13:10 19:2
  47:11 53:21
showed 21:15
  47:12
showing 13:17
  20:11 53:16,24
side 74:17
sign 31:8 75:7,7
signature 21:4
signatures 19:16
signed 19:18
  20:20 22:2
  26:6,6,15
  29:21 45:14
  47:6 67:16,16
  72:7
signing 2:19
  75:18
signs 19:24 21:1
similar 55:22
similarity 69:23
sir 7:14 9:1 12:7
  13:9 18:13
  21:17 37:22
  54:7 67:25
situation 18:20
  20:7 35:15
  44:8 52:20
  60:6,8 61:12
  64:21,25
situations 22:19
six 42:21 43:3
sleeping 40:15
SMITH 2:2
smoking 41:25

snapped 40:4
somebody 10:11
  40:4
SOPs 28:14
  30:14
sorry 4:19 8:4
  30:21 31:3
  38:17 44:19
  45:9 63:12,14
  63:17 71:15
sort 21:20
Sounds 71:19
sour 42:11
south 43:3
SOUTHERN
  1:3
spared 25:14
speak 47:21 48:3
specific 26:5
specifically
  16:10 22:9
  62:19,23
spell 62:2
spells 47:3
spoke 46:18,23
  47:18,19,23
  48:4
staff 24:10 38:1
stand 8:13 15:2
  36:11 42:4,6
standard 23:4
  30:14
Standards 54:12
  58:13
start 11:4 32:20
  32:21 55:2
started 15:15,21
state 1:17 4:3,23
  10:10,10,11,12
  32:17 72:2,4
  72:10 73:2
stated 62:16,19
  63:23 64:15
  74:18
statements 4:10

STATES 1:2
stating 49:7
station 35:25
status 17:8 25:7
statute 3:13
  32:17 53:25
  75:10
stay 38:6,23
stenography
  6:18
Step 69:5
steps 69:1
Steven 17:2
stipulated 2:17
stood 42:10
stop 21:11 30:18
  30:18
street 7:23 8:12
strictly 15:7
  26:14 60:24
stripes 65:4
stuff 5:19,20
  36:6
stumbling 68:12
subject 23:4
  25:23 28:24
  29:1 69:14
subsequent 62:7
  65:8,12,21,25
  66:20
subsequently
  65:3
substance 26:12
successful 27:21
successor 14:1
  14:13,15,16
suckers 26:14
suffers 52:10
sufficient 55:7
  56:12
suggested 75:9
SUITE 2:3
supervision
  35:22
supervisor 17:21

18:1,9 39:12
support 65:9
supposed 29:7
  35:23 36:12
  65:6
sure 4:25 12:17
  26:10 33:2
  40:15 49:25
  70:21
surprise 38:12
suspension 52:5
sustained 57:24
  58:11,11
swear 4:9
sworn 4:16 16:1
  17:6 72:6

───────

**T**

T 2:15,15 3:8
  74:1,1
take 6:2 10:23
  10:24 16:12
  28:11 42:21
  50:15
taken 58:24 71:3
  71:5 75:6
talk 6:6 16:9
  26:23 46:16
  61:17 68:4
talked 7:4 46:25
talking 6:3 8:20
  14:7,12 16:12
  46:3 50:20
  54:4 58:8
tell 6:24 42:24
  45:1,4 46:25
  48:7,20 64:18
tend 25:6 63:8
term 8:7,8 9:10
  10:11 11:23
  13:2,25 14:3
  18:21 22:21
terminate 48:19
  59:13
terminated

55:23 59:9,22
  60:9,12,13
  61:14,18,20
  62:7 64:2,13
termination
  24:20,21,22
  33:19 41:15
  44:2 63:22
  64:11 68:17,25
terms 9:2 11:24
  12:21,21 14:15
  14:16 18:22
  20:3 25:16
  26:5,7 28:11
  36:22 41:3
  44:7,13 45:20
  49:10 50:18
  65:14 70:11
TERRACE 2:9
testified 4:16
testify 34:22
  44:21
testimony 50:3,7
thank 23:25
  30:19 59:6,8
  62:6 67:8
  71:12,20
Thereabouts
  42:19
thereof 12:1
thing 6:16 10:14
  34:22 38:24
  40:19 41:3
things 13:2,22
  23:18 42:11
  47:3 48:5 63:8
think 11:8 15:15
  15:22 17:16
  23:3 26:13
  27:12 39:10
  42:5 45:22
  47:18 51:5
  58:21 60:14
  65:24
third 10:20

third-party 69:8
thorough 27:3,6
thought 41:14
three 10:1,13,19
  10:22 13:2
  36:17 37:10
  56:9
thumbs 31:1
Tim 6:1,2,12
  16:12 30:20,23
  30:24 71:8,10
  71:16
time 1:14 6:3
  8:19,24 15:11
  15:15 16:2,3
  16:13 17:1
  19:19,21 20:20
  20:24 21:20
  35:8,18 36:5,5
  38:4,8,14
  39:14 40:4
  42:20 43:2
  49:2,20 53:5
  57:7 63:2,4,6,8
  64:23 65:3
  66:7 68:17,17
timeframe 16:1
timeline 36:7
timely 36:2
times 5:11 11:4
  13:20
Timofey 1:16
  72:4,9 73:5,15
  75:16
titled 53:25
titles 10:7,7
  47:18
today 5:3 6:22
  6:25 8:18
  43:18 44:22
  50:1 61:8
told 44:13,15,22
  45:2 48:5
  49:16 50:4
  65:18 66:7

totally 71:1
track 27:21
training 58:13
  63:6
transcribed 75:7
transcript 70:19
  73:6,6 74:2
  75:6,8,9,11,13
  75:19
Treasurer 9:16
  10:10
trigger 32:6
triggering 32:12
true 26:1 51:19
  65:10 73:6
  74:18
truly 75:14
Trustees 10:1,13
trusting 71:4
truth 4:11,11,11
  48:11,21 67:14
truthful 48:22
try 38:5,24 39:2
  39:3 44:11
  45:5 50:14
trying 36:3,7
  44:24
Tuesdays 68:10
turn 39:5
twice 39:3
two 6:3 8:8 10:9
  10:20 27:11
  36:17 46:12,20
two-year 9:2
type 55:22
typically 65:20
  66:21

───────

**U**

U 2:15
uhs 6:20
ultimate 26:1
ultimately 52:9
  53:5 61:19
ums 6:20

**undercover** 63:9
**understand** 6:13
 7:2 16:9 32:14
 42:24 45:16
 49:25 70:23
**understanding**
 21:13 22:11
 32:5 33:2
 36:22 59:21
 65:14
**understood**
 11:18 40:7,20
 44:6 47:8
**Unfortunately**
 51:15 67:22
**uniform** 68:13
**Union** 7:21 8:3,6
 8:19,20 9:5,6
 12:2,21,25
 13:5 14:19,20
 15:1,11 21:20
 24:21 26:6,15
 26:19 27:3,7,7
 27:18,23 28:3
 28:25 29:6,21
 32:14 33:8,16
 33:19 35:5
 39:9,13,14
 40:24,24 41:11
 41:14 42:25
 43:10,23 44:2
 44:10,11,22
 45:5,16 46:9
 49:14 50:14,18
 53:4 55:2
 56:15 67:16,17
 67:23 68:16
 69:5
**Union's** 11:2,25
 27:2 34:1
 62:20
**unit** 17:1 24:2,7
 24:15 63:6,7,8
**UNITED** 1:2
**untruthful**

65:17
**unusual** 38:22
**unvoluntarily**
 38:7
**unwillingly**
 39:16
**upper** 66:10
**use** 69:14 74:17
**usually** 31:8

—————
**V**
—————
**V** 74:3 75:4
**vague** 17:14
**valid** 67:20
**various** 18:16
 46:9 52:14
 69:1
**verify** 13:19
**versus** 11:16
**vets** 25:25
**vetting** 27:4,6
**Vice** 9:9,9,10,11
 10:9,21 35:6,6
 46:12,20
**video** 6:18
**view** 48:13
**violate** 25:16
 30:13 31:10
 50:18 70:2,2
**violated** 51:23
 55:9 56:14
 57:18 58:4
 59:23 60:1,5
**violates** 25:21
**violating** 28:13
 45:20
**violation** 29:7
 32:11 33:4,7,8
 33:18 34:4
 37:12 51:20,24
 52:6,10 53:1,4
 53:5 54:6,21
 54:25 55:4,7,9
 55:12,13,16,22
 56:10,14,16

57:24 58:19
 64:9 67:23
**violations** 32:6,9
 52:2 64:16
**void** 14:17
**volunteered**
 38:8
**volunteering**
 38:13
**volunteers** 38:5
 38:6,20
**VS** 1:7

—————
**W**
—————
**wait** 6:8,11 19:7
 44:18
**waive** 51:17
 53:12 70:19
 71:2,2 75:7,18
**waived** 52:21
**Waiver** 75:17
**waiving** 33:9,11
**walk** 54:8
**walking** 40:5
**want** 6:25,25
 11:8 12:17,18
 13:18 33:2
 37:6 44:21,21
 45:1 47:5,20
 49:8,9,14,25
 54:8 62:1,16
 62:20 70:20,21
 71:1,1
**wanted** 46:14,21
 48:5,9,11,11
 48:20 65:15
**wasn't** 15:17
 34:24 38:12
 39:13,23 43:23
 43:25 44:17
 46:2 49:16
 64:23 65:11
 67:14
**way** 25:14 33:15
 41:1,15 42:15

45:18 50:1
 59:18
**Wayne** 19:14
**we're** 26:23
**Wednesday**
 15:20
**week** 38:11
**well-rounded**
 7:25
**went** 26:8,19
 42:11 43:3
 68:21,23 69:5
**weren't** 38:19
 43:19
**whatsoever** 17:7
 33:9 69:23
 70:9
**whim** 23:20
**white** 41:4
**wiggle** 41:6
**willingly** 26:20
 38:5
**win** 65:4
**withdraw** 41:19
 43:13
**WITNESS** 3:2
 4:13 30:21
 31:1 62:19
 64:5,9,20 66:2
 67:10 71:6
**Wonderful**
 71:13
**word** 52:14
**words** 22:19
 58:7,18
**work** 5:6 6:20
 9:2 16:3 36:7
 38:11 52:5
 59:18 63:1
 69:9
**worked** 5:5 51:4
**workforce** 14:25
 14:25
**working** 12:22
 14:23,23 38:11

56:9 57:3
**workplace** 15:1
**works** 6:15
 37:23
**worried** 10:6
**wouldn't** 26:18
 26:22,22 38:25
**WRITE** 74:2
**writing** 50:11
**written** 56:10,15
**wrong** 42:25
 54:20 58:7

—————
**X**
—————
**X** 3:1,8

—————
**Y**
—————
**yeah** 11:15 16:8
 16:23 37:17
 40:8 41:21
 45:19 49:7
 51:3 53:15
 71:16
**year** 8:17
**years** 5:5 7:19
 8:2,8 13:2
 27:25 42:8,14
 42:17,18,22
 43:3 51:3,5

—————
**Z**
—————
**Zoom** 1:15 16:8
 34:14 46:1
 72:6
**Zooming** 34:19
 46:15

—————
**0**
—————

—————
**1**
—————
**1** 3:10 13:11,12
 15:15
**1-71** 73:6
**1.310(e)** 75:22
**1:00** 1:14
**1:22-cv-21004...**

PAUL Ozaeta

**1:5** 74:3
**10** 57:3
**112** 37:12 50:21
  51:20 52:1
  53:1,8,12 54:6
  54:21 58:18
  66:23 67:23
**112.534** 3:13
  53:25
**12/18/2020**
  19:18
**1212** 2:9
**13** 3:10
**14** 42:18
**15** 1:13 42:18
  74:4
**15th** 72:6,7
**16TH** 2:9
**19** 3:11,12
**19th** 34:13 47:19
**1st** 13:24 15:17

**2**

**2** 3:11 19:3,4
  28:8
**2:32** 1:14 71:22
**2000** 7:19
**2008** 7:24
**2015** 7:25 42:18
  62:1
**2016** 62:1
**2018** 13:24
**2020** 8:6 18:12
  18:15 43:12,15
  44:5
**2021** 3:12 8:7,25
  13:25 15:15,20
  15:24 16:6
  34:13 42:21
  43:20,24 45:25
  55:3,25 62:11
  64:14 66:5
**2023** 8:8,25
**2024** 1:13 72:6,7
  73:11 74:4

**75:1**
**2026** 72:11
**20th** 73:11
**25'ish** 15:23
**26** 75:1
**26th** 39:11
**27** 39:11
**284028** 72:11

**3**

**3** 3:12 28:12
  30:15 34:8,9
  47:11 69:5
**30** 27:25 75:9
**30(e)Florida**
  75:21
**30th** 13:25 14:6
**33131-2433** 2:4
**33304** 2:9
**34** 3:12

**4**

**4** 3:4,13 53:17
  53:18,24

**5**

**5** 30:7,9 72:11
**520** 2:3
**53** 3:13 5:5,6
**59** 3:5

**6**

**67** 3:6
**688-2335** 2:4

**7**

**786** 2:4

**8**

**8** 19:13

**9**

**9** 30:17
**954)401-2608**
  2:10
**954)523-5326**
  75:7

EXHIBIT

**1**

04.15.24   OZAETA   TG

**AGREEMENT**

**BETWEEN**

**CITY OF MIAMI BEACH, FLORIDA**

**and**

**MIAMI BEACH FRATERNAL ORDER OF POLICE**

**WILLIAM NICHOLS LODGE NO. 8**

**Period Covered**

**October 1, 2018 through September 30, 2021**

## TABLE OF CONTENT

**PAGE NUMBER**

**AGREEMENT & PREAMBLE**......................................................................................1

**ARTICLE 1.    RECOGNITION** .................................................................................2

**ARTICLE 2.    DEDUCTION OF DUES** .................................................................. 3
Section 2.1.   Check-off ............................................................................... 3
Section 2.2.   Legal Services Trust Fund.................................................... 3
Section 2.3.   Indemnification. .................................................................... 4

**ARTICLE 3.    GRIEVANCE PROCEDURE** ............................................................ 5

Section 3.1.   Definition of Grievance and Time Limit for Filing ............... 5
Section 3.2.   Grievance Procedure ........................................................... 5
    Step 1................................................................................................. 5
    Step 2................................................................................................. 5
    Step 3................................................................................................. 6
Section 3.3.   Binding Arbitration ............................................................... 6
Section 3.4.   Authority of Arbitrator .......................................................... 6
Section 3.5.   Expenses of Arbitration ....................................................... 7
Section 3.6.   Processing Grievances ........................................................ 7
Section 3.7.   Election of Remedies. .......................................................... 7
Section 3.8.   Probationary Period ............................................................. 7
Section 3.9.   FOP Grievance Committee .................................................. 8
Section 3.10. Waiver of Time Limitations or Steps ................................... 8

**ARTICLE 4.    NO STRIKE AND NO LOCKOUT** .................................................... 9
Section 4.1.   No Strike.............................................................................. 9
Section 4.2.   No Lockout .......................................................................... 9

**ARTICLE 5.    MANAGEMENT RIGHTS** ............................................................... 10

**ARTICLE 6.    POLICE EQUIPMENT** .................................................................... 11

**ARTICLE 7.    HOURS OF WORK AND OVERTIME**............................................. 12
Section 7.1.   Purpose............................................................................. 12
Section 7.2.   Normal Workweek ............................................................. 12
Section 7.3.   Four-Day Workweek.......................................................... 12
Section 7.4.   Weekly Overtime ............................................................... 12
Section 7.5.   Distribution of Overtime Opportunity ................................ 13
Section 7.6.   No Pyramiding. ...................................................................14

## TABLE OF CONTENT

**PAGE NUMBER**

**ARTICLE 8.   WAGES AND FRINGE BENEFITS**……………………………………… 15
Section 8.1.   Across-the-Board Wage Increases ...……………………………………15
Section 8.2.   Police Vehicle Policy...................................................................... 15
Section 8.3.   Compensation Plan ....................................................................... 17
Section 8.4.   Step and Longevity Increases.........................................................18
Section 8.5.   Shift Differential .............................................................................18
Section 8.6.   Hazardous Duty Pay ...................................................................... 19
Section 8.7.   Holidays..........................................................................................19
Section 8.8.   Vacation Benefits............................................................................19
Section 8.9.   Sick and Vacation Leave Accrual and Payment on Termination .................20
Section 8.10.  Sick Leave Sell Back Program..........................................................20
Section 8.11   Bereavement .................................................................................. 21
Section 8.12.  Court Time Compensation................................................................21
Section 8.13.  Out-Of-Classification Pay..................................................................22
Section 8.14.  Standby Pay ................................................................................... 22
Section 8.15. Call-In Pay, On-Call Pay and Telephone Calls ……………………………. 22
Section 8.16.  Sunglasses and Prescription Glasses..............................................23
Section 8.17.  Field Training Officer ...................................................................... 23
Section 8.18.  Injury Service Connected (ISC)........................................................ 23
Section 8.19.  Special Assignment Allowance ........................................................ 24
Section 8.20.  Extra Weapon ................................................................................. 24
Section 8.21.  Quality of Life................................................................................... 25
Section 8.22.  Forced Holdover ............................................................................. 25
Section 8.23.  Pension  ......................................................................................... 25
Section 8.24.  Premium Pay Supplement Contingent Upon the Department Obtaining and
              Maintaining Certain Accreditations ..................................................33
Section 8.25.  Buyback of Probationary Time ..........................................................33
Section 8.26.  "Me Too" with the IAFF ................................................................... 34
Section 8.27.  CJSTC Police Instructor Incentive Pay ............................................ 34
Section 8.28   Second Language Pay ......................................................................35
Section 8.29   Arson Investigator (Certified) ...........................................................35
Section 8.30   Arson Investigator (Trainee) .............................................................35
Section 8.31   Drug Recognition Expert (DRE) ........................................................36
Section 8.32   CJIS Pay ........................................................................................36
Section 8.33   Crisis Intervention Team (CIT) ..........................................................36
Section 8.34   Marine Pay .....................................................................................36

**ARTICLE 9.   FOP HEALTH TRUST** ...................................................................... 37
Section 9.1. ........................................................................................................37
Section 9.2. ........................................................................................................38

# TABLE OF CONTENT

PAGE NUMBER

Section 9.3. ..........................................................................................................38
Section 9.4   Health Trust Plan...............................................................................39
Section 9.5   Indemnification ..................................................................................39
Section 9.6   Employment Eligibility .......................................................................39
Section 9.7   Post Employment Coverage ..............................................................39
Section 9.8   Voluntary Benefits Plan .....................................................................39
Section 9.9   Post Employment Health Program (PEHP)........................................39

**ARTICLE 10.  EDUCATIONAL LEAVE AND TUITION REFUND**..............................................41

**ARTICLE 11.  GENERAL PROVISIONS**
Section 11.1.   Safety and Health ........................................................................ 42
Section 11.2.   FOP Activity and Non-Discrimination ........................................... 42
Section 11.3.   Reduction In Work Force ............................................................. 42
Section 11.4.   Uniforms and Clothing Allowance ............................................... 43
Section 11.5.   Disclosure of Records .................................................................. 43
Section 11.6.   Transfers .................................................................................... 44
Section 11.7.   Meeting Between Parties ..............................................................44
Section 11.8.   Negotiating Sessions .................................................................. 44
Section 11.9.   Job Descriptions .......................................................................... 44
Section 11.10.  Defense of Members ................................................................... 44
Section 11.11.  Personnel Rules and Departmental Manual.................................. 45
Section 11.12.  Incorporation of Personnel Rules ................................................ 45
Section 11.13.  Medical Leave of Absence .......................................................... 45

**ARTICLE 12.  SEPARABILITY** .................................................................................46

**ARTICLE 13.  TIME BANK**.....................................................................................47

**ARTICLE 14.  DRUG TESTING** ..............................................................................49

**ARTICLE 15.  DISEASE PRESUMPTION** ................................................................ 51

**ARTICLE 16.  PROMOTIONS** ............................................................................... 53
Section 16.1. ................................................................................................... 53
Section 16.2. ................................................................................................... 53
Section 16.3. ................................................................................................... 53
Section 16.4. ................................................................................................... 54
Section 16.5.   Seniority Points.............................................................................. 54
Section 16.6.   Education Points.............................................................................54

## TABLE OF CONTENT

**PAGE NUMBER**

Section 16.7.   Book Committee ........................................................... 55
Section 16.8.   Written Test Scoring ....................................................55
Section 16.9.   Assessment Center Test Challenges ......................................... 56
Section 16.10. ........................................................................56
Section 16.11. ........................................................................ 56
Section 16.12  Promotional Eligibility for Employees Under Investigation ..........................57

**ARTICLE 17.  FOP PRESIDENT** ..................................................... 58
Section 17.1. ......................................................................... 58
Section 17.2. ......................................................................... 58
Section 17.3. ......................................................................... 59

**ARTICLE 18.  COMPENSATORY TIME** ................................................ 60

**ARTICLE 19.  ENTIRE AGREEMENT** ................................................ 61

**ARTICLE 20.  TERM OF AGREEMENT** ...............................................62

**ELECTION OF REMEDY FORM** ...................................................... 63

**HEARING EXAMINER RULES** ………............................................... 64

**APPENDIX A – COMPENSATION PLAN** ………................................……..66

## **AGREEMENT**

THIS AGREEMENT, made and entered into this __ day of _____, 2019, by and between the CITY OF MIAMI BEACH, FLORIDA (herein called the "City"), and the MIAMI BEACH FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 (herein called the "FOP").

