**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.:1:22-cv-21004-DPG

JESSICA GUASTO,

     PLAINTIFF,

VS.

THE CITY OF MIAMI BEACH, FL,
A FLORIDA MUNICIPALITY,

     DEFENDANT.

_____/

| | |
|---|---|
| DEPOSITION OF: | SGT. REGINALD LESTER |
| DATE: | MARCH 28, 2024 |
| TIME: | 12:14 P.M. - 1:50 P.M. |
| PLACE: | VIA ZOOM REMOTE CONFERENCING |
| REPORTED BY: | TIMOFEY GARBUZ |
| | COURT REPORTER |
| | NOTARY PUBLIC, STATE OF FLORIDA |

**2**

1 APPEARANCES:
2 DANIEL B. BARROUKH, ESQ.
  DEREK SMITH LAW GROUP, PLLC
3 520 BRICKELL KEY DRIVE
  SUITE O-301
4 MIAMI, FLORIDA 33131-2433
  (786) 688-2335
5 DANIELB@DEREKSMITHLAW.COM
    COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
6
7
8 MICHAEL L. ELKINS, ESQ.
  MLE LAW
9 1212 NORTHEAST 16TH TERRACE
  FORT LAUDERDALE, FLORIDA 33304
10 (954)401-2608
  MELKINS@MLELAWFIRM.COM
11    COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.
12
13
14         * * * * * * * * *
15       S T I P U L A T I O N S
16
17     It is hereby stipulated and agreed by and
18 between counsel for the respective parties, and the
19 deponent, that the reading and signing of the deposition
20 are hereby reserved.
21
22
23
24
25

**3**

1           I N D E X
2 WITNESS                   PAGE
3 SGT. REGINALD LESTER
4
  Direct Examination by Mr. Elkins        4
5
  Cross Examination by Mr. Barroukh      54
6
  Redirect Examination by Mr. Elkins     70
7
8         E X H I B I T S
9 DEPOSITION      DESCRIPTION       PAGE
10 Exhibit Number 1   Settlement Agreement   39
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1        P R O C E E D I N G S
2       * * * *
3     THE REPORTER:  I already got your appearances.
4     Mr. Lester, do you swear or affirm that the
5 statements you give in this matter shall be the truth,
6 the whole truth and nothing but the truth so help you
7 God?
8     THE WITNESS:  Yes.
9     THE REPORTER:  Thank you.  You may proceed.
10       SGT. REGINALD LESTER,
11 Having been first duly sworn, testified as follows:
12       DIRECT EXAMINATION
13 BY MR. ELKINS:
14     Q.  Good afternoon, Sergeant Lester.  My name's
15 Michael Elkins, and I represent the City of Miami Beach in a
16 lawsuit that's been filed against the City by Jessica
17 Guasto, who you may know as Jessica Salabarria formerly.
18 And so, I subpoenaed you for this deposition.
19     I assume you did receive the subpoena obviously
20 because you're here, correct?
21     A.  Yes, sir.
22     Q.  Okay.  Have you ever been deposed in a civil case
23 before?  I presume you've been deposed in criminal cases
24 before?
25     A.  I have not.  I've been deposed in criminal cases.

Sgt. Reginald Lester

5

1  I think in my 26-year career, this may be my first time in a
2  civil case, thank God, hopefully, my last.
3      Q.  Right.  Well, certainly, there are no allegations
4  against you.  You're just a witness.  And again, I represent
5  the City.
6      A.  Right.
7      Q.  But you are not a management sergeant, correct?
8      A.  Yes, sir.
9      Q.  So because you are not considered a management
10 employee, I understand you're a supervisor, but below --
11     A.  Yes.
12     Q.  -- then you understand you are a non-management
13 employee, I had to subpoena you for this deposition?
14     A.  Okay.
15     Q.  Do you understand that?
16     A.  Yes, sir.
17     Q.  Okay.  So I'm going to go over just a few basic
18 ground rules, which will hopefully get help us get out of
19 here quickly for you.
20     A.  Okay.
21     Q.  The first rule is, we have a court reporter, Tim,
22 here taking down everything we say.  But Tim cannot take
23 down two people talking at the same time.  So it's very
24 important that we not talk over each other.  So you may
25 anticipate my question and anticipate the answer and want to

6

1  answer quickly.  And I understand that, but I ask that you
2  just hold your -- hold your tongue until I finish the
3  question, and then you can answer it and I won't -- I'll do
4  my best also to not interrupt you.  Does that make sense?
5      A.  Yes.
6      Q.  Also, because the court reporter is taking down
7  what we say, you have to give audible answers.  So nodding
8  your head or shaking your head or ums and ahs are -- don't
9  work.  You have to audibly answer the question.  Do you
10 understand that?
11     A.  I understand.
12     Q.  If at any point in time you don't understand a
13 question or you need clarification, just ask me and I'll
14 clarify it, but if you answer the question, I'm going to
15 presume that you understood the question I asked.  Okay?
16     A.  Okay.
17     Q.  Okay.  You may from time to time hear opposing
18 counsel say what's called "objection to form."  That's fine.
19 You still have to answer the question.  Do you understand
20 that?
21     A.  Yes.
22     Q.  Okay.  Perfect.
23         So you are currently employed with City of Miami
24 Beach, correct?
25     A.  Yes.

7

1      Q.  How long have you been employed with the City?
2      A.  In June -- on June 4th will be 20 years.
3      Q.  And did you work in law enforcement prior to
4  working at the City?
5      A.  Yes.
6      Q.  Where did you work?
7      A.  City of Hialeah Police Department.
8      Q.  Okay.  And then, I presume you went from Hialeah
9  to the beach?
10     A.  Yes.
11     Q.  What is your current rank at the beach?
12     A.  My current rank is Sergeant of police -- police
13 Sergeant, rather, I'm sorry.
14     Q.  And when were you promoted to Sergeant?
15     A.  I was promoted to Sergeant December 25th, 2018.
16     Q.  Okay.  And currently as a Sergeant, like, what is
17 -- what are your responsibilities?
18     A.  Currently, my role as Sergeant, I currently
19 oversee the intelligence unit.  We deal with classified
20 cases, we deal with hate crimes, we deal with dignitary
21 protection, we deal with a multitude of different things.
22     Q.  What did you do before that?
23     A.  Before that, I was assigned as a supervisor in the
24 special events -- in the special events unit.
25     Q.  Okay.  And then, before that?

8

1      A.  Before that I was assigned to the criminal
2  investigation unit.
3      Q.  Okay.  Were you ever a supervisor on patrol, just
4  out of curiosity?
5      A.  I was a supervisor on patrol when I first got
6  promoted for my probationary time, which was nine months,
7  yes.
8      Q.  Okay.  Perfect.
9         Are you a member of the Fraternal Order of Police,
10 Lodge 6?
11     A.  I'm a proud member, yes, sir.
12     Q.  I figured as much.
13         And can you explain the role of --
14         Well, first of all, what is the FOP?  Let's start
15 with that.
16     A.  It's basically a -- the -- to break it down into
17 simple forms, it's a police union that obviously engages
18 with management and -- and ensure that the rights of
19 officers, rights and benefits, rather, of officers are --
20 are not being violated, are protected.
21         And then, we do have some sort of engagement at
22 times with City management, as well as management within the
23 police department to plan and to partner, if you want to
24 say, staffing, of certain events.  We have labor -- we have
25 labor management meetings on certain issues depending on

Sgt. Reginald Lester

9

1  what the issues are.  The union should be there or the union
2  is there to work on behalf of the members, of the FOP for
3  the better good of the organization and the FOP.
4      Q.  And in fact, you and I have been involved in labor
5  management meetings together in the past, correct?
6      A.  Yes, we have.
7      Q.  Okay.  And would it be fair to say that the FOP as
8  -- as the union and the representative of the members of the
9  bargaining unit at the City of Miami Beach, has a lot of
10  different functions.  It's multifaceted, but one of the main
11  functions is to protect the rights of its membership when it
12  comes to disciplinary issues, like termination, suspensions,
13  write-ups, all those types of things; is that fair to say?
14      MR. BARROUKH:  Objection.  Form.
15  BY MR. ELKINS:
16      Q.  You can answer.
17      MR. BARROUKH:  You can answer.
18      THE WITNESS:  It's -- it's partially fair to say
19  depending on the circumstances.  The reason why I would
20  say that is that there are certain issues of such, of
21  like this case, where the union itself wouldn't
22  necessarily navigate certain parts of a grievance or
23  disciplinary hearing.  There would be an attorney,
24  someone who actually practices law and understands
25  things on a better multitude, not that we don't

10

1  understand, but someone who is in the weeds every day
2  with these types of issues.
3      So there are -- there are times that the union do
4  yield to -- to our counsel taking responsibility to
5  handling certain situations, sir.
6  BY MR. ELKINS:
7      Q.  Absolutely.  And so, let me clarify the question.
8  Part of representing -- part of the union role in
9  representing and advocating for the rights of its membership
10  is that the union actually has an attorney that it basically
11  has on staff to represent membership, correct?
12      A.  Yes.
13      Q.  That attorney is Eugene Gibbons; am I right?
14      A.  Yes.
15      Q.  And oftentimes, Mr. Gibbons will get involved in
16  cases involving disciplines, terminations, or any kind of
17  issue where there may be a problem or a concern with an
18  employee's rights, correct?
19      A.  Yes.
20      Q.  Okay.  And that's part of what the union offers
21  its membership in the context of advocating for and
22  protecting employee rights, correct?
23      A.  Yes.  Yes.
24      Q.  Okay.  That's what I was getting at.
25      And what's your current position with the union?

11

1      A.  I'm currently the First Vice President.
2      Q.  Okay.  And how long have you been in that role?
3      A.  Just got in that role, I think it was twenty
4  twenty -- 2023, if I'm not mistaken.  Yeah, 2023 was when we
5  was sworn in, if my -- if my recollection is correct.
6      Q.  And then, prior to that, were you the Second Vice
7  President?
8      A.  Yes, I was the Second Vice President.
9      Q.  Okay.  So explain to me what your duties were as
10  Second Vice President.  What was your -- what did that
11  entail?
12      A.  Well, basically, Second Vice President you have
13  somewhat the same duties, not on a daily basis, but when
14  needed.  You may have to stand -- stand in for the President
15  when the President is not available for meetings, or you may
16  have to partake in labor management and some of the other
17  meetings that come up on behalf of the union.  It's no
18  different than any other vice president role in any other
19  organization.  You are the second in command -- I'm sorry --
20  you are the third in command if you're Second Vice
21  President -- I'm sorry -- because you have President, you
22  have First Vice President, and then, you have the Second
23  Vice President.
24      So on certain issues, you are -- if you're called
25  as Second Vice President, you'll be there -- usually -- it

12

1  doesn't happen that much, but you will be there as if you
2  was the President to fill the role of the presidency.
3      Q.  And did you also participate in the grievance
4  meetings and meetings with management about maybe grievances
5  or discipline or potential discipline and things like that?
6      A.  You do.  But it all depends.  Usually, the second
7  -- it all depends on the -- on the availability of the
8  President.  It also depends on if the President includes
9  you.  There is nothing written in stone that the President
10  has to include you in -- in those type of sessions.
11      But it varies.  I'll be honest with you.  It
12  varies from issue to issue.  Unfortunately, there's nothing,
13  no structure of how, you know, how -- what type of events or
14  what type of meetings you will sit in on.  Sometime it may
15  not be a President, or it may be a Trustee or it may be a
16  committee chair.  So it varies depending on the issues.
17      Q.  Right.  And I wasn't -- let me clarify.  I wasn't
18  asking if you're required to be in those meetings.  I was
19  asking if you personally in your role, did you have occasion
20  to be part of meetings involving potential discipline of
21  employees, in general, as a union member?
22      A.  In general, yes.  In general, I've sat in on some
23  of those meetings, yes, not all of them, but some of them,
24  yes.
25      Q.  Understood.  And that's certainly not unusual,

---

13

1  correct?
2      A.  No, that's not unusual.
3      Q.  In fact, it's -- it is required that if there's
4  going to be a meeting regarding employee discipline, that
5  the employee have a member of the union present, correct?
6      A.  Yes, they're entitled to representation.
7      Q.  Okay.  Perfect.
8          Are you familiar with Jessica Guasto, now
9  Salabarria, formerly Guasto?
10     A.  I am familiar with her.
11     Q.  Okay.  What's the basis of your familiarity?
12     A.  A co-worker.  I know that she was a Sergeant in
13  our organization.  Obviously, in this particular situation,
14  I do remember attending a meeting.  I don't know how much --
15  you know, depending on your questions, how much I know as to
16  what is going to be asked of me.
17         I don't know much about her.  I know that she was
18  obviously married to Nick Guasto, who is an associate of
19  mine that I know.  That's pretty -- that's pretty much it.
20  I've never had dinner with her or never hung out with her
21  outside of work or, you know, we are not friendly in terms
22  of that level, in terms of, you know, that type of
23  friendship.
24         I'm kind of like a guarded guy.  I kind of put my,
25  you know -- respectfully, I put relationships in the

---

14

1  proper -- I like to call it the proper files.  And, you
2  know, the only thing I know is we had a professional work
3  relationship -- that's it -- when need be, you know, when
4  issues arise.  That's it.
5      Q.  Did you ever have occasion to supervise her?
6      A.  No.  I never supervised her.  She -- she actually
7  got promoted -- excuse me.  She actually got promoted on the
8  same list that I got promoted from, if I'm not mistaken.
9  But she scored higher than I did, so I wouldn't have
10  supervised her.
11     Q.  Got it.
12         Did you talk to anybody about this deposition
13  before coming here today?
14     A.  No.
15     Q.  So you didn't talk to Nick?
16     A.  I don't think I -- oh, let me correct that.  I
17  think I told him that I had a deposition, and I didn't know
18  where it came from because it kind of came out of nowhere.
19  And we didn't have much further conversation about her or
20  obviously, about the incident because obviously, Nick has
21  moved on with his life.  You know?
22     Q.  Did you tell Nick it was in relation to his now
23  ex-wife's lawsuit against the City?
24     A.  I don't remember the exact wording of what I said
25  to Nick, but I did have a conversation with Nick.

---

15

1      Q.  But you generally told him, hey, I'm -- generally
2  speaking -- I'm not saying this is the exact words you
3  said -- look, I'm being deposed in Jessica's lawsuit against
4  the City?
5          MR. BARROUKH:  Objection.  Form.
6  BY MR. ELKINS:
7      Q.  You can answer.
8      A.  Repeat the question.
9      Q.  I'm not trying to hold you to your exact words.
10  What I'm asking is:  Did you tell Nick, whatever words you
11  used, that you were being deposed in his ex-wife's lawsuit
12  against the City of Miami Beach?
13         MR. BARROUKH:  Objection to form.
14  BY MR. ELKINS:
15     Q.  You can answer.
16     A.  Yeah.  I -- I told him what I just said earlier.
17  I told him that I had gotten a depo.  I didn't know where it
18  came from.  And there was not a followup lengthy
19  conversation about it, because as I said, Nick has moved on,
20  and he doesn't necessarily want to hear much about Jessica.
21  So, you know, obviously, I respect that.  And we moved on.
22     Q.  What did he say, though, if anything, when you
23  told him that you were being deposed in this case?
24     A.  I can't recall what he said.  I can't recall what
25  he said.

---

16

1      Q.  It was not anything memorable, I take it?
2      A.  It may have been, but I can't recall.  I don't
3  know --
4      Q.  Okay.
5      A.  -- to be honest with you.  I didn't -- I didn't
6  record my conversation or take tabs on what me and Nick
7  talked about in terms of when I let him know.  It was -- it
8  was -- like I said, the reason why I did it was because it
9  was very, you know, some time period has went by, I had
10  heard that other people had been depo'd.  And it was just
11  kind of weird out of nowhere that I was being depo'd or
12  being subpoenaed, rather, not depo'd, being subpoenaed --
13     Q.  Yeah.
14     A.  -- about the situation.  That's it.
15     Q.  Okay.  Fair enough.
16         And other than Nick, you didn't talk to anybody
17  else about it?
18     A.  No.
19     Q.  Okay.  Perfect.
20         Are you familiar with Jessica's claim against the
21  City?
22     A.  No, I'm not.
23     Q.  Okay.  So Jessica has sued the City and she is
24  alleging that her termination or her separation from
25  employment that occurred in January of 2021 is retaliatory

---

Sgt. Reginald Lester

17

1  and in retaliation for her filing an EEOC charge of
2  discrimination in June or July of 2020.  Do you understand
3  that?
4      A.  I understand.
5      Q.  Okay.  Now, you were part of -- correct me if I'm
6  wrong -- a meeting that took place on January 19th, 2021
7  with the Chief of Police -- I think Wayne Jones was there,
8  A.J., Steven Cosner, Paul Ozaeta, Arley Flaherty, and Delvin
9  Brown.  Do you recall that meeting?
10     A.  I recall that meeting in the Chief's office, yes.
11     Q.  Okay.  Prior to that meeting, did you have any
12  involvement in any grievances or discipline or anything
13  related to Jessica?
14     A.  Yes, not a grievance, but I think, if I'm correct,
15  prior to that meeting or its -- this thing is so cloudy to
16  me -- there was at some point Jessica was relieved of duty.
17  I can't remember if it was reference to the same incident of
18  which she -- of the reason why we was in the Chief's office
19  for the meeting.
20         But I remember responding to Internal Affairs for
21  them at some point.  I remember going to Internal Affairs so
22  they can inventory her vehicle, her marked unit, rather.
23  And then, I also remember going to the station so they can
24  clean out her locker.
25         And like I said, I think, from what I recall, it

18

1  was reference -- it was reference to something, man.  I
2  can't recall if it was this or if it was an investigation
3  that had happened prior.
4      Q.  Fair enough.
5         Do you happen to recall maybe what year that --
6      A.  No, I don't recall, man.  I don't --
7      Q.  Fair enough.  And I don't want to guess.
8         So other than being what it sounds like working
9  with Internal Affairs, and then being present when they
10  inventoried her vehicle and cleaned out her locker, did you
11  have any other involvement in any of Jessica's multiple, you
12  know, former EEOC charges, grievances, disciplinary issues,
13  anything like that prior to this meeting?
14     A.  No.  No, not that I recall.  That's the only thing
15  that I've ever been involved in.
16     Q.  Fair enough.
17         How is it that you came to be at this meeting on
18  January 19th, 2021?
19     A.  If I recall correctly, I think I was notified by
20  Paul Ozaeta to attend the meeting because Paul Ozaeta, if
21  I'm correct, had gotten sick.  I don't think he personally
22  was there at the meeting.  I think he was on Zoom.
23     Q.  Did he --
24     A.  And -- I'm sorry?
25     Q.  He attended -- he just attended by Zoom?

