**1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO:  1:22-CV-21004-DPG

JESSICA GUASTO,

          Plaintiff,

vs.

THE CITY OF MIAMI BEACH FLORIDA,
a Florida municipality,

          Defendant.

-----------------------------------/

DEPOSITION OF:       NICHOLAS GUASTO
DATE:                APRIL 23, 2024
TIME:                9:00 A.M. - 10:33 A.M.
PLACE:               VIA REMOTE CONFERENCING


REPORTED BY:         SUSAN BARNARD,
                     PROFESSIONAL COURT STENOGRAPHER
                     NOTARY PUBLIC, STATE OF FLORIDA

**2**

1 APPEARANCES:
2
  DANIEL BARROUKH, ESQ.
3 Derek Smith Law Group, PLLC
  520 Brickell Key Drive
4 Suite O-301
  Miami, Florida 33131-2433
5 Office:  786-688-2335
  E-mail:  Danielb@dereksmithlaw.com
6           COUNSEL APPEARING ON BEHALF OF THE PLAINTIFF.
7
  MICHAEL ELKINS, ESQ.
8 MLE Law
  1212 Northeast 16th Terrace
9 Fort Lauderdale, Florida 33304-2323
  Office:  954-401-2608
10 E-mail:  Melkins@mlelawfirm.com
            COUNSEL APPEARING ON BEHALF OF THE DEFENDANT.
11
12
13
14           * * * * * * * *
15
16
17
18
19
20
21
22
23
24
25

**3**

1              I N D E X
2
3 WITNESS:
4 Nicholas Guasto
5
  DIRECT EXAMINATION                          4
6 By Mr. Elkins
7
8
9
                    -  -  -
10
11        INDEX TO EXHIBITS
12 DEFENDANT'S

13 Exhibit          Description              Page
14    1             Internal Affairs report    17
15    2             Settlement Agreement       21
16    3             EEOC Complaint             25
17    4             Settlement Agreement       36
18    5             Declaration                42
19    6             Charge of Discrimination   45
20
21
22
23
24
25

**4**

1 Thereupon,
2           NICHOLAS GUASTO,
3 having been first duly sworn remotely, was examined and
4 testified as follows:
5           DIRECT EXAMINATION
6 BY MR. ELKINS:
7 Q.   Can you state your full name for the record,
8 please?
9 A.   Nicholas Guasto.
10 Q.   Mr. Guasto, have you ever given a deposition
11 before?
12 A.   Yes.
13 Q.   Okay.  In a civil case?
14 A.   No.
15 Q.   All right.  So let me go over a few ground rules
16 that will hopefully help us get out of here quickly
17 today.  A couple of things, first of all, there is a
18 court reporter here.  She can't take down two people
19 talking at the same time, so it is important that we not
20 talk over each other.  Even though you might anticipate
21 a question or my questions, it is important you wait and
22 let me finish the question.  I will of course do my best
23 to let you finish the answer.
24      Do you understand that?
25 A.   Yes, I do.

NICHOLAS GUASTO

---

5

1 Q.    Okay.  And she can only take down audible
2 responses, so it is important that you actually say yes
3 or no or give answers.  You can't just nod your head or
4 say uh-huh, uh-uh.
5        Does that make sense?
6 A.    Yes, it does.
7 Q.    If you answer my question, I am going to presume
8 that you've understood the question.  But if you don't
9 understand the question, you are certainly free to ask
10 me to clarify it.  This isn't, you know, you don't have
11 to answer just because I ask it.  You have to answer,
12 but you can ask me to clarify to make sure you
13 understand what I am asking you.
14       Does that make sense?
15 A.    Yes, sir.
16 Q.    Okay.  You are not allowed to refer to any other
17 materials during the deposition.
18       Do you understand that?
19 A.    Yes, sir.
20 Q.    Okay.  Did you do anything to prepare for this
21 deposition?
22 A.    I read the Declaration that I signed previously.
23 Q.    You have your Declaration from, I think,
24 November 2021?
25 A.    2021.

---

6

1 Q.    Who prepared this Declaration?
2 A.    Paul Daragjati.
3 Q.    And did he give it to you to review and edit?
4 A.    I don't recall in the exact order if I started
5 it and when it was in conjunction with him.  We went
6 back and forth with it.  So --
7 Q.    So there was edits to the Declaration?
8 A.    None of that I can recall offhand, but I am sure
9 there were.
10 Q.    When you went back and forth, was that more
11 verbal conversations?
12 A.    I believe so.
13 Q.    Okay.  And was this Declaration -- What was the
14 point or purpose of that Declaration?
15 A.    As far as I understood, it was to memorialize
16 the conversation with Chief Clements going back and
17 forth in September 2020.
18 Q.    That was like a year and a few months prior?
19 A.    Yeah, September of 2020.
20 Q.    Was that Declaration submitted to any agency, if
21 you know?
22 A.    I think it was part of the EEOC Complaint or
23 charge.  I am not sure of the specific terms.
24 Q.    Do you happen to know if any other documents
25 besides the Declaration and the EEOC charge were

---

7

1 submitted to the EEOC in 2021? I will tell you why I am
2 asking.  Because we asked Jessica's counsel to provide
3 us with those documents and your Declaration.
4 A.    I don't know.  I know I saw it at some point
5 like the entire packet, but I don't recall what was in
6 it, obviously other than what I had a hand in.
7 Q.    So there was like what you described a packet
8 submitted to the EEOC?
9 A.    Well, I remember --
10     MR. BARROUKH:  Objection.
11     MR. ELKINS:  You can answer.
12 A.    I remember there was a cover page and there was
13 a narrative.  I don't recall how many pages, but there
14 was a narrative explaining, I guess, the nature of the
15 Complaint.  Then I specifically remember my Declaration
16 --
17 Q.    Okay.
18 A.    -- but nothing further than that.
19 Q.    All right.  So let's back up.  Are you currently
20 employed?
21 A.    Yes.
22 Q.    Where?
23 A.    City of Miami Beach as a police officer.
24 Q.    How long have you worked with the City of Miami
25 Beach?

---

8

1 A.    In total?
2 Q.    No, in this current incarnation.
3 A.    Since December 18th of 2023.
4 Q.    And where did you work before that?
5 A.    Prior to that, I was employed by the Texas
6 Department of Transportation from May until, I believe
7 it was, the beginning of October.
8 Q.    Of 2023?
9 A.    '23.  I am sorry.
10 Q.    So May 2023 to October 2023 you worked for the
11 Texas Department of Transportation?
12 A.    Yes.
13 Q.    Then where did you work before May 2023?
14 A.    I was employed as a police officer with the City
15 of Miami Beach for 17 years roughly.
16 Q.    So 17 years, 2006ish?
17 A.    April 10, 2006 to May 2023.
18 Q.    Why did you leave the City of Miami Beach in May
19 2023?
20 A.    It was a personal choice at the time.  I felt
21 like it was time for me to move on, do something
22 different.  I wanted to move out of the area.  I was in
23 a relationship and, you know, we just kind of wanted to
24 move somewhere and start over.
25 Q.    You were in a relationship with somebody not

---

NICHOLAS GUASTO

**9**

1  named Jessica Salabarria formally known as Jessica
2  Guasto?
3  A.    Correct.
4  Q.    And Jessica Salabarria is your ex-wife, correct?
5  A.    Correct.
6  Q.    When was your divorce finalized?
7  A.    June of 2023.  I don't recall the exact date.
8  Q.    When were you married?
9  A.    January of 2021.
10  Q.    When did you start dating?
11  A.    August/September of 2019.
12  Q.    All right.  And when you started dating, you
13  were both employed at the City of Miami Beach; is that
14  right?
15  A.    Yes.
16  Q.    All right.  Have you read the Complaint in this
17  lawsuit?
18  A.    No, I haven't.
19  Q.    Do you understand though what the basis of
20  Jessica's lawsuit is against the City of Miami Beach?
21         MR. BARROUKH:  Objection.
22         MR. ELKINS:  He can answer if he understands
23  what it is.
24  A.    I understand what it is currently as you
25  explained it to me prior.

**10**

1  Q.    And you and I had a conversation prior to this
2  deposition a couple weeks ago, correct?
3  A.    Yes, that's correct.
4  Q.    Okay.  But absent our conversation, did you know
5  what this lawsuit was about?
6  A.    Broadly speaking.  I mean, yes.  But
7  specifically and being real in's and out's, no.  I think
8  I had a broad and general understanding.
9  Q.    Well, what was your broad and general
10  understanding?
11  A.    That the lawsuit is or her complaint in the
12  lawsuit is retaliation and hostile work environment, a
13  complaint of a hostile work environment, retaliation for
14  making that complaint --
15  Q.    Okay.
16  A.    -- or multiple complaints.
17  Q.    Did you assist Jessica in finding Mr. Daragjati
18  who filed this lawsuit initially?
19  A.    Yes.
20  Q.    Can you tell me about that, please?
21  A.    Paul is someone that I have known for a while.
22  He is general counsel for the state lodge at the FOP.
23  And I've been very involved with the FOP for a pretty
24  good chunk of my career.  And he is someone that I have
25  had a relationship with through relationships that I

**11**

1  have in the FOP.
2         So I brought this to him and he agreed to
3  represent me in my Internal Affairs case which was, you
4  know, Jessica and I were subjects together, co-subjects,
5  I don't know.  He agreed to represent me, move forward.
6  And then he agreed to represent her in this EEOC
7  lawsuit.
8  Q.    What did you tell him when you brought him, as
9  you described, into this lawsuit or the idea of this
10  lawsuit?
11         First of all, when did you go to him?  Let's
12  start there, not to represent you in the IA case.  We
13  are going to talk about it but about bringing this
14  particular lawsuit.
15  A.    I think we had a first real conversation about
16  this in June of 2021 I think we had talked about it.
17  Prior to that -- But we met and discussed it in detail
18  in June of 2021, I believe.
19  Q.    And what did you discuss?
20  A.    Well, that was at state conference for the state
21  lodge of Fraternal Order of Police.  Jessica accompanied
22  me there and we both met with Paul.  She conveyed, you
23  know, her complaint of the hostile work environment
24  stuff.
25  Q.    Let me just -- You had a meeting.  It was you,

**12**

1  you were present, Paul and Jessica?
2  A.    Yes.
3  Q.    Okay.  Continue.
4  A.    She spoke about her problems and her complaints
5  about the hostile work environment, things that had gone
6  on, the prior complaints.  And then we discussed what
7  had gone on in the Internal Affairs case with me as well
8  as with her because my case was still -- I don't recall
9  if it was closed.  I don't think it was closed at that
10  time, but it was still going back and forth.  It was
11  influx.  It was still pending.
12  Q.    You are talking about your Internal Affairs case
13  from 2020 that you were in with Jessica?
14  A.    Yes, that's the only one.
15  Q.    You are saying that that was still going on in
16  2021, June of '21?
17  A.    Yeah, yeah.
18  Q.    Okay.  Continue.
19  A.    Trying to catch my place.
20  Q.    That's okay.
21  A.    So we discussed what had gone on with the
22  Internal Affairs case.  Mine was still pending.  Jessica
23  had been resolved and then she was terminated shortly
24  thereafter.  And then that was, you know, kind of the
25  jump off point from there as far as, I guess, the EEOC

NICHOLAS GUASTO

13

1  charge.
2  Q.     Got it.  Okay.  Give me one second.  Did you
3  talk to anybody about this deposition?
4  A.     No, I spoke to you.
5  Q.     Besides me.
6  A.     No.
7  Q.     Did you speak to anyone besides me?
8  A.     I said no.  Sorry.
9  Q.     Okay.  Sorry.  I didn't hear you.  My bad.
10        When was the last time you spoke to Jessica?
11  A.     Some point last year, maybe Summer or so.
12  Q.     Did you ever speak to her -- When was the last
13  conversation you had with her about this lawsuit?
14  A.     I think it was around the Summer or so.  She
15  reached out telling me that she had not heard from
16  Daragjati in a while, if I knew what was going on.  I
17  said I hadn't spoken to him at all and that was really
18  it.
19  Q.     And this was -- You guys were already in the
20  process of getting divorced; is that right?
21  A.     For sure.  But I think we may have been
22  divorced, like the divorce was finalized at that point.
23  But yes, we were already in the process.
24  Q.     Your divorce was finalized in June 2023, right?
25  A.     June 2023.

14

1  Q.     When did that divorce process start?
2  A.     How do you define start?
3  Q.     That's a really good point.  Good question.
4         When was the complaint for divorce filed?  Let's
5  start there.
6  A.     I honestly don't know because it was -- There
7  was a time delay.  The separation was longer before the
8  divorce was initiated, so I don't recall.  I can figure
9  it out if you would like the date.
10  Q.     Okay.
11  A.     It will take me a little bit of time to look
12  through my documents.
13  Q.     When did you two stop living together
14  approximately?
15  A.     December, the end of December 2021.
16  Q.     What happened to cause this separation or
17  divorce?  What was the cause of it between of two of
18  you?
19  A.     I mean, there is -- How involved am I required
20  to go into answering this question?
21  Q.     Well, you can answer the question.  And then if
22  I need to go further, I will go further.  But you have
23  to answer the question.
24  A.     Okay.  It is a personal reason.  That is, it
25  didn't have anything to do with this case.  And there

15

1  were marital issues.
2  Q.     Was there infidelity specifically on her part?
3         MR. BARROUKH:  Objection.
4         MR. ELKINS:  You can answer.
5  A.     Again, I think you have to define infidelity.  I
6  think at the very least, we had grown apart and there
7  was some emotional infidelity, you know.  It is what it
8  is.  Physical, I don't know.  I don't care.  I mean,
9  that's past us.
10  Q.     Right.
11  A.     But, I mean, I would say there was emotional.
12  Everybody was going through a lot, so I don't hold any
13  ill will over it.
14  Q.     Fair enough.  Are you familiar with Jessica's
15  relationship, for lack of a better word, with Lieutenant
16  Cosner?
17  A.     Yes.
18  Q.     Do you know Lieutenant Cosner?
19  A.     Yes.
20  Q.     He currently still works for the City, correct?
21  A.     Yes.
22  Q.     What do you know about the nature of their
23  relationship?
24  A.     I know that there were always rumors of a
25  relationship around the police station.  Sorry, I am

16

1  getting like e-mail popups and stuff.  I apologize.
2  There were rumors around the station of a relationship
3  and things of that nature.  But Jessica always told me
4  that there never was.  And, I mean, I am not the kind of
5  person that -- I mean, without going too deep into
6  personal, but I don't hold people's past against them.
7  And frankly, it wasn't something that I particularly
8  cared about either way.  I was more interested in, you
9  know, today and tomorrow rather than yesterday.  So I
10  know what the rumor was and I know what she told me.
11  Q.     What did --
12  A.     But to know, that's what I know.
13  Q.     What did she tell you?
14  A.     That there was never a relationship.
15  Q.     And that's it?  Nothing else?
16  A.     It was a friendship.  It was strictly a
17  friendship.  That's all it ever was.
18  Q.     Okay.  All right.  So let's start with
19  approximately April of 2020, you were employed with the
20  City then, correct?
21  A.     Yes.
22  Q.     When did you become the subject of an Internal
23  Affairs investigation with Jessica?
24  A.     It was actually May, I think, that the
25  notification form was dated, like May 4th or May 5th.

NICHOLAS GUASTO

17

1   So I am sure they started looking in April, but I think
2   the case was officially initiated April 4th or 5th.  At
3   least that's the dates of any notification as I best
4   recall.  It is kind of seared into my mind a bit.
5   Q.     So I am going to show what I am marking as
6   Exhibit 1.
7         (Exhibit is marked for identification.)
8   Q.     Have you ever seen this document before?
9   A.     No, I haven't.  I haven't.  I've never seen
10  this.  I know what it is, but I have never seen it.
11  Q.     So this is the - I will represent to you - the
12  final Internal Affairs report relating to the IA
13  investigation that was initiated.  You can see the date
14  of the report, April 22, 2020, i.e., Case No. 22001, the
15  case as we colloquially refer to where you and Jessica
16  were both involved in?
17  A.     That's correct.
18  Q.     And it says here that the involved employees
19  were Jessica as well as yourself, right?
20  A.     Yes.
21  Q.     Okay.  Then it lists some other employees:
22  Captain Feldman, Lieutenant Rodriguez, Lieutenant
23  Dohler, Lieutenant Flanagan, Captain Brown and
24  Lieutenant Carvajal and Sergeant Loperfido?
25  A.     Correct.

18

1   Q.     Okay.  First of all, to your knowledge was
2   Cosner involved in any way, shape or form with this
3   Internal Affairs investigation?
4   A.     This investigation, no.
5   Q.     Right.  That's what we are talking about, this
6   investigation.
7   A.     No.
8   Q.     And at the time of this investigation, at the
9   time of this complaint or allegation of employee
10  misconduct against you and Jessica, were you and/or
11  Jessica under any other investigation, discipline,
12  anything like that?
13  A.     I wasn't.
14  Q.     Do you know if Jessica was?
15  A.     I don't think so.  I don't think so.
16  Q.     She had some issues in the past, but those had
17  all been resolved by this point; is that correct?
18  A.     Correct.  I believe so, yes.
19  Q.     And what is your understanding of the claims
20  against you and Jessica in this case?
21  A.     It was essentially an attendance tardiness case
22  essentially.
23  Q.     Right.  I think it says here, "further
24  investigation by Internal Affairs."  You can kind of see
25  where I am reading here?

19

1   A.     Yeah, I am with you.  Go ahead.
2   Q.     "Investigation by Internal Affairs revealed that
3   Sergeant Salabarria would not use her vehicle to travel
4   to and from work and would have Officer Nicholas Guasto
5   pick her up and take her home during the course of his
6   shift.  Investigatory efforts and evidence gathered via
7   Telestaff reports, Track Star AVLS, Station CCTV and
8   Entry/Key Card reports revealed multiple dates for
9   Sergeant Salabarria and Officer Guasto were outside the
10  City when they were supposed to be working within City
11  limits."
12         Right?
13  A.     Yes.
14  Q.     So the general nature of the investigation is
15  both you and Jessica were not where you were supposed to
16  be when you were supposed to be there, right?
17  A.     Yes.
18  Q.     And I think as part of this investigation - if I
19  am remembering right but correct me if I am wrong -
20  the CCTV video from your apartment building where you
21  and Jessica were, you were both together; and in the
22  hallway, Jessica radioed into the City that you guys
23  were on shift in City limits, and that CCTV was
24  timestamped.  And then when you look at the radio
25  timestamp call, obviously matched.

20

1         So when she is radioing in for the two of you,
2   you guys were actually outside the City limits.  Do you
3   remember that?
4         MR. BARROUKH:  Objection.
5         MR. ELKINS:  You can answer.
6   A.     So a couple things about that.  Number one,
7   Jessica never radioed me for anything.  We were in
8   different units, completely different job description,
9   different ranks, number one.  Number two, I had heard
10  that that existed, but I never saw it.  I accepted
11  responsibility for what I did.  I never gave an
12  interview.  I agreed to discipline.
13         So I never saw all of the evidence.  I didn't
14  need to see all the evidence.  I knew what I did.  And,
15  you know, not to canonize myself, but I tried to take
16  responsibility.  Sorry, rookies.  I tried to take
17  responsibility for all of my actions.  So I know what I
18  did.  I took responsibility for it and by doing that.
19         And so I never saw all of this evidence.  I
20  heard it existed, but I never saw it.  So I will take
21  what you're telling me as true, but I don't know that
22  for certain.  I never saw it.
23  Q.     You certainly, would it be fair to say, you did
24  not challenge it?
25  A.     Yes.

NICHOLAS GUASTO

21

1  Q.     At least did not challenge the ultimate
2  challenge, ultimate claim.  But generally speaking, you
3  and Jessica were outside the City when you were supposed
4  to be in the City?
5  A.     I challenged the extent of it.
6  Q.     For sure.  And that's why I clarified the
7  question.  You didn't challenge the ultimate claim which
8  is more than, you know, you say it was.  But generally
9  speaking, you did not challenge that you and Jessica at
10  times might - not saying this to lock you into how many
11  - but you were not in the City when you said you were or
12  were supposed to be?
13      MR. BARROUKH:  Objection.
14      MR. ELKINS:  You can answer.
15  A.     Yes.
16  Q.     I am showing you what I marked as Exhibit 2.
17      (Exhibit is marked for identification.)
18  Q.     And this is a Settlement Agreement between you
19  the City and the Fraternal Order of Police?
20  A.     Yes.
21  Q.     I presume you have seen this document before?
22  A.     Yes, I have.
23  Q.     Okay.  So this relates to IA Case No. 2020-0010.
24  That is the IA case that we were talking about, correct?
25  A.     Yes.

22

1  Q.     And you ultimately accepted, I think, here a
2  20-hour suspension, correct?
3  A.     Yes, that's correct.
4  Q.     You agreed to pay back 136 hours of regular time
5  which amounted to a total of $7,217.52, right?
6  A.     Yes, that's correct.
7  Q.     Okay.  And there was a written reprimand issued
8  to you, I believe, on February 9, 2021.  And the City
9  agreed to revoke that reprimand, correct?
10  A.     That was completely separate and it was -- It
11  had nothing to do with this.  That was something that we
12  went back to.  It had nothing to do -- It was
13  incorporated for convenience, I think.
14  Q.     And I think that's correct.  But remember my
15  question was:  In connection with this Settlement
16  Agreement overall, the City agreed to revoke a written
17  reprimand, correct?
18  A.     I mean, I think we are splitting hairs here.  I
19  don't think it was challenged for anything I did with
20  the settlement.
21  Q.     Mr. Guasto, listen to my question.  I didn't say
22  exchange for anything.  You did.
23  A.     Right.
24  Q.     I am saying:  In connection with this Settlement
25  Agreement, which we are looking at and you are seeing it

23

1  on the screen, does it not say in the Settlement
2  Agreement that, I am saying, in connection to revocation
3  of written reprimand?  Is that not there?
4  A.     Yes, that is there, yes.
5  Q.     You are not testifying that revocation of
6  written reprimand was not in connection with this
7  document, are you?  I mean, it is in the document.
8  A.     Yes.
9  Q.     Okay.  All right.  Let's stop right there.
10      And it says: "On February 9, 2021, Guasto" -
11  that's you - "received a written reprimand separate from
12  any consideration.  Herein, the City revokes the
13  reprimand."
14      Right?
15  A.     Yes.
16  Q.     So that means that it is separated from anything
17  you were given up here?
18  A.     Yes.
19  Q.     Okay.  "The reprimand is represented herein for
20  convenience purposes only."
21      Do you see that?
22  A.     Yes.
23  Q.     "But revocation of the reprimand is not
24  connected to any consideration provided by Guasto."
25      Is that accurate?

24

1  A.     Yes.
2  Q.     The reprimand cannot be used by the City in
3  consideration of future discipline, correct?
4  A.     Correct.
5  Q.     Okay.  And then you released your claims.  You
6  executed waiver and released as part of the settlement,
7  correct?
8  A.     Correct.
9  Q.     Okay.  And is that your signature on the
10  Settlement Agreement?
11  A.     Yes, it is.
12  Q.     That was in July of 2021, correct?
13  A.     Correct.
14  Q.     And FOP vice president signed the agreement
15  also?
16  A.     Yes.
17  Q.     Okay.  And you were represented though by Mr.
18  Daragjati in connection with this agreement; is that
19  accurate?
20  A.     That is accurate.
21  Q.     Just so I understand, it is my understanding,
22  and correct me if I'm wrong, you settled this because
23  you did not dispute the ultimate allegations.  There was
24  disputes over the extent of the time that you were out
25  of the City?

---

25

1      MR. BARROUKH:  Objection.
2      MR. ELKINS:  You can answer.
3  A.     Yes.
4  Q.     Okay.  And this was the same Internal Affairs
5  case that Jessica was involved in as well, correct?
6  A.     Yes.
7  Q.     All right.  Okay.  Let me just go back here.  I
8  am going to show you what I am going to mark as Exhibit
9  3.
10        (Exhibit is marked for identification.)
11  Q.     Okay.  This is marked as Exhibit 3.  Have you
12  ever seen this document before?  I will give you a
13  minute to take a look at it.
14        What do you understand this document to be?
15  A.     I believe that this is the charge or, I guess,
16  what a layman like me would refer to as the Complaint to
17  the EEOC.
18  Q.     And I will scroll down because there are two of
19  them.  This one was filed July 13, 2020, correct?  You
20  see that?
21  A.     Yeah, that's what it says, yeah.
22  Q.     This is when you and Jessica were still together
23  as a couple, correct?
24  A.     Correct.
25  Q.     Okay.  And this charge was filed after the

---

26

1  initiation of the I Internal Affairs investigation, Case
2  No. 2020-0010; is that right?
3  A.     That is right.
4  Q.     That is correct?
5  A.     Yes.
6  Q.     Okay.  And to be clear, that 2020 IA case --
7  Well, is it fair to say that the start of all of this
8  came with the 2020 Internal Affairs case?  Like if we
9  had to have a marker of where everything started, it
10  would be that 2020 IA case in terms of administrative
11  issues?
12        MR. BARROUKH:  Objection.
13        MR. ELKINS:  You can answer.
14  A.     Prior to this, I had a conversation with Deputy
15  Wayne Jones - now Chief Jones - at the NFL experience as
16  part of the Super Bowl about Jessica and I.  And I think
17  that was probably the first place that some of her
18  complaints were voiced through me.
19        But I would say that the beginning of -- When
20  you say issues, if you mean problems, I would say that,
21  yeah, that the Internal Affairs case was the start of
22  that.
23  Q.     And you are referring to the Super Bowl that was
24  here in Miami, correct?
25  A.     Correct.

---

27

1  Q.     That was like around February of 2020?
2  A.     Yeah, it was the end of January, beginning of
3  February, because it was the experience leading up to
4  it.
5  Q.     Okay.  Any of the people that were the subject
6  of this EEOC -- Let me ask it this way.
7  A.     Sure.
8  Q.     The Internal Affairs investigation, was that
9  initiated by any of the people that Jessica had
10  complaints about?
11        You certainly know Cosner wasn't part of it.  We
12  talked about that earlier.
13  A.     You have to define initiated by, I guess.
14  Q.     Let's go back.  Hold on.  We will make it easier
15  for you.  Let me go back to Page 1.  Okay.  So it says
16  here -- Can you see the document, first of all?
17  A.     Yes, I can.
18  Q.     On April 23rd, the Internal Affairs Unit
19  received an allegation of employee misconduct involving
20  Sergeant Salabarria that occurred on April 22, 2020.  On
21  this date of violation, the Department was deployed
22  under the Covid-19 mobilization.  Lieutenant Dohler
23  realized that Sergeant Salabarria was not at work at the
24  time she was supposed to be and attempted to contact
25  her.  After any complaints about Dohler?

---

28

1  A.     She had complained about Dohler in the past.
2  Q.     How much in the past?  How far back?
3        MR. BARROUKH:  Objection.
4  Q.     If you know, how far back?
5  A.     For quite a while.  I don't know exactly how
6  long.  But for quite a while she had worked with him in
7  patrol in the past, and there were some complaints about
8  his behavior by her.
9  Q.     To you or to the City formerly?
10  A.     To me.
11        MR. BARROUKH:  Objection.
12        MR. ELKINS:  You can answer.
13  A.     To me, I don't know if those complaints were
14  lodged officially, but they were vocalized at some point
15  to either Union or to the deputy chief.
16  Q.     All right.  Let's scroll up to the people
17  involved.
18  A.     Sure.
19  Q.     So we have Dohler.  She had complaints about
20  Dohler.  How about Feldman, did she have complaints
21  about Feldman?
22  A.     I don't think she made any official allegations
23  against Captain Feldman.
24  Q.     But how about unofficially?
25  A.     There was some discussion about an inappropriate

---

29

1  picture that had been sent at some point, but I never
2  saw it. And it was -- I don't think it was ever taken
3  further than that.
4  Q.    You mean, discussion between you and her?
5  A.    Well, between her and I, yes. But I think it
6  was one of the like, the first EEOC charge.
7  Q.    Dating prior to this because Jessica had a
8  number of EEOC charges, right?
9  A.    I don't know how many. But yeah, more than one.
10 Q.    Right. She had a number of complaints about a
11 lot of employees, right?
12 A.    Yes.
13 Q.    How about Lieutenant Rodriguez, did she have
14 complaints about him?
15 A.    Again, she complained about him to me at times
16 but never officially that I know of or in a really
17 negative way.
18 Q.    I am not -- I am asking whether the complaints -
19 they don't have to be official - I am asking if she made
20 complaints either to you or the City about the people
21 involved in this Internal Affairs investigation so far?
22 A.    At any time?
23 Q.    Yeah, at any time.
24 A.    Okay.
25 Q.    How about Lieutenant Flanagan, Scott Flanagan?

30

1  A.    She complained about Flanagan.
2  Q.    How, to you?
3  A.    Yes.
4  Q.    What did she tell you about Flanagan?
5  A.    That he was always harassing her. That he would
6  always want to look at her phone. He made inappropriate
7  comments, you know. That's about it.
8  Q.    What about her complaints about Rodriguez, what
9  were those complaints?
10 A.    That he was always calling her, bothering her.
11 He wanted to be with her, but he wasn't -- I mean, I
12 don't think he was like inappropriate but that, you
13 know, he had romantic feelings for her, I guess.
14 Q.    According to Jessica?
15 A.    According to Jessica.
16 Q.    And how about her complaint about Dohler?
17 A.    Dohler was comments. He, according to her, he
18 would make comments asking or would ask other people if
19 he thought that they were an item. He would ask about
20 her sexually and things like that. He would make sexual
21 comments to her and to others about her.
22 Q.    All of that is according to Jessica?
23 A.    According to Jessica.
24 Q.    To you?
25 A.    To me, yes.

31

1  Q.    Okay. So, so far in the list of people involved
2  in this: We have Feldman, she had complaints;
3  Rodriguez, she had complaints; Dohler, she had
4  complaints; Flanagan, she had complaints. All of which
5  surrounded allegedly these individuals being either
6  romantically interested in her in some way or making
7  some sort of inappropriate sexual comment or advance in
8  some way, right?
9        MR. BARROUKH: Objection.
10       MR. ELKINS: You can answer.
11 A.    Yes.
12 Q.    How about lieutenant, now Captain Brown, did she
13 have complaints about him?
14 A.    No, not to me.
15 Q.    Okay. And how about Rosa Carvajal - she is a
16 female - did she complain about her?
17 A.    Not in that method, or not method, not in that
18 vein, I guess.
19 Q.    Well, did she have complaints in some other
20 vein?
21 A.    She thought that she didn't like her and that
22 she treated her, I don't know, rougher, not like
23 physically obviously, but she was harder on her. She
24 didn't like her and things like that but not like the
25 other stuff.

32

1  Q.    Right. How about Sergeant Loperfido?
2  A.    Not sexually, but she didn't -- She had issues
3  with him as far as his treatment but not in that vein
4  again.
5  Q.    What were the issues she had with him as far as
6  his treatment?
7  A.    She didn't think that, you know, I guess in the
8  best way I can describe it, there were similar
9  complaints about Loperfido and Carvajal that she didn't
10 feel she was respected. I guess I could probably say it
11 best that way.
12 Q.    Okay. So turning to the back of Exhibit 3, the
13 EEOC charge, were you involved in any way in preparing
14 this document?
15 A.    Was I involved?
16 Q.    Yes.
17 A.    No, no.
18 Q.    Do you know who prepared this document?
19 A.    I think that was Mr. Pancier.
20 Q.    And this was certainly filed while the two of
21 you were dating, correct?
22 A.    Yes.
23 Q.    So generally speaking, what was your involvement
24 with Jessica and her filing this charge for
25 discrimination?

---

33

1   A.    I never spoke to Pancier a single word in my
2   life.
3   Q.    Okay.
4   A.    So she spoke to Pancier -- Am I pronouncing his
5   name right?
6   Q.    Good enough.  There is no audio recording.  He
7   is not going to hear you.  It is fine.
8   A.    So she spoke to him.  I guess he had represented
9   her previously.  She knew him.  I didn't know him,
10  didn't have a relationship with him, never spoke to him.
11  So obviously I spoke to Jessica.  I don't recall those
12  conversations today.
13        But yeah, I didn't really have much to do with
14  this and Pancier.  I knew it was going on.  I knew it
15  was something that she wanted to do.  And obviously as
16  her husband at the time, I supported her.
17  Q.    You were married at the time of this?
18  A.    I am sorry.  As her boyfriend and in a serious
19  relationship, later her husband, yes.
20  Q.    Right.  You were her husband for the two EEOC
21  charges that we are going to talk about?
22  A.    Correct.
23  Q.    Okay.  All right.  So are you familiar with a
24  meeting in November of 2020 between the City and Jessica
25  and Mr. Pancier, Mr. Gibbons and the chief and a number

---

34

1   of City personnel at the police department?
2   A.    I know that it happened, yes.
3   Q.    What do you know about that meeting?
4   A.    I know that I wasn't there.  I know that I
5   wasn't invited.  I know that it involved all of those
6   people.  And it was about resolving that EEOC complaint
7   and possibly the Internal Affairs case, I believe.
8   Q.    Fair to say it was a meeting to settle all
9   family business?
10        MR. BARROUKH:  Objection.
11        MR. ELKINS:  You can answer.
12  A.    I think so, yes.
13  Q.    Did you have any reason to be there other than
14  the fact that you were dating Jessica?
15  A.    Maybe if it had to do with the Internal Affairs
16  case since I was involved in that.  Other than that, no.
17  Q.    But you and her were treated separately in that
18  Internal Affairs case because there were separate
19  allegations, correct?
20  A.    Yes.
21  Q.    You had your own counsel, Mr. Daragjati,
22  correct?
23  A.    No, I don't recall the timing of all of this.
24  But I do believe that Gene obviously initially started
25  representing both of us as the belage attorney.  I think

---

35

1   -- Not I think, I know at some point we went in front of
2   the Legal Defense Committee seeking to go a different
3   route with counsel.
4   Q.    Who is we?
5   A.    Jessica and I.
6   Q.    And what is the Legal Defense Committee?
7   A.    So Legal Defense Committee is the committee
8   within the local lodge who enters, obviously with the
9   approval the Board, the executive board, enters into the
10  contract with Gene Gibbons for legal defense and who you
11  would go to if you wanted money for legal defense
12  outside of Gene Gibbons.  Gene Gibbons is on retainer
13  for the lodge.
14        If you want to go a different way, don't want to
15  use that, that contract, I guess you would have to show
16  cause.  And so there was a meeting I spoke via telephone
17  to the committee.  And I think -- And honestly I don't
18  recall the timing of all of that, so I just don't
19  remember.
20  Q.    By lodge, you are referring to the FOP, the
21  Union?
22  A.    Yeah, the local lodge, the lodge eight.
23  Q.    For the police station department at the City of
24  Miami Beach?
25  A.    Miami Beach, yes.

---

36

1   Q.    Okay.  What is, if you know, what is your
2   understanding of what happened at the November 2020
3   meeting?
4   A.    I really don't.  I know that she was very upset.
5   I guess there was some discussion about termination and,
6   you know, she didn't think it was going to turn out
7   well.
8   Q.    Okay.  I am going to show you what I am going to
9   mark as Exhibit 4.
10        (Exhibit is marked for identification.)
11  Q.    This is the Settlement Agreement between the
12  City, the Union and Jessica relating to both:  First to
13  IA case number 2020010, which is the IA case you were
14  involved in; and also relating to Case No. 2020-04794,
15  which is the EEOC charge we just talked about.
16        Have you ever seen this document before?
17  A.    Yes.
18  Q.    Okay.  Who showed it to you?
19  A.    She did.
20  Q.    Okay.  And are you familiar with Jessica's
21  signature?
22  A.    Yes.
23  Q.    Are those her initials in the bottom left-hand
24  corner?
25  A.    Yes.

---

**37**

1  Q.     Okay.  And is that her signature?
2  A.     Yes.
3  Q.     Okay.  And this also was accompanied by a Last
4  Chance Agreement, correct?
5  A.     Yes.
6  Q.     And I am showing you the Last Chance Agreement.
7         Have you seen the Last Chance Agreement before?
8  A.     Yes.
9  Q.     Okay.  And are those Jessica's initials on the
10 Last Chance Agreement?
11 A.     Yes.
12 Q.     Okay.  And scrolling down, is that her signature
13 on the Last Chance Agreement?
14 A.     Yes.
15 Q.     And then in connection with this, did she also
16 submit an Irrevocable Letter of Resignation?
17 A.     Yes.
18        MR. BARROUKH:  Objection.
19 Q.     And is that her signature on the Letter of
20 Resignation?
21 A.     Yes.
22 Q.     And of course that Letter of Resignation doesn't
23 get implemented the day you sign it.  It is there in
24 case there is a last chance violation and the City
25 wanted to implement it.

---

**38**

1         Is that your understanding of how this
2  processing works?
3  A.     That is my understanding, yes.
4  Q.     Was Jessica represented by counsel in entering
5  into the Settlement Agreement in the Last Chance
6  Agreement?
7  A.     Yes.
8  Q.     She had two lawyers, right?
9  A.     I believe Pancier and Gene represented her at
10 that time, yes.
11 Q.     And she was represented by the Union, correct?
12 A.     Well, Gene is the lodge attorney, so yeah.
13 Q.     The Union also signed the Last Chance Agreement
14 and the Settlement Agreement, correct?
15 A.     I wasn't looking at it that close.  They
16 probably did.  I mean, they signed mine.
17 Q.     Did they sign both?
18 A.     I would believe that.
19 Q.     The Union is the party to those agreements?
20 A.     Yes, they are.
21 Q.     And she had Union representation in addition to
22 Gene.  She had Kevin Millan from the Union as part of
23 that, correct?
24 A.     Yes, he was involved in that, yes.
25 Q.     Okay.  So she wasn't forced to sign anything,

---

**39**

1  was she?
2  A.     I mean, she was represented.  I wasn't there.  I
3  wasn't.
4  Q.     Fair.  Yeah, that's probably the better
5  question.
6         Were you involved in any way with her
7  representation or in any of the discussions with her
8  lawyers or the union about the Settlement Agreement or
9  the Last Chance Agreement?
10 A.     No.
11 Q.     Okay.  All right.  So are you familiar with
12 Jessica's ultimate separation from employment?
13 A.     Yes.
14 Q.     Okay.  What do you know about that?
15 A.     In January of 2021, she commenced into her
16 resignation.  That was submitted as part of the Last
17 Chance Agreement after an allegation of misconduct was
18 made.  And there was a meeting and they decided to
19 institute that Letter of Resignation, and there was no
20 recourse through the grievance process or anything like
21 that.
22 Q.     Because she had signed the Last Chance Agreement
23 and essentially gave up her rights under the Collective
24 Bargain Agreement, correct?
25        MR. BARROUKH:  Objection.

