UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-21004-MD

**JESSICA GUASTO**,

      Plaintiff,

vs.

**THE CITY OF MIAMI BEACH, FL**,
a Florida municipality,

      Defendant.

_____/

### <u>DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Defendant, THE CITY OF MIAMI BEACH, FL, (the "City"), through its counsel and pursuant to the Court's May 9, 2024, Order Setting Trial and Pre-Trial Schedule, Requiring Mediation and Referring Certain Matters to Magistrate Judge [DE 59], files its Proposed Findings of Fact and Conclusions of Law.[1]

### <u>PROPOSED FINDINGS OF FACT</u>

1.      This is an employment discrimination case brought by Plaintiff, a former Sergeant with the City's Police Department.

2.      On April 2, 2022, Plaintiff filed a ten (10) count Complaint [DE 1].

---

[1]      The foregoing is based on the evidence Defendant anticipates it will adduce at trial. As the Proposed Findings of Fact and Conclusions of Law are due in advance of the Bench Trial in this case, there is no record at trial and therefore, only limited citations are contained herein. The limited citations herein are to deposition testimony that Defendant anticipates it will be substantially similar to the testimony it adduces at trial.

3.      On July 10, 2023, this Court issued its order dismissing eight (8) of the ten (10) counts [DE 32][2] leaving only Counts III and IV, which are claims for retaliation under Title VII and the Florida Civil Rights Act ("FCRA") respectively.[3]

4.      Plaintiff, now on her fifth lawyer, alleges that she was retaliated against by both Lieutenant Steven Cosner ("Lieutenant Cosner") and then-Chief of Police Richard Clements ("Chief Clements") for filing her second EEOC charge of discrimination against the City on July 13, 2020 ("2020 Charge").

5.      City is committed to equal employment opportunity and does not make employment decisions for any factors that are not job-related. The City's policy of equality and opportunity applies to all organizational levels of the City and to all job classifications and is contained in the City's Employee Handbook ("Handbook").

6.      Plaintiff acknowledged receipt of the Handbook.

7.      The City's anti-discrimination/retaliation policy is reiterated in its Personnel Rules.

8.      On or about January 27, 2012, the City hired Plaintiff for the position of Police Officer.

**Plaintiff's 2018 EEOC Charge and Settlement Agreement**

9.      On August 31, 2018, Plaintiff filed a Charge of Discrimination ("2018 Charge") with the EEOC alleging gender discrimination.

---

[2]      The remaining counts are only against the City. Therefore, former Defendants Richard Clements ("Clements") and Steven Cosner ("Cosner") were dismissed as part of the Court's Order. *See* DE 32 (dismissing all counts against Clements and Cosner).

[3]      Courts in the Southern District of Florida apply the same legal analysis to claims brought under Title VII and the FCRA. *See Su v. Broward County, Florida*, Case No. 0:23-CV-61385-CIV-DIMITROULEAS, 2024 WL 1236243, at *3 (S.D. Fla. Mar. 1, 2024) (*citing Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) ("The [FCRA] was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.")).

10.     Importantly, the 2018 Charge makes no mention of sexual harassment or any issues between Plaintiff and Lieutenant Cosner.

11.      On September 13, 2019, Plaintiff entered into a Settlement Agreement (the "First Settlement Agreement") with the City, releasing all claims against the City from the beginning of the world through the date of the First Settlement Agreement, and agreeing to dismiss the 2018 Charge.

12.     The Chief of Police at the time of the First Settlement Agreement was Richard Clements ("Chief Clements") and the FOP President at the time of the First Settlement Agreement was Kevin Millan ("President Millan").

**The 2020 Internal Affairs Investigation**

13.     On April 23, 2020, Internal Affairs ("IA") at the City of Miami Beach received an Allegation of Employee of Misconduct regarding Plaintiff.

14.     On May 4, 2020, Plaintiff was notified that she was under investigation by IA in IA Case No. 2020-010 (the "IA Case").

15.     Lieutenant Cosner was not involved in the IA Case.

**Plaintiff's 2020 EEOC Charge of Discrimination**

16.     On July 13, 2020, Plaintiff filed her second EEOC Charge, EEOC Charge No. 510-2020-04794 ("2020 Charge").

17.     The IA Case came before the 2020 Charge.

18.     The 2020 Charge does not mention Lieutenant Cosner and Plaintiff testified that Lieutenant Cosner is not part of Plaintiff's 2020 Charge.

**The November 2020 Meeting**

19.     On November 2, 2020, there was a confidential settlement meeting between Plaintiff, the Fraternal Order of Police, Lodge 8 ("FOP") and the City (the "November Meeting").

20.     During the November Meeting, Plaintiff was represented by two lawyers: (1) Michael Pancier, Esq.; and (2) Eugene Gibbons, Esq. Additionally, Plaintiff was represented by then-FOP President, Kevin Millan.

21.      The purpose of the November Meeting was to try and settle the IA Case and the 2020 Charge.

22.     The November Meeting was not a subject officer interview pursuant to Florida Statute § 112.532, and Plaintiff was never questioned during the November Meeting.

23.     At no point during the November Meeting did any one of Plaintiff's two attorney's or Mr. Millan, the FOP President, object that the City was violating Florida Statute § 112.532 or invoke the provisions of Florida Statute § 112.534.

24.     During the November Meeting, the City showed Plaintiff, her two lawyers and the FOP President a power point presentation (the "November Meeting Power Point").

25.     The November Meeting Power Point shows that Plaintiff, and her then-boyfriend Police Office Nicholas Guasto ("N. Guasto"), were, among other things, radioing into the City that they were within the City limits and on duty, when they were in fact outside City limits.

26.     The November Meeting Power Point further details all the instances when Plaintiff and N. Guasto claimed to be on duty and within City limits when they were outside of the City, effectively stealing time from the City.

27.     After the November Meeting, Settlement discussions between the City's outside counsel and Plaintiff's two attorneys continued.

**The Settlement Agreement and the Last Chance Agreement**

28.     On or about December 18, 2020, Plaintiff, the FOP, and the City entered into a Settlement Agreement and a Last Chance Agreement.

29.     As part of the Last Chance Agreement, Plaintiff executed an Irrevocable Letter of Resignation ("Resignation"). *See* Exh. 15, Bates Nos. City 001248.

30.     In entering into the Settlement Agreement and the Last Chance Agreement, Plaintiff was represented by two (2) lawyers and the FOP President.

31.     Plaintiff voluntarily entered into the Settlement Agreement and the Last Chance Agreement.

32.     The City did not "put" Plaintiff on the Last Chance Agreement or force her to sign anything.

33.     The Last Chance Agreement made Plaintiff an employee at will.

34.      As part of the Settlement Agreement, the City did not pay any money to Plaintiff.

35.     Instead, Plaintiff accepted a one hundred and sixty (160) hour suspension, and among other things, paid the City Three Thousand Five Hundred Thirty-One Dollars and 20/100 ($3,531.20) which was monies to compensate the Coty for time that Plaintiff said she was working when in reality, she was not.

36.     As part of the Last Chance Agreement, Plaintiff "admits that she committed the misconduct in association with IA Case Number 2020-010 and was in violation of numerous City and Police Department policies and the City Personnel Rules for Classified Service."

37.      The Last Chance Agreement specifically references the IA Case.

38.     The Last Chance Agreement does not reference the 2020 Charge because the 2020 Charge was not the basis for the Last Chance Agreement, or any future performance of Plaintiff or any future discipline pursuant to the Last Chance Agreement.

39.     Accordingly, the 2020 Charge was specifically omitted from reference in the Last Chance Agreement.

**The Relationship Between Plaintiff and Lieutenant Cosner**

40.     In approximately 2014, Plaintiff and Lieutenant Cosner, who was at that time the rank of Police Officer and then Sergeant, spent time together outside of work. *See* Exh. 6, Cosner TR:20-21:18-17.[4]

41.     The nature of the relationship between Plaintiff and Lieutenant Cosner "was professional and it was a friendship."

