UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-21004-CIV-DAMIAN/D'Angelo

JESSICA GUASTO,

     Plaintiff,

v.

THE CITY OF MIAMI BEACH, FL,

     Defendants.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 70]

     **THIS CAUSE** is before the Court upon Defendant, The City of Miami Beach, FL's (the "City" or "Defendant"), Fully Dispositive Motion for Summary Judgment [ECF No. 70 (the "Motion")], filed June 3, 2024.

     THE COURT has reviewed the Motion, the Response [ECF No. 79] and Reply thereto [ECF No. 83], the applicable law, and the pertinent portions of the record and is otherwise fully advised.

     This case arises from Plaintiff, Jessica Guasto's ("Guasto" or "Plaintiff"), termination from her position as a police officer with the City's Police Department. Guasto claims retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Florida Civil Rights Act of 1992 ("FCRA"), Section 760.01, *et seq.*, Florida Statutes. *See generally* Complaint [ECF No. 1]. The City timely filed its Motion seeking summary judgment on these claims. For the reasons set forth below, the City's Motion is due to be granted.

# I.    BACKGROUND[1]

Guasto was hired with the City's Police Department on January 27, 2012. Joint Statement of Undisputed Facts [ECF No. 71 (the "Jnt. SOF")]. When she was hired, Guasto received the City's Employee Handbook (the "Handbook"), which provides, in pertinent part, as follows:

> It is the policy of the City of Miami Beach to provide equal employment opportunity for all, regardless of race, gender, color, national origin, religion, age, disability, marital status, familiar status, citizenship, and/or sexual orientation. It is the policy of the City of Miami Beach to provide an atmosphere and environment to protect and safeguard individuals recruited, selected, hired, and promoted within the City employment system by promoting and maintaining equal employment opportunity by means of affirmative action. As part of its continuing diversity management efforts, in keeping with the guidelines on sexual discrimination issued by the [EEOC], the City of Miami Beach fully supports legislation to protect and safeguard the rights and opportunities of all people to seek, obtain, and hold employment without being subjected to sexual harassment or discrimination of any kind in the work-place. It is the policy of the City of Miami Beach to provide an environment free of sexual harassment.

*See* Defendant's Statement of Material Facts [ECF No. 69 ("Def. SOF")] ¶ 2; Plaintiff's Statement of Material Facts [ECF No. 78 ("Pl. SOF") ¶ 2; [ECF No. 69-1 at 19].

## A.    *The First EEOC Charge.*

On August 31, 2018, Guasto filed the first of three Charges of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") (the "First EEOC Charge"). *See* Jnt. SOF ¶ 2. In the First EEOC Charge, Guasto alleged the City's Police Department discriminated against her on the basis of sex in violation of Title VII when she was demoted

---

[1] Unless otherwise noted, the facts are undisputed. The facts set forth herein are derived from the parties' statements of material facts. *See* ECF No. 69 (Defendant's Statement of Material Facts); ECF No. 78 (Plaintiff's Statement of Material Facts); ECF No. 84 (Defendant's Reply Statement of Material Facts); and ECF No. 71 (Joint Statement of Undisputed Material Facts).

from the position of Sergeant to Officer for purportedly failing to meet performance standards. *See* ECF Nos. 69-5, 71-2. The City and Guasto settled the First EEOC Charge, which resulted in a Settlement Agreement (the "First Agreement") dated September 13, 2019, between Guasto, the City, and the Fraternal Order of Police (the "FOP"), the local police union. Def. SOF ¶ 7.[2] The First Agreement provided that, in executing the Agreement, Guasto would simultaneously withdraw the First EEOC Charge and that she would return to work as a Sergeant in the City's Police Department. ECF No. 69-5 at 1. During that time, Richard Clements ("Clements") was the Chief of Police, and Kevin Millan ("Millan") was the FOP President. Def. SOF ¶ 8.

### B. The City's Internal Affairs Investigation Against Guasto, The Second EEOC Charge, And The Second Settlement Agreement And Last Chance Agreement.

In April 2020, the City's Internal Affairs Department ("IA") received an Allegation of Employee Misconduct against Guasto alleging that she was not present at work during her shift.[3] *Id.* ¶ 9. Guasto was sent a notification in May 2020, although she states that notification did not specifically state that she was under investigation by IA. *Id.* ¶ 10; Pl. SOF ¶ 10. Then, on July 13, 2020, Guasto filed a second EEOC Charge (the "Second EEOC Charge"). Jnt. SOF ¶ 3. In that Charge, Guasto alleged that she was subjected to sexual harassment and discrimination, national origin discrimination, and retaliation when, for example, Lieutenant Eduardo Garcia ("Garcia") took screenshots of Guasto's personal pictures on social media

---

[2] Guasto does not dispute that she entered into the First Agreement, but she disputes that the Agreement also released all of Guasto's claims against the City "from the beginning of the world through the date of [the First Agreement]." Pl. SOF ¶ 7.