## **PREAMBLE**

WHEREAS, the FOP has been selected as the sole and exclusive bargaining representative by a majority of employees in the certified bargaining unit set forth in Article 1, and has been recognized by the City pursuant to the laws of the State of Florida as the sole and exclusive bargaining representative for said employees; and

WHEREAS, it is the intention of the parties to this Agreement to provide in manner which is binding and superior to ordinances and personnel rules of the City, for a salary schedule, fringe benefits, and conditions of employment of the employees covered by this Agreement, and to provide for the continued and efficient operation of the City's Police Department; and to provide for an orderly and prompt method of handling and processing grievances; and

WHEREAS, the FOP and the City agree to seek and maintain high standards for the operation of the Police Department;

NOW, THEREFORE, the parties agree as follows:

**ARTICLE 1**
**RECOGNITION**

The City recognizes the FOP as the sole and exclusive bargaining representative for the purpose of wages, hours, and other terms and conditions of employment for employees in the following classifications in the Police Department (hereafter "employees"):

Trainees

Police Officers

Sergeants of Police

Lieutenant of Police

Detention Officers

All other employees in other existing classifications are specially excluded.

**ARTICLE 2**
**DEDUCTION OF DUES**

**Section 2.1 – Check-off**

Upon receipt of a lawfully executed written authorization from an employee which is presented to the City by an official designated by the FOP in writing, the City agrees during the term of this Agreement to deduct biweekly FOP dues of such employees from their pay and remit such deductions to the FOP Treasurer within fourteen (14) calendar days however, such authorization is revocable at the employee's will upon thirty (30) days' written notice to the City and the FOP. The City shall deduct the dues from the FOP members who have authorized such a deduction in the following manner:  Each member's biweekly wages shall be reduced by the amount equal to one and one half percent (1.5%) of the annual minimum of the pay range of the Police Officer Classification, divided by twenty-six (26) pay periods.

For example:
The current annual minimum for the Police Officer Classification is $53,309.01.
$53,309.01 x .015=$799.64 / 26 = $30.76
$30.76 shall be deducted biweekly from the member's paycheck.

The FOP shall be responsible for advising the City of any change in the percentage of dues calculation in writing.  The City shall revise the calculation for each authorized deduction whenever a change to the annual minimum of the pay range of the Police Officer Classification is made, or whenever so notified in writing by the FOP of a change in the percentage.

The City agrees to use diligence in making prompt delivery of monies owed to the FOP.  The charge for dues deductions shall be calculated by multiplying one average run of check-offs by four (4) and multiplying the product by seven cents ($0.07).  The City shall notify the FOP of the amount owed no later than September 1 of each year.  The FOP shall make payment to the City no later than September 30 of each year.  The FOP will notify the City in writing of the exact amount of such uniform membership dues to be deducted.  The FOP will notify the City thirty (30) days prior to any change in its dues structure or if there are additions or deletions to the established check-off list.

**Section 2.2 – Legal Services Trust Fund**

 If the FOP establishes a Legal Services Trust Fund, upon receipt of a lawfully executed written authorization from an employee which is presented to the City by an official designated by the FOP in writing, the City agrees during the term of this Agreement to take biweekly deductions from such employees from their pay and remit such deductions to the Trustee within fourteen (14) calendar days; however, such authorization is revocable at the employee's will upon thirty (30)

days' written notice to the City and the FOP. There will be no charge to the FOP for Legal Services Trust Fund deductions.

The FOP will notify the City in writing of the exact amount of such uniform Legal Services Trust Fund deductions.  The FOP will notify the City thirty (30) days prior to any change in the deduction structure or if there are additions or deletions to the established Legal Services Trust Fund deduction structure.

## Section 2.3 – Indemnification

The FOP agrees to indemnify and to hold the City harmless against any and all claims, suits, orders, or judgments brought or issued against the City as a result of any action taken or not taken by the City under the provisions of this Article; provided, that the City will not be indemnified or held harmless for any intentional tort.  This indemnification is not intended to cover claims made by, or on behalf of the FOP.

**ARTICLE 3**
**GRIEVANCE PROCEDURE**

**Section 3.1 – Definition of Grievance and Time Limit for Filing**

A grievance is a dispute involving the interpretation or application of the express terms of this Agreement, excluding matters not covered by this Agreement; or where Personnel Board rules and regulations are involved; provided that disciplinary actions, including discharges, may be grieved under this Article, as provided herein.  See Section 3.7 (Election of Remedies) for procedures to be utilized in particular circumstances.  No grievance shall be entertained or processed unless it is submitted within twenty (20) workdays (excluding Saturday, Sunday, or holidays recognized by the City) after the occurrence of the first event giving rise to the grievance or within  twenty (20) workdays after the employee, through the use of reasonable diligence, should have obtained knowledge of the occurrence of the first event giving rise to the grievance.

**Section 3.2 – Grievance Procedure**

The FOP shall have the right to initiate and process grievances on its own behalf or on behalf of named members of the bargaining unit.  However, the FOP shall have the right in its sole discretion not to process grievances on behalf of bargaining unit members who are not members of the FOP, provided it notifies said employee of its decision not to proceed.  Grievances shall be processed, individually, as follows:

> **Step 1**: The grievance shall be presented, in writing on the Grievance Form supplied by the City, to the employee's unit or division commander or a designated representative, who shall answer within five (5) workdays after such receipt. The employee will also provide the FOP with a copy of said grievance.

> **Step 2**: If the grievance is brought by the FOP on its own behalf, or if the grievance is brought on behalf of an individual(s) and is not settled in Step 1 and an appeal is desired, it shall be referred in writing to the Police Chief or his designee.  The Election of Remedy Form shall be completed and signed by the FOP and/or the grievant, and attached to the Step 2 grievance.  The Police Chief shall discuss the grievance within ten (10) workdays with the employee and the FOP grievance committee at a time designated by the Police Chief.  If no settlement is reached, the Police Chief shall give the City's written answer to the employee and the FOP grievance committee within five (5) workdays following their meeting.

> **Step 3**: If the grievance is not settled in Step 2 and both the employee and FOP grievance committee desire to appeal, or if it is a class grievance filed by the

FOP and at least one employee of the named class and FOP grievance committee desire to appeal, it shall be appealed in writing to the City Manager or his designee for Labor Relations within fifteen (15) workdays after the City's answer in Step 2.   Within fifteen (15) workdays after the grievance is submitted is to HR, the parties shall confer to pick a neutral third-party as a mediator. After the mediator is selected, the parties shall schedule a mediation, which shall happen within thirty (30) workdays after the selection of the mediator. The parties can agree to extend this deadline, and it is understood that the selected mediator's schedule may require an extension. The parties shall evenly split the costs of the mediator. The rules of mediation that are applicable in the Florida Courts shall apply, in full. For the avoidance of confusion, this means that anything and everything discussed during mediation is confidential and may not be introduced in any other proceeding, ever. This confidentiality provision shall be interpreted as inclusive. Both parties must have a decision-maker present at the mediation. If the parties are unable to resolve the matter at mediation the mediator shall declare an impasse.

## Section 3.3 – Binding Arbitration

If the grievance is not resolved in Step 3 of the grievance procedure, the FOP grievance committee may refer the grievance to binding arbitration within fifteen (15) workdays after the declaration of impasse from Step 3. The parties may select an arbitrator by mutual agreement. Nonetheless, the parties shall jointly request the Federal Mediation and Conciliation Service to submit a panel of five (5) arbitrators.  Both the City and the FOP shall have the right to strike two names.  The name remaining after the last party strikes shall be the arbitrator.  The parties shall notify the arbitrator of their selection and request the arbitrator's availability for a hear.

Written reprimands shall be settled at Step III.

## Section 3.4 – Authority of Arbitrator

The arbitrator shall have no right to amend, modify, ignore, add to, or subtract from the provisions of this Agreement.  He shall consider and decide only the specific issue submitted to him in writing by the City and the FOP and shall have no authority to make a decision on any other issue not so submitted to him.  The arbitrator shall submit in writing his decision within thirty (30) days following the submission of briefs by the parties. Either party may elect to make a closing argument at the hearing. A party can BOTH make a closing argument and submit a written brief. Written briefs shall be due on a date agreed to by the parties. The parties may agree to extend the deadline for submission of written briefs, and the deadline for the decision from the arbitrator.

The decision shall be based solely upon his interpretation of the meaning or application of the express terms of this Agreement to the facts of the grievance presented.  If the arbitrator acts in accordance with this Section, the decision of the arbitrator shall be final and binding.

## Section 3.5 – Expenses of Arbitration

The fee and expenses of the arbitrator and the cost of a court reporter's attendance and written transcript shall be divided equally between the City and the FOP; provided, however, each party shall be responsible for compensating its own representatives or witnesses.

## Section 3.6 – Processing Grievances

All grievance discussions and investigations shall take place in a manner which does not interfere with the operation of the Police Department.  Any time spent by the Grievance Committee of the FOP in discussions or processing grievances at Step 1, 2, or 3 during their working hours shall not result in a loss of earnings or benefits.

## Section 3.7 – Election of Remedies

Disciplinary actions may be grieved (1) under the grievance/arbitration provisions contained in this Article or (2) to a Hearing Examiner, who shall be selected by utilizing the procedures outlined in Section 3.3 of this Article.  A grievance involving the interpretation or application of this Agreement may be grieved solely under the grievance/arbitration provisions contained in this Article.  Grievances regarding certain non-disciplinary matters, such as disagreements as to the waiving or application of changes to personnel rules or other work rules or policies may be filed via the Personnel Board procedures.

The decision of the hearing officer shall be final & binding.  The cost of a Hearing Examiner shall be borne by the City.  Any proceedings before the Hearing Examiner shall be conducted pursuant to the attached Hearing Examiner Rules.

## Section 3.8 – Probationary Period

Nothing herein shall in any way affect the discretion presently accorded the Police Chief with respect to employees in their probationary period following hire or in their probationary period following promotion.  It is specifically understood by the parties that the exercise of the Police Chief's discretion in this regard shall not in any way be subject to the grievance procedure set forth herein. Newly hired employees shall remain in probationary status for twelve (12) months after completion of the Field Training Officer (FTO) program and have no right to utilize the

grievance procedure for any matter concerning discharge, suspension or other discipline during such period.

Employees promoted to the rank of Sergeant of Police or Lieutenant of Police shall remain in probationary status for nine (9) months after completion of the Supervisor FTO program designed by the Chief of Police, with input from the Union. In no event will the Supervisor FTO program be longer than eight (8) weeks.

## Section 3.9 – FOP Grievance Committee

The FOP shall appoint a Grievance Committee of not more than three (3) members, and shall notify in writing the Police Chief and the City Manager's designee for Labor Relations of the name or names of the employee or employees serving on this committee and of any changes in the numbers of this committee.  The members of this committee may not conduct any investigation while on duty without receiving the permission of the Police Chief, or in his absence, the duly authorized representative acting in his behalf; however, such permission shall not be unreasonably withheld.   Department clerical personnel will not be used by the grievance committee in grievance matters.   The grievance committee shall not unreasonably use other departmental resources for the purpose of conducting grievance-related work.

## Section 3.10 – Waiver of Time Limitations or Steps

The parties may mutually agree in writing to extend any of the time limitations set forth above for the processing of grievances and may also waive any of the intermediate steps of the grievance procedure in writing.

**ARTICLE 4**
**NO STRIKE AND NO LOCKOUT**

**Section 4.1 – No Strike**

The parties hereby recognize the provisions of Chapter 447, Florida Statutes, which define strikes, prohibit strikes, and establish penalties in the case of a strike, and incorporate those statutory provisions herein by reference.

**Section 4.2 – No Lockout**

The City will not lockout any employees during the term of this Agreement as a result of a labor dispute with the FOP.

**ARTICLE 5**
**MANAGEMENT RIGHTS**

It is recognized that except as stated herein, the City shall retain all rights and authority necessary for it to operate and direct the affairs of the City and the Police Department in all of its various aspects, including, but not limited to, the right to direct the work force; to plan, direct, and control all the operations and services of the Police Department; to determine the methods, means, organizations, and personnel by which such operations and services are to be conducted; to assign and transfer employees; to schedule the working hours; to hire and promote; to demote, suspend, discipline or discharge for just cause, or relieve employees due to lack of work or for other legitimate reasons; to make and enforce reasonable rules and regulations; to change or eliminate existing methods, equipment, or facilities; provided, however, that the exercise of any of the above rights shall not conflict with any of the expressed written provisions of this Agreement and that a grievance may be filed alleging such a conflict.

The City shall not employ more than eighty (80) Reserve Police Officers.  No Reserve Police Officers will be authorized to perform off-duty work as a police officer, unless reasonable efforts to fill an off-duty job with bargaining unit member fails.  Reserve Officers shall be compensated one dollar ($1.00) per fiscal year. The cap on reserve officers can be adjusted by mutual agreement of the City Manager or designee and FOP President.

Should the Department determine, in the discretion of the Chief with the concurrence of the FOP President, to utilize reserve officers to staff special events or other circumstances, such reserve officers will be compensated by the City at the prevailing off-duty rate.

**ARTICLE 6**
**POLICE EQUIPMENT**

The City agrees to issue equipment which includes four sets of class B and E uniform shirts and pants or shorts on annual basis. Footwear, duty gear, department issued weapons, ammunition, handcuffs, expandable batons, light and heavy jackets, rain gear and traffic templates, shall be issued as needed.  Additionally, the City will supply an initial issue whistle to all patrol officers. To the extent that a flashlight is a required article of equipment, the City shall provide it.  The City will reimburse employees for the cost of replacement of protective vests up to a maximum of $750.00, when needed. However, as long as the City is a recipient of the U.S. Department of Justice Bulletproof Vest Partnership (BVP) Grant, the City will reimburse employees for the cost of replacement of protective vests up to a maximum of $1,000.00, when needed.  If the City is no longer a recipient of the BVP Grant, then the reimbursement rate shall be $750.00.

If the Department transitions to new or different types of equipment, all employees shall receive the equipment and applicable training within one (1) year of the transition or within a reasonable timeframe.

Necessary ammunition will be issued to each employee every twelve (12) months to guarantee reliability of the ammunition.

**Retiree Service Weapon**

A bargaining unit member who retires in good standing from the City shall receive his/her service firearm upon retirement or upon separation from the Police Officer Reserve Program, provided that the member does not retire in lieu of termination.  The Police Chief (or designee) shall have the right to deny this benefit for any justifiable reason to be approved in conjunctions with the Human Resources Director (or designee).

All bargaining unit members who retire due to in-service connected injuries/disabilities regardless of creditable years of service with the City's Police Department shall be eligible to receive their service firearm.  Any sworn employee who retires and remains as a reserve police officer shall receive his or her retiree weapon when they separate from the Police Officer Reserve Program.

Note:  The Chief of Police may require the wearing of body armor at any time in response to specific events or threats. When the Chief directs that it be worn, members will wear only body armor authorized or approved by the Department. Members who do not have body armor will not be required to wear any, until the Department either supplies it to them or reimburses their purchased and approved body armor.

**ARTICLE 7**
**HOURS OF WORK AND OVERTIME**

**Section 7.1 – Purpose**

This Article is intended to define the normal hours of work and to provide the basis for the calculation and payment of overtime.  It shall not be construed as a guarantee of hours of work per day or per week, or of days of work per week.

**Section 7.2 – Normal Workweek**

The normal workweek shall consist of forty (40) hours per week and such additional time (subject to Section 7.4 and 7.5 below) as may, from time to time, be required in the judgment of the City to serve the citizens of the City.  The workweek shall begin with the employee's first regular shift each week.  All hours scheduled in the normal workday will be consecutive.  An employee called in early in advance of his normal shift starting time will not be sent home early on such day for the purpose of avoiding overtime unless such employee is in agreement with the request to leave early; provided, however, that except as limited by Section 7.3 below, the City shall retain its right to establish and modify normal work schedules.