19

1      A.  Yeah.  I'm going through it, right?  So he was
2  there on Zoom.  I think he notified me that there would be a
3  meeting, if I'm not -- if I'm correct, rather, and I
4  attended the meeting in person.  I was not -- the next
5  person in command of the structure of the union was Arley
6  Flaherty, but I was put in the position to go to the meeting
7  as well.
8         And so, I attended the meeting obviously at the
9  request of Paul Ozaeta saying I need to be there.  And that
10  was the reason.
11     Q.  And at the time, Paul Ozaeta was the FOP
12  President, correct?
13     A.  Yes, he was.
14     Q.  And in terms of the FOP, also present at the
15  meeting I think you mentioned was Arley Flaherty, who was
16  the FOP First Vice President, you were the Second Vice
17  President, and then, Delvin Brown, who was a then
18  Lieutenant, now Captain I think, who was the FOP Grievance
19  Chairman.  Correct?
20     A.  I don't recall.  I'm not saying that he wasn't
21  there.  I actually -- let me think, because -- yeah, you're
22  right.  You're right.  You're right.  You're right.  Yes.
23     Q.  So at this meeting, with the Chief of Police, Rick
24  Clements, at the time, and Wayne Jones, the Deputy Chief,
25  and Steven Cosner, Lieutenant, and A.J. Prieto, the Captain

20

1  of Internal Affairs, Jessica was represented by not one, but
2  four FOP members, correct?
3      A.  Yes.  But for myself, I think when Paul called me,
4  I think I got called because there was some trust issues
5  with Jessica and Arley Flaherty, so I got called as kind of
6  like the lead person.  And my question to that was:  I
7  reached out to Paul and I requested because of the totality
8  of the circumstances, and, you know, this being one of those
9  complicated situations of past history of this whole thing,
10 that I had asked that the union President -- I'm sorry --
11 the union attorney be allowed to attend the meeting or be
12 the one that should attend the meeting as the lead.  And
13 that request at some point was denied through the Chief's
14 office.  And the meeting had to take place.  So that's how I
15 got involved.
16     Q.  Who did -- who did you make that request to?
17 Paul?
18     A.  That request -- that request was made -- that
19 request was made through my conversation when I was told
20 that I needed to go to this meeting.  And I even think that
21 Jessica even made that request.  And -- and when that
22 request came back down, they said, no, the meeting has to
23 take place.  And that's when, like I said, I had -- I had to
24 attend the meeting.
25     Q.  But who did you specifically make that request to?

Sgt. Reginald Lester

---

21

1    A.  I think when I -- when I initially was told about
2  the meeting, I -- I think that I had conversation with --
3  with -- obviously, with Paul, if I'm not mistaken.  I don't
4  know if there's any documentation of emails of it, not with
5  me and Paul, but documentation through the Chief's office to
6  say that that was the scenario.
7         But I do remember that was a conversation as it --
8  as it pertains to the representative of the -- actual
9  attorney of the union being present for the meeting.  And
10 they denied it.
11     Q.  No, I understand that.  But I just want to lock
12 down here who you made the request to.  Did you make it to
13 Paul Ozaeta?
14     A.  If I -- if I recall, I think I may have made the
15 request -- or, like I said, I know Paul was -- was out sick,
16 so I don't remember -- I may have made the request to Paul.
17        I don't know -- to be honest with you, three years
18 later, I don't know.  It would be unfair to me to say that I
19 did make the request or ask the Chief about it.  You know?
20 But I do recall that someone gave me the answer to say that
21 it was denied and that the meeting needed to take place.
22     Q.  Who was that someone?
23     A.  I can't recall at this time, sir.
24     Q.  Okay.  That's fine.
25     A.  It's unfair.

---

22

1     Q.  No, no.  You can only remember what you can
2  remember.  It's -- it was a long time ago.
3         Would it be considered odd that the President of
4  the FOP and the First Vice President and the Grievance
5  Chairman would let the meeting go forward if there was a
6  request for the union lawyer to be there that was denied?
7     A.  I don't know if the First Vice President was made
8  aware of that.  I was told that initially she was not
9  notified through the union about the meeting, because like I
10 said, there was some trust issues there with -- of concern
11 with Jessica.
12        And so, obviously, as a union, what we try to do
13 is, even though, you know, it's a -- it's a internal issue,
14 we try to make sure that members feel comfortable with
15 whoever's going to represent them.  If there's past history
16 or whatever it may be, you know, whatever the issue may be,
17 we try to resolve it without going to the meeting and
18 causing something to be worse by the person feeling like
19 they didn't get proper representation.
20        So I don't -- I'm not for sure how -- you would
21 have to ask her.  I'm not for sure how Arley was notified
22 about the meeting.  But I was notified through Paul.  And it
23 was my understanding that I was the one that was at the
24 forefront of the meeting.
25     Q.  Right.  But my question was:  Would it be unusual

---

23

1  that given all of this FOP leadership in the meeting, the
2  President, you, the Arley, the First Vice President, you,
3  the Second Vice President and the Grievance Chair, that the
4  FOP would allow the meeting to even go forward if there was
5  a request to have a lawyer there and that request was
6  denied?
7        MR. BARROUKH:  Objection.  Form.
8  BY MR. ELKINS:
9     Q.  You can answer.
10    A.  I can't -- I can't state that that is true only
11 because I don't know -- I can't testify to what was said to
12 President Ozaeta.  And I can't testify to other things that
13 other people may have had a part in.  Like, I don't know,
14 you have to ask, you know, the Grievance Chair, who is now
15 our Captain, that question.
16        Like I said, I personally brought up the issue and
17 I think Jessica brought up the issue about an attorney being
18 present.  You know, on these type of issues I think it's to
19 betterment of everybody.  It's to the betterment of the
20 member.  It's to the betterment of the Chief's office.  And
21 it's to the betterment of the City that at the caliber of
22 case it was, that an attorney be present.  Right?
23        If we go to Internal Affairs on a serious case, we
24 don't go there with a FOP rep.  Yes, FOP reps are
25 knowledgeable.  We have a lot of institutional knowledge in

---

24

1  how things work, we know policies, we know procedures but we
2  don't practice law.  You know?  And there are certain things
3  as a -- per -- per the policy, there are certain things that
4  an attorney can do that an actual person who is just a rep
5  cannot do.  You know?  And that's just -- that's the way it
6  is.
7     Q.  Why didn't you stop the meeting?
8     A.  I was told that the meeting was going to take
9  place, so I showed up to the meeting.
10    Q.  Who told you that?
11    A.  I was notified by Paul that I -- that the meeting
12 was going to take place and that it was not going to have an
13 attorney present.  I mean, they was not going to wait.  I
14 think there was a conflict in Gene's schedule or something.
15 And they was going to -- they wasn't going to wait, that the
16 meeting was going to take place, so I showed up to the
17 meeting, sir.
18    Q.  And Paul Ozaeta told you that?
19    A.  Like I said, I think Paul Ozaeta told me that and
20 I -- I am not sure if there was a followup conversation with
21 Chief Clements as well about that, to be fair.
22    Q.  Okay.  Why, though, if you believed an attorney
23 should be present, did you, as the then Second Vice
24 President, not stop the meeting and say, hey, there's no
25 lawyer here, this can't go forward?  Why didn't you do that?

---

Sgt. Reginald Lester

---

**25**

1    A.  Well, to be honest with you, I didn't know what
2 type of meeting it was going to be until, you know, in terms
3 of stopping it like that until, like I said, I want to say
4 it was more a request of Jessica that her attorney be
5 present.  Right?
6         So I was just kind of, like, pushed in this at the
7 last minute and wasn't involved in any sort other than, you
8 know, the things that I told you about.  So it was kind of
9 like you get thrown in the battle.  You know, I showed up to
10 the meeting and -- and, you know, obviously, the rest is
11 history, sir.  I don't know what to tell you.
12    Q.  When you say that Jessica made the request, did
13 she make that request to the union before the meeting; is
14 that what you're referring to?
15    A.  I don't -- I don't know who she made the request
16 to, to be honest.  I don't know if she made it to the union.
17 I don't know if she made it directly to the Chief.  I don't
18 know if she made it directly to the City.  You would have to
19 ask her that.  And there would have to be some sort of
20 documentation to support that, obviously.
21    Q.  How do you know she made the request at all if you
22 don't know who she made it to or when she made it?
23    A.  I told you I think that there was a conversation
24 as it pertains to that, that that's what occurred.  But like
25 you said, maybe it didn't occur.  I don't know.

---

**26**

1    Q.  I know you're saying you think there was a
2 conversation.  That's fine.  But I'm asking you:  Do you
3 know who that conversation was between and if --
4    A.  No, sir.
5    Q.  -- what people?  Okay.  The answer is "no"?
6    A.  No.
7    Q.  During the meeting itself, during the actual
8 meeting -- well, actually let me back up.
9         Did you arrive at the Chief's office where the
10 meeting took place before the meeting, like, before Jessica?
11    A.  Yes.
12    Q.  And did you have any conversations with the Chief
13 or Wayne or Cosner or A.J. before the meeting started?
14    A.  I didn't have any conversation with A.J.  I
15 remember there was some conversation with the Chief in his
16 office.  I think for that conversation, I think the
17 Grievance Chair was there, I think.  I think Arley was
18 there.  And I'm not for sure, I think Cosner came in at some
19 point.  I'm not for sure if he was there for the whole
20 conversation, but he did come in at some point.  I do
21 remember him coming in.
22    Q.  Do you remember what that conversation was?
23    A.  In terms of who?
24    Q.  Anybody.  You were in this -- you were in this I
25 guess what would be like a pre-meeting before Jessica

---

**27**

1 arrived, before the official meeting started.  I'm asking
2 what were you guys talking about before she got there, if
3 you remember?
4    A.  The only thing -- the only thing I can tell you is
5 that I remember my concern as a representative of the union
6 was the allegations of why that meeting was called was
7 because Lieutenant Cosner allegedly, or however you want to
8 put it, said -- wrote -- he -- there was a write-up on
9 Jessica because Jessica had worked overtime shift, and that
10 night in particular Jessica was at some point identified not
11 to be in the area where she was supposed to be supervising
12 officers.  And she was at the station, if I recall
13 correctly.  And there was some back and forth about that.
14 Cosner spoke on it briefly to the Chief.  I don't remember
15 exactly what he said.
16         My -- I don't know if Cosner was in the room or if
17 he was out of the room.  I think we actually was in the room
18 with everybody, and then we left the room.  And then, we
19 came back in the room where it was just me and the Chief.
20 And I want to say Cosner wasn't in there.  Arley Flaherty --
21 and I can't recall if -- if Captain Brown was present for
22 that conversation.  But I remember at some point, whether it
23 was initially, I don't think it was when Cosner was in the
24 room out of due respect, to not get into a back and forth.
25 But I do -- I did say to the Chief, that I felt that

---

**28**

1 termination for that incident did not meet the -- that the
2 violation, rather, did not meet the grounds for termination
3 for that incident.  There was a conversation about that.
4 And I was told that it wasn't just possible termination for
5 that incident, it was because of a Last Chance Agreement
6 that was signed by Jessica.  That's what I was told.
7         I respectfully, right, within the right parameters
8 not compiling everything because I wasn't there, I wasn't
9 called in that meeting for everything that had happened.  I
10 was called in that meeting to deal with the situation that
11 happened between Jessica and Cosner.
12         There was also some conversation in the room about
13 allegations where Jessica had said something had happened
14 between her and Cosner or Cosner was after her because she
15 turned him down.  You know, Cosner said that wasn't true.
16 And that the bottom line is, is that he felt that his
17 write-up was appropriate to the violations of what Jessica
18 had did that night.
19         And I -- like I said, I still -- still disagree
20 that if we was just there for that meeting to talk about the
21 write-up, that the actual discipline for that write-up still
22 did not meet -- meet the grounds for termination.
23         And I was just -- that was the point that I
24 provided.  I can't tell you exactly what everybody else
25 said, Mr. Elkins.  You're on mute.  You're on mute.

---

Coastal Reporting, Inc.
(954) 523-5326

29

1    Q.  You think I would have that figured out by now.
2    First of all, you were told that Jessica was on a
3 Last Chance Agreement, correct?
4    A.  I was told that after I brought up my point.
5    Q.  I understand.  I'm not trying to implicate that
6 your point was wrong or trap you.  I'm just trying to make
7 sure I lay down what you knew at the time you made that
8 prior to -- before when you said this incident doesn't meet
9 the grounds for termination, what you were referring to I
10 think was that under the just cause standard, which is
11 articulated in the Collective Bargaining Agreement, it
12 wouldn't meet the standard for termination; is that right?
13        MR. BARROUKH:  Objection.  Form.
14 BY MR. ELKINS:
15    Q.  You can answer.
16    A.  Yes.  I think you're on point in terms of your
17 explanation.  You know, I think more serious than that,
18 obviously like I said, the write-up did not meet the grounds
19 for termination.  And the problem that I had was -- was that
20 we was there to discuss the write-up.  Right?  We wasn't
21 there to discuss any Last Chance Agreement.  That was not
22 the predetermination hearing part of that.  We was there to
23 only discuss that write-up.  So that was why I brought up
24 the issue.
25    Q.  Let's --

30

1    A.  That was not -- that was not a predetermination
2 hearing that I recall.
3    Q.  That's true.  But let's step back, Mr. Lester.
4    A.  Yes, sir.
5    Q.  For a moment.  Sergeant --
6    A.  Yes, sir.
7    Q.  -- you are familiar with what a Last Chance
8 Agreement is, correct?
9    A.  I was not familiar with the terms of Jessica
10 Salabarria's Last Chance Agreement.  I was not familiar with
11 it.  I know what the terminology means, correct, I'm not --
12 I'm not blind to that or anything, but I was -- I did not go
13 and do my research, like I said, because I wasn't there -- I
14 was never involved in this whole situation when the Last
15 Chance Agreement was done, which was with an attorney -- I
16 wasn't involved under that Last Chance Agreement.  And so,
17 my part -- my part of being there was to address the issue
18 of what happened some months prior.  Because the meeting was
19 -- the meeting was scheduled pretty quick, if I'm not
20 mistaken, sometime prior to the incident happening.  I was
21 there to address that.  So I was only there dealing with
22 that.  You can't -- you can't pull other stuff into this
23 meeting because it's unfair to me.
24    Q.  Mr. Lester, I'm not -- I'm not trying to do that.
25 Listen to my question.  It's very simple:  Generally

31

1 speaking, do you know what a Last Chance Agreement is?  I'm
2 not talking about Jessica.  Generally speaking, as a member
3 of the FOP, as the now First Vice President and the then
4 Second Vice President and someone who's dealt with labor and
5 management relation issues and is a 20-plus year police
6 officer, do you generally understand or know what a Last
7 Chance Agreement is?
8    A.  Yes.
9        MR. BARROUKH:  Objection.  Form.
10 BY MR. ELKINS:
11    Q.  You can answer.  Is your answer "yes"?
12    A.  Yes.
13    Q.  Okay.  And you understand that generally
14 speaking -- we're not talking about Jessica -- a Last Chance
15 Agreement oftentimes contains a provision that says that the
16 employee can be fired without a predetermination hearing,
17 without their rights under the Collective Bargaining
18 Agreement.  They effectively give up those rights in
19 exchange for being given a last chance.  Are you familiar
20 with that concept?
21        MR. BARROUKH:  Objection.  Form.
22        THE WITNESS:  Yes.
23 BY MR. ELKINS:
24    Q.  Okay.  And I understand at the time you were
25 saying that the write-up didn't meet the grounds for

32

1 termination, you did not know that Jessica had a Last Chance
2 Agreement, correct?
3    A.  I was told -- I was told by the Chief in
4 conversation.
5    Q.  Understood.
6        And have you ever read that Last Chance Agreement?
7    A.  No, I haven't.
8    Q.  Okay.  I will represent to you that Jessica's Last
9 Chance Agreement signed well before the meeting that you
10 attended effectively makes her an employee at-will.  She
11 gave up her rights under the Collective Bargaining
12 Agreement.  And the agreement allowed the Chief to terminate
13 her for just about any reason without the requirement for a
14 predetermination hearing.  Do you understand that?
15    A.  Yes, sir.
16        MR. BARROUKH:  Objection.  Form.
17 BY MR. ELKINS:
18    Q.  Okay.  So when you say, well, we weren't here to
19 talk about the Last Chance Agreement, you understand that once an
20 predetermination hearing, you understand that once an
21 employee, not just Jessica, but any employee, once they sign
22 a Last Chance Agreement, any potential discipline that comes
23 after that obviously relates to the Last Chance Agreement?
24        MR. BARROUKH:  Objection.  Form.
25 BY MR. ELKINS:

33

1      Q.  You can answer.
2      A.  Yeah, I think you was making a statement and
3  wasn't asking a question.
4      Q.  No, I'm asking a question.  Do you understand that
5  once any employee signs a Last Chance Agreement, any
6  potential discipline that comes after that will obviously
7  implicate the Last Chance Agreement because they've
8  generally given up their rights under the CBA?
9      MR. BARROUKH:  Objection to form.  You're
10  testifying right now.
11      MR. ELKINS:  No, I'm not.  Actually, I'm asking if
12  he understands that.  And he's not your client.
13      MR. BARROUKH:  You can ask -- you can ask him a
14  question, but you cannot tell him what to say, please.
15      MR. ELKINS:  I'm not telling him what to say.  I'm
16  asking him if he understands it.  And stop making
17  speaking objections or I'll go to the judge and he can
18  tell you.  You can object to form and leave it at that.
19  BY MR. ELKINS:
20      Q.  You can answer.
21      A.  You've kind of got me all over the place, because
22  you talk about Jessica and you talk about other employees.
23  Like, are we going to stick to Jessica or are we going to
24  stick to other employees?  Because my answer to that is when
25  you start talking about other employees, then my whole

34

1  response to that is then why even have that type of meeting?
2  Right?
3      So if they are on the Last Chance Agreement and
4  they're at-will, then for other employees, right, for other
5  employees, then there's no need to have that meeting.  You
6  know?
7      Q.  I'm not talking about --
8      A.  There's a Last Chance Agreement.  So I'm just
9  telling you that I -- I only dealt with the incident on my
10  mindset.  And maybe it was the wrong mindset.  Shame on me.
11  Or maybe it was the fact that I was called in this meeting
12  and pushed in the meeting at the last minute.  Okay?  But I
13  was dealing with the issue at hand.  That's what I thought I
14  was going to that meeting and deal with, the issue at hand.
15      Obviously, it's a complicated situation to your
16  point because there is a Last Chance Agreement.  And I do
17  understand the Last Chance Agreement.  And I did not review
18  the, you know, the language of the Last Chance Agreement
19  because at the end of the day, I didn't think that it was a
20  predetermination hearing, sort of type thing.  And if I'm
21  correct, at some point after the original meeting, this
22  meeting that you're talking about, there was another meeting
23  where that was grounds for the type of conversation.
24      Q.  That's incorrect, but anyway.  You're incorrect on
25  that point.