---

**40**

1  A.     Correct.
2  Q.     And you said there was a meeting.  Are you
3  referring to the meeting on January 19, 2021 between
4  Jessica and the chief members of the union executive
5  board?
6  A.     So there were -- Yeah, there were two meetings.
7  There was the one meeting where she discussed this
8  allegation and then the other meeting where it was
9  finalized, and that was the end of her employment.  It
10 was the following week.
11 Q.     I am referring to the meeting where they
12 discussed this allegation.
13 A.     Yes.
14 Q.     Were you present at that meeting?
15 A.     No.
16 Q.     Okay.  And obviously you were a member of FOP,
17 but you were part of the committee?
18 A.     I was on the executive board at the time.
19 Q.     Okay.  Did you try to be president at that
20 meeting?
21 A.     Of course I did.
22 Q.     What happened with that?
23 A.     I was told by everybody on the Board from the
24 administration, the attorneys that I could not be
25 involved, even though I was on the Board, because of our

---

41

1 relationship.
2 Q.     So everybody, for lack of a better word,
3 everybody across the Board, from the FOP members
4 leadership to FOP counsel told you you could not be part
5 of the meeting; and that was because you were involved
6 in this romantic relationship with Jessica, right?
7 A.     Yes.
8 Q.     So it sounds like they considered it a conflict
9 of interest; is that right?
10 A.     I would say that, yes.
11 Q.     What was your view on that?
12 A.     I mean, you know, objectively four years later I
13 look back at it, and that was the right decision at the
14 time.  Emotions are not ground logic.  So --
15 Q.     True.
16 A.     I am not going to tell you I was happy about it
17 at the time.
18 Q.     Fair.
19 A.     I am not going to tell you I am happy about it
20 now.  It's all very unfortunate, but logic usually wins
21 out.  And logically, I should not have been involved in
22 those discussions.
23 Q.     And were you involved in any discussions
24 relating to the City's decision to implement Jessica's
25 Irrevocable Letter of Resignation?

42

1 A.     No.
2 Q.     Not even today, you are not a decisionmaker at
3 the City, correct?
4 A.     I am not.
5 Q.     Never spoke to anybody involved with the City's
6 decision to separate Jessica from employment, correct?
7 A.     Correct.
8 Q.     Okay.  So now I am going to show you what I will
9 mark as Exhibit 5.
10      (Exhibit is marked for identification.)
11 Q.     Okay.  This is your Declaration, correct?
12 A.     Yes.
13 Q.     I will scroll down.  Is that your signature?
14 A.     Yes.
15 Q.     And I have one other question:  Sitting here
16 today, you have no personal knowledge as to the reason
17 why the City ultimately decided to separate Jessica from
18 employment; is that right?
19 A.     I read the memo that was written by Chief
20 Clements.
21 Q.     Understood.  But beyond what you have read or
22 what anyone told you, you have no personal knowledge?
23 A.     No, I do not.
24 Q.     Okay.  All right.  So this is your Declaration
25 that was signed on November 5, 2021, so almost not quite

43

1 almost a year after Jessica's ultimate separation from
2 employment?
3 A.     About ten months or so, yeah.
4 Q.     Before we get into the specifics of this
5 Declaration, were you familiar with Jessica's retention
6 of Attorney Cueknow (phonetic)?
7 A.     Yes.
8 Q.     What do you know about that?
9 A.     She was referred to him by another police
10 officer she was friendly with.  He agreed to represent
11 her in filing a grievance of the Letter of Resignation.
12 The City refused to process the grievance because of the
13 Last Chance Agreement - excuse me - and that was pretty
14 much the end of the involvement.  Once that was kind of
15 denied, it was -- She decided to go a different route.
16 Q.     One other question before we get into the
17 Declaration:  Do you know if Jessica recorded the
18 meeting in November of 2020?
19 A.     I don't.
20      MR. BARROUKH:  Objection.
21      MR. ELKINS:  You can answer.
22 A.     I don't know.  She said that she didn't.  I
23 wasn't there.  I never saw it or heard it.
24 Q.     You certainly are familiar with the allegation,
25 that she had recorded it?

44

1 A.     Yes, I know there were allegations, yes.
2 Q.     Okay.  All right.  So I think I asked you
3 earlier and I don't want to repeat, but this Declaration
4 was drafted by Mr. Daragjati, correct?
5 A.     Yes.
6 Q.     You approved it before you signed it, I assume?
7 A.     Yes.
8 Q.     Being as you signed it under penalty of perjury,
9 right?
10 A.     Yes.
11 Q.     So let's talk about this.  And this is, at the
12 time that you signed this, about a month before you and
13 Jessica stopped living together; is that right?
14 A.     That is correct.  Well, maybe a little at the
15 end, yeah.
16 Q.     Give or take somewhere in that neighborhood?
17 A.     Yes, sir.
18 Q.     Okay.  It says prior to Jessica Guasto signing
19 the Settlement Agreement.  I think that was the
20 Settlement Agreement which referred to -- Well, let me
21 pull it up, one more document.
22 A.     Sure.
23 Q.     They kind of relate to each other.
24 A.     Okay.
25 Q.     So I am also going to show you what I will mark

45

1 as Exhibit 6.
2       (Exhibit is marked for identification.)
3 Q.     We will maybe look at these together.  The June
4 2021 charge of discrimination, have you seen this
5 before?
6 A.     Yes.
7 Q.     Do you know who prepared this?
8 A.     I believe Paul prepared this.
9 Q.     Were you involved in the preparation of this
10 document?
11 A.     Yes, on a cursory basis, mostly Jessica.  But I
12 had a relationship with Paul, so we would speak.
13 Q.     What was your involvement in preparing this
14 document?
15 A.     I mean, I can't really speak to specific things
16 that I did.  I was just involved in the process.  Like I
17 said, I had a relationship with Paul.  So, you know, I
18 participated.  I was present for most of the
19 conversations.  I tried not to do too much because this
20 was Jessica's story.  And I don't say it, sorry, that it
21 was untrue or anything, just that this is her complaint.
22 But I was involved in the conversations and the
23 recounting of the events, all of that.
24 Q.     So you were present for Jessica's conversation
25 with Paul?

46

1 A.     I wouldn't say all of them but some of them.
2 Q.     Okay.  Well, for the conversations you were
3 present for, what did they talk about?  What did you
4 guys talk about?
5 A.     Just the event, you know, the recounting of the
6 things that had gone on, the complaints of the
7 environment, you know, the things like that, some of the
8 conversations I had like you said that are memorialized
9 in that Declaration, things like that.
10 Q.     Okay.  Going back to -- Let me ask you this:
11 Did you tell Paul -- Well, actually scratch that.
12       Let's go back to Exhibit 5.  It says here:
13 "Prior to Jessica Guasto signed the Settlement Agreement
14 referenced by the City of Miami Beach in their position
15 statement to EEOC Charge No. 2021-05270" - that is
16 Exhibit 6 - "I had a series of meetings concerning the
17 disposition of Internal Affairs investigation 2020-10
18 and the EEOC charge that Jessica Guasto filed in 2020."
19 A.     Yes.
20 Q.     And the EEOC charge that Jessica filed is:
21 510-2020-04794.  Is that accurate?
22 A.     Yes.
23 Q.     Okay.  So you referenced basically, I think,
24 three or four meetings, one over a period of two or,
25 well, actually over a period of nine days?

47

1 A.     Yeah, like a week and a half, yeah.
2 Q.     So the first one is September 15, 2020, which
3 you allegedly a meeting with you and the chief at the
4 police station.  It says you initiated the meeting; is
5 that right?
6 A.     Yes.
7 Q.     And are you sure it was you that initiated it
8 and not the Union?
9 A.     No, it was me.
10 Q.     Okay.  And I think you said here, you talked
11 about wanting to take some responsibility and
12 culpability for the IA case, the 2020 IA case?
13 A.     Uh-huh, yes.
14 Q.     "And he talked about wanting to resolve the
15 case.  And he told me he wanted Jessica and I to go to
16 our IA statements and say we were very sorry for our
17 actions, that we've both been going through significant
18 challenges personally and professionally.  And that we
19 had been seeking shelter with one another.  He said he
20 understood the issues that Jessica has faced and that he
21 wanted to help."
22       So, first of all, what issues do you think that
23 he was referring to that she's faced?
24       MR. BARROUKH:  Objection.
25       MR. ELKINS:  You can answer.

48

1 A.     Those were the hostile work environment type
2 complaints, the sexually charged comments, the porn in
3 the office, things like that.
4 Q.     The things that were in her 2020 EEOC charge?
5 A.     I think so.
6 Q.     Fair enough.  I withdraw the question.
7       And they said -- "He said that if we go into IA
8 and give statements as he described, you would be able
9 to work with that and to reduce the punishment
10 significantly.  He stated he thought this case was
11 similar to the motor unit case and that he wanted to
12 resolve it with a minor suspension and a repayment of
13 some hours.  He said that City Hall wanted to terminate
14 both of us, but that he could help us if we worked with
15 him."
16       Right?
17 A.     Yes.
18 Q.     Now ultimately neither you nor Jessica were
19 terminated as a result of that Internal Affairs case,
20 correct?
21 A.     Correct.
22 Q.     Each of you signed Settlement Agreements which I
23 believe both included suspensions and paying back hours,
24 correct?
25 A.     Yes.

49

1  Q.    Okay.  And that seems to square, correct me if I
2  am wrong, your recollection of the chief's September 15,
3  2020 statements to you?
4  A.    I mean, for the most part.  I didn't consider
5  160 hours a minor suspension.  But, I mean, I guess that
6  is subjective I should say.
7  Q.    But you ultimately agreed to it?
8  A.    Well, I mean, I didn't because --
9  Q.    Jessica did.  I am sorry.
10 A.    Jessica did, yes.
11 Q.    But again, it looks like on September 15, 2020,
12 according to you, the chief discussed generally
13 resolution relating to suspension and paying back hours.
14 And, as I understand it, both you and Jessica resolved
15 your Internal Affairs case with suspensions and paying
16 back hours?
17 A.    That is correct.
18 Q.    Okay.  So then seven days later, there was a
19 meeting with the chief, between you and the chief,
20 according to you at least, at the police station.  And
21 the chief again asked, you say again asked for Jessica's
22 2020 EEOC charge to be dropped in return for lesser
23 punishment.
24        And then you say: "My understanding" - or you
25 say - "my understanding is that under EEOC guidelines,

50

1  this is illegal for the chief to have interfered in an
2  open investigation and promised something in return for
3  it to be dropped."
4        Let me ask you this:  What EEOC guideline are
5  you referring to there?
6        MR. BARROUKH:  Objection.
7        MR. ELKINS:  You can answer.
8  A.    I do not know the EEOC guideline.
9  Q.    But you put in a Declaration under oath, under
10 penalty of perjury:  "My understanding is that under
11 EEOC guidelines" --
12        And you signed this, right?
13 A.    Yes, I did.
14 Q.    You signed it under penalty of perjury, correct?
15 A.    I did.
16 Q.    Looking at that, right?
17 A.    Yes.
18 Q.    And you read it before you signed it, didn't
19 you?
20 A.    I did.
21 Q.    Okay.  So I presume everything in it is
22 accurate, right?
23 A.    Yes.
24 Q.    You wouldn't sign something that wasn't
25 accurate, correct?

51

1  A.    No.
2  Q.    And you put in here:  "My understanding is that
3  under EEOC guidelines, this is illegal for the chief to
4  have interfered in an open investigation and promised
5  something in return for it to be dropped."
6        So you accused the chief of doing something
7  illegal.  And you say: "It is illegal pursuant to EEOC
8  guidelines."
9        I want to know, what were the EEOC guidelines
10 that you say --
11        MR. BARROUKH:  Objection.
12        MR. ELKINS:  You can answer.
13 A.    Like I said, I don't know the EEOC guidelines.
14 I am not an attorney.  But this was prepared in
15 collaboration with Paul Daragjati who, as I recounted
16 the meetings, you know, it was made clear to me that
17 that would be a violation of some sort.
18        It also, for me, passes the smell test, not that
19 that is a legal standard, but it feels like it would
20 pass the smell test.  That, you know, you can't say I
21 will give you less if you get rid of this case, you
22 know.
23        So if you are looking for a detailed legal
24 brief, you are not going to get it.  But common sense to
25 me and again in collaboration with the attorney, that

52

1  was my understanding.
2  Q.    Well, the attorney didn't sign this.  His name
3  is not on this.  He just wrote it for you.  You swore to
4  the efficacy and accuracy of it.  And I think what you
5  are telling me is you have no idea what the EEOC
6  guidelines are in relation to what the chief could or
7  could not do, correct?
8        MR. BARROUKH:  Objection.
9        MR. ELKINS:  You can answer.
10 A.    Like I said, according to Paul Daragjati, this
11 would be a violation.  I don't know the guy --
12 Q.    I am asking what you know.  Paul didn't sign
13 this.  You did.  This is your statement.  So --
14 A.    Am I not allowed to use --
15 Q.    Hold on.  Do you know what the EEOC guidelines
16 are that you claim the chief filed?  It is a yes or no
17 question.  Either you know them or you don't.
18 A.    No, I do not know them.
19 Q.    Okay.  Going back further: "He said he wanted to
20 resolve the case with minor discipline and a repayment
21 of hours and would figure out the best way to do that
22 when we spoke again."
23        And Jessica did receive discipline.  We can
24 quibble about whether it is minor, and she ultimately
25 had to repay hours, correct?

53

1  A.    Correct.
2  Q.    Okay. "He said he didn't have a problem
3  structuring the discipline so that Jessica and I would
4  both be able to take the upcoming promotional test. He
5  said he wanted to resolve the case without giving the
6  statement but would only be able to do that if Jessica
7  dropped the EEOC charge."
8       And this was a conversation that happened, you
9  were recalling it, almost a year later when you signed
10 this Declaration, correct?
11 A.    Yes.
12 Q.    Did you say anything else to the chief in this
13 September 22, 2020 meeting that you allege happened?
14 A.    I mean, that was the gist of it. Obviously, it
15 is not a full word-for-word recap.
16 Q.    Is there anything missing from your recollection
17 here?
18 A.    No.
19 Q.    Okay. Then you say that, "later that day" - so
20 the same day - "09-22-2020, while I was working as a
21 patrolman in the afternoon, I was contacted by a third
22 party and asked if I could respond to the station to
23 meet with him and the chief."
24      Who was the third party?
25 A.    Steve Feldman.

54

1  Q.    Okay. "He told me that Chief Clements requested
2  that he contact me and have me respond to the station so
3  we could meet. At this meeting the chief again insisted
4  that Jessica's 2020 EEOC charge be dropped and that he
5  would be able to reduce discipline and resolve the case
6  amicably for both Jessica and me. He told me that we
7  should not even be meeting and that he will deny it if
8  anyone asks but that he would figure out a way to
9  resolve the case. He told me he wanted to address all
10 of Jessica's concerns about harassment because he
11 understands what she has been through and wanted to
12 help. He echoed the concerns that Deputy Chief Wayne
13 Jones made to me during our previous meeting."
14      I presume that is the meeting you were referring
15 to around the Super Bowl?
16 A.    The Super Bowl, yeah.
17 Q.    "That the department had failed Jessica and that
18 the treatment she has received is disgusting and
19 despicable."
20      And your testimony today, I am assuming, is that
21 this is an accurate representation of this meeting you
22 had with the chief?
23 A.    Yes, it is.
24 Q.    Why didn't you just name Steve Feldman in the
25 Declaration as opposed to referring to him as a third

55

1  party?
2  A.    I mean, he was a third party.
3  Q.    I understand that, but why not just provide his
4  name? You provided everybody else's name.
5  A.    That's, I mean, Paul Daragjati suggested that we
6  write third party. You know, I would have liked to have
7  kept Steve out of it if I could have; but obviously, you
8  know, we are past that.
9  Q.    Okay. And then in Paragraph 10, you talk about
10 the chief telling you that: "I called him and yelled at
11 him based on a call I had with Pancier."
12      Correct?
13 A.    That's what happened.
14 Q.    And then in Paragraph 11, you say that: "The
15 third party" -- I am assuming you are referring to Mr.
16 or Captain Feldman, correct?
17 A.    Again, Feldman.
18 Q.    "Brought up the topic that requested the meeting
19 on Chief Clements' behalf, brought out the topic of
20 discipline for both Jessica and I and suggested that
21 Clements decide on discipline over the next day or two
22 and close the case out quickly with what he thought was
23 appropriate. Clements stated that he thought it
24 appropriate to start with the motor unit investigations
25 as a basis for discipline, ten hours suspension and

56

1  repayment of hours. He further stated he wanted to
2  still convene the discipline panel, but that he would
3  speak to the members prior to the hearing so they knew
4  exactly what he wanted to do so he could implement the
5  discipline with their recommendation."
6       So it sounds like you're taking the position in
7  this Declaration that Steven Feldman was somehow
8  intimately involved in the discipline or the resolution
9  of all of this?
10      MR. BARROUKH:  Objection.
11      MR. ELKINS:  You can answer.
12 A.    I mean, I don't know what you mean by intimately
13 involved, but he was present for these conversations
14 that I said he was present for.
15 Q.    But ultimately no discipline panel was ever
16 convened for Jessica or you, correct?
17 A.    Correct, because we signed Settlement
18 Agreements.
19 Q.    And then it says: "Prior to ending the meeting,
20 Clements says we were getting close to the 180-day
21 limit, that he would need more time to set up the
22 meeting to resolve Jessica's complaint and stated the
23 only way we would be able to move forward is for Jessica
24 and I to agree to toll the case."
25      You are talking about the 180-day rule, right?

NICHOLAS GUASTO

57

1 A.   Correct.
2 Q.   And are you familiar of whether or not that was
3 tolled in Jessica's case?
4 A.   I know that I sent an e-mail after this
5 conversation.  I believe I sent an e-mail to Gene
6 Gibbons or maybe I sent it to Kevin Millan who forwarded
7 it to Gene Gibbons.  I don't recall asking, saying that
8 we were, you know, in agreement with tolling the case.
9 Q.   Do you know if Pancier was involved in the
10 tolling issue?
11      MR. BARROUKH:  Objection.
12      MR. ELKINS:  You can answer.
13 A.   I don't think so because he -- I don't think he
14 had much involvement with the Internal Affairs side of
15 this process.
16 Q.   Okay.  And then it says here you had a telephone
17 call with the chief, and I am just going to summarize
18 here.  It looks like you basically said that the chief
19 yelled at you because he said I yelled at him?
20 A.   That's what happened.
21 Q.   And then you also apparently received a call
22 from FOP executives Hector Fernandez and Kevin Millan
23 and they said that the chief called them furious as
24 well?
25 A.   Yes.

58

1 Q.   Okay.  At any point in your conversations with
2 the chief -- First of all, are you still taking the
3 position that everything in this Declaration is accurate
4 as it is written?
5 A.   Yes.
6 Q.   Even the EEOC guidelines thing?
7 A.   We can --
8      MS. BARROUKH:  Objection.
9 A.   -- but I think it is accurate.
10 Q.   Okay.  At any point in time, did the chief tell
11 you, I am going to fire Jessica because of her 2020 EEOC
12 charge?
13 A.   No.
14 Q.   Okay.  Did he ever --
15 A.   What was the second part?  I guess I cut you
16 off.
17 Q.   Did the chief ever tell you Jessica filed this
18 EEOC charge and I am going to fire her because of it?
19 A.   No.
20 Q.   Was the chief advocating for resolution that
21 included dismissal of the EEOC charge?
22 A.   Yes.
23 Q.   Did he get resolution that included dismissal of
24 the EEOC charge?
25 A.   Yes.

59

1 Q.   Did the -- Let me rephrase that.
2 Q.   Did the City get resolution that included
3 dismissal of the EEOC charge?
4 A.   Yes.
5 Q.   Did you have any conversations with the chief of
6 police or any other decisionmaker at the City after
7 Jessica's Settlement Agreement was signed on December
8 18, 2020 about this?
9 A.   No.
10 Q.   How about any other members of the Union?
11 A.   In what way?
12 Q.   About Jessica's Settlement Agreement or her
13 separation?
14 A.   I mean, yeah.  I mean, it was a topic of
15 conversation for quite a while.  I don't know what you
16 are trying to get at.
17 Q.   Well, let me ask it a different way.  The Union
18 never filed a grievance relating to Jessica's
19 separation, did it?
20 A.   No.
21 Q.   The Union never took the position that Jessica's
22 Last Chance Agreement was implemented improperly because
23 it was retaliation for her filing the 2020 EEOC charge,
24 did it?
25      MR. BARROUKH:  Objection.

60

1      MR. ELKINS:  You can answer.
2 A.   They never said that to me, but they did not.
3 Q.   I am asking -- I am saying:  Let me rephrase the
4 question.  We can agree the Union didn't file any
5 grievance, right?
6 A.   Yes.
7 Q.   Okay.  And at no point has the Union ever taken
8 the position or argued, hey, we think the City
9 implemented the Last Chance Agreement because it was
10 retaliating against Jessica for filing that 2020 EEOC
11 charge?
12      MR. BARROUKH:  Objection.
13 A.   The issue, as far as I understand it, was the
14 Union is more of member versus member.  I don't -- I
15 don't -- No one ever opined on the validity of that Last
16 Chance Agreement to me from the Union.  And to be
17 honest, I mean, what would their opinion really matter
18 anyway.  I think that's for the lawyers and the judges
19 to decide.  But that was never a discussion.  Again, I
20 think it was more a member versus member because Jessica
21 is making allegations of other members and that's where
22 things get a little murky.
23 Q.   So your position is the Union didn't push
24 regarding Jessica's termination because it was
25 allegations against Cosner.  So because it was a member

61

1  versus member, they just decided to let her be
2  terminated?
3       MR. BARROUKH:  Objection.
4  A.    Well, again, I think we are oversimplifying
5  that, you know.  The -- I don't know that the Union has,
6  how much the Union has done EEOC charges for members
7  against other members, you know.  I really don't.  I
8  don't know the answer to that.
9       And again, all I am telling you is no one from
10 the Executive Board ever told me that, you know, this is
11 iron clad, and there is nothing we can do, you know.  It
12 was a member versus member.  And it was, you know, this
13 needs to be handled in a different way because the City
14 is refusing to process this grievance regardless.
15 Q.    Were you involved in all of the meetings between
16 the Executive Board and the Union's counsel regarding
17 Jessica's separation?
18 A.    Meetings between the Executive Board, no, I
19 wasn't involved in any of them.
20 Q.    Okay.  So let's backup then.  You were not part
21 of any meeting between the Executive Board and the
22 Union's lawyer discussing whether or not the Union is
23 going to follow through and file a grievance on
24 Jessica's behalf?
25 A.    No, I was kept out of all of that for the

62

1  reasons that we discussed.
2  Q.    So what you are testifying to here is just what
3  you heard, not any official meetings that you were part
4  of as a member of the Executive Board?
5  A.    That is what it sounds like you were asking me.
6  Because I told you I am telling you what I was told and
7  that's it.  I don't know what it is.  I am telling you
8  what I was told and what I wasn't told.
9  Q.    Okay.  Okay.  That clarifies it.
10      And sitting here today, do you know if Jessica
11 has ever brought any claim for improper representation
12 by the Union?
13      MR. BARROUKH:  Objection.
14      MR. ELKINS:  You can answer.
15 A.    Brought a claim, no.
16 Q.    Are you aware of Jessica's ten counts that she
17 filed again the City, eight of them were dismissed with
18 prejudice by the Judge?
19      MR. BARROUKH:  Objection.  You can answer.
20 A.    Yes, you told me that.
21      MR. ELKINS:  Okay.  Let's take ten minutes.  I
22 might be close to done.  I just want to take a break.
23      MR. BARROUKH:  No problem.
24      (Off the record.)
25      MR. ELKINS:  I just have a few more quick

63

1  questions, and then I will be done.
2       BY MR. ELKINS:
3  Q.    I think you answered this earlier, but I just
4  want to confirm:  You were not involved in any way,
5  shape or form with anybody in the decision for the City
6  to implement Jessica's Letter of Resignation; is that
7  right?
8  A.    That's right.
9  Q.    And at no point in time in any of the
10 conversations that you talked about in your Declaration
11 did Chief Clements ever talk about wanting to fire
12 Jessica because she filed that 2020 EEOC claim; is that
13 right?
14 A.    That is correct, yes.
15 Q.    And you were not involved in any meetings or
16 conversations with the Union in its decision not to
17 pursue anything relating to the City implementing
18 Jessica's Letter of Resignation; is that correct?
19 A.    Correct.
20 Q.    You don't have any firsthand knowledge of why
21 the Union made its decision, do you?
22 A.    No.
23 Q.    And you don't have any firsthand knowledge why
24 the City chose to implement Jessica's Letter of
25 Resignation, correct?

64

1  A.    Correct.
2       MR. ELKINS:  Nothing further.
3       MR. BARROUKH:  I have no questions for the
4  witness.
5       MR. ELKINS:  Nicholas, thank you.  I appreciate
6  you adjusting your schedule to be here.
7       You have the right to read the transcript or you
8  can waive that right.  I don't know if you are familiar
9  with what that means.  If not, I can explain it.
10      THE WITNESS:  No, I would like to read.
11      MR. ELKINS:  Okay.  Susan, I am going to order a
12 mini only.  I think you have the expert depo pending for
13 me this week.  That one I ordered rush?
14      (The deposition concluded at 10:33 a.m.)
15
16
17
18
19
20
21
22
23
24
25



65

1          CERTIFICATE OF OATH
2
3
4
5
6    STATE OF FLORIDA  )
7
8    COUNTY OF BROWARD )
9
10       I, the undersigned authority, certify that
11   NICHOLAS GUASTO remotely appeared before me and was duly
12   sworn.
13
14
15       WITNESS my hand and official seal this 25th day of
16   April, 2024.
17
18
19
20
21          SUSAN BARNARD
            Notary Public,
22          State of Florida
            My Commission No. HH 408027
23          Expires:  June 16, 2027
24
25

66

1          REPORTER'S DEPOSITION CERTIFICATE
2
3    STATE OF FLORIDA  )
4    COUNTY OF BROWARD )
5
6        I, SUSAN BARNARD, Professional Shorthand Court
7    Reporter, certify that I was authorized to and did
8    stenographically report the remote deposition of
9    NICHOLAS GUASTO; that a review of the transcript was
10   requested; and that the transcript is a true and
11   complete record of my stenographic notes.
12       I further certify that I am not a relative,
13   employee, attorney, or counsel of any of the parties,
14   nor am I a relative or employee of any of the parties'
15   attorney or counsel connected with the action, nor am I
16   financially interested in the action.
17
18       Dated this 25th day of April, 2024.
19
20
21
22
23          SUSAN BARNARD
            Notary Public, State of Florida
            My Commission No. HH 408027
24          Expires:  June 16, 2027
25

67

1          E R R A T A   S H E E T
2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES
3    IN RE:        GUASTO VS. THE CITY OF MIAMI BEACH
     CASE NO:     1:22-CV-21004-MD
4    DATE:           APRIL 23, 2024
     DEPONENT NAME:     NICHOLAS GUASTO
5
6    PAGE/LINE      CORRECTION      REASON
7
8
9
10
11
12
13
14
15
16
          (Use other side if necessary)
17
18       Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts stated
     are true.
19
20
21   NICHOLAS GUASTO              DATE
22
23
24
25

68

1    APRIL 25, 2024
2    NICHOLAS GUASTO
     C/O DANIEL BARROUKH, ESQ.
3    Derek Smith Law Group, PLLC
     520 Brickell Key Drive
4    Suite O-301
     Miami, Florida 33131-2433
5
6    IN RE:   GUASTO VS. THE CITY OF MIAMI BEACH
         Deposition of NICHOLAS GUASTO
7
8        This letter is to advise you that the transcript
     taken in the above-referenced deposition has been
     transcribed.  Please contact our office at (954)523-5326
9    to make arrangements to read and sign or sign below to
     waive review of the transcript,
10
11       It is suggested that the review of this transcript
     be completed within 30 days of your receipt of this
     letter as considered reasonable under Federal Rules*;
12   however, there is no Florida Statute to this regard.
13       The original of this transcript has been forwarded
     to the ordering party and your errata, once received,
14   will be forwarded to all ordering parties for inclusion
     in the transcript.
15
16   Very truly yours,
17
18   Susan Barnard, Professional Court Stenographer
19
20   Waiver:
21   I,            , hereby waive the reading and
     signing of my deposition transcript.
22
23
     DEPONENT               DATE
24
25   *Federal Civil Procedure Rule 30(e)Florida Civil

**A**
**a.m** 1:16,16
  64:14
**able** 48:8 53:4,6
  54:5 56:23
**above-referen...**
  68:8
**absent** 10:4
**accepted** 20:10
  22:1
**accompanied**
  11:21 37:3
**accuracy** 52:4
**accurate** 23:25
  24:19,20 46:21
  50:22,25 54:21
  58:3,9
**accused** 51:6
**action** 66:15,16
**actions** 20:17
  47:17
**addition** 38:21
**address** 54:9
**adjusting** 64:6
**administration**
  40:24
**administrative**
  26:10
**advance** 31:7
**advise** 68:7
**advocating**
  58:20
**Affairs** 3:14
  11:3 12:7,12
  12:22 16:23
  17:12 18:3,24
  19:2 25:4 26:1
  26:8,21 27:8
  27:18 29:21
  34:7,15,18
  46:17 48:19
  49:15 57:14
**afternoon** 53:21
**agency** 6:20
**ago** 10:2

**agree** 56:24 60:4
**agreed** 11:2,5,6
  20:12 22:4,9
  22:16 43:10
  49:7
**agreement** 3:15
  3:17 21:18
  22:16,25 23:2
  24:10,14,18
  36:11 37:4,6,7
  37:10,13 38:5
  38:6,13,14
  39:8,9,17,22
  39:24 43:13
  44:19,20 46:13
  57:8 59:7,12
  59:22 60:9,16
**agreements**
  38:19 48:22
  56:18
**ahead** 19:1
**allegation** 18:9
  27:19 39:17
  40:8,12 43:24
**allegations**
  24:23 28:22
  34:19 44:1
  60:21,25
**allege** 53:13
**allegedly** 31:5
  47:3
**allowed** 5:16
  52:14
**amicably** 54:6
**amounted** 22:5
**and/or** 18:10
**answer** 4:23 5:7
  5:11,11 7:11
  9:22 14:21,23
  15:4 20:5
  21:14 25:2
  26:13 28:12
  31:10 34:11
  43:21 47:25
  50:7 51:12

52:9 56:11
  57:12 60:1
  61:8 62:14,19
**answered** 63:3
**answering** 14:20
**answers** 5:3
**anticipate** 4:20
**anybody** 13:3
  42:5 63:5
**anyway** 60:18
**apart** 15:6
**apartment** 19:20
**apologize** 16:1
**apparently**
  57:21
**APPEARANC...**
  2:1
**appeared** 65:11
**APPEARING**
  2:6,10
**appreciate** 64:5
**appropriate**
  55:23,24
**approval** 35:9
**approved** 44:6
**approximately**
  14:14 16:19
**April** 1:15 8:17
  16:19 17:1,2
  17:14 27:18,20
  65:16 66:18
  67:4 68:1
**area** 8:22
**argued** 60:8
**arrangements**
  68:9
**asked** 7:2 44:2
  49:21,21 53:22
**asking** 5:13 7:2
  29:18,19 30:18
  52:12 57:7
  60:3 62:5
**asks** 54:8
**assist** 10:17
**assume** 44:6

**assuming** 54:20
  55:15
**attempted** 27:24
**attendance**
  18:21
**attorney** 34:25
  38:12 43:6
  51:14,25 52:2
  66:13,15
**attorneys** 40:24
**audible** 5:1
**audio** 33:6
**August/Septe...**
  9:11
**authority** 65:10
**authorized** 66:7
**AVLS** 19:7
**aware** 62:16

**B**
**back** 6:6,10,16
  7:19 12:10
  22:4,12 25:7
  27:14,15 28:2
  28:4 32:12
  41:13 46:10,12
  48:23 49:13,16
  52:19
**backup** 61:20
**bad** 13:9
**Bargain** 39:24
**Barnard** 1:24
  65:21 66:6,22
  68:18
**BARROUKH**
  2:2 7:10 9:21
  15:3 20:4
  21:13 25:1
  26:12 28:3,11
  31:9 34:10
  37:18 39:25
  43:20 47:24
  50:6 51:11
  52:8 56:10
  57:11 58:8

59:25 60:12
  61:3 62:13,19
  62:23 64:3
  68:2
**based** 55:11
**basically** 46:23
  57:18
**basis** 9:19 45:11
  55:25
**Beach** 1:8 7:23
  7:25 8:15,18
  9:13,20 35:24
  35:25 46:14
  67:3 68:6
**beginning** 8:7
  26:19 27:2
**behalf** 2:6,10
  55:19 61:24
**behavior** 28:8
**belage** 34:25
**believe** 6:12 8:6
  11:18 18:18
  22:8 25:15
  34:7,24 38:9
  38:18 45:8
  48:23 57:5
**best** 4:22 17:3
  32:8,11 52:21
**better** 15:15
  39:4 41:2
**beyond** 42:21
**bit** 14:11 17:4
**board** 35:9,9
  40:5,18,23,25
  41:3 61:10,16
  61:18,21 62:4
**bothering** 30:10
**bottom** 36:23
**Bowl** 26:16,23
  54:15,16
**boyfriend** 33:18
**break** 62:22
**Brickell** 2:3 68:3
**brief** 51:24
**bringing** 11:13

**broad** 10:8,9
**Broadly** 10:6
**brought** 11:2,8
  55:18,19 62:11
  62:15
**BROWARD**
  65:8 66:4
**Brown** 17:23
  31:12
**building** 19:20
**business** 34:9

**C**

**C/O** 68:2
**call** 19:25 55:11
  57:17,21
**called** 55:10
  57:23
**calling** 30:10
**canonize** 20:15
**Captain** 17:22
  17:23 28:23
  31:12 55:16
**Card** 19:8
**care** 15:8
**cared** 16:8
**career** 10:24
**Carvajal** 17:24
  31:15 32:9
**case** 1:3 4:13
  11:3,12 12:7,8
  12:12,22 14:25
  17:2,14,15
  18:20,21 21:23
  21:24 25:5
  26:1,6,8,10,21
  34:7,16,18
  36:13,13,14
  37:24 47:12,12
  47:15 48:10,11
  48:19 49:15
  51:21 52:20
  53:5 54:5,9
  55:22 56:24
  57:3,8 67:3

**catch** 12:19
**cause** 14:16,17
  35:16
**CCTV** 19:7,20
  19:23
**certain** 20:22
**certainly** 5:9
  20:23 27:11
  32:20 43:24
**CERTIFICATE**
  65:1 66:1
**certify** 65:10
  66:7,12
**challenge** 20:24
  21:1,2,7,9
**challenged** 21:5
  22:19
**challenges** 47:18
**chance** 37:4,6,7
  37:10,13,24
  38:5,13 39:9
  39:17,22 43:13
  59:22 60:9,16
**CHANGES** 67:2
**charge** 3:19 6:23
  6:25 13:1
  25:15,25 29:6
  32:13,24 36:15
  45:4 46:15,18
  46:20 48:4
  49:22 53:7
  54:4 58:12,18
  58:21,24 59:3
  59:23 60:11
**charged** 48:2
**charges** 29:8
  33:21 61:6
**chief** 6:16 26:15
  28:15 33:25
  40:4 42:19
  47:3 49:12,19
  49:19,21 50:1
  51:3,6 52:6,16
  53:12,23 54:1
  54:3,12,22

**55:10,19 57:17**
  57:18,23 58:2
  58:10,17,20
  59:5 63:11
**chief's** 49:2
**choice** 8:20
**chose** 63:24
**chunk** 10:24
**City** 1:8 7:23,24
  8:14,18 9:13
  9:20 15:20
  16:20 19:10,10
  19:22,23 20:2
  21:3,4,11,19
  22:8,16 23:12
  24:2,25 28:9
  29:20 33:24
  34:1 35:23
  36:12 37:24
  42:3,17 43:12
  46:14 48:13
  59:2,6 60:8
  61:13 62:17
  63:5,17,24
  67:3 68:6
**City's** 41:24
  42:5
**civil** 4:13 68:25
  68:25
**clad** 61:11
**claim** 21:2,7
  52:16 62:11,15
  63:12
**claims** 18:19
  24:5
**clarified** 21:6
**clarifies** 62:9
**clarify** 5:10,12
**clear** 26:6 51:16
**Clements** 6:16
  42:20 54:1
  55:21,23 56:20
  63:11
**Clements'** 55:19
**close** 38:15

**55:22 56:20**
  62:22
**closed** 12:9,9
**co-subjects** 11:4
**collaboration**
  51:15,25
**Collective** 39:23
**colloquially**
  17:15
**commenced**
  39:15
**comment** 31:7
**comments** 30:7
  30:17,18,21
  48:2
**Commission**
  65:22 66:23
**committee** 35:2
  35:6,7,7,17
  40:17
**common** 51:24
**complain** 31:16
**complained** 28:1
  29:15 30:1
**complaint** 3:16
  6:22 7:15 9:16
  10:11,13,14
  11:23 14:4
  18:9 25:16
  30:16 34:6
  45:21 56:22
**complaints**
  10:16 12:4,6
  26:18 27:10,25
  28:7,13,19,20
  29:10,14,18,20
  30:8,9 31:2,3,4
  31:4,13,19
  32:9 46:6 48:2
**complete** 66:11
**completed** 68:11
**completely** 20:8
  22:10
**concerning**
  46:16

**concerns** 54:10
  54:12
**concluded** 64:14
**conference**
  11:20
**CONFEREN...**
  1:17
**confirm** 63:4
**conflict** 41:8
**conjunction** 6:5
**connected** 23:24
  66:15
**connection**
  22:15,24 23:2
  23:6 24:18
  37:15
**consider** 49:4
**consideration**
  23:12,24 24:3
**considered** 41:8
  58:11
**contact** 27:24
  54:2 68:8
**contacted** 53:21
**Continue** 12:3
  12:18
**contract** 35:10
  35:15
**convene** 56:2
**convened** 56:16
**convenience**
  22:13 23:20
**conversation**
  6:16 10:1,4
  11:15 13:13
  26:14 45:24
  53:8 57:5
  59:15
**conversations**
  6:11 33:12
  45:19,22 46:2
  46:8 56:13
  58:1 59:5
  63:10,16
**conveyed** 11:22

**corner** 36:24
**correct** 9:3,4,5
  10:2,3 15:20
  16:20 17:17,25
  18:17,18 19:19
  21:24 22:2,3,6
  22:9,14,17
  24:3,4,7,8,12
  24:13,22 25:5
  25:19,23,24
  26:4,24,25
  32:21 33:22
  34:19,22 37:4
  38:11,14,23
  39:24 40:1
  42:3,6,7,11
  44:4,14 48:20
  48:21,24 49:1
  49:17 50:14,25
  52:7,25 53:1
  53:10 55:12,16
  56:16,17 57:1
  63:14,18,19,25
  64:1
**CORRECTION**
  67:5
**Cosner** 15:16,18
  18:2 27:11
  60:25
**counsel** 2:6,10
  7:2 10:22
  34:21 35:3
  38:4 41:4
  61:16 66:13,15
**counts** 62:16
**COUNTY** 65:8
  66:4
**couple** 4:17 10:2
  20:6 25:23
**course** 4:22 19:5
  37:22 40:21
**court** 1:1,24
  4:18 66:6
  68:18
**cover** 7:12