42.     Plaintiff and Lieutenant Cosner were "good friends."

43.     In approximately 2014, Lieutenant Cosner and Plaintiff did things like go to lunch together and he met her parents and grandparents.

44.     Plaintiff introduced Lieutenant Cosner to her parents and grandparents as a friend, and he did not believe that he and Plaintiff were anything more than friends or in a formal relationship.

45.     Into the first quarter of 2015, Plaintiff and Lieutenant Cosner would text each other for hours.

46.      The relationship between Plaintiff and Lieutenant Cosner ended in approximately 2014 - 2015.

---

[4]     Steven Cosner is referred to herein as "Lieutenant Cosner" for ease of reference. However, during the time of 2014-2015, Lieutenant Cosner was the ranks of Police Officer and then Sergeant. He was promoted to Lieutenant in September 2020.

47.     Other than 2017 request from Lieutenant Cosner to Plaintiff for Plaintiff to approve an arrest form, between the end of the relationship in 2014-2015 and December 2020, Plaintiff and Lieutenant Cosner had no other interactions.

48.     During the time referenced on paragraph 46 above, Plaintiff and Lieutenant Cosner ignored each other when they saw each other.

**Lieutenant Cosner's Allegations of Employee Misconduct Against Plaintiff**

49.     On or about January 8, 2021, Lieutenant Cosner submitted via email an Administrative Action Form ("AAF") to then-Internal Affairs Commander A.J. Prieto ("Commander Prieto").

50.     The AAF contains allegations against Plaintiff that span the evening of December 27, 2020 through December 28, 2020 at approximately 6:00 a.m.

51.     In making his allegations against Plaintiff, Lieutenant Cosner used the wrong form. He should have used an "Allegation of Employee Misconduct" form.

52.     The fact that Lieutenant Cosner used the incorrect form has no bearing on the veracity of his allegations against Plaintiff, it was an administrative mistake.

53.     The fact that Lieutenant Cosner did not sign the Administrative Action Form is equally immaterial. There was no question that Lieutenant Cosner was the one who filled out the Administrative Action Form.

54.     The City corrected the form error and put Lieutenant Cosner's allegations against Plaintiff on an Allegation of Employee Misconduct Form ("AEM"), which is the correct form.

55.     The allegations on the Administrative Action Form and the Allegation of Employee Misconduct Form are identical. The City merely corrected a paperwork error.

56.     The AEM is not signed.

57.     The fact that the AEM is not signed does not impact the validity of the allegations contained therein. The AEM does not necessarily have to be signed, it has happened in the past where officers were unable to sign it.

58.     Essentially, Lieutenant Cosner alleged that Plaintiff was not in her assigned area when she was supposed to be, that she failed to give out certain assignments to subordinate officers, and then lied to Lieutenant Cosner (her supervisor that evening) about giving out the assignments.

59.     Critically, at the time that Lieutenant Cosner submitted the AAF, i.e. made his allegations against Plaintiff, he was not aware of: (1) the 2018 Charge; (2) the 2020 Charge; (3) the fact that Plaintiff signed a Settlement Agreement and Last Chance Agreement in December 2020; and (4) the fact that Plaintiff was on a Last Chance Agreement.

60.     There is no evidence that Lieutenant Cosner knew about Plaintiff's 2020 EEOC Charge or her Last Chance Agreement at the time he made his allegations against Plaintiff.

**The January 19, 2021, Meeting**

61.     In January 2021, Chief Clements was notified about the allegations against Plaintiff from Lieutenant Cosner.

62.     Because Plaintiff was on a Last Chance Agreement and thus, an employee at will, based on Lieutenant Cosner's allegations, Chief Clements could have implemented Plaintiff's Resignation without speaking to Plaintiff.

63.     Despite not having to hold any meeting, on January 19, 2021, Chief Clements held a meeting with Plaintiff and the following individuals: (1) Wayne Jones (then Assistant Chief of Police); (2) Lieutenant Paul Ozaeta (then President of the FOP); (3) Sergeant Arley Flaherty, (then FOP First Vice President); (4) Sergeant Reggie Lester, (then FOP Second Vice

President); (5) then-Lieutenant Delvin Brown, (then FOP Grievance Chairman); (6) Commander A.J. Prieto (then Commander of IA); and (7) Lieutenant Steven Cosner.

64.     Prior to the meeting, Chief Clements believed he had enough information to implement Plaintiff's Resignation.

65.     However, Chief Clements held the meeting to provide Plaintiff an opportunity to address the concerns and see if there was something the City didn't consider.

66.     At the meeting, Plaintiff was represented by the FOP's entire Executive Board, i.e. her union's entire leadership.

67.     At no point during the meeting did Plaintiff or any of Plaintiff's four (4) union representative representatives (the top officials in the FOP) request an attorney be present, allege that the City was violating Florida Statute § 112.532, or invoke the provisions of Florida Statute § 112.534.

68.     President Ozaeta re-affirmed that: (1) the union and its attorney reviewed and blessed Plaintiff's Settlement Agreement and Last Chance Agreement; (2) because of the Last Chance Agreement, Chief Clements could have implemented the Resignation without having the January 2021 meeting; (3) Chief Clements held the meeting as a courtesy because he wanted to hear what Plaintiff had to say; and (4) because of the Last Chance Agreement, the City did not have to conduct an investigation into the allegations against Plaintiff.

69.     Had Plaintiff or any of her representatives requested an attorney during the January 19, 2021 meeting, invoked the provisions of Florida Statute § 112.534, or even implied that there was something improper about the January 19, 2021, meeting the meeting would have been stopped.

70.     At the January 19, 2021, meeting, Plaintiff stated that the reason she was at the main police station so long during her December 27-28, 2020, shift was that she was working on Officer Stella's evaluation.

71.     Commander Prieto determined, based on information provided by the City's IT Department, that Officer Stella's evaluation was not even created on Plaintiff's computer until January 10, 2021.

72.     Commander Prieto documented his finding in an email that he sent to Chief Clements on January 25, 2021.

73.     Commander Prieto prepared a PowerPoint regarding his findings as to the overall allegations against Plaintiff, which he provided to Chief Clements.

**Implementing Plaintiff's Resignation**

74.     On January 25, 2021, Chief Clements, who was the decision-maker, implemented Plaintiff's Resignation.

75.     The reasons Chief Clements implemented Plaintiff's Resignation are detailed in the letter to Plaintiff dated January 25, 2021, which also accurately memorializes what happened at the January 19, 2021, meeting.

76.     Chief Clements did not consider Plaintiff's 2020 Charge or any complaints of harassment when implementing Plaintiff's Resignation.

77.     Lieutenant Cosner was not a decision-maker regarding Plaintiff and was not consulted about implementing Plaintiff's Resignation.

**The Decision to Implement the Resignation is Not Reviewable**

78.     Pursuant to paragraph 4 of the Last Chance Agreement, the decision of the Chief Clements is not subject to review or explanation.

79.     Paragraph eleven (11) of the Last Chance Agreement states if Charging Party commits any of the violations referenced in paragraph four (4), "her resignation shall be effective, without the right to grieve or otherwise contest, in any manner, her separation.

80.     Paragraph twelve (12) of the Last Chance Agreement states that if Plaintiff is separated pursuant to the Last Chance Agreement, she further waives the right to challenge or appeal her separation pursuant to any administrative or statutory avenue that may exist.

**Plaintiff's Union Did Not Challenge Implementation of Her Resignation**.

81.     The FOP (Plaintiff's Union) did not challenge the City implementing Plaintiff's Resignation because there was no basis to do so.

**Last Chance Agreements In General At the City**

82.     During Plaintiff's employment with the City, last chance agreements were not rare.

83.     The City frequently proposes/uses last chance agreements, which are always the product of negotiation between the City, the employee and the employee's union.