[3] Guasto does not dispute that the City received the Allegation of Employee Misconduct or that it included these allegations against her. She states, however, that she was not the only person identified in the alleged misconduct. *See* Pl. SOF ¶ 9.

and spread them around the police station. *See* ECF No. 71-3 at 1. Guasto also alleged that Garcia told her that she needed to be "more of an extrovert and less of an introvert." *Id.* Guasto also alleged in the Second EEOC Charge that her colleagues and supervisors made sexually explicit comments to her, viewed pornography on their personal cell phones in her presence, discussed penis enlargements, and made comments about other female employees being promoted due to exchanging sexual favors. *See id.*

On November 2, 2020, a confidential meeting was held which Guasto, the FOP, and the City all attended in an attempt to settle the pending IA case and the Second EEOC Charge. *See* Def. SOF ¶¶ 15, 17; Pl. SOF ¶¶ 15, 17. Attorneys Michael Pancier and Eugene Gibbons, as well as then FOP President, Millan, were also present at the meeting, representing Guasto. *Id.* ¶ 16. During the meeting, neither Guasto's attorneys nor Millan objected that the meeting was being held in violation of Section 112.532, Florida Statutes, which affords officers various rights and protections while they are under investigation by their agency. *Id.* ¶ 19. At the meeting, the City presented a power point presentation that showed Guasto and her then-boyfriend, Nicholas Guasto ("N. Guasto"),[4] reporting to the City that they were on duty within its jurisdictional limits when, in reality, they were outside of the City's limits. *Id.* ¶ 21 Following the meeting, the City and Plaintiff's attorneys continued settlement discussions. *Id.* ¶ 23.

On December 18, 2020,[5] Guasto, the FOP, and the City entered into a second Settlement Agreement (the "Second Agreement"). Jnt. SOF ¶ 4. The Second Agreement

---

[4] The two started dating in August 2019, married in June 2021 and divorced in June 2023. Pl. SOF ¶ 91. N. Guasto remains employed with the City as a police officer. Def. SOF ¶ 73.

[5] Both the City's Statement of Material Facts and the Joint Statement of Undisputed Facts state that the Second Agreement and the Last Chance Agreement were executed "[o]n or

released the City from "any and all claims of any kind whatsoever against the City that [Guasto] had, has or may have from the beginning of the world through the date of th[e] Agreement." [ECF No. 71-4 at 2 (the Second Agreement)]. The Second Agreement also provides that, in exchange for Guasto remaining employed with the City and an early conclusion of the IA's investigation, Guasto would dismiss her Second EEOC Charge, agree to a 160-hour suspension, pay the City $3,531.20, and enter into a Last Chance Agreement (the "LCA"),[6] which was incorporated into the Second Agreement. *See id.* at 1–3, 5–10.

Relevant here, the LCA provides that Guasto would "sign an irrevocable letter of resignation which shall take effect immediately upon her violation of this Agreement or any part of it at any time during" a five-year period therefrom. *Id.* at 8.[7] It also expressly provides:

> Failure to comply with any portion or requirement of this Agreement (including but not limited to the requirement not to violate any City or Police Department policies, Standard Operating Procedures . . . or Personnel Rules . . .) may result in the immediate implementation of the attached letter of resignation . . . . It is the intent and understanding of the parties that the violations contemplated to trigger the implementation of the attached letter of resignation shall not be for individual, discreet minor policy and procedural violations. The parties agree that repeated violation[s] of the same, discreet minor policy may result in an event triggering the implementation of the

---

about December 18, 2023." *Id.* ¶ 24; *see also* Jnt. SOF ¶ 4. The year "2023" appears to be a scrivener's error. The Second Agreement was entered into in December 2020, as demonstrated by the Agreement itself, which was filed concurrently with both the City's Statement of Material Facts and the Joint Statement of Undisputed Facts. *See* ECF Nos. 69-15 and 71-4. Guasto's Statement of Material Facts similarly fails to note this oversight. *See generally* ECF No. 78 ¶ 24. In any event, this case was initiated in April 2022 (*see generally* ECF No. 1), and, thus, the Second Agreement could not have been executed following this matter's inception.

[6] The City frequently uses such agreements, which are the product of negotiations between the City, the employee, and the employee's union and which the City cannot impose upon the employee. Def. SOF ¶ 72; Pl. SOF ¶ 72.

[7] Both the Second Agreement and the LCA are in the docket at ECF No. 71-4 (Exhibit 4 to the parties' Joint Statement of Undisputed Material Facts). The LCA, which is incorporated into the Second Agreement, begins at page 5 of that Exhibit.

> attached letter of resignation. In that event, [Guasto] and the [FOP] understand and agree there will be no recourse or review available pursuant to any grievance, appeal or review process under any federal, state or local statute, ordinance, collective bargaining agreement, or in any other forum or under any other process or procedure.

*Id.* at 7. The LCA further provides that it is exclusively up to the Chief of Police (Clements) to assess and determine Guasto's compliance with the Agreement, and that, in this regard, his decision is not subject to review or explanation. *Id.* at 6. In the LCA, Guasto admits that she committed the misconduct alleged in the IA's investigation—that is, that she was not where she was supposed to be when she was on-duty and that she claimed she was on-duty within the City's limits when she was actually outside of the City. *See Id.* at 5. Guasto also acknowledges that she could have been terminated from her employment in the City's Police Department as a result of the misconduct. *Id.* at 9. The LCA made Guasto an employee at will. Def. SOF ¶ 27; Pl. SOF ¶ 27. It is undisputed that, when she entered into the Second Agreement and its incorporated LCA, Guasto was represented by two attorneys and Millan. *Id.* ¶ 25. It is also undisputed that Guasto voluntarily entered into the Second Agreement and LCA. *Id.* ¶ 26. The Second Agreement and LCA were executed by Guasto, Clements, Millan, and the City's then-Manager, Richard J. Aguila. *See* ECF No. 71-4 at 4, 11.