**Section 7.3 – Four-Day Workweek**

The City shall extend the present policy of a four (4) day workweek to all employees in the bargaining unit except employees on light duty because of injuries or illness which are not service connected.  Employees who suffered a service connected injury or illness and who are permitted to work light duty may work up to thirty-two (32) weeks, measured non-consecutively from the date of injury, on light duty on a 4-10 schedule, or to receive ISC payments for thirty-two (32) weeks, or a combination of both.  Thereafter, the officer may be assigned to work a 5-8's shift in a light duty assignment during the pendency of his/her light duty.

Positions occupied by employees who are permitted to elect either a 4-10 or a 5-8 work schedule shall continue on that basis.

Detention Officers shall continue to work a 5-8 work schedule.

**Section 7.4 – Weekly Overtime**

Any member of the bargaining unit required to perform work outside of his/her regularly assigned shift shall receive pay at time-and-one-half their current hourly rate, subject to the provisions of the following paragraph.

The parties understand and agree that Section 207(k) of the Fair Labor Standards Act Regulations shall apply to hours of work for employees covered under this agreement. Accordingly, the normal biweekly work period shall consist of eighty (80) hours in a fourteen (14) day period.  Hours worked in excess of the eighty (80) hour biweekly work period shall be compensated at the rate of one and one-half times the employee's regular rate of pay; however, sick leave, excluding sick leave taken under the Family and Medical Leave Act (FMLA) and court sick leave (only after having worked at least sixteen (16) consecutive hours), shall not count as hours worked for purposes of overtime calculation.  Leave without pay, excluding leave taken under the Family and Medical Leave Act (FMLA), shall not count as hours worked for purposes of overtime calculation. Hours worked on an off-duty assignment shall not count as hours worked for purposes of overtime calculation.  All other hours in paid status shall count as hours worked for the purposes of overtime calculation.

### Section 7.5 – Distribution of Overtime Opportunity

a)      Overtime is recognized as being of three (3) general types within the Police Department:

1.      **Carry-over Overtime –** Overtime for work carried over from an employee's regular duty assignment (e.g., uniform officer on arrest; detectives' on-going investigations).  "Carry-over Overtime" shall not be subject to equal distribution rules.

2.      **Staffing Overtime** – Overtime due to staffing needs.  Staffing Overtime shall be distributed on a rotating basis, as equally as practicably possible, among employees in the particular work unit who are qualified to perform the particular overtime work, by departmental seniority. The Staffing Overtime list must be exhausted before returning to the top of the list.

Employees who are not in the particular work unit or division will not be assigned to Staffing Overtime unless reasonable attempts to assign employees from within the work unit or division have failed.

3.      **Special Event Overtime** – Overtime for planned events or assignments.  Special Event Overtime shall be distributed on a rotating basis, as equally as practicably possible, among all sworn employees in the Department who are qualified to perform the particular overtime work, by departmental seniority. The Chief of Police will develop and maintain a list of recurring special events.  The

Union President will be notified of special event pre-action and post-action meetings; his or her attendance is optional

b) Records for Staffing Overtime will be maintained at the Platoon or work section level. Records for Special Event Overtime will be maintained at the Department level.

c) Pay for overtime work will be paid no later than two (2) full pay periods following the pay period in which the overtime/court attendance slip is submitted and approved by the employee's supervisor.

## Section 7.6 – No Pyramiding

Compensation shall not be paid more than once for the same hours with the exception of the assignment of "guaranteed minimum hours" provided for in Section 8.12, entitled Court Time Compensation, when the court time does not fall completely within the employee's regular shift or assigned overtime shift. In contrast, if the court time completely falls within the employee's regular or overtime shift, no guaranteed minimum court time hours shall be paid.

**ARTICLE 8**
**WAGES AND FRINGE BENEFITS**

**Section 8.1 – Across-the-Board Wage Increases**

a) Effective with the first pay period ending in October 2018, there shall be a zero percent (0%) across-the-board wage increase.
b) Effective with the first pay period ending in April 1, 2020, there shall be a one percent (1%) across-the-board wage increase. This across-the-board wage increase shall increase the minimums and maximums of the pay ranges for those classifications covered by this Agreement.
c) Effective with the first pay period ending in April 1, 2021, there shall be a one percent (1%) across-the-board wage increase. This across-the-board wage increase shall increase the minimums and maximums of the pay ranges for those classifications covered by this Agreement.

**Section 8.2 – Police Vehicle Policy**

In an effort to reduce the long-term costs to the City in maintenance, repairs and liability, a take-home vehicle program will continue on a phased-in process to the extent that funds are available in compliance with State and Federal law from the Police Confiscated Fund.

Bargaining unit members who are participants in the Take-Home Vehicle Program as of October 1, 1997, shall continue in the Take-Home Vehicle Program as prescribed by the City Commission approved Policy and the Department S.O.P.  Thereafter, priority for allocation of take-home cars shall be given to all eligible personnel by Departmental seniority.

To defray the operating expense incurred by the City as a result of the non-official use of take-home vehicles, employees shall be assessed a user fee.  The fee shall be based on the location of their primary residence as shown below:

| LOCATION | BIWEEKLY FEE |
|---|---|
| Miami Beach | -0- |
| Dade County (other than Miami Beach) | $25.00 |
| Broward County | $30.00 |
| Palm Beach County (as limited below) | $45.00 or $75.00 |

The take-home vehicle program shall be available to any sworn officer who was hired before July 18th, 2001 [the ratification date of 2000-2003 Agreement] who resides in Miami-Dade or Broward County.  Except as stated in this section, the take-home vehicle program shall not be available to any sworn officer who is hired on or after July 18th, 2001 [the ratification date of the 2000-2003

Agreement] (except police applicants in the background process) and resides outside of Miami-Dade County but is available to a sworn officer who is living outside Miami-Dade County and moves back to Miami-Dade County.

As of July 2010, there were one hundred ten (110) cars allocated in the take home vehicle program for Broward County. Going forward, a number of vehicles to be determined (but no less than one hundred ten (110) vehicles) by the mutual agreement of the Police Chief and the FOP will be allocated for Broward County.

The four (4) police officers currently residing in Palm Beach County will be allowed to retain their take home cars and will continue to pay at their current rates (i.e., the $45.00 or $75.00 that applied to each of them respectively per the terms of the 2003-2006 Agreement) for their vehicles. When each one of these four (4) employees separate from City employment, the number of Palm Beach cars will be reduced as each employee leaves.  Whenever one (1) of the four (4) Palm Beach County cars is eliminated, the number of Broward County take home cars will be increased by that same number.

Employees may not park their cars in a location so as to circumvent the restrictions outlined in this section.

The Union agrees that each bargaining unit employee who is assigned a take-home vehicle will purchase at his or her expense an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, within 30 days of this effective date of this agreement. In addition, the employee must maintain an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, for so long as he or she is assigned a take-home vehicle. Employees who are initially assigned a take-home vehicle, subsequent to date of ratification of this agreement, shall be required to obtain and maintain an extended non-owner coverage endorsement or non-owner auto insurance coverage in the amount of at least $100,000, prior to vehicle assignment. Any employee without the required insurance coverage, as stipulated herein, may have the take-home vehicle privilege revoked at the City's discretion. If the insurance industry no longer provides the extended non-owner coverage endorsement or non-owner auto insurance coverage, there will be a re-opener in order for the City and Union to discuss the provisions set forth in this section only.

<u>**Section 8.3 – Compensation Plan**</u>

a)      <u>**Entry Level Pay - Hired on or after October 1, 1997**</u>

     1.   <u>Police Officer</u>

          a)   Non-Certified Hire - A newly hired, non-certified Police Officer will be placed in the Police Officer Trainee Step 1 rate of pay while attending the Police Academy and until he/she receives notification of passing the State Certification examination.  The pay period following the notification of passing the State Certification examination the bargaining unit employee will be placed in Police Officer Trainee Step 2 rate of pay for the duration of his/her first year of service. Upon completing his/her first year of service, in accordance with Section 5 below, the bargaining unit employee shall be placed in Step A.

          b)   Non-Florida Certified Hire Academy Required - A newly hired, Non-Florida certified Police Officer who is required to attend the Police Academy will be placed in the Police Officer Trainee Step 2 rate of pay while attending the Academy and until he/she receives notification of passing the State Certification examination.  The pay period following the notification of passing the State Certification examination, the bargaining unit employee will be placed in Police Officer Trainee Step 3 rate of pay for the duration of his/her first year of service.  Upon completing his/her first year of service, in accordance with Section 5 below, the bargaining unit employee shall be placed in Step A.

          c)   Certified Hire with less than one (1) year of experience - A newly hired Police Officer with less than one (1) year of experience who is not required to attend the Police Academy shall be placed in the Police Officer Trainee Step 3 rate of pay for his/her first six (6) months of service and Step A for the duration of his/her first year of service.

          d)   Certified Hire with or greater than one (1) year but less than three (3) years of experience - A newly hired Police Officer with or greater than one (1) year but less than three (3) years of experience shall be placed in Step A for the duration of his/her first year of service.

e) Certified Hire with or greater than three (3) years of experience - A newly hired Police Officer with or greater than three (3) years of experience shall be placed in Step B for the duration of his/her first year of service.

2. <u>Detention Officer</u>
A newly hired Detention Officer will be placed in Step A of the pay scale for the duration of his/her first year of service.

b) **State Certification Re-examination –** In the event a newly hired Police Officer who is required to take the State Certification examination fails to pass said examination, he/she shall be placed on a leave of absence without pay until such time as he/she passes the State Certification examination. Said bargaining unit employee shall sign up for the next scheduled examination in the State of Florida and take the examination at his/her expense. In the event the bargaining unit employee fails the re-examination, his/her employment with the City shall terminate.

## Section 8.4 – Step and Longevity Increases

All step and longevity increases shall become effective on the payroll period commencing nearest the employee's anniversary date, as per current practice. A step increase shall be awarded based upon the employee receiving a satisfactory evaluation during that rating period, as per current practice.

Effective October 1, 2015, one (1) additional step (Step I) shall be added to the maximum pay range for the classification of Detention Officer. The additional step will increase the maximum of the range for the aforementioned classification by five percent (5%). The minimum pay range shall remain as is and there shall be no immediate pay increase for any employees. Those employees at the maximum of the range (Step H) as of October 1, 2015, will move into the new step (Step I) on October 1, 2015, with their anniversary date remaining unchanged. Thereafter, any employee in the aforementioned classification who is at the maximum step of the range, (Step H), shall be eligible to proceed to Step I upon reaching his or her next anniversary date.

## Section 8.5 – Shift Differential

At the time this Agreement was executed, the City maintained three standard shifts of work to-wit: a first shift starting at approximately 11:00 p.m.; a second shift (also called "Day Shift") starting at approximately 7:00 a.m.; and a third shift (also called "Afternoon Shift") starting at approximately 3:00 p.m.

If the City rearranges the shift scheduling or establishes any new shift, shift differential pay shall follow the below formula based on the time period in which a majority of hours are worked by the

employee.  If a majority of the non-standard shift hours are after 3:00 p.m., all the shift differential pay for all post 3:00 p.m. hours, effective October 1, 2006, shall be seventy-five cents ($.75) per hour.  If a majority of the non-standard hours are after 11:00 p.m., all the shift differential pay for all post 11:00 p.m. hours, effective October 1, 2006 shall be one dollar ($1.00) per hour. However, effective September 30, 2015, if a majority of the non-standard shift hours are after 3:00 p.m., the shift differential pay for all post 3:00 p.m. hours shall be fifty cents ($.50) per hour, which shall be added the employee's hourly rate; and if a majority of the non-standard hours are after 11:00 p.m., the shift differential pay for all post 11:00 p.m. hours shall be seventy-five cents ($.75) per hour, which shall be added to the employee's hourly rate.

## Section 8.6 – Hazardous Duty Pay

All employees covered by this Agreement, shall receive hazardous duty pay in the amount of one hundred twenty-five dollars ($125) per pay period. Hazardous Duty Pay shall not be considered as pensionable earnings.

## Section 8.7 – Holidays

Consistent with the City Commission holiday resolution and current department practices, the holiday benefits presently enjoyed by the employees covered by this Agreement shall continue. Employees shall be paid double time for all hours worked on a holiday.  Employees whose regularly scheduled day off falls on a holiday shall be given another day off.

**The following holidays shall be recognized as follows:**

| Holidays | Recognized Date |
|---|---|
| New Year's Day* | January 1 |
| Independence Day | July 4 |
| Veterans Day | November 11 |
| Christmas Day* | December 25 |

**\*Effective the first full pay period upon ratification, members working midnight shift on Christmas Eve and New Year's Eve shall also be paid double time for all hours worked.**

## Section 8.8 – Vacation Benefits

Consistent with applicable ordinances, the vacation benefits presently enjoyed by the employees covered by this Agreement shall continue.  Employees shall be allowed to take vacation time off upon completion of their entry FTO program.

In the event an employee is not allowed to take a vacation because of scheduling by the City, he will, at the option of the City, either be paid in lieu of vacation time not used, or be allowed to accumulate into the next calendar year pursuant to existing rules governing accumulation. However, in no event shall an employee be penalized by losing accumulated vacation time because he was unable to use it because of departmental needs. This Section shall not apply to sick leave accumulation.

## Section 8.9 – Sick and Vacation Leave Accrual and Payment on Termination

Effective upon ratification of this agreement, all employees covered by this Agreement shall, under applicable ordinances, rules, and regulations, be allowed to accrue no more than 500 hours on an annual basis, and, except in accordance with provisions for postponement of vacation leave as set forth in Article 8, Section 7, of this Agreement; be permitted to transfer sick leave in excess of 360 hours to vacation leave at the rate of two days' sick leave to one day vacation leave to be used in the pay period year when transferred; be permitted a maximum payment at time of termination, death, or retirement of, no more than 620 hours vacation leave and seventy-five percent (75%) of sick leave to a maximum of 620 hours.  Employees shall be permitted to carry vacation hours over the five hundred (500) hour cap until March 31st of the following year.

## Section 8.10 – Sick Leave Sell Back Program

An annual sick leave sell back program, payable on a dollar for dollar basis, has been established and implemented as stated in this section.  The annual sick leave sell back period shall cover each fiscal year, from October 1st to September 30th.  Payments for each annual sick leave sell back period will be made in the last pay period in November after the closing of the applicable sell back period.

The sick leave sell back program will allow qualified employees to sell back their annual sick leave accrual during the sell back period, minus any sick and emergency vacation leave utilized during the same period, to be reduced on an hour for hour basis., Employees who have completed twenty (20) years of service or more, before the start of the applicable sell back period, may sell back up to 136 hours minus any sick and emergency vacation leave utilized during the same period, to be reduced on an hour for hour basis.  Leave utilized under the Family and Medical Leave Act (FMLA) shall not reduce the sick leave sell back amount.

In order to qualify for participation in the sick leave sell back program, employees must: (1) Have been employed by the City throughout the entire sick leave sell back period being measured; and (2) Maintain at least three hundred (300) hours of combined accumulated sick and vacation leave, after each sell back date. Employees who have completed five (5) years of service or less, before the start of the applicable sell back period, must maintain at least two hundred (200) hours of combined accumulated sick and vacation leave, after each sell back date. The sick leave hours

sold back as part of this program cannot cause the employee's accumulated sick and vacation leave to fall below the aforementioned minimum established thresholds.

## Section 8.11 – Bereavement

When there is a death in the immediate family (mother, father, grandparents, grandchildren, current spouse's parents, brother, sister, current spouse, children or stepchildren or domestic partner as defined in the Domestic Partner Leave Ordinance of an employee), he or she shall be allowed four (4) days off for each death for the purpose of making arrangements and/or attending the funeral, without loss of pay and without charge to accrued sick leave or vacation days of said employee. At his or her request, the employee shall be provided two (2) additional work days off, which shall be charged to the employee's accrued sick or vacation leave bank.  In such circumstances, additional time off may be granted at the discretion of the Police Chief and shall be chargeable to the accrued sick or vacation leave of such employee.  Requests for additional time off shall be submitted in writing to the Police Chief.

The City shall be responsible for funeral expenses for any employee killed in the line of duty, up to a maximum of $20,000.

## Section 8.12 – Court Time Compensation

For attendance at court during off-duty hours for purposes related to employment with the City, employees shall be provided with time and one-half pay for such time spent at court with the following minimum hourly guarantees:

a) During an employee's off-duty hours, a minimum of four (4) hours per day shall be guaranteed until September 30, 2015, at which time the minimum hours per day shall decrease to three and one-half (3 ½) hours. However, if an employee's first court appearance begins within one (1) hour of the start of his/her regularly assigned shift or ends within one (1) hour after the end of his/her regularly assigned shift, a minimum of two (2) hours per day shall be guaranteed.

b) For the employee's second off-duty appearance in the same day, an additional two (2) hour minimum shall apply after the expiration of four hours (or two hours if the initial two-hour minimum was in effect).

c) For the employee's third off-duty appearance in the same day, an additional one (1) hour minimum shall apply after the expiration of six hours (or four hours if the initial two-hour minimum was in effect).

d) No Pyramiding.  Compensation shall not be paid more than once for the same hours.

## Section 8.13 – Out-of-Classification Pay

When an employee is assigned by the shift commander to perform at the level of a higher rank, he shall be paid for the duration of the assignment at an hourly rate of pay of three dollars ($3.00) higher than his/her regular rate; provided that this shall in no way constitute an obligation to assign an employee to a higher classification under any circumstances and it is recognized that the City retains the right to determine when and for how long an employee will be temporarily assigned to a higher classification.

## Section 8.14 – Standby Pay

When an employee is placed on standby during off-duty hours by order of the shift commander for the purpose of being available to return to duty to handle emergency crowd control or natural disasters, he will be paid one-half (1/2) of his regular base rate for all standby time up to a maximum of eight (8) full-time hours in a twenty-four (24) hour period, starting with the time he is notified to stand by.  Standby remuneration shall cease at the earlier of sixteen (16) hours in a twenty-four (24) hour period or when the employee is notified by order of the shift commander that the standby order is rescinded.  Standby hours shall not be considered as hours worked for purposes of overtime.

## Section 8.15 – Call-In Pay, On Call Pay, and Telephone Calls

a. Call-In Pay

An employee who is called to perform work outside of his regularly assigned shift will be paid a minimum of two (2) hours' compensation at the straight time hourly rate or time and one-half the regular hourly rate, subject to the provisions of Article 7.4, Weekly Overtime, except when contiguous to the employee's regular schedule.

b. On Call Pay

Effective the first full pay period upon ratification, employees who are designated as on call status will receive a two and half percent (2.5%) supplement pay per pay period on a monthly basis.

Those designated as on call status include the following:
- Criminal Investigations Division
- Hostage Negotiations Team
- SWAT Techs
- Special Weapons and Tactics Team
- Tech Services
- PEU
- Homeless Resource Officers (HRO)
- Intelligence Unit
- PIO

- IA
- FOP President
- Traffic Homicide Investigators
- K-9
- Neighborhood Resource Officers

Members receiving this benefit must be available to the Department when called. Unreasonable failure to respond when called may result in removal of this benefit for up to one year, at the discretion of the Chief.