35

1      But nonetheless, you understand, though, if
2  Jessica had a Last Chance Agreement, which she did, and her
3  Last Chance Agreement said that she was an employee at-will,
4  she basically waived her rights to a predetermination
5  hearing; do you understand that?
6      A.  Yes.
7      MR. BARROUKH:  Objection to form.
8  BY MR. ELKINS:
9      Q.  Okay.  So at the time that you were advocating and
10  talking about a predetermination hearing, you understand
11  that that analysis -- or you would agree with me that that
12  analysis changes when there's a Last Chance Agreement?
13      MR. BARROUKH:  Objection.  Form.
14      THE WITNESS:  If -- yeah, it changes, but it also
15  changes in terms of the union in terms of how we deal
16  with that.
17      And so to your point, because it was a Last Chance
18  Agreement, to me, you know, then there shouldn't be --
19  there shouldn't have been a denial of an attorney to be
20  present.  You know?
21      At the end of the day, you know, because I didn't
22  know -- I didn't -- there was an attorney that deal
23  with that Last Chance Agreement.  And if you're going
24  to say that the Last Chance Agreement was a part of
25  what was highlighted, which is true, all your -- all

36

1  your take on that is true, because I wasn't the person
2  that dealt with that part, then the FOP itself, the
3  union President, I don't know -- you know, I don't want
4  to speak out of turn, but I don't know if the union
5  President had to sign the Last Chance Agreement.
6      But that -- that Last Chance Agreement was not --
7  was not negotiated or settled by -- it may have the
8  title of the FOP at some point on it out of formality,
9  but there was an attorney, which I think was Gene that
10  was involved or someone.  If not, then it was just
11  herself that was involved in that Last Chance
12  Agreement.  And I have no knowledge of that.
13  BY MR. ELKINS:
14      Q.  Understood.  And I'm going to show you the Last
15  Chance Agreement here in a minute.
16      A.  Okay.
17      Q.  But the denial of the attorney -- let me ask it
18  this way:  Did Chief Clements ever tell you directly she
19  couldn't have an attorney there?
20      A.  I can't recall if Chief Clements told me that
21  directly.  I can't, to be honest, to be fair.
22      Q.  That's fine.  Did A.J. Prieto ever tell you that
23  she could not have an attorney there?
24      A.  I never had any conversation with A.J. Prieto.
25      Q.  Did Wayne Jones ever tell you she could not have

37

 1   an attorney there?
 2       A.  No, I never had any conversation with Wayne Jones.
 3       Q.  Okay.  And sitting here today, you don't remember
 4   who it was that told you she could not have an attorney
 5   there?
 6       A.  I don't know.  The only two people that it would
 7   have been was either Paul Ozaeta or Chief Richard Clements.
 8   And to be fair, I can't say to be exact who.  But there was
 9   a conversation about it.
10       MR. ELKINS:  Okay.  Let's take a three-minute
11   break so I can grab a document and we'll come right
12   back.
13       THE WITNESS:  Yes, sir.
14       (Recess was taken.)
15       MR. BARROUKH:  Michael, are you thinking you're
16   going to need a lunch break at any point?
17       MR. ELKINS:  No.
18       MR. BARROUKH:  Okay.
19       THE WITNESS:  We're not going to go that long,
20   Michael?
21       MR. ELKINS:  What's that, Sergeant?
22       THE WITNESS:  I said if we're not going to need a
23   lunch break, that means we're not going to go that
24   long?
25       MR. ELKINS:  That's exactly what that means.

38

 1       THE WITNESS:  Perfect.
 2       MR. ELKINS:  Unless Daniel's going to keep you,
 3   but I don't see that happening.
 4       THE WITNESS:  Okay, thank you.
 5       MR. ELKINS:  Daniel, do you need a lunch break?
 6       MR. BARROUKH:  If we could take 15 minutes at some
 7   point, unless you don't think it's going for another
 8   hour, but --
 9       MR. ELKINS:  I don't -- I don't have that much
10   more for him, so unless you plan --
11       MR. BARROUKH:  Okay.  Well, you had this scheduled
12   until 3:00 P.M, so I wasn't sure what you -- how much
13   longer you wanted and I didn't want to rush you either.
14       MR. ELKINS:  I appreciate that.  We are getting
15   close.  He's answering the questions.
16       MR. BARROUKH:  Okay.
17       MR. ELKINS:  So yeah, we'll see where we are in
18   around 30 minutes or so.  I'm going to probably have
19   another hour.
20       MR. BARROUKH:  Okay.  So then -- so then how about
21   this:  Can we take a 15-minute break at 1 P.M.?
22       MR. ELKINS:  Okay.  Perfect.  Thank you.
23   BY MR. ELKINS:
24       Q.  Okay.  Sergeant, I'm going to show you -- I've got
25   to find the -- one second.  Okay.  All right.  I'm showing

39

 1   you what I'm marking as Exhibit 1.  Do you see this
 2   document?
 3       A.  Yes, sir.
 4       (Deposition Exhibit Number 1 marked for
 5   identification.)
 6   BY MR. ELKINS:
 7       Q.  Okay.  I will represent to you here at the top of
 8   this document it says:  "Settlement Agreement" that's
 9   entered into between the City, Jessica and the FOP.  Do you
10   see that?
11       A.  Yes.
12       Q.  On the --
13       A.  Uh-huh.
14       Q.  Okay.  Great.  I'm going to scroll down.  You see
15   these signatures at the bottom on each page?
16       A.  Yes.
17       Q.  Okay.  I'm going to scroll to the bottom.
18       And I'll represent to you you'll see Kevin Milan
19   signed this Settlement Agreement on behalf of the FOP; do
20   you see that?
21       A.  Correct, yes, sir.
22       Q.  Okay.  And part of the Settlement Agreement is the
23   Last Chance Agreement, which as you can see here, is between
24   the City, the FOP and Jessica; do you see that?
25       A.  Yes, I do.

40

 1       Q.  Okay.  And you can -- you see this is initialed on
 2   each page, right?
 3       A.  Yes, sir.
 4       Q.  There's an initial for the union here, correct?
 5       A.  Yes, sir.
 6       Q.  I'll represent to you that that is also Kevin
 7   Milan's signature; do you understand that?
 8       A.  Yes.
 9       Q.  And I'm going to scroll down.  Can you see here on
10   the Last Chance Agreement, Kevin Milan signed as the
11   President of the FOP; do you understand that?
12       A.  Yes, I do.
13       Q.  Does that change your mind as to whether or not
14   the union was party to or part of Jessica's Last Chance
15   Agreement?
16       A.  I never -- I never made that statement.
17       Q.  Okay.  Would you agree with me that the union is a
18   party to and part of this Settlement Agreement and Last
19   Chance Agreement given that the President signed it?
20       A.  I would agree.
21       Q.  Now, you see here where it says in Paragraph 4:
22   "The Chief of police shall exclusively assess and determine
23   employee's compliance with this agreement."  Do you see
24   that?
25       A.  Yes.

Sgt. Reginald Lester

41

1    Q.  Let's -- let me back up for one moment.  And you
2  see the date on this agreement is December 23rd, 2020,
3  right?
4    A.  Yes, sir.
5    Q.  That's before Lieutenant Cosner's allegations,
6  correct?
7    A.  I'm not sure.
8    Q.  Well, Lieutenant Cosner's allegations were from
9  December 27th.  So December 27th is after December 23rd,
10  correct?
11    A.  Correct.
12    Q.  And your meeting occurred in January of 2021,
13  correct?
14    A.  I would take your word, yes.
15    Q.  January 19th, I think, right?
16    A.  I'll take your word.  I don't -- I don't recall
17  exactly what day, sir.  I'll take your word.
18    Q.  Fair enough.
19         We could agree the meeting and the allegations
20  from Cosner all came after Jessica and the union and the
21  City all entered into this Last Chance Agreement, correct?
22    A.  Yes.
23    Q.  And you understand -- or I'm going to show you
24  here it says:  "The Chief of police shall exclusively assess
25  and determine employee's compliance with this agreement."

42

1  Do you see that?
2    A.  Yes.
3    Q.  It says:  "The Chief's decision as to compliance
4  with this agreement shall not be subject to any grievance
5  and/or review of any kind by Salabarria and/or the union and
6  is not subject to explanation or review."  Do you see that?
7    A.  I do see that.  And you're making my point, sir.
8  I'm not -- my involvement -- you don't see my signature on
9  any of that documents.  Okay?  You don't see my name on any
10  of those documents.  Kevin Milan was the President when
11  those documents happened.
12         I didn't bring up the Last Chance Agreement other
13  than the fact that I said that Chief Clements told me that
14  she was on the Last Chance Agreement.  I admitted to that.
15  I could have not told you that, but he told me that.  So I'm
16  going to be honest.  I swore.  I'm going to be honest that
17  he told me that.
18         So to your point, all I said was if she was on the
19  Last Chance Agreement, right, I got called into this not to
20  deal with any Last Chance Agreement situations, I got called
21  in this to deal with the situation at hand.  And that's all
22  I could testify to.  I can't testify to all this other
23  stuff.  So don't quote me more in.  I'm in -- I'm in deep
24  enough as it is.  You know?  And I don't mind taking, you
25  know, my bruises where I need to take them at.  But I'm not

43

1  debating anything in Last Chance Agreement, so don't --
2  don't put it on the record as if I'm debating it.  I'm not
3  debating anything there.
4    Q.  I just want to make sure that you understand,
5  because you were mentioning predetermination hearings and
6  whether or not it was grounds for termination earlier in
7  your testimony.  And I wanted to make sure you understood
8  what the Last Chance Agreement said and the parameters of
9  it.
10    A.  That's fair.  But I -- once again, like I said, I
11  was never told what type of meeting this was.  So to your
12  point, I wasn't told that it was a predetermination hearing.
13  I was told that it was a meeting because of a white man that
14  had happened to get more explanation.  That's all I'm
15  telling you.
16    Q.  Do you understand, though, or do you agree with
17  that the fact that there is a Last Chance Agreement means
18  there does not have to be a predetermination hearing --
19    A.  I agree with that.
20         MR. BARROUKH:  Objection to form.
21  BY MR. ELKINS:
22    Q.  Okay.  That's what I wanted to make sure.
23    A.  Yes, I agree with that.
24    Q.  Okay.  Fair -- fair enough.  And so, are you --
25  you know why the Chief or the City afforded Jessica this

44

1  meeting?  Do you know the reason for it?  Did anyone ever
2  tell you that?
3    A.  If I can recall, I had a conversation.  In that
4  conversation that I had with the Chief, it was -- he said
5  that it was so he can get an understanding of both sides of
6  what had happened.
7    Q.  So in other words, before the Chief was going to
8  fire or implement her --
9    A.  He didn't say he was going to fire her.
10    Q.  I understand that.  I'm not saying what he said.
11  I'm saying --
12    A.  Yeah, but you just -- you just implemented that he
13  said that.  He didn't say that in any conversation.  He
14  wanted to understand better the scenario before he made a
15  decision of what he was going to do.
16    Q.  And if you let me finish, because remember, the
17  court reporter can't take down two people talking at the
18  same time.
19         What I was going to correct myself in saying was,
20  what the Chief was telling you -- correct me if I'm wrong --
21  is, before he made a decision as to whether to implement her
22  letter of resignation, which is what the Last Chance
23  Agreement is, he wanted to give her the opportunity to
24  explain her side of the story; did that happen?
25         MR. BARROUKH:  Objection.  Form.

```
                                                         45
1  BY MR. ELKINS:
2      Q.  You can answer.
3      A.  That's what I was told by -- by Chief Clements,
4  yes.
5      Q.  Okay.  Fair enough.
6         All right.  Now, during the meeting -- during the
7  actual meeting, not -- I'm not talking about any -- well,
8  let me back up.
9         Prior to the meeting when you were in this room
10 and having these conversations, did the Chief or anyone else
11 from the City talk about Jessica's 2020 EEOC charge?
12     A.  I don't -- I don't recall.  I don't recall.  I'll
13 be fair to say I don't recall.
14     Q.  Did you even know about her 2020 EEOC charge?
15     A.  Maybe.  I didn't know any details to it.  Maybe in
16 -- in rumor mill, you know, but other than that, like I
17 said, I don't know the details to anything.
18     Q.  Did anyone from the -- now, to be clear, you're
19 not a decision-maker on terminations or discipline, correct?
20     A.  No.  No.  No.
21     Q.  And you were not involved in the decision
22 ultimately to implement Jessica's letter of resignation,
23 were you?
24     A.  No, I wasn't.
25     Q.  Okay.  Did anybody from the City ever tell you
```

```
                                                         46
1  that the reason that the City implemented Jessica's letter
2  of resignation was because it was retaliating against her
3  for filing the 2020 EEOC charge?
4         MR. BARROUKH:  Objection.  Form.
5  BY MR. ELKINS:
6      Q.  You can answer.
7      A.  No.
8      Q.  Okay.  During the meeting -- now we're finally to
9  during the meeting, which I know I've said five times.
10 During the meeting, at any point in time, did you or any
11 other member of the FOP stop the meeting or try to stop the
12 meeting and say that it was an improper meeting under the
13 Police Officer Bill of Rights?
14     A.  Not that I recall.
15     Q.  Okay.  And after Jessica was separated from the
16 City, did the FOP file a grievance on her behalf regarding
17 her separation?
18     A.  I don't know.  I don't know if they did.
19     Q.  Well, you're the -- you're the -- you were the
20 third highest ranking officer in the FOP, correct?
21     A.  Yeah.  But unfortunately, sometimes things get
22 filed and, you know, that doesn't necessarily mean I know
23 about everything that happens.
24     Q.  Right.  That's fair.  That's fair.
25         Were you ever part of any discussions as to
```

```
                                                         47
1  whether to file a grievance after Jessica was separated from
2  the City?
3      A.  No.
4      Q.  Including, to be clear, I don't want to know about
5  any discussions with the FOP lawyer.  So -- but you weren't
6  part of any discussions, correct?
7      A.  From -- say that again.
8      Q.  Excluding any conversations with the FOP's lawyer,
9  were you part of any discussions where the FOP was talking
10 about, considering, looking into, filing a grievance on
11 behalf of Jessica after she was separated from the City?
12     A.  That I recall?  I don't recall.
13     Q.  Okay.
14     A.  I don't recall being a part of it.
15     Q.  And sitting here today, you don't know if the FOP
16 ever filed a grievance on her behalf?
17     A.  No, I don't.  I don't.
18     Q.  Do you know if the FOP's ever filed for -- on
19 Jessica's behalf alleging that the City violated 112, the
20 Police Officer Bill of Rights, during this January meeting?
21         MR. BARROUKH:  Objection to form.
22 BY MR. ELKINS:
23     Q.  You can answer.
24     A.  I do remember that there was a discussion with
25 Jessica about it, about her, after the meeting was
```

```
                                                         48
1  conducted, about certain things that happened in particular
2  to being questioned by Commander Prieto in the meeting, that
3  she felt that her Bill of Rights was violated.  But I don't
4  -- I don't know where that ended at.  I don't know where
5  that -- where that whole thing went.
6      Q.  So tell me about the conversation after the
7  meeting.
8      A.  There was a conversation Jessica had, her and
9  Nick, if I'm not mistaken, where it was said to me that -- I
10 want to say more so that Jessica felt that her Bill of
11 Rights was violated and -- and that the union, you know,
12 obviously sat in the meeting and -- and didn't do anything.
13         And more so, only because of, like I said, in the
14 meeting at some point, to get particulars, as to what had
15 happened in that situation, there was times -- normally, in
16 a meeting like this, the Chief of Police talks and they give
17 both sides an opportunity.  Jessica ends up -- Jessica
18 talked about some things and then the accuser, Lieutenant
19 Cosner, talked about some things.
20         But there was some followup -- during that meeting
21 there was followup questions asked of Jessica by Commander
22 -- by Commander Prieto in the meeting.  And that's where she
23 felt like the violation had occurred.
24     Q.  But you said at the beginning -- I just want to
25 make sure I'm clear -- that the conversation after the
```

49

1 **meeting was between Jessica and Nick.  Are you referring to**
2 **Nick Guasto?**
3     A.  Right.  So I think -- if I'm correct, I think that
4 when the issue was brought at hand, brought to me, yes, it
5 was brought to me from -- by -- there was a conversation
6 with both of them, if I'm not mistaken, yes.
7     Q.  Well, wait.  Who -- tell me about -- let's start
8 **first.  Let's back up.**
9     A.  Okay.
10     Q.  Right.  When did -- when did the first
11 **conversation about her 112 rights occur after the meeting?**
12 **Let's start there.**
13     A.  I can't recall exactly when it was.
14     Q.  Right.
15     A.  When the conversation was had, I can't recall, but
16 there was a mention of that to me.
17     Q.  Okay.  And who -- and now, who mentioned it to you
18 **specifically?**
19     A.  I can't remember if it was Nick or Jessica.  I
20 didn't really -- to be honest with you, I didn't really talk
21 to Jessica a lot.  More so, talked to Nick on certain issues
22 or certain things.  I didn't really talk to Jessica a lot
23 because like I said, we was just kind of like co-workers and
24 whatever, but I didn't -- we didn't have the type of
25 relationship.

50

1     And because I wasn't really so embedded in dealing
2 with this whole scenario, it was only because I had to be
3 sent to this meeting.  That was pretty much it.  And I was
4 kind of like the facilitator of -- of that part.  That was
5 really it.  But -- but if I'm correct, I think the
6 conversation was had with both of them being present.  I
7 don't know if it was a phone conversation or it was a
8 conversation in person.  I can't recall.
9     Q.  But it was with you directly?
10     A.  Yes, it was with me directly.
11     Q.  Anybody else besides you, Nick, and/or Jessica?
12     A.  No.  No.  No.  I don't recall them having that
13 conversation.  If they did, not in my presence.
14     Q.  And what did you do -- well, no, I'm asking if
15 there was anyone else present for the conversation that you
16 had with Nick and/or Jessica?
17     A.  No, no, no.  Right.  No.  No.  It was just -- as a
18 matter of fact, I don't know -- like I said, I don't know if
19 it was a phone call or if it was in person, but no, no one
20 else was involved.
21     Q.  And what did you do after that conversation, if
22 anything?
23     A.  I didn't do anything.  I didn't do anything.  I
24 don't know how far after.  I want to say -- that was an
25 initial conversation.  I want to say it happened sometime

51

1 after that meeting was conducted and it was brought up.  And
2 I don't know if it was brought up.  Jessica -- I don't know
3 if -- like I said, I don't know if Nick or Jessica brought
4 it up.
5     But there was a -- at one point a request for me
6 to do an affidavit.  And I said, listen, I'm not doing any
7 affidavit or anything.  I will -- if I'm ever subpoenaed to
8 whatever had happened of my involvement, anybody know me in
9 terms of my integrity, I'm going to tell the truth.  So I
10 said I'll tell the truth if the courts or anybody subpoena
11 me to tell what happened and my involvement, but I'm not
12 doing any -- any affidavit.
13     Q.  Who asked you to do an affidavit?
14     A.  There was -- I don't recall who asked me, but
15 there was a conversation about it.
16     Q.  So --
17     A.  I don't know if it was through the attorney.  I
18 don't know if it was through the attorney or them.  But
19 there was a conversation about an affidavit.
20     Q.  So you had a conversation with some unknown person
21 about --
22     A.  No, no, no, about -- not unknown.  But it was
23 either -- it was -- we are only talking about two people.  I
24 just told you it was only two people involved in this.  It
25 was either Nick or Jessica.  I can't recall who it was.