**Covid-19** 27:22
**Cueknow** 43:6
**culpability**
  47:12
**current** 8:2
**currently** 7:19
  9:24 15:20
**cursory** 45:11
**cut** 58:15

## D

**D** 3:1
**DANIEL** 2:2
  68:2
**Danielb@dere...**
  2:5
**Daragjati** 6:2
  10:17 13:16
  24:18 34:21
  44:4 51:15
  52:10 55:5
**date** 1:15 9:7
  14:9 17:13
  27:21 67:4,21
  68:23
**dated** 16:25
  66:18
**dates** 17:3 19:8
**dating** 9:10,12
  29:7 32:21
  34:14
**day** 37:23 53:19
  53:20 55:21
  65:15 66:18
**days** 46:25 49:18
  68:11
**December** 8:3
  14:15,15 59:7
**decide** 55:21
  60:19
**decided** 39:18
  42:17 43:15
  61:1
**decision** 41:13
  41:24 42:6

  63:5,16,21
**decisionmaker**
  42:2 59:6
**Declaration** 3:18
  5:22,23 6:1,7
  6:13,14,20,25
  7:3,15 42:11
  42:24 43:5,17
  44:3 46:9 50:9
  53:10 54:25
  56:7 58:3
  63:10
**declare** 67:17
**deep** 16:5
**Defendant** 1:9
  2:10
**DEFENDANT...**
  3:12
**defense** 35:2,6,7
  35:10,11
**define** 14:2 15:5
  27:13
**delay** 14:7
**denied** 43:15
**deny** 54:7
**department** 8:6
  8:11 27:21
  34:1 35:23
  54:17
**deployed** 27:21
**depo** 64:12
**DEPONENT**
  67:4 68:23
**deposition** 1:14
  4:10 5:17,21
  10:2 13:3
  64:14 66:1,8
  68:6,8,21
**deputy** 26:14
  28:15 54:12
**Derek** 2:3 68:3
**describe** 32:8
**described** 7:7
  11:9 48:8
**description** 3:13

  20:8
**despicable** 54:19
**detail** 11:17
**detailed** 51:23
**different** 8:22
  20:8,8,9 35:2
  35:14 43:15
  59:17 61:13
**DIRECT** 3:5 4:5
**discipline** 18:11
  20:12 24:3
  52:20,23 53:3
  54:5 55:20,21
  55:25 56:2,5,8
  56:15
**discrimination**
  3:19 32:25
  45:4
**discuss** 11:19
**discussed** 11:17
  12:6,21 40:7
  40:12 49:12
  62:1
**discussing** 61:22
**discussion** 28:25
  29:4 36:5
  60:19
**discussions** 39:7
  41:22,23
**disgusting** 54:18
**dismissal** 58:21
  58:23 59:3
**dismissed** 62:17
**disposition**
  46:17
**dispute** 24:23
**disputes** 24:24
**DISTRICT** 1:1
  1:1
**DIVISION** 1:2
**divorce** 9:6
  13:22,24 14:1
  14:4,8,17
**divorced** 13:20
  13:22

**document** 17:8
  21:21 23:7,7
  25:12,14 27:16
  32:14,18 36:16
  44:21 45:10,14
  67:18
**documents** 6:24
  7:3 14:12
**Dohler** 17:23
  27:22,25 28:1
  28:19,20 30:16
  30:17 31:3
**doing** 20:18 51:6
**drafted** 44:4
**Drive** 2:3 68:3
**dropped** 49:22
  50:3 51:5 53:7
  54:4
**duly** 4:3 65:11

## E

**E** 3:1 67:1,1,1
**e-mail** 2:5,10
  16:1 57:4,5
**earlier** 27:12
  44:3 63:3
**easier** 27:14
**echoed** 54:12
**edit** 6:3
**edits** 6:7
**EEOC** 3:16 6:22
  6:25 7:1,8 11:6
  12:25 25:17
  27:6 29:6,8
  32:13 33:20
  34:6 36:15
  46:15,18,20
  48:4 49:22,25
  50:4,8,11 51:3
  51:7,9,13 52:5
  52:15 53:7
  54:4 58:6,11
  58:18,21,24
  59:3,23 60:10
  61:6 63:12

NICHOLAS GUASTO

Page 72

efficacy 52:4
efforts 19:6
eight 35:22
  62:17
either 16:8
  28:15 29:20
  31:5 52:17
Elkins 2:7 3:6
  4:6 7:11 9:22
  15:4 20:5
  21:14 25:2
  26:13 28:12
  31:10 34:11
  43:21 47:25
  50:7 51:12
  52:9 56:11
  57:12 60:1
  62:14,21,25
  63:2 64:2,5,11
else's 55:4
emotional 15:7
  15:11
Emotions 41:14
employed 7:20
  8:5,14 9:13
  16:19
employee 18:9
  27:19 66:13,14
employees 17:18
  17:21 29:11
employment
  39:12 40:9
  42:6,18 43:2
ENTER 67:2
entering 38:4
enters 35:8,9
entire 7:5
Entry/Key 19:8
environment
  10:12,13 11:23
  12:5 46:7 48:1
errata 68:13
ESQ 2:2,7 68:2
essentially 18:21
  18:22 39:23

event 46:5
events 45:23
everybody 15:12
  40:23 41:2,3
  55:4
evidence 19:6
  20:13,14,19
ex-wife 9:4
exact 6:4 9:7
exactly 28:5
  56:4
EXAMINATI...
  3:5 4:5
examined 4:3
exchange 22:22
excuse 43:13
executed 24:6
executive 35:9
  40:4,18 61:10
  61:16,18,21
  62:4
executives 57:22
Exhibit 3:13
  17:6,7 21:16
  21:17 25:8,10
  25:11 32:12
  36:9,10 42:9
  42:10 45:1,2
  46:12,16
EXHIBITS 3:11
existed 20:10,20
experience
  26:15 27:3
expert 64:12
Expires 65:23
  66:24
explain 64:9
explained 9:25
explaining 7:14
extent 21:5
  24:24

F

faced 47:20,23
fact 34:14

facts 67:18
failed 54:17
fair 15:14 20:23
  26:7 34:8 39:4
  41:18 48:6
familiar 15:14
  33:23 36:20
  39:11 43:5,24
  57:2 64:8
family 34:9
far 6:15 12:25
  28:2,4 29:21
  31:1 32:3,5
  60:13
February 22:8
  23:10 27:1,3
Federal 68:11
  68:25
feel 32:10
feelings 30:13
feels 51:19
Feldman 17:22
  28:20,21,23
  31:2 53:25
  54:24 55:16,17
  56:7
felt 8:20
female 31:16
Fernandez
  57:22
figure 14:8
  52:21 54:8
file 60:4 61:23
filed 10:18 14:4
  25:19,25 32:20
  46:18,20 52:16
  58:17 59:18
  62:17 63:12
filing 32:24
  43:11 59:23
  60:10
final 17:12
finalized 9:6
  13:22,24 40:9
financially

66:16
finding 10:17
fine 33:7
finish 4:22,23
fire 58:11,18
  63:11
first 4:3,17
  11:11,15 18:1
  26:17 27:16
  29:6 36:12
  47:2,22 58:2
firsthand 63:20
  63:23
Flanagan 17:23
  29:25,25 30:1
  30:4 31:4
Florida 1:1,8,8
  1:25 2:4,9 65:6
  65:22 66:3,23
  68:4,12
follow 61:23
following 40:10
follows 4:4
FOP 10:22,23
  11:1 24:14
  35:20 40:16
  41:3,4 57:22
forced 38:25
foregoing 67:18
form 16:25 18:2
  63:5
formally 9:1
formerly 28:9
Fort 2:9
forth 6:6,10,17
  12:10
forward 11:5
  56:23
forwarded 57:6
  68:13,14
four 41:12 46:24
frankly 16:7
Fraternal 11:21
  21:19
free 5:9

friendly 43:10
friendship 16:16
  16:17
front 35:1
full 4:7 53:15
furious 57:23
further 7:18
  14:22,22 18:23
  29:3 52:19
  56:1 64:2
  66:12
future 24:3

G

gathered 19:6
Gene 34:24
  35:10,12,12
  38:9,12,22
  57:5,7
general 10:8,9
  10:22 19:14
generally 21:2,8
  32:23 49:12
getting 13:20
  16:1 56:20
Gibbons 33:25
  35:10,12,12
  57:6,7
gist 53:14
give 5:3 6:3 13:2
  25:12 44:16
  48:8 51:21
given 4:10 23:17
giving 53:5
go 4:15 11:11
  14:20,22,22
  19:1 25:7
  27:14,15 35:2
  35:11,14 43:15
  46:12 47:15
  48:7
going 5:7 6:16
  11:13 12:10,15
  13:16 15:12
  16:5 17:5 25:8

25:8 33:7,14
33:21 36:6,8,8
41:16,19 42:8
44:25 46:10
47:17 51:24
52:19 57:17
58:11,18 61:23
64:11
**good** 10:24 14:3
14:3 33:6
**grievance** 39:20
43:11,12 59:18
60:5 61:14,23
**ground** 4:15
41:14
**Group** 2:3 68:3
**grown** 15:6
**Guasto** 1:5,14
3:4 4:2,9,10
9:2 19:4,9
22:21 23:10,24
44:18 46:13,18
65:11 66:9
67:3,4,21 68:2
68:6,6
**guess** 7:14 12:25
25:15 27:13
30:13 31:18
32:7,10 33:8
35:15 36:5
49:5 58:15
**guideline** 50:4,8
**guidelines** 49:25
50:11 51:3,8,9
51:13 52:6,15
58:6
**guy** 52:11
**guys** 13:19 19:22
20:2 46:4

**H**

**H** 67:1
**hairs** 22:18
**half** 47:1
**Hall** 48:13

**hallway** 19:22
**hand** 7:6 65:15
**handled** 61:13
**happen** 6:24
**happened** 14:16
34:2 36:2
40:22 53:8,13
55:13 57:20
**happy** 41:16,19
**harassing** 30:5
**harassment**
54:10
**harder** 31:23
**head** 5:3
**hear** 13:9 33:7
**heard** 13:15
20:9,20 43:23
62:3
**hearing** 56:3
**Hector** 57:22
**help** 4:16 47:21
48:14 54:12
**hey** 60:8
**HH** 65:22 66:23
**hold** 15:12 16:6
27:14 52:15
**home** 19:5
**honest** 60:17
**honestly** 14:6
35:17
**hopefully** 4:16
**hostile** 10:12,13
11:23 12:5
48:1
**hours** 22:4 48:13
48:23 49:5,13
49:16 52:21,25
55:25 56:1
**husband** 33:16
33:19,20

**I**

**i.e** 17:14
**IA** 11:12 17:12
21:23,24 26:6

26:10 36:13,13
47:12,12,16
48:7
**idea** 11:9 52:5
**identification**
17:7 21:17
25:10 36:10
42:10 45:2
**ill** 15:13
**illegal** 50:1 51:3
51:7,7
**implement**
37:25 41:24
56:4 63:6,24
**implemented**
37:23 59:22
60:9
**implementing**
63:17
**important** 4:19
4:21 5:2
**improper** 62:11
**improperly**
59:22
**in's** 10:7
**inappropriate**
28:25 30:6,12
31:7
**incarnation** 8:2
**included** 48:23
58:21,23 59:2
**inclusion** 68:14
**incorporated**
22:13
**INDEX** 3:11
**individuals** 31:5
**infidelity** 15:2,5
15:7
**influx** 12:11
**initially** 10:18
34:24
**initials** 36:23
37:9
**initiated** 14:8
17:2,13 27:9

27:13 47:4,7
**initiation** 26:1
**insisted** 54:3
**institute** 39:19
**interest** 41:9
**interested** 16:8
31:6 66:16
**interfered** 50:1
51:4
**Internal** 3:14
11:3 12:7,12
12:22 16:22
17:12 18:3,24
19:2 25:4 26:1
26:8,21 27:8
27:18 29:21
34:7,15,18
46:17 48:19
49:15 57:14
**interview** 20:12
**intimately** 56:8
56:12
**investigation**
16:23 17:13
18:3,4,6,8,11
18:24 19:2,14
19:18 26:1
27:8 29:21
46:17 50:2
51:4
**investigations**
55:24
**Investigatory**
19:6
**invited** 34:5
**involved** 10:23
14:19 17:16,18
18:2 25:5
28:17 29:21
31:1 32:13,15
34:5,16 36:14
38:24 39:6
40:25 41:5,21
41:23 42:5
45:9,16,22

56:8,13 57:9
61:15,19 63:4
63:15
**involvement**
32:23 43:12
45:13 57:14
**involving** 27:19
**iron** 61:11
**Irrevocable**
37:16 41:25
**issue** 57:10
60:13
**issued** 22:7
**issues** 15:1 18:16
26:11,20 32:2
32:5 47:20,22
**item** 30:19

**J**

**January** 9:9
27:2 39:15
40:3
**Jessica** 1:5 9:1,1
9:4 10:17 11:4
11:21 12:1,13
12:22 13:10
16:3,23 17:15
17:19 18:10,11
18:14,20 19:15
19:21,22 20:7
21:3,9 25:5,22
26:16 27:9
29:7 30:14,15
30:22,23 32:24
33:11,24 34:14
35:5 36:12
38:4 40:4 41:6
42:6,17 43:17
44:13,18 45:11
46:13,18,20
47:15,20 48:18
49:9,10,14
52:23 53:3,6
54:6,17 55:20
56:16,23 58:11

NICHOLAS GUASTO

58:17 60:10,20
62:10 63:12
**Jessica's** 7:2
9:20 15:14
36:20 37:9
39:12 41:24
43:1,5 45:20
45:24 49:21
54:4,10 56:22
57:3 59:7,12
59:18,21 60:24
61:17,24 62:16
63:6,18,24
**job** 20:8
**Jones** 26:15,15
54:13
**Judge** 62:18
**judges** 60:18
**July** 24:12 25:19
**jump** 12:25
**June** 9:7 11:16
11:18 12:16
13:24,25 45:3
65:23 66:24

**K**

**kept** 55:7 61:25
**Kevin** 38:22
57:6,22
**Key** 2:3 68:3
**kind** 8:23 12:24
16:4 17:4
18:24 43:14
44:23
**knew** 13:16
20:14 33:9,14
33:14 56:3
**know** 5:10 6:21
6:24 7:4,4 8:23
10:4 11:4,5,23
12:24 14:6
15:7,8,18,22
15:24 16:9,10
16:10,12,12
17:10 18:14

20:15,17,21
21:8 27:11
28:4,5,13 29:9
29:16 30:7,13
31:22 32:7,18
33:9 34:2,3,4,4
34:5 35:1 36:1
36:4,6 39:14
41:12 43:8,17
43:22 44:1
45:7,17 46:5,7
50:8 51:9,13
51:16,20,22
52:11,12,15,17
52:18 55:6,8
56:12 57:4,8,9
59:15 61:5,5,7
61:8,10,11,12
62:7,10 64:8
**knowledge** 18:1
42:16,22 63:20
63:23
**known** 9:1 10:21

**L**

**lack** 15:15 41:2
**Lauderdale** 2:9
**Law** 2:3,8 68:3
**lawsuit** 9:17,20
10:5,11,12,18
11:7,9,10,14
13:13
**lawyer** 61:22
**lawyers** 38:8
39:8 60:18
**layman** 25:16
**leadership** 41:4
**leading** 27:3
**leave** 8:18
**left-hand** 36:23
**legal** 10:7 35:2,6
35:7,10,11
51:19,23
**lesser** 49:22
**let's** 7:19 11:11

14:4 16:18
23:9 27:14
28:16 44:11
46:12 61:20
62:21
**letter** 37:16,19
37:22 39:19
41:25 43:11
63:6,18,24
68:7,11
**lieutenant** 15:15
15:18 17:22,22
17:23,24 27:22
29:13,25 31:12
**life** 33:2
**liked** 55:6
**limit** 56:21
**limits** 19:11,23
20:2
**list** 31:1
**listen** 22:21
**lists** 17:21
**little** 14:11 44:14
60:22
**living** 14:13
44:13
**local** 35:8,22
**lock** 21:10
**lodge** 10:22
11:21 35:8,13
35:20,22,22
38:12
**lodged** 28:14
**logic** 41:14,20
**logically** 41:21
**long** 7:24 28:6
**longer** 14:7
**look** 14:11 19:24
25:13 30:6
41:13 45:3
**looking** 17:1
22:25 38:15
50:16 51:23
**looks** 49:11
57:18

**Loperfido** 17:24
32:1,9
**lot** 15:12 29:11

**M**

**making** 10:14
31:6 60:21
**marital** 15:1
**mark** 25:8 36:9
42:9 44:25
**marked** 17:7
21:16,17 25:10
25:11 36:10
42:10 45:2
**marker** 26:9
**marking** 17:5
**married** 9:8
33:17
**matched** 19:25
**materials** 5:17
**matter** 60:17
**mean** 10:6 14:19
15:8,11 16:4,5
22:18 23:7
26:20 29:4
30:11 38:16
39:2 41:12
45:15 49:4,5,8
53:14 55:2,5
56:12,12 59:14
59:14 60:17
**means** 23:16
64:9
**meet** 53:23 54:3
**meeting** 11:25
33:24 34:3,8
35:16 36:3
39:18 40:2,3,7
40:8,11,14,20
41:5 43:18
47:3,4 49:19
53:13 54:3,7
54:13,14,21
55:18 56:19,22
61:21

**meetings** 40:6
46:16,24 51:16
61:15,18 62:3
63:15
**Melkins@mlel...**
2:10
**member** 40:16
60:14,14,20,20
60:25 61:1,12
61:12 62:4
**members** 40:4
41:3 56:3
59:10 60:21
61:6,7
**memo** 42:19
**memorialize**
6:15
**memorialized**
46:8
**met** 11:17,22
**method** 31:17,17
**Miami** 1:2,8 2:4
7:23,24 8:15
8:18 9:13,20
26:24 35:24,25
46:14 67:3
68:4,6
**MICHAEL** 2:7
**Millan** 38:22
57:6,22
**mind** 17:4
**mine** 12:22
38:16
**mini** 64:12
**minor** 48:12
49:5 52:20,24
**minute** 25:13
**minutes** 62:21
**misconduct**
18:10 27:19
39:17
**missing** 53:16
**MLE** 2:8
**mobilization**
27:22

money 35:11
month 44:12
months 6:18
  43:3
motor 48:11
  55:24
move 8:21,22,24
  11:5 56:23
multiple 10:16
  19:8
municipality 1:8
murky 60:22

**N**

N 3:1
name 4:7 33:5
  52:2 54:24
  55:4,4 67:4
named 9:1
narrative 7:13
  7:14
nature 7:14
  15:22 16:3
  19:14
necessary 67:16
need 14:22
  20:14 56:21
needs 61:13
negative 29:17
neighborhood
  44:16
neither 48:18
never 16:4,14
  17:9,10 20:7
  20:10,11,13,19
  20:20,22 29:1
  29:16 33:1,10
  42:5 43:23
  59:18,21 60:2
  60:19
NFL 26:15
Nicholas 1:14
  3:4 4:2,9 19:4
  64:5 65:11
  66:9 67:4,21

68:2,6
nine 46:25
nod 5:3
Northeast 2:8
Notary 1:25
  65:21 66:23
notes 66:11
notification
  16:25 17:3
November 5:24
  33:24 36:2
  42:25 43:18
number 20:6,9,9
  29:8,10 33:25
  36:13

**O**

O-301 2:4 68:4
oath 50:9 65:1
Objection 7:10
  9:21 15:3 20:4
  21:13 25:1
  26:12 28:3,11
  31:9 34:10
  37:18 39:25
  43:20 47:24
  50:6 51:11
  52:8 56:10
  57:11 58:8
  59:25 60:12
  61:3 62:13,19
objectively
  41:12
obviously 7:6
  19:25 31:23
  33:11,15 34:24
  35:8 40:16
  53:14 55:7
occurred 27:20
October 8:7,10
offhand 6:8
office 2:5,9 48:3
  68:8
officer 7:23 8:14
  19:4,9 43:10

official 28:22
  29:19 62:3
  65:15
officially 17:2
  28:14 29:16
okay 4:13 5:1,16
  5:20 6:13 7:17
  10:4,15 12:3
  12:18,20 13:2
  13:9 14:10,24
  16:18 17:21
  18:1 21:23
  22:7 23:9,19
  24:5,9,17 25:4
  25:7,11,25
  26:6 27:5,15
  29:24 31:1,15
  32:12 33:3,23
  36:1,8,18,20
  37:1,3,9,12
  38:25 39:11,14
  40:16,19 42:8
  42:11,24 44:2
  44:18,24 46:2
  46:10,23 47:10
  49:1,18 50:21
  52:19 53:2,19
  54:1 55:9
  57:16 58:1,10
  58:14 60:7
  61:20 62:9,9
  62:21 64:11
once 43:14 68:13
open 50:2 51:4
opined 60:15
opinion 60:17
opposed 54:25
order 6:4 11:21
  21:19 64:11
ordered 64:13
ordering 68:13
  68:14
original 68:13
out's 10:7
outside 19:9

20:2 21:3
  35:12
overall 22:16
oversimplifying
  61:4

**P**

packet 7:5,7
page 3:13 7:12
  27:15
PAGE/LINE
  67:5
pages 7:13
Pancier 32:19
  33:1,4,14,25
  38:9 55:11
  57:9
panel 56:2,15
Paragraph 55:9
  55:14
part 6:22 15:2
  19:18 24:6
  26:16 27:11
  38:22 39:16
  40:17 41:4
  49:4 58:15
  61:20 62:3
participated
  45:18
particular 11:14
particularly
  16:7
parties 66:13
  68:14
parties' 66:14
party 38:19
  53:22,24 55:1
  55:2,6,15
  68:13
pass 51:20
passes 51:18
patrol 28:7
patrolman 53:21
Paul 6:2 10:21
  11:22 12:1

45:8,12,17,25
  46:11 51:15
  52:10,12 55:5
pay 22:4
paying 48:23
  49:13,15
penalties 67:17
penalty 44:8
  50:10,14
pending 12:11
  12:22 64:12
people 4:18 27:5
  27:9 28:16
  29:20 30:18
  31:1 34:6
people's 16:6
period 46:24,25
perjury 44:8
  50:10,14 67:17
person 16:5
personal 8:20
  14:24 16:6
  42:16,22
personally 47:18
personnel 34:1
phone 30:6
phonetic 43:6
Physical 15:8
physically 31:23
pick 19:5
picture 29:1
place 1:17 12:19
  26:17
Plaintiff 1:6 2:6
please 4:8 10:20
  68:8
PLLC 2:3 68:3
point 6:14 7:4
  12:25 13:11,22
  14:3 18:17
  28:14 29:1
  35:1 58:1,10
  60:7 63:9
police 7:23 8:14
  11:21 15:25

21:19 34:1
35:23 43:9
47:4 49:20
59:6
**popups** 16:1
**porn** 48:2
**position** 46:14
56:6 58:3
59:21 60:8,23
**possibly** 34:7
**prejudice** 62:18
**preparation**
45:9
**prepare** 5:20
**prepared** 6:1
32:18 45:7,8
51:14
**preparing** 32:13
45:13
**present** 12:1
40:14 45:18,24
46:3 56:13,14
**president** 24:14
40:19
**presume** 5:7
21:21 50:21
54:14
**pretty** 10:23
43:13
**previous** 54:13
**previously** 5:22
33:9
**prior** 6:18 8:5
9:25 10:1
11:17 12:6
26:14 29:7
44:18 46:13
56:3,19
**probably** 26:17
32:10 38:16
39:4
**problem** 53:2
62:23
**problems** 12:4
26:20

**Procedure** 68:25
**process** 13:20,23
14:1 39:20
43:12 45:16
57:15 61:14
**processing** 38:2
**Professional**
1:24 66:6
68:18
**professionally**
47:18
**promised** 50:2
51:4
**promotional**
53:4
**pronouncing**
33:4
**provide** 7:2 55:3
**provided** 23:24
55:4
**Public** 1:25
65:21 66:23
**pull** 44:21
**punishment**
48:9 49:23
**purpose** 6:14
**purposes** 23:20
**pursuant** 51:7
**pursue** 63:17
**push** 60:23
**put** 50:9 51:2

_____
**Q**

**question** 4:21,22
5:7,8,9 14:3,20
14:21,23 21:7
22:15,21 39:5
42:15 43:16
48:6 52:17
60:4
**questions** 4:21
63:1 64:3
**quibble** 52:24
**quick** 62:25
**quickly** 4:16

55:22
**quite** 28:5,6
42:25 59:15

_____
**R**

**R** 67:1,1
**radio** 19:24
**radioed** 19:22
20:7
**radioing** 20:1
**ranks** 20:9
**reached** 13:15
**read** 5:22 9:16
42:19,21 50:18
64:7,10 67:18
68:9
**reading** 18:25
68:21
**real** 11:15
**realized** 27:23
**really** 13:17 14:3
29:16 33:13
36:4 45:15
60:17 61:7
**reason** 14:24
34:13 42:16
67:5
**reasonable**
68:11
**reasons** 62:1
**recall** 6:4,8 7:5
7:13 9:7 12:8
14:8 17:4
33:11 34:23
35:18 57:7
**recalling** 53:9
**recap** 53:15
**receipt** 68:11
**receive** 52:23
**received** 23:11
27:19 54:18
57:21 68:13
**recollection** 49:2
53:16
**recommendati...**

56:5
**record** 4:7 62:24
66:11
**recorded** 43:17
43:25
**recording** 33:6
**recounted** 51:15
**recounting**
45:23 46:5
**recourse** 39:20
**reduce** 48:9 54:5
**refer** 5:16 17:15
25:16
**referenced**
46:14,23
**referred** 43:9
44:20
**referring** 26:23
35:20 40:3,11
47:23 50:5
54:14,25 55:15
**refused** 43:12
**refusing** 61:14
**regard** 68:12
**regarding** 60:24
61:16
**regardless** 61:14
**regular** 22:4
**relate** 44:23
**relates** 21:23
**relating** 17:12
36:12,14 41:24
49:13 59:18
63:17
**relation** 52:6
**relationship**
8:23,25 10:25
15:15,23,25
16:2,14 33:10
33:19 41:1,6
45:12,17
**relationships**
10:25
**relative** 66:12,14
**released** 24:5,6

**remember** 7:9
7:12,15 20:3
22:14 35:19
**remembering**
19:19
**remote** 1:17 66:8
**remotely** 4:3
65:11
**repay** 52:25
**repayment**
48:12 52:20
56:1
**repeat** 44:3
**rephrase** 59:1
60:3
**report** 3:14
17:12,14 66:8
**REPORTED**
1:24
**reporter** 4:18
66:7
**REPORTER'S**
66:1
**reports** 19:7,8
**represent** 11:3,5
11:6,12 17:11
43:10
**representation**
38:21 39:7
54:21 62:11
**represented**
23:19 24:17
33:8 38:4,9,11
39:2
**representing**
34:25
**reprimand** 22:7
22:9,17 23:3,6
23:11,13,19,23
24:2
**requested** 54:1
55:18 66:10
**required** 14:19
**resignation**
37:16,20,22

39:16,19 41:25
43:11 63:6,18
63:25
**resolution** 49:13
56:8 58:20,23
59:2
**resolve** 47:14
48:12 52:20
53:5 54:5,9
56:22
**resolved** 12:23
18:17 49:14
**resolving** 34:6
**respected** 32:10
**respond** 53:22
54:2
**responses** 5:2
**responsibility**
20:11,16,17,18
47:11
**result** 48:19
**retainer** 35:12
**retaliating** 60:10
**retaliation** 10:12
10:13 59:23
**retention** 43:5
**return** 49:22
50:2 51:5
**revealed** 19:2,8
**review** 6:3 66:9
68:9,10
**revocation** 23:2
23:5,23
**revoke** 22:9,16
**revokes** 23:12
**rid** 51:21
**right** 4:15 7:19
9:12,14,16
13:20,24 15:10
16:18 17:19
18:5,23 19:12
19:16,19 22:5
22:23 23:9,9
23:14 25:7
26:2,3 28:16

29:8,10,11
31:8 32:1 33:5
33:20,23 38:8
39:11 41:6,9
41:13 42:18,24
44:2,9,13 47:5
48:16 50:12,16
50:22 56:25
60:5 63:7,8,13
64:7,8
**rights** 39:23
**Rodriguez** 17:22
29:13 30:8
31:3
**romantic** 30:13
41:6
**romantically**
31:6
**rookies** 20:16
**Rosa** 31:15
**rougher** 31:22
**roughly** 8:15
**route** 35:3 43:15
**rule** 56:25 68:25
**rules** 4:15 68:11
**rumor** 16:10
**rumors** 15:24
16:2
**rush** 64:13

---

**S**

**S** 67:1
**Salabarria** 9:1,4
19:3,9 27:20
27:23
**saw** 7:4 20:10,13
20:19,20,22
29:2 43:23
**saying** 12:15
21:10 22:24
23:2 57:7 60:3
**says** 17:18 18:23
23:10 25:21
27:15 44:18
46:12 47:4

56:19,20 57:16
**schedule** 64:6
**Scott** 29:25
**scratch** 46:11
**screen** 23:1
**scroll** 25:18
28:16 42:13
**scrolling** 37:12
**seal** 65:15
**seared** 17:4
**second** 13:2
58:15
**see** 17:13 18:24
20:14 23:21
25:20 27:16
**seeing** 22:25
**seeking** 35:2
47:19
**seen** 17:8,9,10
21:21 25:12
36:16 37:7
45:4
**sense** 5:5,14
51:24
**sent** 29:1 57:4,5
57:6
**separate** 22:10
23:11 34:18
42:6,17
**separated** 23:16
**separately** 34:17
**separation** 14:7
14:16 39:12
43:1 59:13,19
61:17
**September** 6:17
6:19 47:2 49:2
49:11 53:13
**Sergeant** 17:24
19:3,9 27:20
27:23 32:1
**series** 46:16
**serious** 33:18
**set** 56:21
**settle** 34:8

**settled** 24:22
**settlement** 3:15
3:17 21:18
22:15,20,24
23:1 24:6,10
36:11 38:5,14
39:8 44:19,20
46:13 48:22
56:17 59:7,12
**seven** 49:18
**sexual** 30:20
31:7
**sexually** 30:20
32:2 48:2
**shape** 18:2 63:5
**shelter** 47:19
**shift** 19:6,23
**Shorthand** 66:6
**shortly** 12:23
**show** 17:5 25:8
35:15 36:8
42:8 44:25
**showed** 36:18
**showing** 21:16
37:6
**side** 57:14 67:16
**sign** 37:23 38:17
38:25 50:24
52:2,12 68:9,9
**signature** 24:9
36:21 37:1,12
37:19 42:13
**signed** 5:22
24:14 38:13,16
39:22 42:25
44:6,8,12
46:13 48:22
50:12,14,18
53:9 56:17
59:7
**significant** 47:17
**significantly**
48:10
**signing** 44:18
68:21

**similar** 32:8
48:11
**single** 33:1
**sir** 5:15,19 44:17
**sitting** 42:15
62:10
**smell** 51:18,20
**Smith** 2:3 68:3
**somebody** 8:25
**sorry** 8:9 13:8,9
15:25 20:16
33:18 45:20
47:16 49:9
**sort** 31:7 51:17
**sounds** 41:8 56:6
62:5
**SOUTHERN**
1:1
**speak** 13:7,12
45:12,15 56:3
**speaking** 10:6
21:2,9 32:23
**specific** 6:23
45:15
**specifically** 7:15
10:7 15:2
**specifics** 43:4
**splitting** 22:18
**spoke** 12:4 13:4
13:10 33:1,4,8
33:10,11 35:16
42:5 52:22
**spoken** 13:17
**square** 49:1
**standard** 51:19
**Star** 19:7
**start** 8:24 9:10
11:12 14:1,2,5
16:18 26:7,21
55:24
**started** 6:4 9:12
17:1 26:9
34:24
**state** 1:25 4:7
10:22 11:20,20

65:6,22 66:3
66:23
**stated** 48:10
55:23 56:1,22
67:18
**statement** 46:15
52:13 53:6
**statements**
47:16 48:8
49:3
**STATES** 1:1
**station** 15:25
16:2 19:7
35:23 47:4
49:20 53:22
54:2
**Statute** 68:12
**Stenographer**
1:24 68:18
**stenographic**
66:11
**stenographica...**
66:8
**Steve** 53:25
54:24 55:7
**Steven** 56:7
**stop** 14:13 23:9
**stopped** 44:13
**story** 45:20
**strictly** 16:16
**structuring** 53:3
**stuff** 11:24 16:1
31:25
**subject** 16:22
27:5
**subjective** 49:6
**subjects** 11:4
**submit** 37:16
**submitted** 6:20
7:1,8 39:16
**suggested** 55:5
55:20 68:10
**Suite** 2:4 68:4
**summarize**
57:17

**Summer** 13:11
13:14
**Super** 26:16,23
54:15,16
**supported** 33:16
**supposed** 19:10
19:15,16 21:3
21:12 27:24
**sure** 5:12 6:8,23
13:21 17:1
21:6 27:7
28:18 44:22
47:7
**surrounded**
31:5
**Susan** 1:24
64:11 65:21
66:6,22 68:18
**suspension** 22:2
48:12 49:5,13
55:25
**suspensions**
48:23 49:15
**swore** 52:3
**sworn** 4:3 65:12

––––––––––
**T**

**T** 67:1,1
**take** 4:18 5:1
14:11 19:5
20:15,16,20
25:13 44:16
47:11 53:4
62:21,22
**taken** 29:2 60:7
68:8
**talk** 4:20 11:13
13:3 33:21
44:11 46:3,4
55:9 63:11
**talked** 11:16
27:12 36:15
47:10,14 63:10
**talking** 4:19
12:12 18:5

21:24 56:25
**tardiness** 18:21
**telephone** 35:16
57:16
**Telestaff** 19:7
**tell** 7:1 10:20
11:8 16:13
30:4 41:16,19
46:11 58:10,17
**telling** 13:15
20:21 52:5
55:10 61:9
62:6,7
**ten** 43:3 55:25
62:16,21
**terminate** 48:13
**terminated**
12:23 48:19
61:2
**termination**
36:5 60:24
**terms** 6:23 26:10
**Terrace** 2:8
**test** 51:18,20
53:4
**testified** 4:4
**testifying** 23:5
62:2
**testimony** 54:20
**Texas** 8:5,11
**thank** 64:5
**thing** 58:6
**things** 4:17 12:5
16:3 20:6
30:20 31:24
45:15 46:6,7,9
48:3,4 60:22
**think** 5:23 6:22
10:7 11:15,16
12:9 13:14,21
15:5,6 16:24
17:1 18:15,15
18:23 19:18
22:1,13,14,18
22:19 26:16

28:22 29:2,5
30:12 32:7,19
34:12,25 35:1
35:17 36:6
44:2,19 46:23
47:10,22 48:5
52:4 57:13,13
58:9 60:8,18
60:20 61:4
63:3 64:12
**third** 53:21,24
54:25 55:2,6
55:15
**thought** 30:19
31:21 48:10
55:22,23
**three** 46:24
**time** 1:16 4:19
8:20,21 12:10
13:10 14:7,11
18:8,9 22:4
24:24 27:24
29:22,23 33:16
33:17 38:10
40:18 41:14,17
44:12 56:21
58:10 63:9
**times** 21:10
29:15
**timestamp** 19:25
**timestamped**
19:24
**timing** 34:23
35:18
**today** 4:17 16:9
33:12 42:2,16
54:20 62:10
**told** 16:3,10
40:23 41:4
42:22 47:15
54:1,6,9 61:10
62:6,6,8,8,20
**toll** 56:24
**tolled** 57:3
**tolling** 57:8,10

**tomorrow** 16:9
**topic** 55:18,19
59:14
**total** 8:1 22:5
**Track** 19:7
**transcribed** 68:8
**transcript** 64:7
66:9,10 67:2
68:7,9,10,13
68:14,21
**Transportation**
8:6,11
**travel** 19:3
**treated** 31:22
34:17
**treatment** 32:3,6
54:18
**tried** 20:15,16
45:19
**true** 20:21 41:15
66:10 67:18
**truly** 68:16
**try** 40:19
**trying** 12:19
59:16
**turn** 36:6
**turning** 32:12
**two** 4:18 14:13
14:17 20:1,9
25:18 32:20
33:20 38:8
40:6 46:24
55:21
**type** 48:1

––––––––––
**U**

**uh-huh** 5:4
47:13
**uh-uh** 5:4
**ultimate** 21:1,2
21:7 24:23
39:12 43:1
**ultimately** 22:1
42:17 48:18
49:7 52:24

56:15
**undersigned**
65:10
**understand** 4:24
5:9,13,18 9:19
9:24 24:21
25:14 49:14
55:3 60:13
**understanding**
10:8,10 18:19
24:21 36:2
38:1,3 49:24
49:25 50:10
51:2 52:1
**understands**
9:22 54:11
**understood** 5:8
6:15 42:21
47:20
**unfortunate**
41:20
**union** 28:15
35:21 36:12
38:11,13,19,21
38:22 39:8
40:4 47:8
59:10,17,21
60:4,7,14,16
60:23 61:5,6
61:22 62:12
63:16,21
**Union's** 61:16
61:22
**unit** 27:18 48:11
55:24
**UNITED** 1:1
**units** 20:8
**unofficially**
28:24
**untrue** 45:21
**upcoming** 53:4
**upset** 36:4
**use** 19:3 35:15
52:14 67:16
**usually** 41:20

**V**
**validity** 60:15
**vehicle** 19:3
**vein** 31:18,20
32:3
**verbal** 6:11
**versus** 60:14,20
61:1,12
**vice** 24:14
**video** 19:20
**view** 41:11
**violation** 27:21
37:24 51:17
52:11
**vocalized** 28:14
**voiced** 26:18
**vs** 1:7 67:3 68:6

**W**
**wait** 4:21
**waive** 64:8 68:9
68:21
**waiver** 24:6
68:20
**want** 30:6 35:14
35:14 44:3
51:9 62:22
63:4
**wanted** 8:22,23
30:11 33:15
35:11 37:25
47:15,21 48:11
48:13 52:19
53:5 54:9,11
56:1,4
**wanting** 47:11
47:14 63:11
**wasn't** 16:7
18:13 27:11
30:11 34:4,5
38:15,25 39:2
39:3 43:23
50:24 61:19
62:8
**way** 16:8 18:2

27:6 29:17
31:6,8 32:8,11
32:13 35:14
39:6 52:21
54:8 56:23
59:11,17 61:13
63:4
**Wayne** 26:15
54:12
**we've** 47:17
**week** 40:10 47:1
64:13
**weeks** 10:2
**went** 6:5,10
22:12 35:1
**wins** 41:20
**withdraw** 48:6
**witness** 3:3 64:4
64:10 65:15
**word** 15:15 33:1
41:2
**word-for-word**
53:15
**work** 8:4,13
10:12,13 11:23
12:5 19:4
27:23 48:1,9
**worked** 7:24
8:10 28:6
48:14
**working** 19:10
53:20
**works** 15:20
38:2
**wouldn't** 46:1
50:24
**write** 55:6 67:2
**written** 22:7,16
23:3,6,11
42:19 58:4
**wrong** 19:19
24:22 49:2
**wrote** 52:3

**X**

**X** 3:1

**Y**
**yeah** 6:19 12:17
12:17 19:1
25:21,21 26:21
27:2 29:9,23
33:13 35:22
38:12 39:4
40:6 43:3
44:15 47:1,1
54:16 59:14
**year** 6:18 13:11
43:1 53:9
**years** 8:15,16
41:12
**yelled** 55:10
57:19,19
**yesterday** 16:9

**Z**

**0**
**09-22-2020**
53:20

**1**
**1** 3:14 17:6
27:15
**1:22-CV-2100...**
1:3
**1:22-CV-2100...**
67:3
**10** 8:17 55:9
**10:33** 1:16 64:14
**11** 55:14
**1212** 2:8
**13** 25:19
**136** 22:4
**15** 47:2 49:2,11
**16** 65:23 66:24
**160** 49:5
**16th** 2:8
**17** 3:14 8:15,16
**18** 59:8
**180-day** 56:20

56:25
**18th** 8:3
**19** 40:3

**2**
**2** 3:15 21:16
**20-hour** 22:2
**2006** 8:17
**2006ish** 8:16
**2019** 9:11
**2020** 6:17,19
12:13 16:19
17:14 25:19
26:6,8,10 27:1
27:20 33:24
36:2 43:18
46:18 47:2,12
48:4 49:3,11
49:22 53:13
54:4 58:11
59:8,23 60:10
63:12
**2020-0010** 21:23
26:2
**2020-04794**
36:14
**2020-10** 46:17
**2020010** 36:13
**2021** 5:24,25 7:1
9:9 11:16,18
12:16 14:15
22:8 23:10
24:12 39:15
40:3 42:25
45:4
**2021-05270**
46:15
**2023** 8:3,8,10,10
8:13,17,19 9:7
13:24,25
**2024** 1:15 65:16
66:18 67:4
68:1
**2027** 65:23
66:24

NICHOLAS GUASTO

| **21** 3:15 12:16 | **9** |
|---|---|
| **22** 17:14 27:20 53:13 | **9** 22:8 23:10 |
| **22001** 17:14 | **9:00** 1:16 |
| **23** 1:15 8:9 67:4 | **954-401-2608** 2:9 |
| **23rd** 27:18 | **954)523-5326** 68:8 |
| **25** 3:16 68:1 | |
| **25th** 65:15 66:18 | |

**3**

**3** 3:16 25:9,11 32:12
**30** 68:11
**30(e)Florida** 68:25
**33131-2433** 2:4 68:4
**33304-2323** 2:9
**36** 3:17

**4**

**4** 3:5,17 36:9
**408027** 65:22 66:23
**42** 3:18
**45** 3:19
**4th** 16:25 17:2

**5**

**5** 3:18 42:9,25 46:12
**510-2020-04794** 46:21
**520** 2:3 68:3
**5th** 16:25 17:2

**6**

**6** 3:19 45:1 46:16

**7**

**7,217.52** 22:5
**786-688-2335** 2:5

**8**

**EXHIBIT**
**1**
04.23.24 N. GUASTO SF

MIAMIBEACH



INTERNAL AFFAIRS REPORT

**I.A. CASE NUMBER:**       **2020-010**

**M.B.P.D. CASE NUMBER:**       N/A

**COMPLAINANT:**       Office of the Chief of Police

**DATE OF INCIDENT:**       April 22, 2020

**DATE REPORTED:**       April 22, 2020

**DATE RECEIVED BY INTERNAL AFFAIRS:**   April 23, 2020

**DATE CASE TOLLED:**       April 23, 2020 (S.O.E)
      June 19, 2020 (S.O.E/Exposure)
      September 24, 2020
      April 27, 2021

**DATE CASE UNTOLLED:**       May 27, 2020
      September 20, 2020
      April 1, 2021
      May 11, 2021

**180 DAY EXPIRATION DATE:**       September 21, 2021

**INVOLVED EMPLOYEES:**       Sgt. J. Sgt. Salabarria, ID 1023
      Ofc. N. Officer Guasto, ID 848
      Capt. Steve Feldman, ID 694
      Lieutenant J. Rodriguez, ID 768
      Lieutenant A. Dohler, ID 533
      Lieutenant S. Flanagan, ID 720
      Lieutenant D. Brown, ID 851
      Lieutenant R. Carvajal, ID 971
      Sgt. A. Loperfido, ID 766

**`STIGATOR:**       Sergeant A. Descalzo

**ALLEGATION:**            The Internal Affairs Office received an Allegation of Employee Misconduct memorandum from the Operations Division where it is alleged that Sgt. Jessica Sgt. Salabarria was untruthful and was outside of the city when she was supposed to be working within the city.