84.     The City cannot impose last chance agreements.

**The Testimony of Nicholas Guasto ("N. Guasto")**

85.     N. Guasto is Plaintiff's ex-husband and currently a Police Officer with the City.

86.     Chief Clements never told N. Guasto that he was going to fire Plaintiff because of her 2020 Charge.

87.     Chief Clements wanted resolution of the 2020 Charge that included dismissal of the 2020 Charge and that's what ultimately happened.

88.     N. Guasto never had any conversation with Chief Clements or any other decision-maker at the City about Plaintiff after Plaintiff entered into her December 2020 Settlement Agreement and Last Chance Agreement.

89.     N. Guasto was not involved, in any way, in the decision to implement Plaintiff's Resignation.

90.     N. Guasto does not have firsthand knowledge of why the City implemented Plaintiff's Resignation.

**Plaintiff's Protected Activity and Connection to Cosner's Allegations**

91.     Plaintiff's protected activity is her 2020 Charge.

92.     As noted earlier, Plaintiff testified that Lieutenant Cosner is not part of the allegations in the 2020 Charge.

93.     On June 22, 2021, in advance of this lawsuit, Plaintiff filed an EEOC Charge ("2021 Charge").

94.     Therein, on page 2, Plaintiff alleges that she "was terminated for engaging in a protected activity, filing the 2020 charge of discrimination and retaliation against RP."

95.     Plaintiff testified that she does not know what the phrase "and retaliation agaist RP" means.

96.     When asked to connect her 2020 Charge with her January 2021 termination, Plaintiff testified: "Okay. So I know that I filed a EEOC charge. And then, I was retaliated against for filing that EEOC charge. And then, I was retaliated against for filing that EEOC -- EEOC charge. And then, I suffered an adverse employment action by being terminated for filing that EEOC charge."

97.     When asked to clarify, Plaintiff testified: "by being falsely accused of these allegations that led to this adverse employment action. And I was terminated." When asked to clarify again, Plaintiff testified: "I -- I don't understand your question. I -- all I know is that the way I answered it, that's my answer. And that's as good of an answer that I have right now. I'm sorry."

98.     The false allegations to which Plaintiff is referring are the allegations from Lieutenant Cosner in December 2020.

99.     In alleging that the allegations from Lieutenant Cosner are false, Plaintiff testified that as to most of the allegation, she does not know if they are false, and she did not do any investigation into such prior to filing her lawsuit.

100.    When asked "[b]ut sitting here today after you filed your lawsuit in federal court claiming it's all false, you don't know?" Plaintiff testified: "I don't know."

## CONCLUSIONS OF LAW

## SUMMARY OF THE COURT'S DECISION

Based on the testimony and documentary evidence the Court finds in favor of Defendant because Plaintiff cannot establish her *prima facie* case of retaliation. Specifically, and is detailed more fully below, there is no causal connection between Plaintiff's protected activity (her 2020 Charge) and the City implementing her resignation. At the time Lieutenant Cosner made his allegations against Plaintiff, he did not know about Plaintiff's 2020 Charge or her Last Chance Agreement. Further, Plaintiff testified that Lieutenant Cosner was not part of her allegations in the 2020 Charge. Thus, it is illogical that Lieutenant Cosner would retaliate against Plaintiff for filing a charge of discrimination in which there were no allegations against him. More to the

point, Lieutenant Cosner was not a decision-maker, and there is no evidence that he influenced the decision-maker, Chief Clements.

As to the decision-maker, Chief Clements, there is no evidence that his decision to implement Plaintiff's Resignation was motivated, in any way, by her protected activity.

Even if Plaintiff could establish her *prima facie* case, the City has more than articulated legitimate, non-retaliatory reasons for implementing Plaintiff's Resignation and Plaintiff cannot establish pretext. Based on the foregoing, and the detailed analysis below, the Court enters judgment in favor of the City.

## I.      <u>Plaintiff's Claims for Retaliation Under Title VII and the FCRA Fail.</u>

Counts III and IV of Plaintiff's Complaint assert claims for retaliation under Title VII and the FCRA. *See* DE 1, ¶¶ 67-82. Plaintiff alleges that she was retaliated against for filing her 2020 Charge. DE 1, ¶¶ 69, 77.

The Court finds that there is no causal connection between Plaintiff's protected activity and the City implementing her Resignation. Tthe City had legitimate, nonretaliatory reasons for implementing Plaintiff's Resignation, and there is no evidence of pretext. Each of these are independently fatal to Plaintiff's retaliation claims.

### A.      <u>Plaintiff Does Not Establish a Prima Facie Case of Retaliation Under Title VII and the FCRA</u>

With no direct evidence of any retaliatory action, Plaintiff's claims under Title VII and the FCRA are analyzed under the same burden-shifting framework for circumstantial evidence established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Small v. City of Hollywood*, 661 F.Supp.3d 1187, 1201-02 (S.D. Fla. 2023) (*citing  Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1293 (11th Cir. 2018)); *see also Ypsilantis v. Yellen*, Case

No. 22-cv-61514-BLOOM/Valle, 2023 WL 7524107, at *17 (S.D. Fla. Nov. 14, 2023) (*citing Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

"First, the plaintiff must establish a *prima facie* case of retaliation by demonstrating (1) she 'engaged in a statutorily protected activity'; (2) she 'suffered an adverse employment action'; and (3) there is 'a causal link between the protected activity and the adverse action.'" *Small*, 661 F.Supp.3d at 1202 (*citing Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)).

Once the plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse action. *See Small*, 661 F.Supp.3d at 1202 (*citing Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016)). "If an employer offers a sufficient nondiscriminatory reason, the burden shifts back to the plaintiff, who must put forward evidence that the employer's given reason was a pretext for discrimination." *Small*, 661 F.Supp.3d at 1202 (*citing Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)).

"It is at this point that 'the plaintiff's burden merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination.'" *Small*, 661 F.Supp.3d at 1202 (*citing Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (*quoting Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011))). "This framework serves to 'filter out particularly obvious cases and works to frame more clearly the specific issues to be litigated,' and the 'critical decision' for the court to make is 'whether the plaintiff has created a triable issue concerning the employer's discriminatory intent.'" *Small*, 661 F.Supp.3d at 1202 (*citing Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015)).

Significantly, Plaintiff always retains the ultimate burden of proving that "the desire to retaliate was the but–for cause of the challenged employment action." *Univ. of Texas SW Med.*

*Cent. v. Nassar*, 570 U.S. 338, 339 (2013); *see also Beach v. JP Morgan Chase Bank, N.A.*, 218 F.Supp.3d 1367, 1374 (S.D. Fla. 2016) (referring to the United States Supreme Court in holding that the Title VII retaliation claims require proof that the protected activity was a but-for cause of the alleged adverse action) (*citing Trask v. Sec'y, Dep't of Veterans Affairs,* 822 F.3d 1179, 1194 (11th Cir. 2016)).

                         1.   **Plaintiff Does Not Establish Her Prima Facie Case Because There Is No Causal Connection Between Plaintiff's Protected Activity and the City Implementing Her Letter of Resignation. Accordingly, the City Prevails.**

"[T]o establish a causal connection between protected activity and an adverse employment action, a plaintiff must show 'the protected activity and the adverse action are not completely unrelated.'" *Thompson v. City of Miami Beach, Fla.*, 990 F.Supp.2d 1335, 1341 (S.D. Fla. 2014) (*citing Davis v. Coca–Cola Bottling Co. Consol.,* 516 F.3d 955, 978 n. 52 (11th Cir.2008)).