### C.   *Guasto's Return to Work and Cosner's Allegations Against Her.*

Guasto's first shift back at the City's Police Department after entering into the Second Agreement and LCA was on December 27, 2020. Plf. SOF ¶ 96. She was assigned an additional overtime shift starting at the conclusion of her December 27th shift at midnight on December 28th until 6:00 a.m. *Id.* The overtime shift was supervised by Lieutenant Steven

Cosner ("Cosner"). *See id.* It is undisputed that Cosner and Guasto had a relationship in and around 2014, although the parties dispute the exact nature of the relationship.[8]

Guasto claims that she told Cosner that she did not want a relationship with him and that his gestures were unwelcomed and unwanted. *Id.* ¶ 87. Guasto also asserts that she continued to reject Cosner's advances, that he did not take her rejections well, and that Cosner got "fed up" when he saw Guasto with another man. *Id.* ¶¶ 89–90. While the parties dispute when and why the relationship soured, they do not dispute that the two ignored each other and did not have any communication (other than one work-related task) after the relationship ended some time in 2014. *See* Def. SOF ¶ 39

During her overnight shift on December 28, 2020, Cosner e-mailed Guasto certain assignments to pass along to her subordinates. *See* Plf. SOF ¶ 97. According to Guasto, Cosner sent the email with her assignments nearly four (4) hours late. *Id.* Cosner concedes that he could have sent Guasto the assignments earlier. *Id.* However, the parties do not dispute that Guasto could not have sent the assignments to her subordinates before 3:55 a.m. *Id.* Guasto claims that she completed her assigned tasks. *Id.* ¶ 98. The City, however, asserts that Guasto did not complete her assigned tasks because Guasto was not in her assigned area when she

---

[8] The parties do not dispute that a few years after Guasto began her employment with the City, on or about February 14, 2014, Cosner gave Guasto a Valentine's Day card depicting a man with a box of chocolates on his lap, with an outline of a chocolate penis, telling the woman beside him to "try the one in the center, it's cream-filled." *Id.* ¶ 86. Cosner wrote in the card, "Love you Sweetie!! xxoo." *Id.* At the time, Guasto was twenty-two (22) years old and Cosner was over forty. *Id.* ¶ 87. In April 2014, Cosner gave Guasto another card that stated, "Jessica, I hope this is the best birthday yet. I love you with all my heart and am so happy you have come into my life. You are my princess. I love you babydoll. Love Steve." *Id.* ¶ 87. At his deposition, Cosner testified that Guasto meant a lot to him and that she was a catalyst in his decision to separate from his ex-wife. *Id.* ¶ 89.

should have been, she lied about speaking to her squad about the shift, and she provided detail assignments late. Def. Reply SOF ¶ 98.

Following Guasto's December 27-28th shift, Cosner wrote up an Administrative Action Form ("AAF") in which he claimed Guasto violated twelve (12) Department Rules and Regulations ("DRRs") during her shift spanning December 27 through December 28, 2020. Pl. SOF ¶ 99; *see also* Def. SOF ¶ 41. According to the City, Cosner used the wrong form to assert his allegations against Guasto—instead of using the AAF, Cosner should have used an "Allegation of Employee Misconduct" form. Def. SOF ¶ 42. The City avers that Cosner's use of the wrong form is immaterial, because the City thereafter corrected the form error and placed the allegations in the Allegation of Employee Misconduct form. *See id.* ¶ 43, 45–46. Guasto, in turn, claims that Cosner intentionally selected the AAF, despite both forms being available to him, and that he knew the AAF would likely lead to Guasto being disciplined. Plf. SOF ¶ 42, 99.

In the AAF, Cosner indicated that Guasto engaged in conduct that violated DRRs that, among other things, prohibit officers from intentionally making false reports, require officers to be in their assigned zone to supervise subordinate officers, and forbid officers from making untrue statements. *See id.* ¶¶101–02, 104. Cosner further asserted in the AAF that Guasto was in violation of the DRRs because Cosner was unable to get ahold of her, which indicated she was inattentive to her duties. *Id.* ¶ 103. It is undisputed that Cosner did not confront Guasto with these allegations prior to preparing the AAF. *See id.* ¶¶ 101–04. Additionally, he admitted to including one incorrect DRR, which he attributed to his incorrectly choosing to use the AAF. *Id* ¶ 105. Cosner sent the AAF to the City's counsel and then-Commander of IA, A.J. Prieto. *See id.* ¶ 107. According to the City, at the time he

submitted the AAF, Cosner did not know about Guasto's First or Second EEOC Charge, the Second Agreement, or the LCA. Def. SOF ¶ 50. Guasto disputes this on grounds the only evidence to support it is Cosner's own testimony. Plf. SOF ¶ 50. This Court notes that Plaintiff did not offer any evidence to the contrary.

### D.    Clements's Implementation of Guasto's Resignation.

In January 2021, Clements was notified about Cosner's allegations in the AAF. Def. SOF ¶ 52; Pl. SOF ¶ 52.  As a result, Clements convened a meeting on January 19, 2021 (the "January 2021 meeting"), that Guasto, along with several other members of the City's Police Department, including Cosner and union representative from the FOP, attended. *Id.* ¶ 53. Clements purportedly held the meeting to allow Guasto to address the allegations and to determine whether there was anything the City had not considered. *Id.* ¶ 54. But even prior to the meeting, Clements believed that he possessed enough information to implement Guasto's resignation pursuant to the LCA. *Id.* The City claims that neither Guasto nor the members of the FOP requested that an attorney be present and that neither claimed that the City was violating Florida Statutes, Section 112.532, by holding the meeting. Def. SOF ¶ 56. The City cites testimony from several witnesses who attended the meeting in support of this claim. Guasto disputes this and claims that the meeting was being held in violation of Florida law (*see id.* ¶ 56) and that she was denied an attorney, that Clements stated that he did not want the FOP's attorney present, and that Clements would have fired Guasto had any of the various FOP members present at the meeting objected to it. *See* Pl. SOF ¶ 109–10.