Investigative Supervisor Availability Pay is eliminated effective upon ratification of this Agreement.

c. Telephone Calls

Any off-duty employee who receives a telephone call from a supervisor regarding a matter that pertains to an investigation or incident arising from his/her most recent (last) work shift, shall be paid a 30-minute minimum at straight time or time and one half the regular hourly rate, subject to the provisions of Article 7.4, Weekly Overtime, for the first off duty call on a given day. Subsequent calls that occur after the initial 30 minutes will be compensated in 30-minute increments not to exceed two hours for all matters.

## Section 8.16 – Sunglasses and Prescription Glasses

The City agrees to reimburse employees for the purchase or repair of sunglasses and prescription eyeglasses with a maximum allowable reimbursement of one hundred fifty ($150.00) dollars per employee in a twelve (12) month period, when they are lost or damaged while the employee is engaged in active police work such as arrests, pursuit, physical conflict or vehicular accidents.

## Section 8.17 – Field Training Officer

Bargaining unit employees who are assigned to the Field Training Officer (FTO) program by the Police Chief shall receive five percent (5%) of their base rate of pay on a biweekly basis, for as long as they are assigned to the program. The Chief of Police will assign, reassign, or remove FTOs at least annually.  The Police Chief, or his/her designee, in his/her sole discretion, may assign Officers to Field Training Officer (FTO) assignment.

## Section 8.18 – Injury Service Connected (ISC)

For two (2) sixteen (16) week periods, the City agrees to compensate any member of the bargaining unit with the difference between the weekly disability workers' compensation benefit received or which the employee is entitled to receive, and his or her regular rate of pay for any time lost from work due to injuries sustained under the following circumstances:

a) While on duty and entitled to be paid by the City; or

b) While reasonably exercising police officer functions within the City limits of Miami Beach while off duty; or while working a departmentally sanctioned off-duty job; or

c) While exercising police officer functions when there is a physical danger to a person and the employee takes reasonable action off duty in the state of Florida; or

d) When operating a City vehicle, being duly authorized to do so by the City; or while on a reasonably direct travel route to or from work and home in their private vehicle while within the City limits.

e) In the circumstances described above (subparagraphs 1 through 4), the City agrees that it is and will consider itself the employer and the employee the City's employee.

After the advice and comments of the Police Chief and the FOP President, the City Manager, at his sole discretion, may extend the above described ISC payments beyond thirty-two (32) weeks. This decision is not subject to grievance or arbitration.   The approvals for receipt of this compensation as presently required shall be continued.

## Section 8.19 – Special Assignment Allowance

Employees assigned on a permanent basis to motorcycles or the training unit shall receive a special assignment pay of five percent (5%) of their base pay.

Employees assigned to work a 5-8 shift shall receive a special assignment pay of two and one-half percent (2 ½%).  Employees who are on 5-8 light duty because of non-service connected injury or illness shall not receive the special assignment pay. Employees who are on 5-8 light duty because of service-connected injury or illness, where the City doctor approves a 40-hour work schedule, and who have demonstrated the ability to work a 40-hour workweek, shall receive the special assignment pay for all hours worked on 5-8's.  If the injury service connected light duty employee takes off work and receives ISC payments, the employee will not receive the two and one-half percent (2-1/2%) special assignment pay for time not worked.

## Section 8.20 – Extra Weapon

Employees will be allowed to carry a concealed, extra weapon while on duty, as approved by the range master.

**Section 8.21 – Quality of Life**

The City agrees to continue a Quality of Life Program.  The Quality of Life supplement pay shall be $26.00 per pay period for those employees participating in the program.

The Police Chief or his designee shall develop certification requirements which employees must meet to be eligible for any Quality of Life supplement payments. The Quality of Life supplement will be made available to all qualifying Bargaining Unit Members.

**Section 8.22 – Forced Holdover**

If an employee is forced to stay beyond the hours of his/her shift such additional hours will be paid at double the regular rate. This provision applies to minimum staffing or mandatory overtime as a result of being forced to stay beyond the hours of a pre-planned shift due to a special event. This provision does not include unexpected occurrences such as natural or manmade disasters. The City will give a fourteen (14) calendar day notice whenever practical for planned overtime events. This does not apply to unplanned overtime or extensions of regular shifts. Forced Holdover will not be subject to the provisions contained in Article 7.4 Weekly Overtime calculations.

**Section 8.23 – Pension**

The pension benefits as they currently exist shall continue, except that the City shall amend the pension plan upon ratification of this Agreement, to provide the following benefits for plan members who retire on or after September 30, 2013 (except as otherwise specified below):

A. Military Buy Back: Upon completion of five (5) years of creditable service under the pension system, (ten years for members hired after ratification of this agreement), members may purchase additional creditable service under the system for up to two (2) years of prior military service, in increments of up to three percent (3%) per year of service for a maximum additional multiplier of six percent (6%), purchased at ten percent (10%) or ten and one half percent (10.5%), (for new hires required to contribute 10.5% to the plan as set forth in sections G and H herein), of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year of military service purchased, with the cost prorated for fractional years of service. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave, valued at the employee's hourly rate at the time of purchase. Such purchased creditable service will be available for use as a benefit, including for purposes of reaching normal retirement eligibility. In no event may the purchased service be used for purposes of vesting credits.

The purchase of additional military service must be completed within twenty- four (24) months following a member's completion of five years of creditable service under the pension plan (ten years for members hired after ratification of this agreement). If a member does not complete the purchase within the twenty-four (24) month period, he/she shall not be eligible for the purchase in the future. These

provisions shall be applicable upon attaining ten (10) years of creditable service under the Miami Beach Police/Fire Pension plan for employees hired on or after ratification of this agreement.

**Prior Police Service Buy Back**: Upon ratification, all bargaining unit employees shall have a window between July 1, 2021 and September 30, 2021 in which to purchase up to two years creditable service in increments of up to three percent per year of service for up to two years of prior service. For purposes of determining credit for prior service, in addition to service as a police officer in this state, credit may be given for federal, other state, or county service as long as such service is recognized by the Criminal Justice Standards and Training Commission within the Department of Law Enforcement as provided in chapter 943 or the police officer provides proof to the board of trustees that such service is equivalent to the service required to meet the definition of a police officer. The creditable service shall be purchased at 10% or 10.5% (for employees required to contribute 10.5% to the plan as set forth in sections G and H herein) of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year purchased. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave valued at the employee's hourly rate at the time of purchase, with the cost prorated for fractional years of service. In the event the employee separates from employment after purchase of such creditable service but prior reaching 10 years of creditable service, the employee shall be reimbursed amounts paid in. Such purchased creditable service will be available for use as a benefit, including for purposes of reaching normal retirement eligibility, upon completion of 10 years of creditable service under the pension system. In no event may the purchased service be used for purposes of vesting credits.

**Non Prior Service Buy Back**: Upon ratification, all bargaining unit employees shall have a window between July 1, 2021 and September 30, 2021 in which to purchase up to two years creditable service in increments of up to three percent per year of service for a maximum additional multiplier of six percent (6%), purchased at 10% or 10.5% (for employees required to contribute 10.5% to the plan as set forth in sections G and H herein) of pensionable salary during the 12 calendar months immediately preceding the date of such purchase; for each year purchased. For purposes of this purchase, an employee may use the value of accrued sick and/or annual leave valued at the employee's hourly rate at the time of purchase. Such purchased creditable service will be available for use as a benefit upon completion of 10 years of creditable service under the pension system. In the event the employee separates from employment after purchase of such creditable service but prior reaching 10 years of creditable service, the employee shall be reimbursed amounts paid in. In no event may the purchased service be used for purposes of vesting credits.

The total amount of creditable service available for purchase shall not exceed a total two years (6%) for any combination of the above buy back options, or when an employee has participated in a prior by-back in the Miami Beach Police/Fire Pension system of six percent (6%) or more.

B.   All compensation for work performed pursuant to Off-Duty Assignments, as outlined in the Department's Standard Operating Procedures (SOP's), shall be included in a member's salary for pension purposes, and shall be used in the

calculation of member contributions and benefits. Provided, in no event shall overtime pay and/or off-duty pay, exceed the caps presently specified in the Miami Beach Police and Fire Pension Ordinance. Overtime in excess of 300 hours per year or payments for unused sick and and/or vacation leave may not be included in compensation for pension purposes.

C.    DEFERRED RETIREMENT OPTION PLAN (DROP)

1.    **Eligibility** – Any active employee member of the Miami Beach Police and Firefighters Pension Plan may enter into the DROP on the first day of any month following the date upon which the employee first became eligible for a normal service retirement, subject to the conditions expressed herein or as modified from time to time.

2.    **Conditions of Eligibility** – Upon becoming eligible to participate in the DROP, an employee may elect to enter that program for a period not to exceed sixty (60) months; however, employees who entered the DROP on or before September 30, 2015, may extend their DROP participation period by twelve (12) months, for a total maximum DROP participation period not to exceed seventy-two (72) months. Employees who entered the DROP on or after October 1, 2015, but prior to the date of ratification of this Agreement, may extend their DROP participation period by up to thirty-six (36) months, for a total maximum DROP participation period not to exceed ninety-six (96) months. Employees who enter the DROP on or after the date of ratification of this Agreement will be subject to a total maximum DROP participation period not to exceed ninety-six (96) months. Notwithstanding, participation may not continue beyond that date when the employee's combined years of creditable service and time in the DROP equals four hundred and fifty-six (456) months. Provided also that participation in DROP shall require the employee to complete and submit the following prior to start of DROP payments.

a. Such forms as may be required by the Pension Board of Trustee's Plan Administrator. Election in the DROP is irrevocable once DROP payments begin.

b. A waiver and an irrevocable resignation from employment with the actual date of termination being the date designated by the employee as the end of his/her DROP participation. The administration and timing of execution and delivery of the waiver and resignation forms shall meet the requirements of the Age Discrimination in Employment Act and the Older Worker's Benefits Protection Act, as same may be amended from time to time.

c. Employees currently in the DROP, who meet the requirements set forth in Sections 1 and 2 above, and elect to extend their DROP participation period, must sign such forms as may be required by the Pension Board by no later than September 1, 2019.

3.    **Conditions of Employment for DROP Participants** – Employees shall be subject to termination of employment while in DROP to the same extent as they were in their pre-DROP status. A person who has elected the DROP remains an employee during the DROP period and receives all the

benefits of being an employee during the DROP period, except any form of pension contribution.

**4.      Effect of DROP Participation**

a. An employee's credited service and his/her accrued benefit under the Pension Plan shall be determined on the date of his/her election to participate in the DROP first becomes effective.

b. The employee shall not accrue any additional credited service while he/she is a participant in the DROP, or after termination of participation in the DROP.

c. A DROP participant is not eligible for disability benefits from the Plan.

d. An employee may participate in the DROP only once.

e. Effective with the start date of an employee's DROP participation, contribution to the Pension Plan by the employee and the normal cost contribution to the Pension Plan by the City, on behalf of the employee, shall cease.

**5.      Payments to DROP Account**. A DROP account shall be created for each member who elects to participate in the DROP. A DROP account shall consist of amounts transferred to the DROP from the Plan, which include the monthly retirement benefits, including any future cost of living increases, that would have been payable had the member elected to cease employment and receive a normal retirement benefit upon commencing participation in the DROP, and earnings on those amounts. With the exception of those employees who enter the DROP on or after September 1, 2012, through September 29, 2013, shall continue to receive a zero (0%) cost of living adjustment for the third (3rd) and fourth (4th) annual adjustment dates, regardless of whether the employee remains in the DROP for the applicable maximum participation period.

a. Employees who entered the DROP on or before September 30, 2015, and who choose to extend their DROP participation period by up to twelve (12) months, shall receive a zero (0%) retiree cost of living adjustment (COLA) for their sixth (6th) annual adjustment date. If these employees choose to extend their DROP participation period and separate from employment with the City at any time within the sixth (6th) year, they will not receive a retiree COLA on the sixth (6th) annual adjustment date, but will receive a retiree COLA on the seventh (7th) annual adjustment date and all annual retiree COLAs thereafter.

b. Employees who entered the DROP on or after October 1, 2015, but prior to the date of ratification of this Agreement, who choose to extend their DROP participation period by up to thirty-six (36) months shall receive a zero (0%) retiree COLA for their sixth (6th), seventh (7th), and eighth (8th) annual adjustment dates. If these employees separate from employment with the City at any time within the sixth (6th), seventh (7th), or eighth (8th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

c. Employees entering the eight (8) year DROP on or after the date of ratification of this Agreement shall receive a zero (0%) retiree COLA for their sixth (6th), seventh (7th), and eighth (8th) annual adjustment dates. If these employees separate from employment with the City at any time within the sixth (6th), seventh (7th), or eighth (8th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

d. Employees hired after the date of ratification of this Agreement who enter the DROP shall receive a zero (0%) retiree COLA for their first (1st), second (2nd), third (3rd), and fourth (4th) annual adjustment dates. If these employees separate from employment with the City at any time within the first (1st), second (2nd), third (3rd), or fourth (4th) year in DROP, they will not receive a retiree COLA on the annual adjustment date following their separation of employment with the City, but will receive all annual retiree COLAs thereafter.

6.     **DROP Account Earnings**

a. Members may direct their DROP money to any of the investment options offered and approved by the Board. Any losses incurred by the participant shall not be made up by the City or the Pension Plan. The selection of these programs shall be made by the participant on forms provided by the Board. Any and all interest and or earnings shall be credited to the participant's DROP account.

b. A member's DROP account shall only be credited or debited with earnings while the member is a participant in the DROP and, depending on the DROP Account Payment Options selected, after the member dies, retires, or terminates employment with the City of Miami Beach.

7.     **Payment of DROP Account Funds**

Upon termination of a member's employment (for any reason, whether by retirement, resignation, discharge, disability, or death), the retirement benefits payable to the member or to the member's beneficiary shall be paid to the member or beneficiary and shall no longer be paid to the member's DROP account. In the event of the member's death, payment shall be made directly to the member's beneficiary. No payments will be made from the DROP account until the member terminates employment.

8.     **DROP Account Payment Options** – Following the termination of a participant's employment, the participant shall select one of the following options to begin to receive payment from his/her DROP account. Said selection shall occur no later than 30 days prior to the end of the DROP participation period or within 30 days following the termination of a participant's employment if said termination of employment occurs prior to the end of the DROP participation period:

a.     **Lump Sum** – All accrued DROP benefits, plus interest, shall be paid from the DROP in a single lump sum payment.

b. **Partial Lump Sum** – A member designated portion of accrued DROP benefits, plus interest, shall be paid from the DROP in a partial lump sum payment with the remainder being directly rolled over into an eligible retirement plan.

c. **Direct Rollover** – All accrued DROP benefits, plus interest, shall be paid from the DROP directly to the custodian of an eligible retirement plan.

d. Other method(s) of payment that are in compliance with the Internal Revenue Code and adopted by the Pension Board of Trustees.

9. **Death of DROP Participant** – If a DROP member dies before his/her account balances are paid out in full, the participant member's designated beneficiary shall have the same rights as the member to elect and receive the pay-out options set forth in Paragraph 8, above. DROP payments to a beneficiary shall be in addition to any other retirement benefits payable to the beneficiary.

10. **Administration of DROP Accounts**

a. The Pension Board of Trustees shall make such administrative rules as are necessary for the efficient operation of DROP but shall neither create any rule that is inconsistent with the legislation creating the DROP, nor any rule that would be a mandatory subject of collective bargaining.

b. At all times, the DROP will be administered so that the Plan remains qualified under the Internal Revenue Code and is in compliance with the Internal Revenue Code and applicable laws and regulations.

11. If any provision of this DROP should be found invalid, unlawful, or not enforceable by reason of any existing or subsequently enacted legislation, or by judicial authority, or by an IRS regulation/ruling, the City and the Union agree to meet within 30 days of such determination for the purpose of negotiating a resolution to the invalid provision(s).

In the event that provisions of the Internal Revenue Code operate to limit the benefit amount of employee coverage by the pension provision incorporated in this Agreement to an amount less than set forth in the pension Plan then the City and the Union shall negotiate a method to compensate the affected employee for the difference between the normal pension benefit and the limits allowed by the Internal Revenue Code provided that no such resolution shall jeopardize the exempt status of the Plan under the Internal Revenue Code.

12. A member who elects to participate in the DROP shall retain the earned balance of accrued sick and vacation leave as of date of entry into the DROP, and shall continue to earn sick and vacation leave during the DROP period, in accordance with the stipulations set forth in the collective bargaining agreement between the City and FOP. While in the DROP, the member shall have the one-time option of receiving payment for accrued sick and/or vacation leave, up to the maximum payout upon separation of

employment allowed by the collective bargaining agreement between the City and FOP, provided that the employee shall retain at least one hundred twenty (120) hours of accrued sick leave after such payment. The one-time election to receive payment of leave balances shall be made in any one year of the DROP, by notifying the City no later than August 31 of that year. Employees may request such payment prior to entry into the DROP, but must be in the DROP at the time of payout. Payment will be made on the second pay period of February of the following year. Upon final separation from employment with the City, a member who has participated in the DROP shall be eligible to receive payment for the balance of all accrued sick and vacation leave as of the date of final separation, up to the maximum provided in the collective bargaining agreement, as reduced by the prior payout, if any. In no event shall payments for accrued sick or vacation leave be included in a member's earnings for the purposes of the plan.

D.  Pension benefits for employees hired prior to July 14, 2010; all changes effective September 30, 2013, unless otherwise specified:

1.  The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.  The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 47 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap, regardless of age.

3.  The final average monthly earnings (FAME) shall be based on the member's two (2) highest paid years of creditable service, prior to retirement or separation from employment. Effective September 30, 2015, the final average monthly earnings (FAME) shall be based on the member's three (3) highest paid years of creditable service, prior to retirement or separation from employment.

4.  The retiree cost of living adjustment (COLA) shall be two and one half percent (2.5%) annually.

5.  The maximum pension benefit shall be 85% of pensionable income, with the exception that any member who attains a benefit of 85% of pensionable income or higher as of September 30, 2013, retains the maximum benefit of 90% of pensionable income.

6.  An employee shall be vested after completion of five (5) years of creditable service.

7.  Ten percent (10%) employee pension contribution.

E.  Pension benefits for employees hired on or after July 14, 2010, but prior to September 30, 2013; all changes effective September 30, 2013, unless otherwise specified:

1.  The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.    The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 48 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap regardless of age.

3.    The final average monthly earnings (FAME) shall be based on the Member's three (3) highest paid years of creditable service, prior to retirement or separation from employment.