52

1     Q.  Hold on.  That isn't what you said.  I'm not
2 trying to be difficult.  I just want to be sure I
3 understand.
4     A.  Okay.
5     Q.  Who was it that asked you to provide the affidavit
6 and you said, I don't know, it could have been the attorney.
7 I don't remember.
8     A.  No, no, no.  Right, right.  So what I'm --
9     Q.  Sorry, you keep interrupting.  It's not going to
10 work.  The court reporter can't take down two people talking
11 at the same time.  So let me finish my question and I'll let
12 you answer.  So let me back up.
13     I asked you who you had the conversation with
14 about the affidavit.  And I think you said you didn't
15 remember, it could have been an attorney, could have been
16 Jessica, could have been Nick.  So we are not talking about
17 two people.  I want to know if you remember who talked to
18 you about providing an affidavit?  That's the first thing I
19 want to know.
20     A.  You misunderstood me.
21     Q.  Okay.
22     A.  I did not say that I talked to an attorney.  I
23 said I don't know if they had talked to an attorney.  There
24 was a mention of an affidavit.  I said the only two
25 people -- if you listen, Mr. Elkins, the only two people

53

1  that I ever talked to was Nick and Jessica.  And I don't
2  know which one.  You keep trying to cross me up, man.  I
3  don't know which one.  This was three years ago.  But I'm
4  being honest with you.
5       Q.  I'm not trying to trip you up.
6       A.  Okay.  I didn't say anything that I talked to an
7  attorney.  I didn't talk to an attorney.  And that was it.
8  And I told them when they approached me, or whoever it was,
9  that I was not doing an affidavit, that if I was subpoenaed,
10  through an attorney, or through the courts, that's where the
11  attorney part come in.
12       If I was subpoenaed through an attorney, who you
13  are, or the courts, that I, in terms of my involvement, will
14  be truthful.  And that's all.  So whatever happened,
15  whatever I can remember happened in that -- in that setting,
16  that's it.  That's all I said.
17       Q.  And sitting here today, you've never talked to any
18  other lawyer about this case --
19       A.  No.
20       Q.  -- besides me?
21       A.  No, I've never talked to any other lawyer, sir, at
22  all.  No lawyer.
23       Q.  Perfect.
24       Okay.  And sitting here today, just to confirm,
25  you don't know if the union ever filed a grievance on

54

1  Jessica's behalf relating to her separation?
2       A.  Correct.
3       Q.  And other than me showing you the Last Chance
4  Agreement today, you have never read it before this
5  deposition today, correct?
6       A.  Correct.
7       Q.  And sitting here today, just to confirm, you don't
8  recall who it was that told you Jessica couldn't have a
9  lawyer at this meeting, correct?
10       A.  Correct.
11       MR. ELKINS:  Nothing further.
12       MR. BARROUKH:  All right.
13             CROSS EXAMINATION
14  BY MR. BARROUKH:
15       Q.  Sergeant Lester, I will try to keep this quick.
16       A.  Please.
17       Q.  Yes, sir.
18       You previously stated that it was either Richard
19  Clements or Paul Ozaeta who denied Jessica an attorney at
20  the meeting; is that correct?
21       A.  No, that's not what I said.  I said that it was
22  communicated through either Paul Ozaeta or Richard Clements.
23  I don't know who denied it.  I didn't say that either
24  Richard Clements denied it or Paul Ozaeta denied it.  I said
25  I don't know who -- that's what was communicated to me, that

55

1  a denial for the attorney to be present was denied.  I don't
2  know who made that decision, sir.
3       Q.  But the decision was final, that she was denied an
4  attorney at the meeting, correct?
5       MR. ELKINS:  Objection to form.
6       You can answer.
7       THE WITNESS:  Ask the question again.
8  BY MR. BARROUKH:
9       Q.  The decision to deny her an attorney was made,
10  correct?
11       MR. ELKINS:  Objection to form.
12       THE WITNESS:  Yes.
13  BY MR. BARROUKH:
14       Q.  Could you please answer?
15       A.  Yes, yes.
16       Q.  Thank you.
17       You previously mentioned that there were trust
18  issues between Jessica and Arley Flaherty; is that correct?
19       A.  That's what I was told when I asked about why I
20  was sent to the meeting.  Because I was obviously, the -- I
21  was obviously the Second Vice President.  And that Jessica
22  felt more comfortable with a person that's going to be more
23  fair being there at the meeting, so that's why I went to
24  meeting.
25       Q.  And why do you think Jessica had an issue with

56

1  Sergeant Flaherty?
2       A.  I can't testify to that, sir.  I don't know.
3       Q.  Did you believe you could stop the meeting on
4  January 19th if you tried?
5       MR. ELKINS:  Objection to form.
6  BY MR. BARROUKH:
7       Q.  You can answer.
8       A.  Knowing what I know now, I assume I could have.
9  That's what it's seeming like, like it's -- it's all blamed
10  on me or us, rather, the people that was in there on behalf
11  of the union and partaking.  But at the time, I did not -- I
12  did not know that, sir.  And especially for me, from my
13  angle -- I can't testify to anybody else -- if I knew that
14  the seriousness the totality of the circumstances that I
15  felt that an attorney or Jessica was requesting an attorney,
16  is asked for, and the meeting is still saying that it has to
17  happen, then I don't know if me personally would feel that I
18  had the powers to say that that meeting, me myself.  I could
19  have probably walked out the room, to your point, but I
20  don't know if the meeting would have not still went forward,
21  you know?  And that's been -- I don't know that part.
22       Q.  I understand.
23       And was there a negative or hostile sentiment
24  towards Jessica from your understanding prior to the
25  meeting?

Sgt. Reginald Lester

57

```
1       MR. ELKINS:  Objection to form.
2       THE WITNESS:  I'm sorry.  Yeah, that -- what are
3   you -- what are you mentioning in terms of negative or
4   hostile?
5   BY MR. BARROUKH:
6       Q.  Was there a hostile atmosphere prior to the
7   meeting towards Jessica?
8       MR. ELKINS:  Objection to form.
9       THE WITNESS:  No, no, I didn't -- I didn't witness
10  myself or anything I partake in, you know.  I would
11  definitely not allow it.  That's a totally other topic.
12  I didn't witness anything hostile, me as a union
13  representative.  The formality of what meetings cannot
14  cancel is one thing.  The hostile environment of a
15  meeting, right, that may all be personal -- or I'm not
16  disregarding how Jessica felt personally, but I didn't
17  witness any hostile -- anyone in the meeting hostile
18  towards Jessica that created a hostile environment to
19  that nature.
20  BY MR. BARROUKH:
21      Q.  Okay.
22      A.  I didn't witness that.
23      Q.  And was the meeting recorded?
24      A.  I don't know if the meeting was recorded.  In
25  terms of when you say recorded, by what?
```

58

```
1       Q.  By video recording.
2       A.  I mean -- I mean, unless -- I had no knowledge of
3   the meeting being recorded.  That's something that you would
4   have to ask others, more so administration.  There was no
5   device in there recording.  Other than the fact that
6   Commander Prieto had his computer, I don't know if he had it
7   recorded, I don't know.
8       But there's nothing else in there that I know that
9   -- we wasn't notified that it was recorded.  Let me say
10  that.  We wasn't notified that that meeting was being
11  recorded, unless I missed that part.
12      Q.  All right.  And are you familiar with the Miami
13  Beach Police Department Allegation of Employee Misconduct
14  form?
15      A.  Yes.  I'm a supervisor.  I mean, I don't know when
16  the last time I looked at one, but yeah, I'm familiar with
17  it, sir.
18      Q.  And do you believe that -- I'm going to call it an
19  AEM form.  Okay?
20      A.  Okay.
21      Q.  And do you believe that an AEM form should be
22  signed when it's submitted?
23      MR. ELKINS:  Objection to form.
24      THE WITNESS:  I don't know the circumstances of --
25  of the scenario why it was submitted.  I don't know if
```

59

```
1   it was submitted on DocuSign.  I don't know if it was
2   submitted.  Like, I didn't -- I'm not testifying to
3   that because that's not the part that I partake in.
4   That would be something that you'd have to ask, I
5   assume Lieutenant Cosner or Commander Prieto or former
6   Chief -- Chief Richard Clements.  I can't tell you as
7   to why a document like that wasn't signed, sir.
8   BY MR. BARROUKH:
9       Q.  That's not what I'm asking.
10      I'm asking, do you believe a AEM form needs to be
11  signed before being submitted?
12      MR. ELKINS:  Objection to form.
13      THE WITNESS:  It all depends on the circumstances,
14  as I'm saying to you.  I don't -- I mean, it should,
15  right?  It should be signed, I guess to make it
16  official at some point, especially if it went up --
17  usually, those type of things have to go up the chain
18  of command.
19      In this particular situation, like I said,
20  usually, the time period between an incident happening
21  and someone being brought in or -- and Attorney Elkins
22  talked about predetermination hearing.  In this case,
23  it wasn't a predetermination hearing.
24      But usually, there's -- there's a lengthy time, so
25  those documents are usually signed because there's
```

60

```
1   enough time that had went by to make sure those
2   documents was -- went up the chain of command.
3       In this situation, I don't know if you're telling
4   me that, but I don't know why -- and I can't testify as
5   to -- I'm not saying it's right or wrong, to your
6   point, you know, because I don't know the scenario.
7   BY MR. BARROUKH:
8       Q.  And do you --
9       A.  It usually -- usually, it is signed, though.  If
10  you want me to -- that's a better answer.  Usually, those
11  documents are signed, but usually it's a greater period of
12  time.
13      Q.  And could you explain the process to or in your
14  words the chain of command for a --
15      A.  Usually -- usually, you have a violation is -- is
16  -- is something that's identified by a supervisor.  You,
17  know, and there's different ways you can go about handling
18  it.  But if it gets to this point where you've actually got
19  to put something on a, what you call an AEM form, you write
20  up the allegation of misconduct and there's a process that
21  it has to go through a chain of command.
22      Obviously, I'm a Sergeant.  It goes to Lieutenant.
23  I haven't looked at these forms in a while.  Thank God, I
24  have employees that's good employees, so I could be -- don't
25  -- don't -- don't quote me on this because I don't have the
```

**61**

1 form in front of me.
2     But I'm sure at some point, it has to be signed by
3 other -- other personnel or -- or if it's -- if I'm not
4 right, then my recollection is -- is that allegation of
5 misconduct is signed by you, and then it's forwarded to the
6 Internal Affairs unit.  You know?
7     Q.  So you're a Sergeant, correct?
8     A.  Yes.
9     Q.  If you were following the chain of command, you
10 would send this document up to a Lieutenant, correct?
11    A.  Yeah, I would have -- I would have sent it, yeah,
12 I would have sent it up -- up the chain, yes.  But like I
13 said, do you -- do you have -- just so I'm not speaking off
14 the top of my head, do you have that form in front of you to
15 at least tell me or show me who -- like, I don't -- I don't
16 -- because I don't know what --
17    Q.  So -- so the form at this time -- I'm just
18 speaking about the form, not a specific form in question.
19 Is that all right?
20    A.  Yeah, but you're speaking about my -- obviously,
21 Attorney Elkins when he was speaking about -- to be fair,
22 you know, when he was speaking about the Last Chance
23 Agreement, he pulled it up and he showed me, you know, so I
24 can better give you -- give you the right answer and not
25 just off the top of my head.  It's been a while.

**62**

1     So otherwise, I'm going to have to tell you it's
2 been a while since I've seen that form, so, I don't -- I
3 don't -- that form is not something that's a form that we
4 use every day.
5     So even though I'm a supervisor, you may think,
6 oh, you should know what that form look like.  That's not
7 necessarily the case.  So I want to be fair.
8     Q.  All right.  All right.  I understand.  Then, could
9 I take a five-minute break to pull up the form for you?  Is
10 that all right?
11    A.  Perfect.  Thank you, sir.
12    MR. BARROUKH:  All right.  Michael, that's all
13 right with you?
14    MR. ELKINS:  Whatever you want to do.
15    MR. BARROUKH:  All right.  1:35 we'll be back.
16    (Recess taken.)
17    MR. BARROUKH:  All right.  Is everybody ready?
18    THE WITNESS:  Yes, sir.
19    MR. ELKINS:  Yeah.
20 BY MR. BARROUKH:
21    Q.  All right.  So I'm going to share my screen.
22 Disable.  For whatever reason, I'm not allowed to share my
23 screen.
24    MR. ELKINS:  You should be able to now.
25    MR. BARROUKH:  Thank you.

**63**

1 BY MR. BARROUKH:
2     Q.  So this document is marked City 001250.  Can you
3 see this document?
4     A.  Yes, I could see this document, sir.
5     Q.  And do you know what this document is?  I could
6 Zoom in if you'd like.
7     A.  Yeah, it's a Allegation of Employee Misconduct.
8     Q.  All right.  So as I was asking before, does a form
9 like this need to go through a chain of command when
10 submitted?
11    MR. ELKINS:  Objection to form.
12    THE WITNESS:  Yes.
13 BY MR. BARROUKH:
14    Q.  You can answer.
15    MR. ELKINS:  You can answer.
16    THE WITNESS:  I still can't see.  Is this the
17 complete document?
18 BY MR. BARROUKH:
19    Q.  It's -- this is the form.  I -- I don't need you
20 to talk about the exact document.  But a form like this
21 talking about the Allegation of Employee Misconduct form --
22    A.  So this --
23    Q.  This --
24    A.  I'm sorry, go ahead.
25    Q.  Thank you.  I'm just asking simply:  Does a

**64**

1 document like this when it's submitted and filled out need
2 to follow a chain of command?
3     MR. ELKINS:  Objection.
4     You can answer.
5     THE WITNESS:  Okay.  It would go through some form
6 of a process or a chain of command, either -- either --
7 if I was to write this up as a supervising Sergeant,
8 either it goes to the Lieutenant for review up the
9 chain, or I can't recall, because I don't see the
10 complete document and I'm trying to piece together what
11 you're trying to give me the answer.
12    This form would go directly or is directly
13 submitted to -- to Internal Affairs, because this is a
14 initial report of -- of concerns of a -- of allegations
15 of a police -- of employee misconduct.
16    So in this scenario, I don't know the
17 circumstances in terms of what you're saying to me.  So
18 it's kind of hard to really answer the question on my
19 end.
20 BY MR. BARROUKH:
21    Q.  All right.  I'll try to be a little bit more
22 specific then.  For Steven Cosner's, Lieutenant Cosner's
23 Allegation of Employee Misconduct, which is what sparked the
24 meeting on January 19th, do you believe that he should have
25 brought the complaint through a chain of command?

Sgt. Reginald Lester

---

65

1      MR. ELKINS:  Objection to form.
2      You can answer.
3      THE WITNESS:  I -- like I said, I don't know the
4  circumstances involved in this as, you know, as to why
5  if -- I'm having a hard time understanding.  Like,
6  you're trying to get me to answer what Steve Cosner
7  did.  I can't answer what Steve Cosner did.  And my
8  whole thing is, is that if it was me, then there is a
9  process that it should go to either through the chain
10  of command or to Internal Affairs.  I've already said
11  that.
12  BY MR. BARROUKH:
13      **Q.  Okay.**
14      A.  That's all I can answer for you.
15      **Q.  All right.  Thank you.  I'm going to stop sharing**
16  **my screen.**
17      A.  Okay.
18      **Q.  And one of the last things I want to touch on was**
19  **you did not believe Jessica's actions were grounds for**
20  **termination; is that correct?**
21      MR. ELKINS:  Objection to form.
22      THE WITNESS:  What was reported to me of partaking
23  in the meeting, I didn't believe -- and it's not about
24  Jessica, right?  Usually, when the union deal with
25  issues, it's about the violation.  And progressive --

---

66

1  Mr. Elkins brought that up, progressive discipline.
2      So when I initially was brought into this, I
3  didn't feel like the violation met the need for
4  termination until obviously, it was made known to me,
5  which I reviewed, that there was a Last Chance
6  Agreement.
7      **Q.  And were you aware of any other employees on Last**
8  **Chance Agreements?**
9      A.  I dealt with other Last Chance Agreements.  No --
10  well, prior to Jessica's?
11      **Q.  Prior to Jessica -- following Jessica's situation.**
12      MR. ELKINS:  Objection to form.
13      You can answer.
14      THE WITNESS:  I've heard of scenarios involving
15  Last Chance Agreements, but I don't know directly if I
16  was involved in Last Chance Agreements.  There's only
17  one case that I know of that I don't think the employee
18  was on a Last Chance Agreement because the employee end
19  up -- end up resigning instead of -- in lieu of Last
20  Chance Agreement.  So I don't think I've ever been.
21  And Mr. Elkins know I've been involved in a multitude
22  of different issues.
23      Usually, Last Chance Agreements, to his point, are
24  usually the personnel that's involved is usually the

---

67

1  President of the FOP and as well as obviously, this
2  language that the City attorney has -- has put there
3  that our attorney do review or, you know, there's maybe
4  some back and forth about the different language.
5      But usually, the Second or First Vice President
6  usually are not really, you know, involved in Last
7  Chance Agreements.  Sometimes we are.  But it's more
8  just formality of meetings and not necessarily the
9  process of the Last Chance Agreements.
10  BY MR. BARROUKH:
11      **Q.  And do you know why Jessica was placed on a Last**
12  **Chance Agreement?**
13      MR. ELKINS:  Object to the form.
14      THE WITNESS:  I know Jessica was involved in a
15  Internal Affairs case.  And there was some sort of
16  discipline there.  So I think as a result of that,
17  settling that Internal Affairs case, with discipline, I
18  think the Last Chance Agreement was something that the
19  City put on the table.
20      Usually, with Last Chance Agreements, it all
21  depends on the violation.  Sometimes the severity,
22  rather, it depends on the severity of the incident.  Or
23  it could also be an employee that, you know, is kind of
24  like the frequent flier of certain incidents and the
25  City is trying to get that employee to see, you know,

---

68

1  the light at the end of the tunnel to finish their
2  career.  And it's kind of like an agreement where the
3  employee also has a level of accountability to take to
4  say that I understand these terms and I won't violate
5  any of these terms so I could keep my job.
6  BY MR. BARROUKH:
7      **Q.  Do you believe Jessica was a good police Sergeant?**
8      MR. ELKINS:  Objection to form.
9      THE WITNESS:  I can't testify to that.  I was
10  never a -- I never supervised Jessica and if I -- I
11  never worked with Jessica, and if I testified to that,
12  it will be all opinionated.  And I don't have an
13  opinion on Jessica in terms of whether she was a good
14  or bad Sergeant, to be honest with you.  I don't know
15  much about -- I never -- I don't think I ever worked a
16  shift with Jessica as, you know -- even when I got
17  promoted as a Sergeant, I don't think I even worked
18  with worked a shift with her as a Sergeant.
19  BY MR. BARROUKH:
20      **Q.  Was it standard for you as a Sergeant to work**
21  **shifts with the same Lieutenant?**
22      MR. ELKINS:  Object to the form.
23      THE WITNESS:  Repeat that question.
24  BY MR. BARROUKH:
25      **Q.  As a Sergeant, were you assigned to more than one**

---

Sgt. Reginald Lester

69

1  Lieutenant?
2       MR. ELKINS: Object to the form.
3       THE WITNESS: It all depends on the circumstances.
4  You normally have a Lieutenant that you're assigned to
5  with a set of days off. But the police department has,
6  especially Miami Beach Police Department, we have a lot
7  going on, special events, and you do get held over for
8  other shifts because of, you know, obviously, personnel
9  staffing issues. So there is possibility that you
10 could work for other Lieutenants, if -- if that's your
11 question.
12 BY MR. BARROUKH:
13      Q.  Thank you.
14          And have you ever heard of Jessica's -- strike
15 that. One second.
16          What did you know about Jessica's relationship
17 with Steven Cosner?
18      A.  Don't know about it, other than like I told Mr.
19 Elkins, that there was a insinuation of Jessica allegation
20 of saying that Steve Cosner tried to approach her at one
21 point and she turned him down. I don't know if that to be
22 true or false, to be honest with you. I don't know anything
23 else.
24      Q.  So you only heard that from Jessica; is that
25 correct?