**PERSONS INTERVIEWED:**            Capt. Steve Feldman, ID 694
Lieutenant J. Rodriguez, ID 768
Lieutenant A. Dohler, ID 533
Lieutenant S. Flanagan, ID 720
Lieutenant D. Brown, ID 851
Lieutenant R. Carvajal, ID 971
Sgt. A. Loperfido, ID 766
Ofc. K. Milan, ID 141

**PERSONS NOT INTERVIEWED:**            Sgt. J. Sgt. Salabarria, ID 1023
Ofc. N. Officer Guasto, ID 840

**SYNOPSIS:**

On April 23, 2020, the Internal Affairs Unit received an Allegation of Employee Misconduct involving Sergeant Jessica Salabarria #1023 that occurred on April 22, 2020. On the date of the violation, the department was deployed under the COVID 19 mobilization. Lieutenant Dohler realized that Sgt. Salabarria was not at work at the time she was supposed to be and attempted to contact her. After several attempts, Lieutenant Dohler was able to contact Sgt. Salabarria who stated that she was in the restroom located on the 5th floor. Further investigation by Lieutenant Dohler revealed that Sgt. Salabarria was untruthful being that she was out of the city when she went in service.

Further investigation by Internal Affairs revealed that Sgt. Salabarria would not use her vehicle to travel to and from work and would have Officer Nick Guasto pick her up and take her home during the course of his shift. Investigatory efforts and evidence gathered via Telestaff reports, Trackstar AVLS, Station CCTV, and Entry/Keycard reports revealed multiple dates where Sgt. Salabarria and Officer Guasto were outside the city when they were supposed to be working within city limits.

Multiple interviews were conducted with Sgt. Salabarria's supervisors all of which stated that at no point did they authorize her to leave early, arrive late, or work outside of the

Page 2 of 42                                                            I2020-010
City 001573

city. Some of her supervisors also stated that at no point did Sgt. Salabarria mention that she was having a hardship getting to and from work.

Both Captain Feldman and Sgt. Loperfido were interviewed due to them being Officer Guasto's supervisors in the Tech Unit. Both supervisors stated that there are specific instances where officers assigned to the Tech Unit are allowed to work from home and provided examples. After going through all the instances where Officer Guasto was found to be out of the City of Miami Beach while working with the supervisors, Sgt. Loperfido and Captain Feldman stated that on multiple occasions Officer Guasto took advantage of the honor system the Tech Unit operates under.

After reviewing all of the evidence gathered for the dates of this investigation, it was determined that Sgt. Salabarria and Ofc. Guasto working outside of the city during their shifts. Sgt. Salabarria's total time working outside of the city was 71.18 hours. Ofc. Guasto's total time working outside of the city was 320.11 hours.

During the course of this investigation, both Sgt. Salabarria and Officer Guasto entered into negotiations with the City of Miami Beach. Sgt. Salabarria entered into an agreement with the City of Miami Beach under a last chance agreement on December 18, 2020. Officer Guasto signed his agreement with the City of Miami Beach on July 7, 2021. See Appendix A (Salabarria) and Appendix B (Guasto).

## INVESTIGATION:

### April 23, 2020

- On April 23, 2020, the Internal Affairs Unit received an Allegation of Employee Misconduct involving Sgt. Salabarria #1023 that occurred on April 22, 2020. The allegations listed are untruthfulness and theft of time. Sgt. Salabarria was contacted by Lieutenant Dohler at 0801 hours due to her not being present at roll call. Sgt. Salabarria was scheduled to be at the station at 0730. Sgt. Salabarria advised Lieutenant Dohler that she was on the 5th-floor restroom due to not feeling well. Lieutenant Dohler and Lieutenant Flannagan responded to the 5th floor to check on Sgt. Salabarria's welfare. Upon arriving at the restroom they observed the door to be locked. While waiting outside the restroom. Sgt. Salabarria then enters the 5th floor via the Range/ Roof south side door. It was later determined that the only way to use the female restroom on the 5th floor is using a key that Sgt. Salabarria did not have therefore making it impossible that she used said restroom.

- This investigator was assigned this case and responded to the property window and requested that Property Supervisor Stacey Wright provide Key card usage

City 001574

for both Sgt. Salabarria and Officer Guasto at 1448 hours for the time frame of 10/22/19 thru 03/22/20

- At 1515 Sgt. Han and I observed Sgt. Salabarria's vehicle parked on the west side of the 4th level of the police station facing east on her day off.
- **Case tolled due to a State of Emergency/COVID-19.** See case file for all State of Emergency documentation.

### April 24, 2020

- Gathering of AVL, Telestaff, and key card data inputed into Microsoft Excel to establish inconsistencies such as tardiness.
- Began reviewing the MBPD station surveillance video.

### April 30, 2020

- AVL reviews were conducted on both Sgt. Salabarria's vehicle (17004) and Officer Guasto's vehicle (3391). Sgt. Salabarrias's vehicle appears to be stationary for multiple days at a time. Officer  Guasto's vehicle AVL reveals that he uses it on a daily basis and appears to have a final stop of 117 NW 42 Ave on multiple days.

- Reviewed station video.

### May 4, 2020

- Subject Officer Notification sent to Sgt. Salabarria via email to Lieutenant Baldwin.
- Subject Officer Notification sent to Officer Guasto via email to Sgt. Loperfido. Baldwin.
- Reviewed station video.

### May 8, 2020

- Received the signed copy of Officer Guasto's Subject Ofc. Notification via interoffice mail. See the case file for a copy.

### May 11, 2020

- Received the signed copy of Sgt. Salabarria's Subj Ofc. Notification via inter-office email. See the case file for a copy.
- Reviewed station CCTV video.

**I2020-010**

City 001575

**May 18, 2020**

- During the course of the investigation, this investigator observed that Officer Guasto appeared to be using two key cards/ access keys. While reviewing station camera footage, this investigator observed that Officer Guasto would remove what appeared to be a key card from the visor of his assigned police vehicle and use it to enter the garage. A comparison was then done using the station video and Officer Guasto's key card audit sheet and several inconsistencies were found. These included zero instances where Officer Guasto would use his assigned key card to enter the garage.

- This investigator requested an audit of all key cards being used to enter the parking garage on several dates and specific times where Officer Guasto was observed entering the parking garage via station camera and AVL information. PEU Supervisor S. Wright assisted in providing me a copy of Access Vendor #2 key card information which is the key card this investigator suspected Officer Guasto was using to enter the building based on information gathered. The information on the Access Vendor #2 card was consistent with the times Officer Guasto was entering the garage.

**May 20, 2020**

- Lieutenant Gil, Sgt. Lemus, and I responded to 117 NW 42 Ave (Sgt. Salabarria and Officer Guastos current residence). I met with building manager Mariesly Morales (7864495592) to retrieve the video from 4/22/2020, the date of occurrence for the Allegation of Employee Misconduct.. Ms. Morales was able to provide footage and it was uploaded to the file. While reviewing footage with Ms. Morales, she observed Officer Guasto's vehicle on camera and stated that the vehicle belonged to a Miami Beach Police Officer. She also stated that his girlfriend was also a police officer for Miami Beach. I confirmed the time on the CCTV with the live time and it was accurate. Sgt. Salabarria was scheduled to work 0730-1855 hours.

- I began reviewing the footage provided which revealed the following...

  1. Sgt. Salabarria walking out of the elevator with Officer Guasto at 08:18 hours. Sgt. Salabarria appeared to not be in possession of her duty belt.

  2. Officer Guasto's vehicle (black unmarked Ford Explorer) is then observed driving through the property's parking garage before exiting.

**May 26, 2020**

- Review of AVL for both Sgt. Salabarria and Officer Guasto. Officer Guasto was observed arriving late on 5/22/20.

I2020-010

City 001576

- The time period for the scope of this investigation was determined to be for dates between October 22, 2019, through March 22, 2020, excluding the Super Bowl.
- Witness Officer interview conducted at 225 Washington Ave. See below.

**At 1:55 PM, Sergeant Anthony Loperfido was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Luis Corps and I conducted the interview. Sergeant Anthony Loperfido provided a sworn recorded statement. The following is a synopsis of his statement:**

- Sgt. Loperfido has been employed by MBPD for 16 plus years.
- Currently assigned to the Technical Operations Unit.
- Stated that he is Officer Guasto's direct supervisor.
- At the time of this interview, per Sgt. Loperfido, Officer Guasto's hours were 0600-1600. He is assigned to IT duties along with South Pointe park due to the COVID-19 deployment mask enforcement duties.
- Officer Guasto is supposed to report to Southpoint Park by 0730. Prior to 0730, he is to complete administrative tasks.
- No roll call at the beginning of the shift.
- Per. Sgt. Loperfido, Officer Guasto had been approved for time off for a previous engagement (father's birthday).
- Advised that if Telestaff shows Officer Guasto checked in by Loperfido, then he did check him in for 5/20/20.
- Sgt. Loperfido stated that if there were to be an adjustment to any of his employee's schedules, he would be made aware.
- Loperfido stated that it was common practice for his employees to advise him if they were running late or weren't going to come into work.
- Stated that if Officer Guasto was 1 hour and 42 minutes late on 5/20/20, he would've been made aware.
- Stated that Officer Guasto was working a full 10 hour day and had no approved time off.

**The interview was concluded at 2:06 PM. (Refer to the case file for the entire recorded statement).**

**I2020-010**
City 001577

**May 27, 2020**

- The case was un-tolled.

**May 28, 2020**

- Contact made with MBPD Union President Milan to meet at 225 Washington Ave with Officer Guasto. Officer Guasto responded to the Internal Affairs Office where he surrendered most of his issued equipment to Internal Affairs. The property was impounded under MBPD CS# 2020-39921 with PEU J8. Mahle 884. His vehicle # 3391 was also impounded. Lieutenant Jorge Garcia was advised.

- Commander Prieto asked for Departmentally issued Entry Cards. Officer Guasto surrendered the one assigned to him. When asked if he had another one, he stated that he might have one at home. (NOTE) He is observed entering the station garage on 5/28/20 using the card he keeps on his driver-side visor. When the vehicle was inventoried, the card was not in the vehicle. After speaking with union representation, Officer Guasto surrendered said entry card to FOP Pres. Milan who in turn turned it over to IA. The entry card was confirmed to be the Access Vendor # 2 card.

- When asked about his city-issued laptop computer, Officer Guasto stated he did not have one. That whenever work had to be done, he would connect virtually. After speaking with FOP Pres. Milan, Officer Guasto surrendered the Mac Book Pro that was assigned to him.

- When asked about a city-issued cell phone (Apple iPhone) he surrendered it.

- All of the property that was surrendered on this date was impounded at PEU with the assistance of PEU technician John Mahele. See case file for property receipts and documentation.

- An administrative review of Officer Guasto's city-issued laptop and cell phone in accordance with SOP# 10A was conducted by Sgt. Daniel Han. A review of the cell phone revealed a recorded conversation between Sgt. Salabarria and Lieutenant J. Rodriguez on an unknown date.

- Officer Guasto was relieved of duty. All documents were signed with FOP President Milan present. See case file for documentation. Officer Guasto completed the Memorandum and provided a current home address of 117 NW 42 Ave #1008 in the City of Miami.

- Item # 18 (USB) was signed out reference investigation. NCR completed.

**June 2, 2020**

**I2020-010**
City 001578

- FOP President Milan contacted me to surrender additional issued equipment that Officer Guasto had in his possession. All property was impounded at PEU with the assistance of technician John Mahle. See the case file for property receipts.

- Witness Officer interview conducted at 225 Washington Ave with Lieutenant Jack Rodriguez.

  **At 8:36 PM, Lieutenant Joaquin Rodriguez was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Janelle Delgado and I conducted the interview. Lieutenant Joaquin Rodriguez provided a sworn recorded statement. The following is a synopsis of his statement:**

- Lieutenant Rodriguez has been a supervisor for almost 10 years

- Stated that he has never authorized any employee to record him during a phone conversation.

- The recording with Sgt. Salabarria and Lieutenant Rodriguez was played for Rodriguez.

- Rodriguez acknowledged that he is the male voice heard in the phone conversation.

- Rodriguez stated that the conversation was in reference to a day off request that "she" had made not within her chain of command. When asked who he was referring to when he said "she" he stated Sgt. Salabarria.

- Rodriguez stated that he did not authorize Sgt. Salabarria to record this conversation.

- Rodriguez stated that he did not authorize anyone to record the conversation.

**The interview was concluded at 8:47 and no further questions were asked. (Refer to the case file for the entire recorded statement).**


### June 10, 2020

- Resubmitted evidence Item # 18 (USB) back into PEU under IA evidence.


### June 17, 2020

- Review of AVL and Station CCTV.


### June 22, 2020

City 001579

- Completed downloading of all available Station CCTV for the time period of 2/11/20 through 03/22/2020.

- Reviewed station CCTV and AVL.

- Requested recordings from Nuria Diaz of PSCU via landline for 4/22/20 ( date of the Allegation of Employee Misconduct). Recordings were made available the same day and picked up by this investigator.

I reviewed the recordings which consisted of Main Channel 1,2, and Supervisor Channel 13 between 0630 and 1030 hours. Once the review was completed, I compared the audio to the CCTV footage of Sgt. Salabarria and Officer Guasto leaving their apartment located at 117 NW 42 Ave in Miami.

| Time | Audio Recording | 117 NW 42 Ave CCTV |
|------|-----------------|--------------------|
| 08:13 | Sgt. Salabarria goes 09 and states in Area 4. (Recording time 16:30) | N/A |
| 08:18 | N/A | Sgt. Salabarria and N. Officer Guasto were observed walking out of the elevator at 117 NW 42 Ave. No gun-beLieutenant on, just a radio. |
| 08:30-08:35 | Lieutenant Dohler raises Sgt. Salabarria on PD Main at 08:30 (recording time 21:23) to have her QSY to Channel 13. At 08:31 (recording time 22:36) Sgt. Salabarria is asked what her QTH is, and she asks Dohler if he's on the first floor. Dohler responds by asking her for her QTH again and she states 05. Dohler asks where and she states range bathroom. Dohler responds by having her raise him when she's out of the restroom or to come to the second floor. | Sgt. Salabarria and N. Officer Guasto were observed driving into the station via 12 St. They proceed to drive up to the 5th floor where she observed exiting the passenger side door of the vehicle. She is then observed walking into the range via the helipad where she is encountered by Lieutenant Dohler and Lieutenant Flanagan. **Note:** Sgt. Salabarria is never observed in the fifth-floor bathroom before her arrival at the station at 08:34 |

### July 23, 2020

- The scope of this investigation was for the time period between October 22, 2019, through March 22, 2020, and April 22, 2020. While reviewing AVL, Telestaff, and Station CCTV, it was determined that  Sgt. Salabarria and  Officer Guasto were leaving the city while on duty on several occasions without the approval of a supervisor.

I2020-010

City 001580

**August 3, 2020**

- I requested all overtime slips for Sgt. Salabarria and Officer Guasto for the time period between October 22, 2019, through March 22, 2020, via payroll employee Yamilet Acosta. All overtime slips were received the same day. **NOTE: There were no physical overtime slips for the month of March due to the spring break deployment. All entries were done directly through Telestaff.**

**August 5, 2020**

- During the course of the investigation, multiple resources were used in order to determine whether Sgt. Salabarria and Officer Guasto were outside of the city limits during work hours. Trackstar AVLS, Telestaff, Key card reports, station CCTV, and the CCTV from Officer Guasto and Sgt. Salabarria residence were used. This calculated to the below-listed amount of hours that Sgt. Salabarria and Officer Guasto were outside of the city limits.

    Sgt. Salabarria- 71.18 Hours
    Officer Guasto- 320.11 Hours

    **See the case file for the Microsoft Excel Sheet describing each incident in detail.**

**August 6, 2020**

- Subject Officer Notification of Interview emailed to Sgt. Salabarria via Lieutenant Flanagan at 8:13 PM. The email consisted of the interview notification and a copy of the Officer Bill of Rights. The interview was scheduled for August 20, 2020, at 11 AM.

- Subject Officer Notification of Interview emailed to Officer Guasto via FOP President Milan at 8:38 PM. The email consisted of the interview notification and a copy of the Officer Bill of Rights. The interview was scheduled for August 24, 2020, at 11 AM

**August 7, 2020**

- FOP President Milan responded to the Subject Interview Notification advising me that the FOP attorney would not be available for either interview for the dates scheduled. I responded to Milan advising him that a mutually agreed interview date would be discussed and scheduled for a later date.

**August 10, 2020**

- Received a signed Subject Officer Notification of Interview from Sgt. Salabarria via city email. See the case file for a copy of the signed notification.

- Review of Station CCTV, AVL, and keycard information in preparation for interviews.

**I2020-010**

City 001581

**August 12, 2020**

- FOP President Millian contacted me to discuss dates of availability for the FOP attorneys as it pertains to both Subject Officer interviews. The new dates were taken into consideration and a new Subject Officer Notification of Interviews was sent.

- Sgt. Salabarria was notified of a new interview date via city email through Lieutenant Flanagan. The new interview date was scheduled for August 27, 2020, at 11 AM.

- Officer Guasto was notified of a new interview date via city email through FOP President Milan. The interview was scheduled for September 3, 2020, at 11 AM

**At 1043 AM, Lieutenant Joaquin Rodriguez was interviewed as a Witness Officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Daniel Han and I conducted the interview. Lieutenant Joaquin Rodriguez provided a sworn recorded statement. The following is a synopsis of his statement:**

- During the time period between October 22, 2019, through Spring Break 2020, Lieutenant Rodriguez was assigned to the Operations Division as a Lieutenant on afternoons

- Part of the responsibilities of being a Lieutenant is staffing and approving time off on Telestaff.

- A Sergeant would request time off via Telestaff, word of mouth, or an email.

- Lieutenant Rodriguez stated that if an officer or Sergeant needed time off at the beginning, middle, or end of the shift, he would need to be notified.

- Time would be deducted from the officer's time bank by Telestaff.

- Lieutenant Rodriguez stated that he has supervised Sgt. Salabarria while he was on afternoons during the above-mentioned time period.

| Date | Supervisor Yes or No | Approved time Yes or No |
|------|----------------------|-------------------------|
| 10/23/19 | Yes | No |
| 10/25/19 | Yes | Yes/ Alternate used |
| 10/30/19 | Yes | Yes/1.5 hours Alternate |
| 10/31/19 | No | No |

I2020-010
City 001582

| | | |
|---|---|---|
| 11/1/19 | Yes | No |
| 11/6/19 | Yes | No |
| 11/7/19 | Yes | No |
| 11/8/19 | Yes | No |
| 11/14/19 | Yes | No |
| 11/15/19 | Yes | Yes/Vacation Days |
| 11/20/20 | Yes | No |
| 11/27/19 | Yes | No |
| 11/28/19 | Yes | No |
| 12/4/19 | Yes | No |
| 12/5/19 | Yes | No |
| 12/11/19 | Yes | No |
| 12/12/19 | Yes | Yes/CL 2300-0030 |
| 12/18/19 | Yes | No |
| 12/26/19 | Yes | No |
| 12/27/19 | Yes | No |
| 1/1/20 | Yes | No |
| 1/2/20 | Yes | No |
| 1/3/20 | Yes | No |
| 2/20/19 | Yes | Yes/ CL 1430-1630 |
| 2/26/20 | Yes | No |
| 2/27/20 | Yes | No |
| 2/28/20 | Yes | No |

- Responsibilities of an area Patrol Sergeant include monitoring personnel and radio traffic, approving reports, and administrative tasks with their subordinates. On occasion, Sergeants respond to calls and check on their officers.
- Patrol Sergeants can leave their assigned area with permission from the shift commander. Examples include: Eating out of the zone while they still monitor the radio.
- A Patrol Sergeant is required to be in the city to monitor the radio.
- Lieutenant Rodriguez has never seen Sgt. Salabarria inside Officer Guasto's

I2020-010
City 001583

vehicle.

- Patrol Sergeants are not allowed to leave the city without the shift commanders' permission.

- A supervisor working 1430-0030 must be at the station at 1430. If there was an issue where they are running late, they must notify the shift commander.

- A supervisor working 1430-0030 is allowed to leave the city 15 min before the end of the shift (0015) from within the city limits.

The interview was concluded at 1117 hours and no further questions were asked. **(Refer to the case file for the entire recorded statement).**

### August 13, 2020

**At 1202 PM, Sgt. Loperfido was interviewed as a Witness Officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Jorge Lemus and I conducted the interview. Sgt. Loperfido provided a sworn recorded statement. The following is a synopsis of his statement:**

- Sgt. Loperfido (Loperfido) is the Sergeant that supervises the Tech Services Unit. This includes the Technical Operations section and the Information Systems section.

- Approving time off for his employees is one of his duties.

- Loperfido stated that he should be made aware if one of his employees is working outside of the city limits.

- Has been Officer Guasto's immediate supervisor for approximately 3 years.

- All requests for time off can be made via Telestaff, word of mouth, or a "sticky note" on Loperfido's desk.

- If time off is approved, the time would be deducted from the employee's time bank via Telestaff.

- All of his employee's work hours fluctuate depending on the type of projects they are working on.

- Loperfido advised that he was certain that at times he had employees under his supervision working without his knowledge.

- When it comes to his employees being at work, Sgt Loperfido stated "I only know what I know" and stated that his unit works with a "tremendous honor

**I2020-010**
**City 001584**

policy".

- Tech Services does not complete a daily log or any document that advises Loperfido of tasks that have been completed due to not having time to fill one out and because it is not required. He stated that all of his employees are self-directed.
- Tech Services employees are allowed to work from home. Loperfido stated that the unit was given this direction over 13 years ago. He also stated that the organization doesn't care if you are sitting at home in your bed, as long as the work gets done.
- When asked about specific work locations outside of the city, he stated that no specific location was known but that the tech unit is based on the "honor policy".
- Loperfido stated that if an employee felt that they could complete a task more efficiently out of the city, they were allowed to do it.
- Tech Services does not hold a roll call. When asked where Officer Guasto should be at the beginning of his shift, Loperfido stated "working".

Sgt. Loperfido was then provided Telelstaff printouts and overtime slips for dates that Officer Guasto worked in the timeframe between October 22, 2019, through March 22, 2020. Sgt. Loperfido stated that he had no recollection regarding approval or disapproval of time off requests for the past 9 months.

- Loperfido stated that it would have been acceptable for employees under his supervision to work from home pre, post, and during the COVID-19 deployment.
- When asked if there was a lack of supervision within Tech Services, Loperfido responded stating " we have is a lack of our agency to take care of our people and minimize the amount of workload they put on them".

After a brief recess, Loperfido stated that he takes his job personally and that he was in the position he was in due to Officer Guasto doing something that he shouldn't have done. He then stated that he felt that Officer Guasto took advantage of the "honor policy", of him, and of the Tech Service Unit.

Loperfido was then asked about multiple dates where Officer Guasto leaves the city during his shift and goes to multiple locations throughout Miami Dade and Broward

City 001585

County. Loperfido stated that he had no recollection of being notified nor had any documentation regarding Officer Guasto being outside city limits during work hours. On multiple occasions, Sgt. Loperfido stated that the locations Officer Guasto was responding to had nothing to do with work. These locations include numerous locations in Pembroke Pines (previous residence), Hialeah, Opa Locka, Miami, Unincorporated Dade, and Coral Gables.

Loperfido was then given multiple examples of Officer Guasto leaving the city during his shift and responding to the area of 117 NW 42 Ave Miami, Fl which at the time of this interview is where Officer Guasto currently resides with Sgt. Salabarria. When advised that Officer Guasto was leaving the city to pick up Sgt. Salabarria to bring her to work, Loperfido advised that he knew a handful of times. He also stated that he had approved of Officer Guasto's actions, but only for a couple of times not as many times as had occurred.

Loperfido was then asked if that was based on the information provided to him, did he feel that Officer Guasto took advantage of him. He replied, "Yes, there is some very clear, taking advantage of me". I then asked Loperfido if this behavior was common practice within the Tech Services Unit and he stated "no".

During this investigation, Officer Guasto was observed using a vendor key card to enter the parking garage. He would then use his assigned key card to enter the building. When asked if there would be any logical explanation as to why a Tech Officer would use an unassigned key card, Loperdifo stated "yes". He explained that Tech Services is assigned two (2) vendor key cards to issue to vendors working on projects within the building. Loperfido has one card and Officer Guasto had the other. Loperfido stated that because he is a "lazy" person, he maintains custody of his vendor key and keeps it in his vehicle's visor to use when entering the parking garage. Loperfido then stated that he authorized Officer Guasto to possess the vendor key card.

I then asked Loperfido who authorized Officer Guasto to use the vendor key card for his personal use. He replied by stating that nobody authorized him. The card is assigned to his unit, and it's in his possession so he uses it. I then asked Loperfido if the purpose of

a vendor card was solely for vendors and he stated "yes".

**The interview was concluded at 1536 hours and no further questions were asked. (Refer to the case file for the entire recorded statement, interview transcript, and the spreadsheet highlighting specific dates of violations.).**

**August 14, 2020**

**At 1:11 PM, Lieutenant Scott Flanagan (Flanagan) was interviewed as a Witness Officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Jorge Lemus and I conducted the interview. Lieutenant Scott Flanagan provided a sworn recorded statement. The following is a synopsis of his statement:**

- Flanagan has been employed by MBPD for 19+ years
- He has been a Lieutenant on patrol for five years.
- Approving time off and staffing is part of the responsibilities of a Patrol Lieutenant.
- Flanagan stated that employees would notify him via Telestaff, email, or word of mouth to request time off.
- Flanagan is usually notified if a subordinate needed time off before their shift. Example: A Sergeant calling the sick line requesting an hour off.
- If employees needed time off during their shift or toward the end of the shift, he (Lieutenant) must be notified.
- Time off would be deducted via Telestaff record. No other way the time off would be documented.
- Flanagan has supervised Sgt. Salabarria while he was a lieutenant.
- Flanagan stated some responsibilities of an area patrol sergeant include attendance and assigning daily assignments and tasks. Keeping the lieutenant posted with updates about any significant incidents, monitoring the radio and their personnel, and communicating with other supervisors in reference to personnel and calls and time-off requests.
- Sgt. Salabarria has never communicated any hardships about her commute to and from work.
- Area patrol sergeants are allowed to leave their zone. An example would be to eat

**I2020-010**
City 001587

out of their zone. Flanagan also stated that a sergeant is allowed to leave the zone without notifying a lieutenant if he/she is having lunch in Area 1 while being assigned to Area 4. If they are going to the middle or north from the south, he should be notified.

- Doesn't recall seeing Sgt. Salabarria inside of Officer Guasto's assigned police vehicle first hand. Flanagan then referred to the incident that took place on April 22, 2020, where he observed Sgt. Salabarria exiting a dark-colored SUV in the station parking lot that he suspected was Officer Guasto's vehicle via station CCTV.
- Flanagan stated that a patrol area sergeant is not allowed to leave the city without notifying the shift commander/Lieutenant
- An area patrol sergeant scheduled to work 0630-2000 hours must be at the station at 0630 and no later. If the sergeant encountered an issue where they can't make it to work on time, they would need to notify the shift commander.
- If an area patrol sergeant is working 0630-2000 hours, they are allowed to leave 15 min before the end of their shift. In this case, it would be 1945 and from within city limits.
- A patrol sergeant must be in the city while working patrol overtime.

| Date | Supervisor Yes or No | Approved time Yes or No | Did you Approve time Yes or No | Did you approve her to leave the city Yes or no | Were you aware she was Out of the city | Should she had made you aware? |
|------|------|------|------|------|------|------|
| 3/5/20 | Yes | No | No | No | No | Yes |
| 3/6/20 | Yes | No | No | No | No | Yes |
| 3/7/20 | Yes | No | No | No | No | Yes |
| 3/12/20 | Yes | No | No | No | No | Yes |
| 3/13/20 | Yes | No | No | No | No | Yes |
| 3/14/20 | Yes | No | No | No | No | Yes |
| 3/19/20 | Yes | No | No | No | No | Yes |
| 3/20/20 | Yes | No | No | No | No | Yes |
| 3/21/20 | Yes | No | No | No | No | Yes |
| Refer to questions | Dealing with 4/22/20 | | | | | |
| 4/22/20 | No | No | No | No | No | Yes |

I2020-010

City 001588

**All of the below statements are about the Allegation of Employee Misconduct for the events that transpired on April 22, 2020.**

- Lieutenant Flanagan stated he was working as the Area 1 Lieutenant on 4/22/2020 working 0530-1655 hours during the COVID deployment.
- Lieutenant Dohler and Baldwin were also working. Per Telestaff, Sgt. Salabarria was assigned to Lieutenant Dohler on 4/22/2020.
- Before Sgt. Salabarria's scheduled time, she did not notify Lieutenant Flanagan that she would be late. Lieutenant Flanagan did receive an email from Sgt. Salabarria an hour or more after she arrived at the station requesting that an hour of compensatory leave time be deducted from her time bank. Lieutenant Flanagan emailed me a copy of that email. **See the case file for a copy of the email. As of this date, there was no entry into Telestaff to reflect the time deduction.**

The statements below are what Lieutenant Flanagan recalls as his involvement with the Allegation of Employee Misconduct.

- Lieutenant Flanagan was contacted by Lieutenant Dohler informing him to respond to the first floor of the station garage at approximately 0800 about assisting him in locating Sgt. Salabarria who had not reported to work and was scheduled to be at the station at 0730.
- Lieutenant Flanagan acquired Sgt. Salabarria's car number and conducted an AVL check. The AVL check revealed that the vehicle was in the station on the second floor and that it hadn't moved since April 2, 2020.
- Lieutenant Flanagan stated that Dohler called and raised Sgt. Salabarria on the radio and she stated that she was in the range/fifth-floor bathroom.
- Lieutenant Flanagan and Dohler proceeded to go to the fifth-floor bathroom area. They noticed that both bathrooms were locked. They proceeded to knock on the door and received no answer. At this point, Lieutenant Flanagan became concerned for Sgt. Salabarria's well being and went downstairs to PEU to get a key for the bathroom. When he got back up to the fifth floor, the bathroom door had been opened by who he recalls as range personnel. The women's bathroom was vacant. Sgt. Salabarria was then observed by Lieutenant Flanagan enter the fifth floor via the doors leading into the hallway from the helipad/roof. According to

**I2020-010**

City 001589

Lieutenant Flanagan, she appeared nervous. She stated that she was embarrassed and had to get fresh air because she didn't feel well possibly because of some diet pills she had taken. Lieutenant Flanagan then stated that both he and Lieutenant Dohler asked Sgt. Salabarria if she needed medical attention and she stated that she was fine.

- Lieutenant Flanagan then asked Sgt. Salabarria if she was inside the bathroom and she stated "yes". When asked who was in the bathroom now since it was locked, she stated that she possibly locked it by mistake when she walked out. Lieutenant Flanagan found this suspicious due to the lock being a deadbolt which meant that it had to be physically locked from the inside once the door was shut or with a key from the outside.

- Lieutenant Flanagan went to the Lieutenants office where he asked Lieutenant Baldwin, who has access to the camera system, to review the station cameras. Lieutenant Baldwin then reviewed the cameras with Lieutenant Flanagan present. Footage from the fifth-floor hallway leading to the bathroom was reviewed previous to Lieutenant Flanagan and Dohlers' arrival. Sgt. Salabarria was never observed. The first time she is observed entering the fifth floor is when she walked in via the roof/helipad door. At this point, Lieutenant Flanagan determined there was a problem.

- Further investigation into the camera footage, revealed Sgt. Salabarria exiting a dark-colored SUV with dark tints (assumed to be Officer Guasto's vehicle) on the floor just below the helipad. She is then observed walking up the stairs and walking into the building via the fifth floor/ helipad door.

- Lieutenant Flanagan conducted an AVL check of Officer Guasto's vehicle. **(Refer to the Allegation of Employee Misconduct).** Lieutenant Flanagan stated that the AVL check of Officer Guasto's vehicle is consistent with the time frame in which Sgt. Salabarria is observed exiting the black SUV and entering the station.

- Lieutenant Flanagan stated that according to the Lieutenant's investigation with AVL and camera footage, Sgt. Salabarria couldn't have been in the city at 0813 hours which is when she went into service on channel 1 (Radio Logs and Recording of Channel 1 on file).

- On April 22, 2020, the department was operating under the COVID 19 deployment. Which meant there were 2 start times for officers (0600 and 0800{Flanagan and

**I2020-010**

City 001590

Baldwin}) and two for supervisors (0530-0730 {Dohler and Sgt. Salabarria}).

- Roll Call was conducted daily. One at 0600 on the first floor of the station where officers would have their temperature checked, and checked in by their supervisors. The secend would be at 0800 where the same procedure was conducted. Sgt. Salabarria was scheduled to be at work at 0730 and to be at roll call at 0800.

- All officers and supervisors were aware of the times and locations of their roll calls.

- Lieutenant Flanagan stated that he knew that a key was needed for the bathroom on the fifth floor due to recognizing that it used a deadbolt. This would make it impossible to lock the door from the outside unless someone had a key.

- Lieutenant Flanagan believes the statements provided to him by Sgt. Salabarria were untruthful.

- Based on the information gathered by Lieutenant Flanagan (camera footage, AVL, and statements) he believed Sgt. Salabarria was running very late on 4/22/20. For the past month, she had been riding with Officer Guasto to and from work. Around the times that Sgt. Salabarria is supposed to report to work, Officer Guasto's AVL is observed leaving 117 NW 42 Avenue Miami, FL (later identified as Officer Guasto and Sgt. Salabarria home) and coming into the city. Taking about 20 minutes.