"A plaintiff satisfies this burden 'by showing close temporal proximity between the statutorily protected activity and the adverse employment action.'" *Thompson*, 990 F.Supp.2d at 1341-42 (*citing Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007)). "And if there is no other evidence showing causation, the temporal proximity must be 'very close.'" *Id.*; *see also Drago v. Jenne,* 453 F.3d 1301, 1308 (11th Cir. 2006) ("[I]n the absence of any other evidence of causation, a three- and one-half-month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation.").[5]

---

[5]     The case law is clear that even a three-month gap between statutorily protected activity and adverse employment action is insufficient to establish retaliation based on close temporal proximity. *See Henderson v. City of Birmingham, Alabama*, 826 F. App'x 736, 742 (11th Cir. 2020) (*citing Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007); *see also Reed v. Forney Indus., Inc.*, 800 F. App'x 782, 789 (11th Cir. 2020) (*citing Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that a three-month gap between the protected action and alleged retaliation was not sufficiently proximate to show causation); *Criswell v. Intellirisk Mgmt. Corp., Inc.*, 286 F. App'x 660, 664 (11th Cir. 2008). First, there is a gap of six (6) months and twelve (12) days between Plaintiff's protected activity (the 2020 Charge filed on July 13, 2020) and the adverse action (implementing

In its Order Granting In Part Defendant's Motion to Dismiss, this Court outlined the specific facts that Plaintiff needs to establish to succeed on her retaliation claims. Specifically, this Court held:

> In the instant action, Plaintiff alleges that on her first day back to work after signing the Settlement Agreement, she was assigned to work with Lieutenant Cosner. Lieutenant Cosner was "previously involved in the conduct leading to the 2020 [EEOC] Charge." [ECF No. 1-1 at 2]. Plaintiff also alleges that Lieutenant Cosner knew about the Settlement Agreement and the included LCA, which rendered Plaintiff an at-will employee who could be fired for any policy violation. Plaintiff alleges that based on Lieutenant Cosner's knowledge about the LCA, he submitted a formal allegation of employee misconduct which consisted of false allegations against her. Plaintiff further contends that this contributed to her termination. Based on these allegations, a reasonable person could conclude that Plaintiff's termination was related to her discrimination and harassment claims. Therefore, Counts III and IV may proceed.

*See* DE 32, p. 12.

To that end, based on her Complaint, and this Court's Order [DE 32], the facts Plaintiff needs to prove to prevail are: (1) that "Lieutenant Cosner was 'previously involved in the conduct leading to the 2020 [EEOC] Charge;'" (2) "that Lieutenant Cosner knew about the Settlement Agreement and the included LCA;" (3) "that based on Lieutenant Cosner's knowledge about the LCA, he submitted a formal allegation of employee misconduct which consisted of false allegations against her;" and (4) "that this contributed to her termination." *See* DE 32, p. 12. As is detailed more fully below, Plaintiff's establishes none of the aforementioned.

First, Plaintiff testified that Lieutenant Cosner was not part of Plaintiff's 2020 Charge. More to the point, the 2020 Charge does not mention Lieutenant Cosner. In short, there is no

---

Plaintiff's Resignation on January 25, 2021). Accordingly, there is no causal connection based on temporal proximity.

evidence connecting Lieutenant Cosner to the 2020 Charge. Therefore, Plaintiff does not establish this fact.

Second,  at the time Lieutenant Cosner made his allegations against Plaintiff, he did not know about her 2020 Charge or her Last Chance Agreement. Plaintiff tries to get around Cosner's lack of knowledge by implying knowledge to Lieutenant Cosner. Specifically, Plaintiff testified that he must've known about her 2020 Charge and Last Chance Agreement because it was "common knowledge throughout the entire station." Plaintiff also testified that Cosner must've known because:

> he sat right in back of me in the sergeants' office, and it was common knowledge of my EEOC charge, as well as my LCA that was implemented. And so he sat behind me. It was a common occurrence where sergeants in the sergeants' office were talking about my EEOC charge, as well as my LCA, where they would openly make comments about my EEOC charge and my LCA. And he sat right in back of me, and he was privy to a lot of this information.[6]

*See* Testimony To Be Adduced Trial.

Plaintiff was clear that her basis for claiming that Lieutenant Cosner knew about the 2020 Charge and the Last Chance Agreement at the time he made his allegations is an assumption.[7] Plaintiff did not tell Lieutenant Cosner about her 2020 Charge or Last Chance Agreement, no one told Plaintiff that Lieutenant Cosner knew about her 2020 Charge or Last Chance Agreement, and Plaintiff never heard Lieutenant Cosner discussing her 2020 Charge or Last Chance Agreement. In short, Plaintiff's basis for Lieutenant Cosner's knowledge is a complete guess. Further, no other witness established that Lieutenant Cosner had any

---

[6]     The foregoing comes from Plaintiff's deposition. *See* DE 69-17, p. 28   Plaint. Vol. I TR:109:12-20. Defendant expects to elicit the same or similar testimony at trial.

[7]     In making her "assumption" about Lieutenant Cosner's knowledge of her 2020 Charge and Last Chance Agreement, Plaintiff admits that in all her conversations with other Sergeants, and in hearing conversations from other Sergeants, she never personally had any interaction with Lieutenant Cosner.

knowledge of the 2020 Charge or the Last Chance Agreement at the time he made his allegations. This is not enough for Plaintiff to carry her burden.

More to the point, Cosner testified unequivocally that when he made his allegations against Plaintiff, he was not aware of: (1) the 2018 Charge; (2) the 2020 Charge; (3) the fact that Plaintiff signed a Settlement Agreement and Last Chance Agreement in December 2020; and (4) the fact that Plaintiff was on a Last Chance Agreement. Lieutenant Cosner's testimony is unrebutted, and the Court finds him credible.

Plaintiff's argument becomes more tenuous when one considers that her entire theory is that Lieutenant Cosner harbored anger and resentment dating back to 2014-2015, carried that anger and resentment through December 2020 and then struck when the opportunity arose.

Other than Plaintiff's subjective belief as to Lieutenant Cosner's knowledge and motives (his supposed 5-6 years of pent-up resentment) there is no evidence to support Plaintiff's theory. Plaintiff cannot rest on the mere allegation that Lieutenant Cosner had knowledge of her 2020 Charge and Last Chance Agreement at the time he made his allegations. *See MacKenzie*, 2008 WL 11331842, at *6. Plaintiff must make a sufficient showing to establish the existence of Lieutenant Cosner's knowledge. *See id*. Her "assumption" as to Lieutenant Cosner's knowledge is not admissible evidence and therefore, not sufficient to survive summary judgment. *See Aldabblan v. Festive Pizza, Ltd.*, 380 F.Supp.2d 1345, 1353 (S.D. Fla. 2005) ("Plaintiff's mere belief, speculation, or conclusory allegations that Defendant discriminated against [her], therefore, are insufficient to withstand summary judgment.") (*citing Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073–74 (11th Cir.1995)); *see also Univ. of Texas SW Med. Cent.*, 570 U.S. at 339; *Beach*, 218 F.Supp.3d at 1374 (referring to the United States Supreme

Court in holding that the Title VII retaliation claims require proof that the protected activity was a but-for cause of the alleged adverse action); *Trask,* 822 F.3d at 1194.

In short, there is no evidence, circumstantial or otherwise, to refute or even call into questions Lieutenant Cosner's unequivocal testimony that when he made his allegations against Plaintiff, he was not aware of: (1) the 2018 Charge; (2) the 2020 Charge; (3) the fact that Plaintiff signed a Settlement Agreement and Last Chance Agreement in December 2020; and (4) the fact that Plaintiff was on a Last Chance Agreement. *See* Facts ¶ 50.

Accordingly, the Court finds that Plaintiff does not establish "that Lieutenant Cosner knew about the Settlement Agreement and the included LCA." *See* DE 32, p. 12. Thus, Plaintiff does not carry her burden, entitling the City to judgment in its favor.

Third, Plaintiff tries to link her protected activity and the implementation of her resignation to what she describes as "false allegations" from Lieutenant Cosner. Essentially, Plaintiff argues that Cosner knew about her 2020 Charge and Last Chance Agreement, was angry about her romantically rejecting him back in 2014-15 and pounced in December 2020 by creating false allegations. In this regard, Plaintiff testified as follows:

> Q: Well, I think you had told me that Cosner had, you know, asked you out or tried to take your relationship further than just friendship back in 2014 or '15; and then, you rejected him; and then, from that point forward, in '14 or '15 -- we can call it '15 -- he just wouldn't speak to you. Do you remember that testimony?
>
> A: I remember. And I remember having issues with Cosner, like -- like I explained from 20 -- around the time of 2020, 2013, 2014. All the way till 2021.
>
> Q: Well, that's not what you told me before. What you told me before was you had issues with him in '13, '14 or '15 whenever that was, correct?
>
> A: Yes.