On January 25, 2021, Clements, still the Chief of Police, implemented Guasto's resignation. Jnt. SOF ¶ 5. Clements sent Guasto a memorandum that same day setting out the reasons for the implementation of her resignation and purportedly memorializing the

January 2021 meeting. *See* Def. SOF ¶ 63; *see also generally* ECF No. 71-5 (the "Memorandum"). In the Memorandum, Clements states that Guasto acknowledged at the January 2021 meeting that she did not report to her assigned area during her shift that spanned the night of December 27th and the early morning hours of December 28th, but, instead, remained in her police car for approximately four (4) hours at the City's main station working on administrative matters, such as an employee evaluation[9] and school work. *Id.* at 1–2. He further states that Guasto acknowledged that she missed two radio calls and one phone call from Cosner that night. *Id.* at 2. The Memorandum also indicates that, at the meeting, Cosner stated that Guasto had represented to him that she had completed her assigned tasks when she had not and that she reported to her assigned area only after being instructed to do so by Cosner. *Id.* Clements's Memorandum concludes as follows:

> Pursuant to paragraph 4 of the [Second] Agreement, I determine that you have not complied with the Agreement and engaged in conduct that is beyond an individual, discreet or minor policy violation. Pursuant to paragraph 4 of the [Second] Agreement, my decision in this regard is not subject to review or explanation. Accordingly, . . . I am implementing your Resignation.

*Id.* According to the City, Clements did not consider Guasto's Second EEOC Charge or any of her complaints of harassment when implementing her resignation. Def. SOF ¶ 65.

Guasto filed a third EEOC Charge (the "Third EEOC Charge") against the City five months later, on June 22, 2021. Jnt. SOF ¶ 6. Guasto contends in the Third EEOC Charge that she was terminated for engaging in protected activity, *i.e.*, filing the Second EEOC Charge in July 2020. ECF No. 1-1 at 2.

---

[9] The Memorandum explained that the City reviewed Guasto's laptop, which revealed that the employee evaluation was not created until January 10, 2021. *Id.*

E.     *The Instant Case.*

Guasto filed the Complaint in this case on April 2, 2022. *See generally* Compl. On July 10, 2023, the Court entered an Order granting in part the City's Motion to Dismiss. [ECF No. 32]. In that Order, the Court dismissed Counts I–II and V–X of the Complaint and allowed Counts III and IV, asserting retaliation under Title VII and the FCRA, to proceed. *See id.* at 12–13. On June 3, 2024, the City filed the Motion now before the Court seeking summary judgment on those two remaining Counts. *See generally* Mot. Guasto filed her Response on June 17, 2024. *See generally* Resp. The City filed its Reply on July 22, 2024. *See generally* Reply. The City's Motion is fully briefed and ripe for adjudication.

## II.     LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In reviewing a motion for summary judgment, the Court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1143 (11th Cir. 2007)). Importantly, "at the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter," but only "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

"An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (quoting *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks omitted)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Channa Imps., Inc. v. Hybur, Ltd.*, No. 07-21516-CIV, 2008 WL 2914977, at *2 (S.D. Fla. Jul. 25, 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, "[f]or factual issues to be considered genuine, they must have a real basis in the record. For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted).

The parties have agreed that this case will proceed as a non-jury trial. *See* ECF No. 40. The Eleventh Circuit has indicated that a more relaxed summary judgment standard applies to non-jury cases. *See Coats & Clark, Inc. v. Gary*, 755 F.2d 1506, 1509–10 (11th Cir. 1985) (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978)). In a non-jury setting where "there are 'no issues of witness credibility,' the Court may make factual determinations and draw inferences at the summary judgment stage based on the affidavits, depositions and

other evidence in the record, because '[a] trial on the merits would reveal no additional data'

nor 'aid the determination.'" *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d

1242, 1251 (11th Cir. 2016) (quoting *Nunez*, 572 F.2d at 1123–24). In bench trials, the judge

serves as the sole factfinder and weighs the evidence, evaluates the credibility of witnesses,

and decides questions of fact and issues of law. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th

Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess

the credibility of witnesses and to assign weight to their testimony").

## III.   DISCUSSION

In the Motion, the City asserts it is entitled to summary judgment on grounds that

Guasto's claims for retaliation under Title VII and the FCRA fail as a matter of law because

Guasto has not shown a causal connection between her protected activity and the City's

implementation of her resignation; because, even if such a connection was established,

Guasto fails to rebut the City's evidence of legitimate, non-retaliatory reasons for

implementing Guasto's resignation, for which there is no evidence of pretext. *See, e.g.*, Mot.

at 5.

In the Complaint, Guasto alleges retaliation in violation of Title VII and the FCRA.