4.    The retiree cost of living adjustment (COLA) shall be one and one half percent (1.5%) annually.

5.    The maximum pension benefit shall be 85% of pensionable income.

6.    An employee shall be vested after completion of five (5) years of creditable service.

7.    Ten percent (10%) employee pension contribution.

F.    Pension benefits for employees hired on or after September 30, 2013, but prior to the date of ratification of this collective bargaining agreement:

1.    The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.    The normal retirement date shall be as provided in the current pension plan, except that a member must attain the age of 48 to be eligible for "Rule of 70" retirement or reach the 85% benefit cap regardless of age.

3.    The final average monthly earnings (FAME) shall be based on the Member's five (5) highest paid years of creditable service, prior to retirement or separation from employment.

4.    The retiree cost of living adjustment (COLA) shall be one and one half percent (1.5%) annually.

5.    The maximum pension benefit shall be 85% of pensionable income.

6.    An employee shall be vested after completion of five (5) years of creditable service.

7.    Ten and one half percent (10.5%) employee pension contribution.

G.    Pension benefits for employees hired after the date of ratification of this collective bargaining agreement:

1.    The benefit multiplier shall be three percent (3%) for each year of creditable service for the first twenty (20) years of service, and four percent (4%) for each year of creditable service after twenty (20) years of creditable service.

2.    The normal retirement age shall be 52; however, under "Rule of 70" retirement, a member must attain a minimum age of 48 or reach the 85% benefit cap regardless of age.

3.    The final average monthly earnings (FAME) shall be based on the Member's five (5) highest paid years of creditable service, prior to retirement or separation from employment.

4.    The retiree cost of living adjustment (COLA) shall be one- and one-half percent (1.5%) annually.

5.    The maximum pension benefit shall be 85% of pensionable income.

6.    An employee shall be vested after completion of five (5) years of creditable service. Employees hired after the date of ratification of this agreement shall become vested after completion of ten (10) years of creditable service.

7.    Ten- and one-half percent (10.5%) employee pension contribution.

8.    Employees hired after the date of ratification of this agreement shall not be credited with any prior creditable time in the Miami Beach General Employee Pension Plan.

The pension breakdowns above are for illustrative purposes and do not encompass all pension benefits afforded to respective members. The full itemization of pension benefits is available in the plan summary for the Fire and Police Pension Plan, as well as the Fire and Police Pension Ordinance.

### Section 8.24 – Premium Pay Supplement Contingent Upon the Department Obtaining and Maintaining Certain Accreditations.

In recognition for obtaining and maintaining the accreditation described below, the following premium pay supplement will be paid under the following terms:

a)  All bargaining unit members shall be paid a premium pay supplement of $20.00 per pay period for as long as the Police Department maintains Accreditation by the Commission on Accreditation for Law Enforcement Agencies (CALEA).

If the accreditation provided for above is discontinued for reasons unrelated to the action or inaction of bargaining unit members, then the supplement shall continue.

### Section 8.25.  Buyback of Probationary Time.  Employees hired prior to ratification of this agreement may elect, by written notice served on the Board of Trustees, to receive creditable pension service time for any or all of their time served as probationary police officers.  In order to receive such creditable pension service time, employees should be allowed to purchase any or all of such time through the use of accrued annual leave, sick leave, cash or any combination thereof.  In the event such purchase is not made within six months of successful completion of probationary period, the amount paid shall include interest at the rate of three percent (3%) per annum excluding first six (6) months. Effective upon ratification, all newly hired employees shall participate in the pension plan upon date of hire.

**Section 8.26 – "Me Too" with the IAFF**

The FOP reserves the right to a "me too" agreement with the IAFF should the City modify the IAFF agreement on parallel issues, with the exception of Court time and Alternate Holiday Pay.


**Section 8.27 – CJSTC Police Instructor Incentive Pay**

The City will pay, under the terms stated in this section, an incentive pay of two and one-half percent (2.5%) of the officer's base pay (as stated below) for up to a maximum of seventy-five (75) police officers who obtain and maintain certification from the Criminal Justice Standards and Training Council (CJSTC) as Police Instructors:

a) Effective upon ratification of this Agreement, no more than seventy-five (75) FOP employees will be eligible to receive the two and one-half percent (2.5%) Police Instructor Certification pay.

b) Additional FOP employees (up to the seventy-five(75) employees maximum) must be qualified for the incentive pay by meeting all of the following requirements: (1) a minimum of six (6) years of full-time experience as a certified law enforcement officer employed by a State, County or Municipal Police Department; and (2) passing the required CJSTC Police Instructor Training Course; and (3) have no record of disciplinary action during the twelve (12) month preceding the date of application for the benefit. (4) Employees must teach a minimum of two classes per calendar year. FOP employees will qualify (not to exceed the seventy-five (75) employee cap) on a first come basis, based on the date of each employee's submission of the completed written request to the Police Chief or designee.

c) Newly qualified FOP employees (up to the seventy-five (75) maximum limit), shall start receiving their two and one-half percent (2.5%) pay on the next payroll period beginning after the FOP employee has submitted to the Police Chief (or designee) a written request that includes a copy of the CJSTC Instructor Certification, and proof that he/she has met all other requirements as set forth in this section.

d) Employees shall remain solely responsible for obtaining and maintaining a State Certified CJSTC Certificate. All costs involved in obtaining and/or maintaining the certification shall remain the responsibility of the employee. Failure to have a current certification shall constitute an automatic disqualification from the two and one-half percent (2.5%) incentive pay.

e) The Chief of Police may remove an employee from the CJSTC certified police instructor roster after two (2) incidents wherein the employee refuses or fails to train when requested or exhibits poor performance as a trainer. Such removal from the roster shall

constitute an automatic termination of the two and one-half percent (2.5%) instructor incentive pay.  After the first incident wherein the employee refuses or fails to train when requested or exhibits poor performance as a trainer, the Chief of Police shall provide notice to the employee, with a copy to the Union, advising that the second incident will result in his or her removal from the CJSTC certified police instructor roster and the cessation of the concomitant incentive pay.  After the second incident, the employee shall be removed from the CJSTC certified police instructor roster and the concomitant incentive pay shall be terminated, effective on the date of the second incident.

f) The value of the two and one-half percent (2.5%) incentive pay shall be determined based upon only the base wage of the officer, i.e. no additional incentives or other extra payments or benefits are included in the two and one-half percent (2.5%) pay. The total incentive pay for the Police Instructor Certification benefit will remain at two and one-half percent (2.5%) regardless of any additional certifications that the FOP employee may receive through the CJSTC.

## Section 8.28 – Second Language Pay

Employees who are conversationally proficient in a second of the following languages:  Spanish, Creole, Portuguese, Hebrew, French, Russian, German, Cantonese, Mandarin, Italian, Czech, Korean, or American Sign Language; shall be eligible to receive second language pay equal to two and one-half percent (2.5%) of their biweekly base pay. Proficiency will be determined by an employee obtaining a minimum rating of level 9 on the "Speaking and Listening Assessment" test administered by ALTA Language Services, Inc. via telephone and proctored by the Police Administration. The test may be scheduled with at least seven (7) work days' notice to the Police Administration. The employee will bear the cost of paying for the test.  The employee will be subject to requalification for the pay supplement every five (5) years.  Second language pay shall not be considered as pensionable earnings. If ALTA Language Services, Inc., no longer administers the aforementioned types of tests, there will be a re-opener in order for the City, with Union input, to select a new testing services provider.

## Section 8.29 – Arson Investigator (Certified)

Employees who perform arson investigation work, as designated by the Chief of Police, and are certified by the State of Florida as arson investigators, shall receive an additional five percent (5%) of their biweekly base pay, whenever assigned to perform arson investigation work.

## Section 8.30 – Arson Investigator (Trainee)

Employees who perform arson investigation work, as designated by the Chief of Police, and are in the process of obtaining their certification from the State of Florida as arson investigators,

shall receive an additional two- and one-half percent (2.5%) of their base pay whenever assigned to perform arson investigation work.

## Section 8.31 – Drug Recognition Expert (DRE)

Employees certified as drug recognition experts (DRE), as designated by the Chief of Police, shall receive an additional five percent (5%) of their base pay upon receipt of their drug recognition expert certification.

## Section 8.32 – CJIS Pay

Effective the first full pay period upon ratification, employees who maintain their Criminal Justice Information Systems (CJIS) certification shall have an additional two percent (2%) of their base pay. Effective April 1, 2020, employees who maintain their Criminal Justice Information Systems (CJIS) certification shall have an additional two percent (2%) of their base pay for a total of four percent (4%).

## Section 8.33 – Crisis Intervention Team (CIT)

Effective the first full pay period upon ratification, employees who have already attended and passed the 40-hour crisis intervention team (CIT) training shall receive an additional two and a half percent (2.5%) of their base pay (non-pensionable).  Employees who attend this training after ratification of this Agreement must be vested in order to qualify for this pay. Employees who qualify for this pay will have to attend refresher training as directed by the Chief of Police to maintain their qualification for CIT pay.

## Section 8.34 – Marine Pay

Effective the first full pay period upon ratification, any employee who is assigned to the marine patrol unit on a full-time basis shall receive assignment pay equal to five percent (5%) of their biweekly base pay.

**ARTICLE 9**
**FOP HEALTH TRUST**

<u>Section 9.1 –</u>

The City will continue to fund the current contribution amount for health care.    As of January 1, 2019, the City's contributions shall be:

Single:                          $662.19

Family:                          $1623.23

Future annual increases to the City monthly contributions will be made based upon the Annual Segal Health Plan Cost Trend Survey for Open Access PPOs/POS Plans. The increases shall be effective January 1 of each year beginning January 1, 2020. In no event shall the City monthly contributions be less than the prior year, even if the trend rate is negative.

Audited financial disclosure reports are to be presented from the Trust to the City Manager's designee for Labor Relations no later than March 1st of each year.

The City will make payments to the TRUST by the 15th of the month for the previous month.

In addition:
   a) For all current retirees and active employees on the payroll as of the date of ratification of this Agreement, all employees presently in the DROP, and all eligible dependents under the current eligibility rules, the City contribution for those current retirees and current employees who become future retirees for health coverage shall be equal to the City's Health Trust contribution formula for active employees. Furthermore, the contributions for those current retirees and current employees who become future retirees and their eligible dependents shall be no less than the current value of the contributions for active employees and their eligible dependents.  This Agreement shall be reduced to writing and made individual contracts and shall be vested benefit throughout retirement.

   b) Employees hired after July 14, 2010, who elect to be covered by the Miami Beach Fraternal Order of Police Insurance Trust Fund Plan, to the extent they choose to have medical benefits provided to them and their dependents during retirement, shall

receive a health insurance stipend in lieu of a City contribution to the Trust on behalf of those employees after their retirement. As of September 30, 2018, the stipend shall be a monthly payment equal to $29.77 per each year of creditable service, subject to an annual increase based on the Miami-Ft. Lauderdale All Urban Consumer Price Index (U-CPI) as of September 30th of each fiscal year thereafter.  Additionally, upon separation of employment with the City, the individual's stipend shall continue to be adjusted annually every September 30th thereafter.

## Section 9.2 –

a) All eligible employees and their dependents described in Section 7 shall be eligible to enroll in the FOP Health Trust Plan and shall not be eligible to participate in the City Plan during their employ or retirement for so long as the FOP Trust exists.

b) A non-bargaining unit sworn police officer who elects to enroll in the FOP Health Plan may apply to the Trust and will be enrolled upon leave of the Trustees, and thereafter will be deemed to be a covered employee provided he or she meets the following criteria:

1. Must be on the City Police Department Payroll at the time of enrollment;

2. Must be an FOP member for two years (or length of time in Department if less than two years) prior to enrollment, and must maintain membership throughout the period of coverage;

3. Must meet insurability criteria satisfactory to Trustees; and

4. Must make the election within thirty (30) days after appointment out of the bargaining unit.

## Section 9.3 –

a) All covered employees and covered retirees shall be allowed to continue under the City's Dental Plan as it may exist.

b) The City shall also contribute to the Trust the amount of premium it is paying for term life insurance for covered employees and covered retirees.

### Section 9.4 Health Trust Plan  –

The City shall be provided with a copy of the FOP Health Trust Plan booklet and the Trust Agreement, and any other information required by law.

### Section 9.5 Indemnification –

The FOP shall indemnify and hold the City harmless against any claim, demand, suit, or liability, and for all legal costs arising in relation to the implementation or administration of the FOP Health Insurance Trust and Plan, except if the City's acts or omission give rise to its own liability.

### Section 9.6 Employment Eligibility –

Employees in the bargaining unit eligible for inclusion in the Health Trust Plan must be employed at least ninety (90) days and be on the City Police Department payroll.

### Section 9.7 Post Employment Coverage –

Employees covered by this Agreement who retire, resign, or are terminated by the City must be vested in the Police pension plan at the time of such retirement, resignation or termination in order to receive a contribution by the City towards his/her health insurance premium after such retirement, resignation or retirement.

### Section 9.8 Voluntary Benefits Plan –

Employees in the bargaining unit shall be eligible to participate in the City's voluntary benefits plan, which may be modified by the City from time to time.  The voluntary benefits plan shall be administered by the City.

### Section 9.9 –  Post Employment Health Program (PEHP)

Effective the first pay period ending in October 2013, all employees covered by this agreement shall contribute twenty-five dollars ($25.00) biweekly to the Post Employment Health Program (PEHP). Upon separation of employment from the City, or when participating in DROP, employees covered by this agreement shall contribute ten percent (10%) of their accrued leave payouts toward the PEHP.  Any and all fees/costs associated with administering the PEHP shall be incurred by the FOP. In no event will the City incur any costs associated with this program. Effective upon ratification of this Agreement, the Union shall determine the required employee contribution to the PEHP.  The Union will notify the City, in writing, when it desires to change the

required employee contribution amounts, including the effective date of the change.  The Union will provide the City with at least thirty (30) days' notice prior to making such changes.

**ARTICLE 10**
**EDUCATIONAL LEAVE AND TUITION REFUND**

Subject to applicable Personnel Rules, leave ordinances and tuition practice administrative procedures, an employee may request an educational leave of absence without pay to take a course or courses in a field related to the work assignment of said employee.

Upon ratification of this Agreement, employees covered by the bargaining unit are eligible for the tuition assistance program set forth in Resolution No. 2015-28891, adopted January 14, 2015, which provides the following levels of benefit:

Six Credit hours per semester for a total of twelve credits per calendar year will be reimbursed, as follows:

- Approved undergraduate, community college courses and non-credit/certificate courses will be reimbursed as follows:

  o 80% for courses in which the employee earns an A
  o 60% for courses in which the employee earns a B
  o 40% for courses in which the employee earns a C

- Approved graduate courses will be reimbursed as follows:

  o 80% for courses in which the employee earns an A
  o 60% for courses in which the employee earns a B

The levels of benefit identified above may be subject to change by the City Commission, but in no event shall be less than the levels of benefit identified below:

One course per semester/trimester/quarter equivalent to three credits for a total of twelve credits per calendar year will be reimbursed, as follows:

- Approved undergraduate community college courses and non-credit/certificate courses will be reimbursed at an amount not exceeding $158.25

- Approved undergraduate university courses will be reimbursed at an amount not exceeding $251.16

- Approved graduate courses will be reimbursed at an amount not exceeding $531.15

## ARTICLE 11
## GENERAL PROVISIONS

### Section 11.1 – Safety and Health

The City and the FOP shall cooperate in matters of safety and health affecting the employees covered by this Agreement.

A voluntary law enforcement physical fitness assessment shall be established, the components of which will be mutually agreed upon between the Police Chief and the FOP President. Any employee covered by this Agreement who completes and passes the challenge shall receive a supplement of $75 per pay period effective upon ratification of this Agreement. The challenge will be administered by the Police Department. It will be administered on an annual basis. An employee will have thirty (30) days from the anniversary of his completion of the assessment to schedule the next assessment (for that year). Employees must complete and pass the assessment each year in order to be eligible for continued receipt of the supplement. Physical fitness assessment pay shall not be considered as pensionable earnings.

### Section 11.2 – FOP Activity and Non-Discrimination

Neither the City nor the FOP shall discriminate against any employee due to that employee's membership, non-membership participation, lack of participation, or activities on behalf of, or his refraining from activity on behalf of the FOP.

No employee covered by this Agreement shall be discriminated against because of race, creed, national origin, religion, sex, sexual orientation, ethnic background or age in accordance with applicable State and Federal laws. The FOP agrees to cooperate with the City in complying with Federal, State and local laws requiring affirmative action to assure equal employment opportunity. The parties will comply with the Americans with Disabilities Act.

### Section 11.3 – Reduction In Work Force

When there is a reduction in the work force, employees will be laid off in accordance with their length of time in grade service and their ability to perform the work available and applicable veteran's preference laws. When two or more employees have equal ability, the employee with the least amount of service will be the first one to be laid off. When the working force is increased after a layoff, employees will be recalled in the order of seniority, with employees with greater seniority recalled first. Notice of recall shall be sent to the employee at the last known address by registered mail or certified mail. If an employee fails to report to work within thirty (30) days

from date of receiving notice of recall, he shall be considered to have quit.  No new employee will be hired into the bargaining unit as long as any bargaining unit employee remains on lay-off status.

During the course of this Agreement, no employee will be laid off and no employee will be demoted (except for disciplinary demotions).

## Section 11.4 – Uniforms and Clothing Allowance

The City will continue its present policy concerning uniforms. The uniformed personnel's monthly maintenance allowance shall be sixty dollars ($60.00) per month for a total of $720.00 per year to be paid out in twenty-six (26) biweekly payments.

For those sworn employees assigned to work in civilian clothes, they shall receive a monthly allowance of eighty-five dollars ($85.00) per month for a total of $1,020.00 per year to be paid out in twenty-six (26) biweekly payments.

When transferred into the Criminal Investigation Unit or other unit requiring civilian clothes, the City will advance the employee, at his/her request, the sum of four hundred twenty five dollars ($425.00) for the purchase of clothing.  The employee affected shall agree to relinquish the eighty-five dollar ($85.00) per month clothing allowance for the following five months, and shall also agree to reimburse the City for any pro-rata amount in the event of transfer, termination, resignation, or retirement prior to completion of five (5) months in the civilian clothes assignment. If the reimbursement is caused by a transfer, the reimbursable amount shall be collected at the rate of eighty-five dollars ($85.00) per month.

## Section 11.5 – Disclosure of Records

Employees will not have information contained within any of their files, including an Internal Affairs file, disclosed to persons other than managerial and supervisory employees unless the person requesting such information (including home telephone number, address, etc.) shall complete and sign a "Request for Information" form and present proper identification, provided, however, that information which is made confidential by State or Federal Statute shall not be disclosed except in accordance with the requirements of law. The request form shall have provision for the name, address, and telephone number of the person requesting the information and the reason for the request.  A copy of any such request form completed shall be left in the employee's personnel file and the employee shall be notified in writing via the City's electronic mail system.