70

1       MR. ELKINS: Object to the form.
2       THE WITNESS: I don't know if Steve mentioned it
3  when we had our briefing in that it wasn't true. But I
4  don't know if I even heard that from Jessica or if that
5  was just kind of like the rumor out there. I don't
6  know to what totality of -- where I heard that at, to
7  be honest with you.
8  BY MR. BARROUKH:
9       Q.  And when you say "rumor out there," do you mean in
10 the police station?
11      MR. ELKINS: Object to the form.
12      THE WITNESS: Yes, it would be in the police
13 station. I really -- to be honest with you, I don't
14 know anything about Jessica's relationships or Steve,
15 you know, to be fair to both of them. I'm not friends
16 with either one of them to that nature to know, you
17 know, to know their business, their personal business.
18 BY MR. BARROUKH:
19      Q.  I understand.
20      MR. BARROUKH: All right. I have no further
21 questions.
22      MR. ELKINS: I have a few very brief questions,
23 Sergeant, and then I think we are done.
24      REDIRECT EXAMINATION
25      THE WITNESS: Okay.

71

1  BY MR. ELKINS:
2       Q.  Were you involved at all in the negotiations of
3  Jessica's Settlement Agreement that I showed you as Exhibit
4  1?
5       A.  No, sir.
6       Q.  Were you involved in any of the negotiations
7  relating to her Last Chance Agreement?
8       A.  No, sir.
9       Q.  Were you involved in any decisions to separate her
10 from employment in that decision-making process?
11      A.  No, I wasn't involved in the decision-making
12 process.
13      Q.  And -- Understood.
14      A.  I'm not a manager. No, no. The only involvement
15 I had was what I stated in this meeting. I'm not a manager
16 to make those decisions.
17      Q.  And you're not considered a management employee.
18 I understand as a Sergeant, you're a supervisor?
19      A.  Yes, right.
20      Q.  You're not management, correct?
21      A.  No, I'm not. Correct, correct.
22      MR. ELKINS: Nothing further.
23      MR. BARROUKH: Thank you. I also want to say
24 thank you, Sergeant, for your service. I appreciate
25 it.

72

1       THE WITNESS: Thank you.
2       THE REPORTER: Read or waive?
3       MR. ELKINS: Sergeant, do you -- what's that?
4       THE WITNESS: I'm done?
5       MR. ELKINS: Well, one question, Sergeant: I
6  know -- I know as much as you enjoy spending time with
7  me, you want to get out of here. You have the
8  opportunity to read the deposition transcript or you
9  can waive that. The reason --
10      THE WITNESS: I'll read.
11      MR. ELKINS: Okay. There you go. So he'll read.
12 We are ordering, Tim. Mini. Let me drop the exhibit
13 in the chat for you.
14      THE REPORTER: Okay. Daniel, hold off for now?
15      MR. BARROUKH: Yeah, we'll hold off for now. You
16 want me to drop the exhibit in the chat?
17      THE REPORTER: Yeah. And you want your exhibits
18 to be marked, correct, Daniel?
19      MR. BARROUKH: Not necessarily.
20      MR. ELKINS: He didn't mark it in the depo. He
21 doesn't get to go back and do it after.
22      MR. BARROUKH: I said it's been marked as -- I did
23 read out the marking, actually. Yeah, I did, so it's
24 not my issue.
25      THE REPORTER: Michael, he read the Bates stamp.

73

1   I wasn't sure if he wanted to mark it.  Sometimes you
2   could display exhibit files on the deposition but not
3   necessarily mark it to the transcript, so --
4        MR. ELKINS:  Did he mark it as an exhibit in the
5   depo?  I don't remember.
6        THE REPORTER:  Not that I heard.  That's why I had
7   to ask you, Daniel.  You just listed the Bates stamp
8   number for the exhibit.  But if you want it to be
9   marked with the deposition, then I could do that.
10       MR. BARROUKH:  There's no need.
11       MR. ELKINS:  If he wants to mark it as Exhibit 2,
12  that's fine by me.  I don't think he did it, Tim.
13       MR. BARROUKH:  I don't need to mark it.  It's
14  fine.
15       THE REPORTER:  Okay.  Sounds good.
16       THE WITNESS:  I'm done, Mr. Elkins?
17       MR. ELKINS:  You're done, Sergeant.  Appreciate
18  it.
19       THE WITNESS:  See you at the next one.
20       MR. ELKINS:  I'm sure somewhere.
21       THE WITNESS:  Everyone, have a great day.
22       (Deposition concluded at 1:50 P.M.)
23
24
25

74

1              CERTIFICATE OF OATH
2   STATE OF FLORIDA
3   COUNTY OF BROWARD
4        I, TIMOFEY GARBUZ, Notary Public, State of Florida,
5   certify that SGT. REGINALD LESTER personally appeared before
6   me via Zoom on the 28th day of March 2024 and was duly
7   sworn.
8        Signed this 28th day of March 2024.
9
10       _____
         TIMOFEY GARBUZ
11       Notary Public
         State of Florida
12       My Commission #HH 284028
         Expires July 5, 2026
13
14
15
16
17
18
19
20
21
22
23
24
25

75

1          REPORTER'S DEPOSITION CERTIFICATE
2
     STATE OF FLORIDA    )
3
     COUNTY OF PALM BEACH)
4
5        I, TIMOFEY GARBUZ, Court Reporter, certify that I was
     authorized to and did report the Deposition of SGT. REGINALD
6    LESTER; that a review of the transcript was requested; and
     that the foregoing transcript, pages 1-73, is a true and
7    complete record of my stenographic notes.
8        I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties,
9    nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
10   financially interested in the action.
11       DATED this 16th day of April 2024.
12
13
14
     _____
15       TIMOFEY GARBUZ
         COURT REPORTER
16
17
18
19
20
21
22
23
24
25

76

1              E R R A T A   S H E E T
2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES
3    IN RE:      GUASTO V CITY OF MIAMI BEACH
     CASE NO:    1:22-cv-21004-DPG
4    DATE:       MARCH 28, 2024
     DEPONENT NAME:  SGT. REGINALD LESTER
5
6    PAGE/LINE     CORRECTION          REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17       (Use other side if necessary)
18       Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated are true.
19
20   _____      _____
     SGT. REGINALD LESTER                 DATE
21
22
23
24
25

77

1  DATE: APRIL 16, 2024
2  SGT. REGINALD LESTER
3  REGINALDLESTER@MIAMIBEACHFL.GOV
4
   IN RE: GUASTO V CITY OF MIAMI BEACH
5      Deposition of Sgt. Reginald Lester
6      This letter is to advise you that the transcript
   taken in the above-referenced deposition has been
7  transcribed. Please contact our office at (954)523-5326 to
   make arrangements to read and sign or sign below to waive
8  review of the transcript.
9      It is suggested that the review of this transcript
   be completed within 30 days of your receipt of this letter
10 as considered reasonable under Federal Rules*; however,
   there is no Florida Statute to this regard.
11
       The original of this transcript has been forwarded
12 to the ordering party and your errata, once received, will
   be forwarded to all ordering parties for inclusion in the
13 transcript.
14 Very truly yours,
15
16 Timofey Garbuz, Court Reporter
17 Waiver:
18 I, _____, hereby waive the reading and signing
19 of my deposition transcript.
20 _____    _____
   DEPONENT                    DATE
21
   *Federal Civil Procedure Rule 30(e)Florida Civil Procedure
22 Rule 1.310(e).
23
24
25

Sgt. Reginald Lester

**A**

**A.J** 17:8 19:25
  26:13,14 36:22
  36:24
**able** 62:24
**above-referen...**
  77:6
**Absolutely** 10:7
**accountability**
  68:3
**accuser** 48:18
**action** 75:9,10
**actions** 65:19
**actual** 21:8 24:4
  26:7 28:21
  45:7
**address** 30:17
  30:21
**administration**
  58:4
**admitted** 42:14
**advise** 77:6
**advocating** 10:9
  10:21 35:9
**AEM** 58:19,21
  59:10 60:19
**Affairs** 17:20,21
  18:9 20:1
  23:23 61:6
  64:13 65:10
  67:15,17
**affidavit** 51:6,7
  51:12,13,19
  52:5,14,18,24
  53:9
**affirm** 4:4
**afforded** 43:25
**afternoon** 4:14
**ago** 22:2 53:3
**agree** 35:11
  40:17,20 41:19
  43:16,19,23
**agreed** 2:17
**agreement** 3:10
  28:5 29:3,11

29:21 30:8,10
30:15,16 31:1
31:7,15,18
32:2,6,9,12,12
32:19,22,23
33:5,7 34:3,8
34:16,17,18
35:2,3,12,18
35:23,24 36:5
36:6,12,15
39:8,19,22,23
40:10,15,18,19
40:23 41:2,21
41:25 42:4,12
42:14,19,20
43:1,8,17
44:23 54:4
61:23 66:6,19
66:21 67:12,18
68:2 71:3,7
**Agreements**
  66:9,10,16,17
  66:24 67:7,9
  67:20
**ahead** 63:24
**ahs** 6:8
**allegation** 58:13
  60:20 61:4
  63:7,21 64:23
  69:19
**allegations** 5:3
  27:6 28:13
  41:5,8,19
  64:14
**allegedly** 27:7
**alleging** 16:24
  47:19
**allow** 23:4 57:11
**allowed** 20:11
  32:12 62:22
**analysis** 35:11
  35:12
**and/or** 42:5,5
  50:11,16
**angle** 56:13

**answer** 5:25 6:1
  6:3,9,14,19
  9:16,17 15:7
  15:15 21:20
  23:9 26:5
  29:15 31:11,11
  33:1,20,24
  45:2 46:6
  47:23 52:12
  55:6,14 56:7
  60:10 61:24
  63:14,15 64:4
  64:11,18 65:2
  65:6,7,14
  66:14
**answering** 38:15
**answers** 6:7
**anticipate** 5:25
  5:25
**anybody** 14:12
  16:16 26:24
  45:25 50:11
  51:8,10 56:13
**anyway** 34:24
**appearances** 2:1
  4:3
**appeared** 74:5
**APPEARING**
  2:5,11
**appreciate** 38:14
  71:24 73:17
**approach** 69:20
**approached**
  53:8
**appropriate**
  28:17
**April** 75:11 77:1
**area** 27:11
**Arley** 17:8 19:5
  19:15 20:5
  22:21 23:2
  26:17 27:20
  55:18
**arrangements**
  77:7

**arrive** 26:9
**arrived** 27:1
**articulated**
  29:11
**asked** 6:15 13:16
  20:10 48:21
  51:13,14 52:5
  52:13 55:19
  56:16
**asking** 12:18,19
  15:10 26:2
  27:1 33:3,4,11
  33:16 50:14
  59:9,10 63:8
  63:25
**assess** 40:22
  41:24
**assigned** 7:23
  8:1 68:25 69:4
**associate** 13:18
**assume** 4:19
  56:8 59:5
**at-will** 32:10
  34:4 35:3
**atmosphere** 57:6
**attend** 18:20
  20:11,12,24
**attended** 18:25
  18:25 19:4,8
  32:10
**attending** 13:14
**attorney** 9:23
  10:10,13 20:11
  21:9 23:17,22
  24:4,13,22
  25:4 30:15
  35:19,22 36:9
  36:17,19,23
  37:1,4 51:17
  51:18 52:6,15
  52:22,23 53:7
  53:7,10,11,12
  54:19 55:1,4,9
  56:15,15 59:21
  61:21 67:2,3

75:8,9
**audible** 6:7
**audibly** 6:9
**authorized** 75:5
**availability** 12:7
**available** 11:15
**aware** 22:8 66:8

**B**

**B** 2:2 3:8
**back** 20:22 26:8
  27:13,19,24
  30:3 37:12
  41:1 45:8 49:8
  52:12 62:15
  67:4 72:21
**bad** 68:14
**bargaining** 9:9
  29:11 31:17
  32:11
**Barroukh** 2:2
  3:5 9:14,17
  15:5,13 23:7
  29:13 31:9,21
  32:16,24 33:9
  33:13 35:7,13
  37:15,18 38:6
  38:11,16,20
  43:20 44:25
  46:4 47:21
  54:12,14 55:8
  55:13 56:6
  57:5,20 59:8
  60:7 62:12,15
  62:17,20,25
  63:1,13,18
  64:20 65:12
  66:7 67:10
  68:6,19,24
  69:12 70:8,18
  70:20 71:23
  72:15,19,22
  73:10,13
**basic** 5:17
**basically** 8:16

Sgt. Reginald Lester

10:10 11:12 35:4
**basis** 11:13 13:11
**Bates** 72:25 73:7
**battle** 25:9
**beach** 1:8 4:15 6:24 7:9,11 9:9 15:12 58:13 69:6 75:3 76:3 77:4
**beginning** 48:24
**behalf** 2:5,11 9:2 11:17 39:19 46:16 47:11,16 47:19 54:1 56:10
**believe** 56:3 58:18,21 59:10 64:24 65:19,23 68:7
**believed** 24:22
**benefits** 8:19
**best** 6:4
**better** 9:3,25 44:14 60:10 61:24
**betterment** 23:19,19,20,21
**Bill** 46:13 47:20 48:3,10
**bit** 64:21
**blamed** 56:9
**blind** 30:12
**bottom** 28:16 39:15,17
**break** 8:16 37:11,16,23 38:5,21 62:9
**BRICKELL** 2:3
**brief** 70:22
**briefing** 70:3
**briefly** 27:14
**bring** 42:12
**brought** 23:16

23:17 29:4,23 49:4,4,5 51:1,2 51:3 59:21 64:25 66:1,2
**BROWARD** 74:3
**Brown** 17:9 19:17 27:21
**bruises** 42:25
**business** 70:17 70:17

---
### C

**C** 4:1
**caliber** 23:21
**call** 14:1 50:19 58:18 60:19
**called** 6:18 11:24 20:3,4,5 27:6 28:9,10 34:11 42:19,20
**cancel** 57:14
**Captain** 19:18 19:25 23:15 27:21
**career** 5:1 68:2
**case** 1:5 4:22 5:2 9:21 15:23 23:22,23 53:18 59:22 62:7 66:18 67:15,17 76:3
**cases** 4:23,25 7:20 10:16
**cause** 29:10
**causing** 22:18
**CBA** 33:8
**certain** 8:24,25 9:20,22 10:5 11:24 24:2,3 48:1 49:21,22 67:24
**certainly** 5:3 12:25
**CERTIFICATE**

74:1 75:1
**certify** 74:5 75:5 75:8
**chain** 59:17 60:2 60:14,21 61:9 61:12 63:9 64:2,6,9,25 65:9
**chair** 12:16 23:3 23:14 26:17
**Chairman** 19:19 22:5
**chance** 28:5 29:3 29:21 30:7,10 30:15,16 31:1 31:7,14,19 32:1,6,9,19,22 32:23 33:5,7 34:3,8,16,17 34:18 35:2,3 35:12,17,23,24 36:5,6,11,15 39:23 40:10,14 40:19 41:21 42:12,14,19,20 43:1,8,17 44:22 54:3 61:22 66:5,9 66:10,16,17,19 66:21,24 67:7 67:9,12,18,20 71:7
**change** 40:13
**changes** 35:12 35:14,15 76:2
**charge** 17:1 45:11,14 46:3
**charges** 18:12
**chat** 72:13,16
**Chief** 17:7 19:23 19:24 21:19 24:21 25:17 26:12,15 27:14 27:19,25 32:3 32:12 36:18,20

37:7 40:22 41:24 42:13 43:25 44:4,7 44:20 45:3,10 48:16 59:6,6
**Chief's** 17:10,18 20:13 21:5 23:20 26:9 42:3
**circumstances** 9:19 20:8 56:14 58:24 59:13 64:17 65:4 69:3
**City** 1:8 4:15,16 5:5 6:23 7:1,4 7:7 8:22 9:9 14:23 15:4,12 16:21,23 23:21 25:18 39:9,24 41:21 43:25 45:11,25 46:1 46:16 47:2,11 47:19 63:2 67:2,19,25 76:3 77:4
**civil** 4:22 5:2 77:21,21
**claim** 16:20
**clarification** 6:13
**clarify** 6:14 10:7 12:17
**classified** 7:19
**clean** 17:24
**cleaned** 18:10
**clear** 45:18 47:4 48:25
**Clements** 19:24 24:21 36:18,20 37:7 42:13 45:3 54:19,22 54:24 59:6
**client** 33:12
**close** 38:15