- On 4/22/20, Officer Guasto's vehicle is observed (AVL) leaving the same 117 NW 42 Ave Miami, FL and taking approximately 20 min to come to the station. The AVL indicated that Officer Guasto's vehicle traveled east on 11th 1 Street, bypassed the 11th Street gate, traveled northbound on Washington, then west on 12th Street, and enter the station via the 12th Street gate. Lieutenant Flanagan then stated that he was advised that the 12th Street gate cameras were not operating at the time.

- Lieutenant Flanagan stated that he believes that Officer Guasto and Sgt. Salabarria purposely entered via the 12th Street gate to avoid being captured on the key card access/camera.

The interview was concluded at 1:54 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement and the email).**

**August 17, 2020**

**At 1031 AM, Lieutenant Gregory Baldwin was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Daniel Han and I conducted the interview. Lieutenant Gregory Baldwin provided a sworn recorded statement. The following is a synopsis of his statement:**

- Lieutenant Baldwin has been employed by MBPD for 27 years. He has been a Lieutenant for 5.5 years.
- Currently assigned to the patrol division as a lieutenant.
- Approving time off and staffing is part of the responsibilities of a patrol lieutenant
- If time off is needed, employees would notify him (Lieutenant) via Telestaff, email, or word of mouth.
- If an employee needed time off at the beginning of the shift, Lieutenant Baldwin would be notified via sick line or directly.
- If employees needed time off during their shift or toward the end of the shift, he (lieutenant) would need to be notified via word of mouth or Telestaff.
- Time off would be deducted via Telestaff record to his understanding as he isn't the one that directly deducts the time.
- Lieutenant Baldwin has supervised Sgt. Salabarria while he was a lieutenant on patrol.
- Sgt. Salabarria has never communicated any hardships about her commute to and from work.
- An area patrol sergeant is allowed to leave their zone on occasion ( meal break, or if they are requested. The lieutenant should ideally be notified but not 100 percent of the time.
- A patrol sergeant must be in the city while working patrol overtime.

I2020-010
City 001592

| Date | Supervisor Yes or No | Approved time Yes or No | Did you Approve time Yes or No | Did you approve her to leave the city Yes or no | Were you aware she was Out of the city | Should she had made you aware? |
|------|----------------------|-------------------------|--------------------------------|-------------------------------------------------|----------------------------------------|--------------------------------|
|      |                      |                         |                                |                                                 |                                        |                                |
| 4/22/20 | No/Lieutenant Dohler | No | No | No | No | Yes/ Should've advised |

## All of the below statements are in reference to the Allegation of Employee Misconduct for the events that transpired on April 22, 2020.

- Sgt. Salabarria was scheduled to work 0730-1855 hrs. She should have been at the station at 0730 conducting administrative tasks until Roll Call at 0800.

- Lieutenant Baldwin was scheduled to be the early lieutenant 0530-1655 hours.

- All employees were aware of the times and locations of roll call.

- Lieutenant Baldwin stated he was working as the Area 3 lieutenant on 4/22/2020 working 0530-1655

- Lieutenant's. Dohler and Flanagan were also working. Per Telestaff, Sgt. Salabarria was assigned to Lieutenant Dohler on 4/22/2020.

- Before Sgt. Salabarria's scheduled time, she did not notify Lieutenant Baldwin that she would be late.

- Lieutenant Baldwin was assigned to Areas 2 and 3. He responded to the NESS to conduct a roll call. He was then notified by either Lieutenant Dohler or Flanagan at approximately 9 AM to review station cameras due to Sgt. Salabarria arriving late to work.

- Lieutenant Baldwin responded to headquarters and began reviewing camera footage based on the information provided to him by Lieutenant's. Dohler and Flannagan.

I2020-010
City 001593

- Lieutenant Baldwin observed Sgt. Salabarria exit a black-colored unmarked SUV on the fifth floor. He then observed her enter the range via the helipad/roof entrance.

- At the time (4/22/20) he did not know who the unmarked SUV belonged to but was later advised that it belonged to Officer N. Guasto.

- Lieutenant Baldwin was told by Lieutenant Flanagan that he had reviewed Officer Guasto's AVL. At this point using the information provided by the AVL, Lieutenant Baldwin backtracked the video footage and was able to determine that Officer Guasto's vehicle had entered via 12th Street gate. Refer to Lieutenant Flanagan's interview reference AVL.

- Lieutenant Baldwin believes an AVL review was done of Sgt. Salabarria's vehicle but wasn't sure.

- Lieutenant Baldwin was not present on the fifth floor but it was his understanding that the female bathroom is impossible to lock from the outside unless a key is used due to it being a deadbolt.

- Lieutenant Baldwin stated that he believes that Sgt. Salabarria was not being truthful about her statements on being in the fifth-floor bathroom due to him reviewing the video of the fifth floor 30 min before entering the fifth floor.

The interview was concluded at 1:54 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement).**

## August 18, 2020

**At 1:09 PM, Lieutenant Andy Lozano was interviewed as a Witness Officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Luis Corps and I conducted the interview. Lieutenant Andy Lozano provided a sworn recorded statement. The following is a synopsis of his statement:**

- Lieutenant Lozano has been a lieutenant for 11 months and is currently assigned to the Street Crimes section of Criminal Investigations Division.

- For the time period between 10/22/19- Spring Break 2020, Lieutenant Lozano was a Patrol Lieutenant on the afternoon shift in Area 4.

- Part of the responsibilities of being a lieutenant is staffing and approving time off on Telestaff.

I2020-010
City 001594

- Though assigned to Area 4, Lieutenant Lozano would cover for Area one as the Lieutenant on occasion.
- A Sgt./Ofc. who would need time off, would request time off via Telestaff, advising their immediate supervisor.
- Lieutenant Lozano stated that if an Ofc. or Sgt needed time off at the beginning, middle, or end of the shift, he would need to be notified.
- Time would be deducted from the officer's time bank via Telestaff.
- Lieutenant Lozano stated that to his recollection, he had never supervised Sgt. Salabarria directly.

| Date | Supervisor Yes or no | Approved Time off Yes or No? | Did you approve time off Yes or No? | Did you approve her to leave the city Yes or No? | Were you aware she was out of the city? | Should she have made you aware that she was out of the city? Yes or No? |
|---|---|---|---|---|---|---|
| 11/5/19 | Working Area 4 and poss. Covering Area 1 | No | No | No | No | Yes |
| 1/15/20 | Sgt. Salabarria Sick | Yes/Sick | N/A | N/A | N/A | N/A |
| 2/11/20 | Doesn't recall/Area 4 | No | No | No | No | No |
| 2/19/20 | Working Area 4 and covered Area 1 | No | No | No | No | Yes |

- Has never observed Sgt. Salabarria riding inside of Officer Guasto's police vehicle during her tour of duty.
- A patrol sergeant. is not allowed to leave the city without the shift commander's permission.
- A supervisor working 1430-0030 must be at the station at 1430. If there was an issue where they are running late, they must notify the shift commander.
- A supervisor working 1430-0030 is allowed to leave 15 min prior to the end of the shift (0015) from within the city limits.

I2020-010
City 001595

The interview was concluded at 1:23 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement).**

- During the course of conducting interviews, one of the witness officers interviewed tested positive for COVID-19. All Internal Affairs investigators were quarantined pending test results. FOP President was made aware of the situation and advised of the Subject Officer Interview rescheduling due to other witness officers that needed to be interviewed being exposed to COVID-19.

### August 20, 2020

- Sgt. Salabarria responded to her Subject interview notification advising that she was made aware that her interview had been canceled due to COVID. She also stated that her attorney was not available for an interview on August 27th. See case file for email.

### August 24 – August 26, 2020

- Reviewed the case file.

### August 27 through August 28, 2020

- The Internal Affairs Unit was advised Officer Guasto was reassigned to the Operations Division, afternoon shift, with Thursday, Friday, and Saturday off effective August 31, 2020, per the Chief of Police.

- PEU Lieutenant Jorge Garcia notified PEU Supervisors Morales and Wright to assist in having Officer Guasto's equipment reassigned to him.

- PEU Supervisor Morales contacted me about releasing Officer Guasto's property. I responded with an email advising him to release all of the property except for the Macbook and city-issued cell phone as it is still needed for investigative purposes. Morales advised me that the property will be released but to complete an NCR as soon as possible. See the case file for all emails and NCR.

**August 28, 2020**

**At 1023 AM, Lieutenant Andrew Dohler was interviewed as a Witness Officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Janelle Delgado and I conducted the interview. Lieutenant Andrew Dohler provided a sworn recorded statement. The following is a synopsis of his statement:**

- Lieutenant Dohler has been employed by MBPD for 25 years
- Lieutenant Dohler has been a lieutenant on patrol for 6.5 years and is currently assigned to dayshift area 4.
- Approving time off and staffing are part of the responsibilities of a patrol lieutenant.
- Stated that employees would notify him (Lieutenant) via the chain of command, Telestaff, email, or word of mouth for any time off requests.
- Lieutenant Dohler is usually notified if a subordinate needed time off prior to their shift. Example: A sergeant calling the sick line requesting an hour off.
- If an employee needed time off at any point during their shift, he (Lieutenant) would need to be notified.
- Approved time off would be deducted via Telestaff record. There is no other way the time off would be documented.
- Lieutenant Dohler has supervised Sgt. Salabarria while he was a Lieutenant on patrol.
- Stated some responsibilities of an area patrol sergeant include:
    1. Check Officers in at Roll Call/ Temp. checks
    2. Ensure officers are on time
    3. Provide assignments
    4. Monitor Radio
    5. Approve Arrests
    6. Approve time off
- These responsibilities would have been some of Sgt. Salabarria's responsibility as a sergeant.
- For a sergeant to carry out these responsibilities, they must be within the city.

I2020-010
City 001597

- Sgt. Salabarria never communicated any hardships about her commute to and from work.
- An area patrol sergeant is allowed to leave their zone. Example:
    1. Meal break (within the city)
    2. Family emergency (lieutenant must be notified)
- Stated he observed Sgt. Salabarria exit a black SUV but couldn't make out who the driver was. Found out later that the vehicle belonged to Officer N. Guasto
- Stated that a patrol area sergeant is never allowed to leave the city without notifying the shift commander/lieutenant
- Stated an area patrol sergeant scheduled to work 0630-2000 hours needs to be at the station at 0630. If the sergeant. encountered an issue where they can't make it to work on time, they would need to notify the shift commander.
- Stated an area patrol sergeant scheduled to work 0730-1855 hours needs to be at the station at 0730. If the sergeant encountered an issue where they can't make it to work on time, they would need to notify the shift commander.

- If an area patrol sergeant is working 0630-2000 hours, they are allowed to leave 15 min prior to the end of their shift. In this case, it would be 1945 and from their assigned area within city limits.
- A patrol sergeant. must be in the city while working patrol overtime.

| Date | Supervisor Yes or No | Approved time Yes or No | Did you Approve time Yes or No | Did you approve her to leave the city Yes or no | Were you aware she was out of the city | Should she had made you aware? |
|---|---|---|---|---|---|---|
| 3/8/20 | Yes | No | No | No | No | Yes |
| 3/9/20 | Yes | No | No | No | No | Yes |
| 3/10/20 | Yes | No | No | No | No | Yes |
| 3/15/20 | Yes | No | No | No | No | Yes |
| 3/16/20 | Yes | No | No | No | No | Yes |
| 3/17/20 | Yes | No | No | No | No | Yes |
| 3/22/20 | Yes | No | No | No | No | Yes |
| 4/22/20 | Yes | No | No | No | Yes | Yes |

I2020-010
City 001598

## All of the below statements are in reference to the Allegation of

## Employee Misconduct for the events that transpired on April 22, 2020.

- On 4/22/20, Sgt. Salabarria was scheduled to work 0730-1855 and was under the direct supervision of Lieutenant Dohler. She should have been at the station at 0730 but was not present.

- Sgt. Salabarria did not notify Lieutenant Dohler prior to 0730 that she would be late.

- Lieutenant Dohler made contact with Sgt. Salabarria via channel 13 after observing she was not at work. Sgt. Salabarria stated that she was in the fifth floor/range restroom when speaking to the Lieutenant via police radio.

- Lieutenant's Dohler, Flanagan, and Baldwin were the shift commanders on that date for dayshift.

- Sgt. Salabarria authored an email at 10:16 am on 4/22/20, (two hours and 46 minutes after the beginning of her assigned shift) requesting that she be docked 1 hour of CL for her personal emergency. The email was directed to Lieutenant Dohler, Lieutenant Flanagan, and she copied FOP union, President Kevin Milan.

- From 0730-0800, Sgt. Salabarria was supposed to be conducting administrative tasks to prepare for the 0800 Roll Call.

- Roll Call was being conducted at the station to conduct temperature checks with the assistance of a medical professional due to the COVID 19 deployment.

- Upon Lieutenant Dohler arriving on the first floor for Roll Call at approximately 0800 he observed Sgt. Salabarria was not present.

- At approximately 0818-0820 hours, Dohler became concerned and raised Sgt. Salabarria via main channel due to her not picking up her cell phone. Contact was made on Channel 13 where she stated she was in the fifth floor/range bathroom not feeling well.

- Lieutenant's Dohler and Flanagan immediately responded to the fifth floor and began knocking on the bathroom door and calling out Sgt. Salabarria's name to no avail. At this point, both Lieutenant's became concerned for her safety.

**I2020-010**
City 001599

Lieutenant Flanagan walked to PEU to retrieve a key while Lieutenant Dohler remained on the fifth floor.

- Sgt. Salabarria then entered the fifth floor via the range/helipad door. She appeared out of breath and stated that she was having stomach issues. She then provided pictures of some medication she was having adverse effects with to Lieutenant Dohler.

- Due to the bathroom being locked, Lieutenant Dohler asked if there was someone in the restroom. Sgt. Salabarria responded by saying that she must have accidentally locked it when she walked out. Lieutenant Dohler identified the lock as a deadbolt, which is impossible to lock from the outside unless someone has a key or locks it from the inside.

- Sgt. Salabarria was then asked if she wanted to go to the hospital and she stated that she was fine. She was then advised to check in with the nurse on the first floor.

- A training officer (possibly McVey) provided a key and opened the restroom which revealed it to be empty.

- Lieutenant Dohler then advised Sgt. Salabarria to respond to Medrite to get medically cleared due to the nurse not being on the first floor. She was then medically cleared and stated she was feeling better.

- AVL check conducted by either Lieutenant Flanagan AVL revealed that Sgt. Salabarria's #17004 vehicle has not been moved since April 2, 2020. PEU was asked if Sgt. Salabarria had checked out a loaner vehicle and was advised that she had not checked out a loaner vehicle.

- Sgt. Salabarria never advised any of the Lieutenant's that her vehicle was having problems.

- Lieutenant Flanagan then observed Sgt. Salabarria's vehicle parked between the second and third floor of the station consistent with the AVL.

- Station cameras were reviewed by all three lieutenants'.(Flanagan, Dohler, Baldwin)

- A Black SUV was observed pulling up on the floor just below the helipad. Sgt. Salabarria was observed exiting the passenger side of the SUV and entering the station via the 5th-floor door.

I2020-010
City 001600

- One of the three lieutenant's believed that the SUV belonged to Officer N. Guasto.
- An AVL check was conducted on Officer Guasto's car by Lieutenant Flanagan. The check revealed that around the time Sgt. Salabarria was contacted, Officer Guasto's AVL is observed leaving a City of Miami location and responding directly to the Miami Beach police station never stopping at another location.
- Station cameras then revealed that the Officer Guasto's vehicle bypassed the 11th Street gate going west from Washington Ave, and then enter via the 12th Street. gate. When the lieutenant's attempted to review the 12th Street. key card entry camera, they observed that it was out of service. The SUV was observed entering via another camera on the first floor near the 12th Street gate. The lieutenant's then followed the vehicle from the first floor all the way up to the floor underneath the helipad up until Sgt. Salabarria exited the vehicle.
- Lieutenant Dohler advised that the AVL, camera footage, and his contact with Sgt. Salabarria were all consistent with her being late to work.
- All area 1 and 4 sergeant's and officers were aware of the time and place for roll call on 4/22/20.
- Based on the lieutenant's investigation, and Sgt. Salabarria's radio logs (09 at 0813 hours), Dohler stated that it was not possible for Sgt. Salabarria to be in the city at 0813.
- Lieutenant Dohler stated that Sgt. Salabarria was being untruthful by going into service in the city at 0813 hours.
- Lieutenant Dohler did not tell Sgt. Salabarria to author the email regarding being charged the one hour of CL for her being late. Lieutenant Dohler then made Major De La Espriella aware of the email and was told to not do anything with it.
- Lieutenant Dohler stated that Sgt. Salabarria's statements about being in the restroom were untruthful.
- Lieutenant Dohler concluded that Sgt. Salabarria was out of the city at the time he spoke to her and she stated that she was on the fifth-floor restroom.

The interview was concluded at 1108 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement).**

**At 12:32 PM, Lieutenant Delvin Brown was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Janelle Delgado and I conducted the interview. Lieutenant Delvin Brown provided a sworn recorded statement. The following is a synopsis of his statement:**

- Lieutenant Brown has been a lieutenant for approximately one year and is currently assigned to the Operations Division afternoon shift.

- For the time period between 10/22/19- Spring Break 2020, Lieutenant Brown was an Operations Division lieutenant on the afternoon shift.

- Part of the responsibilities of being a lieutenant is staffing and approving time off on Telestaff.

- A sergeant would request time off via Telestaff, word of mouth, or an email.

- Stated that if an officer or a sergeant needed time off at the beginning, middle, or end of the shift, he would need to be notified via sick line, word of mouth, Telestaff, or by a fellow supervisor.

- Time would be deducted from the officers time bank via Telestaff

- Stated that he has supervised Sgt. Salabarria while he was on afternoons.

| • Date | Supervisor Yes or No | Approved time Yes or No | Did you Approve time Yes or No | Did you approve her to leave the city Yes or no | Were you aware she was Out of the city | Should she had made you aware? |
|---|---|---|---|---|---|---|
| 10/22/19 | Yes | No | No | No | No | Yes |
| 11/12/19 | Yes | No | No | No | No | Yes |
| 11/26/19 | Yes | No | No | No | No | Yes |
| 12/10/19 | Yes | No | No | No | No | Yes |
| 12/17/19 | Yes | No | No | No | No | Yes |
| 12/31/19 | Yes | Yes | No | No | No | Yes |
| 1/7/20 | Yes | No | No | No | No | Yes |
| 1/14/20 | Yes | Yes/CL 1830-0030 | No | No | No | Yes |
| 2/4/20 | Yes | No | No | No | No | Yes |
| 2/18/20 | Yes | No | No | No | No | Yes |

- Responsibilities of an area patrol sergeant include supervising and monitoring their personnel, responding to scenes, approving reports, and monitoring the radio.

- These were some of the responsibilities Sgt. Salabarria had while under Lieutenant Brown's supervision.

- A patrol sergeant must be in the city to carry out these responsibilities to make themselves available.

- Lieutenant Brown has never seen Sgt. Salabarria inside Officer Guasto's vehicle.

- A patrol sergeant is not allowed to leave the city without the permission of the shift commander or a higher ranking officer.

- A supervisor working 1430-0030 must be in the city at 1430. If there was an issue where they are running late, they must notify the shift commander.

- A supervisor working 1430-0030 is allowed to leave 15 min prior to the end of the shift (0015) from within the city limits.

The interview was concluded at 1448 hrs/ 4:48 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement).**


**At 4:05 PM, Lieutenant Rosa Carvajal was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Sgt. Janelle Delgado and I conducted the interview. Lieutenant Rosa Carvajal provided a sworn recorded statement. The following is a synopsis of her statement:**

- Lieutenant Carvajal has been a lieutenant for the past 11 months and is currently assigned to the patrol division.

- For the time period between 10/22/19 through Spring Break 2020, Lieutenant Carvajal was a patrol lieutenant on afternoons area 4.

- Part of the responsibilities of being a lieutenant is staffing and approving time off on Telestaff.

- A sergeant would request time off via Telestaff, word of mouth, or an email.

- Stated that if an officer or a sergeant needed time off at the beginning, middle, or end of the shift, she would need to be notified.

**I2020-010**
City 001603

- Time off would be deducted from the officers time bank via Telestaff
- Stated that she has supervised Sgt. Salabarria while he was on afternoons.

| Date | Supervisor Yes or No | Approved time Yes or No | Did you Approve time Yes or No | Did you approve her to leave the city Yes or no | Were you aware she was Out of the city | Should she had made you aware? |
|---|---|---|---|---|---|---|
| 11/13/19 | Yes | No | No | No | No | Yes |
| 11/19/19 | Yes | No | No | No | No | Yes |
| 12/19/19 | Yes | No | No | No | No | Yes |
| 12/20/19 | Yes | No | No | No | No | Yes |
| 1/8/20 | Yes | No | No | No | No | Yes |
| 1/9/20 | Yes | No | No | No | No | Yes |
| 1/10/20 | Yes | No | No | No | No | Yes |
| 2/6/20 | Yes | No | No | No | No | Yes |
| 2/7/20 | Yes | No | No | No | No | Yes |
| 2/12/20 | Yes | No | No | No | No | Yes |
| 2/13/20 | Yes | No | No | No | No | Yes |
| 2/21/20 | Yes | No | No | No | No | Yes |

- Responsibilities of an area patrol sergeant include responding to major incidents in their vehicles, making sure that officers are carrying out their duties, and monitoring the radio.
- These were some of the responsibilities for Sgt. Salabarria while under Lieutenant Carvajal's supervision.
- A patrol sergeant must be in the city to monitor the radio.
- Lieutenant Carvajal has never seen Sgt. Salabarria inside Officer Guasto's vehicle
- A patrol sergeant is not allowed to leave the city without the shift commander's permission.
- A supervisor working 1430-0030 must be in the city at 1430. If there was an issue where they are running late, they must notify the shift commander.
- A supervisor working 1430-0030 is allowed to leave 15 min prior to the end of the shift (0015) from within the city limits.

**I2020-010**
City 001604

The interview was concluded at 4:21 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement).**

### August 31, 2020

- Using the New World System, I printed Sgt. Salabarria's Officer Activity Report for the time period of October 22, 2019, through March 22, 2020, and April 22, 2020. This report indicates every time Sgt. Salabarria used her assigned police radio to communicate and give a status. The total time reviewed was 153 Days 20 Hours 42 Minutes, with a total of 233 statuses. **See Appendix C for the Officer Activity Report.**

- Using the same system, I obtained Sgt. Salabarria's Officer Dispatch Report for the time period of October 22, 2019, through March 22, 2020, and April 22, 2020. This report provides a summary of information about the activity of a given officer. The review for the given time period revealed a total of 23 calls for service. **See Appendix D for the Officer Dispatch Report.**

### September 1, 2020

- NCR completed at PEU advising that all city-issued equipment could be released to Officer Guasto with the exception of the Macbook and the city-issued Apple iPhone.

### September 10, 2020

- Review of AVL, Key Card logs, CCTV, and Officer Dispatch Reports.

### September 15, 2020

- An updated Subject Notification of Interview was sent via city email to Lieutenant Mitat informing Sgt. Salabarria of the new interview date. The new interview date was scheduled for  09/22/20 at 3 PM.

- Witness interview notification also sent to Major Guerrero advising Capt. Feldman of his witness interview for 09/21/20 at 11 AM.

### September 16, 2020

- Sgt. Salabarria responded to the Internal Affairs Office in person to hand-deliver her Subject Interview Notification to me.

I2020-010

City 001605

**September 21, 2020**

- Sgt. Salabarria was notified via email advising her that her interview for 09/22/20 had been canceled rescheduled for 09/28/20 at 3 PM . FOP President Millian was also notified.


**At 1112 AM, Captain Steven Feldman was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Lieutenant Tony Gil and I conducted the interview. Captain Steven Feldman provided a sworn recorded statement. The following is a synopsis of his statement:**

- Capt. Feldman has been employed by the Miami Beach Police Department for 20 years and is currently the Captain that oversees the Tech Services Unit. He has overseen the unit since 2015.

- Captain Feldman stated that he was Officer Guasto's Captain while he was assigned to Tech Services.

- Captain Feldman stated that at times, he might be the supervisor that approves time off if Sgt. Loperfido is unavailable.

- When asked if prior to the COVID-19 deployment, if there was a specific SOP or DRR that would allow Officer Guasto to work outside of the city, Capt. Feldman stated that there wasn't, but there was a verbal authorization. He explained that at various times, employees were allowed to work from wherever they were at, as long as they were "working". He specified that the Tech Services Unit receives calls after hours requiring their response to complete the tasks that could be done while working remotely. An example of this would be an employee locking themselves out of their profile after hours. The IT Unit would then be able to unlock the profile from anywhere as long as they have their issued laptop and a network connection.

- Captain Feldman stated that there were times, he didn't know how many, that Officer Guasto would notify him that he was working outside of the city. Captain Feldman would tell him to go take care of whatever he needed to do as long as it was work-related.

- Captain Feldman stated that he couldn't think of any locations, other than home, where Officer Guasto would be working from if out of the city.

- Captain Feldman was advised that the scope of this investigation was for the dates between 10/22/19 through 03/22/2020.When asked how many times Officer Guasto was allowed to work from home, Capt. Feldman was unable to provide a number of dates.

- Captain Feldman then stated that Officer Guasto could not just leave the city at

I2020-010

City 001606

his own discretion and not notify a supervisor.

- Capt. Feldman then stated that during the scope of this investigation, Officer Guasto was going through a very "interesting" time in his life. Without going into too many personal details, Capt. Feldman stated that it had to do with his wife and current girlfriend. Due to the ongoing personal issues with his family, Capt. Feldman would authorize Officer Guasto to go take care of the issue, but to stand by his phone in case something work-related came up.

- I then asked Capt. Feldman that if Officer Guasto was in need of taking care of personal issues outside of the City of Miami Beach while scheduled to work, he would have to take time off, and Capt. Feldman stated "correct".

- Capt. Feldman confirmed that the person that Officer Guasto was in a current relationship with was Jessica Salabarria.

- Capt. Feldman stated that he did not authorize Officer Guasto to drive Sgt. Salabarria to and from work during his work hours. He was made aware of a conversation between Officer Guasto and Sgt. Loperfido where Sgt. Loperfido was made aware of the transportation issue and approved it a couple of times. Capt. Feldman was made aware of the situation post Subject Officer Notification. Capt. Feldman also mentioned that he found it unacceptable for Officer Guasto to be leaving during his shift on a constant basis to drive Sgt. Salabarria to work and that he was taking advantage of the agreement between him and Sgt. Loperfido.

- This investigator then referred to the spreadsheet created that listed the numerous dates where Officer Guasto leaves the city to pick up Sgt. Salabarria, and conduct activities not known to be work-related. Capt. Feldman was provided with all Telestaff and overtime slips that were available from payroll. There were a few instances where Capt. Feldman stated that according to the overtime slips provided, the detail that Officer Guasto was working on could've been done remotely due to it being after the conclusion of Officer Guasto's shift. There were multiple occasions where Officer Guasto was scheduled to be working and his vehicle AVL indicates multiple locations throughout Miami-Dade (specifically Hialeah and Miami areas/ his current home address) and Capt. Feldman was not made aware nor did he approve Officer Guasto to be working remotely. **Refer to the Excel spreadsheet for specific dates and unauthorized locations.**

The interview was concluded at 3:08 PM and no further questions were asked. **(Refer to the case file for the entire recorded statement and transcription).**

## September 24, 2020

- On this date, an email was received from attorney Michael Elkins advising that he spoke to FOP attorney Gene Gibbons about tolling the 180 day period for Sgt. Salabarria's pending IA investigation. The FOP had no objection.

The email further confirms that Mr. Elkins spoke to attorney Michael Pancier who also represents Sgt. Salabarria, and he agreed to toll the 180 day period (refer to case file for email).

## September 29, 2020

- Request made for radio communication recordings (Channel 1 and 2) for March 16, 2020, via Nuria Rodriguez of PSCU.

## October 1, 2020

- The recording was completed and picked up by this investigator. A review of the recording revealed Sgt. Salabarria going into service at 0911 via main channel. Her vehicle AVL shows the vehicle off at the station since her prior shift. Officer Guasto's AVL shows it arriving in the city at 0954

## October 9, 2020

- Commander Prieto contacted Tim Vandergiesen of the Miami Dade State Attorney's Office for review in reference to the unauthorized recording of Lieutenant Joaquin Rodriguez done by Sgt. Salabarria (FSS 934.03). Mr. Vandergiesen subsequently responded to Commander Prieto and advised him that his office would not investigate the matter and to proceed administratively.

- Sgt. Han signed Item #55 (Apple iPhone) out of property for investigative purposes.

## October 28, 2020

- Reviewed the case file.

## November 23, 2020

- Reviewed the case file.

## December 16, 2020

- Reviewed the case file.

## December 18, 2020

- Sgt. Salabarria entered into a "Last Chance Agreement". **See Appendix A for a copy of Sgt. Salabarrias' agreement.**

**I2020-010**

City 001608

**January 5, 2021**

- This investigator received a copy of Sgt. Salabarria's signed Request for Withdrawal of Charge of Discrimination. **(See case file for a copy).**

**February 1, 2021**

- Reviewed the case file.

**February 18, 2021**

- Reviewed the case file.

**March 15, 2021**

- Reviewed the case file.

**April 1, 2021**

- I was advised by Commander Prieto that Officer Guasto did not agree with the offer made to him by the city and wanted to proceed with the investigation. **Case untolled.**

**April 8, 2021**

**At 1:09 PM hrs, Officer Kevin Millan was interviewed as a witness officer in this investigation. The interview was conducted at the Miami Beach Police Internal Affairs Office, located at 225 Washington Avenue, Miami Beach, Florida. Lieutenant Gil and I conducted the interview. Officer Kevin Millan provided a sworn recorded statement. The following is a synopsis of his statement:**

- As the F.O.P president, there would be times that he was notified of officers being under investigation by Internal Affairs. It would depend if the officer contacts the FOP and notified them for representation.

- Millan was aware that both Sgt. Salabarria and Officer Guasto were under investigation by Internal Affairs.

- Millan was aware that both Sgt. Salabarria and Officer Guasto were in talks or

**I2020-010**

City 001609

negotiations with the city to resolve their internal affairs case.

- Millan stated that he met with Sgt. Salabarria countless times to discuss the negotiations. When asked how many times exactly, Millan stated that he discussed the terms of the negotiation with her in person less than ten (10) times, and via phone call more than 10 times.

- Millan stated that he met with Officer Guasto the same number of times to discuss the terms of the negotiation.

- Millan stated that these meetings took place at some point between October and December of 2020.

- When asked how long were these negotiations going for, Millan stated that he knew that Sgt. Salabarrias case was resolved. He then stated that Officer Guasto's portion of the case had still not been resolved.

The interview was concluded at 1150 AM and no further questions were asked. **(Refer to the case file for the entire recorded statement and transcription).**

### April 28, 2021

- I received an email from Commander Prieto where attorney Michael Elkins states that Officer Guasto has hired Paul Daragjati as his attorney. The email states that both the City and Officer Guasto have agreed to toll the case for 15 days as of April 27, 2021, due to being close to resolving pending discipline. **(Refer to the case file for the email).**

- **Case tolled as of April 28, 2021.**

### May 11, 2021

- **Case un-tolled due to the 15 day period expiring.**

- Commander Prieto contacted attorney Michael Elkins due to the tolling period. Both Commander Prieto and Elkins agreed to toll the case one additional day after the 15 day period. **Case Tolled for one more day**.

- Per. Michael Elkins, the city and Officer Guasto were unable to come to an agreement for pending discipline. I was then advised that Officer Guasto would have to complete an Internal Affairs subject officer interview.

- Subject Officer Interview date of May 19, 2021, at 3 PM was selected. Elkins was advised of the scheduled interview and notified Officer Guasto's attorney (Daragjati) and advised him of the date and time. This notification was made via email at 2:21 PM. Prior to the selection of the date and time for the interview, I verified that Officer Guasto was working on the date. There was no pending time

**I2020-010**

City 001610

off requests for the date of the interview. At approximately 2:55 PM, Officer Guasto submitted an entry into Telestaff requesting May 19, 2021, off.

- I sent the Subject Officer Notification of Interview memorandum to Officer Guasto via city email advising Lieutenant M. George to serve the notice. I received the signed memorandum via email at 5:49 PM.

- Lieutenant M. George denied the time off request on Telestaff entered by Officer Guasto.

**May 19, 2021**

- The Internal Affairs Unit was advised by Michael Elkins that Officer Guasto entered into an agreement with the City of Miami Beach in reference to discipline. Officer Guasto did not provide an interview to the Internal Affairs Unit as scheduled.

**June 14, 2021**

- Awaiting signed agreement between Officer Guasto and the City of Miami Beach.

**July 5, 2021**

- Awaiting signed agreement between Officer Guasto and the City of Miami Beach.

**August 25, 2021**

- The Internal Affairs Unit received a copy of the settlement agreement between the City of Miami Beach and Officer N. Guasto. The agreement was sent via email by attorney Mike Elkins and was signed by Officer Guasto and the FOP Vice President. See the case file for a copy of the agreement.

I2020-010

City 001611

**OFFICIAL RECORDS**

1. IA Pro Printout
2. IA Final Report
3. IA Advisory Forms
4. IA Statement Forms and Affidavits
5. Trackstar AVLS Report
6. Key Card Report
7. Officer Activity Report
8. Officer Dispatch Report
9. Station CCTV
10. Radio Communication Audio Files
11. Telestaff Roster
12. Emails
13. Digital Recordings of Statements
14. Subject Officer Notifications
15. Witness Officer Notifications
16. Interview Transcripts
17. Settlement Agreements

*"I, the undersigned, do hereby swear, under penaLieutenanty of perjury, that, to the best of my personal knowledge, information, and belief, I have not knowingly or willfully deprived, or allowed another to deprive, the subject of the investigation of any of the rights contained in SS.* 112.532 *and* 112.533, *Florida Statutes."*

**I2020-010**

City 001612

_____          _____
Investigator: Sergeant Andy Descalzo                    Date
Internal Affairs Investigator


_____          _____
Reviewed by: Lieutenant Tony Gil                        Date
Internal Affairs Lieutenant


_____          _____
Reviewed by: Commander A.J. Prieto                      Date
Internal Affairs Commander


_____          10/05/2021
Approved by: Chief Richard Clements      _____
Chief of Police                                         Date

**I2020-010**

City 001613

# APPENDIX

# A

City 001614



MIAMIBEACH

# MEMORANDUM

TO:     Sergeant, Jessica Salabarria

FROM:   Rick Clements, Chief of Police

DATE:   January 25, 2021

RE:     Implementing Letter of Resignation

---

On December 18, 2020, you entered into a Last Chance Agreement ("Agreement"). A copy of that Agreement is attached as Exhibit A. Additionally, as part of the Agreement, on that same date you signed a Letter of Resignation ("Resignation"). A copy of that Resignation is attached as Exhibit B.

Based on the violations outlined below, and per the Agreement, I am implementing the Resignation, effective immediately and as of the date indicated on Resignation attached as Exhibit B.

Specifically, on December 30, 2020, Lieutenant, Steven Cosner submitted an Allegation of Employee Misconduct ("AEM"). A copy of the AEM is attached as Exhibit C. The allegations of the AEM are incorporated in full herein.

On January 19, 2021, I held a meeting with you to discuss the allegations in the AEM. In addition to you and I, also present at that meeting was:

- Wayne Jones, Deputy Chief
- Paul Ozaeta, Lieutenant (FOP President)
- Arley Flaherty, Sergeant (FOP First Vice President)
- Reggie Lester, Sergeant (FOP Second Vice President)
- Delvin Brown, Lieutenant (FOP Grievance Chairman)
- Steven Cosner, Lieutenant
- A.J. Prieto, Captain Internal Affairs.

During the meeting, you were provided a copy of the "AEM" and given the opportunity to review the "AEM" in full. After your review, you informed me that, despite being assigned to the North District, you did not report to the North District. Instead, you remained in your assigned City vehicle, stationary at the City's main police station. You further informed me that while in your vehicle at the police station (for what was at or around four (4) plus hours) you worked on administrative issues (an employee evaluation

City 001615

for Police Officer Vincent Stella) and worked on your "school work." The "school work" at issue is not work assigned by the City. You informed me that, independent from the City, you are working toward a Master's Degree.

Further, you acknowledged that you missed two radio calls specifically to you from Lieutenant Cosner and a phone call from Lieutenant Cosner to your personal cell phone. Ultimately, you did not respond to the North End Sub-Station (in the North District) until approximately 4:20 a.m., and only after being told to do so by Lieutenant Cosner. You further acknowledged that despite receiving an email from Lieutenant Cosner at approximately 3:20 a.m. directing you to have certain officers perform certain assignments, you did not issue the assignments until after 4:20 a.m., and only after speaking with Lieutenant Cosner. You again indicated to me that prior to speaking to Lieutenant Cosner at 4:20 a.m., you were focused on the employee evaluation and your independent school work.

In speaking with Lieutenant Cosner during this meeting, he indicated, among other things that you informed him that you had conveyed the assignment details, when in fact, you had not. You conveyed the assignment details after speaking to Lieutenant Cosner despite telling him you had already done so.

Moreover, Lieutenant Cosner indicated in this meeting that you did not leave the main police station during most of your shift and only left the police station when instructed to do so by Lieutenant Cosner.

The above is only a summary of the events of the January 19, 2021 meeting.

After the meeting, the City reviewed your City issued laptop computer, which is the computer that you would have used to work on Officer Stella's evaluation. A review of the laptop shows that Officer Stella's evaluation was not created until January 10, 2021. The City's Information Technology Department confirmed that Officer Stella's evaluation was not created or saved anywhere else on the City's system.

Pursuant to paragraph 4 of the Agreement, I determine that you have not complied with the Agreement and engaged in conduct that is beyond an individual, discreet or minor policy violation. Pursuant to paragraph 4 of the Agreement, my decision in this regard is not subject to review or explanation. Accordingly, as stated above, I am implementing your Resignation.

City 001616

# EXHIBIT A

City 001617

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY

Page 1 of 7

UNION          JESSICA

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1.     All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2.     During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3.     Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference. In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4.     The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY                                    Page 2 of 7                    UNION            JESSICA

City 001619

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

5. Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6. SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7. Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command. Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8. For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

CITY                    Page 3 of 7              UNION            JESSICA

City 001620

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

9.     Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10.    Employee shall attend and cooperate with any training required by the Chief of Police.

11.    If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12.    In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.    The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

_____
CITY                           Page 4 of 7              UNION          JESSICA

City 001621

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY

Page 5 of 7

UNION       JESSICA

City 001622

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.    SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.    Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.    This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.    This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.    In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida.  SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.