Q:     And you rejected him, correct?

A:      Yes.

Q:     And then, from that moment forward, you didn't work with
       him, you didn't speak to him, he wouldn't speak to you. I
       think you told me that you'd pass him in the hallway and he
       would ignore you. So what other -- are you referring to the
       fact hat he just ignored you for six years, or five years, as
       issues?

A:     I'm respond -- I'm responding to the fact that he held this
       animosity and this – this animosity and this hatred towards
       me from the moment that I rejected him till 2021, which is
       evident by him making false allegations against me. So he
       held that with him all these years –

Q.     Right.

A:      -- and retaliated against me for filing my EEOC complaint.

Q:     Right. So that -- that's what I was getting at. Your point
       about the issues that you're talking about after you rejected
       him, whenever that -- that date was. I know you don't
       remember it off the top of your head. I don't either. But it's
       in the record. The issues that you're referring to after that,
       go to his what you call animosity and anger towards your
       rejection. So he ignored you for six or seven years. And
       your position in this lawsuit is he essentially finally took it
       out on you when he made these allegations against you in
       December of 2020, correct?

A:     Yes.

*See* Testimony To Be Adduced At Trial.[8]

The Court finds that Plaintiff does not know what allegations against her are true or false.

Specifically, during her testimony, Plaintiff was asked about each specific allegation

made by Lieutenant Cosner. In addressing whether each allegation is true or false, the only

specific allegations that Plaintiff testified to as being false were that she never spoke to

---

[8]        The foregoing comes from Plaintiff's deposition. *See* DE 69-32, p. 3, Plaint. Vol. III TR:187-189:10-1.
Defendant expects to elicit the same or similar testimony at trial.

Lieutenant Cosner at the beginning of her overtime shift, and that she never provided Lieutenant Cosner with an overtime slip. These facts are not material in any way to whether Plaintiff engaged in misconduct.

As to almost the entirety of the remaining allegations against Plaintiff, which span almost two, single-spaced pages, Plaintiff responded that either she didn't know, didn't remember, or didn't recall as to whether the allegations were true or false. Incredibly, when asked about each specific sentence in the AEM, and whether the allegation was true or false, Plaintiff responded thirty-one (31) times that she either didn't know, didn't recall, or didn't remember. *See id.*

Instead of addressing each allegation, Plaintiff would continually just repeat, in general terms that Lieutenant Cosner's allegations were false. Examples of this are as follows:

> Q:    And then it says the dispatcher raised you multiple times, and you didn't respond. Is that true or false?
>
> A:    Again, I don't -- I don't remember exactly how everything happened.

*See* Testimony To Be Adduced At Trial.[9]

***

> Q:    And then, Cosner says he again tried to have the dispatcher raise you. And after several attempts by name and unit, you finally responded. Is that true or false?
>
> A:    Again, it happened three years ago. I don't remember the exact -- what happened that night.
>
> Q:    Okay. But you remembered it enough to allege in a federal lawsuit that he made false allegations; now today you don't remember?
>
> A:    That is correct. I remember -- yeah, I remember what happened in the sense of his allegations are not correct, are not true.

---

[9]    The foregoing comes from Plaintiff's deposition. *See* DE 69-32, p. 5, Plaint. Vol. III TR:194:2-6. Defendant expects to elicit the same or similar testimony at trial.

*See* Testimony To Be Adduced At Trial.[10]

\*\*\*

Q:    I'm not asking you what he says you said. I'm asking you if you remember what you said. Do you remember what you said?

A:    No, I don't remember.

Q:    Well, how do you know it's false if you don't remember?

A:    Because I know that his allegations are false.

Q:     Okay. Which allegations are false?

A:    Can you go up to his charges? Keep going. The specific allegations, what he's specifically saying are the allegations, those are all false.[11]

Q:    Okay. But the details of those allegations are contained in the narrative; isn't that true?

A:    That's what it looks like.

Q:    Okay. So what in this narrative -- I mean, I can go through every sentence with you. I'm happy to do that. But if you're saying, for example, failure to supervise is a false allegation, then tell me in this narrative what facts here are false that would establish that failure to supervise is a false allegation.

A:    I just know that his allegations of -- that are in the top are all false and this was never investigated.

Q:    Okay. Well, I've given you the opportunity to read this. You can read it again. But what I'm asking you, and I'll ask you again: What specific facts in this document, if any, do you know to be false or are you –

---

[10]      The foregoing comes from Plaintiff's Deposition. See DE 69-32, p. 5, Plaint. Vol. III TR:194-195:19-4. Defendant expects to elicit the same or similar testimony at trial.

[11]      Plaintiff was referring to the specific policies procedures listed at the top of the AEM.

> A:      You have –
>
> Q:      -- are you testifying that you can't -- you don't remember what's true or false in this narrative?
>
> A:      I -- I just know that his allegations are false. If you have a specific question, I can answer it. But his allegations are false.
>
> Q:      We'll just keep going sentence by sentence then.

*See* Testimony To Be Adduced At Trial.[12]

Plaintiff's lack of memory is incredible considering her entire lawsuit is based on the notion that Lieutenant Cosner's allegations against her are false.

When specifically asked "[b]ut sitting here today after you filed your lawsuit in federal court claiming it's all false, you don't know?" Plaintiff testified: "I don't' know." What's evident from Plaintiff's testimony is that, like every other component of this Lawsuit, her allegations are based on nothing more than her own personal beliefs. Accordingly, Plaintiff does not carry her burden, entitling the City to judgment in its favor.

Fourth, having established that there is no evidence that Lieutenant Cosner's allegations against Plaintiff are false, the Court finds that false allegations did not contribute to the City's decision to implement Plaintiff's Resignation. Accordingly, the Court finds in favor of the City.

## 2. **Lieutenant Cosner Was Not a Decision-Maker and He Did Not Influence the Decision Maker**.

Although not pled, Plaintiff seems to argue that there is liability under a "cat's paw" theory.[13] "[T]he cat's-paw theory of liability 'provides that a plaintiff may establish causation by

---

[12]      The foregoing comes from Plaintiff's Deposition. *See* DE 69-32, pp. 5-6, Plaint. Vol. III TR:197-198:5-13. Defendant expects to elicit the same or similar testimony at trial.

[13]      Plaintiff's Complaint makes no mention of the cat's paw theory or even the notion that Lieutenant Cosner used Chief Clements as a conduit to retaliate against Plaintiff. *See* DE 1. More to the point, and as is discussed more fully herein below, Plaintiff also alleges that Chief Clements had his own retaliatory animus against Plaintiff absent Lieutenant Cosner. The Court addresses the cat's paw theory argument for completeness purposes.

showing that the decisionmaker followed a biased recommendation without independently investigating the complaint against the employee.'" *Lucas v. City of Delray Beach*, Case No. 21-cv-80469-ALTMAN/Matthewman, 2023 WL 6037456, at \*15 (S.D. Fla. Sept. 15, 2023) (*citing Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021)); *see also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the 'cat's paw' theory. This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee. In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." (cleaned up)).

"In other words, cat's paw kicks in when the relevant decisionmaker imposes an adverse employment action on an employee *only because of* the biased (and negative) recommendation of the non-decisionmaker." *Lucas*, 2023 WL 6037456, at \*15.