*See* Compl. ¶¶ 67–82. Specifically, Guasto alleges the City retaliated against her because she

filed the Second EEOC Charge. *See id.* It is well-established that, because the FCRA is

patterned after Title VII, the Eleventh Circuit applies case law interpreting Title VII to claims

brought under the FCRA. *See Albra v. Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007) (quoting

*Byrd v. BT Foods, Inc.*, 948 So.2d 921, 925 (Fla. 4th DCA 2007)); *see also Wilbur v. Corr. Serv.*

*Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004). Thus, Guasto's Title VII and FCRA claims

are analyzed together, and the discussion below applies equally to her retaliation claims under both Title VII and the FCRA.

### A. Establishing A Claim Of Retaliation Under Title VII And The FCRA.

"Retaliation is a separate offense under Title VII." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). "Employers are prohibited from discriminating against employees who oppose the unlawful employment practices set out in Title VII or make charges of discrimination under the statute." *Mohamed v. Pub. Health Trust of Miami–Dade Cnty.*, No. 09–21235–CIV, 2010 WL 2844616, at *10 (S.D. Fla. Jul. 19, 2010) (Altonaga, J.) (citing 42 U.S.C. § 2000e–3(a)). "The employee need not prove the underlying claim of discrimination which led to her protest" in a retaliation claim. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). "Instead, the issue is whether the employee was discriminated against by the employer because of the employee's reliance on Title VII's remedial measures." *Mohamed*, 2010 WL 2844616, at *11.

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal relationship between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (per curiam), *abrogated on other grounds by Lewis v. City of Union City, Georgia*, 918 F.3d 1213 (11th Cir. 2019); s*ee also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993). In this context, where proof of retaliatory intent is offered by way of circumstantial evidence, courts apply a burden-shifting scheme akin to the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action. *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059

(11th Cir. 1999). If the employer proffers a legitimate reason, the burden shifts back to the employee to show that the legitimate reason was pretext for prohibited retaliatory conduct. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

Importantly, a plaintiff establishes a causal connection between the protected conduct and adverse employment action by showing that the relevant decision-maker was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008)). A plaintiff must "at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) ("Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action."). "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Jones v. Miami-Dade Cnty.*, No. 03-cv-20674, 2005 WL 2456869, at *5 (S.D. Fla. Jul. 29, 2005) (Altonaga, J.). The plaintiff bears the burden of persuasion "to proffer evidence sufficient to permit a reasonable fact finder to conclude that the retaliatory animus was the 'but-for' cause" of the adverse action. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013).

Moreover, "[c]lose temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Jones*, 2005 WL 2456869, at *5. However, a lapse in time of several months, in the absence of other evidence tending to show causation, is insufficient. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see also, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); *Wascura v. City of South Miami*, 257 F.3d 1238, 1244–45 (11th Cir. 2001) (holding three and one-half month period between plaintiff's protected conduct and the adverse employment action was insufficient to establish a causal connection).

### B. *Whether Guasto Has Sufficiently Established A* Prima Facie *Case Of Retaliation.*

Here, it is undisputed that Guasto satisfies the first two prongs of the *prima facie* case: (1) she engaged in a statutorily protected activity because she filed the Second EEOC Charge alleging sexual harassment and discrimination, national origin discrimination, and retaliation; and (2) she suffered an adverse employment action when the City implemented her resignation on January 25, 2021. The City, however, contends that Guasto has not satisfied the third prong of the analysis because Guasto has not demonstrated a causal connection between the City's implementation of her resignation and her filing of the Second EEOC Charge.

#### 1. Whether Guasto Has Shown There Is A Causal Connection.

As set forth above, a plaintiff establishes a causal connection between the protected conduct and adverse employment action by showing that the relevant decision-maker was

"aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon,* 292 F.3d at 716.

**It is undisputed that the City knew about the Second EEOC Charge when it implemented Guasto's resignation.**

Guasto asserts that she has adequately demonstrated a causal connection between her termination and her protected activity because the undisputed evidence demonstrates that Clements, who was the decision-maker at the City's Police Department at the time of the events at issue here, knew about Guasto's Second EEOC Charge when he implemented her resignation. *See* Resp. at 6–8.

Although the City contends that Clements *did not consider* Guasto's Second EEOC Charge when implementing her resignation (*see* Def. SOF ¶ 65), there is no dispute regarding the fact that Clements *knew* about Guasto's Second EEOC Charge when he did so. Guasto filed her Second EEOC Charge on July 13, 2020. Jnt. SOF ¶ 3. As a result of her filing the Charge, Clements convened the November 2020 meeting, the purpose of which was to try to settle both the IA investigation on Guasto and her Second EEOC Charge. Def. SOF ¶ 17. Thus, there is no dispute that Clements knew about the Second EEOC Charge when he implemented Guasto's resignation.

**The City has not established the absence of disputed facts regarding whether the implementation of Guasto's resignation and the Second EEOC Charge are wholly unrelated.**

As discussed above, the Eleventh Circuit has held that a plaintiff can establish a *prima facie* case merely by showing the protected activity and the adverse employment action are not wholly unrelated. *See Raney,* 120 F.3d at 1197; *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986). Here, it is undisputed that after Guasto filed her Second EEOC Charge,

Clements convened the November 2020 Meeting for the purpose of resolving that Charge. That is, he wanted Guasto to dismiss her EEOC Charge, and he got just that, by way of the Second Agreement and the LCA, which resulted from the Meeting. *See* Jnt. SOF ¶ 4. Ultimately, Clements implemented Guasto's resignation *pursuant to* the express provisions of the LCA. *See* Def. SOF ¶¶ 24, 63. On this evidence, the City cannot dispute that Guasto's Second EEOC Charge and Clements's decision to implement Guasto's resignation are not *wholly unrelated*.