## Section 11.6 – Transfers

It shall be the sole right of the Police Chief or his designee to transfer employees of the Department.  When a transfer is a change in an employee's unit assignment, reasonable advance notice as is practicable under the circumstances shall be given.  If a transfer is a permanent change in an employee's shift or days off schedule, the employee shall be notified no less than five (5) workdays prior to the transfer in order that the employee may arrange for an orderly change.

The five (5) day notice may be waived by the employee and it need not be given when unforeseen needs of the Department or emergency conditions require that temporary changes be made with little or no advance notice.

## Section 11.7 – Meeting Between Parties

At the reasonable request of either party, the FOP President, or his representative, and the City Manager, or his designee for Labor Relations, shall meet at a mutually agreed upon time and place to discuss matters that require immediate discussion.

## Section 11.8 – Negotiating Sessions

Time and dates for negotiating sessions shall be mutually agreed upon.  Up to six (6) on-duty FOP representatives shall be permitted to attend negotiating sessions without loss of pay or benefits if they were otherwise scheduled to work.

## Section 11.9 – Job Descriptions

It is understood by the parties that the duties enumerated in the job description promulgated by the City are not always specifically described and are to be construed liberally.  The City agrees to notify the FOP President via electronic mail of any change in the job description of any classification in this bargaining unit.

## Section 11.10 – Defense of Members

In the event any action for civil damages is brought against a member of the bargaining unit hereunder individually, and the City is not made a party to any such action, and if the employee hereunder is found liable and a judgment for damages is rendered against him, the City will itself or through insurance pay such damages and counsel fees for the employee providing the employee's liability results from action of the employee arising out of and in the course of his

employment hereunder, and further providing that such judgment against the employee does not result from the wanton and willful action of the employee.

### Section 11.11 – Personnel Rules and Departmental Manual

Copies of the Personnel Rules and Regulations will be kept by Majors and Captains whose copies will be available to members of the bargaining unit upon request.

The manual of the Police Department is provided and available to all employees in the department electronically through PowerDMS and proposed changes in said manual will be supplied to the President of the FOP or his designated representative before implementation and an opportunity to discuss the changes will be afforded.  Any changes to SOP's shall contain a detailed legislative style description of the proposed changes.

### Section 11.12 – Incorporation of Personnel Rules

The parties agree that the City's Personnel Rules are incorporated by reference in this Agreement and made a part hereof, except where a specific Rule is in conflict with the express language of this Agreement, the language of the Agreement shall prevail.

### Section 11.13 – Medical Leave of Absence

After this Agreement is ratified, any employee requesting time off without pay as a Medical Leave will be granted the time requested up to one (1) month, or longer at the Police Chief's discretion. Employees may use any accumulated leave time or comp time during this leave.

**ARTICLE 12**
**SEPARABILITY**

If any provision of this Agreement is held to be in conflict with any law as finally determined by a court of competent jurisdiction, that portion of the Agreement in conflict with said law shall be inoperative and subject to immediate renegotiation for a replacement provision, but the remainder of the Agreement shall continue in full force and in effect.

**ARTICLE 13**
**TIME BANK**

A Time Bank shall be authorized by the City of Miami Beach, whereby members of the bargaining unit may voluntarily donate accrued annual leave and sick leave to an FOP Time Bank to be used as follows: (a) the President, or his designee(s), may draw from such Time Bank, thereby detaching said person(s) from the normal course of their City assigned duties in order that they may be permitted to perform duties in keeping with the obligations of the FOP to its membership, and/or (b) by FOP members pursuant to Ordinance No. 1335, and pursuant to rules and regulations to be established by the FOP that is not otherwise inconsistent with this article or Ordinance No. 1335. The FOP President, along with the Police Chief (or designee) will establish a committee of three (3) members whose purpose is to create the rules and regulations mentioned in subpart b herein. The composition of the Time Bank Committee shall be determined as follows: the FOP President shall appoint one (1) individual to serve on the Time Bank Committee; the Police Chief (or designee) shall appoint one (1) individual that shall serve on the Time Bank Committee and both the FOP President and the Police Chief shall jointly appoint one (1) active FOP bargaining unit member to serve on the Time Bank Committee. The Time Bank shall not be utilized for the purpose of attending collective bargaining sessions between the FOP and the City of Miami Beach.

Time will be deposited into the Time Bank only after the contributor voluntarily signs an authorization card detailing the type and amount of time to be donated. After review by the FOP President or his representative, these cards are to be forwarded on a quarterly basis to the Police Chief for his review, and if appropriate, approval. If approved, the Police Chief will then forward this material to the Support Services Division, who shall take appropriate action to implement the provisions of this section.

Time deposits shall be in hourly increments, with three (3) hours being the minimum amount accepted.

The President, in his own behalf or on behalf of his designee(s), shall fill out the appropriate form to be supplied by the city for each employee authorized to draw from the Time Bank. Said form shall be submitted by the President at least five (5) days in advance of anticipated use. This form shall also include the statement that:

"Upon deduction of time by the City, the undersigned officer agrees to hold the City harmless for any error or omissions in making said deduction or allocating the deducted time to the time pool."

This request shall be reviewed by the Police Chief, or his designee, and approved subject to the manning requirements of the department. Such approval shall not be arbitrarily withheld. Such approval, once having been authorized, may be rescinded subject to the manning requirements of the department.

FOP - 47

Time donated to the Time Bank shall be converted to the salary dollar equivalent of the donor(s), and time used shall be in salary dollar equivalents of the employee(s) using the pool time.  Time donations shall not increase in value.  For purposes of computation, only base pay and longevity will be used.  Time donated but not used will not be retrievable and will remain in the Time Bank for so long as this provision is effective.  In the event the Time Bank is discontinued, the FOP shall be entitled to use the hours remaining pursuant to the provisions of this section.

Any injury received or any accident incurred by an employee whose time is being compensated by the FOP Time Bank, shall not be considered a line-of-duty injury, nor shall such injury or accident be considered to have been incurred in the course and scope of the employee(s) employment by the City of Miami Beach within the meaning of Chapter 440, Florida Statutes, as amended.

**ARTICLE 14**
**DRUG TESTING**

a) All employees are subject to random, unannounced testing for use of substances as set forth below. The use of legal controlled substances is permitted only when prescribed to the employee by a licensed health care provider and is properly used by the employee.

b) Upon reasonable suspicion by a lieutenant or higher ranking officer, that an employee has used a drug as defined in Florida Statutes Section 440.102(1)(c), as that section may be amended or renumbered, and as listed herein; or has used alcohol in violation of any rule, order, policy, procedure, or law; or has intentionally misused a legal controlled substance to the extent that his or her job performance is affected, shall be directed and required to submit to drug and alcohol testing.

c) Testing is subject to the following conditions:

1. An accredited, State licensed clinical testing laboratory will be selected by the City. A split specimen will be taken. If the results are positive, and the employee challenges the results, the second portion of the split specimen will be tested at another accredited, State licensed clinical laboratory of the employee's choice and at the employee's expense. One portion will be tested by each laboratory. All positive tests for illegal or controlled substances shall be confirmed by Gas Chromatography Mass Spectrometry (GC/MS) or equivalent testing method.

2. Testing for alcohol shall be by breath-testing unless the employee is or claims to be unable to provide an adequate sample. In such a case, a blood test will be performed. Any refusal by an employee to consent to the blood test will result in a positive result.

3. A breath alcohol level of 0.04 or higher and it's equivalent blood test outcome shall constitute a positive result. Below are the substance categories tested for.

4. In all cases, the employee shall fully cooperate with testing, including executing any release or authorization necessary for the City to obtain the tests results.

5. The employee must provide a usable specimen/sample.

| Drug | Initial Test Level | GC/MS Confirmation Test Level |
|---|---|---|
| Amphetamine | 1000 ng/ml | 500 ng/ml |
| Barbiturates | 300 ng/ml | 150 ng/ml |
| Benzodiazepines | 300 ng/ml | 150 ng/ml |
| Cocaine metabolites | 300 ng/ml | 150 ng/ml |
| Marijuana metabolites | 50 ng/ml | 15 ng/ml |
| Methadone | 300 ng/ml | 150 ng/ml |
| Methaqualone | 300 ng/ml | 150 ng/ml |
| Methylenedioxyamphetamine (MDA) Analogues | 500 ng/ml | 250 ng/ml |
| Opiates | 2000 ng/ml | 2000 ng/ml |
| Phencyclidine | 25 ng/ml | 25 ng/ml |
| Propoxyphene | 300 ng/ml | 150 ng/ml |

d) Any positive test or any refusal to submit to testing or to cooperate with testing, including executing releases or authorizations and providing multiple specimens if needed, may be grounds for termination of employment.

e) This Article supersedes any agreement, memorandum of understanding, rule, procedure, or order to the extent of any conflict therewith.

**f) Last Chance Agreement**

In the event an employee tests positive for either drugs or alcohol as the result of a random or reasonable suspicion drug/alcohol test, the following shall apply:

At the sole discretion of the City Manager, in consultation with the Police Chief, the employee may be offered a last chance agreement; said agreement does not preclude concurrent disciplinary action. If a last chance agreement is extended to the employee, after he/she is cleared to return to work by a Substance Abuse Professional (SAP) to be selected by the City, the employee shall be subject to unannounced testing administered by the City's Human Resources Department, for a period of no longer than two (2) years. An employee may only be eligible for one last chance agreement during his/her employment with the City. Employees who test positive a second time for drugs or alcohol as the result of an unannounced, random or reasonable suspicion drug/alcohol test, shall be terminated from employment with the City. A Substance Abuse Professional is a licensed physician, psychologist, social worker, employee assistance professional or certified addiction counselor with knowledge of and clinical experience in the diagnosis and treatment of alcohol and controlled substance-related disorders.

If an employee who is offered a last chance agreement has his/her certification revoked through the Florida Department of Law Enforcement, he/she shall immediately be terminated from employment with the Miami Beach Police Department and shall have no right to grieve, oppose the termination, and no right to any other position with the City.

**ARTICLE 15**
**DISEASE PRESUMPTION**

A.  **Heart Disease Presumption**

Any condition or impairment of health of any detention or sworn officer caused by heart disease resulting in total or partial disability or death shall be presumed to have been accidental and to have been suffered in the line of duty unless the contrary be shown by satisfactory evidence; provided, however, that such detention or sworn officer shall have successfully passed a physical examination upon entering into such service as a detention or sworn officer, which examination failed to reveal any evidence of heart disease.  If at any time this Section is placed before an arbitrator for interpretation or application, what is "satisfactory evidence" shall be determined by the arbitrator.  If rights of detention or sworn officers are placed before the Bureau of Workers Compensation, then what is "satisfactory evidence" will be determined by the Bureau in accordance with Workers Compensation law.  Nothing herein shall be construed to be a waiver or limitation of any benefit provided under Florida Statute 112.18.

B.  **Infectious Disease Presumption**

Any documented post-exposure condition or impairment of health caused by Human Immunodeficiency Virus/ Acquired Immune Deficiency Syndrome (HIV/AIDS), Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis shall be presumed to have been accidental and to have been suffered in the line of duty, subject to the following conditions, unless the contrary be shown by competent evidence.

To qualify for the presumption, the following criteria must be met:

> There must be an on-the-job documented exposure that meets scientific standards or criteria, and the significant on-the-job exposure must be stated, in writing, by a licensed medical doctor.  For example, contact with blood is not an exposure unless the employee's skin, where the contact occurred, is not intact. Additionally, the person whose blood came into contact with the employee's broken skin must have one of the blood borne infectious diseases considered herein.

Current Employees:

> 1.  Current employees must undergo a post-employment medical examination, administered by a qualified medical doctor to be selected by the City. The results must reveal no evidence of HIV, AIDS, Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis. Employees who refuse to comply with this post-employment examination requirement shall not be eligible for the presumption.

2.  Current employees shall be required to sign a City-approved medical release form authorizing the physician to provide the examination results directly to the City.

New Employees

3.  New employees, hired after ratification of this agreement, must complete a pre-employment medical examination, administered by a qualified medical doctor to be selected by the City, and the results must reveal no evidence of HIV, AIDS, Hepatitis C, Pulmonary Tuberculosis or Meningococcal Meningitis.

4.  New employees, whose test results reveal evidence of any of the aforementioned infectious diseases, shall not be eligible for the presumption for the disease for which they tested positive.

All current and new employees shall be tested at a health facility selected by the City.  The FOP Health Trust shall incur the cost associated with testing all current employees who are members of the Health Trust; those employees who are not members of the Health Trust shall incur the cost of their testing.  The City shall incur the cost of testing all employees hired after the ratification of this agreement.

All medical examination results, for both current and new employees, shall be released to the City's Risk Manager.

**ARTICLE 16**
**PROMOTIONS**

**Section 16.1 –**

Advancement to the ranks of Sergeant and Lieutenant shall be by examinations that measure the knowledge, skills, and ability of personnel and by seniority. A promotional examination will be given every two (2) years, unless the FOP President and the City Manager or his designee for Labor Relations mutually agrees to some other schedule. Effective with the first test given after ratification, the following revisions to Article 16 shall apply.

The City agrees to a reopener with the FOP on the testing process for promotions to Sergeant and Lieutenant.

**Section 16.2 –**

Eligible applicants for the promotional examination for Sergeant and Lieutenant shall be given a two-part examination, consisting of a validated, written test, which shall comprise fifty percent (50%) of the final examination score, and an Assessment Center. The Assessment levels shall have a weight of fifty percent (50%) of the total score. The written portion shall be given first and applicants for Sergeant or Lieutenant positions must successfully pass the written test with a raw score of seventy percent (70%) to be eligible, at a later date, to take the Assessment Center portion of the examination. Passing scores for the Assessment Center shall be set only by the test developer. If there are not a significant number of minorities promoted after the next round of promotional testing after the effective date of this Agreement, the parties will meet to review the respective weights and re-negotiate the Article, if necessary.

**Section 16.3 –**

All police officers who on the written test date have four (4) years of seniority from date of appointment to Police Officer or Police Officer Trainee, and performance evaluations of satisfactory or above for the preceding twenty-four (24) month period shall be eligible to take the Sergeant's test. All Sergeants who on the written test date have two (2) years seniority from the date of appointment as Sergeant and performance evaluations of satisfactory or above for the preceding twenty-four (24) month period shall be eligible to take the Lieutenant's test. Applicants must, in both cases, apply on or before the application cutoff date and time in accordance with Personnel Rules.

The City Manager or his designee for Human Resources may refuse to permit an applicant to take the examination on the grounds of conduct disgraceful to the Department and his/her officer

status; or refused advancement from probationary status.  In the latter case, if at least three (3) years have elapsed since such failure of probationary advancement, such candidate will be considered qualified.  Should any applicant, so disqualified for any of these alleged reasons, contest such disqualification, he shall have access to the grievance procedure under this contract.

## Section 16.4 –

The City Manager or his designee for Human Resources shall cause to be developed validated examinations which closely measure the knowledge, skills, and abilities of a Miami Beach Sergeant of Police and a Miami Beach Lieutenant of Police, administer such examinations, and prepare a promotional register, one for Sergeants and one for Lieutenants, containing the names of persons who have passed the test, ranked in the order of such examination scores.  Promotions shall be by rank order.

The FOP shall facilitate participation of bargaining unit employees in providing information in order to conduct the job analyses and develop the tests within the time frames requested by the process; provided that such participation shall be on duty time.

## Section 16.5 – Seniority Points

a)  0.2 point shall be added to an employee's Sergeant's passing examination score for each completed year of service, to a maximum of 25 years.

b)  0.25 points shall be added to an employee's Lieutenant's passing examination score for each completed year in grade as a Sergeant.

## Section 16.6 – Education Points

a)  0.02 points shall be added to an employee's Sergeants passing examination score for each completed credit of post-secondary education from an accredited institution of higher learning.

b)  0.02 points shall be added to an employee's Lieutenants passing examination score for each completed credit of post-secondary education from an accredited institution of higher learning.

No combination of seniority and/or education points shall exceed six (6) points per employee. Seniority and education points, in accordance with the above specifications, will be added to the combined score after the candidate has successfully passed all components for the promotional

examination.  Veteran's Preference points will be added after the addition of seniority and education points, in accordance with state law.

Example:

(Written Examination Raw Score *0.50) + (Assessment Center Score *0.50) + Education points + Seniority points + Veterans Preference points = Final Score

## Section 16.7 – Book Committee

A committee consisting of the Human Resources Director, Police Chief, the FOP President and the test developer or their designees, along with two incumbents, one designated by the Police Chief and one designated by the FOP President,  shall select the books and test material from which technical knowledge questions on the written test and Assessment Center will be drawn. Final selection shall be made after consultation with the test developer.  Without exception, no member of the Book Committee shall be a candidate for the promotional examination for which the list is compiled.

Such selection or changes therein, shall only be made after a representative of the FOP shall have a reasonable opportunity to meet and provide input on the selection process.

The test material chosen for the written test and for the Assessment Center shall be described and announced by the City to the FOP and its members at least three (3) months before such test.

The provisions of the 2012-2015 collective bargaining agreement between the City and FOP shall remain in effect solely as it pertains to the book committee for the 2016/2017 Police Sergeant and Police Lieutenant promotional process.

Overview, Orientation, and Preparation sessions for the written test and for the Assessment Center test or the behavioral assessment test shall be given at least thirty (30) days prior to each test.

## Section 16.8 – Written Test Scoring

Within 24 hours after the administration of the written test, an applicant scoring session will be conducted.  Each examinee will be able to review a copy of his/her own answer sheet and the scoring key (for his/her use during the review session only), with the correct response, the name of the reading source and location from which each written test question was drawn.

Challenges will be written and submitted to the test developer during a minimum of two (2) post-test review sessions occurring on separate days and conducted within ten (10) calendar days of test completion.  The Human Resources Director, FOP President and the test developer or their designees shall conclusively decide all challenges by a majority vote.

## Section 16.9 – Assessment Center Test Challenges

Upon completion of the determination of a score for the Assessment Center Test, each examinee shall be furnished with his/her test result.  Human Resources shall establish a reasonable time period within which each examinee may review his/her examination at a post-test review appointment. Challenges regarding the components of this portion of the examination must be made in writing to the test developer within ten (10) calendar days after the post-test review appointment.  The Human Resources Director, FOP President and the test developer, or their designees, shall conclusively decide all challenges by a majority vote.  For each examinee who submitted a challenge, each examinee's own challenge and response will be available no later than eight (8) weeks after the date of the last examinee's submission of challenges.

## Section 16.10 –

Promotional examinations for the position of Sergeant of Police and Lieutenant of Police will be given at least once every twenty-four (24) months, so as to provide continuous active promotional lists.  The City agrees to begin the promotional process no later than nine (9) months prior to expiration of a certified promotional list. Formal examination scores and a promotional list shall be certified and posted within two (2) weeks after completion of all challenges in Section 16.8 above.  Promotional lists shall expire twenty-four (24) months after the certification and posting of the results of the promotional examination.