**cloudy** 17:15
**co-worker** 13:12
**co-workers** 49:23
**Collective** 29:11 31:17 32:11
**come** 11:17 26:20 37:11 53:11
**comes** 9:12 32:22 33:6
**comfortable** 22:14 55:22
**coming** 14:13 26:21
**command** 11:19 11:20 19:5 59:18 60:2,14 60:21 61:9 63:9 64:2,6,25 65:10
**Commander** 48:2,21,22 58:6 59:5
**Commission** 74:12
**committee** 12:16
**communicated** 54:22,25
**compiling** 28:8
**complaint** 64:25
**complete** 63:17 64:10 75:7
**completed** 77:9
**compliance** 40:23 41:25 42:3
**complicated** 20:9 34:15
**computer** 58:6
**concept** 31:20
**concern** 10:17 22:10 27:5
**concerns** 64:14
**concluded** 73:22

conducted 48:1
51:1
CONFEREN...
1:16
confirm 53:24
54:7
conflict 24:14
connected 75:9
considered 5:9
22:3 71:17
77:10
considering
47:10
contact 77:7
contains 31:15
context 10:21
conversation
14:19,25 15:19
16:6 20:19
21:2,7 24:20
25:23 26:2,3
26:14,15,16,20
26:22 27:22
28:3,12 32:4
34:23 36:24
37:2,9 44:3,4
44:13 48:6,8
48:25 49:5,11
49:15 50:6,7,8
50:13,15,21,25
51:15,19,20
52:13
conversations
26:12 45:10
47:8
correct 4:20 5:7
6:24 9:5 10:11
10:18,22 11:5
13:1,5 14:16
17:5,14 18:21
19:3,12,19
20:2 29:3 30:8
30:11 32:2
34:21 39:21
40:4 41:6,10

41:11,13,21
44:19,20 45:19
46:20 47:6
49:3 50:5 54:2
54:5,6,9,10,20
55:4,10,18
61:7,10 65:20
69:25 71:20,21
71:21 72:18
CORRECTION
76:6
correctly 18:19
27:13
Cosner 17:8
19:25 26:13,18
27:7,14,16,20
27:23 28:11,14
28:14,15 41:20
48:19 59:5
65:6,7 69:17
69:20
Cosner's 41:5,8
64:22,22
counsel 2:5,11
2:18 6:18 10:4
75:8,9
COUNTY 74:3
75:3
court 1:2,17
5:21 6:6 44:17
52:10 75:5,15
77:16
courts 51:10
53:10,13
created 57:18
crimes 7:20
criminal 4:23,25
8:1
cross 3:5 53:2
54:13
curiosity 8:4
current 7:11,12
10:25
currently 6:23
7:16,18,18

11:1
_____
D
D 3:1 4:1
daily 11:13
Daniel 2:2 38:5
72:14,18 73:7
Daniel's 38:2
DANIELB@D...
2:5
date 1:14 41:2
76:4,20 77:1
77:20
DATED 75:11
day 10:1 34:19
35:21 41:17
62:4 73:21
74:6,8 75:11
days 69:5 77:9
deal 7:19,20,20
7:21 28:10
34:14 35:15,22
42:20,21 65:24
dealing 30:21
34:13 50:1
dealt 31:4 34:9
36:2 66:10
debating 43:1,2
43:3
December 7:15
41:2,9,9,9
decision 42:3
44:15,21 45:21
55:2,3,9
decision-maker
45:19
decision-maki...
71:10,11
decisions 71:9
71:16
declare 76:18
deep 42:23
DEFENDANT
1:10 2:11
definitely 57:11

Delvin 17:8
19:17
denial 35:19
36:17 55:1
denied 20:13
21:10,21 22:6
23:6 54:19,23
54:24,24 55:1
55:3
deny 55:9
department 7:7
8:23 58:13
69:5,6
depending 8:25
9:19 12:16
13:15
depends 12:6,7
12:8 59:13
67:21,22 69:3
depo 15:17
72:20 73:5
depo'd 16:10,11
16:12
deponent 2:19
76:4 77:20
deposed 4:22,23
4:25 15:3,11
15:23
deposition 1:13
2:19 3:9 4:18
5:13 14:12,17
39:4 54:5 72:8
73:2,9,22 75:1
75:5 77:5,6,19
Deputy 19:24
DEREK 2:2
DESCRIPTION
3:9
details 45:15,17
determine 40:22
41:25
device 58:5
different 7:21
9:10 11:18
60:17 66:23

67:4
difficult 52:2
dignitary 7:20
dinner 13:20
Direct 3:4 4:12
directly 25:17
25:18 36:18,21
50:9,10 64:12
64:12 66:16
Disable 62:22
disagree 28:19
disciplinary
9:12,23 18:12
discipline 12:5,5
12:20 13:4
17:12 28:21
32:22 33:6
45:19 66:1
67:16,17
disciplines 10:16
discrimination
17:2
discuss 29:20,21
29:23
discussion 47:24
discussions
46:25 47:5,6,9
display 73:2
disregarding
57:16
DISTRICT 1:2
1:3
DIVISION 1:4
document 37:11
39:2,8 59:7
61:10 63:2,3,4
63:5,17,20
64:1,10 76:18
documentation
21:4,5 25:20
documents 42:9
42:10,11 59:25
60:2,11
DocuSign 59:1
doing 51:6,12

53:9
**DRIVE** 2:3
**drop** 72:12,16
**due** 27:24
**duly** 4:11 74:6
**duties** 11:9,13
**duty** 17:16

**E**
**E** 3:1,8 4:1,1
  76:1,1,1
**earlier** 15:16
  43:6
**EEOC** 17:1
  18:12 45:11,14
  46:3
**effectively** 31:18
  32:10
**either** 37:7
  38:13 51:23,25
  54:18,22,23
  64:6,6,8 65:9
  70:16
**Elkins** 2:8 3:4,6
  4:13,15 9:15
  10:6 15:6,14
  23:8 28:25
  29:14 31:10,23
  32:17,25 33:11
  33:15,19 35:8
  36:13 37:10,17
  37:21,25 38:2
  38:5,9,14,17
  38:22,23 39:6
  43:21 45:1
  46:5 47:22
  52:25 54:11
  55:5,11 56:5
  57:1,8 58:23
  59:12,21 61:21
  62:14,19,24
  63:11,15 64:3
  65:1,21 66:1
  66:13,22 67:13
  68:8,22 69:2

69:19 70:1,11
70:22 71:1,22
72:3,5,11,20
73:4,11,16,17
73:20
**emails** 21:4
**embedded** 50:1
**employed** 6:23
  7:1
**employee** 5:10
  5:13 10:22
  13:4,5 31:16
  32:10,21,21
  33:5 35:3
  58:13 63:7,21
  64:15,23 66:18
  66:19 67:23,25
  68:3 71:17
  75:8,9
**employee's**
  10:18 40:23
  41:25
**employees** 12:21
  33:22,24,25
  34:4,5 60:24
  60:24 66:8
**employment**
  16:25 71:10
**ended** 48:4
**ends** 48:17
**enforcement** 7:3
**engagement**
  8:21
**engages** 8:17
**enjoy** 72:6
**ensure** 8:18
**entail** 11:11
**ENTER** 76:2
**entered** 39:9
  41:21
**entitled** 13:6
**environment**
  57:14,18
**errata** 77:12
**especially** 56:12

59:16 69:6
**ESQ** 2:2,8
**Eugene** 10:13
**events** 7:24,24
  8:24 12:13
  69:7
**everybody** 23:19
  27:18 28:24
  62:17
**ex-wife's** 14:23
  15:11
**exact** 14:24 15:2
  15:9 37:8
  63:20
**exactly** 27:15
  28:24 37:25
  41:17 49:13
**Examination** 3:4
  3:5,6 4:12
  54:13 70:24
**exchange** 31:19
**Excluding** 47:8
**exclusively**
  40:22 41:24
**excuse** 14:7
**exhibit** 3:10 39:1
  39:4 71:3
  72:12,16 73:2
  73:4,8,11
**exhibits** 72:17
**Expires** 74:12
**explain** 8:13
  11:9 44:24
  60:13
**explanation**
  29:17 42:6
  43:14

**F**
**facilitator** 50:4
**fact** 9:4 13:3
  34:11 42:13
  43:17 50:18
  58:5
**facts** 76:18

**fair** 9:7,13,18
  16:15 18:4,7
  18:16 24:21
  36:21 37:8
  41:18 43:10,24
  43:24 45:5,13
  46:24,24 55:23
  61:21 62:7
  70:15
**false** 69:22
**familiar** 13:8,10
  16:20 30:7,9
  30:10 31:19
  58:12,16
**familiarity**
  13:11
**far** 50:24
**Federal** 77:10
  77:21
**feel** 22:14 56:17
  66:3
**feeling** 22:18
**felt** 27:25 28:16
  48:3,10,23
  55:22 56:15
  57:16
**figured** 8:12
  29:1
**file** 46:16 47:1
**filed** 4:16 46:22
  47:16,18 53:25
**files** 14:1 73:2
**filing** 17:1 46:3
  47:10
**fill** 12:2
**filled** 64:1
**final** 55:3
**finally** 46:8
**financially**
  75:10
**find** 38:25
**fine** 6:18 21:24
  26:2 36:22
  73:12,14
**finish** 6:2 44:16

52:11 68:1
**fire** 44:8,9
**fired** 31:16
**first** 4:11 5:1,21
  8:5,14 11:1,22
  19:16 22:4,7
  23:2 29:2 31:3
  49:8,10 52:18
  67:5
**five** 46:9
**five-minute** 62:9
**FL** 1:8
**Flaherty** 17:8
  19:6,15 20:5
  27:20 55:18
  56:1
**flier** 67:24
**Florida** 1:3,9,18
  2:4,9 74:2,4,11
  75:2 77:10
**follow** 64:2
**following** 61:9
  66:12
**follows** 4:11
**followup** 15:18
  24:20 48:20,21
**FOP** 8:14 9:2,3
  9:7 19:11,14
  19:16,18 20:2
  22:4 23:1,4,24
  23:24 31:3
  36:2,8 39:9,19
  39:24 40:11
  46:11,16,20
  47:5,9,15 67:1
**FOP's** 47:8,18
**forefront** 22:24
**foregoing** 75:6
  76:18
**form** 6:18 9:14
  15:5,13 23:7
  29:13 31:9,21
  32:16,24 33:9
  33:18 35:7,13
  43:20 44:25

Sgt. Reginald Lester

Page 82

46:4 47:21
55:5,11 56:5
57:1,8 58:14
58:19,21,23
59:10,12 60:19
61:1,14,17,18
61:18 62:2,3,3
62:6,9 63:8,11
63:19,20,21
64:5,12 65:1
65:21 66:13
67:13 68:8,22
69:2 70:1,11
**formality** 36:8
57:13 67:8
**former** 18:12
59:5
**formerly** 4:17
13:9
**forms** 8:17
60:23
**FORT** 2:9
**forth** 27:13,24
67:4
**forward** 22:5
23:4 24:25
56:20
**forwarded** 61:5
77:11,12
**four** 20:2
**Fraternal** 8:9
**frequent** 67:24
**friendly** 13:21
**friends** 70:15
**friendship** 13:23
**front** 61:1,14
**functions** 9:10
9:11
**further** 14:19
54:11 70:20
71:22 75:8

**G**

**G** 4:1
**Garbuz** 1:17

74:4,10 75:5
75:15 77:16
**Gene** 36:9
**Gene's** 24:14
**general** 12:21,22
12:22
**generally** 15:1,1
30:25 31:2,6
31:13 33:8
**getting** 10:24
38:14
**Gibbons** 10:13
10:15
**give** 4:5 6:7
31:18 44:23
48:16 61:24,24
64:11
**given** 23:1 31:19
33:8 40:19
**go** 5:17 19:6
20:20 22:5
23:4,23,24
24:25 30:12
33:17 37:19,23
59:17 60:17,21
63:9,24 64:5
64:12 65:9
72:11,21
**God** 4:7 5:2
60:23
**goes** 60:22 64:8
**going** 5:17 6:14
13:4,16 17:21
17:23 19:1
22:15,17 24:8
24:12,12,13,15
24:15,16 25:2
33:23,23 34:14
35:23 36:14
37:16,19,22,23
38:2,7,18,24
39:14,17 40:9
41:23 42:16,16
44:7,9,15,19
51:9 52:9

55:22 58:18
62:1,21 65:15
69:7
**good** 4:14 9:3
60:24 68:7,13
73:15
**gotten** 15:17
18:21
**grab** 37:11
**great** 39:14
73:21
**greater** 60:11
**grievance** 9:22
12:3 17:14
19:18 22:4
23:3,14 26:17
42:4 46:16
47:1,10,16
53:25
**grievances** 12:4
17:12 18:12
**ground** 5:18
**grounds** 28:2,22
29:9,18 31:25
34:23 43:6
65:19
**GROUP** 2:2
**guarded** 13:24
**Guasto** 1:6 4:17
13:8,9,18 49:2
76:3 77:4
**guess** 18:7 26:25
59:15
**guy** 13:24
**guys** 27:2

**H**

**H** 3:8 76:1
**hand** 34:13,14
42:21 49:4
**handling** 10:5
60:17
**happen** 12:1
18:5 44:24
56:17

**happened** 18:3
28:9,11,13
30:18 42:11
43:14 44:6
48:1,15 50:25
51:8,11 53:14
53:15
**happening**
30:20 38:3
59:20
**happens** 46:23
**hard** 64:18 65:5
**hate** 7:20
**he'll** 72:11
**head** 6:8,8 61:14
61:25
**hear** 6:17 15:20
**heard** 16:10
66:15 69:14,24
70:4,6 73:6
**hearing** 9:23
29:22 30:2
31:16 32:14,20
34:20 35:5,10
43:12,18 59:22
59:23
**hearings** 43:5
**held** 69:7
**help** 4:6 5:18
**hey** 15:1 24:24
**HH** 74:12
**Hialeah** 7:7,8
**higher** 14:9
**highest** 46:20
**highlighted**
35:25
**history** 20:9
22:15 25:11
**hold** 6:2,2 15:9
52:1 72:14,15
**honest** 12:11
16:5 21:17
25:1,16 36:21
42:16,16 49:20
53:4 68:14

69:22 70:7,13
**hopefully** 5:2,18
**hostile** 56:23
57:4,6,12,14
57:17,17,18
**hour** 38:8,19
**hung** 13:20

**I**

**identification**
39:5
**identified** 27:10
60:16
**implement** 44:8
44:21 45:22
**implemented**
44:12 46:1
**implicate** 29:5
33:7
**important** 5:24
**improper** 46:12
**incident** 14:20
17:17 28:1,3,5
29:8 30:20
34:9 59:20
67:22
**incidents** 67:24
**include** 12:10
**includes** 12:8
**Including** 47:4
**inclusion** 77:12
**incorrect** 34:24
34:24
**initial** 40:4
50:25 64:14
**initialed** 40:1
**initially** 21:1
22:8 27:23
66:2
**insinuation**
69:19
**institutional**
23:25
**integrity** 51:9
**intelligence** 7:19

**interested** 75:10
**internal** 17:20
  17:21 18:9
  20:1 22:13
  23:23 61:6
  64:13 65:10
  67:15,17
**interrupt** 6:4
**interrupting**
  52:9
**inventoried**
  18:10
**inventory** 17:22
**investigation** 8:2
  18:2
**involved** 9:4
  10:15 18:15
  20:15 25:7
  30:14,16 36:10
  36:11 45:21
  50:20 51:24
  65:4 66:17,22
  66:25 67:6,14
  71:2,6,9,11
**involvement**
  17:12 18:11
  42:8 51:8,11
  53:13 71:14
**involving** 10:16
  12:20 66:15
**issue** 10:17
  12:12,12 22:13
  22:16 23:16,17
  29:24 30:17
  34:13,14 49:4
  55:25 72:24
**issues** 8:25 9:1
  9:12,20 10:2
  11:24 12:16
  14:4 18:12
  20:4 22:10
  23:18 31:5
  49:21 55:18
  65:25 66:23
  69:9

**J**

**January** 16:25
  17:6 18:18
  41:12,15 47:20
  56:4 64:24
**Jessica** 1:6 4:16
  4:17 13:8
  15:20 16:23
  17:13,16 20:1
  20:5,21 22:11
  23:17 25:4,12
  26:10,25 27:9
  27:9,10 28:6
  28:11,13,17
  29:2 30:9 31:2
  31:14 32:1,21
  33:22,23 35:2
  39:9,24 41:20
  43:25 46:15
  47:1,11,25
  48:8,10,17,17
  48:21 49:1,19
  49:21,22 50:11
  50:16 51:2,3
  51:25 52:16
  53:1 54:8,19
  55:18,21,25
  56:15,24 57:7
  57:16,18 65:24
  66:12 67:1,14
  68:7,10,11,13
  68:16 69:19,24
  70:4
**Jessica's** 15:3
  16:20 18:11
  32:8 40:14
  45:11,22 46:1
  47:19 54:1
  65:19 66:11,12
  69:14,16 70:14
  71:3
**job** 68:5
**Jones** 17:7 19:24
  36:25 37:2
**judge** 33:17

**July** 17:2 74:12
**June** 7:2,2 17:2

**K**

**keep** 38:2 52:9
  53:2 54:15
  68:5
**Kevin** 39:18
  40:6,10 42:10
**KEY** 2:3
**kind** 10:16 13:24
  13:24 14:18
  16:11 20:5
  25:6,8 33:21
  42:5 49:23
  50:4 64:18
  67:23 68:2
  70:5
**knew** 29:7 56:13
**know** 4:17 12:13
  13:12,14,15,15
  13:17,17,19,21
  13:22,25 14:2
  14:2,3,17,21
  15:17,21 16:3
  16:7,9 18:12
  20:8 21:4,15
  21:17,18,19
  22:7,13,16
  23:11,13,14,18
  24:1,1,2,5 25:1
  25:2,8,9,10,11
  25:15,16,17,18
  25:21,22,25
  26:1,3 27:16
  28:15 29:17
  30:11 31:1,6
  32:1 34:6,18
  35:18,20,21,22
  36:3,3,4 37:6
  42:24,25 43:25
  44:1 45:14,15
  45:16,17 46:9
  46:18,18,22,22
  47:4,15,18

48:4,4,11 50:7
  50:18,18,24
  51:2,2,3,8,17
  51:18 52:6,17
  52:19,23 53:2
  53:3,25 54:23
  54:25 55:2
  56:2,8,12,17
  56:20,21,21
  57:10,24 58:6
  58:7,8,15,24
  58:25 59:1
  60:3,4,6,6,17
  61:6,16,22,23
  62:6 63:5
  64:16 65:3,4
  66:16,18,22
  67:3,6,11,14
  67:23,25 68:14
  68:16 69:8,16
  69:18,21,22
  70:2,4,6,14,15
  70:16,17,17
  72:6,6
**Knowing** 56:8
**knowledge**
  23:25 36:12
  58:2
**knowledgeable**
  23:25
**known** 66:4

**L**

**L** 2:8,15
**labor** 8:24,25
  9:4 11:16 31:4
**language** 34:18
  67:2,4
**LAUDERDA...**
  2:9
**law** 2:2,8 7:3
  9:24 24:2
**lawsuit** 4:16
  14:23 15:3,11
**lawyer** 22:6 23:5