<u>JC</u>
CITY

Page 6 of 7

UNION        JESSICA

City 001623

DocuSign Envelope ID: CC3C604A-8185-4007-95EB-8735D7C89FEF

This Agreement is dated the ____ day of December 2020, in Miami-Dade County, Florida.

_____
JESSICA SALABARRIA

DocuSigned by:
_Paul J. Aguila_
_____
CITY MANAGER
CITY OF MIAMI BEACH

Date: _12/18/2020_

Date: _____ 12/23/2020 | 1:34 EST_____

FRATERNAL ORDER OF POLICE

_____ Pres.dent
Signature & Title

_Kevin Millan_   _President_
Print Name & Title

_____12/18/2020_____
Date

_____
CHIEF OF POLICE

_12/15/2020_
Date

City 001624

# EXHIBIT B

City 001625

December 18, 2020

City of Miami Beach
Human Resources Department
Miami Beach City Hall
1700 Convention Center Drive
Miami Beach, FL 33139

Re:     *Letter of Resignation as Part of Settlement Agreement and Last Chance Agreement*

To Whom It May Concern:

Pursuant to the Settlement Agreement and Last Chance Agreement to which this Letter of Resignation is attached, I resign my employment with the City of Miami Beach, effective January 25, 2021.

Very Truly Yours,

Jessica Salabarria.

City 001626

# EXHIBIT C

City 001627

## MIAMI BEACH POLICE DEPARTMENT
### Initial Report Concerning a Police Employee - Allegation of Employee Misconduct

| Date and Time Reported<br>12/30/2020   2345 hours | Received By (Employee Name)<br>Lieutenant Steven Cosner | (X) In Person  ( ) By Phone<br>( ) Other _____ |
|---|---|---|
| Date and Time Occurred<br>12/28/2020   0000-0600 hours | Location of Occurrence<br>MBPD | |
| Reporting Party's Name<br>Lieutenant Steven Cosner | Race/Sex<br>W/M | D.O.B | Address: 1100 Washington Ave., Miami<br>Beach, Florida 33139 | Telephone # |

**Specific Allegation (In Brief): Failure to Supervise, Conduct Unbecoming, Insubordination, Neglect of Duty, Untruthfulness (lying/false statements), Performance of Duties, Failure to Monitor Radio**

| Employee (s) Name | | |
|---|---|---|
| 1. Sergeant Jessica Salabarria | 3. | |
| 2 | 4. | |

### Witnesses

| Name | Race/Sex | D.O.B | Address | Telephone |
|---|---|---|---|---|
| Lieutenant Steven Cosner | W/M | | Resident: MBPD | |
| Officer Werner Baumer | W/M | | Business: 1100 Washington Ave., Miami Beach, | |
| Officer Richard Ocejo | W/M | | FL 33139 | |
| Officer Steven Serrano | W/M | | | |
| Officer Christopher Garrido | W/M | | | |
| Officer Hansel Romero | W/M | | | |
| Officer Rodolfo Albaladejo | W/M | | | |
| | | | Resident<br>Business | |

### Details of Allegation

On Sunday night, 12/27/2020 at approximately 2200 hours, I advised Sergeant Jessica Salabarria that we needed a Sergeant on overtime for the midnight shift. I told her that she was the next supervisor to be forced to work over since we did not have any volunteers for the position. She was told that she would be assigned to Area 3 and would be working from 0000-0600 hours. She acknowledged the order and within several minutes she provided me with an overtime slip completed by her in which she documented in her own handwriting that she was working in Area 3. She left the sergeant's office shortly thereafter. At approximately 0355 hours, I forwarded an email to Sergeant Salabarria with the details and watch orders that needed to be assigned to the Area 3 officers for completion prior to the end of their shift. I then sent a text message to her cellular phone advising her to check her email at 0359 hours. After a few minutes I did not receive an acknowledgement of the text message, so I tried to call her phone at 0404 hours. Then phone rang repeatedly and went to voicemail. I tried to raise her via the police radio immediately afterwards. The dispatcher raised her multiple times with no response. Sergeant Wilson Romero advised via radio that he would try to call her. He called me at 0411 hours to advise that he could not reach her and that her phone rang through to voicemail. I again tried to have the dispatcher raise her, and after several attempts by name and unit

City 001628

number, she finally responded. The tone of her voice sounded as if she was just waking up. I spoke with her via the supervisor channel and asked her where she was. She told me that she was "05". I responded by asking if she meant, "05 at the NESS". She said no and that she was at the main station. I asked if she was aware that she was assigned to Area 3 and she answered affirmatively. I then ordered her to respond to Area 3 and to check her email.

I became involved in a vehicle stop along 71 street that resulted in an arrest at 0416. Officer Ocejo was one of the officers who responded as back-up. After the subject was transported, I waited on scene with Officer Ocejo as he waited for a tow truck. I asked Officer Ocejo to check his email to see if the details had been forwarded by Sergeant Salabarria. He told me that he did not have any emails from her. This was at approximately 0520 hours. At 0543 hours, I received an unsolicited text message from Sergeant Salabarria advising that she had emailed me the squad stats and the detail assignments. She claimed that she had told the officers via landline and email of their detail assignments. The email that she sent me was sent at 0536 hours. It included the squad stats and detail assignments. I called Officer Hansel Romero and asked him if he had received any emails, texts, or phone calls from Sergeant Salabarria advising him of detail assignments. He said that he did not and that she had only asked for stats in an email that was sent at 0521 hours. That email was forwarded to me by Officer Ocejo. I began calling all the officers assigned to Area 3 and inquired the same of each of them. Every one of the officers advised that they had not received a call or text advising of the details. Officer Romero then forwarded an email that he received from Sergeant Salabarria at 0542 hours. The email had been sent to each of the Area 3 officers. It was the detail assignments and began with a highlighted line stating, "squad per our conversation please note the below details for our shift". I found this very concerning because it was now the second time that she had claimed to have had a conversation with the officers about their assignments when all six of them claimed that never happened and they did not report to any assigned details during the shift.

I sent an email to Lieutenant Jorge Garcia asking for a Detail Report for Sergeant Salabarria's assigned marked vehicle via the AVL system. My inquiry was for her vehicle movement from 2200 hours on 12/27/2020 through 0600 hours on 12/28/2020. The Detail Report showed that her vehicle had been parked at the station from 2200 hours on 12/27/2020 until 0423 hours on 12/28/2020 which was a few minutes after we spoke on the supervisor channel. For a total of 6 hours and 23 minutes. It is unknown how long the vehicle had been parked prior to that. The report indicated that she left the station and drove directly to 73rd Street and Ocean Terrace where she again parked her vehicle at 0440 hours. The vehicle remained in that position until 0533 hours for a total of 53 minutes. She then left that location and drove directly to the MBPD headquarters.

Note that of the six officers assigned to Area 3 on the shift in question 4 of them have 2 years of experience or less.

Sergeant Salabarria's actions show a willful effort to deceive a supervisor and a failure to obey a direct order from said supervisor. She failed to report to her assigned zone and failed to supervise the officers under her watch. She failed on multiple occasions to respond to the police radio and showed extreme neglect in the performance of her duties.

City 001629

# APPENDIX

# B

City 001630

## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); NICHOLAS GUASTO ("Guasto") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Guasto is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Guasto; and

WHEREAS, Guasto was the subject of Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, the Parties, wish to settle all discipline associated with the Investigation and wish to resolve all other disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, the Parties agree as follows:

1. <u>Recitals</u>. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2. <u>Discipline</u>. Guasto and the FOP agree that, by executing this Agreement, they will simultaneously withdraw, with prejudice, any and all grievances. Additionally, Guasto agrees to accept a Twenty (20) hour suspension, to be completed by the end of 2021. Guasto agrees to pay back One Hundred and Thirty-Six (136) hours of regular time, which is a total amount due of Seven Thousand Two Hundred Seventeen Dollars and 52/100 ($7,217.52). The total amount due was calculated using an hourly rate of $53.07/hour. Guasto must pay back the entire amount referenced herein on or before 365 days from the date of his execution of this Agreement (the "Due Date"). If Guasto fails to make complete payment on or before the Due Date, the City is authorized to take the equivalent of the remaining amounts due from any of Guasto's leave banks. Finally, Guasto agrees that he is not eligible for any promotional opportunities in the year 2021 and for the length of the current Sergeant and Lieutenant Promotional Lists, which run past the year 2021. For the avoidance of confusion, this means that Guasto is not eligible for any promotions until the expiration of the aforementioned Promotional Lists.

3. <u>Revocation of Written Reprimand</u>. On February 9, 2021, Guasto received a written reprimand (the "Reprimand"). Separate from any consideration herein, the City revokes the Reprimand. The Reprimand is referenced herein for convenience purposes only. The revocation of the Reprimand is not connected to any consideration provided by Guasto. The Reprimand cannot be used by the City in considering future discipline.

1

City 001631

4.      Release Of Claims, Covenant Not To Sue. Guasto hereby releases and waives any
and all claims of any kind whatsoever against the City that he had, has or may have from the
beginning of the world through the date of this Agreement. The claims released include, but are
not limited to, any and all claims arising under any federal, state, local or foreign statute or
regulation, including, without limitation, those relating to any and all unfair or discriminatory
employment practices (for example, employment discrimination based on race, national origin,
sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil
Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination
in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida
Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement
Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards
Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and
federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of
1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation
Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and
state employment-related statutes and regulations, and any other employment-related local
ordinance up to the date of this Agreement.

The disputes released by Guasto also include any and all disputes he had, has or may
believe to have against the City in contract or at common law, including, but not limited to: breach
of oral, written and/or implied contract, breach of an implied covenant of good faith and fair
dealing, wrongful discharge under any theory (including for lack of good cause) in violation of
public policy and constructive discharge, intentional and/or negligent infliction of emotional
distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or
fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy,
defamation, and interference with contract and/or prospective economic advantage up to the date
of this Agreement.

Notwithstanding anything contained herein, this release does not include a release of any
workers compensation claims.

Guasto further covenants and agrees that he will not file a lawsuit or claim of any kind
asserting the claims released herein. Guasto understands that this Agreement does not prohibit
participating in an investigation or the filing of a charge with the EEOC or like administrative
agency, but he does understand and agree that, not only is he releasing the stated claims, but also
is releasing the right to any monetary damages or any relief of any kind from those claims, whether
brought by him or on his behalf. Guasto hereby represents that he has not assigned to any person
or entity any rights to the claims released herein.

5.      Effect; Precedent. The Parties agree that Guasto remains subject to all applicable
rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly
otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique
and that this Agreement does not establish precedent of any kind whatsoever and may not be used
in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of
any kind.

City 001632

6.    Consideration.  The consideration for this Agreement are the mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

7.    Miscellaneous.  This Agreement is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral. The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever. This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida.  Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release," is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.


CITY OF MIAMI BEACH

By_____
City Manager


_____
DATE


NICHOLAS GUASTO

_____
NICHOLAS GUASTO


**07/07/2021**
DATE


FRATERNAL ORDER OF POLICE, LODGE 8

By_____
~~President~~ Vice President


**7/8/2021**
DATE


CHIEF OF POLICE

_____
RICK CLEMENTS
Chief of Police

City 001633

# APPENDIX

# C

City 001634

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/22/2020 23:59:59

# Officer Dispatch Report

**Agency:** FL0130700 - Miami Beach Police Department
**CFS Types:** ALL

**Officers:** Salabarria, Jessica - 1023

| Officer | Created Date/Time | CFS # | CFS Type | Dispatched Date/Time | Arrived Date/Time | Cleared Date/Time | Dispatched To Arrived | Dispatched To Cleared |
|---|---|---|---|---|---|---|---|---|
| Salabarria, Jessica | 10/22/2019 15:24:44 | 22579 | 19 | 10/22/2019 15:24:44 | 10/22/2019 15:24:44 | 10/22/2019 15:38:00 | 00:00:00 | 00:13:16 |
| Salabarria, Jessica | 11/06/2019 19:26:48 | 7880 | 27 | 11/06/2019 19:52:47 | 11/06/2019 21:31:12 | 11/07/2019 00:12:20 | 01:38:25 | 04:19:33 |
| Salabarria, Jessica | 11/08/2019 19:54:56 | 9218 | 41 | 11/08/2019 20:02:52 | 11/08/2019 20:17:45 | 11/08/2019 21:37:57 | 00:14:53 | 01:35:05 |
| Salabarria, Jessica | 11/08/2019 22:57:40 | 9300 | 14 | 11/08/2019 23:11:05 | 11/08/2019 23:11:05 | 11/08/2019 23:38:41 | 00:00:00 | 00:27:36 |
| Salabarria, Jessica | 11/13/2019 19:31:26 | 12463 | 18 | 11/13/2019 20:11:46 | 11/13/2019 20:11:46 | 11/13/2019 20:12:18 | 00:00:00 | 00:00:32 |
| Salabarria, Jessica | 11/14/2019 17:23:59 | 12953 | 14 | 11/14/2019 17:23:59 | 11/14/2019 17:23:59 | 11/14/2019 17:29:45 | 00:00:00 | 00:05:46 |
| Salabarria, Jessica | 11/26/2019 18:36:58 | 20900 | 19 | 11/26/2019 18:36:58 | 11/26/2019 18:36:58 | 11/26/2019 18:46:17 | 00:00:00 | 00:09:19 |
| Salabarria, Jessica | 12/05/2019 19:31:42 | 1577 | 317E | 12/05/2019 19:32:51 | 12/05/2019 19:45:10 | 12/05/2019 22:21:54 | 00:12:19 | 02:49:03 |
| Salabarria, Jessica | 12/10/2019 18:04:27 | 5328 | 14 | 12/10/2019 18:10:33 | 12/10/2019 18:23:48 | 12/10/2019 20:08:24 | 00:13:15 | 01:57:51 |
| Salabarria, Jessica | 12/19/2019 22:29:36 | 11330 | BLDGFIRE | 12/19/2019 22:52:56 | 12/19/2019 22:52:56 | 12/20/2019 00:22:24 | 00:00:00 | 01:29:28 |
| Salabarria, Jessica | 01/01/2020 17:05:58 | 19376 | 14 | 01/01/2020 17:05:59 | 01/01/2020 17:05:59 | 01/01/2020 19:17:05 | 00:00:00 | 02:11:06 |
| Salabarria, Jessica | 01/03/2020 21:11:34 | 20947 | 14 | 01/03/2020 21:30:13 | 01/03/2020 21:30:13 | 01/03/2020 23:28:10 | 00:00:00 | 01:57:57 |
| Salabarria, Jessica | 01/09/2020 10:06:33 | 24402 | 14 | 01/09/2020 10:06:33 | 01/09/2020 10:06:33 | 01/09/2020 11:20:28 | 00:00:00 | 01:13:55 |
| Salabarria, Jessica | 01/10/2020 16:18:59 | 303 | 14 | 01/10/2020 16:18:59 | 01/10/2020 16:18:59 | 01/10/2020 16:26:49 | 00:00:00 | 00:07:50 |
| Salabarria, Jessica | 02/01/2020 19:49:01 | 15516 | 36 | 02/01/2020 20:00:41 | 02/01/2020 20:00:41 | 02/01/2020 20:22:17 | 00:00:00 | 00:21:36 |
| Salabarria, Jessica | 02/05/2020 22:07:15 | 18616 | 14 | 02/05/2020 22:21:28 | 02/05/2020 22:42:48 | 02/06/2020 00:16:14 | 00:21:20 | 01:54:46 |
| Salabarria, Jessica | 02/07/2020 17:15:57 | 19793 | 22 | 02/07/2020 17:15:58 | 02/07/2020 17:15:58 | 02/07/2020 18:40:04 | 00:00:00 | 01:24:06 |
| Salabarria, Jessica | 02/11/2020 21:19:05 | 22488 | 43 | 02/11/2020 21:28:33 | 02/11/2020 21:32:46 | 02/11/2020 21:42:39 | 00:04:13 | 00:14:06 |
| Salabarria, Jessica | 02/12/2020 18:35:36 | 23070 | 17 | 02/12/2020 19:40:46 | 02/12/2020 19:58:55 | 02/12/2020 20:06:50 | 00:18:09 | 00:26:04 |
| Salabarria, Jessica | 02/12/2020 19:55:17 | 23105 | 19 | 02/12/2020 19:55:17 | 02/12/2020 19:55:17 | 02/12/2020 19:58:02 | 00:00:00 | 00:02:45 |
| Salabarria, Jessica | 02/19/2020 20:32:31 | 2893 | 34 | 02/19/2020 20:38:27 | 02/19/2020 20:41:23 | 02/19/2020 20:57:40 | 00:02:56 | 00:19:13 |
| Salabarria, Jessica | 03/10/2020 10:02:23 | 16287 | 14 | 03/10/2020 10:02:23 | 03/10/2020 10:02:23 | 03/10/2020 10:03:13 | 00:00:00 | 00:00:50 |

City 001635

**Start Date/Time:**  10/22/2019 00:00:00

**End Date/Time:**  03/22/2020 23:59:59

# Officer Dispatch Report

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Salabarria, Jessica | 03/12/2020 17:00:58 | 18108 315 | 03/12/2020 17:02:28 | 03/12/2020 17:06:56 | 03/12/2020 18:24:40 | 00:04:28 | 01:22:12 |

**Officer CFS Count:** 23

**Total CFS Count:** 23

City 001636

**Start Date/Time:** 04/22/2020 00:00:00

**End Date/Time:** 04/22/2020 23:59:59

# Officer Dispatch Report

**Agency:** FL0130700 - Miami Beach Police Department
**CFS Types:** ALL

**Officers:** Salabarria, Jessica - 1023

| Officer | Created Date/Time | CFS # | CFS Type | Dispatched Date/Time | Arrived Date/Time | Cleared Date/Time | Dispatched To Arrived | Dispatched To Cleared |
|---------|-------------------|-------|----------|----------------------|-------------------|-------------------|-----------------------|-----------------------|
| **Total CFS Count:** 0 | | | | | | | | |

City 001637

| | | |
|---|---|---|
| **Start Date/Time:** | 10/22/2019 00:00:00 |
| **End Date/Time:** | 03/22/2020 23:59:59 |

# Daily CFS Detail

**Agency:** FL0130700 - Miami Beach Police Department   **Sources:** ALL   **From CFS:**   **To:**

**Units:** ALL   **Personnel:** Salabarria, Jessica - 1023   **CFS Types:** ALL

**Dispositions:** ALL   **Include Canceled:** No   **Layer:** ALL

**Areas:** ALL   **Details:** ALL

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 10/22/2019 15:24:44 | 10/22/2019 15:24:44 | 10/22/2019 15:24:44 | 22579 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTConM | | **Location:** S POINTE DR \ OCEAN DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 10/30/2019 21:17:57 | 10/30/2019 21:17:57 | 10/30/2019 21:17:57 | 3041 | 34 | No | | 3 | Officer Initiated |
| **Entered by:** CMB \EMGTChrJ | | **Location:** 800 COLLINS AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/06/2019 19:26:48 | 11/06/2019 19:38:18 | 11/06/2019 19:45:12 | 7880 | 27 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1149 5TH ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/08/2019 19:54:56 | 11/08/2019 19:58:14 | 11/08/2019 20:08:34 | 9218 | 41 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** 411 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/08/2019 22:57:40 | 11/08/2019 23:10:08 | 11/08/2019 23:09:51 | 9300 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 900 WEST AVE 337, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/13/2019 19:31:26 | 11/13/2019 20:11:46 | 11/13/2019 20:11:46 | 12463 | 18 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** MAC ARTHUR CSWY WB \ FOUNTAIN ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001638

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/22/2020 23:59:59

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 11/14/2019 17:23:59 | 11/14/2019 17:23:59 | 11/14/2019 17:23:59 | 12953 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTConT | | **Location:** 1100 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/20/2019 20:52:25 | 11/20/2019 20:52:25 | 11/20/2019 20:52:25 | 16967 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTHanT | | **Location:** 8TH ST \ JEFFERSON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/26/2019 18:36:58 | 11/26/2019 18:36:58 | 11/26/2019 18:36:58 | 20900 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTMcmD | | **Location:** 600 WEST AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/28/2019 15:50:50 | 11/28/2019 16:02:26 | 11/28/2019 16:11:23 | 22005 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1 OCEAN DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/05/2019 19:31:42 | 12/05/2019 19:32:20 | 12/05/2019 19:33:13 | 1577 | 317E | No | | 1 | 911 Call |
| **Entered by:** system | | **Location:** 16TH ST \ ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/10/2019 18:04:27 | 12/10/2019 18:09:32 | 12/10/2019 18:11:34 | 5328 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1523 ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/19/2019 22:29:36 | 12/19/2019 22:30:48 | 12/19/2019 22:35:51 | 11330 | BLDGFIRE | No | 7863429400 | 1 | 911 Call |
| **Entered by:** CMB \EMGTCamM | | **Location:** 61 COLLINS AVE 404, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001639

| | | | | Start Date/Time: | 10/22/2019 00:00:00 |
| | | | | End Date/Time: | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 12/20/2019 20:45:03 | 12/20/2019 20:49:21 | 12/20/2019 20:54:01 | 11877 | 25 | No | MFH, OPER 8772857397 | 2 | Telephone |
| **Entered by:** CMB \EMGTTelN | | **Location:** 311 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/27/2019 21:02:27 | 12/27/2019 21:05:25 | 12/27/2019 21:07:22 | 15842 | 329 | No | PACHECO, DEIRRY | 1 | 911 Call |
| **Entered by:** system | | **Location:** 720 MERIDIAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/01/2020 17:05:58 | 01/01/2020 17:05:59 | 01/01/2020 17:05:59 | 19376 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTHanT | | **Location:** 1100 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/03/2020 21:11:34 | 01/03/2020 21:11:34 | 01/03/2020 21:11:34 | 20947 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | **Location:** 300 ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/09/2020 10:06:33 | 01/09/2020 10:06:33 | 01/09/2020 10:06:33 | 24402 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTGuyT | | **Location:** 1821 W 27TH ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/10/2020 16:18:59 | 01/10/2020 16:18:59 | 01/10/2020 16:18:59 | 303 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | **Location:** MAC CAUSEWAY | | | | **ORIs:** FL0130700 | | |
| 01/10/2020 16:25:03 | 01/10/2020 16:25:52 | 01/10/2020 16:27:20 | 308 | 317E | No | | 1 | 911 Call |
| **Entered by:** system | | **Location:** 6TH ST \ MICHIGAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001640

| | | | | Start Date/Time: | 10/22/2019 00:00:00 |
|---|---|---|---|---|---|
| | | | | End Date/Time: | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 01/10/2020 17:47:40 | 01/10/2020 17:55:04 | | 379 | 38 | No | | 3 | 911 Call |
| Entered by: system | | Location: 535 15TH ST 2, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 01/30/2020 16:09:23 | 01/30/2020 16:09:23 | 01/30/2020 16:09:23 | 13447 | 38 | No | | 3 | Officer Initiated |
| Entered by: CMB \EMGTChrJ | | Location: 1901 CONVENTION CENTER DR, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/01/2020 19:49:01 | 02/01/2020 19:49:01 | 02/01/2020 19:49:01 | 15516 | 36 | No | | 3 | Officer Initiated |
| Entered by: CMB \EMGTMajR | | Location: 1901 CONVENTION CENTER DR, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/05/2020 22:07:15 | 02/05/2020 22:07:15 | 02/05/2020 22:07:15 | 18616 | 14 | No | | 4 | Officer Initiated |
| Entered by: CMB \EMGTChrJ | | Location: 1400 NE 1ST AVE BLK | | | | ORIs: FL0130700 | | |
| 02/07/2020 17:15:57 | 02/07/2020 17:15:58 | 02/07/2020 17:15:58 | 19793 | 22 | No | | 4 | Officer Initiated |
| Entered by: CMB \EMGTChrJ | | Location: 1288 COLLINS AVE, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/11/2020 20:48:24 | 02/11/2020 20:48:24 | 02/11/2020 20:48:24 | 22476 | 14 | No | | 4 | Officer Initiated |
| Entered by: CMB \EMGTMajR | | Location: 1100 5TH ST blk, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/11/2020 21:19:05 | 02/11/2020 21:21:59 | 02/11/2020 21:23:06 | 22488 | 43 | No | -RESIDENT, MIKE | 3 | 911 Call |
| Entered by: system | | Location: 1428 EUCLID AVE, Miami Beach | | | | ORIs: 01012, FL0130700 | | |

City 001641

| Start Date/Time: | 10/22/2019 00:00:00 |
|---|---|
| End Date/Time: | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 02/12/2020 18:35:36 | 02/12/2020 18:41:06 | 02/12/2020 18:50:12 | 23070 | 17 | No | 3057999420 | 4 | Telephone |
| Entered by: CMB \EMGTCunA | | Location: 14TH ST \ ALTON RD, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/12/2020 19:55:17 | 02/12/2020 19:55:17 | 02/12/2020 19:55:17 | 23105 | 19 | No | | 2 | Officer Initiated |
| Entered by: CMB \EMGTHanT | | Location: 11TH ST \ ALTON RD, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/18/2020 17:00:36 | 02/18/2020 17:02:47 | 02/18/2020 17:11:00 | 2069 | WATEREMER | No | CALLER, FEMALE 7862163333 | 1 | Telephone |
| Entered by: CMB \EMGTGarV | | Location: 190 MAC ARTHUR CSWY EB, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/18/2020 22:54:36 | 02/18/2020 22:54:36 | 02/18/2020 22:54:36 | 2248 | 26 | No | | 5 | Officer Initiated |
| Entered by: CMB \EMGTTayC | | Location: 100 MAC ARTHUR CSWY WB | | | | ORIs: FL0130700 | | |
| 02/19/2020 20:32:31 | 02/19/2020 20:33:30 | 02/19/2020 20:39:46 | 2893 | 34 | No | | 3 | 911 Call |
| Entered by: system | | Location: 1504 BAY RD, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/26/2020 19:48:03 | 02/26/2020 20:27:35 | 02/26/2020 20:35:28 | 7766 | 25 | No | OPER4670, CENTRAL 8006332677 | 2 | Telephone |
| Entered by: CMB \EMGTCunA | | Location: 37 STAR ISLAND DR, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/26/2020 20:02:37 | 02/26/2020 20:26:42 | 02/26/2020 20:28:27 | 7773 | 34 | No | 3056722395 | 3 | Telephone |
| Entered by: CMB \EMGTMicA | | Location: 1443 ALTON RD, Miami Beach | | | | ORIs: 01012, FL0130700 | | |
| 02/26/2020 20:42:13 | 02/26/2020 20:52:49 | 02/26/2020 20:56:23 | 7784 | 34 | No | 3059682663 | 3 | Telephone |

City 001642

| | |
|---|---|
| **Start Date/Time:** | 10/22/2019 00:00:00 |
| **End Date/Time:** | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| **Entered by:** CMB \EMGTGarV | | **Location:** 1321 14TH TER, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/05/2020 09:32:24 | 03/05/2020 09:34:43 | 03/05/2020 09:36:16 | 12520 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1501 COLLINS AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/10/2020 10:02:23 | 03/10/2020 10:02:23 | 03/10/2020 10:02:23 | 16287 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTRamR | | **Location:** 1061 MICHIGAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/12/2020 17:00:58 | 03/12/2020 17:02:13 | 03/12/2020 17:03:37 | 18108 | 315 | No | | 1 | Telephone |
| **Entered by:** CMB \PINGSanR | | **Location:** 1330 PENNSYLVANIA AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001643

| | Start Date/Time: | 10/22/2019 00:00:00 |
|---|---|---|
| | End Date/Time: | 03/22/2020 23:59:59 |

# Daily CFS Detail

**Agency:** FL0130700 - Miami Beach Police Department    **Sources:** ALL                **From CFS:**    **To:**

**Units:** ALL                                **Personnel:** Salabarria, Jessica - 1023    **CFS Types:** ALL

**Dispositions:** ALL                         **Include Canceled:** No                   **Layer:** ALL

**Areas:** ALL                                **Details:** ALL

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 10/22/2019 15:24:44 | 10/22/2019 15:24:44 | 10/22/2019 15:24:44 | 22579 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTConM | | **Location:** S POINTE DR \ OCEAN DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 10/30/2019 21:17:57 | 10/30/2019 21:17:57 | 10/30/2019 21:17:57 | 3041 | 34 | No | | 3 | Officer Initiated |
| **Entered by:** CMB \EMGTChrJ | | **Location:** 800 COLLINS AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/06/2019 19:26:48 | 11/06/2019 19:38:18 | 11/06/2019 19:45:56 | 7880 | 27 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1149 5TH ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/08/2019 19:54:56 | 11/08/2019 19:58:14 | 11/08/2019 20:08:34 | 9218 | 41 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** 411 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/08/2019 22:57:40 | 11/08/2019 23:10:08 | 11/08/2019 23:09:51 | 9300 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 900 WEST AVE 337, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/13/2019 19:31:26 | 11/13/2019 20:11:46 | 11/13/2019 20:11:46 | 12463 | 18 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** MAC ARTHUR CSWY WB \ FOUNTAIN ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001644

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | **Start Date/Time:** | 10/22/2019 00:00:00 | | |
| | | | | | **End Date/Time:** | 03/22/2020 23:59:59 | | |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 11/14/2019 17:23:59 | 11/14/2019 17:23:59 | 11/14/2019 17:23:59 | 12953 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTConM | | **Location:** 1100 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/20/2019 20:52:25 | 11/20/2019 20:52:25 | 11/20/2019 20:52:25 | 16967 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTHanT | | **Location:** 8TH ST \ JEFFERSON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/26/2019 18:36:58 | 11/26/2019 18:36:58 | 11/26/2019 18:36:58 | 20900 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTMcmD | | **Location:** 600 WEST AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 11/28/2019 15:50:50 | 11/28/2019 16:02:26 | 11/28/2019 16:11:23 | 22005 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1 OCEAN DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/05/2019 19:31:42 | 12/05/2019 19:32:20 | 12/05/2019 19:33:13 | 1577 | 317E | No | | 1 | 911 Call |
| **Entered by:** system | | **Location:** 16TH ST \ ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/10/2019 18:04:27 | 12/10/2019 18:09:32 | 12/10/2019 18:11:34 | 5328 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1523 ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/19/2019 22:29:36 | 12/19/2019 22:30:48 | 12/19/2019 22:35:51 | 11330 | BLDGFIRE | No | 7863429400 | 1 | 911 Call |
| **Entered by:** CMB \EMGTCamM | | **Location:** 61 COLLINS AVE 404, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001645

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Start Date/Time:** | 10/22/2019 00:00:00 | | | | | | |
| **End Date/Time:** | 03/22/2020 23:59:59 | | | | | | |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 12/20/2019 20:45:03 | 12/20/2019 20:49:21 | 12/20/2019 20:54:01 | 11877 | 25 | No | MFH, OPER 8772857397 | 2 | Telephone |
| **Entered by:** CMB \EMGTTelN | | Location: 311 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 12/27/2019 21:02:27 | 12/27/2019 21:05:25 | 12/27/2019 21:07:22 | 15842 | 329 | No | PACHECO, DEIRRY | 1 | 911 Call |
| **Entered by:** system | | Location: 720 MERIDIAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/01/2020 17:05:58 | 01/01/2020 17:05:59 | 01/01/2020 17:05:59 | 19376 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTHanT | | Location: 1100 WASHINGTON AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/03/2020 21:11:34 | 01/03/2020 21:11:34 | 01/03/2020 21:11:34 | 20947 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | Location: 300 ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/09/2020 10:06:33 | 01/09/2020 10:06:33 | 01/09/2020 10:06:33 | 24402 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTGuyT | | Location: 1821 W 27TH ST, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/10/2020 16:18:59 | 01/10/2020 16:18:59 | 01/10/2020 16:18:59 | 303 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | Location: MAC CAUSEWAY | | | | **ORIs:** FL0130700 | | |
| 01/10/2020 16:25:03 | 01/10/2020 16:25:52 | 01/10/2020 16:27:20 | 308 | 317E | No | | 1 | 911 Call |
| **Entered by:** system | | Location: 6TH ST \ MICHIGAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001646

| | | |
|---|---|---|
| **Start Date/Time:** | 10/22/2019 00:00:00 |
| **End Date/Time:** | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 01/10/2020 17:47:40 | 01/10/2020 17:55:04 | | 379 | 38 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** 535 15TH ST 2, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 01/30/2020 16:09:23 | 01/30/2020 16:09:23 | 01/30/2020 16:09:23 | 13447 | 38 | No | | 3 | Officer Initiated |
| **Entered by:** CMB \EMGTChrJ | | **Location:** 1901 CONVENTION CENTER DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/01/2020 19:49:01 | 02/01/2020 19:49:01 | 02/01/2020 19:49:01 | 15516 | 36 | No | | 3 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | **Location:** 1901 CONVENTION CENTER DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/05/2020 22:07:15 | 02/05/2020 22:07:15 | 02/05/2020 22:07:15 | 18616 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTChrJ | | **Location:** 1400 NE 1ST AVE BLK | | | | **ORIs:** FL0130700 | | |
| 02/07/2020 17:15:57 | 02/07/2020 17:15:58 | 02/07/2020 17:15:58 | 19793 | 22 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTChrJ | | **Location:** 1288 COLLINS AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/11/2020 20:48:24 | 02/11/2020 20:48:24 | 02/11/2020 20:48:24 | 22476 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTMajR | | **Location:** 1100 5TH ST blk, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/11/2020 21:19:05 | 02/11/2020 21:21:59 | 02/11/2020 21:23:06 | 22488 | 43 | No | -RESIDENT, MIKE | 3 | 911 Call |
| **Entered by:** system | | **Location:** 1428 EUCLID AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001647

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Start Date/Time:** | 10/22/2019 00:00:00 | | | | | | |
| **End Date/Time:** | 03/22/2020 23:59:59 | | | | | | |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| 02/12/2020 18:35:36 | 02/12/2020 18:41:06 | 02/12/2020 18:50:12 | 23070 | 17 | No | 3057999420 | 4 | Telephone |
| **Entered by:** CMB \EMGTCunA | | **Location:** 14TH ST \ ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/12/2020 19:55:17 | 02/12/2020 19:55:17 | 02/12/2020 19:55:17 | 23105 | 19 | No | | 2 | Officer Initiated |
| **Entered by:** CMB \EMGTHanT | | **Location:** 11TH ST \ ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/18/2020 17:00:36 | 02/18/2020 17:02:47 | 02/18/2020 17:11:00 | 2069 | WATEREMER | No | CALLER, FEMALE 7862163333 | 1 | Telephone |
| **Entered by:** CMB \EMGTGarV | | **Location:** 190 MAC ARTHUR CSWY EB, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/18/2020 22:54:36 | 02/18/2020 22:54:36 | 02/18/2020 22:54:36 | 2248 | 26 | No | | 5 | Officer Initiated |
| **Entered by:** CMB \EMGTTayC | | **Location:** 100 MAC ARTHUR CSWY WB | | | | **ORIs:** FL0130700 | | |
| 02/19/2020 20:32:31 | 02/19/2020 20:33:30 | 02/19/2020 20:39:46 | 2893 | 34 | No | | 3 | 911 Call |
| **Entered by:** system | | **Location:** 1504 BAY RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/26/2020 19:48:03 | 02/26/2020 20:27:35 | 02/26/2020 20:35:28 | 7766 | 25 | No | OPER4670, CENTRAL 8006332677 | 2 | Telephone |
| **Entered by:** CMB \EMGTCunA | | **Location:** 37 STAR ISLAND DR, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/26/2020 20:02:37 | 02/26/2020 20:26:42 | 02/26/2020 20:28:27 | 7773 | 34 | No | 3056722395 | 3 | Telephone |
| **Entered by:** CMB \EMGTMicA | | **Location:** 1443 ALTON RD, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 02/26/2020 20:42:13 | 02/26/2020 20:52:49 | 02/26/2020 20:56:23 | 7784 | 34 | No | 3059682663 | 3 | Telephone |

City 001648

| | | Start Date/Time: | 10/22/2019 00:00:00 |
|---|---|---|---|
| | | End Date/Time: | 03/22/2020 23:59:59 |

# Daily CFS Detail

| Created Date/Time | Dispatched Date/Time | Arrived Date/Time | CFS # | CFS Type | Report Req. | Caller Name Caller Phone | Priority | Source |
|---|---|---|---|---|---|---|---|---|
| **Entered by:** CMB \EMGTGarV | | **Location:** 1321 14TH TER, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/05/2020 09:32:24 | 03/05/2020 09:34:43 | 03/05/2020 09:36:16 | 12520 | 14 | No | | 4 | 911 Call |
| **Entered by:** system | | **Location:** 1501 COLLINS AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/10/2020 10:02:23 | 03/10/2020 10:02:23 | 03/10/2020 10:02:23 | 16287 | 14 | No | | 4 | Officer Initiated |
| **Entered by:** CMB \EMGTRamR | | **Location:** 1061 MICHIGAN AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |
| 03/12/2020 17:00:58 | 03/12/2020 17:02:13 | 03/12/2020 17:03:37 | 18108 | 315 | No | | 1 | Telephone |
| **Entered by:** CMB PINGSanR | | **Location:** 1330 PENNSYLVANIA AVE, Miami Beach | | | | **ORIs:** 01012, FL0130700 | | |

City 001649

# APPENDIX

# D

City 001650

Miami Beach
Radio Log
Jessica Salabarria

City 001651

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

**Agency:** FL0130700 - Miami Beach Police Department  **Units:** ALL

**Personnel:** Salabarria, Jessica - 1023

| Statuses: | | | | | | |
|---|---|---|---|---|---|---|
| | SL: | 0h 50m 22s | 0.02 % | **Total Statuses:** | 233 | |
| | SA: | 2h 41m 04s | 0.07 % | **Total Dispatches:** | 19 | |
| | SD: | 453h 11m 40s | 12.27 % | **Total Busy:** | 214 | |
| | OL: | 8h 17m 53s | 0.23 % | **Total Traffic Stops:** | 0 | |
| | 05: | 19h 16m 28s | 0.52 % | **Total Time:** 153 Days 20 Hours 42 Minutes 54 Seconds | | |
| | 10: | 17h 08m 53s | 0.46 % | | | |
| | 06: | 2930h 21m 26s | 79.36 % | | | |
| | EN: | 8h 04m 41s | 0.22 % | | | |
| | DI: | 5h 48m 57s | 0.16 % | | | |
| | 09: | 219h 30m 14s | 5.94 % | | | |
| | AR: | 27h 31m 16s | 0.75 % | | | |
| | Total: | 3692h 42m 54s | 100.00 % | | | |