Chief Clements was the decision-maker. Lieutenant Cosner, in addition to not being a decision-maker, was not consulted about implementing Plaintiff's Resignation. The fact that Chief Clements did not consult Lieutenant Cosner in deciding to implement Plaintiff's Resignation is corroborated by then-Director of Human Resources, Mike Smith; then-Commander of Internal Affairs, A.J. Prieto; then-Assistant Chief of Police, Wayne Jones; and Lieutenant Cosner. In short, Lieutenant Cosner did not recommend an adverse action to Chief Clements because he was never consulted about any discipline for Plaintiff. Accordingly, to the extent Plaintiff is arguing the cat's paw theory, the argument fails because there was no recommendation for the decision-maker, in this case Chief Clements, to consider.

Moreover, Chief Clements independently investigated Lieutenant Cosner's allegations. Specifically, Commander Prieto investigated all of Lieutenant Cosner's allegations and Plaintiff's explanations. Commander Prieto then provided his findings to Chief Clements. Thus, Plaintiff's cat's paw theory fails in this regard as well.

### 3. There Is No Evidence That Chief Clements' Decision To Implement Plaintiff's Resignation Was Based On Her Protected Activity.

Chief Clements did not consider Plaintiff's 2020 Charge or any complaints of harassment when implementing Plaintiff's Resignation. There is not a single witness in this case, including Plaintiff, that has any information, circumstantial or otherwise, that Plaintiff's 2020 Charge or complaints of harassment played any role in Chief Clements' decision. Indeed, when asked to connect her 2020 Charge with her January 2021 termination, all Plaintiff could muster was generally repeating that she filed her 2020 Charge and was retaliated against for filing her 2020 Charge by being terminated based on false allegations. Plaintiff does not provide a single piece of evidence connecting Chief Clements' decision to her 2020 Charge or any complaints of harassment.

The reality is the evidence is the opposite. Plaintiff's employment ended when Chief Clements implemented her Resignation. The Resignation derives from Plaintiff's Last Chance Agreement, which made Plaintiff an employee at will. The Last Chance Agreement relates exclusively to Plaintiff's IA Case, not her 2020 Charge. Specifically, the Last Chance Agreement does not reference the 2020 Charge because the 2020 Charge was not the basis for the Last Chance Agreement, or any future performance of Plaintiff or any future discipline pursuant to the Last Chance Agreement. Thus, it was specifically omitted from reference in the Last Chance Agreement.

Further, Plaintiff's own Union members, including her then-President, testified that there was no evidence that Chief Clements' decision was based on the 2020 Charge or any complaints of harassment. Sergeant Flaherty and then-FOP President Ozaeta both testified that there was no information to indicate that Chief Clements' decision was based on the 2020 Charge or any complaints of harassment. The foregoing is further buttressed by the fact that Plaintiff's own Union did nothing to try and get her job back after the City implemented her Resignation.

Plaintiff's argument that the conversations between Chief Clements and her then-boyfriend, now ex-husband Nicholas Guasto ("N. Guasto") establish circumstantial evidence that Chief Clements implemented Plaintiff's Resignation because of her 2020 Charge is unavailing. These conversations are hearsay for which there is no exception. However, even if the Court were to consider such conversations, they do not establish retaliatory animus.

N. Guasto was also under investigation during the IA Case. N. Guasto testified that throughout his dealings with Chief Clements regarding Plaintiff's 2020 Charge, Chief Clements repeatedly stated that he wanted a resolution that included dismissal of the 2020 Charge. The record is clear that Chief Clements got exactly what he told N. Guasto he wanted, dismissal of the 2020 EEOC Charge. Ultimately, after the alleged conversations between Chief Clements and N. Guasto, Plaintiff entered into a Settlement Agreement wherein she dismissed her 2020 Charge. N. Guasto acknowledged that, based on his conversations with Chief Clements regarding the 2020 Charge, Chief Clements got exactly what he wanted, a dismissal.

Further, N. Guasto testified that Chief Clements never told him that he was going to fire Plaintiff because of her 2020 Charge. Significantly, N. Guasto never had any conversation with Chief Clements or any other decision-maker at the City about Plaintiff after Plaintiff entered into her December 2020 Settlement Agreement and Last Chance Agreement.

More to the point, he was not involved, in any way, in the decision to implement Plaintiff's Resignation. *See id*. Importantly, N. Guasto does not have firsthand knowledge of why the City implemented Plaintiff's Resignation.

Even if the conversations happened exactly as N. Guasto alleges, Plaintiff does not connect the alleged conversations to the City implementing her Letter of Resignation ("Resignation"). Instead, Plaintiff recites the alleged conversations without producing evidence connecting the alleged conversations to the City implementing her Resignation. This is because the alleged conversations centered around Clements' desire for Plaintiff to withdraw her 2020 Charge, which is exactly what happened.

Moreover, the alleged conversations supposedly took place in September 2020. City implemented Plaintiff's Resignation on January 25, 2021, almost four (4) months after the alleged conversations and over a month after Plaintiff withdrew her 2020 Charge. laintiff did not withdraw her 2020 Charge at the time of the alleged conversations (September 2020), and she was not fired.

Instead, in December 2020, Plaintiff, through her two lawyers and Union President, negotiated a Settlement Agreement with the City. As part of the Settlement Agreement, Plaintiff withdrew her 2020 Charge. The City implemented Plaintiff's Resignation over a month later. Accordingly, there is no connection between the alleged conversations and Plaintiff's separation from the City.

In short, other than Plaintiff's own mis-guided belief, there is not one piece of evidence connecting Chief Clements' decision to implement Plaintiff's Resignation to her 2020 Charge or any complaints of harassment. To find in Plaintiff's favor, this Court must ignore the testimony of everyone in this case, including Plaintiff's own former lawyers and Union President in favor

of Plaintiff's unsupported, subjective beliefs, guesses and assumptions. That is not even close to enough for Plaintiff to sustain her burden.

To that end, there is no causal connection between Plaintiff's protected activity and her separation from employment. Thus, the Court finds in favor of the City.

### 4.  **Plaintiff and the City Agreeing to the Last Chance Agreement Does Not Establish Retaliation.**

In trying to connect the LCA to the implementation of her Resignation and somehow establish retaliation, Plaintiff cites *Baskerville v. Secretary of Department of Veteran Affairs*, Case No. 6:18-cv-1728-WWB-DCI, 2021 WL 1338203 (M.D. Fla. Feb. 8, 2021). *Baskerville* does not apply.

In *Baskerville*, plaintiff filed various EEOC charges against defendant. *See Baskerville*, 2021 WL 1338203, at *1. Between 2015 and 2017, plaintiff had disciplinary issues that subjected plaintiff to possible termination. *See id*. The defendant offered plaintiff a last chance agreement without discussing it with him. *See id*. "Plaintiff declined to sign the Last Chance Agreement offered by [defendant] and was ultimately terminated … for misconduct arising from the 2017 incidents." *See id*. at *2. The defendant admitted that "it 'offered Plaintiff [the] [l]ast [c]hance [a]greement, conditioned upon him dismissing all of his existing EEOC charges.'" *See id*. In denying summary judgment, defendant's admission that it offered the last chance agreement conditioned on dismissal of the existing EEOC charges was critical. *See id*. at *3.

*Baskerville* is premised on facts that do not exist here. First, Plaintiff's LCA was negotiated by her lawyers and Union President, that did not happen in *Baskerville*. Second, Plaintiff signed a Settlement Agreement, agreeing to withdraw her 2020 Charge, that did not happen in *Baskerville*. Third, Plaintiff signed the LCA, that did not happen in *Baskerville*. Fourth, the LCA is not premised on Plaintiff withdrawing her 2020 Charge, that did not happen

in *Baskerville*. Fifth, there is no admission from the City that the LCA was conditioned on withdrawl of the 2020 Charge. The undisputed facts show the LCA references the Internal Affairs Case (the "IA Case"); not the 2020 Charge because the 2020 Charge was not the basis for the LCA. Nor was the 2020 Charge the basis for Plaintiff's future performance or discipline pursuant to the LCA. Accordingly, *Baskerville* does not apply.