Accordingly, Guasto has demonstrated both (1) that Clements knew of the Second EEOC Charge *and* (2) that the Second EEOC Charge and the City's implementation of her resignation are not wholly unrelated.

### The City has not shown the absence of a causal connection.

The City disputes that there is a causal connection on the basis of (1) the lack of temporal proximity between Guasto's termination and her protected activity (*see* Mot. at 7–8), and (2) Cosner's lack of knowledge of Guasto's Second EEOC Charge. *See* Mot. at 7–9. But these distinctions are of no moment here. First, Guasto does not solely rely on temporal proximity to establish causation, and its absence is not fatal to a showing of causation. *See, e.g.*, *Barr v. City of Eagle Lake*, No. 8:06-CV-1568T27TGW, 2008 WL 717821, at *12 (M.D. Fla. Mar. 17, 2008) (finding plaintiff adequately demonstrated that the protected activity and the adverse action were not wholly unrelated, despite the absence of close temporal proximity); *see also Gupta*, 212 F.3d at 590 (holding plaintiff demonstrated a causal connection where she was denied a merit raise around the time she filed an EEOC charge and was denied an extension for her tenure clock the following year); *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1106 (11th Cir. 2001) (concluding series of adverse employment actions

18

following the filing of an EEOC charge was sufficient to demonstrate causal connection although they occurred over the course of one year), *overruled in part on other grounds by Crawford*, 529 F.3d 961.

Second, Cosner's knowledge regarding the Second EEOC Charge when he prepared the allegations of misconduct against Guasto is not the focus of the Court's inquiry for the purpose of determining causation because Cosner was not the decision-maker—Clements was. *See McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (a plaintiff must show that "the *decision-makers* were aware of the protected conduct" (emphasis added) (citation omitted)).

In sum, for the above reasons, the City has not shown the absence of genuine issues of material fact regarding the elements of a *prima facie* case of retaliation.

**B.      *Whether the City Has Demonstrated A Legitimate, Non-Retaliatory Reason For Implementing Guasto's Resignation And Guasto's Contention Of Pretext.***

1.      Legitimate, Non-Retaliatory Reasons.

The City argues that even if Guasto establishes a *prima facie* case of retaliation, the City is nonetheless entitled to summary judgment because it has met its burden to rebut the presumption of retaliation by producing legitimate, non-retaliatory reasons for implementing Guasto's resignation. *See* Mot. at 16–17.

As the Court noted above, once a plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Gupta*, 212 F.3d at 590. The employer's burden of rebuttal is "exceedingly light." *Tipton*, 872 F.2d at 1495. The rebuttal burden is one of production only. *Jones*, 2005 WL 2456869, at *5 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)) (alterations in original). If the employer meets

its burden of production, in order to defeat summary judgment, the plaintiff must demonstrate a "genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action." *Raney*, 120 F.3d at 1196.

Here, the City has offered substantial evidence of a legitimate, non-discriminatory reason for terminating Guasto—namely, Guasto's misconduct during her shift on the night of December 27 and the early morning hours of December 28, 2020. In the January 25, 2021 Memorandum, Clements detailed the reasons for the implementation of Guasto's resignation. *See generally* ECF No. 71-5. In it, he wrote that Guasto acknowledged at the January 2021 meeting that she did not report to her assigned area during her shift, instead remaining in her police car outside of the City's main station for approximately four (4) hours while she worked on an employee evaluation and schoolwork. *Id.* at 1–2. The Memorandum also indicates that Guasto acknowledged she missed two radio calls and one phone call from Cosner during her shift, that Cosner stated that Guasto informed him she had completed her assigned tasks when, in reality, she had not, that Guasto reported to her assigned area only after being instructed to do so by Cosner, and that a review of Guasto's laptop revealed that the employee evaluation she claimed to be working on during her shift was not created until more than a week after the end of that shift. *Id.* at 2. Finally, the Memorandum indicates that Clements had determined that Guasto did not comply with the provisions of the Second Agreement and the LCA, and that, as a result, Clements was implementing her resignation. *Id.*

Guasto disputes the Memorandum itself on grounds that the January 2021 meeting was not recorded and that the Memorandum only summarizes the meeting. Plf. SOF ¶ 64. She does not, however, dispute the veracity of the information set forth in the Memorandum, and she cites no documents or evidence in the record that would create a genuine issue of

material fact as to the legitimate, non-retaliatory reasons for the implementation of her resignation as outlined in the Memorandum. Guasto, as the non-movant, must "identify specific evidence in the record, and [] articulate the 'precise manner' in which that evidence supported [her] claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)). Guasto's only reference to the record on this issue is to the Memorandum itself, and it "is not the task of this Court to scour the record to find evidence in support of the parties' positions." *Howell v. Baldwin Cnty. Bd. of Educ.*, No. 20-cv-502, 2024 WL 265874, at *15 (S.D. Ala. Jan. 24, 2024); *see also Chavez v. Sec., Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting "district court judges are not required to ferret out delectable facts buried in a massive record" (quotation marks and citation omitted)).

The undersigned has undertaken a careful review of Guasto's challenges to the City's proffered reasons for implementing her resignation and has considered the record evidence in the light most favorable to Guasto, drawing all reasonable inferences in Guasto's favor. The undersigned finds that the City has carried its burden of demonstrating a legitimate, non-discriminatory reason for implementing Guasto's resignation. The burden thus shifts back to Guasto to demonstrate genuine disputed facts regarding whether the City's proffered explanation is pretextual.