## Section 16.11 –

In the event of same day promotions, seniority rank in the new position shall be determined, in the order of standing on the promotional list.  If there is a tie in the final scores that places more than one examinee in the same position on the promotional list, these examinee's ranking order on the promotional list shall be determined in the order of the examinee's seniority in the rank that they presently hold (i.e., a tie score between two (2) sergeants will be determined by awarding the highest ranking to the examinee with the most seniority as a sergeant, and a tie score between two (2) officers will be determined by awarding the higher ranking to the examinee with the most seniority as an officer, etc.).

## Section 16.12 – Promotional Eligibility for Employees Under Investigation

An employee under any type of investigation who has been relieved of duty, with or without pay, shall be removed from any promotional eligibility list and will be bypassed for promotion.  Upon conclusion of the investigation:

1(a).    If an employee is bypassed for promotion pursuant to this article, and the charge(s) leading to the investigation are found to be anything other than substantiated, or, if the employee receives discipline less than a one (1) day suspension without pay, he or she shall be made whole in every respect, including promotion, compensation and seniority, irrespective of whether an active eligibility list is in effect upon conclusion of the investigation.

1(b).   If an employee is removed from the eligibility list pursuant to this article, and the charge(s) leading to the investigation are found to be anything other than substantiated, or, if the employee receives discipline less than a one (1) day suspension without pay, he or she shall be returned to their position on the eligibility list, provided the list is still in effect (active) upon conclusion of the investigation.

2.       If the charge(s) leading to the investigation are found to be substantiated and result in discipline consisting of a one (1) day suspension without pay or greater, the employee shall continue to be removed from any promotional eligibility list and will be bypassed for promotion. In such case, the employee will be eligible to apply and compete for promotion in subsequent testing cycles without limitation.

**ARTICLE 17**
**FOP PRESIDENT**

**Section 17.1 –**

The Miami Beach Fraternal Order of Police, William Nichols Lodge No. 8, Lodge President shall have the option, for each fiscal year, of closed "D.D." (Detached Duty), as outlined in Section 17.2 below, or to conduct union business (under the conditions described in Section 17.2 below), through the use of a time bank.  The FOP President shall notify the Police Chief in writing by September 15 of each contract year, whether he or she elects to utilize the 1500 hour time back provision or the D.D. provisions contained in Section 17.2 below, during the following contract year.  Unused time bank hours from one contract year shall rollover to the next contract year, not to exceed a total maximum of 3000 hours per contract year.  Time for attendance at negotiations for a successor agreement is addressed in Article 11.8 of this Agreement.

**Section 17.2 –**

The Miami Beach Fraternal Order of Police, Lodge No. 8, Lodge President shall be released and detached from full time duties as a sworn law enforcement officer while serving as Lodge President and shall be carried full-time in a pay status to be shown on the payroll as "D.D." (Detached Duty).  The following conditions shall apply:

a) For the purpose of recording time, the Lodge President will notify the Police Chief of all absences, including vacations, sick leave, meeting attendances, out of town trips, etc. The Lodge President shall be required to work a 40-hour workweek.

b) The Lodge President will be available at the FOP office currently located at 999 11th Street, Miami Beach, Florida 33139, for consultation with the Police Department Management or the City Administrators between normal working hours.

c) Should the Lodge President wish to change offices, (s)he will notify the Police Chief, in writing, at least five (5) working days prior to the proposed change.  Said notice will include the address and the telephone number of the new office for the FOP Lodge President.

d) In the absence of the Lodge President, the Lodge President's designee may represent the Fraternal Order of Police.

e)   The FOP will not send additional employees in a pay status to attend City Commission or Personnel Board meetings without approval of the Police Chief or his designee.

f)   All applicable Miami Beach Police Department rules, regulations and order shall apply to the person who is the President of the Lodge and on D.D.

**Section 17.3 –**

The Management of the Miami Beach Police Department or the City Administration reserves the right to rescind the provisions of this Article in the event that it is found to be illegal.  Canceling the Article shall not preclude further discussions of any Lodge Presidents' release for Union business.

**ARTICLE 18**
**<u>COMPENSATORY TIME</u>**

Employees shall no longer accrue more than 150 hours of compensatory time in a calendar year. Employees will not be permitted to have more than 240 hours of compensatory time in their time bank. Employees assigned to the Motor Unit will continue to be able to accrue 320 hours of compensatory time as per the Settlement Agreement.

**ARTICLE 19**
**ENTIRE AGREEMENT**

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the City and the FOP, for the duration of this Agreement, except as provided in the Florida Statutes, or as specifically excepted by provisions of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter referred to, or with respect to any subject or matter not specifically referred to, or covered in this Agreement, even though such subject or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement. This Article shall not be construed to in any way limit or restrict the parties from negotiating, as provided in the Florida Laws, or any succeeding agreement to take effect upon the termination of this Agreement or any succeeding term of this Agreement.

**ARTICLE 20**
**TERM OF AGREEMENT**

This Agreement shall be effective as of the 1st day of October 2018 and shall remain in full force and effect until the 30th day of September, 2021.

It shall be automatically renewed from year to year thereafter unless either party shall notify the other in writing at least thirty (30) days prior to the anniversary date it desire to modify this Agreement.

EXECUTED by the parties hereto on this_____ day of _____2019.

MIAMI BEACH FRATERNAL ORDER            CITY OF MIAMI BEACH, FLORIDA
OF POLICE, LODGE NO. 8


By: _____            By: _____

    Kevin Milan                              Jimmy Morales
    FOP President                            City Manager


By: _____            By: _____

    Alejandro Bello                          Dan Gelber
    FOP Secretary                            Mayor


_____     By: _____

Approved by Vote of the City Commission      Richard Clements
                                            Police Chief


on the _____day of _____, 2019.


ATTEST:


_____      Date _____

Rafael E. Granado
City Clerk

## FRATERNAL ORDER OF POLICE
## FOP LODGE NO. 8
## ELECTION OF REMEDY FORM

Grievance No. _____

1._____    I/We elect to utilize the Grievance Procedure contained in the current Contract between the City of Miami Beach, Florida, and the FOP.  In making this election, I/we understand that selection of another forum, as defined by the FOP Contract, shall bar any consideration of the Grievance under the FOP collective bargaining agreement.

2._____    I/We elect to utilize another forum for my/our grievance, and in doing so, I/we understand that this election shall bar any consideration of this matter under the FOP collective bargaining agreement.

_____            _____
Signature                                                        Date

Subject of Grievance/Appeal: _____

FOP - 63

**Addendum:  Hearing Examiner Rules**

## HEARING EXAMINER RULES

**SECTION 1:   REQUEST FOR HEARING:**  Any member of the bargaining unit may appeal from disciplinary action within ten (10) days after the delivery or mailing to him/her of such written notice, by filing a written request for a hearing to the Hearing Examiner or his/her designee.  If the tenth day falls on a Saturday or Sunday, he/she will have the ability to file for an appeal on the following Monday.

**SECTION 2:   DISCIPLINARY HEARINGS:**

(a)     The City Manager or his/her designee not later than ten (10) days after receipt of such appeal, shall fix a place and time for holding a public hearing within a reasonable time thereafter.  Written notice of such time and place shall be delivered or mailed promptly to both the Appellant and the Appointing Officer.

Only the Hearing Examiner may grant a continuance to either party for good and sufficient cause.  No continuance shall be granted to either party unless such request for continuance is received in writing by the City Manager or his designee at least ten (10) days prior to the date of said scheduled hearing of appeal.

(b)     The Hearing Examiner may, at the request of the Appointing Officer or the Appellant, call or request any person or records for the purpose of ascertaining the facts.

(c)     The Appointing Officer or a representative designated by him/her, shall have the right to be present at such hearing and to be represented by the City Attorney.

(d)     The Appellant shall have the right to be present at such hearing and to be represented by an attorney of his/her choice.

Said attorney shall be an attorney duly admitted and licensed to practice in the State of Florida.  In the event that the Appellant does not retain an attorney, said Appellant may have an advisor of his/her choice present.  Such advisor shall not have the right to interrogate any witnesses or to enter objections to any testimony or evidence presented to the Hearing Examiner, nor may such advisor speak in the Appellant's behalf.

(e)     The findings of the Hearing Examiner shall be based upon competent substantial evidence of record.

(f)     The Appointing Officer shall have the burden of presenting evidence to support the truth of the charges as contained in the written notice.

(g)     The Appellant shall have the right to present evidence to refute the charges brought against him/her.

(h)     The Appellant shall have the right to be confronted by his/her accuser, and the Appellant and the Appointing Officer shall each have the right to cross-examine the witnesses of the other.

(i)     After both the Appointing Officer and the Appellant shall have presented their testimony and evidence, the Hearing Examiner shall receive argument in summation. The Appointing Officer shall have both the opening and closing argument.

(j)     After the completion of closing oral argument, the Hearing Examiner shall consider the testimony and evidence presented before the Hearing Examiner to determine the truth or untruth of the charges.

(k)     Within five (5) working days after the completion of the hearing, the Hearing Examiner shall issue his or her findings as to the truth or untruth of the charges in writing. The City Manager or his/her designee shall promptly deliver or mail a copy of such findings to the Appointing Officer and to the Appellant.

(l)     A copy of the written statement given the officer or employee, a copy of any reply thereto, and a copy of the findings of the Hearing Examiner shall be filed as a Public Record in the Human Resources Department.

| | | | | | Effective First Pay Period Ending in October 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Longevity 1=2.5% | 2=5.0% | 3=7.5% | 4=10% | 5=11% | | | | |
| | | | | | 7 years | 10 years | 15 years | 20 years | 25 years | | | | |
| **Job Classification (Range)** | | | | | | | | | | | | | |
| STEP | | 1 | 2 | 3 | A | B | C | D | E | F | G | H | I |
| 5305 | Detention Officer | | | | 45,631.56 | 48,954.62 | 52,520.26 | 56,344.86 | 60,448.70 | 64,851.28 | 69,574.18 | 74,641.32 | 78,373.36 |
| | | | | | 1,755.06 | 1,882.87 | 2,020.01 | 2,167.11 | 2,324.95 | 2,494.28 | 2,675.93 | 2,870.82 | 3,014.36 |
| | | | | | 21.94 | 23.54 | 25.25 | 27.09 | 29.06 | 31.18 | 33.45 | 35.89 | 37.68 |
| 8001 | Police Officer Trainee | 49,817.82 | 52,748.28 | 55,679.00 | | | | | | | | | |
| | | 1,916.07 | 2,028.78 | 2,141.50 | | | | | | | | | |
| | | 23.95 | 25.36 | 26.77 | | | | | | | | | |
| 5011 | Police Officer | | | | 58,609.20 | 61,541.18 | 64,606.36 | 67,949.44 | 71,290.96 | 74,880.78 | 78,531.18 | 82,493.58 | 86,618.22 |
| | | | | | 2,254.20 | 2,366.97 | 2,484.86 | 2,613.44 | 2,741.96 | 2,880.03 | 3,020.43 | 3,172.83 | 3,331.47 |
| | | | | | 28.18 | 29.59 | 31.06 | 32.67 | 34.27 | 36.00 | 37.76 | 39.66 | 41.64 |
| 5010 | Sergeant of Police | | | | | | | | | 86,577.92 | 90,907.70 | 95,488.12 | 100,262.50 |
| | | | | | | | | | | 3,329.92 | 3,496.45 | 3,672.62 | 3,856.25 |
| | | | | | | | | | | 41.62 | 43.71 | 45.91 | 48.20 |
| 5009 | Lieutenant of Police | | | | | | | | 95,488.12 | 100,193.08 | 105,266.72 | 110,527.56 | 116,054.12 |
| | | | | | | | | | 3,672.62 | 3,853.58 | 4,048.72 | 4,251.06 | 4,463.62 |
| | | | | | | | | | 45.91 | 48.17 | 50.61 | 53.14 | 55.80 |

**City of Miami Beach**
**Compensation Plan**

**Effective First Pay Period Ending in October 2020**

| Job Classification (Range) | | | | | Longevity 1=2.5%<br>7 years | 2=5.0%<br>10 years | 3=7.5%<br>15 years | 4=10%<br>20 years | 5=11%<br>25 years | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STEP | | 1 | 2 | 3 | A | B | C | D | E | F | G | H | I |
| 5305 | Detention Officer | | | | 46,087.88 | 49,444.17 | 53,045.46 | 56,908.31 | 61,053.19 | 65,499.79 | 70,269.92 | 75,387.73 | 79,157.09 |
| | | | | | 1,772.61 | 1,901.70 | 2,040.21 | 2,188.78 | 2,348.20 | 2,519.22 | 2,702.69 | 2,899.53 | 3,044.50 |
| | | | | | 22.16 | 23.77 | 25.50 | 27.36 | 29.35 | 31.49 | 33.78 | 36.24 | 38.06 |
| 8001 | Police Officer Trainee | 50,316.00 | 53,275.76 | 56,235.79 | | | | | | | | | |
| | | 1,935.23 | 2,049.07 | 2,162.92 | | | | | | | | | |
| | | 24.19 | 25.61 | 27.04 | | | | | | | | | |
| 5011 | Police Officer | | | | 59,195.29 | 62,156.59 | 65,252.42 | 68,628.93 | 72,003.87 | 75,629.59 | 79,316.49 | 83,318.52 | 87,484.40 |
| | | | | | 2,276.74 | 2,390.64 | 2,509.71 | 2,639.57 | 2,769.38 | 2,908.83 | 3,050.63 | 3,204.56 | 3,364.78 |
| | | | | | 28.46 | 29.88 | 31.37 | 32.99 | 34.62 | 36.36 | 38.13 | 40.06 | 42.06 |
| 5010 | Sergeant of Police | | | | | | | | | 87,443.70 | 91,816.78 | 96,443.00 | 101,265.13 |
| | | | | | | | | | | 3,363.22 | 3,531.41 | 3,709.35 | 3,894.81 |
| | | | | | | | | | | 42.04 | 44.14 | 46.37 | 48.69 |
| 5009 | Lieutenant of Police | | | | | | | | 96,443.00 | 101,195.01 | 106,319.39 | 111,632.84 | 117,214.66 |
| | | | | | | | | | 3,709.35 | 3,892.12 | 4,089.21 | 4,293.57 | 4,508.26 |
| | | | | | | | | | 46.37 | 48.65 | 51.12 | 53.67 | 56.35 |

**City of Miami Beach**
**Compensation Plan**

**Effective First Pay Period Ending in October 2021**

| Job Classification (Range) | | | | | | | | | Longevity 1=2.5%<br>7 years | 2=5.0%<br>10 years | 3=7.5%<br>15 years | 4=10%<br>20 years | 5=11%<br>25 years | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STEP | | 1 | 2 | 3 | A | B | C | D | E | F | G | H | I |
| 5305 | Detention Officer | | | | 46,548.76 | 49,938.61 | 53,575.91 | 57,477.39 | 61,663.72 | 66,154.79 | 70,972.62 | 76,141.61 | 79,948.66 |
| | | | | | 1,790.34 | 1,920.72 | 2,060.61 | 2,210.67 | 2,371.68 | 2,544.42 | 2,729.72 | 2,928.52 | 3,074.95 |
| | | | | | 22.38 | 24.01 | 25.76 | 27.63 | 29.65 | 31.81 | 34.12 | 36.61 | 38.44 |
| 8001 | Police Officer Trainee | 50,819.16 | 53,808.52 | 56,798.15 | | | | | | | | | |
| | | 1,954.58 | 2,069.56 | 2,184.54 | | | | | | | | | |
| | | 24.43 | 25.87 | 27.31 | | | | | | | | | |
| 5011 | Police Officer | | | | 59,787.24 | 62,778.16 | 65,904.94 | 69,315.22 | 72,723.91 | 76,385.89 | 80,109.65 | 84,151.71 | 88,359.24 |
| | | | | | 2,299.51 | 2,414.54 | 2,534.81 | 2,665.97 | 2,797.07 | 2,937.92 | 3,081.14 | 3,236.60 | 3,398.43 |
| | | | | | 28.74 | 30.18 | 31.69 | 33.32 | 34.96 | 36.72 | 38.51 | 40.46 | 42.48 |
| 5010 | Sergeant of Police | | | | | | | | | 88,318.14 | 92,734.95 | 97,407.43 | 102,277.78 |
| | | | | | | | | | | 3,396.85 | 3,566.73 | 3,746.44 | 3,933.76 |
| | | | | | | | | | | 42.46 | 44.58 | 46.83 | 49.17 |
| 5009 | Lieutenant of Police | | | | | | | | 97,407.43 | 102,206.96 | 107,382.58 | 112,749.17 | 118,386.81 |
| | | | | | | | | | 3,746.44 | 3,931.04 | 4,130.10 | 4,336.51 | 4,553.34 |
| | | | | | | | | | 46.83 | 49.14 | 51.63 | 54.21 | 56.92 |

DocuSign Envelope ID: CC3C604A-8185-4067-9F5B-8735D7C89F5F

**EXHIBIT**

**2**

**04.15.24 OZAETA TG**

## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, Salabarria is the subject of an on-going Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2020-04794 ("EEOC Charge"); and

WHEREAS, the Investigation and EEOC charge are all pending and constitute all the charges, investigations and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of further investigation, litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.      Recitals. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.      EEOC Charge Withdrawn With Prejudice and Discipline. Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the attached Notice of Withdrawal with Prejudice and immediately filing same with the EEOC. Additionally, as discipline for the matters that are the subject of the Investigation, Salabarria agrees to accept the following:

     a.  A One Hundred and Sixty (160) hour suspension,

     b.  Payback of Eighty-Six (86) total hours, of which Forty-Four (44) Hours is regular time and Twenty-Four (24) hour is overtime. The regular rate is Forty-Four Dollars and 14/100 ($44.14) for a total of One Thousand Nine Hundred Forty-Two Dollars and 00/100 ($1,942.16) of regular time. The overtime hourly rate is Sixty-Six Dollars and 21/100 ($66.21), for a total amount of One

1

City 001235

Thousand Five Hundred Eighty-Nine Dollars and 04/100 ($1,589.04). **Accordingly, the Total Amount due to the City is Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) ("the Total Amount")**. Salabarria can pay the Total Amount via a cashier's check made payable to the City of Miami Beach on or before January 4, 2021. If the City does not receive full payment on or before 5:00 p.m. on January 4, 2021, then the City is authorized to deduct the remaining amounts due from Salabarria's vacation leave bank.

c. Salabarria will execute the attached Last Chance Agreement, which contains additional provisions. The Last Chance Agreement is incorporated by reference into this Agreement.

d. Permanent deletion, from all platforms (platforms includes but is not limited to: Apple Podcasts, Stitcher, Spotify, Spotify Podcasts, Google Play Music, Google Podcasts, iHeart Radio, and any other social media and/or electronic platform) the podcast titled: "Cafecitos y Chisme with Nick & Jess."

e. Salabarria will immediately have a meeting with the Chief of Police wherein she will address the claims made in the Charge, including but not limited to identifying the names of all persons who allegedly engaged in the conduct addressed in the Charge. The refusal to name the persons who have allegedly engaged in the conduct in the Charge shall be grounds for immediate termination, as discussed in the attached Last Chance Agreement. Salabarria shall be entitled to have a Union Representative with her during this meeting.

f.     <u>Release Of Claims, Covenant Not To Sue</u>.  Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement. The claims released also include any claims under the United States Constitution, including but not limited to claims arising under the First Amendment or any other claims whatsoever.