24:25 47:5,8
  53:18,21,22
  54:9
**lay** 29:7
**lead** 20:6,12
**leadership** 23:1
**leave** 33:18
**left** 27:18
**lengthy** 15:18
  59:24
**Lester** 1:13 3:3
  4:4,10,14 30:3
  30:24 54:15
  74:5 75:6 76:4
  76:20 77:2,5
**let's** 8:14 29:25
  30:3 37:10
  41:1 49:7,8,12
**letter** 44:22
  45:22 46:1
  77:6,9
**level** 13:22 68:3
**lieu** 66:20
**Lieutenant**
  19:18,25 27:7
  41:5,8 48:18
  59:5 60:22
  61:10 64:8,22
  68:21 69:1,4
**Lieutenants**
  69:10
**life** 14:21
**light** 68:1
**line** 28:16
**list** 14:8
**listed** 73:7
**listen** 30:25 51:6
  52:25
**little** 64:21
**lock** 21:11
**locker** 17:24
  18:10
**Lodge** 8:10
**long** 7:1 11:2
  22:2 37:19,24

**longer** 38:13
**look** 15:3 62:6
**looked** 58:16
  60:23
**looking** 47:10
**lot** 9:9 23:25
  49:21,22 69:6
**lunch** 37:16,23
  38:5

**M**

**main** 9:10
**making** 33:2,16
  42:7
**man** 18:1,6 53:2
**management** 5:7
  5:9 8:18,22,22
  8:25 9:5 11:16
  12:4 31:5
  71:17,20
**manager** 71:14
  71:15
**March** 1:14 74:6
  74:8 76:4
**mark** 72:20 73:1
  73:3,4,11,13
**marked** 17:22
  39:4 63:2
  72:18,22 73:9
**marking** 39:1
  72:23
**married** 13:18
**matter** 4:5 50:18
**mean** 24:13
  46:22 58:2,2
  58:15 59:14
  70:9
**means** 30:11
  37:23,25 43:17
**meet** 28:1,2,22
  28:22 29:8,12
  29:18 31:25
**meeting** 13:4,14
  17:6,9,10,11
  17:15,19 18:13

18:17,20,22
  19:3,4,6,8,15
  19:23 20:11,12
  20:14,20,22,24
  21:2,9,21 22:5
  22:9,17,22,24
  23:1,4 24:7,8,9
  24:11,16,17,24
  25:2,10,13
  26:7,8,10,10
  26:13 27:1,6
  28:9,10,20
  30:18,19,23
  32:9 34:1,5,11
  34:12,14,21,22
  34:22 41:12,19
  43:11,13 44:1
  45:6,7,9 46:8,9
  46:10,11,12,12
  47:20,25 48:2
  48:7,12,14,16
  48:20,22 49:1
  49:11 50:3
  51:1 54:9,20
  55:4,20,23,24
  56:3,16,18,20
  56:25 57:7,15
  57:17,23,24
  58:3,10 64:24
  65:23 71:15
**meetings** 8:25
  9:5 11:15,17
  12:4,4,14,18
  12:20,23 57:13
  67:8
**MELKINS@...**
  2:10
**member** 8:9,11
  12:21 13:5
  23:20 31:2
  46:11
**members** 9:2,8
  20:2 22:14
**membership**
  9:11 10:9,11

10:21
**memorable** 16:1
**mention** 49:16
  52:24
**mentioned** 19:15
  49:17 55:17
  70:2
**mentioning** 43:5
  57:3
**met** 66:3
**Miami** 1:4,8 2:4
  4:15 6:23 9:9
  15:12 58:12
  69:6 76:3 77:4
**Michael** 2:8 4:15
  37:15,20 62:12
  72:25
**Milan** 39:18
  40:10 42:10
**Milan's** 40:7
**mill** 45:16
**mind** 40:13
  42:24
**mindset** 34:10
  34:10
**mine** 13:19
**Mini** 72:12
**minute** 25:7
  34:12 36:15
**minutes** 38:6,18
**misconduct**
  58:13 60:20
  61:5 63:7,21
  64:15,23
**missed** 58:11
**mistaken** 11:4
  14:8 21:3
  30:20 48:9
  49:6
**misunderstood**
  52:20
**MLE** 2:8
**moment** 30:5
  41:1
**months** 8:6

30:18
**moved** 14:21
  15:19,21
**multifaceted**
  9:10
**multiple** 18:11
**multitude** 7:21
  9:25 66:22
**MUNICIPAL...**
  1:9
**mute** 28:25,25

**N**

**N** 2:15 3:1 4:1
**name** 42:9 76:4
**name's** 4:14
**nature** 57:19
  70:16
**navigate** 9:22
**necessarily** 9:22
  15:20 46:22
  62:7 67:8
  72:19 73:3
**necessary** 76:17
**need** 6:13 14:3
  19:9 34:5
  37:16,22 38:5
  42:25 63:9,19
  64:1 66:3
  73:10,13
**needed** 11:14
  20:20 21:21
**needs** 59:10
**negative** 56:23
  57:3
**negotiated** 36:7
**negotiations**
  71:2,6
**never** 13:20,20
  14:6 30:14
  36:24 37:2
  40:16,16 43:11
  53:17,21 54:4
  68:10,10,11,15
**Nick** 13:18

14:15,20,22,25
  14:25 15:10,19
  16:6,16 48:9
  49:1,2,19,21
  50:11,16 51:3
  51:25 52:16
  53:1
**night** 27:10
  28:18
**nine** 8:6
**nodding** 6:7
**non-managem...**
  5:12
**normally** 48:15
  69:4
**NORTHEAST**
  2:9
**Notary** 1:18
  74:4,11
**notes** 75:7
**notified** 18:19
  19:2 22:9,21
  22:22 24:11
  58:9,10
**number** 3:10
  39:4 73:8

**O**

**O** 2:15 4:1
**O-301** 2:3
**OATH** 74:1
**object** 33:18
  67:13 68:22
  69:2 70:1,11
**objection** 6:18
  9:14 15:5,13
  23:7 29:13
  31:9,21 32:16
  32:24 33:9
  35:7,13 43:20
  44:25 46:4
  47:21 55:5,11
  56:5 57:1,8
  58:23 59:12
  63:11 64:3

65:1,21 66:13
68:8
**objections** 33:17
**obviously** 4:19
8:17 13:13,18
14:20,20 15:21
19:8 21:3
22:12 25:10,20
29:18 32:23
33:6 34:15
48:12 55:20,21
60:22 61:20
66:4 67:1 69:8
**occasion** 12:19
14:5
**occur** 25:25
49:11
**occurred** 16:25
25:24 41:12
48:23
**odd** 22:3
**offers** 10:20
**office** 17:10,18
20:14 21:5
23:20 26:9,16
77:7
**officer** 31:6
46:13,20 47:20
**officers** 8:19,19
27:12
**official** 27:1
59:16
**oftentimes** 10:15
31:15
**oh** 14:16 62:6
**Okay** 4:22 5:14
5:17,20 6:15
6:16,17,22 7:8
7:16,25 8:3,8
9:7 10:20,24
11:2,9 13:7,11
16:4,15,19,23
17:5,11 21:24
24:22 26:5
31:13,24 32:8

32:18 34:12
35:9 36:16
37:3,10,18
38:4,11,16,20
38:22,24,25
39:7,14,17,22
40:1,17 42:9
43:22,24 45:5
45:25 46:8,15
47:13 49:9,17
52:4,21 53:6
53:24 57:21
58:19,20 64:5
65:13,17 70:25
72:11,14 73:15
**once** 32:20,21
33:5 43:10
77:12
**opinion** 68:13
**opinionated**
68:12
**opportunity**
44:23 48:17
72:8
**opposing** 6:17
**Order** 8:9
**ordering** 72:12
77:12,12
**organization** 9:3
11:19 13:13
**original** 34:21
77:11
**outside** 13:21
**oversee** 7:19
**overtime** 27:9
**Ozaeta** 17:8
18:20,20 19:9
19:11 21:13
23:12 24:18,19
37:7 54:19,22
54:24

———
**P**
**P** 2:15 4:1
**P.M** 1:15,15

38:12,21 73:22
**page** 3:2,9 39:15
40:2
**PAGE/LINE**
76:6
**pages** 75:6
**PALM** 75:3
**Paragraph**
40:21
**parameters** 28:7
43:8
**part** 10:8,8,20
12:20 17:5
23:13 29:22
30:17,17 35:24
36:2 39:22
40:14,18 46:25
47:6,9,14 50:4
53:11 56:21
58:11 59:3
**partake** 11:16
57:10 59:3
**partaking** 56:11
65:22
**partially** 9:18
**participate** 12:3
**particular** 13:13
27:10 48:1
59:19
**particulars**
48:14
**parties** 2:18 75:8
77:12
**parties'** 75:9
**partner** 8:23
**parts** 9:22
**party** 40:14,18
77:12
**patrol** 8:3,5
**Paul** 17:8 18:20
18:20 19:9,11
20:3,7,17 21:3
21:5,13,15,16
22:22 24:11,18
24:19 37:7

54:19,22,24
**penalties** 76:18
**people** 5:23
16:10 23:13
26:5 37:6
44:17 51:23,24
52:10,17,25,25
56:10
**Perfect** 6:22 8:8
13:7 16:19
38:1,22 53:23
62:11
**period** 16:9
59:20 60:11
**perjury** 76:18
**person** 19:4,5
20:6 22:18
24:4 36:1 50:8
50:19 51:20
55:22
**personal** 57:15
70:17
**personally** 12:19
18:21 23:16
56:17 57:16
74:5
**personnel** 61:3
66:25 69:8
**pertains** 21:8
25:24
**phone** 50:7,19
**piece** 64:10
**place** 1:16 17:6
20:14,23 21:21
24:9,12,16
26:10 33:21
**placed** 67:11
**PLAINTIFF** 1:7
2:5
**plan** 8:23 38:10
**please** 33:14
54:16 55:14
77:7
**PLLC** 2:2
**point** 6:12 17:16

17:21 20:13
26:19,20 27:10
27:22 28:23
29:4,6,16
34:16,21,25
35:17 36:8
37:16 38:7
42:7,18 43:12
46:10 48:14
51:5 56:19
59:16 60:6,18
61:2 66:24
69:21
**police** 7:7,12,12
8:9,17,23 17:7
19:23 31:5
40:22 41:24
46:13 47:20
48:16 58:13
64:15 68:7
69:5,6 70:10
70:12
**policies** 24:1
**policy** 24:3
**position** 10:25
19:6
**possibility** 69:9
**possible** 28:4
**potential** 12:5
12:20 32:22
33:6
**powers** 56:18
**practice** 24:2
**practices** 9:24
**pre-meeting**
26:25
**predeterminat...**
29:22 30:1
31:16 32:14,20
34:20 35:4,10
43:5,12,18
59:22,23
**presence** 50:13
**present** 13:5
18:9 19:14

21:9 23:18,22
24:13,23 25:5
27:21 35:20
50:6,15 55:1
**presidency** 12:2
**president** 11:1,7
11:8,10,12,14
11:15,18,21,21
11:22,23,25
12:2,8,8,9,15
19:12,16,17
20:10 22:3,4,7
23:2,2,3,12
24:24 31:3,4
36:3,5 40:11
40:19 42:10
55:21 67:1,5
**presume** 4:23
6:15 7:8
**pretty** 13:19,19
30:19 50:3
**previously** 54:18
55:17
**Prieto** 19:25
36:22,24 48:2
48:22 58:6
59:5
**prior** 7:3 11:6
17:11,15 18:3
18:13 29:8
30:18,20 45:9
56:24 57:6
66:11,12
**probably** 38:18
56:19
**probationary**
8:6
**problem** 10:17
29:19
**Procedure** 77:21
77:21
**procedures** 24:1
**proceed** 4:9
**process** 60:13,20
64:6 65:9 67:9

71:10,12
**professional**
14:2
**progressive**
65:25 66:1
**promoted** 7:14
7:15 8:6 14:7,7
14:8 68:17
**proper** 14:1,1
22:19
**protect** 9:11
**protected** 8:20
**protecting** 10:22
**protection** 7:21
**proud** 8:11
**provide** 52:5
**provided** 28:24
**providing** 52:18
**provision** 31:15
**Public** 1:18 74:4
74:11
**pull** 30:22 62:9
**pulled** 61:23
**pushed** 25:6
34:12
**put** 13:24,25
19:6 27:8 43:2
60:19 67:2,19

___

**Q**

**question** 5:25
6:3,9,13,14,15
6:19 10:7 15:8
20:6 22:25
23:15 30:25
33:3,4,14
52:11 55:7
61:18 64:18
68:23 69:11
72:5
**questioned** 48:2
**questions** 13:15
38:15 48:21
70:21,22
**quick** 30:19

54:15
**quickly** 5:19 6:1
**quote** 42:23
60:25

___

**R**

**R** 4:1 76:1,1
**rank** 7:11,12
**ranking** 46:20
**reached** 20:7
**read** 32:6 54:4
72:2,8,10,11
72:23,25 76:18
77:7
**reading** 2:19
77:18
**ready** 62:17
**really** 49:20,20
49:22 50:1,5
64:18 67:6
70:13
**reason** 9:19 16:8
17:18 19:10
32:13 44:1
46:1 62:22
72:9 76:6
**reasonable**
77:10
**recall** 15:24,24
16:2 17:9,10
17:25 18:2,5,6
18:14,19 19:20
21:14,20,23
27:12,21 30:2
36:20 41:16
44:3 45:12,12
45:13 46:14
47:12,12,14
49:13,15 50:8
50:12 51:14,25
54:8 64:9
**receipt** 77:9
**receive** 4:19
**received** 77:12
**Recess** 37:14

62:16
**recollection** 11:5
61:4
**record** 16:6 43:2
75:7
**recorded** 57:23
57:24,25 58:3
58:7,9,11
**recording** 58:1,5
**Redirect** 3:6
70:24
**reference** 17:17
18:1,1
**referring** 25:14
29:9 49:1
**regard** 77:10
**regarding** 13:4
46:16
**Reginald** 1:13
3:3 4:10 74:5
75:5 76:4,20
77:2,5
**REGINALDL...**
77:3
**related** 17:13
**relates** 32:23
**relating** 54:1
71:7
**relation** 14:22
31:5
**relationship**
14:3 49:25
69:16
**relationships**
13:25 70:14
**relative** 75:8,9
**relieved** 17:16
**remember** 13:14
14:24 17:17,20
17:21,23 21:7
21:16 22:1,2
26:15,21,22
27:3,5,14,22
37:3 44:16
47:24 49:19

52:7,15,17
53:15 73:5
**REMOTE** 1:16
**rep** 23:24 24:4
**Repeat** 15:8
68:23
**report** 64:14
75:5
**reported** 1:17
65:22
**reporter** 1:17
4:3,9 5:21 6:6
44:17 52:10
72:2,14,17,25
73:6,15 75:5
75:15 77:16
**REPORTER'S**
75:1
**represent** 4:15
5:4 10:11
22:15 32:8
39:7,18 40:6
**representation**
13:6 22:19
**representative**
9:8 21:8 27:5
57:13
**represented**
20:1
**representing**
10:8,9
**reps** 23:24
**request** 19:9
20:13,16,18,18
20:19,21,22,25
21:12,15,16,19
22:6 23:5,5
25:4,12,13,15
25:21 51:5
**requested** 20:7
75:6
**requesting** 56:15
**required** 12:18
13:3
**requirement**

Sgt. Reginald Lester

32:13
**research** 30:13
**reserved** 2:20
**resignation**
  44:22 45:22
  46:2
**resigning** 66:20
**resolve** 22:17
**respect** 15:21
  27:24
**respectfully**
  13:25 28:7
**respective** 2:18
**responding**
  17:20
**response** 34:1
**responsibilities**
  7:17
**responsibility**
  10:4
**rest** 25:10
**result** 67:16
**retaliating** 46:2
**retaliation** 17:1
**retaliatory**
  16:25
**review** 34:17
  42:5,6 64:8
  67:3 75:6 77:8
  77:9
**reviewed** 66:5
**Richard** 37:7
  54:18,22,24
  59:6
**Rick** 19:23
**right** 5:3,6 10:13
  12:17 19:1,22
  19:22,22,22
  22:25 23:22
  25:5 28:7,7
  29:12,20 33:10
  34:2,4 37:11
  38:25 40:2
  41:3,15 42:19
  45:6 46:24

49:3,10,14
50:17 52:8,8
54:12 57:15
58:12 59:15
60:5 61:4,19
61:24 62:8,8
62:10,12,13,15
62:17,21 63:8
64:21 65:15,24
70:20 71:19
**rights** 8:18,19
  9:11 10:9,18
  10:22 31:17,18
  32:11 33:8
  35:4 46:13
  47:20 48:3,11
  49:11
**role** 7:18 8:13
  10:8 11:2,3,18
  12:2,19
**room** 27:16,17
  27:17,18,19,24
  28:12 45:9
  56:19
**rule** 5:21 77:21
  77:22
**rules** 5:18 77:10
**rumor** 45:16
  70:5,9
**rush** 38:13

───────
**S**
**S** 2:15,15 3:8 4:1
  76:1
**Salabarria** 4:17
  13:9 42:5
**Salabarria's**
  30:10
**sat** 12:22 48:12
**saying** 15:2 19:9
  19:20 26:1
  31:25 44:10,11
  44:19 56:16
  59:14 60:5
  64:17 69:20

**says** 31:15 39:8
  40:21 41:24
  42:3
**scenario** 21:6
  44:14 50:2
  58:25 60:6
  64:16
**scenarios** 66:15
**schedule** 24:14
**scheduled** 30:19
  38:11
**scored** 14:9
**screen** 62:21,23
  65:16
**scroll** 39:14,17
  40:9
**second** 11:6,8,10
  11:12,19,20,22
  11:25 12:6
  19:16 23:3
  24:23 31:4
  38:25 55:21
  67:5 69:15
**see** 38:3,17 39:1
  39:10,14,18,20
  39:23,24 40:1
  40:9,21,23
  41:2 42:1,6,7,8
  42:9 63:3,4,16
  64:9 67:25
  73:19
**seen** 62:2
**send** 61:10
**sense** 6:4
**sent** 50:3 55:20
  61:11,12
**sentiment** 56:23
**separate** 71:9
**separated** 46:15
  47:1,11
**separation** 16:24
  46:17 54:1
**sergeant** 4:14
  5:7 7:12,13,14
  7:15,16,18

13:12 30:5
37:21 38:24
54:15 56:1
60:22 61:7
64:7 68:7,14
68:17,18,20,25
70:23 71:18,24
72:3,5 73:17
**serious** 23:23
  29:17
**seriousness**
  56:14
**service** 71:24
**sessions** 12:10
**set** 69:5
**setting** 53:15
**settled** 36:7
**Settlement** 3:10
  39:8,19,22
  40:18 71:3
**settling** 67:17
**severity** 67:21
  67:22
**Sgt** 1:13 3:3 4:10
  74:5 75:5 76:4
  76:20 77:2,5
**shaking** 6:8
**Shame** 34:10
**share** 62:21,22
**sharing** 65:15
**shift** 27:9 68:16
  68:18
**shifts** 68:21 69:8
**show** 36:14
  38:24 41:23
  61:15
**showed** 24:9,16
  25:9 61:23
  71:3
**showing** 38:25
  54:3
**sick** 18:21 21:15
**side** 44:24 76:17
**sides** 44:5 48:17
**sign** 32:21 36:5