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 10/22/2019 14:59:55 | 1023 | 1023 | 09 | | | |
| 10/22/2019 15:00:24 | 1023 | 1023 | SD | | | |
| 10/22/2019 15:24:44 | 1023 | 1023 | AR | 2019-00094126 / IUYX53 | | |
| 10/22/2019 15:24:44 | 1023 | 1023 | AR | 2019-00094126 / IUYX53 | | |
| 10/22/2019 15:38:00 | 1023 | 1023 | 09 | 2019-00094126 / IUYX53 | | |
| 10/22/2019 16:35:15 | 1023 | 1023 | SD | | | |
| 10/23/2019 00:16:30 | 1023 | 1023 | 06 | | | |
| 10/23/2019 15:13:10 | 1023 | 1023 | 09 | | | |
| 10/23/2019 18:08:05 | 1023 | 1023 | SD | | | |
| 10/24/2019 00:55:47 | 1023 | 1023 | 06 | | | |
| 10/25/2019 15:29:38 | 1023 | 1023 | 09 | | | |
| 10/25/2019 5:32:20 | 1023 | 1023 | SD | | | |
| 10/25/2019 22:05:23 | 1023 | 1023 | 09 | | | |

City 001652

Start Date/Time:  10/22/2019 00:00:00

End Date/Time:  03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 10/25/2019 22:13:44 | 1023 | 1023 | 06 | | | |
| 10/28/2019 22:39:34 | 1023 | 1023 | 09 | | | |
| 10/29/2019 00:43:58 | 1023 | 1023 | SD | | | |
| 10/29/2019 01:37:20 | 1023 | 1023 | 06 | | | |
| 10/30/2019 16:03:40 | 1023 | 1023 | 09 | | | |
| 10/30/2019 16:03:47 | 1023 | 1023 | SD | | | |
| 10/30/2019 21:19:06 | 1023 | 1023 | EN | | | |
| 10/30/2019 21:19:06 | 1023 | 1023 | EN | | | |
| 10/30/2019 22:18:11 | 1023 | 1023 | 09 | | | |
| 10/31/2019 00:17:12 | 1023 | 1023 | 06 | | | |
| 10/31/2019 14:40:30 | 1023 | 1023 | 09 | | | |
| 10/31/2019 16:12:11 | 1023 | 1023 | SD | | | |
| 11/01/2019 02:49:18 | 1023 | 1023 | 06 | | | |
| 11/01/2019 15:10:49 | 1023 | 1023 | 09 | | | |
| 11/01/2019 15:13:18 | 1023 | 1023 | SD | | | |
| 11/01/2019 15:35:36 | 1023 | 1023 | 09 | | | |
| 11/01/2019 15:35:52 | 1023 | 1023 | 10 | | | |
| 11/01/2019 16:18:39 | 1023 | 1023 | 09 | | | |
| 11/01/2019 16:27:04 | 1023 | 1023 | SD | | | |
| 11/01/2019 19:43:16 | 1023 | 1023 | 05 | | | |
| 11/01/2019 19:53:14 | 1023 | 1023 | 09 | | | |
| 11/01/2019 19:53:18 | 1023 | 1023 | SD | | | |
| 11/02/2019 00:22:09 | 1023 | 1023 | 06 | | | |

City 001653

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 11/05/2019 15:21:43 | 1023 | 1023 | 09 | | | |
| 11/05/2019 15:21:50 | 1023 | 1023 | SD | | | |
| 11/05/2019 15:45:28 | 1023 | 1023 | 10 | | | |
| 11/05/2019 17:08:34 | 1023 | 1023 | 09 | | | |
| 11/05/2019 17:46:35 | 1023 | 1023 | SD | | | |
| 11/06/2019 00:16:12 | 1023 | 1023 | 06 | | | |
| 11/06/2019 15:58:00 | 1023 | 1023 | 09 | | | |
| 11/06/2019 15:58:14 | 1023 | 1023 | SD | | | |
| 11/06/2019 19:52:47 | 1023 | 1023 | DI | | 05 - 2129H | |
| 11/06/2019 19:52:50 | 1023 | 1023 | EN | | 05 - 2129H | |
| 11/06/2019 21:31:12 | 1023 | 1023 | AR | | 05 - 2129H | |
| 11/06/2019 21:31:16 | 1023 | 1023 | SA | | 05 - 2129H | |
| 11/07/2019 00:12:20 | 1023 | 1023 | 09 | | 05 - 2129H | |
| 11/07/2019 00:30:27 | 1023 | 1023 | 06 | | | |
| 11/07/2019 15:53:11 | 1023 | 1023 | 09 | | | |
| 11/07/2019 15:55:35 | 1023 | 1023 | SD | | | |
| 11/08/2019 00:28:47 | 1023 | 1023 | 06 | | | |
| 11/08/2019 14:31:35 | 1023 | 1023 | 09 | | | |
| 11/08/2019 14:31:46 | 1023 | 1023 | 05 | | | |
| 11/08/2019 15:27:30 | 1023 | 1023 | 09 | | | |
| 11/08/2019 15:39:25 | 1023 | 1023 | SD | | | |
| 11/08/2019 20:02:52 | 1023 | 1023 | DI | | | |
| 11/08/2019 20:08:27 | 1023 | 1023 | EN | | | |

City 001654

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 11/08/2019 20:17:45 | 1023 | 1023 | AR | | | |
| 11/08/2019 21:37:57 | 1023 | 1023 | 09 | | | |
| 11/08/2019 21:38:19 | 1023 | 1023 | SD | | | |
| 11/08/2019 22:15:08 | 1023 | 1023 | 09 | | | |
| 11/08/2019 23:11:05 | 1023 | 1023 | AR | | | |
| 11/08/2019 23:11:05 | 1023 | 1023 | AR | | | |
| 11/08/2019 23:38:41 | 1023 | 1023 | 09 | | | |
| 11/09/2019 00:02:14 | 1023 | 1023 | SD | | | |
| 11/09/2019 00:20:27 | 1023 | 1023 | 06 | | | |
| 11/12/2019 8:35:17 | 1023 | 1023 | 09 | | | |
| 11/12/2019 18:35:23 | 1023 | 1023 | SD | | | |
| 11/12/2019 22:14:24 | 1023 | 1023 | 09 | | | |
| 11/13/2019 00:20:37 | 1023 | 1023 | 06 | | | |
| 11/13/2019 15:20:53 | 1023 | 1023 | 09 | | | |
| 11/13/2019 15:21:05 | 1023 | 1023 | SD | | | |
| 11/13/2019 20:11:46 | 1023 | 1023 | AR | 2019-00101274 / | | |
| 11/13/2019 20:11:46 | 1023 | 1023 | AR | 2019-00101274 / | | |
| 11/13/2019 20:12:18 | 1023 | 1023 | 09 | 2019-00101274 / | | |
| 11/13/2019 21:16:21 | 1023 | 1023 | SD | | | |
| 11/14/2019 01:47:20 | 1023 | 1023 | 09 | | | |
| 11/14/2019 06:15:18 | 1023 | 1023 | 06 | | | |
| 11/14/2019 5:47:16 | 1023 | 1023 | 09 | | | |
| 11/14/2019 15:47:31 | 1023 | 1023 | SD | | | |

City 001655

**Start Date/Time:**   10/22/2019 00:00:00

**End Date/Time:**   03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 11/14/2019 17:23:59 | 1023 | 1023 | AR | 2019-00101527 / | | |
| 11/14/2019 17:23:59 | 1023 | 1023 | AR | 2019-00101527 / | | |
| 11/14/2019 17:29:45 | 1023 | 1023 | 09 | 2019-00101527 / | | |
| 11/14/2019 17:30:10 | 1023 | 1023 | SD | | | |
| 11/15/2019 00:14:51 | 1023 | 1023 | 06 | | | |
| 11/19/2019 15:20:42 | 1023 | 1023 | 09 | | | |
| 11/19/2019 15:20:47 | 1023 | 1023 | SD | | | |
| 11/19/2019 18:13:52 | 1023 | 1023 | 10 | | | |
| 11/19/2019 19:58:18 | 1023 | 1023 | 09 | | | |
| 11/19/2019 19:58:26 | 1023 | 1023 | SD | | | |
| 11/20/2019 00:22:41 | 1023 | 1023 | 06 | | | |
| 11/20/2019 15:21:33 | 1023 | 1023 | 09 | | | |
| 11/20/2019 15:21:39 | 1023 | 1023 | SD | | | |
| 11/20/2019 21:35:34 | 1023 | 1023 | DI | / LWZD65 | | |
| 11/20/2019 21:35:37 | 1023 | 1023 | EN | / LWZD65 | | |
| 11/20/2019 22:23:32 | 1023 | 1023 | 09 | / LWZD65 | | |
| 11/21/2019 00:13:18 | 1023 | 1023 | 06 | | | |
| 11/26/2019 15:28:11 | 1023 | 1023 | 09 | | | |
| 11/26/2019 16:23:43 | 1023 | 1023 | SD | | | |
| 11/26/2019 18:36:58 | 1023 | 1023 | AR | 2019-00105233 / KGCT03 | | |
| 11/26/2019 18:36:58 | 1023 | 1023 | AR | 2019-00105233 / KGCT03 | | |
| 11/26/2019 18:46:17 | 1023 | 1023 | 09 | 2019-00105233 / KGCT03 | | |
| 11/27/2019 00:17:36 | 1023 | 1023 | 06 | | | |

City 001656

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|
| 11/27/2019 15:32:33 | 1023 | 1023 09 | | | |
| 11/27/2019 15:46:35 | 1023 | 1023 SD | | | |
| 11/28/2019 00:00:53 | 1023 | 1023 09 | | | |
| 11/28/2019 00:16:50 | 1023 | 1023 06 | | | |
| 11/28/2019 14:32:29 | 1023 | 1023 09 | | | |
| 11/28/2019 14:32:36 | 1023 | 1023 05 | | | |
| 11/28/2019 15:13:47 | 1023 | 1023 09 | | | |
| 11/28/2019 16:50:31 | 1023 | 1023 DI | | | |
| 11/28/2019 18:57:25 | 1023 | 1023 09 | | | |
| 11/29/2019 00:20:29 | 1023 | 1023 SD | | | |
| 11/29/2019 06:17:06 | 1023 | 1023 06 | | | |
| 12/03/2019 15:18:53 | 1023 | 1023 09 | | | |
| 12/03/2019 15:31:14 | 1023 | 1023 SD | | | |
| 12/03/2019 22:14:47 | 1023 | 1023 09 | | | |
| 12/04/2019 00:17:27 | 1023 | 1023 06 | | | |
| 12/04/2019 14:30:22 | 1023 | 1023 09 | | | |
| 12/04/2019 14:30:26 | 1023 | 1023 05 | | | |
| 12/04/2019 15:43:43 | 1023 | 1023 09 | | | |
| 12/04/2019 15:43:52 | 1023 | 1023 SD | | | |
| 12/05/2019 00:15:50 | 1023 | 1023 06 | | | |
| 12/05/2019 14:29:52 | 1023 | 1023 09 | | | |
| 12/05/2019 19:32:51 | 1023 | 1023 DI | | | |
| 12/05/2019 19:45:10 | 1023 | 1023 AR | | | |

City 001657

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 12/05/2019 22:21:54 | 1023 | 1023 | 09 | | | |
| 12/06/2019 00:17:44 | 1023 | 1023 | 06 | | | |
| 12/10/2019 14:41:30 | 1023 | 1023 | 09 | | | |
| 12/10/2019 14:41:38 | 1023 | 1023 | 05 | | | |
| 12/10/2019 15:16:04 | 1023 | 1023 | 09 | | | |
| 12/10/2019 15:16:12 | 1023 | 1023 | SD | | | |
| 12/10/2019 18:10:33 | 1023 | 1023 | DI | | 9TH ST & ALTON RD | |
| 12/10/2019 18:23:48 | 1023 | 1023 | AR | | 9TH ST & ALTON RD | |
| 12/10/2019 20:08:24 | 1023 | 1023 | 09 | | 9TH ST & ALTON RD | |
| 12/10/2019 20:13:09 | 1023 | 1023 | SD | | | |
| 12/11/2019 00:21:14 | 1023 | 1023 | 06 | | | |
| 12/11/2019 15:35:02 | 1023 | 1023 | 09 | | | |
| 12/11/2019 15:35:09 | 1023 | 1023 | SD | | | |
| 12/11/2019 17:44:28 | 1023 | 1023 | 06 | | | |
| 12/11/2019 17:44:30 | 1023 | 1023 | 09 | | | |
| 12/11/2019 17:44:39 | 1023 | 1023 | SD | | | |
| 12/11/2019 22:11:33 | 1023 | 1023 | 09 | | | |
| 12/12/2019 00:20:35 | 1023 | 1023 | 06 | | | |
| 12/12/2019 15:54:40 | 1023 | 1023 | 09 | | | |
| 12/12/2019 15:54:44 | 1023 | 1023 | SD | | | |
| 12/12/2019 22:52:09 | 1023 | 1023 | 06 | | | |
| 12/17/2019 1:33:45 | 1023 | 1023 | 09 | | | |
| 12/17/2019 17:05:44 | 1023 | 1023 | SD | | | |

City 001658

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 12/18/2019 00:18:13 | 1023 | 1023 | 06 | | | |
| 12/18/2019 15:35:26 | 1023 | 1023 | 09 | | | |
| 12/18/2019 15:35:38 | 1023 | 1023 | SD | | | |
| 12/18/2019 22:11:08 | 1023 | 1023 | 09 | | | |
| 12/18/2019 23:11:58 | 1023 | 1023 | SD | | | |
| 12/18/2019 23:40:57 | 1023 | 1023 | 09 | | | |
| 12/19/2019 00:31:19 | 1023 | 1023 | 06 | | | |
| 12/19/2019 16:14:20 | 1023 | 1023 | 09 | | | |
| 12/19/2019 16:28:21 | 1023 | 1023 | SD | | | |
| 12/19/2019 22:52:56 | 1023 | 1023 | AR | | | |
| 12/19/2019 22:52:56 | 1023 | 1023 | AR | | | |
| 12/20/2019 00:22:24 | 1023 | 1023 | 09 | | | |
| 12/20/2019 00:22:34 | 1023 | 1023 | 06 | | | |
| 12/20/2019 15:23:45 | 1023 | 1023 | 09 | | | |
| 12/20/2019 15:23:52 | 1023 | 1023 | SD | | | |
| 12/20/2019 20:49:25 | 1023 | 1023 | DI | | | |
| 12/20/2019 20:49:28 | 1023 | 1023 | EN | | | |
| 12/20/2019 20:51:47 | 1023 | 1023 | 09 | | | |
| 12/20/2019 20:51:55 | 1023 | 1023 | SD | | | |
| 12/20/2019 22:08:31 | 1023 | 1023 | 09 | | | |
| 12/21/2019 00:05:44 | 1023 | 1023 | SD | | | |
| 12/21/2019 00:14:52 | 1023 | 1023 | 06 | | | |
| 12/26/2019 14:32:34 | 1023 | 1023 | 09 | | | |

City 001659

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 12/26/2019 14:32:42 | 1023 | 1023 | 05 | | | |
| 12/26/2019 15:21:47 | 1023 | 1023 | 09 | | | |
| 12/26/2019 15:21:53 | 1023 | 1023 | SD | | | |
| 12/27/2019 00:15:44 | 1023 | 1023 | 06 | | | |
| 12/27/2019 14:37:10 | 1023 | 1023 | 09 | | | |
| 12/27/2019 14:37:14 | 1023 | 1023 | 05 | | | |
| 12/27/2019 15:44:13 | 1023 | 1023 | 09 | | | |
| 12/27/2019 17:38:38 | 1023 | 1023 | SD | | | |
| 12/27/2019 21:06:01 | 1023 | 1023 | DI | | | |
| 12/27/2019 23:17:31 | 1023 | 1023 | 09 | | | |
| 12/27/2019 23:17:37 | 1023 | 1023 | SD | | | |
| 12/28/2019 00:16:13 | 1023 | 1023 | 06 | | | |
| 12/31/2019 17:04:12 | 1023 | 1023 | 09 | | | |
| 12/31/2019 17:04:16 | 1023 | 1023 | SD | | | |
| 01/01/2020 00:18:32 | 1023 | 1023 | 06 | | | |
| 01/01/2020 14:35:49 | 1023 | 1023 | 09 | | | |
| 01/01/2020 14:37:12 | 1023 | 1023 | SD | | | |
| 01/01/2020 17:05:59 | 1023 | 1023 | AR | 2020-00000236 / | | |
| 01/01/2020 17:05:59 | 1023 | 1023 | AR | 2020-00000236 / | | |
| 01/01/2020 19:17:05 | 1023 | 1023 | 09 | 2020-00000236 / | | |
| 01/01/2020 19:22:15 | 1023 | 1023 | SD | | | |
| 01/02/2020 00:14:33 | 1023 | 1023 | 06 | | | |
| 01/02/2020 15:14:50 | 1023 | 1023 | 09 | | | |

City 001660

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 01/02/2020 15:14:56 | 1023 | 1023 | 05 | | | |
| 01/02/2020 16:58:22 | 1023 | 1023 | 09 | | | |
| 01/02/2020 16:58:33 | 1023 | 1023 | SD | | | |
| 01/03/2020 00:14:22 | 1023 | 1023 | 06 | | | |
| 01/03/2020 16:15:27 | 1023 | 1023 | 09 | | | |
| 01/03/2020 16:15:31 | 1023 | 1023 | SD | | | |
| 01/03/2020 21:30:13 | 1023 | 1023 | AR | | | |
| 01/03/2020 21:30:13 | 1023 | 1023 | AR | | | |
| 01/03/2020 22:20:31 | 1023 | 1023 | AR | | | |
| 01/03/2020 23:28:10 | 1023 | 1023 | 09 | | | |
| 01/04/2020 00:14:17 | 1023 | 1023 | 06 | | | |
| 01/07/2020 14:44:34 | 1023 | 1023 | 09 | | | |
| 01/07/2020 14:44:38 | 1023 | 1023 | 05 | | | |
| 01/07/2020 16:47:21 | 1023 | 1023 | 09 | | | |
| 01/07/2020 16:47:27 | 1023 | 1023 | SD | | | |
| 01/07/2020 22:34:10 | 1023 | 1023 | 09 | | | |
| 01/08/2020 00:16:07 | 1023 | 1023 | 06 | | | |
| 01/08/2020 14:32:38 | 1023 | 1023 | 09 | | | |
| 01/08/2020 14:32:42 | 1023 | 1023 | 05 | | | |
| 01/08/2020 16:16:31 | 1023 | 1023 | 09 | | | |
| 01/08/2020 16:16:40 | 1023 | 1023 | SD | | | |
| 01/09/2020 00:16:16 | 1023 | 1023 | 06 | | | |
| 01/09/2020 10:06:33 | 1023 | 1023 | 09 | | | |

City 001661

Start Date/Time:   10/22/2019 00:00:00

End Date/Time:   03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 01/09/2020 10:06:33 | 1023 | 1023 | AR | | | |
| 01/09/2020 10:06:33 | 1023 | 1023 | AR | | | |
| 01/09/2020 11:20:28 | 1023 | 1023 | 09 | | | |
| 01/09/2020 11:20:32 | 1023 | 1023 | 06 | | | |
| 01/09/2020 11:24:49 | 1023 | 1023 | 09 | | | |
| 01/09/2020 11:24:50 | 1023 | 1023 | 06 | | | |
| 01/09/2020 15:20:29 | 1023 | 1023 | 09 | | | |
| 01/09/2020 15:20:36 | 1023 | 1023 | OL | | | |
| 01/09/2020 16:15:58 | 1023 | 1023 | 09 | | | |
| 01/09/2020 2:36:32 | 1023 | 1023 | SD | | | |
| 01/10/2020 00:18:26 | 1023 | 1023 | 06 | | | |
| 01/10/2020 15:24:14 | 1023 | 1023 | 09 | | | |
| 01/10/2020 15:24:21 | 1023 | 1023 | OL | | | |
| 01/10/2020 16:18:59 | 1023 | 1023 | AR | 2020-00003111 / | | |
| 01/10/2020 16:18:59 | 1023 | 1023 | AR | 2020-00003111 / | | |
| 01/10/2020 16:26:49 | 1023 | 1023 | 09 | 2020-00003111 / | | |
| 01/10/2020 16:26:52 | 1023 | 1023 | DI | | | |
| 01/10/2020 16:26:57 | 1023 | 1023 | EN | | | |
| 01/10/2020 17:54:53 | 1023 | 1023 | 09 | | | |
| 01/10/2020 17:55:04 | 1023 | 1023 | EN | | | |
| 01/10/2020 17:55:04 | 1023 | 1023 | EN | | | |
| 01/10/2020 :56:24 | 1023 | 1023 | 09 | | | |
| 01/10/2020 18:05:18 | 1023 | 1023 | SD | | | |

City 001662

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 01/11/2020 00:15:19 | 1023 | 1023 | 06 | | | |
| 01/14/2020 15:05:08 | 1023 | 1023 | 09 | | | |
| 01/14/2020 15:05:10 | 1023 | 1023 | OL | | | |
| 01/14/2020 16:57:03 | 1023 | 1023 | 09 | | | |
| 01/14/2020 17:10:23 | 1023 | 1023 | 10 | | | |
| 01/14/2020 17:36:22 | 1023 | 1023 | 09 | | | |
| 01/14/2020 17:54:24 | 1023 | 1023 | SD | | | |
| 01/14/2020 17:54:38 | 1023 | 1023 | 06 | | | |
| 01/23/2020 06:36:29 | 1023 | 1023 | 09 | | | |
| 01/23/2020 08:00:24 | 1023 | 1023 | 10 | | | |
| 01/23/2020 09:46:10 | 1023 | 1023 | 09 | | | |
| 01/23/2020 19:52:54 | 1023 | 1023 | 06 | | | |
| 01/25/2020 08:55:27 | 1023 | 1023 | 09 | | | |
| 01/25/2020 08:56:37 | 1023 | 1023 | SD | | | |
| 01/25/2020 19:11:06 | 1023 | 1023 | 06 | | | |
| 01/26/2020 11:35:37 | 1023 | 1023 | 09 | | | |
| 01/26/2020 20:34:38 | 1023 | 1023 | 06 | | | |
| 01/28/2020 12:17:43 | 1023 | 1023 | 09 | | | |
| 01/29/2020 05:55:27 | 1023 | 1023 | 06 | | | |
| 01/30/2020 16:09:36 | 1023 | 1023 | EN | | | |
| 01/30/2020 16:09:36 | 1023 | 1023 | EN | | | |
| 01/30/2020 16:11:53 | 1023 | 1023 | 09 | | | |
| 01/30/2020 23:33:53 | 1023 | 1023 | 06 | | | |

City 001663

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 02/01/2020 20:00:41 | 1023 | 1023 | AR | | | |
| 02/01/2020 20:00:41 | 1023 | 1023 | AR | | | |
| 02/01/2020 20:22:17 | 1023 | 1023 | 09 | | | |
| 02/02/2020 00:17:10 | 1023 | 1023 | 06 | | | |
| 02/04/2020 16:08:47 | 1023 | 1023 | 09 | | | |
| 02/04/2020 16:31:24 | 1023 | 1023 | SD | | | |
| 02/05/2020 00:15:05 | 1023 | 1023 | 06 | | | |
| 02/05/2020 15:59:12 | 1023 | 1023 | 09 | | | |
| 02/05/2020 22:21:28 | 1023 | 1023 | EN | | | |
| 02/05/2020 22:21:28 | 1023 | 1023 | EN | | | |
| 02/05/2020 22:42:48 | 1023 | 1023 | AR | | | |
| 02/06/2020 00:16:14 | 1023 | 1023 | 09 | | | |
| 02/06/2020 00:16:15 | 1023 | 1023 | 06 | | | |
| 02/06/2020 17:05:19 | 1023 | 1023 | 09 | | | |
| 02/06/2020 17:59:43 | 1023 | 1023 | SD | | | |
| 02/07/2020 00:21:48 | 1023 | 1023 | 06 | | | |
| 02/07/2020 15:37:15 | 1023 | 1023 | 09 | | | |
| 02/07/2020 15:37:23 | 1023 | 1023 | OL | | | |
| 02/07/2020 16:41:48 | 1023 | 1023 | 09 | | | |
| 02/07/2020 16:42:11 | 1023 | 1023 | SD | | | |
| 02/07/2020 17:15:58 | 1023 | 1023 | AR | / LZZU791 | | |
| 02/07/2020 17:15:58 | 1023 | 1023 | AR | / LZZU791 | | |
| 02/07/2020 18:40:04 | 1023 | 1023 | 09 | / LZZU791 | | |

City 001664

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 02/07/2020 18:40:14 | 1023 | 1023 | 05 | | | |
| 02/07/2020 19:12:43 | 1023 | 1023 | 10 | | | |
| 02/07/2020 20:50:38 | 1023 | 1023 | 09 | | | |
| 02/08/2020 00:37:12 | 1023 | 1023 | 06 | | | |
| 02/11/2020 15:20:03 | 1023 | 1023 | 09 | | | |
| 02/11/2020 15:20:07 | 1023 | 1023 | OL | | | |
| 02/11/2020 16:16:02 | 1023 | 1023 | 09 | | | |
| 02/11/2020 16:16:45 | 1023 | 1023 | SD | | | |
| 02/11/2020 20:51:53 | 1023 | 1023 | DI | | | |
| 02/11/2020 21:00:35 | 1023 | 1023 | 09 | | | |
| 02/11/2020 21:00:48 | 1023 | 1023 | SD | | | |
| 02/11/2020 21:28:33 | 1023 | 1023 | DI | | | |
| 02/11/2020 21:32:46 | 1023 | 1023 | AR | | | |
| 02/11/2020 21:42:39 | 1023 | 1023 | 09 | | | |
| 02/11/2020 21:58:35 | 1023 | 1023 | SD | | | |
| 02/12/2020 00:37:37 | 1023 | 1023 | 06 | | | |
| 02/12/2020 16:02:28 | 1023 | 1023 | 09 | | | |
| 02/12/2020 16:02:44 | 1023 | 1023 | SD | | | |
| 02/12/2020 19:40:46 | 1023 | 1023 | DI | | | |
| 02/12/2020 19:40:48 | 1023 | 1023 | EN | | | |
| 02/12/2020 19:54:54 | 1023 | 1023 | 09 | | | |
| 02/12/2020 19:55:17 | 1023 | 1023 | AR | 2020-00012841 / IFPA22 | | |
| 02/12/2020 19:55:17 | 1023 | 1023 | AR | 2020-00012841 / IFPA22 | | |

City 001665

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 02/12/2020 19:58:02 | 1023 | 1023 | 09 | 2020-00012841 / IFPA22 | | |
| 02/12/2020 19:58:09 | 1023 | 1023 | EN | | | |
| 02/12/2020 19:58:09 | 1023 | 1023 | EN | | | |
| 02/12/2020 19:58:55 | 1023 | 1023 | AR | | | |
| 02/12/2020 20:06:50 | 1023 | 1023 | 09 | | | |
| 02/12/2020 22:30:42 | 1023 | 1023 | SD | | | |
| 02/13/2020 00:26:09 | 1023 | 1023 | 06 | | | |
| 02/13/2020 16:03:28 | 1023 | 1023 | 09 | | | |
| 02/13/2020 16:59:36 | 1023 | 1023 | SD | | | |
| 02/14/2020 0:16:05 | 1023 | 1023 | 06 | | | |
| 02/18/2020 15:15:36 | 1023 | 1023 | 09 | | | |
| 02/18/2020 15:15:38 | 1023 | 1023 | OL | | | |
| 02/18/2020 16:41:30 | 1023 | 1023 | 09 | | | |
| 02/18/2020 16:41:34 | 1023 | 1023 | SD | | | |
| 02/18/2020 17:03:45 | 1023 | 1023 | DI | | | |
| 02/18/2020 17:04:03 | 1023 | 1023 | EN | | | |
| 02/18/2020 17:07:52 | 1023 | 1023 | 09 | | | |
| 02/18/2020 17:07:52 | 1023 | 1023 | DI | | | |
| 02/18/2020 17:20:29 | 1023 | 1023 | 09 | | | |
| 02/18/2020 22:56:26 | 1023 | 1023 | EN | | | |
| 02/18/2020 22:56:26 | 1023 | 1023 | EN | | | |
| 02/18/2020 :13:53 | 1023 | 1023 | 09 | | | |
| 02/19/2020 00:35:31 | 1023 | 1023 | 06 | | | |

City 001666

| | Start Date/Time: | 10/22/2019 00:00:00 |
| | End Date/Time: | 03/23/2020 23:59:59 |

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 02/19/2020 15:15:47 | 1023 | 1023 | 09 | | | |
| 02/19/2020 15:15:55 | 1023 | 1023 | SD | | | |
| 02/19/2020 20:38:27 | 1023 | 1023 | EN | | 3RD FL | |
| 02/19/2020 20:38:27 | 1023 | 1023 | EN | | 3RD FL | |
| 02/19/2020 20:41:23 | 1023 | 1023 | AR | | 3RD FL | |
| 02/19/2020 20:57:40 | 1023 | 1023 | 09 | | 3RD FL | |
| 02/19/2020 20:58:29 | 1023 | 1023 | SD | | | |
| 02/19/2020 23:36:37 | 1023 | 1023 | 05 | | | |
| 02/20/2020 00:15:13 | 1023 | 1023 | 06 | | | |
| 02/20/2020 06:55:16 | 1023 | 1023 | 09 | | | |
| 02/20/2020 23:04:57 | 1023 | 1023 | SD | | | |
| 02/21/2020 00:13:19 | 1023 | 1023 | 06 | | | |
| 02/21/2020 15:36:17 | 1023 | 1023 | 09 | | | |
| 02/21/2020 15:51:49 | 1023 | 1023 | SD | | | |
| 02/22/2020 00:12:58 | 1023 | 1023 | 06 | | | |
| 02/26/2020 15:45:32 | 1023 | 1023 | 09 | | | |
| 02/26/2020 16:16:45 | 1023 | 1023 | SD | | | |
| 02/26/2020 20:26:42 | 1023 | 1023 | DI | | | |
| 02/26/2020 20:26:44 | 1023 | 1023 | EN | | | |
| 02/26/2020 20:27:29 | 1023 | 1023 | 09 | | | |
| 02/26/2020 20:27:35 | 1023 | 1023 | DI | | | |
| 02/26/2020 20:28:14 | 1023 | 1023 | EN | | | |
| 02/26/2020 20:29:07 | 1023 | 1023 | 09 | | | |

City 001667

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 02/26/2020 20:29:13 | 1023 | 1023 | SD | | | |
| 02/26/2020 20:52:49 | 1023 | 1023 | DI | 2020-00016972 / | | |
| 02/26/2020 20:53:58 | 1023 | 1023 | 09 | 2020-00016972 / | | |
| 02/26/2020 20:54:02 | 1023 | 1023 | SD | | | |
| 02/26/2020 23:02:57 | 1023 | 1023 | 09 | | | |
| 02/27/2020 00:14:23 | 1023 | 1023 | 06 | | | |
| 02/27/2020 16:13:08 | 1023 | 1023 | 09 | | | |
| 02/27/2020 22:34:46 | 1023 | 1023 | SD | | | |
| 02/28/2020 00:12:54 | 1023 | 1023 | 06 | | | |
| 02/28/2020 5:09:15 | 1023 | 1023 | 09 | | | |
| 02/28/2020 15:09:22 | 1023 | 1023 | OL | | | |
| 02/28/2020 16:19:10 | 1023 | 1023 | 09 | | | |
| 02/28/2020 23:41:18 | 1023 | 1023 | SD | | | |
| 02/29/2020 00:10:19 | 1023 | 1023 | 06 | | | |
| 03/03/2020 06:33:33 | 1023 | 1023 | 09 | | | |
| 03/03/2020 06:33:41 | 1023 | 1023 | 05 | | | |
| 03/03/2020 06:34:05 | 1023 | 1023 | 09 | | | |
| 03/03/2020 06:34:21 | 1023 | 1023 | 05 | | | |
| 03/03/2020 07:27:33 | 1023 | 1023 | 09 | | | |
| 03/03/2020 07:27:40 | 1023 | 1023 | SD | | | |
| 03/03/2020 14:17:11 | 1023 | 1023 | 06 | | | |
| 03/05/2020 7:48:25 | 1023 | 1023 | 09 | | | |
| 03/05/2020 07:50:16 | 1023 | 1023 | SD | | | |

City 001668

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 03/05/2020 09:42:58 | 1023 | 1023 | DI | | 15TH ST/OCEAN | |
| 03/05/2020 09:42:58 | 1023 | 1023 | DI | | ON TAC 7 | |
| 03/05/2020 09:58:42 | 1023 | 1023 | SL | | 15TH ST/OCEAN | |
| 03/05/2020 09:58:42 | 1023 | 1023 | SL | | ON TAC 7 | |
| 03/05/2020 10:23:53 | 1023 | 1023 | 09 | | 15TH ST/OCEAN | |
| 03/05/2020 10:23:53 | 1023 | 1023 | 09 | | ON TAC 7 | |
| 03/05/2020 10:45:09 | 1023 | 1023 | SD | | | |
| 03/05/2020 16:20:04 | 1023 | 1023 | 06 | | | |
| 03/06/2020 07:25:00 | 1023 | 1023 | 09 | | | |
| 03/06/2020 08:17:12 | 1023 | 1023 | SD | | | |
| 03/06/2020 08:49:34 | 1023 | 1023 | 09 | | | |
| 03/06/2020 09:33:58 | 1023 | 1023 | SD | | | |
| 03/06/2020 19:17:14 | 1023 | 1023 | 06 | | | |
| 03/06/2020 19:19:16 | 1023 | 1023 | 09 | | | |
| 03/06/2020 19:19:18 | 1023 | 1023 | 06 | | | |
| 03/07/2020 06:21:14 | 1023 | 1023 | 09 | | | |
| 03/07/2020 06:21:16 | 1023 | 1023 | 05 | | | |
| 03/07/2020 07:33:23 | 1023 | 1023 | 09 | | | |
| 03/07/2020 14:54:04 | 1023 | 1023 | SD | | | |
| 03/07/2020 19:16:51 | 1023 | 1023 | 06 | | | |
| 03/08/2020 06:31:34 | 1023 | 1023 | 09 | | | |
| 03/08/2020 06:31:43 | 1023 | 1023 | 05 | | | |
| 03/08/2020 07:15:05 | 1023 | 1023 | 09 | | | |

City 001669

Start Date/Time: 10/22/2019 00:00:00

End Date/Time: 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 03/08/2020 16:11:32 | 1023 | 1023 | 10 | | | |
| 03/08/2020 19:45:16 | 1023 | 1023 | 06 | | | |
| 03/09/2020 06:35:19 | 1023 | 1023 | 09 | | | |
| 03/09/2020 06:35:36 | 1023 | 1023 | 05 | | | |
| 03/09/2020 07:38:14 | 1023 | 1023 | 09 | | | |
| 03/09/2020 15:40:30 | 1023 | 1023 | SD | | | |
| 03/09/2020 20:13:36 | 1023 | 1023 | 06 | | | |
| 03/10/2020 07:19:54 | 1023 | 1023 | 09 | | | |
| 03/10/2020 07:20:21 | 1023 | 1023 | 10 | | | |
| 03/10/2020 10:02:23 | 1023 | 1023 | AR | | | |
| 03/10/2020 10:02:23 | 1023 | 1023 | AR | | | |
| 03/10/2020 10:03:13 | 1023 | 1023 | 09 | | | |
| 03/10/2020 19:57:28 | 1023 | 1023 | 06 | | | |
| 03/12/2020 08:13:53 | 1023 | 1023 | 09 | | | |
| 03/12/2020 08:14:03 | 1023 | 1023 | SD | | | |
| 03/12/2020 17:02:28 | 1023 | 1023 | EN | | | |
| 03/12/2020 17:02:28 | 1023 | 1023 | EN | | | |
| 03/12/2020 17:06:56 | 1023 | 1023 | AR | | | |
| 03/12/2020 18:24:40 | 1023 | 1023 | 09 | | | |
| 03/12/2020 19:31:57 | 1023 | 1023 | 05 | | | |
| 03/12/2020 19:52:45 | 1023 | 1023 | 06 | | | |
| 03/13/2020 3:11:40 | 1023 | 1023 | 09 | | | |
| 03/13/2020 20:08:52 | 1023 | 1023 | 06 | | | |

City 001670

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 03/14/2020 07:32:24 | 1023 | 1023 | 09 | | | |
| 03/14/2020 07:32:44 | 1023 | 1023 | SD | | | |
| 03/14/2020 19:44:22 | 1023 | 1023 | 06 | | | |
| 03/15/2020 07:44:06 | 1023 | 1023 | 09 | | | |
| 03/15/2020 08:21:12 | 1023 | 1023 | SD | | | |
| 03/15/2020 19:44:09 | 1023 | 1023 | 09 | | | |
| 03/15/2020 19:45:58 | 1023 | 1023 | 06 | | | |
| 03/16/2020 09:11:16 | 1023 | 1023 | 09 | | | |
| 03/16/2020 15:41:50 | 1023 | 1023 | SD | | | |
| 03/16/2020 19:45:32 | 1023 | 1023 | 06 | | | |
| 03/17/2020 07:56:16 | 1023 | 1023 | 09 | | | |
| 03/17/2020 07:56:22 | 1023 | 1023 | SD | | | |
| 03/17/2020 17:42:50 | 1023 | 1023 | 05 | | | |
| 03/17/2020 19:09:40 | 1023 | 1023 | 09 | | | |
| 03/17/2020 19:46:43 | 1023 | 1023 | 06 | | | |
| 03/19/2020 07:41:11 | 1023 | 1023 | 09 | | | |
| 03/19/2020 07:41:21 | 1023 | 1023 | SD | | | |
| 03/19/2020 19:43:42 | 1023 | 1023 | 06 | | | |
| 03/20/2020 07:47:26 | 1023 | 1023 | 09 | | | |
| 03/20/2020 07:47:46 | 1023 | 1023 | SD | | | |
| 03/20/2020 19:54:51 | 1023 | 1023 | 06 | | | |
| 03/21/2020 07:04:48 | 1023 | 1023 | 09 | | | |
| 03/21/2020 07:04:51 | 1023 | 1023 | SD | | | |

City 001671

**Start Date/Time:** 10/22/2019 00:00:00

**End Date/Time:** 03/23/2020 23:59:59

# Officer Activity Report

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 03/21/2020 09:59:17 | 1023 | 1023 | 10 | | | |
| 03/21/2020 11:30:29 | 1023 | 1023 | 09 | | | |
| 03/21/2020 11:30:33 | 1023 | 1023 | 10 | | | |
| 03/21/2020 13:12:29 | 1023 | 1023 | 09 | | | |
| 03/21/2020 13:12:33 | 1023 | 1023 | SD | | | |
| 03/21/2020 19:38:36 | 1023 | 1023 | 06 | | | |
| 03/22/2020 07:04:13 | 1023 | 1023 | 09 | | | |
| 03/22/2020 07:33:26 | 1023 | 1023 | 05 | | | |
| 03/22/2020 08:58:50 | 1023 | 1023 | 09 | | | |
| 03/22/2020 8:59:03 | 1023 | 1023 | SD | | | |
| 03/22/2020 19:40:06 | 1023 | 1023 | 06 | | | |
| 03/23/2020 07:31:37 | 1023 | 1023 | 09 | | | |
| 03/23/2020 09:15:25 | 1023 | 1023 | SD | | | |
| 03/23/2020 18:41:36 | 1023 | 1023 | 06 | | | |
| 03/23/2020 18:47:01 | 1023 | 1023 | 09 | | | |
| 03/23/2020 19:40:30 | 1023 | 1023 | 06 | | | |

City 001672

Start Date/Time: 04/22/2020 00:00:00

End Date/Time: 04/22/2020 23:59:59

# Officer Activity Report

**Agency:** FL0130700 - Miami Beach Police Department **Units:** ALL

**Personnel:** Salabarria, Jessica - 1023

| Statuses: | | | | | | |
|---|---|---|---|---|---|---|
| SD: | | 4h 41m 29s | 29.75 % | **Total Statuses:** | 1 | |
| 06: | | 5h 18m 36s | 33.67 % | **Total Dispatches:** | 0 | |
| 09: | | 5h 46m 15s | 36.59 % | **Total Busy:** | 1 | |
| Total: | | 15h 46m 20s | 100.00 % | **Total Traffic Stops:** | 0 | |

**Total Time:** 0 Days 15 Hours 46 Minutes 20 Seconds

| Activity Date/Time | Unit # | Badge # | Status | Incident #/ Plate | Unit Location | Nature Of Call |
|---|---|---|---|---|---|---|
| 04/22/2020 08:13:39 | 1023 | 1023 | 09 | | | |
| 04/22/2020 13:59:54 | 1023 | 1023 | SD | | | |
| 04/22/2020 18:41:23 | 1023 | 1023 | 06 | | | |

City 001673



EXHIBIT

# 2

04.23.24 N. GUASTO  SF

## <u>SETTLEMENT AGREEMENT</u>

The SETTLEMENT AGREEMENT ("Agreement") is entered into between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); NICHOLAS GUASTO ("Guasto") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Guasto is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Guasto; and

WHEREAS, Guasto was the subject of Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, the Parties, wish to settle all discipline associated with the Investigation and wish to resolve all other disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, the Parties agree as follows:

1.      <u>Recitals</u>.  The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.      <u>Discipline</u>.  Guasto and the FOP agree that, by executing this Agreement, they will simultaneously withdraw, with prejudice, any and all grievances. Additionally, Guasto agrees to accept a Twenty (20) hour suspension, to be completed by the end of 2021. Guasto agrees to pay back One Hundred and Thirty-Six (136) hours of regular time, which is a total amount due of Seven Thousand Two Hundred Seventeen Dollars and 52/100 ($7,217.52). The total amount due was calculated using an hourly rate of $53.07/hour. Guasto must pay back the entire amount referenced herein on or before 365 days from the date of his execution of this Agreement (the "Due Date"). If Guasto fails to make complete payment on or before the Due Date, the City is authorized to take the equivalent of the remaining amounts due from any of Guasto's leave banks. Finally, Guasto agrees that he is not eligible for any promotional opportunities in the year 2021 and for the length of the current Sergeant and Lieutenant Promotional Lists, which run past the year 2021. For the avoidance of confusion, this means that Guasto is not eligible for any promotions until the expiration of the aforementioned Promotional Lists.