Further, Plaintiff claims she entered the LCA solely because she settled her 2020 Charge.[14] This is not true. The LCA does not reference the 2020 Charge. It references the IA Case, wherein Plaintiff admits she engaged in the conduct alleged in the IA Case and that she violated numerous City policies. The LCA does not reference the 2020 Charge because that had nothing to do with Plaintiff's job performance or ensuring that she did not again violate City policies. There is no evidence to support that the LCA and the 2020 Charge have any connection. Moreover, Plaintiff conveniently ignores that the IA Case came before her 2020 Charge.

The Court does not find that the City and the Plaintiff entering into the Last Chance Agreement establishes retaliation or provides any indicia of retaliatory animus.

Plaintiff does not establish her *prima facie* case. Therefore, the Court finds in favor of the City on all remaining counts.

> ### B.   Even If Plaintiff Did Establish A *Prima Facie* Case, Which She Did Not, The City Had Legitimate, Non-Retaliatory Reasons and There Is No Evidence of Pretext.

Even if Plaintiff could establish a prima facie case of retaliation, which she cannot, the City has clearly met its burden to produce legitimate non-retaliatory reasons for implementing Plaintiff's Resignation. Importantly, the City's burden is "exceedingly light" because it "need

---

[14]   Plaintiff continues to ignore the fact that in entering the LCA she was represented by two attorneys and her Union. The Union also signed the LCA.

only produce, not prove, a non-discriminatory reason." *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (internal quotations omitted).

In evaluating an employer's proffered explanation, it is not this Court's role to act as a super-personnel department and second-guess or quarrel with the wisdom of the employer's decision; rather, this Court's inquiry is limited to whether the employer gave an honest, non-retaliatory explanation that might motivate a reasonable employer. *See Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000); *see also Elrod v. Sears, Roebuck & Co.*, 939 F. 2d 1466, 1470 (11th Cir. 1991) An employer may lawfully fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, as long as its action is not for discriminatory reasons." *Id*.

Here, the legitimate non-retaliatory reasons for implementing Plaintiff's Resignation are detailed both in the January 25, 2021, Memorandum from Chief Clements to Plaintiff and in Chief Clements' testimony. Specifically, Chief Clements testified that, among other things, he wanted a truthful explanation from Plaintiff as to why she didn't follow the directive from her Shift Commander. Chief Clements also testified that the falsity of Plaintiff's explanation as to why she was not in her assigned zone was one of the reasons he implemented her Resignation, a reason that is also in the January 25, 2021, Memorandum.

In that regard, Commander Prieto provided Chief Clements evidence that showed that the evaluation that Plaintiff claimed she was working on in December 2020, was not even created until January 10, 2021. Moreover, Commander Prieto investigated the veracity of Lieutenant Cosner's remaining allegations and provided further information to Chief Clements.[15]

---

[15]     Notably, then-FOP First Vice President, Sergeant Arley Flaherty testified that she too reviewed Lieutenant Cosner's allegations against Plaintiff, and she determined that Lieutenant Cosner had "done his homework," and had "all of is backing."

In short, there is no question that the City has produced extensive, legitimate non-retaliatory reasons for implementing Plaintiff's Resignation.

In satisfying its burden of producing legitimate, non-retaliatory reasons for implementing Plaintiff's Resignation, Plaintiff bears the burden of persuasion that the proffered reason is pretextual, that is, she must prove "both that the reason articulated was false, and that discrimination was the real reason" for the employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-17 (1993).

To establish pretext, Plaintiff must show more than a mistake on the part of the City. *See Silvera v. Orange Cty. Sch. Bd.*, 244 F. 3d 1253, 1261 (11th Cir. 2001). She must show that the City lied – a standard she cannot meet. *See id.*; *Alvarez*, 610 F. 3d at 1265.

"In conducting a pretext analysis, the court should focus on the perception of the decision-maker." *Aldabblan*, 380 F.Supp. 2d at 1353 (*citing Chapman v. AI Transp.,* 229 F.3d 1012, 1034 (11th Cir.2000)). "Plaintiff's mere belief, speculation, or conclusory allegations that Defendant discriminated against [her], therefore, are insufficient to withstand summary judgment." *Aldabblan*, 380 F.Supp. 2d at 1353 (*citing Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073–74 (11th Cir.1995)). "Further, Plaintiff may not establish that Defendant's proffered reasons are pretextual 'merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer.'" *Aldabblan*, 380 F.Supp. 2d at 1353 (*citing Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997)); *see also Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999). Said another way, Plaintiff can't recast the City's proffered nonretaliatory reasons or substitute her business judgment for that of the City. *See Aldabblan*, 380 F.Supp. 2d at 1353 (*citing Chapman,* 229 F.3d at 1030).

As noted above, Plaintiff argues that Lieutenant Cosner's allegations were false, and thus, that establishes retaliation. This argument fails for all of the reasons articulated above. More to the point, the Court notes that: (1) the truth of Lieutenant Cosner's allegations doesn't matter; and (2) even if it did matter, as stated above herein, Plaintiff has no evidence of their falsity.

**1.   Whether   Lieutenant   Cosner's   Allegations   Are   True   or   False   Is Immaterial.**

Title VII does not require the City to have good cause for its decision. *See Whitehurst v. Liquid Environmental Solutions, Inc.*, 45 F.Supp.3d 1328, 1348 (M.D. Fla. 2014). The City can fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. *See Whitehurst*, 45 F.Supp.3d at 1348. An employer that fires an employee under a mistaken but honest impression that an employee violated a work rule is not liable for discriminatory conduct. *See id.* (*citing Hudson v. Blue Cross Blue Shield of Ala.,* 431 Fed.Appx. 868, 869 (11th Cir.2011)); *see also Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1363 (11th Cir.1999). The sole concern is whether unlawful discriminatory animus motivated the termination. *See Whitehurst*, 45 F.Supp.3d at 1348 (*citing Alvarez.*, 610 F.3d at). The relevant inquiry is whether the employer made its decision with a discriminatory motive or not. *See Whitehurst*, 45 F.Supp.3d at 1348.

Plaintiff devotes an inordinate amount of time in this litigation quarreling with the basis of Lieutenant Cosner's allegations. The veracity of Lieutenant Cosner's allegations is almost the entire basis of Plaintiff's claim for retaliation. Specifically, when asked to connect her 2020 Charge with her January 2021 separation, Plaintiff testified that the false allegations from Cosner led to her adverse employment action. Plaintiff's reliance on the merits of Lieutenant Cosner's allegations is also present in Plaintiff's Complaint and her 2021 Charge. *See* DE 1, ¶¶ 43-45; DE 1-1, p. 2.

Whether Plaintiff engaged in the conduct alleged by Lieutenant Cosner is immaterial. To establish pretext, Plaintiff needs to demonstrate that Chief Clements was motivated by retaliatory animus. Plaintiff does not have any evidence to carry her burden. As is articulated above, aside from Lieutenant Cosner's allegations, Chief Clements relied on additional information from Commander Prieto in making his decision. More to the point, and as articulated above, the documentary evidence clearly establishes that the Last Chance Agreement, and anything flowing from the Last Chance Agreement had nothing to do with the 2020 Charge.

Importantly, Plaintiff has not presented a single piece of evidence that casts doubt on Chief Clements' motivations. In short, the entirety of her case is based solely on what she believes, not actual evidence. There is no pretext. Thus, the Court finds in favor of the City.

### 2. Plaintiff Does Not Establish The Falsity of Lieutenant Cosner's Allegations.

Even if the veracity of Lieutenant Cosner's was relevant, which it is not, based on the analysis in Section I.A.1. above, which is incorporated herein, the Court finds that Plaintiff did not establish that any of Lieutenant Cosner's allegations were false.

To that end, there is no evidence of "lies" or a "phony reason for some action." *See Silvera*, 244 F. 3d at 1261. The record contains no evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence. *See Alvarez*, 610 F. 3d at 1265. It is irrelevant whether Plaintiff believes that Lieutenant Cosner's allegations are false, or that she was terminated for engaging in protected activity—what matters is what was in the mind of the decisionmaker.

The Court will not now reexamine the City's business decision.