2.   <u>Pretext.</u>

At this stage of the burden shifting framework, to establish retaliation under Title VII, a plaintiff must meet the ultimate burden of showing that the reasons given for the adverse action against her were a pretext for retaliation and that retaliation was the but-for cause of the adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Springer*, 509 F.3d at 1348 (a plaintiff may establish pretext by exposing "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning). In evaluating pretext, the Court asks "whether the plaintiff has cast sufficient doubt on the defendant's proffered non[-retaliatory] reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation marks omitted). As long as the proffered reason is one that might motivate a reasonable employer, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

It is here that Guasto's attempt to create a genuine factual dispute to survive summary judgment fails.

Guasto argues that the City's reason for implementing her resignation constitutes pretext because (1) she and the City would not have entered into the LCA if she had not filed her Second EEOC Charge, (2) the City intentionally forced Guasto to be supervised by Cosner, with whom she had a tenuous history and, therefore, had not interacted for several years, and (3) the City violated its own policies and procedures in relying on purportedly fabricated and false allegations contained in Cosner's AAF. *See* Resp. at 9–17. Notwithstanding these contentions, Guasto fails to put forth adequate record evidence to demonstrate a genuine factual dispute on the issue of pretext.

Initially, to the extent Guasto argues the City exploited the then-pending IA investigation as leverage to dismiss her Second EEOC Charge and enter into the Second Agreement and LCA, her claim is undermined by the following undisputed facts: when she entered into the Second Agreement and LCA, Guasto was represented by two lawyers and

the then-FOP president; Guasto acknowledged that she voluntarily entered into the Agreements and that no one forced her to enter into the Agreements; and Guasto admitted in the LCA that she committed the misconduct alleged in the IA investigation and acknowledged that she could have been terminated from her employment in the City's Police Department as result of that misconduct. *See* Def. SOF ¶¶ 25–26, 29; *see* Plf. SOF ¶¶ 25-26, 29; *see also* ECF No. 71-4 at 9.

Guasto's reliance on *Baskerville v. Secretary of Department of Veteran Affairs*, No. 6:18-CV-1728-WWB-DCI, 2021 WL 1338203 (M.D. Fla. Feb. 8, 2021), in support of her claim that the LCA demonstrates pretext is misplaced. The circumstances in *Baskerville* differ significantly. In *Baskerville*, the district court held that a last chance agreement offered to the plaintiff showed pretext where the defendant acknowledged that the agreement was conditioned on the plaintiff dismissing his existing EEOC charges. *Id.* at *3. However, unlike the present case, the defendant in *Baskerville* had not discussed the last chance agreement with the plaintiff. *Id.* 2. In Guasto's case, unlike *Baskerville*, the LCA was negotiated by Guasto's lawyers and the then-FOP president, and Guasto acknowledged that she voluntarily entered into the Agreement. *See* Def. SOF ¶¶ 23, 25, 28;[10] Plf. SOF ¶¶ 23, 25, 28.

Next, Guasto's assertion that the City intentionally forced her to work under Cosner's supervision also fails to carry the day for her. Guasto avers that Cosner deviated from

---

[10] Guasto also relies on a declaration by her ex-husband, N. Guasto, to establish pretext inasmuch as his testimony suggests that she would not have been terminated had she not filed her Second EEOC Charge. *See* Resp. at 10; Plf. SOF ¶¶ 92–95. Even if this evidence were sufficient to create an issue of fact, the Court may not rely on this evidence because it rests on statements Clements purportedly made to N. Guasto which are inadmissible hearsay, and, therefore, will not be considered on a motion for summary judgment. *See Open Sea Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1176 (M.D. Fla. 2023) (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012)).

standard procedure and that his allegations are false. But Cosner's subjective beliefs are irrelevant. He was not the decision maker, and it is undisputed that he was not consulted about implementing Guasto's resignation. *See id.* ¶ 66. Moreover, although there is evidence that Guasto and Cosner had a strained relationship, Guasto has not identified record evidence that shows that Clements knew of Cosner and Guasto's prior relationship when he assigned Guasto to be supervised by Cosner nor that Clements intentionally forced Guasto to be supervised by Cosner. Similarly, Guasto does not identify any evidence that at the time he submitted the AAF, Cosner knew about Guasto's Second EEOC Charge, the Second Agreement, or the LCA. *See* Def. SOF ¶ 50.[11] Thus, viewing the evidence in the light most favorable to Guasto, this Court finds that Guasto has not shown that there is a genuine dispute of material fact regarding whether, as she suggests, Cosner improperly influenced Clements, the decision-maker.

In addition, although Guasto repeatedly contends that the allegations in the AAF are false, the validity of those allegations is not pertinent to the present inquiry. Clements claims to have implemented Guasto's resignation as a result of the misconduct outlined in the AAF. But whether or not Guasto actually committed the alleged misconduct is irrelevant. This is because "[t]he heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("The [pretext] inquiry . . .

---

[11] Although Guasto disputes Cosner's knowledge in this regard (*see* Plf. SOF ¶ 50), she cites no evidentiary support that would disprove this fact, and, thus, it is deemed admitted. *See* S.D. Fla. L.R. 56.1(b)(1)(B); 56.1(c).

is limited to whether [the employer] believed [the plaintiff] was guilty of harassment, and if so, whether this belief was the reason behind [the plaintiff's] discharge.").