2



City 001236

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf. Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

g.  Effect; Precedent.  The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind, with the exception of any labor proceeding involving Salabarria. The parties further agree that Salabarria's prior settlement agreement may also be used in any labor proceeding involving Salabarria.

h.  Consideration.  The consideration for this Agreement is the City's early conclusion of the Investigation. The parties acknowledge that the City could continue the Investigation. The parties further acknowledge that continuing the Investigation would likely be detrimental to Salabarria. Therefore, the City is giving up its right to continue the Investigation in exchange fro Salabarria's agreement to the provisions and terms of this Agreement. The mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

i.  Miscellaneous.  This Agreement (which includes the exhibits attached hereto that are incorporated by reference), is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral. The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever. This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release,"

3

City 001237

is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

**CITY OF MIAMI BEACH**

By _Paul J. Aguila_
City Manager
DocuSigned by: 2B3D6240F92B45D...

12/23/2020 | 1:34 EST
DATE

**CHIEF OF POLICE**

RICK CLEMENTS
Chief of Police

**JESSICA SALABARRIA**

JESSICA SALABARRIA

DATE 12/18/2020

**FRATERNAL ORDER OF POLICE, LODGE 8**

By
KEVIN MILLAN
President

DATE 12/18/2020

4

City 001238

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY                    Page 1 of 7                    UNION          JESSICA

City 001240

DocuSign Envelope ID: CC3C604A-8185-4067-9FEB-8735D7C89F5F

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1. All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2. During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3. Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4. The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY

Page 2 of 7

UNION        JESSICA

City 001241

5. Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6. SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7. Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command. Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8. For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

CITY

Page 3 of 7         UNION         JESSICA

City 001242

9.     Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10.    Employee shall attend and cooperate with any training required by the Chief of Police.

11.    If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12.    In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement  that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.    The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

CITY                                      Page 4 of 7                    UNION          JESSICA

City 001243

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

_____
CITY

Page 5 of 7

UNION          JESSICA

DocuSign Envelope ID: CC3C60AA-8185-4097-9BEB-8735D7C89F5F

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.     SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.     Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.     This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.     This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.     In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida. **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY                    Page 6 of 7                    UNION        JESSICA

City 001245

This Agreement is dated the ____ day of December 2020, in Miami-Dade County, Florida.

**JESSICA SALABARRIA**

DocuSigned by:

Paul J. Aguila

2B3D6240F92B45D...

**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: _12/18/2020_

Date: _12/23/2020 | 1:34 EST_

**FRATERNAL ORDER OF POLICE**

_____ President
Signature & Title

Kevin Millan    President
Print Name & Title

_12/18/2020_
Date

**CHIEF OF POLICE**

12/18/2020
Date

City 001246



EXHIBIT
**3**
04.15.24 OZAETA  TG



## MEMORANDUM

TO:           Sergeant, Jessica Salabarria

FROM:         Rick Clements, Chief of Police

DATE:         January 25, 2021

RE:           Implementing Letter of Resignation

___

On December 18, 2020, you entered into a Last Chance Agreement ("Agreement"). A copy of that Agreement is attached as Exhibit A. Additionally, as part of the Agreement, on that same date you signed a Letter of Resignation ("Resignation"). A copy of that Resignation is attached as Exhibit B.

Based on the violations outlined below, and per the Agreement, I am implementing the Resignation, effective immediately and as of the date indicated on Resignation attached as Exhibit B.

Specifically, on December 30, 2020, Lieutenant, Steven Cosner submitted an Allegation of Employee Misconduct ("AEM"). A copy of the AEM is attached as Exhibit C. The allegations of the AEM are incorporated in full herein.

On January 19, 2021, I held a meeting with you to discuss the allegations in the AEM. In addition to you and I, also present at that meeting was:

- Wayne Jones, Deputy Chief
- Paul Ozaeta, Lieutenant (FOP President)
- Arley Flaherty, Sergeant (FOP First Vice President)
- Reggie Lester, Sergeant (FOP Second Vice President)
- Delvin Brown, Lieutenant (FOP Grievance Chairman)
- Steven Cosner, Lieutenant
- A.J. Prieto, Captain Internal Affairs.

During the meeting, you were provided a copy of the "AEM" and given the opportunity to review the "AEM" in full. After your review, you informed me that, despite being assigned to the North District, you did not report to the North District. Instead, you remained in your assigned City vehicle, stationary at the City's main police station. You further informed me that while in your vehicle at the police station (for what was at or around four (4) plus hours) you worked on administrative issues (an employee evaluation

for Police Officer Vincent Stella) and worked on your "school work." The "school work" at issue is not work assigned by the City. You informed me that, independent from the City, you are working toward a Master's Degree.

Further, you acknowledged that you missed two radio calls specifically to you from Lieutenant Cosner and a phone call from Lieutenant Cosner to your personal cell phone. Ultimately, you did not respond to the North End Sub-Station (in the North District) until approximately 4:20 a.m., and only after being told to do so by Lieutenant Cosner. You further acknowledged that despite receiving an email from Lieutenant Cosner at approximately 3:20 a.m. directing you to have certain officers perform certain assignments, you did not issue the assignments until after 4:20 a.m., and only after speaking with Lieutenant Cosner. You again indicated to me that prior to speaking to Lieutenant Cosner at 4:20 a.m., you were focused on the employee evaluation and your independent school work.

In speaking with Lieutenant Cosner during this meeting, he indicated, among other things that you informed him that you had conveyed the assignment details, when in fact, you had not. You conveyed the assignment details after speaking to Lieutenant Cosner despite telling him you had already done so.

Moreover, Lieutenant Cosner indicated in this meeting that you did not leave the main police station during most of your shift and only left the police station when instructed to do so by Lieutenant Cosner.

The above is only a summary of the events of the January 19, 2021 meeting.

After the meeting, the City reviewed your City issued laptop computer, which is the computer that you would have used to work on Officer Stella's evaluation. A review of the laptop shows that Officer Stella's evaluation was not created until January 10, 2021. The City's Information Technology Department confirmed that Officer Stella's evaluation was not created or saved anywhere else on the City's system.

Pursuant to paragraph 4 of the Agreement, I determine that you have not complied with the Agreement and engaged in conduct that is beyond an individual, discreet or minor policy violation. Pursuant to paragraph 4 of the Agreement, my decision in this regard is not subject to review or explanation. Accordingly, as stated above, I am implementing your Resignation.

City 001254

# EXHIBIT A

City 001255

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI
BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter,
"the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's
Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment
contained in the Collective Bargaining Agreement between the Union and the City effective
October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA
Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty
when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City
when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to
continue to be employed by the City, and the FOP desires for Employee to continue to be
employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA
Case Number 2020-010 and was in violation of numerous City and Police Department policies
and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include:
to protect and preserve the integrity of the Police Department and all its officers and to give
Employee the opportunity to further and support that purpose; and to give Employee the

CITY

Page 1 of 7

UNION          JESSICA

City 001256

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

opportunity to rehabilitate herself personally and as a police sergeant for  the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1.      All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2.      During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3.      Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference.  In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4.      The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY

UNION                    JESSICA

City 001257

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

5.      Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6.      SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7.      Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command.  Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8.      For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

_____
CITY

Page 3 of 7

_____
UNION

_____
JESSICA

City 001258

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

9. Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10. Employee shall attend and cooperate with any training required by the Chief of Police.

11. If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12. In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13. The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

CITY     Page 4 of 7    UNION   JESSICA

City 001259

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY                    Page 5 of 7                    UNION          JESSICA

City 001260

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.    SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.    Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.    This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.    This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.    In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida.    **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY    Page 6 of 7    UNION    JESSICA

City 001261

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

This Agreement is dated the _____ day of December 2020, in Miami-Dade County, Florida.

DocuSigned by:

Paul J. Aguila

263D6240F92B45D...

**JESSICA SALABARRIA**

**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: _12/18/2020_

Date: _12/23/2020 | 1:34 EST_

**FRATERNAL ORDER OF POLICE**

_____ President
Signature & Title

_Kevin Millan_   _President_
Print Name & Title

_12/18/2020_
Date

_____
**CHIEF OF POLICE**

_12 / 15 / 2020_
Date

City 001262

# EXHIBIT B

City 001263

December 18, 2020

City of Miami Beach
Human Resources Department
Miami Beach City Hall
1700 Convention Center Drive
Miami Beach, FL 33139

Re: *Letter of Resignation as Part of Settlement Agreement and Last Chance Agreement*

To Whom It May Concern:

Pursuant to the Settlement Agreement and Last Chance Agreement to which this Letter of Resignation is attached, I resign my employment with the City of Miami Beach, effective January 25, 2021.

Very Truly Yours,

Jessica Salabarria.

City 001264

# EXHIBIT C

City 001265

## MIAMI BEACH POLICE DEPARTMENT
### Initial Report Concerning a Police Employee - Allegation of Employee Misconduct

| Date and Time Reported<br>12/30/2020    2345 hours | Received By (Employee Name)<br>Lieutenant Steven Cosner | ( X ) In Person  (  ) By Phone<br>(  ) Other _____ |
|---|---|---|
| Date and Time Occurred<br>12/28/2020   0000-0600 hours | Location of Occurrence<br>MBPD | |

| Reporting Party's Name<br>Lieutenant Steven Cosner | Race/Sex<br>W/M | D.O.B | Address: 1100 Washigton Ave., Miami Beach, Florida 33139 | Telephone # |
|---|---|---|---|---|

**Specific Allegation (In Brief):**  Failure to Supervise, Conduct Unbecoming, Insubordination, Neglect of Duty, Untruthfulness (lying/false statements), Performance of Duties, Failure to Monitor Radio

| Employee (s) Name | | |
|---|---|---|
| 1. Sergeant Jessica Salabarria | 3. | |
| 2. | 4. | |

### Witnesses

| Name | Race/Sex | D.O.B | Address | Telephone |
|---|---|---|---|---|
| Lieutenant Steven Cosner | W/M | | Resident: MBPD | |
| Officer Werner Baumer | W/M | | Business: 1100 Washington Ave., Miami Beach, | |
| Officer Richard Ocejo | W/M | | Fl. 33139 | |
| Officer Steven Serrano | W/M | | | |
| Officer Christopher Garrido | W/M | | | |
| Officer Hansel Romero | W/M | | | |
| Officer Rodolfo Albaladejo | W/M | | | |
| | | | Resident | |
| | | | Business | |

### Details of Allegation

On Sunday night, 12/27/2020 at approximately 2200 hours, I advised Sergeant Jessica Salabarria that we needed a Sergeant on overtime for the midnight shift.  I told her that she was the next supervisor to be forced to work over since we did not have any volunteers for the position.  She was told that she would be assigned to Area 3 and would be working from 0000-0600 hours.  She acknowledged the order and within several minutes she provided me with an overtime slip completed by her in which she documented in her own handwriting that she was working in Area 3. She left the sergeant's office shortly thereafter.  At approximately 0355 hours, I forwarded an email to Sergeant Salabarria with the details and watch orders that needed to be assigned to the Area 3 officers for completion prior to the end of their shift.  I then sent a text message to her cellular phone advising her to check her email at 0359 hours. After a few minutes I did not receive an acknowledgement of the text message, so I tried to call her phone at 0404 hours.  Then phone rang repeatedly and went to voicemail.  I tried to raise her via the police radio immediately afterwards.  The dispatcher raised her multiple times with no response.  Sergeant Wilson Romero advised via radio that he would try to call her.  He called me at 0411 hours to advise that he could not reach her and that her phone rang through to voicemail.  I again tried to have the dispatcher raise her, and after several attempts by name and unit

City 001266

number, she finally responded. The tone of her voice sounded as if she was just waking up. I spoke with her via the supervisor channel and asked her where she was. She told me that she was "05". I responded by asking if she meant, "05 at the NESS". She said no and that she was at the main station. I asked if she was aware that she was assigned to Area 3 and she answered affirmatively. I then ordered her to respond to Area 3 and to check her email.

I became involved in a vehicle stop along 71 street that resulted in an arrest at 0416. Officer Ocejo was one of the officers who responded as back-up. After the subject was transported, I waited on scene with Officer Ocejo as he waited for a tow truck. I asked Officer Ocejo to check his email to see if the details had been forwarded by Sergeant Salabarria. He told me that he did not have any emails from her. This was at approximately 0520 hours. At 0543 hours, I received an unsolicited text message from Sergeant Salabarria advising that she had emailed me the squad stats and the detail assignments. She claimed that she had told the officers via landline and email of their detail assignments. The email that she sent me was sent at 0536 hours. It included the squad stats and detail assignments. I called Officer Hansel Romero and asked him if he had received any emails, texts, or phone calls from Sergeant Salabarria advising him of detail assignments. He said that he did not and that she had only asked for stats in an email that was sent at 0521 hours. That email was forwarded to me by Officer Ocejo. I began calling all the officers assigned to Area 3 and inquired the same of each of them. Every one of the officers advised that they had not received a call or text advising of the details. Officer Romero then forwarded an email that he received from Sergeant Salabarria at 0542 hours. The email had been sent to each of the Area 3 officers. It was the detail assignments and began with a highlighted line stating, "squad per our conversation please note the below details for our shift". I found this very concerning because it was now the second time that she had claimed to have had a conversation with the officers about their assignments when all six of them claimed that never happened and they did not report to any assigned details during the shift.

I sent an email to Lieutenant Jorge Garcia asking for a Detail Report for Sergeant Salabarria's assigned marked vehicle via the AVL system. My inquiry was for her vehicle movement from 2200 hours on 12/27/2020 through 0600 hours on 12/28/2020. The Detail Report showed that her vehicle had been parked at the station from 2200 hours on 12/27/2020 until 0423 hours on 12/28/2020 which was a few minutes after we spoke on the supervisor channel. For a total of 6 hours and 23 minutes. It is unknown how long the vehicle had been parked prior to that. The report indicated that she left the station and drove directly to 73rd Street and Ocean Terrace where she again parked her vehicle at 0440 hours. The vehicle remained in that position until 0533 hours for a total of 53 minutes. She then left that location and drove directly to the MBPD headquarters.

Note that of the six officers assigned to Area 3 on the shift in question 4 of them have 2 years of experience or less.

Sergeant Salabarria's actions show a willful effort to deceive a supervisor and a failure to obey a direct order from said supervisor. She failed to report to her assigned zone and failed to supervise the officers under her watch. She failed on multiple occasions to respond to the police radio and showed extreme neglect in the performance of her duties.

City 001267



Select Year: 2023 ☉ Go

# The 2023 Florida Statutes (including Special Session C)

<table>
<tr><td>Title X<br>PUBLIC OFFICERS, EMPLOYEES,<br>AND RECORDS</td><td>Chapter 112<br>PUBLIC OFFICERS AND EMPLOYEES:<br>GENERAL PROVISIONS</td><td>View Entire<br>Chapter</td></tr>
</table>

**112.534   Failure to comply; official misconduct.**—

(1) If any law enforcement agency or correctional agency, including investigators in its internal affairs or professional standards division, or an assigned investigating supervisor, intentionally fails to comply with the requirements of this part, the following procedures apply. For purposes of this section, the term "law enforcement officer" or "correctional officer" includes the officer's representative or legal counsel, except in application of paragraph (d).

(a) The law enforcement officer or correctional officer shall advise the investigator of the intentional violation of the requirements of this part which is alleged to have occurred. The officer's notice of violation is sufficient to notify the investigator of the requirements of this part which are alleged to have been violated and the factual basis of each violation.

(b) If the investigator fails to cure the violation or continues the violation after being notified by the law enforcement officer or correctional officer, the officer shall request the agency head or his or her designee be informed of the alleged intentional violation. Once this request is made, the interview of the officer shall cease, and the officer's refusal to respond to further investigative questions does not constitute insubordination or any similar type of policy violation.

(c) Thereafter, within 3 working days, a written notice of violation and request for a compliance review hearing shall be filed with the agency head or designee which must contain sufficient information to identify the requirements of this part which are alleged to have been violated and the factual basis of each violation. All evidence related to the investigation must be preserved for review and presentation at the compliance review hearing. For purposes of confidentiality, the compliance review panel hearing shall be considered part of the original investigation.

(d) Unless otherwise remedied by the agency before the hearing, a compliance review hearing must be conducted within 10 working days after the request for a compliance review hearing is filed, unless, by mutual agreement of the officer and agency or for extraordinary reasons, an alternate date is chosen. The panel shall review the circumstances and facts surrounding the alleged intentional violation. The compliance review panel shall be made up of three members: one member selected by the agency head, one member selected by the officer filing the request, and a third member to be selected by the other two members. The review panel members shall be law enforcement officers or correctional officers who are active from the same law enforcement discipline as the officer requesting the hearing. Panel members may be selected from any state, county, or municipal agency within the county in which the officer works. The compliance review hearing shall be conducted in the county in which the officer works.

(e) It is the responsibility of the compliance review panel to determine whether or not the investigator or agency intentionally violated the requirements provided under this part. It may hear evidence, review relevant documents, and hear argument before making such a determination; however, all evidence received shall be

strictly limited to the allegation under consideration and may not be related to the disciplinary charges pending against the officer. The investigative materials are considered confidential for purposes of the compliance review hearing and determination.

(f) The officer bears the burden of proof to establish that the violation of this part was intentional. The standard of proof for such a determination is by a preponderance of the evidence. The determination of the panel must be made at the conclusion of the hearing, in writing, and filed with the agency head and the officer.

(g) If the alleged violation is sustained as intentional by the compliance review panel, the agency head shall immediately remove the investigator from any further involvement with the investigation of the officer. Additionally, the agency head shall direct an investigation be initiated against the investigator determined to have intentionally violated the requirements provided under this part for purposes of agency disciplinary action. If that investigation is sustained, the sustained allegations against the investigator shall be forwarded to the Criminal Justice Standards and Training Commission for review as an act of official misconduct or misuse of position.

(2)(a) All the provisions of s. 838.022 shall apply to this part.

(b) The provisions of chapter 120 do not apply to this part.

**History.**—s. 4, ch. 74-274; s. 35, ch. 77-104; s. 1, ch. 78-291; s. 4, ch. 82-156; s. 4, ch. 93-19; s. 3, ch. 2000-184; s. 8, ch. 2003-158; s. 3, ch. 2009-200; s. 5, ch. 2011-4; s. 6, ch. 2016-151.

Copyright © 1995-2024 The Florida Legislature • Privacy Statement • Contact Us