77:7,7
**signature** 40:7
  42:8
**signatures** 39:15
**signed** 28:6 32:9
  39:19 40:10,19
  58:22 59:7,11
  59:15,25 60:9
  60:11 61:2,5
  74:8
**signing** 2:19
  77:18
**signs** 33:5
**simple** 8:17
  30:25
**simply** 63:25
**sir** 4:21 5:8,16
  8:11 10:5
  21:23 24:17
  25:11 26:4
  30:4,6 32:15
  37:13 39:3,21
  40:3,5 41:4,17
  42:7 53:21
  54:17 55:2
  56:2,12 58:17
  59:7 62:11,18
  63:4 71:5,8
**sit** 12:14
**sitting** 37:3
  47:15 53:17,24
  54:7
**situation** 13:13
  16:14 28:10
  30:14 34:15
  42:21 48:15
  59:19 60:3
  66:12
**situations** 10:5
  20:9 42:20
**SMITH** 2:2
**somewhat** 11:13
**sorry** 7:13 11:19
  11:21 18:24
  20:10 52:9

57:2 63:24
**sort** 8:21 25:7,19
34:20 67:15
**sounds** 18:8
73:15
**SOUTHERN**
1:3
**sparked** 64:23
**speak** 36:4
**speaking** 15:2
31:1,2,14
33:17 61:13,18
61:20,21,22
**special** 7:24,24
69:7
**specific** 61:18
64:22
**specifically**
20:25 49:18
**spending** 72:6
**spoke** 27:14
**staff** 10:11
**staffing** 8:24
69:9
**stamp** 72:25
73:7
**stand** 11:14,14
**standard** 29:10
29:12 68:20
**start** 8:14 33:25
49:7,12
**started** 26:13
27:1
**state** 1:18 23:10
74:2,4,11 75:2
**stated** 54:18
71:15 76:18
**statement** 33:2
40:16
**statements** 4:5
**STATES** 1:2
**station** 17:23
27:12 70:10,13
**Statute** 77:10
**stenographic**

75:7
**step** 30:3
**Steve** 65:6,7
69:20 70:2,14
**Steven** 17:8
19:25 64:22
69:17
**stick** 33:23,24
**stipulated** 2:17
**stone** 12:9
**stop** 24:7,24
33:16 46:11,11
56:3 65:15
**stopping** 25:3
**story** 44:24
**strike** 69:14
**structure** 12:13
19:5
**stuff** 30:22 42:23
**subject** 42:4,6
**submitted** 58:22
58:25 59:1,2
59:11 63:10
64:1,13
**subpoena** 4:19
5:13 51:10
**subpoenaed**
4:18 16:12,12
51:7 53:9,12
**sued** 16:23
**suggested** 77:9
**SUITE** 2:3
**supervise** 14:5
**supervised** 14:6
14:10 68:10
**supervising**
27:11 64:7
**supervisor** 5:10
7:23 8:3,5
58:15 60:16
62:5 71:18
**support** 25:20
**supposed** 27:11
**sure** 22:14,20,21
24:20 26:18,19

29:7 38:12
41:7 43:4,7,22
48:25 52:2
60:1 61:2 73:1
73:20
**suspensions**
9:12
**swear** 4:4
**swore** 42:16
**sworn** 4:11 11:5
74:7

**T**

**T** 2:15,15 3:8
76:1,1
**table** 67:19
**tabs** 16:6
**take** 5:22 16:1,6
20:14,23 21:21
24:8,12,16
36:1 37:10
38:6,21 41:14
41:16,17 42:25
44:17 52:10
62:9 68:3
**taken** 37:14
62:16 77:6
**talk** 5:24 14:12
14:15 16:16
28:20 32:19
33:22,22 45:11
49:20,22 53:7
63:20
**talked** 16:7
48:18,19 49:21
52:17,22,23
53:1,6,17,21
59:22
**talking** 5:23
27:2 31:2,14
33:25 34:7,22
35:10 44:17
45:7 47:9
51:23 52:10,16
63:21

**talks** 48:16
**tell** 14:22 15:10
25:11 27:4
28:24 33:14,18
36:18,22,25
44:2 45:25
48:6 49:7 51:9
51:10,11 59:6
61:15 62:1
**telling** 33:15
34:9 43:15
44:20 60:3
**terminate** 32:12
**termination**
9:12 16:24
28:1,2,4,22
29:9,12,19
32:1 43:6
65:20 66:4
**terminations**
10:16 45:19
**terminology**
30:11
**terms** 13:21,22
16:7 19:14
25:2 26:23
29:16 30:9
35:15,15 51:9
53:13 57:3,25
64:17 68:4,5
68:13
**TERRACE** 2:9
**testified** 4:11
68:11
**testify** 23:11,12
42:22,22 56:2
56:13 60:4
68:9
**testifying** 33:10
59:2
**testimony** 43:7
**thank** 4:9 5:2
38:4,22 55:16
60:23 62:11,25
63:25 65:15

69:13 71:23,24
72:1
**thing** 14:2 17:15
18:14 20:9
27:4,4 34:20
48:5 52:18
57:14 65:8
**things** 7:21 9:13
9:25 12:5
23:12 24:1,2,3
25:8 46:21
48:1,18,19
49:22 59:17
65:18
**think** 5:1 11:3
14:16,17 17:7
17:14,25 18:19
18:21,22 19:2
19:15,18,21
20:3,4,20 21:1
21:2,14 23:17
23:18 24:14,19
25:23 26:1,16
26:16,17,17,18
27:17,23 29:1
29:10,16,17
33:2 34:19
36:9 38:7
41:15 49:3,3
50:5 52:14
55:25 62:5
66:18,21 67:16
67:18 68:15,17
70:23 73:12
**thinking** 37:15
**third** 11:20
46:20
**thought** 34:13
**three** 21:17 53:3
**three-minute**
37:10
**thrown** 25:9
**Tim** 5:21,22
72:12 73:12
**time** 1:15 5:1,23

6:12,17,17 8:6
16:9 19:11,24
21:23 22:2
29:7 31:24
35:9 44:18
46:10 52:11
56:11 58:16
59:20,24 60:1
60:12 61:17
65:5 72:6
**times** 8:22 10:3
46:9 48:15
**Timofey** 1:17
74:4,10 75:5
75:15 77:16
**title** 36:8
**today** 14:13 37:3
47:15 53:17,24
54:4,5,7
**told** 14:17 15:1
15:16,17,23
20:19 21:1
22:8 24:8,10
24:18,19 25:8
25:23 28:4,6
29:2,4 32:3,3
36:20 37:4
42:13,15,15,17
43:11,12,13
45:3 51:24
53:8 54:8
55:19 69:18
**tongue** 6:2
**top** 39:7 61:14
61:25
**topic** 57:11
**totality** 20:7
56:14 70:6
**totally** 57:11
**touch** 65:18
**transcribed** 77:7
**transcript** 72:8
73:3 75:6,6
76:2 77:6,8,9
77:11,13,19

**trap** 29:6
**tried** 56:4 69:20
**trip** 53:5
**true** 23:10 28:15
30:3 35:25
36:1 69:22
70:3 75:6
76:18
**truly** 77:14
**trust** 20:4 22:10
55:17
**Trustee** 12:15
**truth** 4:5,6,6
51:9,10
**truthful** 53:14
**try** 22:12,14,17
46:11 54:15
64:21
**trying** 15:9 29:5
29:6 30:24
52:2 53:2,5
64:10,11 65:6
67:25
**tunnel** 68:1
**turn** 36:4
**turned** 28:15
69:21
**twenty** 11:3,4
**two** 5:23 37:6
44:17 51:23,24
52:10,17,24,25
**type** 12:10,13,14
13:22 23:18
25:2 34:1,20
34:23 43:11
49:24 59:17
**types** 9:13 10:2

**U**

U 2:15
**Uh-huh** 39:13
**ultimately** 45:22
**ums** 6:8
**understand** 5:10
5:12,15 6:1,10

6:11,12,19
10:1 17:2,4
21:11 29:5
31:6,13,24
32:14,20 33:4
34:17 35:1,5
35:10 40:7,11
41:23 43:4,16
44:10,14 52:3
56:22 62:8
68:4 70:19
71:18
**understanding**
22:23 44:5
56:24 65:5
**understands**
9:24 33:12,16
**understood** 6:15
12:25 32:5
36:14 43:7
71:13
**unfair** 21:18,25
30:23
**unfortunately**
12:12 46:21
**union** 8:17 9:1,1
9:8,21 10:3,8
10:10,20,25
11:17 12:21
13:5 19:5
20:10,11 21:9
22:6,9,12
25:13,16 27:5
35:15 36:3,4
40:4,14,17
41:20 42:5
48:11 53:25
56:11 57:12
65:24
**unit** 7:19,24 8:2
9:9 17:22 61:6
**UNITED** 1:2
**unknown** 51:20
51:22
**unusual** 12:25

13:2 22:25
**use** 62:4 76:17
**usually** 11:25
12:6 59:17,20
59:24,25 60:9
60:9,10,11,15
60:15 65:24
66:24,25,25
67:5,6,20

**V**

V 76:3 77:4
**varies** 12:11,12
12:16
**vehicle** 17:22
18:10
**vice** 11:1,6,8,10
11:12,18,20,22
11:23,25 19:16
19:16 22:4,7
23:2,3 24:23
31:3,4 55:21
67:5
**video** 58:1
**violate** 68:4
**violated** 8:20
47:19 48:3,11
**violation** 28:2
48:23 60:15
65:25 66:3
67:21
**violations** 28:17
**VS** 1:7

**W**

**wait** 24:13,15
49:7
**waive** 72:2,9
77:7,18
**waived** 35:4
**Waiver** 77:17
**walked** 56:19
**want** 5:25 8:23
15:20 18:7
21:11 25:3
27:7,20 36:3

38:13 43:4
47:4 48:10,24
50:24,25 52:2
52:17,19 60:10
62:7,14 65:18
71:23 72:7,16
72:17 73:8
**wanted** 38:13
43:7,22 44:14
44:23 73:1
**wants** 73:11
**wasn't** 12:17,17
19:20 24:15
25:7 27:20
28:4,8,8,15
29:20 30:13,16
32:19 33:3
36:1 38:12
43:12 45:24
50:1 58:9,10
59:7,23 70:3
71:11 73:1
**way** 24:5 36:18
**Wayne** 17:7
19:24 26:13
36:25 37:2
**ways** 60:17
**we'll** 37:11
38:17 62:15
72:15
**we're** 31:14
37:19,22,23
46:8
**weeds** 10:1
**weird** 16:11
**went** 7:8 16:9
48:5 55:23
56:20 59:16
60:1,2
**weren't** 32:18
47:5
**whoever's** 22:15
**witness** 3:2 4:8
5:4 9:18 31:22
35:14 37:13,19

Sgt. Reginald Lester

37:22 38:1,4
55:7,12 57:2,9
57:9,12,17,22
58:24 59:13
62:18 63:12,16
64:5 65:3,22
66:15 67:14
68:9,23 69:3
70:2,12,25
72:1,4,10
73:16,19,21
**word** 41:14,16
41:17
**wording** 14:24
**words** 15:2,9,10
44:7 60:14
**work** 6:9 7:3,6
9:2 13:21 14:2
24:1 52:10
68:20 69:10
**worked** 27:9
68:11,15,17,18
**working** 7:4
18:8
**worse** 22:18
**wouldn't** 9:21
14:9 29:12
**write** 60:19 64:7
76:2
**write-up** 27:8
28:17,21,21
29:18,20,23
31:25 43:13
**write-ups** 9:13
**written** 12:9
**wrong** 17:6 29:6
34:10 44:20
60:5
**wrote** 27:8

---

**X**

**X** 3:1,8

---

**Y**

**yeah** 11:4 15:16
16:13 19:1,21

33:2 35:14
38:17 44:12
46:21 57:2
58:16 61:11,11
61:20 62:19
63:7 72:15,17
72:23
**year** 18:5 31:5
**years** 7:2 21:17
53:3
**yield** 10:4

---

**Z**

**Zoom** 1:16
18:22,25 19:2
63:6 74:6

---

**0**

**001250** 63:2

---

**1**

**1** 3:10 38:21
39:1,4 71:4
**1-73** 75:6
**1.310(e)** 77:22
**1:22-cv-21004...**
1:5 76:3
**1:35** 62:15
**1:50** 1:15 73:22
**112** 47:19 49:11
**12:14** 1:15
**1212** 2:9
**15** 38:6
**15-minute** 38:21
**16** 77:1
**16th** 2:9 75:11
**19th** 17:6 18:18
41:15 56:4
64:24

---

**2**

**2** 73:11
**20** 7:2
**20-plus** 31:5
**2018** 7:15
**2020** 17:2 41:2

45:11,14 46:3
**2021** 16:25 17:6
18:18 41:12
**2023** 11:4,4
**2024** 1:14 74:6,8
75:11 76:4
77:1
**2026** 74:12
**23rd** 41:2,9
**25th** 7:15
**26-year** 5:1
**27th** 41:9,9
**28** 1:14 76:4
**284028** 74:12
**28th** 74:6,8

---

**3**

**3:00** 38:12
**30** 38:18 77:9
**30(e)Florida**
77:21
**33131-2433** 2:4
**33304** 2:9
**39** 3:10

---

**4**

**4** 3:4 40:21
**4th** 7:2

---

**5**

**5** 74:12
**520** 2:3
**54** 3:5

---

**6**

**6** 8:10
**688-2335** 2:4

---

**7**

**70** 3:6
**786** 2:4

---

**8**

---

**9**

**954)401-2608**
2:10

**954)523-5326**
77:7

---



EXHIBIT
1
03.28.24 LESTER  TG

## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, Salabarria is the subject of an on-going Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2020-04794 ("EEOC Charge"); and

WHEREAS, the Investigation and EEOC charge are all pending and constitute all the charges, investigations and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of further investigation, litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.    Recitals. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.    EEOC Charge Withdrawn With Prejudice and Discipline. Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the attached Notice of Withdrawal with Prejudice and immediately filing same with the EEOC. Additionally, as discipline for the matters that are the subject of the Investigation, Salabarria agrees to accept the following:

    a.  A One Hundred and Sixty (160) hour suspension,

    b.  Payback of Eighty-Six (86) total hours, of which Forty-Four (44) Hours is regular time and Twenty-Four (24) hour is overtime. The regular rate is Forty-Four Dollars and 14/100 ($44.14) for a total of One Thousand Nine Hundred Forty-Two Dollars and 00/100 ($1,942.16) of regular time. The overtime hourly rate is Sixty-Six Dollars and 21/100 ($66.21), for a total amount of One

1

Thousand Five Hundred Eighty-Nine Dollars and 04/100 ($1,589.04). **Accordingly, the Total Amount due to the City is Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) ("the Total Amount")**. Salabarria can pay the Total Amount via a cashier's check made payable to the City of Miami Beach on or before January 4, 2021. If the City does not receive full payment on or before 5:00 p.m. on January 4, 2021, then the City is authorized to deduct the remaining amounts due from Salabarria's vacation leave bank.

c. Salabarria will execute the attached Last Chance Agreement, which contains additional provisions. The Last Chance Agreement is incorporated by reference into this Agreement.

d. Permanent deletion, from all platforms (platforms includes but is not limited to: Apple Podcasts, Stitcher, Spotify, Spotify Podcasts, Google Play Music, Google Podcasts, iHeart Radio, and any other social media and/or electronic platform) the podcast titled: "Cafecitos y Chisme with Nick & Jess."

e. Salabarria will immediately have a meeting with the Chief of Police wherein she will address the claims made in the Charge, including but not limited to identifying the names of all persons who allegedly engaged in the conduct addressed in the Charge. The refusal to name the persons who have allegedly engaged in the conduct in the Charge shall be grounds for immediate termination, as discussed in the attached Last Chance Agreement. Salabarria shall be entitled to have a Union Representative with her during this meeting.

f. <u>Release Of Claims, Covenant Not To Sue.</u> Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement. The claims released also include any claims under the United States Constitution, including but not limited to claims arising under the First Amendment or any other claims whatsoever.

2

City 001236

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf. Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

g.    Effect; Precedent.    The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind, with the exception of any labor proceeding involving Salabarria. The parties further agree that Salabarria's prior settlement agreement may also be used in any labor proceeding involving Salabarria.

h.    Consideration.    The consideration for this Agreement is the City's early conclusion of the Investigation. The parties acknowledge that the City could continue the Investigation. The parties further acknowledge that continuing the Investigation would likely be detrimental to Salabarria. Therefore, the City is giving up its right to continue the Investigation in exchange fro Salabarria's agreement to the provisions and terms of this Agreement. The mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

i.    Miscellaneous.    This Agreement (which includes the exhibits attached hereto that are incorporated by reference), is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral. The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever. This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release,"

3

is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

**CITY OF MIAMI BEACH**

DocuSigned by:

By _Paul J. Aguila_
City Manager    2B3D6240F92B45D...

**JESSICA SALABARRIA**

JESSICA SALABARRIA

**FRATERNAL ORDER OF POLICE, LODGE 8**

By _____
KEVIN MILLAN
President

12/23/2020 | 1:34 EST

DATE _____

DATE _12/18/2020_

DATE _12/18/2020_

**CHIEF OF POLICE**

RICK CLEMENTS
Chief of Police

4

City 001238

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY

UNION          JESSICA

City 001240

DocuSign Envelope ID: CC3C604A-8486-4907-B5EB-8735D7C895E5

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1.      All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2.      During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3.      Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4.      The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY

Page 2 of 7

UNION        JESSICA

City 001241

DocuSign Envelope ID: CC3C60Af-8486-4907-95EB-8735D7C895E5

5.    Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6.    SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7.    Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command.  Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8.    For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

CITY

Page 3 of 7

UNION            JESSICA

City 001242

9. Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10. Employee shall attend and cooperate with any training required by the Chief of Police.

11. If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12. In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13. The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

CITY

Page 4 of 7

UNION          JESSICA

City 001243

DocuSign Envelope ID: CC3C60AA-9185-4907-B5EB-8735D7C895E5

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY                                    Page 5 of 7                    UNION          JESSICA

City 001244

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.     SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.     Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.     This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.     This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.     In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida. **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY                              Page 6 of 7                              UNION            JESSICA

City 001245

This Agreement is dated the _____ day of December 2020, in Miami-Dade County, Florida.

**JESSICA SALABARRIA**

DocuSigned by:

Paul J. Aguila

2B3D6240F92B45D...

**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: 12/18/2020

Date: 12/23/2020 | 1:34 EST

**FRATERNAL ORDER OF POLICE**

_President_
Signature & Title

Kevin Millan    President
Print Name & Title

12/18/2020
Date

**CHIEF OF POLICE**

12/18/2020
Date

City 001246