3.      <u>Revocation of Written Reprimand</u>. On February 9, 2021, Guasto received a written reprimand (the "Reprimand"). Separate from any consideration herein, the City revokes the Reprimand. The Reprimand is referenced herein for convenience purposes only. The revocation of the Reprimand is not connected to any consideration provided by Guasto. The Reprimand cannot be used by the City in considering future discipline.

4.   <u>Release Of Claims, Covenant Not To Sue</u>.  Guasto hereby releases and waives any and all claims of any kind whatsoever against the City that he had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement.

The disputes released by Guasto also include any and all disputes he had, has or may believe to have against the City in contract or at common law, including, but not limited to:  breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Notwithstanding anything contained herein, this release does not include a release of any workers compensation claims.

Guasto further covenants and agrees that he will not file a lawsuit or claim of any kind asserting the claims released herein. Guasto understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but he does understand and agree that, not only is he releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by him or on his behalf. Guasto hereby represents that he has not assigned to any person or entity any rights to the claims released herein.

5.   <u>Effect; Precedent</u>.  The Parties agree that Guasto remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind.

6.      <u>Consideration</u>.  The consideration for this Agreement are the mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

7.      <u>Miscellaneous</u>.  This Agreement is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral. The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever. This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release," is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.


CITY OF MIAMI BEACH         NICHOLAS GUASTO         FRATERNAL ORDER OF
                                                    POLICE, LODGE 8

By_____         _____       By_____
City Manager                NICHOLAS GUASTO         ~~President~~ Vice President


_____           _07/07/2021_            _7/8/2021_
DATE                        DATE                     DATE

CHIEF OF POLICE


_____
RICK CLEMENTS
Chief of Police


3

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

**Charge Presented To:**

[ ] FEPA
[X] EEOC

**Agency(ies) Charge No(s):**

510-2020-04794

EXHIBIT
3
04.23.24 N. GUASTO SF

**Florida Commission on Human Relations** and EEOC

*State or local Agency, if any*

| | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Name (Indicate Mr., Ms., Mrs.)<br>Ms. Jessica Sallabarria | | 1991 |

**Street Address** City, State and ZIP Code

117 NW 42nd Ave # 1008, Miami Fl 33126. [Confidential per Fla. Stat. s. 119.071 – Do not disclose in FOIA]

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of Miami Beach – Police Department | 15-100 | 305-673-7901 |

**Street Address** City, State and ZIP Code

1100 Washington Avenue          Miami Beach, FL 33139

| | | Earliest | Latest |
|---|---|---|---|
| [ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [X] NATIONAL ORIGIN | | 09/2019 | |
| [X] RETALIATION [ ] AGE [ ] DISABILITY [ ] GENETIC INFORMATION | | | |
| [ ] OTHER (Specify) | | [X] CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am female. I had a previous EEOC Claim against the City which was resolved in full when I reinstated to the position of Sergeant in September 2019. After I resolved my prior EEOC complaint, I started to receive sexually explicit text messages from a command staff member. I did not report the harassment for fear of retaliation as I was on a probationary status after being reinstated to Sergeant and given that another female sergeant in the department also reported sexual harassment and was retaliated against. Also, after I resolved my prior EEO Complaint, I had an issue in October or November of 2019 where Lieutenant Garcia was screenshotting personal pictures of my social media and forwarding it to the whole police station. Within a few days my personal pictures were on the phones of most of my colleagues. This was humiliating and mortifying. My colleagues were talking about the photograph and would come up to me to show me and when I asked, they said it come from Lieutenant Eduardo Garcia. Lieutenant Garcia used to ask me to join him for breakfast or to work out in the gym and when I would say no, he would get cold with me. He pulled me aside and attacked my personality, saying I needed to be more of an extrovert and less of an introvert

From February 2020 and onward, I was subjected to a hostile environment such as when my supervisors and others openly engage in sexually inappropriate and offensive comments and viewing pornographic videos in the workplace on their cellphones. The Lieutenants and Sergeants would openly laugh and make comments like "this is how so and so got the new position, or this is what you have to do around here to get in a specialized unit." Captain M. Rivero has been present while sergeants and lieutenants make sexual innuendo comments and she would laugh about it and not stop the behavior. I have been subjected to listening to my colleagues talk about penis enlargements and detail how the procedure is done. I have had to listen to some of my colleagues disparage black supervisors and use derogatory comments like "these negros are entitled and racist." I continuously have to listen to all my male colleagues who hold supervisory positions talk about women and sex on a constant basis.

Continued on following page

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| | 1/13/2020 |
| 7/13/2020 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) July 13th, 2020 |
| Date          Charging Party Signature | |

EEOC-MDO
Recieved 07/15/2020

EDUARDO PAZ
MY COMMISSION # GG 054055
EXPIRES: 00/19/2022
Bonded Thru Notary Public Underwriters

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| **Florida Commission on Human Relations** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

*Continued from page 1*

In or about February of 2020, I had another Lieutenant asking several sergeants whom he saw speaking to me if they were sleeping with me. This Lieutenant also made comments such as I could rule the department if sleep my way to the top. I've also had a Major inappropriately grabbing my wrist in an inappropriate manner under the guise to personally inspect my tattoo and then he started to ask me personal questions about my relationship status.

Another situation in Feb/Mar 2020 occurred when a male Sgt. was verbally counseled for violating a state emergency order by having lunch in a restaurant after the city and governor advised no person shall eat inside any establishment. He was seen eating inside a restaurant with two (2) other officers. The officers and the sergeant did not receive any discipline. Instead, I was punished by being switched with the sergeant in lieu of the sergeant receiving discipline. Lieutenant Flanagan, Lieutenant Baldwin, and Lieutenant Dohler advised me verbally of the switch in area of responsibility and stated they are making this switch to protect the male sergeant from receiving formal written discipline.

In March or April of 2020, I was having a conversation with a Lieutenant when I told him that an officer would be coming in a couple hours late due to a dental visit where he would be getting a tooth filling. The Lieutenant responded with "what is he doing? A rectum filling?" A few weeks later, the Lieutenant started to imitate sexual acts in the workplace and saying, "this is what Andrew Gillum was doing last night" he also made a comment that the Covid-19 temperature checks were going to be conducted through the rectum.

I've also been subjected to disparate treatment. For example, even though command staff has stated that we need to have less contact with the public due to Covid, In May 2020, Ast Chief Acosta threatened to send me home if my vehicle didn't move much from the station which is uncomfortable considering the fact sergeants and lieutenants sleep on duty in the office and in their cars while working in front of me or in front of their supervisors. Yet no one tells them to move their vehicles.

In April 2020, my personal cell phone had run out of battery during my tour of duty and I left it in the car charging. One of my Lieutenants demanded me to respond to the Lieutenant's office and demanded to see my personal cell phone to check its battery life. I stated that her phone was in the car charging and that it was out of battery. I felt targeted and harassed as I had never seen anyone else be required or having been demanded to produce their personal phone for inspection by a supervisor. As I exited, I was contacted by several other supervisors who were appalled at this treatment and advised me that the Lieutenant had planned to make this request of her. That he stated verbatim "I know she's lying and when she walks in here, I am going to ask to see her phone."

Also on April 22, 2020, I was on the phone with Lt. Dohler and told him I was running late because I had a personal emergency due to a gastrointestinal issue. I had severe stomach cramps and could not hold the pain or keep from using the restroom. I had to shower again. As I was on my way in, the Lieutenant radioed me and asked what restroom I was in. I advised the lieutenant that I would be in the 5th-floor range restroom because that was the restroom I was headed towards. I was running up the station garage stairs because I had to use that restroom and I knew that would be the only one stall restroom I could use to maintain privacy and dignity. When I arrived, the lieutenants would be waiting for me outside the restroom door in a tactical position sneaking around standing in front of the restroom. When I walked in, I found both lieutenants in that position and asked what they were doing. They demanded to know who was in the restroom and who was I with. I was confused as to why they would be asking her this when I told Lieutenant Dohler of my emergency. I was humiliated due to this incident. Later, the same lieutenant filed an internal affairs complaint based on this incident which is currently pending.

When the above comments and behavior takes place in the workplace, I remove myself from the situation, but then I am criticized for not being a team player or for being an introvert.

In June of 2020, I had Lieutenant make comments in front of me that it's the Hispanics causing riots in Miami and making the protests violent, knowing very well I am a Hispanic female.

I have also had co-workers tell me that they did not want to be associated with me specifically because of my prior harassment/discrimination complaints.

I believe that I was subjected to sexual harassment and sexual discrimination, national origin discrimination, and retaliation because of my objections and complaints of the discriminatory behavior in the workplace in violation of Title VII of the Civil Rights Act of 1964, as amended, the Florida Civil Rights Act of 1992, as amended.



## SETTLEMENT AGREEMENT

The SETTLEMENT AGREEMENT ("Agreement") is entered into, by, and between the CITY OF MIAMI BEACH, its elected and appointed officials, its employees, and its insurers, attorneys, or agents of any kind (collectively, the "City"); JESSICA SALABARRIA ("Salabarria") and the FRATERNAL ORDER OF POLICE, WILLIAM NICHOLS LODGE NO. 8 ("FOP") (all collectively, the "Parties").

WHEREAS, Salabarria is employed by the City in its Police Department; and

WHEREAS, the FOP is the exclusive bargaining representative for a bargaining unit of City police employees, including Salabarria; and

WHEREAS, Salabarria is the subject of an on-going Internal Affairs investigation, I.A. Case No. 2020-010 ("the Investigation"); and

WHEREAS, Salabarria has filed an EEOC Charge, EEOC Charge No. 510-2020-04794 ("EEOC Charge"); and

WHEREAS, the Investigation and EEOC charge are all pending and constitute all the charges, investigations and grievances by or on behalf of Salabarria that have been or may be filed as of the Effective Date of this Agreement that have not otherwise been resolved or otherwise achieved finality; and

WHEREAS, the Parties, wish to avoid the burdens of further investigation, litigation and to resolve the disputes between them.

NOW, THEREFORE, intending to be legally bound but without setting precedent, do hereby agree as follows:

1.      Recitals. The Parties acknowledge and agree that the Recitals above are true to the best of their knowledge and belief and incorporate them as if fully set forth here and that the Recitals are a material inducement for the Parties to enter into this Agreement.

2.      EEOC Charge Withdrawn With Prejudice and Discipline. Salabarria and the FOP agree that, by executing this Agreement, they will simultaneously withdraw the Charge with prejudice by executing the attached Notice of Withdrawal with Prejudice and immediately filing same with the EEOC. Additionally, as discipline for the matters that are the subject of the Investigation, Salabarria agrees to accept the following:

   a. A One Hundred and Sixty (160) hour suspension,

   b. Payback of Eighty-Six (86) total hours, of which Forty-Four (44) Hours is regular time and Twenty-Four (24) hour is overtime. The regular rate is Forty-Four Dollars and 14/100 ($44.14) for a total of One Thousand Nine Hundred Forty-Two Dollars and 00/100 ($1,942.16) of regular time. The overtime hourly rate is Sixty-Six Dollars and 21/100 ($66.21), for a total amount of One

1

Thousand Five Hundred Eighty-Nine Dollars and 04/100 ($1,589.04). **Accordingly, the Total Amount due to the City is Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) ("the Total Amount")**. Salabarria can pay the Total Amount via a cashier's check made payable to the City of Miami Beach on or before January 4, 2021. If the City does not receive full payment on or before 5:00 p.m. on January 4, 2021, then the City is authorized to deduct the remaining amounts due from Salabarria's vacation leave bank.

c.  Salabarria will execute the attached Last Chance Agreement, which contains additional provisions. The Last Chance Agreement is incorporated by reference into this Agreement.

d.  Permanent deletion, from all platforms (platforms includes but is not limited to: Apple Podcasts, Stitcher, Spotify, Spotify Podcasts, Google Play Music, Google Podcasts, iHeart Radio, and any other social media and/or electronic platform) the podcast titled: "Cafecitos y Chisme with Nick & Jess."

e.  Salabarria will immediately have a meeting with the Chief of Police wherein she will address the claims made in the Charge, including but not limited to identifying the names of all persons who allegedly engaged in the conduct addressed in the Charge. The refusal to name the persons who have allegedly engaged in the conduct in the Charge shall be grounds for immediate termination, as discussed in the attached Last Chance Agreement. Salabarria shall be entitled to have a Union Representative with her during this meeting.

f.  <u>Release Of Claims, Covenant Not To Sue</u>. Salabarria hereby releases and waives any and all claims of any kind whatsoever against the City that she had, has or may have from the beginning of the world through the date of this Agreement. The claims released include, but are not limited to, any and all claims arising under any federal, state, local or foreign statute or regulation, including, without limitation, those relating to any and all unfair or discriminatory employment practices (for example, employment discrimination based on race, national origin, sex, religion, age, disability or handicap, and harassment of any kind) under the federal Civil Rights Acts of 1866, 1871, 1964 and 1991 (including Title VII), the federal Age Discrimination in Employment Act ("ADEA"), including the Older Workers Benefits Protection Act, the Florida Civil Rights Act, the federal Americans With Disabilities Act, the federal Employee Retirement Income Security Act of 1974, the Internal Revenue Code of 1986, the federal Fair Labor Standards Act of 1938, the Florida Wage Discrimination Law, the Florida Wage and Hour laws, Florida and federal statutes regarding "whistleblower" activities, the federal Family and Medical Leave Act of 1993, the federal Rehabilitation Act of 1973, the Consolidated Omnibus Budget Reconciliation Act of 1985 (known as "COBRA"), the Federal Fair Credit Reporting Act, any other federal and state employment-related statutes and regulations, and any other employment-related local ordinance up to the date of this Agreement. The claims released also include any claims under the United States Constitution, including but not limited to claims arising under the First Amendment or any other claims whatsoever.

2

City 001884

The disputes released by Salabarria also include any and all disputes she had, has or may believe to have against the City in contract or at common law, including, but not limited to: breach of oral, written and/or implied contract, breach of an implied covenant of good faith and fair dealing, wrongful discharge under any theory (including for lack of good cause) in violation of public policy and constructive discharge, intentional and/or negligent infliction of emotional distress, negligent retention and/or supervision, assault, battery, negligence, misrepresentation or fraud of any kind, duress, unfair dealing, breach of fiduciary or other duty, invasion of privacy, defamation, and interference with contract and/or prospective economic advantage up to the date of this Agreement.

Salabarria further covenants and agrees that she will not file a lawsuit or claim of any kind asserting the claims released herein. Salabarria understands that this Agreement does not prohibit participating in an investigation or the filing of a charge with the EEOC or like administrative agency, but she does understand and agree that, not only is she releasing the stated claims, but also is releasing the right to any monetary damages or any relief of any kind from those claims, whether brought by her or on her behalf. Salabarria hereby represents that she has not assigned to any person or entity any rights to the claims released herein.

g.    Effect; Precedent.    The Parties agree that Salabarria remains subject to all applicable rules, policies, orders, procedures or regulations of whatever kind, except as may be expressly otherwise provided herein. The Parties agree that the facts underlying this Agreement are unique and that this Agreement does not establish precedent of any kind whatsoever and may not be used in any manner whatsoever in any proceeding, including but not limited to any labor proceeding of any kind, with the exception of any labor proceeding involving Salabarria. The parties further agree that Salabarria's prior settlement agreement may also be used in any labor proceeding involving Salabarria.

h.    Consideration.    The consideration for this Agreement is the City's early conclusion of the Investigation. The parties acknowledge that the City could continue the Investigation. The parties further acknowledge that continuing the Investigation would likely be detrimental to Salabarria. Therefore, the City is giving up its right to continue the Investigation in exchange fro Salabarria's agreement to the provisions and terms of this Agreement. The mutual promises, releases, and forbearances recited herein, the adequacy of which is hereby affirmed by the Parties.

i.    Miscellaneous.    This Agreement (which includes the exhibits attached hereto that are incorporated by reference), is the entire agreement between the Parties on its subject matter and supersedes any other agreement or understanding whatsoever, whether written or oral. The Parties have entered into this Agreement solely on the basis of the language, representations, and understandings expressed in this Agreement and not on the basis of any other representation or understanding whatsoever. This Agreement shall be construed and applied according to its express language and not strictly against any Party, regardless of authorship. This Agreement shall be governed by and construed according to the laws of the State of Florida. Any dispute arising from this Agreement, its application, or its breach shall be heard by a judge and not a jury. The Parties agree that venue shall be proper in Miami-Dade County, Florida, and agree that they shall not challenge such venue, regardless of convenience. If any provision or part thereof of this Agreement shall be found invalid or unenforceable by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable, provided, however, that if Paragraph 3, "Release,"

3

City 001885

is found invalid or unenforceable, the entire Agreement shall fail and be null and void and shall be treated as if it were never made. The prevailing party in any action of or relating to this Agreement shall be entitled to an award of reasonable attorney's fees and costs.

IN WITNESS WHEREOF, having read and fully understood this Agreement in its entirety, having duly considered the same, and intending to enjoy the benefits and undertake the obligations established herein, the Parties do hereby enter into and execute this Agreement as set forth below.

**CITY OF MIAMI BEACH**          **JESSICA SALABARRIA**          **FRATERNAL ORDER OF POLICE, LODGE 8**

By_____          _____          By_____
City Manager                                 JESSICA SALABARRIA                 KEVIN MILLAN
                                                                                              President

_____          ____12/18/2020____          ___12/18/2020___
DATE                                            DATE                                       DATE

**CHIEF OF POLICE**

_____
RICK CLEMENTS
Chief of Police

4

City 001886

## LAST CHANCE AGREEMENT

THIS LAST CHANCE AGREEMENT is entered into between the CITY OF MIAMI BEACH, FLORIDA (hereinafter, the "City"), FRATERNAL ORDER OF POLICE, (hereinafter, "the Union") and JESSICA SALABARRIA (hereinafter, "SALABARRIA" or "Employee").

WHEREAS, SALABARRIA is employed by the City as a Police Officer in the City's Police Department.

WHEREAS, SALABARRIA is subject to the terms and conditions of employment contained in the Collective Bargaining Agreement between the Union and the City effective October 1, 2018 through September 30, 2021;

WHEREAS, SALABARRIA is the subject of an Internal Affairs ("IA") Investigation, IA Case Number 2020-010, which arose from SALABARRIA's involvement in not being on-duty when she was supposed to be, and from SALABARRIA's claims of being on-duty in the City when she was actually outside the City;

WHEREAS, the City wishes to continue to employ Employee, Employee wishes to continue to be employed by the City, and the FOP desires for Employee to continue to be employed under the terms and conditions described herein; and

WHEREAS, the Employee admits that she committed misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for the Classified Service; and

WHEREAS, the purposes of this Agreement, with which all the Parties concur, include: to protect and preserve the integrity of the Police Department and all its officers and to give Employee the opportunity to further and support that purpose; and to give Employee the

CITY

Page 1 of 7

UNION                JESSICA

City 001887

opportunity to rehabilitate herself personally and as a police sergeant for the City and this Department; and to give Employee an opportunity to preserve her career.

NOW, THEREFORE, without establishing precedent for any purpose and intending to be bound, the Parties agree as follows:

1.      All of the above statements are true and correct to the best of the Parties' belief and knowledge and for a five (5) year period beginning with the execution of this Agreement by all parties, SALABARRIA will be subject to the provisions of this Agreement.

2.      During this period, SALABARRIA must be on-duty and in the City limits during all of her scheduled shifts unless given prior authorization. For the avoidance of confusion, this means that, during the terms of this Agreement, SALABARRIA shall not be outside the City limits when she is on-duty, shall not tell the City she's on-duty when she is outside the City's limits, and shall not leave before the end of her scheduled shift, unless given prior authorization.

3.      Additionally, SALABARRIA shall refrain from violating any City or Police Department policies, rules or regulations; Standard Operating Procedures ("SOPs") or Personnel Rules, all of which (including any amendments or additions) are incorporated herein by reference.  In any instance during which City or Police Department policies, procedures or Personnel Rules differ from or conflict with the stipulations set forth in the applicable collective bargaining agreement, the City or Police Department policies, procedures or Personnel Rules shall prevail.

4.      The Chief of Police shall exclusively assess and determine Employee's compliance with this Agreement. The Chief's decision as to compliance with this Agreement shall not be subject to any grievance and/or review of any kind by SALABARRIA and/or the Union and is not subject to explanation or review.

CITY                              Page 2 of 7                    UNION          JESSICA

City 001888

5.      Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules, as referenced in paragraph 3 above) may result in the immediate implementation of the attached letter of resignation as referenced in paragraph 9 below. It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation of the same, discreet minor policy may result in an event triggering the implementation of the attached letter of resignation. In that event, the Employee and the Union understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

6.      SALABARRIA shall serve a four-week (160 hour) suspension without pay and waive any and all rights to grieve or appeal that suspension. Employee shall also be subject to the additional provisions of the Settlement Agreement to which this Agreement is attached and is made part of via incorporation by reference.

7.      Further, for the same five (5) year period described above, the Chief of Police shall have full discretion regarding Employee's assignments, including, without limitation, duties, supervisor and chain of command.  Employee shall have the ability to bid for shift and days off, if the employee is reassigned her duty hours and days off shall remain the same.

8.      For a period of one (1) year from the date of execution of this Agreement, Employee is not eligible for any promotional opportunities.

CITY

Page 3 of 7

UNION        JESSICA

City 001889

9.     Employee shall sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during the term of this Last Chance Agreement. .

10.     Employee shall attend and cooperate with any training required by the Chief of Police.

11.     If during the above-referenced five (5) year period, SALABARRIA violates any provisions of this agreement or any City or Police Department policies, Standard Operating Procedures ("SOPs") or Personnel Rules and/or regulations as previously referenced in paragraph #4 , her resignation shall be effective , without the right to grieve or otherwise contest, in any manner, her separation. .

12.     In the event that SALABARRIA is separated pursuant to the terms and conditions of this Last Chance Agreement, she and the Union understand that her separation is not subject to appeal pursuant to the contractual grievance/arbitration procedure, or otherwise. In other words, SALABARRIA agrees that should she be separated pursuant to the terms of this agreement  that she waives her right to utilize the contractual grievance and arbitration procedure and she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

13.     The City retains the right to rely upon the facts and circumstances of the events from which this Last Chance Agreement arose in any future proceeding in the event the Employee successfully meets the terms and conditions referred to in this Agreement but thereafter has deficiencies in conduct or performance, and such deficiencies shall be sufficient to warrant discipline, including dismissal.

CITY

Page 4 of 7

UNION          JESSICA

City 001890

14.     It is understood and agreed by all parties hereto that this Last Chance Agreement is executed based on the particular circumstances of this case and does not establish precedent for the resolution of other cases.

15.     SALABARRIA acknowledges that she could be terminated from her employment from the City as a result of her conduct as referenced above and that remaining employed by the City is adequate consideration for entering into this Last Chance Agreement, serving the suspension without pay and waiving the rights described herein and in the Settlement Agreement.

16.     SALABARRIA being of lawful age, for and in consideration of the above-action agreed to by the City, and other valuable consideration received from or on behalf of the City, receipt whereof is hereby acknowledged, does hereby release, acquit, satisfy and forever discharge the City, as well as each and everyone of the City's former and current officers, agents, attorneys, employees and officials -- in both their official and individual capacities -- and their successors and assigns, from any and all claims, cause and causes of action, grievances, unfair labor practice charges, lawsuits, claims of employment discrimination (including, but not limited to claims under the Americans With Disabilities Act), and any and all other claims and demands whatsoever, in law or in equity, tort or contract, which SALABARRIA has or may have against the above-named individuals in both their individual and official capacities, from the beginning of the world until today, including, but not limited to, all matters concerning or arising out of her employment with the CITY, her discipline stemming from the incidents described in this Last Chance Agreement and the execution of this Last Chance Agreement.

17.     It is understood and agreed that this Last Chance Agreement does not constitute an admission by the City or SALABARRIA of any violation of the collective bargaining

CITY                          Page 5 of 7              UNION              JESSICA

City 001891

agreement. This Last Chance Agreement is being entered into by the parties solely for the purpose of avoiding the expense and inconvenience of further administrative proceedings.

18.      SALABARRIA has received and reviewed this Last Chance Agreement prior to executing it and she agrees to be bound by its terms and conditions.

19.      Prior to signing this Last Chance Agreement, SALABARRIA had the opportunity, and did, in fact, consult with her attorney and/or with the Union.

20.      This Last Chance Agreement, and the Settlement Agreement which is attached constitutes the entire understanding and agreement of the parties hereto, and can be modified, amended or revoked only by express written consent of all parties.

21.      This Last Chance Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and where applicable, federal laws. The language of this Last Chance Agreement shall be construed as a whole, according to its fair meaning, and not strictly construed for or against either party.

22.      In the event that any party to this Last Chance Agreement institutes legal proceedings regarding the terms of this Last Chance Agreement, it is stipulated and agreed that such a claim shall be heard and determined by the court, and not by a jury, in Miami-Dade County, Florida.   **SALABARRIA AGREES AND UNDERSTANDS THAT SHE IS WAIVING THE RIGHT TO A JURY TRIAL, IF ONE EXISTS, AS TO ANY CLAIM REGARDING THE TERMS OF THIS AGREEMENT.**

CITY                              Page 6 of 7                    UNION            JESSICA

City 001892

This Agreement is dated the _____ day of December 2020, in Miami-Dade County, Florida.

**JESSICA SALABARRIA**

**CITY MANAGER**
**CITY OF MIAMI BEACH**

Date: __12/18/2020__

Date: _____

**FRATERNAL ORDER OF POLICE**

_____ President
Signature & Title

Kevin Millan    President
Print Name & Title

__12/18/2020__
Date

**CHIEF OF POLICE**

__12/18/2020__
Date

Page 7 of 7

City 001893

December 18, 2020

City of Miami Beach
Human Resources Department
Miami Beach City Hall
1700 Convention Center Drive
Miami Beach, FL 33139

      Re:    *Letter of Resignation as Part of Settlement Agreement and Last Chance Agreement*

To Whom It May Concern:

      Pursuant to the Settlement Agreement and Last Chance Agreement to which this Letter of Resignation is attached, I resign my employment with the City of Miami Beach, effective _____.

                                      Very Truly Yours,

                                        Jessica Salabarria.

City 001894



## DECLARATION OF NICHOLAS GUASTO

NICHOLAS GUASTO does hereby submit this declaration pursuant to Florida Statute 92.525(2), and states as follows:

1.     I am over the age of twenty-one (21). I am offering this declaration voluntarily and based on my own personal knowledge.

2.     I am married to the Charging Party in EEOC Charge No. 510-2021-05270, Jessica Guasto.

3.     I am employed by the City of Miami Beach as a police officer.

4.     Prior to Jessica Guasto signing the settlement agreement referenced by the City of Miami Beach in their position statement to EEOC Charge No. 510-2021-05270, I had a series of meetings concerning the disposition of Internal Affairs investigation 2020-10 and the EEOC Charge that Jessica Guasto filed in 2020 (EEOC Charge No. 510-2020-04794).

### Meeting – September 15, 2020

5.     On September 15th, 2020, I attended a meeting with Chief Richard Clements, Miami Beach Police Department, at the police station, 1100 Washington Ave.

6.     I initiated this meeting with the intention of thanking the Chief for bringing me back to work prior to the IA case (2020-10) being completed. We have a long relationship/history, and I thought it appropriate to show my appreciation and to advise him that both Jessica and I wanted to take responsibility for some culpability in the IA case. After a few minutes, Chief Clements steered the conversation towards how he wanted to resolve the case. Chief Clements told me he wanted Jessica and I to go to our IA statements and to say that we were sorry for our actions, that we had both been going through significant challenges personally and professionally, and that we had been seeking shelter with one another. He said he understood the issues that Jessica has faced and that he wanted to help. He said if we go into IA and give statements as he described that he would be able to work with that and to reduce the punishment significantly. He stated he thought this case was similar to the "Motor Unit case" and that he wanted to resolve it with a minor suspension and a repayment of some hours. He said that City Hall wanted to terminate both of us, but that he could help us if we worked with him.

### Meeting – September 22, 2020

7.     On September 22nd, 2020, at 0550 hours, I attended a meeting with Chief Richard Clements at the police station.

8.     The Chief again asked for Jessica's 2020 EEOC charge to be dropped in return for lesser punishment. My understanding is that under EEOC guidelines this is illegal for the Chief to have interfered in an open investigation and promise something in return for it to be dropped. He said he wanted to resolve the case with minor discipline and a repayment of hours and would figure out the best way to do that when we spoke again.  He said he didn't have a problem structuring the discipline so that Jessica and I

1

Scanned with CamScanner

would both be able to take the upcoming promotional test. He also said he wanted to resolve the case without giving a statement but would only be able to do that if Jessica dropped the EEOC charge.

9.      Later that day (09-22-2020), while I was working as a patrolman in the afternoon, I was contacted by a third party and asked if I could respond to the station to meet with him and the Chief.  He told me that Chief Clements requested that he contact me and have me respond to the station so we could meet. At this meeting, the Chief again insisted that Jessica's 2020 EEOC charge be dropped and that he would be able to reduce discipline and resolve the case amicably for both Jessica and me. He told me that we should not even be meeting, and that he will deny it if anyone asks, but that he had figured out a way to resolve the case. He told me he wanted to address all of Jessica's concerns about harassment because he understands what she has been through and wanted to help. He echoed the concerns that Deputy Chief Wayne Jones made to me during a previous meeting, that the department had failed Jessica and that the treatment she has received is disgusting and despicable.

10.      Chief Clements told me that Jessica and I needed to contact her attorney, Michael Pancier, and tell him that she wanted to dismiss the 2020 EEOC charge and handle the case internally. Chief Clements said we needed to tell Pancier that we thought there was an opportunity to resolve the IA case and the EEOC charge simultaneously but that we hadn't spoken to the Chief yet. He anticipated Pancier would call Miami Beach City Attorney Michael Elkins and advise of such, and Elkins would call Clements who would then agree to the meeting to resolve the cases. During that meeting, Clements stated he wanted to address all of Jessica's concerns, and that she could have anyone there that she felt comfortable speaking in front of. As Jessica's harassment and treatment is sensitive and uncomfortable to speak about, she has always maintained she wanted people to be present as witnesses. Again, Clements stressed the importance of dismissing the EEOC charge, in exchange for this consideration.

11.      The third party that requested the meeting on Chief Clements' behalf brought up the topic of the discipline for both Jessica and I and suggested that Clements decide on discipline over the next day or two and close the case out quickly with what he thought was appropriate. Clements stated that he thought it appropriate to start with the Motor Unit investigation as a basis for discipline (10 hour suspension and repayment of hours). He further stated that he wanted to still convene the Discipline Panel but that he would speak to the members prior to the hearing so they knew exactly what he wanted to do so he could implement the discipline with their recommendation.

12.      Prior to ending the meeting, Clements said we were getting close to the 180 day limit on the case, but that he would need more time to set up the meeting to resolve Jessica's complaint and stated that the only way we would be able to move forward is for

2

Scanned with CamScanner

Jessica and I to agree to toll the case.[1] He assured me that everything would be resolved favorably if we tolled the case to give him the time he needed. I reluctantly agreed, as I felt that Clements was insinuating that if we did not toll the case, he would continue the case and I would be facing termination and Jessica facing at least demotion, if not termination.

### Telephonic Meeting – September 24, 2020

13.   On September 24th, 2020, at 1800 hours, while celebrating my birthday with family, I received a text message from the same third party stating that Clements was angry and wanted to speak to me. However, he would be calling me with the Chief on the line, as Chief Clements did not want his number showing up on my call history. He said he was called into Clements' office and told, "get your boy on the phone!"

14.   When I answered the phone, I was immediately attacked and yelled at by Chief Clements, accusing me of getting him in trouble with Michael Elkins because Elkins thought we had spoken about the case, which we had. Chief Clements said that either Jessica or I had told Pancier the wrong thing and that Pancier told Elkins I had spoken to the Chief and that the Chief wanted to resolve the case.

15.   Chief Clements was highly upset and demanded that either Jessica or I speak to Pancier and insist that Chief Clements and I had not spoken, but that I had been approached by a "proxy" to discuss the case.

16.   Chief Clements told me he would not be able to help me if I didn't do things as he said to do them.

17.   I also received phone calls from FOP executives Hector Fernandez and Kevin Millan, advising that the Chief had called them furious that I had said we had meetings to resolve the case, and he insisted that he had not spoken to me about anything.

**Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true.**

Dated this 5TH day of November 2021.

_N. G_____

NICHOLAS GUASTO

---

[1] Under Florida Statute § 112.532(6), internal investigations of police officers must be completed within 180 days, unless the time is tolled pursuant to one of the enumerated reasons or by agreement between the officer and the agency.

3

Scanned with CamScanner

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

**EXHIBIT 6**
04.23.24 N. GUASTO SF

Charge Presented To:
☐ FEPA
☒ EEOC

**Florida Commission on Human Relations** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Mrs. Jessica Guasto | | 1991 |

| Street Address | City, State and ZIP Code |
|---|---|
| 117 NW 42nd Ave # 1008, Miami Fl 33126. [Confidential per Fla. Stat. s. 119.071 – Do not disclose in FOIA] | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| City of Miami Beach – Miami Beach Police Department | 15-100 | 305-673-7901 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1100 Washington Avenue | Miami Beach, FL 33139 |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 09/2019 Latest:
☒ CONTINUING ACTION

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

Additional respondents responsible for discriminatory conduct:
Rick Clements, Chief of Police Miami Beach Police Department
Wayne Jones, Deputy Chief Miami Beach Police Dept.
Lt. Steven Cosner, Miami Beach Police Dept.
Cmdr. A.J. Prieto, Miami Beach Police Dept.

Charging Party (CP) is a female and was employed by the Responding Party (RP) in a supervisory position. CP has filed two previous EEOC charges against the RP, the first in 2019 after the CP was inappropriately demoted, and the second in 2020 after continuing discriminatory conduct by the RP after reinstatement to her supervisory position. The 2019 charge was resolved with the RP reinstating the CP to her supervisory position.

CP filed the second EEOC complaint in July 2020. RP initiated an internal investigation regarding work rule violations in May 2020. In December 2020, a meeting was held where the RP threatened to terminate CP's employment with RP for the alleged work rule violations, even though similar employees were given lesser penalties for equivalent alleged conduct. In exchange for withdrawing her charge with the EEOC, the RP gave CP equal punishment to other employees, but also had CP sign an agreement waiving her job security rights under the collective bargaining agreement and forcing CP to sign a letter of resignation.

*Continued on next page*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

06|22|2021
Date

Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)* 06/22/2021

YINA RODRIGUEZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# GG324066
Expires...

City 001160

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**Florida Commission on Human Relations** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

### Continued From Page 1

On the first day back to work after CP signed the agreement, Respondent Cosner, who was previously involved in the conduct leading to the 2020 charge, accused CP of further violations of workplace rules. The RP conducted a perfunctory investigation, led by Respondent Prieto. On January 19, 2021, Respondents Clements, Jones, Cosner and Prieto attended a meeting with CP to "discuss the allegations" against CP. In that meeting, the Respondents accused CP of falsifying documents without cognizable evidence. On January 25, 2021, Respondent Clements notified CP that the RP was "implementing" the letter of resignation and terminated CP's employment.

CP was terminated for engaging in a protected activity, filing the 2020 charge of discrimination and retaliation against RP. The RP's act in threatening more severe penalties for similar alleged conduct, compelling CP to agree to waive her rights under the collective bargaining agreement and the subsequent Cosner allegation of misconduct were merely pretext for discrimination and retaliation.

CP requests a finding of "cause" or "reasonable cause" under both the Florida and federal statutes prohibiting discrimination based on sex, national origin and retaliation, and an award of all damages, including liquidated damages, lost wages, compensatory damages, punitive damages, pain and suffering and emotional distress and attorney fees and costs.

City 001161