### 3.   The City Properly Conducted the January 19, 2021, Meeting

Plaintiff improperly relies on Florida Statute § 112.532. Fla. Stat., known as the "Police Officers' Bill of Rights," which guarantees police officers certain rights. § 112.534, titled "Failure to Comply," details the procedure and remedies for an alleged violation of § 112.532. Specifically, when there is an alleged violation of § 112.532, "[t]he law enforcement officer or correctional officer shall advise the investigator of the intentional violation of the requirements of this part which is alleged to have occurred." *See* Fla. Stat. § 112.534(a).

Plaintiff alleges that during the January 19, 2021, meeting ("Meeting"), the City violated her rights. Plaintiff is wrong. Then Union President, Paul Ozaeta testified as follows:

> Q.     Why didn't the Union file a grievance or try to take action after the meeting for the Chief's denial of the lawyer being present?
> A.     We believed that his decision to not have the Union attorney present did not violate the terms of the Last Chance Agreement.
> Q.     Okay. And let's be clear: We are talking about Chapter 112, the Police Officer Bill of Rights, correct?
> A.     Correct.

*See* Testimony to be Adduced At Trial. [16]

Further, Plaintiff waived her rights under Fla. Stat. § 112.532. Ozaeta testified as follows:

> Q.     And by continuing with the interview, the officer can waive their 112 rights; is that not also correct?
> A.     Yes.
> Q.     And that happened here, didn't it?
> A.     Yeah.

*See* Testimony to be Adduced At Trial.[17]

---

[16]      The foregoing comes from Ozaeta's deposition. *See* DE 69-23, p. 13, TR:50:14-22. Defendant expects to elicit the same or similar testimony at trial.

[17]      The foregoing comes from Ozaeta's deposition. *See* DE 69-23, p. 14, TR:53:11-15. Defendant expects to elicit the same or similar testimony at trial.

At the Meeting, Plaintiff was represented by the entire Union Executive Board. At no point during or after the Meeting did anyone invoke the provisions of Fla. Stat. § 112.534. This is because there were no violations.[18] It is undisputed that had Plaintiff or any of her representatives requested an attorney or invoked § 112.534, the Meeting would have been stopped. Plaintiff or her Union could have sought relief after the Meeting; they did not. Plaintiff's Union could have filed a grievance about the Meeting; it did not. Plaintiff's attorney, Eugene Gibbons testified there was no basis to file a grievance because the City properly implemented Plaintiff's Resignation. Accordingly, the Court finds that Plaintiff's argument in this regard is without merit.

### 4.  The City Did Not Have to Investigate The Allegations Against Plaintiff.

As a basis for pre-text, Plaintiff essentially argues that Clements didn't investigate. This argument is misplaced. Plaintiff was an employee at will. Thus, the City did not have to investigate the allegations against Plaintiff. Ozaeta, Plaintiff's Union President, agreed that because of the LCA, the City did not have to investigate the allegations against Plaintiff. Ozaeta testified that pursuant to the LCA, Clements could have fired Plaintiff without a meeting.

### 5.  The Opinions of Non-Decision Makers Has No Bearing on the Legitimacy of the City's Non-Retaliatory Reasons for Implementing Plaintiff's Resignation.

Plaintiff tries to establish pretext by claiming non-decision makers didn't agree with her separation. Plaintiff misrepresents the facts. It is undisputed Plaintiff's Union did not challenge her separation because there was no basis to do so. Plaintiff also misrepresents the testimony of Ozaeta and Lester. Ozaeta testified that if Plaintiff wasn't on an LCA, then her actions did not

---

[18]   The remedy for a violation of § 112.532 is the agency head removes the offending investigator from further involvement. *See* Fla. Stat. § 112.534(g). An investigation is also initiated into the conduct of the investigator. *See id*. There is no remedy that involves Plaintiff getting her job back.

warrant termination. However, Plaintiff was on an LCA. Critically, Ozaeta also testified that the Union's position was that implementation of Plaintiff's Resignation was not for a discreet or minor policy violation and that there was no basis to challenge the City's implementation of Plaintiff's Resignation. Lester equivocated, noting that his view changed when he learned of the LCA. Lester also admitted he never reviewed Plaintiff's LCA, negating any opinion he has.

### 6.  <u>Plaintiff Does Not Establish A Convincing Mosaic.</u>

The Eleventh Circuit is clear that a "convincing mosaic" is a metaphor, not a legal test or a framework. *See Jeter v. Roberts*, Case No. 22-13983, 2024 WL 507183, at *3 fn. 4 (11th Cir. Feb. 9, 2024) (*citing Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023)). "No matter how a plaintiff intends to show discrimination, 'the ultimate question in a [retaliation] case is whether there is enough evidence to show that the reason for an adverse employment action was illegal [retaliation].'" *Id.* (*citing Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023)). The only question for a court at summary judgment is whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee. *Id.* (*citing Berry*, 84 F.4th at 1311).

"[A] plaintiff's failure to prove a prima facie case under *McDonnell Douglas* 'often also reflects a failure of the overall evidence.'" *Copeland v. Georgia Dept. of Corrections*, 97 F.4th 766, 782, fn 8 (11th Cir. 2024) (*citing Tynes*, 88 F.4th at 946). "Even under a convincing mosaic theory of retaliation, a plaintiff must still demonstrate that retaliation was the but-for cause of the employment action." *Curet v. Ulta Salon, Cosmetics & Fragrance, Inc.*, Case No. 8:21-cv-1801-VMC-TGW, 2022 WL 4464751, at *12 (M.D. Fla. Sept. 26, 2022) (*citing Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1274 (11th Cir. 2021)). Plaintiff must still produce evidence

sufficient to permit a reasonable factfinder to conclude the reasons given by the City were not the real reasons for the adverse employment decision. *See Curet*, 2022 WL 4464751, at *11.

Plaintiff's claim fails under a convincing mosaic theory for the same reasons her claim under *McDonnell Douglas* fails. Even under the convincing mosaic metaphor, Plaintiff does not demonstrate Clements was motivated by retaliatory animus. There is no causal connection between Plaintiff's protected activity (her 2020 Charge) and the City implementing her Resignation. It is undisputed that at the time Cosner made his allegations against Plaintiff, he did not know about Plaintiff's 2020 Charge or her LCA. Cosner was not a decision-maker, and Plaintiff does not rebut the fact that he did not influence the decision-maker, Clements. As to Clements, there is no evidence that his decision to implement Plaintiff's Resignation was motivated, in any way, by her protected activity. Further, the City has more than articulated legitimate, non-retaliatory reasons for implementing Plaintiff's Resignation and Plaintiff cannot establish pretext. Plaintiff's claims fail and the Court finds in favor of the City on all remaining counts.

Dated: September 18, 2024.

Respectfully submitted,

By: /s/*Michael L. Elkins*
Michael L. Elkins, Esq.
Florida Bar No. 523781
melkins@mlelawfirm.com
**MLE LAW**
1212 NE 16th Terrace
Fort Lauderdale, FL 33304
Telephone: 954.401.2608
*Co-Counsel for Defendant*

By: /s/*Henry J. Hunnefeld*
Henry J. Hunnefeld, Esq.
Florida Bar No. 343811
henryhunnefeld@miamibeachfl.gov

By: */s/Benjamin J. Braun*
Benjamin J. Braun, Esq.
Florida Bar No. 1017937
benjaminbraun@miamibeachfl.gov

**CITY OF MIAMI BEACH**
**CITY ATTORNEY**
City Attorney's Office
1700 Convention Center Drive
Fourth Floor- Legal Department
Miami Beach, FL 33139
Telephone: 305.673.7470
*Co-Counsel for Defendant*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 18, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/Michael L. Elkins*
Michael L. Elkins

### SERVICE LIST

CASE NO.: 1:22-cv-21004-MD

Daniel J. Barroukh, Esq.
danielb@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
520 Brickell Key Drive
Suite O-301
Miami, FL 33131
*Counsel for Plaintiff*