Consequently, whether Guasto actually committed the misconduct alleged in the AAF is immaterial. Instead, the appropriate question is "whether [Clements] had a good faith belief that [Guasto] was guilty of the misconduct." *Jones*, 2005 WL 2456869, at *9. Guasto does not present evidence to create a genuine issue of fact regarding whether Clements did have a good faith belief that Guasto committed the misconduct alleged in the AAF. Nor does she present sufficient evidence to demonstrate that Clements gave inconsistent reasons for his actions. To the contrary, the City has offered substantial record evidence demonstrating that Clements was acting pursuant to the provisions of the Second Agreement and the LCA (which Guasto voluntarily entered into), that he believed he had enough information to implement Guasto's resignation even before convening the January 2021 meeting, and that he conducted the meeting to give Guasto an opportunity to address the allegations despite the fact that he was not required to do so. *See* Def. SOF ¶¶ 54, 63; *see also generally* ECF No. 71-5. Guasto altogether fails to rebut that evidence with credible or substantiated evidence.

In any event, the City did not need to launch an investigation regarding the misconduct alleged in the AAF. Because the LCA clearly rendered Guasto an employee at will and gave Clements the discretion to determine whether Guasto complied with its terms, the City was under no obligation to follow standard procedure nor, for that matter, to convene a meeting to address the allegations. Furthermore, that other non-decision-makers indicated that they may not have agreed with Clements's implementation of Guasto's resignation is not relevant to the Court's inquiry, for the reasons set forth above. Again, the relevant consideration is limited to whether Clements had a good faith belief that Guasto committed the misconduct

alleged in the AAF. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n. 2 (11th Cir. 1989), *cert. den.*, 495 U.S. 935 (1990) (that the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.). Guasto offers no evidence to demonstrate that he did not.

Because Guasto fails to present sufficient evidence from which a reasonable factfinder could conclude that the City's stated reasons for its actions were pretextual, she fails to rebut the City's legitimate, non-retaliatory reasons for implementing her resignation. Viewing the evidence in the light most favorable to Guasto and drawing all reasonable inferences in her favor, there is simply no basis to find that the City's proffered reason for implementing Guasto's resignation was pretext. Therefore, she fails to defeat the City's Motion for Summary Judgment insofar as it is based on Guasto's failure to establish her retaliation claims under the *McDonnell Douglas* framework.

### C.  Whether Guasto Has Demonstrated A Convincing Mosaic.

Guasto argues that even if her claims fail under the *McDonnell Douglas* framework, the City is nevertheless not entitled to judgment as a matter of law because she has presented a convincing mosaic of circumstantial evidence that raises a reasonable inference of retaliation. *See* Resp. at 17–20.

Under the "convincing mosaic" standard, a plaintiff may defeat summary judgment by showing "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019). "*McDonnell Douglas* is only one method by which [ ] plaintiff can prove discrimination by circumstantial evidence." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (quotation marks and citation omitted). Thus, the inability to satisfy individual elements of

*McDonnell Douglas* "does not necessarily doom the plaintiff's case." *Id.* (quotation marks and citation omitted). "Indeed, the plaintiff will always survive judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* (emphasis added) (quotation marks and citation omitted).

    Guasto's Response and citations to evidence again fall short.

    Guasto argues that she has presented sufficient record evidence of suspicious timing, ambiguous statements, and other information from which unlawful intent may be inferred. Resp. at 19. But as the Eleventh Circuit has explained: "The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee. That legal standard applies *no matter how an employee presents her circumstantial evidence*." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) (emphasis added).

    Guasto has not put forth evidence demonstrating that Clements's decision to implement her resignation was driven by retaliatory motives. Again, Guasto has not offered any evidence to create a genuine dispute concerning whether, when Cosner made his allegations against Guasto in the AAF, he was unaware of her Second EEOC Charge or her LCA. There is no evidence to dispute that Cosner was not involved in the decision-making process, and Guasto does not offer evidence to create a genuine dispute regarding the City's assertion that Cosner did not improperly influence Clements. Guasto fails to offer sufficient evidence to create an issue of fact as to her claim that her protected activity was the cause of Clements's decision to implement her resignation. What she offers is nothing more than her own speculation that that must have been the case, but that is not sufficient to defeat summary

judgment where the City has presented substantial, substantiated, unrebutted evidence demonstrating otherwise.

In short, Guasto fails to present sufficient evidence to defeat the City's Motion under the convincing mosaic theory.

## IV.   CONCLUSION

In sum, although Guasto establishes a *prima facie* case of retaliation, she fails to offer sufficient evidence to rebut the City's proffered non-discriminatory reason for the implementation of her resignation or to show that it is pretextual, and she fails to present evidence showing a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination. Therefore, the City is entitled to summary judgment on Guasto's Title VII and FCRA claims in Counts III and IV of the Complaint.

Accordingly, it is

**ORDERED AND ADJUDGED** that the City's Motion for Summary Judgment [**ECF No. 70**] is **GRANTED**. Summary judgment is entered in favor of Defendant, the City of Miami Beach, FL, as to Counts III and IV of the Complaint. As these are the only remaining Counts of the Complaint, a final judgment will be entered separately pursuant to this Order.

The Clerk is directed to **CLOSE** this case and deny any pending motions as moot.

**DONE AND ORDERED** in Chambers in the Southern District of Florida, this 20th day of February, 2025.

_____
**MELISSA DAMIAN**
**UNITED STATES DISTRICT JUDGE**

cc:    Counsel of Record